**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**The Rottlund Company, Inc.**
**d/b/a/ Rottlund Homes, a Minnesota**
**Corporation**

**Civil No. 01-1980 (DSD/SRN)**

**Plaintiff,**

**v.**

**ORDER**

**Pinnacle Corporation**
**d/b/a/ Town & Country Homes,**
**an Illinois Corporation, and**
**Town & Country Homes, Inc.,**
**a Minnesota Corporation, Bloodgood**
**Sharp Buster Architects and Planners of**
**Iowa, Inc., an Iowa Corporation, and**
**The Bloodgood Group, Inc., an Iowa**
**Corporation,**

**Defendants,**

**and**

**Town & Country Homes, Inc.,**
**a Minnesota Corporation,**

**Third-Party Plaintiff,**

**v.**

**Bloodgood Sharp Buster**
**Architects & Planners of Iowa, Inc.,**
**an Iowa Corporation**

**Third-Party Defendant.**

Craig S. Krummen, Esq., and David Davenport, Esq., on behalf of Plaintiff

Darren B. Schwiebert, Esq., on behalf of Defendant Town & Country Homes, Inc.

Christopher Murdoch, Esq., on behalf of Defendant Pinnacle Corp.

Holly J. Newman, Esq., on behalf of Defendant Bloodgood Sharp Buster and The Bloodgood Group, Inc.

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-entitled matter came before the undersigned United States Magistrate Judge on Plaintiff's Motion for Sanctions Pursuant to the Court's Inherent Power, 28 U.S.C. § 1927, Federal Rules of Civil Procedure 11, 26, and 37 (Doc. Nos. 320, 321, 322). This matter has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

## I. BACKGROUND

This is in large measure a copyright infringement case. Plaintiff The Rottlund Company (Rottlund) owns copyrights on architectural design plans and architectural works–covering certain townhome technical drawings and as-built works. Rottlund has brought several copyright infringement claims against Defendants Pinnacle Corporation d/b/a Town & Country Homes (Pinnacle), Town & Country Homes of Minnesota (TCM), Bloodgood Sharp Buster (BSB), and the Bloodgood Group, Inc. Rottlund, Pinnacle, and TCM are all direct competitors in the design, development, construction, and sale of townhomes. BSB is an architectural firm utilized by TCM and Pinnacle.

In order to better understand the issues involved in this motion, a brief overview of particular townhome products and relationships is necessary. Initially, Rottlund only sued Pinnacle Corporation,

which does business as and is more commonly known as Town & Country Homes. Ultimately, an entity known as Town & Country of Minnesota, which Pinnacle refers to as its Minneapolis division but claims is a separate entity, was added. The Fredrikson & Byron law firm represented Pinnacle until September of 2002, (Doc. No. 86), and has always represented Town & Country of Minnesota. In September of 2002, the Holland & Knight law firm began representing Pinnacle. In its original complaint, Rottlund asserted ownership of a technical drawing copyright for a townhome product know as the Rush Creek Villa II, 8 unit w/no step.[1] Rottlund claimed that Pinnacle was infringing the Villa II technical drawing copyright. Importantly for the discussion that follows, the main townhome product in Minnesota that allegedly infringes Rottlund's copyrights is known as the Homestead collection, but during the design/developmental phase, the Homestead Collection was called the "Villas."[2] Pinnacle claims that TCM is solely responsible for actually building the Homestead Collection townhomes, but it has become clear that Pinnacle's in-house architect Steve Sandelin was directly involved in the design or development of the Homestead Collection townhomes in Minnesota.

By this motion, Rottlund seeks sanctions against Pinnacle and its current and/or former counsel. The catalyst for this motion was the revelation in a deposition, after nearly two years of discovery, that Pinnacle, despite its repeated representations to the contrary, had not produced relevant documents clearly responsive to Rottlund's requests. That was the catalyst, but the motion involves much more than this isolated incident. The Court has lost some confidence in Pinnacle and its counsel's efforts in

[1] Rottlund has subsequently added architectural works or as-built structure copyrights.

[2] The townhome technical drawing alleged in the initial complaint to be infringing was the Bayview. The Bayview townhome is an individual townhome within the Homestead Collection of townhomes. Compare (Compl. ¶21-24), with e.g., (Fifth Amended Compl. ¶43).

conducting discovery due to a troubling pattern of conduct involving abuse of the judicial process, discovery incompetence, and defiance of Court orders, not to mention periodic episodes of brazen disrespect to the Court and an instance of cowardly harassment during a deposition. The climax is this motion, but the problems have been building over a long period of time. Sanctions are warranted.

## II. FINDINGS OF FACT

The Court notes at the outset that its familiarity with all aspects of this case is pervasive given the status conferences that the Court has conducted at a rate of at least one per month since approximately October of 2002 as well as discovery and dispositive motion practice. That said, the Court makes the following findings.

### A. Pinnacle's Lack of Candor in Connection with Its Motion to Dismiss for Lack of Personal Jurisdiction

On July 5, 2001, Rottlund sent Pinnacle a cease and desist letter warning Pinnacle that it was engaging in architectural design copyright infringement. (Davenport Aff. ¶74). Pinnacle's general counsel, Peter Brennan, obtained the letter and gave it to Pinnacle's in-house architect, Steve Sandelin. Four days later, Sandelin took the letter and faxed it to Larry Moore, an architect at BSB, and stated:

> Please see the attached letter, where Rottlund's attorney references the back to back townhomes your firm *designed* for *our* Centennial Crossing community in Maple Grove, MN. They are obviously similar to Rottlund's Villa product. Are these *designs* under a co-ownership agreement with them or are they yours alone? What's our situation with them? We need to develop a response quickly.

(Davenport Aff. Ex. 23) (emphasis added).

On July 17, 2001, attorney Dean Karau from the law firm of Fredrikson & Byron responded to Rottlund's cease and desist letter. (Davenport Aff. Ex. 24). Karau's letter made clear that Pinnacle

d/b/a Town & Country knew townhome designs were at issue but wanted Rottlund to clarify exactly which designs allegedly were being infringed. Id.

Rottlund filed suit against Pinnacle on October 30, 2001, alleging infringement of its technical drawing copyright. (Compl. ¶¶13-14, 23, Ex. A). At this point, Pinnacle was represented by the Fredrikson & Byron firm. Pinnacle answered the complaint and asserted that this Court lacked personal jurisdiction over Pinnacle. (Davenport Aff. Ex. 5). Pinnacle asserted in its First Amended Answer that it "has never developed . . . any homes on the Hollander Property, in the Centennial Crossing development . . . in Maple Grove, or anywhere else in Minnesota." (Davenport Aff. Ex. 6, at p. 5-6). Almost three months after the complaint was filed, on January 22, 2002, Pinnacle served a motion to dismiss for lack of personal jurisdiction and filed it with the Court on February 15, 2002.

Pinnacle's argument, advanced by the Fredrikson & Byron firm, in support of the motion to dismiss was the bold, blanket assertion that Pinnacle has never had any contact with Minnesota with regard to townhomes, and, more specifically, Pinnacle "had no involvement in any way in developing the Hollander Property [the Centennial Crossing development in Maple Grove, Minnesota]." (Davenport Aff. Ex. 26, at 5). Pinnacle also argued in its reply memorandum that it "has not taken any action inside or outside Minnesota that is affecting Rottlund in Minnesota," and "[t]he Court should *deny Rottlund's request to go fishing for non-existent facts relating to jurisdiction*." (Davenport Aff. Ex. 12, at 22, 26) (emphasis added).[3] As explained below, the waters of Pinnacle were an

[3] Pinnacle asserted in a Sur-Sur-Reply Memorandum that "any Pinnacle conduct outside of Minnesota that may reach Minnesota does not relate to Rottlund's causes of action." (Davenport Aff. Ex. 13, at 6).

angler's paradise, but the locals would have rather not revealed their hot spots.

On April 2, 2002, prior to oral argument on Pinnacle's motion to dismiss, Pinnacle attorney Dean Karau spoke with James Grundmeier, an architect from BSB. (Davenport Aff. Ex. 30). Grundmeier forwarded Larry Moore's–another BSB architect–design file to attorney Karau, which was received on April 3, 2002. Id.; (Davenport Aff. Ex. 32). As Rottlund thoroughly explains in its brief, (Rottlund Mem. in Supp. of Mots. for Sanctions, at 9), Larry Moore's design file contains several documents that unequivocally demonstrate that *Pinnacle architect Steve Sandelin was heavily involved in designing the allegedly infringing townhomes in Minnesota*:

1. On April 9, 1998, BSB architect Larry Moore sent Art Plante, TCM's president, townhome designs for a product in the Chicago market and stated: "[w]e can't use these units, but this concept might be worth considering for the Minneapolis area. . . . I believe Doug Buster and Steve Sandelin are meeting on Friday to discuss the possibilities." (Davenport Aff. Ex. 32, at D00252).
2. On May 5, 1998, Larry Moore sent Steve Sandelin a "[c]ompetition product survey for the Minneapolis area" concerning the Villa townhomes. Id. at D00225.
3. On May 14, 1998, BSB architect Chris Jorgensen sent Steve Sandelin a revised concept plan and partial elevation for the Villas. Id. at D00214.
4. On May 30, 1998, Larry Moore sent Steve Sandelin revised schematic unit plans for the Villas. Id. at D00205.
5. On June 2, 1998, Chris Jorgensen sent Steve Sandelin and Art Plante revised master bath and closet designs for the Villas. Id. at D00203.
6. On June 10, 1998, Larry Moore sent Steve Sandelin and Art Plante revised plans for Unit A and B "per your most recent comments." Id. at D00196.
7. On June 26, 1998, Chris Jorgensen, at the request of Art Plante, sent Steve Sandelin the "latest floor plans & elevations" for the Villas for Sandelin's review and comment. Id. at D00178.

These documents are all significant because they show, or at the very least are highly relevant, to the question of Pinnacle's (Steve Sandelin) direct involvement in the design of the Villas, which were later renamed the Homestead Collection. The Homestead Collection/Villas are one of the main townhome

products *in Minnesota* that allegedly infringe Rottlund's copyrights, and in the initial complaint Rottlund alleged that the *design* of the Homestead Collection/Villas infringed its *technical drawing*. Thus, the initial complaint pitted design versus design. In other words, these documents are directly relevant to specific personal jurisdiction.

Indeed, at a deposition occurring in December of 2002, Steve Sandelin admitted that he was involved in the design process of TCM's back-to-back, Villa townhome (the Homestead Collection) because TCM's president, Art Plante, needed his expertise. (Davenport Aff. Ex. 34, at 84:6-86:23); see also (Murdoch Aff. Ex. 10, at 255:21-23) ("Those are the only three areas [Chicago, Florida, and Minneapolis] that I've been involved with as far as product development.").

Based on its motion to dismiss, Pinnacle initially refused to provide Federal Rule of Civil Procedure 26(a) disclosures. (Davenport Aff. Ex. 28 and 29). At a meet and confer held on April 3, 2002, the same day Pinnacle's counsel received Larry Moore's design file, Pinnacle's counsel failed to disclose the existence of Moore's file and resisted amending the Rule 26(a) disclosures given the motion to dismiss. (Davenport Aff. Ex. 29; ¶75-76). The next day, April 4, 2002, Pinnacle served amended Rule 26(a) disclosures but did not mention Larry Moore's design file demonstrating Steve Sandelin's involvement in the design process or identify Sandelin, Moore, Grundmeier, Buster, Jorgensen, or BSB as individuals/entities likely to have discoverable information. (Davenport Aff. Ex. 35). The same goes for the second amended Rule 26(a) disclosures served on April 12, 2002. (Davenport Aff. Ex. 36).

On April 22, 2002, about twenty days after Pinnacle's counsel received Larry Moore's design file, oral argument was heard on Pinnacle's motion to dismiss for lack of personal jurisdiction.

Pinnacle's counsel advanced the arguments contained in their briefs and stated, among other things, that "Pinnacle hasn't done anything from where it sits that has caused these townhomes to be built in Minnesota that Rottlund alleges is now injuring it." (Davenport Aff. Ex. 37, at 18:15-17). The undersigned recommended denial of the motion to dismiss.

Pinnacle objected to the undersigned's Report and Recommendation and argued again that "[t]here is *no evidence that Pinnacle actually designs*, builds or sells homes *in Minnesota, let alone the town homes at issue*." (Davenport Aff. Ex. 16, at 14) (emphasis added). The Honorable David S. Doty rejected Pinnacle's arguments, adopted the undersigned's recommendation, and noted that "the facts overwhelmingly demonstrate defendant has sufficient minimum contacts with Minnesota." July 19, 2002 Order, at 5.

In September of 2002, Pinnacle changed counsel. Fredrikson & Byron was terminated as counsel for Pinnacle and the firm of Holland & Knight assumed the role of lead counsel for Pinnacle with the Donna & Daly firm serving as local counsel for Pinnacle. Fredrikson & Byron remained lead counsel for TCM.

Rottlund conducted a Rule 30(b)(6) deposition of Pinnacle in December of 2002. Steve Sandelin testified on behalf of Pinnacle concerning the company's architectural drafting processes. Sandelin, on behalf of Pinnacle, revealed that in 1998 he traveled to Minnesota and toured Rottlund's Villa II townhome with TCM's president and BSB architects, (Davenport Aff. Ex. 42), pictures were taken during the tour, (Davenport Aff. Ex. 43), and brochures of Rottlund's Villa II townhome were obtained. (Davenport Aff. Ex. 44). Of significant importance, Sandelin also identified for the first time a file he kept that he pointedly referred to as "a great big file called Minnesota." (Davenport Aff. Ex.

45, at 126:23). This great big Minnesota file was responsive to Rottlund's first set of discovery requests served on March 21, 2002 but had not been produced. (Davenport Aff. Ex. 55, Int. No. 4, Doc. Req. no. 24). Of course, neither the great big Minnesota file nor Sandelin's trips to Minnesota to tour the very townhomes Rottlund alleges were infringed were disclosed to the Court when Pinnacle repeatedly argued that it had absolutely no contacts with Minnesota in its personal jurisdiction motion.

In January of 2003, Rottlund moved for sanctions regarding Pinnacle's motion to dismiss for lack of personal jurisdiction and general discovery misconduct. At that time, the Court acknowledged that Rottlund's arguments had some merit but declined to impose sanctions. August 15, 2003 Order, at 19 (Doc. No. 257). The Court will not revisit the issue of whether to impose Rule 11 sanctions for Pinnacle's motion to dismiss for lack of personal jurisdiction, but the events surrounding the motion to dismiss, which the Court believes are presented in greater detail than in the earlier motion, greatly inform the pattern of misconduct described herein.

### B. Pinnacle's Failure to Obey the Court's Order to Produce Revenue and Cost Information

Twice in October of 2002 (Doc. No. 105 and 106), the Court ordered Pinnacle to produce all revenue and cost information for *all* townhome products in each development where allegedly infringing townhomes were located. The Court conducted multiple status conferences regarding how the revenue and cost information was to be produced. At a status conference held on or about November 22, 2002, Matthew Farmer, counsel for Pinnacle, made available Pinnacle's Chief Financial Officer, Paul Anderson, to explain the burden of producing revenue and cost information in the manner that Rottlund proposed. (Farmer Aff. ¶3); (Pinnacle's Mem. in Opp'n to Mot. for Sanctions, at 13-15). To the

Court's surprise and in defiance of its Order, Mr. Anderson admitted that Pinnacle had unilaterally limited production of its revenue and cost information to only the infringing townhomes.

**C. Example of Pinnacle's Counsel's Disrespect for the Court**

Throughout this case, one document has been repeatedly discussed–the BSB transmittal to Steve Sandelin at Pinnacle (d/b/a Town & Country Homes) referencing the enclosure of a "[c]ompetition product survey for Minneapolis area." (Davenport Aff. Ex. 32, at D00225). Rottlund has loudly voiced a reasonable suspicion that the competition product survey would likely have some reference to or include Rottlund materials, which, of course, would be potentially important evidence regarding access. Unfortunately, Mr. Sandelin, the person to whom the survey was addressed, does not remember it and cannot find it. Larry Moore, the person who sent the survey, cannot find it. The Fredrikson & Byron firm, the entity that received Larry Moore's design file, avers that it does not have the survey.

In an effort to pin down the whereabouts/contents of the referenced competition product survey, the Court sought a stipulation regarding the contents of the Larry Moore design file sent to Pinnacle's former counsel, Fredrikson & Byron, on April 2, 2002. (Davenport Aff. Ex. 30). The Court made this effort because Mr. Moore's design file received by Fredrikson & Byron contained, at least, the transmittal page referencing the attached competition product survey. Pinnacle's former counsel (Fredrikson & Byron) readily agreed to a stipulation. However, without any understandable basis, Pinnacle's current counsel (Holland & Knight) refused. In the course of that dialogue, Pinnacle's counsel, Scott Petersen, exhibited brazen disrespect for the Court. The following exchange occurred between the Court and Mr. Petersen:

Court: Mr. Petersen, let me ask you to respond here. I presume that Pinnacle has no objection–I mean takes the same position as TCM does on these documents that you'd be willing to stipulate since it was your counsel at the time that those are the documents that were attached and described as Larry Moor[e]'s design file.

Mr. Petersen: No. I'm not prepared to stipulate to that.

Court: And tell me why.

Mr. Petersen: May I confer with counsel?

Court: You may, yes.

Mr. Petersen: Your Honor, we just–we don't have information as to the file, as to the authenticity of the file, and I'm not prepared to stipulate here in open court just because counsel wants us to stipulate.

Court: But your counsel is already–I mean TCM has already done an affidavit, and the affidavit is from your counsel. They were your client's counsel at the time this issue arose.[4]

Mr. Petersen: Yes.

Court: So by stating to the Court that you're not prepared to stipulate, if you were in my shoes, that would be a big red flag that there's some shenanigans going on here. If you won't, and I won't make you decide that this moment, I'm going to have to let full bore discovery go forward because if this competition survey exists and it's been moved around because of the change of counsel or something, we better find out what happened.

Mr. Petersen: Your Honor, full bore discovery has been going on. We've been giving them everything and we've gotten nothing from them.

Court: Mr. Schwiebert does not want Mr. Karau to be deposed and I would prefer that he not be deposed.

Mr. Petersen: And I don't think it's appropriate.

---

[4] At the time the Larry Moore design file was forwarded to attorney Dean Karau at Fredrikson & Byron, Fredrikson & Byron represented Pinnacle.

Court: Well, but what I'm saying is that something–I'm smelling a rat here and you could take care of that by–

Mr. Petersen: Oh, Your Honor, please.

Court: –ensuring–

Mr. Petersen: Smelling a rat?

Court: Excuse me but this is the Court. Okay. I expect respect.

(Davenport Aff. Ex. 61, June 18, 2003 hearing).

The transcript, of course, does not capture the extremely sarcastic demeanor with which Mr. Peterson conversed. Mr. Peterson has not appeared since this incident.

### D. **Pinnacle's Counsel's Unprofessional Conduct During the Jorgenson Deposition**

Meanwhile, in August of 2003, an unprofessional, to say the least, incident unrelated to the competition product survey, or, frankly, to anything in this case, occurred during a deposition. On August 4, 2003, the deposition of Rottlund witness Steven Kahn occurred. Mr. Kahn is Rottlund's Chief Financial Officer. Mr. Kahn's testimony is important to understand what occurred at a later deposition. Mr. Kahn testified as follows:

Q: Is Rottlund currently trying to increase its market share in the Des Moines, Iowa market?

A: No.

Q: Why not?

A: Because we don't see Des Moines as a future market.

Q: Is Rottlund trying to maintain its status quo in terms of market share in Des Moines, or are you phasing it out?

A: Can we go off the record? Can we do that?

Counsel for BSB: Not while a question's pending.

Mr. Krummen: Well then I'll object to proprietary, mark it as attorneys' eyes only. You may answer.

Witness: Okay. Our strategy is to phase out of the Des Moines Market within about two years.

(Kahn Dep., at 364:6-24).

A few weeks later Pinnacle took the deposition of Rottlund witness Jason Jorgenson. At the hearing on this motion, Rottlund's counsel explained who Mr. Jorgenson is:

He [Jason Jorgenson] is an employee of Rottlund's Iowa division. He was identified as someone who had discoverable information. Your Honor, he has information as to access. He knows about several employees that the Town & Country defendants hired away from Rottlund to work on the Homestead collection. . . . Jason Jorgenson is in his mid-20s. He has a family with three daughters. He lives about 52 miles away from Des Moines so he drives 52 miles [one way] every day to work. He lives so far away because his wife needs to live at home close to their mother because [Court interrupted] . . . of health reasons . . . .

(January 28, 2004 Hearing, at 76:24-77:5, 77:19-78:4).

Christopher Carmichael, from the Holland & Knight law firm, took Mr. Jorgenson's deposition on behalf of Pinnacle. What occurred–obvious, bad-faith harassment–speaks for itself:

Mr. Carmichael: Do you enjoy working for Rottlund?

Mr. Jorgenson: Yes.

Mr. Carmichael: Do you see working for Rottlund in the future?

Mr. Jorgenson: Yes.

Mr. Carmichael: Here in Des Moines?

Mr. Jorgenson: Yes.

Mr. Carmichael: Do you know Rottlund's current plans with regard to the market in Des Moines to expand here, or are they going to stop building in this area?

Mr. Jorgenson: The plans are to expand.

Mr. Carmichael: Do you know a man named Steven Kahn?

Mr. Jorgenson: Yes.

Mr. Carmichael: Do you know what his position is?

Mr. Jorgenson: CFO.

Mr. Carmichael: Of which company?

Mr. Jorgenson: Rottlund Homes.

Mr. Carmichael: Would it surprise you to learn Mr.–

Mr. Krummen: Instruct you not to ask that question or I'll move for sanctions.

(Jorgenson Dep., at 40:20-41:14).

Mr. Carmichael's intolerable conduct will be dealt with in Part II of this Order.

### E. <u>The "Competition Product Survey," Rottlund's Discovery Requests Set VI, and Pinnacle's Failure to Produce Relevant Documents</u>

The Court again attempted to resolve issues surrounding the referenced competition product survey during a November 21, 2003 status conference.[5] (Murdoch Aff. Ex. 27, at p. 55-85). Rottlund expressed concern that Pinnacle may be withholding production of the competition product survey based on baseless objections to Rottlund's Discovery Requests Set VI. <u>Id.</u> at p. 59:2-66:23.

---

[5] The Court was intermittently faced with the competition product survey issue prior to the November 21, 2003 conference. (Davenport Aff. Ex. 62, July 15, 2003 conference, at 97:8-98:19).

Specifically, request number one asks for all documents which reference or relate to the "Competition product survey for Minneapolis area" referenced in the May 1998 transmittal from Larry Moore to Steve Sandelin. (Murdoch Aff. Ex. 18, at 3). Pinnacle objected based on over breadth and undue burden. Id. at 4. Rottlund also noted that Pinnacle's general objections stated that Pinnacle was limiting its general production to the time period beginning February 1, 2000. Id. at 3; (Murdoch Aff. Ex. 27, at p. 62:23-63:16). Finally, Rottlund feared that, based on Pinnacle's response that "relevant" documents related to the competition product survey had been produced, Pinnacle might be withholding documents relating to the Minnesota survey it considered irrelevant because of Pinnacle's position that the only relevant townhomes for purposes of Pinnacle were the Washington Square townhomes in Illinois. (Murdoch Aff. Ex. 27, at pp. 63:17-65:11, 68:1-3, 76:24-77:14). Mr. Farmer, on behalf of Pinnacle, then stated that Pinnacle does have a general time period objection but has produced documents beyond that time period pursuant to specific orders. Id. at 67:1-68:3. Mr. Farmer noted, "Mr. Sand[e]lin is going to be deposed again in a couple of weeks. He's produced what he has. And you know, whether Mr. Krummen wants to speculate what's sitting in Mr. Sand[e]lin's office. It's neither here nor there." Id. at 68:19-23.

Given the record, the Court ordered an amended answer to document request number one of Rottlund's Set VI "signed by the client that they have done a thorough search of all of the Pinnacle files going back not limited to Illinois, not limited in time, no limitations, okay, to locate what appears to have been a document [the competition product survey] that was once in their possession." Id. at 69:12-19. Mr. Farmer said he would be happy to secure such a response. Id. at 69:4, 69:20.

The Court held another status conference a few days later on November 26, 2003 and similar

issues arose. This time, however, the Court ordered Pinnacle to revamp its discovery responses in general, not just the response specific to the competition product survey request. The discussion was particularly important because Rottlund was scheduled to take potentially final, key depositions of Pinnacle personnel the week of December 8, 2003. Pinnacle was represented by Christopher Murdoch during the conference, and Rottlund was represented by Craig Krummen. Mr. Murdoch started the discussion off by asserting:

> And I think what we're seeing here, Your Honor, is a situation where they don't want to take our depositions yet because they know that once they take our people's depositions then discovery is basically complete and they will end up with what they have, which is nothing.

(Murdoch Aff. Ex. 28, at 14:7-12).

Mr. Krummen responded to the Court's question about a basis to delay the depositions:

> The reason Rottlund does not want to go forward with the Pinnacle depositions until these issues are resolved is because Rottlund does not have the documents it needs to fairly take these depositions despite two years of discovery. . . .
>
> And I can't fathom coming back to the Court for a third round of Pinnacle depositions because they've withheld key materials that predate February of 2000.

Id. at 15:17-22, 16:21-24.

Rottlund described some of Pinnacle's objections to its discovery requests that arose during the November 21, 2003 conference and asserted:

> We face Pinnacle fencing us out of any materials that predate February of 2000, and fencing us out of anything beyond that single Illinois development. . . .
>
> So Pinnacle would love for us to come to Chicago on December 8 and ask questions about materials that have never been produced, and then start this whole process again. And then argue they had their seven hours. It's not our fault they wasted it trying to figure out whether documents existed or not.
>
> A more measured approach and a more reasonable approach is to clean up all of what we consider frivolous objections, get the responsive documents, and then go

> forward with the single round of Pinnacle depositions, not a piecemeal round of several depositions.

Id. at 18:6-9, 18:22-19:9).

Mr. Murdoch boldly retorted:

> That's absolutely false, Your Honor, completely 100 percent unadulterated untrue, Your Honor. Pinnacle's only development, only developed by Pinnacle which has any back-to-back in it is the Washington Square.
>
> We limited production to 2000 because that's when we started considering a back-to-back in Illinois. Town & Country didn't so limit its production. So they have all of the documents relating to pre-2000 from Town & Country.
>
> *Pinnacle doesn't have documents left to produce, Your Honor*.

Id. at 19:12-25 (emphasis added).

Later, the Court began to ask Mr. Murdoch the following question, "Have you in the produced documents limited to the Washington Square development–", but was interrupted. Id. at 26:14-16.

Continuing the Court asked:

> Okay. Is it your position that you have produced relevant documents from 1998 forward which would be responsive to the requests that–that Rottlund has given you, or did you limit your production to 2000 forward and to that Washington Square development with the exception of the one request where I ordered that those additional architectural drawings be produced?
>
> Mr. Murdoch: Your Honor, my understanding is that the 2000 date is when the Washington Square development started conceptually in Illinois. We have produced everything relating to the Washington Square development. And we have also produced documents predating 2000 which are relevant or are likely to lead to the discovery of relevant information relating to Minnesota activities.
>
> Court: *All right*. *What I want you to do is this, because I'm not satisfied that Pinnacle has–that someone at Pinnacle–in part because I see different lawyers every time, but that someone has really taken the bull by the horns here*. *And I tried to do so with Mr. Farmer at the last hearing*.
>
> I want to be clear–and maybe the way to do that is for you to remove those objections and to be clear in your responses, that you have looked for any relevant

> documents, that is documents requested by the Plaintiffs that date back to January 1997 forward, that you've produced all those. And that you're not withholding documents based on the objections that you assert, which is we're only producing documents 2000 forward and we're only producing documents in connection with the Washington Square development.
>
> *I need you to go back and take a look at that. I am not satisfied that it's been done.*
>
> Mr. Murdoch: *Your Honor, I don't have to go back and look at that. I can assure you that that has been done and I can get you an affidavit from whoever our custodian of record is that says that we have produced everything relating to–other than–other than privilege or attorney-client privilege that everything in Chicago that relates to these accused Minnesota products . . . has already been turned over to the Plaintiffs.*
>
> Court: I think it's very important then that you update your pleadings. I don't want an affidavit. I want updated pleadings that reflect what you have done.

Id. at 27:14-29:17, 29:22-30:1) (emphasis added).

Given Mr. Murdoch's representations as an officer of the Court that all documents had been produced, the Court ordered the scheduled Pinnacle depositions to proceed. Rottlund was not convinced and stated:

> [I]f you're ordering them to [proceed with depositions] on the 8th, I respectfully request we place a bookmarker right here today. Because if that representation is being made, all the parties should take it seriously. And I think the Court should remember it down the road.

Id. at 46:17-23.

Mr. Murdoch agreed:

> *I observed the Court's attitude towards these types of issues. I am not making representations lightly.*
>
> *And I suggest that Rottlund proceed with these depositions. And they will be more than satisfied with what they discover, which will be nothing.*

Id. at 47:2-9 (emphasis added).

The Court penned the mental mark: "You can be assured, Mr. Krummen, that the Court recalls the history of this case." Id. 47:11-13.

Thus, two clear orders were in place: (1) the Court ordered Pinnacle, at the November 21, 2003 conference, to remove all objections to the competition product survey requests in Rottlund's Discovery Requests Set VI–except for privilege objections which require a log–and submit an answer that all Pinnacle files had been thoroughly searched with no limitations placed on the search; and (2) the Court ordered Pinnacle, at the November 26, 2003 conference, to remove the 2000 forward objection (documents were to be produced January 1997 forward) and remove the Washington Square limitation (documents were to be produced regarding the allegedly infringing townhomes in Minnesota) that Pinnacle interposed to Rottlund's Discovery Requests Set VI.

Yet another status conference was held days later on December 4, 2003. Pinnacle had given Rottlund its Court ordered "updated" responses to Rottlund's Discovery Requests Set VI. Remarkably, the most pertinent competition product survey request, request number one, included potential relevance and privilege (with no log) objections: "Pinnacle states that any *relevant*, *non-privileged* documents in its possession or control that are responsive to this request have already been produced in this litigation." (Emphasis added). The Court noted that the relevancy objection was wholly unfounded given the Court's prior instructions; if it were to remain, Pinnacle could hide behind its theory that the only relevant documents are those that relate to the Washington Square development in Illinois, and documents concerning Minnesota townhomes, including the competition product survey for Minnesota, were irrelevant. Moreover, request number 8 sought documents that relate to all back to back townhome competition product surveys generated by Pinnacle, but Pinnacle objected on the

basis that the phrase “competition product survey” was vague and ambiguous. The Court noted its concern:

> [Y]ou see what’s happened here is that I specifically asked Mr. Murdoch, I believe it was, and I apologize if it wasn’t Mr. Murdoch, to file an updated answer so that it would be clear and instead he objects to competition product survey as being ambiguous. Those are the words in the transmittal. There’s nothing ambiguous about what’s being referred to and then objects on relevance and privilege grounds. I can’t fathom it unless it’s in bad faith. He must think there are irrelevant documents related to the question or there must be privileged documents that he’s apparently not producing, why else would he assert those objections?
>
> Mr. Farmer: I suppose to the extent any privileged documents existed we were maintaining that privilege, but I will also–
>
> Court: But if there’s privileged documents, I want to know that.

(Court Tape Nos. 292-93, December 4, 2003 conference).

Then, Mr. Farmer remarkably admitted that the privilege objection, inserted just days or hours earlier by Pinnacle and its counsel, was baseless.

> Farmer: And there will be a log produced. In this case, I can tell you, I will represent that there are none. I think that this was probably an example of, you know, a lawyer being cautious and wishing not to waive any privilege.
>
> Court: Alright, I want these two requests, and I want you to go through the other requests. I want a new updated set to the Plaintiff before the deposition. So I want it by Friday.
>
> Farmer: And that’s for, just so I’m clear Your Honor, which set?
>
> Court: It looks like, well this is called set VI.
>
> Farmer: Set VI to Pinnacle.
>
> Court: And it’s called “Pinnacle’s Updated Supplemental Responses.” Mr. Farmer, you understand what I want, go through here and make sure you either say you have the documents or you don’t.

Id.

Also arriving on December 4, 2003, was an affidavit from Pinnacle's general counsel, Peter Brennan. Brennan stated that "[i]n connection with Pinnacle's document gathering process, Pinnacle has scoured its files (including the files of its officers and employees) for all documents that relate (or may relate) to the May 5, 1998 transmittal sheet [the competition product survey for Minnesota] that I reference in paragraph 2 of this affidavit." (Murdoch Aff. Ex. 9, ¶3).

The Pinnacle depositions occurred the week of December 8, 2003. Rottlund's concerns materialized. Steve Sandelin, Pinnacle's in-house architect, revealed once again the existence of unproduced responsive documents–this time Rottlund brochures. Even according to Pinnacle's counsel, it did not take "intense investigation or strenuous cross examination" to discover the existence of Sandelin's brochure file. (Davenport Aff. Ex. 48, at 2). Sandelin testified in relevant part as follows:

> Mr. Krummen: Now, what have you done to look for the competition product survey for the Minneapolis area that's referenced on D00225 of Exhibit 225? And please be as specific as possible.
>
> Mr. Sandelin: I've gone through every file or area of my office that would relate to Minnesota to find that document.
>
> Mr. Krummen: What files have you gone through?
>
> Mr. Sandelin: Minnesota, Washington Square, and various product files.
>
> Mr. Krummen: What product files?
>
> Mr. Sandelin: Brochure files.
>
> Mr. Krummen: What brochure files?
>
> Mr. Sandelin: I have–you know, for work that we were doing in Chicago, for work that we've done elsewhere.

Mr. Krummen: What is elsewhere?

Mr. Sandelin: Florida, Minneapolis. It would be general information. I may have stored it there, but I've not found anything.

Mr. Krummen: Now, you said you looked through your Minnesota file for the competition product survey, correct?

Mr. Sandelin: Correct.

Mr. Krummen: And you looked through a Washington Square file for the competition product survey, correct?

Mr. Sandelin: Correct.

Mr. Krummen: Then you looked through product files, correct?

Mr. Sandelin: Yes.

Mr. Krummen: Are those the same as brochure files?

Mr. Sandelin: Yes.

* * *

Mr. Krummen: I asked you where these brochures were from and you said Chicago, Florida, and Minneapolis, correct?

Mr. Sandelin: For, not from.

Mr. Krummen: What do you mean for as opposed to from?

Mr. Sandelin: Those are the only three areas that I've been involved with as far as product development.

* * *

Mr. Krummen: Have you produced in this litigation all of your brochure files for Minneapolis?

Mr. Sandelin: No.

* * *

Mr. Krummen: And my question is: If it [the competition product survey] got misfiled, you've not taken the next step and looked through everything to try to find it, correct?

Mr. Farmer: [objection].

Mr. Sandelin: No, I have not.

* * *

Mr. Krummen: Why did you not turn over your brochure file for the Minneapolis area?

Mr. Sandelin: I didn't think of it, I suppose. It was, you know, more of a library file for me.

Mr. Krummen: You didn't think of it, but you did look through your brochure file for the Minneapolis area when you were trying to find the competition product survey, correct?

Mr. Sandelin: Correct.

(Murdoch Aff. Ex. 10, at 253:15-255:5, 255:14-13, 256:8-11, 257:19-258:3, 263:22-264:9).

Mr. Sandelin's brochures of Rottlund's townhomes were responsive to any number of discovery requests from Rottlund's Discovery Requests Set VI–the very set of requests discussed at the November 21, November 26, and December 4, 2003 conferences. See Murdoch Aff. Ex. 18 (Set VI), req. no. 4, req. no. 46, req. nos. 48-49, req. no. 51, req. no. 53;[6] Murdoch Aff. Ex. 19 (Set VII),

[6] Request number 4 seeks: "All documents which reference, relate to, constitute, and/or concern Rottlund's back to back townhomes, including but not limited to: notes, pictures, competition surveys, marketing brochures . . . ." Request number 46 seeks: "All designs sketches, elevations, plans, etc., Mr. Sandelin reviewed regarding TCM's back to back townhomes products." Request number 48 seeks: "All documents which constitute and/or concern competitor brochures concerning back to back townhome products." Request number 49 seeks: "All documents which constitute and/or concern floor plans concerning competitors' back to back townhome products." Request number 53 seeks: "*All marketing brochures taken during the product tour(s)* which Mr. Sandelin took of Rottlund's

req. no. 5.[7]

After this incident, Rottlund informed the Court of what happened and requested sanctions in a status conference on December 18, 2003. The Court, noting what had become a pattern of discovery incompetence, indicated that a formal motion for sanctions would be necessary. Rottlund moved for sanctions against Pinnacle and its current and former counsel. A lengthy hearing was held spanning portions of three days–January 28, February 5, and February 23, 2004.

## III. DISCUSSION

### A. Applicable Legal Standards

Sanctions are considered based on the record as a whole, rather than merely considering the latest instance of misconduct that broke the camel's back. Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 642, 96 S.Ct. 2778 (1976) (citing Link v. Wabash R. Co., 370 U.S. 626, 634-35, 82 S.Ct. 1386 (1962)); Cine Forty-Second St. Theatre Corp. v. Allied Artists Picture Corp., 602 F.2d 1062, 1068 (2d Cir. 1979) ("[S]anctions must be weighed in light of the full record in the case.").

#### 1. Rule 26(g)

Federal Rule of Civil Procedure 26(g) "imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through

---

Villa II back to back townhome." (Emphasis added). Request number 51 seeks: "All marketing brochures of back to back townhome products located in Minnesota."

[7] Request number 5 seeks: "[A]ll documents referring or relating to any inspection and/or tour Pinnacle and/or TCM participated in, in any way, of any Rottlund product after Rottlund's July 2001 cease and desist letter."

37." Fed. R. Civ. P. 26(g), adv. comm. notes 1983 amendments. The spirit and purpose of the discovery rules were clearly delineated by the Supreme Court in Hickman v. Taylor, 329 U.S. 495, 500-01, 67 S.Ct. 385 (1947):

> The pre-trial deposition-discovery mechanism established by Rules 26 to 37 is one of the most significant innovations of the Federal Rules of Civil Procedure. . . . The various instruments of discovery now serve (1) as a device, along with the pre-trial hearing under Rule 16, to narrow and clarify the basic issues between the parties, and (2) as a device for ascertaining the facts, or information as to the existence or whereabouts of facts, relative to those issues. Thus civil trials in the federal courts no longer need be carried on in the dark. The way is now clear, consistent with recognized privileges, for the parties to obtain the fullest possible knowledge of the issues and facts before trial.

To that end, Rule 26(g) provides in pertinent part:

> (2) Every discovery request, response, or objection made by a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name, whose address shall be stated. An unrepresented party shall sign the request, response, or objection and state the party's address. The signature of the attorney or party constitutes a certification that to the best of the signer's knowledge, information, and belief, *formed after a reasonable inquiry*, the request, response, or objection is:
>
> (A) consistent with these rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law;
>
> (B) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation . . . .
>
> (3) If without substantial justification a certification is made in violation of the rule, the court, upon motion or upon its own initiative, shall impose upon the person who made the certification, the party on whose behalf the disclosure, request, response, or objection is made, or both, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney's fee.

(Emphasis added).

The rule explicitly encourages sanctions where counsel or a party makes a faulty response after failing to conduct a reasonable inquiry under the circumstances. Fed. R. Civ. P. 26(g), adv. comm. notes 1983 amendments ("Rule 26(g) makes explicit the authority judges now have to impose appropriate

sanctions and requires them to use it."); see also St. Paul Reinsurance Co., Ltd. v. Commercial Financial Corp., 198 F.R.D. 508, 515-16 (N.D. Iowa 2000). What constitutes a reasonable inquiry depends on the "totality of the circumstances." Fed. R. Civ. P. 26(g), adv. comm. notes 1983 amendments. Objective reasonableness is guided by case law under Rule 11. In re Byrd, Inc., 927 F.2d 1135, 1137 (10th Cir. 1991).

**2. Rule 37(b)**

Federal Rule of Civil Procedure 37(b) provides for a spectrum of sanctions when a party "fails to obey an order to provide or permit discovery." An oral order suffices for purposes of Rule 37(b) as long as it "'unequivocally give[s] a litigant notice' of the discovery required " Avionic Co. v. Gen. Dynamics Corp., 957 F.2d 555, 558 (8th Cir. 1992).

Pinnacle submits that a willful violation of a court order is necessary before *any* sanction may be imposed under Rule 37(b). The Court disagrees. It is true that the Eighth Circuit Court of Appeals has stated that "[i]n order to impose sanctions under Rule 37, there must be an order compelling discovery, a willful violation of that order, and prejudice to the other party." Chrysler Corp. v. Carey, 186 F.3d 1016, 1019 (8th Cir. 1999) (citing Baker v. General Motors Corp., 86 F.3d 811, 816 (8th Cir.1996), rev'd on other grounds, 522 U.S. 222, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998)). The Court finds, however, that a careful reading of the Eighth Circuit's cases, and the rule itself, reveals that "willfulness" or "bad faith" is only required where dismissal or effective entry of default is the sanction imposed.[8] For instance, in Edgar v. Slaughter, 548 F.2d 770, 772 (8th Cir. 1977), the Eighth Circuit

---

[8] Baker, 86 F.3d at 817 ("[T]he sanction forced the jury to find for the plaintiffs."); Shelton v. Am. Motors. Corp., 805 F.2d 1323, 1330 (8th Cir. 1986) (default judgment); Anderson v. Home Ins.

explained: "When noncompliance is the result of dilatory conduct by counsel, the courts should investigate the attorney's responsibility as an officer of the court and, if appropriate, impose on the client sanctions less extreme than dismissal or default, *unless it is shown that the client is deliberately or in bad faith failing to comply with the court's order*." (Emphasis added); see also Savola v. Webster, 644 F.2d 743, 745-46 (8th Cir. 1981) ("Where, however, the drastic sanctions of dismissal or default are imposed, the range of discretion is more narrow and the losing party's noncompliance must be due to willfulness or bad faith.").

The Court's conclusion that the level of culpability is relevant only to the selection of the type of sanction imposed is explicitly supported by Rule 37's advisory committee notes for the 1970 amendment.[9] Moreover, "[t]he weight of authority . . . holds that the culpability of a party who fails to

---

Co., 724 F.2d 82, 84 (8th Cir. 1983) (dismissal); Lorin Corp. v. Goto & Co., Ltd., 700 F.2d 1202, 1207-08 (8th Cir. 1983) (dismissal); Savola v. Webster, 644 F.2d 743, 745-46 (8th Cir. 1981) (dismissal); Edgar, 548 F.2d at 772 (dismissal).

[9] The advisory committee notes to the 1970 amendment explain:
Rule 37 sometimes refers to a "failure" to afford discovery and at other times to a "refusal" to do so. Taking note of this dual terminology, courts have imported into "refusal" a requirement of "wilfullness." See *Roth v. Paramount Pictures Corp.*, 8 F.R.D. 31 (W.D.Pa.1948); *Campbell v. Johnson*, 101 F.Supp. 705, 707 (S.D.N.Y.1951). In *Societe Internationale v. Rogers*, 357 U.S. 197 (1958), the Supreme Court concluded that the rather random use of these two terms in Rule 37 showed no design to use them with consistently distinctive meanings, that "refused" in Rule 37(b)(2) meant simply a failure to comply, and that wilfullness was relevant only to the selection of sanctions, if any, to be imposed. Nevertheless, after the decision in *Societe*, the court in *Hinson v. Michigan Mutual Liability Co.*, 275 F.2d 537 (5th Cir. 1960) once again ruled that "refusal" required wilfullness. Substitution of "failure" for "refusal" throughout Rule 37 should eliminate this confusion and bring the rule into harmony with the *Societe Internationale* decision. See Rosenberg, *supra*, 58 Col.L.Rev. 480, 489-490 (1958).

comply with a court order determines only which sanctions the court should impose and not whether any sanctions are appropriate at all." Halas v. Consumer Serv., Inc., 16 F.3d 161, 164-65 (7th Cir. 1994) (internal quotations omitted); see also Bollard v. Volkswagen of America, Inc., 56 F.R.D. 569, 583 (W.D. Mo. 1971).

**3. Inherent Power**

Pursuant to its inherent powers, a court may "fashion an appropriate sanction for conduct which abuses the judicial process." Chambers v. NASCO, Inc., 501 U.S. 32, 44-45, 111 S.Ct. 2123 (1991). "When rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap," Shepherd v. Am. Broadcasting Cos., Inc., 62 F.3d 1469, 1474 (D.C. Cir. 1995), but "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." Chambers, 501 U.S. at 49.

There is a split among the circuits with regard to whether a court can impose certain types of sanctions pursuant to its inherent powers without a finding of bad faith. United States v. Seltzer, 227 F.3d 36, 41 (2d Cir. 2000) (collecting cases). The Eighth Circuit has stated that "the 'bad faith' requirement [does not extend] to every possible disciplinary exercise of the court's inherent power," Harlan v. Lewis, 982 F.2d 1255, 1260 (8th Cir. 1993), such as "a monetary sanction against counsel," Dillon v. Nissan Motor Co., 986 F.2d 263, 267 (8th Cir. 1993), but "[a] bad faith finding is specifically required in order to assess attorneys' fees." Stevenson v. Union Pacific R. Co., 354 F.3d 739, 751 (8th Cir. 2004).

**4. 28 U.S.C. § 1927**

Section 1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

**B. Sanctions to be Imposed**

At the outset, the Court emphasizes that the imposition of sanctions is informed by and based upon the history of incidents of abuse, incompetence, defiance, and misconduct (many of which are sanctionable individually), not merely the latest incident. Chrysler Corp. v. Carey, 186 F.3d 1016, 1020 (8th 1999) ("While the production of the letter on the fourth day of trial may have been the catalyst for the investigation leading to the imposition of the sanction, a fair appraisal of the record reveals that the court was motivated in fact by a systematic pattern of abuse and 'blatant disregard of the Court's orders and the discovery rules.'"); Penthouse Int'l, Ltd. v. Playboy Enter., Inc., 663 F.2d 371, 388 (2d Cir. 1981) ("[I]t would be excessively formalistic to view the defiance of the order in isolation rather than against the background of Penthouse's prolonged and vexatious obstruction of discovery . . . ."). With that, the Court opens its discussion at the beginning.

**1. Lack of Candor**

The Court finds that Pinnacle and/or its counsel's lack of candor in connection with Pinnacle's motion to dismiss for lack of personal jurisdiction abused the judicial process and constituted a reckless disregard for their obligations to the Court, such conduct, at least with regard to Pinnacle, being tantamount to bad faith. From the time it received the cease and desist letter from Rottlund's counsel, Pinnacle knew that townhome *designs* or technical drawings were at the center of the dispute between the companies. Pinnacle's general counsel, Peter Brennan, immediately gave the letter to Pinnacle's in-

house architect, Steve Sandelin. Sandelin sent the letter to BSB and asked if the designs were under a co-ownership agreement with Rottlund. Thus, the key people at Pinnacle were aware of what was at issue from the beginning–designs.

Nevertheless, Pinnacle moved to dismiss for lack of personal jurisdiction boldly asserting that it had no contacts with Minnesota and certainly no contacts with Minnesota that related to the cause of action–designs. In doing so, Pinnacle failed to inform the Court, and its counsel, of a wealth of contacts it had with Minnesota, including contacts that specifically related to the cause of action. Despite the initial complaint alleging infringement of a technical drawing for a townhome being built in Minnesota (a townhome from the Centennial Crossing development in Maple Grove, Minnesota), Pinnacle never divulged to its counsel or the Court that Pinnacle's in-house architect, Steve Sandelin, was involved in, what turns out to be, the design of this very townhome–now known to be a Homestead Collection townhome, but previously known, during the design, as the Villas.[10]

For instance, the Court was not informed about Steve Sandelin's "great big file called Minnesota." (Davenport Aff. Ex. 45, at 126:23). Rather, it took a Rule 30(b)(6) deposition of Mr. Sandelin taken in December of 2002, almost a year after the motion to dismiss was filed, for the existence of the great big Minnesota file to be revealed. Pinnacle argues that the great big Minnesota file was not produced in response to Sandelin's revelation during his deposition. According to Pinnacle, it produced the Minnesota file pursuant to Rottlund's Fourth Set of Discovery Requests, and

[10] To clear up any confusion, Rottlund has a copyright on technical drawings and architectural works for a townhome product known as the Villa II, and, during development, the townhomes built at the Centennial Crossing development that allegedly infringe Rottlund's Villa II copyrights were also known as the Villas.

its response to those requests was not due until after Sandelin's deposition. Pinnacle is mistaken. The great big Minnesota file should have been produced in response to Rottlund's very first set of discovery requests served on March 21, 2002. (Davenport Aff. Ex. 55, Int. No. 4, Doc. Req. No. 24).[11] Any failure to produce a file *known to Pinnacle as* "a great big file called Minnesota" in response to Rottlund's first set of discovery was possibly a violation of Federal Rule of Civil Procedure 26(g) because a minimally competent or objectively reasonable investigation obviously would have revealed such an important file. The Court finds it more likely, however, that the fault lies with Pinnacle, specifically its in-house counsel Peter Brennan, in failing to disclose the file to its outside counsel. The Court notes that a "party is charged with knowledge of what its agents know or what is in the records available to it." Poole ex rel. Elliott v. Textron, Inc., 192 F.R.D. 494, 501 (D. Md. 2000) (internal quotations omitted). In fact, it appears that Pinnacle actually knew the contents of the big Minnesota file were specifically relevant to this case. For instance, when Sandelin first revealed the big Minnesota file, he testified that he thought the Bayview design (the specific design the initial complaint alleged to be infringing) was in the Minnesota file. (Davenport Aff. Ex. 45, at 127:2-12). The great big Minnesota file was plainly relevant to the issue of personal jurisdiction but was not presented to the Court.

Next, the Court was not informed about Steve Sandelin's physical presence in Minnesota for the specific purpose of touring, evaluating, and garnering ideas about, among other townhomes, Rottlund's Villa II. Sandelin came to Minnesota for tours more than once and during the tours pictures

---

[11] Interrogatory number 4 states in part: "Please identify all employees, former employees, or other persons acting on your behalf who were involved with or who have personal knowledge of any of the matters at issue in this lawsuit." Document request number 24 asks for "all documents that relate to, concern and/or were identified in your responses to Plaintiff's interrogatories."

were taken and brochures of Rottlund's Villa II townhome were obtained. (Davenport Aff. Ex. 42, 43, 44). At least one of Sandelin's tours occurred in 1998, which was the time period for the "kicking off [of] the design process" for TCM's back to back townhome program. (Davenport Aff. Ex. 34, at 84:6-85:18). In addition, Pinnacle's "entire executive team," including Sandelin, toured Rottlund townhomes in Minnesota in September of 2001 because one particular townhome had a "unique style of architecture." (Davenport Aff Ex. 11, at 33:22-23, 44:7-45:10).

Finally, the Court was not informed about the contents of the design file of BSB architect Larry Moore. As explained supra Part II(A), at 6-7, Larry Moore's design file demonstrates that Steve Sandelin of Pinnacle was directly involved with the design/development of allegedly infringing townhomes located in Minnesota. Pinnacle did not disclose Sandelin's involvement in the design process. This is despite the fact that Pinnacle's in-house counsel knew that designs were at issue and, within days of receiving the cease and desist letter, gave Steve Sandelin the letter to contact Larry Moore, the BSB architect with whom Sandelin was working on the designs. Here, however, is where Pinnacle's counsel failed in its responsibilities to the Court. BSB sent the Fredrikson & Byron firm Larry Moore's design file on April 3, 2002. (Davenport Aff. Ex. 30 and 32). This was about twenty days *before* oral argument on the motion to dismiss for lack of personal jurisdiction and long before the objections to the Report and Recommendation recommending denial of the motion were filed. In its objections filed June 5, 2002, Pinnacle's counsel argued "*[t]here is no evidence that Pinnacle actually designs*, builds or sells homes *in Minnesota, let alone the town homes at issue*." (Davenport Aff. Ex. 16, at 14) (emphasis added). That statement is false. The evidence that Pinnacle's in-house architect was directly involved in the design of the townhomes at issue was sitting in

Fredrikson & Byron's offices since April 3, 2002.

All of these facts are plainly relevant to personal jurisdiction but were never provided to the Court when Pinnacle argued so boldly that it had absolutely no contacts with Minnesota. Pinnacle admitted as much at the hearing on this matter:

> Mr. Murdoch: Now, the issues relating to Mr. Sand[e]lin about his visits to Minnesota and his touring of the projects and taking pictures and picking up brochures, those are all contacts which can create personal jurisdiction over his employer, Pinnacle. I concede that. They would create, I believe, specific jurisdiction over Pinnacle–
>
> Court: Yes.
>
> Mr. Murdoch: –arising out of–so the actions must arise out of his visits to Minnesota.
>
> Court: Because they specifically had to do with the alleged infringement in this case.
>
> Mr. Murdoch: That's right.

(Janauary 28, 2004 Hearing, at 92:24-93:14).

After reviewing the in camera affidavits submitted by the Fredrikson & Byron firm in connection with the previous motion for sanctions, the Court finds that Pinnacle and Pinnacle's outside counsel, the Fredrikson & Byron firm, are responsible for failing to bring this information to the Court's attention in connection with the personal jurisdiction motion. Pinnacle completely failed to disclose any of the above information to its outside counsel[12] despite questions by outside counsel that should have induced a response revealing Sandelin's design/development involvement, Sandelin's trips to Minnesota that involved tours, pictures, and brochures of Rottlund's townhomes, and Sandelin's great big Minnesota

[12] It should be emphasized that Larry Moore's design file containing evidence that Steve Sandelin was involved in the design process of the allegedly infringing townhomes in Minnesota was given to Fredrikson & Byron by BSB, not Pinnacle.

file. The Fredrikson & Byron firm's failure is limited to failing to disclose the contents of Larry Moore's design file despite it being in their possession well before oral argument on the motion and before filing objections to the Report and Recommendation.

Moreover, Pinnacle objected to participating in discovery while its motion to dismiss for lack of personal jurisdiction was pending. Worse yet, Pinnacle argued in its reply memorandum that "[t]he Court should deny Rottlund's request *to go fishing for non-existent facts relating to jurisdiction*." (Davenport Aff. Ex. 12, at 26) (emphasis added).

The appropriate sanction for this lack of candor requires some analysis. A Rule 26(g) certification sanction would not apply because Pinnacle refused to participate in discovery.[13] See generally United Missouri Bank v. Bank of New York, 723 F.Supp. 408, 412-16 (W.D. Mo. 1989) (sanctioning a party pursuant to Rule 26(g) for advocating that it had no contact with Missouri when a reasonable inquiry in response to interrogatories would have revealed the contacts that eventually came to light), abrogated on other grounds by Lakin v. Prudential Sec., Inc., 348 F.3d 704, 708 n.5 (8th Cir. 2003). Since no discovery order was in place at the time, Rule 37(b) is inapplicable. Pinnacle also argues that it was not required to disclose Steve Sandelin's name or any of Sandelin's files in its initial disclosures pursuant to Rule 26(a)(1) because it did not plan to "use" Sandelin or his files "to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A) and (B) (requiring disclosure where "the disclosing party may use [the person or documents] to support its claims or defenses"). The Court notes that "use" is construed quite broadly. Fed. R. Civ. P. 26(a)(1), advisory committee's notes 2000

---

[13] Rule 26(g) comes into play, however, with the big Minnesota file that is relevant to the personal jurisdiction motion.

amendment. More importantly, the Court knows of no rule that permits a party to withhold plainly relevant information that directly contradicts its assertions in the hopes that the Court will be duped by the misleading arguments and dismiss the withholding party from the suit. If Pinnacle were to have had it its way, the motion to dismiss for lack of personal jurisdiction would have "accomplished little more than the adjudication of a hypothetical fact situation imposed by [Pinnacle's] selective [or non] disclosure of information." Rozier v. Ford Motor Co., 573 F.2d 1332, 1346 (5th Cir. 1978). This was an abuse of the judicial process, and a gap, in these circumstances, that the Court's inherent powers should fill.

The Court can come to no other conclusion, based on this incident, the obvious relevancy of the information, and the subsequent history of the case, that Pinnacle's lack of candor was the result of deliberate, willful conduct that is tantamount to bad faith. The Court cannot conclude, however, given the in camera affidavits, that the Fredrikson & Byron firm's lack of candor was willful or in bad faith. Therefore, the Court declines to impose a monetary sanction against Fredrikson & Byron.

The Court specifically imposes a sanction on Pinnacle pursuant to its inherent powers for its deliberate lack of candor. Pinnacle shall pay Rottlund twenty percent of the attorney fees and costs Rottlund incurred in defending against Pinnacle's motion to dismiss for lack of personal jurisdiction. Rottlund incurred $22,463.50 opposing the personal jurisdiction motion. (Krummen Aff. ¶7-9, Ex. B). The Court has reviewed the specific entries, including the rates charged, the tasks performed, and the hours allotted to specific tasks, and finds them reasonable. Had the information directly relevant to specific personal jurisdiction been disclosed to outside counsel, the motion to dismiss for lack of personal jurisdiction most likely would not have even been filed; thus, relieving Rottlund of all fees and

costs incurred. Moreover, Rottlund would not have been forced to scout the waters of Pinnacle for information related to general jurisdiction and other specific jurisdictional facts had the withheld information been disclosed. Finally, Rottlund would not have had to defend against the misguided argument regarding piercing the corporate veil because direct evidence of specific personal jurisdiction would have been known. A fine payable to the Court might also be appropriate, but the Court declines to make such order. Thus, the Court finds it fair and appropriate for Pinnacle to pay Rottlund $4,492.70 as a sanction.

The events surrounding the personal jurisdiction motion set the stage for the following events and informs the Court's decision regarding the appropriate sanction for other misconduct.

**2. Failure to Obey the Court's Order to Produce Revenue and Cost Information**

In November of 2002, Pinnacle failed to obey this Court's order to produce all revenue and cost information for all townhome products in each development where allegedly infringing townhomes were located. Pinnacle's chief financial officer, Paul Anderson, admitted that Pinnacle unilaterally limited production of the information to the allegedly infringing townhomes as opposed to all townhomes within developments where allegedly infringing townhomes were located. At the first day of hearings on this matter, Mr. Murdoch conceded Pinnacle's failure: "I can assure you that that was an error. He [Mr. Anderson] didn't know. He just ran it for the back-to-backs." (January 28, 2004 Hearing, at 144:5-7). Mr. Murdoch continued: "That's–we just–we blew it on that one too, Your Honor." Id. at 145:9-10.

When the hearing on this matter continued days later, however, Mr. Murdoch's position

changed. Mr. Murdoch claimed that Pinnacle did comply and that Paul Anderson was in error to say that Pinnacle limited its production. To support his new argument, Mr. Murdoch offered the full set of revenue and cost information showing that information for all townhome products had been produced. This argument demonstrates again the lack of care Pinnacle takes before it makes representations to the Court. As Rottlund explained in its supplemental letter dated February 17, 2004, Mr. Murdoch simply gave the Court what amounts to the end product of production after Pinnacle finally complied. The initial production was limited to allegedly infringing townhomes, but after the Court noted, and Mr. Anderson admitted, Pinnacle's non-compliance, Pinnacle ultimately complied by producing the required information. Ultimate production of material does not excuse initial disobedience where the production is untimely and especially where the ultimate compliance required further court involvement, as here. See State of Ohio v. Arthur Andersen & Co., 570 F.2d 1370, 1374 (10th Cir. 1978).

The undersigned conducted multiple status conferences on this very issue and finds that Pinnacle failed to comply with the Court's orders dated October 7, 2002 and October 10, 2002. The fact that the Court spent so much time parsing this issue only to have Pinnacle fail to comply was quite disappointing and suggests to the Court a lack of effort. This disobedience is independently sanctionable pursuant to Federal Rule of Civil Procedure 37(b)(2).

### 3. Disrespect and Harassment

As discussed supra Part II(C) and (E), the Court and the parties have devoted significant attention to a transmittal from BSB architect Larry Moore to Pinnacle architect Steve Sandelin referencing an attached "competition product survey for Minneapolis area." Nobody seems to know where the attached competition product survey for Minneapolis is or what the attachments may have

been. When BSB forwarded Larry Moore's design file to Fredrikson & Byron, one of the documents in Larry Moore's file was the transmittal page referencing the competition product survey for Minneapolis. (Davenport Aff. Ex. 30 and 32). Thus, in an effort to pin down the potential contents of the attachment to the transmittal, the Court sought a stipulation from Pinnacle regarding the contents of Larry Moore's design file. TCM, represented by Fredrikson & Byron, was willing to stipulate to the contents of Larry Moore's file because Dean Karau of Fredrikson & Byron was the attorney, then representing Pinnacle, that received Mr. Moore's file. Curiously, Pinnacle refused to stipulate because they could not authenticate the contents of the file despite the fact that Pinnacle's former counsel and counsel that actually received the file was so willing. The Court pressed this point: "So by stating to the Court that you're not prepared to stipulate, if you were in my shoes, that would be a big red flag that there's some shenanigans going on here. . . . [I]f this competition survey exists and it's been moved around because of the change of counsel or something, we better find out what happened." (Davenport Aff. Ex. 61, at 27:11-15, 27:18-21). The Court continued: "Well, but what I'm saying is that something–I'm smelling a rat here and you could take care of that by–" Id. at 28:6-8. Mr. Petersen then rudely interjected: "Oh, Your Honor, please. [Court: –ensuring–] Smelling a rat?" Id. at 28:9-12. The Court was then forced to correct Mr. Petersen's attitude and decorum, reminding him that he was addressing the Court. As previously mentioned, the transcript fails to adequately capture Mr. Petersen's sarcastic attitude. Rottlund's counsel noted that this colloquy was one of the most uncomfortable situations he has been in since practicing law.

A court's inherent powers fundamentally include the "power to impose silence, respect, and decorum, in their presence." Chambers, 501 U.S. at 43. Mr. Petersen is one of the most senior

attorneys admitted *pro hac vice* on behalf of Pinnacle. The conduct described above is not acceptable for an attorney at any level of experience, let alone an attorney with Mr. Petersen's experience. Mr. Petersen has not returned to appear on behalf of Pinnacle; should he, the undersigned will expect the respect and decorum deserving of this institution.

Though it need not accept it, the Court is better equipped to handle periodic episodes of attorney misconduct than are lay witnesses. Christopher Carmichael's harassment of Rottlund witness Jason Jorgenson is intolerable. See supra Part II(D), at 12-14. There can be no doubt about what Mr. Carmichael was doing. Mr. Carmichael had read Steven Kahn's previous deposition, Rottlund's CFO, and discovered that Rottlund, according to Mr. Kahn, intended to eliminate the Iowa division. Then, during Mr. Jorgenson's deposition, who was a witness identified as having knowledge about access, Mr. Carmichael began to set up Mr. Jorgenson by asking him if he likes working for Rottlund and plans on staying there in the future. Mr. Jorgenson, of course, answered affirmatively and stated that he foresaw a future with Rottlund in Iowa. Mr. Carmichael asked if Mr. Jorgenson knew Mr. Kahn and what position Mr. Kahn had at Rottlund. Of course, Mr. Jorgenson answered affirmatively. Once the set up was complete, Mr. Carmichael went for the dagger: "Would it surprise you to learn Mr.–" (Jorgenson Dep., at 40:20-41:14). Mr. Krummen stepped in and strong-armed Mr. Carmichael into not finishing the obvious question by threatening sanctions. The Court imposes the sanctions now.

The unstated conclusion to Mr. Carmichael's question is obvious. Mr. Carmichael, an opposing attorney taking Mr. Jorgenson's deposition, wanted to be the first to tell Mr. Jorgenson, who is about 25 years old, drives 50 some miles one way to work, and has three daughters, that he was going to lose his job. This conduct is the epitome of bad faith harassment. The line of questioning had

nothing to do with the lawsuit and was intended for no other reason than to inflict emotional angst. Further, the information Mr. Carmichael was about to reveal had been designated as confidential/attorneys-eyes-only. The Court finds Mr. Carmichael's conduct sanctionable under its inherent powers and 28 U.S.C. § 1927. It should go without saying that the Federal Rules of Civil Procedure permitting discovery by deposition give no license to intimidate, harass, or embarrass witnesses, but "[i]t is clear from experience that pretrial discovery by depositions and interrogatories has a significant potential for abuse." Seattle Times v. Rhinehart, 467 U.S. 20, 34, 104 S.Ct. 2199 (1984). Unfortunately, Mr. Carmichael used the deposition practice for that purpose.[14] The Court finds the most appropriate sanction to be a written apology to Mr. Jorgenson and Rottlund. Mr. Carmichael shall write a letter apologizing for asking questions (or setting up an inferential situation) meant to embarrass Mr. Jorgenson and that were clearly outside the bounds of this lawsuit. Mr. Carmichael shall mail the letter to Mr. Jorgenson and Rottlund by certified mail. Mr. Carmichael shall submit a copy of his letter to the Court with evidence that the letter was sent to Mr. Jorgenson and Rottlund. Mr. Carmichael shall have until October 1, 2004 to fully comply with this Order.

**4. The Competition Product Survey and Discovery Set VI**

The events surrounding the competition product survey and Rottlund's discovery requests set

[14] The Court notes that Mr. Farmer used unprofessional language during a deposition: "Did you ever call up the seller of that piece of property in Chaska and say why the hell didn't you tell me this piece of property was on the selling block?" (Stutz Dep., at 210:13-16). This was inappropriate and arguably worthy of sanction. See Nelson v. Ellerbe Becket Const. Serv., Inc., No. 01-1849, 2002 WL 31571177, at *1-2 (D. Minn. Nov. 15, 2002) (Davis, J.) (sanctioning counsel $500.00 and requiring a letter of apology for counsel's statement during oral argument that, "Cronen's affidavit shows the structure of the whole *damn* company," when attempting to rebut an allegation by plaintiff).

VI illuminate an amalgamation of failures. At the November 21, 2003 conference, the Court ordered Pinnacle, to remove all objections to the competition product survey requests in Rottlund's Discovery Requests Set VI–except for privilege objections which require a log–and submit an updated answer, meaning a pleading, to request number one stating that all Pinnacle files and been thoroughly searched with no limitations placed on the search. Then, at the November 26, 2003 conference, the Court ordered Pinnacle to generally revamp its entire response to Rottlund's discovery request set VI by removing the 2000 forward objection and removing the Washington Square limitation. These oral orders, especially in the context of the Court's dealings with the parties, unequivocally gave Pinnacle notice of the discovery responses or, if found, the documents required. See Avionic Co. v. Gen. Dynamics Corp., 957 F.2d 555, 558 (8th Cir. 1992).

Pinnacle's updated response to Rottlund's Set VI failed to comply with the Court's order. The response most pertinent and repeatedly discussed–request number one to Rottlund set VI–contained potential or evasive relevancy and privilege objections (no log was produced). See supra Part II(E). Moreover, Mr. Farmer admitted that any objection or qualification to request number one on the basis of privilege was unfounded but had erroneously been included. This failure is independently sanctionable under Rule 37(b)(2).

The Court's order that Pinnacle conduct a thorough, unlimited search of its files for the competition product survey specifically referenced in a transmittal from Larry Moore to Steve Sandelin was disobeyed. Peter Brennan submitted an affidavit stating that Pinnacle "scoured its files" looking for the competition product survey referenced, which on its face suggests compliance. (Brennan Aff. ¶3). Brennan's averment, however, is contradicted by the very person named in the transmittal, Steve

Sandelin. Sandelin testified in December 2003 regarding his efforts to find the referenced competition product survey:

> Mr. Krummen: Have you looked anywhere other than the Minnesota file, the Washington Square file, and the general information file as you've defined it to find this competition product survey?
>
> Mr. Sandelin: No.
>
> Mr. Krummen: So if it was misfiled in some other file, you've done nothing to try to find out, correct?
>
> Mr. Farmer: [objection].
>
> Mr. Sandelin: I've looked everywhere I could conceivably think it may be.
>
> Mr. Krummen: And you've already explained to me where those places are. And my question is: If it got misfiled, you've not taken the next step and looked through everything to try to find it, correct?
>
> Mr. Farmer: [objection].
>
> Mr. Sandelin: *No, I have not*.

(Murdoch Aff. Ex. 10, at 256:24-285:3) (emphasis added).

It is inconceivable to the Court that Mr. Sandelin, the person most likely to have and recognize the survey, did not take the extra step to search files, including his own, in which the survey may have been misplaced. Indeed, the Court ordered Pinnacle to do just that: "That you indeed have done a thorough search, not just of Mr. Sand[e]lin's but of all of Pinnacle's records . . . . [The Court ordered an] answer to question number 1 signed by the client that they have done a thorough search of all of the Pinnacle files going back not limited to Illinois, not limited in time, no limitations, okay, to locate what appears to have been a document [the competition product survey] that was once in their possession."

(Murdoch Aff. Ex. 27, at 69:6-8, 69:12-18). It is equally inconceivable that counsel for Pinnacle would permit such flagrant disobedience of the Court's order after the Court and parties spent multiple, lengthy status conferences discussing the competition product survey. This was a time, as discussed infra, where counsel should have been directly involved in the ground-level search.

### 5. Failure to Conduct a Reasonable Inquiry

A reasonable inquiry under the circumstances of this case was not conducted prior to responding to Rottlund's Discovery Set VI and VII in violation of Federal Rule of Civil Procedure 26(g).

At both the November 21, 2003 and November 26, 2003 status conferences, counsel for Pinnacle repeatedly proclaimed that Pinnacle had produced all responsive documents. Mr. Farmer stated that "Mr. Sand[e]lin is going to be deposed again in a couple of weeks. *He's produced what he has. And you know, whether Mr. Krummen wants to speculate what's sitting in Mr. Sand[e]lin's office. It's neither here nor there*." (Murdoch Aff. Ex. 27, at 68:19-23) (emphasis added). Mr. Murdoch termed Mr. Krummen's concerns about Pinnacle withholding documents as "absolutely false," "completely 100 percent unadulterated untrue." (Murdoch Aff. Ex. 28, at 19:12-25). Mr. Murdoch asserted that "Pinnacle doesn't have documents left to produce," and "everything in Chicago that relates to these accused Minnesota products . . . has already been turned over to the Plaintiffs." Id. at 19:29:12-15. Finally, Mr. Murdoch concluded: "I suggest that Rottlund proceed with these depositions. *And they will be more than satisfied with what they discover, which will be nothing*." Id. at 47:2-9 (emphasis added).

Prior to these representations, Rottlund requested any and all brochures in Pinnacle's

possession that related to Rottlund townhomes, competitors' back to back townhomes, Rottlund's Villa II, or brochures taken by Mr. Sandelin during his tours of Rottlund's townhomes. See Murdoch Aff. Ex. 18 (Set VI), req. no. 4, req. no. 46, req. nos. 48-49, req. no. 51, req. no. 53;[15] Murdoch Aff. Ex. 19 (Set VII), req. no. 5. Mr. Sandelin admitted that during the tours of Rottlund's townhomes brochures were obtained. (Davenport Aff. Ex. 44); see also (Murdoch Aff. Ex. 36, at 38:19-24). Pinnacle's response to Rottlund's requests was that it could not find any brochures; thus, it claimed all responsive documents in its possession had been produced. (Murdoch Aff. Ex 18, Answer to req. nos. 4, 46, 48-49, 51, 53 and Ex. 19, Answer to req. no. 5). As Mr. Murdoch explained at the first day of hearings on this matter, "Mr. Sand[e]lin testified that he picked up brochures before and that it's just that he couldn't find them." (January 28, 2004 Hearing, at 99:8-10). Pinnacle had not produced all documents responsive to Rottlund's brochure requests in Rottlund's Discover Requests Set VI, req. no. 4, req. no. 46, req. nos. 48-49, req. no. 51, req. no. 53 and Set VII, req. no. 5. (Murdoch Aff. Ex 18 and 19). A reasonable inquiry under the circumstances would have revealed the existence of the brochures. In fact, a most elementary inquiry would, and did, reveal the existence of Rottlund brochures in none other than Mr. Sandelin's competitor brochure file.

It is now known that Mr. Sandelin maintains a file specifically called competitor brochure file. Remarkably, however, Mr. Sandelin reviewed Rottlund's requests for competitor brochures with counsel, but states that "it did not occur to me that documents in my *brochure file* could have any

---

[15] For instance, request number 53 seeks: "*[a]ll marketing brochures taken during the product tour(s)* which Mr. Sandelin took of Rottlund's Villa II back to back townhome." (Emphasis added). Request number 51 seeks: "[a]ll marketing brochures of back to back townhome products located in Minnesota."

bearing on this litigation." (Sandelin in camera Aff. ¶6) (emphasis added).[16] So, Mr. Sandelin, believing that his brochure file would not contain documents responsive to a request for brochures, did not inform Pinnacle's counsel about the brochure file. Id. at ¶8. Rottlund has a request for a variety of brochures, Mr. Sandelin admits that brochures were obtained during tours, Mr. Sandelin knows he has a brochure file, and Pinnacle's counsel informs Mr. Sandelin about the request for brochures, yet Mr. Sandelin states that he did not think his brochure file could have any bearing on the litigation and therefore refused to disclose it. Such incompetence, in light of the history of this case and the history with Mr. Sandelin, is tantamount to bad faith.

On a slightly different point, the Court finds that Pinnacle's counsel, the Holland & Knight firm, is not without fault. Holland & Knight's procedure for conducting discovery was to (1) explain Rottlund's discovery requests to Pinnacle personnel, usually Mr. Brennan; (2) request that *Pinnacle personnel* search the files for any relevant documents; (3) obtain the documents *Pinnacle personnel uncovered*; and (4) produce what counsel thought was responsive. See (Farmer in camera Aff. ¶3); (Brennan Aff. ¶2-3).[17] In other words, Holland & Knight attorneys never searched for or reviewed Pinnacle's files/documents at the ground level. Under the circumstances of this case, Pinnacle's counsel's failure to roll-up its sleeves and search for documents in the first instance greatly contributed to the failure to conduct a reasonable inquiry. See Penthouse, 663 F.2d at 388 ("On this record it is

---

[16] **The Court reveals the contents of this and other affidavits submitted in camera where the contents revealed are not privileged or confidential.**

[17] Mr. Murdoch explained the process at various times during the first day of hearings on this matter as follows: "My understanding of the process is that Mr. Brennan reviews them [the requests] with counsel, identifies which employees are likely to be responsible for files that fall within the scope of these requests." (January 28, 2004 Hearing, at 105:21-24).

questionable whether [counsel] intentionally and deliberately misrepresented to the court material facts with respect to the existence of the relevant Penthouse records. It is conceivable that he was misled by his client. However, the record does support [the] finding that [counsel], beginning in November, 1977, was grossly negligent in not pursuing the matter more diligently to ascertain the facts from his client . . .").

From the very beginning, problems with discovery at Pinnacle, many specifically involving Mr. Sandelin, were apparent. The most glaring, and independently sanctionable pursuant to the Court's inherent powers, was Pinnacle's lack of candor when pursuing the personal jurisdiction motion. The lack of candor surrounding the personal jurisdiction motion went right to the top at Pinnacle–Pinnacle's general counsel, Peter Brennan. In addition, the lack of candor involved Steve Sandelin because it was Sandelin's contacts with Minnesota that were not revealed. Mr. Brennan either did not ask Mr. Sandelin about his contacts with Minnesota, despite being the first person Brennan contacted about the cease and desist letter, or Mr. Sandelin refused to reveal his contacts. Either way, the Court was misled. Next, Pinnacle's chief financial officer admits that Pinnacle unilaterally limited production of revenue and cost information in defiance of this Court's orders. Following this, Rottlund discovered during Mr. Sandelin's Rule 30(b)(6) deposition that Mr. Sandelin failed to identify for production a file he titled "a great big file called Minnesota" despite it being requested months earlier. Pinnacle produced the file, but "[i]t was not their option to simply react to plaintiff's fortuitous discovery of the existence of relevant documents by making disjointed searches, each time coming up with a few more documents, and each time representing that was all they had." <u>Tarlton v. Cumberland County Corr. Facility</u>, 192 F.R.D. 165, 170 (D. N.J. 2000). Finally, even in the Court ordered "search" for the

competition product survey, which was sent to Mr. Sandelin but he claims no knowledge of it, Mr. Sandelin admits that he searched only a few of the most obvious files but no more.

Pinnacle submits without citing any authority that "[t]he attorney is not required to personally search for responsive information and documents." (Pinnacle's Mem. in Opp'n to Mot. for Sanctions, at 20). That may be true in some cases where discovery is proceeding relatively free from complications and the client's theretofore discovery conduct is not marked with a black-eye. In making its inquiry, counsel "may rely on assertions by the client and on communications with other counsel in the case *as long as that reliance is appropriate under the circumstances*," Fed. R. Civ. P. 26(g), advisory committee notes, 1983 amendment (emphasis added), and "[b]lind reliance on the client is seldom a sufficient inquiry." In re Kunstler, 914 F.2d 505, 514 (4th Cir. 1990) (quoting Southern Leasing Partners, Ltd. v. McMullan, 801 F.2d 783, 788 (5th Cir. 1986)). Here, Pinnacle's conduct in discovery was very poor and in some instances marked by bad faith. The Court had already begrudgingly denied a motion for sanctions. Further, the discovery problems frequently involved documents in the possession of the same person, Mr. Sandelin. In fact, Mr. Murdoch admitted during the first day of hearings on this matter that there has been a history of problems with Mr. Sandelin.[18]

---

[18] At the hearing the following exchange occurred:

> Court: But let's step back a minute because indeed at the time that your client argued before this Court that there was no connection of any kind with Minnesota and apparently represented to its counsel, not you but it's former counsel, that there were no files related to Minnesota, he had the big Minnesota file. So this is a–there's a history with Mr. Sand[e]lin here. This is not the only time that there's been some kind of issue of misunderstanding.
>
> Mr. Murdoch: I understand. And I agree with Your Honor.

Counsel's reliance on assertions by Pinnacle that it did not have any more documents was not reasonable in the context of this case. Rather, Rule 26(g) required counsel to search Pinnacle's files in the first instance as opposed to relying on Pinnacle personnel to uncover responsive information. Pinnacle had already proved, on too many occasions involving quite relevant information, incapable of understanding its obligations to permit reasonable reliance. See Metro. Opera Ass'n v. Local 100, 212 F.R.D. 178, 222 (S.D.N.Y. 2003) (rejecting argument that counsel is not personally required to supervise every step of discovery because the context of the case warranted such involvement). Thus, reliance on Pinnacle was objectively unreasonable.

Perhaps most telling of the fact that counsel did not conduct a reasonable inquiry prior to responding to Rottlund's Discovery Requests Set VI and VII regarding brochures, is the fact that Mr. Sandelin so freely and quickly identified the existence of his competitor brochure file when posed basic questions by Rottlund's counsel. Mr. Krummen simply asked Mr. Sandelin what files he looked through when "searching" for the competition product survey.[19] Pinnacle admits as much when it stated

(January 28, 2004 Hearing, at 88:9-21).

[19] Incredibly, Mr. Sandelin looked through his competitor brochure file while looking for the competition product survey but nevertheless failed to produce Rottlund's brochures after that search. Pinnacle defends this failure by arguing that Mr. Sandelin was not looking for brochures when he was searching for the competition product survey. This argument fails to consider that Pinnacle has an absolute duty to supplement whenever relevant documents come to light. Fed. R. Civ. P. 26(e). The argument also fails to consider that Rottlund's brochures could have easily been part of the "competition product survey for Minneapolis." Pinnacle claims that Mr. Sandelin does not know what was in the competition product survey for Minneapolis. If that is true, the search should have obviously encompassed documents likely to have been a part of the survey. Likewise, Pinnacle's counsel argues that it did not need to be part of the search for the competition product survey because it does not know what was contained therein. This argument can be quickly rejected. Pinnacle does not know, so it claims, what was contained in the survey either; so, counsel's efforts would have been just as useful as Pinnacle's.

in its status conference letter opposing sanctions that "Mr. Sandelin's file was not discovered after some intense investigation or strenuous cross examination." (Davenport Aff. Ex. 48, at 2).

Rule 26(g) requires counsel to "stop and think" about a response. Fed. R. Civ. P. 26(g), advisory committee notes, 1983 amendment. When ordered by the Court to revamp its discovery responses to Rottlund Discovery Set VI to remove 2000 forward objections and Washington Square limitations and make sure all responsive documents had been produced, Pinnacle's counsel did not stop and think about the legitimacy of the responses. The Court stated: "I need you to go back and take a look at that. I am not satisfied that it's been done." (Murdoch Aff. Ex. 29:2-4). Mr. Murdoch did not stop to think. Rather, he stated: "I don't have to go back and look at that. I can assure you that that has been done and I can get you an affidavit from whoever our custodian of record is that says that we have produced everything . . . ." Id. at 29:5-9. Rottlund Discovery Requests Set VI included requests for brochures. It was patently obvious that the Court wanted counsel to diligently reexamine its responses, but counsel was unwilling to think about its responses further despite the Court's concern.

Thus, Pinnacle's counsel's Rule 26(g) certification for Pinnacle's responses to Rottlund's Discovery Requests Set VI, req. nos. 4, 46, 48-49, 51, 53 (Murdoch Aff. Ex. 18) and Rottlund's Discovery Requests Set VII, req. no. 5, was not made after a reasonable inquiry under the circumstances, which was inconsistent with the rules and caused unnecessary delay and needless increase in the cost of litigation. Documents responsive to those requests existed in Pinnacle's files, despite Pinnacle's counsel's repeated assurances that all documents had been produced, and the documents would have been discovered if a reasonable, elementary inquiry had been made. Pinnacle and its counsel must be sanctioned pursuant to Federal Rule of Civil Procedure 26(g).

Rule 26(g) permits "an appropriate sanction" to be levied on "the person who made the certification, the party on whose behalf the disclosure, request, response, or objection is made, or both." The sanction "may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney's fee." Fed. R. Civ. P. 26(g)(3).

In considering this motion and the sanction to be imposed, the Court has attempted to hold fast to two important principles. First, a sanction is to be tailored to the sanctionable conduct, but it may reflect the record of misconduct as whole, not merely the triggering event. Nat'l Hockey League, 427 U.S. at 642 (citing Link, 370 U.S. at 634-35); Carey, 186 F.3d at 1020; Penthouse, 663 F.2d at 388; Cine Forty-Second, 602 F.2d at 1068. Second, "[i]f the fault lies with the attorneys, that is where the impact of sanction should be lodged. If the fault lies with the clients, that is where the impact of the sanction should be lodged." Herring v. City of Whitehall, 804 F.2d 464, 468 (8th Cir. 1986).

The Court finds that the record of abuse of the judicial process, discovery incompetence, and defiance of Court orders warrants a significant sanction. The Court requested the parties to brief the imposition of five potential sanctions: (1) admission of personal jurisdiction; (2) striking the affirmative defense of lack of access; (3) attorneys fees and costs incurred by Rottlund in connection with every effort to ensure Pinnacle's compliance with discovery; (4) revocation of *pro hac vice* admission; and (5) attorneys fees and costs for additional depositions of Pinnacle's employees regarding the brochures. The Court has considered the sanctions regarding admission of personal jurisdiction, e.g., Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 102 S.Ct. 2099 (1982); English v. 21st Phoenix Corp., 590 F.2d 723, 727-28 (8th Cir. 1979), and the striking of the affirmative defense of lack of access and finds that other sanctions will appropriately deter future misconduct and

recompense the prejudiced party. The Court believes that admission of personal jurisdiction, although related to part of the misconduct, would do little to compensate or deter misconduct. This is so because the Court finds that the personal jurisdiction issue is already settled. It exists. Any argument otherwise would be foolhardy. Thus, the Court declines to order admission of personal jurisdiction or strike the affirmative defense of lack of access. With regard to Pinnacle's counsel's *pro hac vice* status, the Court will not revoke their privileges. Pinnacle's counsel, however, should take heed. The Court has lost some confidence in counsel's good faith efforts regarding discovery. Further, the Court has experienced some disrespect from counsel. No less than any other federal court, the undersigned expects befitting decorum at all times from all parties. The Court finds that a monetary sanction is most appropriate. Based on the whole record, however, the Court finds that much of the fault lies with Pinnacle as opposed to its counsel and the sanction will be structured accordingly.

For the Rule 26(g) violation, a sanction of ten percent of the total attorney fees and costs Rottlund has incurred in connection with ensuring that Pinnacle complied with document discovery is appropriate. The total amount of attorneys fees and costs Rottlund incurred ensuring Pinnacle complied with document discovery amounts to $101,374.71. (Krummen Aff. ¶6, Ex. A). Thus, a sanction of $10,137.47 to compensate Rottlund for and deter future Rule 26(g) violations is imposed. The Court has considered various methods of calculating the sanction. For instance, the Court has considered awarding only the fees and costs associated with status conferences where Pinnacle staunchly represented everything, including documents from Rottlund's Requests Set VI that included brochure requests, had been produced–such as the November 21 and 26, 2004 conferences and the December 4, 2004 conference–these fees and costs would amount to around $8,500. (Krummen Aff. Ex. A,

entries from 11/14/03 to12/8/03). The Court finds, however, that a broader sanction for the Rule 26(g) violation involving a percentage of efforts to ensure compliance with document discovery more appropriately captures the history of discovery incompetence, which obstructed Rottlund's ability to engage in effective discovery. See Perkinson v. Houlihan's/D.C., Inc., 108 F.R.D. 667, 676-77 (D.D.C. 1985) (ordering payment of fees and costs for discovery abuse from a certain date forward ). Further, a broader award is necessary to satisfy the deterrent purpose for which Rule 26(g) partially exists. See Johnson Intern. Co. v. Jackson Nat. Life Ins. Co., 19 F.3d 431, 439 n.10 (8th Cir. 1994) (explaining that "the purpose of sanctions under Rules 37 and 26(g)" is "to deter abuse and compensate the opposing party"); Lockheed Shipbuilding Co. v. Ins. Co. of N. Am., No. CA90-0587P, 1993 WL 358442, at *5 (D.R.I. Apr. 2, 1993) ("In addition to deterring inappropriate conduct, actions should 'compensate the wronged party . . . .'"); Fed. R. Civ. P. 26(g), advisory committee notes, 1983 amendment (stating that "[t]he subdivision provides a deterrent to both excessive discovery and evasion"). Deterrence is an important objective of the Rule 26(g) sanction imposed, not only because of the history of this case, but also to alert other parties or attorneys that the Court takes discovery obligations seriously and they must resist laxity in order to avoid sanction.

Rottlund's attorneys fees and costs incurred in prosecuting this motion and the December 18, 2003 status conference hearing are also awarded. Johnson Intern., 19 F.3d at 439 n.10 ("The court also determined that fees under Rule 37(a)(4) should be awarded for prosecuting the motion for sanctions. Such an award is consistent with the purposes of sanctions under Rules 37 and 26(g)–to deter abuse and compensate the opposing party for 'all expenses, whenever incurred, that would not have been sustained had the opponent conducted itself properly,' *In re Stauffer Seeds*, 817 F.2d at 50

(citation omitted); *see also* Fed.R.Civ.Pro. 26(g) advisory committee's note (1983 amendment).”). The Court has reviewed the time sheets in exhibit C to the first Krummen affidavit (detailing the fees and costs incurred through January 11, 2004 in connection with the December 18, 2003 hearing and the instant motion) and exhibit A to the supplemental Krummen affidavit (detailing the fees and costs incurred from January 12, 2004 through February 23, 2004 in connection with this motion). As noted, the hearing on this matter spanned portions of three days–January 28, February 5, and February 23, 2004. The factual history that needed to be culled and the vigor with which the motion would be and was contested required the parties to expend considerable effort. The Court specifically requested briefing on a number of potential sanctions. That the Court did not impose certain sanctions does not mean fees and expenses for those tasks should not be awarded. All the sanctions briefed were within the realm of discretion, but the Court has simply attempted to narrowly tailor the severity of the sanctions to fulfill the purposes of the Rules and preserve the sanctity of the judicial process. Accordingly, the Court awards $50,000.00 in reasonable attorney fees and costs for prosecution of this motion and the December 18, 2003 hearing.

The monetary sanctions shall be structured as follows: (1) Pinnacle shall pay Rottlund $4,492.70 representing twenty percent of the fees and costs incurred in connection with the motion to dismiss for lack of personal jurisdiction as set forth supra Part III(B)(1); (2) Pinnacle shall pay Rottlund seventy-five percent of the award for the Rule 26(g) violation and the award for fees and costs incurred in prosecuting this motion; and (3) Holland & Knight shall pay Rottlund twenty-five percent of the award for the Rule 26(g) violation and the award for fees and costs incurred in prosecuting this motion. The total of the Rule 26(g) violation award ($10,137.47) and the award for fees and costs incurred in

prosecuting this motion ($50,000) is $60,137.47. Thus, Pinnacle shall pay Rottlund a total of $49,595.80 ($45,103.10 + $4,492.70). Holland & Knight shall pay Rottlund a total of $15,034.37. This structure most appropriately recognizes the culpability of the client and lawyers. All awards shall be paid by delivering payment to Rottlund's counsel Winthrop & Weinstein, within thirty (30) days of the date of this Order.

Finally, Pinnacle shall reimburse Rottlund for *all* reasonable attorney fees and costs that Rottlund incurred as a result of having to redepose any of those persons who were scheduled to have their deposition taken during the week of December 8, 2003.

Therefore, based on all the files, records, and proceedings herein,

**IT IS HEREBY ORDERED that:**

**1.** Plaintiff's Motion for Sanctions Pursuant to the Court's Inherent Power, 28 U.S.C. § 1927, and Federal Rules of Civil Procedure 11, 26, and 37 (Doc. Nos. 320, 321, 322) is **GRANTED in part** and **DENIED in part**.

**2.** Pinnacle shall pay Rottlund, by delivering payment to its counsel Winthrop & Weinstein, $49,595.80 within thirty (30) days of the date of this Order.

**3.** Holland & Knight shall pay Rottlund, by delivering payment to its counsel Winthrop & Weinstein, $15,034.37 within thirty (30) days of the date of this Order.

**4.** Pinnacle shall reimburse Rottlund for *all* reasonable attorney fees and costs that Rottlund incurred as a result of having to redepose any of those persons who were scheduled to have their deposition taken during the week of December 8, 2003.

**5.** Christopher Carmichael shall prepare and submit a letter of apology as set forth herein.

Dated: June 30, 2004.

s/ Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge