UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

The Rottlund Company, Inc.,
d/b/a Rottlund Homes,
a Minnesota Corporation,

Plaintiff,

v.

Pinnacle Corporation,
d/b/a Town & Country Homes,
an Illinois Corporation,
et al.,

Defendants,

and,

Town & Country Homes, Inc.,
a Minnesota Corporation,

Third-Party Plaintiff,

v.

Bloodgood Sharp Buster
Architects & Planners of Iowa, Inc.,
an Iowa Corporation,

Third-Party Defendant.

Civil Action No. 01-CV-1980 DSD/SRN

**NOTICE OF OBJECTION BY PINNACLE CORPORATION AND HOLLAND & KNIGHT LLP TO MAGISTRATE'S ORDER OF SANCTIONS DATED JUNE 30, 2004**

**(ORAL ARGUMENT REQUESTED)**

---

For the reasons stated below, Pinnacle Corporation ["Pinnacle"] and Holland & Knight LLP ["Holland & Knight"] object to Magistrate Judge Nelson's June 30, 2004 Order entering sanctions against them.

1. Pinnacle and Holland & Knight object to the June 30, 2004 Order because the Magistrate improperly and erroneously pre-judged this matter. On December 18, 2003, nearly a month before this motion was even served, the Magistrate stated that she was going to "entertain a formal motion for sanctions *and will award sanctions.*" (Dkt. 326, Transcript from Dec. 18,

2003 hearing at 48.) (Emphasis supplied.) A large part of the Magistrate's Order amounts to an erroneous and improper reconsideration of an earlier motion for sanctions that she had denied a year earlier. (Order 4-8, 29-36.)

2. Pinnacle and Holland & Knight object to the portions of the Magistrate's Order that revisit (in a non-Rule 11 context) Pinnacle's Motion to Dismiss Based on a Lack of Personal Jurisdiction. (Order 4-8, 29-36.) The Magistrate never ruled that Pinnacle's Motion to Dismiss violated Fed. R. Civ. P. 11, nor did she enter an order under Rule 11(c)(1)(B) to begin that process, something she could have done when she requested briefing on all the potential sanctions she considered "within the realm of discretion." (Order at 53.) Instead, the Magistrate revisits that motion as a starting point for the "pattern" of conduct she claims exists. (Order at 4, 9, 24, 29.) Pinnacle and Holland & Knight object to the Magistrate's erroneous claim that Pinnacle violated Rule 26(a) by failing to produce Mr. Sandelin's file on Minnesota as part of its initial disclosures. The affirmative duty to disclose under Rule 26(a) is limited to the evidence supporting the party's claims. Fed. R. Civ. P. 26(a)(1)(A) (requiring disclosures where "the disclosing party may use [the person or documents] to support its claims or defenses").

3. Pinnacle and Holland & Knight object to the Magistrate's erroneous conclusion that the comments of Attorney Scott Petersen of Holland & Knight on June 18, 2003, "exhibited brazen disrespect for the Magistrate." (Order at 10.) The Magistrate reached her unsupported conclusion by wholly ignoring the context in which the exchange occurred. While Mr. Petersen's comments are not the subject of any individual sanctions, the Magistrate did find it worthy of mention – and judicial criticism. Moreover, this incident is one of the many the Magistrate uses to form her judgment about the efforts, candor, and courtesy of Pinnacle and its

counsel, all of which bear directly on the "pattern" the Magistrate has divined in this case. (Order at 4, 9, 24, 29.)

The Magistrate's Order omits the fact that during the June 18, 2003 status conference Rottlund's counsel requested without prior notice that Mr. Petersen stipulate to the contents of a file – Larry Moore's file – that he had never seen. The Magistrate's finding that Mr. Petersen "refused" to stipulate is clearly erroneous. (Id. at 10.) Rather, Mr. Petersen merely stated that he would need to confer with his client and offered to advise the Court within a week.

> MR. PETERSEN: Your Honor, I think I would like to speak with our client before making such a stipulation. I'm just not prepared to do so today in open court. (Dkt. 224, June 18, 2003 Hearing Tr. at 28-29.)
>
> * * *
>
> MR. PETERSEN: It's just a matter of letter [sic] me confer with our client. I would like to speak with Pinnacle, and we can perhaps get back to Your Honor within the week." (*Id.* at 32.)

The Magistrate's Order also omits the fact that after she effectively accused Mr. Petersen of smelling like a "rat" engaged in "shenanigans," she admitted that her demanded oral stipulation was ambiguous and unclear:

> MR SCHWIEBERT: I think the question you asked Pinnacle was would they stipulate it's the design file.
> THE COURT: No.
> MR. SCHWIEBERT: I don't think --
> THE COURT: That's not what I asked.
> MR. SCHWIEBERT: Okay. I --
> THE COURT: So if I'm not being clear, maybe that's my fault. What I want from Pinnacle is the same that TCM's given . . . ."
> MR. SCHWIEBERT: Yes. And I apologize to the extent that in that affidavit I used TCM as my current client and what I intended to do, as you asked was to say TCM's attorneys Fredrikson & Byron is not withholding any documents. There is no – there's no rat. There's no shell game. It's we don't – this is it. (*Id.* at 29-30.)

Moments later, the Magistrate admitted that she had also confused two points -- the design file and a product survey.

THE COURT: Two separate transmittals. And I am confusing it for the record. You're right. That's correct. (*Id.* at 33.)

The entire transcript of the June 18, 2003 hearing, as opposed to the incomplete and misleading selections in the Magistrate's Order reveals that Mr. Petersen was neither disrespectful nor unreasonable when he asked for leave to consult with his client before stipulating to material facts. (The Magistrate's Order also ignored her resolution of this matter – a resolution Mr. Petersen had suggested to her earlier: "Maybe what we ought to do is this. Let me ask Mr. Petersen to talk to his client so that you can report back to the Court." (*Id.* at 31.)) That the Order's reliance on the perception of a young associate that the "colloquy was one of the most uncomfortable situations he has been in since practicing law" speaks volumes about the insignificant nature of this alleged slight. In the final analysis, the Order's reliance on this event confirms her pre-judgment of this sanctions motion. Had Mr. Petersen's comment truly warranted a sanctions, the Magistrate should have invoked the contempt procedure set forth at 28 U.S.C. §636. She did not.

4. To provide additional support for a claimed "pattern" of conduct (Order at 4, 9, 24, 29), the Order incorrectly states that Rottlund's plan for expansion or contraction of its Iowa operation is "unrelated to anything in this case" and "has nothing to do with this lawsuit." (Order at 12, 39-40.) Pinnacle and Holland & Knight object to these conclusions because the Order used it as the starting point to excoriate Attorney Christopher Carmichael for attempting to ask a Rottlund employee questions that bear directly on this issue.

Moreover, the Magistrate is well aware that Rottlund's financial wherewithal bears directly on Rottlund's damage claim. Bernard Rotter, Rottlund's chairman of the board, testified that the only factor that limited Rottlund's ability to build Villa townhomes was the *availability*

*of land* (Farmer Aff., Ex. A, Bernard Rotter Tr. at 176-77), and its damage model hinges on the assumption that Rottlund could and would have acquired the land TCM developed.

Throughout this lawsuit, Pinnacle has sought discovery on this issue of "capacity to build," and the Magistrate has been directly involved. On August 13, 2003, the Magistrate ruled that this capacity-related information was discoverable and ordered Rottlund to produce such information from 1998 through the present. (Farmer Aff., Ex. B, Aug. 13, 2003 Hearing Tr. at 17-19.) Just ten days earlier, Steven Kahn, Rottlund's CFO, testified that Rottlund had shut down its New Jersey operations, sold off its Indiana operations, shuttered some of its Florida operations, and was planning to close its Iowa operations. (Farmer Aff., Ex. C, Kahn Tr. at 383-85.) Each of these corporate decisions bears directly on Rottlund's capacity to build during the years in question. Two weeks after the Magistrate ruled on the discoverability of capacity issues, Rottlund's chairman, David Rotter, contradicted his own CFO and testified that Rottlund was not scaling back its Iowa operations; it was in fact waiting for more opportunities to come in. (Farmer Aff., Ex. D, David Rotter Tr. at 42.) Notably, Rottlund's counsel (the same attorney who represented Mr. Kahn during his deposition) did not lodge any objections to any of these questions, which sought the same information that was asked of Mr. Kahn.

In an *ad hominem* attack on Mr. Carmichael for attempting to ask a Rottlund witness about these issues, the Order ignores the factual and legal context in which these issues arose. It is counsel's job in preparing for trial to determine how many different versions of Rottlund's tale its witnesses will tell. Lawyers frequently ask three different witnesses the same question only to receive three different answers. It was entirely appropriate to try to determine from Rottlund's officers, as well as its employees, which of Rottlund's stories is true.

Pinnacle and Holland & Knight also object to the Magistrate's citation of the self-serving, inadmissible narrative offered by Rottlund's counsel about the witness Mr. Carmichael deposed, the witness's family, his commute, and his mother's health problems. (Order at 13.) There is nothing in the record to support these claims, and they are wholly irrelevant to the propriety of Mr. Carmichael's examination and to this matter in general.

5. Pinnacle and Holland & Knight object to the Order's repeatedly erroneous statements that Pinnacle failed to comply with the Magistrate's October 7 and October 10, 2002 Orders by limiting production of financial information to its back-to-back townhome product, rather than to the sole development in which those homes were built. (Order at 9-10, 35-37, 46.) The Magistrate cites only a non-transcribed phone hearing for its claim that Pinnacle (not TCM) failed to produce revenue and cost information documents for the entire development. The documents Pinnacle produced in late October 2002 -- long before the Magistrate conducted its November 22, 2002 phone hearing -- disprove that assertion. (Dkt. 338, Transcript from Feb. 6, 2004 Hearing at 10-17.) Pinnacle's counsel made these very documents – *and counsel's October 28, 2002 transmittal letter* – available to the Magistrate at the February 6 hearing. As Pinnacle's counsel pointed out to the Magistrate during the hearing, "[O]n the very first page of the documents we produced pursuant to your Order, the first type of building is a 25AL5 which is an alley loaded townhome. We also have various alley loaded townhomes with their various options. You have to turn to the back, Your Honor, but they are in here. On page 101, we have all of the back-to-backs. The T25BB6 on page 101 and the T25BB6 continues on 102, and they are in here, Your Honor." (*Id.*, Transcript from February 6, 2004 Hearing at 16.) The Magistrate acknowledged during that hearing that she could not explain that fact. (Id.) The Order does not attempt to explain it either.

6. Pinnacle and Holland & Knight object to the different standards that govern the obligations of Rottlund's counsel to search for documents. For example, the president of Rottlund's Iowa division recently testified during a deposition that he was never asked by his counsel whether he had any documents. (Farmer Aff., Ex. E, April 16, 2004 Theis Tr. 187-94.) At a hearing on this matter, the Magistrate assured defense counsel that Rottlund's *in camera* affidavit answered the question whether the witness was in fact asked for documents. (Dkt. 405, Transcript from May 7, 2004 Hearing at 8.) The Magistrate even suggested that the witness might not have understood the question during the deposition. (*Id.* at 8-9.) Interestingly, the Magistrate did not state that the *in camera* affidavit indicated to her that Rottlund's lawyers "roll[ed] up their sleeves" and "searched for or reviewed [Mr. Theis's] files/documents at the ground level" – the standard now being applied to Pinnacle's counsel. (*See* Order at 45.)

The Magistrate's suggestion that this executive did not understand the questions put to him is amazing, given the basic questions put to this litigation-savvy witness.

April 16, 2004 Theis Tr.
00187

Q. Okay. Mr. Theis, you understand that documents have been produced from Rottlund of Iowa to the defendants in litigation between Rottlund Homes, Incorporated and Pinnacle Town & Country and BSB; is that correct?

A. Yes.

Q. Were you involved in the collection of those documents for production to the defendants?

A. For Pinnacle?

Q. Were you involved in the collection of documents by Rottlund of Iowa to be produced to Pinnacle and Town & Country?

A. No, I was not.

Q. Do you know who was?

A. No, I don't.

Q. But you do know the documents have been collected and produced?

A. Yes.

Q. Did anyone ask you for documents?

A. No.

Q. Your current title at? You're currently employed by Rottlund?

A. Rottlund Homes, as division president of Rottlund Homes of Iowa.

Q. And as the division president of Rottlund Homes of Iowa, nobody asked you to look for any documents in the Oaks or Rogers litigation?
A. No, they haven't. Not to my knowledge. I mean, I do not remember.
Q. Let me be a little more specific. Has anybody asked you for any documents relating to the Oaks or Rogers litigation since last time you were deposed in this litigation?
A. No, they have not.
Q. Do you know of any other employees of the Iowa division of Rottlund were asked for documents?
A. No.

(Farmer Aff., Ex. E, April 16, 2004 Theis Tr. 187-89.)

The double standard applied in this case is obvious and wholly improper, particularly when the Magistrate dispenses meat-cleaver justice to Pinnacle and its counsel while treating Rottlund and its counsel with kid gloves. Pinnacle's counsel raised this double standard with the Magistrate during a recent hearing involving Rottlund's failure to produce documents. (Dkt. 405, Transcript from May 7, 2004 Hearing at 13-15.)

The double standard was also evident after the May 29, 2003 deposition of Rottlund's president, Todd Stutz. Mr. Stutz testified that six months earlier (which was the beginning of December 2002) he had reviewed certain responsive land development proposal documents, even though those materials were not produced to Pinnacle's counsel until well after Mr. Stutz testified to their existence. (Farmer Aff., Ex. F, Stutz Tr. May 29, 2003 at 188-90.) Most troubling was that on December 10, 2002, Mr. Stutz's *signed a sworn interrogatory answer* in which he stated that "Plaintiff incorporates its response to Interrogatory No. 16 herein and states that it does not retain files or documents, beyond what it has already produced to Defendants, concerning bids or development proposals for most significant land development projects in Minnesota which are not awarded to it." (Farmer Aff., Ex. G, Exhibit 148 to Stutz Deposition.) According to his own testimony, Mr. Stutz signed this sworn answer during the same time frame that he reviewed (and opted not to produce) these responsive land development proposal

documents. (Farmer Aff., Ex. F, Stutz Tr. 188-89.) Pinnacle received these document only after cross-examination in May 2003 revealed their existence. Either Mr. Stutz reviewed this file and then signed off on a sworn answer saying there were no such documents, or Mr. Stutz signed off on his sworn answer and reviewed the responsive documents shortly thereafter. In that case, he, having reviewed and signed the interrogatory answer, knew they should have been produced. Moreover, as he pointed out during his testimony, he again reviewed those same documents just two weeks before his May 2003 deposition. (*Id.*, Stutz Tr. at 189.) Again he (or his counsel) elected not to produce these documents.

None of this troubled the Magistrate, who *has* noted in her Order that *Pinnacle* has an absolute duty to supplement whenever relevant documents come to light. (Order at 48.) Moreover, Rottlund's counsel again obviously failed to meet the "roll up your sleeves and search at the ground level" test that the Magistrate applies to Pinnacle's current counsel, otherwise these documents would have been produced back in 2002, when they were requested.

The Magistrate's "roll up your sleeves and search at the ground level" standard was also not applied when it came to the requests made by Pinnacle's former counsel: "Pinnacle completely failed to disclose any of the above information to its outside counsel despite questions by outside counsel that should have induced a response revealing Sandelin's design/development involvement, Sandelin's trips to Minnesota that involved tours, pictures, and brochures of Rottlund's townhomes, and Sandelin's great big Minnesota file. The Fredrikson & Byron firm's failure is limited to failing to disclose the contents of [documents the firm actually had in its possession.]" (Order at 33-34.)

Though the Magistrate selectively disclosed contents of Mr. Farmer's *in camera* affidavit in her opinion (something she did not do with the Fredrikson & Byron affidavits, the contents of

which seemed to satisfy her, or the Winthrop & Weinstine affidavits, which seemed to satisfy her concerns with respect to Mr. Theis's failure to produce documents), she paid little heed to the portions of the affidavit that outlined the actual steps Mr. Farmer took to gather documents at Pinnacle. (Dkt. 332, Transcript from Jan. 28, 2004 Hearing at 84-85, 138-141.)

7. Pinnacle and Holland & Knight object to the erroneous and factually unsupported assertions the Order makes about Mr. Sandelin's September 2001 tour of the Liberty on the Lake development: "In addition, Pinnacle's 'entire executive team' toured *Rottlund townhomes* in Minnesota in September of 2001 because *one particular townhome* had a "*unique style of architecture.*" (Order at 32; emphasis supplied.) Mr. Sandelin in fact testified to no such thing. Mr. Sandelin testified that he and his colleagues, as part of a Minnesota product tour, toured a development called Liberty on the Lake. (Dkt. 331, at Ex. 36, Dec. 9, 2003 Sandelin Tr. at 27-28.) That development contained homes constructed by roughly six different builders. (*Id.*) Mr. Sandelin also testified that he did not know that David Bernard Builders, one of the six builders, was affiliated in any way with Rottlund. (*Id.* at 26-27.) Mr. Sandelin never testified that he toured a townhome in the Liberty on the Lake development – much less "one particular townhome" with a "unique style of architecture." There is *no* evidence in the record that Mr. Sandelin toured *any* townhomes at the Liberty on the Lake development. There is no evidence in the record that there are *any* townhomes at Liberty on the Lake.

Mr. Sandelin was questioned extensively about the David Bernard brochures -- Exhibits 291-92 -- that he picked up in September 2001. (Dkt. 331, at Ex. 25-26.) Those brochures are brochures for single family homes, not townhomes. (Dkt. 331, at Ex. 36, Dec. 9, 2003 Sandelin Tr. at 37.) Mr. Sandelin's comment that "this was a place to come see and we went and saw it just because of its presentation and the unique style of architecture" referred to the Liberty on the

Lake community – not to Rottlund product, not to David Bernard product, and – most emphatically – not to "one particular townhome [that] had a 'unique style of architecture.'" ((*Id.*, Dec. 9, 2003 Sandelin Tr. at 44-45.) The Order totally and distorts and misrepresents the deposition testimony. These assertions are clearly erroneous.

8. Pinnacle and Holland & Knight object to the Order's erroneous decision to ignore the undisputed fact that 3769 of 3843 pages from Mr. Sandelin's brochure file, which was produced in its entirety immediately after Mr. Sandelin's December 8, 2003 deposition session, consisted of documents that do not fall within the scope of *any* Rottlund discovery request. Inflating the importance of these documents, and therefore the nature of Pinnacle's conduct, the Order repeatedly refers to Mr. Sandelin's file as his "competitor brochure file." (Order at 44, 48) Indeed, one of the things the Order finds most troubling about counsel's efforts was that "Mr. Sandelin so freely and quickly identified the existence of his competitor brochure file when posed basic questions by Rottlund's counsel." (*Id.* at 48.) The Magistrate also noted: "Incredibly, Mr. Sandelin looked through his competitor brochure file while looking for the competition product survey . . . ." (*Id.* at 48 n.19.)

9. Pinnacle and Holland & Knight object to the Order's wholesale adoption of advocate's language throughout the invective-filled "opinion." Mr. Sandelin, for example, has *never* testified that he has a "competitor brochure file." Counsel for Pinnacle explained this to the Magistrate during the January 28, 2004 hearing. (Dkt. 332, Jan. 28, 2004 Hearing Tr. at 86-88.)

The Magistrate simply adopted the loaded language that Rottlund's counsel uses to describe the file and treats it as fact. The Magistrate's mischaracterization of Mr. Sandelin's brochure file is further proof that she crossed the line into advocacy. Her abandonment of

impartiality is underscored by her description of her own role in the discovery process, recently referring to some of Mr. Sandelin's documents as "the competitor brochures that *we've* been looking for." (*Id.*, Jan. 28, 2004 Hearing Tr. at 101 (emphasis supplied).)

Mr. Sandelin has never appeared before the Magistrate, but just a review of some of the Magistrate's most recent comments in open court demonstrates her lapse into advocacy. For example, the following exchange from oral argument on the sanctions motion involves a memo that Mr. Sandelin wrote to an architect at BSB. The Magistrate's characterizations of this brief memo are astounding, as are the inferences she drew without ever having seen Mr. Sandelin in her courtroom.

(Dkt. 338, Feb. 6, 2004 Hearing Tr. at 50-52 (emphasis supplied).)

MAGISTRATE NELSON: But he [Mr. Sandelin] forwards it *plenty worried about his liability*, doesn't he?

MR. MURDOCH: No, absolutely not, Your Honor.

MAGISTRATE NELSON: *We read that memo very differently.*

MR. MURDOCH: Those townhomes are obviously similar because they are both eight unit back-to-backs.

MAGISTRATE NELSON: *And do we have an agreement on this, how are we going to spin this, how are we going to handle this?*

MR. MURDOCH: He doesn't say, how are we going to spin this. He asks --

MAGISTRATE NELSON: *We can go back and read it. It's essentially what he says.*

MR. MURDOCH: I respectfully disagree, Your Honor. He does not say, and the extent to which he is worried doesn't effect the calculus of personal jurisdiction, Your Honor. He is, for the equivalent example, is if he is the billing partner in a law firm, has no knowledge of some underlying piece of litigation but all contacts with the client go through him. That's sort of the equivalent of what happened here. Somebody looked at this and said, this is an architect's issue, get it off to the architect. We can argue about what admissions are made in his cover letter but to say that the general counsel or other people at Pinnacle were aware of Mr. Sandalin's contacts with Minnesota, that evidence doesn't exist.

The Magistrate has abandoned any pretense of impartiality in this matter. She has concluded that Mr. Sandelin was "plenty worried about his liability" and wanted to "spin this" issue. More troubling, in another exchange with Pinnacle's counsel during oral argument on the sanctions hearing, the Magistrate again rewrote Mr. Sandelin's brief memo to support the pre-

determined outcome she wanted to reach. The Magistrate substituted Mr. Sandelin's own word choice -- "obviously similar," which is not a legal term -- for her own word choice – "substantially similar," which, as she knows, is the legal standard for infringement:

> MAGISTRATE NELSON: Four days after the letter is written, so maybe two days after Pinnacle receives it, that letter is in Mr. Sandalin's hands. Pinnacle knows he's a key player. And he sends a memo saying, *oh, my goodness, these designs look substantially similar* with regard to our Minnesota project. How are we going to respond to this? (Dkt. 332, Jan. 28, 2004 Hearing Tr. at 89-90 (emphasis supplied).)

The Magistrate is fully aware from other arguments in this case that designs can be "obviously similar" without infringing. *See, e.g., Mayotte & Assoc. v. MGC Building Co.*, No. 94-72157, 1995 U.S. Dist. LEXIS 19628, at *8, (E.D. Mich., Sept. 6, 1995) ("Moreover, despite the obvious similarities between Plaintiffs' and Defendants' plans, the Defendants have submitted affidavits citing many (more than 150) differences. . . . Many courts have held substantial similarity to be a question for the jury."); *Hoch v. MasterCard*, 284 F. Supp. 2d 1217, 1223 (D. Minn. 2003) ("Plaintiffs argue that these 'obvious similarities' preclude summary judgment. The Magistrate disagrees and concludes the similarities are nothing more than scenes a faire."). Sandelin did not use the term "substantially similar"; the Magistrate's purposeful substitution of this phrase is quite disturbing.

10. Pinnacle and Holland & Knight object to the Order's gratuitous conclusion that the comments of attorney Matthew Farmer of Holland & Knight on June 18, 2003, arguably warranted sanctions. Although the Order does not sanction Mr. Farmer for using the word "hell" in one of his questions, the Order's comments about the deposition excerpt – wholly devoid of context -- underscore Magistrate's effort to create a sanctionable pattern of conduct. First, the Order's reference to this deposition (in a footnote relating to intimidation, harassment, and embarrassment of witnesses) indicates that the event plays into the overall decision in this case.

Second, the Order's selective citation from Mr. Farmer's examination completely ignored the context of the deposition in which the exchange took place.

Mr. Farmer was deposing Rottlund's president, Todd Stutz. Several months earlier, Mr. Stutz had submitted a scathing sworn interrogatory accusing one of his former colleagues, Richard Palmiter, of usurping Rottlund corporate opportunities. (Farmer Aff., Ex. G, Dep. Ex. 148 from Stutz deposition.) (At the time of the deposition, Mr. Palmiter worked for TCM.) Mr. Palmiter attended the portion of the deposition at which Mr. Stutz's affidavit was discussed. With Mr. Palmiter seated across the table from him, Mr. Stutz backed off of nearly every allegation in his affidavit during the questioning by Mr. Farmer. (Farmer Aff., Ex. F, Stutz Tr. at 183- 211.)

Mr. Farmer's systematic questioning of Rottlund's president demonstrated that Mr. Stutz had no factual basis for most of the claims in his affidavit, and had done next to nothing to investigate those claims he contended he was still investigating. (*Id.*, Stutz Tr. at 183-211) Toward the end of that line of questioning, Mr. Farmer did use the word "hell" in one of his questions, but the word was not directed at the witness. Mr. Farmer used the word in a question to demonstrate that Mr. Stutz's feigned indignation about losing land opportunities to TCM was just that – feigned indignation. Moreover, neither Mr. Stutz nor his counsel could feign outrage over the use of the word "hell" in this context, particularly when Mr. Stutz stated, "Oh, shit," in response to a question on the record just minutes before. (*Id.*, Stutz Tr. at 156.) The witness was clearly not offended by Mr. Farmer's use of the word "hell," noting, "I can use those words, too." (*Id.*, Stutz Tr. at 210.) The witness, of course, had already demonstrated his ability to use language far worse.

Although Magistrate Judge Nelson was concerned about the use of the word "hell" in a deposition, she did not seem concerned about offending anyone's sensibilities when she injected the phrase "Good Lord" into her comments in open court on July 15, 2003. (Farmer Aff., Ex. H, July 15, 2003 Hearing Tr. at 56-57.)

11. Pinnacle and Holland & Knight object that the Magistrate has applied a double standard regarding conduct during depositions. For example, during the Rule 30(b)(6) deposition of Rottlund, Rottlund's counsel repeatedly instructed Rottlund's witnesses not to answer questions regarding Rottlund's copyright infringement suits. (*See*, *e.g.*, Dkt. 229, Ex. 1-3, Whitten Tr. at 52, 169-70, 223-24; Stutz Tr. 239-43; Kahn Tr. 165-66.)

> Whitten Tr. at 52
> Q. Have you ever given any deposition testimony before today?
>
> Mr. Krummen: I'm going to instruct you not to answer that question. Other lawsuits are deemed irrelevant per the March 24 order. The March 14 order.
>
> Mr. Farmer: Well I think we have a disagreement about the scope of the judge's order. The judge ruled upon a document request at that time.
>
> Whitten Tr. at 169-71
> Q. Have the Villa townhomes, by that I mean Original Villa, New Villa and Villa II, been at issue in any other Rottlund litigation other than this lawsuit and the Oaks case in Iowa?
>
> A. I believe that there are another – there was at least another case.
>
> Q. Where was that case pending?
>
> Mr. Krummen: Hang on a second.
>
> A. I don't know if I can recall.
>
> Mr. Krummen: I'll stand on page 12 of the court's order and instruct you not to get into prior litigation.
>
> Mr. Farmer: That's fine.

> Q. I'm getting into the Rottlund Villa product you designed, --
>
> A. Umm-hmm.
>
> Q. – and I just want to know where other than the federal court in Iowa and the federal court up here in Minnesota your design has been litigated.
>
> Mr. Krummen: I will instruct you not to answer that until the court clarifies, or changes, rather, its March 14 order at page 12.
>
> Mr. Farmer: Well I will state for the record that the court did not foreclose inquiry regarding litigation. The court denied a request for documents. It had nothing to do with deposition inquiry, but I'm not going to argue it here. We'll take it up with the court and we can bring you back to answer that.
>
> Mr. Krummen: If they don't let you get at it through the documents, Mr. Farmer, I don't know how you can get at it through oral testimony.
>
> Mr. Farmer: It's a different means of discovery, but I'm not going to argue that here, we'll take it up with the court.
>
> Whitten Tr. at 223-24
> Q. Are you aware of any other – Let me ask this. The Rottlund Oaks litigation in which you testified did not involve gestalt; did it, sir?
>
> Mr. Krummen: I would instruct you not to answer that question, it's already been ruled on by the court.

These instructions were not based upon attorney-client privilege; they were based solely upon a tortured reading of one of the Magistrate's Orders. Moreover, after issuing these improper instructions, Rottlund's counsel did not move promptly for a protective order, as it was required to do. *See*, *e.g.*, *Furniture World, Inc. v. D.A.V. Thrift Stores, Inc.*, 197 F.R.D. 61, 63 (D.N.M. 1996) (citing cases). Instead, it did nothing, fully aware that it would pay no price in the Magistrate's courtroom for its tactics. That tactic has continued (to date, successfully) through the April 2004 deposition of Rottlund's Mr. Theis.

Rottlund's counsel has not, however, limited its egregious deposition conduct to questions involving prior litigation. Instead, as the following excerpts from Mr. Whitten's deposition reveal, Rottlund's counsel blocked questions based on vagueness, relevance, and scope of notice.

> Whitten Tr. at 178
> Q. Let me ask the question again: Have you ever designed a sprinkler system?
> * * *
> Mr. Krummen: And I'll instruct you not to answer that as vague and ambiguous then.
>
> Whitten Tr. at 116-17
> Q. So are all two car garages substantially similar in size?
>
> * * *
> Mr. Krummen: You're asking about designs of an individual element so it's outside the relevancy, and I'll instruct you not to answer.
>
> Mr. Farmer: That's fine, and we will take this up with the court.
>
> Whitten Tr. at 134-35
> Q. And so, you know, as we sit here today you're not testifying that putting a kitchen next to a garage in 1986 for the Original Villa was your own creation; right?
>
> A. It was my creation in regards to the package of the Villas.
>
> Q. Right.
>
> A. But individually as one item, it probably had been done before.
>
> Q. Well it's not that it probably had been done before, --
>
> A. Okay.
>
> Q. – you were aware in 1986 that it had been done for decades; were you not?
>
> Mr. Krummen: Done for decades on what product?
>
> Q. On products in any marketplace.

> Mr. Krummen: Irrelevant. I'll instruct you not to answer. Individual design elements on different products is inconsistent with the court's order.
>
> Mr. Farmer: Would you mark that answer, please?
>
> Whitten Tr. at 43
> Q. Did AFI or you personally subscribe to any architectural publications?
>
> * * *
> Mr. Krummen: Don't answer that question, it's outside the scope.
>
> Whitten Tr. at 62.
> Q. When did you first meet Tim Johnson?
>
> A. At HRMA.
>
> Q. And what was his position at HRMA at the time that you met him.
>
> Mr. Krummen: I'm going to object to this as outside of the scope. If he isn't working on Rottlund projects there, Mr. Whitten, I will instruct you not to answer.
>
> Whitten Tr. at 150
> Q. Were you aware, Mr. Whitten, in December of 2002, that a copyright could not be assigned without a written transfer?
>
> Mr. Krummen: Same instruction. To the extent you had any awareness, if it came from your attorneys, I instruct you not to answer.
>
> Mr. Farmer: I'm not asking for any communication, I'm asking whether he was aware of that fact. It's an improper instruction.

(Id. at Ex. 1.)

These tactics were wholly inappropriate. Counsel may direct a witness not to answer a deposition question only under the following circumstances: (1) "when necessary to preserve a privilege," (2) "to enforce a limitation on evidence directed by the court," or (3) to protect a witness from an examination "being conducted in bad faith or in such a manner as unreasonably

to annoy, embarrass, or oppress the deponent or party." Fed. R. Civ. P. 30(d)(1)&(3). None of those reasons existed here. Pinnacle asked the Magistrate to reprimand Rottlund's counsel and order them to cease such tactics. Despite a lengthy hearing on the motion (July 15, 2003), the Court *never even questioned* Rottlund's counsel about the propriety of these instructions, much less reprimand the attorney for the conduct. Moreover, rather than issue a written (appealable) decision in which she might be forced to address such conduct, the Magistrate issued a minute order, with no notice to the parties, which was entirely cryptic. (Dkt. 257.)

12. Pinnacle and Holland & Knight object to having been given no ability and no meaningful way to see or challenge the amount of fees and costs claimed by Rottlund, both of which were submitted to the Magistrate via *in camera* affidavits. The bulk of the Magistrate's sanction involves Pinnacle's defense of this motion, even though the Magistrate declined to impose most of the sanctions for which she requested briefing and for which she entertained over seven hours of oral argument.

13. Pinnacle and Holland & Knight object to the Magistrate's conclusions regarding counsel's competence and level of preparation for hearings. (Order at 3, 4, 17, 24, 29, 37-41, 43-45, 47-48) The transcript of the hearing on the motion for sanctions illustrates a predisposition to criticize Pinnacle's counsel, even when faced with a record that does not bear out the Magistrate's statements. The Magistrate, for example, stated in open court that Mr. Farmer was unable to "answer a single question I asked [him] about the status of Rottlund – of Pinnacle discovery.

> THE COURT: Do you know that at two consecutive status conferences, one attended by Mr. Peterson who was very rude to the Magistrate, and one attended by Mr. Farmer, they couldn't answer a single question I asked them about the status of Rottlund – of Pinnacle discovery. They didn't know. I have explained over and over again that every time we have a status conference, somebody else appears for Pinnacle here. (Dkt. 332, Transcript from January 28, 2004 Hearing at 112-13.)

At the next hearing, Holland & Knight's counsel, Mr. Murdoch, did his best to disabuse the Magistrate of this notion, directing her to the record from the hearings in question:

> MR. MURDOCH: The last issue, Your Honor, I really need to resist the general idea that the attorneys for Holland & Knight have been unprepared or unresponsive during these court hearings, Your Honor. You said at the last hearing that there has been this general impression that we don't know the answers to certain questions and that when you ask us about discovery we don't know the answer.
>
> For example, at the hearing you said to me, you said, do you know that at two consecutive status conferences, one attended by Mr. Petersen, who was very rude to the Magistrate, and one attended by Mr. Farmer, they couldn't answer a single question I asked them about the status of Pinnacle discovery. They didn't know.
>
> Now, Mr. Farmer was very concerned about this and we went and we looked through the record, Your Honor. Mr. Petersen appeared before this Magistrate on June 18, just once. At the next hearing when Mr. Farmer was here it was July 15, Your Honor, and Mr. Farmer went through the transcript and he doesn't fail to answer a single question. He is literally Mr. Johnny-on-the-spot. So then he went back and looked at the hearing before that, which was on May 28 and, again, he doesn't find any pattern of not knowing the answer to specific questions.
>
> I think what happens here, Your Honor, is that we've had lengthy and involved and complicated status conferences and there are always housekeeping issues or issues that come up off the cuff or on the fly and we don't know the answers to all of those so we admit that we don't know the answers to them and we go back and we try to find the answers. We submit letters to the Magistrate, we submit affidavits to the Magistrate. It has happened to all of us.
>
> I can tell you that in the July 15 and in the May hearings, Mr. Krummen and Mr. Davenport say on several occasions that they don't know the answers to certain questions. They are not expected to know the answers to every single question. They are generally prepared, and I believe that Mr. Farmer and I have always strived to be generally prepared for these hearings, particularly with issues that are briefed and addressed to the Magistrate.
>
> In fact, at the December 18 hearing, Your Honor, the first status conference on this motion, you were kind enough to say to me, many times I had asked other counsel, not Mr. Murdoch, but other Pinnacle counsel, questions about discovery and I get an answer, I don't know Judge. I have felt for months that Pinnacle has not rolled up its sleeves and done its job.
>
> And you were also kind enough to say the same thing to Mr. Farmer at the November 21, 2003 status conference. At page 75, line 23, we have pending before me a motion to take a lawyer's deposition over this issue. Now Mr. Farmer I know you haven't been here, but I have not been satisfied with the responses I have gotten from Pinnacle's counsel who has appeared.
>
> This goes, Your Honor, to the specificity, the specific need for explicit findings of fact.
>
> * * * *
>
> Do you have any questions, Your Honor?
>
> MAGISTRATE NELSON: No, I don't.

(Dkt. 338, Transcript from February 6, 2004 Hearing at 68-73.)

The Magistrate never acknowledged that her potshots at Mr. Farmer's performance during the July 15 hearing were unwarranted and wholly unsupportable. Nor did she acknowledge that the only lawyers unable to answer her questions during that hearing were Rottlund's lawyers.

14. Pinnacle and Holland & Knight object that a disproportionate share of the Magistrate's sanctions relate largely to time spent briefing and arguing the sanctions motion, not to the discovery conduct that was actually at issue. (Order at 53-54.)

15. Pinnacle and Holland & Knight object that the sanctions award is erroneous because it bears no relation to the actual prejudice to Rottlund, which was minimal. Mr. Sandelin's brochure file was made available to Rottlund's counsel immediately after Mr. Sandelin disclosed its existence to everyone (including his own attorney) during the December 8, 2004 deposition. Mr. Sandelin was made available for the continuation of his deposition the next day. Pinnacle's counsel agreed to make Mr. Sandelin available for additional questioning after that session, if needed.

For the reasons stated above and the reasons stated in the accompanying memorandum of law, the sanctions order should be vacated.

Dated: July 15, 2004 Respectfully Submitted,

By: ___/s Christopher J. Murdoch____

Edward F. Ryan
Christopher J. Murdoch
Matthew I. Farmer
HOLLAND & KNIGHT LLP
131 South Dearborn Street, 30th Fl.
Chicago, IL 60603
Telephone: (312) 263-3600
Facsimile: (312) 578-6666

David Donna (#163624)
**DONNA & DALY**
1460 Buffet Way, Suite 150
Eagan, MN 55121
Telephone: (651) 406-4242
Facsimile: (651) 406-4243

ATTORNEYS FOR DEFENDANT
PINNACLE CORPORATION

# 2110175_v1