Exhibit R23.1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.d/b/a Rottlund Homes,
a Minnesota corporation, Plaintiff,
vs. Case No. 01-CV-1980Pinnacle Corpora
d/b/a Town & Country Homes,an Illinois Corporation, and
Town & Country Homes, Inc.,a Minnesota Corporation, and
Bloodgood Sharp BusterArchitects & Planners of Iowa,
Inc., an Iowa corporation, Defendants,
andTown & Country Homes, Inc.,
a Minnesota corporation, Third-Party Plaintiff,
vs.Bloodgood Sharp Buster
Architects & Planners of Iowa,Inc., an Iowa corporation,
Third-Party Defendant.- - - - - - - - - - - - - - - -

DEPOSITION OF TIMOTHY M. WHITTEN 30(b)(6) VOLUME

(The following is the 30(b)(6) deposition of TIMOTHY M. WHITTEN, taken pursuant to Notice of Taking Deposition, at the offices of Moore, Costello & Hart, 1400 Fifth Street Center, 55 East Fifth Street, in the city of St. Paul, state of Minnesota, commencing at approximately 8:12 o'clock a.m., May 28, 2003.)

meeting?
A. No.
Q. Who suggested -- Well let's back up again.
At this meeting did Mr. Bud Rotter suggest, as part of his vision, that the home in question be a back-to-back townhome?
A. I don't believe that to be the case. I think it came up through discussion.
Q. Who else was present during this discussion?
A. I believe it was just the two of us.
Q. Well is it fair to say that one of you suggested during that discussion that the product be a back-to-back townhome?
A. I would say that would be a fair statement.
Q. Which one of you made that suggestion?
A. I don't recall.
Q. And walking into that meeting that day you had never heard of a back-to-back townhome; correct?
A. I had not.
Q. And to your knowledge Mr. Bud Rotter had never built one; correct?
A. That is correct.
Q. And do you know whether that's accurate, that as of 1986 Rottlund had not built a back-to-back townhome?

A. I believe that to be accurate.
Q. At some point in time somebody decided that this was going to be a back-to-back product, this affordable villa product; correct?
A. Correct.
Q. When did that eureka moment occur?
A. Early in the discussion.
Q. In the discussion that day with Mr. Rotter?
A. I would believe that to be the case. I -- I can't recall whether we had a subsequent meeting and that meeting also could have generated that idea.
Q. During that meeting with Mr. Rotter, did he show you any drawings?
A. I don't believe so.
Q. Did you show him any drawings?
A. No.
Q. Did he show you any -- any documents whatsoever, marketing brochures, economic data, anything at all?
A. Not that I recall.
Q. It was just two men in a room talking.
A. Correct.
Q. But by the time that meeting ended and the two of you left that room, there had been a decision made that AFI was going to design a back-to-back villa for Rottlund; is that correct?

product?

A. In my conversations with my attorneys.

Q. Can you describe for me the gestalt of the Villa that you designed back in 1986?

A. Yes, it's the -- the way the building is combined with the fact that we did it in eights or in possibly a twelve-unit combination where we took the larger units to be on the corners of the buildings with two-car garages, with the interior units being smaller with single-car garages; with the fact that we did the roof structure from front to back to keep the cost down; the fact that we put the patios adjacent to the front entries; the fact that we arranged the rooms the way we had from the entries of the main level to the two story, we vaulted the space on the ends of the units a certain way; the way we placed the fireplaces at the ends of the buildings to give it a certain mass and look and a feel; the way I combined the two garages together in the center to be able to generate more of a two-car-garage look to lessen the feel that there were so many units in one particular building; the way I focused on the ends of the buildings to be able to break up the amount of mass so that we could shadow some of the patio spaces and -- and make that feel of the end-unit building

very comfortable so it was more of a four-sided architecture; the way we broke up the spaces on the interior of the kitchen in the rear of the unit, to how we arranged the stairs, to how we arranged the different rooms adjacent to each other. That's just a sampling of some of the of the things that I believe would be the gestalt of the total look and feel of the building as opposed to a single element.

Q. Well what you just identified for me were a -- a whole series of elements; correct?

A. Yes, and how they are combined together, yes.

Q. Now you're aware, sir, that Rottlund has referred to the project that you did for it in 1986 and '87 for purposes of this litigation as the Original Villa; is that accurate?

A. That is accurate.

Q. Do you know when Rottlund first built the Original Villa?

A. I believe it was in 1988 and it was summerfield in Brooklyn Park. Summerfield was the name of the project.

Q. Summerwood?

A. Summerwood.

Q. Do you know where else Rottlund built the Original Villa?

A. I would have to -- I'd have to reference something to some list of all of our projects to be able to tell you which ones were Originals and which ones are New. Even with that I would probably need some help.
Q. Do you know whether the Original Villa was built anywhere other than Minnesota?
A. I believe the Original Villa was built in Iowa as well.
Q. Do you know where in Iowa?
A. Again I'm going to go just by memory. It would be Ankeny, Iowa and possibly West Des Moines, and I think also in the City of Des Moines.
Q. Were some of these Original Villas eight-unit buildings?
A. Yes.
Q. Were some of them 12-unit buildings?
A. Yes.
Q. And none of them were 10-unit buildings; is that accurate?
A. That is not accurate. There probably were a couple of 10-unit buildings.
Q. Now you just described for me what you believed to be the gestalt of the Original Villa. Is the gestalt of an 8-unit Original Villa the same as the

gestalt of a 12-unit Original Villa?
A. Yes, only the fact that it's a longer building. The general gestalt would be the same.
Q. Is there something other than the general gestalt like a specific gestalt that you're referring to when you distinguish here?
A. I don't understand your question.
Q. You just --
You just referred to the "general gestalt."
MR. KRUMMEN: I'll object to the extent that he's asking for a legal conclusion. You may give your opinion if you understand the question.
Q. Let me try to make the question more clear. You said that the general gestalt of the 8- and 10- and 12-unit original Villas would be the same. Is there a -- a gestalt other than the general gestalt that you referred to?
A. No. I guess I could rephrase that as just the gestalt of the 8-unit building is the same as the 12.
Q. Now Mr. Whitten, you've also been designated as an expert in this lawsuit; correct?
A. Yes.
Q. And what is the scope of your expertise in this lawsuit?
A. I don't understand the question.

Q. Do you know whether Rottlund's undertaken any or contracted with anybody to undertake these studies?
A. Specific to Villas?
Q. Correct.
A. No. No, I do not know.
Q. What else did Mr. Stutz tell you about this new generation, next generation of Villas?
A. That's all that I recall.
Q. And so you sat down at this point -- Did you have a contract with Whitten and associates for this next project?
A. I'm pretty certain we did, but I don't recall exactly how it was structured.
Q. Do you know what -- where are the files and records of Whitten and associates today?
A. Well the -- any remnants of -- of -- that I had found in my search I had given to the attorneys --
Q. In 1991 or 1992 did you discuss copyright issues with Mr. Stutz before undertaking this project?
A. We had -- My understanding was with Rottlund that Rottlund would own the plans.
Q. What's the basis for your understanding in 1991 or 1992 that that would be the case?
A. We discussed it, as I remember, and there was also the understanding at Architectural Forum, and

that that would continue.
Q. When did that understanding at Architectural Forum -- Let me ask this.
Who reached that understanding at Architectural Forum?
A. Who reached the understanding at Architectural Forum who would own the plans?
Q. Sure.
A. The partnership.
Q. So you had a discussion with Mr. Mazzara and Mr. Buxley?
A. Buxell.
Q. Buxell, excuse me, regarding ownership of copyrights?
A. That would have been something we would have discussed as a partnership, yes.
Q. Did you have that discussion?
A. I can't recall sitting down in a particular meeting, but I believe that was the case, yes.
Q. At some point in time is it your testimony that AFI ceded its ownership in copyrights for designs it had done for Rottlund?
A. The word -- Using the word again, I'm sorry?
Q. Ceded.
A. "Ceded," I don't know what that means.

Q. Gave up.
A. They assigned over to The Rottlund Company the ownership of the plans, yes.
Q. When you say "they"?
A. AFI.
Q. And AFI, of which you were a partner; correct?
A. Yes.
Q. And which plans did AFI assign over to Rottlund?
A. The first Villas, or as we call it, the Original Villas.
Q. Were those the only plans that AFI assigned to Rottlund?
A. I don't recall.
Q. Do you recall who at Rottlund was involved in those negotiations with AFI at that time?
A. Bud Rotter.
Q. Do you recall how this issue arose?
A. I know that it was a general understanding, there was some discussion I know that Bud had with either myself or Jerry and Jack about that, and then I think that at some point it was basically -- a document was signed saying that that was the case.
Q. When you say there was a general understanding, who was the general understanding among?
A. The partners and Bud Rotter.

to, making revisions to the Original Villa?
A. Yeah, I consider it to be a -- the next generation of the Villa.
Q. Does the New Villa have a gestalt?
A. Yes.
Q. What is the gestalt of the New Villa?
A. The total look and feel, you would like me to describe all the pieces that --
Q. Well my client is being sued for infringing upon the gestalt of the Villa, and I'm trying to understand what that gestalt is.
MR. KRUMMEN: Of the Villa II.
MR. FARMER: Sure.
MR. KRUMMEN: Okay.
Q. But let's --
We're going to work to the Villa II. I'd right now like to know what the gestalt of the New Villa, the next generation of villa is.
A. Okay. Well it is the package of either an 8- or a 12-unit building, with two-car garages on the ends of the units, with a single-car garage paired up together in the interior, with a -- basic dimensions of 26-foot wide on the interior units and 32-foot wide on the ends of the buildings. They have a -- a sloped roof front to back with added some gables on

the dormers of the bedrooms up above, and then they have an assembly of units or a floor plan of spaces that go together, the entrance locations to the patio, exterior patio locations, to the window locations, to the fireplace locations, to how the spaces work on the upper level, how they open up onto the lower level, the location of the stairs. I would say that that's a -- kind of a preliminary description of what the gestalt would be for the -- the New Villas.

Q. Is the gestalt of the New Villa different than the gestalt of the Original Villa?

MR. KRUMMEN: Object to the extent that it calls for a legal conclusion. You may answer.

Q. I'm asking you as an architect and the gentleman who designed both of these units whether the gestalt of the New Villa differs or is the same as the gestalt of the Original Villa.

MR. KRUMMEN: Same objection. You may give your opinion.

A. Okay. There -- There's some similar parts of the gestalt of the Original Villas with the gestalt of the New Villas.

Q. And what are those?

A. Well I -- You want me to go through it again?

Q. Please. It's not "again." This is the first time you're going to provide me with the similarities.

A. Okay. I thought you were -- You want me to describe the similarities between the --

The last question was about the gestalt of the New Villas and --

Q. Let me stop.

A. Okay. I'm sorry.

Q. What I'd like --

What I'm trying to determine is whether the gestalt of the New Villa is the same as or different from the gestalt of the Original Villa.

A. They would be different.

Q. And why are they different?

A. There are elements of the New Villas that are different than the elements of the Original Villas.

Q. Is it fair to say that you cannot understand or discuss gestalt without -- the gestalt of a Villa without discussing the various elements that comprise that gestalt?

A. In order to -- to discuss the gestalt you would have to describe all the pieces and how they work together. That is, to my understanding, the definition of gestalt, the total look and feel of the

product.

Q. Okay. And so there are similarities -- Well let me stop here.

Is gestalt an all-or-nothing proposition? Is the gestalt either the same or not the same, or is there a gray area where the -- the gestalts are similar?

MR. KRUMMEN: Object to the extent it calls for a legal conclusion. You may give your opinion.

A. I think the gestalt is different. I would look at the gestalt of the new urban -- the New Villas, rather, different than the Original Villas.

Q. What makes the gestalt of the New Villa different from the gestalt of the Original Villa?

A. The elements that are different --

Q. So -- So is that -- is it the elements that are different that make the gestalt different?

A. No, the reason why I'm saying it that way is because I would have to repeat all the things that were of the Original Villas to describe the New and then add those items to it. I can certainly go back through and -- and do that, but I'm just saying that there are some differences between the New Villas and the Original Villas that would make this gestalt -- that gestalt different than the Original Villas.

Q. Okay. And now I'd like for you to tell me what those items are that differentiate --
A. Okay.
Q. -- the gestalt of the New Villa from the Original Villa.
A. Okay. That there is -- we have different gables, different dimensions on the floor plans, different materials on the exterior, different placements of the windows in some cases.
Q. Anything else?
A. There probably are other items, I can't think off the top of my head what they might be.
Q. Is there anything that would help refresh your recollection as to what those items are?
A. If I had two sets of plans in front of me.
Q. Okay. So different dimensions, that's one of the items you identified as making the gestalt of the two projects different; correct?
A. Well I don't know, as I -- as I kind of think through that, I mean I guess I would probably say -- I mean it's hard for me to say. I say the gestalt is similar to each other only with some differences. To say that -- I mean, it's all in -- in kind of the, you know, the two products, one's the next generation of the other, that they have similarities to each

other and there are just some differences, and how you describe that as gestalt and -- I guess it's a --
Q. I'm not describing it as gestalt.
A. Okay.
Q. I'm asking you.
A. Yeah, I think -- I think that they are closer to the same than they are different from each other.
Q. So you -- you're taking back the testimony you gave me just a couple minutes ago in which you said that the gestalt was different.
MR. KRUMMEN: That's not inconsistent.
A. You know, I think it's -- it's somewhat, because they're so close to each other, I think it's hard to describe.
Q. What's hard to describe?
A. The gestalt differences between the two. I would say that if somebody built our New Villas and we had the Original Villas, I would say that they're infringing on the gestalt of the Original Villas.
Q. And you say that having no training as a copyright lawyer; correct?
A. That's correct. In my opinion. I think you were asking for my opinion.
Q. I didn't mention the word "infringing," I was asking for --

A. Oh, I apologize.
Q. -- you to talk about the gestalt --
A. That's fair.
Q. -- of two products that you've designed.
A. That's fair.
Q. So just so we're clear now, it's your testimony that the gestalt of the New Villa is similar to the gestalt of the Original Villa?
A. I would say that's right.
Q. And so the testimony you gave earlier that the gestalt is different than the gestalt of the -- the gestalt of the New Villa is different than the gestalt of the Original Villa, do you wish to retract that testimony?
MR. KRUMMEN: He said it's more similar than different. There's no inconsistency, and I'm objecting to the question as argumentative.
Q. "QUESTION: What I'd like -- What I'm trying to determine is whether the gestalt of the New Villa is the same as or different from the gestalt of the Original Villa.
ANSWER: They would be different."
MR. KRUMMEN: Yeah. Listen to your question, "the same." He never testified they're the same, Mr. Farmer, so I'm objecting to your most

recent question as misstating his prior testimony.
MR. FARMER: Okay.
Q. So it's your testimony as we sit here today that the gestalt of the two are similar; correct?
A. Yes.
Q. And again the first time you've used the term "gestalt" in connection with any of the Villas you designed was just within the last several months; right?
A. Yeah, it's -- I've used the term total look and feel, but gestalt has been -- I've replaced that.
Q. And when did you first use the term "total look and feel" to describe one of the Villa products you designed?
A. Probably many times in my life.
Q. Now the Villa as an 8-unit building or a 10-unit building or a 12-unit building has its own gestalt; is that accurate?
A. No.
Q. What's not accurate about that?
A. To me they're the same gestalt, they just happen to be...
Q. Let me -- Let me ask the question.
A 12-unit Villa that you designed has its own gestalt; correct? I mean, just as -- as -- in the

abstract, has its own gestalt?

MR. KRUMMEN: Object to that one as vague and ambiguous.

A. Yeah, that's --

Q. Does every building you've designed have its own gestalt?

A. No.

Q. Why not?

A. They could be varia -- a Villa, which would have its own gestalt, may be a 8-unit building, it may be a 12-unit building. The only difference I see is the fact that it has more units added to it. The units are all --

Q. Okay. Let's focus on the 8-unit building. When we're referring to the gestalt of the 8-unit Original Villa we're referring to this entire 8-unit building, correct, for purposes of our discussion today?

A. I would take in the fact that it would include a 12-unit building and a 10-unit building as well.

Q. What I'm getting at, sir, is this: The 8-unit building as -- as a shell, including all eight units, has its own gestalt as a building; correct?

A. Yes.

Q. Does each of the units have its own gestalt?

A. I would say yes.

Q. And why is that?
A. That a particular unit, designed and assembled in a certain way with the window locations, the garage location in relationship to the kitchen, to the relationship to the patio, to how the stairs are located, to getting up into the upper floors and how it relates to the bedrooms and so forth, that individual unit would have its own gestalt, yes.
Q. And within each one of those units, would each individual room have its own gestalt? For example, a kitchen in one of your Original Villa units, would the kitchen have its own gestalt?
A. I guess I wouldn't consider that a -- Well, I don't know. I don't know quite how to answer that. I've seen a kitchen -- that a kitchen could be unique and somebody could -- you know, that it would be hard to create that.
Q. What does uniqueness have to do with my question?
A. Well gestalt I look at it as being something that is a total look and feel that's unique onto itself. That's how I would define gestalt.
Q. Okay. And so I guess let's get back to my question about the kitchen. Does the kitchen of one of the units of your Original Villas have its own

gestalt?
A. I would say yes.
Q. Now what about the -- the working triangle, are you familiar with that term within a kitchen?
A. Umm-hmm.
Q. Does the working --
Is that a "yes"?
A. Yes.
Q. Does the working triangle of the kitchen in one of your units of one of the Original Villas have its own gestalt?
A. I would say no.
Q. So each room within these units can have its own gestalt; is that accurate?
A. I would say yes.
Q. Let's focus for a minute on one of these rooms, on the kitchen in the Original Villa. What provides it with its own gestalt?
A. I'd say that the layout of the kitchen itself --
Q. Let's stop. What do you mean by "layout of the kitchen"?
A. The placement of the appliances, the countertop, the upper cabinets, to the heighth of the ceiling, the distance of the upper cabinets to the ceiling, whether or not the cabinets are of a certain style,

whether they have a certain hardware, whether they have a certain crown molding, whether it's a certain type of refrigerator, whether its a certain type of stove, whether it has a certain flooring, and how it enters in from different spaces around it, gets into that kitchen, what kind of sink it has, what kind of dishwasher it has, what kind of faucet it has, what kind of detailing it has around the -- the back splash and the back of the counter.

Q. So the gestalt of a particular kitchen will vary depending on what type of refrigerator it has; is that accurate?

A. I don't think that's what I was saying. I think it's the total look and feel of a kitchen, not just whether it has a refrigerator in it or not.

Q. Well if I want to determine whether the gestalt of a kitchen, of one kitchen is like that of another, those would be factors that I would look for, factors that you explained are part of the layout of that kitchen, and among those factors are the types of dishwashers, kitchens, crown molds, et cetera.

A. I'd saw the total description of the kitchen, not just an individual item, yes.

Q. And again we can't describe that kitchen in total without looking at its components; correct?

signing this document?
A. What it was that I was representing. I was representing the items that I felt that were individual items that collectively added together would create a comparison between the Homestead series and the Villas.
Q. Did you know you were being asked to verify the accuracy of interrogatory answers for a legal proceeding?
A. Yes.
Q. Now let's take a look at interrogatory number 6. Do you see that?
A. Yes.
Q. It says, "Identify and describe in detail each and every design element and/or feature of the town homes in the Illinois development project referenced in the Amended Complaint which Plaintiff claims is substantially similar to a design element and/or feature in the Technical Drawings...," and I'll stop there for the moment, the interrogatory goes on.
Now you answer, the answer that you verified the accuracy of here it says, "Plaintiff incorporates its answer to Interrogatory No. 5 herein." Do you see that?
A. Yes.

Q. Now if you look at the answer for interrogatory number 5 you'll see that it says it incorporates the answer to interrogatory number 3 herein; correct?
A. Yes.
Q. Now the answer to interrogatory number 3 contains, among other things, a listing of 65 features or elements that Rottlund contends are part of or help make up the gestalt of its Villa II home. Do you see that?
A. The list, yes.
Q. Did you put this list together?
A. I think I did it with our attorneys.
Q. Now to the extent the answer to interrogatory number 6, which asks for every feature that the Illinois development product -- project, which is one my client built, is -- those are features that are supposedly substantially similar to features in the Original Villa. I want to ask what you did to conclude that that was the case, and let's focus for a minute on r, the layout of the garage.
A. Okay.
Q. What steps did you take to determine that the garages built by my client in the Washington Square development were substantially similar to the layout of the Villa II's garage?

A. That the general size of the garage and its location in the building and its access into the -- into the unit and its -- the placements in regard to the overall building are the same.
Q. Now at what point does a garage -- does one garage -- Excuse me.
At what point does the size of one garage become substantially similar to the size of another garage?
A. If it's a two-car garage there's a general width and depth dimension that's very similar from one to the other.
Q. So are all two-car garages substantially similar in size?
MR. KRUMMEN: Object as outside the scope, page 24 of the March 14 order says designs and registrations covering individual elements are not relevant.
MR. FARMER: Correct, and I'm not asking for anything -- any registration of an individual element.
Q. You may answer the question.
MR. KRUMMEN: You're asking about designs of an individual element so it's outside the relevancy, and I'll instruct you not to answer.
MR. FARMER: That's fine, and we will take

this up with the court.
BY MR. FARMER:
Q. The gestalt, sir, as you've testified today, can only be understood by understanding the individual elements that comprise that gestalt; correct?
A. How they relate to each other in the totality, yes.
Q. Correct.
Did you determine what the layout of Pinnacle's garage was at Washington Square before you signed this interrogatory answer?
A. I have seen the plans from, I believe it's the Aurora project, or Aurora, Illinois.
Q. If -- What was the --
What are the dimensions of the Villa II's two-car garage?
A. I don't know exactly. Somewhere between -- It's right around 19 feet, and it's somewhere between twenty -- wide, and 20 to 22 foot deep.
Q. Now what about for the Original Villa, the two-car garage in the Original Villa?
A. Similar.
Q. Well you've kicked around the terms "substantially similar" and "similar" today. Were they substantially similar?

A. Between the Original Villa and the New Villa?
Q. The Original Villa and the Villa II, the two two-car garages.
A. Oh, I'm sorry, I misunderstood. I thought you were going from the Original Villas to the New Villas. So from New Villas to --
Q. Let's talk about the Original Villa that you designed --
A. Okay.
Q. -- in 1986 which had both one- and two-car garages; correct?
A. Okay. Fair enough.
Q. The dimensions of that -- of the two-car garage in that unit were what?
A. I -- Okay. I believe they were approximately 19 foot wide by 20 foot deep.
Q. And that's a standard set of measurements for a two-car garage; correct?
A. No.
Q. It's not.
A. It can vary from, you know, a little bit over 18 feet to 22 foot in width, and it can go from probably 22 -- or 20 foot in depth to about 22 foot in depth.
Q. Two-car garages have grown in size, have they not, since the SUV has become a popular vehicle?

A. Garages for attached townhomes have grown in size; is that your question? I'm sorry.
Q. Just two-car garages in general, new two-car garages.
A. I would say that -- that the demand for a little larger garage has increased.
Q. Now is the two-car garage that's in the Original Villa, again, and let's use your term, substantially similar to the two-car garage in the Villa II?
A. Yes.
Q. But they don't have identical dimensions; right?
A. No.
Q. At what point --
Well what would you have to do with the dimensions of the Villa II garage to make it not substantially similar to the Original Villa garage?
A. I would have to look at it as a package. I -- I wouldn't identify by just the sheer dimension.
Q. But dimensions are one of the features, or proportions, as you state here in this interrogatory answers, that you look at; correct?
A. I'd say general sizes and general proportions, yes.
Q. Okay. So you can't tell me that there's a range within which a builder is in jeopardy of infringing

upon the -- of building a garage whose dimensions contribute to being substantially similar to the gestalt of a Rottlund villa?

MR. KRUMMEN: Instruct you not to answer.

MR. FARMER: Let me back up. That was a bad question.

BY MR. FARMER:

Q. The dimensions of the Villa II garage are substantially similar, as you stated, to the dimensions of the Original Villa garage; right?

A. They're similar, yes.

Q. They're not substantially similar?

A. They're substantially similar.

Q. Which one is it?

A. Substantially similar.

Q. Okay. And why is that?

A. That as far as their relationship with the size of the unit --

Q. I'm just talking about the dimensions of the garage, the proportions.

A. Why are they?

Q. What makes them substantially similar?

MR. KRUMMEN: That's irrelevant per the court's March 14th order. If you want to ask him about how it fits into the gestalt I'll allow the

inquiry. If not, I'll stand on the order.
Q. Why -- Why is the gestalt of the Villa II garage substantially similar to the gestalt of the Original Villa garage?
A. Their general size and proportion, their relationship to the unit, their relationship to the building would be items, how they access into the unit.
Q. Could you build a Villa III, going forward here, and change the dimensions of that garage in such a way that they would not be substantially similar to the gestalt of the Villa II garage or the Original Villa garage?
A. Well that's a vague question. I mean a modest change in dimension, would that do it are you saying? No.
Q. I'm asking what -- what is the change in dimension that would do it?
A. If I put a four-car garage on there that prob -- that might affect -- I mean --
Q. Well, sir, you've testified that a room within one of your units can have its own gestalt; correct? We've established that.
A. Umm-hmm.
Q. And what I'm asking is: If you were to do a

Villa III garage, a new generation of Villa, and wanted to include in that a garage that did not have the same gestalt as the Villa II and the Original Villa garage, what could you do to the dimensions -- what would you need to do to the dimensions to alter the gestalt of that garage?
A. I would never take a dimension of a garage and include it in my discussion with gestalt. I mean that's just a -- a detail item that --
Q. What about the proportion of a garage, would you include that in your discussion of gestalt?
A. As an element.
Q. Okay. What would you have to do to the proportion of a garage to change the gestalt in your new Villa III that we're hypothetically speaking of here?
A. I don't think I can answer that.
Q. Why is that?
A. I think it's such a vague question that it just -- it's -- you're focusing on one element of one piece of one room and asking me to change that to change the gestalt.
Q. I'm focusing on item t here of interrogatory answer 3, which is -- is referenced in interrogatory 6, and what I'm trying to figure out, sir, is that

the extent that proportions of a garage have a bearing on the gestalt of your building of your unit.
A. A piece of it, yes.
Q. Correct. What would you need to do to that piece to cause it to have -- to change the gestalt of the building?
MR. KRUMMEN: Vague and ambiguous. You may answer if you understand the question.
A. I -- The way I can do it is if I look at one and to the other and determine whether or not they're -- they're similar. To sit there and say what did I do --
Q. I'm sorry, to determine whether or not they're what?
A. Different or similar.
Q. And again that's a determination you make based on no defined set of architectural standards; right?
A. Correct.
Q. And nothing you can point me to in terms of a manual or a text or a treatise; right?
A. That's correct.
Q. And you've had no special training that allows you to render such an opinion; correct?
A. Other than being a professional architect of residential design for over 20 years.

Q. Right. Well let's go back to this -- this point you made earlier that a room can have its own gestalt, and I want to just focus for the moment on this garage. To change the gestalt of a garage, presumably one of the ways you can do that is by changing its dimensions; correct?
A. I would have to look at it in total form. I couldn't say that changing a dimension one inch is going to change anything.
Q. Well let's do it this way, then. If a builder does not want to run afoul of Rottlund and build something that infringes upon its gestalt, wouldn't a builder need to look at individual elements?
A. I would say that if they designed it originally they'd be safe.
Q. Okay. But you can't make changes in the abstract to a building, can you, sir, as you sit here today as a licensed architect, you need to make changes to specific parts of a building; right?
MR. KRUMMEN: Object to the form of that question.
A. I don't understand.
Q. Well you talk about understanding gestalt as a whole and you don't want to focus on individual parts; correct? We get back to this -- this subject

of the garage, and when I ask, you've already said there can be a gestalt to a garage; right?
A. I don't think we ever went there. We talked about the kitchen.
Q. Let's talk about the kitchen. Let's talk about the powder room. Can a powder room have gestalt?
A. I think it can. I think -- We have actually taken a 10-by-12 bathroom and come up with, you know, tens and tens upon different designs for it. I think one particular bathroom could have a gestalt.
Q. Well does the Villa II powder room have its own gestalt?
A. I would look at the Villa II gestalt as a total package, not as an individual space.
Q. So is the ans --
So the Villa II powder room does not have its own gestalt?
A. I don't think I can form an opinion.
Q. I'm not asking you for an opinion, I'm asking you based on your statement earlier that rooms within your Villas can have their own gestalt, whether the powder room is one of those rooms. I mean, you've already testified that a kitchen --
MR. KRUMMEN: Can you read that back for me, please?

(Record read by the reporter.)

MR. KRUMMEN: I object as vague and ambiguous.

Q. Sir, you testified earlier, you recall, that a kitchen can have its own gestalt and you ran through a litany of features that helped make up that gestalt. Do you recall that testimony generally?

A. Umm-hmm.

THE REPORTER: Your answer, please?

Q. Is that a "yes"?

A. Yes.

THE WITNESS: I'm sorry. I'm trying not to answer that way. I apologize.

Q. I'm just turning to the room next to your kitchen in the Villa II which is the powder room. Does that powder room have its own gestalt?

A. Pressed to an answer, I would say yes.

Q. And what makes up that gestalt?

A. The fact that there could be numerous different bathroom designs available, that one particular one has its own identity.

Q. And what is it, that's what I'm trying to figure out. What is the gestalt of that powder room?

A. It's the size of the room, it's the placement of the fixtures, it's the items that are included. It

would be the flooring, it would be the -- the type -- whether they have double sinks, single sinks, whether you have a three-quarter shower or a full shower, whether you have a whirlpool tub, whether you have a standard tub, whether you have a bidet, whether it's a nine-foot ceiling, whether it's an eight-foot ceiling, whether you have two entrances into the bathroom, only one, if it's connected to a dressing room, not connected to a dressing room --

(Interruption by the reporter.)

THE WITNESS: I'm sorry, I apologize.

A. That's a short list.

Q. And I guess the question is: Referring to the Villa II, which we're getting to, but you designed as well, right, the Villa II?

A. Yes.

Q. What is the gestalt of that particular powder room? You just gave me a bunch options that may or may not exist, and I'm asking you to focus on a room you designed.

A. That has a number of bathroom arrangements in the options, I'd have to look at the set of plans.

Q. So the bathroom within the Villa II --

A. The standard -- I'm sorry, go ahead.

Q. -- can have a number of different gestalts; is

that accurate? The powder room within the Villa II, next to the kitchen?
A. Oh, the powder room.
Q. Correct. That's what we're talking about.
A. Oh, I'm sorry. I went into the bathroom, --
Q. Right.
A. -- I apologize.
Q. We've established that the powder room in the Villa II has its own gestalt. And my question is: What is that gestalt?
A. Well it would be the size and the location of that powder room, to the number of fixtures and what fixtures are in there, how you access that powder room, what -- what doorway, how it's placed, what kind of flooring you have in there, what kind of wall covering you have, how high is the ceiling, what kind of light fixtures you have in there, where are the switches, where is the exhaust fan.
Q. And again you -- so we're not talking in the abstract here, because what I'm getting from you are a list of potential features, and maybe the answer is you need the drawings to see what -- what the gestalt of the powder room in the Villa II is. It has those things in certain places; am I correct? It has fixtures in certain places, it has certain

proportions; does it not?
A. Yes.
Q. And that doesn't vary from building to building within the Villa II's? I mean it's not an option; is it?
A. No, I think it's a standard as I understand it. I could be mistaken, but I think --
Q. And could you explain to me what you believe that that gestalt of that particular room is?
MR. KRUMMEN: Asked and answered.
A. Yeah, I thought I just went through that. I'm sorry.
Q. So it's just the -- the various locations of various features and placements relating to each other?
A. I started with the proportion of the room, the placement of the room, the access to the adjacent rooms, to where the door is placed, to the fixtures that were in there, to the kind of flooring you would have, the kind of surface you would have, whether you have a pedestal sink, whether you have a vanity, whether there's a linen closet involved, whether it's an eight-foot ceiling, what kind of light switch you have, where the switches are located, where the bath fan might be.

Q. Now is there --
You referenced a set of materials earlier called architecture --
A. The book, the reference material?
Q. Right.
A. The architectural standards.
Q. Architectural standards features an entire section on powder rooms; does it not?
A. It has a section on what qualifies as a handicapped -- I haven't seen one in years, so -- We since have not referred to it. I'm trying to picture the page that it has. It has the kind of required dimension of the toilet from an outside wall to the center of the toilet. I think it's mostly focused on handicapped and what the laws are as far as distances, or it may have a standard distance from the front of the toilet to the back of the wall.
Q. How did you decide to put the powder room next to the kitchen in the Villa II?
A. The Villa II, I think we introduced the powder room in the New Villas and found that the buyers were -- were happy with that, and I placed it there because of the proximity to the plumbing and the fact that it was more of a private area. If you took a -- If somebody was a guest in your -- in your house,

that if they wanted to use the powder room they could go down a path and be kind of hidden as opposed to being directly off of the entry or the -- or the living room.

Q. The powder room in the Villa II doesn't have a window; does it?

A. No.

Q. Why not?

A. It's on an inside wall.

Q. Why did you decide not to put it on a windowed wall?

A. I chose to put windows for other spaces on the outside walls.

Q. Again, why?

A. Because I thought that the light and the window experience were more important for other rooms than a powder room.

Q. And what about the kitchen, the kitchen in the Villa II does not have windows either; does it?

A. No, it's a -- it has views to the patio door, which is part of the dining room so it's kind of an open-air setting as opposed to a window directly on the kitchen walls, so you're correct.

Q. And why again did you decide not to put windows in the kitchen?

A. I felt that the -- the window locations were more important for other rooms, and that the -- the kitchen would get that -- that light and feel indirectly and that would be enough for that kitchen.
Q. Now the dining room in the Villa II does have windows; correct?
A. It has a patio door.
Q. So it's got a view of the outside.
A. Yes, it does.
Q. And why did you decide that the patio door should be placed off of the dining room?
A. Basically because of the furniture arrangement, that was better, since you had to have access to the door, that it was more -- and the dining room was -- was lesser used of the spaces, that it's easier for people to get through there, plus the fact that if somebody wanted to ay eat out on the patio that it was a shorter distance from the kitchen to the patio, and then the furniture arrangement of the living room, it's easier to place the furniture without a patio door than with one.
Q. Now in the Original Villa the garage opened up into the kitchen; did it not?
A. Yeah, you open the door and you enter into the kitchen, correct.

Q. And that carried forth in the New Villa and the Villa II; right?
A. Yes.
Q. Now when you sat down to design the Original Villa in 1986, you were aware of all sorts of designs in which garages opened into kitchens; were you not?
A. I had designed, on occasion, concepts that had the garage opening out -- opening directly into the kitchen, yes.
Q. But you weren't aware that -- that it was just a common design solution that's been used by architects for decades?
MR. KRUMMEN: Object to the question as argumentative.
Q. You may answer.
THE WITNESS: I'm sorry, am I to answer?
MR. KRUMMEN: You may answer.
THE WITNESS: Okay.
A. I'd say that it was relatively common to have the garage open into a kitchen.
Q. And why is that?
A. Carrying groceries.
Q. And so, you know, as we sit here today you're not testifying that putting a kitchen next to a garage in 1986 for the Original Villa was your own

creation; right?
A. It was my creation in regards to the total package of the Villas.
Q. Right.
A. But individually as one item, it probably had been done before.
Q. Well it's not that it probably had been done before, --
A. Okay.
Q. -- you were aware in 1986 that it had been done for decades; were you not?
MR. KRUMMEN: Done for decades on what product?
Q. On products in any marketplace.
MR. KRUMMEN: Irrelevant. I'll instruct you not to answer. Individual design elements on different products is inconsistent with the court's order.
MR. FARMER: Would you mark that answer, please?
Q. This goes to the design process when you're designing Rottlund Homes, and my question, sir, is this, and if it draws another instruction, so be it. That when you designed the garage in the Original Villa adjacent to the kitchen, opening up into the

kitchen in 1986, you were fully aware that architects, designers had been designing garages that open up into kitchens for decades as a very common design solution; are you not?

MR. KRUMMEN: Vague and ambiguous as to product type. You may answer.

A. Okay. I would say that that was a solution. There are many solutions. Yes, it was a common solution, but there were many others.

Q. And it was a solution that you were aware of in 1986; right?

A. Yes.

MR. FARMER: Why don't we take a five-minute break and then we'll run up to the time of the court hearing.

MR. KRUMMEN: Actually I have to go back to our offices for that. We can take a break if you'd like to, but I'm going to need to leave at least fifteen minutes in advance, so a quarter of.

MR. FARMER: That's fine.

(Recess taken from 11:17 to 11:26 a.m.)

BY MR. FARMER:

Q. Mr. Whitten, what are the dimensions, as best you recall, of the Villa II powder room?

A. I don't recall. I'd probably have to see it.