Civil No. 01-1980 (DSD/SRN) – Rottlund / Pinnacle
Davenport Affidavit dated July 19, 2004

Exhibit R23.2

Approximately five by five.
Q. How many different places in that five-by-five space can you place a toilet?
A. Four walls, corners of the room, eight.
Q. Okay. And how many are practical for doing that? You -- First off, you believe that it's a square powder room?
A. I say I -- I don't know for sure, but I said that it could be approximately five by five.
Q. How did you decide, of those eight possible toilet placement sites, to place the toilet where you placed it in the Villa II powder room?
A. How did I make the decision?
Q. Right.
A. Depends on which way the door was coming in and from what room, and visually if you could see the toilet from one room to the other.
Q. So would you just rule out out of hand, as an architect, certain possible sites for that toilet because they just would not be good practical solutions? For example, putting it right across from a door?
A. I would have to look at the total plan to be able to determine that, but there are some locations that would be better than others --

Q. Right.
A. -- out of those eight.
Q. And which -- which ones would those be, in your estimation?
A. That I, me personally, would typically not put the toilet straight on from the door that's coming in, that I would put it in some other location.
Q. And again, you made a decision when you designed the Villa II as to where you were going to place it. How did you come up with that decision?
A. Of the toilet itself?
Q. Sure.
A. I just mentioned to you that it is that, and probably proximity to plumbing possibly, but I'd have to take a look at the plan as a whole to describe exactly what I was thinking at the time.
Q. Did you --
Did you rule out those five or six other options, or did you -- do you recall whether you went through and gave equal amount of consideration to each one?
A. No, I think in -- the one advantage of experience is that you start to learn what you should not do or would not work and then move on from there. So I'm sure I ruled out a number of them before I

placed the toilet in its ultimate location.
Q. And that's the type of experience that all competent professional architects with experience designing residences would have; right?
A. I would have a different way of saying that, because in my ex -- I think that's one advantage that I have. If somebody started designing right the first time they would make a lot of the mistakes and have to learn what doesn't work before they find out what does work.
Q. Umm-hmm.
A. And so I think that not anyone can do that. Somebody with a lot of experience can do that.
Q. So how do you find out what doesn't work?
A. Trial.
Q. So have you installed toilets in powder rooms, for example, that have just been disastrous locations?
A. No, you just learn what -- from the buyer's perspective in times that you did something earlier that you get feedback, or just from experimenting with different locations from my own imagery of what the buyers would see and look and how they would like one design better than another.
Q. Did you grow up in the Twin Cities area?

twelve months after I joined the company.
Q. And you had known Tim Johnson already from your prior firm, HRMA; correct?
A. Correct.
Q. Did you recruit Tim Johnson to come join you?
A. I did.
Q. Why is that?
A. Because the amount of work that I saw forthcoming, it made sense to -- to bring in some help.
Q. Why Tim Johnson?
A. I was impressed with his skills and thought it was appropriate.
Q. How long had you two worked together before he joined Rottlund?
A. It was sporadic, so I couldn't -- if you want a length of time where we directly worked together I would probably have to guess somewhere around a year.
Q. And what was Tim's title when he joined Rottlund?
A. I'm only going to have to guess. I think project architect maybe.
Q. What work did Tim do on the Villa II project?
A. He did -- worked on the design development portion of the project.

A. Right, but I think that there was some, if I recall, that we were doing architectural works and that I know that there were some corrective forms being done to address the issue of whether -- what really defines derivative work and what does not, and I know that some efforts were made in that regard.

Q. Now you added a master bath suite, gabled roofs to the New Villa, right, from the Original Villa?

A. Correct.

Q. And did that substantially change the gestalt of that building from the Original Villa?

A. No, it did not.

Q. Adding a master bath suite wouldn't do it?

A. No.

Q. And adding gabled roofs wouldn't do it?

A. No.

Q. And what's the basis for that conclusion?

A. A vast majority of the building was the same.

Q. Now when you built the Villa II you added access from the master bedroom to a common bath; correct? Gabled side entry to exterior units?

A. Correct.

Q. An upper-level loft; correct?

A. Correct.

Q. And those changes weren't enough to alter or

change the gestalt of the Villa II from the New Villa; correct?

A. I would say they were -- they were more similar than not.

Q. So it changed the gestalt, but just a bit.

A. It was a similar gestalt.

Q. And if it's similar it's not identical; right?

A. It's not identical.

Q. Okay. So it has changed. It can't be identical because it's changed and it's now just similar; right?

A. Correct.

Q. And so is it fair to say, Mr. Whitten, that the gestalt of the Original Villa is similar to the gestalt of the New Villa?

A. Yes.

Q. And the gestalt of the New Villa is similar to the gestalt of the Villa II?

A. I'd say they're less similar but similar.

Q. And the gestalt of the Villa II is similar to the Original Villa?

A. They're the next generation of it so they would have some similarities.

Q. And inherently they'd have some differences as well; correct?

A. Correct.
Q. Can you tell me, sir, I want to just direct your attention to page RCI 3050, 3052.
A. Why am I not seeing 52?
Q. It's the back pages of --
A. Oh, I'm sorry.
Q. The last two pages.
A. Okay.
Q. There's reference to e-mails received from Vicki Handler of Winthrop & Weinstine in October of 2002. Have you ever seen those e-mails?
A. I have not. I don't believe so.
Q. Do you know what the substance of those e-mails was?
A. No.
MR. FARMER: Subject to the questions that were -- that drew instructions not to answer, I have no further questions at this time.
(Exhibits 140 - 141 marked for identification.)

EXAMINATION

BY MR. SCHWIEBERT:
Q. Mr. Whitten, my name is Darren Schwiebert and I represent Town & Country Homes, Inc. We've actually met before; right?

A. I do.
Q. And the answer is you -- "Plaintiff incorporates its answer to Interrogatory No. 3 herein..."
MR. KRUMMEN: I just want to lodge a standing objection. I believe Mr. Farmer covered this document in the current topic, so to the extent there is an objection, it is asked and answered. You may answer.
MR. FARMER: Let me state I did not cover it regarding the Minnesota townhomes.
MR. KRUMMEN: Fair enough.
A. You're -- I'm sorry. If I get interrupted I lose track of the question, so please repeat it.
Q. The answer is: "Plaintiff incorporates its answer to Interrogatory No. 3..." I just want to make sure we get to the right part. 5 says identify in detail each and every design element or feature --
A. Okay.
Q. -- of the townhomes in each Minnesota development that plaintiff claims is substantially similar to a design element or feature in the technical drawings, and the answer is, see interrogatory answer number 3 herein; right?
A. Fair enough. Yes.
Q. Okay. And then if we go to answer to

interrogatory number 3 presumably we're going to find the answer to the description in detail of each and every design element or feature in the townhomes in Minnesota development projects that plaintiff claims is substantially similar. Correct?
A. Yes.
Q. Have I got the document working the right direction?
A. I believe so.
Q. Okay. And in the answer to interrogatory number 3 there are a. through triple m. list of a combination or gestalt of design elements and/or features; is that correct?
A. Correct.
Q. What analysis did you do to verify the accuracy of each of the items from a. through triple m.?
A. I reviewed the plans.
Q. Okay. Did you review the --
Is this the same review that you did in conjunction with the production of Exhibit 150?
A. Yes. Well -- Let me think about that for a minute. They were at similar times.
Q. Okay. Sir, my question was: You reviewed -- Did you review Exhibits 5 and 104 to verify the accuracy of all of the items from a. to triple m.?

A. I did use Exhibits 104 and 5 to create this list, and its accuracy --
Q. So you generated this list.
A. Myself and the attorney, yes.
Q. Okay. When did you perform that analysis?
A. I can't recall the exact date.
Q. Okay. You signed this on December 10th of 2002; is that correct?
A. That is correct.
Q. So it had to have been before then.
A. Yes.
Q. Did you use all of the tools that you previously testified in producing the list of elements a. through triple m.?
A. "All of the tools." I used tools in my offi -- you mean like the --
Q. Scale, --
A. -- scale and so forth?
Q. -- triangle, a transparency, a pencil?
A. Sure, yes.
Q. You used all of those tools to produce a. through triple m.
A. I used tools. I don't know if all the tools is --
Q. Well sir, you testified that all of those tools

would be necessary in order for you to perform the analysis. When you performed the analysis prior to December 10th of 2002 did you use all of those tools?
A. I did use those tools.
Q. Okay. Let's start with -- oh, let's pick a fun one -- with double q., proportions of the powder room.
A. Okay.
Q. Please identify what it is in Exhibit 5 that Rottlund contends is substantially similar in the proportions of the powder room to Exhibit 104.
A. Okay, I'm ready. I need to answer?
Q. Yes.
A. Okay. The powder rooms appear to be in the general si -- same general size, proportions, dimension and length. Width and length.
MS. NEWMAN: Mr. Whitten, what page on Exhibit 105 are you referring to, please? Or Exhibit 5, I'm sorry, so I can follow along?
THE WITNESS: Oh, the this-and-that theory again? I'm sorry.
MS. NEWMAN: No, just I'm asking just so I can follow along. What page are you referring to?
THE WITNESS: Oh, I'm sorry. On Exhibit 104 I'm on page A5, and on Exhibit 5 I have -- it

seems like there's something...

A. I apologize. What I'm searching -- Why I am not seeing the end unit as opposed to I'm just seeing the interior unit on this exhibit that you handed me of 5. It seems like it's incomplete. That is a interior unit, that's an interior unit, that's an interior unit, that is an interior unit.

Yeah, I believe that this document is incomplete. I see the upper level of the end unit but not the floor plan, so I -- the two floor plans are virtually identical but it still would not be fair for me to compare, so... I'm missing it.

MR. KRUMMEN: Mr. Schwiebert, I think that the copy given to the witness is missing BSB 02606. I know that my copy of Exhibit 5 has 2606, the witness' does not.

MR. SCHWIEBERT: Hmm. I apologize.

(Discussion off the record.)

[A replacement copy was made.]

BY MR. SCHWIEBERT:

Q. Mr. Whitten, we were comparing page A5 of Exhibit 104, which was D 00006, and I believe the answer is going to be the page of the Exhibit 5 that you compared was BSB 02606; is that correct?

A. That's correct.

Q. What are the proportions of the powder room in Exhibit 104?
A. The proportion would be the size of the room, and I believe that the powder room in the BSB exhibit 2606 is very similar in proportion to Exhibit A5 from document 104.
Q. Sir, my question is: What are the proportions of the powder room in Exhibit 104?
A. That it is probably approximately two-and-a-half times longer than it is wider.
Q. There are actually dimensions for the powder room?
A. I don't know if I can read them, the print's pretty small. I would only speculate. It looks like from out -- Well that's not even center wall to center wall, it looks like it might say eight foot four. It then looks like it says -- That's from outside of wall garage to the center wall of the other end of the bath, or the powder room, so if we were to do the inside dimension that would probably be six and two, eight, it'd probably be seven foot eight on the inside dimension. And then it looks like it's three foot ten and seven eighths from the out -- from the center wall of the unit to -- oh, yeah, to the center wall, so you take out -- five, is

seven inches from that so it's probably three foot three inside dimension and seven foot eight on the length, so that's why I'm speculating that it's about two-and-a-half times longer than it is wider.
Q. And sir, you looked at that proportion prior to signing Exhibit --
A. I did not -- I don't recall comparing exact dimensions. I probably used my scale at the time and measured them to give me an approximate. When I look at the proportions that if the length or the width are generally the same then I would say the proportions are generally the same.
Q. They're generally the same?
A. Yes.
Q. Does "generally the same" mean the same as "substantially similar" to you, sir?
A. Yes.
Q. So any time, in your opinion, the proportions of two structures are generally the same they are substantially similar?
A. In this particular case it would be substantially similar.
Q. What are the proportions of the powder room in the Centennial Crossing Homestead Collection?
A. It appears to be about two-and-a-half times --

the length is two-and-a-half times greater than the width.

Q. Sir, do you know the specific dimensions of the powder room in that --

A. You know I don't see where I could -- I don't see the dimensions. If somebody could help me? I don't see the exact dimensions on the plans.

Q. Sir, if it's three-and-a-half times longer than --

A. Two and a half, I'm sorry.

Q. I know. My question is: If it's three and a half times --

A. Oh, I apologize.

Q. -- longer, is it not substantially similar?

A. I don't know if I would conclude that.

Q. If it's four times longer than it is wide is that not substantially similar in the proportion --

A. I'm not sure.

Q. -- of the powder room?

A. I really would like to see the rooms that we're comparing before I would determine whether one was proportionally the same as the other.

Q. But sir, you're asserting that the -- Rottlund is asserting that the architectural design drawings of Exhibit 5 are substantially similar to the

architectural design drawings that were deposited
with the copyright at issue, right, VAu 447-395; is
that correct?
A. Yes.
Q. Okay. So you don't need to see the rooms in
order to make that analysis; do you, sir?
A. That they're substantially similar?
Q. That the proportions of the powder room are
substantially similar in the architectural drawings.
A. I don't need to see the rooms to determine
whether their proportions are the same, is that what
you just said?
Q. Right. You have the architectural drawings for
both; correct?
A. Oh, I see, the physical rooms. Be standing in
the rooms. No, I can tell by the drawings that the
proportions are substantially similar.
Q. And how is it you know that?
A. By looking at the plans.
Q. And you have the plans in front of you.
A. I do.
Q. And you had the plans in front of you before you
signed this on December 10th of 2002.
A. Yes.
Q. Are there any other elements of the proportion

of the powder rooms in Exhibit 5 and Exhibit 104 that
are substantially similar?
A. Any other -- I'm sorry, you're confusing me.
Maybe we have a different terminology.
Any other proportions in the powder rooms of the
two plans that we're comparing that are substantially
-- any other than --
Q. Let me try and rephrase it. I think you're
right, I was confusing it. Your tes --
What is it about the proportions of the powder
rooms that you allege are substantially similar?
A. That the width of the powder room in comparison
to the length of the powder rooms in the two plans
are almost identical, and that the dimensions are
approximately the same. That, to me, would be enough
to support that the proportions were substantially
similar.
Q. Sir, how much would the proportions have to
change to no longer be substantially similar?
A. That's an abstract question I don't think I can
answer. I'd have to see -- You're asking me to
compare the two together, that's how I would compare
and make -- determine -- a determination whether
they're substantially similar or not.
Q. But sir, if you can't imagine any room that

doesn't have proportions that are not substantially similar then everything's going to be substantially similar; right?
A. No, I'm saying that I need --
Q. At some point it's no longer substantially similar; is that correct?
A. At some point plans are not substantially similar, that is correct.
Q. At some point the proportions to powder rooms are no longer substantially similar.
A. I would agree.
Q. At what point are they no longer substantially similar?
A. I would have to see the plans to be able to determine that. I would have to compare the plans.
Q. There's no ratio, percentage, any other basis upon which you could say at some point it is no longer substantially similar other than you, in your opinion, physically sitting and looking at the two plans.
A. That's the only fair way I could make that judgment.
Q. Sir, what's the --
Is it Rottlund's position that the proportion of two and a half -- the length being two and a half

times the width of a powder room is something that Rottlund created?
A. No, I'd say that the proportions -- those proportions are in the plans that are being compared.
Q. I understand that testimony, sir.
Is it Rottlund's position that those proportions are original?
A. Not necessarily.
Q. Are they original to Rottlund?
A. "Original to Rottlund." Meaning have we put them in plans before this plan?
Q. Had anybody ever come up with a proportion of a powder room that's two and a half times its width?
A. I would suspect that somebody may have in time come up with those proportions, yes.
Q. As a matter of fact it's almost a certainty; right?
A. I would say yes.
Q. What is it about the proportions of the powder room that Rottlund alleges is original?
A. In the context of --
MR. KRUMMEN: Let me --
THE WITNESS: Oh, fair enough.
MR. KRUMMEN: -- back up. The objection is I'm not certain that there's facts in the record that

say Rottlund alleged that that was original. You may answer. So I guess the objection is assuming facts not entered into the record.

Q. Is your answer still "fair enough"?

A. Go back to the question, please.

Q. What is it about the proportion of the powder room that Rottlund alleges is original?

MR. KRUMMEN: Lack of foundation. You may answer.

A. Let me understand that in the -- in the category that we're in, number 3, is it stating that Rottlund is saying that all of these elements are original? It looks like that we're saying that it's derive -- that they're substantially the same, and I think that was the challenge was to determine if the proportions of the powder room were substantially the same, and I believe that I've made that statement.

Q. Sir, you've determined that the proportions of the powder room in the Rottlund plans were two and a half to one; is that correct?

A. That's just an estimate from visual, yes.

Q. If the proportions of the powder room in the back-to-back townhome were three to one, would the proportions be substantially similar?

A. I don't know that. I'd have to look at the two

plans and put them side by side.
Q. If it had exactly the same width but it was a half a percent longer, would they be substantially similar?
A. I would agree to that.
Q. So if it's three feet wide and it's seven and a half feet long, that's two and a half to one; is that correct?
A. I'd have to do my math.
Q. Three times two-and-a-half is seven-and-a half, I think.
A. That's three ti -- I said it's two and a half times. That was just a guess, that it was -- that it was three foot something and seven foot something, so I was just guessing that it was about two and a half times.
Q. If it was two feet longer but had the same width, would it be -- would the proportions be substantially the same?
A. I'd need to compare the two rooms together.
Q. Why do you need to look at the drawings to determine whether or not that would be substantially similar in your analysis? Why the proportions would be substantially similar?
A. Because it's really -- it's a visual thing as

well as a dimensional thing. You look at it and you go there's only a certain number of ways that bathrooms can be arranged, and if a bathroom is arranged in such a way that the two fixtures are across from each other, you enter in from the side, I believe that if it was more than two-and-a-half times it could still be a substantially similar proportion, but I can't tell you exactly how much you keep moving that bar out, of exactly at what point does it not become the proportion is substantially similar. That's like asking somebody if they're tall or short and giving me quarter-inch increments and saying that at what point do they become tall and at what point do they become short.

Q. But sir, in your opinion there is some point at which the proportions of the powder rooms are substantially similar; is that correct?

A. Yes.

Q. And that's simply a ratio of width to length in your analysis.

A. Not simply. I told you, it's -- I looked at it and it's a visual and it's also a dimensional, and it's also professional opinion. You look at it and if somebody asks in your professional opinion is the proportions of this room similar to the proportions

of this room, substantially similar, in this case I said yes.
Q. But the proportions are just the mathematical ratio of the length to the width; is that correct?
A. Not necessarily.
Q. Okay. What else goes into the proportions of a room?
A. It would be the general area of which the room is confined in. So, you know, the proportion of the length and the width and the height and just the general size of the room would be, I would consider, the proportion, as opposed to one dimension or two dimensions.
Q. Okay. So there's a ratio of the height to the width to the length of the room, and that's the proportions of the room?
A. I'd say that would be fair, yes.
Q. Okay. And that again is simply a ratio between three sides; is that correct?
A. Yes.
Q. And you're comparing that ratio of three sides to the ratio of three sides for another room in order to determine they're substantially similar; is that correct?
A. Yes.

Q. If that's true, why is it you need to see the fixtures to figure out if they're substantially similar in proportions of the powder room?
A. Because I look at it and say it's the proportions and it's the total package as well, so you look at both, but...
Q. Okay. But you have a separate element for layout and you have a separate element for placement.
A. And that's -- that's fair. I mean, you're right. That if focusing just on proportions it would not include any -- anything to do with the fixtures, it's just that it's partly you look at the whole picture as you're analyzing a portion of just proportion, or just layout, or whatever, you do look at the overall.
Q. Let's just look at proportions.
A. Fair enough.
Q. In your opinion, at some point are the portions -- proportions sufficiently different that they are not substantially similar between two powder rooms?
A. Yes.
Q. Okay. At what point, in your opinion, are the proportions no longer substantially similar?
A. I can't answer that.
Q. If all three dimensions were different could

they still be substantially similar?
A. Yes.
Q. If all three were different by five feet could they be substantially similar?
A. If they were all enlarged by a similar percentage you could still consider that substantially similar.
Q. Okay. If one of them was enlarged by five feet but the other two were left the same, could that still be substantially similar?
A. Again I would have to see it. You're just describing numbers, and I can't answer that.
Q. Prior to signing this interrogatory answer in December 2002 did you calculate the exact proportions of the Town & Country townhome for the -- I'm sorry, the proportions of the powder room?
A. I did look at the powder rooms and I did use my scale to measure it, and between those two I believe I had enough sufficient information to determine that they were substantially similar.
Q. Did you calculate the exact proportions of those rooms, of Town & Country's powder room?
A. "The exact proportion." Because proportion is abstract. Are you --
Q. It's a ratio of three numbers; isn't that

of back-to-back townhomes?

A. It was an original idea and it had never been done in Minnesota. Again I'll answer that if it had been done in another part of the country and I wasn't aware of it, then how can I answer that question?

MR. KRUMMEN: Darren, whenever you have a logical break point maybe we could take a five-minute break?

MR. SCHWIEBERT: That's fine.

(Recess taken from 4:18 to 4:33 p.m.)

BY MR. SCHWIEBERT:

Q. Mr. Whitten, you testified early this afternoon about the tools that you would need to accurately determine the proportion of the garage in Exhibit 5 and Exhibit 104 and your conclusion that those proportions are substantially similar. Is that correct?

A. Yes.

Q. And those tools were a scale, a triangle, some pencils, transparencies and full-size documents. Do I have all the tools?

A. I would say to review that specific item that would work, yes.

Q. Okay. Let's see if we got it.

A. I'm impressed.

Q. That's a scale?
A. It is a scale.
Q. A triangle?
A. And that's a triangle.
Q. And transparencies?
A. The problem is it's not a 45-degree triangle. I'm kidding.
(Laughter.)
Q. You'll get an isosceles triangle.
Transparencies?
A. Yes.
Q. Pencils.
A. All right.
Q. All right. And full-size drawings.
And you already did this once before; is that correct?
A. Yes.
Q. All right. And you said you believe that when you did it you actually made notations on the full-size drawings; is that correct?
A. That's possible, yes.
Q. Do you know if you still have the copy that has your notations on them?
A. Not that I recall.
Q. If you wanted to find it, how would you go about

it?
A. I'd search my office.
Q. Have you --
Could you search your office for that, sir?
A. I would certainly be happy to, yes.
Q. And you'd let us know if you had that?
A. I would.
Q. Okay. Let's start with --
And I'm going to ask you not to actually draw on this one.
A. Okay.
Q. And the reason why is it is the ribbon-sealed version from the copyright office.
MR. SCHWIEBERT: Thank you for moving the coffee. I've already done that once.
Q. And I realize I had you move everything out of the way, but I just want to make sure that Exhibit -- that what I've handed you is Exhibit 104 that we were talking about before.
MS. NEWMAN: Just so the record is clear, that is the registration that was received from the copyright office for the architectural work so it does include those photographs that you had testified about earlier.
THE WITNESS: Okay.

MS. NEWMAN: So it won't be identical to Exhibit 104. The drawings will be, but I'm not -- it has some additional documents, just so our record is clear as to what it is that you're looking at, but I also don't want to lose my original set. So to the extent we can all agree that if this is marked that I retain the original, that would be fine. To the extent we can agree that this won't be marked, that's great too.

THE WITNESS: And just so people know that a good thing to do with these plans is to roll them in the opposite direction. One thing is that it shows the label of the plans on the outside, and the other thing is it's much easier to work with so they don't curl up on you. Just something that I learned over time.

Q. Appreciate the tip.

A. Now I'm going to go to -- Oh, I'm sorry. I've got to go back a couple pages. A5. Okay.

And would it be okay if I write notes on this sheet of paper as I go through it?

Q. That'd be perfect.

A. All right. And the scale is here.

Q. And just so the record's clear, you're looking at page A5?

A. A5, yes, of exhibit or similar to Exhibit 104; right?

MS. NEWMAN: (Nodding.)

THE WITNESS: That work?

A. Okay. Then the -- I would need that exhibit as well [indicating].

Q. Okay. Why don't we walk through it a piece at a time.

A. Okay.

Q. You determined the dimensions of the Rottlund garage; is that correct?

A. I've measured the inside dimension per scale of the Rottlund garage, --

Q. Okay.

A. -- yes.

Q. And those dimensions are 17 and 18, if I can read your handwriting upside down?

A. 17 by 18 three.

Q. By 18 three.

A. Yes.

Q. Okay. And that's not actually -- Is that 17 feet by 18 feet three, or that is the scaled numbers?

A. No, that's actually would relate to the feet. So that would be 17 feet in the inside -- in full-size drawing to 18 foot three.

Q. Is it possible to determine the third dimension?
A. The height?
Q. Yeah.
A. Ceiling height? That you have a section in the building that would reflect a section through the A -- you see 1 over A6, we'd cut a section through here and from that I would scale the ceiling height of the garage as well.
Q. So can you determine what the ceiling height is?
A. You can on the -- typically we reference the ceiling height on the plans. And so you'd have a nine-foot ceiling. And the garage is a step down and yet the floor would be the same for the upper floor, so there's going to be a modest dimension change so I would rather refer to the section and get a more accurate dimension than to try to work down from there.
Q. And by "the section" you mean another section of this set of drawings.
A. Yes.
Q. Okay.
A. And this 1/A6, for example, that I referenced is detail 1 on page A6, so I would just go to the next page.
Q. And did you do this analysis of determining the

height of the garage prior to December 10th of 2002?
A. I believe that's what I would do, yes.
Q. Okay.
A. It all seems familiar now. The garage does slope and so I would just take one dimension, and all garage floors do slope, or typically they should, just to get the water out of there in case there's melting. So when I've got a nine-foot ceiling in this portion, and you see it steps down in the garage, so by code you'd have a step down so carbon monoxide, and then I would just measure that just to make sure that it's about a nine foot four, nine foot five depth, or height.
Q. I'm sorry, what was that number?
A. Nine foot five.
Q. Nine foot five. Okay.
A couple of points I just want to pick up on what you testified. You said you believe that's what you did, yes. Did you in fact do exactly this same analysis as part of generating the list a. through triple m. which included the proportions of the garage?
A. I did make a comparison of the plan, I did use a scale and I did measure things, so I say yes.
Q. And you measured and determined the proportion

of all three dimensions as figuring out the proportion.
A. If -- I wouldn't have to measure in every case because the documents would reference certain dimensions, so you wouldn't have to use a scale and measure. So, for example, I know that this room is nine foot just by the floor plan. I wouldn't have to use a scale to do that.
Q. Okay. And you said that --
A. Or I knew that would be eight foot because the plan says eight foot.
Q. So either using the scale to measure or notations on the drawings that indicate those dimensions, --
A. Yes.
Q. -- you used that information to determine the dimensions in all three directions?
A. Yes.
Q. And using those you determined the proportion of the garage; is that correct?
A. Well right now I know the proportion is these dimensions, and my next goal is to take a comparison look at Town & Country's.
Q. Sir, the dimension of the Rottlund garage is 17 feet, by 18 foot three inches, by nine and a half,

nine feet five inches?
A. Yes.
Q. Okay.
A. All right. Yep.
Q. Just want to make sure I got all three. We did it in steps, Just wanted to make sure I got it all together. And you said that the height of the garage was dictated by code. What does that mean?
A. No, not necessarily. What I'm saying is the step down from the main floor down to the garage there has to be a drop of, I believe it to be four inches because of carbon monoxide. So I know that there's a step, that's why I wanted to use a scale to measure this as opposed to just referencing the drawings.
Q. Okay. And -- But the height of the garage is nine feet five inches across the entire garage.
A. No, not necessarily. As I was mentioning earlier, it does slope down to the front because by code you have to do that as well. If a car -- If water melts from a car that the water runs out of the garage instead of back into the house. So what I would do is I would measure in the same location in both plans.
Q. But the fact is that the proportions of both

garage slopes are dictated by the code.
A. There is variations that you need to slope front to back and then back to front.
Q. And that's dictated by the code.
A. I believe so, yes.
Q. Okay. Let's --
A. Okay. And then for the record, this is Exhibit -- We used to call it 5. Is that still --
MS. NEWMAN: Similar to 5.
A. And this is actually a different development than what I was -- I was looking at the Centennial Crossings, and this is Maple Grove. Oh, it is Centennial Crossings, I apologize.
Okay. Now I'm going to go to -- and the other -- the first set I got that would be --
Q. And hopefully when they copied these they didn't leave a page out like --
A. Yeah.
Q. And which page is it, sir, that you're looking at?
A. I'm looking at page P2-2.1.
Q. Okay.
A. And I'm looking at the dimension of 19. And this is going to be T&C and T [making notes] --
And then we have 19 foot three. And then it

says a ceiling height here, but the ceiling height here is nine foot as well. Here the section is A-A on P2.2. Here's another garage that's a different -- different scale, but it looks like it's the same, eighth inch. So it's going to be a little less accurate, but it looks like it's the same, nine foot five. And --

Q. Let me just stop you there.

A. Yes.

Q. So sir, the dimensions of the Town & Country garage is 19 feet, by 19 foot three inches, --

A. Yeah.

Q. -- by nine feet five inches high; is that correct?

A. Yes.

Q. And sir, it's your testimony that the proportions of 17 feet by 18 foot three is substantially similar to the -- to the dimensions or the proportions of 19 feet by 19 feet three?

A. Yes.

Q. Okay. Let's do the living room.

A. Okay.

Q. Same -- Actually, as long as you got that sheet, let's just throw a little sticker on that one.

(Exhibit 157 marked for identification.)

A. Okay, and this time we'll do this in reverse because the sheets are set up that way.
So we'll do -- This is garage, this would be living room [making notes on Ex. 157].
Q. And just so the record's clear, your work in determining the dimensions for the garage is reflected in Exhibit 157; is that correct?
A. Well I'd say that --
Q. That you just performed in this room.
A. Yes, I'd say again I mentioned there's two things; one is checking the dimensions and also visual looking at the proportions. The fact that in the comparison of the garage it is narrower, modestly narrower in the front in comparison to the depth, and that is true in both cases, and the fact the ceiling heights are the same that I consider these two to be substantially similar in proportion.
Q. Before we get to the living room I just have a couple questions there.
The Town & Country garage is three inches narrower than it is wide -- No, I got it backwards. It's three --
A. It's three inches deeper than it is wide.
Q. Okay. In a scale of 19 feet.
A. Yes.

Q. The copyrighted Town & Country garage is one foot two -- I'm sorry, Rottlund garage is one foot two inches narrower than it is wide.
A. Yes. No -- Narrower than it is wide, that's a tough one.
Q. Narrower than it is deep.
A. Yes.
Q. I'm sorry, it's been a long day.
A. It has.
Q. And your position, sir, is that a -- in a scale of 19 feet, the change in roughly a foot in the differences between the garage, it's still substantially similar in your opinion.
A. It is in my opinion. I would do an exercise that would look something similar to this to continue on that, and you would see that very modest difference between those two garages.
Q. Sir, what's the largest two-car --
MS. NEWMAN: Before we move on, just quickly, "similar to this," you were referring to the back side of what we've just marked as Exhibit 157?
THE WITNESS: She's my this-and-that police.
MS. NEWMAN: That's right, I am.
THE WITNESS: That is correct.

MS. NEWMAN: Thank you.
Q. Sir, what's the largest two-car garage that you've seen in a back-to-back townhome?
A. I can only reference our back-to-back townhomes and this one, so I would say that it could be -- I think our Garden Homes, we have I think four or five different back-to-back townhomes and I believe our Garden Homes is the largest, and I think it's 20 by 22. So it's 20 foot wide and 22 foot deep.
Q. What's the smallest two-car garage you've ever seen in a back-to-back townhome?
A. Well I'd have to -- to go by memory, but I do think that our Villa -- our Villa II is the smallest that I've seen. The smallest in our grouping, and it's smaller than Town & Country's.
Q. And that was 17 feet wide by 18 foot three inches deep; is that correct?
A. That is correct.
Q. Sir, you testified about the dimensions of your Garden townhomes; is that correct?
A. Garden Homes.
Q. Garden Homes. Is that a --
That's a back-to-back product?
A. It is.
Q. Okay. Is it your testimony that the proportions

of the garage in the Garden Homes are substantially similar to the proportions of the garage in the Villa II?
A. I would say that's true. The -- The difference between the front dimension, the width and the depth is slightly greater, the depth is slightly greater than the width, and I would argue that the proportion would be similar, substantially similar.
Q. So it's your testimony that the garage with dimensions 20 foot wide and 20 foot two deep is also substantially similar to Rottlund's 18 foot wide, 13 -- I'm sorry -- 17 foot wide, 18-foot-three-inch deep garage.
A. I would look at that -- the fact that I would add dimensions and the proportions of those dimensions to each other in determining that.
Q. So sir, is it fair to say that any two-car garage that's in a back-to-back product, in your opinion, is substantially similar to the proportions -- in proportions to the two-car garage in Rottlund's Villa?
A. I wouldn't be able to say that because I haven't seen "any" garage. But a two-car garage could be wider than it is deep, it could be 26-foot wide, it could be 28-foot deep, it could be -- we have a -- I

mean, there could be any number of combinations.
Q. Sir, does it make logical sense to you as an architect to put a 28-foot-deep garage in a back-to-back townhome?
A. I know that we've done it.
Q. Where?
A. In our Gable Townhomes. Our Gable --
Q. Which? Gable back-to-back townhomes?
A. Yes.
Q. Which ones?
A. Gables.
MR. KRUMMEN: I'll renew my standing objection that we're outside of the boundaries of the court's March 14th, 2003 order. You may answer.
Q. Is it your position that the proportions of the garage in the Gables townhome is substantially similar to the proportions of the garage in the Villa II townhome?
A. I would have to see the plans adjacent to each other to make that determination.
Q. But you designed both of them.
A. I did.
Q. Do you have an opinion without looking at the plans for both of them?
A. No.

Q. Okay.
A. I design a lot of plans.
Q. Let's see if we can't do the living room, at least, real quick, then we'll continue another day.
A. Okay. Living room.
Q. And you're now looking at Town & Country's plans; is that correct?
A. Just to be efficient, I figure since this one's rolled out I'll do this one first then come back to ours.
Q. That's fine.
A. So that is -- Thank you.
And since you could argue what's width and what's depth I'll just kind of keep the same consistency that we did with the garages. And that is also a nine-foot ceiling.
Q. So sir, based on your calculations --
You're moving the paper that's got my answers on it. Sorry.
A. Oh, you wanted to read it. Sure.
Q. The dimensions of the living room in the Town & Country product is 13 foot even wide, --
A. Yes.
Q. -- 16 feet deep and nine feet high; is that correct?

A. Correct.
Q. Okay.
MS. NEWMAN: May I ask before you change, I don't mean to jump on your deposition here, but were you including the -- the stairs as part of the living room or -- or not?
THE WITNESS: I was including this -- the doorway, it's -- I was going to do it consistently for both, that there's a logical line right here. I could also consistently draw the line across here, but it -- you would have to argue which is living room and which is something -- some other space. So instead I really define that this is -- the entry is really defined here, the dining room is the edges would be here, and so that's what I'm using as a dimension.
MS. NEWMAN: So I can rephrase that for our record, the living room, the dimension that you measured was just to, if we can, the top of the entryway door --
THE WITNESS: Yes.
MS. NEWMAN: -- into -- into the unit. There is a line shown on this plan.
THE WITNESS: Yes.
MS. NEWMAN: And that's what you measured

to.

THE WITNESS: That's correct.

MS. NEWMAN: Okay.

THE WITNESS: Thank you.

BY MR. SCHWIEBERT:

Q. And again you're looking at page A5 of the ribbon copy of Rottlund's deposit materials; is that correct?

A. Yes, thank you.

Exhibit 104, page A5. Nineteen three, if I have that right. Nineteen three. Nine-foot ceiling.

So if you want to read the dimensions, or I can repeat them, either way.

Q. Feel free.

A. The living room dimensions for the Rottlund Villa II is 13 foot three -- I'm sorry, 13 foot and three inches wide, by 19 foot and three inches deep and it has a nine-foot ceiling.

Q. And sir, is it your opinion that the proportion of the Rottlund living room at 13-feet-three-inches wide and 19-feet-three-inches deep is substantially similar to the Town & Country home living room with a dimension of 13-feet wide and 16-feet deep?

A. That is correct. Yes.

MS. NEWMAN: May I ask just a quick

question before we're done?

MR. SCHWIEBERT: Yeah.

MS. NEWMAN: Again what we've done in terms of measuring the living room is you've selected a line which is actually now on this plan below the entry door into the Rottlund unit; is that right?

THE WITNESS: No, I did not. I did go to this line here [indicating].

MS. NEWMAN: Oh, I apologize. Okay. So that would be a line just to the top of the stairs that go upstairs.

THE WITNESS: Right, yes.

MS. NEWMAN: Thank you.

(Beeping interruption.)

(Discussion off the record.)

MR. SCHWIEBERT: I think we're going to pause at this point and continue another day.

(Deposition adjourned at approximately 5:00 p.m.)