Civil No. 01-1980 (DSD/SRN) – Rottlund / Pinnacle
Davenport Affidavit dated July 19, 2004

Exhibit R23.3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.d/b/a Rottlund Homes,

a Minnesota corporation, Plaintiff,

vs. Case No. 01-CV-1980Pinnacle Corpora

d/b/a Town & Country Homes,an Illinois Corporation, and

Town & Country Homes, Inc.,a Minnesota Corporation, and

Bloodgood Sharp BusterArchitects & Planners of Iowa,

Inc., an Iowa corporation, Defendants,

andTown & Country Homes, Inc.,

a Minnesota corporation, Third-Party Plaintiff,

vs.Bloodgood Sharp Buster

Architects & Planners of Iowa,Inc., an Iowa corporation,

Third-Party Defendant.- - - - - - - - - - - - - - - -

DEPOSITION OF TIMOTHY M. WHITTEN 30(b)(6)

VOLUME III, Pages 510 - 742

(The following is the continuation of the 30(b)(6) deposition of TIMOTHY M. WHITTEN, taken pursuant to Notice of Taking Deposition, at the offices of Colliers Towle, Fifth Street Center, 55 East Fifth Street Mezzanine, in the city of St. Paul, state of Minnesota, commencing at approximately 9:00 a.m., June 12, 2003.)

with The Rottlund Company, no.

Q. Okay. Who at Rottlund Company would have the information on the design process that was used for developing new products before AFI started work for them?

A. I don't know.

Q. Don't know who that would be?

A. I do not.

Q. Okay. Once AFI started working for Rottlund was that the only outside consultant that was used by Rottlund for developing new product?

A. I don't believe I can answer that as well.

Q. You just don't know?

A. That's the only one I was aware of.

Q. Okay. You don't know if while AFI was doing work for Rottlund they were also working with other architects, you're just not sure?

A. I don't believe so, but I'm not positive.

Q. Who would know the answer to that information?

A. I don't know.

Q. When you designed the Original Villa for Rottlund, did you do anything to confirm that the Original Villa design was not substantially similar to product already existing in the marketplace?

A. It was an original design. I would not need to

do that.
Q. Do you know one way or another if the Rottlund Original Villa product is substantially similar to other product existing in the marketplace?
MR. KRUMMEN: At what time?
Q. When it was developed.
A. When it was originally developed?
Q. Yes.
A. It would not be substantially similar to anything else because it was an original design.
Q. Well isn't it possible that something's an original design but it ends up being substantially similar to something else that's in the marketplace?
MR. KRUMMEN: Object to the extent it calls for a legal conclusion. You may answer.
A. Well I think that I've just gone through an exercise of just taking three elements of design and showing that it could be a thousand different combinations. I would say that it would be virtually impossible for just the luck of two people coming up with the same idea at the same time.
Q. What is Rottlund's policy on retention of earlier schematic phases of design on new product?
A. What is their policy?
Q. On retention of documents related to earlier

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation, and
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF TIMOTHY M. WHITTEN, 30(b)(6)
VOLUME IV, Pages 743 - 821

(The following is the continuation of the 30(b)(6) deposition of TIMOTHY M. WHITTEN, taken pursuant to Notice of Taking Deposition, at the offices of Winthrop & Weinstine, P.A., 225 South Sixth Street, Suite 3500, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:06 o'clock a.m., August 6, 2003.)

lawyer's told you that his objections contain some sort of coded instruction as to what the answer's supposed to be, he's not really talking to you. All right?

A. Okay.

Q. Did you bring any new documents to your deposition today?

A. I have not.

Q. Okay. Have you reviewed the transcript of your first two sessions?

A. I have reviewed most of the transcript, yes.

Q. Is there anything you want to change?

A. Not at this point.

Q. Is there anything you want to clarify?

A. I don't believe so.

Q. The first thing I'd like to ask you about is the initial meetings you had with Mr. Rotter back in 1986 or 1987 that resulted in the creation of the Villa, okay?

A. Okay.

Q. Now as I understand it, Mr. Rotter asked you to design a housing structure for a new market segment that he anticipated would be growing in the near future. Is that fair?

A. I'd say that's fair, yes.

Q. All right. And the market segment was single parents; is that right?
A. That's one of the markets that he identified at the time of the meeting, yes.
Q. What other market segments did he identify at the time of the meeting?
A. I don't recall. I know that that was his focus, but I'm sure that that was not the only market that he was intending on addressing.
Q. Why are you sure of that?
A. Well in knowing that he wouldn't want to just limit his opportunities for sales to just one specific market. We still to this day don't do that. We try to be a little bit more general than that. But that was his intent was to try to address that buyer with an affordable product.
Q. All right. And that was one of the other things that you talked about during the first or second meeting was that there was an anticipated price range for the product?
A. I don't recall exactly the price range. I know that he wanted to reach a lower price range.
Q. Right. Without talking about specific numbers, you had an understanding with Mr. Rotter that the resulting design would be for a more affordable price

level; is that fair?
A. That would be correct.
Q. All right. And during one of the first two meetings you also talked about the idea that these could be back-to-back townhomes; right?
A. That's correct.
Q. Now I think you testified earlier that when you had a general understanding of what the price point or market range would be for these products that helped you determine what the approximate square footage would be; right?
A. I would believe so, yes.
Q. And that's because as an architect you have a general understanding of what the sticks and bricks cost; right?
A. Yes.
Q. And if these were going to be --
Would you characterize them as entry level, or how would you describe the price point?
A. I would say entry level is fair, yes.
Q. All right. So for entry-level townhomes, you wouldn't be able to design 4,000-square-foot units; could you?
A. That would be correct.
Q. The anticipated price point also focused your

design efforts in other ways; didn't it?
A. I don't know what you mean.
Q. Well, for instance, you couldn't build these out of Lannon stone; could you?
A. No, I think I would think about the materials that would be included as part of that reaching that affordability component of the design.
Q. Do you agree with me?
A. Yes.
Q. Is that what your answer indicates?
A. Yes.
Q. So you couldn't build these out of Lannon stone.
A. I mean you could, but it wouldn't be smart.
Q. Well you wouldn't be able to match the owner's desired price point; correct?
A. I would say that's fair, that we look at what the buyers would be looking for, what they'd be willing to pay for as part of our design process. And stone probably wouldn't fit into the category of the affordable market.
Q. Right. So would you agree with me that if you were trying to design an affordable or entry-level townhome, stone exteriors is not one of your design options?
A. I would think not.

Q. You also couldn't have slate roofs; right?
A. I would think not.
Q. You couldn't have cedar shingle roofs; could you?
A. I don't know if I would preclude that.
Q. Okay. The idea that these would be entry-level or affordable townhomes also focused your decisions as an architect in terms of the level of finish and the trims, right?
A. Yes.
Q. And it eliminated certain design options; right?
A. I would say it would, yes.
Q. Did it also predetermine that these units would not have basements?
A. Not necessarily.
Q. All right. Do you think it's possible to design an entry-level or affordable townhome that has a basement?
A. Yes.
Q. Is it more efficient or cheaper to build slab on grade?
A. Than a full basement?
Q. Yes.
A. Yes.
Q. At the time that you had these initial meetings

with Mr. Rotter was there any discussion of slab on grade versus basement?
A. I don't recall.
Q. Did you ever --
At that time did you have any understanding or belief as to whether or not a full basement was a profitable alternative?
A. I don't think I probably would have made that determination early in the process.
Q. And I think you earlier testified that after your first pair of meetings with Mr. Rotter you had a general -- and you began the design process, right, that's when you started taking pen to paper?
A. After those two meetings?
Q. Yes.
A. I believe that there was a couple of meetings that -- where we shared ideas, but I may have put pen to paper between the first and second meeting, I don't recall.
Q. Okay. That's fair.
And when you started putting pen to paper, though, you had a general understanding of what the potential buyers would expect to see in these units; right?
A. Only what either Bud Rotter or myself would have

tail end of that question.

BY MR. SCHWIEBERT:

Q What is it about the total look and feel of the architectural documents for the Rush Creek Villa II that Rottlund contends is substantially similar to the total look and feel of the architectural documents for the defendants' Homestead Collection?

MR. KRUMMEN: You may answer.

A That they're substantially similar?

BY MR. SCHWIEBERT:

Q What is it about the total look and feel of the architectural drawings for the Rush Creek Villa II that Rottlund contends is substantially similar to the total look and feel of the architectural drawings for the Homestead Collection?

MR. KRUMMEN: Asked and answered for four and a half days. You may answer.

A I don't think I totally understand. You're asking for specific elements?

BY MR. SCHWIEBERT:

Q Well, sir, what I'm trying to do is --

A Because there's a total look and feel which I think that if you compare the two documents together that is obvious. Now you're asking me to

describe that in more detail?

Q Does Rottlund contend that the substantial similarity between the technical drawings copyrighted under VAu 447395 can be determined exclusively by examining the architectural drawings for the Homestead Collection?

A Yes. You can compare the two architectural documents and say that they are substantially similar.

Q And in your previous testimony that's what we talked about, is that correct?

A I believe that was part of the testimony, yes.

Q Okay. And you understand there's a separate question of the gestalt of the architectural work as built for copyright registration 534723, is that correct?

A Yes.

Q Are there aspects of Town & Country's Homestead Collection as built, the architectural work, that Rottlund contends are substantially similar other than that contained in the architectural drawings?

MR. KRUMMEN: Object to the form of the question. Object as vague and ambiguous.

A I mean I think that you look at it from a different perspective. You look at the two buildings and you look at that and you determine whether or not it has a total same look and feel.

BY MR. SCHWIEBERT:

Q Have you done that, sir?

A Yes, I have.

Q Have you prepared an analysis of the as-built structures, the similarities and differences?

A I have looked at both and I have visually determined that they are substantially similar by such a great degree that I haven't gone through and done a line-by-line item.

Q Are there elements of the alleged substantial similarity between the as-built structure, the Homestead Collection and Rottlund's registration of the architectural work that are different in the elements of the technical drawings?

A I don't know. That has to assume that what Town & Country built and Homestead exactly followed their working drawings.

Q You understand there are differences between the various as-built structures in the Homestead Collection, correct?

A I would believe that would be the case, yes.

Q And Rottlund alleges that each one of the different Homestead structures which are different from each other are all substantially similar to Rottlund's copyright for the architectural work, is that correct?

MR. KRUMMEN: Object to the first half of that question characterizing differences. You may answer.

A I can say that of the buildings even if they had minor modifications they're so substantially similar that the minor modifications would outweigh the similarities.

BY MR. SCHWIEBERT:

Q In the as-built structures?

A Yes.

Q So for example if you added another room to the Homestead Collection like Lakeville has --

A I'd have to see the comparison but I don't believe adding a room would make any difference to the substantial similarity.

Q Did you tour Town & Country's product in Lakeville?

A I'm not sure if I have.

Q Are there elements of the as-built structures in the Homestead Collection that Rottlund contends are infringed that are different from elements of the technical drawings that you've previously testified about?
A I don't know.
Q You're not prepared to answer that question today?
A Of the buildings themselves each individual item of the buildings I have not analyzed.
Q What about the gestalt of the building?
A The gestalt, absolutely. They are the same.
Q Can you analyze the gestalt of technical drawings without examining the as-built structures?
A Yes, you can.
Q Have you prepared a list of the similarities of the as-built structures between Rush Creek's Villa II and each one of the individual Town & Country structures?
A I have not.
Q Do you intend to offer any opinion regarding substantial similarity of the as-built structure of Rush Creek and any of Town & Country's

as-built structures?

MR. KRUMMEN: Asked and answered.

A Yes. If I have seen each of the different products of Town & Country's Homestead Collection I would offer an opinion.

BY MR. SCHWIEBERT:

Q You understand that Rottlund was provided with an opportunity to inspect each one of those developments?

A Yes, and I may have inspected all of them. I just don't know for sure.

Q And based on that you're still not prepared to issue an opinion as to the similarities between the as-built structures, Rush Creek's Villa II and those as-built structures, is that correct?

A Of the ones that I've seen I would offer an opinion.

Q But you have no list of similarities between those structures?

A I do not.

Q Do you know what the similarities are between those structures?

A I would be able to sit down and put something together but I can't tell you off the top

of my head.

Q As you sit here today as Rottlund's corporate designee on this topic you're unable to provide the similarities between the as-built structures?

A My opinion as I sit here today is that they're so substantially similar that there aren't enough differences between them that would make any difference.

Q I'm not asking for your opinion. I'm asking for the position of Rottlund Corporation and their position through you as their corporate designee.

As you sit here today can you tell us the similarities between the as-built structures of Rush Creek Villa II and each of the Homestead Collection structures?

A As a representative I can say that they're substantially similar.

Q What are the similarities between the Rush Creek Villa II as-built structure and the Homestead Collection in Lakeville?

MR. KRUMMEN: Asked and answered for four and a half days. You may answer.

A I think I've answered the question.

BY MR. SCHWIEBERT:

Q Sir, we spent a lot of time talking about the technical drawings and the similarities between them.

My question now is the similarities alleged between the as-built structures.

A Yeah. I would have to compare the two as-built structures side-by-side to be able to give you a list of similarities.

Q And you haven't done that before today, have you, sir?

A I have not.

Q As you sit here today can you provide that list of similarities between the as-built structures?

A As I sit here today? No.

Q Can you provide a list of the similarities between any of the Town & Country products and the as-built Villa II?

A No.

Q Exhibit F is the picture of the inside of an exterior unit for a Villa II, is that correct?

A Yes.

Q Do you know what development this picture was taken in?

A I do not.
Q You're aware, sir, that Rottlund was intending on building Villa II's on a piece of land in Brooklyn Park, is that correct?
A Yes.
Q And Rottlund didn't end up building the Villa II's, is that correct?
A That's correct.
Q And you understand that the reason why Rottlund didn't build the Villa II's was that the City of Brooklyn Park wanted larger garages in the Villa II, is that correct?
A No, that's not what I recall.
Q Why did Rottlund not build the Villa II's in Brooklyn Park?
A That may have been part of the requirements or the request of the city. But what I recall as being an element that was challenging for us was that they were looking for something that was safe from tornadoes so they wanted either a full basement or a safe room of some sort in the structures.
Q Has Rottlund ever built a Villa II that has a safe room in it?
A No.

Q And based on the city's requirements for a larger garage and either a safe room or a basement Rottlund did not build the Villa II's in Brooklyn Park, is that correct?

A Not necessarily. I can't recall whether or not we were willing to do the garage and willing to do some other things, but it could have been the full basement or the safe room that decided that we weren't going to do it. So I don't think you can lump them together and say that was the reason for not doing it.

It was kind of an ongoing process of negotiation. The city would ask for this and ask for certain things and we were considering during that period of time which we would be willing to do.

Q And Rottlund concluded it was not willing to make those changes, is that correct?

A That's correct.

Q Has Rottlund built garages which are larger than the garages contained at the Villa II in Rush Creek?

A We may have.

Q Presumably you would have to do that, right? You would have to design the larger garages?

A I would be involved with it. I just can't

recall if we actually have done that on a particular project.

Q You don't know if a larger garage has ever been designed for the Villa II?

A I don't know for sure. I'd have to go back and look at all the documents.

Q Have you ever designed a larger garage for the Villa II?

A I may have.

Q You just don't know?

A I don't know.

Q Has Rottlund ever designed a larger garage for the Villa II's?

A That would be one and the same.

Q Because you'd have to do it?

A Right.

Q And you just don't know if you have or not?

A That's right.

Q Has Rottlund ever designed a safe room for a Villa II?

A Not that I recall.

Q And you understand that the city -- your testimony is that the City of Brooklyn Park required a safe room for the back-to-back projects you built

in Brooklyn Park?

A Not necessarily. It was discussed. I don't know if they would have made us do it or not. We decided to not continue with the process.

Q Were you involved in the decision not to continue with the process?

A I was involved.

Q And you don't remember what the reason was why you didn't continue with the process?

A What I recall was that there was kind of continuous added requests and we had to kind of consider the probability of whether or not the city was actually going to take those requests and turn them into requirements or conditions of approval.

And I don't recall at what point we decided it's not something we were going to pursue. The project was small. It was 60 units. So I just remember discussing it and I remember some of the issues but I don't recall exactly what was the straw that broke the camel's back.

Q Does expanding the size of the garage in the Villa II change the floor plan?

A Well, I mean it would physically change the architectural documents regarding the particular dimension of the garage.

Q Would it also affect the dimensions of the rooms around the garage?
A Not necessarily.
Q You could expand the entire building?
A Expand the entire building?
Q Well, if you add space to the garage and you don't take it from another room how can you accomplish that without expanding the footprint of the entire building?
A You could expand the depth of the garage so it wouldn't affect the room so it would come forward.
Q You could stick out of the Villa II?
A Yeah. It would just be a shorter driveway or something along those lines.
Q Has Rottlund ever done that?
A Not that I recall but we do a lot of projects.
Q Could you expand the width of the garage without changing the dimensions of the other rooms or changing the footprint of the entire building?
A I don't believe so.
Q Has Rottlund ever built a larger version of the Villa II's meaning a larger footprint than that of Rush Creek?

A I don't believe so.
Q And you'd know that as the architect who designs the Villa II?
A I would. I mean I don't know if there was 4 inches added someplace because of thickness of a wall or something that had to be done because of a requirement of a city for an area separation wall or something like that.
I don't know for sure but the general concept of the floor plans have not changed in dimensions.
Q Let's go back to that testimony. Has the Villa II been expanded by 4 inches due to a city requirement for an area separation wall?
A I don't know.
Q You would have to have designed it if it did?
A Well, not necessarily. I mean I would be aware of it.
Q And as you sit here today you don't remember that ever happening?
A I don't remember it happening. I mean you're asking me whether or not it's ever been expanded at any point and I said it could be a couple inches. I don't know for sure but I don't

believe so.

Q When did Rottlund design the third bedroom option for the Villa II?

A Initially.

Q What do you mean by initially?

A I remember drawing it up as a concept, one of the options when I designed it.

Q Was a third bedroom option included in the plans for the Villa II at Rush Creek?

A I'm not sure. It may have been. It may have been an option offered to the buyers.

Q You've reviewed the material that was deposited to the copyright office as attached to Exhibit C, is that correct?

A Exhibit C? The question again? I'm sorry.

Q You reviewed the architectural plans that are attached that were deposited with the copyright material with Exhibit C, is that correct?

A I don't know if I -- I would have reviewed it but I don't know if I have recently.

Q We went through them in your last deposition, is that correct?

A I'm sorry. Say that again.

Q Yeah. I'm sorry. We went through them at

your last deposition, is that correct?

A Could be. I'm sorry. It's all running together. All right.

Q When is the first time Rottlund ever built or offered to the public a third bedroom option?

A I'm not sure.

Q Do you know which development it was at?

A I'm not sure.

Q And you would have been the person who would have had to have changed the Villa II architectural drawings to include a third bedroom option, is that correct?

A I would have been involved in the design of the third bedroom option. I would not have been involved where they decided to offer that or not offer it.

Q Were you involved in the change in the design of the Villa II to include a third bedroom option?

MR. KRUMMEN: Mischaracterize his earlier testimony. You may answer.

A Repeat the question.

BY MR. SCHWIEBERT:

Q Was there a change to the Villa II to include a third bedroom option?

A I wouldn't say that there would be a change. I would say that I know that I designed that option initially so I wouldn't qualify that as a change.

Q When there's a third bedroom option in a Rottlund Villa II is there a two-story space with a loft?

A Excuse me. I just turned off my phone just to make sure it didn't ring. I don't recall if the concept -- it might have been the three bedroom option that included the two-story space as well.

Q Do you know if Rottlund has ever built that structure, a three-bedroom Villa II that still had a two-story vaulted?

A I don't know.

Q Why did Rottlund begin offering a third bedroom option on the Villa II?

A All I can tell you is that I came up with it as a concept not knowing whether or not the marketplace would be wanting that or whether we in the Minneapolis division in sales and marketing would want to offer it.

Q My question isn't about your alleged initial concept. My question is about why Rottlund began offering it. Why did Rottlund begin offering

a third bedroom option on the Villa II?
A I defer to Todd Stutz on that.
Q Has Rottlund produced to the defendants your initial concepts which contain the concept of the third bedroom for the Villa II?
A I know that we supplied you with the concepts. I can't tell you for sure if that included the third bedroom option or not.
Q You don't know?
A I believe it did. I would have to look at the documents again.
Q But that option didn't make it into the final architectural plans registered for the Rush Creek Villa II, did it, sir?
A I don't know. It may have.
Q Did the Rush Creek Villa II's have a third bedroom option?
A I don't know.
Q Did the Villa II's that have the third bedroom option have the same or substantially similar gestalt to the Villa II's that do not have the third bedroom option?
A I would say yes.
Q What's the basis of that conclusion?
A You know, that's just a piece. That's one

item of hundreds in the overall look and feel of a plan that I don't think that would change it.

Q Have you seen a Villa II with a third bedroom option built in it?

A I may have.

Q Do you know if you have or not?

A No.

Q Do you know where the third bedroom option is located in the Villa II that you believe you have seen?

A No. I know that I came up with the concept and they may have taken advantage of that in one of the projects and I may have toured it. I don't know.

Q But you don't know if you actually toured a Villa II that had a third bedroom option?

A I don't recall.

Q Why don't we take a break. We need about 15 minutes.

(Break taken.)

BY MR. SCHWIEBERT:

Q Let's go back on. I've placed in front of you what's been previously marked as Deposition Exhibit 104, is that correct?

A Yes.

Q And you understand that this is the materials that were deposited with the copyright office in connection with copyright VAu 447395, is that correct?
A Yes.
Q Sir, do these architectural drawings contain a third bedroom option for the Villa II?
A I do not see one.
Q If you can turn to A5 D 00006?
A Yes.
Q This is the floor plan for the end unit?
A Yes.
Q And if you look in the center of page A5 you see the floor plan for the upper level of the unit C or end unit, is that correct?
A Yes.
Q Was the optional third bedroom that you designed on the second level?
A Yes.
Q It wasn't on the first floor?
A It was not.
Q Okay. Was the optional third bedroom in the area indicated as loft in the upper floor plan for unit C or the end unit?
A I believe so. I seem to recall that I did

a concept for both, whether it would be just the loft switching over to a bedroom and keeping the two-story space and also one option where it included the two-story space but not absolutely sure.

Q So in one design there was a two-story space meaning it was open below into the living room but there was no loft area, is that correct?

A Correct.

Q And in a separate design you covered the space which is indicated as open below meaning the living room did not have a two-story space, is that correct?

A I believe so.

Q Was there still a loft in that second variation where the bedroom was over the space that was open to below?

A I believe that was true but the loft would have stayed in the same place as the original design and then the third bedroom would be in the two-story space.

Q Do you know if Rottlund has ever built a third bedroom or had a third bedroom option with Villa II's where the bedroom was exclusively in the loft area?

A I don't know for sure.
Q You do understand that Rottlund has a third bedroom option in some of its Villa II's?
A I believe so.
Q You just don't know where that third bedroom is located?
A It's been a long time since I've looked at a Villa optional plan so I don't really recall.
Q Is Rottlund currently offering a third bedroom option in developments where it's currently building Villa II's?
A I'm not sure.
Q Is it Rottlund's position that if a third bedroom is added such that there is no two-story space for the living room that the gestalt of the end units of the Villa II is substantially similar to that structure?
MR. KRUMMEN: Asked and answered. You may answer again.
A Yes, I believe the gestalt would be the same or similar.
BY MR. SCHWIEBERT:
Q Substantially similar?
A Substantially similar. Thank you.
Q Item number 7 on the bottom half of this

drawing is the optional fireplace media center, is that correct?

A Yes.

Q The standard plans don't include a fireplace or media center, is that correct?

A Correct.

Q In addition to the optional fireplace and media center depicted here has Rottlund offered another optional fireplace for its Villa II products?

A I believe so, yes.

Q Why?

A Somebody may choose to want the option of a fireplace and the arch above it without the shelving adjacent to it or they may want some shelving on either side of it.

Q This shelving only appears on one side, that's correct?

A That is correct on this plan.

Q Did Rottlund offer an optional fireplace media center that had shelving on both sides?

A They may.

Q So you would have had to have designed that option, right?

A I would have been involved in the design,

yes.

Q Did you? Were you involved in any option where the fireplace had shelving on both sides?

A I know that we have. I can't recall if it was this particular project or another particular project.

Q But it was a Villa II?

A I believe so.

Q Do you know where that Villa II was built?

A I don't. I would have to do some research.

Q And you understand there is an option where there is no media center, just the optional fireplace?

A I believe that to be the case as well that it's just the fireplace but I'd have to research that as well.

Q Turn to A7.

A Yes.

Q Is it Rottlund's contention that the floor plan for the unit D or interior units as depicted on A7 is substantially similar to the floor plan of the interior units of Town & Country's Homestead Collection?

A No. It's our contention that the end unit

Homestead Collection has been used to be the interior unit and the end unit is substantially similar to our end unit plan.

Q Let me see if I can break it down into pieces. Does Rottlund contend that the interior unit or unit D plan is substantially similar to the interior unit plan for the Town & Country Homestead Collection?

A No.

Q Does Rottlund contend the as-built structure built at Rush Creek interior units are substantially similar to the as-built Homestead Collection interior units?

A Of the floor plan, no.

Q I'm sorry. I'm talking about as-built structures, not floor plans.

The as-built structure, does Rottlund contend that its copyright on the as-built structure for the Rush Creek development interior units is substantially similar to the interior units of the as-built back-to-back townhomes for the Homestead Collection?

A No.

Q No, they don't contend that?

A We're not contending that the interior

unit of the Rottlund plan is substantially similar to the interior unit of the Homestead plan.

Q Either in the architectural drawings or the as-built structure?

A Correct.

Q Turning back to A5?

A Yes.

Q Is it Rottlund's contention that the gestalt of the master bedroom on the upper level in the floor plan of the Rush Creek development is substantially similar to the gestalt of the master bedroom in the upper level of the end units of Rottlund's Homestead Collection?

MR. KRUMMEN: Object to the question as being inconsistent with the court's order that individual design elements are not at issue in this case.

A Yeah. I'm looking at the total package of the design, not the individual element.

BY MR. SCHWIEBERT:

Q You testified before that buildings can have gestalt, right?

A Yes.

Q And you testified that units could have gestalt?

A Yes.

Q And you testified that rooms could have gestalts?

A They can. I'm saying that in this particular case I'm looking at the total unit.

Q Does Rottlund contend that the gestalt of the master bedroom in its floor plans is substantially similar to the gestalt of the master bedroom in Town & Country's Homestead Collection floor plans?

A I'm not forming an opinion on the separate master bedroom. I'm forming an opinion on the overall plan.

Q I'm not asking for your opinion. I'm asking for Rottlund's position.

Is it Rottlund's contention that the gestalt of the master bedroom in its end units is substantially similar to the gestalt of the master bedroom in the Town & Country Homestead Collection floor plans?

A We haven't formed an opinion.

Q So that's not the current contention?

A No, I said we haven't formed an opinion. We haven't looked at the individual gestalt of a particular room.

Q And that's true for every room in the upper floor, is that correct?

A I would say that's true, yes.

Q Rottlund currently doesn't have a position, for example, with regard to the gestalt of the second bedroom on the second floor of its units as compared to the gestalt of the second bedroom in Town & Country's floor plans, is that correct?

A The same answer as the master bedroom.

Q Rottlund just doesn't currently have a position?

A We haven't studied that specific issue of a particular room.

Q Rottlund's capable of doing that, correct?

A Besides I think it's unnecessary. The idea is to look at the overall plan. That's been our position all along.

Q My question wasn't whether it was necessary. My question was capability. Is Rottlund capable of doing that?

MR. KRUMMEN: Object as outside the scope of the court's prior orders. You may answer.

A Rottlund as a company is capable of analyzing space and making a determination. I would say that's probably true.

BY MR. SCHWIEBERT:
Q In fact you believe that you're capable of making that comparison, is that correct?
A I'm capable of forming any opinion architecturally. I would say yes.
Q You're capable of forming an opinion as to whether or not the gestalt of the master bedroom in the floor plans of the Rush Creek end unit is similar to the gestalt of the master bedroom in the floor plans of the Homestead Collection?
A I'm capable.
Q You just haven't done it?
A I don't need to.
Q Sir, my question wasn't a question of need. It was a question of having done it or not.
A But you ask it like I should have done it when in fact there is no requirement to do it and in my professional opinion it's not required.
Q I just want to know if you've performed the analysis or not.
A I haven't. Then you asked me if I was capable and I said yes.
Q But you haven't?
A I have not.
Q Does Rottlund contend the master bedroom

in the as-built structure at Rush Creek is substantially similar to the master bedroom of the as-built Homestead Collections in the end units?

MR. KRUMMEN: Outside of the court's prior orders. It deals with individual design features. You may answer.

A We haven't analyzed individual rooms per se as far as on their own. We've only looked at the entire unit.

BY MR. SCHWIEBERT:

Q In the as-built structures as well?

A Yes.

Q Is that true for the rooms in the lower level too?

A Yes.

Q Rottlund has not analyzed or compared any of the individual rooms in the lower level of the as-built structures with the individual rooms in the lower level of the as-built structures for Homestead Collection?

A We have analyzed the different rooms and we have looked at both but to say that we've gone and compared room to room, no.

Q Rottlund has not compared, for example, the kitchen in its floor plan for its end unit with

the kitchen in the floor plan of the Homestead Collection, is that correct?

MR. KRUMMEN: Mischaracterizes his testimony.

A No, we have in the element of the whole, not as an individual element.

BY MR. SCHWIEBERT:

Q Does Rottlund contend that the kitchen in the floor plan for the Rush Creek Villa II end unit is substantially similar to the kitchen in the Homestead Collection floor plans?

MR. KRUMMEN: Outside of the scope of the court's prior orders. You may answer.

A Again, the kitchen is in relationship to the whole of the two units.

BY MR. SCHWIEBERT:

Q Sir, my question is does Rottlund contend that the kitchen in the floor plan for the Rush Creek Villa II have substantially similar gestalt to the kitchen in the floor plan for the Homestead Collection in the end units?

MR. KRUMMEN: Same objection. Harassing the witness on day five. You may answer.

A Same answer as the other ones.

BY MR. SCHWIEBERT:

Q And that answer is no?
A Repeat the question.
Q Does Rottlund contend that the kitchen in the Rush Creek Villa II floor plan is substantially similar to the gestalt of the kitchen of the floor plan for the Homestead Collection in the end unit?
A And the answer is the same answer is that we haven't analyzed it on a specific room-by-room basis.
BY MR. SCHWIEBERT:
Q What percentage of the as-built Villa II's at Rush Creek had the optional fireplace media center depicted on page A5?
MR. KRUMMEN: Foundation. You may answer.
A You're asking me how many buyers selected the option of a fireplace? I don't know that answer. I would defer to Todd Stutz on that.
BY MR. SCHWIEBERT:
Q Have you ever seen a townhome, a back-to-back townhome built by somebody other than Rottlund which has a third bedroom option?
A I have not.
Q Off the record for just a second.
(Discussion off the record.)
BY MR. SCHWIEBERT: