Exhibit R24

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation, and
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation, and
The Bloodgood Group, Inc., an
Iowa corporation
Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF DAVID H. ROTTER
August 27, 2003

(The following is the deposition of DAVID H. ROTTER, taken pursuant to Notice of Taking Deposition, at the offices of Fredrikson & Byron, 4000 Pillsbury Center, 200 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:05 o'clock a.m., August 27, 2003.)

A. But if you're talking about the -- the resources of dollars spent or your resources in time of people spent or those kind of resources, there's no way to capitalize, you know, how many hours you worked on any particular plan. To say, you know, how many -- how many days, what was that worth? I mean it's sweat, it's -- it's effort. I mean, we make effort every day. How do you quantify that?
Q. Do you get bills from Mr. Krummen for his time?
A. Mr. Krummen, who's Mr. Krummen?
MR. KRUMMEN: I instruct you not to answer that question.
Q. The lawyer next to you.
(Interruption by the reporter.)
Q. I said: Do you get bills from Mr. Krummen for the time he's spent?
A. I'm going to spend -- or answer the question with my attorney's answer.
Q. Well Rottlund in the past has hired outside architects, correct, to design products for it?
A. Has hired outside architects, not necessarily to design products for it. They could. They have had products that we've developed that they've drawn and fine tuned.
Q. Well Mr. Whitten developed the Original Villa

product; correct?
A. I think my brother developed the original product. He sketched it, brought it to Mr. Whitten.
Q. So he brought sketches to Mr. Whitten?
A. I believe.
Q. And what's the basis for that statement?
A. He told me.
Q. When did he tell you that?
A. Back when we were developing the product.
Q. What else did he tell you about his designs for that product?
A. He just believed that the product was a -- could be a real winner, could do well.
Q. So it's your understanding he provided Mr. Whitten with sketches?
A. I believe.
Q. Did you ever see those sketches?
A. No.
Q. Do you know what those sketches consisted of?
A. I just kind of answered it. No, I'd never seen them so I couldn't say what they consist of.
Q. Sure. He described to you, though, he told you that he did sketches for the product; correct?
A. Right. My brother -- My brother spends a lot of time with sketching out layouts of floor plans and

Exhibit R25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.d/b/a Rottlund Homes,
a Minnesota corporation, Plaintiff,
vs. Case No. 01-CV-1980Pinnacle Corpora
d/b/a Town & Country Homes,an Illinois Corporation, and
Town & Country Homes, Inc.,a Minnesota Corporation, and
Bloodgood Sharp BusterArchitects & Planners of Iowa,
Inc., an Iowa corporation, Defendants,
andTown & Country Homes, Inc.,
a Minnesota corporation, Third-Party Plaintiff,
vs.Bloodgood Sharp Buster
Architects & Planners of Iowa,Inc., an Iowa corporation,
Third-Party Defendant.- - - - - - - - - - - - - - - -

DEPOSITION OF GERALD J. MAZZARA VOLUME I, Pa

(The following is the deposition of GERALD J. MAZZARA, taken pursuant to Notice of Taking Deposition and Subpoena, at the offices of Fredrikson & Byron, 4000 Pillsbury Center, 200 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:01 o'clock a.m., June 4, 2003.)

documents, you mentioned that he told you about this lawsuit; correct?
A. Yes.
Q. Was that the first you had heard of this lawsuit?
A. Yes.
Q. Sir, what's the highest academic degree you've received?
A. Bachelor of Arts, Architecture.
Q. And you're a licensed architect; is that correct?
A. No, I am not.
Q. From what school did you receive your degree?
A. Minnesota.
Q. University of Minnesota?
A. Correct.
Q. When?
A. '67, '68.
Q. Have you lived in Minnesota all your life?
A. Yes.
Q. Have you lived in the Twin Cities area all your life?
A. Yes.
Q. Sir, when was the first time you had ever heard of or seen a back-to-back townhome?

A. When we developed the product for Rottlund.
Q. When you say "we developed the product" --
A. When Architectural Forum developed the product for Rottlund.
Q. And that was not a project that you designed personally; correct?
A. Mr. Whitten did.
Q. Did Mr. Whitten, at any point in the design process, show you the back-to-back project that he had designed?
A. Certainly. We all knew what --
We all knew, in a sense, of what we were all working on.
Q. Did you consider it revolutionary when you saw a design like this, something that in 19 or 20 years as an architect you had never before seen a back-to-back townhome?
A. Well closer to 40 years as an architect or a designer, and --
Q. Well I'm sorry, this --
MR. DAVENPORT: Let him answer, please. You asked him a question --
A. I started out working for the Pemtom companies in the late '60s, and they were, at that time, and even retrospectively, they did the first townhome

communities in the Twin Cities; Windsor Green, Walden, Birnam Wood, and we were fairly innovative in doing those products back then.

Q. When you say "we," who do you mean?

A. Well Pemtom. Me -- Jack Buxell and myself, okay? So housing became kind of a specialty of ours, especially -- especially market-rate housing. When the product, the Villa product that was developed at Architectural Forum by Tim Whitten came about, it was pretty unique in the sense that it was a product that would give you fairly good density, and density, of course, is related to land costs, and as you probably know, that land costs are the -- probably the number one escalating cost back then, and continue to be, in housing development. So anything you can do to achieve a liveable housing unit and still achieve a high density is pretty unique.

Q. Let me go back and ask the question again.

When Mr. Whitten showed you his designs for a back-to-back townhome, did you find them revolutionary in that you'd never seen a back-to-back townhome in --

A. We had never --

Q. Sir, --

A. Yeah.

Q. -- let me finish my question.
-- in that you had never before seen a back-to-back townhome in the 18 or 19 years since you'd finished at the University of Minnesota?
A. No, I had not.
Q. Did you consider his designs revolutionary?
A. Well it's a relative question. What is revolutionary? I considered them unique, and very market applicable, and a very good density solution.
Q. And so, sir, as you sit --
A. So for a firm like ours which specialized in housing, it was a good product.
Q. Sir, as we sit here today you were unaware, is it accurate, that back-to-back product had been built in the Twin Cities area in the 1970's?
MR. DAVENPORT: Objection, assumes facts not in evidence.
A. I was unaware.
Q. And as you sit here today, you --
A. I mean what do you mean by "back-to-back product"?
Q. Well sir, I asked you a series of questions --
(Outside noise disruption.)
MR. FARMER: Off the record.
(Discussion off the record.)

BY MR. FARMER:
Q. Sir, I just asked you a series of questions about a back-to-back townhome design, and I guess I should have prefaced my question with this question: What do you understand a back-to-back townhome to be?
A. Back-to-back townhouse is -- well it could be a number of different configurations, but it would be -- probably -- well it's when there's a -- a property-line configuration that allows two units or more, two, four, six, eight, ten, to have a blank adjoining-property wall.
Q. Anything else?
A. Generally serviced on opposing sides by vehicles and front doors, access to the units.
Q. And when did you first gain this understanding?
A. Of what it was?
Q. Umm-hmm. Yes.
A. What it is? I don't know.
Q. Sir, prior to 1987 had you ever heard of or seen a product that fits the description that you just gave me?
A. No.
MR. FARMER: David, you said you needed to take a break for Mr. Mazzara to make a phone call. Is this the time you need?

Exhibit R26

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

- - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes, a Minnesota
Corporation,

Plaintiff,

vs.

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc.,
a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - -

Deposition of

ROGER E. CONHAIM

Wednesday, August 13, 2003

9:02 a.m.

A Yes.
Q Describe the Muse product to me.
A Oh, boy. I can't. I'm not able to. I can only refer to the fact that there was a builder in the Twin Cities who called their product a Muse product probably in the early '80s. And I don't recall what the format of that product was.
Q Fair enough. You testified just a minute ago that in the mid '80s you see back-to-back product starting to arrive in the Twin Cities?
A Starting to be built in the Twin Cities.
Q Who built it?
A Rottlund Homes.
Q Anybody else?
A Well, I've always felt in my professional capacity that they were probably the first to build that product.
Q In the Twin Cities?
A In the Twin Cities. Soon -- soon thereafter and I can't -- I don't know dates, I became aware of other builders building that product in the Twin Cities.
Q Do you remember names?
A BrightKeys probably comes to mind as being the next one I saw of that product.

Exhibit R27

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

---

The Rottlund Company, Inc.
d/b/a Rottlund Homes, a Minnesota
corporation,

Plaintiff,

vs.

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois corporation, and
Town & Country Homes, Inc.,
a Minnesota corporation,

Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa corporation,

Third-Party Defendant.

---

Videotaped Deposition of
LARRY MOORE
Thursday, September 4, 2003
9:40 a.m.

the Town & Country end.

Q. And in terms of your involvement with design development, was Steve Sandelin involved from the Town & Country end?

A. Specifically, I can't rem- -- I can't remember of any instance. But I -- I guess he probably was. I'd be guessing, but it --

Q. Do you know who was involved from the Town & Country end or anyone involved from the Town & Country end during the construction document phase for the Homestead Collection?

A. Other than the people I've already mentioned, no, I wouldn't know of any additional.

Q. Now, I believe you testified in your last deposition that you were the one that came up with the schematic designs for the Homestead Collection. Correct?

A. Correct.

Q. Were those designs derived from any other BSB of Iowa project?

A. They were derived from ideas that came out of our -- our marketing design file.

Q. Okay. Which marketing design file?

A. Which marketing design file? The design -- the design file -- the marketing design file in our

marketing department. That's one large collection of files for all of our company, for resource we have.

Q. And I think we covered that the last time, so let me get more specific this time. Did you look at any marketing designs from Sandburg Village, a development in Chicago, Illinois?

A. I don't recognize that name.

Q. How about a four-wheel -- a fourplex pinwheel built by Kimball Hill, did you look at that material when you were working on the schematic designs for the Homestead Collection?

A. I didn't specifically access it. But I know that project, so I didn't have to.

Q. And how is it that you know that Kimball Hill fourplex pinwheel project?

A. I've seen it in the design file, going through it for other projects.

Q. Was it built in the late '70s?

A. Couldn't tell you when it was built. I don't look at that data.

Q. Did it predate your start with BSB of Iowa, the design and construction of the Kimball Hill project? I'm talking about the pinwheel.

A. I don't know when it was built, so I don't

know if it predated it or not. I -- you know, I don't know.

Q. Let's get back to your earlier testimony. And I don't want to mischaracterize it, but I'm not sure if you looked at the Kimball Hill designs when you were working on the schematic design for the Homestead Collection or not. What happened in that regard?

A. In reference to the Kimball Hill?

Q. That's right. Did you look at the Kimball Hill designs when you were working on the schematic design phase for the Homestead Collection?

A. No, I don't think I did specifically for that.

Q. How about the Hemphill at Adare Farm designs, did you look at those when you were coming up with the schematic design for the Homestead Collection?

A. No, I don't think I did.

Q. How about the Coventry Court for Town & Country Homes, did you look at those designs when you came up with the Homestead Collection schematic design?

A. I don't remember those, no.

Q. How about the Streamwood project for Kirk

Corporation, did you look at those designs when you came up with the schematic design for the Homestead Collection?

A. I was familiar with those, but I did not access them.

Q. Now, let's -- I -- I think you said you were familiar with Kimball Hill's designs, and now you've told me you're familiar with the Streamwood designs, correct?

A. And -- and familiar in that I have seen them as I've gone through files, accessing them for -- for other marketing purposes. So I don't have a tremendous -- tremendous familiarity with it, but, yeah, I have seen those names.

Q. Okay. Did you derive the Homestead's schematic design from the Kimball Hill designs?

A. No.

Q. Did you derive the Homestead Collection schematic design from the Streamwood designs?

A. Specifically, no. Ideas came out of all of those projects, which, you know, were incorporated as far as ideas on how to assemble room locations and elements and things like that, so --

Q. When you say, "all of those projects," could you tell me which projects you're referring

to?

A. Well, specifically the ones that -- that I used and had in my files were Midland, Good Value Homes, Jerry's Homes. Those are the three I can remember off the top of my head.

Q. And those are the three that you gave me before. I think that there was a fourth back-to-back that you worked on, but it postdated your schematic design for the Homestead Collection. Let me make sure I get that right. DeMaria?

A. DeMaria.

Q. That was after the Homestead Collection, right?

A. Yes. Correct.

Q. Okay. So the ones you looked at were Midland, Good Value, and Jerry's Homes. DeMaria came later. Let me just keep working through this list, though. In terms of the Adare Farm and College Hill, did you have any reference point or opportunity to look at those designs --

A. Could I --

Q. -- during the schematic --

A. Could I --

Q. -- design process?

A. Excuse me. Could I see that list? Because

Q. It is -- it is substantially different. And the next question is, is the Homestead Collection substantially different than the Midland back-to-back townhome?

A. Yes.

Q. Is the Homestead Collection substantially different than the Jerry's Homes back-to-back townhome?

A. Yes.

Q. Why do you say that the Homestead Collection is substantially different than the Jerry's Homes back-to-back townhome?

MS. NEWMAN: Objection, form and foundation. Go ahead if you can make the comparison without those documents in front of you.

THE WITNESS: From what I can recall without the documents in front of me is that there are, once again, substantial differences to detailed items in the plan, to the elevations, materials, massing of the building, volumes, proportions of those. That's general. Without looking at drawings and comparing, you know, elements, I couldn't go into more break -- detail breakdown.

BY MR. KRUMMEN:

Q. Is the Homestead Collection more similar to

Midland or more similar to Rottlund's Villa II back-to-back townhomes?

MS. NEWMAN: Objection as to form and foundation. You can answer if you can do that without comparing documents.

MR. CARMICHAEL: Join in the objection as to the word "similar."

MS. NEWMAN: Go ahead.

THE WITNESS: I don't think you could categorize it more or less similar than -- than any one project. They all have their specific feel and collection, combination of elements that I think makes each one what it is; unique, if you want to call it that.

BY MR. KRUMMEN:

Q. Is the Homestead Collection more similar to Rottlund's Villa II back-to-back townhome or more similar to Jerry's Homes back-to-back townhome?

MS. NEWMAN: Same objections. Go ahead.

THE WITNESS: Since -- since we used our experience on the BSB projects, I would have to say it's more similar to -- to Jerry's Homes.

BY MR. KRUMMEN:

Q. So in your opinion, the Homestead Collection back-to-back townhome design is more

Value's back-to-back design versus Rottlund's Villa II design, correct?

MS. NEWMAN: Objection as to form and foundation. Go ahead.

THE WITNESS: Yeah, I would say it's more similar to Good Value.

BY MR. KRUMMEN:

Q. Now, you said you didn't have access to Rottlund's materials. Maybe I mischaracterized that, but is it your testimony that you didn't have access --

A. No.

Q. -- to anything of Rottlund's --

A. No. That's --

Q. -- when you designed the Homestead Collection?

A. That's not -- that's not a correct statement. We had access. We did not access them. We did not use them.

Q. When you say you had access, I believe that you told me in the last deposition that you toured Rottlund's Villa II during the schematic design phase for the Homestead Collection. Correct?

MS. NEWMAN: Objection as to the form of the question. I think it mischaracterizes the prior

MS. NEWMAN: Objection as to foundation. You can answer if you know.

THE WITNESS: I don't know if it's been produced in this -- since it's come to light, I mean, for me to see that and refresh my memory. I -- I don't know where that stands in this process.

BY MR. KRUMMEN:

Q. Can you sit here and testify with certainty that the competition product survey you received from Art Plante in May of '98 did not have any Rottlund materials in it?

A. Nothing I saw -- nothing I saw had Rottlund materials in it here.

MR. KRUMMEN: Move to strike the question. Could you read back my prior one, please.

THE REPORTER: Your last question?

MR. KRUMMEN: Move to strike the response. If you could read back my last question, please.

(The requested portion of the record was read by the reporter.)

MS. NEWMAN: Objection as to form. Go ahead and answer if you know.

THE WITNESS: I can't say for certainty what -- what was in it exactly.

BY MR. KRUMMEN:

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,
vs. Case No. 01-CV-1980
Pinnacle Corporation (DSD/SRN)
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,
Defendants,
and
Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,
vs.
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF LARRY W. MOORE
VOLUME II, Pages 215 - 378

(The following is the deposition of LARRY W. MOORE, taken pursuant to Notice of Taking Deposition, by videotape, at the offices of Winthrop & Weinstine, 225 South Sixth Street, Suite 3500, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:09 o'clock a.m., February 17, 2004.)

produce. Because at the time they were giving us the price the design wasn't done. So I think this was put together to say, here's the scope of what you have to do; it's a building of this size, it's a building of this many units and the units repeat, and that way Design Development was able to give us a price on what their services would cost.

Q. So you gave Exhibit 330 to Design Development, Inc.?

A. That's --

I believe that to be correct.

Q. So you gave Design Development, Inc. what you've admitted are Rottlund floor plans at the inception of this Midland townhome design process; is that fair?

A. As a guide or as a program guide for them to establish scope, yes.

Q. Did you give Design Development, Inc. any floor plans other than what appears in front of you as Exhibit 330 which you understand belonged to Rottlund at the time?

A. No, I don't believe I did, but I don't remember. I don't remember there was anything else.

Q. We've ruled Design Development, Inc. out as the candidate for pasting together these individual floor plans of Rottlunds which appear on Exhibit 330;

correct?
A. I would rule them out, yeah.
Q. Can you rule yourself out, Mr. Moore?
A. No, can't.
Q. So as we sit here today you may have pasted together Rottlund's floor plans and created Exhibit 330; correct?
MS. NEWMAN: Objection, asked and answered. You may answer again.
A. There's a possibility I -- yeah, that was my work.
Q. Have you endeavored to find out whether indeed you did create Exhibit 330 or not?
A. No, there's no way I could -- nine or ten years ago there's no way I could know that for sure.
Q. But you could check your files to see if there were any other, I guess, documents which would refresh your recollection; correct?
A. The files have been checked.
Q. You have checked those files personally?
A. No, I handed those files over to the people in our office who had that responsibility --
Q. So --
A. -- for this process.
Q. Have you looked through, prior to today's

Exhibit R28

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

THE ROTTLUND COMPANY, INC.,
d/b/a Rottlund Homes, a
Minnesota Corp.,
Plaintiff,
vs
PINNACLE CORPORATION, d/b/a
TOWN & COUNTRY HOMES, an
Illinois Corp., TOWN &
COUNTRY HOMES, INC., a
Minnesota Corp., BLOODGOOD
SHARP BUSTER ARCHITECTS &
PLANNERS OF IOWA, INC., an
Iowa Corp., and THE
BLOODGOOD GROUP, INC., an
Iowa Corp.,
Defendants.

Case No. 01 CV 1980

------------------------------

TOWN & COUNTRY HOMES, INC.,
a Minnesota Corp.,
Third-Party Plaintiff,
vs
BLOODGOOD SHARP BUSTER
ARCHITECTS & PLANNERS OF
IOWA, INC., an Iowa Corp.,
Third-Party Defendant.

The deposition of TOM RYAN taken pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at One Pierce Place, Suite 295-E, Itasca, Illinois, commencing at 8:55 a.m, on the 9th of December 2003.

REPORTED BY TERRI A. CLARK
CSR LICENSE NO. 084-001957

Q. If I heard you earlier this morning correctly you were in Minnesota as the division president from January of 1993 for approximately two and a half to three years, correct?

A. Correct.

Q. Let's just start with the year 1993. And my question is was there net income at the Town & Country Minnesota division level or was there net loss?

A. I don't think there was net income for four, five years.

Q. So four or five years clearly includes the two and a half to three years that you spent in the Minnesota division, correct?

A. Yes.

Q. And so it's fair to say that there were no net income, there was no net income in the 1993 through 1995 time span, correct?

A. Correct, yes.

Exhibit R29

moments glance at two photographs of the exterior that they're substantially similar?

MR. KRUMMEN: Misstates his prior testimony. You may answer.

A I don't believe I said that.

BY MS. NEWMAN:

Q You can make a decision that the exteriors of the townhomes are substantially similar by driving by and spending two minutes looking at them?

A Two completed structures and looking at just the exteriors, I drove by those two, I know ours, I know theirs, they are substantially similar. They are almost identical. I drive by sometimes and I'm wondering why did we build there? In that particular case I can't -- they are completed there. They're available. You're asking two different forms and you're asking a piece of the puzzle. It's not fair.

Q Would you look at Exhibit 27 that's before you, page 1908?

A Yes.

Q Now you have the entire building floor plans for each of the units in front of you, is that correct?

A Yes.

Exhibit R30

UNITED STATES DISTRICT COURT DISTRICT O

FOURTH DIVISION No.:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -The Rottlund C

d/b/a Rottlund Homes, a MinnesotaCorporation,

Plaintiff,vs.

Pinnacle Corporationd/b/a Town & Country Homes,

an Illinois Corporation, andTown & Country Homes, Inc.,

a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc.,

a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &

Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

Videotaped

30(b)(6) Deposition of

BLOODGOOD SHARP BUSTER ARCHITECTS &

PLANNERS OF IOWA, INC.

(Testimony of Larry W. Moore)

Thursday, March 6, 2003 (Volume I, pages 1 - 61)

Friday, March 7, 2003 (Volume II, pages 61 - 327)

Q Now, you identified DeMaria Building Company on your resume. You just testified that that's a form of back-to-back, correct?
A Correct.
Q Are there any others on this resume that are back-to-back or some form of back-to-back?
A (Reviewing.) I do not believe so.
Q Okay. How much involvement did you have with the DeMaria Building Company? I believe you identified it as retail on the first floor and back-to-back on the two above that?
A Correct.
Q How much involvement did you have in that project?
A Initial client contact, working with the program script the client brought to us, design. And pretty much at design -- the end of schematic design, it would start to transition to our project manager and his team.
Q What year was that, or years?
A I'm going to say the process started in 1999.
Q So that was after you were involved in the Town & Country Homestead Collection back-to-back?
A Correct.
Q So far we've identified projects you were involved with as, number one, Midland Homes; number two,

Good Value Homes; number three, Jerry's Homes; number four, DeMaria; and then Town & Country of Minnesota. All of those were projects that you worked on that involved some kind of back-to-back townhome, correct?
A Correct.
MS. NEWMAN: Object to the form of the question.
BY MR. KRUMMEN:
Q I believe you said that your involvement in the Mid- -- in the Midland Homes case was initial client contact. Correct?
A Correct.
Q Did you have any other involvement beyond the initial client contact?
A Well, after --
MR. FARMER: Objection. Asked and answered.
A Client contact, again, the -- working with the program the client brought to us, schematic design.
BY MR. KRUMMEN:
Q You'd call that something more than minimal involvement, as you used the term, correct?
A Yes.
Q How would you characterize your involvement in the

Midland Homes case? Would it be substantial involvement?

MR. FARMER: Objection. Form.

MS. NEWMAN: Same objection.

A In the -- in the Midland Homes back-to-back townhouses?

BY MR. KRUMMEN:

Q Yes, sir.

A That would be a substantial contribution to the project.

Q And then on the Good Value Homes back-to-back project, I believe you used the words "minimal involvement." Correct?

A Yes.

Q Jerry's Homes back-to-back project, I believe you used the worms -- the words "minimal involvement." Correct?

A I would use the words "very minimal" on that project.

Q Thank you. And then DeMaria, how would you characterize your involvement in that project?

A Substantial.

Q And obviously substantial involvement in the Town & Country back-to-back project, correct?

MR. FARMER: Objection. Form.

knowledge of what they do. I'm more familiar with
their product that's front-to-back.
Q I'm using Exhibit 101 sort of as a marker
chronologically, and the next question is not tied
to Exhibit 101, although that may help you in
answering it. When was the first time you
discussed a back-to-back townhome design with
anyone at Town & Country of Minnesota or anyone at
Town & Country of Illinois?
MR. FARMER: Object to the preamble.
A The first time would have been when Art Plante
contacted us about the possibility of doing that
work in probably March '98.
BY MR. KRUMMEN:
Q Did you take any notes or do you have any memoranda
regarding that initial contact?
A That I don't remember. It -- it would be in my
schematic file, if it existed.
Q What do you recall about that conversation?
A Quite -- quite little. Very little.
Q Do you recall anything about the conversation you
had sometime in March of 1998 with Mr. Plante about
the possibility of designing a back-to-back
townhome for Town & Country?
A What I do recall is that Art wanted us to come up

and discuss the program, and we talked about it. I mean, it was a back-to-back. We knew we were going to be doing that.

And I think he gave me enough preliminary information that -- that I researched our files. I went armed with the knowledge of -- of what we had done previously, the company, BSB.

Q You say you went armed with the information of what BSB had done previously. Do you mean with respect to back-to-back townhome projects?

A That's correct.

Q So in looking through the old files, is it fair to say you looked at the materials that related to, say, the Midland Homes back-to-back project you were involved with?

MR. FARMER: Object to form.

A I think I probably did.

BY MR. KRUMMEN:

Q And also the Good Value Homes that BSB of Iowa was involved with, back-to-back project?

A I would say I did, yes.

Q And you also looked through the Jerry's Homes back-to-back files that BSB of Iowa was involved with?

A That's correct.

Q But the DeMaria project didn't start until 1999, so
you didn't look through those files, correct?
A That's correct.
Q Did you look through any other materials at BSB
Iowa or anywhere else before you went up to speak
with Art Plante?
A I may have. I really don't remember.
Q Did you speak with anyone from -- well, strike the
question.
Are you familiar with an entity known as Tracy
Cross Associates, Inc.?
A Yeah, I'm familiar with Tracy Cross Associates.
Q Have you worked with Tracy Cross in the past?
A Yes.
MS. NEWMAN: Objection as to form.
BY MR. KRUMMEN:
Q Let's -- when did you first begin working with
Tracy Cross?
A I -- I'm -- I'm -- early '90s. I'm make -- making
a guess.
Q Do you recall what the project was that you worked
on that Tracy Cross -- well, strike the question.
Was it a project the first involvement you had
with Tracy Cross or was it something else?
A It was a project.

identification by the reporter.)

THE REPORTER: 114.

BY MR. KRUMMEN:

Q Before you as Exhibit Number 114 is a transmittal from you to Steve Sandelin at Town & Country Homes. The date is Tuesday, May 5, 1998, and it relates to a villa townhomes project. Have I accurately characterized the exhibit thus far?

A Correct.

Q The bottom right-hand corner contains the Bates label BSB 01944, and under the "Remarks" you wrote, "Steve," colon, quote, "Competition product survey for Minneapolis area," period, end quote. Have I accurately read that?

A Yes.

Q What does the competition product survey language refer to in your transmittal?

A I do not remember this. I don't think we had any kind of a product or project survey that I remember.

Q How would you go about finding whatever it was that you transmitted to Mr. Sandelin in connection with this Tuesday, May 5, 1998, transmittal, as you sit here today?

MS. NEWMAN: Objection. Foundation. Calls for speculation. You can answer if you know.

MS. NEWMAN: Objection as to form.
MR. FARMER: Object. Form.
A No. But it has been, in the past, that we'd give an administrative assistant the responsibility of gathering information and then firing it off to somebody. So that could be a -- that could be a situation where I wouldn't necessarily know what was in the file, in the -- in the transmittal. I don't know if that's the case here.
BY MR. KRUMMEN:
Q Exhibit 114, the competition product survey referenced there, did it contain any materials from Tracy Cross Associates?
MS. NEWMAN: Objection. Asked and answered. And foundation. Form. Answer if you know.
A I don't know.
BY MR. KRUMMEN:
Q Do you have any knowledge regarding the competition product survey file that's referenced in Exhibit 114, as you sit here today?
MR. FARMER: Objection. Asked and answered.
MS. NEWMAN: Same objection.
A I do not know what that was.

A I believe so, yes. Late March.
Q So Mr. Plante contacted you in late March of 1998 and invited you to come up to Minnesota to discuss a back-to-back possibility program?
A Correct.
Q What happened next?
A Chris Jorgensen and I took a trip up to Minneapolis and met with Art and at least one of his group, in -- in their offices. We got up there, I think it was in the morning.
Q And you met with him before you signed the contract, correct?
A Correct.
Q Did you go on a tour of any of Town & Country of Minnesota's competitors when you were up there in March of 1998?
MR. SCHWIEBERT: Object. Form.
A Yes, we did.
MR. FARMER: Foundation as to the time of the trip.
BY MR. KRUMMEN:
Q Which competitors' products did you tour in March of 1998?
MR. FARMER: Same objection.
A There were several--we had quite a full day--spread

out all over the place. There's a number.
BY MR. KRUMMEN:
Q Do you recall any of the competitors whose products you toured?
A A few. Centex, Pulte -- I'm -- I think Pulte. Rottlund. There were a number of smaller builders that I'm just not familiar -- that familiar with. I believe Ryland. Those are the ones that come to mind.
Q Did you look at a Rottlund back-to-back townhome during your tour that occurred in March of 1998?
A Yes. Yes, we did.
Q Do you recall where it was located?
A No.
Q Did you take any notes of your tour of the Rottlund back-to-back townhome in March of 1998?
MR. FARMER: Object to foundation --
A No.
MR. FARMER: -- as to the time.
BY MR. KRUMMEN:
Q Did you take any pictures, videotapes of the Rottlund back-to-back townhome?
A No.
Q Did anyone else in your group do so?
A Not that I remember.

Q Did anyone else in your group take notes of the Rottlund back-to-back townhome that was toured in March of 1998?

MR. FARMER: Foundation objection as to time.

A Not that I remember.

BY MR. KRUMMEN:

Q Were any brochures picked up by anyone in the group during the tour of the Rottlund back-to-back townhome in March of 1998?

MR. FARMER: Same objection.

A I don't remember having any brochures to look at as we were riding from project to project. I just know that Chris and I did not pick up brochures.

BY MR. KRUMMEN:

Q Did either of you look at any competitor brochures during the tour that occurred of back-to-back townhomes in March of 1998?

MR. FARMER: Same objection.

A I don't recall any brochures, no, I don't.

BY MR. KRUMMEN:

Q Do you recall any Rottlund brochures that you looked at during the March of 1998 tour of Rottlund's back-to-back townhome?

MR. FARMER: Same objection.

A No.

BY MR. KRUMMEN:

Q Why was it necessary to look at Rottlund's back-to-back townhome in March of 1998?

MS. NEWMAN: Objection as to --

MR. FARMER: Objection. Foundation as to time frame and as to the necessity. Form of the question.

MS. NEWMAN: Objection as to form.

A We looked at a lot of products primarily to help us, BSB, get a feel for that market. I guess we liked to put ourselves in the buyer's shoes, go out, tour the product, see what I like to say is how sophisticated the market is, how -- what the interiors, the quality of the furnishings and -- and how they decorate the units. It tells you a lot about what the builder will expect as far as a -- a design of a product and just general feel. So we -- we kind of just shop it that way from the buyer's viewpoint.

BY MR. KRUMMEN:

Q Were there any other reasons for touring Rottlund's back-to-back townhome and other competitors in March of 1998?

MR. FARMER: Objection. Foundation as to

time frame.
A In -- in general, again, we just -- we'd like to see the products that are out there to see -- with our experience nationally, there are a lot of good trends and things that we can bring to any product. We like to understand if those are in the market or not.
Again, as I said, the buyer's perspective is important to us. We go in and we -- we look for mistakes. We look for obvious things that the -- the -- the -- the builders in that market are doing or not doing. Like I say, from our experience, we have a lot of opportunities to bring great ideas in from all over the country.
And generally we don't -- we don't study the competition. We're not there long enough. I mean, this is -- there's a lot of things we're doing in one day. It wasn't a full day either. But we look for opportunities to basically one-up the competition.
BY MR. KRUMMEN:
Q What do you mean by that?
A We see a mistake they're making and we better it. If their rooms are too small, we make them bigger. If their closets are too small, we make them

bigger. We better it.
Q What mistakes did Rottlund make in its back-to-back townhome which you toured in March of 1998?
MS. NEWMAN: Objection.
MR. FARMER: Objection. Foundation. Form.
MS. NEWMAN: Same -- same objections. Go ahead.
A I don't know that I noted anything specific. Again, we weren't studying individual units to that -- to that extent. Glaring errors we would look at. Nothing stands out in my mind from any specific product.
BY MR. KRUMMEN:
Q Did you meet with Mr. Plante or anyone else that represented Town & Country, after the March of 1998 tour?
MR. FARMER: Objection. Foundation as to time frame of the tour.
A After the tour, we went back to Des Moines, generated the proposal and then put that back in front of Art by mail, I'm sure, or fax, and then moved into schematic design after that. I don't remember that we had any more face-to-face meetings through the process.

Exhibit R36

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc. d/b/a Rottlund Homes, a Minnesota Corporation,

Plaintiff,

vs.

Pinnacle Corporation d/b/a Town & Country Homes, an Illinois Corporation, and Town & Country Homes, Inc., a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc., a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

Discovery Conference
Wednesday, November 26, 2003
10:46 a.m.

without the benefit of these documents.

So that is Rottlund's position as to the scope of the deposition. Give us a time limitation if BSB demands one, but don't limit us to this document and this document only when there are attachments we'd like to ask about and context that we need to put in.

MAGISTRATE JUDGE NELSON: Ms. Newman?

MS. NEWMAN: All right. In concept I don't really have a problem with establishing some form of time limitation. I think that's fine.

Let me address the attachment issue. No attachment exists in BSB's files. Again, I say to you there has been no withholding of any documents. You have got a memo that references some items, but those items are not available to produce. If they were, we would produce them but they're not. They're not there. We don't have them. There's no documents that are being withheld.

So to suggest that, well, you can't limit it these documents that you produced because we also want to talk to you about attachments that we don't have is going to end

Exhibit R37

BLOODGOOD SHARP BUSTER
ARCHITECTS & PLANNERS, INC.

JOB DATE 8 July

Jim -

TED GROB'S 8-PLEX

Exhibit 338
Date: 2-17-04
Debby J. Campeau
Stirewalt & Associates

- OUR DESIGN
- HIS REDLINES & REDESIGN
- ROTTLUND PRODUCT

1. YOUR OPINION - IS OUR DESIGN ENOUGH "DEPARTURE" FROM ROTTLUND (DESIGN OF THIS 8-PLEX NOT 8-PLEX CONCEPT, ROTTLUND CAN'T © CONCEPT

BSB 10208

2. ANY THOUGHTS ON TED'S REVISIONS ?

LM.

3001 Grand Avenue
Des Moines, IA 50312
515/283-0404

15436 N. Florida Ave. Suite 101
Tampa, FL 33613
813/265-4808

400 Capitol Mall 9th Floor
Sacramento, CA 95814
916/449-3979

3436 N. Kennicott Suite 260
Arlington Heights, IL 60004
708/253-0404

Exhibit R38

UNITED STATES DISTRICT COURT DISTRICT O

FOURTH DIVISION No.:

- - - - - - - - - - - - - - - - - - - - - - - - - - - -The Rottlund C

d/b/a Rottlund Homes, a MinnesotaCorporation,

Plaintiff,vs.

Pinnacle Corporationd/b/a Town & Country Homes,

an Illinois Corporation, and

Town & Country Homes, Inc.,

a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc.,

a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &

Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

Videotaped

30(b)(6) Deposition of

BLOODGOOD SHARP BUSTER ARCHITECTS &

PLANNERS OF IOWA, INC.

(Testimony of Chris A. Jorgensen)

Wednesday March 5, 2003 9:07 a.m.

they take place in Minnesota or were they predominantly over the telephone prior to the time that Exhibit 26 was authored?

MR. SCHWIEBERT: Objection. Form.

A Generally they were probably over the phone. There was a time prior -- prior to this proposal where myself and Larry Moore went up to Minneapolis and met with the client.

BY MR. KRUMMEN:

Q Now, you went up to Minneapolis and met with the client prior to April 6th of 1998, correct?

A Yes. I believe it was the end of March, first of -- first of April.

Q Was the purpose of that trip to discuss back-to-back townhomes or did you go up there for other reasons?

MR. FARMER: Objection to form.

MS. NEWMAN: Same objection.

A That certainly was one of the topics or perhaps the main topic. We would have -- we would have talked about our general projects on the single-family as well and -- and this townhouse program also.

BY MR. KRUMMEN:

Q Did you review any documents concerning back-to-back townhomes that Town & Country of

Minnesota may have had in mind, during that meeting?
A Reviewed documents?
Q That's right. Did they, for example, give you any brochures of competitors and say, "Here are some back-to-back townhomes that are doing well in the Minneapolis market"?
A Well, no. At that time we -- we toured some product in the -- in the marketplace and certainly had the opportunity to discuss this program and then the -- the competition in the marketplace as well.
Q So to make sure I understand the date, prior to the time this contract was drafted you went on a tour up in the Minneapolis area with the Town & Country of Minnesota people?
A Yes.
MR. FARMER: Objection. Foundation.
BY MR. KRUMMEN:
Q And did you tour back-to-back townhomes built by Town & Country of Minnesota's competitors?
A Yes.
Q Which competitors' townhomes did you tour during the March tour?
A The ones I generally recall are the ones I

mentioned earlier. It would -- would have been Centex, I believe Ryland and Rottlund, and I -- there was others. And there may have been product that was not back-to-back as well.

Q What was the purpose of that tour, as you understood it?

A To -- to become -- for -- for BSB to come -- become familiar with Town & Country's competition in the marketplace. Given that -- that we're -- we're here in Des Moines at times, we will do product tours with -- with -- with the client.

Q And why is that necessary from BSB Iowa's perspective?

MR. SCHWIEBERT: Objection. Foundation.

MS. NEWMAN: Same objection.

A Just to get a sense of what is being built in the marketplace from a cost construction standpoint. You know, that's an important factor in -- in designing a project for a client, that -- understanding that, what -- also what -- what the buyers are seeing and what -- what they are looking for in the marketplace.

BY MR. KRUMMEN:

Q I believe you testified earlier that you, Mr. Jorgensen, and Mr. Larry Moore participated in

this tour that occurred in late March or early April of 1998. Correct?
A Yes.
Q Did anyone else from BSB Iowa attend that tour?
A No.
Q Who on behalf of Town & Country of Minnesota attended?
A Art Plante and Bill Anner.
Q Do you know what Bill Anner's position was at Town & Country Minnesota at the time?
A Land development acquisition type of role. I'm not sure what his title was.
Q Was anyone else present on the March 1998 tour?
A Not that I recall.
Q Did anyone take a camera along on this tour?
A Not that I recall.
Q Did anyone pick up any brochures of the competitors or marketing materials from the competitors?
A I'm certain people looked at brochures. When you go into a model home, you'll -- one of the first things you'll do is look at the floor plans. A lot of times they'll have them up on the wall for -- for potential buyers and the public to -- to view, so sometimes that's not necessary.
But certainly from, you know, our viewpoint, I

mean, we -- we look at the -- the floor plans that they're offering. And then typically we would not take those with us. At least I wouldn't. And then we would walk the product.

Q What do you mean by "walk the product"?

A Walk through the models that the -- the -- the builder is offering to the public.

Q Now I want to get a little more specific here, and I'm going to confine the tour of the Rottlund product in March of 1998. For the next series of questions, they're confined to Rottlund.

Did you look at any Rottlund marketing materials during the March 1998 tour? And when I say, "you," I'm referring to Mr. Jorgensen.

A I may have looked at a brochure, yes.

Q Did Mr. Larry Moore look at any Rottlund marketing materials or brochures during the March 1998 tour?

A I couldn't say.

Q How about Mr. Art Plante?

A I couldn't say.

Q And the same question for Mr. Bill Anner.

A I couldn't say for certain.

Q Do you recall anyone taking any pictures, in that March of 1998 tour, of Rottlund's product?

A I don't recall, no.

give him pause.
A No. I mean, the product brochures are -- are public information. Certainly they're available and open to me as -- as they are to anyone.
BY MR. KRUMMEN:
Q And the Rottlund brochures were copyrighted, were they not? They had a copyright notice on them?
MS. NEWMAN: Objection.
MR. FARMER: Objection.
MS. NEWMAN: Foundation.
MR. FARMER: Foundation.
MS. NEWMAN: Calls for speculation. Form.
A Yeah. I don't know whether they did or not.
BY MR. KRUMMEN:
Q Regardless, you kept those in your Jerry's Homes file, correct?
MR. SCHWIEBERT: Objection. Foundation.
A Yes. They are there.
BY MR. KRUMMEN:
Q And Jerry's Homes' was a back-to-back townhome that you worked on in the year 1997, correct?
A Correct.
Q And here we are in the year 1998 and you're working on a back-to-back townhome for Town & Country

foundation.

BY MR. KRUMMEN:

Q Is this the first time when BSB became aware that the villas project was going to be changed to the Homestead Collection project?

MR. FARMER: Objection. Form and foundation.

MS. NEWMAN: Same objections.

A I don't know.

BY MR. KRUMMEN:

Q Do you recall hearing that they were going to change the names of the villas project to Homestead Collection, prior to September 1 of 1999?

A I don't recall.

Q Do you recall anything about when the name change occurred?

A No, I don't.

Q But you do understand that the villas back-to-back project is now known as the Homestead back-to-back collection, correct?

A That's correct.

THE VIDEOGRAPHER: Off the record. Ending tape 1 at 11:16.

(Deposition Exhibit Number 82 was marked for identification by the reporter.)