Civil No. 01-1980 (DSD/SRN) -- Rottlund / Pinnacle
Davenport Affidavit dated July 19, 2004

# THIS EXHIBIT HAS BEEN OMITTED

Exhibit R53

Exhibit R56

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

The Rottlund Company, Inc.,

Plaintiff,

vs. Case No. 01-1980

Pinnacle Corporation, et.al.,

Defendants.

---

THE HONORABLE SUSAN R. NELSON

United States Magistrate Judge

* * * *

TRANSCRIPT OF PROCEEDINGS

* * * *

Date: February 23, 2004

Reporter: Leslie R. Pingley

unable to do that. It is not --

THE COURT: Well, then I need an affidavit explaining that it because it would be highly unusual to discard any of your client's files in the pendency of litigation, so I would certainly need to understand why that's the case.

MR. SCHWIEBERT: Well, the Art Plante transmittal that you're talking about happened before the litigation was pending.

THE COURT: Well, sure.

MR. SCHWIEBERT: Art Plante and, I just want to clarify this because it came up earlier, Town & Country Minnesota, Inc. and Art Plante are clients of Fredrikson and have been for some time.

THE COURT: Right.

MR. SCHWIEBERT: So although we represented Pinnacle at the time they were our client.

I do not believe that we can recreate the attachments that were attached to that Art Plante letter. I

am just being honest. I don't -- it's not maintained in the file in such a way that you can say it's that.

THE COURT: Well, then I need that in a --

MR. SCHWIEBERT: I can submit an affidavit explaining --

THE COURT: I guess I need an explanation for why on earth that wouldn't be the case, yes.

MR. SCHWIEBERT: Okay. I know what the BSB one is. We have talked about that a bunch of times, fine.

What's the third transmittal? I don't understand.

THE COURT: There's a transmittal from Pinnacle, is there not?

MALE SPEAKER: There is the -- I think it's BSB 1980 and it makes reference to Mr. Plante's files that were sent. There's a reference to Chris Jorgenson's files. We do not know whether Mr. Karau contacted Mr. Jorgenson after Mr. Plante

Exhibit R58

UNITED STATES DISTRICT COURT DISTRICT O

FOURTH DIVISION No.:

- - - - - - - - - - - - - - - - - - - - - - - - - - - -The Rottlund C

d/b/a Rottlund Homes, a MinnesotaCorporation,

Plaintiff,vs.

Pinnacle Corporationd/b/a Town & Country Homes,

an Illinois Corporation, and

Town & Country Homes, Inc.,

a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc.,

a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &

Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

Videotaped

30(b)(6) Deposition of

BLOODGOOD SHARP BUSTER ARCHITECTS &

PLANNERS OF ILLINOIS, INC.

(Testimony of Douglas N. Buster)

Thursday March 6, 2003 9:03 a.m.

BY MR. KRUMMEN:
Q Any recollection of any conversations with Mr. Sandelin about the back-to-back idea?
MR. FARMER: Objection. Form.
A No. The only conversations I've had on back-to-back has been related to the transfer of Minneapolis product to the Chicago market. That's all.
BY MR. KRUMMEN:
Q I want to back up to early 1998 and ask you what your position was and which entity you worked for at BSB.
A I think at the time in '98 I would have still been a part of the Illinois corporation in terms of working for the Chicago office. And about '9- -- let's see. So about '99 I went to the headquarters function, representing the entire company.
Q So when you were speaking with Steve Sandelin about the front-to-back townhome referenced in Exhibit 101, you were working for BSB Illinois; is that true?
MS. NEWMAN: Objection as to foundation, form. Go ahead.
A I don't know the exact date. But any conversation I've had with Steve Sandelin was on front-load

through townhouses, not on back-to-back townhouses ever.

MR. KRUMMEN: And I'll move to strike as nonresponsive.

BY MR. KRUMMEN:

Q The question, sir, related to which hat you were wearing. Was it the BSB Illinois group that you were working for as of April 9, 1998, or was it someone else?

A On April 9, 1998, I would have been speaking to Steve Sandelin about front-load through townhouses, probably representing the Illinois group, but I may have also been functioning as a national representative as well because of the connection with Town & Country.

Q Now, what do you mean by "a national representative"?

A Meaning that I have an interest in all the company as the majority stockholder of our company.

Q But you didn't --

A I'll help any -- any office that needs my help at any time. I tend to help them, and that's been for a long time, not just since '99.

Q But as of April of 1998, you were not working for the parent company, The Bloodgood Group, Inc., were

you?

A I work for the parent company every day. But my billing was assessed through the Illinois corporation in 1998.

Q Where was your title held?

A My title at the time?

Q Correct.

A Been senior vice president.

Q Of BSB Illinois, correct?

A Of -- of -- no. Of Bloodgood Sharp Buster Architects and Planners, Inc. Had nothing to do with BSB Illinois, my title. My title has never been broken down to Illinois.

I have an office in Illinois. I represent the entire company. Even before going on to a headquarters function, I represented the entire company.

If I did work for one of the regions while I was involved with a region, I would bill intercompany, work to that region, whether it be Iowa or California or Florida. And if I did work for Chicago, I billed my time to Chicago.

Q Could you pull Exhibit 97 back out of the pile.

A (Complies.) Uh-huh.

Q As of April 9, 1998, which box did you work for?

MR. FARMER: Objection. Foundation.
A As of April 09, 1998, I worked for every one of those boxes.
BY MR. KRUMMEN:
Q As of April 9, 1998, which entity on Exhibit Number 97 did you hold position or positions with?
MR. FARMER: Objection. Foundation regarding this document.
A I don't know the legalities of your question. In April of 1998, my title was senior vice president of Bloodgood Sharp Buster Architects and Planning, Inc., and I had a senior vice president role in virtually all of these subsidiary companies of the parent company, The Bloodgood Group.
BY MR. KRUMMEN:
Q Including the Illinois entity, correct?
A Sure.
Q Why were you talking to Steve Sandelin about front-to-back townhome designs in or about April of 1998?
MS. NEWMAN: Objection as to form and foundation. Go ahead.
A As -- as if the question is related to why am I speaking to Steve Sandelin about front-to-back, front through -- front-loaded through townhouses

for the Minneapolis market? Is that your question?
BY MR. KRUMMEN:
Q It is.
A Because I was acting as a liaison to make sure that Steve Sandelin felt comfortable transferring Town & Country work to another group outside the Chicago area, because he had never worked with any of our other groups before.
Q What was your involvement, if any, subsequent to this conversation with Mr. Sandelin that occurred in or about April of 1998 --
MR. FARMER: Object to form.
BY MR. KRUMMEN:
Q -- as to Town & Country Minnesota townhomes, be they front-to-back, back-to-back or of any other type?
A I don't have any recollection whatsoever. I personally don't ever remember the meeting happening, because I assume that they decided to go to a back-to-back. I had talked to Steve Sandelin about front-load only. I've never had the conversation with Steve about back-to-back.
Q So as far as you can recall, the next interaction you personally had with respect to back-to-back townhomes and Town & Country Minnesota was when

A My involvement was a process of working for the Illinois office at the time and redeveloping the exteriors to be put into the Chicago market. I had no involvement with the plans. I had no involvement with the transfer of the product. I had no involvement with any units, any co-change or any other aspect of work. Only conceptual design work for the elevation.

Q When you say, "conceptual design work for the elevation," what are you referring to?

A I re-elevated Town & Country/BSB Minneapolis back-to-back townhouses for the Chicago marketplace.

Q And when you say you re-elevated them, what does that mean?

A I looked at what they were building in Minneapolis. I -- I didn't feel it was the right product for the Chicago market. I believe I was requested also by Town & Country to relook at it for the Chicago market, and they gave it -- Joe Safin asked me to help out on the project in terms of coming up with a design to be used in the Chicago marketplace, which I did, and then turned my designs back over to BSB Illinois to incorporate into their jurisdictional transfer.

knowledge?

A Well, from experience, for one thing. From my traveling around the country, I've seen many back-to-back products, but I've seen also a multitude of other multifamily product types, and particularly in the Kimball Hill Talbot Mill case.

It was really a combination of knowing back-to-back as well as active, adult, multifamily product, flat villas, a ranch villa product, understanding how single-floor living works, understanding how to connect a ranch -- a flat-over-flat product to a townhouse product and make the roofs work.

So from my part, it was past experience. For others, it may have been an educational process of structures or connections but less on the design more than the technical. I probably led the design at that time.

Q Do you know whether, since that project was built, Kimball Hill has built any other back-to-backs in the Chicago area?

A I have no idea. They had been building back-to-backs for years, well from the early '80s, if not the '70s.

Q Now, you talked a bit about your work preparing

re-elevations --

A Mm-hm.

Q -- in connection with Washington Square.

A Yes.

MS. NEWMAN: You have to say yes.

A Yes.

BY MR. FARMER:

Q Thanks.

How did you get involved with that work?

A Well, I don't --

Q Who asked you to do it?

A Joe Safin. Joe Safin is the partner who runs the Chicago office. Joe generally gets me involved with multifamily for sure but generally would have not got me involved with a simpler product like a back-to-back, except for probably his schedule.

I may have gotten involved because the rest of the designers were tied up on existing commitments, but I remember Joe just simply asked me could I work on Town & Country's back-to-back re-elevation, as well as my past relationship with Town & Country people and the fact that I'd worked with them for so many years on so many different other product types.

Q Now, can you give me a time frame for when this

together today in this lawsuit?

A I've never seen or walked Rottlund product from their land. I have driven through Minneapolis with friends and other business things that we've done in Minneapolis and seen a Rottlund sign and seen that it was a Rottlund community.

I've never been in a Rottlund community, I've never walked a Rottlund community, and I did not have Rottlund material with me when I re-elevated or did Washington Square.

Q Had you had any discussions with Steve Sandelin or anybody else at the Pinnacle Lombard office regarding Rottlund product at the time you embarked upon the re-elevation?

A No. Word never came up.

Q Take me through what you did in terms of this re-elevation work. Number one, how long did it take you to do?

A Well, I'm generally considered extremely fast. I'm considered one of the fastest designers in -- in our office as well as in the industry. But since it was our own product that I was working from, it wasn't a reestablishment of a new.

I -- I probably took the existing elevation sheets off of the BSB Iowa drawings, laid them down

on my table to get the -- the scale element of the building, simply was able to recreate the massing so that I didn't have to start from scratch on the massing, but then pulled out the bottom sheet and just started to feel how the building looked and keep what I wanted to keep and not keep what I wanted to keep. My part on that generally takes a day and a half or two.

Q What do you mean by "recreate the massing"?

A Well, I first studied the building, keeping gables. And I didn't like that for Aurora. I thought Aurora could afford the -- the feel of the hip. And then breaking down the scale of the building, so I changed stuff from a gable to a hip.

Q Explain the term "massing."

A "Massing" is generally the scale, the mass of the building. It's how it tends to feel as you look at an architectural element. Generally what -- what we try to do in suburban multifamily work is break the scale of massing to lower on the ends, higher in the middle.

And if it's an extremely simple product and it -- it simply has a one-truss design across -- which every builder has in their portfolio. It's not a matter of being embarrassed about simple

Exhibit R62

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

FOURTH DIVISION

| | | |
|---|---|---|
| THE ROTTLUND COMPANY, INC. d/b/a ROTTLUND HOMES, A MINNESOTA CORPORATION<br><br>Plaintiff<br><br>vs.<br><br>PINNACLE CORPORATION d/b/a TOWN & COUNTRY HOMES, AN ILLINOIS CORPORATION, TOWN & COUNTRY HOMES, INC., A MINNESOTA CORPORATION, BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., AN IOWA CORPORATION, AND THE BLOODGOOD GROUP, INC., AN IOWA CORPORATION<br><br>Defendants<br><br>and<br><br>TOWN & COUNTRY HOMES, INC., A MINNESOTA CORPORATION<br><br>Third-Party Plaintiff<br><br>vs.<br><br>BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., AN IOWA CORPORATION<br><br>Third-Party Defendant | ) | No. 01-CV-1980<br><br>DEPOSITION OF STEVEN THIES |

Reported by: Connie Overberg, RPR, CSR

Q. Do you have any information about Town & Country's access to Plaintiff's copyrighted works?
A. Only that some of our ex-employees do work for them.
Q. Just so we have your complete knowledge on that topic, what former Rottlund employees are you aware of that went to work for Town & Country?
A. I am aware of Marc Harris, Joey Zorn, Chad Cooper.
Q. And Mr. Harris, Mr. Zorn and Mr. Cooper were all Rottlund employees out of the Iowa Division, correct?
A. There was also a vice president of architecture Tim Johnson works for -- I can't remember his last name.
Q. Tim Johnson is right.
A. Tim Johnson is somebody from the purchasing department, and a guy from the land -- I want to say Pommerant (sic).
Q. Richard Palmiter?
A. Palmiter. Those are the people that I am aware of.
Q. Did you personally know Tim Johnson?
A. I met and talked to him.
Q. About what?

Q. More than 10?
A. Does that count the divorce?
Q. Excluding the divorce.
A. Probably less than 10.
Q. How many times for Rottlund, do you know?
A. Counting this one?
Q. Counting this one.
A. Two or three. Counting, and maybe, you know, it may be more because of the Meadows litigation.
Q. In the past have you been on any mind altering drugs or any prescription medication that would affect your ability to remember events or recall events at the time?
A. Not to my knowledge.
Q. Have you ever been accused of a crime of moral interpretude?
A. No.
Q. In the Oaks litigation do you know the Judge's order dismissing the -- I am sorry -- the preliminary injunction? Do you know of that?
A. I know that under advice from my counsel that that whole proceeding had been sealed, and I am not to answer any questions about the Oaks litigation.

Exhibit R63

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation, and
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation, and
The Bloodgood Group, Inc., an
Iowa corporation
Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF KAREN J. ALBERTSON
August 25, 2003

(The following is the deposition of KAREN J. ALBERTSON, taken pursuant to Notice of Taking Deposition, at the offices of Fredrikson & Byron, 4000 Pillsbury Center, 200 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:14 o'clock a.m., August 25, 2003.)

the product built by Rottlund known as the Villa?
A. Yes.
Q. As I understand it, the Villa has three iterations that are referred to as the Original Villa, the New Villa and the Villa II. Are you familiar with all three of those types of Villa?
A. No.
Q. Are those names that you've heard before?
A. When I started at Rottlund the Villa II, basically, was what we were building at the time. I know that there was a version prior to that, but I really had nothing to do with it.
Q. You're familiar with the Villa II.
A. Yes.
Q. Okay. What knowledge do you have that relates to the copyrighted nature of the Villa II?
A. Only that every document that Rottlund does is copyrighted, every plan that we do is copyrighted.
Q. This is a Rottlund policy.
A. Yes.
Q. How are you aware that that -- that there is such a policy?
A. General knowledge I suppose, and the fact that every plan that has ever been on my desk has been copyrighted.

Q. It isn't that it's somewhere in a Rottlund procedures manual or that someone drew you aside and specifically told you, you just remember hearing that all of Rottlund's plans are copyrighted. Is that about accurate?
A. Yes, and seeing that they all have the copyright logo on them.
Q. Have you ever helped in preparing a copyright for the Villa II?
A. No.
Q. Have you ever seen a copyright application for the Villa II product?
A. No.
Q. Has anyone ever described what Rottlund does in terms of copyrighting its Villa II?
A. No.
Q. Is it fair to say that the knowledge that you have that relates to plaintiff's copyrighted works is that you're aware that Rottlund copyrights its plans?
A. Yes.
Q. And that you're aware that that's general policy.
A. Yes.
Q. And that you don't have any specific knowledge regarding whether a particular plan was copyrighted

other than to say it's general policy that they would be.

MR. KRUMMEN: Objection, mischaracterizes her testimony. You may answer.

A. All I know is that we copyright everything. So whether a specific one is or isn't, I would say that we do on all of them.

Q. This paragraph says you have knowledge of the facts and issues involved in this matter including knowledge related to plaintiff's copyrighted works. Do you have knowledge of any other fact or issue that relates to this lawsuit?

A. Such as?

Q. I think I'm asking you. Are you aware of any other fact or issue that's relevant to this lawsuit?

A. Besides the Dan Geegan correlation, and there's also -- there was another person in my department, Jeff Corneia, that also left and went with Dan Geegan. I know that this is a copyright issue regarding the Villa product.

Q. Well let me stop you and let's talk about the two issues that you raised. Now you said you knew about the Dan Geegan correlation. Explain that to me. What is it about Dan Geegan?

A. Only that he was in my same position, had access

to the same information that I have access to, as well as Jeff Corneia, and they both have left Rottlund and worked for Town & Country.

Q. When you say they had access to the same information that you have access to, what information are we talking about?

A. Any of the -- the bidding documents, the plans, quantity takeoffs, pricing information, vendor information, anything.

Q. Same thing for Mr. Corneia.

A. Yes.

Q. So as I understand your testimony, you know, number one, that Rottlund's plans are typically copyrighted as a matter of general principle; you know, number two, that Dan Geegan and Jeff Corneia left Rottlund and began working for Town & Country Homes of Minnesota. Is there any other fact or issue that you know of that is relevant in this lawsuit?

A. No.

Q. Okay.

MR. PATRICK: I think that's all the questions I have for right now. Thank you.

EXAMINATION

BY MR. SCHWIEBERT:

Q. Ms. Albertson, we already met, I'll introduce

A. I guess yes.
Q. Do you have any specific memory of communities that have those back-to-back products?
A. No.
Q. And you don't remember when the first time you saw a back-to-back product was.
A. No.
Q. You just know they've been around for awhile.
A. Yes.
Q. Have you ever been inside a Town & Country back-to-back product?
A. I don't think so.
Q. Have you ever seen a Town & Country back-to-back product?
A. I don't think so.
Q. Have you ever heard of the Pinnacle Corporation?
A. No.
Q. Ever heard of Town & Country?
A. Yes.
Q. And you've heard of them because a couple of former Rottlund employees are now there.
A. I've --
I knew the name before I knew that, yes.
Q. Have you ever had any discussions with any employees of Town & Country Homes, Inc.?

A. Only when Dan Geegan left.
Q. Was that a discussion with Dan Geegan?
A. Yes.
Q. So this was at -- when he left Rottlund and before he started at Town & Country; is that right?
A. Yes.
Q. Do you remember what you discussed with Dan Geegan?
A. He implied that if I would like to go with him that that opportunity would be there.
Q. Did you ever interview with Town & Country?
A. No.
Q. How did he imply that that was true?
A. He basically said that, that if -- if I was interested, that he would see what could be done.
Q. That's your memory of exactly what he said, if you were interested he would see what he could do, or what could be done?
A. I guess I don't know the exact wording, but something along those lines, yes.
Q. Have any discussions with anyone else at Town & Country?
A. No.
Q. Have you ever had any discussions with anyone -- Well let me back up.

Exhibit R64

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation, and
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF STEPHEN T. SWANSON

(The following is the deposition of STEPHEN T. SWANSON, taken pursuant to Agreement of Counsel, at the offices of Fredrikson & Byron, 4000 Pillsbury Center, 200 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:01 o'clock a.m., July 31, 2003.)

A. Yes, I do.

Q. What was his name?

A. Mike Burton.

Q. Okay. And he asked for a vendor list, a list of Rottlund's vendors.

MR. FARMER: Could you spell that, "Mike"?

THE WITNESS: I'm guessing B-U-R-T-O-N, I believe.

Q. He came on site, he asked for a list of Rottlund's vendors?

A. Yes, he did.

Q. Okay. And it's your understanding that at that time he was employed by Town & Country Homes?

A. He volunteered that, yes.

Q. Okay.

A. And that was his assignment for the week or the day or the -- whatever the case may be.

Q. Did he say why he wanted it?

A. Basically that that was his directive, that he was -- just had gotten hired by Town & Country, what else did he say? Again I know of him because he worked for Rottlund at the same time I was employed by Rottlund. And that -- I remember he was be -- he was excited. I think he made mention that he would have been, had he had some computer knowledge or

background, he would have been a vice-president of operations instead of just simply a production manager in this case.

Q. What date are we talking about?

A. I can tell you exactly where it was. I believe it probably would have been '94, give or take a year. It was in a site in Apple Valley, and if memory serves me right that site would have been Green Leaf.

Q. Is the Villa product built in that development?

A. No.

Q. Okay. Did he get a list of vendors?

A. Well no, he did not.

Q. Are you aware of any other instances in which Town & Country Homes of Minnesota had access to Rottlund's copyrighted products?

A. No, I don't.

Q. Okay. Are you aware of any instances in which Bloodgood Sharp Buster had any -- had any access to Rottlund's copyrighted products?

A. No.

Q. Do you know who Bloodgood Sharp Buster is?

A. No, I don't.

Q. Have you ever heard the name before I introduced myself to you at the beginning of the deposition?

A. No.

Yeah, they're another -- I mean there --
There's Town & Country, there's Potlan -- or Pulte, there's Ryland, Centex. I'm aware that they're all here and exist.
Q. Okay. Would that be fair to say, that's what you know about Town & Country Homes is that they're another developer operating in the Twin Cities area?
A. Yeah, I probably know --
Town & Country has a lot of former Rottlund employees of which I know, and I infrequently do run into them at building functions or, you know, whatever.
(Telephone interruption.)
Q. Who --
Do you remember any of their names?
A. I remember quite a number of their names.
Q. Tell me who you remember.
A. Most recently Dan Cates, he's there. Joey Zorn, I believe he's still there, I'm not certain. He was a Rottlund employee. I spent a couple days with him in his training process, he came from Iowa. Tim Johnson, who's part of the architectural staff over there. Richard Palmiter. There might be some more, I'm --
Q. Okay.

list in the trailer that day?
A. Yes, to the degree that he wasn't going to be obtaining it.
Q. So is it accurate that you told Mr. Burton he was not going to get Rottlund's vendor list?
A. Yes, I believe I did.
Q. And what did Mr. Burton say to you?
A. Well I -- I think -- If you knew him it might make a little bit more sense. It -- He just went off on another subject and dismissed it like it was nothing. I still considered that a violation, not so much personally, but obviously the company that I worked for and represent, and still do.
Q. Now when was the last time you talked to Mike Burton?
A. Oh, it might have been two or three years ago. I do see him from time to time at various builder functions, Reggie Awards. To my knowledge it probably was two years ago, it might have been three years ago.
Q. Do you know for whom he currently works?
A. At that point I think he was working for Orrin Thompson.
Q. Do you know for whom he currently works?
A. No, I do not.

Q. And in your dealings with him over the years when you were at Rottlund together and even through today you've not had any reason to consider him anything other than an honest businessman; correct?
A. From my perspective, correct.
Q. When was the last time you talked with Joey Zorn?
A. I haven't seen him for awhile. Probably about a year and a half ago, it might even be two and a half years ago. It was a Lyman Lumber appreciation night at -- I believe that was in Minnetonka or -- I believe it was in Minnetonka. And I saw him briefly there, late towards the end of the evening.
Q. When was the lame time you talked to Dan Cates?
A. Dan Cates, same time I bumped into Tim Johnson, at the same function up in Majestic Oaks. The golf course at Majestic Oaks.
Q. Have you ever discussed this lawsuit with any of the gentlemen that we just talked about?
A. No, I have not.
Q. Have you ever been recruited to come to work for Town & Country Minnesota?
A. Yes, I have.
Q. When did that happen?
A. Five years ago, four years ago.

Exhibit R66

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,
vs. Case No. 01-CV-1980 (DSD/SRN)
Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation, and
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation, and
The Bloodgood Group, Inc., an
Iowa corporation,
Defendants,
and
Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,
vs.
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF MICHAEL A. SWANSON
August 18, 2003

they do business here through Town & Country Homes. Let's assume for a second that those are wholly separate corporations, that Pinnacle Corporation is an Illinois corporation that builds homes in Illinois and that Town & Country Homes, Inc. is a Minnesota corporation that builds only in Minnesota. Let's assume that for just a second.

Do you have any knowledge of the business conducted by Pinnacle Corporation other than the business done by Town & Country Homes?

MR. KRUMMEN: Object to the form of the question. Object to the hypothetical nature of the question. You may answer.

A. I guess I'm not sure exactly what you're asking.

Q. Okay.

A. I -- They attempted to hire me, if you want to get to that, and I had a meeting with Art Plante, had dinner with him actually, and talked over the opportunity there. They basically wanted me to come and do the exact same things I'm doing for Rottlund, and have for years, for their company.

Q. Well let's start with that. When -- When are we talking about, year-wise?

A. I think it was late '99, early 2000.

Q. Were you approached by somebody from Town &

Country Homes?
A. A headhunter called me first and then ended up setting me up to speak with Art Plante. Then we had dinner and a job over was made.
Q. And you ultimately declined.
A. Well it went on a little longer than that. They made a written offer, I made a counteroffer, then Mike Ryan flew in from Chicago to meet with me because, I made the assumption, not that they came out and said it, but a higher-level hire like they were looking at for myself, that the Ryans seemed to have a big part in making the decision on yea or nay that you're going to be hired. And they countered back and gave me everything I wanted, and for whatever reason I decided to stay with Rottlund.
Q. What reason was it?
A. Well I've been at Rottlund for almost 14 years and I basically have built my team there, and it's my home and I didn't want to leave.
Q. Was there an offer made at that time also to Steve Swanson?
A. Basically it was kind of a package deal, and they -- they approached me, and they -- and basically I told them that there may be some other people that might be interested if I would be making the move,

Exhibit R67

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation, and
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF KATHLEEN M. GARDAS

(The following is the deposition of KATHLEEN M. GARDAS, taken pursuant to Agreement of Counsel, at the offices of Moore, Costello & Hart, 55 East Fifth Street, in the city of St. Paul, state of Minnesota, commencing at approximately 1:32 o'clock a.m., June 26, 2003.)

A. That's correct.
Q. Do you have personal knowledge of the state of incorporation of Pinnacle Corporation?
A. No, I do not.
Q. Do you have any personal knowledge where the principal place of business of Pinnacle Corporation is?
A. No, I do not.
Q. Have you ever been to 1806 South Highland Avenue?
A. No, I have not.
Q. Have you ever been to Lombard, Illinois?
A. No, I have not.
Q. What part of paragraph 2 do you have personal knowledge of?
A. That there was someone from this particular location that contacted me approximately three to four years ago --
Q. The -- I'm sorry, I didn't mean to interrupt you.
MR. KRUMMEN: Let her finish, please.
A. -- that asked if I was interested in interviewing for a position with Town & Country Homes in Minnesota, and they asked if I was interested in coming to Chicago for -- or excuse me, coming to

Illinois for an interview.
Q. How do you know what location they were calling you from?
A. They identified themselves.
Q. They identified themselves as being at 1806 South Highland Avenue, Lombard, Illinois?
A. No, sir. When I asked them where they were calling from, they said Illinois.
Q. Okay. So when you said "from this particular location," you meant the state of Illinois.
A. That's correct. That's correct.
Q. Who from Pinnacle Corporation called you?
A. I don't recall the name.
Q. Are you aware of any documents or other things that would reflect the fact that this conversation took place three to four years ago?
A. No.
Q. Is there anything in paragraph 2 -- Let me start over again.
There's nothing in paragraph 2 about any discussions between you and Pinnacle Corporation; is there?
A. No, there is not.
Q. Any other paragraphs that you have personal knowledge about?

A. Just paragraph number 3, that they identified the position to be with Town & Country Homes in Minnesota.
Q. Is there anything --
There's nothing in paragraph 3 that has anything to do with a position at Town & Country Homes in Minnesota; is there?
A. No, there's not.
Q. Paragraph number 3 states that, "Defendant Town & Country Homes, Inc. ('TCM') is a Minnesota corporation whose principal place of business is 7615 Smetana Lane -- Smetana Lane, Suite 180, Eden Prairie Minnesota"; is that correct?
A. That's correct.
Q. Do you have any knowledge about the state of incorporation of Town & Country Homes, Inc.?
A. No, I do not.
Q. Do you have any personal knowledge about the principal place of business of Town & Country Homes, Inc.?
A. No, I do not.
Q. Have you ever been to 7615 Smetana Lane?
A. No, I have not.
Q. Ever been to Suite 180?
A. No, I have not.

Q. Are there any other paragraphs in Exhibit 136 to which you have personal knowledge?
A. Under the heading Villa II, as we have been discussing after -- and as I have answered questions regards to the Villa II.
Q. Okay. Which numbered paragraph?
A. It is the heading above paragraph number 17.
Q. So you have personal knowledge of the facts set forth starting at paragraph 17 and ending where?
A. I have infor -- or I have information about the Villa II product as I have answered the questions here today.
Q. Besides the answers you've already provided do you have any specific personal knowledge regarding the Villa II?
A. None that I've -- except for what I've answered here today.
Q. That you've already answered.
A. Yes.
Q. Okay. Are there any other paragraphs in Exhibit 136 to which you have personal knowledge?
A. No, sir.
Q. Did you ever interview with Pinnacle Corporation?
A. No, I did not.

Q. Did you ever receive any communication from Pinnacle Corporation regarding interviewing with them?
A. Besides that phone call, no, sir.
Q. No paper or no letter?
A. No, sir.
Q. Do you know when, specifically, that conversation allegedly took place?
A. I do not have the specific date.
Q. How about the year?
A. No, I don't have the specific year.
Q. What position do you believe that Pinnacle Corporation was asking you to interview for?
A. They did not at that time list a specific position title.
Q. Did you have a headhunter working for you at this period of time?
A. No, I do not.
Q. Do you have any idea why you would be contacted?
A. No, I couldn't speak for them.
Q. Were you contacted at work or at home?
A. At work.
Q. And you were at Rottlund at that point; is that correct?
A. That's correct.

A. Could you repeat the question?
Q. Well is there a homeowner's association for the West Fish Lake Townhomes?
A. Yes, there is.
Q. Okay. Is there a person in charge of the homeowner's association?
A. Yes, there is.
Q. Is it you?
A. No, sir.
Q. Who is the person?
A. I don't recall the president's name offhand. I don't recall his name in particular, who the president is.
MR. SCHWIEBERT: Craig, we'll request that the entire Metro Fire folder also be produced.
I have no further questions.
MS. NEWMAN: Nothing.
MR. FARMER: Just a couple.

EXAMINATION

BY MR. FARMER:
Q. Do you know what position you held at Rottlund at the time you received this call from Pinnacle Corporation?
A. I was the director of purchasing.
Q. So the call occurred during the last six years?

A. That's correct.
Q. Was it a man or a woman who called you?
A. It was a woman.
Q. And she identified herself, you just don't recall the name; correct?
A. That's correct.
Q. How long did the two of you speak?
A. I don't recall specifically, but I would say no more than ten minutes.
Q. Did she tell you how she got your name?
A. No.
Q. Did you ask?
A. No, I did not.
Q. As best you can recall can you tell me what she said to you and what you said to her?
A. She asked if I was interested in interviewing for a position with Town & Country at -- in Minnesota. And I said that I was not looking for a move at this time, that I had been working for Rottlund Homes and that I was happy there. And she asked if I would be interested in coming to Chicago for an interview and again I said I was not actively look for a position at that time. And she once again said we would like to interview you for a position with Town & Country Homes in Minnesota, and I -- once

again I said, I'm sorry, but I am not interested in a -- in -- for an opportunity with an interview with -- with Town & Country at that time.

Q. Was she badgering you or was she polite?

A. She was polite.

Q. Had you ever received a cold call like this before in your professional career? And "like this" I mean someone offering you a job interview unsolicited over the phone.

A. I have had a headhunter call and asked if I would be interested in coming in and interviewing, but they would never identify who they were representing. I've had that happen only once.

Q. Did the headhunter tell you what type of employer they were representing?

A. No.

Q. So you don't know --

A. Excuse me, I'm sorry. It was in the construction industry is the only thing they told me.

Q. And so at the end of your conversation with the woman who called from Illinois you had expressed to her that you were not interested in seeking new work and she let it go at that; correct?

A. Yes, she did.

Q. Did she ask you for any names of any other

# THIS EXHIBIT HAS BEEN OMITTED

Exhibit R68

Exhibit R74


PARTY WALL AT DRAFTSTOP
THRESHOLD DETAIL
ROOF CONST.
WALL CONST.
PARTY WALL AT FLOOR FOR UNIT 'C' TO 'D'
EAVE DETAIL AT 'C' UNIT ENTRY COLUMN
SPRINKLER ROOM SECTION
FOUND. @ UNITS 'C' TO 'D'
HALF WALL CAP DETAIL
SPRINKLER ROOM PLAN DETAIL
SECTION @ ELECTRIC METERS
CORNER FRAMING DETAIL
PERPENDICULAR PARTITION INTERSECTION
EXHIBIT
ROTTLUND HOMES
THE RESERVE
PLYMOUTH, MN
THE VILLA II
DETAILS
NOVEMBER 1, 2000
A10