Exhibit R100


R:\Town & Country Homes - 202118\AutoCAD Incoming
File Edit View Favorites Tools Help
Back Search Folders
Address R:\Town & Country Homes - 202118\AutoCAD Incoming
Go
Norton AntiVirus
Folders
Park Village
PINE TREE RETAIL
REGATTA COMMONS
Ron Mar Foods
St Louis Park
Town & Country Homes - 2021
3D
AutoCAD Incoming
CD-Clover Ridge
CD-Park Square
CD-Pinebrook
JUNK
Outdated as of 1-10-03
Outdated as of 12-17-02
Outdated as of 12-18-02
Outdated as of 1-31-03
Outdated as of 3-26-03
Outgoing
twin ponds townhomes
WEDGEWOOD RETAIL
Name Size Modified
0301551.dwg 266 KB 3/31/2003 5:17 PM
0301552.dwg 284 KB 3/31/2003 5:16 PM
0301553.dwg 269 KB 3/31/2003 5:16 PM
0301554.dwg 480 KB 3/31/2003 5:15 PM
ELEV-RICH.dgn 420 KB 5/2/2003 6:48 AM
Floor Plans v 14.dgn 847 KB 3/31/2003 11:31 AM
FLOOR PLANS v 14.dwg 913 KB 2/5/2003 12:28 PM
front door.dwg 38 KB 2/10/2003 6:03 PM
INT-ELEV 14.dwg 882 KB 5/2/2003 6:23 AM
INT-ELEV V14-4-17.dwg 1,031 KB 4/17/2003 10:44 AM
INT-ELEV.dgn 740 KB 5/2/2003 7:08 AM
INTERIOR ELEVATIONS v14.dwg 1,031 KB 5/16/2003 7:58 AM
STD EAVE DTL v 14.dwg 48 KB 3/5/2003 5:11 PM
TITLEBLOCK.dwg 417 KB 3/31/2003 5:15 PM
unit plans.zip 527 KB 2/5/2003 2:44 PM
15 object(s) (Disk free space: 496 MB)
7.99 MB
Local intranet

## GENERAL STRUCTURAL NOTES

STRENGTH OF MATERIALS
- CONCRETE: FOOTINGS F'c = 3000 PSI @ 28 DAYS. SLAB ON GRADE F'c = 3000 PSI @ 28 DAYS. ALL OTHERS F'c = 4000 PSI @ 28 DAYS. EXTERIOR CONCRETE SHALL CONTAIN ENTRAINED AIR.
- REINFORCING STEEL: ASTM A615, GRADE 60 EXCEPT TIES, GRADE 40
- DIMENSIONAL LUMBER: BEAMS: - HEM-FIR No.2 OR BETTER. STUDS: - SPRUCE-PINE-FIR STUD GRADE OR BETTER (2x4, 2x6 & 2x8). STUDS: - 2x6 TIMBERSTRAND LSL. E = 1,300,000 PSI, Fb = 1700 PSI. DOUBLE CAP PLATES AT ALL FLOORS & ROOF SHALL BE DOUGLAS FIR LARCH No.2 OR BETTER. LAMINATED VENEER LUMBER: Fb = 2600 PSI, E = 1,900,000 PSI, Fc (perpendicular) = 750 PSI, Fc (parallel) = 2510 PSI, Fv = 285 PSI
- ROOF TRUSSES: STRESS GRADED AS REQUIRED BY DESIGN
- FLOOR TRUSSES: STRESS GRADED AS REQUIRED BY DESIGN, LIVE LOAD DEFLECTION NOT TO EXCEED L/360.

DESIGN LIVE LOADS
- WIND: BASIC WIND SPEED 80 MPH
- ROOF: 40 PSF + SNOW DRIFT
- FLOOR: 40 PSF

BUILDING CODE
- 1998 MINNESOTA STATE BUILDING CODE AND AMMENDED 1997 UNIFORM BUILDING CODE.

FOUNDATION AND FOOTINGS
- MAXIMUM SOIL PRESSURE USED FOR DESIGN: 2000 PSF, GENERAL CONTRACTOR VERIFY BEFORE PLACING CONCRETE.
- SEE SOIL REPORT FOR EACH SITE.
- SOIL CORRECTION SHALL INCLUDE REMOVING ALL TOP SOIL, SWAMP DEPOSITS AND SOFT SOILS.
- FOOTINGS SHALL REST ON APPROVED UNDISTURBED SOIL OR WELL GRADED COMPACTED NON-EXPANSIVE GRANULAR FILL.
- SOILS ENGINEER SHALL OBSERVE FOUNDATION EXCAVATIONS AND TEST DENSITY OF ENGINEERED FILL BELOW FOUNDATIONS, FLOOR SLAB AND PAVING.
- CONTRACTOR SHALL PROVIDE TEMPORARY SOIL RETENTION SYSTEM DURING FOUNDATION CONSTRUCTION. THE RESPONSIBILITY TO PROVIDE SAFE WORKING CONDITIONS ON THIS SITE IS SOLELY THAT OF THE CONTRACTOR.
- FOOTING ELEVATIONS ARE GIVEN TO THE TOPS OF FOOTINGS.
- WALL FOOTINGS AND PIERS ARE CENTERED ON COLUMNS.
- PLACE NO CONCRETE UNTIL ALL REINFORCING STEEL FOR THE POUR IS TIED IN ITS PROPER LOCATION.
- WALL FOOTINGS TO BE STEPPED WHERE ELEVATION CHANGE 1 VERTICAL TO 2 HORIZONTAL IN VERTICAL INCREMENTS OF 1'-4" (MAXIMUM), UNLESS OTHERWISE NOTED.
- EXTERIOR WALL FOOTINGS SHALL HAVE 4'-0" MINIMUM SOIL COVER FOR FROST PROTECTION, MEASURED FROM BOTTOM OF FOOTING.

SLAB ON GRADE
- SLAB ON GRADE SHALL BEAR ON 6" GRANULAR BASE, VERIFY WITH SOILS ENGINEER. VERIFY FOR AREAS OF BUILDING THAT REQUIRE VAPOR BARRIER. IN THESE AREAS VAPOR BARRIER SHALL BE LOCATED BELOW 2" GRANULAR BASE.
- PRIOR TO PLACING CONCRETE, BASE FILL SHALL BE MOISTENED.
- INTERIOR FLOOR SLABS SHALL BE POURED AFTER BUILDING ENCLOSED.

REINFORCED CONCRETE
- CODE FOR REINFORCED CONCRETE DESIGN AND CONSTRUCTION - A.C.I. 318-89.
- REINFORCING SHALL BE DETAILED IN ACCORDANCE WITH A.C.I. DETAILING MANUAL.
- WHERE REINFORCING BARS ARE SHOWN CONTINUOUS, LAP BARS 40 DIAMETERS AT SPLICE, UNLESS OTHERWISE NOTED.
- PROVIDE SUITABLE WIRE SPACERS, CHAIRS, ECT. FOR SUPPORTING REINFORCING STEEL IN PROPER POSITION WHILE PLACING CONCRETE. ALL BARS SHALL BE TIED TO PREVENT DISPLACEMENT. FABRICATOR SHALL SUBMIT A COMPLETE LIST OF

WOOD ROOF AND FLOOR TRUSSES
- WOOD TRUSSES SHALL BE DESIGNED AND FABRICATED TO CONFORM TO TRUSS PLATE INSTITUTE STANDARD TPI - 85. WOOD TRUSSES SHALL BE INSPECTED DURING FABRICATION IN ACCORDANCE WITH THE TPI - 85. ADDITIONALLY, EACH WOOD TRUSS TYPE SHOP DRAWING SHALL BEAR A STAMP WHICH STATES THE NAME OF THE MANUFACTURER, THE DESIGN LIVE AND TOTAL LOADS, THE NAME OR LOGOGRAM OF THE INSPECTION AGENCY, A REFERENCE TO TRUSS PLATE INSTITUTE STANDARD TPI - 85 AND SIGNED BY A REGISTERED ENGINEER.
- TRUSS SUPPLIER SHALL PROVIDE BRACING DETAILS AND NOTES FOR ALL TRUSSES AND GABLE END WALLS ON THE TRUSS SHOP DRAWINGS.
- FLOOR TRUSSES SHALL BE DESIGNED FOR MAXIMUM LIVE LOAD DEFLECTION NOT TO EXCEED L/360.

DIMENSION LUMBER
- NATIONAL DESIGN SPECIFICATION FOR STRESS-GRADE LUMBER AND ITS FASTENINGS - LATEST EDITION.
- DIMENSION LUMBER SHALL BE AS NOTED ABOVE.
- ALL MEMBER SIZES GIVEN ON PLAN ARE NOMINAL DIMENSIONS.
- SPACING OF BRIDGING FOR FLOOR JOISTS SHALL NOT EXCEED 10 FEET.
- WOOD LINTELS OR HEADERS SHALL BEAR FULLY ON POSTS OR CRIPPLES. PROVIDE 1 STUD AND 1 TRIMMER(S) MINIMUM AT ENDS OF ALL LINTELS. SEE PLANS FOR ADDITIONAL MEMBERS.
- ALL POSTS, TRIMMER(S) AND STUDS SHALL BE BLOCKED SOLID BETWEEN FLOORS AND CONTINUOUS TO FOUNDATION.
- SILL PLATES BEARING ON CONCRETE OR MASONRY SHALL BE TREATED WITH A PRESERVATIVE AND ANCHORED WITH 1/2" ANCHOR BOLTS AT 4'-0" o.c.
- ALL TOP PLATES OF BEARING WALLS SHALL BE MINIMUM OF 2 - 2x's, ALL SOLE PLATES SHALL BE A MINIMUM OF 1 - 2x.
- ALL BEAMS AND JOISTS NOT BEARING ON SUPPORTING MEMBERS SHALL BE FRAMED WITH "SIMPSON" JOIST HANGERS OR EQUAL, USE TYPE STYLE JB.
- WOOD JOISTS SHALL BEAR ON THE FULL WIDTH OF SUPPORTING MEMBERS (STUD WALLS, BEAMS, ETC.) UNLESS NOTED OTHERWISE.
- FLOOR SHEATHING SHALL BE EXTERIOR GLUE 3/4" TONGUE & GROOVE, APA INDEX 42/16 EXPOSURE 1. TYP. NAILING SHALL BE 8d RING-SHANK 6" o.c. AT EDGES & 8" o.c. AT INTERMEDIATE SUPPORTS. ALL FLOOR SHEATHING SHALL BE GLUE NAILED TYPICAL. PROVIDE DOUBLE ROW OF NAILS AT ALL SHEAR WALLS.
- ROOF SHEATHING SHALL BE EXTERIOR GRADE 1/2" APA, (5/8" WHERE NOTED) INDEX 32/16 EXPOSURE 1. NAIL SHALL BE 8d COATED COMMON SMOOTH THAN 6" o.c. ALONG PANEL EDGES, 12" o.c. AT INTERMEDIATE SUPPORTS. PROVIDE NAILING AT 3" o.c. AT TRUSSES LOCATED AT SHEAR WALLS.
- "H" CLIPS REQUIRED FOR SHEATHING EDGE SUPPORT WHERE SUPPORTS SPACED AT 2'-0" o.c. OR GREATER. PROVIDE ONE "H" CLIP CENTERED BETWEEN ROOF TRUSSES AT UNSUPPORTED SHEATHING EDGES, WHERE NOTED ON PLAN.
- WALL SHEATHING SHALL BE 3/8" GYPSUM SHEATHING EXTERIOR GRADE WITH TREATED CORE. NAILS AT EXTERIOR WALLS SHALL BE GALVANIZED. SEE WALL SCHEDULE FOR NAILING REQUIREMENTS AND SPACING.

- MINIMUM REQUIREMENT FOR NAILS:

| | |
|---|---|
| ROOF TRUSSES | 3 - 16d EACH END |
| 2x FLOOR JOIST | 3 - 16d EACH END |
| PLYWOOD SHEATHING | SEE ABOVE |
| JOIST BRIDGING / BLOCKING | 2 - 10d EACH END |
| STUD TO SOLE PLATE | 4 - 8d TOENAIL (OR 2 - 16d FACE NAIL) |
| DOUBLE STUDS, FACE NAIL | 16d AT 16" o.c. (2 - ROWS, STAGGERED) |
| LINTELS, FACE NAIL | 16d - 2 ROWS AT 12" o.c. |
| LINTEL BEARING | 2 - 16d AT EACH 2x HEADER TO FULL HEIGHT STUD |

- MAXIMUM HOLE SIZE THROUGH WOOD STUDS:
  1. HOLES BORED UP TO 40% OF STUD DEPTH - 2x4 STUDS (1 3/8" DIAMETER HOLES); 2x6 STUDS (2 1/4" DIAMETER HOLES); 2x8 STUDS (3" DIAMETER HOLES). NO HOLES SHALL BE LOCATED CLOSER THAN 5/8" TO FACE OF STUD.
  2. BORED HOLES 40% TO 60% OF STUD DEPTH - THE CONTRACTOR SHALL DOUBLE THE STUDS.
- MAXIMUM HOLE SIZE THROUGH WOOD JOISTS AND BEAMS:
  1. HOLES BORED IN JOISTS SHALL NOT BE CLOSER THAN 2" FROM THE TOP OR BOTTOM OF THE JOIST, AND THE DIAMETER OF ANY SUCH HOLE SHALL NOT EXCEED 1/3 THE JOIST DEPTH.
  2. DO NOT BORE HOLES WITHIN 1/4 SPAN FROM SUPPORTS.
  3. SPACING OF BORED HOLES SHALL BE A MINIMUM OF 4 TIMES THE HOLE DIA.

GENERAL NOTES
- VERIFY ALL ARCHITECTURAL, MECHANICAL, AND ELECTRICAL OPENINGS FOR SIZE, LOCATION AND NUMBER IN THE STRUCTURE WITH ACCOMPANYING PLANS.
- THE STRUCTURE SHALL BE ADEQUATELY BRACED AND SHORED DURING ERECTION AGAINST WIND AND ERECTION LOADS. STRUCTURAL MEMBERS ARE DESIGNED FOR "INPLACE" LOADS.
- THE STRUCTURAL ENGINEER IS NOT RESPONSIBLE FOR THE MEANS AND METHODS OF CONSTRUCTION, NOR FOR THE SAFETY ON THE JOBSITE, AND THAT THESE RESPONSIBILITIES ARE INTENDED TO BE AND TO REMAIN SOLELY THOSE OF THE GENERAL CONTRACTOR.

INSPECTIONS
- CONTRACTOR SHALL NOTIFY THE BUILDING OFFICIAL WHEN WORK IS READY FOR REQUIRED INSPECTIONS BY THE BUILDING OFFICIAL.
- PERIODIC SPECIAL INSPECTIONS SHALL BE MADE BY A QUALIFIED TESTING LABORATORY.

EARTHWORK - (SPECIFITION SECTION 2200) OPTIMUM MOISTURE, MAXIMUM SOIL DENSITY, FIELD DENSITY AND ACCEPTANCE TESTS.

CAST-IN-PLACE CONCRETE - (SPECIFITION SECTION 3300) AGGREGATE TESTS, MIX DESIGNS, COMPRESSIVE STRENGTH, SLUMP AND AIR ENTRAINMENT.



1 / S1 FOUNDATION PLAN UNIT - "A"
1/8" = 1'-0"

NOTES:
1. SEE TYPICAL NOTES AT FOUNDATION PLAN 3/S1.



2 / S1 FOUNDATION PLAN UNIT - "B"
1/8" = 1'-0"

NOTES:
1. SEE TYPICAL NOTES AT FOUNDATION PLAN 3/S1.



3 / S1 FOUNDATION PLAN UNIT - "C"
1/8" = 1'-0"

NOTES:
1. REFERENCE ELEVATION (+0) EQUALS EL. 100'-0" TOP OF CONCRETE FLOOR. SEE PLAN FOR ELEVATIONS NOTED (-) FROM REFERENCE.
2. FOOTING ELEVATIONS GIVEN TO TOP OF FOOTING AND NOTED (-) FROM REFERENCE.
3. FOOTINGS ARE CENTERED ON WALLS AND COLUMNS U.N.O.
4. U.N.O. DENOTES UNLESS NOTED OTHERWISE.
5. CONTRACTOR SHALL COORDINATE ALL FTG. STEPS WHERE REQD. SEE DETAIL 9/S4. VERIFY LOCATIONS AND INVERTS OF ALL MECH. PIPES w/ MECH./CIVIL.
6. PROVIDE CONTROL JOINTS IN SLAB AT A MAX. SPACING OF 12'-0" o.c.

FOOTING SCHEDULE

| MARK | SIZE | REINFORCING EACH WAY, U.N.O. |
|---|---|---|
| A | 2'-0" x 2'-0" x 1'-0" | 3-#5 |

NOTE: SEE PLANS FOR FOOTING ELEVATIONS.

PIER SCHEDULE

| MARK | SIZE | REINFORCING | NOTES |
|---|---|---|---|
| P1 | 12"x12" CONCRETE | 4-#6 VERT. w/ #3 TIES @ 12" o.c. | |

NOTE: GROUT ALL CELLS SOLID.

TUSHIE MONTGOMERY ARCHITECTS

TOWN & COUNTRY TOWNHOMES
Pinebrook, Brooklyn Park, Minnesota

Prepared For: TOWN & COUNTRY HOMES

Meyer Borgman Johnson Structural Engineers

PINEBROOK TOWNHOMES

FOUNDATION PLAN AND GENERAL STRUCTURAL NOTES

S1


TUSHIE MONTGOMERY ARCHITECTS
TOWN & COUNTRY TOWNHOMES
Pinebrook, Brooklyn Park, Minnesota
TOWN & COUNTRY HOMES
SECOND FLOOR FRAMING PLAN AND DETAILS
S2
SECOND FLOOR FRAMING UNIT - "A"
SECOND FLOOR FRAMING UNIT - "B"
SECOND FLOOR FRAMING UNIT - "C"
HEADER SCHEDULE
BEAM SCHEDULE
POST SCHEDULE
TYPICAL HEADER DETAIL AT EXTERIOR WALL
TYPICAL FLOOR TRUSS BEARING AT EXTERIOR WALL
DETAIL




DETAIL
TYPICAL DETAIL BETWEEN GARAGE & UNIT
TYPICAL 2x6 PARTY WALL DETAIL
TYPICAL 2x4 PARTY WALL DETAIL
TYPICAL NON-BEARING WALL DETAIL
TYPICAL STOOP DETAIL




'A' UNIT INTERIOR ELEVATIONS


'B' UNIT INTERIOR ELEVATIONS


TOWN & COUNTRY HOMES
PLANS
'B' UNIT 3 BEDROOM UPPER LEVEL
MASTER BEDROOM
M. BATH
LAUN.
BEDROOM #2
BEDROOM #3
BATH
'B' UNIT STANDARD UPPER LEVEL
MASTER BEDROOM
BATH
MECH.
LAUN.
BEDROOM #2
LOFT
'B' UNIT MAIN LEVEL
STORAGE
POWDER
KITCHEN
GARAGE
DINING
LIVING

TM 00570











[Unlicensed]

TM 00571






'A' UNIT INTERIOR ELEVATIONS


'B' UNIT INTERIOR ELEVATIONS













Unlicensed


'A' UNIT INTERIOR ELEVATIONS
'B' UNIT INTERIOR ELEVATIONS




6/D3 TYPICAL EAVE DETAIL

SCALE: 1" = 1'-0"

TUSHIE MONTGOMERY ARCHITECTS

TOWN & COUNTRY TOWNHOMES

Pinebrook, Brooklyn Park, Minnesota

TOWN & COUNTRY HOMES

PINEBROOK TOWNHOMES

TM 00576

Exhibit R101

**6/9/2004 Bloom, Albert (BSB's expert architect)**

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

-----------------------------------------------------

The Rottlund Company, Inc.
d/b/a Rottlund Homes, a Minnesota
Corporation,

Plaintiff,

vs.

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc.,
a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

-----------------------------------------------------

Volume I

Deposition of

Albert H. Bloom, A.I.A.

Wednesday, June 9, 2004

8:09 a.m.

Q. What documents did you look at in coming up with that opinion?
A. I looked at the plans that were provided for the Homestead Collection, and I looked at the New Villa II plans that Rottlund or Tim Whitten had prepared. I also reviewed files that were provided from BSB regarding the procedure and the timeline of the design process that they went through with Town & Country.
Q. So you were asked to examine the plans to determine whether or not there was copying? That was one of the materials you were asked to review?
A. Yes.
Q. Did anyone ask you to examine whether or not there was similarity of ideas between the Villa II and the Homestead Collection?
A. Yes.
Q. Are there similarity of ideas between the Villa II and the Homestead Collection?
A. Yes.
Q. When you say there are similarity of ideas between the Villa II and the Homestead Collection, what do you mean?
A. They're very similar in concept. They're both back-to-back townhouse products. They have end units or exterior units. They also have interior units. They're

slab-on-grade construction. They're two-car garages. They have similar scope as far as the room counts go in living, dining, kitchen, bedrooming, loft spaces, and there's a similarity as far as the gross mass of the building size.
Q. Were you also asked to examine whether or not there was similarity of expression between the Villa II and the Homestead Collection?
A. I don't know what you mean by "expression."
Q. As expressed on these plans that you looked at, were you asked to examine how the Homestead Collection was expressed on the plans that you looked at versus how the Villa II was expressed on the plans that you looked at?
A. No.
Q. You have no opinion as to whether or not the expression of the Villa II and the expression of the Homestead Collection are similar; is that correct?
A. That's correct.
Q. How do you explain the difference between examining similarity of ideas and examining similarity of expression?
A. I don't know what you mean by "expression."
Q. So, in your opinion, your entire report relates to similarity of ideas?

MR. FARMER: Objection to foundation.

MS. NEWMAN: And objection to the form of the question and mischaracterizes evidence. Go ahead.

A. Yes, specifically the elevation in question, basically the gable side entry, is such a common feature that is used in both townhouse and single-family construction, it's not an issue of copying. There were many numerous -- numerous design changes made between the two, and it really is a functional adjunct to the building providing shelter. It's just one way of doing it.

BY MR. KRUMMEN:

Q. Was Town & Country required to put gable side entries over its doors as opposed to a sloped shed side entry?

A. Not that I'm aware of.

MR. SCHWIEBERT: Objection, no foundation.

BY MR. KRUMMEN:

Q. When you look at the total look and feel of the elevation of the Homestead Collection and one has a gable side entry, the other has a sloped shed side entry, are they the same?

MR. SCHWIEBERT: Objection to the form of the question.

MS. NEWMAN: Same objection, incomplete

MS. NEWMAN: Yeah, and also object to the form of the question in that it mischaracterizes the prior testimony on this subject. You may answer, though.

A. I'm not sure that BSB put the photograph or the note on this drawing.

BY MR. KRUMMEN:

Q. And that's fair. You understand that Mr. Art Plante, the president of Town & Country's Minnesota Division, put the note and the photo on the drawing, correct?

A. I believe that's what I've read.

Q. And then you understand that BSB subsequently changed the sloped roof side entry to a gabled roof side entry, correct?

A. Yes.

Q. Was it appropriate for BSB to make that change after receiving these Rottlund materials?

A. Yes.

Q. Why?

A. It's a standard roof form, and BSB has used it extensively throughout other projects and products.

Q. Was BSB required to put a gabled roof over the side entry of its Homestead Collection?

A. I don't believe they were required to, no.

of your report, did BSB use a turned gable on the Homestead Collection back-to-back product?
A. I believe they did, yes.
Q. Was BSB required to use a turned gable on the Homestead Collection back-to-back product?
A. I don't believe they were required to use it, no.
Q. They could have used something else, correct?
A. Yes.
Q. Turning to page 13 of your report, which is marked as Exhibit 388, do you see the "Powder Rooms" section?
A. Yes.
Q. Was BSB required to put a powder room on the first floor of the Homestead Collection?
A. I believe it was probably part of a program requirement.
Q. Who came up with that requirement?
MS. NEWMAN: Objection, foundation. You can answer if you know.
A. I don't know.
BY MR. KRUMMEN:
Q. As far as you know, there was no code requirement that demanded that BSB put a powder room on the first floor of the Homestead Collection, correct?
A. Not that I'm aware of.

Q. So this requirement that you identified for powder room that was in the program was either something generated by the client or by BSB, correct?
A. Yes.
Q. Could have BSB designed the powder room for the Homestead Collection differently?
A. Yes.
Q. Moving on to the "Fireplace Elevations," page 14 of your report, was there a requirement that BSB design a fireplace elevation for the Homestead Collection in the manner in which it appears today?
MR. FARMER: Objection to form. Required by the client? By the U.N.? What?
A. I don't know. I don't know what requirement would be necessary.
BY MR. KRUMMEN:
Q. Could have BSB designed the fireplace elevations for the Homestead Collection differently?
A. Yes.
Q. Moving on to page 16 of your disclosure, do you see your section that references "Rottlund's Fourth Amended Complaint"?
A. Yes.
Q. You categorize Rottlund's contentions in three very broad topics, correct?

A. Yes.

Q. Topic number 1 refers to Rottlund's claims concerning interior or exterior spaces, correct?

A. Yes.

Q. And then we have approximately 11 items listed that relate to this category of interior or exterior spaces of the Rottlund Villa II, correct?

A. Yes.

Q. The question is, could have BSB designed its loft for the Homestead Collection differently?

A. Could they have designed it differently?

Q. Yes, sir.

A. Yes.

Q. The next question is, could BSB have designed the garage for the Homestead Collection differently?

A. Yes.

Q. Could BSB have designed the living interior or exterior space for the Homestead Collection differently?

A. Yes.

Q. Could BSB have designed the dining interior space for the Homestead Collection differently?

A. Yes.

Q. Could BSB have designed the stairwell for the interior space of the Homestead Collection differently?

A. Yes.

Q. Could BSB have designed the kitchen for the interior space of the Homestead Collection differently?
A. Yes.
Q. Could BSB have designed the patio for the Homestead Collection differently?
A. Yes.
Q. Could BSB have designed the powder room for the Homestead Collection differently?
A. Yes.
Q. Could BSB have designed the master bedroom for the Homestead Collection differently?
A. Yes.
Q. Could BSB have designed the master bath for the Homestead Collection differently?
A. Yes.
Q. Could BSB have designed the second bedroom for the Homestead Collection differently?
A. Yes.
Q. Moving on to your second point, or category, regarding the contentions in Rottlund's fourth amended complaint, in general, you lumped together approximately three features and tagged them with the caption "exterior elevation features," correct?
A. Yes.
Q. The question is, could BSB have designed its side

entries differently?

A. Yes.

Q. Could BSB have designed the placement of the windows on the Homestead Collection differently?

A. Yes.

Q. Could BSB have designed the roof configuration for the Homestead Collection differently?

A. Yes.

Q. Moving on to point number 3, you then have taken Rottlund's allegations in its fourth amended complaint and lumped them into a topic called "the placement, layout and features of Rottlund's Villa II," correct?

A. Yes.

Q. And then you list approximately seven features in that general category, correct?

A. Yes.

Q. Could BSB have designed the fireplaces for the Homestead Collection differently?

A. Yes.

MR. FARMER: Objection, foundation as to whether BSB designed the fireplaces.

BY MR. KRUMMEN:

Q. Could BSB have designed the placement, layout and features of the surrounding details of the fireplace in the Homestead Collection differently?

A. Yes.

BY MR. KRUMMEN:

Q. Could BSB have designed the placement, layout and features of the detailing of the railings and moldings for the Homestead Collection differently?

A. Yes.

Q. Could BSB have designed the placement, layout and features of the pantry for the Homestead Collection differently?

A. Yes.

Q. Could BSB have designed the placement, layout and features of the peninsula breakfast bar in the Homestead Collection differently?

A. Yes.

Q. Could BSB have designed the placement, layout and features of the bathtubs in the Homestead Collection differently?

A. Yes.

Q. Could BSB have designed the placement, layout and features of the vanity sinks in the Homestead Collection differently?

A. Yes.

Q. Could BSB have designed the placement, layout and features of the toilets in the Villa II -- or excuse me, the Homestead Collection differently?

A. Yes.
Q. Then, you went through and you compared in your report the interior townhouse units of the Homestead Collection with those of the Villa II, correct?
A. Yes.
Q. Now, in terms of this interior townhouse unit, you speak of the first floor, and then on page 17, your last sentence says, "BSB's plan layout is similar to previous projects they have designed including Hansen & Horn, Jerry's Homes, Midland and others," correct?
A. Yes.
Q. Do you still have that Hansen & Horn elevation and --
A. Yes.
Q. -- floor plan in front of you? Did the Hansen & Horn back-to-back product have an interior unit?
A. No.
Q. So how can it be that the interior unit on the Hansen & Horn back-to-back townhome is similar to the interior unit of the BSB Homestead?
A. I was talking about the standard location of the standard spaces regarding living, dining, kitchen.
Q. So in your opinion, you can have an external floor plan on the Hansen & Horn back-to-back product that is similar to the internal floor plan on the BSB

Exhibit R102

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION
No.: 01-CV-1980 (DSD/SRN)

---

The Rottlund Company, Inc.
d/b/a Rottlund Homes, a Minnesota
Corporation,
Plaintiff,
vs.
Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,
Defendants,
and
Town & Country Homes, Inc.,
a Minnesota Corporation,

Third-Party Plaintiff,
vs.
Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

---

Deposition of
Jeffrey A. Scherer, FAIA
Wednesday, June 30, 2004
9:06 a.m.

as to the extent you still haven't provided what definition of original you want him to use.

MR. FARMER: Beyond the scope of the opinion he's been asked to give in this case.

A. The Town & Country and the Homestead townhomes both, I believe, solve very important and fundamental design problems for the potential buyer, and that each do it based on arranging those elements of the plan in a way that they believe best addresses the needs of their potential customers, and in my opinion, both the Homestead and the townhome -- Town & Country solutions solve that problem in their own way.

BY MR. KRUMMEN:

Q. Does the Homestead Collection have an unoriginal plan arrangement?

MR. FARMER: Same objections as before.

MR. SCHWIEBERT: Same objections.

A. The Homestead plan arrangement, I believe, arranges the plan elements in a conventional and in a logical order that relates to the way that an individual or a family would normally expect to be able to use the space in their day-to-day living. And whether or not one would characterize that as original or unoriginal, to me is not what I was asked to do. It's simply a matter of fact in my opinion that this arrangement of

plans and elements within the plan is solving through the interrelationship of those design ideas a very discrete and known market problem.

BY MR. KRUMMEN:

Q. Is Rottlund's plan an unoriginal plan arrangement, the Villa II plan?

MR. SCHWIEBERT: Same objection.

MR. FARMER: Scope of the opinion.

A. As I believe I just said, both Rottlund and Town & Country did a great job from their -- each of their own perspective of arranging the design ideas of a kitchen and a bathroom and a living room and a dining room to reflect the normal logical needs of the potential homeowners so that, as I understand it, when a person visits the model home in deciding whether they're going to buy one product or another, there are no surprises, and it allows them to make a judgment on whether or not they want to purchase that unit because it is a conventionally addresses their day-to-day living needs.

BY MR. KRUMMEN:

Q. So Rottlund's Villa II plan is an unoriginal plan arrangement or not?

MR. SCHWIEBERT: Objection, mischaracterizes his testimony, compound, asked and answered.

whether or not they want to purchase that unit because it conventionally addresses their day-to-day living needs.

BY MR. KRUMMEN:

Q. So Rottlund's Villa II plan is an unoriginal plan arrangement or not?

MR. SCHWIEBERT: Objection, mischaracterizes his testimony, compound, asked and answered.

MR. FARMER: Beyond the scope.

MR. PATRICK: Same objections as before.

A. Rottlund chose to -- as I understand it, chose to arrange the elements within their plan in a particular way that solved to the best of their market analysis and to the best of their ability how a potential purchaser would expect to use that townhome, and I believe they did a terrific job in arranging those design ideas in a way that -- that those potential purchasers would not be confused or surprised or questioned why certain elements of the plan were placed in juxtaposition to other elements.

BY MR. KRUMMEN:

Q. Do you have an opinion as to whether or not Rottlund's Villa II plan is an unoriginal plan arrangement?

MR. FARMER: Same objection, beyond the

scope of his opinions in this case.

MR. SCHWIEBERT: Vague to the extent that you haven't defined what an unoriginal plan element is.

A. I believe that the Rottlund plan demonstrates that Rottlund, as does the Town & Country plan demonstrate, that they clearly understand and have their finger on the pulse of how people live, how people work, how people cook, how people entertain, and how people expect their living needs to be met. And each of those companies, I believe, arranged the plan elements in a way that they felt best demonstrated their understanding and the needs of those potential homeowners. I can't speak to anything other than the facts that those arrangements of those plans in both cases, I believe, assembled those design ideas in a very -- in a way that addresses those problems very well.

BY MR. KRUMMEN:

Q. You seem to be reluctant to testify as to whether or not either plan is original or unoriginal. Is that a fair characterization?

MR. FARMER: Objection, argumentative, misstates his testimony.

A. My responsibility was to review and compare two plans. I -- I'm not a lawyer, and if one were to be able to answer the question that you've asked about

originality, I believe to do it fairly and objectively, one would have to analyze the plans of several hundred thousand townhomes around the country to determine if -- if, in fact, it was original. But what I was asked to do is to look at whether the two plans were substantially similar or not, and that's what I thought I did.

BY MR. KRUMMEN:

Q. Do you still have your preliminary report, which is Exhibit 422, in front of you, sir?

A. Yes.

Q. Could you turn to page 10? Do you see the first full paragraph two-thirds of the way down, you wrote, quote, "If we agree (as I believe Rottlund must) that the idea of an eight-unit, back-to-back row of townhomes is not protectable, then I would contend that the arrangement of the basic elements of the interior is also not protectable," end quote. Did you write that?

A. I did.

Q. Then you go on to say, "In any event, the sworn testimony of the BSB architects supports my opinion that they independently created their own plan arrangement." Is that a fair reading of your report?

A. You've read it correctly.

Q. Would you read the next sentence of your report

arrangement does not solve the living needs of potential homeowner in a way that hasn't been solved before.

Q. Why would you need to look at hundreds of thousands of Twin City builders to figure out whether or not a plan arrangement is original when your report says all you looked at was Centex?

MR. FARMER: Miss Tate's earlier testimony he didn't limit it to Twin Cities builders.

A. I believe what I said, Mr. Krummen, was that in order to objectively get at the question of originality, the basis for that would have to be broader than what I was doing here. In this case, what I believe I was trying to do was to state that the marketplace, the Twin Cities marketplace, for example, has within it a certain set of expectations that these homeowners bring with them. They expect to be able to logically cook dinner for their family, they expect to logically being able to bring that food from the kitchen to the dining room, and they expect to be able to entertain their family and friends, they expect to be able to easily get from the garage to the kitchen, they expect to conveniently use the bathroom, to kiss their children good night, and what I meant in this context, this narrow context, was that because these builders clearly Rottlund and Town & Country, clearly understand what those marketplace needs

are, it leads to the logical arrangement of those plan elements in a way that those potential homeowners expect them to be arranged.

BY MR. KRUMMEN:

Q. How long have you been practicing architecture?

A. I was licensed as an architect in 1978.

Q. Have you ever seen an original plan arrangement for a back-to-back townhome?

A. I have not seen townhomes that are sold in the marketplace arranged the plan elements in any unexpected way.

Q. So before you can call something original, it means you have to see some type of a plan arrangement that's unexpected?

MR. SCHWIEBERT: Mischaracterizes his previous testimony.

A. Well, what I meant in that context, I'm sorry I wasn't very clear about that, but I believe that one of the responsibilities of an architect is to solve the problem that's been put before them in the best way that they can using their best professional judgment. And I think the way in which architects approach the design of a townhome, I believe, and this is my opinion, leads to plan arrangements that are pretty expected. I don't doubt that there are -- and there may be in the future

immediately prior to what's marked as page 31 of 33, there's a conclusion in the middle of that page?

A. I'm sorry, could you repeat that? I was looking --

Q. Sure. Do you have Exhibit 423 in front of you?

A. Right.

Q. There's a page number. , and it says 31 of 33.

A. Right.

Q. Could you turn to the page immediately preceding that with no page number on it?

A. Right: Okay.

Q. Do you see where there's a conclusion section?

A. Correct.

Q. You're talking about the Town & Country Homestead versus the Villa II, correct?

A. Correct.

Q. And you agree that the products have obvious superficial similarities, correct?

A. I agreed with the statement about Mr. Desnick, that the two products are obviously similar, yes.

Q. And then you state the questions before us are whether defendants units are substantially similar to Rottlund's design and whether Rottlund's design is an original one, correct?

A. That's correct.

MR. SCHWIEBERT: Mischaracterizes his previous testimony regarding the issues that he reviewed these. He testified he skimmed them.

A. In the direct matter of this case, no.

BY MR. KRUMMEN:

Q. Are the general ideas the same between the Villa II and the Homestead Collection?

MR. FARMER: Objection, lack of foundation, vague. Definition general ideas.

A. Could you repeat the question, please?

BY MR. KRUMMEN:

Q. Are the general ideas between the Homestead Collection and the Villa II the same?

MR. FARMER: Objection vagueness as to what you mean by general ideas.

A. I believe that the objective details of those design ideas contained in both Rottlund and Town & Country reveal that they're not substantially similar.

BY MR. KRUMMEN:

Q. Were you asked to look at what the general ideas are in terms of the Villa II?

MR. FARMER: Objection, vague, unless you define the term.

MR. SCHWIEBERT: It's beyond the scope.

A. I was asked to look at the objective details of

the design ideas.

BY MR. KRUMMEN:

Q. You were not asked to look at the general ideas themselves between the Villa II and the Homestead Collection, correct?

MR. FARMER: Objection, form. What do you mean by "general ideas"?

A. I was specifically asked to look at the objective details of the design ideas.

BY MR. KRUMMEN:

Q. Is the Villa II a residential product?

A. I believe that Villa II is designed and marketed for residential use.

Q. Is the Homestead Collection a residential product?

A. I believe that the Homestead Collection is designed and marketed for residential use.

Q. Is the Chateau collection a residential product?

A. I believe the Chateau collection is designed and marketed for residential use.

Q. Is the Villa II a multifamily product?

MR. PATRICK: Objection, vague. Whose definition of multifamily, city? State? Builder?

A. The Villa II product, as I was asked to look at it, contains units which have living rooms, dining

rooms, and kitchens and bedrooms as one legal bounded entity by party walls. And in the case of the Villa II that I was asked to look at, there are eight of those individual units together. If eight would serve to be a definition of multifamily, then I would characterize the Villa II as a building that would house multiple families.

BY MR. KRUMMEN:

Q. Is the Homestead Collection a multifamily product?

MR. PATRICK: Same objection.

A. The Homestead Collection has individual units that contain garages, kitchens, dining rooms and living rooms and bedrooms, and those individual units are assembled together as in this case eight units, and I think that the assemblage of more than one residential unit owned by different people next to each other would be -- could be characterized as a building that has multiple families within it.

BY MR. KRUMMEN:

Q. Is the Chateau Collection a multifamily product?

MR. PATRICK: Same objection.

A. I would answer that the Chateau Collection is a -- is a building that contains multiple housing units.

BY MR. KRUMMEN:

Q. Is it a multifamily product?
MR. PATRICK: Same objection.
MR. SCHWIEBERT: Asked and answered.
A. I believe whenever a builder or an architect chooses to gain together more than one individual unit and market those assemblage of units to more than one family, that the common definition to the marketplace would be that they are multifamily.
BY MR. KRUMMEN:
Q. You wrote in your report that the Villa II was a townhome, correct?
A. The Villa II is self-characterized as a townhome.
Q. You wrote in your report Homestead Collection is a townhome, correct?
A. The Rottlund Company and Town & Country both refer to their products as townhomes, and I took their individual definitions at face value.
Q. And in your second report, which you characterized the supplemental expert report which is Exhibit 424, you referred to the Chateau Collection as a townhome, correct?
A. I believe that Town & Country chose to designate Chateau Collection as a townhome.
Q. Is the Villa II a back-to-back product?
MR. FARMER: Objection to form, vague.

A. The Villa II and the Town & Country product both, as I said earlier, assemble individual living units together side by side and back-to-back with common party walls.

BY MR. KRUMMEN:

Q. Is the Homestead Collection a back-to-back product?

A. The Town & Country home --

MR. FARMER: Objection, form, vague.

A. The Town & Country company, at least in my objective analysis of it, have decided that they can assemble their individual living units together side by side and back-to-back.

BY MR. KRUMMEN:

Q. Is the Chateau Collection a back-to-back product?

MR. FARMER: Same objection.

A. I believe that Chateau Collection relies on the same technique of assembling their living units side by side and back-to-back.

BY MR. KRUMMEN:

Q. Is the Villa II a slab-on-grade product?

MR. SCHWIEBERT: Objection, relevance, beyond the scope.

A. The Villa II product, Rottlund Company appears to have chosen not to build a residential unit with the

basement, and therefore in this case, it -- the logical way in which that residential unit is structured is to place the first floor directly on the ground.

BY MR. KRUMMEN:

Q. Is the Homestead Collection a slab-on-grade product?

A. The Homestead Collection, as developed by Town & Country, includes the placement of the first floor structural floor slab directly on the ground.

Q. Is the Chateau Collection a slab-on-grade product?

A. The Chateau Collection relies on the conventional technique of placing the ground floor slab directly on the ground.

Q. Is the Villa II a two-story product?

A. Rottlund Company, in the plans that I analyzed, relied on placing the bedrooms on the second floor immediately above the dining, living room, kitchen and garage.

Q. Is the Homestead Collection a two-story product?

A. The Homestead Collection relied on placing the bedrooms on the second floor.

Q. Is the Chateau Collection a two-story product?

A. The Chateau Collection relied on placing the sleeping quarters on the second floor.

Q. Is the Villa II have an attached garage?
A. The Villa II has a garage that is connected to the unit by -- by a common wall with the living area, and if the connection by a common wall is accepted as a definition of attached, then it is attached.
Q. Is the Homestead Collection an attached garage product?
A. The Homestead Collection relies on the common design idea of abutting a garage to a common wall with a living area in order for -- as was done at the Rottlund project, an individual to move directly from the garage into the house, and by having a common wall with a living room and the living quarters, then that garage could be characterized as attached.
Q. Is the Chateau Collection an attached garage product?
A. The Chateau Collection relies on the conventional design idea of being able to park your car within a structure that allows for the occupant of that car to go through the common wall into the kitchen, breakfast area, and by using a common wall, I believe in that case also, you could characterize that as attached.
Q. Is there more than one way to build a residential multifamily back-to-back slab-on-grade two-story multifamily townhome with an I attached garage?