# Exhibit R104

Exhibit 418
Date: 6/23/04
David A. Campeau

**Supplemental Expert Report of Anthony Desnick, AIA**
The Rottlund Company, Inc. v. Pinnacle Corporation, et al

## I. Introduction

Pursuant to the Court's February 25, 2004 Third Amended Pretrial Scheduling Order, this Supplemental Report will overview the supplemental materials that were produced by the Defendants since I issued my May 30, 2003 Preliminary Expert Report and supplement the chronology which appears in my earlier Report. This report will provide my supplemental opinions regarding the supplemental documents and other information that became available since my earlier Report and also provide my opinions regarding the Chateau Collection.

In forming my opinions, I have considered a significant amount of information, including the materials cited in this report and those listed in the attached Appendix A.

## II. Documents and Deposition Testimony – A Supplemental Chronology

In 1987, Rottlund created its Original Villa design for an eight unit back to back townhome product.

In 1992, BSB claims it designed a townhome product for Good Value Homes. Unfortunately, I have not been presented with any of the source materials that led up to the creation of the final construction documents for this product.

In 1994, Midland Homes commissioned BSB to design an eight unit back to back townhome. Larry Moore has testified that he was the architect in charge of the project. Mr. Moore, in turn, hired Design Development, Inc., to produce construction drawings for the Midland townhome. According to the May 9, 1994 letter agreement, Design Development promised to produce "construction drawings per schematic design drawings provided by your [Larry Moore's] office. . . . The building will contain eight units. . . similar to the Rottlund Homes plans you provided in our meeting." (Ex. 374, DDI000024).

Mr. Moore admitted in his deposition that either Midland or Mr. Moore took Rottlund's floor plans and performed a "cut and paste job" to create an eight unit cluster floor plan. (Ex. 330; Moore Depo. at 239-240). Mr. Moore claimed he gave this "cut and paste job" to Ms. Alfson at Design Development so she could purportedly "use it as a guide" to determine the scope of the project. (Moore Depo. at 228-229). Ms. Alfson, however, did not recall receiving this document from Mr. Moore. (Alfson Depo. at 38-39). Instead, she testified that Mr. Moore gave her several Villa product floor plan and elevation documents. (Alfson Depo. 39-40, Ex. 374 at DDI000021-23). When the floor plans that Mr. Moore gave to Ms. Alfson are compared with the "cut and paste job" he had in his files, it is clear that someone cut out Rottlund's floor plans, cut off the Rottlund logo and Rottlund copyright notice, and pasted together into an eight unit cluster a regular floor plan, a reversed floor plan, an inverted floor plan, and an inverted/reversed floor plan for both the outside and inside units. (Ex. 330). Mr. Moore testified that he may have performed this cut and paste job. (Moore Depo. at 239-240). When I compared the Rottlund elevation in Ms. Alfson's files (Ex. 374 at DDI000023) with the elevations that Mr. Moore prepared I found the two were strikingly similar. (Ex. 335 at BSB03484 and Ex. 376 at DDI000309).

The Midland elevation (Ex. 376 at DDI000309) is very similar to the Rottlund elevation (Ex. 374 at DDI000023) in many ways. For instance, the Midland elevation reflects the same placement, location, and layout of the three gable design detail, even at a detailed level such as the circular louver placed within the center gable as shown in the Rottlund elevation. Other similarities include the placement, location, and layout of the two car garages on the end units and one car garages on the interior units, and the window placements, locations and layouts for the front lower level, the front upper level, side lower level, and side upper level. In particular, someone redlined the end unit three over three window configuration in the Midland plan to a two over two window configuration (Ex. 376 at DDI000309): the same window configuration reflected in the Rottlund design (Ex. 374 at DDI000023). The entry door locations on all units are also the same. These and many other similarities, in my opinion, make the total look and feel of the Midland product substantially similar to the Rottlund product. The differences between the two units do not so outweigh the similarities as to make the similarities inconsequential.

On July 8, 1994, BSB architect Larry Moore wrote an internal memo to The Bloodgood Group, Inc. representative Jim Grundmeier concerning Midland's back to back townhome design, and referenced three attachments to the memo: "our design; his redlines & redesign; Rottlund

product." Mr. Moore then wrote: "your opinion – is our design enough 'departure' from Rottlund. . .". (Ex. 338 at BSB10208). In 20 years of professional experience, I have never seen nor practiced the cutting and pasting of another architect's original design as a method to arrive at a design of my own or someone else's design. Such a practice flies in the face of the concept of creating an original work. The fact that Larry Moore or Midland "cut and pasted" Rottlund's drawings into an 8 unit back to back floor plan and then after creating this drawing needed to ask his colleagues if the schematic design for Midland was enough "departure" from Rottlund is troublesome. The ethical implications of this type of design methodology are disturbing.

Other evidence that Mr. Moore copied Rottlund's design materials include the "copyright issue" language that appears on the Midland Homes schematic designs Mr. Moore prepared (Ex. 335 at BSB03482) and the "can we omit this [gable] offset" reference on the Midland design (Ex. 335 at BSB03484). By omitting the offset gable design element, the overall total look and feel of the Midland design became even more substantially similar to the Rottlund design.

Finally, in an internal set of handwritten notes dated November 21, 1994, Larry Moore wrote that the name for Midland's townhome product was "THE VILLAS?" Then, this was crossed out and Mr. Moore wrote "THE VILLAS AT GREYSTONE." Then, this was crossed out and Mr. Moore wrote "GREYSTONE TOWNHOMES." (Ex. 339). The first two titles Mr. Moore recorded are similar to Rottlund's "VILLAS OF ASHWORTH GLEN." (Ex. 374 at DDI000023).

In or about 1997, Jerry's Homes retained BSB to design a back to back townhome product for Jerry's Homes. On March 11, 1997, Jerry's Homes faxed floor plans and elevations of Rottlund's "Villas" of Meredith Pointe product to BSB architect Chris Jorgenson. (Ex. 55A). Subsequently, BSB forwarded final construction drawings to Jerry's Homes. The drawings were captioned the Bent Tree "Villas." (Ex. 226).

Sometime in early 1998, representatives from BSB, Pinnacle, and Town & Country began discussing the concept of designing a multi-family townhome product. On March 19, 1998, Mr. Doug Buster, the majority shareholder in The Bloodgood Group, Inc., made a multi-family presentation to Pinnacle in-house architect and Vice President of Product Development Steve Sandelin and others. (PINN04622).

During March-April 1998, representatives from Pinnacle, Town & Country, and BSB toured Rottlund's back to back townhome on more than one

occasion. Members of this tour group took pictures of Rottlund's Villa II townhome. (Exs. 267, 300). At least one member of this group took a copy of Rottlund's marketing brochure, which contains conceptual design drawings of Rottlund's Villa II townhome including its floor plans. (Exs. 288, 289; Sandelin Depo. Tr. at 97:5-98:2, 103:4-104:13; Moore Depo. Tr. at 37:10-12; Jorgensen Depo. Tr. at 26:20-27:11; Plante Depo. Tr. at 94:15-95:19). Although it is not clear how many tours were taken of Rottlund's Villa II townhome, BSB architects Chris Jorgensen's and Larry Moore's deposition testimony, calendars, and other documents establish that tours occurred on March 31, 1998, and April 29, 1998. (BSB04490.1; BSB12223; BSB 04498.1; Jorgensen Depo. Tr. at 26:20-27:11; Moore Depo. Tr. at 36:14-18). Pinnacle's in-house architect Steve Sandelin participated in at least one of these tours. (Sandelin Depo. Tr. at 207:16-23; Ex. 266, PINN 04667; D16025-29). Town & Country President Art Plante testified to still other tours that he took of Rottlund's Villa II product. (Plante Depo. Tr. at 6:21-9:9, 104:10-105:25).

According to BSB architect Larry Moore, Pinnacle, BSB, and Town & Country toured Rottlund's Villa II townhomes to find "mistakes" that Rottlund and other competitors were making with their back-to-back townhome designs. The goal of the tours was to fix these "mistakes" and "find opportunities to one-up" the competition. (Moore Depo. Tr. at 39:22-41:1). According to Mr. Moore: "We see a mistake they're making and we better it. If their rooms are too small, we make them bigger. If their closets are too small, we make them bigger. We better it." (Moore Depo. Tr. at 40:23-41:1). In my opinion and based upon my nearly 20 years of architectural experience, this is not how architects and their clients independently create an architectural design. I believe this testimony demonstrates that Pinnacle, BSB, and Town & Country did not even attempt to independently create a back to back townhome design. Instead, they began with the premise that they would copy designs such as Rottlund's and then try to make the design slightly better.

In a contract dated April 6, 1998, BSB and Town & Country agreed to jointly design a back-to-back townhome as part of their "Villa Program." (Exhibit 26). The name "Villa Program" does not seem to be merely coincidental to the name of Rottlund's Villa II townhome. Also, the quoted price was approximately $25,000. I understand in speaking with Tim Whitten that he devoted well over a year of his time coming up with the original designs for Original Villa, New Villa and Villa II. I believe $25,000 is a fee that is below market rates for a building of this scale and scope.

On May 5, 1998, BSB architect Larry Moore sent a transmittal to Pinnacle Vice President of Product Development Steve Sandelin which concerned

the "Villa Townhomes" project and referenced an attached "Competition product survey for Minneapolis area." (Exhibit 114). Discovery thus far has not uncovered the attachment to this transmittal: neither Larry Moore nor Steve Sandelin can remember and identify the contents of the attachment with any certainty. (Moore Depo. 24-25, 153, 155; Sandelin Depo. 153).

On July 13, 1998, Town & Country President Art Plante sent a redlined copy of the townhome designs to BSB. On the redlined design, Mr. Plante attached a photograph of Rottlund's Villa II side entry gable, drew a rough sketch of a gabled entry, and added the note "see Rottlund product". (Exhibit 6; Plante Depo. Tr. at 333:14-337:2; Jorgensen Depo. Tr. at 71:17-75:7). BSB then changed its design from a sloped roof over the side entries to a gabled roof, which is very similar to Rottlund's design only less expensive to build.

According to a fax dated June 7, 1999, Chris Jorgensen spoke with Art Plante and made several notes on the fax which was addressed to Art Plante. (Exhibit 78; Jorgensen Depo. Tr. at 97:1-98:13). Up until this time, BSB, Town & Country, and Pinnacle had been calling their back to back townhome product "The Villas", which does not seem to be merely coincidental to the "Villa II" back-to-back townhome name Rottlund had been using for some time. On the June 7 facsimile, Mr. Jorgensen wrote "END OF JUNE, NEW NAMES. . . USED { VILLAS. . .}". (Exhibit 78).

On September 1, 1999, Art Plante sent an e-mail and renamed the "The Villas" to "Homestead Collection – back to backs". (Exhibit 81).

On January 5, 2000, Pinnacle Vice President of Product Development Steve Sandelin authored a memorandum and stated "The back-to-back townhomes for Homestead, Aurora will be developed from the working drawings originally prepared for Maple Grove, Minnesota. . ." (PINN01469) Mr. Sandelin testified in his deposition that the back to back townhomes Pinnacle constructed in Aurora were "obviously similar" to Rottlund's Villa II townhomes. (Sandelin Depo. Tr. at 79:1-6).

On February 4, 2000, BSB representative Michael Wagenknecht sent to Mark Kranz at Town & Country an external front elevation and external side elevation of the Homestead Collection townhome building. (BSB01621, 1624). When compared with Rottlund's external front elevation and external side elevation of its Villa II townhome building, it is my opinion that these two elevations are strikingly similar.

On February 17, 2000, Mssrs. Wagenknecht and Kranz revised the design of the side elevation and discussed omitting the window above the gabled side entry because of its cost. (Exhibit 84, BSB01588-590; BSB01587). According to the March 6, 2000 construction documents, the windows were removed from the design. (Exhibit 5, BSB02593, 2597). This minor difference in window configuration between Rottlund's side elevation and Town & Country's side elevation was cost driven: Town & Country wanted to build a cheaper product.

In a document dated February 28, 2000, BSB, Pinnacle, and Town & Country agreed that the August 26, 1999 construction document designs for the Homestead Collection townhomes Town & Country was planning to build in Maple Grove, Minnesota, could used by Pinnacle. (Exhibits 3, 4).

Subsequently, Town & Country began building its Homestead Collection back to back townhomes at Centennial Crossing. I compared an internal picture of one of these townhome units (Exhibit 110) with an internal picture of one of Rottlund's Villa II townhome units (Exhibit 109). Next, I compared the front and side external elevations of the Homestead Collection townhomes with the front and side external elevations of Rottlund's Villa II townhomes. (Exhibit 128B, RCI001418-37). Then, I compared a copy of the floor plan of an external Homestead Collection townhome unit with a copy of the floor plan of Rottlund's external Villa II townhome unit. (Exhibit 2, RCI000300-RCI000301). Finally, I compared a copy of the floor plan of an internal Homestead Collection townhome unit with a copy of the floor plan of Rottlund's external Villa II townhome unit. (Exhibit 2, RCI000300-RCI000301). In my opinion, these pictures, elevations, and floor plans are all substantially similar.

On July 5, 2001, Rottlund sent a cease and desist letter to Mr. Michael Ryan at Pinnacle, and alleged that the Homestead Collection townhomes infringed on Rottlund's copyright protected Villa II townhomes. (Exhibit 11).

On July 9, 2001, Steve Sandelin, Pinnacle's in-house architect and Vice President of Product Design, sent a transmittal to BSB architect Larry Moore regarding "Copyright Infringement." Mr. Sandelin then stated that Town & Country's townhomes were "obviously similar to Rottlund's Villa product." (Exhibit 11). I understand that Mr. Sandelin has more design expertise than anyone else in the Pinnacle and Town & Country organizations. I agree with Mr. Sandelin's assessment that the townhomes are obviously similar. He then asked if "these designs [are] under a co-ownership agreement with them or are they yours alone?" (Exhibit 11). As an architect with nearly 20 years of professional

experience, I am extremely surprised that BSB and Pinnacle/Town & Country did not address and resolve this question at the beginning of the design process. Instead, they chose to address this key question after the design process was complete and after construction was well under way. It is my understanding that neither BSB, Pinnacle, nor Town & Country have a co-ownership agreement with Rottlund.

On July 16, 2001, Art Plante, President of Town & Country, wrote a letter to Dean Karau and attached a file with the documentation pertaining to the design and development of the Homestead Collection townhomes. According to Mr. Plante, "Unfortunately, it appears that much of the competitor brochures that I would have gathered during the research to develop this product have already by [sic] disposed of as this product was developed in early 1998." (Exhibit 41). The fact that this information is missing has hampered my investigation of the design process.

On July 25, 2001, less than three weeks after both Town & Country and BSB received a copy of Rottlund's cease and desist letter, Town & Country representative Dan Geegan faxed BSB architect Beth Miller a design for a back to back townhome sprinkler room layout and sprinkler system. (Exhibit 89A). When I compared the attached sprinkler room and system design with Rottlund's construction drawings, I discovered they are direct copies of Rottlund's actual drawings. (Ex. 228, RCI001434). I understand that Dan Geegan worked for Rottlund immediately before he was employed by Town & Country, and that he had access to the Rottlund Villa II designs and drawings while working at Rottlund. (Albertson Depo. Depo. Tr. at 11:9-12:7, 13:21-14:18). BSB architect Beth Miller testified that Dan Geegan informed her he used to work for Rottlund, but Ms. Miller could not recall when Mr. Geegan informed her of this fact. (Miller Depo. 28:1-5). After receiving Rottlund's sprinkler room design, BSB architect Beth Miller wrote, "SPRINKLER ROOM TO BE LOCATED @ OPPOSITE END OF ELEC. METER SHED EACH BLDG @ HARVEST HILLS." (Ex. 89A, BSB01262). Town & Country later placed a sprinkler room in the same location as is reflected on the Rottlund construction documents that Town & Country faxed to BSB.

On November 2, 2001, BSB architect Beth Miller had a phone conversation with Town & Country employee Dan Geegan regarding the sprinkler system for the Harvest Hills Homestead Collection. According to Ms. Miller's notes: "Dan is going to call an old arch. friend to determine what they did in this situation." (Ex. 245).

On December 5, 2001, BSB apparently began to redesign the fireplace option for the Homestead collection. (Exhibit 87). The prior fireplace

option is pictured in Exhibit 110. It is curious that this revision was not discussed until after Town & Country received Rottlund's cease and desist letter.

On February 18, 2002, Art Plante, President of Town & Country, sent to Mr. Karau a spreadsheet of "some of the comparisons that I did on the Rottlund plans versus the Town & Country's plans." (Exhibit 42). In my opinion, the differences noted in Mr. Plante's attachment are unimportant and insignificant when viewed against the similarities between the two plans. Certainly, the differences Mr. Plante noted in the two plans do not so outweigh the similarities that the similarities can only be deemed inconsequential within the total context of Rottlund's plans.

On March 11, 2002, Town & Country employee Dan Geegan sent BSB architect Beth Miller a crude sketch of some information needed for the Harvest Hills Homestead Collection sprinkler room. (Ex. 250).

On April 2, 2002, The Bloodgood Group, Inc. representative James Grundmeier sent to Dean Karau a transmittal and indicated he was forwarding "the contents of Larry Moore's design file for the Town & Country project" along with "work for other clients". (Exhibits 58, 225). This file demonstrates that Pinnacle's in-house architect Steve Sandelin was very involved in the design process with BSB. (Ex. 225 – D00178, D00196, D00203, D00205, D00225, D00252).

On April 10, 2002, Town & Country Project Manager Krista Flemming sent BSB architect Chris Jorgenson a transmittal. (Exhibit 95). According to Ms. Flemming, "The lawsuit issue comes into play when we talk about changes to the architecture. We need to make some changes anyway so Art Plante feels we should look at making significant architectural changes as opposed to slight changes." (Exhibit 95). In my professional opinion, if these changes needed to be made the appropriate time for them would have been four years earlier in the design process.

On April 25, 2002, Lori Meier at BSB received a facsimile with an attached design for a back to back townhome sprinkler room and sprinkler system. (Exhibit 43). When I compared the attached sprinkler room and system design with Rottlund's construction drawings, I discovered they are direct copies of Rottlund's actual drawings. (Ex. 228, RCI001434). Someone tried to delete the right-hand margins on the pages attached to Exhibit 43 (BSB001022-23) which signify that these designs belong to Rottlund. Moreover, after reviewing BSB001023 of Exhibit 43, I discovered that someone scribbled over Rottlund's logo and its copyright notice. In addition, BSB architect Beth Miller redlined Rottlund's sprinkler room

design. (Miller Depo. 112-113, 116, 163-165, Ex. 43, BSB01023, Ex. 43A).

On July 8, 2002, Ms. Meier received from Tim Johnson, an architect at Town & Country, a facsimile with an attached design for a back to back townhome sprinkler system. (Exhibit 90). I understand that Mr. Johnson worked for Rottlund as an architect before he began working for Town & Country. Exhibit 90 appears to be a direct copy of Exhibit 43, page BSB001022, only someone completely cut off the right hand margin that attributes the design to Rottlund. In addition, letters were added to the words "SPRINKLER" and "SCALE", and the scale was crossed out.

On August 7, 2002, BSB architect Beth Miller received this same page from Tim Johnson. (Ex. 251). It appears that BSB could not complete the sprinkler system design based on the crude sketch Dan Geegan forwarded to Beth Miller on March 11, 2002. (Ex. 250). In their Harvest Hills construction documents, BSB and Town & Country essentially copied Rottlund's design for the entire sprinkler room and sprinkler system including their placement, location and layout. (Compare Ex. 228 with Ex. 128, D00750, Ex. 128A, BSB02898, BSB02901, Ex. 128B, BSB02921, BSB02954).

During discovery, two copies of Rottlund's Villa II brochure, which contains design details and floor plans, were discovered in Pinnacle's in-house architect's files. (Exs. 288, 289; Sandelin Depo. Tr. at 97:5-98:2, 103:4-104:13). I have reviewed these materials, and I believe they contain sufficient information for a designer or architect to work from and to produce technical drawings which would instruct a builder on how to proceed to construct the Villa II townhome. In my opinion, they also contain the information necessary to instruct a knowledgeable design/build firm with in-house architects or other design professionals on how to proceed to construct Rottlund's Villa II back to back townhome. This is particularly true in the case of Pinnacle and Town & Country. As previously mentioned, Pinnacle's in-house architect and Town & Country's president both personally toured Rottlund's Villa II product, took pictures of Rottlund's Villa II product, and obtained copies of Rottlund's marketing brochure which reflected Villa II design details and floor plans. Town & Country also hired several former Rottlund employees that enjoyed access to Rottlund's Villa II construction drawings while previously working for Rottlund – Mark Harris, Joey Zorn, and Dan Geegan. (Theis Depo. 58; Steve Swanson Depo. 36; Albertson Depo. 13-14; J. Jorgenson Depo. 16-17, 26-27).

After it hired Mssrs. Harris, Zorn, and Geegan away from Rottlund, Town & Country placed them on the "redline design team" for Town & Country's back to back townhome product. (Exhibit 242). In addition, Town & Country hired former Rottlund in-house architect Tim Johnson, an individual who also enjoyed access to Rottlund's Villa II construction drawings while working for Rottlund. Mr. Johnson was also involved in revising Town & Country's design for its back to back townhome product. As mentioned above, while working for Town & Country, two former Rottlund employees – Dan Geegan and Tim Johnson – forwarded portions of Rottlund's copyrighted Villa II construction documents to BSB. BSB then copied designs from Rottlund's copyrighted Villa II construction documents and incorporated these designs into the construction documents for Town & Country's back to back townhome. (Exhibits RCI001434; 43A; 89A; 90; 228; 251; 128A at BSB02898 and BSB02901; 128B at BSB02921 and BSB02954).

## III. Chateau Collection Chronology

From June – August 2002, Town & Country submitted proposed preliminary plat/site plan reviews to representatives at Brooklyn Park and Chaska. In these plan reviews, Town & Country proposed building Homestead Collection townhomes at a development known as Pinebrook in Brooklyn Park and a development known as Traditions at Clover Ridge in Chaska. (D33281-284; D31376-382). Later, some minor changes were made to the Homestead Collection. On October 18, 2002, Town & Country explained these changes in a facsimile to a representative of Brooklyn park: "We basically added a porch to the end as opposed to just a stoop, added dormers at the ends and kept the shutters on the ends." (D33317-18). This was apparently done because "The City has requested that we [Town & Country] need more architecture on the ends of the building." (D35201-203). On October 25, 2002, and again on November 12, 2002, Town & Country again explained to Brooklyn Park that some "enhancements" had been made to the "revised architectural elevations." (D33320-21; D31436-37). Ultimately, the revised Homestead Collection back to back product was named the Chateau Collection. On March 21, 2003, Town & Country explained the "enhancements" or differences between the Chateau Collection in a memorandum to the City of Brooklyn Park:

> The attached architectural elevations show the enhancements. Gables were added to break up the mass of

> the roofline and end elevations. Two different end unit styles/floor plans are now offered. One style features an entrance from the end with an angled living room/bedroom area, while the other enters from the same side as the private driveway without the angle while still offering a porch on the end elevation.

(D33269, D33166-33170). In my opinion, these revisions or differences from the Homestead Collection design do not so outweigh the similarities between the two designs as to render the similarities inconsequential. I believe Town & Country agrees with my opinion in this regard. In the March 21, 2003 memorandum to the City of Brooklyn Park, Town & Country later stated it was "excited to offer these architectural enhancements." In an April 4, 2003 memorandum to the City of Chaska Town & Country referred to the Chateau Collection architecture was also described as "architectural enhancements on the back-to-back product at Traditions." (D31544). Town & Country represented to the City officials at Brooklyn Park and at Chaska that the Chateau Collection was merely an enhanced or derivative version of the Homestead Collection with only a few differences.

## IV. Substantial Similarities Between The Villa II And The Chateau Collection

I have reviewed Rottlund's Villa II construction documents for Rush Creek and The Reserve (D00001-14 and RCI004150-4166) and the Chateau Collection bidding documents that Town & Country produced in discovery (D30321-356 and D30357-391). A partial, but not exhaustive, explanation of the arrangement and composition of spaces and elements, or gestalt or combination of the spaces, features and elements, of the Chateau Collection design which is substantially similar to the Villa II design, is set forth below:

- placement of entry doors for inside units;
- placement of sloped roof over entry doors for inside units;
- layout of sloped roof over entry doors for inside units;
- placement of two car garages for inside units;
- layout of two car garages for inside units;

- layout of sloped roof over two car garages for inside units;
- placement of two car garages for outside units;
- layout of two car garages for outside units;
- placement of windows for inside units;
- layout of windows for inside units;
- placement of faux chimney;
- placement of sprinkler room;
- layout of sprinkler room;
- placement of powder room on lower level of B unit;
- placement of stairwell of B unit;
- placement of kitchen of B unit;
- layout of kitchen of B unit;
- placement of master bedroom on upper floor of B unit;
- placement of kitchen on C unit;
- placement of dining room on C unit;
- layout of dining room on C unit;
- placement of living room on C unit;
- placement of bedroom #2 on upper floor of C unit;
- placement of bathroom on upper floor of C unit;
- placement of loft on upper floor of C unit;

In addition, the overall proportion of the main gable over the garage in the outside/corner unit is similar. On the Chateau design, that gable has been nearly duplicated over the internal units. The "lap" siding on the main body of the elevation and the use of "shakes" type siding at the gables is

also similar. Other similarities include the overall massing of both the Chateau and the Villa II buildings.

Another question arises as to the reason for changing the gabled entry over the end units as designed for the Homestead Collection to a shed roof used on the Chateau Collection. Mr. Sandelin testified that gables were necessary over the Homestead Collection side entries instead of shed roofs because shed roofs caused unwanted icing on the side entry sidewalks. (Sandelin Depo. at 138-139). Did Town & Country use a shed roof over the Chateau Collection side entries simply to create a difference from Rottlund's design?

This is a partial listing of my analysis of the substantial similarities between the gestalt or total look and feel of Rottlund's Villa II product and Town & Country's Chateau Collection product. In my opinion, the differences between the two products do not so outweigh the similarities as to render the similarities inconsequential. In addition, as with the Homestead Collection, it appears that Chateau Collection design elements such as the sprinkler system were directly copied from Rottlund's construction documents. (TM00573).

Because discovery is not yet complete, I reserve the right to supplement this report and these opinions as additional information becomes available.

## V. Trial Exhibits

My trial exhibits will include, but are not necessarily limited to, the documents and other materials referenced in this report. I respectfully reserve the right to supplement this list of trial exhibits as discovery continues, trial approaches and/or as additional materials are made available to me through the expert discovery phase of this litigation.

## VI. Publications for the past 10 years

In the past 10 years I have had no articles published.

## VII. Compensation

My current billing rate for this matter is $170/hour.

## VIII. Listing of trial testimony and/or deposition in past 4 years

I have not been deposed nor have I testified at trial during the past 4 years.

This report submitted by:

Anthony Desnick, AIA

Anthony Desnick, AIA

Date: April 15, 2004

**Appendix A – Materials Considered for Supplemental Expert Report of A. Desnick**

Rottlund's Rule 30(b)(6) depositions, Timothy Whitten and Todd Stutz, deponents, with accompanying exhibits;

Deposition of Timothy Whitten, with accompanying exhibits;

Deposition of Steve Sandelin, with accompanying exhibits (12/8-9/03);

Excerpts from the depositions of Art Plante (12/19/02), Beth Miller (9/3/03), Karen Albertson, Steve Thies, Steve Swanson and Jason Jorgenson;

Excerpts from Steve Sandelin's 12/16/02 deposition;

BSB's Rule 30(b)(6) depositions, with accompanying exhibits;

Depositions of James Grundmeier (9/2/03 and 2/17/04) and Larry Moore (9/4/03 and 2/17/04), with accompanying exhibits;

Deposition of Linda Alfson, with accompanying exhibits;

Copies of expert reports of A. Bloom, D. Buster, L. Moore, J. Safin, C. Jorgensen, and J. Scherer;

Additional Deposition exhibits: 2-6, 11, 26, 41, 42, 43, 43A, 55A, 59, 60, 78, 81, 84, 87, 89A, 90, 95, 109, 110, 114, 128, 128A, 128B, 129, 130, 225, 226, 228, 242, 245, 250, 251, 266, 267, 288, 289, 300, 314, 330, 335, 338, and 339;

RCI000300 – 301
RCI001418 - 37
RCI001434
RCI009705 – 9723
RCI001603 – 1616
RCI002525 – 2532
RCI021227 – 21238
RCI009658
RCI021227-38
RCI004150 - 66

DDI000002
DDI000021 – 25

TM00563
TM00569
TM00573
TM00322-327
TM00256-262
TM00881-882
TM00871-72
TM00172
TM00873-879
TM00886-895
TM00906-908
TM00535-36
TM0635-639
TM00631-634
TM00523-576
TM00693
TM00759
TM00750

D00001 - 14
D16025 - 29
D31393-31408
D31578
D34909 – 34919
D31498 – 502
D31504-05
D33269
D33281-84
D31376-82
D31370-75
D31495-96
D31491-94
D34180-81
D35199
D34607-615
D34624-28
D33188-201
D35184-85
D33317-18
D35201-03
D33299
D33320-33321
D34513-535

D34817-820
D31436-37
D34167
D35132-142
D35156-165
D34163
D35198
D35118-22
D34629-635
D34648-650
D34636-37
D33310
D33264-270
D31544
D33166-70
D33171-73
D34944
D30357-391
D30321-356
D33266-67
D33285-89
D34826
D35204-05
D31355
D34651-56
D35212-216
D34616-618
D34657-660
D34602-06
D34638-642
D35217-223
D34643-647
D34619-623
D34340-345
D35224-228

PINN01469
PINN04622
PINN04667

BSB01262
BSB01587
BSB01588 - 90
BSB01621

BSB01624
BSB02593
BSB02597
BSB03754
BSB04490.1
BSB04498.1
BSB04539 – 551
BSB12223