# Exhibit R117

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

THE ROTTLUND COMPANY, INC. D/B/A ROTTLUND HOMES, a Minnesota Corporation,
Plaintiff,
vs. No. 01-CV-1980(DSD/SRN)
PINNACLE CORPORATION D/B/A TOWN & COUNTRY HOMES, an Illinois Corporation, TOWN & COUNTRY HOMES, INC., a Minnesota Corporation, BLOODGOOD, SHARP, BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., an Iowa Corporation and THE BLOODGOOD GROUP, INC., an Iowa Corporation,
Defendants.
------------------------
TOWN & COUNTRY HOMES, INC., a Minnesota Corporation,
Third-Party Plaintiff,
vs.
BLOODGOOD, SHARP, BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., an Iowa Corporation,
Third-Party Defendant.

Videotaped deposition of PAUL ANDERSON taken before CYNTHIA A. SPLAYT, C.S.R., and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at Suite 295-E, One Pierce Place, in the City of Itasca, DuPage County, Illinois, commencing at 9:04 o'clock A.M. on the 10th day of December, A.D., 2003.

Q. Is that what we've been referring to as either Pinnacle or the Town & Country, Illinois division?

A. Yes, it is.

Q. Does that include any assets, liabilities or stockholders' equity from any other entity affiliated with Town & Country of Illinois?

A. Yes. Town -- Pinnacle Corporation is -- occasionally, there will be an inner company transaction between related companies, so for example, I mentioned to you earlier we're blanketed under one insurance policy. When the premium falls due for that insurance policy, generally, the bill is received by Pinnacle, and then the appropriate premium dollars would be allocated to the other companies, and that would create an inner company transaction; whereby, money is owed to Pinnacle from, for example, Minnesota, the following

month, then, that inner company obligation would be paid, so when you see a line that says receivables due from affiliates, which is the second line under assets in the balance sheet, that would refer to those types of transactions.
Q. And then if you turn to PINN 7940, we have more detail on these receivables you're describing?
A. Yes. That's true.
Q. You mentioned insurance is one of these intercompany transactions, and I want to focus on just Town & Country, Illinois and Town & Country, Minnesota for a moment. What other intercompany transactions occur between those two entities?
A. It could be, oh, a myriad of items. For example, if I were to travel to Minnesota in capacity as CFO of the Minnesota company, my travel costs would be charged back to

Minnesota.

Q. Now, when I deposed you approximately a year ago, we talked about a company called was it TCH comma, Inc.?

A. TCH, Inc., that's correct.

Q. I thought TCH, Inc. worked out your salary proration between the Illinois and the Minnesota divisions of Town & Country. Did I misunderstand?

A. That's -- that's correct.

Q. So why would travel expenses for your purposes of dealing with Minnesota be treated differently than your salary?

A. Certain -- when I submit an expense report for cost that I might have incurred on behalf of Pinnacle, I generally submit one expense report and then it's broken out, so rather than run it through the holding -- TCH, Inc., which we also refer to as the holding company, it's quite

possible that I would just run it through Pinnacle as a matter of convenience.

Q. Are there any intercompany transactions between Town & Country, Illinois and TCH, Inc.?

A. Yes, there are. Principally, payroll.

Q. Are those reflected on PINN 7940?

A. Yes.

Q. Where?

A. It would fall into really the total.

Q. Would it not be the holding company line item 4 down?

A. Yes.

Q. Okay. So that $417,841 deals with expenses -- well, what does it deal with? It deals with the month ended September 30, 2003, we know that, correct?

A. Yeah. It's -- it's -- it's actually a receivable, so I would be

guessing as to what all the individual components of that number are without perhaps going to a general ledger to obtain all the detail.

Q. And the general ledger would tell you why there's a receivable in terms of $417,841 from the holding company, correct?

A. Yes.

Q. It might be that some of that money is attributable to your salary which is being paid by Town & Country of Minnesota, correct?

MR. FARMER: Objection. Form.

THE WITNESS: It would pertain to -- it could potentially pertain to my salary as it relates specifically to Pinnacle, not at all to Minnesota. There would be --

MR. KRUMMEN: Q. It would be a receivable at the Minnesota division --

would probably charge that at the project level just for a tracking mechanism.

Q. Turning to the Harvest Hills Homestead line item on D 30888, do you see any line item for legal within this Harvest Hills Homestead?

A. Let's look at page -- let me find it. 30887.

Q. Okay.

A. Under other subdivision income expense, we have a row there project legal fees. In this instance, there's actually a credit in there, so we probably got a refund from one of our law firms from a prior period.

Q. Let me ask this question. Has the legal fee expense as it relates to the Homestead Collection been allocated against the Harvest Hills development in the financial statement that appears before you?

A. Legal fees concerning this

matter?
Q. That's correct.
A. No, they have not.
Q. Why is that?
A. We've classified those legal fees under the umbrella of general and administrative cost. I can show you where they are on the statement.
Q. Yes. Would you show me where they're at?
A. Sure. On document 30781.
Q. Okay.
A. Toward the bottom of administrative expenses. Litigation expense.
Q. Right.
A. That would be the fees for this lawsuit.
Q. And you're probably going to tell me that's variable, right?
MR. FARMER: Object to form.
MR. KRUMMEN: Q. Well, we'll get there.

Why is it that there's a litigation expense deducted out on D 30781 of the Town & Country Homes, Minnesota financial statements?

A. Well, we've incurred costs. I mean, we're spending money, so --

Q. Let me switch now to Town & Country of Illinois. If we went through in painstaking detail that particular financial statement for September 30th, 2003, would I find another litigation expense that relates to this litigation? We can pull that out, if you'd like to.

A. I'd be speculating where that's being charged in Illinois. I would expect we have a --

Q. Do you still have Exhibit 293, the Pinnacle financial statements?

A. Yes, I do.

Q. Can you turn to the same page that would reflect general and administrative costs for Town &

Country of Illinois? Which page are you on, by the way?

A. I am on page 07952.

Q. So PINN 7952 of Exhibit 293, that Pinnacle financial statements, correct?

A. Yes.

Q. Is there a legal or litigation expense that would be affiliated with the Town & Country, Illinois portion of this lawsuit?

A. It looks to me like all of our legal fees have been lumped into one line item called legal fees.

Q. Do you know why there is a difference between Town & Country, Illinois on the financial statements versus Town & Country of Minnesota?

A. As to the classification, I don't. Other than it's quite possible when Art was putting his budget together, he wanted to segregate those items, and Tom Ryan probably didn't.

Exhibit R121

EXHIBIT 97




BSB 03661

Exhibit R122

UNITED STATES DISTRICT COURT DISTRICT O
FOURTH DIVISION No.:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -The Rottlund C
d/b/a Rottlund Homes, a MinnesotaCorporation,
Plaintiff,vs.
Pinnacle Corporationd/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,
Defendants,
and
Town & Country Homes, Inc.,
a Minnesota Corporation,
Third-Party Plaintiff,
vs.
Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa Corporation,
Third-Party Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
Videotaped
30(b)(6) Deposition of
BLOODGOOD SHARP BUSTER ARCHITECTS &
PLANNERS OF ILLINOIS, INC.
(Testimony of Douglas N. Buster)
Thursday March 6, 2003 9:03 a.m.

A Yes.
Q I'd like to just figure out where Bloodgood Sharp Buster of Illinois fits into this case and where it fits in with The Bloodgood Group. So I'm going to hand you what's been previously marked as Exhibit Number 97. Exhibit Number 97 is a one-page document. It has a Bates number of BSB 03661. Have I accurately characterized Exhibit 97?
A Yes.
Q Is this an organization chart that shows the reader how Bloodgood Sharp Buster of Illinois fits in with the other subsidiaries of The Bloodgood Group, Inc.?
MR. FARMER: Objection. Form.
MR. SCHWIEBERT: Foundation.
A Bloodgood Sharp Buster Architects and Planners of Illinois is one of the corporations of The Bloodgood Group.
BY MR. KRUMMEN:
Q What relationship, if any, does Bloodgood of Illinois have with Bloodgood Sharp Buster of Iowa?
A They are one of the corporations of The Bloodgood Group and would be a similar corporation of Bloodgood Iowa.
Q If you know, what is Bloodgood Plan Service, Inc.?

through townhouses, not on back-to-back townhouses ever.

MR. KRUMMEN: And I'll move to strike as nonresponsive.

BY MR. KRUMMEN:

Q The question, sir, related to which hat you were wearing. Was it the BSB Illinois group that you were working for as of April 9, 1998, or was it someone else?

A On April 9, 1998, I would have been speaking to Steve Sandelin about front-load through townhouses, probably representing the Illinois group, but I may have also been functioning as a national representative as well because of the connection with Town & Country.

Q Now, what do you mean by "a national representative"?

A Meaning that I have an interest in all the company as the majority stockholder of our company.

Q But you didn't --

A I'll help any -- any office that needs my help at any time. I tend to help them, and that's been for a long time, not just since '99.

Q But as of April of 1998, you were not working for the parent company, The Bloodgood Group, Inc., were

you?

A I work for the parent company every day. But my billing was assessed through the Illinois corporation in 1998.

Q Where was your title held?

A My title at the time?

Q Correct.

A Been senior vice president.

Q Of BSB Illinois, correct?

A Of -- of -- no. Of Bloodgood Sharp Buster Architects and Planners, Inc. Had nothing to do with BSB Illinois, my title. My title has never been broken down to Illinois.

I have an office in Illinois. I represent the entire company. Even before going on to a headquarters function, I represented the entire company.

If I did work for one of the regions while I was involved with a region, I would bill intercompany, work to that region, whether it be Iowa or California or Florida. And if I did work for Chicago, I billed my time to Chicago.

Q Could you pull Exhibit 97 back out of the pile.

A (Complies.) Uh-huh.

Q As of April 9, 1998, which box did you work for?

MR. FARMER: Objection. Foundation.
A As of April 09, 1998, I worked for every one of those boxes.
BY MR. KRUMMEN:
Q As of April 9, 1998, which entity on Exhibit Number 97 did you hold position or positions with?
MR. FARMER: Objection. Foundation regarding this document.
A I don't know the legalities of your question. In April of 1998, my title was senior vice president of Bloodgood Sharp Buster Architects and Planning, Inc., and I had a senior vice president role in virtually all of these subsidiary companies of the parent company, The Bloodgood Group.
BY MR. KRUMMEN:
Q Including the Illinois entity, correct?
A Sure.
Q Why were you talking to Steve Sandelin about front-to-back townhome designs in or about April of 1998?
MS. NEWMAN: Objection as to form and foundation. Go ahead.
A As -- as if the question is related to why am I speaking to Steve Sandelin about front-to-back, front through -- front-loaded through townhouses

for the Minneapolis market? Is that your question?
BY MR. KRUMMEN:
Q It is.
A Because I was acting as a liaison to make sure that Steve Sandelin felt comfortable transferring Town & Country work to another group outside the Chicago area, because he had never worked with any of our other groups before.
Q What was your involvement, if any, subsequent to this conversation with Mr. Sandelin that occurred in or about April of 1998 --
MR. FARMER: Object to form.
BY MR. KRUMMEN:
Q -- as to Town & Country Minnesota townhomes, be they front-to-back, back-to-back or of any other type?
A I don't have any recollection whatsoever. I personally don't ever remember the meeting happening, because I assume that they decided to go to a back-to-back. I had talked to Steve Sandelin about front-load only. I've never had the conversation with Steve about back-to-back.
Q So as far as you can recall, the next interaction you personally had with respect to back-to-back townhomes and Town & Country Minnesota was when

there was a jurisdictional transfer of the plans from the BSB Iowa office to the BSB Illinois office --
MS. NEWMAN: Objection as --
BY MR. KRUMMEN:
Q -- is that fair?
MS. NEWMAN: Objection as to form, "next interaction." That mischaracterizes prior testimony. Go ahead.
A I did answer that question before. There was an intermediate set of drawings sent to me from the Iowa group to me personally, showing me their progress on a back-to-back product that they were developing for the Town & Country Minneapolis group.
They were simply sending it to me to keep me informed as a liaison to let me know that they were doing a good job for Town & Country. As I stated previously, my only comment back was "Back-to-back product is a very old product."
(Deposition Exhibit Number 102 was marked for identification by the reporter.)
THE REPORTER: Okay. Number 102.
BY MR. KRUMMEN:
Q Sir, before you is Exhibit Number 102. It's a

facsimile dated Monday, May 18th, 1998, and the Bates number range, at least as to Exhibit 102, is BSB 01662 through -666. Have I accurately characterized Exhibit 102?
A It starts where?
Q 01662 and runs through 01666.
A Okay.
Q Now, do you see under the message, it says (as read), "Regarding: Town & Country, Villas." Do you --
A Uh-huh.
Q -- see that?
A Yes.
Q And then it says, quote, "Doug Buster called and faxed these to me after talking with Steve Sandelin," end quote. Have I accurately read that?
A Yes.
Q Now, does that refresh your recollection that you were indeed involved in talking with Steve Sandelin about the back-to-back townhomes that Town & Country Minnesota was designing on or about May 18th of 1998?
MR. FARMER: Objection. Mischaracterizes the document, time and conversation.
MS. NEWMAN: Same objection.

A Yes. It -- it doesn't tell me anything. I don't remember the conversation, I don't remember the interaction, and I have had no time to look at any information behind here.

BY MR. KRUMMEN:

Q Sir, you can have as much time as you need.

A (Reviewing.) Okay. There is a -- the back of this is GM Homes' villas, the Cyprus; GM Home villas, Cyprus II; and GM Homes' villas, the Cedar. They all appear to be back-to-back townhouse units, two-car. One is an end unit, one is an interior middle unit, and the other one is an end unit as well.

First statement (as read): "Town & Country, Villas. Doug Buster called and faxed these to me after talking with Steve Sandelin. Steve was wondering if we could incorporate a breakfast nook in the Villas for Town & Country.

"Doug thought it might be good to call Art Plante and discuss with him what Steve is suggesting. Art did call you today 11:40 AM but I didn't talk" -- "Art did call you today 11:40 AM but I did not talk with him. I can call Art if you don't have time. Call me to let me know."

This is a letter from Chris Jorgensen to Larry

Moore. First of all, I've never seen this letter, and I've never seen the plans behind it, and I did not fax them to anybody. Sorry.
Q So you deny that you faxed to Larry Moore the three-page or four-page attachment to Exhibit 102?
MR. FARMER: Objection.
A It says --
MR. FARMER: Objection. Lack of foundation regarding this document.
MS. NEWMAN: Same objection.
A Yeah. It's from Chris Jorgensen to Larry Moore. It says, "Doug Buster called and faxed these to me after talking with Steve Sandelin." It may be that Steve Sandelin faxed these to Chris Jorgensen. I did not fax these to Chris, and I've never seen this plan. And I'm not familiar with GM Homes' villas, and, in 1998, I was not working on back-to-backs. Sorry.
BY MR. KRUMMEN:
Q Did you speak with Steve Sandelin about the possibility of incorporating a breakfast nook into the Town & Country villas?
A I had no recollection of that discussion. I wasn't working on back-to-backs in '98.
Q Did Mr. Sandelin ever ask you to copy GM Homes'

breakfast nook into the Town & Country Homes of Minnesota villas?
A I --
MS. NEWMAN: Objection as to form. Go ahead.
A I have no recollection of that conversation ever happening, and that is not something we would do.
BY MR. KRUMMEN:
Q What was your -- strike the question.
What knowledge do you have, if any, regarding the referenced conversation between you and Mr. Larry Moore about Exhibit Number 102 before you?
A I have no recollection of this conversation, I have no recollection of this action, and I have no recollection of the discussion about back-to-backs until I received a copy of Iowa -- BSB Iowa's work for Town & Country through a design development stage way -- way after the need for this.
Q Who is Joe Safin?
A Joe Safin is our partner, who runs the Chicago office.
Q Was he involved in the jurisdictional transfer of the Town & Country Minnesota back-to-back designs to Town & Country of Illinois?
A Yes. He would have been.

Q What involvement did he have?
MS. NEWMAN: Objection as to foundation.
Go ahead.
A You'll have to ask Joe Safin that.
BY MR. KRUMMEN:
Q I certainly intend to. I'm just curious who worked on that at this point in time.
MR. FARMER: Object to form.
A I can tell you I worked on the elevation part. Who Joe had work on the rest of the project I do not know. He'll be ready for testimony on that himself.
BY MR. KRUMMEN:
Q Who prepared the contract that related to the jurisdictional transfer? Did you or did Mr. Safin?
A That would have been Mr. Safin.
Q Do you have any knowledge regarding the jurisdictional transfer contract?
A No. I have no knowledge whatsoever about the contract.
Q Were you involved in any way, shape or form in the jurisdictional transfer con- -- contract? And when I say that, I'm relating it to the transfer of the designs from Town & Country Minnesota to Town & Country Illinois.

A My involvement was a process of working for the Illinois office at the time and redeveloping the exteriors to be put into the Chicago market. I had no involvement with the plans. I had no involvement with the transfer of the product. I had no involvement with any units, any co-change or any other aspect of work. Only conceptual design work for the elevation.

Q When you say, "conceptual design work for the elevation," what are you referring to?

A I re-elevated Town & Country/BSB Minneapolis back-to-back townhouses for the Chicago marketplace.

Q And when you say you re-elevated them, what does that mean?

A I looked at what they were building in Minneapolis. I -- I didn't feel it was the right product for the Chicago market. I believe I was requested also by Town & Country to relook at it for the Chicago market, and they gave it -- Joe Safin asked me to help out on the project in terms of coming up with a design to be used in the Chicago marketplace, which I did, and then turned my designs back over to BSB Illinois to incorporate into their jurisdictional transfer.

(Deposition Exhibit Number 103 was marked for identification by the reporter.)

THE REPORTER: 103.

MR. FARMER: I'm sorry. 103?

THE REPORTER: 103.

MR. FARMER: Thank you.

BY MR. KRUMMEN:

Q Sir, I've handed --

MS. NEWMAN: Before we begin, this is a Pinnacle-identified document with attorneys' eyes only stamped on it, before we go any further.

MR. FARMER: We will permit use of this document during this examination.

MR. KRUMMEN: Thank you.

BY MR. KRUMMEN:

Q Exhibit 103 begins with PIN00003 and runs through -0022.

A Mm-hm.

Q And on the right-hand side, it says, "Washington Square Back to Back Towns, Town & Country Homes, Aurora, Illinois," and below that, it says, "Bloodgood Sharp Buster," correct?

A That's correct.

Q Are you familiar with this document?

A I am somewhat familiar with this document as a

result of the Illinois BSB corporation developing it for Town & Country of Illinois.

Q And this would be what in terms of BSB's Illinois vernacular? Construction drawings? What -- what do you refer to this type of document as?

MR. FARMER: Object to form.

A It appears to be a progress set somewhere between design development and construction documents. It may be a 90 percent set of construction documents. I don't know. But it's beyond -- it's beyond design development. It may not be finalized working drawings.

BY MR. KRUMMEN:

Q What changes did you make to the elevations which appear on Exhibit Number 103?

A Well, this is -- I don't know what year this is in. '00 -- sometime prior to '00 anyway. I remember I had changed the overall roof structure from a gable to a hip. I had broken the scale of one of the units down to a smaller gable so that when they're combined, two large gables wouldn't running into each other.

I looked at the siding structure and worked on a process to develop a wider siding structure on the bottom and a narrower siding structure on the

top. I probably looked at the pitch of the roof and -- and maybe the addition of the dormers.

I don't remember the Town & Country Minnesota version of this building, but at the time, we had been adding dormers to a lot of work throughout the country because of the neotraditional influence. And we may have added the dormers at that time. It may have come with dormers. I don't remember.

Generally I was probably trying to stretch the envelope to, you know, spend as much money on elevations as -- as we possibly could and still meet the market demand for Town & Country in the Aurora market.

Q In your opinion, are the elevations that appear before you substantially similar to the elevations that were transferred to you from the BSB Iowa group?

MR. FARMER: Objection. Foundation. Form. Calls for a legal conclusion.

MS. NEWMAN: Same objections.

MR. FARMER: Asks for --

A The honest answer to that is, these are similar to what I remember developing for the Aurora project. I have very little remembrance of the transferred product from Minnesota to Iowa, but I do remember

developing the hip roof, the gable treatments and the double gable widths and the additional smaller gables. That --

MS. NEWMAN: Doug, there's not a question in front of you.

THE WITNESS: Sorry.

THE REPORTER: Number 5.

MR. KRUMMEN: Did I give you two? Could you give one of those back to me, sir? I gave you my --

MS. NEWMAN: No, no. He wants this too.

MR. KRUMMEN: I gave you my copy.

MS. NEWMAN: There you go.

BY MR. KRUMMEN:

Q Before you is Exhibit 5. It is a document which begins BSB 02593 and runs through 02607 (sic).

A Mm-hm.

Q On the right-hand side, it says, "Homestead Collection at Centennial Crossing, Maple Grove, Minnesota" and "Bloodgood Sharp Buster Architects & Planners, Inc."

A Mm-hm.

Q Now, this was, in essence, part of the jurisdictional transfer that took place between BSB Iowa and BSB Illinois, correct?

Exhibit R123

UNITED STATES DISTRICT COURT DISTRICT O

FOURTH DIVISION No.:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -The Rottlund C

d/b/a Rottlund Homes, a MinnesotaCorporation,

Plaintiff,vs.

Pinnacle Corporationd/b/a Town & Country Homes,

an Illinois Corporation, and

Town & Country Homes, Inc.,

a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc.,

a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &

Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

Videotaped

30(b)(6) Deposition of

BLOODGOOD SHARP BUSTER ARCHITECTS &

PLANNERS OF IOWA, INC.

(Testimony of James Grundmeier)

Tuesday March 4, 2003 10:05 a.m.

Q Do you spend roughly an equivalent amount of time with each of the subsidiaries on an annual basis or you spend more time with the Iowa subsidiary?
A It varies somewhat by size of the group, type of projects they're working on right at the time, the personnel at the different groups. Some -- some communicate more than others.
Q Back to The Bloodgood Group, Inc., which you have your title with. Is there some kind of a profit-sharing or -- or revenue stream that flows up to The Bloodgood Group, Inc., from the subsidiaries?
A Yes.
Q Would you explain how that works, financially speaking.
A Each of the separate corporations would have their own income statement for their income, expenses, and bottom-line profits. And not being a financial person, I guess I'm not sure that I know -- I know how it appears to me, but I'm not sure of the -- the technical portions of that.
Q Well, does a certain percentage of the bottom-line profits flow upstream to The Bloodgood Group, Inc., from the subsidiaries?
MR. SCHWIEBERT: Objection. No

foundation.

A The Bloodgood Group, Inc., has a specific profit-sharing formula that is based on profits of the total parent corporation, which is a total of what the subsidiaries make. It's also based on the profits of each of those subsidiaries and based on some other factors.

BY MR. KRUMMEN:

Q So each of these subsidiaries has a bottom-line profit number. And does 100 percent of those profits initially come up to The Bloodgood Group, Inc.?

MS. NEWMAN: Objection as to foundation and form.

A Those profits come up to the parent corporation to fit into the profit-sharing formula.

BY MR. KRUMMEN:

Q And then you have a profit-sharing formula, and I assume that the profits are then distributed back downstream to the various subsidiaries based on something. Correct?

MR. FARMER: Objection. Form.

MS. NEWMAN: Same objection.

A The overall profits are distributed to all the various corporate entities.

BY MR. KRUMMEN:
Q How is the determination made as to which subsidiary is entitled to what amount of profits?
MS. NEWMAN: Objection as to foundation.
A That's determined by the formula.
BY MR. KRUMMEN:
Q What's the formula?
MS. NEWMAN: Same objection.
A It's not a specific -- it -- it's just changed somewhat for the year 2003, and we just had a discussion of it last Thursday and Friday. Is this really related to any of the questions I was supposed to answer?
MS. NEWMAN: With respect to the relationship of the corporations, I believe that that was one of the -- the topics. But --
THE WITNESS: Okay.
MS. NEWMAN: -- maybe Mr. Krummen could indicate what topic he's asking you.
MR. KRUMMEN: Sure. I'm asking about that, and I thought this is the revenue and profit guy.
BY MR. KRUMMEN:
Q So ultimately I get to figure out where all the revenues and profits off of the --

A Okay.
Q -- Town & Country Homes job ended up, and it sounds like they started out at BSB Iowa, went upstream to --
A Okay.
Q -- The Bloodgood Group, Inc., and came back down. So that's where I'm headed. But let's just talk about --
A I misread that question, then, because it just listed the particular Town & Country projects. So I only really studied project-wise.
Q Well, those projects ended up on the bottom line of the profit analysis for The Bloodgood Group in Iowa, correct?
A Yes.
Q And then they floated upstream to The Bloodgood Group, Inc., if I understood your earlier testimony correctly. Is that a fair statement?
A That's a fair statement.
Q And then they got redistributed back down to all the subsidiaries. And my question was who makes that determination and what is it based on. So let's parse that. We have the profits from the Town & Country project coming through BSB Iowa, Inc., and it goes upstream to The Bloodgood Group,

Inc., correct?
A Correct.
Q How does The Bloodgood Group, Inc., decide where to distribute those profits to from that point on?
MR. FARMER: Objection. Foundation.
MS. NEWMAN: Same objection.
A We have a different policy today than we did back in 1998 when this work was done.
BY MR. KRUMMEN:
Q Let's confine it, first of all, to 1998 through, what, yesterday or whenever you had this 2003 meeting. So 1998 through 2002 is where I'll start, and then I'll come back and work on 2003 and the formula change.
MS. NEWMAN: That would not be relevant. I'll object on the basis of it's not covered by any of the topics in the deposition notice and as irrelevant.
What you've asked this witness to prepare to talk about were gross revenues, profits and costs with BSB's involvement and our services provided in connection with any of the following, and then listed Homestead Collection, Bayview, Starwood, Savannah, so on and so forth.
So those questions were not properly noted,

and we don't have a witness designated to testify
on those, so I'll object on that grounds.
BY MR. KRUMMEN:
Q We're starting with '98 through 2002, and I'm
working on profits. They're up at The Bloodgood
Group, Inc., under the old formula, and I want to
know how they're distributed from that point
forward.
A I do not recall.
Q Who would know the answer to that question?
A Probably our financial partner.
Q What's your financial partner's name?
A Jane Knutson.
Q Where is Ms. Knutson based?
A In Des Moines.
Q Now, the earlier question I had was how did the
Town & Country project profits come back downstream
from The Bloodgood Group, Inc., level. Let me
follow up on that. In general how would profits
get distributed during the 1998 through 2002 time
frame from The Bloodgood Group, Inc., level back
down to the subsidiaries?
MS. NEWMAN: Objection as to foundation.
Objection as outside the scope of the deposition
topics.

A They would be distributed according to company policy at that time.

BY MR. KRUMMEN:

Q Was the company policy based on hours? Was it based on performance? What was the policy?

MR. FARMER: Objection. Form.

MS. NEWMAN: Objection. Foundation. Objection as to outside the deposition topics.

A I don't recall.

BY MR. KRUMMEN:

Q If I wanted to know the answer to that question, where would you find the policy?

MR. SCHWIEBERT: Objection. No foundation.

A I would -- I would talk to others in the firm.

BY MR. KRUMMEN:

Q To whom would you speak?

A First off, I would talk to our person in charge of finance.

Q Is that Jane Knutson?

A Yes.

Q Who else would you speak with?

A That would depend on what information she can provide.

Q Who else would have knowledge about that subject?

MS. NEWMAN: Objection as to foundation. Objection as to outside the deposition topics. Objection as to speculation.
A I'm not going to speculate.
BY MR. KRUMMEN:
Q Why was the formula changed in 2003?
A It's been an ongoing discussion to make sure that we're fair and equitable to all the various parties.
Q Did the formula change have anything to do with this litigation?
A No.
Q When you say to make sure that you're fair and equitable, what do you mean by that?
MS. NEWMAN: Objection as beyond the scope of the deposition topics. Objection as to relevance.
A We have different regions, different profit figures, different challenges, different needs. We just want to periodically review to be sure that we are fair and equitable to all parties.
BY MR. KRUMMEN:
Q I want to confine the next series of questions to 1998 through 2002, and I am curious what challenges or equitable considerations you faced in making

distributions to BSB Iowa and to BSB Illinois.
MS. NEWMAN: Objection as to form.
MR. FARMER: Objection to form.
A I don't recall.
BY MR. KRUMMEN:
Q Who would know the answer to that question?
MS. NEWMAN: Objection. Calls for speculation.
A Our finance person.
BY MR. KRUMMEN:
Q Do you recall anything about the distributions to BSB Iowa during the 1998 through 2002 time frame?
MS. NEWMAN: Objection as to form. Vague.
A Not at this time.
BY MR. KRUMMEN:
Q Do you recall anything about the distributions to BSB Illinois during the 1998 to 2002 time frame?
MS. NEWMAN: Same objection.
A Not at this time.
BY MR. KRUMMEN:
Q Has BSB Iowa made any profits off of the Town & Country account in the year 2003?
MS. NEWMAN: "Account," what do you mean by that? Objection as to vague, form.