# Exhibit A

**Preliminary Expert Report of Anthony Desnick, AIA**
The Rottlund Company, Inc. v. Pinnacle Corporation, et al

## I. Qualifications

Since 1984, I have been a practicing architect, registered in the State of Minnesota. During my career, I have worked with firms in New York, Italy, Finland, and Minneapolis, and was the principal of my own firm from 1984 – 1992. Over the past two decades, I have acquired extensive architectural expertise through my formal education, continuing education seminars and studies, and through working on corporate/commercial, government, single family and multi-family housing projects. I am currently a Vice President at Elness Swenson Graham Architects, Inc., a national architecture firm and a leader in multi-family housing design based in Minneapolis, Minnesota. I have attached as Appendix B to this report a copy of my Curriculum Vitae.

I believe my opinions will be helpful to a layperson who is trying to understand important issues in this lawsuit such as the phases of design for a townhome project, the interaction between the architect and client during the design process, the detail design process, architectural diagrams, floorplans, elevations, blueprints, construction documents, etc. My opinions are based on my knowledge, skill, experience, training, and education as an architect. Because fact discovery has not yet been completed, and because additional documents and other information or materials may become available or be produced subsequent to the time I complete this report, I respectfully reserve the right to amend, supplement, and/or revise the opinions set forth below.

## II. Information Considered in Forming Expert Opinions

In forming my opinions, I have considered a significant amount of information, including the design drawings and construction drawings from Rottlund for the following projects:

- The Dunhill in the Villas II in Maple Grove, Minnesota; dated July 17, 1997.
- The Chatham in the Villas II in Maple Grove, Minnesota; dated July 17, 1997. (RCI00001 – 13)

In addition, I reviewed the issue of Rottlund Homes "Happenings" Volume 17, Issue 2 1998 where the Villa II development in Apple Valley was featured. It is my understanding that this was a sales brochure for the Villa II end unit. (RCI000294 – 301)

I also reviewed design drawings and construction drawings from Pinnacle and Town and Country for the following projects:

Exhibit 417
Date: 6/23/04
David A. Campeau



Received 05-30-2003 17:52 From-612 347 0600 To-MOORE COSTELLO& HART Page 004

- Homestead Collection at Centennial Crossing in Maple Grove, Minnesota dated August 26, 1999. (D00001 – 15)
- Washington Square Back to Back Towns in Aurora, Illinois dated June 19, 2000. (PIN000567-585)
- Homestead Collection at Harvest Hills in Plymouth, Minnesota dated March 26, 2001. (D00728 – 750)
- Homestead Collection at Cornerstone Lake in Lakeville, Minnesota dated April 9, 2001. (D00751 – 780)
- Homestead Collection at Providence Pointe in Shakopee, Minnesota dated May 31, 2001. (D00696 – 727)
- Homestead Collection at Springbrook in Lakeville, Minnesota dated June 29, 2001. (D001622 – 1661)

In addition, I reviewed design and development drawings of projects and correspondence between Pinnacle, Town and Country, and BSB, as well as deposition testimony of individuals designated to testify on behalf of these business entities. An overview of these documents and deposition testimony is provided below and Appendix A sets forth documents and depositions considered.

### A. Documents and Deposition Testimony – A Timeline

Sometime in early 1998, representatives from BSB, Pinnacle, and Town & Country began discussing the concept of designing a multi-family townhome product. On March 19, 1998, Mr. Doug Buster, the majority shareholder in The Bloodgood Group, Inc., made a multi-family presentation to Pinnacle Vice President of Product Development Steve Sandelin and others. (PINN04622).

During March-April 1998, representatives from Pinnacle, Town & Country, and BSB toured Rottlund's back to back townhome on more than one occasion. At least one member of this tour group took pictures of Rottlund's Villa II townhome. At least one member of this group took a copy of Rottlund's marketing brochure, which I understand contained design details of Rottlund's Villa II townhome such as its floor plan. (Sandelin Depo. Tr. at 97:5-98:2, 103:4-104:13; Moore Depo. Tr. at 37:10-12; Jorgensen Depo. Tr. at 26:20-27:11; Plante Depo. Tr. at 94:15-95:19). Although it is not clear how many tours were taken of Rottlund's Villa II townhome, Mr. Sandelin's deposition testimony, calendar, and other Pinnacle documents establish that one such tour occurred on April 29, 1998. (Sandelin Depo. Tr. at 207:16-23; PINN 04667; D16025-29). BSB architects Chris Jorgensen and Larry Moore testified that another tour occurred in March 1998. (Jorgensen Depo. Tr. at 26:20-27:11; Moore Depo. Tr. at 36:14-18). Town & Country President Art Plante testified to still other tours. (Plante Depo. Tr. at 6:21-9:9, 104:10-105:25).

According to BSB architect Larry Moore, Pinnacle, BSB, and Town & Country toured Rottlund's Villa II townhomes to find "mistakes" that Rottlund and other



Received 05-30-2003 17:52 From-612 347 0600 To-MOORE COSTELLO& HART Page 005

competitors were making with their back-to-back townhome designs. The goal of the tour was to fix these "mistakes" and "find opportunities to one-up" the competition. (Moore Depo. Tr. at 39:22-41:1). According to Mr. Moore: "We see a mistake they're making and we better it. If their rooms are too small, we make them bigger. If their closets are too small, we make them bigger. We better it." (Moore Depo. Tr. at 40:23-41:1). In my opinion and based upon my nearly 20 years of architectural experience, this is not how architects and their clients independently create an architectural design. I believe this testimony demonstrates that Pinnacle, BSB, and Town & Country did not even attempt to independently create a back-to-back townhome design. Instead, they began with the premise that they would copy designs such as Rottlund's and then try to make the design slightly better.

In a contract dated April 6, 1998, BSB and Town & Country agreed to jointly design a back-to-back townhome as part of their "Villa Program." (Exhibit 26). The name "Villa Program" does not seem to be merely coincidental to the name of Rottlund's Villa II townhome. Also, the quoted price was approximately $25,000. I understand in speaking with Tim Whitten that he devoted well over a year of his time coming up with the original designs for Original Villa, New Villa and Villa II.

On May 5, 1998. BSB architect Larry Moore apparently sent a transmittal to Pinnacle Vice President of Product Development Steve Sandelin which concerned the "Villa Townhomes" project and referenced an attached "Competition product survey for Minneapolis area." (Exhibit 114). Discovery thus far has not uncovered the attachment to this transmittal, and I reserve my right to supplement this report when the attachment is found.

On July 13, 1998, Town & Country President Art Plante sent a redlined copy of the townhome designs to BSB. On the redlined design, Mr. Plante attached a photograph of Rottlund's Villa II side entry gable, drew a rough sketch of a gabled entry, and added the note "see Rottlund product". (Exhibit 6; Plante Depo. Tr. at 333:14-337:2; Jorgensen Depo. Tr. at 71:17-75:7). BSB then changed its design from a sloped roof over the side entries to a gabled roof, which is very similar to Rottlund's design only less expensive to build.

According to a fax dated June 7, 1999, Chris Jorgensen spoke with Art Plante and made several notes on the fax which was addressed to Art Plante. (Exhibit 78; Jorgensen Depo. Tr. at 97:1-98:13). Up until this time, BSB, Town & Country, and Pinnacle had been calling their back to back townhome product "The Villas", which does not seem to be merely coincidental to the "Villa II" back-to-back townhome name Rottlund had been using for some time. On the June 7 facsimile, Mr. Jorgensen wrote "END OF JUNE, NEW NAMES. . . USED ( VILLAS. . .)". (Exhibit 78).

On September 1, 1999, Art Plante sent an e-mail and renamed the "The Villas" to "Homestead Collection – back to backs". (Exhibit 81).

On January 5, 2000, Pinnacle Vice President of Product Development Steve Sandelin authored a memorandum and stated "The back-to-back townhomes for Homestead, Aurora will be developed from the working drawings originally prepared for Maple Grove, Minnesota. . ." (PINN01469) Mr. Sandelin testified in his deposition that the back-to-back townhomes Pinnacle constructed in Aurora were "obviously similar" to Rottlund's Villa II townhomes. (Sandelin Depo. Tr. at 79:1-6).

On February 4, 2000, BSB representative Michael Wagenknecht sent to Mark Kranz at Town & Country an external front elevation and external side elevation of the Homestead Collection townhome building. (BSB01621, 1624). When compared with Rottlund's external front elevation and external side elevation of its Villa II townhome building, it is my opinion that these two elevations are strikingly similar.

On February 17, 2000, Mssrs. Wagenknecht and Kranz revised the design of the side elevation and discussed omitting the window above the gabled side entry because of its cost. (Exhibit 84, BSB01588-590; BSB01587). According to the March 6, 2000 construction documents, the windows were removed from the design. (Exhibit 5, BSB02593, 2597). This minor difference in window configuration between Rottlund's side elevation and Town & Country's side elevation was cost driven: Town & Country wanted to build a cheaper product.

In a document dated February 28, 2000, BSB, Pinnacle, and Town & Country agreed that the August 26, 1999 construction document designs for the Homestead Collection townhomes Town & Country was planning to build in Maple Grove, Minnesota, could used by Pinnacle. (Exhibits 3, 4).

Sometime after March 6, 2000, Town & Country began building its Homestead Collection back to back townhomes at Centennial Crossing. I compared an internal picture of one of these townhome units (Exhibit 110) with an internal picture of one of Rottlund's Villa II townhome units (Exhibit 109). I also compared a copy of the floor plan of an external Homestead Collection townhome unit with a copy of the floor plan of Rottlund's external Villa II townhome unit. In my opinion, these pictures and these floor plans are substantially similar.

On July 5, 2001, Rottlund sent a cease and desist letter to Mr. Michael Ryan at Pinnacle, and alleged that the Homestead Collection townhomes infringed on Rottlund's copyright protected Villa II townhomes. (Exhibit 11).

On July 9, 2001, Steve Sandelin, Pinnacle's Vice President of Product Design, sent a transmittal to BSB architect Larry Moore regarding "Copyright

infringement." Mr. Sandelin then stated that Town & Country's townhomes were "obviously similar to Rottlund's Villa product." (Exhibit 11). I understand that Mr. Sandelin has more design expertise than anyone else in the Pinnacle and Town & Country organizations. I agree with Mr. Sandelin's assessment that the townhomes are obviously similar. He then asked if "these designs [are] under a co-ownership agreement with them or are they yours alone?" [redacted]. As an architect with nearly 20 years of professional experience, I am extremely surprised that BSB and Pinnacle/Town & Country did not address and resolve this question at the beginning of the design process. Instead, they chose to address this key question after the design process was complete and after construction was well under way. It is my understanding that neither BSB, Pinnacle, nor Town & Country have a co-ownership agreement with Rottlund.

On July 16, 2001, Art Plante, President of Town & Country, wrote a letter to Dean Karau and attached a file with the documentation pertaining to the design and development of the Homestead Collection townhomes. According to Mr. Plante, "Unfortunately, it appears that much of the competitor brochures that I would have gathered during the research to develop this product have already by [sic] disposed of as this product was developed in early 1998." (Exhibit 41). The fact that this information is missing has hampered my investigation of the design process.

On December 5, 2001, BSB apparently began to redesign the fireplace option for the Homestead collection. (Exhibit 87). The prior fireplace option is pictured in Exhibit 110. It is curious that this revision was not discussed until after Town & Country received Rottlund's cease and desist letter.

On February 18, 2002, Art Plante, President of Town & Country, sent to Mr. Karau a spreadsheet of "some of the comparisons that I did on the Rottlund plans versus the Town & Country's plans." (Exhibit 42). In my opinion, the differences noted in Mr. Plante's attachment are unimportant and insignificant when viewed against the similarities between the two plans. Certainly, the differences Mr. Plante noted in the two plans do not so outweigh the similarities that the similarities can only be deemed inconsequential within the total context of Rottlund's plans.

On April 2, 2002, The Bloodgood Group Inc. representative James Grundmeier sent to Dean Karau a transmittal and indicated he was forwarding "the contents of Larry Moore's design file for the Town & Country project" along with "work for other clients". (Exhibit 58). Discovery has not yet uncovered the referenced design file of Larry Moore. I reserve the right to supplement this report if the attachment is later discovered.

On April 10, 2002, Town & Country Project Manager Krista Flemming sent BSB architect Chris Jorgenson a transmittal. (Exhibit 95). According to Ms. Flemming, "The lawsuit issue comes into play when we talk about changes to the



Received 05-30-2003 17:52 From-612 347 0600 To-MOORE COSTELLO& HART Page 008

architecture. We need to make some changes anyway so Art Plante feels we should look at making significant architectural changes as opposed to slight changes." (Exhibit 95). In my professional opinion, if these changes needed to be made the appropriate time for them would have been four years earlier in the design process.

On April 25, 2002, Lori Meier at BSB received a facsimile with an attached design for a back to back townhome sprinkler system. (Exhibit 43). When I compared the attached sprinkler system design with Rottlund's construction drawings, I discovered they are direct copies of Rottlund's sprinkler system design and actual drawings. (RCI001434). Someone tried to delete the right-hand margins on the pages attached to Exhibit 43 (BSB001022-23) which signify that these designs belong to Rottlund. Moreover, after reviewing BSB001023 of Exhibit 43, I discovered that someone scribbled over Rottlund's logo and its copyright notice.

On July 8, 2002, Ms. Meier received from Tim Johnson, an architect at Town & Country, a facsimile with an attached design for a back to back townhome sprinkler system. (Exhibit 90). I understand that Mr. Johnson worked for Rottlund as an architect before he began working for Town & Country. Exhibit 90 appears to be a direct copy of Exhibit 43, page BSB001022, only someone completely cut off the right hand margin that attributes the design to Rottlund. In addition, letters were added to the words "SPRINKLER" and "SCALE", and the scale was crossed out.

**Issues and Opinions**

I have been asked by The Rottlund Company, Inc. ("Rottlund") to address several important issues and offer several independent expert opinions which are designed to help the jury to understand the evidence as it relates to architectural designs. These opinions include:

(a) an explanation of the process of creating a townhouse design, the number of choices and decisions that must be made during this process, and the purpose behind those decisions;

(b) a review of the facts and documents that show Defendants Pinnacle, Town & Country, and BSB did not independently create the Homestead Collection or Washington Square Townhome Design, but rather substantially copied Rottlund's Villa II Townhome Design;

(c) a comparison of the gestalt of the design elements in Rottlund's Villa II townhome products and Defendant Pinnacle's and Defendant Town & Country Homes' townhome products (*e.g.*, the Savannah, Bayview, Broadmoor, Starwood, and Arlington); and



Received 05-30-2003 17:52 From-612 347 0600 To-MOORE COSTELLO& HART Page 009

(d) an overview and explanation of the ethical guidelines and requirements for architects who design buildings such as multi-family townhomes for clients and conclusion that BSB violated these guidelines and requirements.

**Background Information - Townhome Design**

I define a townhouse as a building containing two or more dwelling units, each of which has primary ground floor access to the outside, and which are attached to each other by common walls without openings. As outlined in many urban and suburban zoning ordinances, a stand-alone townhouse is considered a "two-family" dwelling, providing there are no more than two dwelling units within the structure. Two or more townhouse structures per lot, or any townhouse containing three or more dwelling units is considered a multi-family use.

Townhouse and unit designs will vary greatly depending on many factors, including customer preferences, land uses, site possibilities, and price. For instance, two different potential townhouse buyers with otherwise identical financial resources, community preferences, and commute distances, frequently prefer townhomes with very little resemblance to one another. Differences in consumer preferences constitute a broad range from smaller detail design elements such as wood flooring or crown molding to larger general design elements such as the need for a basement or a one level townhome to accommodate the transitory needs of an elderly family member. The diversity in customer preferences largely explains the rich array of different townhome designs that have been created.

**Designing Townhouse Projects**

The design of townhouse projects is comprised of an immeasurable variation of design decisions that will create a project to serve the needs of owners, renters, and developers. Site and market constraints will often drive some of these decisions. The decision making process is not a linear one; instead, each decision is made while understanding the entire process and the effect each decision will have on the completed design. Decisions can include, but certainly are not limited to, the following issues:

- The number of units in each building?
- Will they be side-by-side, back to back, or both?
- One story or two or more?
- Will the building include a basement?
- Will the garage be in the front? The side? The rear? Beneath?
- How many bedrooms?
- Building materials?
- Amenities?



Received 05-30-2003 17:52 From-612 347 0600 To-MOORE COSTELLO& HART Page 010

Each of the above sample questions can have many answers and the solution will affect the decisions for each of the other areas so the design in total will be affected by individual seemingly smaller decisions.

**Choices In Designing Townhomes**

Architects that design townhomes have many choices to make concerning the first floor of a townhome. The floor plan may or may not include any of the following features: a living room, a stand-alone dining room, a half, three-quarter, full or no bath, an eat-in kitchen, a pantry, a patio, an attached walk-in garage, a bedroom, shelving, closet space, wood flooring, carpeting, linoleum, crown molding, built-in television and stereo system/entertainment center, a fireplace, the number of windows, their size, and their placement, *etc.* Kitchen design options can vary widely depending on cabinet materials and design as well the quality of appliances. Some of the architect's design decisions depend upon whether the townhome is a one-story or two-story townhome, and whether the townhome includes a basement. Other decisions are driven by the square footage of the townhome, the presence or absence of a loft, the size of the garage, *etc.* But certainly, the gestalt of the townhome is affected by the sum of the design elements, their placement, location, and layout.

If the townhome includes a second floor, an architect must make a host of additional decisions regarding design elements, their placement, location, and layout. For instance, some townhomes have open stairwells, lofts, multiple bedrooms with walk-in closets, a den, laundry facilities, and/or walk-in bathrooms attached to the bedrooms, vaulted ceilings, custom trim, extravagant shelving, window placement and size, natural ceiling light, *etc.* Others contain none or only some of these features. Again, choices concerning any one of these design elements may have a dramatic effect on the overall gestalt of the townhome.

A townhome unit's exterior and the building in which it is placed also presents an architect with a wide array of design element options and design decisions. Massing of the buildings can result in gable roof designs, hip roof, or in some case flat roof designs. Town home buildings can include "floors through", back-to-back, four unit, six unit, eight unit, ten unit, twelve unit. Side entries, if they are included in the design, can complicate the decision process; for example, a gabled side entry has a remarkably different look and feel as compared to a sloped roof side entry. Townhomes can have a colonial look, a more modern look, *etc.* The urban or suburban context will often complicate the decisions a designer/builder has as to how to tackle these design problems.

In an attempt to vary the massing of the building elements, exterior walls can "bump out" from the often rectilinear massing to offer some shade and shadow and some interest in the massing. How this can be accomplished is varied by as many different design solutions as exist. For example, sometimes a bay window

or a bump will be added to capture an important view on the site explaining further why site context can be an important design consideration.

**Comparison of Town & Country's Designs and Rottlund's Designs**

I have compared the designs of Town & Country's townhomes with the designs of Rottlund's townhomes. A brief overview of the similarities of the two designs' total look and feel is set forth below.

Placement of the gable roof covered entry
The slope of the roof is similar on the Town and Country Designs to those created by Rottlund. The use of "split shake" vinyl siding is identical on both designs as well. The drawing by Bloodgood Sharp Buster and created for Town and Country dated June 24, 1998, would suggest that the Rottlund design for the gable entry was indeed copied. Onto the conceptual elevation drawing was placed a photo of the Rottlund building with a sketch and note adjacent to the photograph. The sketch of the gable entry is similar to the one shown in the photograph and the note says, "see Rottlund product." (BSB02013).

Placement of gabled side entries
The entry at the side of the end units has been placed in the same location relative to the living room and the dining room demising wall. The significance of this placement is that one experiences the space of the living room, the fireplace, and the lofted space of the second floor in virtually the same way for both units.

Placement of the optional fireplace
In each of the units, the optional fireplace was designed in the same location relative to the media units on either side and to the unit entrance and the lofted second floor space.

Layout and proportions of the optional fireplace
The fireplace in both Town and Country and Rottlund designs is placed between media or book shelves and beneath an arched niche above the mantel. The most striking similarity is found in the promotional photographs each company has used in selling the unit designs.

Second floor loft
The proportion of the loft spaces are similar in each of the projects reviewed. Town and Country's wood railing protecting the loft space occupants from falling to the living room below is similar to the design in Rottlund's design. The railing design is important because it represents a significant part of the wall design above the fireplace and media/book shelves. There was an electrical outlet placed in the floor adjacent to the middle area of the railing of the Rottlund unit. The same was found at the Town and Country unit.

Second floor living room windows
While the windows in the Town and Country units were smaller the positioning and the juxtaposition of the windows to others in the units and to the rooms is the same. As a result the light and shadows fall across elements in the unit – particularly the fireplace, mantle, and bookshelves in a similar way.

Placement of the first floor living room windows
On the long side of the back-to-back building, the living room windows are designed in a three light configuration in the Town and Country unit and a two window configuration in the Rottlund unit. The width of the composite windows are the same but the heights are not the same in both composite windows but the light and shadows come in to the unit in very similar ways.

Garage
The garage is located in the same place relative to the adjacent rooms in both units with one exception. The stairway is placed in the Town and Country unit so that it is to the rear of the garage space enabling the design of a closet adjacent to the kitchen. The Rottlund unit design places the stair into the garage space so that the upper part of the garage space opposite the overhead garage door is impinged by the stairway. The juxtaposition of the garage and its door into the unit is the same so that movement from one's car into and through the unit is similar.

First floor powder room
The Rottlund and the Town and Country units both had powder rooms directly off the breakfast area of the kitchen. This can result in unpleasant sounds and odors invading the eating area and I believe was a mistake in the Rottlund design. The fact that Town & Country made the same mistake, in my opinion, provides evidence that Town & Country simply copied Rottlund without giving thought to making improvements to the powder room.

Living/dining rooms
The living/dining rooms and the spatial relationship to each of the adjacent spaces; the entrance door, the stairway and the loft is the same in the Rottlund units and the Town and Country units. The one difference is called out by the different dimension taken from the outside face of the front of the living room wall to the same place on the unit which backs up to it. On the Rottlund units that dimension is longer by several feet. This is the main reason for the stair location on different sides of the demising wall between the garage and kitchen. While a review of the floor plan drawings show this difference, it is indiscernible when visiting the actual living/dining room space.

Dining room patio
The size and location of the patio outside the dining rooms are similar in both Rottlund's and Town and Country's units. The patio doors are both sliding doors centered on the dining room wall.

Master Bedroom Suite
The entrance from the stairway/loft space to the suite is through a wall positioned at 45 degrees in both the Rottlund and Town and Country units. The sizes and proportions are similar being offset slightly by the difference in overall unit depth by several feet. The bathrooms contain the same amenities down to the two vanities in a continuous countertop and a somewhat separate toilet. In both designs one passes through or alongside of the master bedroom closet.

Roof configuration
When Rottlund was first starting to build these units, they turned the gables at each end of the building, which had the effect of reducing the mass of the building and of giving the building an anchor. This was an innovation when it was designed and still isn't found on many townhouse projects today. The Town and Country units have the same gable roof with the "turned" ends at the ends of the building. The bumped out bays at the loft spaces on the second floor are also similar in both the Rottlund and Town and Country products.

Exterior materials
Both Rottlund and Town and Country units are primarily clad in vinyl siding with a stone or brick base. The height to which the base rises on the building seems to be a function of local building ordinances.

A partial, but not exhaustive, explanation of the arrangement and composition of spaces and elements, or gestalt or combination of the spaces, features and elements, of Defendants' townhome design, which is substantially similar to Rottlund's townhome design, is set forth below:

- placement of gabled side entries;
- layout of gabled side entries;
- proportions of gabled side entries;
- placement of optional fireplace;
- layout of optional fireplace;
- proportions of optional fireplace;
- architectural detail above optional fireplace, including recessed drywall arch;
- placement of recessed shelving next to optional fireplace;

- placement of tile and trim design adjacent to optional fireplace;
- placement of loft;
- layout of loft;
- proportions of loft;
- architectural detail of loft including railings, spindles, banisters, and molding;
- placement of second story window in living room;
- placement of first story windows in living room;
- proportions of first story windows in living room;
- placement of garage;
- layout of garage;
- placement of garage entry into kitchen area;
- proportions of garage;
- placement of living room;
- proportions of living room;
- layout of living room;
- placement of dining room;
- proportions of dining room;
- layout of dining room;
- placement of stair well;
- proportions of stair well;
- layout of stair well;
- placement of kitchen;

- proportions of kitchen;
- placement of kitchen pantry;
- proportions of kitchen pantry;
- layout of shelving in kitchen pantry;
- placement of exterior patio;
- proportions of exterior patio;
- layout of exterior patio;
- entry way from exterior patio into dining room area directly adjacent to living room area;
- placement of powder room;
- proportions of powder room;
- layout of powder room, including single sink and toilet with no tub or shower;
- placement of master bedroom/owner's suite;
- proportions of master bedroom/owner's suite;
- layout of master bedroom/owner's suite;
- window placement in master bedroom/owner's suite;
- proportions of windows in master bedroom/owner's suite;
- placement of owner's suite bathroom;
- proportions of owner's suite bathroom;
- layout of owner's suite bathroom;
- placement of second bedroom;
- proportions of second bedroom;

- layout of second bedroom;
- window placement in second bedroom;
- proportions of windows in second bedroom; and
- roof configuration.

## Conclusions

This is a partial listing of my analysis of the substantial similarities between the gestalt of Rottlund's product and Town and Country's product. After analyzing these elements, I agree with the conclusion of Town and Country's Vice President of Product Design, Steve Sandelin, that the two products are "obviously similar."

I believe the similarities between Rottlund's and Town and Country's products far outweigh the differences both in number and importance. The same is true for the gestalt of the two products. In my opinion, two architects, operating completely independently of one another, could not create two townhomes with such similarity. This conclusion is supported by the testimony given in this case, as Steve Sandelin, Pinnacle's Vice President of Product Development, and Art Plante, Town and Country's President, both testified that they and their BSB architects had participated in multiple tours of Rottlund's Villa II townhome, taken pictures, and taken Rottlund brochures. Some of these materials were produced as part of BSB's redline versions of Town and Country's townhome design drawings.

A careful review of drawings and photographs has revealed to me the overwhelming similarities between Rottlund's product and Town and Country Homes' product. This overwhelming similarity was confirmed for me in the site visits. After inspecting Town and Country's product, I inspected Rottlund's product. When I entered Rottlund's unit, I said to myself, "It feels like I am still inspecting Town & Country's townhome."

## Ethical Rules

The American Institute of Architects ("AIA") is an institution whose members are dedicated to the highest standards of professionalism, integrity, and competence. The AIA Code of Ethics and Professional Conduct ("Code of Ethics") sets forth many principles and guidelines to help its members fulfill these obligations. 1993 AIA Code of Ethics, Preamble.

The Code of Ethics provides that members "should maintain and advance their knowledge of the art and science of architecture, respect the body of architectural accomplishment, and contribute to its growth. Learned and



Received 05-30-2003 17:52 From-612 347 0600 To-MOORE COSTELLO& HART Page 017

uncompromised professional judgment should take precedence over any other motive in the pursuit of the art and science of architecture." *Id.*, Canon I.

The Code of Ethics further obligates members to "uphold the integrity and dignity of the profession." *Id.* at Canon IV. The Code then specifically provides that "[m]embers shall neither copy nor reproduce the copyrighted works of other architects or design professionals." *Id.*, Rule 4.108. The Commentary to Rule 4.108 states that "[t]he copyright laws of the United States shall be used as guidelines for interpretation and enforcement of this rule." *Id.*

In my professional opinion, the Defendants Pinnacle and Town & Country and their BSB architects violated the letter and the spirit of Rule 4.108 when they copied Rottlund's Villa II copyrighted work. This opinion is based in large part on the documents that have been produced during discovery.

For example, in a July 9, 2001 memorandum, Town & Country's Vice President of Product Development referred to his company's townhomes as "obviously similar" to Rottlund's copyrighted Villa II townhomes. (BSB 01931) In addition, in Town and Country Homes' July 7, 1998 Revised Concept Elevation for its "Villa Elevation A", there is a circle and redline over Town & Country's sloped side entry roof and a line to a picture showing the placement, location, and aesthetic appeal of Rottlund's gabled roof side entry along with a handwritten note that states, "see Rottlund's product" (BSB02035A). When Pinnacle and Town & Country completed their final design and began building townhomes, they used a gabled side entry roof which has virtually the same location, placement, layout, and aesthetic appeal of Rottlund's gabled roof side entry. Furthermore, Town & Country, Pinnacle, and BSB copied Rottlund's complex sprinkler system design and someone went so far as to scratch out Rottlund's logo and copyright notice.

This opinion is also based on the testimony of Steve Sandelin, Pinnacle's Vice President of Product Development, and Art Plante, Town and Country's President. Both executives testified that they and their BSB architects participated in multiple tours of Rottlund's Villa II townhome, during which photographs and brochures of Rottlund's product were taken. Deposition testimony establishes that the purpose of the tours was to use and try to improve architectural designs of others. Some of these materials taken of Rottlund's product were produced as part of BSB's redline versions of Town and Country's townhome design drawings. Other materials were produced from Messrs. Plante's and Sandelin's respective files.

Discovery is not yet complete in this matter, and I reserve the right to supplement, revise, and/or alter my opinions as additional information comes available and/or if the scope of my assignment changes.

**Summary**

In sum, it is my opinion that BSB, Town & Country, and Pinnacle did not independently create the design for the Homestead Collection back-to-back townhomes or the Washington Square townhomes; rather, they copied a substantial portion of Rottlund's Villa II townhome design. The Homestead Collection and the Washington Square back-to-back townhomes are substantially similar to Rottlund's Villa II townhomes. The differences between the Homestead Collection/Washington Square townhomes and the Villa II townhomes do not so outweigh the similarities that they make the similarities inconsequential. In designing the Homestead Collection/Washington Square townhomes, Pinnacle, Town & Country, and BSB violated both the spirit and the letter of the AIA Code of Ethics and Professional Conduct.

## III. Trial Exhibits

My trial exhibits will include, but are not necessarily limited to, the documents and other materials referenced in this report. I respectfully reserve the right to supplement this list of trial exhibits as discovery continues, trial approaches and/or as additional materials are made available to me through the expert discovery phase of this litigation.

## IV. Publications for the past 10 years

In the past 10 years I have had no articles published.

## V. Compensation

My current billing rate for this matter is $170/hour.

## VI. Listing of trial testimony and/or deposition in past 4 years

I have not been deposed nor have I testified at trial during the past 4 years.

This report submitted by:

Anthony Desnick, AIA
Elness Swenson Graham Architects, Inc.
Minneapolis, MN

[signature]
Anthony Desnick, AIA

30 MAY 2003 Date

## Appendix A – Material Considered

RCI00001 – 13
RCI000102 – 105
RCI000125 – 131
RCI000137 - 147
RCI000163 – 175
RCI000125
RCI000133 – 134
RCI000270
RCI000294 – 301
RCI001434

BSB000737
BSB001022-1023
BSB01587-1590
BSB01621
BSB01624
BSB01662 - 1666
BSB01830 – 1977
BSB02013 – 2050
BSB02593 - 2597

D00001 - 15
D00116 – 252
D00265 – 309
D00340 – 371
D00513 – 630
D00696 - 727
D00728 – 750
D00751 – 780
D016025-29
D001622 – 1661

PIN000567 – 585
PINN01469
PINN04622
PINN04667

Deposition and accompanying exhibits for Steve Sandelin
Deposition and accompanying exhibits for Art Plante
Deposition and accompanying exhibits for Larry Moore
Deposition and accompanying exhibits for Chris Jorgensen
Deposition and accompanying exhibits for James Grundmeier
Deposition and accompanying exhibits for Douglas Buster

Exhibits specifically referenced in the report:

Deposition Exhibit 3
Deposition Exhibit 4
Deposition Exhibit 5
Deposition Exhibit 6
Deposition Exhibit 11
Deposition Exhibit 26
Deposition Exhibit 41
Deposition Exhibit 42
Deposition Exhibit 43
Deposition Exhibit 58
Deposition Exhibit 78
Deposition Exhibit 81
Deposition Exhibit 84
Deposition Exhibit 87
Deposition Exhibit 90
Deposition Exhibit 95
Deposition Exhibit 109
Deposition Exhibit 110
Deposition Exhibit 114

Site Inspections of Town and Country's Homestead Collection townhomes at Harvest Hills, Providence Pointe, Cornerstone Lake, and Springbrook. In addition, I inspected an external townhome unit at the Centennial Crossing development and the exterior of an 8 unit townhome also at Centennial Crossing.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

The Rottlund Company, Inc.
d/b/a Rottlund Homes, a Minnesota
Corporation,

Plaintiff,

vs.

Pinnacle Corporation
d/b/a Town & Country Homes, et al.,

Defendants,

Case No.: 01-CV-1980 (DSD/SRN)

**NOTIFICATION OF CONVENTIONAL FILING OF PART OF EXHIBIT A TO AFFIDAVIT OF DAVID A. DAVENPORT IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION OF DEFENDANT'S MOTION TO COMPEL DISCOVERY**

**[FILED UNDER SEAL]**

This document is a place holder for the following item(s) which are filed in conventional or physical form with the Clerk's Office:

Appendix B to Supplemental Expert Report of Anthony Desnick, AIA, dated May 30, 2003

If you are a participant in this case, this filing will be served upon you in conventional format.

This filing was not e-filed for the following reason:

__X_ Item Under Seal* (Document number of protective order: 9; 205 (Addendum)

* Filing of these items requires Judicial Approval.

This Notice is e-filed as a place holder in ECF for the documents filed conventionally. A copy of this Notice and a copy of the NEF are filed with the Clerk's Office along with the conventionally filed item(s).

2132839v1