Civil No. 01-1980 (DSD/SRN) – Rottlund/Pinnacle
Davenport Affidavit dated July 22, 2004

Exhibit F

COPY

WINTHROP WEINSTINE

ATTORNEYS AND COUNSELORS AT LAW

June 24, 2004

David A. Davenport
(612) 604-6716
ddavenport@winthrop.com

**BY FAX and U.S. MAIL**
Darren Schwiebert, Esq.
FREDRIKSON & BYRON
4000 Pillsbury Center
200 South Sixth Street
Minneapolis, MN 55402-3397

**Re:** ***Rottlund v. Town & Country, et al. v. Bloodgood Architects and Planners of Iowa, Inc.***
Court File No. 01-CV-1980 (DSD/SRN)
Our File No. 10150-3

Dear Darren:

K&B Copy Service made copies of many of Ms. Snelson's documents and materials considered prior to her deposition at your direction. We have yet to receive copies of any of those documents, nor have any of them been Bates labeled. Please ensure that you appropriately Bates label the documents and produce copies to us immediately. As I mentioned to you over a break during Ms. Snelson's deposition, these documents cannot simply exist in the Defendants' files without any Bates labels or production to Rottlund.

As you know, we will depose Jeffrey Scherrer on June 30, 2004. Please confirm that Mr. Scherrer's materials and documents considered, along with his notes and any other information related to his communications with Fredrikson & Byron and/or Holland & Knight will be made available for us to review and inspect on Monday. By copy of this letter to Chris Murdoch, we request that he do the same.

Concerning your June 23, 2004 letter to Craig Krummen, we will consider your inquiry. However, Mr. Desnick testified that he does not retain prior drafts of his reports. You apparently believe that attorneys' files are discoverable, so we respectfully request the following by Monday:

(1) production of all communications, in any form, between Fredrikson & Byron, Art Cobb and/or Jeff Sherrer, and all communications, in any form, between Holland & Knight, Art Cobb and/or Jeff Scherrer; and

(2) the relevant legal authority to support your position.

In addition, please ensure that all documents related to the above communications are made available on Monday as well. By copy of this letter to Chris Mordoch, we request that he do the same.

Very truly yours,

**WINTHROP & WEINSTINE, P.A.**

David A. Davenport
DAD:jep

2126445v1

c: Holly J. Newman, Esq. (by fax and U.S. Mail)
Christopher Murdoch, Esq. (by fax and U.S. Mail)

# Exhibit G

**MOORE, COSTELLO & HART, P.L.L.P.**
A Professional Limited Liability Partnership
**ATTORNEYS**

REPLY TO

MINNEAPOLIS OFFICE

WRITER'S DIRECT DIAL NUMBER

(612) 395-8669
jbp@mch-pllp.com

July 21, 2003

DAVID DAVENPORT
WINTHROP & WEINSTINE PA
225 SOUTH 6TH STREET
SUITE 3500
MINNEAPOLIS, MN 55402-4629

Re: The Rottlund Company, Inc. v. Pinnacle Corporation d/b/a Town & Country Homes and Town & Country Homes, Inc., et al.
Court File No. 01-CV-1980 (DST/SRN)

Dear David:

I am in receipt of your letter of July 17, 2003, enclosing the notes of Melissa Snelson. BSB did not request Ms. Snelson's notes, and we are unwilling to disclose any notes taken by any of our experts. If our access to Ms. Snelson's notes is predicated upon such disclosure, as your letter appears to suggest, please notify me and BSB will return Ms. Snelson's notes.

If you have any questions, do not hesitate to contact Holly Newman or me.

Sincerely,

**MOORE, COSTELLO & HART, P.L.L.P.**

By Ben Patrick
Ben Patrick

cc: Holly Newman
Darren Schwiebert
Matthew Farmer

MPLS:45194.1/16850-166

# Exhibit H

**MOORE, COSTELLO & HART, P.L.L.P.**
A Professional Limited Liability Partnership
**ATTORNEYS**

REPLY TO

MINNEAPOLIS OFFICE

WRITER'S DIRECT DIAL NUMBER

(612) 395-8669
jbp@mch-pllp.com

July 28, 2003

DAVID DAVENPORT
WINTHROP & WEINSTINE PA
225 SOUTH 6TH STREET
SUITE 3500
MINNEAPOLIS, MN 55402-4629

Re: The Rottlund Company, Inc. v. Pinnacle Corporation d/b/a Town & Country Homes and Town & Country Homes, Inc., et al.
Court File No. 01-CV-1980 (DST/SRN)

Dear David:

Enclosed, per your request, please find Melissa Snelson's notes. Please be advised that you have previously received all bills sent by BSB to TCM for the Homestead Collection. Also, please be advised that you have previously received all time sheets for the years 1999-present which reflect work done by BSB on the Homestead Collection. Finally, as I stated in previous correspondence to you, it was impossible for BSB to complete its review of the requested Rottlund documents, as Rottlund chose not to disclose all requested documents.

If you have any questions, do not hesitate to contact Holly Newman or me.

Sincerely,

**MOORE, COSTELLO & HART, P.L.L.P.**

By Ben Patrick

55 E FIFTH ST · SUITE 1400 · ST. PAUL, MN 55101-1792 · TEL. (651) 227-7683 · FAX (651) 602-2670

701 FOURTH AVENUE SOUTH · SUITE 1350 · MINNEAPOLIS, MN 55415-1823 · TEL. (612) 673-0148 · FAX (612) 395-8600

Enclosure

cc: Holly Newman (without enclosures)
Darren Schwiebert (without enclosures)
Matthew Farmer (without enclosures)

MPLS:45294.1/16850-166

# Exhibit I

rvd. 11/02/03 SEE PAGE 2 FOR ATTORNEY'S AGREEMENTS

REPORTER'S NOTE: Since this deposition has been realtimed and you may be in possession of a rough draft form, please be aware that there may be a discrepancy regarding page and line numbers when comparing the realtime screen, the rough draft, rough ASCII, and the final transcript. Also, please be aware that the realtime screen and the unedited, uncertified rough draft transcript may contain untranslated steno: "[STPHAUD]," "[TPHA*UT]," "[SKRAF]"; an occasional reporter's note: "RPTRS'NOTE, " followed by a note to myself; a misspelled proper name: "bill, " "gym"; and/or nonsensical English word combinations, "at that time/tattoo, " "ran some/ransom;" misspelled words, some of them flagged/marked (~/+). All such entries are corrected on the final certified transcript.

This realtime rough draft transcript is an invaluable service for your same-day review of the proceedings, and is not provided for nor meant to be used or cited in any type of court proceedings.

The realtime draft will be compared against an audiotape in order to ensure complete accuracy on the final transcript.

* * * * *

ATTORNEY'S AGREEMENTS: By accepting a rough draft transcript or a rough ASCII diskette, I am hereby agreeing to the terms as specified below. I also acknowledge that I am releasing the court reporter, and any agents thereof, from liability for any lost data or damage to my computer as a result of my use of the rough draft ASCII diskette or realtime software.

I, the party working with realtime, understand that if I choose to use the realtime rough draft screen, a printout, or diskette, that I am doing so with the understanding that the rough draft is uncertified.

The realtime rough draft may be used in place of or in addition to my notes taken during testimony. Specifically, if I choose to cross-examine or prepare a witness by using a rough draft, I am doing so with full knowledge that the rough draft is uncertified, and that I am doing so at my own risk. However, I may contact the court reporter and request that a portion of the transcript be certified for use in a court document or court proceeding.

I further agree not to share, give, copy, scan, fax, or in any way distribute the realtime rough draft in any form (written or computerized) to any party. However, my own experts, co-counsel, and staff may have limited internal use of same with the understanding that I agree to destroy all realtime rough draft and/or computerized forms, if any, and replace same with the final transcript and/or final computerized form, upon its completion.

I further agree that I will pay for this extra service. If I choose not to order a final transcript, I agree to pay for the hard copy or computerized form of the rough draft as if it were the final transcript.

* * * * *

Present today: Schwiebert, Newman, Krummen & Ms. Snelson (expert) No one from Mr. Farmer's firm is present today.

Starting at 9:05.

(Deposition Exhibit Numbers 432 through 433 were marked by the reporter before the deposition commenced.)

(Oath administered.)

WITNESS RESPONSE: I do.

EXAMINATION

BY MR. KRUMMEN:

Q Please state your name for the record.

A My name is Joseph D. Kenyon.

Q Mr. Kenyon, I briefly introduced myself earlier. As you know my name is Craig Krummen and I represent Rottlund in this matter. Thank you for coming in today. In front of you are two. Exhibits one was marked as Exhibit 432 and one was marked as Exhibit 433, correct?

A Yes.

Q Would you identify for the record what is

brochure and walked through them, I can't
remember if I went into Centex or not.
Q Do you have a Centex Club West development
brochure in your files anywhere?
A I don't know. I don't know. I can't remember.
Q Did you take any pictures of Centex's Club West
development?
A Yes.
Q Did you produce those pictures in connection
with this lawsuit?
A I don't know if they were produced or not.
Q Why did you take pictures of Centex's
development?
A I just took pictures of all of these.
Q Did you take pictures of the outside?
A Yeah, just the outside, I didn't take any
pictures of the inside.
Q So you took pictures of Rottlund's Club West
development?
A Yes.
Q And you took pictures of Rottlund's Maple Lakes
development?
A You know, yes, I don't know if we took pictures
of all of them, we may have taken pictures of
all of them on the outside.

Q You keep saying "we" I don't mean to interrupt but could you be more specific?
A I'm sorry, "We." Actually Dave Kiwus with me actually the way our firm is I speak would, I mean I was there, but I say we a lot.
Q You also took pictures of Town & Country Centennial lakes development?
A I think so. I just have to go back and look at my file.
Q And you took pictures at TCM's Springbrook development?
A I may or may not have because I was at the end, we drove down to Lakeville at the end.
Q Why did you take pictures of these developments?
A I thought it would be good to see what the heck I'm trying to deal with, you know you shouldn't be trying to calculate damages in a vacuum, you should trying try to get as much understanding of actually what's happening. I mean I just think anybody who is going to do calculations such as this would go out and look at the projects.
Q Did counsel participate in the tours you're speaking of.
A They did go with me, yes.

Q Who picked Centex to be one destination to tour, you or counsel?
A I don't remember. I just asked do you know of any other back-to-backs you could go to I think somebody says Centex has some in Blaine so we went to that.
Q Could gone to D.R. Horton or Pulte or anybody else that built a back-to-back in the Twin Cities correct?
A I'm sure we could have.
Q For some reason Centex was chosen, correct?
A For some reason, yes.
Q Why is that?
A I don't know. Nothing insidious that I know of, we just went to it.
Q You have approximately eight to ten conclusions set forth in page 2 of your report, correct?
A Yes.
Q Do you intend to offer any conclusions at trial or any opinions at trial that exceed the list set forth on page 2 of your report, which is marked as Exhibit 432?
A (Reviewing.) I don't recollect. I'll have to go through this and see if anything pops up that isn't listed here, I don't recollect anything in

very good basis to try to come up with an empirical calculation as to what effect design has in the buying decision versus other factors. And I thought that would be the best -- I mean using Rottlund's information was a very good source of trying to assist us with this issue of apportionment. That is what portion of the profits of the alleged infringing product relates to the infringing elements versus all the other reasons people buy townhomes including back-to-backs.

Q You concluded that based on the Rottlund survey 20 percent of the respondents said design was important to them is that your conclusion?

A Well, what we did is we took really two sets of surveys, we had first 100 and then we received a little over 100, then we received a another set surveys a little over a hundred, and we went through there and summarized up all of the summarized up all of the answers with respect to those things that influenced their buying decision. We also summarized up all those issues with respect to what pieces of parts of design did they like, the kitchen, living room, quality of product, and whatever, and we used

those studies and weighted the ranking so that if somebody said they had one out of five or one out of six, depends on the survey, we went through and weighted those, giving a one much greater weighting than a two, each one mathematically weighted came with a weighted average to determine when you looked at the pool of all of the things that Rottlund thought that the customer considered in buying that it appeared approximately 20 percent of the profits got down to with a related to the apparently what would be the alleged infringing portion of the units.

Q You produced the working papers which explained that weighting process that you came up with?

A I don't know.

Q Do you have those at your office?

A Yes.

Q Could we get a copy of those over the lunch hour so we go go through and could go through and understand how you determined to weight these?

A I don't know.

Q Do you want to stop for five minutes and make a call and see if you can get four copies of your work papers so that you can explain to me how

you weighted these responses?

MS. NEWMAN: Object to the form of the question. He meeds to explain anything that he needs them to explain anything to you go ahead.

BY MR. KRUMMEN:

Q Well, you definitely considered these working papers in many could go up with weighted average correct?

A That's true.

Q So why didn't you produce those to me?

A I wasn't asked to produce those.

MR. KRUMMEN: Let's take a five-minute break and I'll encourage you to make that call otherwise we'll have to have a motion about it.

(A recess was taken from 11:30 until 11:47 a.m.)

(Deposition Exhibit Number 436 marked for identification by the reporter.)

BY MR. KRUMMEN:

Q Sir, before we broke we were talking about the Rottlund survey, correct?

A Yes.

Q And I've put in front of you as Exhibit 436 a single document which starts with RCI 007950, and runs through RCI 007953?

A Yes.

Q Do you know with a kind or type document Exhibit 436 is?
A We understand this is the consumer customer surveys performed by Rottlund.
Q And it's just a single survey before you as Exhibit 436, correct?
A I believe so, yes.
Q It's the same type of survey that you testified to earlier where you got a waive of approximately 100 surveys the first time and then additional surveys later, correct?
A Yes.
Q I'd like to walk through your expert report and tie it to Exhibit 436 as an example only. But in your report on page 9 you're talking about Rottlund has produced surveys purporting to set forth reasons why occurs purchased its units, could you show me on Exhibit 436 the portion of the Rottlund survey example that you think purports to set forth reasons why customers purchased Rottlund's units?
A We did summarize two things, page 3.
Q Which is RCI 007952 of Exhibit 436, correct?
A That's true, yes.
Q Please continue.

average prices that we used to calculate this.
Q Do you have any other notes or work papers that haven't been produced?
A We may have some memorandums with respect to information that's put -- within -- is already within the report.
Q Do you have any other notes or work papers that haven't been produced?
A I don't believe so. I'd have to go back and look at my file.
Q You also had some pictures from tours you took of Rottlund Villa II among other?
A I have pictures, yes, I do.
Q S also have brochures of tours you took of Rottlund's Villa II among other products, correct?
A I think so, yes.
Q Did Ms. Newman accompany you on the tour of Rottlund's Villa II?
A I believe so, yes.
Q Did you clear that with Rottlund before you went?
A She never actually went. I mean she went with but never went -- never went into the products, never went into the projects. She just sat out

in the car. But I didn't know where these places were and she pointed out where they were and then I went inside and I took pictures on the outside, but she never entered the properties.
Q Do you have any notes of conversations with Ms. Newman?
A No.
Q Do you have any written materials you received from Ms. Newman?
A There's correspondence.
Q Did you produce the correspondence you've had with Ms. Newman to me?
A It would be up to Ms. Newman.
Q Well, it hasn't been produced yet has it, sir?
A I don't know. I mean I haven't produced it.
Q Do you have any correspondence with any other members of Ms. Newman's law firm?
A It's possible. I don't know. I have to go back and look.
Q Did Ms. Newman help you write your expert reports?
A No.
Q Did she review any drafts of your expert reports?

A We sent one draft over.
Q Of which report?
A I don't remember. I'm assuming it -- I know the first one we did. The second one I can't remember.
Q Do you have a prior draft of either report?
A No. We just have it on Word and we just update it as we go. There was no marked up draft if that's what you're looking at.
Q Was there a telephone conversation with respect to suggested changes to your report between you and Ms. Numerous man?
A There was a telephone conversation and issues, issues with respect to you know we had the facts right, and some typos, but really nothing of substance.
Q Who made the decision to give you the documents that you considered?
A They pretty much gave us almost -- I don't know I mean I've got a room full of documents, rows and rows and rows, and paralegal kept sending stuff over, we got a lot of stuff, I don't know exactly who made the decision, I imagine counsel legal counsel you know I don't know if stuff I don't have or do have. I have lots of

still had difficult time getting it.
Q Why did you talk to Mr. Cobb about the Town & Country financial information?
A So we could update our report, I was trying to get incremental profits from Town & Country so I could apply our methodology and -- and he I assumed he had the information.
Q Definite it?
A Well, I don't know if he -- I don't remember if he had it or not. We got some financial information but from that I couldn't tell what their real margins were from that information.
Q Did you receive the financial information from Mr. Cobb or through some other source?
A I don't remember. We got some financial information but I don't know where it came from. And it we couldn't use it. I mean, we didn't use it because we couldn't quite figure out what it was.
Q Do you still have the financial information that you received shortly after the second conversation with Mr. Cobb?
A Yes, I didn't throw it away I'm not sure which information it was. I don't know if I can identify it.

Q Have you produced financial information you received shortly after you conversed with Mr. Cobb?
A I don't know. I'm assuming it was produced by him.
Q You don't know if it was or was not correct?
A I don't know. It was something we did not -- we did forgot rely upon.
Q I'd like to go through your history of testifying as an expert witness, when did you first testify either deposition or at trial as an expert witness?
A Probably mid to late '80s.
Q How many times have you testified in deposition as an expert witness?
A I don't know. I'd have to count it up from my list of cases.
Q Is it more than 20?
A Probably.
Q Is it more than 50?
A For depositions alone.
Q Yes?
A (Counting.) Probably not more than 50.
Q So somewhere between 20 and 50 since the mid to late 1980s?