The Rottlund Company, Inc. v.
Pinnacle Corporation and Town & Country Homes, Inc.
Court File No. 01-1980 DSD/SRN

Second Schwiebert Affidavit in Support of Defendants'
Motion for Partial Summary Judgment

# EXHIBIT X

RECEIVED BY MAIL
JUN 17 2004
CLERK US DIST COURT MINNEAPOLIS MN



UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

The Rottlund Company, Inc., dba Rottlund Homes,
Plaintiff,

-vs-

Pinnacle Corporation, dba Town & County Homes, a Minnesota corporation; Bloodgood Group, Inc., an Iowa corporation; Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa corporation,
Defendants.

CV 01-01980 (DSD/SRN)

St. Paul, Minnesota
April 29, 2004
1:45 p.m.

ORIGINAL

---

BEFORE THE HONORABLE SUSAN R. NELSON
UNITED STATES MAGISTRATE JUDGE
(CIVIL MOTIONS)

APPEARANCES:

For the Plaintiff: CRAIG S. KRUMMEN
DAVID A. DAVENPORT
Winthrop & Weinstine
225 South Sixth Street, #3500
Minneapolis, Minnesota, 55402-4629

For Defendant Pinnacle: CHRISTOPHER J. MURDOCH
MATTHEW I. FARMER
Holland & Knight
131 S. Dearborn Street, 30th Floor
Chicago, Illinois 60603

DAVID A. DONNA
Donna & Daly
1460 Buffet Way, #150
Eagan, Minnesota 55121

For Defendant Town & Country: DARREN BRAYER SCHWIEBERT
Fredrikson & Byron
200 South 6th St., #4000
Minneapolis, Minnesota 55402-1425



412

APPEARANCES (continued)

For Defendant Bloodgood: HOLLY JEAN NEWMAN
Moore Costello & Hart
701 Fourth Avenue South, #1350
Minneapolis, Minnesota 55415-1823

Court Reporter: Gail M. Hinrichs, RPR
Shaddix & Associates
9100 W. Bloomington Frwy, #122
Bloomington, Minnesota 55431

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

analysis is going to be a 30 mile an hour drive-by, look at our home, it's a Whitten signature. It's not the right test and we will be in the Eighth Circuit, I mean, I think if that's what's applied here.

THE COURT: Well, because maybe this is a different case. Maybe this is a different case. Maybe this is a signature case. That's what gestalt means is that that's a Rottlund town home. That's a Frank Lloyd Wright home. And it seems to me that there ought to be some viable cause of action to Frank Lloyd Wright if he were living today if somebody created a home that if you looked at had his signature that you thought that's a Frank Lloyd Wright home.

And that's, I think, the question we have. If that's the question we have, then, excluding galley kitchens and L-shaped kitchens is an irrelevant consideration. And this is not the issue I believe in Kootenia or Moore.

MR. FARMER: Well, the issue I was addressing was the issue of filtration and how do you do away with what needs to be done away with in the first step. That's what the court did in Kootenia, that's what the court did in Moore, that's what the court did in Hoch versus MasterCard and they talked about -- in fact, Hoch, I think, used the phrase after discarding the nonprotectable

The Rottlund Company, Inc. v.
Pinnacle Corporation and Town & Country Homes, Inc.
Court File No. 01-1980 DSD/SRN

Second Schwiebert Affidavit in Support of Defendants'
Motion for Partial Summary Judgment

# EXHIBIT Y

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,
vs. Case No. 01-CV-1980 (DSD/SRN)
Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,
Defendants,
and
Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,
vs.
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF ANTHONY S. DESNICK
VOLUME I, Pages 1 - 218

(The following is the deposition of ANTHONEY S. DESNICK, taken pursuant to Notice of Taking Deposition, at the offices of Fredrikson & Byron, 4000 Pillsbury Center, 200 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:11 o'clock a.m., June 23, 2004.)

COPY

13:57:01 II?
13:57:02 A. Adjacent to the eating area, yes.
13:57:04 Q. It's just something you would never do?
13:57:07 A. Exactly.
13:57:07 Q. Just like putting a master bedroom over a
13:57:09 garage; correct?
13:57:11 A. I think that both of them are ill-advised ideas,
13:57:15 yes.
13:57:15 Q. Can you recognize a Whitten design?
13:57:21 MR. KRUMMEN: Beyond the scope.
13:57:22 A. I'm not sure I understand the question.
13:57:23 Compared to what?
13:57:25 Q. Compared to the work of other designers in the
13:57:28 area.
13:57:29 A. I don't think that I can, no.
13:57:31 Q. Why is that?
13:57:32 MR. KRUMMEN: Objection, foundation;
13:57:36 objection, outside the scope.
13:57:39 A. I think there are -- the way I'd answer the
13:57:42 question, there are very few architects in the world
13:57:45 whose work you would recognize as theirs, and when I
13:57:48 say very few I mean you could count them on one hand
13:57:51 maybe, and --
13:57:54 Q. Why is that?
13:57:57 MR. KRUMMEN: Objection, outside the scope.

13:58:02 A. I have a personal opinion about it and I think
13:58:05 that the reason, if you are asking me why you can for
13:58:09 the very few, is because their work tends to become a
13:58:13 cliche on itself over time, and I've always believed
13:58:16 that the really talented architects can make new and
13:58:20 fresh ideas with every new project, so it's very
13:58:23 difficult to see the evolution from last project to
13:58:27 this project and in some cases there isn't any
13:58:30 evolution. They are thinking freshly and uniquely
13:58:35 about every project.
13:58:36 Q. And by their thinking freshly and uniquely, you
13:58:40 are referring to the vast majority of architects that
13:58:44 can't be identify by signature design?
13:58:52 MR. KRUMMEN: Objection, outside the scope.
13:58:52 This is a different question.
13:58:52 A. Yeah, I can't answer that because I can't
13:58:54 quantify -- first of all, I don't know the work of
13:58:55 enough architects to say these architects are in this
13:58:59 camp, these are in this camp and these are still in
13:59:02 another camp, but I can say that if you were to drive
13:59:05 me out to an urban or suburban location and show me a
13:59:10 town house, I could not tell you whether it was
13:59:13 architect A's or architect B's.
13:59:15 MR. KRUMMEN: Can we have a five-minute
13:59:17 break?

13:59:18 MR. FARMER: Let me finish this two
13:59:20 questions.
13:59:22 BY MR. FARMER:
13:59:22 Q. What were the handful of architects that you
13:59:24 just identified as being among those who you could
13:59:28 identify their work by looking at it?
13:59:31 A. Two that come to mind would be Michael Graves
13:59:33 and Frank Gehry.
13:59:34 Q. Is that because their work has become cliche?
13:59:37 A. I believe it's a cliche on itself.
13:59:41 MR. FARMER: We can take a break.
14:13:05 (Recess taken from 2:00 to 2:13 p.m.)
14:13:05 BY MR. FARMER:
14:13:05 Q. Mr. Desnick, I just want to double back to your
14:13:09 design work between 1984 and 1994.
14:13:13 A. Before we do that, I'd like to clear up, if I
14:13:16 can, my comments about Tim Whitten's work, and it
14:13:19 stemmed from the fact that I'm unfamiliar with a lot
14:13:22 of his projects but I'm very familiar with two of
14:13:26 them, and I know those wherever I see them.
14:13:33 Q. Now you just -- we just took a break; correct?
14:13:37 A. Uh-huh.
14:13:37 Q. And you left with Mr. Krummen; correct?
14:13:39 A. I did.
14:13:44 Q. Let me get back to the question that I had for

14:13:46 you.
14:13:47 A. Sure.
14:13:48 Q. Regarding your design work from 1984 to 1994.
14:13:57 A. Okay.
14:14:00 Q. First of all, during that entire period, were
14:14:03 you president of a firm?
14:14:07 A. Yes. '93, I believe, yes.
14:14:11 Q. '84 to '93?
14:14:14 A. Yes.
14:14:14 Q. You were president of a firm. That firm had
14:14:16 several different names; is that correct?
14:14:18 A. Correct.
14:14:19 Q. Only one of which is listed on your CV; correct?
14:14:22 A. Correct.
14:14:24 Q. For your specific housing experience, the CV
14:14:27 says you designed several single-family residences
14:14:30 and townhomes in Minneapolis, New York and Baltimore;
14:14:30 correct?
14:14:33 A. Correct.
14:14:35 Q. Now you said you did a single-family project for
14:14:36 a friend who was an attorney in Baltimore; correct?
14:14:40 A. Correct.
14:14:40 Q. You did two lofts in New York; correct?
14:14:43 A. Correct.
14:14:43 Q. Were either of those a townhome?

A. No.

Q. You did -- In fact, you weren't in charge of those two New York lofts; correct?

A. I was not.

Q. You did two designs in Edina; correct?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. What were those designs?

A. They were single-family houses. The project in Baltimore, while I called it a single-family house, was actually a row house in an 18th-century part of town, so technically speaking, based on my definition in the report, Exhibit No. 417, that would be a town house.

Q. And just so I know which adjectives are modifying which announce here, --

A. Sure.

Q. -- you did not do several townhomes in Minneapolis, New York and Baltimore during that time period?

A. Correct.

Q. You did one townhome and it was in Baltimore; correct?

A. In Baltimore, correct.

14:15:39 Q. And of the several single-family residences,
14:15:44 there are two lofts in New York and two single-family
14:15:49 residences in Edina; correct?
14:15:51 A. Correct.
14:15:51 Q. And that was the extent of your residential
14:15:53 design during that 10-year period?
14:15:56 A. There were several additions, remodelings and so
14:16:01 on that I also did during that time and that would
14:16:01 have expanded.
14:16:04 Q. And that's in addition --
14:16:04 A. That's in addition to what's listed here, yes.
14:16:07 Q. That's in addition to the couple cabins, couple
14:16:10 kitchen remodelings, couple additions and
14:16:13 single-family homes you did between 1994 and 2004?
14:16:17 A. Correct.
14:16:18 Q. What was the other work that you did between '84
14:16:20 and '94 in terms of residential design?
14:16:23 A. I can't even remember all the projects. There
14:16:24 was a house in New Richmond, Wisconsin, we did a
14:16:27 remodeling to, there was an internal remodeling we
14:16:30 did for a couple in south Minneapolis, there was a
14:16:37 porch addition that we did and a basement remodeling
14:16:41 to a house in Hopkins. At this time that's all that
14:16:47 I remember.
14:16:48 Our practice was primarily a residential

14:16:50 practice if you think about the number of projects
14:16:55 that we had in the office. If you think about the
14:16:59 number of fees that we would take in, we got a lot
14:17:02 more fees from the larger scale commercial work that
14:17:04 we had.
14:17:05 Q. What is it about the two Tim Whitten designs
14:17:07 that you just brought up again after the break that
14:17:12 allow you to identify them as Whitten's?
14:17:18 A. I can only tell you that when I've seen them,
14:17:21 you know, either purposely when I've gone to visit
14:17:26 them or when I've driven by, I've known they were Tim
14:17:29 Whitten's designs, and it's been borne out by the
14:17:34 signs at the corner that says it's a Rottlund
14:17:37 development.
14:17:37 Q. Now you didn't meet Tim Whitten until around the
14:17:43 time you got involved in this case; correct?
14:17:43 A. I met Tim Whitten probably several years before
14:17:45 at an architects' convention but we are not friends
14:17:49 and don't have a relationship.
14:17:51 Q. And you didn't know of his designs until you got
14:17:54 involved in this litigation; right?
14:17:56 A. I knew he was the designer for Rottlund Homes.
14:17:58 Q. But you have not seen any of his work; right?
14:18:00 A. I had not seen his work, no.
14:18:04 Q. So you first became familiar with Mr. Whitten's

14:18:07 work when you got involved in this lawsuit, paid
14:18:08 expert; right?
14:18:10 A. That's correct.
14:18:12 Q. And it's your testimony that the only designs of
14:18:14 his that you have seen are the designs at issue in
14:18:20 this lawsuit?
14:18:20 A. It's my testimony that the two designs I'm most
14:18:22 familiar with are the ones that when I see them I can
14:18:27 identify them immediately as Tim Whitten's designs.
14:18:31 Q. And these are the designs that you have been
14:18:33 living with during the last two years on this case;
14:18:33 correct?
14:18:37 A. One of them, yes. The other one was the design
14:18:39 that was involved in the Scott Larson case.
14:18:42 Q. Correct. And designs you have been getting paid
14:18:44 to review and analyze; correct?
14:18:46 A. Exactly.
14:18:51 Q. And it's through that work and that familiarity
14:18:54 that you have come to know those as Whitten designs;
14:18:54 right?
14:18:58 A. Yes.
14:19:16 Q. Is there any special training in the AIA canon
14:19:23 of ethics?
14:19:26 A. How would define special training?
14:19:29 Q. Well did you study it at the University of

The Rottlund Company, Inc. v.
Pinnacle Corporation and Town & Country Homes, Inc.
Court File No. 01-1980 DSD/SRN

Second Schwiebert Affidavit in Support of Defendants'
Motion for Partial Summary Judgment

# EXHIBIT Z

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

The Rottlund Company, Inc.,
Plaintiff,

COPY

vs. Case No. 01-1980

Pinnacle Corporation, et.al.,
Defendants.

---

THE HONORABLE SUSAN R. NELSON
United States Magistrate Judge

* * * *

TRANSCRIPT OF PROCEEDINGS
OF
STATUS CONFERENCE

* * * *

Date: May 7, 2004
Reporter: Leslie R. Pingley

searched for and produced and that representation has been made to the Court.

However, the Court does agree with Mr. Schwiebert's point that the 30(b)(6) deposition was not completed. I understand Mr. Krummen's point that I did ask for a list of topics and that's a good point, but I do believe I will permit a brief, and I mean brief, one-half day 30(b)(6) deposition of a Rottlund designee on the issue of the Oaks litigation on the condition that there is an agreement in advance on the 30(b)(6) topics and there's a 30(b)(6) topic list provided in a timely way and I will ask you to meet and confer on that and if there's any more specifics that you need the Court's involvement, I'm free to get that.

With respect to the request for a ruling on the request for admissions, the Court believes that that ruling ought to be in writing and so I am going to provide a brief written



ruling. I understand the need for it quickly given the June 15th hearing and we'll try to prioritize that issue.

Any questions about the ruling? All right.

Let's see, Ms. Newman, you wanted to raise an issue about labeling.

Is that correct?

MALE SPEAKER: Your Honor, I think it would make the most sense if we're talking about the complaint from me just to tell the Court what the clerk said yesterday.

We attempted to address the concerns that they raised, but I think it's administrative.

THE COURT: You're welcome to do that. Go ahead. Actually, I had a separate, distinct issue about labeling documents, but we can --

MALE SPEAKER: I apologize.

THE COURT: No, let's get to this and then we can get on to that. That's fine.

MALE SPEAKER: Just very



briefly, Your Honor, as you know you granted our motion to amend and serve a fifth amended complaint and we served that despite the Court's order granting that motion and it was then subjected to a motion to strike or for a more definite statement and the Court ruled on that. You required us to make a few changes to some language in connection with the more definite statement and you ordered us to make those and serve the fifth amended complaint within five days. We did that. It was captioned Fifth Amended Complaint.

We first received Bloodgood defendant's answer and it said Answer to the Sixth Amended Complaint. We wrote them a letter and said I don't know why this is happening, but you're going to cause confusion with the record, please fix it. Then we got the Town & Country Homes defendant answer to sixth amended complaint with a footnote further confusing the record because the footnote says plaintiff has



incorrectly designated it's latest complaint as the sixth amended complaint. It is actually plaintiff's sixth amended complaint. For clarity of the record, TCM refers to the pleading properly herein as the sixth amended complaint.

I think there was a typo. I'm not trying to raise concerns about a typo, but it confuses the record and so we get the letter then from Ms. Newman to the Court saying the caption isn't right. We wanted to not bother the Court with this, so we served a sixth amended complaint.

THE COURT: And the clerk's office said you didn't seek order of the Court to do so.

MR. KRUMMEN: So I spoke with Heather in the clerk's office yesterday. She understood what happened. We went through the whole thing and she said, yes, I saw your fifth amended complaint come in and I had seen the Court's order so I knew it