Court File No. 01-1980 / ROTTLUND / Pinnacle
Mahowald Affidavit dated July 27, 2004

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

---

The Rottlund Company, Inc.
d/b/a Rottlund Homes, a Minnesota
corporation,

Plaintiff,

vs.

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois corporation, and
Town & Country Homes, Inc.,
a Minnesota corporation,

Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa corporation,

Third-Party Defendant.

---

Videotaped Deposition of
LARRY MOORE
Thursday, September 4, 2003
9:40 a.m.

the Town & Country end.

Q. And in terms of your involvement with design development, was Steve Sandelin involved from the Town & Country end?

A. Specifically, I can't rem- -- I can't remember of any instance. But I -- I guess he probably was. I'd be guessing, but it --

Q. Do you know who was involved from the Town & Country end or anyone involved from the Town & Country end during the construction document phase for the Homestead Collection?

A. Other than the people I've already mentioned, no, I wouldn't know of any additional.

Q. Now, I believe you testified in your last deposition that you were the one that came up with the schematic designs for the Homestead Collection. Correct?

A. Correct.

Q. Were those designs derived from any other BSB of Iowa project?

A. They were derived from ideas that came out of our -- our marketing design file.

Q. Okay. Which marketing design file?

A. Which marketing design file? The design -- the design file -- the marketing design file in our

marketing department. That's one large collection of files for all of our company, for resource we have.

Q. And I think we covered that the last time, so let me get more specific this time. Did you look at any marketing designs from Sandburg Village, a development in Chicago, Illinois?

A. I don't recognize that name.

Q. How about a four-wheel -- a fourplex pinwheel built by Kimball Hill, did you look at that material when you were working on the schematic designs for the Homestead Collection?

A. I didn't specifically access it. But I know that project, so I didn't have to.

Q. And how is it that you know that Kimball Hill fourplex pinwheel project?

A. I've seen it in the design file, going through it for other projects.

Q. Was it built in the late '70s?

A. Couldn't tell you when it was built. I don't look at that data.

Q. Did it predate your start with BSB of Iowa, the design and construction of the Kimball Hill project? I'm talking about the pinwheel.

A. I don't know when it was built, so I don't

know if it predated it or not. I -- you know, I don't know.

Q. Let's get back to your earlier testimony. And I don't want to mischaracterize it, but I'm not sure if you looked at the Kimball Hill designs when you were working on the schematic design for the Homestead Collection or not. What happened in that regard?

A. In reference to the Kimball Hill?

Q. That's right. Did you look at the Kimball Hill designs when you were working on the schematic design phase for the Homestead Collection?

A. No, I don't think I did specifically for that.

Q. How about the Hemphill at Adare Farm designs, did you look at those when you were coming up with the schematic design for the Homestead Collection?

A. No, I don't think I did.

Q. How about the Coventry Court for Town & Country Homes, did you look at those designs when you came up with the Homestead Collection schematic design?

A. I don't remember those, no.

Q. How about the Streamwood project for Kirk

Corporation, did you look at those designs when you came up with the schematic design for the Homestead Collection?

A. I was familiar with those, but I did not access them.

Q. Now, let's -- I -- I think you said you were familiar with Kimball Hill's designs, and now you've told me you're familiar with the Streamwood designs, correct?

A. And -- and familiar in that I have seen them as I've gone through files, accessing them for -- for other marketing purposes. So I don't have a tremendous -- tremendous familiarity with it, but, yeah, I have seen those names.

Q. Okay. Did you derive the Homestead's schematic design from the Kimball Hill designs?

A. No.

Q. Did you derive the Homestead Collection schematic design from the Streamwood designs?

A. Specifically, no. Ideas came out of all of those projects, which, you know, were incorporated as far as ideas on how to assemble room locations and elements and things like that, so --

Q. When you say, "all of those projects," could you tell me which projects you're referring

to?

A. Well, specifically the ones that -- that I used and had in my files were Midland, Good Value Homes, Jerry's Homes. Those are the three I can remember off the top of my head.

Q. And those are the three that you gave me before. I think that there was a fourth back-to-back that you worked on, but it postdated your schematic design for the Homestead Collection. Let me make sure I get that right. DeMaria?

A. DeMaria.

Q. That was after the Homestead Collection, right?

A. Yes. Correct.

Q. Okay. So the ones you looked at were Midland, Good Value, and Jerry's Homes. DeMaria came later. Let me just keep working through this list, though. In terms of the Adare Farm and College Hill, did you have any reference point or opportunity to look at those designs --

A. Could I --

Q. -- during the schematic --

A. Could I --

Q. -- design process?

A. Excuse me. Could I see that list? Because

Q. It is -- it is substantially different. And the next question is, is the Homestead Collection substantially different than the Midland back-to-back townhome?

A. Yes.

Q. Is the Homestead Collection substantially different than the Jerry's Homes back-to-back townhome?

A. Yes.

Q. Why do you say that the Homestead Collection is substantially different than the Jerry's Homes back-to-back townhome?

MS. NEWMAN: Objection, form and foundation. Go ahead if you can make the comparison without those documents in front of you.

THE WITNESS: From what I can recall without the documents in front of me is that there are, once again, substantial differences to detailed items in the plan, to the elevations, materials, massing of the building, volumes, proportions of those. That's general. Without looking at drawings and comparing, you know, elements, I couldn't go into more break -- detail breakdown.

BY MR. KRUMMEN:

Q. Is the Homestead Collection more similar to

Midland or more similar to Rottlund's Villa II
back-to-back townhomes?
MS. NEWMAN: Objection as to form and
foundation. You can answer if you can do that
without comparing documents.
MR. CARMICHAEL: Join in the objection as
to the word "similar."
MS. NEWMAN: Go ahead.
THE WITNESS: I don't think you could
categorize it more or less similar than -- than any
one project. They all have their specific feel and
collection, combination of elements that I think
makes each one what it is; unique, if you want to
call it that.
BY MR. KRUMMEN:
Q. Is the Homestead Collection more similar to
Rottlund's Villa II back-to-back townhome or more
similar to Jerry's Homes back-to-back townhome?
MS. NEWMAN: Same objections. Go ahead.
THE WITNESS: Since -- since we used our
experience on the BSB projects, I would have to say
it's more similar to -- to Jerry's Homes.
BY MR. KRUMMEN:
Q. So in your opinion, the Homestead
Collection back-to-back townhome design is more

Value's back-to-back design versus Rottlund's Villa II design, correct?

MS. NEWMAN: Objection as to form and foundation. Go ahead.

THE WITNESS: Yeah, I would say it's more similar to Good Value.

BY MR. KRUMMEN:

Q. Now, you said you didn't have access to Rottlund's materials. Maybe I mischaracterized that, but is it your testimony that you didn't have access --

A. No.

Q. -- to anything of Rottlund's --

A. No. That's --

Q. -- when you designed the Homestead Collection?

A. That's not -- that's not a correct statement. We had access. We did not access them. We did not use them.

Q. When you say you had access, I believe that you told me in the last deposition that you toured Rottlund's Villa II during the schematic design phase for the Homestead Collection. Correct?

MS. NEWMAN: Objection as to the form of the question. I think it mischaracterizes the prior

MS. NEWMAN: Objection as to foundation. You can answer if you know.

THE WITNESS: I don't know if it's been produced in this -- since it's come to light, I mean, for me to see that and refresh my memory. I -- I don't know where that stands in this process.

BY MR. KRUMMEN:

Q. Can you sit here and testify with certainty that the competition product survey you received from Art Plante in May of '98 did not have any Rottlund materials in it?

A. Nothing I saw -- nothing I saw had Rottlund materials in it here.

MR. KRUMMEN: Move to strike the question. Could you read back my prior one, please.

THE REPORTER: Your last question?

MR. KRUMMEN: Move to strike the response. If you could read back my last question, please.

(The requested portion of the record was read by the reporter.)

MS. NEWMAN: Objection as to form. Go ahead and answer if you know.

THE WITNESS: I can't say for certainty what -- what was in it exactly.

BY MR. KRUMMEN:

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,
vs. Case No. 01-CV-1980 (DSD/SRN)
Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,
Defendants,
and
Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,
vs.
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF LARRY W. MOORE
VOLUME II, Pages 215 - 378

(The following is the deposition of LARRY W. MOORE, taken pursuant to Notice of Taking Deposition, by videotape, at the offices of Winthrop & Weinstine, 225 South Sixth Street, Suite 3500, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:09 o'clock a.m., February 17, 2004.)

produce. Because at the time they were giving us the price the design wasn't done. So I think this was put together to say, here's the scope of what you have to do; it's a building of this size, it's a building of this many units and the units repeat, and that way Design Development was able to give us a price on what their services would cost.
Q. So you gave Exhibit 330 to Design Development, Inc.?
A. That's --
I believe that to be correct.
Q. So you gave Design Development, Inc. what you've admitted are Rottlund floor plans at the inception of this Midland townhome design process; is that fair?
A. As a guide or as a program guide for them to establish scope, yes.
Q. Did you give Design Development, Inc. any floor plans other than what appears in front of you as Exhibit 330 which you understand belonged to Rottlund at the time?
A. No, I don't believe I did, but I don't remember. I don't remember there was anything else.
Q. We've ruled Design Development, Inc. out as the candidate for pasting together these individual floor plans of Rottlunds which appear on Exhibit 330;

correct?

A. I would rule them out, yeah.

Q. Can you rule yourself out, Mr. Moore?

A. No, can't.

Q. So as we sit here today you may have pasted together Rottlund's floor plans and created Exhibit 330; correct?

MS. NEWMAN: Objection, asked and answered. You may answer again.

A. There's a possibility I -- yeah, that was my work.

Q. Have you endeavored to find out whether indeed you did create Exhibit 330 or not?

A. No, there's no way I could -- nine or ten years ago there's no way I could know that for sure.

Q. But you could check your files to see if there were any other, I guess, documents which would refresh your recollection; correct?

A. The files have been checked.

Q. You have checked those files personally?

A. No, I handed those files over to the people in our office who had that responsibility --

Q. So --

A. -- for this process.

Q. Have you looked through, prior to today's

Court File No. 01-1980 / ROTTLUND / Pinnacle
Mahowald Affidavit dated July 27, 2004

# EXHIBIT B

UNITED STATES DISTRICT COURT DISTRICT O

FOURTH DIVISION No.:

- - - - - - - - - - - - - - - - - - - - - - - - - - - -The Rottlund C

d/b/a Rottlund Homes, a MinnesotaCorporation,

Plaintiff,vs.

Pinnacle Corporationd/b/a Town & Country Homes,

an Illinois Corporation, andTown & Country Homes, Inc.,

a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc.,

a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &

Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

Videotaped

30(b)(6) Deposition of

BLOODGOOD SHARP BUSTER ARCHITECTS &

PLANNERS OF IOWA, INC.

(Testimony of Larry W. Moore)

Thursday, March 6, 2003 (Volume I, pages 1 - 61)

Friday, March 7, 2003 (Volume II, pages 61 - 327)

Q Now, you identified DeMaria Building Company on your resume. You just testified that that's a form of back-to-back, correct?
A Correct.
Q Are there any others on this resume that are back-to-back or some form of back-to-back?
A (Reviewing.) I do not believe so.
Q Okay. How much involvement did you have with the DeMaria Building Company? I believe you identified it as retail on the first floor and back-to-back on the two above that?
A Correct.
Q How much involvement did you have in that project?
A Initial client contact, working with the program script the client brought to us, design. And pretty much at design -- the end of schematic design, it would start to transition to our project manager and his team.
Q What year was that, or years?
A I'm going to say the process started in 1999.
Q So that was after you were involved in the Town & Country Homestead Collection back-to-back?
A Correct.
Q So far we've identified projects you were involved with as, number one, Midland Homes; number two,

Good Value Homes; number three, Jerry's Homes; number four, DeMaria; and then Town & Country of Minnesota. All of those were projects that you worked on that involved some kind of back-to-back townhome, correct?
A Correct.
MS. NEWMAN: Object to the form of the question.
BY MR. KRUMMEN:
Q I believe you said that your involvement in the Mid- -- in the Midland Homes case was initial client contact. Correct?
A Correct.
Q Did you have any other involvement beyond the initial client contact?
A Well, after --
MR. FARMER: Objection. Asked and answered.
A Client contact, again, the -- working with the program the client brought to us, schematic design.
BY MR. KRUMMEN:
Q You'd call that something more than minimal involvement, as you used the term, correct?
A Yes.
Q How would you characterize your involvement in the

Midland Homes case? Would it be substantial involvement?

MR. FARMER: Objection. Form.

MS. NEWMAN: Same objection.

A In the -- in the Midland Homes back-to-back townhouses?

BY MR. KRUMMEN:

Q Yes, sir.

A That would be a substantial contribution to the project.

Q And then on the Good Value Homes back-to-back project, I believe you used the words "minimal involvement." Correct?

A Yes.

Q Jerry's Homes back-to-back project, I believe you used the worms -- the words "minimal involvement." Correct?

A I would use the words "very minimal" on that project.

Q Thank you. And then DeMaria, how would you characterize your involvement in that project?

A Substantial.

Q And obviously substantial involvement in the Town & Country back-to-back project, correct?

MR. FARMER: Objection. Form.

knowledge of what they do. I'm more familiar with their product that's front-to-back.

Q I'm using Exhibit 101 sort of as a marker chronologically, and the next question is not tied to Exhibit 101, although that may help you in answering it. When was the first time you discussed a back-to-back townhome design with anyone at Town & Country of Minnesota or anyone at Town & Country of Illinois?

MR. FARMER: Object to the preamble.

A The first time would have been when Art Plante contacted us about the possibility of doing that work in probably March '98.

BY MR. KRUMMEN:

Q Did you take any notes or do you have any memoranda regarding that initial contact?

A That I don't remember. It -- it would be in my schematic file, if it existed.

Q What do you recall about that conversation?

A Quite -- quite little. Very little.

Q Do you recall anything about the conversation you had sometime in March of 1998 with Mr. Plante about the possibility of designing a back-to-back townhome for Town & Country?

A What I do recall is that Art wanted us to come up

and discuss the program, and we talked about it. I mean, it was a back-to-back. We knew we were going to be doing that.

And I think he gave me enough preliminary information that -- that I researched our files. I went armed with the knowledge of -- of what we had done previously, the company, BSB.

Q You say you went armed with the information of what BSB had done previously. Do you mean with respect to back-to-back townhome projects?

A That's correct.

Q So in looking through the old files, is it fair to say you looked at the materials that related to, say, the Midland Homes back-to-back project you were involved with?

MR. FARMER: Object to form.

A I think I probably did.

BY MR. KRUMMEN:

Q And also the Good Value Homes that BSB of Iowa was involved with, back-to-back project?

A I would say I did, yes.

Q And you also looked through the Jerry's Homes back-to-back files that BSB of Iowa was involved with?

A That's correct.

Q But the DeMaria project didn't start until 1999, so you didn't look through those files, correct?
A That's correct.
Q Did you look through any other materials at BSB Iowa or anywhere else before you went up to speak with Art Plante?
A I may have. I really don't remember.
Q Did you speak with anyone from -- well, strike the question.
Are you familiar with an entity known as Tracy Cross Associates, Inc.?
A Yeah, I'm familiar with Tracy Cross Associates.
Q Have you worked with Tracy Cross in the past?
A Yes.
MS. NEWMAN: Objection as to form.
BY MR. KRUMMEN:
Q Let's -- when did you first begin working with Tracy Cross?
A I -- I'm -- I'm -- early '90s. I'm make -- making a guess.
Q Do you recall what the project was that you worked on that Tracy Cross -- well, strike the question.
Was it a project the first involvement you had with Tracy Cross or was it something else?
A It was a project.

identification by the reporter.)

THE REPORTER: 114.

BY MR. KRUMMEN:

Q Before you as Exhibit Number 114 is a transmittal from you to Steve Sandelin at Town & Country Homes. The date is Tuesday, May 5, 1998, and it relates to a villa townhomes project. Have I accurately characterized the exhibit thus far?

A Correct.

Q The bottom right-hand corner contains the Bates label BSB 01944, and under the "Remarks" you wrote, "Steve," colon, quote, "Competition product survey for Minneapolis area," period, end quote. Have I accurately read that?

A Yes.

Q What does the competition product survey language refer to in your transmittal?

A I do not remember this. I don't think we had any kind of a product or project survey that I remember.

Q How would you go about finding whatever it was that you transmitted to Mr. Sandelin in connection with this Tuesday, May 5, 1998, transmittal, as you sit here today?

MS. NEWMAN: Objection. Foundation. Calls for speculation. You can answer if you know.

MS. NEWMAN: Objection as to form.
MR. FARMER: Object. Form.
A No. But it has been, in the past, that we'd give an administrative assistant the responsibility of gathering information and then firing it off to somebody. So that could be a -- that could be a situation where I wouldn't necessarily know what was in the file, in the -- in the transmittal. I don't know if that's the case here.
BY MR. KRUMMEN:
Q Exhibit 114, the competition product survey referenced there, did it contain any materials from Tracy Cross Associates?
MS. NEWMAN: Objection. Asked and answered. And foundation. Form. Answer if you know.
A I don't know.
BY MR. KRUMMEN:
Q Do you have any knowledge regarding the competition product survey file that's referenced in Exhibit 114, as you sit here today?
MR. FARMER: Objection. Asked and answered.
MS. NEWMAN: Same objection.
A I do not know what that was.

A I believe so, yes. Late March.
Q So Mr. Plante contacted you in late March of 1998 and invited you to come up to Minnesota to discuss a back-to-back possibility program?
A Correct.
Q What happened next?
A Chris Jorgensen and I took a trip up to Minneapolis and met with Art and at least one of his group, in -- in their offices. We got up there, I think it was in the morning.
Q And you met with him before you signed the contract, correct?
A Correct.
Q Did you go on a tour of any of Town & Country of Minnesota's competitors when you were up there in March of 1998?
MR. SCHWIEBERT: Object. Form.
A Yes, we did.
MR. FARMER: Foundation as to the time of the trip.
BY MR. KRUMMEN:
Q Which competitors' products did you tour in March of 1998?
MR. FARMER: Same objection.
A There were several--we had quite a full day--spread

out all over the place. There's a number.
BY MR. KRUMMEN:
Q Do you recall any of the competitors whose products you toured?
A A few. Centex, Pulte -- I'm -- I think Pulte. Rottlund. There were a number of smaller builders that I'm just not familiar -- that familiar with. I believe Ryland. Those are the ones that come to mind.
Q Did you look at a Rottlund back-to-back townhome during your tour that occurred in March of 1998?
A Yes. Yes, we did.
Q Do you recall where it was located?
A No.
Q Did you take any notes of your tour of the Rottlund back-to-back townhome in March of 1998?
MR. FARMER: Object to foundation --
A No.
MR. FARMER: -- as to the time.
BY MR. KRUMMEN:
Q Did you take any pictures, videotapes of the Rottlund back-to-back townhome?
A No.
Q Did anyone else in your group do so?
A Not that I remember.

Q Did anyone else in your group take notes of the Rottlund back-to-back townhome that was toured in March of 1998?

MR. FARMER: Foundation objection as to time.

A Not that I remember.

BY MR. KRUMMEN:

Q Were any brochures picked up by anyone in the group during the tour of the Rottlund back-to-back townhome in March of 1998?

MR. FARMER: Same objection.

A I don't remember having any brochures to look at as we were riding from project to project. I just know that Chris and I did not pick up brochures.

BY MR. KRUMMEN:

Q Did either of you look at any competitor brochures during the tour that occurred of back-to-back townhomes in March of 1998?

MR. FARMER: Same objection.

A I don't recall any brochures, no, I don't.

BY MR. KRUMMEN:

Q Do you recall any Rottlund brochures that you looked at during the March of 1998 tour of Rottlund's back-to-back townhome?

MR. FARMER: Same objection.

A No.

BY MR. KRUMMEN:

Q Why was it necessary to look at Rottlund's back-to-back townhome in March of 1998?

MS. NEWMAN: Objection as to --

MR. FARMER: Objection. Foundation as to time frame and as to the necessity. Form of the question.

MS. NEWMAN: Objection as to form.

A We looked at a lot of products primarily to help us, BSB, get a feel for that market. I guess we liked to put ourselves in the buyer's shoes, go out, tour the product, see what I like to say is how sophisticated the market is, how -- what the interiors, the quality of the furnishings and -- and how they decorate the units. It tells you a lot about what the builder will expect as far as a -- a design of a product and just general feel. So we -- we kind of just shop it that way from the buyer's viewpoint.

BY MR. KRUMMEN:

Q Were there any other reasons for touring Rottlund's back-to-back townhome and other competitors in March of 1998?

MR. FARMER: Objection. Foundation as to

time frame.
A In -- in general, again, we just -- we'd like to see the products that are out there to see -- with our experience nationally, there are a lot of good trends and things that we can bring to any product. We like to understand if those are in the market or not.
Again, as I said, the buyer's perspective is important to us. We go in and we -- we look for mistakes. We look for obvious things that the -- the -- the -- the builders in that market are doing or not doing. Like I say, from our experience, we have a lot of opportunities to bring great ideas in from all over the country.
And generally we don't -- we don't study the competition. We're not there long enough. I mean, this is -- there's a lot of things we're doing in one day. It wasn't a full day either. But we look for opportunities to basically one-up the competition.
BY MR. KRUMMEN:
Q What do you mean by that?
A We see a mistake they're making and we better it. If their rooms are too small, we make them bigger. If their closets are too small, we make them

bigger. We better it.
Q What mistakes did Rottlund make in its back-to-back townhome which you toured in March of 1998?
MS. NEWMAN: Objection.
MR. FARMER: Objection. Foundation. Form.
MS. NEWMAN: Same -- same objections. Go ahead.
A I don't know that I noted anything specific. Again, we weren't studying individual units to that -- to that extent. Glaring errors we would look at. Nothing stands out in my mind from any specific product.
BY MR. KRUMMEN:
Q Did you meet with Mr. Plante or anyone else that represented Town & Country, after the March of 1998 tour?
MR. FARMER: Objection. Foundation as to time frame of the tour.
A After the tour, we went back to Des Moines, generated the proposal and then put that back in front of Art by mail, I'm sure, or fax, and then moved into schematic design after that. I don't remember that we had any more face-to-face meetings through the process.

# EXHIBIT E

BLOODGOOD SHARP BUSTER
ARCHITECTS & PLANNERS, INC.

JOB

DATE 8 July

Jim -

TED GROB'S 8-PLEX

Exhibit 338
Date: 2-17-04
Debby J. Campeau
Stirewalt & Associates

- OUR DESIGN
- HIS REDLINES & REDESIGN
- ROTTLUND PRODUCT

1. YOUR OPINION - IS OUR DESIGN ENOUGH "DEPARTURE" FROM ROTTLUND (DESIGN OF THIS 8-PLEX NOT 8-PLEX CONCEPT, ROTTLUND CAN'T © CONCEPT

BSB 10208

2. ANY THOUGHTS ON TED'S REVISIONS ?

LM.

3001 Grand Avenue
Des Moines, IA 50312
515/283-0404

15436 N. Florida Ave. Suite 101
Tampa, FL 33613
813/265-4808

400 Capitol Mall 9th Floor
Sacramento, CA 95814
916/449-3979

3436 N. Kennicott Suite 260
Arlington Heights, IL 60004
708/253-0404

# EXHIBIT F

UNITED STATES DISTRICT COURT DISTRICT O
FOURTH DIVISION No.:
- - - - - - - - - - - - - - - - - - - - - - - - - - -The Rottlund C
d/b/a Rottlund Homes, a MinnesotaCorporation,
Plaintiff,vs.
Pinnacle Corporationd/b/a Town & Country Homes,
an Illinois Corporation, andTown & Country Homes, Inc.,
a Minnesota Corporation,
Defendants,
and
Town & Country Homes, Inc.,
a Minnesota Corporation,
Third-Party Plaintiff,
vs.
Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa Corporation,
Third-Party Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
30(b)(6) Deposition of
TOWN & COUNTRY HOMES, INC.
(Testimony of Arthur J. Plante)
Thursday, December 19, 2002
9:00 a.m. - 4:48 p.m. (pages 1 - 311)
Friday, December 20, 2002
9:11 a.m. - 10:13 a.m. (pages 311 - 351)

Deposition, taken before Myrina Kleinschmidt, a Notary Public in and for the County of Hennepin, State of Minnesota, held at the law offices of WINTHROP & WEINSTINE, P.A., 3000 Dain Rauscher Plaza, 60 South Sixth Street, Minneapolis, Minnesota.

WHEREUPON, the following proceedings were duly had:

(Oath administered by the reporter.)

WITNESS RESPONSE: I do.

TOWN & COUNTRY HOMES, INC.

Testimony of ARTHUR J. PLANTE,

a witness in the above-entitled proceedings, after having been first duly sworn, deposed under oath as follows:

EXAMINATION

BY MR. KRUMMEN:

Q Please state your name for the record.

A Arthur Plante.

Q Mr. Plante, have you ever toured a Rottlund Villa II townhome before?

A I've toured a number of competitors' townhomes. I believe that I have been in a Rottlund townhome.

Q When did you tour a Rottlund Villa II townhome?

A I've toured many competitors' townhomes since 1998.

MR. KRUMMEN: Move to strike as nonresponsive. Could you read my question back, please.

(The requested portion of the record was read by the reporter.)

A I believe that the first time I saw a Rottlund townhome--and I don't know if it was a Villa II--was in 1998, early 1998.

BY MR. KRUMMEN:

Q I believe you said the first time you saw a Rottlund townhome was in early 1998. Correct?

A Correct.

Q The question was, when did you tour a Rottlund Villa II townhome?

MS. PREBLE: Objection. Asked and answered.

MR. KRUMMEN: Half right.

A What's the difference between tour and see or view?

BY MR. KRUMMEN:

Q Did you go inside the Rottlund Villa II townhome that you saw in early 1998?

A Yes.

MS. PREBLE: Objection. Mischaracterizes prior testimony.

MR. PETERSEN: Same objection.

BY MR. KRUMMEN:

Q The answer?

THE WITNESS: Do I have to answer that?

MS. PREBLE: Yes. Go ahead and answer the question. Could you read back the last question, please.

(The record was read as follows: "Q Did you go Villa II townhome that you saw in

A I've been through Rottlund townhomes. I don't know if it was called a Villa II.

MR. KRUMMEN: Move to strike as nonresponsive.

BY MR. KRUMMEN:

Q You saw --

MS. PREBLE: Objection. Hang on. Counsel, that's the witness' answer. How do you think it's not responsive?

MR. KRUMMEN: We'll let the judge decide, Ms. Preble. You don't have a robe on.

BY MR. KRUMMEN:

Q But back to the question. You went inside the Rottlund townhome you saw in early 1998, correct?

A I go through models typically when I go to communities to look at competition.

MR. KRUMMEN: Move to strike as --

A So I --

MR. KRUMMEN: -- nonresponsive.

BY MR. KRUMMEN:

Q Did you go inside the Rottlund townhome that you saw in early 1998, yes --

A Yes.

Q -- or no?

A Yes.

Q Did you pick up any marketing brochures that Rottlund had generated when you toured that townhome?

A Possibly. I can't say for certain.

Q Do you have any basis to deny that you picked up a Rottlund brochure when you toured that townhome?

MS. PREBLE: Objection. This is a repetitive line of questioning. Asked and answered.

A For the past 20 years, it's been my business practice to pick up brochures routinely as I go through competitors' model homes. Whether I picked up a brochure at Rottlund, I'm not certain. It's very possible that I did. That would be fairly routine for what I ask for when I go into a model home: "Do you have a brochure you can provide?"

Something of that nature.

MR. KRUMMEN: Move to strike as nonresponsive. Could you read my question back, please.

MS. PREBLE: Objection. The witness has answered the question.

MR. PETERSEN: And objection. Argumentative. He's answered the question. What do you want?

MS. PREBLE: Read back the question, please.

(The record was read as follows: "Q Do you have
you picked up a Rottlund brochure

MS. PREBLE: Counsel, the witness has answered the question. He's told you he doesn't recall whether or not he picked up that brochure. The question has been asked and answered. Please move on.

BY MR. KRUMMEN:

Q You may answer.

MS. PREBLE: Do you have anything else to add other than your previous answer?

A I don't know whether I picked one up or not.

BY MR. KRUMMEN:

Q So you have no basis --

A I can't say with certainty that I did or I can't say with certainty that I did not.

Q Now, listen to my question. My question was, do you have a basis to deny that you picked up a Rottlund brochure when you toured the Rottlund townhome in early 1998, yes or no? That's the question.

MS. PREBLE: Objection. Asked and answered. Go ahead.

A I have no basis to deny that I picked up --

BY MR. KRUMMEN:

Q Thank you, Mr. Plante. Moving on, are you familiar with the product known as the Homestead Collection?

A The Homestead Collection is a Town & Country name. Yes, I'm familiar with the Town & Country Homestead Collection.

Q What does Homestead Collection refer to?

A It refers to our back-to-back style townhome product.

Q Do you have specific names for the back-to-back units within the Homestead Collection?

A Yes, we do.

Q What are the names?

A We have a Bayview, we have a Starwood, we have a Broadmoor and a Savannah.

meeting that you've already identified?
A I don't know.
Q Once a year? Once a month? Once a week? Can you give me a ballpark?
A I'd be speculating. But probably a couple times a year in the -- maybe the early years. 1997 I think we met -- we may have met twice. Subsequent years, I don't know. But there's -- there's a distance between our offices that makes it somewhat inconvenient to get together in person.
Q Whose decision was it to design a back-to-back townhome for Town & Country Minnesota?
A That was my decision.
Q When did you make that decision?
A I started thinking about that product in the spring of 1998, after beginning to observe the marketplace and seeing a high -- a high amount -- a very large amount of developments either completed or in process with that style of product. I felt that was a product that to compete in the market would be a necessary product.
Q Can you be more specific than thinking about this back-to-back townhome idea in the spring of 1998 and specificity with respect to date?
MS. PREBLE: Hold on just a second.

MS. PREBLE: Objection. Assumes facts not in evidence.

A I have no idea how many times I toured Rottlund or any other competitors' townhomes. I mentioned earlier that I've been in a number of competitors' townhomes, both at that time and since that time.

BY MR. KRUMMEN:

Q Did you tour Rottlund's townhome more than once?

MS. PREBLE: Objection. Asked and answered. He just answered that question.

A Possible. I may have looked at more than one community that that company builds, as I would any other competitor. It's my business to understand who's building what and in what locations at any given time, particularly those that we were either building in or interested in building in, where consumers and the home-buying public wants to live.

BY MR. KRUMMEN:

Q Have you ever taken any pictures of Rottlund's back-to-back townhome?

MS. PREBLE: Objection. Assumes facts not in evidence that he's been in a Rottlund townhome.

A During the years I've been in the home-building industry, I have taken pictures of builders'

products, floor plan ideas, fireplace walls, architectural elements, planter boxes, landscaping, exteriors, interiors, a variety of features in products, to have a concrete example of how things can be done and what looks appealing. Absolutely. Taken photography.

MR. KRUMMEN: Could you read my question back, please.

(The record was read as follows: "Q Have you ev Rottlund's back-to-back townhome?")

A Possibly.

BY MR. KRUMMEN:

Q Do you know --

A Probably.

Q Do you know roughly when you took the pictures?

MS. PREBLE: Objection.

MR. PETERSEN: Assuming that he took pictures.

A I don't. It's possible I took pictures during this period of time. I've taken pictures as recently as this weekend of builders' products in the marketplace.

BY MR. KRUMMEN:

Q Do you have any basis to deny that you took pictures of Rottlund's townhome in or about April

of 1998?

MS. PREBLE: Objection. Asked and answered. He's told you what he knows about whether or not he took pictures and when.

A I have no basis to deny that I took pictures.

BY MR. KRUMMEN:

Q Have you ever toured Rottlund's back-to-back townhome by yourself?

A I don't know.

Q Have you ever toured Rottlund's back-to-back townhome with other individuals?

A Possibly.

Q What do you recall?

A I will say that I have toured model homes in the marketplace both individually, on my own, and with people that worked for me and/or with architects that I work with. I've done it in all sorts of combinations. Whether I toured a Rottlund townhome individually or with a group, I can't be certain.

Q You have no recollection of touring a Rottlund townhome with a group of people?

MS. PREBLE: Objection. Asked and answered.

A During the early part of 1998, I recall that I took a tour in the marketplace with one of the fellows

who worked for me at the time, Bill Anner, and with Larry and Chris. We looked at a number of builders that were building homes in the Minneapolis market at that time.

Who we looked at, what day we looked at them, what time we looked at them, whether we went in them or not, whether we took pictures or not, I don't have a solid memory of all of that.

But as I said, for the past 20 years, it's been my practice to do this. This is what home builders do to understand the marketplace they're in and to understand their competitors.

BY MR. KRUMMEN:

Q Do you know when you toured townhomes with Bill Anner, Larry Moore, and Chris Jorgensen?

A I just said it. I said sometime in early 1998.

Q Was anyone else --

A Might have been spring of '98. I don't know the exact date.

Q Was anyone else present on this tour?

A Those are the -- those are the four that I can recall.

Q What was the purpose of the tour?

A To understand the market, to see what's being built in the market.

Court File No. 01-1980 / ROTTLUND / Pinnacle
Mahowald Affidavit dated July 27, 2004

EXHIBIT G

UNITED STATES DISTRICT COURT DISTRICT O

FOURTH DIVISION No.:

- - - - - - - - - - - - - - - - - - - - - - - - - - - -The Rottlund C

d/b/a Rottlund Homes, a MinnesotaCorporation,

Plaintiff,vs.

Pinnacle Corporationd/b/a Town & Country Homes,

an Illinois Corporation, and

Town & Country Homes, Inc.,

a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc.,

a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &

Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

Videotaped

30(b)(6) Deposition of

BLOODGOOD SHARP BUSTER ARCHITECTS &

PLANNERS OF IOWA, INC.

(Testimony of Chris A. Jorgensen)

Wednesday March 5, 2003 9:07 a.m.

they take place in Minnesota or were they predominantly over the telephone prior to the time that Exhibit 26 was authored?

MR. SCHWIEBERT: Objection. Form.

A Generally they were probably over the phone. There was a time prior -- prior to this proposal where myself and Larry Moore went up to Minneapolis and met with the client.

BY MR. KRUMMEN:

Q Now, you went up to Minneapolis and met with the client prior to April 6th of 1998, correct?

A Yes. I believe it was the end of March, first of -- first of April.

Q Was the purpose of that trip to discuss back-to-back townhomes or did you go up there for other reasons?

MR. FARMER: Objection to form.

MS. NEWMAN: Same objection.

A That certainly was one of the topics or perhaps the main topic. We would have -- we would have talked about our general projects on the single-family as well and -- and this townhouse program also.

BY MR. KRUMMEN:

Q Did you review any documents concerning back-to-back townhomes that Town & Country of

Minnesota may have had in mind, during that meeting?

A Reviewed documents?

Q That's right. Did they, for example, give you any brochures of competitors and say, "Here are some back-to-back townhomes that are doing well in the Minneapolis market"?

A Well, no. At that time we -- we toured some product in the -- in the marketplace and certainly had the opportunity to discuss this program and then the -- the competition in the marketplace as well.

Q So to make sure I understand the date, prior to the time this contract was drafted you went on a tour up in the Minneapolis area with the Town & Country of Minnesota people?

A Yes.

MR. FARMER: Objection. Foundation.

BY MR. KRUMMEN:

Q And did you tour back-to-back townhomes built by Town & Country of Minnesota's competitors?

A Yes.

Q Which competitors' townhomes did you tour during the March tour?

A The ones I generally recall are the ones I

mentioned earlier. It would -- would have been Centex, I believe Ryland and Rottlund, and I -- there was others. And there may have been product that was not back-to-back as well.

Q What was the purpose of that tour, as you understood it?

A To -- to become -- for -- for BSB to come -- become familiar with Town & Country's competition in the marketplace. Given that -- that we're -- we're here in Des Moines at times, we will do product tours with -- with -- with the client.

Q And why is that necessary from BSB Iowa's perspective?

MR. SCHWIEBERT: Objection. Foundation.

MS. NEWMAN: Same objection.

A Just to get a sense of what is being built in the marketplace from a cost construction standpoint. You know, that's an important factor in -- in designing a project for a client, that -- understanding that, what -- also what -- what the buyers are seeing and what -- what they are looking for in the marketplace.

BY MR. KRUMMEN:

Q I believe you testified earlier that you, Mr. Jorgensen, and Mr. Larry Moore participated in

this tour that occurred in late March or early April of 1998. Correct?
A Yes.
Q Did anyone else from BSB Iowa attend that tour?
A No.
Q Who on behalf of Town & Country of Minnesota attended?
A Art Plante and Bill Anner.
Q Do you know what Bill Anner's position was at Town & Country Minnesota at the time?
A Land development acquisition type of role. I'm not sure what his title was.
Q Was anyone else present on the March 1998 tour?
A Not that I recall.
Q Did anyone take a camera along on this tour?
A Not that I recall.
Q Did anyone pick up any brochures of the competitors or marketing materials from the competitors?
A I'm certain people looked at brochures. When you go into a model home, you'll -- one of the first things you'll do is look at the floor plans. A lot of times they'll have them up on the wall for -- for potential buyers and the public to -- to view, so sometimes that's not necessary.
But certainly from, you know, our viewpoint, I

mean, we -- we look at the -- the floor plans that they're offering. And then typically we would not take those with us. At least I wouldn't. And then we would walk the product.

Q What do you mean by "walk the product"?

A Walk through the models that the -- the -- the builder is offering to the public.

Q Now I want to get a little more specific here, and I'm going to confine the tour of the Rottlund product in March of 1998. For the next series of questions, they're confined to Rottlund.

Did you look at any Rottlund marketing materials during the March 1998 tour? And when I say, "you," I'm referring to Mr. Jorgensen.

A I may have looked at a brochure, yes.

Q Did Mr. Larry Moore look at any Rottlund marketing materials or brochures during the March 1998 tour?

A I couldn't say.

Q How about Mr. Art Plante?

A I couldn't say.

Q And the same question for Mr. Bill Anner.

A I couldn't say for certain.

Q Do you recall anyone taking any pictures, in that March of 1998 tour, of Rottlund's product?

A I don't recall, no.

give him pause.
A No. I mean, the product brochures are -- are public information. Certainly they're available and open to me as -- as they are to anyone.
BY MR. KRUMMEN:
Q And the Rottlund brochures were copyrighted, were they not? They had a copyright notice on them?
MS. NEWMAN: Objection.
MR. FARMER: Objection.
MS. NEWMAN: Foundation.
MR. FARMER: Foundation.
MS. NEWMAN: Calls for speculation. Form.
A Yeah. I don't know whether they did or not.
BY MR. KRUMMEN:
Q Regardless, you kept those in your Jerry's Homes file, correct?
MR. SCHWIEBERT: Objection. Foundation.
A Yes. They are there.
BY MR. KRUMMEN:
Q And Jerry's Homes' was a back-to-back townhome that you worked on in the year 1997, correct?
A Correct.
Q And here we are in the year 1998 and you're working on a back-to-back townhome for Town & Country

foundation.

BY MR. KRUMMEN:

Q Is this the first time when BSB became aware that the villas project was going to be changed to the Homestead Collection project?

MR. FARMER: Objection. Form and foundation.

MS. NEWMAN: Same objections.

A I don't know.

BY MR. KRUMMEN:

Q Do you recall hearing that they were going to change the names of the villas project to Homestead Collection, prior to September 1 of 1999?

A I don't recall.

Q Do you recall anything about when the name change occurred?

A No, I don't.

Q But you do understand that the villas back-to-back project is now known as the Homestead back-to-back collection, correct?

A That's correct.

THE VIDEOGRAPHER: Off the record. Ending tape 1 at 11:16.

(Deposition Exhibit Number 82 was marked for identification by the reporter.)