Court File No. 01-1980 / ROTTLUND / Pinnacle
Mahowald Affidavit dated July 27, 2004

EXHIBIT P




ROTTLUND HOMES

THE RESERVE
PLYMOUTH, MN

THE VILLA II

DETAILS

NOVEMBER 1, 2000

A10

Court File No. 01-1980 / ROTTLUND / Pinnacle
Mahowald Affidavit dated July 27, 2004

EXHIBIT U

**H**

United States District Court, S.D. New York.

SOFTEL, INC., Plaintiff,
v.
DRAGON MEDICAL AND SCIENTIFIC COMMUNICATIONS LTD., Dragon Medical And Scientific Communications, Inc., John R. Darsee, H. Eugene Hodge, Nina Romanoff, Hoffman Laroche, Inc. Pfizer, Inc., and Pfizer Pharmaceuticals, Inc., Defendants.

**No. 87 Civ. 0167 (MGC).**

Oct. 16, 1995.

Brown & Seymour, by Whitney North Seymour, Jr., Craig A. Landy, Peter James Clines, New York City, Charla R. Bikman, New York City, for Plaintiff.

Stroock & Stroock & Lavan, by Bruce H. Schneider, Gordon Kessler, New York City, Jaffe & Asher by William A. Rome, New York City, for Defendants.

MEMORANDUM OPINION AND ORDER

CEDARBAUM, District Judge.

*1 Defendants have moved for reconsideration of my Memorandum Opinion and Order dated July 7, 1995. They argue that defendant Darsee should not be held jointly liable for the profits earned by defendant Dragon from the use of plaintiff's computer code. Defendants also contend that the punitive damage awards against them are excessive based on the evidence presented at trial, and should be reduced. For the reasons discussed below, defendants' motion is granted in part and denied in part.

*Joint Liability for Dragon's Profits*

Defendants argue that Darsee should not be held liable for Dragon's profits because disgorgement of profits is available only as against the defendant who earned the profits. Defendants correctly point out that the general rule under copyright law is that liability for illegal profit is several and not joint -- that is, "one defendant is not liable for the profit of another." *MCA, Inc. v. Wilson*, 677 F.2d 180, 186 (2d Cir. 1981) (1909 Act); *see also Abeshouse v. Ultragraphics, Inc.*, 754 F.2d 467, 472 (2d Cir. 1985) (applying *MCA* in case under the 1976 Act). However, there may be an exception to this general rule "where the infringement was not innocent." *Abeshouse*, 754 F.2d at 472; *Harris v. Miller*, 50 U.S.P.Q. 625 (S.D.N.Y. 1941); 3 M. Nimmer, *Nimmer on Copyright* § 12.04[C][3] (1994). Judge Cannella's findings in the liability trial justify this exception.

Furthermore, under the law of New York (and of other jurisdictions) an employee may be held jointly liable for the profits earned by the employer as a result of the employee's misappropriation of a trade secret. *See Minnesota Mining & Mfg. Co. v. Technical Tape Corp.*, 23 Misc.2d 671, 192 N.Y.S.2d 102, 123 (Sup. Ct. Westchester Cty. 1959), *aff'd*, 15 A.D.2d 960, 226 N.Y.S.2d 1021 (2d Dep't 1962); *see also Structural Dynamics Research Corp. v. Engineering Mechanics Research Corp.*, 401 F. Supp. 1102, 1120 (E.D. Mich. 1975). Because the trade secret damages are coextensive with defendants' profits from copyright infringement, it is appropriate to apply New York law regarding trade secret misappropriation, and to hold Darsee and Dragon jointly liable for Dragon's profits from the trade secret misappropriation.

*Punitive Damages*

Darsee argues that the punitive damage award assessed against him is excessive in light of the evidence presented at trial. Darsee relies on *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992), for the proposition that the award of punitive damages against him should not exceed ten percent of his net worth. Darsee's reliance on *Vasbinder* is misplaced for several reasons. First, *Vasbinder* awarded punitive damages under a federal civil rights statute, while the punitive damages in this case are awarded pursuant to New York common law. Second, *Vasbinder* did not hold that a punitive damages award could not exceed ten percent of net worth. Rather, it held that the punitive damage awards against defendants who were near retirement age were excessive in light of the dramatic reduction in retirement income caused by the punitive damage awards. Darsee is not close to retirement age -- he is 47 years old. (Tr. at 471.) Plaintiff points out that under N.Y. Civ. Prac. L. & R. § 5231(b), a judgment

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

creditor may obtain execution against only ten percent of a debtor's annual income. The rule adequately addresses the concern of the Second Circuit that the punitive damage award should not "result in the financial ruin of the defendant." *Vasbinder*, 976 F.2d at 121.

***2** Finally, Darsee's argument that the punitive damage award against him is a disproportionately large percentage of his net worth presupposes that I credit his trial testimony regarding his income and assets. At trial, I asked Darsee whether he was a shareholder of Scientific Information Systems ("SIS"), the company by which he is now employed, and he answered, "No." (Tr. at 480.) On cross examination, plaintiff's counsel asked Darsee who owned the shares of SIS, and he replied that the shares were owned by his wife, his 23-year-old daughter and one other person. (Tr. at 486.) Although defendants' counsel argued that Darsee's answer to my question was "truthful, although perhaps too literal," (Tr. of Oral Arg., July 21, 1995, at 14), I find that Darsee's answer to my question evidenced his intent to obscure his true financial situation from the court. The evidence at trial showed that Darsee has taken other steps to attempt to insulate himself and misrepresent his true income. For example, in 1993, SIS paid him a salary of $20,500 and paid his wife a salary of $83,000. Darsee admitted at trial that he had spent more time working for SIS than had his wife. (Tr. at 487.) Because Darsee was not forthcoming about his financial situation, I do not credit his testimony, and base the award of punitive damages on an estimate of his income and assets that takes into account his attempt to conceal his true financial situation.

Dragon argues that the punitive damage award against it is excessive in light of the evidence presented at trial that its only remaining assets are bank accounts valued at $16,187.26.

"[T]he purpose of punitive damages is to punish the defendant and to deter him and others from similar conduct in the future. *Vasbinder*, 976 F.2d at 121. Accordingly, a punitive damage award should not be so high as to result in a defendant's financial ruin. *Id.* The defendant bears "the burden of showing [[its] modest means -- facts peculiarly within its power -- if [it] wants this considered in mitigation of damages." *Zarcone v. Perry*, 572 F.2d 52, 56 (2d Cir. 1978); *see also Ostanzo Commerzanstalt v. Telewide Systems, Inc.*, 608 F. Supp. 1359, (S.D.N.Y. 1985), *aff'd in part, rev'd in part*, 794 F.2d 763 (2d Cir. 1986); *Keen v. Keen*, 113 A.D.2d 964, 493 N.Y.S.2d 636, 638 (3d Dep't 1985).

No evidence was presented by Dragon of the value of Dragon's assets prior to dissolution. The evidence regarding the current value of Dragon's bank accounts does not shed light on the value of any assets of Dragon that may have been transferred to Dragon's parent upon Dragon's voluntary dissolution. As discussed above, the evidence presented by Darsee regarding his net worth was not credible. Therefore, it is extremely difficult to determine the appropriate punitive damage awards in this case.

However, upon further reflection on the evidence presented at trial and on the principles enunciated in *Vasbinder*, I find that the punitive damage awards against Darsee and Dragon are excessive because they are greater than necessary to serve the purpose of deterrence. Therefore, I reduce the award against Darsee to $35,000 and the award against Dragon to $50,000.

*Conclusion*

***3** For the foregoing reasons, defendants' motion for reconsideration is granted in part and denied in part. Plaintiff shall settle judgment on two days notice.

SO ORDERED.

1995 WL 606307 (S.D.N.Y.), 1995 Copr.L.Dec. P 27,476, 37 U.S.P.Q.2d 1282

END OF DOCUMENT

Court File No. 01-1980 / ROTTLUND / Pinnacle
Mahowald Affidavit dated July 27, 2004

# EXHIBIT V

H

HARRIS
v.
MILLER et al.

District Court, S. D. New York

No. 3-417

Decided July 26, 1941

United States Patents Quarterly Headnotes

**COPYRIGHTS**
**[1] Costs and damages**
Since all defendants participated in production of infringing play they are jointly liable for all of plaintiff's damages resulting from infringement; defendants, who published infringing play, are jointly liable for plaintiff's damages resulting from publication, and are jointly and severally liable for profits received from its publication and for royalties received from producers of infringing play; defendants, who produced infringing play, although innocent infringers, as to profits of play which are attributable to use of plaintiff's copyrighted material, are severally liable for profits received by each and are jointly liable for all of such profits.

Action by Nellie Harris against Gilbert Miller, Norman Marshall, Leslie Stokes, Sewell Stokes, Random House, Inc., and Heron Publications, Inc., for copyright infringement. On application of plaintiff to modify opinion reported at 50 USPQ 306. Application granted.

CHARLES S. ROSENSCHEIN (CHARLES S. ROSENSCHEIN and HAROLD M. TANCER of counsel), both of New York, N. Y., for plaintiff.

HOWARD E. REINHEIMER (HOWARD E. REINHEIMER, WILLIAM J. BRATTER and IRVING COHEN of counsel), all of New York, N. Y., for defendants .

LEIBELL, District Judge

On June 23rd, 1941 [50 USPQ 306], I filed my opinion in this case, together with findings of fact and conclusions of law.

In one of the concluding paragraphs of my opinion I stated [50 USPQ 311]:

> "It was stipulated at the trial of this suit that the liability of Miller and his corporation, if any, are the same, and that if either one is liable the other is liable to the same extent. I am of the opinion that the defendants, Marshall, Miller and Heron Productions, Inc., are severally liable for the profits they received from the production of the play in New York. Barry v. Hughes, 103 F.2d 427 [41 USPQ 340]; Sheldon v. Metro Goldwyn Corp., 26 F.Supp. 134 [40 USPQ 238]; 106 F.2d 45 [42 USPQ 540].'

I made, among others, the following findings of fact:--

> "69. That the defendants, Norman Marshall, Gilbert Miller and Heron Productions Inc. jointly brought about and maintained the production, presentation, public exhibition and performance of said play in the Borough of Manhattan, City of New York, for profit.
>
> 70. That the defendants, Gilbert Miller, Heron Productions Inc., Norman Marshall, Sewell Stokes and Leslie Stokes aided and abetted in the production, presentation, public exhibition and performance of said play ' Oscar Wilde' in the Borough of Manhattan, City of New York, for profit.'

On the question of liability for damages and profits I arrived at the following conclusion of law:--

> "IX. * * * * *
>
> (b) Awarding to the plaintiff as against the defendants, Leslie and Sewell Stokes, jointly and

COPR. © 2004 The Bureau of National Affairs, Inc.

severally such damages as the plaintiff may have suffered due to the infringement; and against all the defendants severally that part of the profits the defendants have made, which are attributable to the use of plaintiff's copyrighted material by the defendants in the production of the play, which said award shall be several against the defendants for their respective shares of the profits; and jointly and severally against the defendants, Leslie Stokes and Sewell Stokes, in respect to profits they received from the infringement of plaintiff's copyright by the publication of the play; or in lieu of actual damages and profits such damages as to the Court shall appear to be just; together with the costs and disbursements to be taxed by the Clerk, including a reasonable attorney's fee to the plaintiff as part of the costs;

* * * * * *'

[1] Plaintiff's attorney has refrained from entering judgment pending the determination of an application which he has made, asking that the conclusion of law above quoted be modified so as to hold all the defendants jointly liable for all of plaintiff's damages and jointly and severally liable for all the profits resulting to them from the infringement of plaintiff's copyright. Plaintiff argues that the statement in Barry v. Hughes, 103 F.2d 427 [41 USPQ 340], as to the liability of innocent infringers for profits, was at best dictum and that its context so indicates. Plaintiff also contends that the rule to be followed where parties jointly engage in the acts which constitute infringement, even though they be innocent infringers is that they should be held jointly liable for plaintiff's damages. In support of this contention plaintiff cites Haas v. Leo Feist, Inc., 234 F. 105; Gross v. Van Dyk Gravure Co., 230 F. 412. I am of the opinion that all the defendants, because they participated in the production of the play, are jointly liable for all of plaintiff's damages resulting from that infringement.

As to the profits, my reason for stating that I thought the liability of the defendants (except the Stokes brothers) was several and not joint was the fact that those defendants were innocent infringers and should be severally accountable as such on the ground of unjust enrichment. Barry v. Hughes, supra. The Stokes brothers were not innocent infringers. The other defendants, Miller, Marshall and Heron Productions Inc. were innocent infringers, at least up to the time that they received plaintiff's notice of the alleged infringement, which was two weeks before the play closed in New York City.

However, under the arrangements pursuant to which the play was produced, certain fixed royalties were paid to the Stokes brothers and a certain overhead sum per week to the Heron Productions, Inc. and then the remaining net profits were divided between the Heron Productions Inc. and Marshall on a percentage basis. Miller controlled the corporation, Heron Productions Inc., and it has been stipulated that if the corporation is found liable, Miller's liability should be the same, since the corporation and Miller were one.

The act of infringement of the defendants was the production of the play, which I have found was a joint venture of Miller, Marshall and Heron Productions Inc. and therefore each of said defendants is not only severally liable for his own share of the profits of the joint venture, but is also jointly liable for what each of the others received as a share of the profits. I believe that this is the rule even where the joint venturers were innocent infringers. In the production of the play the defendants, Miller, Marshall and Heron Productions Inc., were in effect partners. The Stokes brothers aided and abetted in the production of the play by furnishing the use of the infringing manuscript for which they received a royalty. They are jointly liable with the other defendants for plaintiff's damages. The Stokes brothers are also jointly and severally liable for what they themselves received from the production of the play. I shall leave to the Special Master, on the evidence to be adduced before him, the determination of the question--whether the royalties paid to Leslie Stokes and Sewell Stokes by the other defendants as the producers of the play are a proper expense for which the other defendants are entitled to a credit in calculating the profits they realized from the production of the play.

Accordingly conclusion of law IX (b) will be amended to read as follows:--

"(b) Directing all the defendants to pay to the plaintiff such damages as the plaintiff may have suffered due to the infringement of plaintiff's copyright by the production of the play, for which said damages all the defendants shall be held jointly liable; directing the defendants, Leslie Stokes and Sewell Stokes, to pay to the plaintiff such damages as the plaintiff may have suffered due to the infringement of plaintiff's copyright by the printing and publication of the play, for which they shall be held jointly liable;

COPR. © 2004 The Bureau of National Affairs, Inc.

directing the defendants, Gilbert Miller, Norman Marshall and Heron Productions Inc., to pay to the plaintiff that part of the profits that said defendants have made, which are attributable to the use of the plaintiff's copyrighted material by the defendants in the production of the play, and as to the said profits each of the said defendants shall be held severally liable for such part thereof as he or it separately received, and jointly liable with the other said defendants for such part of the said profits as each of the other said defendants received; directing the defendants, Leslie Stokes and Sewell Stokes, to pay to the plaintiff, such profits as they respectively received from the printing and publication of the play by Random House Inc., and from the production of the play by Gilbert Miller, Norman Marshall and Heron Productions Inc., for which said profits the said defendants, Leslie Stokes and Sewell Stokes, shall be held jointly and severally liable; or in lieu of the actual damages and profits hereinabove mentioned, such damages as to the Court shall appear to be just and for which said damages all the defendants shall be jointly liable; together with the costs and disbursements to be taxed by the Clerk, including a reasonable attorney's fee to the plaintiff as part of the costs.'

A formal amendment to the above effect is being filed with the Clerk of the Court, together with this supplemental memorandum.

S.D.N.Y.

50 U.S.P.Q. 625

END OF DOCUMENT

COPR. © 2004 The Bureau of National Affairs, Inc.

Court File No. 01-1980 / ROTTLUND / Pinnacle
Mahowald Affidavit dated July 27, 2004

EXHIBIT W

United States District Court, S.D. New York.

**BULL HN INFORMATION SYSTEMS, INC. and Bull HN Information Systems Limited, Plaintiffs,**
**v.**
**AMERICAN EXPRESS BANK LIMITED, Defendant.**

**No. 88 CIV. 2103 (SWK).**

April 6, 1990.

MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

*1 This is an action brought under federal copyright laws, with pendent state claims of misappropriation, breach of contract, and fraud. Defendant American Express Bank Limited ("AEBL") has moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), while plaintiff has moved for a partial default.

Background

The following facts are adopted from plaintiffs' Second Amended Complaint. Bull HN Information Systems, Inc. ("Bull Inc.") is a Delaware corporation that engages in developing, manufacturing, and marketing computer systems and related products and services worldwide. Bull HN Information Systems, Limited ("Bull Ltd.") is a Bull Inc. subsidiary organized under the laws of the United Kingdom (collectively, "plaintiffs" or "Bull"). AEBL is a subsidiary of American Express Company, which is a Connecticut corporation that engages in international banking and uses computers to facilitate its banking transactions.

Plaintiffs created and developed a computer program known as "Transaction Processing System 6" ("TPS6") in the mid-1970's. TPS6 was designed to process high volume transactions that required fast responses. The applications of TPS6 include stock control systems, telephone sales order control, and insurance quotes. The application programs are written in plaintiffs' "proprietary" computer language, "Screenwrite." TPS6 contains a translator and an interpreter that converts Screenwrite code into a form that the computer can understand. Second Amended Compl. ¶ 9. The whole package of TPS6 includes the software and user manuals. Second Amended Compl. ¶ 10.

On March 3, 1979 and August 18, 1983, plaintiffs and AEBL entered into licensing agreements under which plaintiffs licensed TPS6 to AEBL to use in its European and American facilities. Plaintiffs assisted AEBL in the development of an international banking application for the TPS6, which is written in Screenwrite and known as Standard Banking System ("SBS"). SBS was used with Bull Computers known as the DPS6.

Plaintiffs allege that without their knowledge and consent, AEBL hired a computer consultant, TSR Inc. ("TSR"), to convert the SBS software to run on IBM computers. Plaintiffs allege that TSR and AEBL developed infringing computer software that "duplicates the TPS6 operating environment in its smallest detail and cause applications running under TPS6 to run unchanged on IBM computer software and hardware." [FN1] Second Amended Compl. ¶ 19. Plaintiffs also allege that the infringing software copies the "overall structure, sequence and organization and all significant elements of TPS6, including (1) the look and feel of TPS6 to the programmer; and (2) the functions of TPS6." Second Amended Compl. ¶ 21.

FN1TPS6 enables application programs written in Screenwrite to run on computer hardware manufactured by plaintiffs. The infringing software enables application programs written in Screenwrite to run on hardware manufactured by IBM.

*2 On or about March 26, 1986, ABEL and plaintiffs executed a Software Marketing Agreement ("Marketing Agreement") under which plaintiffs would have the right to market to SBS to third parties. It provided that AEBL would receive royalties for each

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

sale. Plaintiffs allege that AEBL made numerous materially false representations concerning AEBL's intentions with respect to SBS prior to reaching this marketing agreement. These misrepresentations include statements on October 29, 1985 by William Biederman, a representative of AEBL, to the effect that the agreement between TSR and AEBL was exclusively for the purpose of solving the capacity problem in AEBL's New York branch. Second Amended Compl. ¶ 40. AEBL's representatives further allegedly assured plaintiffs that AEBL would use SBS only on Bull's computers in all offices except New York where it would be used on IBM computers. Second Amended Compl. ¶ 42. These representations purportedly induced plaintiffs to enter the Marketing Agreement. Plaintiffs now contend, however, that AEBL had no intention of continuing to utilize Bull computers at the time it made these contrary representations to plaintiffs. Second Amended. Compl. ¶ 45.

On August 20, 1986, representatives of plaintiffs and AEBL met in Paris. At the meeting, an AEBL representative stated that it "desired and would seriously consider" a Bull dual vendor proposal that would allow AEBL to continue to use the DPS6 computers to perform some of its banking functions and IBM computers to perform other functions. Second Amended Compl. ¶ 48. On February 28, 1987, representatives from the two sides met again. Following this meeting, an AEBL representative stated to a Bull Inc. representative that AEBL would engage Bull Inc. to upgrade the computer capacity of AEBL's Frankfurt office as long as that office did not become a regional bank serving several countries.

Acting on these representations, plaintiffs incurred costs in marketing SBS and preparing two proposals, one for the dual vendor arrangement and one for upgrading AEBL's Frankfurt branch. Plaintiffs, however, allege that AEBL had no intention to pursue a dual vendor arrangement when it made the proposal and had in fact decided to convert entirely to IBM hardware prior to August 20, 1986. Second Amended Compl. ¶ 50. Although the Frankfurt branch has not become a regional facility, it has converted to IBM computer hardware.

## DISCUSSION

1) Infringement Claim

Count one asserts an infringement claim for copying plaintiffs screenwrite language, its TPS6 program and the associated user manuals. Defendant concedes that plaintiffs at least state a claim for infringement of TPS6 and the associated user manuals. Defendants move to dismiss infringement allegations regarding Screenwrite and certain functions of TPS6.

Plaintiff cannot sue defendant for infringement of Screenwrite without a valid copyright registration for Screenwrite. Dynamic Solutions v. Planning & Control, 646 F. Supp. 1329, 1337 (citing Novelty Textile Mills v. Joan Fabrics Corp., 558 F.2d 1090, 1092 n.1 (2nd Cir. 1977)); Conan Properties v. Mattel, 601 F. Supp. 1179, 1182 (S.D.N.Y. 1984). Plaintiff does not claim that it has a separate registration for Screenwrite or that another registration -- such as its registration for TPS6 -- covers Screenwrite. For this reason, the Court dismisses the claims in count one for infringement of Screenwrite. [FN2]

FN2Defendant also moves to dismiss any Screenwrite infringement claims, arguing that computer languages, as opposed to computer programs, are not copyrightable. See Compendium II of Copyright Office Practice, § 325.02(c) (1984) ("Copyright Office will refuse registration if the claim is based solely on language"); Brief English Systems v. Owen, 48 F.2d 555 (2d Cir. 1931) (system of shorthand was not copyrightable, as it was merely a system for reducing words into shorter forms). The Court, however, does not reach the issue since dismissal of the Screenwrite claim is based on the jurisdictional ground that plaintiff does not have a copyright registration for Screenwrite.

*3 AEBL further argues that this claim is defective because plaintiffs plead that AEBL copied the functions of TPS6, and that mere functions, like ideas, are not subject to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

copyright protection. Plaintiffs, however, do not claim copyright protection for the functions of TPS6. Rather, the allegation of functional similarities is to support the claim that the TPS6 is copied wholesale, not merely that certain functions were duplicated. Plaintiffs allege that the infringing software "duplicates the TPS6 operating environment in its smallest detail and causes applications running under TPS6 to run unchanged on IBM computer software and hardware." Second Amended Compl. ¶ 21. They also allege that the infringing software copies the "overall structure, sequence and organization and all significant elements of TPS6." Second Amended Compl. ¶ 19.

"[T]o the extent structural similarities in a computer program are 'not necessary to [the] purpose or function' of the program, they constitute a protectable expression of an idea." Dynamic Solutions, Inc. v. Planning & Control, Inc., 1987 Copyright L. Dec. (CCH) ¶ 26,062, 29,912 (S.D.N.Y. 1987) (quoting Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc., 797 F.2d 1222, 1236 (3rd Cir. 1986), cert. denied, 479 U.S. 1031 (1987)). Faced with the difficult task of distinguishing between an idea or function on one hand, and its expression on the other, the Third Circuit suggested that "the purpose or function of a utilitarian work would be the work's idea, and everything that is not necessary to that purpose or function would be part of the expression of the idea." Whelan Associates, supra, 797 F.2d at 1236. There may well be other operating environments that could achieve the same purpose or function of the TPS6. Therefore, whether AEBL has violated copyright laws will depend, at least in part, on whether the infringing software duplicates the TPS6's operating environment to such an extent that the duplication was unnecessary to the purpose or function of the infringing program. This issue cannot be resolved by a motion to dismiss but is better reserved for trial.

AEBL also moves to dismiss the infringement claim to the extent that plaintiffs seek, as a measure of damages, all profits derived from the sale of the infringing software, including profits made by TSR. AEBL argues that it cannot be held jointly liable for profits made by a co-infringer. As a general rule, a "co-infringer ordinarily may be held jointly liable only for the actual damages suffered by a plaintiff copyright holder, [but] not for the profits of his fellow infringers." Abeshouse v. Ultragraphics, Inc., 754 F.2d 467, 472 (2d Cir. 1985). Exceptions to this rule apply (1) where the infringement was not innocent or (2) where the defendants engaged in a partnership, joint venture, or similar enterprise. Id. Plaintiffs allegations regarding AEBL's joint effort with TSR and its alleged misrepresentations to Bull regarding its intentions for the product of the AEBL-TSR software development, effort state a claim falling within either of these exceptions. See Complaint ¶¶ 16-19. Consequently, AEBL's motion to dismiss the damage claim for TSR's profits is denied.

2) Fraud Claims

*4 Count four alleges fraud in the inducement of the Marketing Agreement. Count five alleges fraud by virtue of AEBL's representation that it would consider a "dual vendor" operation and would continue to use Bull hardware in the Frankfurt office under certain conditions. AEBL argues that Bull cannot state a fraud claim in count five for misrepresentations that purportedly induced plaintiffs to continue to perform the Marketing Agreement, as they had a pre-existing duty to perform. AEBL additionally claims that Bull has not pleaded facts from which scienter might be inferred. See Connecticut National Bank v. Fluor Corp., 808 F.2d 957, 962 (2d Cir. 1987) (plaintiffs must provide at least a minimal factual basis for their conclusory allegations of scienter).

Although Bull's fraud claims could not be based alone on statements that caused it to continue to perform the Marketing Agreement, Bull's fifth claim for fraud further alleges that Bull relied on misstatements that resulted in expenditures in excess of those required under the Marketing Agreement. These claims are based on damages from preparing the dual vendor proposal, as well as

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

the proposal for an upgrade of the Frankfurt office.

In Connecticut National Bank, the Second Circuit stated that even though Fed. R. Civ. P. 9(b) does not require particularity with regard to intent,

'[i]t is reasonable to require that the plaintiff plead those events' which 'give rise to a strong inference' that the defendants had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth.

808 F.2d at 962 (quoting Ross v. A.H. Robbins Co., 607 F.2d 545, 558 (2d Cir. 1979), cert. denied, 446 U.S. 946 (1980)). With regard to the fraudulent inducement claim, plaintiffs allege that certain statements regarding the limited use of the IBM-compatible SBS software developed by AEBL and TSR were false when made. Specifically, Bull states that defendants began in March 1985 to assist TSR in marketing and selling the infringing software to plaintiffs' customers. Second Amended Compl. ¶ 20. Additionally, plaintiffs contend that AEBL used its Poole, England facilities as a "show room" for potential TSR customers. Id. On the fraud cause of action, plaintiffs specifically allege that AEBL had already decided, prior to suggesting that plaintiffs submit the dual vendor and Frankfurt proposals, that it would convert all of its facilities to IBM equipment. Second Amended Compl. ¶ 50. This Court therefore finds that plaintiff have satisfied the liberal pleading requirements for scienter. [FN3]

FN3 The parties have submitted evidence on the issue of scienter that cannot be considered on a motion to dismiss. Moreover, this issue would be better reserved for resolution at trial, as there appears to be conflicting evidence on whether or not circumstances existed at the time of the alleged misrepresentations that would have made it unlikely or impossible for AEBL to honor such representations.

3) Default Judgment

*5 Plaintiffs move this Court to enter default judgment on the two claims -- misappropriation and breach of contract -- that are not part of this motion. Plaintiffs argue that AEBL is required to submit a separate answer to the misappropriation and breach of contract claims because they are not part of this motion. This is not required by the plain language of the rule, and such a default judgment would be very harsh remedy under the circumstances.

In the only case on point, the District Court for the Eastern District of Michigan held that defendant was required under the rule to move or answer as to each count because there was "no reason for delaying the progress of litigation with respect to those counts of a complaint which are not addressed by a motion filed under F.R.C.P. 12(b)." Gerlach v. Michigan Bell Tel. Co., 448 F. Supp. 1168, 1174 (E.D. Mich. 1978). The Gerlach court, however, exercised its discretion not to enter a default judgment because it would have been an unnecessarily harsh remedy given the fact that plaintiff had not been severely prejudiced by the delay in receiving a responsive pleading. Id. This Court also finds that any prejudice to plaintiff on these two pendent state claims was not so sever as to warrant such a remedy. Defendant should file an answer within ten days.

CONCLUSION

For the reasons stated above, plaintiffs' motion to dismiss the infringement claim on Screenwrite from count one is granted, but the motion to dismiss the other infringement claims in count one is denied. Defendant's other motions to dismiss are denied, as is plaintiffs' motion for a default judgment. Discovery should continue on all remaining claims.

SO ORDERED.

1990 WL 48098, 1990 WL 48098 (S.D.N.Y.), 1990 Copr.L.Dec. P 26,555

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works