# Exhibit 2.1

Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.

THE ROTTLUND COMPANY, INC. d/b/a/ Rottlund Homes, a Minnesota Corporation,
Plaintiff,
v.
PINNACLE CORPORATION d/b/a/ Town & Country Homes, an Illinois Corporation, and Town & Country Homes, Inc., a Minnesota Corporation, Bloodgood Sharp Buster Architects and Planners of Iowa, Inc., an Iowa Corporation, and The Bloodgood Group, Inc., an Iowa Corporation, Defendants,
and
Town & Country Homes, Inc., a Minnesota Corporation, Third-Party Plaintiff,
v.
Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation, Third-Party Defendant.

**Civ. No. 01-1980(DSD/SRN).**

June 30, 2004.

**Background:** Owner of copyrights on architectural design plans and architectural works covering certain townhome technical drawings and as-built works brought copyright infringement claims against direct competitors in the design, development, construction, and sale of townhomes, and an architectural firm utilized by them. Plaintiff moved for discovery sanctions against one defendant.

**Holdings:** The District Court, Nelson, United States Magistrate Judge, held that:
(1) defendant's lack of candor in connection with its motion to dismiss for lack of personal jurisdiction warranted monetary sanction of $4,492.70;
(2) defendant's failure to make reasonable inquiry before certifying that its response to plaintiff's document discovery requests was complete and correct warranted monetary sanction of $10,137.47; and
(3) defendant's record of abuse of the judicial process, discovery incompetence, and defiance of court orders warranted monetary sanction under rule governing discovery sanctions of award of $50,000.00 in reasonable attorney fees and costs for plaintiff's prosecution of motion for sanctions.

Motion granted in part and denied in part.

**[1] Federal Civil Procedure 1278**

170Ak1278

Willful violation of a court order is not necessary before any sanction may be imposed under rule governing sanctions for discovery violations; rather, "willfulness" or "bad faith" is only required where dismissal or effective entry of default is the sanction imposed. Fed.Rules Civ.Proc.Rule 37(b), 28 U.S.C.A.

**[2] Federal Civil Procedure 2757**
170Ak2757

Pursuant to its inherent powers, a court may fashion an appropriate sanction for conduct which abuses the judicial process.

**[3] Federal Civil Procedure 2791**
170Ak2791

**[3] Federal Civil Procedure 2814**
170Ak2814

Defendant's lack of candor in failing to inform the court of a wealth of contacts it had with forum state, including contacts which specifically related to copyright infringement cause of action, while its motion to dismiss for lack of personal jurisdiction was pending, warranted sanction under court's inherent powers of requiring defendant to pay plaintiff $4,492.70, which was twenty percent of the attorney fees and costs plaintiff incurred in defending against its motion, especially considering that plaintiff's lack of candor was the result of deliberate, willful conduct that was tantamount to bad faith.

**[4] Federal Civil Procedure 1952**
170Ak1952

A court's inherent powers fundamentally include the power to impose silence, respect, and decorum, in its

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

presence.

[4] Federal Courts 3.1
170Bk3.1

A court's inherent powers fundamentally include the power to impose silence, respect, and decorum, in its presence.

[5] Federal Civil Procedure 2795
170Ak2795

[5] Federal Civil Procedure 2820
170Ak2820

Attorney's bad faith harassment of deposition witness which occurred when attorney attempted to tell witness, an employee of plaintiff, through a line of questioning that he was about to lose his job, based on information designated as confidential/attorneys-eyes-only, warranted sanction under court's inherent powers and under vexatious conduct statute of requiring attorney to write a letter of apology to witness and plaintiff; attorney's questions had nothing to do with lawsuit and were intended for no other reason than to inflict emotional angst. 28 U.S.C.A. § 1927.

[6] Federal Civil Procedure 1637
170Ak1637

Defendant's failure to make reasonable inquiry before certifying that its response to plaintiff's document discovery requests was complete and correct warranted monetary sanction of $10,137.47, representing ten percent of total attorney fees and costs plaintiff incurred in connection with ensuring that defendant complied with document discovery. Fed.Rules Civ.Proc.Rule 26(g), 28 U.S.C.A.

[7] Federal Civil Procedure 1278
170Ak1278

Defendant's record of abuse of the judicial process, discovery incompetence, and defiance of court orders warranted monetary sanction under rule governing discovery sanctions of award of $50,000.00 in reasonable attorney fees and costs for plaintiff's prosecution of motion for sanctions. Fed.Rules Civ.Proc.Rule 37(a)(4), 28 U.S.C.A.

Craig S. Krummen, David Davenport, St. Paul, MN, for Plaintiff.

Darren B. Schwiebert, Minneapolis, MN, for Defendant Town & Country Homes, Inc.

Christopher Murdoch, Chicago, IL, for Defendant Pinnacle Corp.

Holly J. Newman, Minneapolis, MN, for Defendant Bloodgood Sharp Buster and The Bloodgood Group, Inc.

***ORDER***

NELSON, United States Magistrate Judge.

*1 The above-entitled matter came before the undersigned United States Magistrate Judge on Plaintiff's Motion for Sanctions Pursuant to the Court's Inherent Power, 28 U.S.C. § 1927, Federal Rules of Civil Procedure 11, 26, and 37 (Doc. Nos. 320, 321, 322). This matter has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

**I. BACKGROUND**

This is in large measure a copyright infringement case. Plaintiff The Rottlund Company (Rottlund) owns copyrights on architectural design plans and architectural works--covering certain townhome technical drawings and as-built works. Rottlund has brought several copyright infringement claims against Defendants Pinnacle Corporation d/b/a Town & Country Homes (Pinnacle), Town & Country Homes of Minnesota (TCM), Bloodgood Sharp Buster (BSB), and the Bloodgood Group, Inc. Rottlund, Pinnacle, and TCM are all direct competitors in the design, development, construction, and sale of townhomes. BSB is an architectural firm utilized by TCM and Pinnacle.

In order to better understand the issues involved in this motion, a brief overview of particular townhome products and relationships is necessary. Initially, Rottlund only sued Pinnacle Corporation, which does business as and is more commonly known as Town & Country Homes. Ultimately, an entity known as Town & Country of Minnesota, which Pinnacle refers to as its Minneapolis division but claims is a separate entity, was added. The Fredrikson & Byron law firm represented Pinnacle until September of 2002, (Doc. No. 86), and has always represented Town & Country of Minnesota. In September of 2002, the Holland & Knight law firm began representing Pinnacle. In its original complaint, Rottlund asserted ownership of a technical drawing

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

copyright for a townhome product know as the Rush Creek Villa II, 8 unit w/no step. [FN1] Rottlund claimed that Pinnacle was infringing the Villa II technical drawing copyright. Importantly for the discussion that follows, the main townhome product in Minnesota that allegedly infringes Rottlund's copyrights is known as the Homestead collection, but during the design/developmental phase, the Homestead Collection was called the "Villas." [FN2] Pinnacle claims that TCM is solely responsible for actually building the Homestead Collection townhomes, but it has become clear that Pinnacle's in-house architect Steve Sandelin was directly involved in the design or development of the Homestead Collection townhomes in Minnesota.

By this motion, Rottlund seeks sanctions against Pinnacle and its current and/or former counsel. The catalyst for this motion was the revelation in a deposition, after nearly two years of discovery, that Pinnacle, despite its repeated representations to the contrary, had not produced relevant documents clearly responsive to Rottlund's requests. That was the catalyst, but the motion involves much more than this isolated incident. The Court has lost some confidence in Pinnacle and its counsel's efforts in conducting discovery due to a troubling pattern of conduct involving abuse of the judicial process, discovery incompetence, and defiance of Court orders, not to mention periodic episodes of brazen disrespect to the Court and an instance of cowardly harassment during a deposition. The climax is this motion, but the problems have been building over a long period of time. Sanctions are warranted.

## II. FINDINGS OF FACT

*2 The Court notes at the outset that its familiarity with all aspects of this case is pervasive given the status conferences that the Court has conducted at a rate of at least one per month since approximately October of 2002 as well as discovery and dispositive motion practice. That said, the Court makes the following findings.

### A. *Pinnacle's Lack of Candor in Connection with Its Motion to Dismiss for Lack of Personal Jurisdiction*

On July 5, 2001, Rottlund sent Pinnacle a cease and desist letter warning Pinnacle that it was engaging in architectural design copyright infringement. (Davenport Aff. ¶ 74). Pinnacle's general counsel, Peter Brennan, obtained the letter and gave it to Pinnacle's in-house architect, Steve Sandelin. Four days later, Sandelin took the letter and faxed it to Larry Moore, an architect at BSB, and stated:

> Please see the attached letter, where Rottlund's attorney references the back to back townhomes your firm *designed* for *our* Centennial Crossing community in Maple Grove, MN. They are obviously similar to Rottlund's Villa product. Are these *designs* under a co-ownership agreement with them or are they yours alone? What's our situation with them? We need to develop a response quickly.

(Davenport Aff. Ex. 23) (emphasis added).

On July 17, 2001, attorney Dean Karau from the law firm of Fredrikson & Byron responded to Rottlund's cease and desist letter. (Davenport Aff. Ex. 24). Karau's letter made clear that Pinnacle d/b/a Town & Country knew townhome designs were at issue but wanted Rottlund to clarify exactly which designs allegedly were being infringed. *Id.*

Rottlund filed suit against Pinnacle on October 30, 2001, alleging infringement of its technical drawing copyright. (Compl. ¶ ¶ 13-14, 23, Ex. A). At this point, Pinnacle was represented by the Fredrikson & Byron firm. Pinnacle answered the complaint and asserted that this Court lacked personal jurisdiction over Pinnacle. (Davenport Aff. Ex. 5). Pinnacle asserted in its First Amended Answer that it "has never developed ... any homes on the Hollander Property, in the Centennial Crossing development ... in Maple Grove, or anywhere else in Minnesota." (Davenport Aff. Ex. 6, at p. 5-6). Almost three months after the complaint was filed, on January 22, 2002, Pinnacle served a motion to dismiss for lack of personal jurisdiction and filed it with the Court on February 15, 2002.

Pinnacle's argument, advanced by the Fredrikson & Byron firm, in support of the motion to dismiss was the bold, blanket assertion that Pinnacle has never had any contact with Minnesota with regard to townhomes, and, more specifically, Pinnacle "had no involvement in any way in developing the Hollander Property [the Centennial Crossing development in Maple Grove, Minnesota]." (Davenport Aff. Ex. 26, at 5). Pinnacle also argued in its reply memorandum that it "has not taken any action inside or outside Minnesota that is affecting Rottlund in Minnesota," and "[t]he Court should *deny Rottlund's request to go fishing for non-existent facts relating to jurisdiction.*" (Davenport Aff. Ex. 12, at 22, 26) (emphasis added). [FN3] As explained below, the waters of Pinnacle were an angler's paradise, but the locals would have rather not revealed their hot spots.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

***3** On April 2, 2002, prior to oral argument on Pinnacle's motion to dismiss, Pinnacle attorney Dean Karau spoke with James Grundmeier, an architect from BSB. (Davenport Aff. Ex. 30). Grundmeier forwarded Larry Moore's--another BSB architect--design file to attorney Karau, which was received on April 3, 2002. *Id.;* (Davenport Aff. Ex. 32). As Rottlund thoroughly explains in its brief, (Rottlund Mem. in Supp. of Mots. for Sanctions, at 9), Larry Moore's design file contains several documents that unequivocally demonstrate that *Pinnacle architect Steve Sandelin was heavily involved in designing the allegedly infringing townhomes in Minnesota:*

1. On April 9, 1998, BSB architect Larry Moore sent Art Plante, TCM's president, townhome designs for a product in the Chicago market and stated: "[w]e can't use these units, but this concept might be worth considering for the Minneapolis area.... I believe Doug Buster and Steve Sandelin are meeting on Friday to discuss the possibilities." (Davenport Aff. Ex. 32, at D00252).
2. On May 5, 1998, Larry Moore sent Steve Sandelin a "[c]ompetition product survey for the Minneapolis area" concerning the Villa townhomes. *Id.* at D00225.
3. On May 14, 1998, BSB architect Chris Jorgensen sent Steve Sandelin a revised concept plan and partial elevation for the Villas. *Id.* at D00214.
4. On May 30, 1998, Larry Moore sent Steve Sandelin revised schematic unit plans for the Villas. *Id.* at D00205.
5. On June 2, 1998, Chris Jorgensen sent Steve Sandelin and Art Plante revised master bath and closet designs for the Villas. *Id.* at D00203.
6. On June 10, 1998, Larry Moore sent Steve Sandelin and Art Plante revised plans for Unit A and B "per your most recent comments." *Id.* at D00196.
7. On June 26, 1998, Chris Jorgensen, at the request of Art Plante, sent Steve Sandelin the "latest floor plans & elevations" for the Villas for Sandelin's review and comment. *Id.* at D00178.

These documents are all significant because they show, or at the very least are highly relevant, to the question of Pinnacle's (Steve Sandelin) direct involvement in the design of the Villas, which were later renamed the Homestead Collection. The Homestead Collection/Villas are one of the main townhome products *in Minnesota* that allegedly infringe Rottlund's copyrights, and in the initial complaint Rottlund alleged that the *design* of the Homestead Collection/Villas infringed its *technical drawing.* Thus, the initial complaint pitted design versus design. In other words, these documents are directly relevant to specific personal jurisdiction.

Indeed, at a deposition occurring in December of 2002, Steve Sandelin admitted that he was involved in the design process of TCM's back-to-back, Villa townhome (the Homestead Collection) because TCM's president, Art Plante, needed his expertise. (Davenport Aff. Ex. 34, at 84:6-86:23); *see also* (Murdoch Aff. Ex. 10, at 255:21-23) ("Those are the only three areas [Chicago, Florida, and Minneapolis] that I've been involved with as far as product development.").

***4** Based on its motion to dismiss, Pinnacle initially refused to provide Federal Rule of Civil Procedure 26(a) disclosures. (Davenport Aff. Ex. 28 and 29). At a meet and confer held on April 3, 2002, the same day Pinnacle's counsel received Larry Moore's design file, Pinnacle's counsel failed to disclose the existence of Moore's file and resisted amending the Rule 26(a) disclosures given the motion to dismiss. (Davenport Aff. Ex. 29; ¶ 75-76). The next day, April 4, 2002, Pinnacle served amended Rule 26(a) disclosures but did not mention Larry Moore's design file demonstrating Steve Sandelin's involvement in the design process or identify Sandelin, Moore, Grundmeier, Buster, Jorgensen, or BSB as individuals/entities likely to have discoverable information. (Davenport Aff. Ex. 35). The same goes for the second amended Rule 26(a) disclosures served on April 12, 2002. (Davenport Aff. Ex. 36).

On April 22, 2002, about twenty days after Pinnacle's counsel received Larry Moore's design file, oral argument was heard on Pinnacle's motion to dismiss for lack of personal jurisdiction. Pinnacle's counsel advanced the arguments contained in their briefs and stated, among other things, that "Pinnacle hasn't done anything from where it sits that has caused these townhomes to be built in Minnesota that Rottlund alleges is now injuring it." (Davenport Aff. Ex. 37, at 18:15-17). The undersigned recommended denial of the motion to dismiss.

Pinnacle objected to the undersigned's Report and Recommendation and argued again that "[t]here is *no evidence that Pinnacle actually designs,* builds or sells homes *in Minnesota, let alone the town homes at issue.*" (Davenport Aff. Ex. 16, at 14) (emphasis added). The Honorable David S. Doty rejected Pinnacle's arguments, adopted the undersigned's recommendation, and noted that "the facts overwhelmingly demonstrate defendant has sufficient minimum contacts with Minnesota." July 19, 2002 Order, at 5.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

In September of 2002, Pinnacle changed counsel. Fredrikson & Byron was terminated as counsel for Pinnacle and the firm of Holland & Knight assumed the role of lead counsel for Pinnacle with the Donna & Daly firm serving as local counsel for Pinnacle. Fredrikson & Byron remained lead counsel for TCM.

Rottlund conducted a Rule 30(b)(6) deposition of Pinnacle in December of 2002. Steve Sandelin testified on behalf of Pinnacle concerning the company's architectural drafting processes. Sandelin, on behalf of Pinnacle, revealed that in 1998 he traveled to Minnesota and toured Rottlund's Villa II townhome with TCM's president and BSB architects, (Davenport Aff. Ex. 42), pictures were taken during the tour, (Davenport Aff. Ex. 43), and brochures of Rottlund's Villa II townhome were obtained. (Davenport Aff. Ex. 44). Of significant importance, Sandelin also identified for the first time a file he kept that he pointedly referred to as "a great big file called Minnesota." (Davenport Aff. Ex. 45, at 126:23). This great big Minnesota file was responsive to Rottlund's first set of discovery requests served on March 21, 2002 but had not been produced. (Davenport Aff. Ex. 55, Int. No. 4, Doc. Req. no. 24). Of course, neither the great big Minnesota file nor Sandelin's trips to Minnesota to tour the very townhomes Rottlund alleges were infringed were disclosed to the Court when Pinnacle repeatedly argued that it had absolutely no contacts with Minnesota in its personal jurisdiction motion.

***5** In January of 2003, Rottlund moved for sanctions regarding Pinnacle's motion to dismiss for lack of personal jurisdiction and general discovery misconduct. At that time, the Court acknowledged that Rottlund's arguments had some merit but declined to impose sanctions. August 15, 2003 Order, at 19 (Doc. No. 257). The Court will not revisit the issue of whether to impose Rule 11 sanctions for Pinnacle's motion to dismiss for lack of personal jurisdiction, but the events surrounding the motion to dismiss, which the Court believes are presented in greater detail than in the earlier motion, greatly inform the pattern of misconduct described herein.

**B. *Pinnacle's Failure to Obey the Court's Order to Produce Revenue and Cost Information***

Twice in October of 2002 (Doc. No. 105 and 106), the Court ordered Pinnacle to produce all revenue and cost information for *all* townhome products in each development where allegedly infringing townhomes were located. The Court conducted multiple status conferences regarding how the revenue and cost information was to be produced. At a status conference held on or about November 22, 2002, Matthew Farmer, counsel for Pinnacle, made available Pinnacle's Chief Financial Officer, Paul Anderson, to explain the burden of producing revenue and cost information in the manner that Rottlund proposed. (Farmer Aff. ¶ 3); (Pinnacle's Mem. in Opp'n to Mot. for Sanctions, at 13-15). To the Court's surprise and in defiance of its Order, Mr. Anderson admitted that Pinnacle had unilaterally limited production of its revenue and cost information to only the infringing townhomes.

**C. *Example of Pinnacle's Counsel's Disrespect for the Court***

Throughout this case, one document has been repeatedly discussed--the BSB transmittal to Steve Sandelin at Pinnacle (d/b/a Town & Country Homes) referencing the enclosure of a "[c]ompetition product survey for Minneapolis area." (Davenport Aff. Ex. 32, at D00225). Rottlund has loudly voiced a reasonable suspicion that the competition product survey would likely have some reference to or include Rottlund materials, which, of course, would be potentially important evidence regarding access. Unfortunately, Mr. Sandelin, the person to whom the survey was addressed, does not remember it and cannot find it. Larry Moore, the person who sent the survey, cannot find it. The Fredrikson & Byron firm, the entity that received Larry Moore's design file, avers that it does not have the survey.

In an effort to pin down the whereabouts/contents of the referenced competition product survey, the Court sought a stipulation regarding the contents of the Larry Moore design file sent to Pinnacle's former counsel, Fredrikson & Byron, on April 2, 2002. (Davenport Aff. Ex. 30). The Court made this effort because Mr. Moore's design file received by Fredrikson & Byron contained, at least, the transmittal page referencing the attached competition product survey. Pinnacle's former counsel (Fredrikson & Byron) readily agreed to a stipulation. However, without any understandable basis, Pinnacle's current counsel (Holland & Knight) refused. In the course of that dialogue, Pinnacle's counsel, Scott Petersen, exhibited brazen disrespect for the Court. The following exchange occurred between the Court and Mr. Petersen:

> ***6** Court: Mr. Petersen, let me ask you to respond here. I presume that Pinnacle has no objection--I mean takes the same position as TCM does on these documents that you'd be willing to stipulate

since it was your counsel at the time that those are the documents that were attached and described as Larry Moor[e]'s design file.
Mr. Petersen: No. I'm not prepared to stipulate to that.
Court: And tell me why.
Mr. Petersen: May I confer with counsel?
Court: You may, yes.
Mr. Petersen: Your Honor, we just--we don't have information as to the file, as to the authenticity of the file, and I'm not prepared to stipulate here in open court just because counsel wants us to stipulate.
Court: But your counsel is already--I mean TCM has already done an affidavit, and the affidavit is from your counsel. They were your client's counsel at the time this issue arose. [FN4]
Mr. Petersen: Yes.
Court: So by stating to the Court that you're not prepared to stipulate, if you were in my shoes, that would be a big red flag that there's some shenanigans going on here. If you won't, and I won't make you decide that this moment, I'm going to have to let full bore discovery go forward because if this competition survey exists and it's been moved around because of the change of counsel or something, we better find out what happened.
Mr. Petersen: Your Honor, full bore discovery has been going on. We've been giving them everything and we've gotten nothing from them.
Court: Mr. Schwiebert does not want Mr. Karau to be deposed and I would prefer that he not be deposed.
Mr. Petersen: And I don't think it's appropriate.
Court: Well, but what I'm saying is that something--I'm smelling a rat here and you could take care of that by--
Mr. Petersen: Oh, Your Honor, please.
Court: --ensuring--
Mr. Petersen: Smelling a rat?
Court: Excuse me but this is the Court. Okay. I expect respect.
(Davenport Aff. Ex. 61, June 18, 2003 hearing).

The transcript, of course, does not capture the extremely sarcastic demeanor with which Mr. Petersen conversed. Mr. Petersen has not appeared since this incident.

### D. *Pinnacle's Counsel's Unprofessional Conduct During the Jorgenson Deposition*

Meanwhile, in August of 2003, an unprofessional, to say the least, incident unrelated to the competition product survey, or, frankly, to anything in this case, occurred during a deposition. On August 4, 2003, the deposition of Rottlund witness Steven Kahn occurred. Mr. Kahn is Rottlund's Chief Financial Officer. Mr. Kahn's testimony is important to understand what occurred at a later deposition. Mr. Kahn testified as follows:

Q: Is Rottlund currently trying to increase its market share in the Des Moines, Iowa market?
A: No.
Q: Why not?
A: Because we don't see Des Moines as a future market.
Q: Is Rottlund trying to maintain its status quo in terms of market share in Des Moines, or are you phasing it out?
*7 A: Can we go off the record? Can we do that?
Counsel for BSB: Not while a question's pending.
Mr. Krummen: Well then I'll object to proprietary, mark it as attorneys' eyes only. You may answer.
Witness: Okay. Our strategy is to phase out of the Des Moines Market within about two years.
(Kahn Dep., at 364:6-24).

A few weeks later Pinnacle took the deposition of Rottlund witness Jason Jorgenson. At the hearing on this motion, Rottlund's counsel explained who Mr. Jorgenson is:

He [Jason Jorgenson] is an employee of Rottlund's Iowa division. He was identified as someone who had discoverable information. Your Honor, he has information as to access. He knows about several employees that the Town & Country defendants hired away from Rottlund to work on the Homestead collection.... Jason Jorgenson is in his mid-20s. He has a family with three daughters. He lives about 52 miles away from Des Moines so he drives 52 miles [one way] every day to work. He lives so far away because his wife needs to live at home close to their mother because [Court interrupted] ... of health reasons ....
(January 28, 2004 Hearing, at 76:24-77:5, 77:19-78:4).

Christopher Carmichael, from the Holland & Knight law firm, took Mr. Jorgenson's deposition on behalf of Pinnacle. What occurred--obvious, bad-faith harassment--speaks for itself:

Mr. Carmichael: Do you enjoy working for Rottlund?
Mr. Jorgenson: Yes.
Mr. Carmichael: Do you see working for Rottlund in the future?
Mr. Jorgenson: Yes.
Mr. Carmichael: Here in Des Moines?

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Mr. Jorgenson: Yes.
Mr. Carmichael: Do you know Rottlund's current plans with regard to the market in Des Moines to expand here, or are they going to stop building in this area?
Mr. Jorgenson: The plans are to expand.
Mr. Carmichael: Do you know a man named Steven Kahn?
Mr. Jorgenson: Yes.
Mr. Carmichael: Do you know what his position is?
Mr. Jorgenson: CFO.
Mr. Carmichael: Of which company?
Mr. Jorgenson: Rottlund Homes.
Mr. Carmichael: Would it surprise you to learn Mr.--
Mr. Krummen: Instruct you not to ask that question or I'll move for sanctions.
(Jorgenson Dep., at 40:20-41:14).

Mr. Carmichael's intolerable conduct will be dealt with in Part II of this Order.

**E. *The "Competition Product Survey," Rottlund's Discovery Requests Set VI, and Pinnacle's Failure to Produce Relevant Documents***

The Court again attempted to resolve issues surrounding the referenced competition product survey during a November 21, 2003 status conference. [FN5] (Murdoch Aff. Ex. 27, at p. 55-85). Rottlund expressed concern that Pinnacle may be withholding production of the competition product survey based on baseless objections to Rottlund's Discovery Requests Set VI. *Id.* at p. 59:2-66:23. Specifically, request number one asks for all documents which reference or relate to the "Competition product survey for Minneapolis area" referenced in the May 1998 transmittal from Larry Moore to Steve Sandelin. (Murdoch Aff. Ex. 18, at 3). Pinnacle objected based on over breadth and undue burden. *Id.* at 4. Rottlund also noted that Pinnacle's general objections stated that Pinnacle was limiting its general production to the time period beginning February 1, 2000. *Id.* at 3; (Murdoch Aff. Ex. 27, at p. 62:23- 63:16). Finally, Rottlund feared that, based on Pinnacle's response that "relevant" documents related to the competition product survey had been produced, Pinnacle might be withholding documents relating to the Minnesota survey it considered irrelevant because of Pinnacle's position that the only relevant townhomes for purposes of Pinnacle were the Washington Square townhomes in Illinois. (Murdoch Aff. Ex. 27, at pp. 63:17-65:11, 68:1-3, 76:24-77:14). Mr. Farmer, on behalf of Pinnacle, then stated that Pinnacle does have a general time period objection but has produced documents beyond that time period pursuant to specific orders. *Id.* at 67:1-68:3. Mr. Farmer noted, "Mr. Sand[e]lin is going to be deposed again in a couple of weeks. He's produced what he has. And you know, whether Mr. Krummen wants to speculate what's sitting in Mr. Sand[e]lin's office. It's neither here nor there." *Id.* at 68:19-23.

***8** Given the record, the Court ordered an amended answer to document request number one of Rottlund's Set VI "signed by the client that they have done a thorough search of all of the Pinnacle files going back not limited to Illinois, not limited in time, no limitations, okay, to locate what appears to have been a document [the competition product survey] that was once in their possession." *Id.* at 69:12-19. Mr. Farmer said he would be happy to secure such a response. *Id.* at 69:4, 69:20.

The Court held another status conference a few days later on November 26, 2003 and similar issues arose. This time, however, the Court ordered Pinnacle to revamp its discovery responses in general, not just the response specific to the competition product survey request. The discussion was particularly important because Rottlund was scheduled to take potentially final, key depositions of Pinnacle personnel the week of December 8, 2003. Pinnacle was represented by Christopher Murdoch during the conference, and Rottlund was represented by Craig Krummen. Mr. Murdoch started the discussion off by asserting:

> And I think what we're seeing here, Your Honor, is a situation where they don't want to take our depositions yet because they know that once they take our people's depositions then discovery is basically complete and they will end up with what they have, which is nothing.

(Murdoch Aff. Ex. 28, at 14:7-12).

Mr. Krummen responded to the Court's question about a basis to delay the depositions:

> The reason Rottlund does not want to go forward with the Pinnacle depositions until these issues are resolved is because Rottlund does not have the documents it needs to fairly take these depositions despite two years of discovery....
> And I can't fathom coming back to the Court for a third round of Pinnacle depositions because they've withheld key materials that predate February of 2000.

*Id.* at 15:17-22, 16:21-24.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Rottlund described some of Pinnacle's objections to its discovery requests that arose during the November 21, 2003 conference and asserted:

> We face Pinnacle fencing us out of any materials that predate February of 2000, and fencing us out of anything beyond that single Illinois development....
>
> So Pinnacle would love for us to come to Chicago on December 8 and ask questions about materials that have never been produced, and then start this whole process again. And then argue they had their seven hours. It's not our fault they wasted it trying to figure out whether documents existed or not.
>
> A more measured approach and a more reasonable approach is to clean up all of what we consider frivolous objections, get the responsive documents, and then go forward with the single round of Pinnacle depositions, not a piecemeal round of several depositions.

*Id.* at 18:6-9, 18:22-19:9.

Mr. Murdoch boldly retorted:

> That's absolutely false, Your Honor, completely 100 percent unadulterated untrue, Your Honor. Pinnacle's only development, only developed by Pinnacle which has any back-to-back in it is the Washington Square.
>
> ***9** We limited production to 2000 because that's when we started considering a back-to-back in Illinois. Town & Country didn't so limit its production. So they have all of the documents relating to pre-2000 from Town & Country.
>
> *Pinnacle doesn't have documents left to produce, Your Honor.*

*Id.* at 19:12-25 (emphasis added).

Later, the Court began to ask Mr. Murdoch the following question, "Have you in the produced documents limited to the Washington Square development--", but was interrupted. *Id.* at 26:14-16. Continuing the Court asked:

> Okay. Is it your position that you have produced relevant documents from 1998 forward which would be responsive to the requests that--that Rottlund has given you, or did you limit your production to 2000 forward and to that Washington Square development with the exception of the one request where I ordered that those additional architectural drawings be produced?
>
> Mr. Murdoch: Your Honor, my understanding is that the 2000 date is when the Washington Square development started conceptually in Illinois. We have produced everything relating to the Washington Square development. And we have also produced documents predating 2000 which are relevant or are likely to lead to the discovery of relevant information relating to Minnesota activities.
>
> Court: *All right. What I want you to do is this, because I'm not satisfied that Pinnacle has--that someone at Pinnacle--in part because I see different lawyers every time, but that someone has really taken the bull by the horns here. And I tried to do so with Mr. Farmer at the last hearing.*
>
> I want to be clear--and maybe the way to do that is for you to remove those objections and to be clear in your responses, that you have looked for any relevant documents, that is documents requested by the Plaintiffs that date back to January 1997 forward, that you've produced all those. And that you're not withholding documents based on the objections that you assert, which is we're only producing documents 2000 forward and we're only producing documents in connection with the Washington Square development.
>
> *I need you to go back and take a look at that. I am not satisfied that it's been done.*
>
> Mr. Murdoch: *Your Honor, I don't have to go back and look at that. I can assure you that that has been done and I can get you an affidavit from whoever our custodian of record is that says that we have produced everything relating to--other than--other than privilege or attorney-client privilege that everything in Chicago that relates to these accused Minnesota products ... has already been turned over to the Plaintiffs.*
>
> Court: I think it's very important then that you update your pleadings. I don't want an affidavit. I want updated pleadings that reflect what you have done.

*Id.* at 27:14-29:17, 29:22-30:1 (emphasis added).

Given Mr. Murdoch's representations as an officer of the Court that all documents had been produced, the Court ordered the scheduled Pinnacle depositions to proceed. Rottlund was not convinced and stated:

> ***10** [I]f you're ordering them to [proceed with depositions] on the 8th, I respectfully request we place a bookmarker right here today. Because if that representation is being made, all the parties should take it seriously. And I think the Court should remember it down the road.

*Id.* at 46:17-23.

Mr. Murdoch agreed:

> *I observed the Court's attitude towards these types of issues. I am not making representations lightly. And I suggest that Rottlund proceed with these depositions. And they will be more than satisfied with what they discover, which will be nothing.*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

*Id.* at 47:2-9 (emphasis added).

The Court penned the mental mark: "You can be assured, Mr. Krummen, that the Court recalls the history of this case." *Id.* 47:11-13.

Thus, two clear orders were in place: (1) the Court ordered Pinnacle, at the November 21, 2003 conference, to remove all objections to the competition product survey requests in Rottlund's Discovery Requests Set VI--except for privilege objections which require a log--and submit an answer that all Pinnacle files had been thoroughly searched with no limitations placed on the search; and (2) the Court ordered Pinnacle, at the November 26, 2003 conference, to remove the 2000 forward objection (documents were to be produced January 1997 forward) and remove the Washington Square limitation (documents were to be produced regarding the allegedly infringing townhomes in Minnesota) that Pinnacle interposed to Rottlund's Discovery Requests Set VI.

Yet another status conference was held days later on December 4, 2003. Pinnacle had given Rottlund its Court ordered "updated" responses to Rottlund's Discovery Requests Set VI. Remarkably, the most pertinent competition product survey request, request number one, included potential relevance and privilege (with no log) objections: "Pinnacle states that any *relevant, non-privileged* documents in its possession or control that are responsive to this request have already been produced in this litigation." (Emphasis added). The Court noted that the relevancy objection was wholly unfounded given the Court's prior instructions; if it were to remain, Pinnacle could hide behind its theory that the only relevant documents are those that relate to the Washington Square development in Illinois, and documents concerning Minnesota townhomes, including the competition product survey for Minnesota, were irrelevant. Moreover, request number 8 sought documents that relate to all back to back townhome competition product surveys generated by Pinnacle, but Pinnacle objected on the basis that the phrase "competition product survey" was vague and ambiguous. The Court noted its concern:

> [Y]ou see what's happened here is that I specifically asked Mr. Murdoch, I believe it was, and I apologize if it wasn't Mr. Murdoch, to file an updated answer so that it would be clear and instead he objects to competition product survey as being ambiguous. Those are the words in the transmittal. There's nothing ambiguous about what's being referred to and then objects on relevance and privilege grounds. I can't fathom it unless it's in bad faith. He must think there are irrelevant documents related to the question or there must be privileged documents that he's apparently not producing, why else would he assert those objections?
>
> *11 Mr. Farmer: I suppose to the extent any privileged documents existed we were maintaining that privilege, but I will also--
>
> Court: But if there's privileged documents, I want to know that.

(Court Tape Nos. 292-93, December 4, 2003 conference).

Then, Mr. Farmer remarkably admitted that the privilege objection, inserted just days or hours earlier by Pinnacle and its counsel, was baseless.

> Farmer: And there will be a log produced. In this case, I can tell you, I will represent that there are none. I think that this was probably an example of, you know, a lawyer being cautious and wishing not to waive any privilege.
>
> Court: Alright, I want these two requests, and I want you to go through the other requests. I want a new updated set to the Plaintiff before the deposition. So I want it by Friday.
>
> Farmer: And that's for, just so I'm clear Your Honor, which set?
>
> Court: It looks like, well this is called set VI.
>
> Farmer: Set VI to Pinnacle.
>
> Court: And it's called "Pinnacle's Updated Supplemental Responses." Mr. Farmer, you understand what I want, go through here and make sure you either say you have the documents or you don't.

*Id.*

Also arriving on December 4, 2003, was an affidavit from Pinnacle's general counsel, Peter Brennan. Brennan stated that "[i]n connection with Pinnacle's document gathering process, Pinnacle has scoured its files (including the files of its officers and employees) for all documents that relate (or may relate) to the May 5, 1998 transmittal sheet [the competition product survey for Minnesota] that I reference in paragraph 2 of this affidavit." (Murdoch Aff. Ex. 9, ¶ 3).

The Pinnacle depositions occurred the week of December 8, 2003. Rottlund's concerns materialized. Steve Sandelin, Pinnacle's in-house architect, revealed once again the existence of unproduced responsive documents--this time Rottlund brochures. Even according to Pinnacle's counsel, it did not take

"intense investigation or strenuous cross examination" to discover the existence of Sandelin's brochure file. (Davenport Aff. Ex. 48, at 2). Sandelin testified in relevant part as follows:

Mr. Krummen: Now, what have you done to look for the competition product survey for the Minneapolis area that's referenced on D00225 of Exhibit 225? And please be as specific as possible.
Mr. Sandelin: I've gone through every file or area of my office that would relate to Minnesota to find that document.
Mr. Krummen: What files have you gone through?
Mr. Sandelin: Minnesota, Washington Square, and various product files.
Mr. Krummen: What product files?
Mr. Sandelin: Brochure files.
Mr. Krummen: What brochure files?
Mr. Sandelin: I have--you know, for work that we were doing in Chicago, for work that we've done elsewhere.
Mr. Krummen: What is elsewhere?
Mr. Sandelin: Florida, Minneapolis. It would be general information. I may have stored it there, but I've not found anything.
*12 Mr. Krummen: Now, you said you looked through your Minnesota file for the competition product survey, correct?
Mr. Sandelin: Correct.
Mr. Krummen: And you looked through a Washington Square file for the competition product survey, correct?
Mr. Sandelin: Correct.
Mr. Krummen: Then you looked through product files, correct?
Mr. Sandelin: Yes.
Mr. Krummen: Are those the same as brochure files?
Mr. Sandelin: Yes.

* * *

Mr. Krummen: I asked you where these brochures were from and you said Chicago, Florida, and Minneapolis, correct?
Mr. Sandelin: For, not from.
Mr. Krummen: What do you mean for as opposed to from?
Mr. Sandelin: Those are the only three areas that I've been involved with as far as product development.

* * *

Mr. Krummen: Have you produced in this litigation all of your brochure files for Minneapolis?
Mr. Sandelin: No.

* * *

Mr. Krummen: And my question is: If it [the competition product survey] got misfiled, you've not taken the next step and looked through everything to try to find it, correct?
Mr. Farmer: [objection].
Mr. Sandelin: No, I have not.

* * *

Mr. Krummen: Why did you not turn over your brochure file for the Minneapolis area?
Mr. Sandelin: I didn't think of it, I suppose. It was, you know, more of a library file for me.
Mr. Krummen: You didn't think of it, but you did look through your brochure file for the Minneapolis area when you were trying to find the competition product survey, correct?
Mr. Sandelin: Correct.

(Murdoch Aff. Ex. 10, at 253:15-255:5, 255:14-13, 256:8-11, 257:19-258:3, 263:22-264:9).

Mr. Sandelin's brochures of Rottlund's townhomes were responsive to any number of discovery requests from Rottlund's Discovery Requests Set VI--the very set of requests discussed at the November 21, November 26, and December 4, 2003 conferences. *See* Murdoch Aff. Ex. 18 (Set VI), req. no. 4, req. no. 46, req. nos. 48-49, req. no. 51, req. no. 53; [FN6] Murdoch Aff. Ex. 19 (Set VII), req. no. 5. [FN7]

After this incident, Rottlund informed the Court of what happened and requested sanctions in a status conference on December 18, 2003. The Court, noting what had become a pattern of discovery incompetence, indicated that a formal motion for sanctions would be necessary. Rottlund moved for sanctions against Pinnacle and its current and former counsel. A lengthy hearing was held spanning portions of three days--January 28, February 5, and February 23, 2004.

## III. DISCUSSION

### A. *Applicable Legal Standards*

Sanctions are considered based on the record as a whole, rather than merely considering the latest instance of misconduct that broke the camel's back. *Nat'l Hockey League v. Metro. Hockey Club, Inc.,* 427 U.S. 639, 642, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (*citing Link v. Wabash R. Co.,* 370 U.S. 626, 634-35, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)); *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.,* 602 F.2d 1062, 1068 (2d Cir.1979) (

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

"[S]anctions must be weighed in light of the full record in the case.").

### 1. Rule 26(g)

***13** Federal Rule of Civil Procedure 26(g) "imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37." Fed.R.Civ.P. 26(g), adv. comm. notes 1983 amendments. The spirit and purpose of the discovery rules were clearly delineated by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 500-01, 67 S.Ct. 385, 91 L.Ed. 451 (1947):

> The pre-trial deposition-discovery mechanism established by Rules 26 to 37 is one of the most significant innovations of the Federal Rules of Civil Procedure.... The various instruments of discovery now serve (1) as a device, along with the pre-trial hearing under Rule 16, to narrow and clarify the basic issues between the parties, and (2) as a device for ascertaining the facts, or information as to the existence or whereabouts of facts, relative to those issues. Thus civil trials in the federal courts no longer need be carried on in the dark. The way is now clear, consistent with recognized privileges, for the parties to obtain the fullest possible knowledge of the issues and facts before trial.

To that end, Rule 26(g) provides in pertinent part:

> (2) Every discovery request, response, or objection made by a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name, whose address shall be stated. An unrepresented party shall sign the request, response, or objection and state the party's address. The signature of the attorney or party constitutes a certification that to the best of the signer's knowledge, information, and belief, *formed after a reasonable inquiry*, the request, response, or objection is:
> (A) consistent with these rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law;
> (B) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation ....
> (3) If without substantial justification a certification is made in violation of the rule, the court, upon motion or upon its own initiative, shall impose upon the person who made the certification, the party on whose behalf the disclosure, request, response, or objection is made, or both, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney's fee.

(Emphasis added).

The rule explicitly encourages sanctions where counsel or a party makes a faulty response after failing to conduct a reasonable inquiry under the circumstances. Fed.R.Civ.P. 26(g), adv. comm. notes 1983 amendments ("Rule 26(g) makes explicit the authority judges now have to impose appropriate sanctions and requires them to use it."); *see also St. Paul Reinsurance Co., Ltd. v. Commercial Financial Corp.*, 198 F.R.D. 508, 515-16 (N.D.Iowa 2000). What constitutes a reasonable inquiry depends on the "totality of the circumstances." Fed.R.Civ.P. 26(g), adv. comm. notes 1983 amendments. Objective reasonableness is guided by case law under Rule 11. *In re Byrd, Inc.*, 927 F.2d 1135, 1137 (10th Cir.1991).

### 2. Rule 37(b)

***14** Federal Rule of Civil Procedure 37(b) provides for a spectrum of sanctions when a party "fails to obey an order to provide or permit discovery." An oral order suffices for purposes of Rule 37(b) as long as it " 'unequivocally give[s] a litigant notice' of the discovery required" *Avionic Co. v. Gen. Dynamics Corp.*, 957 F.2d 555, 558 (8th Cir.1992).

[1] Pinnacle submits that a willful violation of a court order is necessary before *any* sanction may be imposed under Rule 37(b). The Court disagrees. It is true that the Eighth Circuit Court of Appeals has stated that "[i]n order to impose sanctions under Rule 37, there must be an order compelling discovery, a willful violation of that order, and prejudice to the other party." *Chrysler Corp. v. Carey*, 186 F.3d 1016, 1019 (8th Cir.1999) (*citing Baker v. General Motors Corp.*, 86 F.3d 811, 816 (8th Cir.1996), *rev'd on other grounds*, 522 U.S. 222, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998)). The Court finds, however, that a careful reading of the Eighth Circuit's cases, and the rule itself, reveals that "willfulness" or "bad faith" is only required where dismissal or effective entry of default is the sanction imposed. [FN8] For instance, in *Edgar v. Slaughter*, 548 F.2d 770, 772 (8th Cir.1977), the Eighth Circuit explained: "When noncompliance is the result of dilatory conduct by counsel, the courts should investigate the attorney's responsibility as an officer of the court and, if appropriate, impose on the client sanctions less extreme than dismissal or default, *unless it is shown that the client is deliberately or in bad faith failing to comply with the court's order.* " (Emphasis added);

*see also* Savola v. Webster, 644 F.2d 743, 745-46 (8th Cir.1981) ("Where, however, the drastic sanctions of dismissal or default are imposed, the range of discretion is more narrow and the losing party's noncompliance must be due to willfulness or bad faith.").

The Court's conclusion that the level of culpability is relevant only to the selection of the type of sanction imposed is explicitly supported by Rule 37's advisory committee notes for the 1970 amendment. [FN9] Moreover, "[t]he weight of authority ... holds that the culpability of a party who fails to comply with a court order determines only which sanctions the court should impose and not whether any sanctions are appropriate at all." *Halas v. Consumer Serv., Inc.*, 16 F.3d 161, 164-65 (7th Cir.1994) (internal quotations omitted); *see also* *Bollard v. Volkswagen of America, Inc.*, 56 F.R.D. 569, 583 (W.D.Mo.1971).

### 3. Inherent Power

[2] Pursuant to its inherent powers, a court may "fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). "When rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap," *Shepherd v. Am. Broadcasting Cos., Inc.*, 62 F.3d 1469, 1474 (D.C.Cir.1995), but "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Chambers*, 501 U.S. at 49, 111 S.Ct. 2123.

***15** There is a split among the circuits with regard to whether a court can impose certain types of sanctions pursuant to its inherent powers without a finding of bad faith. *United States v. Seltzer*, 227 F.3d 36, 41 (2d Cir.2000) (collecting cases). The Eighth Circuit has stated that "the 'bad faith' requirement [does not extend] to every possible disciplinary exercise of the court's inherent power," *Harlan v. Lewis*, 982 F.2d 1255, 1260 (8th Cir.1993), such as "a monetary sanction against counsel," *Dillon v. Nissan Motor Co.*, 986 F.2d 263, 267 (8th Cir.1993), but "[a] bad faith finding is specifically required in order to assess attorneys' fees." *Stevenson v. Union Pacific R. Co.*, 354 F.3d 739, 751 (8th Cir.2004).

### 4. 28 U.S.C. § 1927

Section 1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

### B. Sanctions to be Imposed

At the outset, the Court emphasizes that the imposition of sanctions is informed by and based upon the history of incidents of abuse, incompetence, defiance, and misconduct (many of which are sanctionable individually), not merely the latest incident. *Chrysler Corp. v. Carey*, 186 F.3d 1016, 1020 (8th Cir.1999) ("While the production of the letter on the fourth day of trial may have been the catalyst for the investigation leading to the imposition of the sanction, a fair appraisal of the record reveals that the court was motivated in fact by a systematic pattern of abuse and 'blatant disregard of the Court's orders and the discovery rules.' "); *Penthouse Int'l, Ltd. v. Playboy Enter., Inc.*, 663 F.2d 371, 388 (2d Cir.1981) ("[I]t would be excessively formalistic to view the defiance of the order in isolation rather than against the background of Penthouse's prolonged and vexatious obstruction of discovery ...."). With that, the Court opens its discussion at the beginning.

### 1. Lack of Candor

[3] The Court finds that Pinnacle and/or its counsel's lack of candor in connection with Pinnacle's motion to dismiss for lack of personal jurisdiction abused the judicial process and constituted a reckless disregard for their obligations to the Court, such conduct, at least with regard to Pinnacle, being tantamount to bad faith. From the time it received the cease and desist letter from Rottlund's counsel, Pinnacle knew that townhome *designs* or technical drawings were at the center of the dispute between the companies. Pinnacle's general counsel, Peter Brennan, immediately gave the letter to Pinnacle's in-house architect, Steve Sandelin. Sandelin sent the letter to BSB and asked if the designs were under a co-ownership agreement with Rottlund. Thus, the key people at Pinnacle were aware of what was at issue from the beginning--designs.

***16** Nevertheless, Pinnacle moved to dismiss for lack of personal jurisdiction boldly asserting that it had no contacts with Minnesota and certainly no contacts with Minnesota that related to the cause of action-- designs. In doing so, Pinnacle failed to inform the Court, and its counsel, of a wealth of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works