Rottlund / Pinnacle 01-1980 (DSD/SRN)
Exhibits to July 29, 2004 Davenport Affidavit

# Exhibit 2.2

contacts it had with Minnesota, including contacts that specifically related to the cause of action. Despite the initial complaint alleging infringement of a technical drawing for a townhome being built in Minnesota (a townhome from the Centennial Crossing development in Maple Grove, Minnesota), Pinnacle never divulged to its counsel or the Court that Pinnacle's in-house architect, Steve Sandelin, was involved in, what turns out to be, the design of this very townhome--now known to be a Homestead Collection townhome, but previously known, during the design, as the Villas. [FN10]

For instance, the Court was not informed about Steve Sandelin's "great big file called Minnesota." (Davenport Aff. Ex. 45, at 126:23). Rather, it took a Rule 30(b)(6) deposition of Mr. Sandelin taken in December of 2002, almost a year after the motion to dismiss was filed, for the existence of the great big Minnesota file to be revealed. Pinnacle argues that the great big Minnesota file was not produced in response to Sandelin's revelation during his deposition. According to Pinnacle, it produced the Minnesota file pursuant to Rottlund's Fourth Set of Discovery Requests, and its response to those requests was not due until after Sandelin's deposition. Pinnacle is mistaken. The great big Minnesota file should have been produced in response to Rottlund's very first set of discovery requests served on March 21, 2002. (Davenport Aff. Ex. 55, Int. No. 4, Doc. Req. No. 24). [FN11] Any failure to produce a file *known to Pinnacle as* "a great big file called Minnesota" in response to Rottlund's first set of discovery was possibly a violation of Federal Rule of Civil Procedure 26(g) because a minimally competent or objectively reasonable investigation obviously would have revealed such an important file. The Court finds it more likely, however, that the fault lies with Pinnacle, specifically its in-house counsel Peter Brennan, in failing to disclose the file to its outside counsel. The Court notes that a "party is charged with knowledge of what its agents know or what is in the records available to it." *Poole ex rel. Elliott v. Textron, Inc.*, 192 F.R.D. 494, 501 (D.Md.2000) (internal quotations omitted). In fact, it appears that Pinnacle actually knew the contents of the big Minnesota file were specifically relevant to this case. For instance, when Sandelin first revealed the big Minnesota file, he testified that he thought the Bayview design (the specific design the initial complaint alleged to be infringing) was in the Minnesota file. (Davenport Aff. Ex. 45, at 127:2-12). The great big Minnesota file was plainly relevant to the issue of personal jurisdiction but was not presented to the Court.

*17 Next, the Court was not informed about Steve Sandelin's physical presence in Minnesota for the specific purpose of touring, evaluating, and garnering ideas about, among other townhomes, Rottlund's Villa II. Sandelin came to Minnesota for tours more than once and during the tours pictures were taken and brochures of Rottlund's Villa II townhome were obtained. (Davenport Aff. Ex. 42, 43, 44). At least one of Sandelin's tours occurred in 1998, which was the time period for the "kicking off [of] the design process" for TCM's back to back townhome program. (Davenport Aff. Ex. 34, at 84:6-85:18). In addition, Pinnacle's "entire executive team," including Sandelin, toured Rottlund townhomes in Minnesota in September of 2001 because one particular townhome had a "unique style of architecture." (Davenport Aff. Ex. 11, at 33:22-23, 44:7-45:10).

Finally, the Court was not informed about the contents of the design file of BSB architect Larry Moore. As explained *supra* Part II(A), at 6-7, Larry Moore's design file demonstrates that Steve Sandelin of Pinnacle was directly involved with the design/development of allegedly infringing townhomes located in Minnesota. Pinnacle did not disclose Sandelin's involvement in the design process. This is despite the fact that Pinnacle's in-house counsel knew that designs were at issue and, within days of receiving the cease and desist letter, gave Steve Sandelin the letter to contact Larry Moore, the BSB architect with whom Sandelin was working on the designs. Here, however, is where Pinnacle's counsel failed in its responsibilities to the Court. BSB sent the Fredrikson & Byron firm Larry Moore's design file on April 3, 2002. (Davenport Aff. Ex. 30 and 32). This was about twenty days *before* oral argument on the motion to dismiss for lack of personal jurisdiction and long before the objections to the Report and Recommendation recommending denial of the motion were filed. In its objections filed June 5, 2002, Pinnacle's counsel argued "*[t]here is no evidence that Pinnacle actually designs,* builds or sells homes *in Minnesota, let alone the town homes at issue.*" (Davenport Aff. Ex. 16, at 14) (emphasis added). That statement is false. The evidence that Pinnacle's in-house architect was directly involved in the design of the townhomes at issue was sitting in Fredrikson & Byron's offices since April 3, 2002.

All of these facts are plainly relevant to personal jurisdiction but were never provided to the Court when Pinnacle argued so boldly that it had absolutely no contacts with Minnesota. Pinnacle admitted as much at the hearing on this matter:

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Mr. Murdoch: Now, the issues relating to Mr. Sand[e]lin about his visits to Minnesota and his touring of the projects and taking pictures and picking up brochures, those are all contacts which can create personal jurisdiction over his employer, Pinnacle. I concede that. They would create, I believe, specific jurisdiction over Pinnacle--
***18** Court: Yes.
Mr. Murdoch: --arising out of--so the actions must arise out of his visits to Minnesota.
Court: Because they specifically had to do with the alleged infringement in this case.
Mr. Murdoch: That's right.
(January 28, 2004 Hearing, at 92:24-93:14).

After reviewing the in camera affidavits submitted by the Fredrikson & Byron firm in connection with the previous motion for sanctions, the Court finds that Pinnacle and Pinnacle's outside counsel, the Fredrikson & Byron firm, are responsible for failing to bring this information to the Court's attention in connection with the personal jurisdiction motion. Pinnacle completely failed to disclose any of the above information to its outside counsel [FN12] despite questions by outside counsel that should have induced a response revealing Sandelin's design/development involvement, Sandelin's trips to Minnesota that involved tours, pictures, and brochures of Rottlund's townhomes, and Sandelin's great big Minnesota file. The Fredrikson & Byron firm's failure is limited to failing to disclose the contents of Larry Moore's design file despite it being in their possession well before oral argument on the motion and before filing objections to the Report and Recommendation.

Moreover, Pinnacle objected to participating in discovery while its motion to dismiss for lack of personal jurisdiction was pending. Worse yet, Pinnacle argued in its reply memorandum that "[t]he Court should deny Rottlund's request *to go fishing for non-existent facts relating to jurisdiction.*" (Davenport Aff. Ex. 12, at 26) (emphasis added).

The appropriate sanction for this lack of candor requires some analysis. A Rule 26(g) certification sanction would not apply because Pinnacle refused to participate in discovery. [FN13] *See generally United Missouri Bank v. Bank of New York,* 723 F.Supp. 408, 412-16 (W.D.Mo.1989) (sanctioning a party pursuant to Rule 26(g) for advocating that it had no contact with Missouri when a reasonable inquiry in response to interrogatories would have revealed the contacts that eventually came to light), *abrogated on other grounds by Lakin v. Prudential Sec., Inc.,* 348 F.3d 704, 708 n. 5 (8th Cir.2003). Since no discovery order was in place at the time, Rule 37(b) is inapplicable. Pinnacle also argues that it was not required to disclose Steve Sandelin's name or any of Sandelin's files in its initial disclosures pursuant to Rule 26(a)(1) because it did not plan to "use" Sandelin or his files "to support its claims or defenses." Fed.R.Civ.P. 26(a)(1)(A) and (B) (requiring disclosure where "the disclosing party may use [the person or documents] to support its claims or defenses"). The Court notes that "use" is construed quite broadly. Fed.R.Civ.P. 26(a)(1), advisory committee's notes 2000 amendment. More importantly, the Court knows of no rule that permits a party to withhold plainly relevant information that directly contradicts its assertions in the hopes that the Court will be duped by the misleading arguments and dismiss the withholding party from the suit. If Pinnacle were to have had it its way, the motion to dismiss for lack of personal jurisdiction would have "accomplished little more than the adjudication of a hypothetical fact situation imposed by [Pinnacle's] selective [or non] disclosure of information." *Rozier v. Ford Motor Co.,* 573 F.2d 1332, 1346 (5th Cir.1978). This was an abuse of the judicial process, and a gap, in these circumstances, that the Court's inherent powers should fill.

***19** The Court can come to no other conclusion, based on this incident, the obvious relevancy of the information, and the subsequent history of the case, that Pinnacle's lack of candor was the result of deliberate, willful conduct that is tantamount to bad faith. The Court cannot conclude, however, given the in camera affidavits, that the Fredrikson & Byron firm's lack of candor was willful or in bad faith. Therefore, the Court declines to impose a monetary sanction against Fredrikson & Byron.

The Court specifically imposes a sanction on Pinnacle pursuant to its inherent powers for its deliberate lack of candor. Pinnacle shall pay Rottlund twenty percent of the attorney fees and costs Rottlund incurred in defending against Pinnacle's motion to dismiss for lack of personal jurisdiction. Rottlund incurred $22,463.50 opposing the personal jurisdiction motion. (Krummen Aff. ¶ 7-9, Ex. B). The Court has reviewed the specific entries, including the rates charged, the tasks performed, and the hours allotted to specific tasks, and finds them reasonable. Had the information directly relevant to specific personal jurisdiction been disclosed to outside counsel, the motion to dismiss for lack of personal jurisdiction most likely would not have even been filed; thus, relieving Rottlund of all fees and

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

costs incurred. Moreover, Rottlund would not have been forced to scout the waters of Pinnacle for information related to general jurisdiction and other specific jurisdictional facts had the withheld information been disclosed. Finally, Rottlund would not have had to defend against the misguided argument regarding piercing the corporate veil because direct evidence of specific personal jurisdiction would have been known. A fine payable to the Court might also be appropriate, but the Court declines to make such order. Thus, the Court finds it fair and appropriate for Pinnacle to pay Rottlund $4,492.70 as a sanction.

The events surrounding the personal jurisdiction motion set the stage for the following events and informs the Court's decision regarding the appropriate sanction for other misconduct.

**2. Failure to Obey the Court's Order to Produce Revenue and Cost Information**

In November of 2002, Pinnacle failed to obey this Court's order to produce all revenue and cost information for all townhome products in each development where allegedly infringing townhomes were located. Pinnacle's chief financial officer, Paul Anderson, admitted that Pinnacle unilaterally limited production of the information to the allegedly infringing townhomes as opposed to all townhomes within developments where allegedly infringing townhomes were located. At the first day of hearings on this matter, Mr. Murdoch conceded Pinnacle's failure: "I can assure you that that was an error. He [Mr. Anderson] didn't know. He just ran it for the back-to-backs." (January 28, 2004 Hearing, at 144:5-7). Mr. Murdoch continued: "That's--we just--we blew it on that one too, Your Honor." *Id.* at 145:9-10.

***20** When the hearing on this matter continued days later, however, Mr. Murdoch's position changed. Mr. Murdoch claimed that Pinnacle did comply and that Paul Anderson was in error to say that Pinnacle limited its production. To support his new argument, Mr. Murdoch offered the full set of revenue and cost information showing that information for all townhome products had been produced. This argument demonstrates again the lack of care Pinnacle takes before it makes representations to the Court. As Rottlund explained in its supplemental letter dated February 17, 2004, Mr. Murdoch simply gave the Court what amounts to the end product of production after Pinnacle finally complied. The initial production was limited to allegedly infringing townhomes, but after the Court noted, and Mr. Anderson admitted, Pinnacle's non-compliance, Pinnacle ultimately complied by producing the required information. Ultimate production of material does not excuse initial disobedience where the production is untimely and especially where the ultimate compliance required further court involvement, as here. *See* *State of Ohio v. Arthur Andersen & Co.*, 570 F.2d 1370, 1374 (10th Cir.1978).

The undersigned conducted multiple status conferences on this very issue and finds that Pinnacle failed to comply with the Court's orders dated October 7, 2002 and October 10, 2002. The fact that the Court spent so much time parsing this issue only to have Pinnacle fail to comply was quite disappointing and suggests to the Court a lack of effort. This disobedience is independently sanctionable pursuant to Federal Rule of Civil Procedure 37(b)(2).

**3. Disrespect and Harassment**

As discussed *supra* Part II(C) and (E), the Court and the parties have devoted significant attention to a transmittal from BSB architect Larry Moore to Pinnacle architect Steve Sandelin referencing an attached "competition product survey for Minneapolis area." Nobody seems to know where the attached competition product survey for Minneapolis is or what the attachments may have been. When BSB forwarded Larry Moore's design file to Fredrikson & Byron, one of the documents in Larry Moore's file was the transmittal page referencing the competition product survey for Minneapolis. (Davenport Aff. Ex. 30 and 32). Thus, in an effort to pin down the potential contents of the attachment to the transmittal, the Court sought a stipulation from Pinnacle regarding the contents of Larry Moore's design file. TCM, represented by Fredrikson & Byron, was willing to stipulate to the contents of Larry Moore's file because Dean Karau of Fredrikson & Byron was the attorney, then representing Pinnacle, that received Mr. Moore's file. Curiously, Pinnacle refused to stipulate because they could not authenticate the contents of the file despite the fact that Pinnacle's former counsel and counsel that actually received the file was so willing. The Court pressed this point: "So by stating to the Court that you're not prepared to stipulate, if you were in my shoes, that would be a big red flag that there's some shenanigans going on here.... [I]f this competition survey exists and it's been moved around because of the change of counsel or something, we better find out what happened." (Davenport Aff. Ex. 61, at

27:11- 15, 27:18-21). The Court continued: "Well, but what I'm saying is that something--I'm smelling a rat here and you could take care of that by--" *Id.* at 28:6-8. Mr. Petersen then rudely interjected: "Oh, Your Honor, please. [Court: --ensuring--] Smelling a rat?" *Id.* at 28:9-12. The Court was then forced to correct Mr. Petersen's attitude and decorum, reminding him that he was addressing the Court. As previously mentioned, the transcript fails to adequately capture Mr. Petersen's sarcastic attitude. Rottlund's counsel noted that this colloquy was one of the most uncomfortable situations he has been in since practicing law.

***21** [4] A court's inherent powers fundamentally include the "power to impose silence, respect, and decorum, in their presence." *Chambers,* 501 U.S. at 43, 111 S.Ct. 2123. Mr. Petersen is one of the most senior attorneys admitted *pro hac vice* on behalf of Pinnacle. The conduct described above is not acceptable for an attorney at any level of experience, let alone an attorney with Mr. Petersen's experience. Mr. Petersen has not returned to appear on behalf of Pinnacle; should he, the undersigned will expect the respect and decorum deserving of this institution.

[5] Though it need not accept it, the Court is better equipped to handle periodic episodes of attorney misconduct than are lay witnesses. Christopher Carmichael's harassment of Rottlund witness Jason Jorgenson is intolerable. *See supra* Part II(D), at 12-14. There can be no doubt about what Mr. Carmichael was doing. Mr. Carmichael had read Steven Kahn's previous deposition, Rottlund's CFO, and discovered that Rottlund, according to Mr. Kahn, intended to eliminate the Iowa division. Then, during Mr. Jorgenson's deposition, who was a witness identified as having knowledge about access, Mr. Carmichael began to set up Mr. Jorgenson by asking him if he likes working for Rottlund and plans on staying there in the future. Mr. Jorgenson, of course, answered affirmatively and stated that he foresaw a future with Rottlund in Iowa. Mr. Carmichael asked if Mr. Jorgenson knew Mr. Kahn and what position Mr. Kahn had at Rottlund. Of course, Mr. Jorgenson answered affirmatively. Once the set up was complete, Mr. Carmichael went for the dagger: "Would it surprise you to learn Mr.--" (Jorgenson Dep., at 40:20-41:14). Mr. Krummen stepped in and strong-armed Mr. Carmichael into not finishing the obvious question by threatening sanctions. The Court imposes the sanctions now.

The unstated conclusion to Mr. Carmichael's question is obvious. Mr. Carmichael, an opposing attorney taking Mr. Jorgenson's deposition, wanted to be the first to tell Mr. Jorgenson, who is about 25 years old, drives 50 some miles one way to work, and has three daughters, that he was going to lose his job. This conduct is the epitome of bad faith harassment. The line of questioning had nothing to do with the lawsuit and was intended for no other reason than to inflict emotional angst. Further, the information Mr. Carmichael was about to reveal had been designated as confidential/attorneys-eyes-only. The Court finds Mr. Carmichael's conduct sanctionable under its inherent powers and 28 U.S.C. § 1927. It should go without saying that the Federal Rules of Civil Procedure permitting discovery by deposition give no license to intimidate, harass, or embarrass witnesses, but "[i]t is clear from experience that pretrial discovery by depositions and interrogatories has a significant potential for abuse." *Seattle Times v. Rhinehart,* 467 U.S. 20, 34, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). Unfortunately, Mr. Carmichael used the deposition practice for that purpose. [FN14] The Court finds the most appropriate sanction to be a written apology to Mr. Jorgenson and Rottlund. Mr. Carmichael shall write a letter apologizing for asking questions (or setting up an inferential situation) meant to embarrass Mr. Jorgenson and that were clearly outside the bounds of this lawsuit. Mr. Carmichael shall mail the letter to Mr. Jorgenson and Rottlund by certified mail. Mr. Carmichael shall submit a copy of his letter to the Court with evidence that the letter was sent to Mr. Jorgenson and Rottlund. Mr. Carmichael shall have until October 1, 2004 to fully comply with this Order.

**4. The Competition Product Survey and Discovery Set VI**

***22** The events surrounding the competition product survey and Rottlund's discovery requests set VI illuminate an amalgamation of failures. At the November 21, 2003 conference, the Court ordered Pinnacle, to remove all objections to the competition product survey requests in Rottlund's Discovery Requests Set VI--except for privilege objections which require a log--and submit an updated answer, meaning a pleading, to request number one stating that all Pinnacle files and been thoroughly searched with no limitations placed on the search. Then, at the November 26, 2003 conference, the Court ordered Pinnacle to generally revamp its entire response to Rottlund's discovery request set VI by removing the 2000 forward objection and removing the Washington Square limitation. These oral orders, especially in the context of the Court's dealings with the parties, unequivocally gave Pinnacle notice of the

discovery responses or, if found, the documents required. *See* Avionic Co. v. Gen. Dynamics Corp., 957 F.2d 555, 558 (8th Cir.1992).

Pinnacle's updated response to Rottlund's Set VI failed to comply with the Court's order. The response most pertinent and repeatedly discussed--request number one to Rottlund set VI--contained potential or evasive relevancy and privilege objections (no log was produced). *See supra* Part II(E). Moreover, Mr. Farmer admitted that any objection or qualification to request number one on the basis of privilege was unfounded but had erroneously been included. This failure is independently sanctionable under Rule 37(b)(2).

The Court's order that Pinnacle conduct a thorough, unlimited search of its files for the competition product survey specifically referenced in a transmittal from Larry Moore to Steve Sandelin was disobeyed. Peter Brennan submitted an affidavit stating that Pinnacle "scoured its files" looking for the competition product survey referenced, which on its face suggests compliance. (Brennan Aff. ¶ 3). Brennan's averment, however, is contradicted by the very person named in the transmittal, Steve Sandelin. Sandelin testified in December 2003 regarding his efforts to find the referenced competition product survey:

> Mr. Krummen: Have you looked anywhere other than the Minnesota file, the Washington Square file, and the general information file as you've defined it to find this competition product survey?
> Mr. Sandelin: No.
> Mr. Krummen: So if it was misfiled in some other file, you've done nothing to try to find out, correct?
> Mr. Farmer: [objection].
> Mr. Sandelin: I've looked everywhere I could conceivably think it may be.
> Mr. Krummen: And you've already explained to me where those places are. And my question is: If it got misfiled, you've not taken the next step and looked through everything to try to find it, correct?
> Mr. Farmer: [objection].
> Mr. Sandelin: *No, I have not.*

(Murdoch Aff. Ex. 10, at 256:24-285:3) (emphasis added).

It is inconceivable to the Court that Mr. Sandelin, the person most likely to have and recognize the survey, did not take the extra step to search files, including his own, in which the survey may have been misplaced. Indeed, the Court ordered Pinnacle to do just that: "That you indeed have done a thorough search, not just of Mr. Sand[e]lin's but of all of Pinnacle's records .... [The Court ordered an] answer to question number 1 signed by the client that they have done a thorough search of all of the Pinnacle files going back not limited to Illinois, not limited in time, no limitations, okay, to locate what appears to have been a document [the competition product survey] that was once in their possession." (Murdoch Aff. Ex. 27, at 69:6-8, 69:12-18). It is equally inconceivable that counsel for Pinnacle would permit such flagrant disobedience of the Court's order after the Court and parties spent multiple, lengthy status conferences discussing the competition product survey. This was a time, as discussed *infra,* where counsel should have been directly involved in the ground-level search.

**5. Failure to Conduct a Reasonable Inquiry**

*23 A reasonable inquiry under the circumstances of this case was not conducted prior to responding to Rottlund's Discovery Set VI and VII in violation of Federal Rule of Civil Procedure 26(g).

At both the November 21, 2003 and November 26, 2003 status conferences, counsel for Pinnacle repeatedly proclaimed that Pinnacle had produced all responsive documents. Mr. Farmer stated that "Mr. Sand[e]lin is going to be deposed again in a couple of weeks. *He's produced what he has. And you know, whether Mr. Krummen wants to speculate what's sitting in Mr. Sand[e]lin's office. It's neither here nor there.*" (Murdoch Aff. Ex. 27, at 68:19-23) (emphasis added). Mr. Murdoch termed Mr. Krummen's concerns about Pinnacle withholding documents as "absolutely false," "completely 100 percent unadulterated untrue." (Murdoch Aff. Ex. 28, at 19:12-25). Mr. Murdoch asserted that "Pinnacle doesn't have documents left to produce," and "everything in Chicago that relates to these accused Minnesota products ... has already been turned over to the Plaintiffs." *Id.* at 19:29:12-15. Finally, Mr. Murdoch concluded: "I suggest that Rottlund proceed with these depositions. *And they will be more than satisfied with what they discover, which will be nothing.*" *Id.* at 47:2-9 (emphasis added).

Prior to these representations, Rottlund requested any and all brochures in Pinnacle's possession that related to Rottlund townhomes, competitors' back to back townhomes, Rottlund's Villa II, or brochures taken by Mr. Sandelin during his tours of Rottlund's townhomes. *See* Murdoch Aff. Ex. 18 (Set VI), req. no. 4, req. no. 46, req. nos. 48-49, req. no. 51, req. no. 53; [FN15] Murdoch Aff. Ex. 19 (Set VII), req. no. 5. Mr. Sandelin admitted that during the tours of

Rottlund's townhomes brochures were obtained. (Davenport Aff. Ex. 44); *see also* (Murdoch Aff. Ex. 36, at 38:19-24). Pinnacle's response to Rottlund's requests was that it could not find any brochures; thus, it claimed all responsive documents in its possession had been produced. (Murdoch Aff. Ex 18, Answer to req. nos. 4, 46, 48-49, 51, 53 and Ex. 19, Answer to req. no. 5). As Mr. Murdoch explained at the first day of hearings on this matter, "Mr. Sand[e]lin testified that he picked up brochures before and that it's just that he couldn't find them." (January 28, 2004 Hearing, at 99:8-10). Pinnacle had not produced all documents responsive to Rottlund's brochure requests in Rottlund's Discover Requests Set VI, req. no. 4, req. no. 46, req. nos. 48- 49, req. no. 51, req. no. 53 and Set VII, req. no. 5. (Murdoch Aff. Ex 18 and 19). A reasonable inquiry under the circumstances would have revealed the existence of the brochures. In fact, a most elementary inquiry would, and did, reveal the existence of Rottlund brochures in none other than Mr. Sandelin's competitor brochure file.

It is now known that Mr. Sandelin maintains a file specifically called competitor brochure file. Remarkably, however, Mr. Sandelin reviewed Rottlund's requests for competitor brochures with counsel, but states that "it did not occur to me that documents in my *brochure file* could have any bearing on this litigation." (Sandelin in camera Aff. ¶ 6) (emphasis added). [FN16] So, Mr. Sandelin, believing that his brochure file would not contain documents responsive to a request for brochures, did not inform Pinnacle's counsel about the brochure file. *Id.* at ¶ 8. Rottlund has a request for a variety of brochures, Mr. Sandelin admits that brochures were obtained during tours, Mr. Sandelin knows he has a brochure file, and Pinnacle's counsel informs Mr. Sandelin about the request for brochures, yet Mr. Sandelin states that he did not think his brochure file could have any bearing on the litigation and therefore refused to disclose it. Such incompetence, in light of the history of this case and the history with Mr. Sandelin, is tantamount to bad faith.

***24** On a slightly different point, the Court finds that Pinnacle's counsel, the Holland & Knight firm, is not without fault. Holland & Knight's procedure for conducting discovery was to (1) explain Rottlund's discovery requests to Pinnacle personnel, usually Mr. Brennan; (2) request that *Pinnacle personnel* search the files for any relevant documents; (3) obtain the documents *Pinnacle personnel uncovered;* and (4) produce what counsel thought was responsive. *See* (Farmer in camera Aff. ¶ 3); (Brennan Aff. ¶ 2-3). [FN17] In other words, Holland & Knight attorneys never searched for or reviewed Pinnacle's files/documents at the ground level. Under the circumstances of this case, Pinnacle's counsel's failure to roll-up its sleeves and search for documents in the first instance greatly contributed to the failure to conduct a reasonable inquiry. *See* Penthouse, 663 F.2d at 388 ("On this record it is questionable whether [counsel] intentionally and deliberately misrepresented to the court material facts with respect to the existence of the relevant Penthouse records. It is conceivable that he was misled by his client. However, the record does support [the] finding that [counsel], beginning in November, 1977, was grossly negligent in not pursuing the matter more diligently to ascertain the facts from his client ...").

From the very beginning, problems with discovery at Pinnacle, many specifically involving Mr. Sandelin, were apparent. The most glaring, and independently sanctionable pursuant to the Court's inherent powers, was Pinnacle's lack of candor when pursuing the personal jurisdiction motion. The lack of candor surrounding the personal jurisdiction motion went right to the top at Pinnacle-Pinnacle's general counsel, Peter Brennan. In addition, the lack of candor involved Steve Sandelin because it was Sandelin's contacts with Minnesota that were not revealed. Mr. Brennan either did not ask Mr. Sandelin about his contacts with Minnesota, despite being the first person Brennan contacted about the cease and desist letter, or Mr. Sandelin refused to reveal his contacts. Either way, the Court was misled. Next, Pinnacle's chief financial officer admits that Pinnacle unilaterally limited production of revenue and cost information in defiance of this Court's orders. Following this, Rottlund discovered during Mr. Sandelin's Rule 30(b)(6) deposition that Mr. Sandelin failed to identify for production a file he titled "a great big file called Minnesota" despite it being requested months earlier. Pinnacle produced the file, but "[i]t was not their option to simply react to plaintiff's fortuitous discovery of the existence of relevant documents by making disjointed searches, each time coming up with a few more documents, and each time representing that was all they had." *Tarlton v. Cumberland County Corr. Facility,* 192 F.R.D. 165, 170 (D.N.J.2000). Finally, even in the Court ordered "search" for the competition product survey, which was sent to Mr. Sandelin but he claims no knowledge of it, Mr. Sandelin admits that he searched only a few of the most obvious files but no more.

***25** Pinnacle submits without citing any authority

that "[t]he attorney is not required to personally search for responsive information and documents." (Pinnacle's Mem. in Opp'n to Mot. for Sanctions, at 20). That may be true in some cases where discovery is proceeding relatively free from complications and the client's theretofore discovery conduct is not marked with a black-eye. In making its inquiry, counsel "may rely on assertions by the client and on communications with other counsel in the case *as long as that reliance is appropriate under the circumstances*," Fed.R.Civ.P. 26(g), advisory committee notes, 1983 amendment (emphasis added), and "[b]lind reliance on the client is seldom a sufficient inquiry." *In re Kunstler*, 914 F.2d 505, 514 (4th Cir.1990) (*quoting Southern Leasing Partners, Ltd. v. McMullan*, 801 F.2d 783, 788 (5th Cir.1986)). Here, Pinnacle's conduct in discovery was very poor and in some instances marked by bad faith. The Court had already begrudgingly denied a motion for sanctions. Further, the discovery problems frequently involved documents in the possession of the same person, Mr. Sandelin. In fact, Mr. Murdoch admitted during the first day of hearings on this matter that there has been a history of problems with Mr. Sandelin. [FN18] Counsel's reliance on assertions by Pinnacle that it did not have any more documents was not reasonable in the context of this case. Rather, Rule 26(g) required counsel to search Pinnacle's files in the first instance as opposed to relying on Pinnacle personnel to uncover responsive information. Pinnacle had already proved, on too many occasions involving quite relevant information, incapable of understanding its obligations to permit reasonable reliance. *See Metro. Opera Ass'n v. Local 100*, 212 F.R.D. 178, 222 (S.D.N.Y.2003) (rejecting argument that counsel is not personally required to supervise every step of discovery because the context of the case warranted such involvement). Thus, reliance on Pinnacle was objectively unreasonable.

Perhaps most telling of the fact that counsel did not conduct a reasonable inquiry prior to responding to Rottlund's Discovery Requests Set VI and VII regarding brochures, is the fact that Mr. Sandelin so freely and quickly identified the existence of his competitor brochure file when posed basic questions by Rottlund's counsel. Mr. Krummen simply asked Mr. Sandelin what files he looked through when "searching" for the competition product survey. [FN19] Pinnacle admits as much when it stated in its status conference letter opposing sanctions that "Mr. Sandelin's file was not discovered after some intense investigation or strenuous cross examination." (Davenport Aff. Ex. 48, at 2).

Rule 26(g) requires counsel to "stop and think" about a response. Fed.R.Civ.P. 26(g), advisory committee notes, 1983 amendment. When ordered by the Court to revamp its discovery responses to Rottlund Discovery Set VI to remove 2000 forward objections and Washington Square limitations and make sure all responsive documents had been produced, Pinnacle's counsel did not stop and think about the legitimacy of the responses. The Court stated: "I need you to go back and take a look at that. I am not satisfied that it's been done." (Murdoch Aff. Ex. 29:2-4). Mr. Murdoch did not stop to think. Rather, he stated: "I don't have to go back and look at that. I can assure you that that has been done and I can get you an affidavit from whoever our custodian of record is that says that we have produced everything ...." *Id.* at 29:5-9. Rottlund Discovery Requests Set VI included requests for brochures. It was patently obvious that the Court wanted counsel to diligently reexamine its responses, but counsel was unwilling to think about its responses further despite the Court's concern.

***26** Thus, Pinnacle's counsel's Rule 26(g) certification for Pinnacle's responses to Rottlund's Discovery Requests Set VI, req. nos. 4, 46, 48-49, 51, 53 (Murdoch Aff. Ex. 18) and Rottlund's Discovery Requests Set VII, req. no. 5, was not made after a reasonable inquiry under the circumstances, which was inconsistent with the rules and caused unnecessary delay and needless increase in the cost of litigation. Documents responsive to those requests existed in Pinnacle's files, despite Pinnacle's counsel's repeated assurances that all documents had been produced, and the documents would have been discovered if a reasonable, elementary inquiry had been made. Pinnacle and its counsel must be sanctioned pursuant to Federal Rule of Civil Procedure 26(g).

Rule 26(g) permits "an appropriate sanction" to be levied on "the person who made the certification, the party on whose behalf the disclosure, request, response, or objection is made, or both." The sanction "may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney's fee." Fed.R.Civ.P. 26(g)(3).

In considering this motion and the sanction to be imposed, the Court has attempted to hold fast to two important principles. First, a sanction is to be tailored to the sanctionable conduct, but it may reflect the record of misconduct as whole, not merely the triggering event. *Nat'l Hockey League*, 427 U.S. at 642, 96 S.Ct. 2778 (*citing Link*, 370 U.S. at 634-35,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

82 S.Ct. 1386); *Carey*, 186 F.3d at 1020; *Penthouse*, 663 F.2d at 388; *Cine Forty-Second*, 602 F.2d at 1068. Second, "[i]f the fault lies with the attorneys, that is where the impact of sanction should be lodged. If the fault lies with the clients, that is where the impact of the sanction should be lodged." *Herring v. City of Whitehall*, 804 F.2d 464, 468 (8th Cir.1986).

The Court finds that the record of abuse of the judicial process, discovery incompetence, and defiance of Court orders warrants a significant sanction. The Court requested the parties to brief the imposition of five potential sanctions: (1) admission of personal jurisdiction; (2) striking the affirmative defense of lack of access; (3) attorneys fees and costs incurred by Rottlund in connection with every effort to ensure Pinnacle's compliance with discovery; (4) revocation of *pro hac vice* admission; and (5) attorneys fees and costs for additional depositions of Pinnacle's employees regarding the brochures. The Court has considered the sanctions regarding admission of personal jurisdiction, *e.g.*, *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982); *English v. 21st Phoenix Corp.*, 590 F.2d 723, 727-28 (8th Cir.1979), and the striking of the affirmative defense of lack of access and finds that other sanctions will appropriately deter future misconduct and recompense the prejudiced party. The Court believes that admission of personal jurisdiction, although related to part of the misconduct, would do little to compensate or deter misconduct. This is so because the Court finds that the personal jurisdiction issue is already settled. It exists. Any argument otherwise would be foolhardy. Thus, the Court declines to order admission of personal jurisdiction or strike the affirmative defense of lack of access. With regard to Pinnacle's counsel's *pro hac vice* status, the Court will not revoke their privileges. Pinnacle's counsel, however, should take heed. The Court has lost some confidence in counsel's good faith efforts regarding discovery. Further, the Court has experienced some disrespect from counsel. No less than any other federal court, the undersigned expects befitting decorum at all times from all parties. The Court finds that a monetary sanction is most appropriate. Based on the whole record, however, the Court finds that much of the fault lies with Pinnacle as opposed to its counsel and the sanction will be structured accordingly.

***27** [6] For the Rule 26(g) violation, a sanction of ten percent of the total attorney fees and costs Rottlund has incurred in connection with ensuring that Pinnacle complied with document discovery is appropriate. The total amount of attorneys fees and costs Rottlund incurred ensuring Pinnacle complied with document discovery amounts to $101,374.71. (Krummen Aff. ¶ 6, Ex. A). Thus, a sanction of $10,137.47 to compensate Rottlund for and deter future Rule 26(g) violations is imposed. The Court has considered various methods of calculating the sanction. For instance, the Court has considered awarding only the fees and costs associated with status conferences where Pinnacle staunchly represented everything, including documents from Rottlund's Requests Set VI that included brochure requests, had been produced--such as the November 21 and 26, 2004 conferences and the December 4, 2004 conference--these fees and costs would amount to around $8,500. (Krummen Aff. Ex. A, entries from 11/14/03 to 12/8/03). The Court finds, however, that a broader sanction for the Rule 26(g) violation involving a percentage of efforts to ensure compliance with document discovery more appropriately captures the history of discovery incompetence, which obstructed Rottlund's ability to engage in effective discovery. *See Perkinson v. Houlihan's/D.C., Inc.*, 108 F.R.D. 667, 676-77 (D.D.C.1985) (ordering payment of fees and costs for discovery abuse from a certain date forward). Further, a broader award is necessary to satisfy the deterrent purpose for which Rule 26(g) partially exists. *See Johnson Intern. Co. v. Jackson Nat. Life Ins. Co.*, 19 F.3d 431, 439 n. 10 (8th Cir.1994) (explaining that "the purpose of sanctions under Rules 37 and 26(g)" is "to deter abuse and compensate the opposing party"); *Lockheed Shipbuilding Co. v. Ins. Co. of N. Am.*, No. CA90-0587P, 1993 WL 358442, at *5 (D.R.I. Apr. 2, 1993) ("In addition to deterring inappropriate conduct, actions should 'compensate the wronged party ....' "); Fed.R.Civ.P. 26(g), advisory committee notes, 1983 amendment (stating that "[t]he subdivision provides a deterrent to both excessive discovery and evasion"). Deterrence is an important objective of the Rule 26(g) sanction imposed, not only because of the history of this case, but also to alert other parties or attorneys that the Court takes discovery obligations seriously and they must resist laxity in order to avoid sanction.

[7] Rottlund's attorneys fees and costs incurred in prosecuting this motion and the December 18, 2003 status conference hearing are also awarded. *Johnson Intern.*, 19 F.3d at 439 n. 10 ("The court also determined that fees under Rule 37(a)(4) should be awarded for prosecuting the motion for sanctions. Such an award is consistent with the purposes of sanctions under Rules 37 and 26(g)--to deter abuse

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

and compensate the opposing party for 'all expenses, whenever incurred, that would not have been sustained had the opponent conducted itself properly,' *In re Stauffer Seeds*, 817 F.2d at 50 (citation omitted); *see also* Fed.R.Civ.Pro. 26(g) advisory committee's note (1983 amendment)."). The Court has reviewed the time sheets in exhibit C to the first Krummen affidavit (detailing the fees and costs incurred through January 11, 2004 in connection with the December 18, 2003 hearing and the instant motion) and exhibit A to the supplemental Krummen affidavit (detailing the fees and costs incurred from January 12, 2004 through February 23, 2004 in connection with this motion). As noted, the hearing on this matter spanned portions of three days--January 28, February 5, and February 23, 2004. The factual history that needed to be culled and the vigor with which the motion would be and was contested required the parties to expend considerable effort. The Court specifically requested briefing on a number of potential sanctions. That the Court did not impose certain sanctions does not mean fees and expenses for those tasks should not be awarded. All the sanctions briefed were within the realm of discretion, but the Court has simply attempted to narrowly tailor the severity of the sanctions to fulfill the purposes of the Rules and preserve the sanctity of the judicial process. Accordingly, the Court awards $50,000.00 in reasonable attorney fees and costs for prosecution of this motion and the December 18, 2003 hearing.

***28** The monetary sanctions shall be structured as follows: (1) Pinnacle shall pay Rottlund $4,492.70 representing twenty percent of the fees and costs incurred in connection with the motion to dismiss for lack of personal jurisdiction as set forth *supra* Part III(B)(1); (2) Pinnacle shall pay Rottlund seventy-five percent of the award for the Rule 26(g) violation and the award for fees and costs incurred in prosecuting this motion; and (3) Holland & Knight shall pay Rottlund twenty-five percent of the award for the Rule 26(g) violation and the award for fees and costs incurred in prosecuting this motion. The total of the Rule 26(g) violation award ($10,137.47) and the award for fees and costs incurred in prosecuting this motion ($50,000) is $60,137.47. Thus, Pinnacle shall pay Rottlund a total of $49,595.80 ($45,103.10 + $4,492.70). Holland & Knight shall pay Rottlund a total of $15,034.37. This structure most appropriately recognizes the culpability of the client and lawyers. All awards shall be paid by delivering payment to Rottlund's counsel Winthrop & Weinstein, within thirty (30) days of the date of this Order.

Finally, Pinnacle shall reimburse Rottlund for *all* reasonable attorney fees and costs that Rottlund incurred as a result of having to redepose any of those persons who were scheduled to have their deposition taken during the week of December 8, 2003.

Therefore, based on all the files, records, and proceedings herein,

**IT IS HEREBY ORDERED that:**

1. Plaintiff's Motion for Sanctions Pursuant to the Court's Inherent Power, 28 U.S.C. § 1927, and Federal Rules of Civil Procedure 11, 26, and 37 (Doc. Nos. 320, 321, 322) is **GRANTED in part** and **DENIED in part**.
2. Pinnacle shall pay Rottlund, by delivering payment to its counsel Winthrop & Weinstein, $49,595.80 within thirty (30) days of the date of this Order.
3. Holland & Knight shall pay Rottlund, by delivering payment to its counsel Winthrop & Weinstein, $15,034.37 within thirty (30) days of the date of this Order.
4. Pinnacle shall reimburse Rottlund for *all* reasonable attorney fees and costs that Rottlund incurred as a result of having to redepose any of those persons who were scheduled to have their deposition taken during the week of December 8, 2003.
5. Christopher Carmichael shall prepare and submit a letter of apology as set forth herein.

FN1. Rottlund has subsequently added architectural works or as-built structure copyrights.

FN2. The townhome technical drawing alleged in the initial complaint to be infringing was the Bayview. The Bayview townhome is an individual townhome within the Homestead Collection of townhomes. *Compare* (Compl. ¶ 21-24), *with e.g.*, (Fifth Amended Compl. ¶ 43).

FN3. Pinnacle asserted in a Sur-Sur-Reply Memorandum that "any Pinnacle conduct outside of Minnesota that may reach Minnesota does not relate to Rottlund's causes of action." (Davenport Aff. Ex. 13, at 6).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

FN4. At the time the Larry Moore design file was forwarded to attorney Dean Karau at Fredrikson & Byron, Fredrikson & Byron represented Pinnacle.

FN5. The Court was intermittently faced with the competition product survey issue prior to the November 21, 2003 conference. (Davenport Aff. Ex. 62, July 15, 2003 conference, at 97:8-98:19).

FN6. Request number 4 seeks: "All documents which reference, relate to, constitute, and/or concern Rottlund's back to back townhomes, including but not limited to: notes, pictures, competition surveys, marketing brochures ...." Request number 46 seeks: "All designs sketches, elevations, plans, etc., Mr. Sandelin reviewed regarding TCM's back to back townhomes products." Request number 48 seeks: "All documents which constitute and/or concern competitor brochures concerning back to back townhome products." Request number 49 seeks: "All documents which constitute and/or concern floor plans concerning competitors' back to back townhome products." Request number 53 seeks: "*All marketing brochures taken during the product tour(s)* which Mr. Sandelin took of Rottlund's Villa II back to back townhome." (Emphasis added). Request number 51 seeks: "All marketing brochures of back to back townhome products located in Minnesota."

FN7. Request number 5 seeks: "[A]ll documents referring or relating to any inspection and/or tour Pinnacle and/or TCM participated in, in any way, of any Rottlund product after Rottlund's July 2001 cease and desist letter."

FN8. *Baker,* 86 F.3d at 817 ("[T]he sanction forced the jury to find for the plaintiffs."); *Shelton v. Am. Motors. Corp.,* 805 F.2d 1323, 1330 (8th Cir.1986) (default judgment); *Anderson v. Home Ins. Co.,* 724 F.2d 82, 84 (8th Cir.1983) (dismissal); *Lorin Corp. v. Goto & Co., Ltd.,* 700 F.2d 1202, 1207-08 (8th Cir.1983) (dismissal); *Savola v. Webster,* 644 F.2d 743, 745-46 (8th Cir.1981) (dismissal); *Edgar,* 548 F.2d at 772 (dismissal).

FN9. The advisory committee notes to the 1970 amendment explain:

Rule 37 sometimes refers to a "failure" to afford discovery and at other times to a "refusal" to do so. Taking note of this dual terminology, courts have imported into "refusal" a requirement of "wilfullness." See *Roth v. Paramount Pictures Corp.,* 8 F.R.D. 31 (W.D.Pa.1948); *Campbell v. Johnson,* 101 F.Supp. 705, 707 (S.D.N.Y.1951). In *Societe Internationale v. Rogers,* 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958), the Supreme Court concluded that the rather random use of these two terms in Rule 37 showed no design to use them with consistently distinctive meanings, that "refused" in Rule 37(b)(2) meant simply a failure to comply, and that wilfullness was relevant only to the selection of sanctions, if any, to be imposed. Nevertheless, after the decision in *Societe,* the court in *Hinson v. Michigan Mutual Liability Co.,* 275 F.2d 537 (5th Cir.1960) once again ruled that "refusal" required wilfullness. Substitution of "failure" for "refusal" throughout Rule 37 should eliminate this confusion and bring the rule into harmony with the *Societe Internationale* decision. See Rosenberg, *supra,* 58 Col.L.Rev. 480, 489- 490 (1958).

FN10. To clear up any confusion, Rottlund has a copyright on technical drawings and architectural works for a townhome product known as the Villa II, and, during development, the townhomes built at the Centennial Crossing development that allegedly infringe Rottlund's Villa II copyrights were also known as the Villas.

FN11. Interrogatory number 4 states in part: "Please identify all employees, former employees, or other persons acting on your behalf who were involved with or who have personal knowledge of any of the matters at issue in this lawsuit." Document request number 24 asks for "all documents that

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

relate to, concern and/or were identified in your responses to Plaintiff's interrogatories."

FN12. It should be emphasized that Larry Moore's design file containing evidence that Steve Sandelin was involved in the design process of the allegedly infringing townhomes in Minnesota was given to Fredrikson & Byron by BSB, not Pinnacle.

FN13. Rule 26(g) comes into play, however, with the big Minnesota file that is relevant to the personal jurisdiction motion.

FN14. The Court notes that Mr. Farmer used unprofessional language during a deposition: "Did you ever call up the seller of that piece of property in Chaska and say why the hell didn't you tell me this piece of property was on the selling block?" (Stutz Dep., at 210:13-16). This was inappropriate and arguably worthy of sanction. *See Nelson v. Ellerbe Becket Const. Serv., Inc.*, No. 01-1849, 2002 WL 31571177, at *1-2 (D.Minn. Nov. 15, 2002) (Davis, J.) (sanctioning counsel $500.00 and requiring a letter of apology for counsel's statement during oral argument that, "Cronen's affidavit shows the structure of the whole *damn* company," when attempting to rebut an allegation by plaintiff).

FN15. For instance, request number 53 seeks: "*[a]ll marketing brochures taken during the product tour(s)* which Mr. Sandelin took of Rottlund's Villa II back to back townhome." (Emphasis added). Request number 51 seeks: "[a]ll marketing brochures of back to back townhome products located in Minnesota."

FN16. **The Court reveals the contents of this and other affidavits submitted in camera where the contents revealed are not privileged or confidential.**

FN17. Mr. Murdoch explained the process at various times during the first day of hearings on this matter as follows: "My understanding of the process is that Mr. Brennan reviews them [the requests] with counsel, identifies which employees are likely to be responsible for files that fall within the scope of these requests." (January 28, 2004 Hearing, at 105:21- 24).

FN18. At the hearing the following exchange occurred:
Court: But let's step back a minute because indeed at the time that your client argued before this Court that there was no connection of any kind with Minnesota and apparently represented to its counsel, not you but it's former counsel, that there were no files related to Minnesota, he had the big Minnesota file. So this is a--there's a history with Mr. Sand[e]lin here. This is not the only time that there's been some kind of issue of misunderstanding.
Mr. Murdoch: I understand. And I agree with Your Honor.
(January 28, 2004 Hearing, at 88:9-21).

FN19. Incredibly, Mr. Sandelin looked through his competitor brochure file while looking for the competition product survey but nevertheless failed to produce Rottlund's brochures after that search. Pinnacle defends this failure by arguing that Mr. Sandelin was not looking for brochures when he was searching for the competition product survey. This argument fails to consider that Pinnacle has an absolute duty to supplement whenever relevant documents come to light. Fed.R.Civ.P. 26(e). The argument also fails to consider that Rottlund's brochures could have easily been part of the "competition product survey for Minneapolis." Pinnacle claims that Mr. Sandelin does not know what was in the competition product survey for Minneapolis. If that is true, the search should have obviously encompassed documents likely to have been a part of the survey. Likewise, Pinnacle's counsel argues that it did not need to be part of the search for the competition product survey because it does not know what was contained therein. This argument can be quickly rejected. Pinnacle does not know, so it claims, what was contained in the survey either; so, counsel's efforts would have been just as useful as Pinnacle's.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2004 WL 1494579 (D.Minn.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works