**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**The Rottlund Company, Inc.**
**d/b/a/ Rottlund Homes, a Minnesota Corporation**

**Civil No. 01-1980 (DSD/SRN)**

**Plaintiff,**

**v.**

**REPORT AND RECOMMENDATION**

**Pinnacle Corporation**
**d/b/a/ Town & Country Homes,**
**an Illinois Corporation, and**
**Town & Country Homes, Inc.,**
**a Minnesota Corporation, Bloodgood Sharp Buster Architects and Planners of Iowa, Inc., an Iowa Corporation, and The Bloodgood Group, Inc., an Iowa Corporation,**

**Defendants,**

**and**

**Town & Country Homes, Inc.,**
**a Minnesota Corporation,**

**Third-Party Plaintiff,**

**v.**

**Bloodgood Sharp Buster**
**Architects & Planners of Iowa, Inc.,**
**an Iowa Corporation**

**Third-Party Defendant.**

---

Craig S. Krummen, Esq., and David Davenport, Esq., on behalf of Plaintiff

Darren B. Schwiebert, Esq., on behalf of Defendant Town & Country Homes, Inc.

Christopher Murdoch, Esq., on behalf of Defendant Pinnacle Corp.

Holly J. Newman, Esq., on behalf of Defendant Bloodgood Sharp Buster and The Bloodgood Group, Inc.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-entitled matter came before the undersigned United States Magistrate Judge on Plaintiff The Rottlund Company's (Rottlund) Motion for Partial Summary Judgment on Liability Issues of Validity, Direct Copying, Access, and Substantial Similarity Concerning Plaintiff's § 102(a)(5) Copyrighted Technical Drawings (Doc. No. 333); Plaintiff's Motion to Strike the Affidavit of Jeffrey Scherer (Doc. No. 369); Defendant Bloodgood Sharp Buster Architects and Planners of Iowa, Inc. and the Bloodgood Group, Inc.'s (hereinafter collectively BSB) Motion for Partial Summary Judgment on Copyright Validity (Doc. No. 350); and Defendants' Motion for Partial Summary Judgment (Doc. Nos. 382, 384, and 406). These matters have been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

This is in large measure a copyright infringement case involving claims of infringement of technical drawings and architectural works as-built structures, 17 U.S.C. § 102(a)(5) and (a)(8). Rottlund claims it holds copyrights in technical drawings (§102(a)(5)) and the as-built structures (§102(a)(8)) of three townhomes: the Original Villa, the New Villa, and the Villa II. Rottlund claims

Defendants infringed the Villa II copyrights, which carry forward the Original and New Villa copyrights.

The Court briefly explains the content of the various motions and what will be addressed by this report and recommendation. Plaintiff's motion requests summary judgment on the validity of its technical drawing copyrights and a finding that Defendant TCM's Homestead Collection (Davenport Aff. Ex. TT (Centennial Crossing) and Ex. AAA (Harvest Hills)) technical drawings and Defendant Pinnacle's Washington Square (Krummen Aff. Ex. R) technical drawings infringe Plaintiff's Villa II (Davenport Aff. Ex. F (Rush Creek) and Ex. G (The Reserve)) technical drawing copyrights. Defendant BSB's motion requests a finding that all of Plaintiff's copyrights (technical drawings and as-built structures) are invalid. Defendants' collective motion seeks a finding that the Homestead Collection, Washington Square, and Chateau Collection technical drawings and as-built structures do not infringe Plaintiff's Villa II technical drawings or as-built structure copyrights, and a finding that the contributory infringement and vicarious liability claims fail. In this report and recommendation, the Court considers Plaintiff's motion, BSB's motion, and that portion of Defendants' collective motion that deals with infringement of the Homestead Collection and Washington Square technical drawings. In a separate report and recommendation, the Court will consider the Defendants' collective motion regarding whether the Chateau Collection technical drawings infringe the Villa II technical drawings; whether the Homestead Collection, Washington Square, and Chateau Collection as-built structures infringe the Villa II as-built structure; and the contributory infringement and vicarious liability claims.

Rottlund, Pinnacle, and TCM are all direct competitors in the design, development, construction, and sale of townhomes. BSB is an architectural firm utilized by TCM and Pinnacle.

## I. FACTUAL BACKGROUND

### A. Part I

Sometime in 1985 or 1986, Bud Rotter of Rottlund was asked by a developer to build a housing structure on a 12 acre parcel that was zoned for apartments. (Davenport Aff. Ex. EEE, at 40-47) (explaining Bud Rotter's discovery of the back to back idea). Mr. Rotter initially turned down the request, but the developer was persistent. So, Mr. Rotter, having a long time interest in designing but no formal training, began to formulate a design he thought might fit the parcel. Mr. Rotter knew that he had to fit 12 units per acre but was not sure how that configuration would work. Mr. Rotter started with a square and eventually came up with an idea. He took his sketch to a draftsman at Rottlund, Don Kangas. Mr. Kangas drew a quarter inch scale plan of the 12 unit building, which Mr. Rotter described as an accordion. Mr. Rotter ran some material and supply cost numbers, which seemed affordable. Mr. Rotter met with his partners to discuss the potential of moving forward on the project. The risk/reward assessment was favorable so Mr. Rotter searched for an architect.

Tim Whitten of Architectural Forum Inc. (AFI) was selected as the architect. Id. at 46; Ex. FFF, at 748:16-750:6, 753:10-19. Mr. Rotter and Mr. Whitten met in 1986 on a couple of occasions to discuss Mr. Rotter's ideas.[1] The discussions resulted in an agreement that Mr. Whitten would work on designing a back-to-back townhome for Rottlund. (Patrick Aff. Ex. A, at 24:4-26:9). AFI and

---

[1] There appears to be a factual dispute about whether Mr. Rotter brought any designs to his meeting with Mr. Whitten. Mr. Rotter says he showed Mr. Whitten drawings, which is supported by the fact that later contracts indicate AFI produced its drawings "from Rottlund drawings," (Davenport Aff. Ex. III), but Mr. Whitten says he does not remember Mr. Rotter presenting any drawings. Compare (Davenport Aff. Ex. EEE, at 46:20-22), with (Patrick Aff. Ex. A, at 25:12-14).

Rottlund executed a written agreement on April 21, 1986 regarding the design and presentation of Rottlund's 12 unit townhouse. (Davenport Aff. Ex. HHH). AFI agreed to, inter alia, "[r]ework" two plans and design a "new" elevation. Id. Mr. Whitten then began the design process and would periodically submit his work to Mr. Rotter for feedback. E.g., (Patrick Aff. Ex. A, at 28:25-29:6, 30:11-31:20).

Mr. Whitten's work for Rottlund's 12 unit townhome became known as the Original Villa and was first used in a development known as Summerwood. (Davenport Aff. Ex. JJ, at 48:12-23). The design process progressed. On May 12, 1987, AFI and Rottlund executed another written agreement regarding Rottlund's 12 unit townhouse design (the Original Villa) for the Summerwood development. Id. Ex. III. The May 12 contract provided that AFI would:

> Produce working drawings base from Rottlund's drawings, to include: 1. Final building plan. 2. Building elevation (1 style). 3. Overall section necessary for construction. 4. Main & upper level plans. 5. Footing layout. 6. Stair sections. 7. Electrical layout. 8. Roof plan. 9. Interior elevation of bathroom, kitchen & necessary features. 10. Necessary details for construction consistent with normal builder practice.

Id.

The May 12 agreement also stated that AFI "retains ownership of all ideas, concepts and working drawings and the right to publish and shall not sell the above to other clients." Id. Despite this language, it is undisputed that AFI and Rottlund orally agreed that AFI "would assign the ownership of the [Original Villa] plans to The Rottlund Company from AFI." (Krummen Aff. Ex. S, Mazzara Dep., at 141:25-142:1, 137:17-143:3, 145:22-149:4);[2] (Davenport Aff. Ex. JJ, Whitten Dep., at 71:18-

[2] Gerald Mazzara was AFI's President.

73:10). Although the timing of the oral agreement is a bit unclear, it appears to have occurred shortly after the May 12, 1987 agreement or "once [AFI] began to do a number of–of Villa developments." (Krummen Aff. Ex. S, at 148:13-149:25); see also id. at 164:16-165:17. The oral agreement was memorialized in a written agreement on January 15, 1989. (Davenport Aff. Ex. JJJ); see also (Krummen Aff. Ex. S. 145:22-147:17) ("Q: So did this oral agreement–was this oral agreement reached shortly before you entered into the written agreement that you're discussing? A: That would be correct."). The 1989 written agreement transferred all copyright ownership and other interests in the Original Villa drawings to Rottlund. It provides:

> Whereas pursuant to an agreement by and between AFI and ROTTLUND on or about May 12, 1987, AFI developed certain architectural plans (hereinafter "Plans") including:
>
> 1. Front and Rear Elevation, dated 11/3/87
> 2. Footing and Foundation Plan, dated 11/3/87
> 3. Unit "A" Second Floor Plan, dated 11/3/87
> 4. Unit "B" Second Floor Plan, dated 11/3/87
>
> to be used by ROTTLUND for a development known as Summerwood, Brooklyn Park. AFI was compensated for its development of the Plans, and continues to receive continuing fees dependent upon the number of units built in accordance with the Plans. At the time of the May 12, 1987 Agreement AFI retained the right to the right of publication of the Plans without specific recital of ownership of the other rights in the Plans. *AFI hereby transfers any and all right, title and interest in its rights to the Plans under the Copyright laws to ROTTLUND.* ROTTLUND shall have for its own use, and for its successors and assigns, all rights in the Plans as defined above which AFI may have held had this AGREEMENT and sale not been made. Rottlund hereby transfers to AFI an exclusive license to the right of publication of the Plans.

(Davenport Aff. Ex. JJJ) (emphasis added).

On September 1, 1989, Rottlund registered the Summerwood (Original Villa) technical drawings. (Davenport Aff. Ex. B). The Summerwood (Original Villa) copyright registration is VAu 159-813. Id. Rottlund listed AFI as the author of the Summerwood and stated that AFI assigned the

interest to Rottlund. Id.

Tim Whitten left AFI sometime around 1990 and formed Whitten Associates, Inc. Whitten Associates, Inc. consisted only of Tim Whitten and his wife who is not an architect. (Krummen Aff. Ex. V, at 64:7-12). In 1991, Rottlund contacted Mr. Whitten to create the next generation of Villa townhome. Id. at 63:21-64:21. Mr. Whitten and Rottlund orally agreed that Rottlund would own all rights in the New Villa prepared by Mr. Whitten. Id. at 139:23-140:5; (Davenport Aff. Ex. JJ, at 71:18-24). To solidify this oral agreement, Mr. Whitten, on behalf of Whitten Associates, Inc., and Rottlund signed a written agreement in 2002[3] memorializing the previous oral agreement that Rottlund owns all interests in the New Villa designs. (Davenport Aff. Ex. LLL).

On October 1, 1993, Rottlund applied for and received copyright registration for the New Villa technical drawings, VAu 268-404. (Davenport Aff. Ex. C (registration); Krummen Aff. Ex. W (deposit/source materials)).[4] Rottlund listed itself as the author of the New Villa and checked that it was a "work made for hire." Id. Rottlund did not indicate that the New Villa was a derivative of the Summerwood (Original Villa). Id. Also on October 1, 1993, Rottlund applied for a copyright on a technical drawing titled the Original Villas, VAu 268-380. (Patrick Aff. Ex. F).[5] Rottlund listed itself as the author of the Original Villa and checked that it was a "work made for hire." Id.

Tim Whitten joined Rottlund in 1995. (Krummen Aff. Ex. V, at 141:24-142:23). As a

---

[3] In 1995, Tim Whitten joined Rottlund as Vice President of architecture, but Whitten Associates, Inc. remains an active corporation.

[4] John Dierbeck, Rottlund's Vice President of Sales and Marketing, filled out the application.

[5] John Dierbeck, Rottlund's Vice President of Sales and Marketing, filled out the application.

Rottlund employee, Mr. Whitten designed the final Villa townhome in 1997, the Villa II. Rottlund obtained a copyright in the Villa II technical drawings in June 1999, VAu 447-395. (Davenport Aff. Ex. D, The Rush Creek Villa II),[6] and in February 2002, VAu 546-285. Id. Ex. E (The Reserve Villa II).[7] Rottlund listed itself as the author and checked that it was a "work made for hire." Id. Exs. D and E. Rottlund did not indicate that the Villa II was a derivative of the Original Villa or New Villa. Id.

In 2002, Rottlund obtained architectural work copyrights, 17 U.S.C. § 102(a)(8), for its Original Villa (VAu 539-993), New Villa (VAu 554-948), and Villa II (VAu 534-723) townhomes. (Krummen Aff. Ex. T, Y, CC). On each, Rottlund listed itself as the author, checked that the work was a "work made for hire," and did not indicate that the work was a derivative.

After this litigation commenced, Rottlund submitted supplementary copyright applications for the New Villa and the Villa II technical drawing and architectural works copyrights. (Krummen Aff. Ex. X, AA, BB (technical drawing supplements); Ex. Y and CC (architectural works supplements)). The supplementary applications stated that the New Villa technical drawings and architectural works are derivatives of the Original Villa, and the Villa II technical drawings and architectural works are derivatives of the Original Villa and the New Villa. The Reserve Villa II technical drawing supplement also identified it as a derivative of the Rush Creek Villa II. The Copyright Office issued supplementary copyright registrations. Id.

**B. Part II**

---

[6] John Dierbeck, Rottlund's Vice President of Sales and Marketing, filled out the application.

[7] Todd Stutz, a Rottlund executive, filled out the application.

In 1994, or after the Original Villa and New Villa were created, Defendant BSB was working on drawings for Midland Homes. BSB outsourced some of the drawings to another entity named Design Development, Inc. (Newman Aff. Ex. K, at 253:22-258:19). BSB and Design Development met, at which time BSB architect Larry Moore gave Design Development a copy of Rottlund's floor plans. (Davenport Aff. Ex. I); (Krummen Aff. Ex. A) (Dep. Ex. 330). Moore testified that BSB had a copy of Rottlund's floor plan for one of Rottlund's Villa products. (Krummen Aff. Ex. B, at 225:3-10). Moore explained that what Krummen Aff. Ex. A appears to be "is a, what I'll call a cut-and-paste job" and a scenario in which it (Krummen Aff. Ex. A) came into being "would be that if there was a brochure of Rottlund units, that Xeroxes were made and then a–this was pasted or taped together to form what an 8-plex building would be like." (Krummen Aff. Ex. B, at 226:13-23). Moore believes he or BSB gave the cut and paste Rottlund floor plan to Design Development. Id. at 229:8-11. That is consistent with the following letter from Design Development to Larry Moore recapping the parties' meeting:

> As a follow-up to our meeting last Friday, I would like to review the services that Design Development Inc. is proposing for your company on the Midland Homes 8 plex townhome project. The services will involve producing construction drawings per schematic design drawings provided by your office. The project will be a two story wood frame building with slab on grade foundation. The building will be contain [sic] eight units, with two unit types of approximately 1200 and 1300 square feet *similar to the Rottlund Homes plans you provided in our meeting.*

Id. (emphasis added).

Larry Moore claims he did not instruct Design Development to produce drawings similar to Rottlund's but only gave the Rottlund drawings to Design Development so that it could have an idea about the scope of the project. (Krummen Aff. Ex. B, at 228:23-229:7); (Newman Aff. Ex. K, at 254:14-

255:4). Later, while apparently working on the Midland Homes's project, Larry Moore hand wrote a note that provided: "• Our Design. • His Redlines & Redesign. • Rottlund Product. 1. Your opinion–is our design enough 'departure' from Rottlund (design of this 8-plex, not 8-plex concept, Rottlund can't © concept." (Davenport Aff. Ex. K). BSB cannot find the Rottlund product apparently attached to this memo. Id. Ex. L.

In 1996, BSB designed a back-to-back townhome for Jerry's Homes. (Jorgensen Aff. ¶7). The construction drawings were completed on July 12, 1996. Id. ¶8. Later, on March 11, 1997, Jerry's Homes sent BSB architect Chris Jorgensen a fax that contained a Rottlund brochure for the Villas of Meredith Pointe floor plan. (Davenport Aff. Ex. M).[8] Chris Jorgensen states that the Rottlund brochures were faxed to him solely to give him a sample of the artwork that Jerry's Homes was considering. (Jorgensen Aff. ¶8). Subsequent to receiving the fax, BSB slightly altered its construction drawings for Jerry's Homes (name change, mechanical room and coat closet moved, foundation between the house and garage was changed), but Jorgensen maintains that the changes had nothing to do with the fax containing Rottlund materials. Id. ¶9.

TCM hired BSB to design a back-to-back townhome in 1998, which was named the "Villa Product." (Davenport Aff. Ex. O, at 19:21-20:7; Ex. P, at 38:11-21; Ex. BB). In preparing for the TCM project, Larry Moore reviewed and obtained ideas from his Midland Homes file and the Jerry's Homes marketing file.[9] Id. at 20:8-25; Ex. FF 15:18-16:5. In March 1998, Moore and Jorgensen of

---

[8] Defendants state that this appears to be an Original Villa or New Villa townhome. (Pinnacle, Mem. in Opp'n to Mot. for Summ. J., at 13); (BSB's Mem. in Opp'n to Mot. for Summ. J., at 5 n.1).

[9] Moore states that the Jerry's Homes marketing file, as opposed to the project file, did not contain the Rottlund materials that were faxed to Jorgensen in March 1997. (Newman Aff. Ex. E, at

BSB and Art Plante of TCM toured a variety of townhomes in Minnesota including Rottlund's Villa II. Id. Ex. W, at 26:23-28:8. Moore explained that the purpose of the tours he takes is to look at the products from the perspective of a buyer and see how he might be able to improve the products.[10]

Another tour of townhomes occurred on April 29, 1998. There is some dispute about who participated in the tour. Moore and Jorgensen claim they did not participate, (Moore Aff. ¶12; Jorgensen Aff. ¶16), but testimony from Steve Sandelin, Pinnacle's in-house architect, suggests they did. Id. Ex. U, at 150:21-24, 152:9-13. In any event, there is no dispute that TCM's president, Art Plante, and Pinnacle's in-house architect, Steve Sandelin, toured Rottlund's Villa II. Id. Ex. U, at 150:21-24, 152:9-13. Photographs were taken during the tour. Id. Ex. P, at 102:19-104:5; Ex. U, at 158:8-159:254; Ex. X. Defendants have produced copies of Rottlund brochures, including brochures with floor plans from Sandelin's files. Id. Ex. Y, Z, and AA.

A few weeks later, May 5, 1998, Moore sent Sandelin a "competition product survey for Minneapolis market." Id. Ex. EE. It is unknown what was included in the competition product survey. Id. Ex. O, at 26:10-19; Ex. FF, at 157:1-25.

---

104:8-106:11; 314-315:9).

[10] Specifically, Moore explained as follows:

> In–in general, again, we just–we'd like to see the products that are out there to see–with our experience nationally, there are a lot of good trends and things that we can bring to any product. We like to understand if those are in the market or not.
>
> Again, as I said, the buyer's perspective is important to us. We go in and we–we look for mistakes. We look for obvious things that the–the–the builders in the market are doing or not doing. . . . But we look for opportunities to basically one-up the competition. . . . We see a mistake they're making and we better it. If their rooms are too small, we make them bigger. If their closets are too small, we make them bigger. We better it.

(Davenport Aff. Ex. O, at 40:2-12, 40:18-20, 40:23-41:1).

By June 23, 1998, BSB had completed the schematic designs for TCM's Villas product, and the parties executed a second contract related to design development and construction drawings. Id. Ex. GG. BSB sent TCM's Art Plante a sent of drawings thereafter. Id. Ex. HH. TCM returned the drawings to BSB on July 13, 1998 with TCM's "redlines." Id. (BSB 02034). On one of the drawings, TCM attached a photo of Rottlund's Villa II, sketched a drawing, and wrote "see Rottlund product." Id. (BSB 02035A). In early June 1999, after BSB informed it that the "Villas" name was already used, TCM changed the name of its back-to-back townhome from the Villa to the Homestead Collection. Id. Ex. II.

TCM has hired a number of former Rottlund employees and has failed in its bid to hire others. E.g., Id. Ex. KK, at 58:5-22; Ex. LL, at 36:9-25; Ex. MM, at 13:24-14:9; Ex. OO, at 34:16-35:25. Tim Johnson was an architect at Rottlund. Id. Ex. JJ, at 143:2-22. While at Rottlund, Tim Johnson worked on the design development of Rottlund's Villa II project. Id. Ex. JJ, at 143:23-25. Sometime thereafter, TCM hired Tim Johnson as an architectural coordinator. Id. Ex. Q, at 247:18-248:12. Dan Geegan, Marc Harris, and Joey Zorn are other former Rottlund employees that TCM hired. Id. Ex. KK, at 58:5-22. While at Rottlund, Geegan had access to "the bidding documents, the plans, quantity takeoffs, pricing information, vendor information, anything." Id. Ex. MM, at 13:22-14:9; (Krummen Aff. Ex. G).

In January 2000, Pinnacle began developing a back-to-back townhome product for Aurora, Illinois that was to based on TCM's Homestead Collection. Id. Ex. RR. Doug Buster of BSB helped adapt the Homestead Collection for Aurora, Illinois by re-elevating the Homestead Collection. Id. Ex. SS, at 59:16-60:22, 69:11-15, 138:16-139:8. The Pinnacle back-to-back townhomes have become

known as Washington Square.

TCM began selling the Homestead Collection townhomes in Maple Grove, Minnesota in 2000. Id. Ex. TT. This development is known as Centennial Crossing. TCM also used the Homestead Collection townhomes in a development called Harvest Hills in Plymouth, Minnesota. Id. Ex. UU (TCM contract with BSB for Plymouth, Minnesota development). On July 5, 2001, Rottlund sent Town & Country Homes a cease and desist letter claiming that the Homestead Collection is substantially similar to certain of Rottlund's designs. Id. Ex. A. Pinnacle's in-house architect, Steve Sandelin, forwarded the letter to BSB, wrote that the designs are "obviously similar," and inquired whether BSB had a co-ownership agreement with Rottlund. Id. (emphasis added).

While TCM was developing the Harvest Hills townhomes (a version of the Homestead Collection) in July 2001, its employee Dan Geegan sent a drawing for a design and layout of a sprinkler room to BSB architect Beth Miller. Id. Ex. VV. The sprinkler room drawings Geegan sent were a portion of Rottlund's Villa II (The Reserve) technical drawings, VAu 546-285–the margin identifying the drawings as Rottlund's was simply cut off. Compare id. Ex. VV, with Ex. WW. A few months later, Beth Miller drafted a note about the sprinkler system and said that Geegan "is going to call an old arch. friend to determine what they did in this situation." Id. XX. On April 25, 2002, Todd Dosch of Metro Fire Protection, Inc., sent BSB a fax of Rottlund's sprinkler room drawings. Id. YY. Prior to sending the drawings, Dosch scribbled out Rottlund's logo and copyright notice. Id.; (Newman Aff. Ex. M, at 47).

## II. DISCUSSION

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered

forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A dispute about a material fact, one that may affect the outcome under the governing law, is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

A moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and it must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). All evidence will be viewed in the light most favorable to the nonmoving party. E.g., Liberty Lobby, 477 U.S. at 255.

The oft stated test to prevail on a copyright infringement claim requires a plaintiff to prove (1) ownership of a valid copyright and (2) copying of original expression. Feist Publ'n, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S.Ct. 1282 (1991); Moore v. Columbia Pictures Indus., Inc., 972 F.2d 939, 941 (8th Cir. 1992). The test can be easily stated, but its application is not always so.

### A. Ownership of a Valid Copyright

Defendants[11] argue that Rottlund does not own the copyrights in the Original Villa and the New Villa, that the copyrights in the Original Villa and New Villa are invalid for fraudulently failing to identify

[11] Not all Defendants make the same arguments regarding ownership and validity of the copyrights. TCM and Pinnacle simply respond to Rottlund's motion for summary judgment on ownership and validity. BSB has itself brought a motion for summary judgment on validity.

the true author, and that the copyrights in the New Villa and Villa II are invalid for fraudulently failing to disclose that they are derivatives. The Court finds Defendants' arguments without merit. Rottlund is entitled to summary judgment of validity of its registered technical drawing copyrights. BSB's motion for summary judgment of invalidity should be denied.

A certificate of registration constitutes prima facie evidence of ownership of a valid copyright. 17 U.S.C. § 410(c); Hamil Am., Inc. v. GFI, 193 F.3d 92, 98 (2d Cir. 1999). Defendants may rebut this presumption, but they have not.

**1. Ownership**

Ownership of a copyright "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). Under the "work for hire" provisions, 17 U.S.C. §§ 201(b) and 101, employers are considered authors. Importantly, copyright protection . . . "exists whether or not it is ever registered," Arthur Rutenberg Homes, Inc. v. Drew Homes, Inc., 29 F.3d 1529, 1531 (11th Cir. 1995), as it "subsists from the moment the work is 'fixed in any tangible medium of expression.'" S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1085 (9th Cir. 1989). Section 408(a)[12] of the Copyright Act "makes clear that registration is a separate issue from the existence of the copyright itself." Drew Homes, 29 F.3d at 1531.

---

[12] This section provides in pertinent part:

> a) Registration Permissive.–At any time during the subsistence of the first term of copyright in any published or unpublished work in which the copyright was secured before January 1, 1978, and during the subsistence of any copyright secured on or after that date, the owner of copyright or of any exclusive right in the work may obtain registration of the copyright claim . . . . *Such registration is not a condition of copyright protection*.

17 U.S.C. § 408(a) (emphasis added).

Ownership issues of the copyrights in this case are quite similar to those in Arthur Rutenberg Homes, Inc. v. Drew Homes, Inc., 29 F.3d 1529 (11th Cir. 1995). Here, Bud Rotter of Rottlund had an idea about a new townhome and may have made some sketches himself and with the help of a Rottlund draftsman. Rottlund, however, engaged the services of Tim Whitten at AFI to produce the actual architectural technical drawings. Bud Rotter offered his advice, insight, and comments throughout the process, but it was Tim Whitten that drew the drawings. Under today's case law, AFI–Mr. Whitten's employer–appears to be the author of the Original Villa technical drawings.[13] Thus, copyright and ownership of the Original Villa initially vested in AFI. 17 U.S.C. § 201; see Drew Homes, 29 F.3d at 1530.

Initially, the parties' May 12, 1987 agreement provided that AFI "retain[ed] ownership of all ideas, concepts and working drawings and the right to publish." Whatever ownership interests this agreement encompassed,[14] the undisputed evidence demonstrates that AFI and Rottlund orally agreed that AFI assigned all interests, copyright or otherwise, in the Original Villa drawings to Rottlund. (Krummen Aff. Ex. S, Mazzara Dep., at 141:25-142:1, 137:17-143:3, 145:22-149:4); (Davenport Aff. Ex. JJ, Whitten Dep., at 71:18-73:10). Thus, shortly after the 1987 agreement and when AFI began to do a number of Villa developments for Rottlund, Rottlund held, at a minimum, "a contractual

---

[13] Rottlund makes reference to the idea that it might be a joint author but makes no real argument in support thereof; nor does Rottlund make any argument in support of authorship by work for hire.

[14] "The Copyright Act expressly distinguishes between ownership in the work copyrighted and ownership in the copyright for a work . . . ." Donald Frederick Evans and Assoc., Inc. v. Continental Homes, Inc., 785 F.2d 897, 904 n.10 (11th Cir. 1986) (citing 17 U.S.C. § 202); see also United States v. Smith, 686 F.2d 234, 240 (5th Cir. 1982).

right by oral assignment to the copyright in the [Original Villa] drawings." Drew Homes, 29 F.3d at 1530-31. At this point, Rottlund could register the Original Villa copyright. E.g., id. at 1532-33 ("Chrysalis [the builder] was not required to have written evidence of the assignment from Heise [the architect] as a prerequisite to application for and the issuance of a valid copyright registration."); Billy-Bob Teeth, Inc. v. Novelty, Inc., 329 F.3d 586, 589-92 (7th Cir. 2003) (explaining oral transfer to corporation in May 1996, registration of copyright by corporation in 1999, and nunc pro tunc written assignment *during trial* in 2001).

The Copyright Act's statute of frauds, 17 U.S.C. § 204, does not give effect to otherwise binding oral transfers of copyright ownership. See, e.g., Eden Toys, Inc. v. Florelee Undergarment Co., Inc., 697 F.2d 27, 36 (2d Cir. 1982). 17 U.S.C. § 204 provides: "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed . . . ." As many courts have recognized, "the chief purpose of section 204(a), (like the Statute of Frauds), is to resolve disputes between copyright owners and transferees and to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses or copyright ownership." Imperial Residential Design, Inc. v. Palms Dev. Group, Inc., 70 F.3d 96, 99 (11th Cir. 1995) (per curiam); compare, e.g., In re Guardianship of Huesman, 354 N.W.2d 860, 863 (Minn. App. 1984). Thus, it is well settled that AFI's oral assignment of ownership of the Original Villa copyright interests could be confirmed by a later writing to satisfy § 204. Billy-Bob Teeth, 329 F.3d at 591 ("As the statute indicates, an oral assignment may be confirmed later in writing."); Magnuson v. Video Yesteryear, 85 F.3d 1424, 1428 (9th Cir. 1996) ("[C]ase law holds that under some circumstances a prior oral grant that is confirmed

by a later writing becomes valid as of the time of the oral grant, even if the writing is subsequent to the initiation of litigation on the copyright infringement."); Drew Homes, 29 F.3d at 1532 ("Many courts have held that the requirements of 17 U.S.C. § 204(a) can be satisfied by an oral assignment later ratified or confirmed by a written memorandum of the transfer."); Eden Toys, 697 F.2d at 36 ("[T]he 'note or memorandum of the transfer' need not be made at the time when the license is initiated; the requirement is satisfied by the copyright owner's later execution of a writing which confirms the agreement."). Contemporaneity is not required, e.g., Eden Toys, 697 F.2d at 36, and that the written note occurs during litigation or even during trial is of no consequence. E.g., Billy-Bob Teeth, 329 F.3d at 589; Kaplan Co., Inc. v. Panaria Intern., Inc., No. 96-7973, 1998 WL 603225, at *2 (S.D.N.Y. Sept. 11, 1998) ("[A] writing, even if signed after litigation commenced, can serve to satisfy the requirements of § 204.").

The 1989 written agreement between AFI and Rottlund satisfies the writing requirement of § 204. (Davenport Aff. Ex. JJJ). The 1989 Agreement explained the parties' understanding of the previous 1987 written agreement: "At the time of the May 12, 1987 Agreement AFI retained right to the right of publication of the Plans without specific recital of ownership of the other rights in the Plans." Id. AFI then, in conformity with the oral agreement testified to, "transfer[ed] any and all right, title and interest in its rights to the Plans under the Copyright laws to ROTTLUND." Id.

BSB argues that this agreement only transferred copyright ownership in the four plans specifically listed in the 1989 agreement.[15] The Court rejects that reading of the 1989 agreement as

---

[15] Not inconsequentially, at this point, Rottlund already *owned* all the Original Villa copyrights, but needed a writing signed by AFI for the *Copyright Act* to recognize its ownership.

contrary to its literal terms and the undisputed intent of the parties. The agreement provides: "Whereas pursuant to an agreement by and between AFI and ROTTLUND on or about May 12, 1987, AFI developed certain architectural plans (hereinafter "Plans") including: [four specific plans listed] to be used by Rottlund for a development known as Summerwood, Brooklyn Park." (Davenport Aff. Ex. JJJ). The "Plans," as defined by the 1989 agreement, are all those plans/drawings AFI developed pursuant to an agreement by and between AFI and Rottlund on or about May 12, 1987. Were the "Plans" limited to the four specific drawings, the "(hereinafter 'Plans')" clause would have been placed after the listing of the specific plans. If any ambiguity exists, the intent of the persons signing the 1989 agreement on behalf of the transferor (AFI) was clearly that all interests in all Original Villa plans were transferred to Rottlund.[16] (Krummen Aff. Ex. S, Mazzara Dep., at 141:25-142:1, 137:17-143:3, 145:22-149:4); (Davenport Aff. Ex. JJ, Whitten Dep., at 71:18-73:10). See Sunham Homes Fashions, LLC v. Pem-Am., Inc., No. 02-6284, 2002 WL 31834477, at *7 (S.D.N.Y. Dec. 17, 2002) ("[A]s the transfers do not contain merger clauses, the Court is permitted to examine extrinsic evidence in considering them.") (citing P.C. Films Corp. v. MGM/UA Home Video, Inc., 138 F.3d 453 (2d Cir.1998); Bourne v. Walt Disney Co., 68 F.3d 621 (2d Cir.1995)); see also Donnay v. Boulware, 144 N.W.2d 711, 716 (Minn. 1966). Indeed, should any doubt about the intent of the 1989 agreement remain, Gerald Mazzara, who signed the 1989 agreement as the President of AFI, along with Tim Whitten, who was with AFI at the time of the 1989 agreement, and Bernard Rotter of

---

[16] Testimony from Jack Buxell was for whatever reason not presented, but Gerald Mazzara, then President of AFI who signed the 1989 agreement, and Tim Whitten, then with AFI, agree that AFI transferred all interests in the Original Villa designs.

Rottland executed a memorandum of understanding in 2002 that states that once the Original Villa drawings were completed, AFI transferred all interest, copyright or otherwise, in the Original Villa drawings to Rottlund. (Davenport Aff. Ex. KKK). Thus, the oral assignment coupled with the 1989 writing satisfies the writing requirement of 17 U.S.C. § 204. Rottlund owns the Original Villa copyrights.

Defendants also argue that because the creation date listed in the copyright registration for VAu 268-380 is 1988, those drawings could not have been part of the drawings assigned to Rottlund by the 1989 Agreement. Nothing has been presented that suggests that all drawings created pursuant to the 1987 contract had to be completed in 1987; thus, the fact that some of the drawings created for purposes of the 1987 contract were actually completed in 1988 is consistent with the assignment of all drawings by way of the 1989 Agreement. That is also exactly what all parties involved intended.

Finally, Defendants argue that the 2002 memorandum of understanding does not satisfy § 204 because, at the time it was executed, AFI had dissolved and its former officers could not bind the dissolved corporation. This argument misses the mark. The 2002 writing is not necessary to satisfy 17 U.S.C. § 204 given the 1989 writing. The 2002 writing is, however, helpful to solidify the parties' intent, which is unmistakably clear–Rottlund was to own all the copyrights in the Original Villa.

Significantly and independently dispositive, "[e]ven if all this were not true, [Defendants], nevertheless, would lose on this point. [They] simply do[] not having standing under § 204." Billy-Bob Teeth, 329 F.3d at 592. From what the Court can gather, Rottlund is not now claiming ownership in the Original Villa through the "work for hire" doctrine but solely by assignment. Section 204, as noted, "is in the nature of a statute of frauds and is designed to resolve disputes among copyright owners and

transferees." Id.; accord, e.g., Imperial Residential, 70 F.3d at 99. Thus, "where there is no dispute between the copyright owner and the transferee about the status of the copyright, it would be unusual and unwarranted to permit a third-party infringer to invoke section 204(a) to avoid suit for copyright infringement." Imperial Residential, 70 F.3d at 99; accord Eden Toys, 697 F.2d at 36. That there is no dispute between Rottlund and the individuals making up AFI is undisputed.[17] Accordingly, in these circumstances, the cases are legion holding that a third-party infringer lacks standing to invoke § 204. Billy-Bob Teeth, 329 F.3d at 592; Imperial Residential, 70 F.3d at 99; Eden Toys, 697 F.2d at 36; John G. Danielson, Inc. v. Winchester-Conant Prop., Inc., 186 F.Supp.2d 1, 12-13 (D. Mass. 2002); Films by Jove, Inc. v. Berov, 154 F.Supp.2d 432, 477-78 (E.D.N.Y. 2001) (collecting cases); Great Southern Homes, Inc. v. Johnson & Thompson Realtors, 797 F.Supp. 609, 611 (M.D. Tenn. 1992).

A similar analysis applies to the New Villa technical drawings. Rottlund engaged the services of Tim Whitten, by then of Whitten Associates, Inc., to design the New Villa. At the time Mr. Whitten agreed to design the New Villa, he also orally agreed that Rottlund would own all rights, copyright or otherwise, in the New Villa drawings. (Krummen Aff. Ex. V, at 139:23-140:14); (Davenport Aff. Ex. JJ, at 71:18-24). Thus, Whitten Associates and Rottlund are in complete accord that Rottlund owns the New Villa technical drawing copyrights, and Defendants lack standing to challenge the assignment.[18]

---

[17] "[A] corporation cannot literally discuss anything with anyone." Billy-Bob Teeth, 329 F.3d at 592. Hence, agreement of the principals involved on each side of transaction is relied on.

[18] That Rottlund and Whitten Associates, Inc. agreed that Rottlund owns the New Villa drawings makes sense as Rottlund owned the Original Villa and was the only entity that could make a derivative.

The theory that it would be anomalous to permit a third party to contest this assignment is especially compelling in this circumstance where the transfer is between Tim Whitten of Whitten Associates, Inc.–the only other "associate" being Mr. Whitten's wife–and Rottlund where Tim Whitten

Nevertheless, in 2002, Whitten Associates, Inc. and Rottlund executed a written agreement stating that, at the time the New Villa drawings were completed, Whitten Associates, Inc. understood and agreed that all interest, copyright or otherwise, in the New Villa drawings were transferred to Rottlund. This writing plainly satisfies 17 U.S.C. § 204. There is no concern that Whitten Associates, Inc. is dissolved or that Tim Whitten is not authorized to sign on behalf of Whitten Associates, Inc.[19] This is so because absolutely no evidence has been presented otherwise. Indeed, the Court may take judicial notice of the fact that the Minnesota Secretary of State lists Whitten Associates, Inc. as an active domestic corporation and in good standing with the state of Minnesota in 2004. Whitten Associates, Inc. consists only of Tim Whitten and his wife who is not an architect. Rottlund owns the New Villa copyrights.

BSB submits that the writing memorializing Whitten Associates' assignment in 2002 failed to expressly assign accrued causes of action and, because the alleged infringement had already occurred, Rottlund cannot sue for infringement of the New Villa. The Court disagrees. First, Rottlund is suing for infringement of the Villa II. Second, Whitten Associates orally granted Rottlund ownership in the copyrights and all other interests in the New Villa designs at the time they were made in 1991 or prior to the alleged infringement, and "a prior oral grant that is confirmed by a later writing becomes valid *as*

---

is currently employed. <u>See</u> <u>Magnuson</u>, 85 F.3d at 1429 ("The logic of *Eden Toys* is particularly compelling in this case, where the conveyance is between John Magnuson as CEO of Columbus, and John Magnuson as owner of John Magnuson Associates.").

[19] At the time of the writing, Tim Whitten was employed by Rottlund, but signed the transfer agreement on behalf of the entity he created, Whitten Associates, Inc. This arrangement is hardly of concern. Individuals in today's commercial world commonly sit in positions of authority at more than one entity.

*of the time of the oral grant, even if the writing is subsequent to the initiation of litigation on the copyright infringement*." Magnuson, 85 F.3d at 1428; accord Drew Homes, 29 F.3d at 1533 ("'[I]f a prior oral grant is subsequently confirmed in writing, this will validate the grant *ab initio* as of the time of the oral grant.'") (quoting Great Southern Homes, 797 F.Supp. at 612). Even if the Court were to accept BSB's argument, it would simply permit Rottlund to obtain such a writing from Tim Whitten and Whitten Associates and proceed. See Billy-Bob Teeth, 329 F.3d at 589, 592 ("So to straighten things out, during trial of this matter, on May 31, 2001, White, as owner, signed a nunc pro tunc copyright assignment, assigning his works to Billy-Bob Teeth, Inc.").

There is no dispute that Rottlund owns the Villa II technical drawing copyrights. Tim Whitten joined Rottlund in 1995 as Vice President of Architecture. While a Rottlund employee and in the scope of that employ, Tim Whitten produced the Villa II technical drawings. Rottlund owns any copyrights in the Villa II (Rush Creek/Reserve or otherwise). 17 U.S.C. § 201(b).

**2. Validity**

Rottlund registered its copyrights in the Original Villa, New Villa, and Villa II technical drawings. The registrations constitute prima facie evidence of validity placing the burden on Defendants to prove otherwise. E.g., Hamil Am., 193 F.3d at 98 (ordering the burden of proof and holding that failure to accurately name author did not prejudice defendants and was not grounds for invalidating registration). As noted, Defendants claim Rottlund's copyrights are invalid due to fraud on the Copyright Office.

Defendants assert that Rottlund's claim of authorship in its registrations of the Original Villa and New Villa was fraudulent. As a matter of law, it was not. Here, all the copyright registrations, except

the first (Davenport Aff. Ex. B, VAu 159-813),[20] claim Rottlund is the author by way of the "work for hire" doctrine. Rottlund's dealings with AFI began in the late 1980s. During this time period, a "claim of authorship by 'work-for-hire' apparently reflected the common practice at the time where drawings were created for an employer by an 'independent contractor.'" Drew Homes, 29 F.3d at 1530. Indeed, laymen, or even those learned in the law, filling out a copyright registration, might understandably assume that work of this sort was work for hire. This might have been the correct assumption under the 1909 Act and early interpretations of the 1976 Act, as some interpretations encompassed a broad range of relationships as a work for hire, not merely formal employees. See generally Easter Seal Soc'y for Crippled Children and Adults of Louisiana, Inc. v. Playboy, Inc., 815 F.2d 323, 327-334 (5th Cir. 1987) (reviewing both Acts and the varying tests for "work for hire" that had developed); but see Aitken, Hazen, Hoffman, Miller, P.C. v. Empire Const. Co., 542 F.Supp. 252, 256-58 (D. Neb. 1982). It took judicial clarification from the United States Supreme Court in, Community for Creative Non-Violence v. Reid, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), to clarify the test for the "work for hire doctrine" and subsequent case law, though generally finding that outside architects are not to be considered an "employee" of the developer, e.g., M.G.B. Homes, Inc. v. Ameron Homes, Inc., 903 F.2d 1486, 1491-92 (11th Cir. 1990), establishes that the employee/independent contractor determination is a particularly fact intensive legal determination. Rottlund's claim of work for hire authorship in the initial 1993 registrations for the Original Villa, VAu 268-380, and New Villa, VAu 268-404, was hardly fraudulent. Nothing presented suggests intentional

[20] Nobody disputes that everything on the VAu 159-813 registration was accurate; it named AFI as the author and Rottlund owner by assignment. It was applied for by attorneys.

deception. Rather, Rottlund thought it might be judicially determined, if necessary, that under the factual circumstances, the works were for hire. That Rottlund's designation is likely wrong under current case law does not even approach fraudulent conduct. Nothing *precludes* an outside architect, under a particular factual milieu considering all the agency factors, Reid, 490 U.S. at 751-52, from being deemed an employee for purposes of the work for hire doctrine. BSB is forced to argue that Rottlund's relationship with AFI and Whitten Associates was not one of employee/employer. BSB's argument cites to no particular factual evidence in the record, but Rottlund does not dispute it. However, that is part of the point: each circumstance must be judged on its facts and because a determination results in an unfavorable finding for the claimant does not make the claimant guilty of fraud. Moreover, the deposit/source materials for the Original Villa architectural works and the New Villa technical drawings and architectural works filed with the Copyright Office state that Tim Whitten prepared the drawing or work (signed by Tim Whitten) and listed, for the relevant product, AFI and Rottlund or Whitten Associates and Rottlund in the title block. (Krummen Aff. Ex. U and W).[21] See Urantia Foundation v. Maaherra, 114 F.3d 955, 963-64 (9th Cir. 1997) (finding no fraud where plaintiff erroneously listed itself as author by work for hire but deposited the contents of the work that identified the origin of the work). BSB's argument that fraud or intentional deception was practiced on the Copyright Office because Rottlund claimed it was an author by work for hire is wholly without merit and factual support.

Other courts have declined to invalidate a registration where it incorrectly labeled the work as

[21] The deposit/source material for one of the Original Villa technical drawings, VAu 268-380, was apparently lost. (Patrick Aff. Ex. G).

one for hire. Billy-Bob Teeth, 329 F.3d at 591;[22] Urantia Foundation, 114 F.3d at 963-64;[23] Drew Homes, 29 F.3d at 1530-31; Tiffany Design, Inc. v. Reno-Tahoe Speciality, Inc., 55 F.Supp.2d 1113, 1117 (D. Nev. 1999) ("While the original registration incorrectly labeled the 1998 Image as a 'work made for hire', such misstatements generally will not affect the validity of a copyright or bar an action for its infringement.") (footnote and citation omitted); Godinger Silver Art Co., Ltd. v. Int'l Silver Co., No. 95-9199, 37 U.S.P.Q.2d 1453, 1995 WL 702357, at *4-5 (S.D.N.Y. Nov. 28, 1995).

The test for fraud on the Copyright Office has not been met for a more basic reason. "Absent

---

[22] The Billy-Bob Teeth case is instructive and interesting. There, Jonah White and Robert Bailey, came up with the idea for novelty teeth–crooked, oversized, and chipped teeth that jokesters can fit over their real teeth. The particular teeth designed by White were at issue. White authored the subject teeth in 1995. In 1996, White and Bailey incorporated the entity Billy-Bob Teeth. In 1999, Billy-Bob Teeth, Inc. obtained copyright registrations for White's teeth, and the registrations described Billy-Bob Teeth, Inc. as author by "'employer for hire of Jonah White.'" 329 F.3d at 589. Eventually, another company, Novelty, Inc., was alleged to have infringed Billy-Bob's copyrighted teeth. Billy-Bob sued, but realized that Billy Bob Teeth, Inc. could not be the owner of the copyright by work for hire because it was not in existence at the time White created the teeth. So, during the trial, White, as the author, executed an assignment of the copyright to Billy-Bob Teeth, Inc. The district court held that Billy-Bob Teeth, Inc. could not show ownership in the copyright because it was not in existence at the time White made the teeth so it could not be a work for hire, and found the assignment ineffective. The Seventh Circuit reversed. The Seventh Circuit agreed that "Billy-Bob, Inc. cannot claim that the teeth are works made for hire" because "the corporation did not exist when the teeth were authored." 329 F.3d at 591. In fact, on appeal, Billy-Bob Teeth, Inc. conceded that "[t]he work-made-for-hire provisions are not relevant to th[e] case." Id. Nonetheless, the Seventh Circuit explained that "[a]n error on the registration is not fatal to Billy-Bob's case" and recognized, quoting Urantia Foundation v. Maaherra, 114 F.3d 955, 963 (9th Cir.1997), that "'case law is overwhelming that inadvertent mistakes on registration certificates do not . . . bar infringement actions.'" 329 F.3d at 591. The court went on to hold that the assignment, during trial, from White to Billy-Bob Teeth, Inc. gave the corporation ownership of the copyright.

[23] In Urantia, the defendant argued that the plaintiff intentionally claimed work for hire so as not "to reveal to the Copyright Office that the 'authors' were celestial beings because the Copyright Office would have rejected the application." 114 F.3d at 963. That argument was rejected because the deposit materials identified the "celestial beings" that authored the work.

intent to defraud and prejudice, inaccuracies in copyright registrations do not bar actions for infringement." Harris v. Emus Records Corp., 734 F.2d 1329, 1335 (9th Cir. 1984); accord S.O.S., Inc., 886 F.2d at 1086. For purposes of this case, the work for hire designation is relevant only because it is a means of conferring authorship, and authorship confers ownership. 17 U.S.C. § 201. Rottlund, however, is already the owner of the Original Villa and New Villa technical drawing copyrights by assignment. Thus, the allegedly erroneous work for hire designation is immaterial and caused no prejudice to Defendants. See Datastorm Technologies, Inc. v. Excalibur Communications, Inc., 888 F.Supp. 112, 114 (N.D. Cal. 1995) ("[E]nforcement of a copyright is precluded only if the inaccuracies were entered with the intent to defraud and the infringing party was prejudiced by such inaccuracies.").

The same result holds for Defendants' argument that Rottlund practiced fraud on the Copyright Office by not designating the New Villa and Villa II copyrights as derivative works. There is nothing in the record that suggests the failure was intentional or fraudulent other than Defendants' allegation and speculation. The error was immaterial. Rottlund submitted supplementary copyright applications for the New Villa and the Villa II technical drawing and architectural works copyrights. (Krummen Aff. Ex. X, AA, BB (technical drawing supplements); Ex. Y and CC (architectural works supplements)). The supplementary applications clarified that the New Villa was a derivative of the Original Villa, and the Villa II was a derivative of the New Villa and Original Villa. Id. To invalidate the copyright registration, the knowing misstatement must have been one that might have occasioned the rejection of the application. Eckes v. Card Prices Update, 736 F.2d 859, 861 (2d Cir. 1984). Here, when presented with supplementary applications designating the New Villa and Villa II as derivatives, the

Copyright Office issued the supplementary registrations. (Krummen Aff. Ex. X, AA, BB, (technical drawing supplements); Ex. Y and CC (architectural works supplements)). See S.O.S., Inc., 886 F.2d at 1083, 1086 (finding no prejudice from failure to designate software as a derivative); Twentieth Century Fox Film Corp. v. Marvel Enter., Inc., 220 F.Supp.2d 289, 298 (S.D.N.Y. 2002) (holding that "Fox's failure to identify its logos as derivative does not affect the validity of Fox's copyright registrations" because "the Court has found that Fox's logos would have been copyrightable regardless of whether Fox advised the Copyright Office that its works were based on Marvel's"). No prejudice has been shown.

Defendants have failed to rebut the presumption of ownership of valid copyrights. No reasonable juror could find for them on their "fraud on the Copyright Office" theory given the undisputed facts in the record. Rottlund owns the technical drawing copyrights, and they are valid. Rottlund's motion for summary judgment of validity of its technical drawing copyrights should be granted. Although the above discussion nearly compels the granting of summary judgment in Rottlund's favor of ownership and validity of the *architectural works copyrights* as well, Rottlund has not brought that motion, but the above discussion certainly requires denial of BSB's motion for summary judgment of invalidity of the architectural work copyrights.

**B. Copyrightable Expression: Scope of the Copyrights**

Facts and ideas are not entitled to copyright protection; anyone may copy either freely. Feist Pub., Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 344, 350 111 S.Ct. 1282 (1991). "The question at what point an idea, too vague or abstract to warrant copyright protection, becomes sufficiently concrete or detailed to constitute protected expression is the endlessly baffling subject of Judge Learned Hand's

famous abstractions discussion in *Nichols*, 45 F.2d at 121." Sparaco v. Lawler, Matusky, Skelly, Engineers, LLP, 303 F.3d 460, 469 (2d Cir. 2002). That task "is particularly acute when the work of 'authorship' is of a functional nature, as is a plan for the accomplishment of an architectural or engineering project." Attia v. Soc'y of New York Hosp., 201 F.3d 50, 55 (2d Cir. 1999).

Rottlund has listed some seventy elements that it claims, in their placement, layout, and proportions, comprise the total look and feel or gestalt of its two technical drawings. (Am. Compl. ¶64); (Davenport Aff. Ex. SSS).[24] Importantly, Rottlund does not claim protection in any one individual element but asserts that its selection, arrangement, and coordination of the elements is protectible.

The Court "filters out" the *use of* individual elements of Rottlund's drawings. The use of, for instance, gabled entries, lofts, or fireplaces in this case represent mere ideas that others may utilize without consequence. Sturdza v. United Arab Emirates, 281 F.3d 1287, 1297 (D.C. Cir. 2002) ("In and of themselves, domes, wind-towers, parapets, and arches represent ideas, not expression."); CSM Investors, Inc. v. Everest Dev., Ltd., 840 F.Supp. 1304, 1310 (D. Minn. 1994) ("Thus, the use of standard structural elements and the concept of a one-story office showroom are not copyrightable."); Nelson-Salabes Inc. v. Morningside Holdings, No. 98-2226, 2001 WL 419002, at *4 (D. Md. Feb. 16, 2001) ("The Court agrees that Nelson-Salabes's use of certain individual features, such as the bay windows or the octagonal entrance, is neither original nor an expression of artistic merit.") vacated in

[24] These elements include, for example, the use of gabled side entries, a fireplace, a loft, a living room, first and second story windows, dining room, breakfast bar, patio, powder room, and sprinkler room.

part on other grounds by 284 F.3d 505 (4th Cir. 2002). The question is what is left? Defendants would have the Court find that nothing protectible remains after filtering the individual elements; the drawings merely being sheets of paper shareable amongst architects and builders to copy at will. That would be acceptable if no expression remains in the drawings for copyright "encourages others to build freely upon the ideas and information conveyed by a work." Feist, 499 U.S. at 350. As urged by Rottlund, however, the Court finds that the selection, arrangement, and combination of the elements expressed in the technical drawings are sufficiently original and detailed to be afforded copyright protection. Sturdza, 281 F3d at 1296 ("Considering the works as a whole is particularly important because protectible expression may arise through the ways in which artists combine even unprotectible elements."); CSM, 840 F.Supp. at 1310 ("The court concludes that the combination and arrangement of elements and the particular building design embodied in Everest's plans and drawings are sufficiently original to be afforded copyright protection."); Nelson-Salabes, 2001 WL 419002, at *4 ("[T]he Court finds that Nelson-Salabes's combination of common features such as a Y-shaped footprint, bay windows, the octagonal silo entrance, and gables created a unique design."); Richmond Homes Mgmt, Inc. v. Raintree, Inc., 862 F.Supp. 1517, 1523 (W.D. Va. 1994) reversed in part on other grounds by 66 F.3d 316 (4th Cir. 1995).

The Court discusses three cases that inform its decision. The first is Attia v. Soc'y of New York Hosp., 201 F.3d 50 (2d Cir. 1999). Attia alleged that the defendants copied his drawings for the renovation of the New York Hospital. The Hospital, located adjacent to F.D.R. Drive in Manhattan, had considered renovation for years and initially was set on a proposal to fill in existing courtyard space as opposed to utilizing air rights over F.D.R. Drive. A new Hospital board member requested Attia to

formulate an alternative. Attia "developed a concept centered on a new building that would be constructed on a platform over the F.D.R. Drive. He prepared a series of architectural drawings and sketches to present this concept, which he collected in a booklet . . . ." 201 F.3d at 52. Attia's plan became the Hospital's preferred solution, and the Hospital arranged for Attia and another architect, TCA, to develop the plan. Attia and TCA's relationship soured. So, the Hospital had a contest to select the architect that would design the renovation. Attia's team was not selected, but TCA's team (HOK/TCA) was. HOK/TCA spent years designing the plans and ultimately submitted schematic design drawings to the Hospital. Attia saw the proposal–erecting a new building over F.D.R. Drive–in the New York Times and brought suit claiming the drawings infringed his drawings. The Second Circuit's decision hinged on the protectability of Attia's drawings; specifically, the idea/expression dichotomy. The Court explained that determining when one moves from copying ideas to copying expression "often turns on the level of abstraction or generalization of the works being compared." Id. at 54. With architectural plans, the Court noted:

> As a generalization, to the extent that such plans include generalized notions of where to place functional elements, how to route the flow of traffic, and what methods of construction and principles of engineering to rely on, these are "ideas" that may be taken and utilized by a successor without violating the copyright of the original "author" or designer. On the other hand, to the extent that the copier appropriates not only those ideas but the author's personal expression of them, infringement may be found.

Id. at 55.

The Second Circuit then explained that Attia's plans were at such a generalized level of abstraction that the elements and even arrangement of the elements represented mere concepts or ideas, very valuable, but not protectible:

> The failure of Plaintiff's claim lies in the principles outlined above. Plaintiff's "Option 1A" booklets do undoubtedly contain creative ideas on how to extend New York Hospital over the F.D.R. Drive in a manner that would connect the Hospital's existing buildings with the new structure. However, the drawings in his booklets are highly preliminary and generalized; they describe Plaintiff's proposed design at a very general level of abstraction. Defendants' schematic design drawings, in contrast, which HOK/TCA prepared over several years of work on the Hospital's commission, constitute a detailed expression of how to effectuate the Major Modernization Program by constructing over the F.D.R. Drive and restructuring existing buildings.
>
> The issue we must decide is whether the similar elements that Defendants assertedly copied from Plaintiff's drawings were protected matter. Without doubt there are similarities between Plaintiff's drawings and Defendants' architectural plans. However, even assuming (as we must and do) that the similarities result from copying, we conclude there was no infringement, because the similarities do not go beyond the concepts and ideas contained in Plaintiffs' drawings.

Id.

After considering Attia's drawings, which themselves stated the purpose was to "'suggest an *idea*'" and "'demonstrat[e] a *concept*,'" the Court again emphasized the drawings "are barely a first step toward the realization of a plan. How these and other ideas would be expressed or realized in a finished plan is not even approached in Plaintiff's drawings." Id. at 56. Finally, the Court specifically distinguished cases such as CSM where the architectural plans consisted of detailed drawings that would enable construction. Id. at 56-57.

The Second Circuit revisited the issue of copyright protection for architectural drawings in Sparaco v. Lawler, Matusky, Skelly, Engineers, LLP, 303 F.3d 460 (2d Cir. 2002). Plaintiff Sparaco was hired by two architectural firms to develop a "site plan" for an assisted living facility. As the Court explained, "[a] site plan is a development plan for a plot of land. It specifies existing land conditions, including topography, boundaries, and physical structures, and can also specify the proposed improvements to the site." 303 F.3d at 462. Sparaco completed the site plan, submitted it to the city,

and it was approved. The plan depicted (1) existing physical characteristics of the site and (2) proposed physical improvements to the site. The developer, NMF, later removed the architect from the project and hired a new construction and architectural firm. Changes were made to the building that required the new architects to change Sparaco's site plan. Sparaco offered to make the changes for a fee, but NMF declined and gave the task to another architect. The eventual site plan used "'was basically a copy of the approved A.R. Sparaco plan with several minor changes.'" 303 F.3d at 464. Sparaco sued claiming the defendants copied his site plan. The district court initially found some protection for Sparaco's plan, but after the Second Circuit's decision in Attia, held that the site plan was not entitled to protection. The Second Circuit vacated the judgment in part. The Court held that the individual facts of the first part of the site plan, that depicting existing physical characteristics, was not protectible because the existing physical features represent facts; on this score, however, the Court explained that a particularly original manner in selecting the unprotected information could be protected. 303 F.3d at 467. As for the part of the site plan that depicted proposed physical improvements, the Court found it protectible expression. Id. at 469. In the Second Circuit's view, "the site plan was significantly different from Attia's proposal of ideas for the expansion of the hospital. Sparaco's site plan specifies more than vague, general indications of shape and placement of the elements. It provides detailed specifications for preparation of the site." Id. at 468. The Court held:

> Recognizing that the site plan was not an architectural plan for a building but only a plan for the preparation of a site, we conclude that it did not consist only of the kinds of general ideas that we ruled in *Attia* were not protected from copying. It included specific expression and realization of those ideas, with the consequence that copying could constitute an infringement of copyright.

Id. at 469.

What can be learned from Attia and Sparaco, is the general principle[25] that plans or drawings that merely propose use of conceptual elements are not protectible because, at that general level of abstraction, such plans represent ideas, but where the plans stretch beyond "vague general notions relating to placement of elements," id. at 468, and express in detail the manner in which to capitalize on the ideas, copyright affords protection.

Next, in Sturdza v. United Arab Emirates, 281 F.3d 1287 (D.C. Cir. 2002), the United Arab Emirates (UAE) held a competition for the design of its new embassy. Sturdza and another architect, Demetriou, submitted designs. Sturdza won. Over the next couple of years, Sturdza submitted designs to the UAE, the UAE requested changes, and Sturdza complied. Just when Sturdza and the UAE were about to execute a contract, communication broke off. Sturdza later found out that the UAE was going to use a design by Demetriou. Sturdza thought Demetriou's design copied her's and sued for copyright infringement. The district court "'filter[ed] out' those elements of Sturdza's design it viewed as unprotectible ideas: 'domes, wind-towers, parapets, arches, and Islamic patterns.'" 281 F.3d at 1297. As the district court explained, "Sturdza's *expression of these elements*, but not her use of them, *is protectible*." Id. (emphasis added). The D.C. Circuit agreed. Id. The district court,

[25] The Second Circuit was careful to explain that its holdings do not mean that "technical drawings cannot achieve protected status unless they are sufficiently complete and detailed to support actual construction," but simply that Sparaco's drawings crossed the continuum into expression. 303 F.3d at 469; see also Attia, 201 F.3d at 57 ("In distinguishing these cases, we do not mean to suggest that, in the domain of copyrighted architectural depictions, only final construction drawings can contain protected expression. And we express no view whether, in other circumstances, an architect's sketches of visual elements (for example, Frank Lloyd Wright's preliminary sketches of the facade of the Guggenheim Museum) might include the type of expressive content entitled to copyright protection.").

however, found that Sturdza's expression of the elements was not similar to Demetriou's expression of the same elements. Id. The D.C. Circuit disagreed and analyzed the expression of the elements individually and the combination of the "overall look and feel" of the elements and found that a jury could find them substantially similar. Id. at 1298-99.

Sturdza is important because it recognizes that even when filtering out the use of individual elements such as domes and arches as representing ideas, the particular manner in which an architect expresses those generally unprotectible elements *is* protectible. It follows that the particular manner in which an architect expresses unprotectible elements by selecting, arranging, and combining them is protectible. Id. at 1296 ("Considering the works as a whole is particularly important because protectible expression may arise through the ways in which artists combine even unprotectible elements.").

Finally, the CSM case bears heavily on the undersigned's analysis, and it is carefully followed. The idea of an 8-unit back-to-back, slab on grade townhome is separate from the expression of that idea in Rottlund's detailed plans. CSM, 840 F.Supp. at 1310 ("The idea of an office showroom is separate from the expression of that idea in the Everest plans."). Rottlund has expressed its idea of how to combine a variety of elements for a back-to-back townhome in detailed plans clearly enabling the construction of its townhomes. Defendants may independently design their own townhome, and they argue they have, but they cannot copy Rottlund's design. Id. ("While Everest cannot prevent anyone from innocently building a similar office showroom, it can prevent others from deliberately

copying the originality of its plans.").[26]

Rottlund's designs are also original. "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." Feist, 499 U.S. at 345. No evidence has been presented that Rottlund copied its drawings from another. Rather, the drawings owe their origin to the thoughts and creative spark of Tim Whitten and Bernard Rotter. See id. at 346-47. The degree of creativity required "is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be." Id. at 345; see also Alfred Bell & Co. v. Catalda Fine Arts, 191 F.2d 99, 103 (2d. Cir. 1951) ("Originality in this context 'means little more than a prohibition of actual copying.' No matter how poor artistically the 'author's' addition, it is enough if it be his own.") (footnote omitted). Rottlund's Villa II drawings make the grade. Indeed, the Villa II, carrying forward the Original and New Villa copyrights, represents a creative effort on the part of Tim Whitten and Bernard Rotter to develop a product that would satisfy, among other things, size and market constraints. See CSM, 840 F.Supp. at 1310 (rejecting the argument that the "plans lack originality because the design of the project was dictated by geographic and legal constraints imposed on the development of the site" because "the adaptations to the site in the Everest plans reflect Everest's creativity and thus are copyrightable").

---

[26] By stating that Defendants can independently create their own townhome that is similar to Rottlund's, the Court is not suggesting that innocent or subconscious copying is permitted. It is not. E.g., ABKCO Music, Inc. v. Harrisongs Music, Ltd., 722 F.2d 988, 998-99 (2d. Cir. 1983).

**C. Copying**

"Copying may be proven either by direct evidence or by demonstrating circumstantial evidence establishing 'access and 'substantial similarity' of the two works.'" Nelson v. PRN Prod., Inc., 873 F.2d 1141, 1142 (8th Cir. 1989).

**1. Direct Evidence of Copying**

Rottlund submits that there is ample direct evidence of copying in this case. First, it argues that BSB architect Larry Moore admitted that he relied on earlier projects – Midland Homes and Jerry's Homes projects – when designing the Homestead Collection, and that files from those earlier projects contained actual floor plans for Rottlund's Original Villa or New Villa townhomes. In fact, in connection with designing Midland Homes, Rottlund underscores the fact that Moore asked in an internal memo if the designs were enough of a "departure" from Rottlund's. Second, prior to designing the Homestead Collection, Rottlund notes that Defendants toured Rottlund's Villa II townhome on more than one occasion, took photos and obtained Rottlund brochures. Rottlund points out that, in the redline process of the Homestead Collection, TCM president Art Plante attached a photo of a Rottlund product with an inscription referencing the Rottlund product. Finally, Rottlund notes that BSB and TCM had copies of the sprinkler room technical drawing for the Villa II (The Reserve), VAu 546-285, and Dan Geegan and Tim Johnson, former Rottlund employees, were involved in obtaining these drawings.

Defendants submit that the facts Rottlund relies on do not relate to direct copying of the technical drawings at issue, VAu 447-395 and 546-285, with the exception of the sprinkler room drawings for VAu 546-285. As for the sprinkler room drawings, Defendants assert, correctly, that

infringement of individual elements in this case cannot be the basis for liability.

Although Rottlund's arguments might raise eyebrows, Defendants are entitled to all inferences. The Court finds that genuine issues of material fact preclude a finding at this stage of direct copying.

**2. Access**

Rottlund argues that there is significant evidence of access in this case. Former Rottlund employees, who personally had access to the Villa II designs now work for TCM. Defendants have possession of Rottlund floor plans, took multiple tours of Rottlund's Villa II townhome, and took photographs of Rottlund's Villa product. Finally, Rottlund alleges that Larry Moore has admitted that BSB had access. Specifically, Rottlund explains that Tim Johnson, while a Rottlund employee, worked on the Villa II designs, and other former Rottlund employees, such as Dan Geegan, also had access to the Villa II designs while in Rottlund's employ. Citing a long line of cases, including Imperial Homes Corp. v. Lamont, 458 F.2d 895 (5th Cir. 1972), Donald Frederick Evans and Assoc., Inc. v. Continental Homes, Inc., 785 F.2d 897, 904-05 (11th Cir. 1986), and Robert R. Jones Assoc., Inc. v. Nino Homes, 858 F.2d 274, 277 n.2 (6th Cir. 1988), (Pl.'s Mem. in Supp. of Mot. for Summ. J., at 26 n.16), Rottlund submits that access to its Villa II abridged floor plans in brochures, (Davenport Aff. Ex. Z and AA), constitutes access to the technical drawings. See Donald Frederick, 785 F.2d at 904 (rejecting the defendants' argument that "because they did not have access to the technical working drawings, which are the documents described in the copyright registration, they did not copy the protected works").

Defendants argue that all of the evidence regarding product tours and photographs is irrelevant because it does not constitute access to the technical drawings. But see Kootenia Homes, Inc. v.

Reliable Homes, Inc., No. 00-1117, 2002 WL 15594, at *5 (D. Minn. Jan. 3, 2002) ("[Eventual homeowner's] tour minimally suffices to create a factual issue as to the extent of Defendants' access to the Hoeffel Home design."). Defendants assert that floor plans in brochures cannot constitute access to the technical drawings deposited with the Copyright Office, and Defendants submit that the brochures in question, (Davenport Aff. Ex. Z and AA), are not of the Villa II. Defendants further argue that access to the Rottlund materials in BSB's Midland Homes' and Jerry Homes' files is irrelevant, again because those files do not contain technical drawings. Defendants, at least TCM and BSB, admit that they had access to the sprinkler room technical drawings for the Villa II (The Reserve), VAu 546-285, but state that that does not constitute access to the entire technical drawing. Finally, TCM argues that hiring former Rottlund employees does not establish access to the technical drawings.

Access is established by showing Defendants "had an 'opportunity to view or to copy'" Rottlund's technical drawings. Moore v. Columbia Pictures Indus., Inc., 972 F.2d 939, 942 (8th Cir. 1992); accord, e.g., Nino Homes, 858 F.2d at 277 ("Access merely means an opportunity to view the protected material."). Rottlund must demonstrate a "reasonable possibility" of access, a bare or metaphysical possibility will not suffice. Moore, 972 F.2d at 942.

The Court finds that Defendants had a reasonable opportunity to view Rottlund's technical drawings. It remains undisputed that, while an in-house architect for Rottlund, Tim Johnson worked on the design development of Rottlund's Villa II project. (Davenport Aff. Ex. JJ, at 143:23-25). Thus, not only did Tim Johnson have the opportunity to view the technical drawings, he personally helped create them. Tim Johnson then moved to TCM where he is the coordinator of architecture. Id. Ex. Q, at 247:18-248:12. This plainly constituted direct access to the technical drawings; the Court need not

rely on circumstantial evidence. See Taylor Corp. v. Four Seasons Greetings, LLC, 315 F.3d 1039, 1042 (8th Cir. 2003) ("It is undisputed that Four Seasons had direct access to at least four of Taylor's six designs, because the three artists who created the designs [while employed by Taylor] later created the alleged infringing designs for Four Seasons [while employed by Four Seasons]."); Control Data Sys., Inc. v. Infoware, Inc., 903 F.Supp. 1316, 1321 (D. Minn. 1995) ("The prior employment with Control Data and the access to manuals containing the NOS source code demonstrate a reasonable possibility that Defendant had an opportunity to review the copyrighted material."); Costello, Erdlen & Co., Inc. v. Winslow, King, Richards & Co., 797 F.Supp. 1054, 1056, 1062 (D. Mass. 1992) ("[I]t can reasonably be assumed that Winslow had access to other Costello guides during his employment."); Saenger Org., Inc. v. Nationwide Ins. Licensing Assoc., Inc., 864 F.Supp. 246, 249 (D. Mass. 1994) (explaining that the parties did not dispute access where the individual defendant "was employed by [plaintiff] from July 15, 1986 to September 15, 1992 during which time he 'worked on, and assisted' in developing these texts [the copyright work]"). Moreover, another former Rottlund employee, Dan Geegan, now with TCM, had a clear opportunity to view Rottlund's Villa II designs while a Rottlund employee. Karen Albertson testified that she is the current Rottlund estimating coordinator and has been since about 2000. (Krummen Aff. Ex. G., at 9:3-20). Ms. Albertson testified that the previous estimating coordinator for Rottlund was Dan Geegan. Id. at 9:21-10:1). Ms. Albertson explained that, as Rottlund's estimating coordinator, Dan Geegan "had access to the same information that I have access to" such as "[a]ny of the–bidding documents, the plans, quantity takeoffs, pricing information, vendor information, anything." Id. at 13:25-14:9). See Chere Amie, Inc. v. Windstar Apparel, Corp., 191 F.Supp.2d 343, 350 (S.D.N.Y. 2001) ("Access is uncontested since

the former Obvious Employees certainly had access to the Sleepwear Designs during their employment with that company.").[27] Still other former Rottlund employees, Marc Harris and Joey Zorn, joined TCM, and it is reasonable to assume that they at least had an opportunity to view the Villa II drawings during their employment with Rottlund. (Davenport Aff. Ex. KK, at 58:5-22.).

Access to both versions of the Villa II is established. According to Defendants, "[t]he only alleged difference between the 546-285 registration [Villa II–the Reserve] and the 447-395 registration [Villa II–Rush Creek] is that the former includes a room at one end of the building containing the required sprinkler pipes." (Defs.' Mem. in Supp. of Mot. for Partial Summ. J., at 4) (Doc. No. 409). Both TCM and BSB had physical possession of the technical drawings for the sprinkler room of the Villa II. Compare Davenport Aff. Ex. VV at BSB01262-63, Ex. YY, at BSB001022-23, and Ex. ZZ, at BSB00975-76, with Ex. WW.

TCM argues that there is no evidence that any former Rottlund employees "utilized [their] knowledge . . . in the development of the Centennial Crossings or Harvest Hills technical drawings." (TCM's Mem. in Opp'n to Mot. for Summ. J., at 24). TCM submits that the only evidence is a letter from Geegan to BSB indicating that Geegan, Harris, and Zorn were involved in the red lining process for Harvest Hills, but this was after the Centennial Crossing drawings were completed. First, a plaintiff simply need not prove a defendant utilized its knowledge of the protected work to constitute access, a

---

[27] The undersigned recognizes that some of the cases cited in this section are in the context of a motion for preliminary injunction, but the Court finds that the logic of the holdings can be securely extended to the standard for access on summary judgment where similar facts are undisputed. Indeed, in most of the cases the defendant did not even dispute access where its employee(s) formerly worked for the plaintiff.

mere reasonable *opportunity to view* will suffice. Indeed, proof of actual viewing much less utilizing knowledge gained from viewing is not even necessary. See, e.g., Moore, 972 F.2d at 942 ("[Plaintiff] can establish access by showing that the defendants had an 'opportunity to view or to copy' his work."); Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1249 (11th Cir. 1999) ("[S]ome courts have defined access as the actual viewing and knowledge of plaintiff's work by the defendant. This circuit, however, regards a 'reasonable opportunity to view' as access."); see also Am. Greetings Corp. v. Easter Unlimited, Inc., 579 F.Supp. 607, 613-14 (S.D.N.Y. 1983) (finding access "in the formative stages" of development). Second, proof that Geegan, Zorn, or Harris were directly involved in designing both of TCM's townhomes is not necessary. It is sufficient that TCM, through these former Rottlund employees, had an opportunity to view the protected works. Further, Defendants do not dispute that Tim Johnson was involved in the design process of TCM's townhomes.

TCM's access to Rottlund's technical drawings reaches the other Defendants. A "Plaintiff may prove access by showing that a third person with creative input for the designer has had access to the copyrighted work." Kootenia, 2002 WL 15594, at *5; c.f. Kamar Intern., Inc. v. Russ Berrie and Co., 657 F.2d 1059, 1062 (9th Cir. 1981) ("'[E]vidence that a third party with whom both the plaintiff and defendant were dealing had possession of plaintiff's work is sufficient to establish access by the defendant . . . .'"); 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, §13.02[A], at 13-17. Here, BSB was TCM's architect. TCM and BSB had multiple discussions about the design of TCM's townhomes, and TCM participated in redlining the designs of its townhomes. Thus, TCM's clear access is reasonably imputed to its architect for the Homestead Collection townhomes. See Arthur Rutenberg Corp. v. Parrino, 664 F.Supp. 479, 481 (M.D. Fla. 1987) (finding that "Joseph

Parrino's [the homeowner] access to the 'Inverness' plans is fairly attributable to Precision [the architect]").[28]

Likewise, BSB designed Pinnacle's Washington Square townhome by adapting TCM's Homestead Collection townhomes.[29] (Davenport Aff. Ex. RR; Ex. SS, at 59:16-60:22, 69:11-15, 138:16-139:8). The key feature between TCM and Pinnacle is "the close relationship linking the intermediary and the alleged copier." Moore, 972 F.2d at 944.[30] Pinnacle's in-house architect, Steve Sandelin, was involved in the design of TCM's Homestead Collection from the very beginning–actually recommending BSB as the architect. (Davenport Aff. Ex. U, at 34:2-22). As has been explained in previous Orders of this Court, June 30, 2004 Order, at 6 (Doc. No. 418), Pinnacle's Sandelin commented on or gave input on TCM's Homestead Collection designs. Sandelin toured Rottlund's Villa II with TCM representatives and possibly representatives from BSB. Ultimately, while designs for TCM's Centennial Crossing townhome were finishing up, Pinnacle decided that it would design a back-to-back townhome for Aurora, Illinois "from the working drawings originally prepared for Maple Grove, Minnesota (TCM's Centennial Crossing townhome). (Davenport Aff. Ex. RR; TT). Faced with this relationship between the parties, the Court finds that TCM was in a position to transmit its

---

[28] The Court notes that BSB architect Larry Moore testified, in response to a question as to whether he had access to Rottlund's materials, that, "We had access. We did not access them. We did not use them." (Davenport Aff. Ex. FF, at 42:8-19).

[29] TCM and Pinnacle are not totally unrelated entities. Pinnacle does business as Town & Country Homes, and TCM is the allegedly separate Minnesota division of Town & Country Homes.

[30] The concept of an intermediary usually is found in cases where a party sends a musical recording or literary work to a company and, through an inferential chain, access is established as to the copier. Nimmer, § 13.02[A], 13-17-24. The circumstances here are analogous.

information to Pinnacle. Thus, the inferential chain reaches Pinnacle.

When a reasonable opportunity to view is established, it is appropriate not just to find a mere inference of access but to deem access established. As Nimmer explains:

> It would seem clearer and more just in terms of the plaintiff's burden of proof to regard a reasonable opportunity to view as access in itself and not merely as creating an inference of access. This approach is consistent with what is perhaps the more prevailing definition of access, i.e., the opportunity to copy. The trier of fact may conclude that the person who created defendant's work had, but did not avail himself of, the opportunity to view, but this conclusion properly goes to the ultimate issue of copying, and not to the subordinate issue of access.

Nimmer, §13.02[A], at 13-16 (footnotes omitted).

Plaintiff is entitled to a finding of summary judgment on access – that Defendants had a reasonable opportunity to view the Villa II technical drawings.

**2. Substantial Similarity**

The Eighth Circuit Court of Appeals has directed that "*Hartman v. Hallmark Cards, Inc.*, 833 F.2d 117, 120 (8th Cir.1987), indites the law in this Circuit pertaining to substantial similarity." Nelson v. PRN Prod., Inc., 873 F.2d 1141, 1143 (8th Cir. 1989). Hartman provides:

> There must be substantial similarity "not only of the general ideas but of the expressions of those ideas as well." First, similarity of ideas is analyzed extrinsically, focusing on objective similarities in the details of the works. Second, if there is substantial similarity in ideas, similarity of expression is evaluated using an intrinsic test depending on the response of the ordinary, reasonable person to the forms of expression.

833 F.2d at 120.

Thus, at the extrinsic step, district courts in this Circuit are required to consider the similarity of ideas, all of which are unprotectible. Id.; Taylor Corp. v. Four Seasons Greetings LLC, 171 F.Supp.2d 970, 975 (D. Minn. 2001) ("First, an 'extrinsic' analysis is performed to determine whether the general idea

of the two works is substantially similar."). The extrinsic test looks at such matters as "'the type of artwork involved, the materials used, the subject matter, and the setting for the subject.'" Nelson v. PRN Prod., Inc., 873 F.2d at 1143 (quoting Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp., 562 F.2d 1157, 1164 (9th Cir.1977)). Expert evidence is admissible at this stage of analysis (and only at this stage). Id.

A comparison of the Villa II plans and the Homestead Collection and Washington Square plans reveals that there is a similarity of ideas. The type of work involved is similar: both are architectural drawings. The subject matter is similar: both depict residential, back-to-back townhomes. The materials used are similar. As TCM and Pinnacle's expert, Jeffery Scherer, states, each plan utilizes similar ideas of structure, function, and design: wood framed structure, slab-on-grade; kitchen, dining, living, bathroom, 2-car garage, master bedroom and bath, bedroom, laundry, shared bath, and spare room; gabled roofs, double-hung windows, protected entrances, and siding with masonry base. (Scherer Aff. Ex. A, at 9).[31] Further, although concluding that the plans are not "substantially similar," Scherer nevertheless admits that the plans utilize "similar elements, proportions, and roof configurations." Id. at 30. Finally, BSB's expert, Albert Bloom, testified on this very topic:

> Q: Are there similarity of ideas between the Villa II and the Homestead Collection?
> A: Yes.
> Q: When you say there are similarity of ideas between the Villa II and the Homestead Collection, what do you mean?
> A: They're very similar in concept. They're both back-to-back townhouse products.

---

[31] The Court notes that Pinnacle states Mr. Scherer's report and analysis of the plans, although only explicitly dealing with the Villa II and the Homestead Collection, applies with equal force to Pinnacle's Washington Square product. (Defs.' Mem. in Supp. of Mot. for Partial Summ. J., at 27) (Doc. No. 409).

> They have end units or exterior units. They also have interior units. They're slab-on-grade construction. They're two-car garages. They have similar scope as far as the room counts go in living, dining, kitchen, bedrooming, loft spaces, and there's a similarity as far as the gross mass of the building size.

(Davenport Aff. in Opp'n to Defs.' Mot. for Summ. J., Ex. R101, at 6:17-7:5)

Thus, TCM, Pinnacle, and BSB's own experts agree that the designs share similarity in the details of the objective ideas. This Court finds this level of comparison of ideas to be appropriate under the precedent of this Circuit. To tread into greater levels of detail as Defendants propose, would be to approach a comparison of the expressive coordination and arrangement of ideas, which is clearly saved for the intrinsic stage of the analysis. This conclusion is consistent with CSM where the Court, considering the extrinsic test, explained:

> A comparison of the objective details of the Everest plans and the two sets of CSM plans shows there is a similarity of ideas between them. Both Everest and CSM proposed and designed a rectangular office showroom for the Roseville site.

840 F.Supp. at 1311.

Whether the drawings' expression is similar, the intrinsic test, depends on the response of an ordinary, reasonable person. Hartman, 833 F.2d at 120. In other words, "[i]nfringement of expression occurs only when the total concept and feel of the works in question are substantially similar." Id. at 120-21; see also Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960) (explaining the test as whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same"). Summary judgment at this stage "is not favored." Id. at 120; accord, e.g., Sturdza, 281 F.3d at 1298 (explaining that "'[b]ecause substantial similarity is customarily an extremely close question of fact, summary judgment

has traditionally been frowned upon in copyright litigation'") (quoting Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 977 (2d Cir. 1980)).

Considering the drawings at issue (the Villa II Rush Creek and Reserve and the Homestead Collection Centennial Crossing and Harvest Hills and the Washington Square), the Court finds that a reasonable juror could find that the total look and feel of how the drawings selected, arranged, and coordinated the elements is substantially similar, but a reasonable juror would not be compelled to so find. Thus, no party is entitled to summary judgment on the issue of substantial similarity (the intrinsic analysis) of the Villa II and Homestead Collection and Washington Square technical drawings.

**D. Motion to Strike the Scherer Affidavit**

At this point, it is appropriate to discuss the propriety of Jeffery Scherer's expert report. Oral argument was heard on Rottlund's motion on two separate days, due to the length of argument. Rottlund moved to strike the Scherer report after the first hearing but before the second under Rule 56(e) and Federal Rules of Evidence 104(a) and 702. TCM and Pinnacle argue that Rottlund's motion is untimely because it should have been submitted with Rottlund's reply brief and Rottlund never mentioned a dispute with Mr. Scherer's affidavit at the first hearing. This Court is unpersuaded by TCM and Pinnacle's argument. Timeliness of a motion to strike an affidavit is left to the district court's discretion. Nat'l Union Fire Ins. Co. v. Siliconix, Inc., 726 F.Supp. 264, 268 (N.D. Cal. 1989). There is no rule requiring a motion to strike to be submitted with a reply brief, although that might be preferable. Contrary to TCM and Pinnacle's argument, Rottlund did object to or contest the Scherer report during the first day of argument; though it did not formally move to strike until after the hearing. Although initially claiming that much of their argument would have to be redone, that concern did not

materialize and TCM and Pinnacle have not suffered prejudice due to the timing of the motion. Moreover, even in the absence of Rottlund's motion, the weight given to Scherer's report would be the same.

TCM and Pinnacle also argue that Rottlund's motion should be denied because Rottlund's previous position in the litigation was that expert testimony is necessary for the extrinsic test, and the Court ordered Rottlund to provide a list of the elements of Rottlund's drawings that it claimed were protectible with expert disclosures. There is no dispute that expert testimony is admissible in regard to the extrinsic test. That is not, as explained below, the basis for the motion to strike. In addition, Rottlund's theory of protectible expression does not involve use of individual elements; in other words, Rottlund is not claiming protection for any one element so there is nothing to identify. Rather, Rottlund's protectible expression consists of the selection, arrangement, and coordination of the individual elements, and it has provided Defendants a list of the elements that have been expressively selected, arranged, and coordinated. Further, the Court has engaged, supra, in the requisite filtering or analysis of how Rottlund's drawings are protectible.

With regard to the contents of the Scherer report, the Court disregards much of it. Rottlund argues that Scherer's report impermissibly offers an opinion on copyright infringement in general and seeks to redefine the standards for originality and independent creation. TCM and Pinnacle submit that Scherer's report is admissible on the issue of substantial similarity.

One thing is clear: "Although expert opinion evidence is admissible in connection with the first step of the substantial similarity analysis to show *similarity of ideas*, analytical dissection and expert opinion are not called for under the second step in which substantial *similarity of expression* is

measured by a different standard--the response of the ordinary, reasonable person." Hartman, 833 F.2d at 120 (emphasis added). Thus, expert opinion evidence is admissible under the extrinsic test (ideas), and it is not admissible under the intrinsic test (expression). The Court considers the Scherer affidavit, to the extent it discusses similarity of ideas, but, when Scherer evaluates how individual elements are expressed, the Court finds that such an analysis moves too far into expression; thereby invading the province of the jury. The point at which Scherer purportedly evaluates the townhomes, he simply states that he is going to explain why the townhomes are not "substantially similar." (Scherer Aff. Ex. A, at 17).[32] Opining generally on substantial similarity is something Scherer clearly may not do. Substantial similarity is a legal test with two prongs–extrinsic and intrinsic–and the extrinsic prong is the only prong that accepts expert opinion evidence. While Scherer does not always explicitly say he is evaluating expression (the Court does not expect one with no legal training to appreciate the difficult idea/expression dichotomy, and TCM/Pinnacle argue that Scherer's evaluation should be cloaked with the description of comparing objective details of the ideas as opposed to comparing expression), it is telling that at some points he does. For instance, in evaluating the placement of the gabled roof, Scherer tells the Court that use of the gabled roof "is not subject to copyright," but also that "the manner in which each architect independently created his own *expression* of the traditional

---

[32] Scherer states that the purpose of his report "is to offer my opinion as to whether there is copyright infringement arising under the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq*." (Scherer Aff. Ex. A, at 1). Elsewhere, Scherer affirmatively states "I would contend that the arrangement of the basic elements of the interior is also not protectible." Id. at 10. The Court will not consider Scherer's "'attempt to tell the court what result to reach.'" Dow Corning Corp. v. Safety Nat'l Cas. Corp., 335 F.3d 742, 752-53 (8th Cir. 2003); see also Kostelecky v. NL Acme Tool/NL Indus., Inc., 837 F.2d 828, 830 (8th Cir. 1988) (explaining the principle that expert opinion evidence that simply tells the jury what result to reach is not helpful).

gable–within the narrow restriction mentioned above–establishes that they are not substantially similar." (Scherer Aff. Ex. A, at 18) (emphasis added).

With regard to originality, the Scherer report reads more like an amicus brief. "The touchstone for the admissibility of expert testimony is whether it will assist or be helpful to the trier of fact." McKnight by and through Ludwig v. Johnson Controls, Inc., 36 F.3d 1396, 1408 (8th Cir. 1994). The Eighth Circuit has recognized that "[b]ecause the judge and not a witness is to instruct the factfinder on the applicable principles of law, exclusion of opinion testimony is appropriate if the terms used have a separate, distinct, and special legal meaning." Hogan v. Am. Tel. & Tel. Co., 812 F.2d 409, 411-12 (8th Cir. 1987) (citing Marx & Co. v. Diners' Club, Inc., 550 F.2d 505, 509-10 (2d Cir. 1977) and Torres v. County of Oakland, 758 F.2d 147, 151 (6th Cir. 1985)). Scattered throughout the report, Scherer offers his opinions concerning originality. (Scherer Aff. Ex. A, 1-2) ("To determine whether there has been copyright infringement, I will examine the issues of *original works of authorship* . . . .") (emphasis in original); id. at 2 ("[I]t is further assumed that an *Original Work of Authorship* is only the result of an individual working closely and autonomously with an Owner for the purpose of producing an original work.") (emphasis in original); id. at 12 ("In effect, the marketplace for affordable suburban housing discourages *Original Works of Authorship* that are born from the 'genius' of an individual.") (emphasis in original); id. at 17 ("All of the rooms are rectangular and do not posses any distinguishing features that would identify them as original."); id. ("There are no distinguishing or original geometric configurations or plan arrangements that convey imagination or originality."). The Court finds that the Scherer report's discussion of originality would be unhelpful to the fact finder. See EZ Dock, Inc. v. Schafer Sys., Inc., 2003 WL 1610781, at *7 (D. Minn. Mar. 8, 2003) ("[I]ssues of law are not

properly the subject of expert testimony. It is the *Court's* duty to instruct the jury on the applicable principles of patent law . . . ."). Regardless of what Scherer thinks original means, "original" for purposes of copyright law has a distinct, special legal meaning. The Supreme Court has outlined the special meaning of original:

> To qualify for copyright protection, a work must be original to the author. Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, "no matter how crude, humble or obvious" it might be. Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying.

Feist, 499 U.S. at 345.

Scherer's report relies on his own standard for originality. Contra Richmond Homes, 862 F.Supp. at 1526 ("There is no requirement in copyright law that the plans be particularly unusual; they simply must be original. Mass-produced house floor plans are commonly protected."). The Court, of course, will evaluate originality based on the standard set by the Supreme Court. The Court disregards Scherer's discussion of originality for it is unhelpful.

On the other hand, some of Scherer's discussion about how architects operate and what processes they utilize to develop a drawing may be helpful. Thus, for purposes of this motion, the Court will only disregard the inadmissible portions of the Scherer affidavit and will consider the admissible portions. See Lee v. Nat'l Life Assurance Co., 632 F.2d 524, 529 (5th Cir. 1980). The Court will not strike the entire Scherer report but will leave it to the trial judge to determine if a jury should consider particular testimony. See In re St. Jude Med., Inc. Silzone Heart Valves Prod.

Liability Litig., No. MDL 01-1396, 2004 WL 45503, at *16 (D. Minn. Jan. 5, 2004).

The Court does not need to reach the issue of independent creation at this point, and, therefore, does not address the Scherer report's analysis of independent creation.

Based upon the foregoing and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED that:**

1. Plaintiff The Rottlund Company's (Rottlund) Motion for Partial Summary Judgment on Liability Issues of Validity, Direct Copying, Access, and Substantial Similarity Concerning Plaintiff's § 102(a)(5) Copyrighted Technical Drawings (Doc. No. 333) should be **GRANTED in part** and **DENIED in part**.

2. Plaintiff's Motion to Strike the Affidavit of Jeffrey Scherer (Doc. No. 369) should be **DENIED without prejudice**.

3. Defendant Bloodgood Sharp Buster Architects and Planners of Iowa, Inc. and the Bloodgood Group, Inc.'s (hereinafter collectively BSB) Motion for Partial Summary Judgment on Copyright Validity (Doc. No. 350) should be **DENIED**.

4. Defendants' Motion for Partial Summary Judgment (Doc. Nos. 382, 384, and 406) should be **DENIED in part.** In a separate report and recommendation, the Court will consider the Defendants' collective motion regarding whether the Chateau Collection technical drawings infringe the Villa II technical drawings; whether the Homestead Collection, Washington Square, and Chateau Collection as-built structures infringe the Villa II as-built structure; and the contributory infringement and vicarious liability claims.

Dated: August 20, 2004.

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. L.R. 72.1(c)(2) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties within 10 days a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Any party wishing to oppose such objections must file and serve all parties with its response in accordance with L.R. 72.1(c)(2). Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.