Court File No. 01-1980 / ROTTLUND / Pinnacle
Davenport Affidavit dated August 26, 2004

Exhibit R105

Exhibit 419
Date: 6/23/04
David A. Campeau

**Rebuttal Expert Report of Anthony Desnick, AIA**
The Rottlund Company, Inc. v. Pinnacle Corporation, et al.

## I. Introduction

This Rebuttal Report follows my May 30, 2003 Preliminary Report and my April 15, 2004 Supplemental Report, and is submitted pursuant to the Court's Third Amended Pretrial Scheduling Order. The purpose of this report is to address points made in the defendants' liability expert reports which were not addressed in my prior Reports or were not addressed in detail in my prior Reports.

In forming my opinions, I have considered a significant amount of information, including the materials cited in the Report as well as the materials cited in my prior Reports.

## II. Rebuttal of Mr. Scherer's and Mr. Bloom's Reports

### A. Rebuttal Points Concerning Direct Evidence of Copying

I have read the August 15, 2003 report submitted by Jeffrey Scherer, FAIA, on behalf of defendants Pinnacle and Town & Country. I have also read the August 15, 2003, and April 15, 2004 reports submitted by Albert Bloom, AIA, on behalf of Defendants Bloodgood, Sharp, Buster and The Bloodgood Group, Inc. Because both experts made many of the same points, I will address their common points together in the next several sections.

#### 1. Other Previous Projects Done By BSB

Mr. Scherer opined on more than one occasion that Town & Country's design ideas can be seen in "previous projects" done by BSB. (Scherer, p. 16). Mr. Bloom makes this same point. (Bloom, p. 3; Bloom Supp. Report, pp. 12-13). Both Mr. Scherer and Mr. Bloom are apparently unaware of several very important facts in this case which are evidence that the defendants directly copied Rottlund's architectural designs and works.

BSB architect Larry Moore was responsible for the initial design concepts for the Town & Country townhome. When Mr. Moore was deposed, he could only remember researching three prior BSB back to back townhome project files before he assembled the design for Town & Country: (1) Midland Homes' file; (2) Jerry's Homes' file; and (3) Good Value's file. (Moore Depo. 13-14, 20-21). He only had substantive involvement as an architect with one of these prior projects: Midland Homes. (Moore Depo. at 8-10). I will address each of these prior design projects in turn.

Regarding BSB's design for Midland Homes, BSB architect Larry Moore used Rottlund's Villa product plans when BSB assembled the Midland Homes back to back design. Mr. Moore signed a contract with Design Development, Inc., and instructed Design Development to assemble construction drawings "similar to the Rottlund Homes plans" he provided to Design Development. (BSB10173.1). Mr. Moore then testified he gave a "cut and paste job" of Rottlund's floor plans to Design Development. (Moore Depo. at 228-229, Ex. 330). When the Rottlund floor plans which were produced from Design Development's files are compared with the pasted up document, it is evident that someone cut off Rottlund's copyright notice and logo and assembled the "cut and paste" document using the floor plans in Rottlund's marketing brochure. (Compare Ex. 374, DDI000021, DDI000022 with Ex. 330). Rottlund's lower level internal and external unit floor plans were cut out, copied, reversed, copied, inverted, copied, inverted and reversed, copied, and then assembled into an eight unit back to back floor plan configuration. For instance, the distinctive marks on the garage of Rottlund's floor plan (Ex. 374, DDI000021) appear on every external unit in the eight unit cluster found in the "cut and paste" document (Ex. 330). In addition, for example, the word "GARAGE" appears left to right in the lower left external unit, but the word "GARAGE" is reversed in the lower right external unit. The word "GARAGE" is inverted, and then inverted and reversed, in the upper right and upper left external units on the "cut and paste" document. (Ex. 330). This is not something that was independently created as Mr. Bloom suggests (Bloom Supp. Report, p. 15); rather, it was copied directly from Rottlund's floor plans. Mr. Bloom is apparently unaware of these documents. Mr. Scherer is also apparently unaware of these documents, as any teacher of "Professional Practice, Ethics and Design" should know that direct copying of another architect's design is in violation of the AIA's ethical standards. (Scherer, p. 1).

My opinion is further supported by comparing the Rottlund Villa elevation that Mr. Moore gave to Design Development (Ex. 374, DDI000023) with the elevation which BSB assembled for Midland Homes (Ex. 376, DDI000309). The change from the three over three window design to a two over two window design further evidences the copying (Ex. 376, DDI000309). Also, in the earlier draft of the Midland elevation, a hand written note above the offset center gables states: "can we omit this offset?" The offset was omitted and the center gables were changed to mirror Rottlund's single center gable design. I believe this question, along with the check box for "copyright issue" on the first page of this same June 15, 1994 version of the Midland designs (Ex. 335, BSB03482), is evidence that BSB was copying Rottlund.

Later, on July 8, 1994, Mr. Moore wrote an internal memorandum questioning whether the final design for Midland Homes was enough "departure" from the Rottlund design to avoid copyright liability. (BSB10208). In my opinion, this is additional direct evidence that BSB copied Rottlund's design when BSB assembled the back to back town home design for Midland Homes.

Concerning BSB's design for Jerry's Homes, BSB architect Chris Jorgensen received a facsimile from Jerry's Homes that included the floor plans and elevations for Rottlund's Villas of Meredith Pointe. (Exhibit 55A). Subsequently, BSB changed the name of the project for Jerry's Homes to the Bent Tree "Villas." Obviously, Jerry's Homes had these materials before they were forwarded to BSB. It is unclear if Jerry's Homes or BSB copied these or other Rottlund design materials earlier in the design process. Regardless, Chris Jorgensen certainly received these Rottlund Villa product floor plans and elevations well before he began working on the back to back townhome design for Town & Country's Homestead Collection.

As for BSB's design for Good Value, BSB failed to produce the source materials for its back to back townhome design project for Good Value.

## 2. Professional Practice, Ethics and Design

According to his report, Mr. Scherer taught "Professional Practice, Ethics and Design" from 1979-1998. (Scherer, p. 1). As a professor of ethics, Mr. Scherer should know that ethical architects should not engage in the following activities which occurred in this case: (1) cutting and pasting Rottlund's copyrighted floor plans into a drawing illustrating an eight-unit cluster for the Midland design; (2) essentially mirroring Rottlund's copyrighted elevation in the Midland elevation; (3) asking internally if there was enough "departure" from Rottlund's designs in the Midland designs to avoid copyright infringement; (4) using the Midland designs which were copied from Rottlund's designs to help create the Homestead Collection designs; (5) touring and photographing Rottlund's town home for the purpose of "one upping the competition"; (6) taking marketing brochures with Rottlund's floor plans and keeping them in an architect's files; (7) writing "see Rottlund product", attaching a picture of Rottlund's side entry gable to one of the defendants' preliminary designs, and then revising the defendants' design to include a side entry gable; (8) placing former Rottlund employees on the redline team for Town & Country's town home design and allowing at least two of these former employees to transmit portions of Rottlund's construction documents to outside architects that worked on the Homestead Collection; (9) after receiving Rottlund's cease and desist letter, admitting internally that the Homestead Collection designs are "obviously similar" to Rottlund's Villa II designs and then asking for the first time if the architects had a co-license agreement with Rottlund; (10) after receiving Rottlund's cease and desist letter, redlining Rottlund's construction documents concerning Rottlund's sprinkler system and sprinkler design and using the redlined version in the defendants' design; *etc.*

In my professional opinion, this is not how ethical architects independently create a town home design.

Mr. Scherer either was not made aware of, or else ignored, essentially all of these facts. When he did offer an opinion regarding a very small part of this

direct evidence of copying, all he could offer was a personal belief that it did not amount to a "smoking gun". (Scherer, p. 30). For instance, he opines there is no "smoking gun" and dismisses the redline design documents with Art Plante's redline note to "see Rottlund product", personal sketch of a gabled roof over the side entry, and the attached picture he sent of Rottlund's gabled roof over the side entry, coupled with the subsequent change to the defendants' design from a sloped side entry to a gabled roof over the side entry. (Scherer, pp. 29-30, BSB2035A). Elsewhere, he opines that "it is impossible to establish that the source of the Defendants' architect's inspiration [for the side entry gabled roof] is anything other than a commonly used and economical architectural element." (Scherer, p. 27). I disagree. The documents demonstrate that the source of the architect's inspiration was a sketch drawn by Defendant's President Art Plante imitating Rottlund's design, a picture of Rottlund's design, and a note to "see Rottlund product." (BSB2035A).

### 3. Copying Rottlund's Sprinkler System and Sprinkler Room Designs

According to the Affidavit of Jeffrey A. Scherer dated March 7, 2004, Mr. Scherer believes that Rottlund's sprinkler system and sprinkler room designs are not original works of authorship. (Scherer Aff., par. 4). Mr. Bloom made a similar statement in his Supplemental Report. (Bloom Supp. Report, pp. 16-17).

Both Mr. Scherer and Mr. Bloom fail to address the direct evidence that Town & Country and BSB copied the sprinkler system and sprinkler room designs from Rottlund's actual construction documents. (Ex. 89A; Ex. 228; Ex. 43; Ex. 90; Ex. 251; Ex. 250; Ex. 128; Ex. 128A; Ex. 128B; Ex. 379; D36254). They also fail to address the fact that the sprinkler system and sprinkler room in a back to back town home can be designed in many different ways, as third party Metro Fire explained in its deposition. (Dosch Depo. at 140-142).

Mr. Scherer and Mr. Bloom also fail to mention that Rottlund has designed several different sprinkler systems and sprinkler rooms for back to back town homes. For example, Rottlund first put a sprinkler room and sprinkler system in a Villa product in or about 1991. At that time, the sprinkler system and sprinkler room were housed inside an exterior Villa unit owned by a homeowner. (Steve Swanson Depo. at 66-68, 73-74). Rottlund then devised other designs for the sprinkler room and sprinkler system, the most recent of which appeared on the construction documents for Rottlund's Villa II at the Reserve in Plymouth, Minnesota. (RCI001434). As explained in my earlier reports, these portions of Rottlund's construction documents were transmitted from Town & Country to BSB on several occasions from July 2001 through August 2002. Mr. Scherer and Mr. Bloom simply fail to address any of these facts in their cursory opinions.

Finally, Mr. Scherer and Mr. Bloom ignore the fact that Town & Country threatened to sue Metro Fire for Metro Fire's role in Town & Country's and BSB's infringing sprinkler system and sprinkler room design. (Dosch Depo. at 161-162).

### 4. Rottlund's Independent Creation of the Villa Products

Mr. Scherer opined that Rottlund's architects/designers did "reconnaissance" on the competition when they created the Villa products, and Mr. Scherer then accused Rottlund's architects of using "shared ideas." (Scherer, p. 4). This unsupported opinion is directly contradicted by Rottlund owner/designer Bud Rotter and Rottlund's in-house architect Tim Whitten. (Bud Rotter Depo. 40-44; Whitten Depo. 33-35, 37-38). They both testified that Mr. Rotter and Mr. Whitten started with a blank sheet of paper and created the Villa product designs from scratch. It is unfortunate that Mr. Scherer, without any basis, accuses Rottlund's designers and architects of the misconduct that the defendants have engaged in.

### 5. Market Demand

Mr. Scherer wrote:

> Market expectations also weigh heavily on the question of originality. What is meant by this statement? Simply that the more intense the pressures of affordability and marketability become, the more likely that architects will rely on precedents and tradition to satisfy the developer's need to attract potential buyers.

(Scherer, p. 12). Mr. Scherer opines that infringement of copyrighted designs can be justified if there is demand by the marketplace. I strongly disagree with this opinion. If market demand would justify the copying of others' designs rather than promoting and rewarding the effort on the part of architects to be original, then there would be no need in the marketplace for architectural services. We would only need copy services.

Elsewhere, Mr. Scherer comments that "projects like the ones at issue here. . . are defined by the marketplace." (Scherer, p. 3). In the real world, however, the market does not design anything. This is why architects are needed. Again, I strongly disagree with, and as an architect am offended by, Mr. Scherer's implication that market forces justify copying. If anything, market forces demand creative architects such as Mr. Whitten so that designers and builders such as Rottlund can set themselves apart from their competition.

In his report, Mr. Scherer mentioned Frank Gehry as an architect has created building designs with a "signature stamp". Gehry was and continues to work at the least restricted end of the spectrum as defined by Mr. Scherer. (Scherer, p. 8). One need only look at the work of the late Sam Mockbee, an award winning architect, who designed creative housing solutions for the very poor in

the rural South. Mr. Mockbee was arguably designing at the most "restricted end of the spectrum" as Mr. Scherer defines the phrase. I believe Mr. Scherer must concede that affordable housing is at a much more "restricted end of the design spectrum" versus the multi-family town homes at issue here that sell for over $180,000 per unit. (Scherer, p. 8).

### 6. Rottlund's External Unit Floor Plans Copied Into Defendants' Internal Unit Floor Plans.

Mr. Scherer and Mr. Bloom spend many pages in their respective reports analyzing differences between the Villa II internal unit floor plans and the Homestead Collection internal unit floor plans. I do not understand why these comparisons were made. Rottlund's architect, Mr. Tim Whitten, clearly explained in his deposition that Rottlund claims the defendants' copied Rottlund's external unit floor plan for the defendants' external unit floor plan, and then copied Rottlund's external unit floor plan for the defendants' internal unit floor plan. (Whitten Depo. at 903-904). In other words, Rottlund contends that the defendants' internal unit floor plan was copied from, and is substantially similar to, Rottlund's external unit floor plan. Rottlund further contends that its external elevations were copied for both the internal units and external units. I agree with Rottlund's contention and Mr. Whitten's testimony in this regard. I do not understand why Mr. Scherer and Mr. Bloom ignore Rottlund's contention and analyze something Rottlund is not contending in this case.

### 7. L-Flip and Transparency Exhibit

Mr. Scherer opined that "[s]hifting the master bedroom from one corner to the other seems a logical way to distance the master bedroom from the street and garage and provide a better view." (Scherer, p. 15). I strongly disagree. From an architectural point of view, it makes no sense to put the master bedroom over a cold garage, especially in Minnesota. It also makes no sense to place the best bedroom directly over a noisy garage door opener. As for the view, it is doubtful that townhome owners would generally prefer a view of a concrete driveway to a view of open green space off the end of the buildings.

I believe the main reason Town & Country would shift the master bedroom is to make the copying of Rottlund's floor plan look less obvious. As Rottlund architect Tim Whitten explained in his deposition, Town & Country merely flipped Rottlund's master bedroom with its guest bedroom about a 45 degree axis. A simple transparency demonstrates this "flip", and further demonstrates that, once flipped, Town & Country's master bedroom, closet, shower, tub, vanity, toilet, bedroom all line up in exactly the same position as Rottlund's. (Whitten Depo. 160-166, Exhibit 153).

### 8. One Logical Way/Parade of Homes Exhibit

Mr. Scherer opined that "the practical number of variations [for a town home] is small." (Scherer, p. 5). He then opines that Rottlund's placement of the garage and the "resulting arrangements are. . . inevitable." (Scherer, p. 14). I disagree. As I explained in my prior report, there is an immeasurable variation of design decisions that go into a townhome design. Also, as Mr. Whitten partially explained during his deposition using a few illustrations of hand drawn designs and designs from the Parade of Homes magazine, there are many different ways to create a back to back town home design including, but not limited to, choices involving garage type and placement, kitchen placement and layout, *etc.* (Whitten Depo., 45-100, 262, 342-351, Exs. 151 and 152).

### 9. Third Bedroom Option

Mr. Scherer wrote that "Plaintiff eventually added a third-bedroom option (in lieu of the loft) to its Villa II design." (Scherer, p. 15). Rottlund's architect, Tim Whitten, testified that he designed the third bedroom option when he initially designed the Villa II product. (Whitten Depo., 894-898). Apparently, Mr. Scherer did not read this part of Mr. Whitten's deposition transcript.

## B. Rebuttal Points Concerning Definitions

### 1. Original Works of Authorship

On page two of his report, Mr. Scherer states that Rottlund's Villa II townhome is an "unoriginal plan arrangement". (Scherer, p. 10, 17, 26). Mr. Scherer does not define the term "original". Instead, he provides only his own personal belief that something must be novel to be original: *e.g.,* "if I, through my imagination and talent, create a new fireplace and invent a bookshelf system that is clearly an original creation, then I would expect to protect that copyright." (Scherer, p. 31).

I do not believe Mr. Scherer is aware of the United States Supreme Court's definition of originality set forth in the *Feist* decision, which I understand to be as follows: "The requisite level of creativity for [copyright protection] is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, no matter how crude, humble or obvious it might be. Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying."

Mr. Scherer does not accuse Rottlund of copying some third party in creating the Villa II design, so he apparently agrees that Rottlund's Villa II design is original.

### 2. Gestalt

Mr. Scherer notes my use of the word "gestalt", and then describes it as a "vague application of a term from psychology" and as "amorphous". (Scherer, pp. 26, 32). Mr. Scherer failed to acknowledge that I used the words "total look and feel", "arrangement and composition of spaces and elements", and "combination of the spaces, features and elements" to further explain what was meant by the word "gestalt". (Preliminary Report, pp. 9, 11). I understand this Court in *CSM* used the phrase "total concept and feel" to describe the same concept.

I also find it curious that Mr. Scherer acknowledges that certain architectural designs and buildings have a "signature stamp". Mr. Scherer does not define what "signature stamp" means, but he apparently does not feel this phrase is vague or amorphous. (Scherer, p. 2). He also apparently feels that a copyright holder of a "signature stamp" design could bring a lawsuit against an infringer and prevail.

In addition, unlike Mr. Scherer, Defendants BSB and BGI's liability expert, Mr. Bloom, had no difficulty understanding my use of the word "gestalt" or Rottlund's theory of liability. In his supplemental report, Mr. Bloom admitted that the use of the term "gestalt" means "the total look and feel of the townhome". (Bloom Supp. Disclosure, p. 1). Although he is the defendant's expert, Mr. Bloom ultimately concluded that "the gestalt of Rottlund's and BSB's exterior unit are similar." (Bloom Initial Disclosure, p. 23).

### 3. Substantial Similarity

Mr. Scherer wrote: "While the sheer number of elements identified by Mr. Desnick may tempt one to infer that the elemental similarities are so overwhelming that they support the claim of substantial similarity, they do not." (Scherer, p. 27). Mr. Scherer does not offer his definition of "substantial similarity" other than his personal opinion that no design is protected by the copyright laws unless the author "invents" a design that is "clearly an original creation", and someone else unethically and consciously copies the design into a substantially similar design. (Scherer, pp. 30-31). Mr. Scherer has apparently ignored the following definition of substantial similarity which I understand was established by this Court in *CSM:* "differences will not negate infringement unless they so outweigh similarities that the similarities can only be deemed inconsequential within the total context of the copyrighted work."

## III. Rebuttal of Mr. Bloom's Reports

As mentioned above, I have read the August 15, 2003 Initial Disclosure and April 15, 2004 Supplemental Disclosure submitted by Albert Bloom, AIA, on behalf of Defendants Bloodgood, Sharp, Buster and The Bloodgood Group, Inc.

This portion of my Rebuttal Disclosure will address the points raised in Mr. Bloom's reports which were not addressed above.

## A. Mr. Bloom's Initial Disclosure

### 1. Back to Back Design

Mr. Bloom references other back to back designs in motel architecture (Holiday Inns and Red Roof Inns) and in suburban apartments. (Bloom, p. 2). He then discusses garageless pinwheel design townhouses. (Bloom, p. 2). Next, he discusses other pinwheel and two story boxes with attached garages. (Bloom, p. 3). Finally, Mr. Bloom discusses the 3 back to back multi-family town home designs BSB architect Larry Moore admits he limited his research to at the time Mr. Moore began working on the Homestead Collection design: (1) Good Value Homes; (2) Midland Homes; and (3) Jerry's Homes. (Bloom, p. 3). As mentioned above, for the Midland Homes and Jerry's Homes designs, there is direct evidence of BSB copying Rottlund's Villa designs. BSB has not produced its source files for the Good Value Homes design, and Mr. Bloom did not provide any documents that suggest BSB did not copy from Rottlund's floor plans and elevations when BSB worked on the Good Value Homes design.

### 2. Fact Pattern/Product Tours/Ethics Opinion

The fact pattern Mr. Bloom relies on is limited to just thirteen cursory sentences. (Bloom, pp. 7-8). It does not appear that Mr. Bloom has seen all of the documents and deposition testimony referenced in my prior reports which indicates the defendants directly copied Rottlund's Villa product floor plans, elevations, and construction documents. For example, he completely ignores the documents that demonstrate Larry Moore at BSB was cutting and pasting Rottlund's Villa floor plans and using Rottlund's Villa elevations to assemble a back to back design for Midland Homes. He also ignores the fact that Mr. Moore was asking internally if his Midland designs were "enough departure" from Rottlund's designs to avoid copyright infringement.

Next, Mr. Bloom ignores the many pictures that were taken of Rottlund's Villa II during product tours and used during the design process of the Homestead Collection, such as the picture Defendant's President Art Plante sent to BSB and the note to "see Rottlund product." Mr. Bloom also ignores the two separate copies of floor plans of Rottlund's Villa II exterior unit that were found in Pinnacle's in-house architect's files and taken during a tour of Rottlund's Villa II product. Copying Rottlund seems to be the purpose for taking these tours, photographs, and floor plans. As BSB architect Larry Moore stated, the purpose of the tours was to "find opportunities to one-up" the competition and fix mistakes the competitors such as Rottlund were making. (Moore Depo. Tr. at 39-41). I do not agree with Mr. Bloom that this type of "touring of product and the gathering of information about the product is typical and necessary." (Bloom, p. 11).

Mr. Bloom ignores Steve Sandelin's, Pinnacle's in-house architect's, candid admission that the Homestead Collection designs are "obviously similar" to Rottlund's Villa II designs. He also ignores the question Mr. Sandelin asked as to whether BSB has a co-license agreement with Rottlund.

These facts and many others set forth in my earlier reports are simply not addressed by Mr. Bloom. If Mr. Bloom addressed these facts, I believe he would have concluded BSB representatives did not act ethically and instead copied Rottlund's Villa products in the past. Perhaps this is why Mr. Bloom chose to focus on his personal knowledge of, and apparent friendship with, Doug Buster when he addressed my earlier opinions concerning BSB's ethics. (Bloom, pp. 23-24).

### 3. Turned Gables/Powder Rooms/Fireplace Elevations

Mr. Bloom admits that the defendants used turned gables, powder rooms, and fireplace elevations in the Homestead Collection that are similar to Rottlund's use of these design features. (Bloom, pp. 12-16). It is unclear why he focuses on these three features and ignores the remainder of features which comprise the total look and feel of the two products. I did not see any materials from Mr. Bloom's files that reflect a back to back product that had a total look and feel as substantially similar to Rottlund's Villa II product as Pinnacle's and Town & Country's Homestead/Washington Square Collection.

### 4. Interior Townhouse Unit

Mr. Bloom spends several pages of his report comparing the Villa II interior floor plans with the Homestead Collection interior floor plans. (Bloom, pp. 16-19). He correctly concludes that the exterior elevations include the roof massing are "similar if not the same". (Bloom, p. 18). As for the floor plans, Mr. Bloom is comparing the wrong floor plans before making his conclusion. As Mr. Whitten explained in his deposition, and as I explained above, Rottlund alleges that the defendants copied the Villa II exterior unit floor plan and used it in both the Homestead Collection's exterior units and interior units.

### 5. Exterior Townhouse unit

Mr. Bloom opined that on the first floor, the "physical layout of the living, dining, kitchen, grarage and service areas is virtually the same in the Rottlund and BSB plans". (Bloom, p. 20). He later opines that the "gestalt of these spaces will be similar" with a minor exception. (Bloom, p. 20).

As for the second floor, Mr. Bloom admits that the gestalt of the two plans at issue is similar, the only major difference being BSB has a laundry room while Rottlund has a laundry closet. (Bloom, p. 21).

As for the elevations, Mr. Bloom opines that the "side or entry elevations have very similar massings" and the "[g]eneral size and location of the windows is very similar". (Bloom, p. 22).

Mr. Bloom even concedes that "most of the features in both plans have the same similarities and commonalities" and the "fireplace options have the most similar featues and locations in the plans." (Bloom, p. 22).

Finally, Mr. Bloom concludes that the "gestalt of Rottlund's and BSB's exterior unit are similar." (Bloom, p. 23).

I believe Mr. Bloom has essentially made Rottlund's case with these opinions. BSB cannot seriously claim the two town homes are not substantially similar because Mr. Bloom has proffered an expert opinion that the two town homes are similar.

### B. Mr. Bloom's Supplemental Disclosure

#### 1. Introduction

As mentioned above, Mr. Bloom, unlike Mr. Scherer, had no difficulty understanding my use of the word "gestalt" in my earlier reports. Mr. Bloom defines the term "gestalt" to mean "the total look and feel of the townhome, including individual design elements as well as how those elements are combined together." (Bloom Supp., p. 1).

#### 2. Villa II Exterior Unit v. Homestead Interior Unit

Mr. Bloom admits that the "layout of individual spaces on the first floor fall into the same zones", an opinion with which I agree. Mr. Bloom then opines that the gestalt will feel different primarily because there is light coming in from the sides of Rottlund's exterior unit but not in the defendants' interior unit and a few other differences. Mr. Bloom does not opine that the differences so outweigh the similarities so as to render the similarities inconsequential within the total concept of the work. As mentioned in my earlier report, they do not.

#### 3. Jerry's Homes and Midland Homes

I addressed the direct evidence of BSB's copying Rottlund's Villa products for the Jerry's Homes and Midland Homes designs and explained how that related to the products at issue in this case. I will not address again those issues in detail here. It bears noting, however, that BSB architect Chris Jorgenson obtained copies of Rottlund's copyrighted Villa product elevations and floor plans while working on the Jerry's Homes project. BSB architect Larry Moore obtained copies of Rottlund's copyrighted Villa product elevations and floor plans while working on the Midland Homes project. Both Chris Jorgenson and Larry Moore worked on

the Homestead Collection after receiving these Rottlund copyrighted elevations and floor plans. In addition, BSB architect Larry Moore testified that he referenced both the Jerry's Homes design and the Midland Homes design before he started designing the Homestead Collection. I believe it is inappropriate for BSB to use Rottlund's copyrighted Villa product floor plans and elevations in the manner that BSB used them. For example, it is not appropriate to perform a "cut and paste job" on Rottlund's floor plans during the design process, and it is not appropriate to sign a contract with a third party CAD service to make construction documents "similar to Rottlund homes plans". Finally, it is very problematic that BSB was asking internally if it had departed enough from Rottlund's designs to avoid copyright liability. This simply is not how architects "independently create" designs.

## IV. Rebuttal of "Expert Disclosures" of Douglas Buster, Chris Jorgensen, Larry Moore, and Joe Safin

Douglas Buster, Chris Jorgensen, Larry Moore, and Joe Safin each submitted an "Expert Disclosure" in connection with this matter. As for actual substantive opinions, Mr. Buster's disclosure has just eight conclusory sentences. Mr. Jorgensen's disclosure has just seven conclusory sentences. Mr. Moore's disclosure has just seven conclusory sentences. Mr. Safin's disclosure has just five conclusory sentences. None of these individuals provide any bases for their short, conclusory opinions. Because none of these disclosures contain a complete statement of all opinions to be expressed and the basis and reasons therefor, it is not possible to rebut them.

I believe my three Reports, in their totality, address at least some of the conclusory sentences these individuals claim are "expert disclosures," but it is not possible to know for certain because none of the bases for any of the conclusory sentences were provided.

## V. Trial Exhibits/Publications/Compensation

My trial exhibits will include, but are not necessarily limited to, the documents and other materials referenced in this report. I respectfully reserve the right to supplement this list of trial exhibits as discovery continues, trial approaches and/or as additional materials are made available to me through the expert discovery phase of this litigation.

In the past 10 years I have had no articles published.

My current billing rate for this matter is $170/hour.

## VI. Listing of trial testimony and/or deposition in past 4 years

I have not been deposed nor have I testified at trial during the past 4 years.

This report submitted by:

Anthony Desnick, AIA
Elness Swenson Graham Architects, Inc.
Minneapolis, MN

Anthony Desnick, AIA

**Dated: MAY 14, 2004**

**Appendix A – Additional Material Considered**

D36254

Deposition and accompanying exhibits for each of the following deponents:

Linda Alfson
Todd Dosch
Tim Johnson

Exhibit R106

**Second Rebuttal Expert Report of Anthony Desnick, AIA**
The Rottlund Company, Inc. v. Pinnacle Corporation, et al.

Exhibit 420
Date: 6/23/04
David A. Campeau

## I. Introduction

This Second Rebuttal Report is submitted pursuant to the Court's Third Amended Pretrial Scheduling Order, and in response to the Defendants' experts' opinions concerning the Chateau Collection. In a report dated April 15, 2004, Mr. Bloom submitted his opinions regarding the Chateau Collection on behalf of Defendants The Bloodgood Group and Bloodgood Sharp Buster. In a report dated May 14, 2004, Mr. Scherer submitted his opinions regarding the Chateau Collection on behalf of Defendants Town & Country of Illinois and Town & Country of Minnesota. I reserve the right to address the other, non-Chateau Collection opinions set forth in Mr. Scherer's May 14, 2004 report at a later time.

## II. Rebuttal of Mr. Scherer's and Mr. Bloom's Chateau Collection Opinions

### A. The General Ideas Concerning The Chateau Collection And The Villa II Are Substantially Similar.

In my opinion, the general ideas reflected in the Chateau Collection product are substantially similar to the general ideas reflected in the Villa II product. Neither Mr. Scherer nor Mr. Bloom opine that the general ideas reflected in the Chateau Collection and the Villa II are not substantially similar. In fact both of them must concede that the general ideas of a multi-family, back-to-back, two-story, slab-on-grade, attached garage town home are the same between the two products.

Even at the level of detailed expression, neither Mr. Scherer nor Mr. Bloom opine that the differences between the Chateau Collection and the Villa II so outweigh the similarities between these two products as to render the similarities inconsequential. Even at the detailed expression level, the differences set forth in Mr. Scherer's and Mr. Bloom's reports do not, in my opinion, so outweigh the similarities as to render the similarities inconsequential.

I believe Town & Country's prior public statements about the Chateau Collection support my opinions. As explained in more detail in my April 15, 2004 Supplemental Report, the Homestead Collection – which I previously opined is substantially similar to the Villa II – was modified to create the Chateau Collection. On March 21, 2003, Town & Country explained the "enhancements" or differences between the Chateau Collection and the Homestead Collection in a memorandum to the City of Brooklyn Park:

> The attached architectural elevations show the enhancements. Gables were added to break up the mass of the roofline and end elevations. Two different end unit styles/floor plans are now offered. One style features an entrance from the end with an angled living room/bedroom area, while the other enters from the

> same side as the private driveway without the angle while still offering a porch on the end elevation.

(D33269, D33166-33170). Town & Country then stated it was "excited to offer these architectural enhancements." In an April 4, 2003 memorandum to the City of Chaska, Town & Country also explained that the Chateau Collection contained "architectural enhancements on the back-to-back product". (D31544). Town & Country did not represent to Brooklyn Park or Chaska officials that the Chateau Collection contained so many different ideas that the similarities between the Chateau Collection and the Homestead Collection were inconsequential.

In other words, Town & Country publicly represented to Brooklyn Park and Chaska officials that the ideas were essentially the same in the Chateau Collection and the Homestead Collection, although there were a few "enhancements" in the manner in which these ideas were expressed. In my opinion, even with these "enhancements", the ideas reflected in the Chateau Collection are substantially similar to the ideas reflected in the Homestead Collection. (I previously opined at length as to why the total look and feel of the Homestead Collection is substantially similar to the Villa II.) For the reasons set forth in my April 15, 2004 Supplemental Report, the general ideas and the total look and feel between the "enhanced" Chateau Collection and the Villa II are substantially similar.

## III. Trial Exhibits/Publications/Compensation

My trial exhibits will include, but are not necessarily limited to, the documents and other materials referenced in this report. I respectfully reserve the right to supplement this list of trial exhibits as discovery continues, trial approaches and/or as additional materials are made available to me through the expert discovery phase of this litigation.

In the past 10 years I have had no articles published.

My current billing rate for this matter is $170/hour.

## IV. Listing of trial testimony and/or deposition in past 4 years

I have not been deposed nor have I testified at trial during the past 4 years.

This report submitted by:

Anthony Desnick, AIA
Elness Swenson Graham Architects, Inc.
Minneapolis, MN

Anthony Desnick, AIA
**Dated: June 1, 2004**

**Appendix A – Additional Material Considered**

Deposition and accompanying exhibits for each of the following deponents:

Steve Theis

# OMITTED

Exhibits R107-111