Exhibit R141

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

FOURTH DIVISION

THE ROTTLUND COMPANY, INC., )d/b/a ROTTLUND HOMES, a Minnesota)
Corporation, ) Plaintiff, )
v. )PINNACLE CORPORATION )
d/b/a TOWN & COUNTRY HOMES, )an Illinois corporation, and )C
TOWN & COUNTRY HOMES, INC., )01-CV-1980 DSD/SRNa Minnesota Corpo
Defendants. )--------------------------------)
TOWN & COUNTRY HOMES, INC. )A Minnesota Corporation, )
Third-Party Plaintiff, )v. )
BLOODGOOD, SHARP, BUSTER )ARCHITECTS & PLANNERS OF IOWA, )
an Iowa Corporation. ) Third-Party Defendant. )

The deposition of Ed Fitch, called by the Rottlund Company, Plaintiff, taken pursuant to the provisions of the Federal Rules of Evidence and Civil Procedure pertaining to the taking of depositions, before KATRINA M. BEAUDIN, CSR, RMR, CRR, at M & M Reporting Inc., One Pierce, Suite 295-E, Itasca, Illinois, on the 16th day of December, 2002, at 3:29 p.m.

Q. Town & Country Homes in general.

A. That would have been out of the Chicago division.

Q. Were you at all involved in that marketing effort, the website?

A. I was involved in the effort to create Town & Country Homes, the presentation of Town & Country Homes' website. Yes.

Q. What year did that occur?

A. I believe it would have been about 1989, 1990.

Q. So you put the website up in '89/'90, correct?

MR. FARMER: He said he went to work in '94.

THE WITNESS: I'm sorry. I misspoke. 1999/2000.

BY MR. KRUMMEN:

Q. 1999, just so the record is clear or early 2000, you were responsible for creating the Town & Country Homes website, correct?

A. I was involved in its creation.

Q. Who else was involved?

A. We hired a consultant by the name of

Triton Tech which helped us create it, at least the structure of it. And our advertising agency, Chicago advertising agency, also was involved.

Q. Which Chicago advertising agency?

A. It's Marc USA, M-A-R-C USA. At the time I believe they were K&R Marc.

Q. We're in late 1999 early 2000 and you are one of the people on behalf of Pinnacle Corporation involved in creating a website, correct?

A. Correct.

Q. Who else on behalf of Pinnacle was responsible for creating a website?

MR. FARMER: Which website again?

MR. KRUMMEN: The website we're talking about in late 1999 early 2000.

MR. FARMER: Is there an address or a site name we're referring to?

THE WITNESS: This would be www.townandcountryhomes.com.

I'm trying to think of who else was involved. Actually the structure was primarily my responsibility.

BY MR. KRUMMEN:

Q. So you interfaced with, I believe you said Triton and K&R Marc USA, correct?
A. Correct.
Q. What did Triton do?
A. They are a website programmer. They basically built the architecture for the site.
Q. What did K&R Marc do?
A. They provided the basic general formatting for the website.
Q. Is it fair to say that someone at Pinnacle Corporation had to come up with the language that they ultimately wanted to see on the website? Triton really didn't know what kind of message you were trying to convey nor did K&R Marc, correct?
A. K&R Marc would have written the copy, and I would have approved the copy.
Q. But someone had to explain to K&R Marc that, for example, you sold homes, right?
MR. FARMER: Objection: Foundation.
THE WITNESS: Do I answer?
BY MR. KRUMMEN:
Q. You may answer.
A. We have worked with K&R Marc for --

well, my entire tenure with the company. So most of the material on the website they were familiar with already.

Q. Including the different products and services that you offered as Pinnacle Corporation?

A. They are responsible for our collateral material and in the context of doing that, the website is kind of an offshoot of that.

Q. Collateral material, does that mean your marketing brochures, et cetera?

A. Yes.

Q. So they had some idea but, again, when we back up a step and we talk about who worked with K&R Marc and explained to them what should go in the advertising brochures, the company had to go on record and say here is who we are and here are the products we have to offer, et cetera, correct?

A. Correct.

Q. Were you the person on behalf of the company that was trying to explain the different product types that you had in advertising materials including the website?

A. As it relates to the Chicago operation,

yes.
Q. How about the Minnesota operation?
A. I had no involvement in that website.
Q. Who was responsible for the Minnesota website?
A. I have no idea.
Q. And someone linked the Minnesota website to the Pinnacle website, correct?
A. Correct.
Q. And the difference is the Pinnacle website, if I heard you correctly, is www.townandcountryhomes.com, correct?
A. Correct.
Q. And the Minnesota one is www.townandcountryhomesmn.com?
A. Correct.
Q. Who worked on the mn.com features?
A. I don't know, I had no involvement with that.
Q. You have -- not only did you have no involvement with the Minnesota website, you don't even know who from Minnesota worked on the website?
A. No.

Q. How would you find out the answer to that question?

A. I would have to contact Mr. Plante.

Q. Do you know what appears on the townandcountryhomes.com website as it relates to your Minnesota division?

A. No.

Q. Now, how do you refer to Pinnacle Corporation, it's just Town and Country Homes, correct?

A. It's Pinnacle Corporation doing business as Town and Country Homes.

Q. Is that what it would say on your business card if you had one?

A. No, it would say Town & Country Homes.

Q. Right. I may still ask you to run out to your car at the first break and grab that business card for me. But your business card says Town & Country Homes and there is a little logo on it, correct?

A. Correct.

Q. A little picture of like a tree or something?

A. Correct.

Q. And what do you refer to the Minnesota entity as?

A. The Minnesota division of Town & Country Homes.

Q. So it would say on a Minnesota business card, for example, Town & Country Homes Minnesota division or what would it say, do you know?

MR. FARMER: Objection: Foundation.

THE WITNESS: I don't know what their business cards say.

BY MR. KRUMMEN:

Q. On the Town & Country Homes website, are there any references to the Minnesota division?

A. There is a home page that allows -- because we realize that a number of people would type in www.townandcountryhomes, they're delivered to a home page which then allows a link to either our Illinois operation, our Florida operation, our Minnesota operation.

Q. And now did you have any involvement with that initial interface, the page you just described, the home page which allows you to go to Chicago, Florida or Minnesota?

A. Yes.

MR. FARMER: Objection to the form.
BY MR. KRUMMEN:
Q. What involvement did you have?
A. The design of the page.
Q. And you obviously have thought about this a fair amount or you wouldn't know that there was confusion when a customer types in Town & Country Homes, correct?
A. It wasn't because of confusion, it was that we know people buy in location and that when people hear Town & Country, that that would be the likely thing that they would type in, and not knowing where people were inquiring from, we wanted to provide the outlet for them to get to any location they wanted to review.
Q. So you knew that, for example, someone in Florida would know of Town & Country Homes but they would type in Town & Country Homes and that would lead them to your Pinnacle Corporation website, correct?
A. To an opening generic home page, yes.
Q. And you wanted them to be able to go back down to the Florida sub web page for lack of a better term?

MR. FARMER: Object to the form.
THE WITNESS: Correct.
BY MR. KRUMMEN:
Q. And the same is true of Minnesota, correct?
A. Correct.
Q. I would like you to pull out what previously has been marked as Exhibit No. 2 and it should be towards the bottom of the pile before you. Now on the front page of Exhibit No. 2 and let me identify it for the record first. There is a Town & Country Homes logo, correct?
A. Correct.
Q. And that's the Pinnacle logo, right, it's the tree with the Town & Country Homes language upon it, correct?
A. I never heard it referred to as a Pinnacle logo, it's the Town & Country Homes logo.
Q. When you say Town & Country Homes, you are referring to the Chicago Town & Country Homes, correct?
A. When I do, yes.
Q. When we get your business card it will probably have a logo like the one that appears on

# FILED UNDER SEAL

Exhibit R142 - 145

Exhibit R146

United States District Court, S.D. New York.

**Cynthia MAURIZIO, Plaintiff,**
**v.**
**Olivia GOLDSMITH, a/k/a Justine Rendal, a/k/a Randi J. Goldfield, Defendant.**

**No. 96 CIV. 4332(LMM).**

Dec. 5, 2001.

MEMORANDUM AND ORDER

MCKENNA, D.J.

*1 Cynthia Maurizio ("plaintiff") commenced this action on June 12, 1996 against Olivia Goldsmith, a/k/a Justine Rendal, a/k/a Randi J. Goldfield ("defendant") [FN1] for copyright infringement, a declaration of joint authorship and an accounting in connection with joint authorship, violation of Section 43(a) of the Lanham Act and various state law violations. The claims relate to the drafting and publishing of the novel, *The First Wives Club* ("FWC"), which was subsequently made into a motion picture.

FN1. "Olivia Goldsmith" is the defendant's pen name. Defendant's actual name is Justine Rendal but she also goes by Randi J. Goldfield.

On January 26, 2000, in response to defendant's first motion for summary judgment, the Court issued a Memorandum and Order dismissing Count One (copyright infringement) to the extent that the infringing acts occurred before three years prior to the filing of plaintiff's complaint, Count Two (joint authorship), Count Six (violation of New York General Business Law Section 349) and Count Seven (violation of New York General Business Law Section 350) of plaintiff's eight claims. The Court's decision was affirmed by the Second Circuit as to Counts Two, Six and Seven on November 1, 2000. *Maurizio v. Goldsmith*, 230 F.3d 518 (2d Cir.2000). The Court of Appeals did not consider Count One. *Id.* at 521.

Defendant now makes a renewed summary judgment motion as to the remaining claims. For the reasons set forth below, the Court grants in part and denies in part defendant's renewed summary judgment motion.

Background

The facts of this case have been set forth in detail in the Court's previous opinion, *Maurizio v. Goldsmith*, 84 F.Supp.2d 455, 458-61 (S.D.N.Y.2000), *aff'd*, 230 F.3d 518 (2d Cir.2000), and, thus, will be reiterated here only to the extent they are relevant to the following discussion.

Summary Judgment Standard

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party establishes a prima facie case demonstrating the absence of a genuine issue of material fact, the nonmoving party has the burden of presenting "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Alemenas*, 143 F.3d 105, 114 (2d Cir.1998). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Discussion

*2 Defendant's renewed motion for summary judgment seeks to dismiss the following claims: 1) copyright infringement (Count One), 2) violations of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count Three), 3) common law unfair competition (Count Five) and 4) constructive trust (Count Eight). [FN2] In her Reply Memorandum, defendant also appears to challenge Count Four--a claim for wrongful misappropriation of novel and original literary ideas. (Def .'s Reply Mem. at 9-11.) The motion is granted as to Counts Five and Eight and denied as to Counts One, Three and Four.

FN2. While it appears that defendant's motion addresses plaintiff's joint authorship claim, it should be noted that the entire claim for joint authorship was dismissed as time barred in the Court's first opinion. *Maurizio,* 84 F.Supp.2d at 463-64.

1. Copyright Infringement

A. The Two Chapters

With regard to the two chapters, plaintiff's sole remaining claim under the Copyright Act, 17 U.S.C §§ 101 *et seq.* after the Court's Memorandum and Order of January 26, 2000, was that the defendant infringed her copyright by copying plaintiff's two draft chapters of the FWC into the final version of the novel. As stated in the Court's previous opinion, plaintiff must show: "(1) ownership of a valid copyright and (2) the defendant's infringement by unauthorized copying in order to prevail on a claim for copyright infringement." *Maurizio,* 84 F.Supp.2d at 467 (quoting *Debitetto v. Alpha Books,* 7 F.Supp.2d 330, 332 (S.D.N.Y.1998)). Further, if there was unauthorized copying, plaintiff must demonstrate that defendant's and plaintiff's works are substantially similar. *Id.* (quoting *Laureyssens v. Ideal Group, Inc.,* 964 F.2d 131, 140 (2d Cir.1992)).

In the Court's previous analysis of the copyright infringement claim, the Court concluded that "[t]here appears to be little question that at least some copying occurred" and that "[t]he Court cannot say that the works are not substantially similar." *Id.* at 468. Defendant, however, now argues that plaintiff's infringement claim does not even survive the first element of the infringement test. Defendant maintains that Maurizio did not hold a valid copyright because the two women were joint authors of the draft chapters just as they were, as the Court concluded, joint authors of the outline. Therefore, defendant asks the Court to dismiss the infringement claim in its entirety. (Def.'s Mem. at 6.) Defendant relies on the following testimony plaintiff gave at her deposition on August 13, 1997 to support her joint authorship point:

Q: Is it your contention then that Justine is also [a] co-author with you of the two chapters?
A: Yes.

* * *

Q: I'm just referring back to your statement that Justine is co-author of the two chapters that you wrote.... [Y]ou don't assert that she actually wrote [words] in the two chapters that you wrote, right?
A: She didn't write words in the chapters as I first submitted them to her, no.
Q: Oh, but she added words afterward?
A: In the published novel there's differences, yes.
Q: Take away the published novel. I am talking about the two chapters you actually wrote.
A: Uh-huh.
*3 Q: Are you--you're claiming that Justine is [a] co-author of the two chapters that you actually wrote as you wrote them, not as they appear in the book?
A: That we were co-authors together [o]n the whole project.
Q: Including your two chapters?
A: Yes.
Q: You do agree now that the two chapters that you wrote are not identical to the two chapters as published in the book?
A: Not identical, no.
Q: I hesitated because it was one of those double negatives. Yes, it's correct that they are not identical?
A: Yes, it's correct that they are not identical.

(Def.'s Mem. at 3-4.) The defendant argues that this testimony establishes that the

plaintiff did not individually author the draft chapters. (Def.'s Reply Mem. at 4-6 .) The Court disagrees.

Although it is true that joint authorship and copyright infringement are "alternative and mutually exclusive theories," *Maurizio,* 230 F.3d at 519, plaintiff's deposition testimony is not conclusive as to whether the two parties were "joint authors" in the legal sense of the phrase. Another reading of the transcript could result in the conclusion that plaintiff believed she was a co-author generally of the entire project--not necessarily of the two draft chapters which plaintiff claims are hers. (Decl. Schwartz, Ex. B at 537, ¶ 2-9.) Plaintiff's deposition testimony merely indicates that a question of fact remains as to whether the draft chapters were jointly authored. Such a question of fact may be raised at trial but the Court declines to grant summary judgment as to the copyright infringement claim.

B. The Outline

In the January 26, 2000 Memorandum and Order, the Court concluded that the outline was jointly authored by Maurizio and Goldsmith and thus could not be the subject of an infringement claim. 84 F.Supp.2d at 468 (citing *Weissmann v. Freeman,* 868 F.2d 1313, 1318 (2d Cir.1989)). Maurizio argued in the Court of Appeals that this Court was, in its conclusion of joint authorship, in error, but that, if her joint authorship claim was barred by limitations, "she should be able to pursue infringement claims at trial based on the outline as well as the draft chapters." *Maurizio,* 230 F.3d at 521. The Court of Appeals noted that it lacked jurisdiction of the issue, *id.,* but added that, "[h]aving held that Maurizio's joint authorship claim is time-barred, the district court is free to reevaluate its ruling concerning what claims Maurizio may pursue at trial." *Id.* Maurizio seeks permission to pursue at trial a claim of copyright infringement of the outline, and Goldsmith opposes. The parties have set forth their positions in separate letter briefs.

The Court concludes that Maurizio should be allowed to pursue a claim of copyright infringement of the outline at trial if she believes such a claim is consistent with the facts. The claim would, of course, be subject to this Court's ruling in the January 26, 2000 Memorandum and Order that Maurizio's copyright infringement claims are limited to acts of infringement occurring within three years preceding the filing of the complaint. Although it is true that a claim of joint authorship is inconsistent with a claim of infringement, inconsistent claims may be pleaded. Fed.R.Civ.P. 8(e)(2). Maurizio's legal characterizations of the facts do not necessarily preclude the assertion of an infringement claim. A court cannot resolve issues of fact on a motion for summary judgment, *United States v. Matheson,* 532 F.2d 809, 813 (2d Cir.), *cert. denied,* 429 U.S. 823 (1976), so that this Court's statements of fact in its earlier Memorandum and Order cannot constitute findings of fact binding at trial. The Court, on the earlier motion, dealt with a specific record on a specific motion, and, at root, was determining whether there were issues of fact. Since Maurizio has pleaded an infringement claim as well as a joint authorship (and therefore ownership) claim, the Court concludes that pursuit of the infringement claims is not barred. *See Carell v. The Shubert Org.,* 104 F.Supp.2d 236, 251-55 (S.D.N.Y.2000).

2. Lanham Act

***4** Plaintiff's third claim, for violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) states:

[Defendant] fail[ed] to provide credit to [plaintiff] as a co-author of the [FWC] ... including in connection with the printed editions of the [FWC] and the forthcoming motion picture version thereof, [and] have made and continued to make false designations of the origin of the [FWC], false or misleading descriptions of the [FWC], and false or misleading representations of fact, which have been and are likely to cause confusion, mistake or deception by making it appear that [defendant] is the sole author of the [FWC] when, in fact, [FWC] includes [plaintiff's] Copyrighted Contributions, numerous copyrightable segments and

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

fragments original with [plaintiff, plantiff's] novel and original ideas, characters and characterizations.

(Pl.'s Compl. at 7, ¶ 31.) Essentially, plaintiff alleges that defendant failed to properly credit her while selling the FWC. (*Id* . at 7, ¶ 32.) In response, defendant submits that this claim "constitutes nothing more than a reiteration of her claims under the Copyright Act" (Def.'s Reply Mem. at 7-8) and thus must be dismissed because it is duplicative of the copyright infringement cause of action. The Court disagrees with the defendant's contention.

The Second Circuit has labeled plaintiff's claim under the Lanham Act as "reverse passing off"--a type of misrepresentation where A sells B's product under A's name. *Attia v. Soc'y of the N.Y. Hosp.*, 201 F.3d 50, 59 (2d Cir.1999). In the context of written works, the Second Circuit has said that reverse passing off "is separate and distinct from a claim of copyright infringement." *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 781 (2d Cir.1994).

While the distinction between copyright infringement and the Lanham Act's concept of reverse passing off is somewhat murky, the Second Circuit has concluded that the two causes of action address different harms. *Id.* at 781. In particular, "[t]hrough a copyright infringement action, a copyright owner may control who publishes, sells or otherwise uses a work. Through a Lanham Act action, an author may ensure that his or her name is associated with a work when the work is used." *Id.* Thus, it is possible that the misuse of one author's work by another author may result in different harms leaving two separate causes of action under both the Copyright Act and the Lanham Act.

In contrast to the elements of copyright infringement, set forth in the discussion above, reverse passing off requires plaintiffs to demonstrate: "(1) that the work at issue originated with the plaintiff; (2) that the origin of the work was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin." *Lipton v. Nature Co.*, 71 F.3d 464, 473 (2d Cir.1995).

*5 Although the two claims are distinct, courts routinely rely on copyright law to guide Lanham Act analyses. For example, under the tests for copyright infringement and reverse passing off, the plaintiff must be the original creator of the work. *Waldman*, 43 F.3d at 781-82. Thus, because there are issues of fact as to the nature of the authorship of the two draft chapters and the outline, there is an issue of fact as to the first prong of the reverse passing off test in this case.

Beyond proving originality, the plaintiff must demonstrate that the defendant falsely designated the origin of the work. *Carrell*, 104 F.Supp.2d at 262. Here, plaintiff must show that the defendant made affirmative misrepresentations about who authored the work. *Id.* Although a plaintiff cannot demonstrate false designation of origin merely by showing that the defendant falsely obtained a copyright notice, *Lipton*, 71 F.3d at 473, the element is satisfied by a showing that the defendant published a work without attributing credit to plaintiff's copyrightable work. *Waldman*, 43 F.3d at 782; *see also Carrell*, 104 F.Supp.2d at 261 (permitting copyright infringement claim and Lanham act claim to survive where plaintiff went beyond merely alleging that defendant's false copyright notice was a false designation of origin and alleged "affirmative misrepresentations" of ownership in videos and press releases); *Scholastic, Inc. v. Stouffer*, 124 F.Supp.2d 836, 844- 45 (S.D.N.Y.2000) (finding Lanham Act claim not duplicative of copyright infringement claim because plaintiff alleged the requisite misrepresentation); *Richard Feiner & Co., Inc. v. Larry Harmon Pictures Corp.*, 38 F.Supp.2d 276, 280 (S.D.N.Y.1999) (refusing to dismiss Lanham Act claim where it was alleged that defendant "openly and notoriously claimed they were the owners and licensors of the plaintiff's" work).

Defendant relies on a number of cases where the courts were reluctant to permit Lanham Act claims to go forward. (Def.'s Mem. at 8-9.)

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

However, such reliance is inconclusive here because the plaintiffs in those cases failed to demonstrate how the defendants' actions went beyond infringement. *E.g., Armstrong v. Virgin Records, Ltd.*, 91 F.Supp.2d, 628, 633 (S.D.N.Y.2000) (concluding that "even when viewed in the light most favorable to Armstrong, his claims under the Lanham Act essentially track those asserted under copyright law."); *Weber*, 63 F.Supp.2d at 464 (finding that plaintiff's claim failed to demonstrate the "requisite affirmative action of false claiming originality beyond that implicit in any allegedly false copyright."). To the contrary, in this case, plaintiff has alleged that defendant took her work, used it in the final version of the FWC and sold it to the public without crediting her work. Such alleged misrepresentation goes further than merely restating a claim for copyright infringement.

Moreover, to prove false designation of origin, plaintiff is required to demonstrate that her work was copied. The Second Circuit has stated that the "substantial similarity" standard set forth above in the copyright infringement discussion is "an appropriate one for determining false designation of origin under the Lanham Act ." *Id.* at 783. The Court has already found that such a determination of the similarity of the works is an issue for trial. *Maurizio*, 84 F.Supp.2d at 468.

***6** Thus, based on the evidence presently before the Court, there is a genuine issue of fact as to whether the defendant has violated the Lanham Act and the Court cannot dismiss the claim.

3. Wrongful Misappropriation of Novel and Original Literary Ideas

In her Reply Memorandum, defendant additionally seeks summary judgment with respect to Count Four of the complaint--wrongful misappropriation of novel and original literary ideas. (Def.'s Reply Mem. at 9-11.) Defendant's sole argument to dismiss this count is that it is preempted by the Copyright Act. However, the Court previously held that "[plaintiff]'s misappropriation claim is not preempted" because "the Copyright Act provides protection for the expression of ideas, not the ideas themselves." *Maurizio*, 84 F.Supp.2d. at 468. Thus, the Court has already denied summary judgment on this claim.

4. Common Law Unfair Competition

The defendant argues that plaintiff's claim of common law unfair competition is also preempted by the Copyright Act. (Def.'s Mem. at 7-11.) The Court agrees.

The Copyright Act expressly preempts "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship ...." 17 U.S.C. § 301(a). Thus, "[w]hether a state law claim is preempted depends on whether it is derivative of a copyright claim or is based on an 'extra element' beyond those of a copyright claim." *Weber v. Geffen Records, Inc.*, 63 F.Supp.2d 458, 462 (S.D.N.Y.1999) (citing *Kregos v. Associated Press*, 3 F .3d 656, 666 (2d Cir.1993)). In particular, courts have found that because a claim for common law unfair competition requires no extra element beyond a copyright infringement claim, it is preempted by federal law. *Kregos*, F.3d at 666; *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 717 (2d Cir.1992); *Feiner*, 38 F .Supp.2d at 280. Thus, the Court now grants summary judgment as to plaintiff's state law claim for unfair competition.

5. Constructive Trust

Plaintiff's eighth claim, for the imposition of a constructive trust, is based on the theory of unjust enrichment. (Decl. Schwartz. Ex. A at 11, ¶¶ 57-58.) Plaintiff alleges that "GOLDSMITH will be unjustly enriched at the expense of MAURIZIO if GOLDSMITH is allowed to retain funds which should have been paid and which will become payable to MAURIZIO." (*Id.* at ¶ 57.) " 'Courts have generally concluded that the theory of unjust enrichment protects rights that are essentially 'equivalent' to rights protected under the Copyright Act; thus, unjust enrichment claims

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

relating to the use of copyrighted material are generally preempted." ' *Weber,* 63 F.Supp.2d at 462 (quoting *Netzer v. Continuity Graphic Assocs. Inc.*, 963 F.Supp. 1308, 1322 (S.D.N.Y.1997). The Court holds that the claim for a constructive trust is preempted and the claim is dismissed.

Conclusion

***7** To summarize, the Court grants summary judgment as to Counts Five and Eight and denies summary judgment as to Counts One, Three and Four. The Court will permit plaintiff to pursue a copyright infringement claim with respect to the outline.

So Ordered.

2001 WL 1568428 (S.D.N.Y.), 2002 Copr.L.Dec. P 28,368

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Exhibit R147

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

**Patricia A. CRAIG, Plaintiff,**
**v.**
**Henrick DABROWSKI, Henry L. Mikolajczyk, Ryszard Ogrodnik, and Zbigniew Bednarz, Defendants.**

**No. 98 C 405.**

June 8, 1999.

*MEMORANDUM OPINION*

GRADY, J.

*1 Before the court is plaintiff's motion for summary judgment on Counts I, IV, and V of the first amended complaint (the "complaint"). For the reasons set forth below, the motion is granted in part.

Also before the court is defendants' motion to reopen discovery, which is denied.

*BACKGROUND*

Plaintiff Patricia A. Craig is a licensed architect who designs and creates architectural plans and drawings from which various types of structures, including single-family homes, are constructed. Craig sells and distributes her plans to land developers, builders, realtors, and private individuals in the Chicago area.

Craig alleges that, in 1995, she designed plans (the "1995 Plans") for a single family home to be constructed at 1745 West Fletcher Street in Chicago (the "Fletcher home"). [FN1] In 1996, Craig created new plans for the Fletcher home (the "1996 Plans") by altering the floor plan arrangement and front exterior of the 1995 Plans. In April 1997, Craig applied for and received copyright registrations of the 1995 Plans (No. VA 767-157) and the 1996 Plans (No. VA 767-158).

FN1. Craig states that the 1995 Plans were created by altering her 1994 Design for a single family home to be constructed at 2145 North Southport Avenue in Chicago.

In connection with the construction of the Fletcher home, the 1995 Plans were filed with the City of Chicago's Department of Buildings on or about November 9, 1995. The 1996 Plans were filed with the city on or about July 12, 1996. A sales brochure for the Fletcher home was created and publicly distributed; the brochure included the floor plan arrangement and the front elevation view of the 1996 Plans. Morevoer, a copy of the front elevation view of the 1996 Plans was listed on the Multiple Listing Service ("MLS"). Craig contends that the Fletcher home was eventually constructed according to the 1996 Plans and that several open houses were held there.

Craig alleges that, in January 1997, she saw a single family home being constructed at 1811 West Newport Avenue (the "Newport home") in Chicago, and believed that its design was a copy of her 1996 Plans. She contacted Century 21 Chicagoland, the real estate office promoting the sale of the Newport home, and requested a copy of any available sales information. Craig received a facsimile copy of a sales brochure for the Newport home (the "Newport brochure") from defendant Henrick Dabrowski, the real estate agent for the property. The brochure consisted of a front elevation view, a list of specifications, and plans for the basement, first floor, and second floor. Dabrowski prepared the brochure along with defendant Ryszard Ogrodnik, the general contractor who built the Newport home.

The architectural plans for the Newport home (the "Newport plans") were prepared by defendant Zbigniew Bednarz, with input from Ogrodnik and defendant Henry L. Mikolajczyk, a registered architect who reviewed and signed the Newport plans. [FN2]

FN2. Bednarz is not a licensed architect.

Craig filed this action on January 23, 1998. The complaint alleges that Dabrowski

willfully and intentionally infringed Craig's copyright in the 1995 and 1996 Plans by creating and distributing sales material for the Newport home (Count I). Craig also alleges that Ogrodnik infringed her copyrights by constructing and selling the Newport home (Count IV), and that Bednarz infringed her copyrights by creating and selling the Newport plans (Count V). Counts II and III allege that Dabrowski and Mikolajczyk, respectively, contributorily infringed her copyrights. [FN3]

FN3. Each count alleges two claims because each goes to the infringement of both the 1995 and 1996 Plans.

Courts have interpreted Rule 10(b) of the Federal Rules of Civil Procedure to "require[ ] a separate count for each distinctive statutory and constitutional claim." *Goerlich v. Davis,* 1991 WL 195772, 91 C 1743, at *2 (N.D.Ill. Sept. 25, 1991). One purpose of separating claims is to enable the court to grant relief on an entire count, not just part of a count. As discussed below, the instant motion for summary judgment only goes to the claims regarding the 1996 Plans, not the 1995 Plans. We believe plaintiff's claims will be more easily discussed in future proceedings in this case if they are set forth in separate counts. Therefore, the court orders plaintiff to amend the complaint and organize each claim into separate counts.

***2** Craig seeks to enjoin defendants from using, selling, or distributing her Plans or any works substantially similar to them, or in any other way infringing her copyrights. She also seeks orders directing the defendants to produce all materials and plans that infringe or are substantially similar to her Plans, and to produce a list of all customers and accounts to which defendants have distributed plans and drawings that infringe or are substantially similar to her Plans. Furthermore, Craig seeks reasonable attorney's fees and costs plus actual damages and any additional profits of the defendants, or in the alternative statutory damages under 17 U.S.C. § 504. [FN4]

FN4. Defendants argue that "it is questionable as to whether or not [Craig] is entitled to any of the relief which she is seeking given the express terms of 17 U.S.C. 412(2)." Memorandum in Opposition to Plaintiff's Motion for Summary Judgment of Copyright Infringement ("Opposition") at 2. 17 U.S.C. § 412 provides that "no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for ... any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work." Defendants contend that Craig's Plans were first published in July 1996 and their registration was not made until April 1997, and that § 412(2) therefore bars "any" of the relief sought by Craig.

The damages issue is not ripe at this juncture; therefore, we do not reach the merits of this argument. Still, we wish to point out to defendants that § 412(2) by its terms refers only to statutory damages and attorney's fees. Craig seeks other types of relief as well, to which § 412(2) does not apply.

Craig now moves for summary judgment on Counts I, IV, and V of the complaint. However, Craig's summary judgment motion only goes to the claims alleging infringement of the 1996 Plans. Moreover, it does not address the issue of whether defendants "willfully and intentionally" infringed her Plans, as alleged in the complaint.

In the claims at issue on the instant motion, Craig complains that her Plans were infringed by (1) Dabrowski's creation and distribution of the Newport brochure; (2) Bednarz's creation and sale of the Newport plans; and (3) Ogrodnik's construction and sale of the Newport home.

Also before the court is defendants' motion to reopen discovery.

*DISCUSSION*

Defendants' Motion to Reopen Discovery

Defendants have moved to reopen discovery, in particular as to defendant Bednarz. The discovery cutoff in this case was originally set for August 30, 1998. We vacated that date because defendants were delinquent as to discovery, and extended the cutoff to September 30, 1998. In October, we gave plaintiff leave to file an amended complaint,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

adding Bednarz as a defendant. Plaintiff agreed to allow defendants an additional thirty days for discovery. However, plaintiff states that defendants never indicated an intention to pursue additional discovery, nor did they seek leave from the court to do so. In January 1999, nearly three months after the amended complaint was filed, defendants filed the instant motion seeking additional discovery.

While defendants state that they anticipate taking one deposition and filing one set of interrogatories, they have not adequately specified what discovery they need or even indicated that it relates to Craig's claim against Bednarz. They do not state what specific discovery they need, nor do they explain how the lack of it affects their ability to respond to plaintiff's summary judgment motion. [FN5] They also fail to explain why they did not seek discovery within the thirty-day period after the amended complaint was filed, or why they filed this motion nearly three months later. The court believes that defendants have had ample opportunity to conduct appropriate discovery. Accordingly, their motion to reopen discovery is denied.

FN5. Fed.R.Civ.P. 56(f) provides: "Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just." However, "[a] party who has been dilatory in discovery may not use Rule 56(f) to gain a continuance where he has made only vague assertions that further discovery would develop genuine issues of material fact." *United States v. Bob Stofer Oldsmobile-Cadillac, Inc.*, 766 F.2d 1147, 1153 (7th Cir.1985). Here, defendants have not made any such assertions, not even vague ones.

Plaintiff's Motion for Summary Judgment

A. Summary Judgment Standard

***3** Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *See O'Connor v. DePaul Univ.*, 123 F.3d 665, 669 (7th Cir.1997). "A dispute over material facts is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party." ' *Kennedy v. Children's Serv. Soc'y*, 17 F.3d 980, 983 (7th Cir.1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *McGrath v.. Gillis*, 44 F.3d 567, 569 (7th Cir.1995).

B. Copyright Infringement

The Copyright Act protects architectural plans as both "pictorial, graphic, and sculptural works" and "architectural works." *See* 17 U.S.C. § 102(a)(5), (8); *see also* 17 U.S.C. § 101 (definitions of "pictorial, graphic, and sculptural works" and "architectural work").

To establish copyright infringement, the plaintiff must demonstrate that (1) he owns a valid copyright; and (2) the defendant copied the protected work. *See Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). A certificate of copyright registration constitutes prima facie evidence of the validity of a copyright. 17 U.S.C. § 410(c). This is a rebuttable presumption. *See Mid America Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir.1995). The second element of the infringement test may be established by direct evidence of copying, which is rarely available, or by circumstantial evidence. *See Selle v. Gibb*, 741 F.2d 896, 901 (7th Cir.1984). In order to prove copying by circumstantial evidence, a plaintiff must demonstrate that (1) the defendant had access to the copyrighted work; and (2) the accused work is substantially similar to the copyrighted work. *See Wildlife Express Corp. v.*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*Carol Wright Sales, Inc.*, 18 F.3d 502, 508 (7th Cir.1994); 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.02[B] (1998 ed.) (hereinafter "Nimmer"). Alternatively, the plaintiff can establish an inference of access if she can prove that the similarity between the works is "so striking that the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded." *Selle*, 741 F.2d at 901.

1. Validity of the Copyright in the 1996 Plans

Defendants admit that Craig has a valid copyright in the 1996 Plans. Rule 12(N) Response to Statement of Facts in Support of Plaintiff's Motion for Summary Judgment ("Defendants' 12(N) Statement"), ¶ 28. [FN6]

FN6. We note that defendants' statement does not contain citations to the record, as required by Local General Rule 12(N). Nevertheless, we have examined the materials submitted by defendants to determine whether they could establish a genuine issue of material fact if they had supported the "facts" in their statement with citations to the record.

2. Copying

*4 Craig argues that the Newport brochure, plans, and home are not merely substantially, but strikingly, similar to her 1996 Plans. We address each work in turn.

a. Striking Similarity

To determine similarity between two works, the Seventh Circuit uses the "ordinary observer" test: "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Wildlife Express*, 18 F.3d at 509 (quoting *Atari, Inc. v. North Am. Phillips Consumer Elecs. Corp.*, 672 F.2d 607, 614 (7th Cir.1982)). "The *sine qua non* of the ordinary observer test ... is the overall similarities rather than the minute differences between the two works." *Atari*, 672 F.2d at 618 (citations omitted). Courts in this circuit may make "side-by-side" and "ocular" comparisons of works to determine similarity. *See Wildlife Express*, 18 F.3d at 506-07 n. 1.

i. The Newport Brochure (Count I)

Count I alleges that Dabrowski infringed the 1996 Plans by creating and distributing the Newport brochure. Dabrowski admits that he created and distributed the Newport brochure. Plaintiff's 12(M) Statement, Ex. G (Transcript of Dabrowski Deposition), at 20, 25. He also concedes that the Newport brochure and the 1996 Plans have dozens of identical elements. [FN7] He even admits that the Newport brochure and the 1996 Plans are strikingly similar. Defendants' 12(N) Statement, ¶ 59.

FN7. Dabrowski admits that the Newport brochure's basement floor plan and the 1996 Plans' basement floor plan contain the following identical placements: fireplace in Rec Room/Play Room; storage closet off of Rec Room/Play Room; stairway to first floor; storage closet under stairway; bathroom; bathtub, toilet and sink in bathroom; window in bathroom; mechanical room; furnace, hot water heater, ejector pump, and sump pump in mechanical room; laundry room; washer and dryer units in laundry room; window in laundry room; den; closet in den; and entry to basement at rear of house. Moreover, defendants admit the identical configuration of the stairway to the first floor and designations of the furnace, hot water heater, ejector pump, and sump pump. Plaintiff's 12(M) Statement and Defendants' 12(N) Statement, ¶ 55. Dabrowski admits that the Newport brochure's first floor plan and the 1996 Plans' first floor plan contain the following identical placements: front entry and closet off of front entry; window in front entry; living room; windows in front wall of living room; fireplace in living room; windows on opposite sides of fireplace; dining room on first floor; all windows in dining room; powder room; sink, toilet, and window in powder room; stairway; window in stairway; kitchen; sink in U-shaped countertop configuration; stovetop in U-shaped countertop configuration; family room; windows in family room (the 1996 Plans include an additional window); and first floor deck off of family room. Moreover, defendants admit the identical configurations of the front porch, front entry, and closet off of front entry; sink in powder room; stairway; U-shaped countertops in kitchen, and first

floor deck off of family room. *Id.*, ¶ 56, 57.
Dabrowski admits that the Newport brochure's second floor plan and the 1996 Plans' second floor plan contain the following identical placements: bedroom # 2; chimney; closets in bedroom # 2; windows in bedroom # 2; second floor bathroom; double-bowl sink, toilet, and bathtub in second floor bathroom; window in second floor bathroom; bedroom # 1; all windows in bedroom # 1; closet in bedroom # 1; master bedroom; master bathroom; double-bowl vanity/sink, shower, toilet, and bathtub in master bathroom; windows in master bathroom; and walk-in closet in master bedroom. Moreover, defendants admit the identical configuration of the chimney, double-bowl sink in second floor bathroom; closet in bedroom # 1; cathedral ceiling in master bedroom; double-bowl vanity/sink, shower, toilet, and bathtub in master bathroom; and the identical dimensions of bedroom # 2, bedroom # 1, and master bedroom. *Id.*, ¶ 57.
Dabrowski admits that the Newport brochure's exterior plan and the 1996 Plans' exterior plan contain the following identical elements: configurations of porch, windows on first and second floors, porch railing, and door; placement of windows on first and second floors, lanterns on opposite sides of door, and porch overhang; type of windows on first and second floors; decorative trim and trim at peak of roof; and roof pitch. *Id.*, ¶ 58.

The court's own side-by-side comparison confirms that the drawings are virtually identical. Even most of the handwriting in the Newport brochure floor plans is identical to that in the 1996 Plans.

Moreover, unusual common errors exist in the Newport brochure and the 1996 Plans, which constitute strong evidence of copying. *See Selle,* 741 F.2d at 904 ("[I]f the complaining work includes what appears to be an error and the accused work repeats the ... error, then it is more likely that there is some connection between the pieces."). Here, both the 1996 Plans and the Newport brochure omit the chimney from the front elevation view; it should appear on the right side of the house (as facing the viewer). Similarly, the living room dimensions are omitted from both (the dimensions for all other large rooms on the first and second floors are specified). [FN8] Plaintiff's 12(M) Statement, Exs. D, F, M.

FN8. Plaintiff also contends that the omission of gutters and downspouts from the front elevation views is a common error, but we are not convinced. The other claimed errors are self-evident, but we are unsure if gutters and downspouts are regularly depicted in front elevation views, and plaintiff does not tell us. Thus, we doubt that the omission is truly an "error."
Defendants do not respond to plaintiff's arguments regarding common errors and suspicious dissimilarities.

Even dissimilarities between protected works and accused works can be evidence of copying in some instances if they are "suspicious." *Selle,* 741 F.2d at 904 (citing *Joshua Meier Co. v. Albany Novelty Mfg. Co.*, 236 F.2d 144, 146 (2d Cir.1956) (inversion and substitution of certain words in catalogue in a "crude effort to give the appearance of dissimilarity" are themselves evidence of copying). Three details in particular strike us as crude efforts to create dissimilarities. First, the 1996 Plan includes a pocket door in the first floor powder room. The Newport brochure also shows a pocket door, but has a regular, swinging door for the same entryway as well. [FN9] Second, the Newport brochure's location of the door to bedroom # 2 is different from that in the 1996 Plans, but the Newport brochure still includes the 1996 Plan's doorframe. Third, the elements in the Newport brochure that differ from those in the 1996 Plans (refrigerator, desk, and pantry in kitchen and deck on second floor) have designations in a completely different handwriting from the rest of the brochure. Plaintiff's 12(M) Statement, Exs. D, F, M.

FN9. A "pocket door" slides out from inside a wall.

*5 Such common errors and suspicious dissimilarities are hard to explain with any hypothesis other than copying. It appears that, for the Newport brochure, Craig's 1996 Plans were simply shrunk and photocopied, with most dimension designations and other details whited out. Overall, there is no genuine issue as to whether the Newport brochure and the 1996 Plans are not merely substantially, but strikingly, similar.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

ii. The Newport Plans (Count V)

Count V alleges that Bednarz infringed the 1996 Plans by creating and selling the Newport plans. Bednarz admits that he prepared the Newport plans and sold them to Ogrodnik. Plaintiff's 12(M) Statement, Ex. I (Transcript of Bednarz Deposition), at 3-4. Moreover, Bednarz admits that the Newport plans and the 1996 Plans have numerous identical elements. [FN10] He also concedes that the Newport plans and the 1996 Plans are strikingly similar. Defendants' 12(N) Statement, ¶ 65.

FN10. Bednarz admits that the Newport plans and the 1996 Plans contain the same identical placements, configurations, and dimensions as do the Newport brochure and the 1996 Plans, listed *supra* n. 7, except for roof pitch. Defendants' 12(N) Statement, ¶¶ 61-64.

The Newport plans do not include the common errors and suspicious dissimilarities of the Newport brochure, but our side-by-side comparison reveals that they nonetheless contain all the same identical elements as do the Newport brochure and the 1996 Plans. Plaintiff's 12(M) Statement, Exs. D, K, O. Therefore, we conclude that there is no genuine issue as to whether the Newport plans and the 1996 Plans are strikingly similar.

iii. The Newport Home (Count IV)

Count IV alleges that Ogrodnik infringed the 1996 Plans by constructing and selling the Newport home. Ogrodnik admits that he constructed and sold the home. Plaintiff's 12(M) Statement, Ex. H (Transcript of Ogrodnik Deposition), at 4. Ogrodnik concedes that the Newport home is strikingly similar to Craig's 1996 Plans and that it was built in substantial conformity with the Newport plans. Defendants' 12(N) Statement, ¶¶ 67, 69.

Defendants point out that "numerous minor variations do exist." *id.* ¶ 67. Nonetheless, the determining factor is the overall similarity between the Newport home and the 1996 Plans. *Atari,* 672 F.2d at 618. We have found that the Newport plans are strikingly similar to the 1996 Plans. The Newport home was built in substantial conformity with those plans; therefore, there is no genuine issue as to whether the home is strikingly similar to the 1996 Plans as well.

b. Access

"If ... two works are so similar as to make it highly probable that the later one is a copy of the earlier one, the issue of access need not be addressed separately, since if the later work was a copy its creator must have had access to the original." *Ty, Inc. v. GMA Accessories, Inc.,* 132 F.3d 1167, 1170 (7th Cir.1997). "Of course the inference of access, and hence of copying, could be rebutted by proof that the creator of the later work could not have seen the earlier one or (an alternative mode of access) a copy of the earlier one." *Id.*

There is no genuine issue that the Newport brochure, plans, and home are all strikingly similar to the 1996 Plans. Moreover, defendants submit no evidence creating a genuine issue of fact as to their access to the 1996 Plans.

c. Commonplace Design

***6** "[S]imilarities should appear in a sufficiently unique or complex context as to make it unlikely that both pieces were copied from a prior common source." *Selle,* 741 F.2d at 904.

Despite conceding the validity of Craig's copyright in the 1996 Plans and that the Newport brochure, plans, and home are all strikingly similar to the 1996 Plans, defendants make a feeble attempt to oppose summary judgment. They argue that, despite the similarities, Craig still has not established that their works infringe her copyright because her design is commonplace in Chicago, more specifically in the Lakeview neighborhood. Defendants contend that Craig's Plans are nothing more than "stock plans" that "rather closely resemble many other residences in the same immediate vicinity." Opposition at 3. To bolster their

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

argument, defendants attach several unsupported photos and one sketch depicting the front elevation views of various Lakeview-area homes, which are similar to the front elevation views of the Fletcher and Newport homes. [FN11] Opposition, Exs. C-J.

FN11. Defendants also state that Craig's design is "not unique or wholly original." Opposition at 3. However, originality goes to the validity of a copyright. To the extent that defendants' argument pertains to originality, it is foreclosed by their admission that Craig's copyright in the 1996 Plans is valid.

Craig objects to defendants' exhibits, arguing that there is no foundation for them by way of affidavit or otherwise. We agree that the exhibits are unsupported, but in any case they are only marginally relevant to defendants' argument that Craig's Plans are commonplace. The photos and sketch depict only the front views of various homes but not the actual architectural plans, which are the protected items at issue here. Craig is claiming copyright infringement of her Plans in their entirety, not just the front elevation views. Defendants' evidence is insufficient to raise a genuine issue of material fact as to whether Craig's 1996 Plans are commonplace.

Defendants also argue that the similarities between the front elevation views are due to the fact that both homes incorporated mass manufactured products. This contention is related to defendants' other argument that the similarities between the Fletcher and Newport homes are due to their identical lot sizes. However, these functional considerations are not of such a nature that the architectural plans detailing a single-family home must be strikingly or even substantially similar. Craig's 1996 Plans contain many original features and a combination of those features that are not required by mass-manufactured product characteristics or the size of the lot.

The paltry, and unsupported, evidence submitted by defendants does not create a genuine issue of material fact as to whether their works infringe Craig's 1996 Plans.

*CONCLUSION*

For the foregoing reasons, defendants' motion to reopen discovery is denied. Plaintiff's motion for summary judgment on Counts I, IV, and V of the complaint is granted, but only as to plaintiff's claims of infringement of the 1996 Plans. A status hearing is set for June 29, 1999, at 10:00 a.m.

1999 WL 412581 (N.D.Ill.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.