Court File No. 01-1980 / ROTTLUND / Pinnacle
Davenport Affidavit dated August 26, 2004

Exhibit R148

Motions, Pleadings and Filings

United States District Court, D. Minnesota.

**KOOTENIA HOMES, INC., Plaintiff,**
**v.**
**RELIABLE HOMES, INC., Rick Toston, Michael Gleason, Todd Purtell, Ann Weisensee, John Doe and Mary Roe, Defendants.**

**No. CIV. 00-1117ADMAJB.**

Jan. 3, 2002.

Barbara M. Ross, Esq., Best & Flanagan, L.L.P., Minneapolis, Minnesota, appeared for and on behalf of the Plaintiff.

Robert L. Bach, Esq., and Daniel R. Kelly, Esq., Felhaber, Larson, Fenlon & Vogt, P.A., Minneapolis, Minnesota, appeared for and on behalf of the Defendants.

MEMORANDUM OPINION AND ORDER

MONTGOMERY, District J.

INTRODUCTION

*1 On October 29, 2001, the undersigned United States District Judge heard Cross-Motions for Summary Judgment by Plaintiff Kootenia Homes, Inc. ("Plaintiff"), [Doc. No. 47] and Defendants Reliable Homes, Inc., Rick Toston, Michael Gleason (collectively "Defendants") [Doc. No. 37]. For the reasons set forth below, Plaintiff's Motion is denied and Defendants' Motion is granted.

BACKGROUND

Plaintiff brings this action against Defendants for copyright infringement under 17 U.S.C. §§ 101 *et. seq.*, and unjust enrichment. Plaintiff is a Minnesota corporation in the business of designing and building custom homes. Plaintiff is one of ten custom home builders authorized to build in the Wedgewood development of Woodbury, Minnesota. In 1998, Plaintiff created a design and built a home for David and Jennifer Hoeffel at 3555 Crestmore Terrace in the Wedgewood development (the "Hoeffel Home"). David Frosch ("Frosch") fashioned the floor plan for the Hoeffel Home and Susan Welles ("Welles") drafted it. Both Frosch and Welles were Plaintiff's employees. Plaintiff's claims are based on the architectural plan [FN1] for the Hoeffel Home.

FN1. The plan was registered with the United States Copyright Office as an architectural work by Kootenia Homes and bears the copyright registration number VAu467-477. Becker Aff. ¶ 6.

Defendant Reliable Homes, Inc., ("Reliable"), a Minnesota corporation, also is a designer and builder of custom homes authorized to do business in the exclusive Wedgewood development. Defendant Rick Toston ("Toston") owns Reliable and employs Defendant Michael Gleason ("Gleason") as a designer. Reliable built a home for Todd Purtell and Ann Weisensee, husband and wife (the "Purtells"). [FN2] This home is the nexus of this dispute. Plaintiff alleges that the floor plan Reliable designed for the Purtells' home ("Purtell Home") is a copy of the Hoeffel Home.

FN2. Plaintiff and Defendants Purtell and Weisensee have entered a stipulation for dismissal.

In the summer of 1999, the Purtells initiated plans to move from Memphis, Tennessee to the Twin Cities area. *See* Weisensee Dep., at 6-7. Weisensee, a pediatric radiologist accepted a position at Woodlands Hospital in Woodbury. *Id.* at 12. In August, 1999, the Purtells visited the Wedgewood community in Woodbury. *Id.* at 13. The Purtells completed a "Wedgewood Guest Card" that the development office supplied to all of the authorized builders. *See* Ziton Dep., at 25-28.

Plaintiff's exclusive real estate agent, Kim Ziton, contacted the Purtells by telephone and by mailing them a package of marketing materials. *Id.* The Purtells communicated their intention to travel to Minnesota and select a lot and a builder. *Id.* On October 16,

1999, Ziton met with the Purtells at the Plaintiff's model home. She showed the Purtells several of Plaintiff's floor plans. *Id.* at 31. Ziton also presented the Purtells with the Hoeffel Home floor plan because it matched the Purtells' general description of the type of home they intended to build. *Id.* She arranged for the Purtells to tour the Hoeffel Home because it shared many of the design features Weisensee had described as desirable to them. *Id.* at 54, 55.

***2** On October 17, 1999, the Purtells toured the Hoeffel Home for approximately 45 minutes. *See* Ziton Dep., at 36; Weisensee Dep., at 29; Purtell Dep., at 85-86; Hoeffel Dep., at 45-47. The Purtells did not take any measurements, photographs, or notes during the tour of the Hoeffel Home. *See* Hoeffel Dep., at 47. The Hoeffels did not provide the Purtells, or anyone at Reliable, [FN3] with a copy of their floor plan. *Id.* at 24.

FN3. The Hoeffels testified that they never allowed a Reliable employee inside their home. *Id.*

On October 18, 1999, the Purtells met with Toston of Reliable. *See* Weisensee Dep., at 38. Prior to this meeting, the Purtells had faxed Toston a photocopy of a "dream home" floor plan from a magazine. *See* Kelly Aff., Ex. M. Although the Purtells appreciated that their actual floor plan would not have as much square footage as this "dream home" floor plan, it included some design features they wanted to incorporate into their own plan. *See* Purtell Dep., at 21; Kelly Aff., Ex. M. Using the "dream home" as a starting point, the Purtells and Toston discussed general design elements of the home they intended to build. Based upon their discussions with Toston, the Purtells chose Reliable to be their builder. *See* Weisensee Dep., at 40-43.

On October 21, 1999, Reliable's designer, Gleason, conversed with the Purtells by telephone about specific design features to include in their new home. *See* Gleason Dep., at 30-40; Kelly Aff., Ex. N. The Purtells listed specific elements they desired, including a master bedroom on the east side of the home, a great room in the center, with the kitchen to the west, a walk-out basement, an angled garage, a breakfast room off the kitchen with a sunroom on the southwest, a dining room in the front, a sitting room off the master bedroom, and a master bathroom off the master bedroom. *See* Weisensee Dep., at 61. Based on this discussion, Gleason created two preliminary sketches. *See* Gleason Dep., at 44-48; Kelly Aff., Ex. V. Thereafter, he created a straight-line drawing, a more formal version of the hand-drawn plan. *See* Gleason Dep., at 54-55, 65-66; Kelly Aff., Ex. O.

Gleason faxed his straight-line drawing to the Purtells. *Id.* at 40. The Purtells made a number of specific changes to the straight-line drawing using a scaled ruler and cut-outs of rooms and features in the home. *See* Purtell Dep., at 45-48; Kelly Aff. Ex. W. The Purtells also requested a variety of changes during several telephone calls with Gleason. *See* Gleason Dep., at 82-83. Because the Purtells desired a "French traditional" appearance for the exterior of their home, they sent photographs to Gleason to better convey their concept. *See* Purtell Dep., at 39-42; Kelly Aff. Ex. X. After extensive discussions and revisions, Gleason and the Purtells completed the final floor plan on December 1, 1999. *See* Gleason Dep., at 25-26, 93.

Gleason submitted the plan to the Wedgewood Architectural Review Committee. *Id.* While at the Wedgewood sales office, Gleason briefly reviewed the Hoeffel Home floor plan to ensure that the plans were not substantially similar. *Id.* at 20-21, 25. The architectural guidelines for the Wedgewood development provide that no two homes may be of the same design or detail. *Id.* at 26-27. Toston instructed Gleason to review the plans because Toston had heard rumors that Ziton and Frosch were accusing Reliable of copying the Hoeffel Home. *Id.;* Toston Dep., at 19. Both Gleason and Toston deny that they ever viewed the Hoeffel Home floor plan prior to completion of the Purtell Home floor plan. *See* Toston Dep., at 21; Gleason Dep., at 25.

***3** Reliable constructed the Purtell Home from December, 1999, to June, 2000. During construction, Ziton formed an opinion that

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

based on her showing the Purtells the Hoeffel Home, the Defendants had copied Plaintiff's plan. *See* Ziton Dep., at 41-42. On May 3, 2000, Plaintiff initiated this lawsuit.

DISCUSSION

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Copyright law protects architectural plans and drawings as "pictorial, graphic, and sculptural works" and "architectural works." 17 U.S.C. §§ 102(a)(5) & (8). An "architectural work" is the "design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings." *Id.* § 101. "The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features." *Id.* Thus, copyright protection is extended to the plans for the design of a house as well as the house itself. *See J.R. Lazaro Builders, Inc. v. R.E. Ripberger Builders, Inc.*, 883 F.Supp. 336, 339 (S.D.Ind.1995).

Nevertheless, the outset of a copyright infringement analysis implicates the fundamental principle copyright doctrine: ideas, concepts, and processes are not protected from copying. *See* 17 U .S.C. § 102(b) ; *Attia v. Society of New York Hosp.*, 201 F.3d 50, 54 (2d Cir.1999) (citing *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir.1930) (Hand, J.)). The Copyright Act "assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349-50 (1991). "This principle, known as the idea/expression or fact/ expression dichotomy, applies to all works of authorship." *Id.* Thus, the Copyright Act protects the specific expression of ideas in the Hoeffel Home plan, but exempts the ideas themselves from protection. *See* 17 U.S.C. § 102(b); *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547 (1985).

The Second Circuit recently explained this idea/expression dichotomy as it applies to architectural works:

The problem of distinguishing an idea from its expression is particularly acute when the work of "authorship" is of a functional nature, as is a plan for the accomplishment of an architectural or engineering project. As a generalization, to the extent that such plans include generalized notions of where to place functional elements, how to route the flow of traffic, and what methods of construction and principles of engineering to rely on, these are "ideas" that may be taken and utilized by a successor without violating the copyright of the original "author" or designer. On the other hand, to the extent that the copier appropriates not only those ideas but the author's personal expression of them, infringement may be found.

*4 *Attia*, 201 F.3d at 55.

Although there are similarities between the Purtell Home and the Hoeffel Home, the similarities do not go beyond the concepts and ideas contained in the Hoeffel Home plan. When beginning the design process for their new residence, some aspiring homeowners choose architects, designers, and builders based on a "signature" design that can be immediately recognized as uniquely associated with an individual architect, such as Frank Lloyd Wright, Mies Van Der Rohe, or Frank Gehry. *See* Kelly Aff., Ex. K, at 2. [FN4] It is more common to choose a design of a future residence by selecting one among derivations of historical precedents, such as Tudor, Cape Cod, Colonial, French Provincial, Shaker Style, or even Farm House. *Id.* Moreover, the market forces drive a tendency towards similarity and conformity in single-family residences. *Id.* at 3. People generally choose a

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

neighborhood based upon the knowledge that their home will coexist nicely with their neighbors' houses, within a certain style and price range. *Id.* These market forces create incentives for many subdivisions to impose restrictive covenants on the designs of homes built within them. *Id.* The Wedgewood development is an example of a subdivision where many homes share similarities.

FN4. This exhibit is the expert witness report of Jeffrey A. Scherer.

An approved builder in an exclusive subdivision arranges the basic rooms and spaces in a single-family residence to accommodate how the family wishes to live. *Id.* at 4. Many features of a designed residence are common in many other homes. Efficiency concerns and the need for functional living in the home inevitably constrain the number of variations in the configuration of the rooms and spaces. *Id.* Common elements and generic features are shared by all homes. The Copyright Act does not protect the ideas for juxtaposing these living spaces. *Attia,* 201 F.3d at 55. Based upon the testimony of Frosch, who designed the Hoeffel Home, and Welles, who drafted it, the only original design element that Plaintiff seeks to protect is the location of the home office off the kitchen area. *See* Kelly Aff. ¶ 3. All other design elements of the Hoeffel Home are common to many other homes. *See* Kelly Aff., Ex. K, at 5.

Mindful of the fundamental principle that copyright protection does not extend to ideas, the infringement analysis will be addressed. To establish copyright infringement, Plaintiff must prove its ownership of the copyright and copying by Defendants. *Feist,* 499 U.S. at 361; *Moore v. Columbia Pictures Indus., Inc.,* 972 F.2d 939, 941 (8th Cir.1992); *Hartman v. Hallmark Cards, Inc.,* 833 F.2d 117, 120 (8th Cir.1987). There is no dispute that Plaintiff registered its Hoeffel Home architectural plan with the United States Copyright Office.

Plaintiff concedes that it possesses no direct evidence that Defendants copied the Hoeffel Home floor plan. *See* Pl. Mem. in Supp., at 19. Plaintiff therefore must demonstrate copying through circumstantial evidence. In this inferential method, copying can be established by demonstrating "access" by the alleged infringer and "substantial similarity" between the works at issue. *See Moore,* 972 F.2d at 941-42; *Nelson v. PRN Prods., Inc.,* 873 F.2d 1141, 1142 (8th Cir.1989).

*5 Plaintiff can establish access by showing that the defendants had an "opportunity to view or to copy" its work. *Moore,* 972 F.2d at 942. Establishing a "bare possibility" of access is insufficient, Plaintiff must prove that Defendants had a "reasonable possibility" of viewing its work. *Id.* The Hoeffels did not provide anyone at Reliable with a copy of their floor plan. However, Plaintiff may prove access by showing that a third person with creative input for the designer has had access to the copyrighted work. *See J.R. Lazaro Builders,* 883 F.Supp. at 342. In *J.R. Lazaro Builders,* the court held that when an allegedly infringing homeowner provided guidance into his builder's design of his home, that homeowner's tour of the two copyrighted homes established access on the part of the builder sufficient to preclude summary judgment. *Id.* Similarly, in this case the Purtells toured the Hoeffel Home and subsequently instructed Gleason about the specific design elements they desired in their home. Although the Purtells did not take any measurements, photographs, or notes, their tour minimally suffices to create a factual issue as to the extent of Defendants' access to the Hoeffel Home design.

Plaintiff must not only demonstrate access but also must establish a substantial similarity between its work, the Hoeffel Home, and the alleged copy, the Purtell Home. Determining whether or not a substantial similarity exists involves a two-step analysis. *Moore,* 972 F.2d at 945. First, the Court must extrinsically analyze the similarity of ideas, focusing on objective similarities in the details of the works. *Id.* Second, if there is substantial similarity in ideas, the Court must evaluate the similarity of expression using an intrinsic test, depending on the response of the ordinary, reasonable person to the forms of expression.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*Id.; Hartman v. Hallmark Cards, Inc.*, 833 F.2d 117, 120 (8th Cir.1987) (citations omitted). In sum, the Court determines whether the details of the works contain objective similarities, and if they do, then the Court examines the works to ascertain if they are so dissimilar that "reasonable minds [could] not differ as to the absence of substantial similarity in expression." *Moore*, 972 F.2d at 945; *Hartman*, 833 F.2d at 120 (quoting *Litchfield v. Spielberg*, 736 F.2d 1352, 1355-56 (9th Cir.1984).

First, an analysis of the objective similarities in the details of the works depends on expert testimony. *See Moore*, 972 F.2d at 945. Plaintiff's expert, James Larson, failed to identify similarities in the *details* of the Hoeffel Home and the Purtell Home. Eschewing the actual floor plans and using "bubble diagrams," Plaintiff's expert illustrates *generic* similarities between the homes. *See* Larson Report, figs. 3, 4. Highlighting similarities in the general ideas of locating functional elements of the home is insufficient to create a genuine issue of fact.

***6** Defendants' expert, Jeffrey Scherer, opined that a comparison of the Purtell Home and the Hoeffel Home revealed that each builder arranged standard features as desired by the respective homeowner. *See* Kelly Aff., Ex. K, at 9. Scherer found no originality and no distinguishing elements in the Hoeffel Home. *Id.* Other than what could be identified in any conventional home, he found no substantial similarities in the objective details of the works that suggests copying. *Id.* Scherer concluded that the Purtell Home was derived from ideas of the Purtells, the market, established expectations in the Wedgewood development, their budget, and the experience and skills of Reliable. *Id.*

While there are general similarities between the Purtell Home and the Hoeffel Home, the similarities do not exceed the ideas contained in the Hoeffel Home plan. Indeed, the particular expressions of those ideas are distinct in the two homes. Dissimilarity may be important in determining whether there is substantial similarity. See *Attia*, 201 F.3d at 58.

Defendants identify a multitude of differences between the Hoeffel Home and the Purtell Home. *See* Gleason Aff. ¶ 3. Significant among these differences are: a difference of 193 square feet of living space and 403 square feet overall, different roof lines, different stair locations, different number and configuration of windows, different juxtaposition of master bathroom and walk-in closets, different layout of mud room and laundry room, and different arrangement of second-floor rooms. *Id.;* Kelly Aff. Ex. K. Further, the Purtell Home features a side-load angled garage while the Hoeffel Home has a front-load garage set at a ninety-degree angle. The contrasting garage locations give the two homes immediately discernable appearances from a curbside point of view.

A close scrutiny of the objective similarities in the details of the home offices reveals distinguishable characteristics. The home office of the Purtell Home has two entrances, allowing entry from the sun room and laundry room. The Hoeffel Home's office has one entry. Thus, the specific details of the home office floor plans create different traffic patterns in the two homes. They are not substantially similar. Any overall general similarities between the Hoeffel Home and the Purtell Home extend only to unprotectable concepts or ideas. *See Attia*, 201 F.3d at 58.

Next, the Court must evaluate the response of the ordinary, reasonable person as to whether or not a substantial similarity in expression exists. Judge Learned Hand phrased this issue as whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them and regard their aesthetic appeal as the same." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960).

To the untrained eye, the exteriors of the homes are clearly distinct. The Purtell Home has a "French traditional" appearance. As previously discussed, the side-load angled garage of the Purtell Home presents a facade obviously distinct from the Hoeffel Home, which has a front-load garage. The floor plans indicate that walking tours through the Purtell Home and the Hoeffel Home would

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

result in noticeably divergent experiences. The staircases are in different locations. The room sizes vary. The Hoeffel Home is larger. Unlike the Hoeffel Home, the Purtell Home has a second doorway to access the home office directly from the garage. The Purtell Home's master bathroom and walk-in closet design is strikingly different than the arrangement in the Hoeffel Home. The second-floor layouts of the two homes are also distinct. An ordinary, reasonable person could not conclude that a substantial similarity in expression exists.

*7 Finally, Defendants have presented extensive documentary evidence, as well as the uncontradicted testimony of Toston, Gleason, Weisensee and Purtell, to demonstrate that they independently created the Purtell Home. Independent creation is a defense to a copyright infringement claim. *See Donald v. Uarco Bus. Forms,* 478 F.2d 764, 765 (8th Cir.1973); *Wildlife Exp. Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 508 (7th Cir.1994). Plaintiff merely relies on the similarities between the two homes to rebut Defendants' proof of independent creation. Plaintiff's effort to manufacture a genuine issue of fact as to independent creation is unavailing. In light of the absence of substantial similarity, Defendants' uncontradicted evidence that they independently created the Purtell Home justifies summary judgment. *Cf. Novak v. Nat'l. Broad. Co., Inc.*, 752 F.Supp. 164 (S.D.N.Y.1990).

Summary judgment on the copyright infringement claim renders Plaintiff's unjust enrichment claim moot.

## CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, IT IS HEREBY ORDERED that:

(1) Plaintiff's Motion for Summary Judgment [Doc. No. 47] is DENIED;

(2) Defendants' Motion for Summary Judgment [Doc. No. 37] is GRANTED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

2002 WL 15594 (D.Minn.), 2002 Copr.L.Dec. P 28,400, 69 U.S.P.Q.2d 1675

Motions, Pleadings and Filings (Back to top)

. 0:00CV01117 (Docket) (May. 03, 2000)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Exhibit R149

United States District Court, M.D. Florida, Orlando Division.

**Larry KENT, Plaintiff,**
**v.**
**Earl REVERE and James L. Maassen, individuals, Defendants.**

**No. 84-798-CIV-ORL-18.**

Oct. 28, 1985.

Herbert L. Allen, Orlando, Fla., for plaintiff.

William Carpenter, Longwood, Fla., for defendants.

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*

GEORGE KENDALL SHARP, District Judge.

*1 This case came before the Court for a non-jury trial on October 3, 1985. Upon consideration of the testimony and exhibits produced at trial, the Court, pursuant to Federal Rule of Civil Procedure 52, enters the following findings of fact and conclusions of law.

FINDINGS OF FACT

In this action, plaintiff Larry Kent seeks damages, an accounting of defendants' profits, and injunctive relief from defendant James L. Maassen for copyright infringement of plaintiff's copyrighted house plans and drawings. Plaintiff has amicably settled his claim against homeowner Earl Revere, who was initially named as a defendant in this action. Plaintiff alleges that defendant Maassen had access to and copied plaintiff's copyrighted house plans of the "Sunburst" model in designing a house plan for Earl Revere. Defendant contends that he independently created the plans for the Revere house (Revere plans).

Plaintiff is a licensed building contractor who has constructed residences in the Deltona, Florida area for over ten years. Of the approximately 1,000 homes which plaintiff has constructed, 150 to 200 homes have been built in accordance with his "Sunburst" design. Plaintiff conceived and created the "Sunburst" house plans in 1979, and, according to the copyright registration, the plans were first published on March 12, 1979. The parties have stipulated that the Register of Copyrights duly issued Registration No. VA 97-349 for plaintiff's "Sunburst" model and that plaintiff's copyright in the "Sunburst" model is valid and subsisting. Plaintiff's copyright on the "Sunburst" model technical drawings was effective November 23, 1981.

In the "Sunburst" model, two bedrooms, two full bathrooms, a living room, a dining room, a kitchen with breakfast nook, and a garage are arranged within a rectangular "box." The brochure prepared to promote sales of the "Sunburst" model includes a rendering, a floor plan, and a list of the model's features. The floor plan in the promotional brochure includes a copyright notice, and plaintiff testified that all of his plans and brochures, including those sent to contractors and governmental offices, include such a copyright notice.

In the Fall of 1983, plaintiff was made aware by an employee of one of his electricians that a residence potentially similar to his "Sunburst" model had been or would be constructed on Gondola Street in Deltona. After plaintiff's initial investigation revealed nothing, he returned periodically to monitor the Gondola Street location. In the Spring of 1984, plaintiff, while on one of his investigative visits to Gondola Street, noticed a house with basic configurations which appeared similar to those in the "Sunburst" model. Plaintiff copied the building permit number from the permit posted at the site, and sent one of his employees to the Volusia County Building Zoning Department to review the file on this permit number and trace the plans in the file. Plaintiff then contacted his attorney, and his attorney sent a demand letter to homeowner Revere and defendant Maassen, who was listed in the building permit file as the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

preparer of the plans. After the defendants failed to respond to the demand letter, this action was filed.

*2 Approximately two days after the suit was filed, Revere visited plaintiff in his office. The parties stipulated that Kent would be permitted to testify without hearsay objections as to what Revere told him at that meeting. Revere told Kent that he was leasing one of plaintiff's brother's homes, and that he had visited a "Sunburst" model house on Gold Coast in Deltona. Revere claimed that he had prepared a layout consisting of a combination of Larry Kent's "Sunburst" model and Kent's brother's model. Specifically, Revere indicated that he used plaintiff's brother's floor plan, and substituted plaintiff's kitchen and garage area. Brochures of the "Sunburst" plan were available at the plaintiff's model homes. Revere stated that he took a sketch of a layout to Maassen and hired Maassen to prepare blueprints for Revere's house, which Revere personally constructed. Kent admitted that Revere did not say that he copied the "Sunburst" plans or submitted the plans to Maassen. The "Sunburst" house on Gold Coast was not constructed until 1983. However, the Revere plans drawn by Maassen bear a February 24, 1981 date.

The parties have stipulated that defendant Maassen prepared the plans for the Revere house. Maassen is a residential designer in the Central Florida area, and has been designing residential homes since 1968. He has belonged to the Florida Residential Designers Association for seven years, and designs both residential and commercial buildings. Maassen has drafted over 3,000 designs over the course of his career.

According to defendant's testimony, the Reveres came to him and indicated that they wanted a house of approximately 1,200 square feet. He indicated that they requested a two-bedroom, two-bathroom house with a kitchen and breakfast nook, one car garage, screened patio and front porch. Maassen admitted on cross-examination that the Reveres did not give him specific room sizes. He assumes that they requested a design with the bedrooms on one side and the garage on the opposite side because the Revere plans were drawn in that design.

Maassen testified that it was his routine procedure to follow a specific plan preparation outline in interviewing clients. The plan preparation outline indicates that at the first meeting with a client, Maassen requests information concerning the lot size and location, the price range or square footage, number of bedrooms, number of bathrooms, dining room, living room, family room, breakfast nook, den, etc., kitchen and the type of appliances in the kitchen, and the garage. In addition, defendant's plan preparation outline indicates that he generally requests information concerning the type of construction of the house and the exterior finish, and shows clients reduced plans in his collection that may have elements that meet their requirements. However, defendant admitted at trial that he did not know if he followed this plan preparation outline in his interview with the Reveres. Defendant testified that he first saw the plans for plaintiff's "Sunburst" model when he received the summons and complaint in this action, and specifically denied that Revere ever showed him the plans or a brochure on the "Sunburst" model. Maassen was unable to recall whether or not the Reveres brought him a sketch of the layout at the initial consultation, and testified that even if they had he would no longer have them in his files.

*3 Maassen claims that he created the Revere plans from a combination of floor plans in his collection and in various architectural and engineering books. Defendant produced in discovery and at trial several plans which he believes were the major sources for the components included in the Revere plans. He does not recall if he showed these plans to the Reveres. Included in the various plans which defendant believes were the source for his Revere house design are several plans he drew during 1970 through 1972 while he was employed as a residential designer for Calbert Construction, Inc. Calbert Construction was a residential construction firm in the Central Florida area in the early 1970s.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Defendant specifically noted the similarity in the kitchens in several Calbert models he designed in the early 1970s and concluded that it was *possible* that he obtained the idea for the Revere kitchen from this Calbert brochure. One model, the Calbert 1526, is particularly similar in general layout and design to the "Sunburst" and Revere plans. At trial, defendant placed great weight on the Calbert 1526 model as proof that defendant created the Revere plans based upon his experience and prior work rather than based upon copies of the "Sunburst" model plans. However, Maassen does not recall whether or not he actually reviewed the Calbert 1526 or any other plans in his collection or in books when he prepared the Revere plans.

A review of the "Sunburst" model plans and the Revere plans shows that the layout and design of the plans is virtually identical. Larry Kent testified that, in his opinion, as the author of the "Sunburst" plans, the two sets of plans are identical. He based his opinion on the relationships of all of the rooms and closets, the identical location of closets, bathtubs and the pantry, the location of doors, the location of appliances, and similar features. The only differences he noted were that the Revere plan is 1' 4" longer and 8" deeper; the washer and dryer were moved within the garage and a one-half bath was added within the garage; the porch in the "Sunburst" model is a combined concrete and courtyard area while the Revere porch is solid concrete; and the "Sunburst" model has a "hip-section" roof line which leaves the courtyard open, while the Revere porch is covered, thus necessitating a different roof line.

Plaintiff's expert, Steven Cook, reviewed copies of the "Sunburst" model plans, the Revere plans, and Mylar reproductions of both plans. Based upon the relationship of the spaces within the plans, the type of construction, and the overall asthetics, Cook determined that in his opinion the "Sunburst" and Revere plans are substantially similar or virtually identical. He also indicated that he did not believe that the two works could have been independently created. Cook noted that the elevations have the same basic volumemetric height, size, and relationship, and indicated that the minor changes between the two plans are cosmetic in nature. Cook specifically commented on the identical placement and configuration of the bathrooms and closets and the kitchen layout. He noted that the living-dining room area has a fairly unique shape, which is identical on both plans.

***4** The Court, from its own review of the "Sunburst" and Revere plans, notes the identity of the placement and configuration of the rooms and the identity in the location of the windows, doors, bathrooms, closets, and major appliances. The only difference not noted by the parties is that several of the doors on the Revere plan open from a different direction than those in the "Sunburst" plans. The Court finds that the "Sunburst" plans and the Revere plans are substantially, indeed strikingly, similar.

Furthermore, comparison of the Sunburst/Revere plans with the Calbert 1526 model which plaintiff believes was the primary source for his design shows that, as the defendant admitted, the Sunburst/Revere plans are more similar to one another than to the Calbert 1526 plan. One major difference between the Sunburst/Revere plans and the Calbert 1526 plan is that the former have a garage while in the latter a den/office and a utility room have been substituted for the garage. The numerous other differences between the Sunburst/Revere plans and the Calbert 1526 include: (1) a different location for the door into the master bathroom; (2) a different location for the master bathroom fixtures; (3) a linen closet adjacent to and which is entered from the master bathroom in the Sunburst/Revere plans is not included in the same manner in the Calbert 1526 plan; (4) the master bedroom closet in the Sunburst/Revere plans is consequently smaller and has a different type of door from the Calbert 1526 plan; (5) the different type of door in the closet in the Calbert plan eliminates the hallway into the master bedroom which is present in the Sunburst/Revere plans; (6) the smaller bedroom in the Calbert 1526 plan is slightly larger than the Sunburst/Revere

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

small bedroom; (7) the Calbert plan includes an enclosed foyer which is not present in the Sunburst/Revere plans; (8) the second bathroom sink and toilet are on opposite sides of the bathroom in the two sets of plans; (9) in the Sunburst/Revere plans the refrigerator is on the side opposite from the refrigerator in the Calbert 1526 plan; (10) the door from the kitchen to the garage is next to the outside wall in the Sunburst/Revere plans but is in the middle of the kitchen on the Calbert 1526 plan; and (11) the pantry is therefore in different places on the two sets of plans. As this review shows, the "Sunburst" and Revere plans share many dissimilarities from the Calbert 1526 plan.

At trial, defendant attempted to show that given the basic room sizes and the basic arrangement of two bedrooms on the opposite side of the house from the garage and kitchen with breakfast nook there is only one basic design which is possible--that of the Sunburst, Revere, and Calbert 1526 plans. However, defendant admitted during cross-examination that the Reveres did not give him specific room sizes when they consulted with him, and no evidence was produced at trial to show that they actually specified the two bedrooms opposite the garage and kitchen arrangement. Furthermore, even assuming that rooms such as bedrooms, living rooms, dining rooms, kitchens, and garages are within a standard range of size, defendant's argument fails to explain the virtual identity of the configuration and spatial relationships in the "Sunburst" and Revere plans. Defendant also failed to explain the identity of the location of features such as windows, doors, appliances, and closets.

*5 At trial, plaintiff produced evidence of the average profits of $6853.00 he made on 'Sunburst' homes constructed beginning in mid-1984. Plaintiff also testified to $3,000-4,000.00 damages for loss of time and expenses in prosecuting this suit.

*CONCLUSIONS OF LAW*

The Court has jurisdiction over this copyright action pursuant to 28 U.S.C. § 1338(a). The plaintiff in a copyright action must establish his ownership of the copyright and copying by defendant or a person acting on the defendant's behalf. *Southern Bell Telephone and Telegraph Company v. Associated Telephone Directory Publishers*, 756 F.2d 801, 810 (11th Cir.1985); *Ferguson v. National Broadcasting Company*, 584 F.2d 111 (5th Cir.1978); *Samet & Wells, Inc. v. Shalom Toy Company*, 429 F.Supp. 895, 900 (S.D.N.Y.1977), *aff'd*, 578 F.2d 1369 (1978); 3 M. Nimmer, *Copyright* § 13.01 (1985).

At trial, plaintiff's ownership of a valid copyright was not a contested issue. Under 17 U.S.C. § 102(a)(5), pictoral, graphic and sculptural works are included in the categories of works which are copyrightable. Pictoral, graphic, and sculptural works are defined to include technical drawings, 17 U.S.C. § 101, and the House report on the 1976 Copyright Act indicates that an architect's plans and drawings would be protected by the Copyright Act. H.R.Rep. No. 1476, 94th Cong., 2d Sess. *reprinted in* 1976 U.S.Code Cong. and Ad.News 5659, 5668; *see Wickham v. Knoxville International Energy Exposition, Inc.*, 555 F.Supp. 154, 155 (E.D.Tenn.1983); *DeSilva Construction Corporation v. Herrald*, 213 F.Supp. 184, 193 (M.D.Fla.1962); 37 C.F.R. 202.3(b)(iii); 1 M. Nimmer, *Copyright* § 2.08[D][2]. Plaintiff's copyright on his technical drawings was registered in 1979, and defendant has conceded the validity of the copyright. Thus, in accordance with the agreement of the parties, the Court concludes that plaintiff had a valid and subsisting copyright, and that by registration of his copyright he complied with the statutory prerequisite to suit. 17 U.S.C. § 411(a).

The second element plaintiff must prove in order to sustain his copyright infringement claim is copying. This element may be established by proving that defendant or a person acting on his behalf had access to the copyrighted work and that the defendant's work is substantially similar to the plaintiff's copyrighted plans. *See Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 829 (11th Cir.1982); *Ferguson v. National Broadcasting Company, Inc.*, 584 F.2d at 113. However, "[i]f the two works are so strikingly

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

similar as to preclude the possibility of independent creation, 'copying' may be proved without a showing of access." *Ferguson v. National Broadcasting Company, Inc.*, 584 F.2d at 113 (citations omitted); *see Donald v. Zack Meyer's T.V. Sales & Service*, 426 F.2d 1027 (5th Cir.1970), *cert. denied*, 400 U.S. 992 (1971); 3 M. Nimmer, *Copyright* § 13.01[A]. In summary, plaintiff may prove copying either by showing access plus substantial similarity or by demonstrating a striking similarity between the two works. However, proof of copying by establishing access and substantial similarity merely raised a presumption of copying which may be rebutted by Mr. Maassen with evidence of his independent creation of the "Revere plans." *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d at 829.

*6 The Fifth Circuit has defined access as "an opportunity to view the copyrighted work," and has indicated that the evidence must show a "reasonable possibility of access." *Ferguson v. National Broadcasting Company, Inc.*, 584 F.2d at 113. Access similarily has been defined as "a reasonable opportunity to copy." *M.S.R. Imports, Inc. v. R.E. Greenspan Company, Inc.*, 220 USPQ 361, 371 (E.D.Pa.1983); 3 M. Nimmer, *Copyright* § 13.02[A]. With respect to the issue of access, the evidence at trial showed the following: (1) defendant's client, Revere, toured one of plaintiff's "Sunburst" model homes; (2) brochures which included floor plan renderings were available at plaintiff's model homes; (3) Revere made a sketch of a layout, which by his own admission contained elements of plaintiff's "Sunburst" plans; and (4) Revere delivered the sketch to defendant. From this evidence, the Court concludes that defendant had a reasonable opportunity to view and copy the renderings of plaintiff's "Sunburst" floor plans through Revere. In reaching this conclusion, the Court did not consider plaintiff's statements at trial concerning Revere's deposition testimony since these statements referred to events which apparently were beyond the stipulated scope of Kent's testimony as to Revere's statements.

Through Revere, defendant had access to promotional floor plans which included a copyright notice rather than to the copyrighted technical drawings. Arguably, copyright infringement cannot occur without access to the technical drawings rather than access merely to the promotional floor plans. However, defendant did not raise this issue. Furthermore, this Court previously has held, based upon the Fifth Circuit's decision in *Imperial Homes v. Lamont*, 458 F.2d 895 (5th Cir.1972), that architectural designs may be copied from such floor plans because the floor plans contain the information necessary to instruct a would be builder on how to proceed to construct the dwelling pictured. *Donald Fredrick Evans and Associates, Inc. v. Continental Homes, Inc.*, Case No. 81-706-Civ-ORL-18 (August 28, 1984); *see also Herman Frankel Organization v. Tegman*, 367 F.Supp. 1051, 1053-1054 (E.D.Mich.1983). *But see Scholz Homes, Inc. v. Maddox*, 379 F.2d 84, (6th Cir.1967). Similarily, such floor plans contain sufficient information for a residential designer to produce technical drawings which could instruct a would-be builder on how to proceed to construct the house pictured. Therefore, the Court concludes that copying of the designs in the promotional floor plans constitutes copyright infringement.

In addition to access, plaintiff must show substantial similarity between the two works in order to prove copying. The determination that two works are substantially similar may be based upon the untrained observations of a lay observer. *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d at 829. Upon review of the "Sunburst" and "Revere plans," the Court concluded as a finding of fact that the plans are substantially similar. *Id.* at 825 n. 4.

*7 As noted above, in lieu of establishing access and substantial similarity a plaintiff may prove copying by showing that the works are "so strikingly similar as to preclude the possibility of independent creation." *Ferguson v. National Broadcasting Company*, 584 F.2d at 113. One commentator has indicated that "[s]triking similarity simply means that in human experience it is virtually impossible that the two works could have been

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

independently created." 3 M. Nimmer, *Copyright* § 13.02[B] n. 20. Some courts have indicated that in order to establish that similarities are striking, plaintiff must show that "such similarities are of a kind that can only be explained by copying, rather than by coincidence, independent creation, or prior common source." *Stratchborneo v. Arc Music Corporation*, 357 F.Supp. 1393, 1403 (S.D.N.Y.1973); *Midway Mfg. Co. v. Dirkschneider*, 571 F.Supp. 282, 285 (D.Neb.1983); *Association of American Medical Colleges v. Mikaelian*, 571 F.Supp. 144, 151 (E.D.Pa.1983), *aff'd*, 734 F.2d 3 (3d Cir.1984). However, works need not be exactly identical to be strikingly similar. *See Testa v. Janssen*, 492 F.Supp. 198, 203 (W.D.Pa.1980). The Court has examined the "Sunburst" and Revere plans and finds that they meet the standard for striking similarity. Not only are the general layout, spacial relationships, and configurations in the two plans essentially identically, but also many smaller details such as the placement of door, closets, windows, and appliances are the same. Some adjustments appear to have been made on the Revere plans in order to accommodate the client's preferences. Nevertheless, the "Sunburst" and Revere plans are virtually identical. Although defendant attempted to establish independent creation, and by implication prior common source, the feature-for-feature identity of both major and minor elements in these plans simply cannot be explained by coincidence, independent creation or a prior common source. Even though the identity of the general layout might be attributed to coincidence, independent creation or a prior common source, these possibilities do not adequately account for the consistent identity of numerous details.

Some courts require expert testimony in order to establish striking similarity. *Id.* However, the Court regards such testimony as unnecessary in this case because this is not a "technical" field in which the trier of fact is not able or equipped to make this determination. *See M.S.R. Imports, Inc. v. R.E. Greenspan Company*, 220 USPQ at 371; 3 M. Nimmer, *Copyright* § 13.02[B]. Moreover, although plaintiff's expert did not employ the term "strikingly similar," he indicated that the plans are virtually identical and testified that he did not believe that they could have been independently created. Thus, the Court's conclusions concerning the striking similarity between the plans are supported by the testimony of plaintiff's expert witness.

Once plaintiff has established access and substantial similarity, defendant may rebut the presumption of copying by showing that his work was independently created. "If defendant offers evidence of independent creation, the plaintiff has the burden of proving that the defendant in fact copied the protected material." *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365 (5th Cir.1981). The evidence at trial clearly showed that plaintiff's plans were created prior to defendant's design of the Revere plans. Defendant proffered evidence of independent creation in the form of other old house plans and drawings from books. Defendant admitted, however, that he does not recall whether or not he actually reviewed these plans when he prepared the Revere house design. Although these prior works include features which bear some resemblance to elements in both the "Sunburst" and "Revere plans," these similarities merely show that houses of this type not infrequently share some elements. However, the similarity between the Revere and "Sunburst" plans transcends mere shared elements and results in virtual identity of design.

*8 Defendant also attempted to show through a demonstrative exhibit that the Revere plans were the only design possible given certain layout requirements and dimensions. However, the Court has found that the facts in this case did not support the assumptions upon which defendant's demonstrative exhibit was premised. The Court also is not convinced that the "Sunburst"/ Revere layout is the only possible design given the stated layout requirements and dimensions. Finally, even if the general design is the only possible layout, defendant's demonstrative exhibit did not explain the identity of the location of specific items such as windows, doors, closets,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

and appliances.

In summary, the Court concludes that plaintiff has proved copying by showing access and substantial similarity or, alternatively, by showing that the two works are strikingly similar. Thus, plaintiff has proved the two elements, ownership and copying, necessary to establish his right to recover from defendant for copyright infringement.

Under 17 U.S.C. § 504, plaintiff is entitled to recover his actual damages and any profits of the infringer that are attributable to the infringement and are not taken into account in computing actual damages or, at his election, statutory damages. The usual measure of recovery of actual damages is the injury to the market value of the copyrighted work. 3 M. Nimmer, *Copyright* § 14.02. Because it is often difficult to determine the market value, courts generally measure the value by use of indirect evidence such as the profits which the plaintiff might have accrued but for the defendant's infringement. *Id; see, e.g., Taylor v. Merrick,* 712 F.2d 1112 (7th Cir.1983); *Baldwin Cooke Company v. Keith Clark, Inc.*, 420 F.Supp. 404 (N.D.Ill.1976). At trial, plaintiff apparently attempted to prove damages through this 'profits on lost sales' method since he offered evidence of his average profit on "Sunburst" model homes. However, it appears to the Court that this method of proving actual damages is inappropriate in this case. Maassen prepared plans for Revere so that Revere could construct his own home. Because Revere planned to build his home, the Court finds that it would be mere conjecture to conclude that plaintiff, a building contractor, lost the sale of a home because of defendant's infringement. *See Baldwin Cook Company v. Keith Clark, Inc.*, 420 F.Supp. at 407. No evidence of defendant's profits, the other component of actual damages, was produced at trial. Plaintiff cited no authority to show that plaintiff's personal losses in the investigation and prosecution of this suit are compensable as actual damages, and the Court upon independent research finds no authority to show that these items are recoverable as actual damages. Therefore, the Court concludes that the evidence at trial does not provide the Court with proof of actual damages.

In his closing argument, plaintiff's counsel indicated that plaintiff would accept statutory damages if the proof of actual damages was insufficient. Section 504(c) provides for statutory damages "in a sum of not less than $250 or more than $10,000 as the court considers just." Within the statutory limits, the amount of statutory damages is committed to the discretion of this Court. 17 U.S.C. § 504(c); *F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233 (1952); *Morley Music Co. v. Dick Stacey's Plaza Motel, Inc.*, 725 F.2d at 3. In determining the appropriate amount of statutory damages, "the Court is guided by the purposes of the Federal Copyright Act, including the restitution of wrongfully acquired gains to prevent unjust enrichment of the defendant, reparation for injury done to plaintiff, and the deterrence of further wrongful conduct by the defendant and others." *United Feature Syndicate v. Sunrise Mold Co.*, 569 F.Supp. 1475, 1481 (S.D.Fla.1983). In order to fulfill these purposes, the Court in its discretion concludes that a statutory damages award of $750.00 is just in this case.

*9 In addition to $750.00 statutory damages, plaintiff is entitled to a permanent injunction. Therefore, defendant Maassen, his agents, servants, employees and all those in privity with him are hereby enjoined from infringing plaintiff's copyright for the "Sunburst" model. Pursuant to 17 U.S.C. § 505, plaintiff shall recover costs and reasonable attorney's fees. *See Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d at 832. The plaintiff shall file affidavits in support of his claim for attorney's fees within 15 days. Defendant shall have 15 days thereafter to respond.

Accordingly, it is ORDERED that the Clerk shall enter judgment for plaintiff for $750.00 statutory damages, costs and attorney's fees. The Court retains jurisdiction to determine the amount of attorney's fees and costs.

It is SO ORDERED.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1985 WL 6453 (M.D.Fla.), 229 U.S.P.Q. 828,
1986 Copr.L.Dec. P 26,001

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.