Exhibit R150.2

developed); *but see Aitken, Hazen, Hoffman, Miller, P.C. v. Empire Const. Co.*, 542 F .Supp. 252, 256-58 (D.Neb.1982). It took judicial clarification from the United States Supreme Court in, *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), to clarify the test for the "work for hire doctrine" and subsequent case law, though generally finding that outside architects are not to be considered an "employee" of the developer, *e.g., M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1491-92 (11th Cir.1990), establishes that the employee/independent contractor determination is a particularly fact intensive legal determination. Rottlund's claim of work for hire authorship in the initial 1993 registrations for the Original Villa, VAu 268-380, and New Villa, VAu 268-404, was hardly fraudulent. Nothing presented suggests intentional deception. Rather, Rottlund thought it might be judicially determined, if necessary, that under the factual circumstances, the works were for hire. That Rottlund's designation is likely wrong under current case law does not even approach fraudulent conduct. Nothing *precludes* an outside architect, under a particular factual milieu considering all the agency factors, *Reid,* 490 U.S. at 751-52, from being deemed an employee for purposes of the work for hire doctrine. BSB is forced to argue that Rottlund's relationship with AFI and Whitten Associates was not one of employee/employer. BSB's argument cites to no particular factual evidence in the record, but Rottlund does not dispute it. However, that is part of the point: each circumstance must be judged on its facts and because a determination results in an unfavorable finding for the claimant does not make the claimant guilty of fraud. Moreover, the deposit/source materials for the Original Villa architectural works and the New Villa technical drawings and architectural works filed with the Copyright Office state that Tim Whitten prepared the drawing or work (signed by Tim Whitten) and listed, for the relevant product, AFI and Rottlund or Whitten Associates and Rottlund in the title block. (Krummen Aff. Ex. U and W). [FN21] *See Urantia Foundation v. Maaherra,* 114 F.3d 955, 963-64 (9th Cir.1997) (finding no fraud where plaintiff erroneously listed itself as author by work for hire but deposited the contents of the work that identified the origin of the work). BSB's argument that fraud or intentional deception was practiced on the Copyright Office because Rottlund claimed it was an author by work for hire is wholly without merit and factual support.

FN20. Nobody disputes that everything on the VAu 159-813 registration was accurate; it named AFI as the author and Rottlund owner by assignment. It was applied for by attorneys.

FN21. The deposit/source material for one of the Original Villa technical drawings, VAu 268-380, was apparently lost. (Patrick Aff. Ex. G).

***13** Other courts have declined to invalidate a registration where it incorrectly labeled the work as one for hire. *Billy-Bob Teeth,* 329 F.3d at 591; [FN22] *Urantia Foundation,* 114 F.3d at 963-64; [FN23] *Drew Homes,* 29 F.3d at 1530-31; *Tiffany Design, Inc. v. Reno-Tahoe Speciality, Inc.*, 55 F.Supp.2d 1113, 1117 (D.Nev.1999) ("While the original registration incorrectly labeled the 1998 Image as a 'work made for hire', such misstatements generally will not affect the validity of a copyright or bar an action for its infringement.") (footnote and citation omitted); *Godinger Silver Art Co., Ltd. v. Int'l Silver Co.*, No. 95-9199, 37 U.S.P.Q.2d 1453, 1995 WL 702357, at *4-5 (S.D.N.Y. Nov. 28, 1995).

FN22. The *Billy-Bob Teeth* case is instructive and interesting. There, Jonah White and Robert Bailey, came up with the idea for novelty teeth-crooked, oversized, and chipped teeth that jokesters can fit over their real teeth. The particular teeth designed by White were at issue. White authored the subject teeth in 1995. In 1996, White and Bailey incorporated the entity Billy-Bob Teeth. In 1999, Billy-Bob Teeth, Inc. obtained copyright registrations for White's teeth, and the registrations described Billy-Bob Teeth, Inc. as author by " 'employer for hire of Jonah White." ' 329 F.3d at 589. Eventually, another company, Novelty, Inc., was alleged to have infringed Billy-Bob's copyrighted teeth. Billy-Bob sued, but realized that Billy Bob Teeth, Inc. could not be the owner of the copyright by work for hire because it was not in existence at the time White

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

created the teeth. So, during the trial, White, as the author, executed an assignment of the copyright to Billy-Bob Teeth, Inc. The district court held that Billy-Bob Teeth, Inc. could not show ownership in the copyright because it was not in existence at the time White made the teeth so it could not be a work for hire, and found the assignment ineffective. The Seventh Circuit reversed. The Seventh Circuit agreed that "Billy-Bob, Inc. cannot claim that the teeth are works made for hire" because "the corporation did not exist when the teeth were authored." 329 F.3d at 591. In fact, on appeal, Billy-Bob Teeth, Inc. conceded that "[t]he work-made-for-hire provisions are not relevant to th[e] case." *Id* . Nonetheless, the Seventh Circuit explained that "[a]n error on the registration is not fatal to Billy-Bob's case" and recognized, quoting *Urantia Foundation v. Maaherra,* 114 F.3d 955, 963 (9th Cir.1997), that " 'case law is overwhelming that inadvertent mistakes on registration certificates do not ... bar infringement actions." ' 329 F.3d at 591. The court went on to hold that the assignment, during trial, from White to Billy-Bob Teeth, Inc. gave the corporation ownership of the copyright.

FN23. In *Urantia,* the defendant argued that the plaintiff intentionally claimed work for hire so as not "to reveal to the Copyright Office that the 'authors' were celestial beings because the Copyright Office would have rejected the application." 114 F.3d at 963. That argument was rejected because the deposit materials identified the "celestial beings" that authored the work.

The test for fraud on the Copyright Office has not been met for a more basic reason. "Absent intent to defraud and prejudice, inaccuracies in copyright registrations do not bar actions for infringement." *Harris v. Emus Records Corp.,* 734 F.2d 1329, 1335 (9th Cir.1984); *accord S.O.S., Inc.,* 886 F.2d at 1086. For purposes of this case, the work for hire designation is relevant only because it is a means of conferring authorship, and authorship confers ownership. 17 U.S.C. § 201. Rottlund, however, is already the owner of the Original Villa and New Villa technical drawing copyrights by assignment. Thus, the allegedly erroneous work for hire designation is immaterial and caused no prejudice to Defendants. *See Datastorm Technologies, Inc. v. Excalibur Communications, Inc.,* 888 F.Supp. 112, 114 (N.D.Cal.1995) ("[E]nforcement of a copyright is precluded only if the inaccuracies were entered with the intent to defraud and the infringing party was prejudiced by such inaccuracies.").

The same result holds for Defendants' argument that Rottlund practiced fraud on the Copyright Office by not designating the New Villa and Villa II copyrights as derivative works. There is nothing in the record that suggests the failure was intentional or fraudulent other than Defendants' allegation and speculation. The error was immaterial. Rottlund submitted supplementary copyright applications for the New Villa and the Villa II technical drawing and architectural works copyrights. (Krummen Aff. Ex. X, AA, BB (technical drawing supplements); Ex. Y and CC (architectural works supplements)). The supplementary applications clarified that the New Villa was a derivative of the Original Villa, and the Villa II was a derivative of the New Villa and Original Villa. *Id.* To invalidate the copyright registration, the knowing misstatement must have been one that might have occasioned the rejection of the application. *Eckes v. Card Prices Update,* 736 F.2d 859, 861 (2d Cir.1984). Here, when presented with supplementary applications designating the New Villa and Villa II as derivatives, the Copyright Office issued the supplementary registrations. (Krummen Aff. Ex. X, AA, BB, (technical drawing supplements); Ex. Y and CC (architectural works supplements)). *See S.O.S., Inc.,* 886 F.2d at 1083, 1086 (finding no prejudice from failure to designate software as a derivative); *Twentieth Century Fox Film Corp. v. Marvel Enter., Inc.,* 220 F.Supp.2d 289, 298 (S.D.N.Y.2002) (holding that "Fox's failure to identify its logos as derivative does not affect the validity of Fox's copyright registrations" because "the Court has found that Fox's logos would have been copyrightable regardless of whether Fox advised the Copyright Office that its works were based on Marvel's"). No prejudice has been shown.

***14** Defendants have failed to rebut the presumption of ownership of valid copyrights. No reasonable juror could find for them on

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

their "fraud on the Copyright Office" theory given the undisputed facts in the record. Rottlund owns the technical drawing copyrights, and they are valid. Rottlund's motion for summary judgment of validity of its technical drawing copyrights should be granted. Although the above discussion nearly compels the granting of summary judgment in Rottlund's favor of ownership and validity of the *architectural works copyrights* as well, Rottlund has not brought that motion, but the above discussion certainly requires denial of BSB's motion for summary judgment of invalidity of the architectural work copyrights.

B. *Copyrightable Expression: Scope of the Copyrights*

Facts and ideas are not entitled to copyright protection; anyone may copy either freely. *Feist Pub., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 344, 350 111 S.Ct. 1282 (1991). "The question at what point an idea, too vague or abstract to warrant copyright protection, becomes sufficiently concrete or detailed to constitute protected expression is the endlessly baffling subject of Judge Learned Hand's famous abstractions discussion in *Nichols*, 45 F.2d at 121." *Sparaco v. Lawler, Matusky, Skelly, Engineers, LLP*, 303 F.3d 460, 469 (2d Cir.2002) . That task "is particularly acute when the work of 'authorship' is of a functional nature, as is a plan for the accomplishment of an architectural or engineering project." *Attia v. Soc'y of New York Hosp.*, 201 F.3d 50, 55 (2d Cir.1999).

Rottlund has listed some seventy elements that it claims, in their placement, layout, and proportions, comprise the total look and feel or gestalt of its two technical drawings. (Am.Compl.¶ 64); (Davenport Aff. Ex. SSS). [FN24] Importantly, Rottlund does not claim protection in any one individual element but asserts that its selection, arrangement, and coordination of the elements is protectible.

FN24. These elements include, for example, the use of gabled side entries, a fireplace, a loft, a living room, first and second story windows, dining room, breakfast bar, patio, powder room, and sprinkler room.

The Court "filters out" the *use of* individual elements of Rottlund's drawings. The use of, for instance, gabled entries, lofts, or fireplaces in this case represent mere ideas that others may utilize without consequence. *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1297 (D.C.Cir.2002) ("In and of themselves, domes, wind-towers, parapets, and arches represent ideas, not expression."); *CSM Investors, Inc. v. Everest Dev., Ltd.*, 840 F.Supp. 1304, 1310 (D.Minn.1994) ("Thus, the use of standard structural elements and the concept of a one-story office showroom are not copyrightable."); *Nelson-Salabes Inc. v. Morningside Holdings*, No. 98-2226, 2001 WL 419002, at *4 (D.Md. Feb. 16, 2001) ("The Court agrees that Nelson-Salabes's use of certain individual features, such as the bay windows or the octagonal entrance, is neither original nor an expression of artistic merit.") *vacated in part on other grounds by* 284 F.3d 505 (4th Cir.2002). The question is what is left? Defendants would have the Court find that nothing protectible remains after filtering the individual elements; the drawings merely being sheets of paper shareable amongst architects and builders to copy at will. That would be acceptable if no expression remains in the drawings for copyright "encourages others to build freely upon the ideas and information conveyed by a work." *Feist*, 499 U.S. at 350. As urged by Rottlund, however, the Court finds that the selection, arrangement, and combination of the elements expressed in the technical drawings are sufficiently original and detailed to be afforded copyright protection. *Sturdza*, 281 F3d at 1296 ("Considering the works as a whole is particularly important because protectible expression may arise through the ways in which artists combine even unprotectible elements."); *CSM*, 840 F.Supp. at 1310 ("The court concludes that the combination and arrangement of elements and the particular building design embodied in Everest's plans and drawings are sufficiently original to be afforded copyright protection."); *Nelson-Salabes*, 2001 WL 419002, at *4 ("[T]he Court finds that Nelson-Salabes's combination of common features such as a Y-shaped footprint, bay

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

windows, the octagonal silo entrance, and gables created a unique design."); *Richmond Homes Mgmt. Inc. v. Raintree, Inc.*, 862 F.Supp. 1517, 1523 (W.D.Va.1994) *reversed in part on other grounds by* 66 F.3d 316 (4th Cir.1995).

***15** The Court discusses three cases that inform its decision. The first is *Attia v. Soc'y of New York Hosp.*, 201 F.3d 50 (2d Cir.1999). Attia alleged that the defendants copied his drawings for the renovation of the New York Hospital. The Hospital, located adjacent to F.D.R. Drive in Manhattan, had considered renovation for years and initially was set on a proposal to fill in existing courtyard space as opposed to utilizing air rights over F.D.R. Drive. A new Hospital board member requested Attia to formulate an alternative. Attia "developed a concept centered on a new building that would be constructed on a platform over the F.D.R. Drive. He prepared a series of architectural drawings and sketches to present this concept, which he collected in a booklet...." 201 F.3d at 52. Attia's plan became the Hospital's preferred solution, and the Hospital arranged for Attia and another architect, TCA, to develop the plan. Attia and TCA's relationship soured. So, the Hospital had a contest to select the architect that would design the renovation. Attia's team was not selected, but TCA's team (HOK/TCA) was. HOK/TCA spent years designing the plans and ultimately submitted schematic design drawings to the Hospital. Attia saw the proposal-erecting a new building over F.D.R. Drive-in the New York Times and brought suit claiming the drawings infringed his drawings. The Second Circuit's decision hinged on the protectability of Attia's drawings; specifically, the idea/expression dichotomy. The Court explained that determining when one moves from copying ideas to copying expression "often turns on the level of abstraction or generalization of the works being compared." *Id.* at 54. With architectural plans, the Court noted:

As a generalization, to the extent that such plans include generalized notions of where to place functional elements, how to route the flow of traffic, and what methods of construction and principles of engineering to rely on, these are "ideas" that may be taken and utilized by a successor without violating the copyright of the original "author" or designer. On the other hand, to the extent that the copier appropriates not only those ideas but the author's personal expression of them, infringement may be found.
*Id.* at 55.

The Second Circuit then explained that Attia's plans were at such a generalized level of abstraction that the elements and even arrangement of the elements represented mere concepts or ideas, very valuable, but not protectible:

The failure of Plaintiff's claim lies in the principles outlined above. Plaintiff's "Option 1A" booklets do undoubtedly contain creative ideas on how to extend New York Hospital over the F.D.R. Drive in a manner that would connect the Hospital's existing buildings with the new structure. However, the drawings in his booklets are highly preliminary and generalized; they describe Plaintiff's proposed design at a very general level of abstraction. Defendants' schematic design drawings, in contrast, which HOK/TCA prepared over several years of work on the Hospital's commission, constitute a detailed expression of how to effectuate the Major Modernization Program by constructing over the F.D.R. Drive and restructuring existing buildings.
***16** The issue we must decide is whether the similar elements that Defendants assertedly copied from Plaintiff's drawings were protected matter. Without doubt there are similarities between Plaintiff's drawings and Defendants' architectural plans. However, even assuming (as we must and do) that the similarities result from copying, we conclude there was no infringement, because the similarities do not go beyond the concepts and ideas contained in Plaintiffs' drawings.
*Id.*

After considering Attia's drawings, which themselves stated the purpose was to " 'suggest an *idea*" ' and " 'demonstrat[e] a *concept,*" ' the Court again emphasized the drawings "are barely a first step toward the realization of a plan. How these and other ideas would be expressed or realized in a finished plan is not even approached in

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Plaintiff's drawings." *Id.* at 56. Finally, the Court specifically distinguished cases such as *CSM* where the architectural plans consisted of detailed drawings that would enable construction. *Id.* at 56-57.

The Second Circuit revisited the issue of copyright protection for architectural drawings in *Sparaco v. Lawler, Matusky, Skelly, Engineers, LLP,* 303 F.3d 460 (2d Cir.2002). Plaintiff Sparaco was hired by two architectural firms to develop a "site plan" for an assisted living facility. As the Court explained, "[a] site plan is a development plan for a plot of land. It specifies existing land conditions, including topography, boundaries, and physical structures, and can also specify the proposed improvements to the site." 303 F.3d at 462. Sparaco completed the site plan, submitted it to the city, and it was approved. The plan depicted (1) existing physical characteristics of the site and (2) proposed physical improvements to the site. The developer, NMF, later removed the architect from the project and hired a new construction and architectural firm. Changes were made to the building that required the new architects to change Sparaco's site plan. Sparaco offered to make the changes for a fee, but NMF declined and gave the task to another architect. The eventual site plan used " 'was basically a copy of the approved A.R. Sparaco plan with several minor changes." ' 303 F.3d at 464. Sparaco sued claiming the defendants copied his site plan. The district court initially found some protection for Sparaco's plan, but after the Second Circuit's decision in *Attia,* held that the site plan was not entitled to protection. The Second Circuit vacated the judgment in part. The Court held that the individual facts of the first part of the site plan, that depicting existing physical characteristics, was not protectible because the existing physical features represent facts; on this score, however, the Court explained that a particularly original manner in selecting the unprotected information could be protected. 303 F.3d at 467. As for the part of the site plan that depicted proposed physical improvements, the Court found it protectible expression. *Id.* at 469. In the Second Circuit's view, "the site plan was significantly different from Attia's proposal of ideas for the expansion of the hospital. Sparaco's site plan specifies more than vague, general indications of shape and placement of the elements. It provides detailed specifications for preparation of the site." *Id.* at 468. The Court held:

***17** Recognizing that the site plan was not an architectural plan for a building but only a plan for the preparation of a site, we conclude that it did not consist only of the kinds of general ideas that we ruled in *Attia* were not protected from copying. It included specific expression and realization of those ideas, with the consequence that copying could constitute an infringement of copyright.

*Id.* at 469.

What can be learned from *Attia* and *Sparaco,* is the general principle [FN25] that plans or drawings that merely propose use of conceptual elements are not protectible because, at that general level of abstraction, such plans represent ideas, but where the plans stretch beyond "vague general notions relating to placement of elements," *id.* at 468, and express in detail the manner in which to capitalize on the ideas, copyright affords protection.

FN25. The Second Circuit was careful to explain that its holdings do not mean that "technical drawings cannot achieve protected status unless they are sufficiently complete and detailed to support actual construction," but simply that Sparaco's drawings crossed the continuum into expression. 303 F.3d at 469; *see also Attia,* 201 F.3d at 57 ("In distinguishing these cases, we do not mean to suggest that, in the domain of copyrighted architectural depictions, only final construction drawings can contain protected expression. And we express no view whether, in other circumstances, an architect's sketches of visual elements (for example, Frank Lloyd Wright's preliminary sketches of the facade of the Guggenheim Museum) might include the type of expressive content entitled to copyright protection.").

Next, in *Sturdza v. United Arab Emirates,* 281 F.3d 1287 (D.C.Cir.2002), the United Arab Emirates (UAE) held a competition for the design of its new embassy. Sturdza and another architect, Demetriou, submitted

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

designs. Sturdza won. Over the next couple of years, Sturdza submitted designs to the UAE, the UAE requested changes, and Sturdza complied. Just when Sturdza and the UAE were about to execute a contract, communication broke off. Sturdza later found out that the UAE was going to use a design by Demetriou. Sturdza thought Demetriou's design copied her's and sued for copyright infringement. The district court " 'filter[ed] out' those elements of Sturdza's design it viewed as unprotectible ideas: 'domes, wind-towers, parapets, arches, and Islamic patterns." ' 281 F.3d at 1297. As the district court explained, "Sturdza's *expression of these elements,* but not her use of them, *is protectible."* *Id.* (emphasis added). The D.C. Circuit agreed. *Id.* The district court, however, found that Sturdza's expression of the elements was not similar to Demetriou's expression of the same elements. *Id.* The D.C. Circuit disagreed and analyzed the expression of the elements individually and the combination of the "overall look and feel" of the elements and found that a jury could find them substantially similar. *Id.* at 1298-99.

*Sturdza* is important because it recognizes that even when filtering out the use of individual elements such as domes and arches as representing ideas, the particular manner in which an architect expresses those generally unprotectible elements *is* protectible. It follows that the particular manner in which an architect expresses unprotectible elements by selecting, arranging, and combining them is protectible. *Id.* at 1296 ("Considering the works as a whole is particularly important because protectible expression may arise through the ways in which artists combine even unprotectible elements.").

Finally, the *CSM* case bears heavily on the undersigned's analysis, and it is carefully followed. The idea of an 8-unit back-to-back, slab on grade townhome is separate from the expression of that idea in Rottlund's detailed plans. *CSM,* 840 F.Supp. at 1310 ("The idea of an office showroom is separate from the expression of that idea in the Everest plans."). Rottlund has expressed its idea of how to combine a variety of elements for a back-to-back townhome in detailed plans clearly enabling the construction of its townhomes. Defendants may independently design their own townhome, and they argue they have, but they cannot copy Rottlund's design. *Id.* ("While Everest cannot prevent anyone from innocently building a similar office showroom, it can prevent others from deliberately copying the originality of its plans."). [FN26]

FN26. By stating that Defendants can independently create their own townhome that is similar to Rottlund's, the Court is not suggesting that innocent or subconscious copying is permitted. It is not. *E.g .,* *ABKCO Music, Inc. v. Harrisongs Music, Ltd.,* 722 F.2d 988, 998-99 (2d. Cir.1983).

*18 Rottlund's designs are also original. "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist,* 499 U.S. at 345. No evidence has been presented that Rottlund copied its drawings from another. Rather, the drawings owe their origin to the thoughts and creative spark of Tim Whitten and Bernard Rotter. *See id.* at 346-47. The degree of creativity required "is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be." *Id.* at 345; *see also Alfred Bell & Co. v. Catalda Fine Arts,* 191 F.2d 99, 103 (2d. Cir.1951) ("Originality in this context 'means little more than a prohibition of actual copying.' No matter how poor artistically the 'author's' addition, it is enough if it be his own.") (footnote omitted). Rottlund's Villa II drawings make the grade. Indeed, the Villa II, carrying forward the Original and New Villa copyrights, represents a creative effort on the part of Tim Whitten and Bernard Rotter to develop a product that would satisfy, among other things, size and market constraints. *See CSM,* 840 F.Supp. at 1310 (rejecting the argument that the "plans lack originality because the design of the project was dictated by geographic and legal constraints imposed on the development of the site" because "the adaptations to the site in

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

the Everest plans reflect Everest's creativity and thus are copyrightable").

C. *Copying*

"Copying may be proven either by direct evidence or by demonstrating circumstantial evidence establishing 'access and 'substantial similarity' of the two works." ' *Nelson v. PRN Prod., Inc.*, 873 F.2d 1141, 1142 (8th Cir.1989).

1. Direct Evidence of Copying

Rottlund submits that there is ample direct evidence of copying in this case. First, it argues that BSB architect Larry Moore admitted that he relied on earlier projects--Midland Homes and Jerry's Homes projects--when designing the Homestead Collection, and that files from those earlier projects contained actual floor plans for Rottlund's Original Villa or New Villa townhomes. In fact, in connection with designing Midland Homes, Rottlund underscores the fact that Moore asked in an internal memo if the designs were enough of a "departure" from Rottlund's. Second, prior to designing the Homestead Collection, Rottlund notes that Defendants toured Rottlund's Villa II townhome on more than one occasion, took photos and obtained Rottlund brochures. Rottlund points out that, in the redline process of the Homestead Collection, TCM president Art Plante attached a photo of a Rottlund product with an inscription referencing the Rottlund product. Finally, Rottlund notes that BSB and TCM had copies of the sprinkler room technical drawing for the Villa II (The Reserve), VAu 546-285, and Dan Geegan and Tim Johnson, former Rottlund employees, were involved in obtaining these drawings.

***19** Defendants submit that the facts Rottlund relies on do not relate to direct copying of the technical drawings at issue, VAu 447-395 and 546-285, with the exception of the sprinkler room drawings for VAu 546-285. As for the sprinkler room drawings, Defendants assert, correctly, that infringement of individual elements in this case cannot be the basis for liability.

Although Rottlund's arguments might raise eyebrows, Defendants are entitled to all inferences. The Court finds that genuine issues of material fact preclude a finding at this stage of direct copying.

2. Access

Rottlund argues that there is significant evidence of access in this case. Former Rottlund employees, who personally had access to the Villa II designs now work for TCM. Defendants have possession of Rottlund floor plans, took multiple tours of Rottlund's Villa II townhome, and took photographs of Rottlund's Villa product. Finally, Rottlund alleges that Larry Moore has admitted that BSB had access. Specifically, Rottlund explains that Tim Johnson, while a Rottlund employee, worked on the Villa II designs, and other former Rottlund employees, such as Dan Geegan, also had access to the Villa II designs while in Rottlund's employ. Citing a long line of cases, including *Imperial Homes Corp. v. Lamont*, 458 F.2d 895 (5th Cir.1972), *Donald Frederick Evans and Assoc., Inc. v. Continental Homes, Inc.*, 785 F.2d 897, 904-05 (11th Cir.1986), and *Robert R. Jones Assoc., Inc. v. Nino Homes*, 858 F.2d 274, 277 n. 2 (6th Cir.1988), (Pl.'s Mem. in Supp. of Mot. for Summ. J., at 26 n. 16), Rottlund submits that access to its Villa II abridged floor plans in brochures, (Davenport Aff. Ex. Z and AA), constitutes access to the technical drawings. *See Donald Frederick*, 785 F.2d at 904 (rejecting the defendants' argument that "because they did not have access to the technical working drawings, which are the documents described in the copyright registration, they did not copy the protected works").

Defendants argue that all of the evidence regarding product tours and photographs is irrelevant because it does not constitute access to the technical drawings. *But see Kootenia Homes, Inc. v. Reliable Homes, Inc.*, No. 00-1117, 2002 WL 15594, at *5 (D.Minn. Jan. 3, 2002) ("[Eventual homeowner's] tour minimally suffices to create a factual issue as to the extent of Defendants' access to the Hoeffel Home design."). Defendants assert that floor plans in brochures cannot constitute access to

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

the technical drawings deposited with the Copyright Office, and Defendants submit that the brochures in question, (Davenport Aff. Ex. Z and AA), are not of the Villa II. Defendants further argue that access to the Rottlund materials in BSB's Midland Homes' and Jerry Homes' files is irrelevant, again because those files do not contain technical drawings. Defendants, at least TCM and BSB, admit that they had access to the sprinkler room technical drawings for the Villa II (The Reserve), VAu 546-285, but state that that does not constitute access to the entire technical drawing. Finally, TCM argues that hiring former Rottlund employees does not establish access to the technical drawings.

***20** Access is established by showing Defendants "had an 'opportunity to view or to copy" ' Rottlund's technical drawings. *Moore v. Columbia Pictures Indus., Inc.*, 972 F.2d 939, 942 (8th Cir.1992); *accord, e.g., Nino Homes,* 858 F.2d at 277 ("Access merely means an opportunity to view the protected material."). Rottlund must demonstrate a "reasonable possibility" of access, a bare or metaphysical possibility will not suffice. *Moore,* 972 F.2d at 942.

The Court finds that Defendants had a reasonable opportunity to view Rottlund's technical drawings. It remains undisputed that, while an in-house architect for Rottlund, Tim Johnson worked on the design development of Rottlund's Villa II project. (Davenport Aff. Ex. JJ, at 143:23-25). Thus, not only did Tim Johnson have the opportunity to view the technical drawings, he personally helped create them. Tim Johnson then moved to TCM where he is the coordinator of architecture. *Id.* Ex. Q, at 247:18-248:12. This plainly constituted direct access to the technical drawings; the Court need not rely on circumstantial evidence. *See Taylor Corp. v. Four Seasons Greetings, LLC,* 315 F.3d 1039, 1042 (8th Cir.2003) ("It is undisputed that Four Seasons had direct access to at least four of Taylor's six designs, because the three artists who created the designs [while employed by Taylor] later created the alleged infringing designs for Four Seasons [while employed by Four Seasons]."); *Control Data Sys., Inc. v. Infoware, Inc.*, 903 F.Supp. 1316, 1321 (D.Minn.1995) ("The prior employment with Control Data and the access to manuals containing the NOS source code demonstrate a reasonable possibility that Defendant had an opportunity to review the copyrighted material."); *Costello, Erdlen & Co., Inc. v. Winslow, King, Richards & Co.*, 797 F.Supp. 1054, 1056, 1062 (D.Mass.1992) ("[I]t can reasonably be assumed that Winslow had access to other Costello guides during his employment."); *Saenger Org., Inc. v. Nationwide Ins. Licensing Assoc., Inc.*, 864 F.Supp. 246, 249 (D.Mass.1994) (explaining that the parties did not dispute access where the individual defendant "was employed by [plaintiff] from July 15, 1986 to September 15, 1992 during which time he 'worked on, and assisted' in developing these texts [the copyright work]"). Moreover, another former Rottlund employee, Dan Geegan, now with TCM, had a clear opportunity to view Rottlund's Villa II designs while a Rottlund employee. Karen Albertson testified that she is the current Rottlund estimating coordinator and has been since about 2000. (Krummen Aff. Ex. G., at 9:3-20). Ms. Albertson testified that the previous estimating coordinator for Rottlund was Dan Geegan. *Id.* at 9:21-10:1). Ms. Albertson explained that, as Rottlund's estimating coordinator, Dan Geegan "had access to the same information that I have access to" such as "[a]ny of the-bidding documents, the plans, quantity takeoffs, pricing information, vendor information, anything." *Id.* at 13:25-14:9). *See Chere Amie, Inc. v. Windstar Apparel, Corp.*, 191 F.Supp.2d 343, 350 (S.D.N.Y.2001) ("Access is uncontested since the former Obvious Employees certainly had access to the Sleepwear Designs during their employment with that company."). [FN27] Still other former Rottlund employees, Marc Harris and Joey Zorn, joined TCM, and it is reasonable to assume that they at least had an opportunity to view the Villa II drawings during their employment with Rottlund. (Davenport Aff. Ex. KK, at 58:5-22.).

FN27. The undersigned recognizes that some of the cases cited in this section are in the context of a motion for preliminary injunction, but the Court finds that the logic of the holdings can be securely

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

extended to the standard for access on summary judgment where similar facts are undisputed. Indeed, in most of the cases the defendant did not even dispute access where its employee(s) formerly worked for the plaintiff.

***21** Access to both versions of the Villa II is established. According to Defendants, "[t]he only alleged difference between the 546-285 registration [Villa II-the Reserve] and the 447-395 registration [Villa II-Rush Creek] is that the former includes a room at one end of the building containing the required sprinkler pipes." (Defs.' Mem. in Supp. of Mot. for Partial Summ. J., at 4) (Doc. No. 409). Both TCM and BSB had physical possession of the technical drawings for the sprinkler room of the Villa II. *Compare* Davenport Aff. Ex. VV at BSB01262-63, Ex. YY, at BSB001022-23, *and* Ex. ZZ, at BSB00975-76, *with* Ex. WW.

TCM argues that there is no evidence that any former Rottlund employees "utilized [their] knowledge ... in the development of the Centennial Crossings or Harvest Hills technical drawings." (TCM's Mem. in Opp'n to Mot. for Summ. J., at 24). TCM submits that the only evidence is a letter from Geegan to BSB indicating that Geegan, Harris, and Zorn were involved in the red lining process for Harvest Hills, but this was after the Centennial Crossing drawings were completed. First, a plaintiff simply need not prove a defendant utilized its knowledge of the protected work to constitute access, a mere reasonable *opportunity to view* will suffice. Indeed, proof of actual viewing much less utilizing knowledge gained from viewing is not even necessary. *See, e.g., Moore,* 972 F.2d at 942 ("[Plaintiff] can establish access by showing that the defendants had an 'opportunity to view or to copy' his work."); *Herzog v. Castle Rock Entm't,* 193 F.3d 1241, 1249 (11th Cir.1999) ("[S]ome courts have defined access as the actual viewing and knowledge of plaintiff's work by the defendant. This circuit, however, regards a 'reasonable opportunity to view' as access."); *see also Am. Greetings Corp. v. Easter Unlimited, Inc.,* 579 F.Supp. 607, 613-14 (S.D.N.Y.1983) (finding access "in the formative stages" of development). Second, proof that Geegan, Zorn, or Harris were directly involved in designing both of TCM's townhomes is not necessary. It is sufficient that TCM, through these former Rottlund employees, had an opportunity to view the protected works. Further, Defendants do not dispute that Tim Johnson was involved in the design process of TCM's townhomes.

TCM's access to Rottlund's technical drawings reaches the other Defendants. A "Plaintiff may prove access by showing that a third person with creative input for the designer has had access to the copyrighted work." *Kootenia,* 2002 WL 15594, at *5; *c.f. Kamar Intern., Inc. v. Russ Berrie and Co.,* 657 F.2d 1059, 1062 (9th Cir.1981) (" '[E]vidence that a third party with whom both the plaintiff and defendant were dealing had possession of plaintiff's work is sufficient to establish access by the defendant...." '); 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, § 13.02[A], at 13-17. Here, BSB was TCM's architect. TCM and BSB had multiple discussions about the design of TCM's townhomes, and TCM participated in redlining the designs of its townhomes. Thus, TCM's clear access is reasonably imputed to its architect for the Homestead Collection townhomes. *See Arthur Rutenberg Corp. v. Parrino,* 664 F.Supp. 479, 481 (M.D.Fla.1987) (finding that "Joseph Parrino's [the homeowner] access to the 'Inverness' plans is fairly attributable to Precision [the architect]"). [FN28]

FN28. The Court notes that BSB architect Larry Moore testified, in response to a question as to whether he had access to Rottlund's materials, that, "We had access. We did not access them. We did not use them." (Davenport Aff. Ex. FF, at 42:8-19).

***22** Likewise, BSB designed Pinnacle's Washington Square townhome by adapting TCM's Homestead Collection townhomes. [FN29] (Davenport Aff. Ex. RR; Ex. SS, at 59:16-60:22, 69:11-15, 138:16-139:8). The key feature between TCM and Pinnacle is "the close relationship linking the intermediary and the alleged copier." *Moore,* 972 F.2d at 944. [FN30] Pinnacle's in-house architect, Steve Sandelin, was involved in the design of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.