# Exhibit R150.3

TCM's Homestead Collection from the very beginning-actually recommending BSB as the architect. (Davenport Aff. Ex. U, at 34:2-22). As has been explained in previous Orders of this Court, June 30, 2004 Order, at 6 (Doc. No. 418), Pinnacle's Sandelin commented on or gave input on TCM's Homestead Collection designs. Sandelin toured Rottlund's Villa II with TCM representatives and possibly representatives from BSB. Ultimately, while designs for TCM's Centennial Crossing townhome were finishing up, Pinnacle decided that it would design a back-to-back townhome for Aurora, Illinois "from the working drawings originally prepared for Maple Grove, Minnesota (TCM's Centennial Crossing townhome). (Davenport Aff. Ex. RR; TT). Faced with this relationship between the parties, the Court finds that TCM was in a position to transmit its information to Pinnacle. Thus, the inferential chain reaches Pinnacle.

FN29. TCM and Pinnacle are not totally unrelated entities. Pinnacle does business as Town & Country Homes, and TCM is the allegedly separate Minnesota division of Town & Country Homes.

FN30. The concept of an intermediary usually is found in cases where a party sends a musical recording or literary work to a company and, through an inferential chain, access is established as to the copier. Nimmer, § 13.02[A], 13-17-24. The circumstances here are analogous.

When a reasonable opportunity to view is established, it is appropriate not just to find a mere inference of access but to deem access established. As Nimmer explains:

It would seem clearer and more just in terms of the plaintiff's burden of proof to regard a reasonable opportunity to view as access in itself and not merely as creating an inference of access. This approach is consistent with what is perhaps the more prevailing definition of access, i.e., the opportunity to copy. The trier of fact may conclude that the person who created defendant's work had, but did not avail himself of, the opportunity to view, but this conclusion properly goes to the ultimate issue of copying, and not to the subordinate issue of access.

Nimmer, § 13.02[A], at 13-16 (footnotes omitted).

Plaintiff is entitled to a finding of summary judgment on access--that Defendants had a reasonable opportunity to view the Villa II technical drawings.

2. Substantial Similarity

The Eighth Circuit Court of Appeals has directed that *"Hartman v. Hallmark Cards, Inc.*, 833 F.2d 117, 120 (8th Cir.1987), indites the law in this Circuit pertaining to substantial similarity." *Nelson v. PRN Prod., Inc.*, 873 F.2d 1141, 1143 (8th Cir.1989). *Hartman* provides:

There must be substantial similarity "not only of the general ideas but of the expressions of those ideas as well." First, similarity of ideas is analyzed extrinsically, focusing on objective similarities in the details of the works. Second, if there is substantial similarity in ideas, similarity of expression is evaluated using an intrinsic test depending on the response of the ordinary, reasonable person to the forms of expression. ***23** 833 F.2d at 120.

Thus, at the extrinsic step, district courts in this Circuit are required to consider the similarity of ideas, all of which are unprotectible. *Id.; Taylor Corp. v. Four Seasons Greetings LLC*, 171 F.Supp.2d 970, 975 (D.Minn.2001) ("First, an 'extrinsic' analysis is performed to determine whether the general idea of the two works is substantially similar."). The extrinsic test looks at such matters as " 'the type of artwork involved, the materials used, the subject matter, and the setting for the subject." ' *Nelson v. PRN Prod., Inc.*, 873 F.2d at 1143 (*quoting Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir.1977)). Expert evidence is admissible at this stage of analysis (and only at this stage). *Id.*

A comparison of the Villa II plans and the Homestead Collection and Washington Square plans reveals that there is a similarity of ideas. The type of work involved is similar: both are architectural drawings. The subject matter is similar: both depict residential,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

back-to-back townhomes. The materials used are similar. As TCM and Pinnacle's expert, Jeffery Scherer, states, each plan utilizes similar ideas of structure, function, and design: wood framed structure, slab-on-grade; kitchen, dining, living, bathroom, 2-car garage, master bedroom and bath, bedroom, laundry, shared bath, and spare room; gabled roofs, double-hung windows, protected entrances, and siding with masonry base. (Scherer Aff. Ex. A, at 9). [FN31] Further, although concluding that the plans are not "substantially similar," Scherer nevertheless admits that the plans utilize "similar elements, proportions, and roof configurations." *Id.* at 30. Finally, BSB's expert, Albert Bloom, testified on this very topic:

FN31. The Court notes that Pinnacle states Mr. Scherer's report and analysis of the plans, although only explicitly dealing with the Villa II and the Homestead Collection, applies with equal force to Pinnacle's Washington Square product. (Defs.' Mem. in Supp. of Mot. for Partial Summ. J., at 27) (Doc. No. 409).

Q: Are there similarity of ideas between the Villa II and the Homestead Collection?
A: Yes.
Q: When you say there are similarity of ideas between the Villa II and the Homestead Collection, what do you mean?
A: They're very similar in concept. They're both back-to-back townhouse products. They have end units or exterior units. They also have interior units. They're slab-on-grade construction. They're two-car garages. They have similar scope as far as the room counts go in living, dining, kitchen, bedrooming, loft spaces, and there's a similarity as far as the gross mass of the building size.
(Davenport Aff. in Opp'n to Defs.' Mot. for Summ. J., Ex. R101, at 6:17-7:5)

Thus, TCM, Pinnacle, and BSB's own experts agree that the designs share similarity in the details of the objective ideas. This Court finds this level of comparison of ideas to be appropriate under the precedent of this Circuit. To tread into greater levels of detail as Defendants propose, would be to approach a comparison of the expressive coordination and arrangement of ideas, which is clearly saved for the intrinsic stage of the analysis. This conclusion is consistent with *CSM* where the Court, considering the extrinsic test, explained:

***24** A comparison of the objective details of the Everest plans and the two sets of CSM plans shows there is a similarity of ideas between them. Both Everest and CSM proposed and designed a rectangular office showroom for the Roseville site.
840 F.Supp. at 1311.

Whether the drawings' expression is similar, the intrinsic test, depends on the response of an ordinary, reasonable person. *Hartman,* 833 F.2d at 120. In other words, "[i]nfringement of expression occurs only when the total concept and feel of the works in question are substantially similar." *Id.* at 120-21; *see also Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir.1960) (explaining the test as whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same"). Summary judgment at this stage "is not favored." *Id.* at 120; *accord, e.g., Sturdza,* 281 F.3d at 1298 (explaining that " '[b]ecause substantial similarity is customarily an extremely close question of fact, summary judgment has traditionally been frowned upon in copyright litigation" ') (quoting *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 977 (2d Cir.1980)).

Considering the drawings at issue (the Villa II Rush Creek and Reserve and the Homestead Collection Centennial Crossing and Harvest Hills and the Washington Square), the Court finds that a reasonable juror could find that the total look and feel of how the drawings selected, arranged, and coordinated the elements is substantially similar, but a reasonable juror would not be compelled to so find. Thus, no party is entitled to summary judgment on the issue of substantial similarity (the intrinsic analysis) of the Villa II and Homestead Collection and Washington Square technical drawings.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

D. *Motion to Strike the Scherer Affidavit*

At this point, it is appropriate to discuss the propriety of Jeffery Scherer's expert report. Oral argument was heard on Rottlund's motion on two separate days, due to the length of argument. Rottlund moved to strike the Scherer report after the first hearing but before the second under Rule 56(e) and Federal Rules of Evidence 104(a) and 702. TCM and Pinnacle argue that Rottlund's motion is untimely because it should have been submitted with Rottlund's reply brief and Rottlund never mentioned a dispute with Mr. Scherer's affidavit at the first hearing. This Court is unpersuaded by TCM and Pinnacle's argument. Timeliness of a motion to strike an affidavit is left to the district court's discretion. *Nat'l Union Fire Ins. Co. v. Siliconix, Inc.*, 726 F.Supp. 264, 268 (N.D.Cal.1989). There is no rule requiring a motion to strike to be submitted with a reply brief, although that might be preferable. Contrary to TCM and Pinnacle's argument, Rottlund did object to or contest the Scherer report during the first day of argument; though it did not formally move to strike until after the hearing. Although initially claiming that much of their argument would have to be redone, that concern did not materialize and TCM and Pinnacle have not suffered prejudice due to the timing of the motion. Moreover, even in the absence of Rottlund's motion, the weight given to Scherer's report would be the same.

***25** TCM and Pinnacle also argue that Rottlund's motion should be denied because Rottlund's previous position in the litigation was that expert testimony is necessary for the extrinsic test, and the Court ordered Rottlund to provide a list of the elements of Rottlund's drawings that it claimed were protectible with expert disclosures. There is no dispute that expert testimony is admissible in regard to the extrinsic test. That is not, as explained below, the basis for the motion to strike. In addition, Rottlund's theory of protectible expression does not involve use of individual elements; in other words, Rottlund is not claiming protection for any one element so there is nothing to identify. Rather, Rottlund's protectible expression consists of the selection, arrangement, and coordination of the individual elements, and it has provided Defendants a list of the elements that have been expressively selected, arranged, and coordinated. Further, the Court has engaged, *supra,* in the requisite filtering or analysis of how Rottlund's drawings are protectible.

With regard to the contents of the Scherer report, the Court disregards much of it. Rottlund argues that Scherer's report impermissibly offers an opinion on copyright infringement in general and seeks to redefine the standards for originality and independent creation. TCM and Pinnacle submit that Scherer's report is admissible on the issue of substantial similarity.

One thing is clear: "Although expert opinion evidence is admissible in connection with the first step of the substantial similarity analysis to show *similarity of ideas,* analytical dissection and expert opinion are not called for under the second step in which substantial *similarity of expression* is measured by a different standard--the response of the ordinary, reasonable person." *Hartman,* 833 F.2d at 120 (emphasis added). Thus, expert opinion evidence is admissible under the extrinsic test (ideas), and it is not admissible under the intrinsic test (expression). The Court considers the Scherer affidavit, to the extent it discusses similarity of ideas, but, when Scherer evaluates how individual elements are expressed, the Court finds that such an analysis moves too far into expression; thereby invading the province of the jury. The point at which Scherer purportedly evaluates the townhomes, he simply states that he is going to explain why the townhomes are not "substantially similar." (Scherer Aff. Ex. A, at 17). [FN32] Opining generally on substantial similarity is something Scherer clearly may not do. Substantial similarity is a legal test with two prongs-extrinsic and intrinsic-and the extrinsic prong is the only prong that accepts expert opinion evidence. While Scherer does not always explicitly say he is evaluating expression (the Court does not expect one with no legal training to appreciate the difficult idea/expression dichotomy, and TCM/Pinnacle

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

argue that Scherer's evaluation should be cloaked with the description of comparing objective details of the ideas as opposed to comparing expression), it is telling that at some points he does. For instance, in evaluating the placement of the gabled roof, Scherer tells the Court that use of the gabled roof "is not subject to copyright," but also that "the manner in which each architect independently created his own *expression* of the traditional gable-within the narrow restriction mentioned above-establishes that they are not substantially similar." (Scherer Aff. Ex. A, at 18) (emphasis added).

FN32. Scherer states that the purpose of his report "is to offer my opinion as to whether there is copyright infringement arising under the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq."* (Scherer Aff. Ex. A, at 1). Elsewhere, Scherer affirmatively states "I would contend that the arrangement of the basic elements of the interior is also not protectible." *Id.* at 10. The Court will not consider Scherer's " 'attempt to tell the court what result to reach ." ' *Dow Corning Corp. v. Safety Nat'l Cas. Corp.*, 335 F.3d 742, 752-53 (8th Cir.2003); *see also Kostelecky v. NL Acme Tool/NL Indus., Inc.*, 837 F.2d 828, 830 (8th Cir.1988) (explaining the principle that expert opinion evidence that simply tells the jury what result to reach is not helpful).

***26** With regard to originality, the Scherer report reads more like an amicus brief. "The touchstone for the admissibility of expert testimony is whether it will assist or be helpful to the trier of fact." *McKnight by and through Ludwig v. Johnson Controls, Inc.*, 36 F.3d 1396, 1408 (8th Cir.1994). The Eighth Circuit has recognized that "[b]ecause the judge and not a witness is to instruct the factfinder on the applicable principles of law, exclusion of opinion testimony is appropriate if the terms used have a separate, distinct, and special legal meaning." *Hogan v. Am. Tel. & Tel. Co.*, 812 F.2d 409, 411- 12 (8th Cir.1987) (*citing Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509-10 (2d Cir.1977) and *Torres v. County of Oakland*, 758 F.2d 147, 151 (6th Cir.1985)). Scattered throughout the report, Scherer offers his opinions concerning originality. (Scherer Aff. Ex. A, 1-2) ("To determine whether there has been copyright infringement, I will examine the issues of *original works of authorship* ....") (emphasis in original); *id.* at 2 ("[I]t is further assumed that an *Original Work of Authorship* is only the result of an individual working closely and autonomously with an Owner *for the purpose* of producing an original work.") (emphasis in original); *id.* at 12 ("In effect, the marketplace for affordable suburban housing discourages *Original Works of Authorship* that are born from the 'genius' of an individual.") (emphasis in original); *id.* at 17 ("All of the rooms are rectangular and do not posses any distinguishing features that would identify them as original."); *id.* ("There are no distinguishing or original geometric configurations or plan arrangements that convey imagination or originality."). The Court finds that the Scherer report's discussion of originality would be unhelpful to the fact finder. *See EZ Dock, Inc. v. Schafer Sys., Inc.*, 2003 WL 1610781, at *7 (D.Minn. Mar. 8, 2003) ("[I]ssues of law are not properly the subject of expert testimony. It is the *Court's* duty to instruct the jury on the applicable principles of patent law...."). Regardless of what Scherer thinks original means, "original" for purposes of copyright law has a distinct, special legal meaning. The Supreme Court has outlined the special meaning of original:

To qualify for copyright protection, a work must be original to the author. Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, "no matter how crude, humble or obvious" it might be. Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying.

***27** *Feist*, 499 U.S. at 345.

Scherer's report relies on his own standard for originality. *Contra Richmond Homes*, 862 F.Supp. at 1526 ("There is no requirement in

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

copyright law that the plans be particularly unusual; they simply must be original. Mass-produced house floor plans are commonly protected."). The Court, of course, will evaluate originality based on the standard set by the Supreme Court. The Court disregards Scherer's discussion of originality for it is unhelpful.

On the other hand, some of Scherer's discussion about how architects operate and what processes they utilize to develop a drawing may be helpful. Thus, for purposes of this motion, the Court will only disregard the inadmissible portions of the Scherer affidavit and will consider the admissible portions. *See Lee v. Nat'l Life Assurance Co.*, 632 F.2d 524, 529 (5th Cir.1980). The Court will not strike the entire Scherer report but will leave it to the trial judge to determine if a jury should consider particular testimony. *See In re St. Jude Med., Inc. Silzone Heart Valves Prod, Liability Litig.*, No. MDL 01- 1396, 2004 WL 45503, at *16 (D.Minn. Jan. 5, 2004).

The Court does not need to reach the issue of independent creation at this point, and, therefore, does not address the Scherer report's analysis of independent creation.

Based upon the foregoing and all the files, records, and proceedings herein,

IT IS HEREBY RECOMMENDED that:
1. Plaintiff The Rottlund Company's (Rottlund) Motion for Partial Summary Judgment on Liability Issues of Validity, Direct Copying, Access, and Substantial Similarity Concerning Plaintiff's § 102(a)(5) Copyrighted Technical Drawings (Doc. No. 333) should be GRANTED in part and DENIED in part.
2. Plaintiff's Motion to Strike the Affidavit of Jeffrey Scherer (Doc. No. 369) should be DENIED without prejudice.
3. Defendant Bloodgood Sharp Buster Architects and Planners of Iowa, Inc. and the Bloodgood Group, Inc.'s (hereinafter collectively BSB) Motion for Partial Summary Judgment on Copyright Validity (Doc. No. 350) should be DENIED.
4. Defendants' Motion for Partial Summary Judgment (Doc. Nos. 382, 384, and 406) should be DENIED in part. In a separate report and recommendation, the Court will consider the Defendants' collective motion regarding whether the Chateau Collection technical drawings infringe the Villa II technical drawings; whether the Homestead Collection, Washington Square, and Chateau Collection as-built structures infringe the Villa II as-built structure; and the contributory infringement and vicarious liability claims.

Under D. Minn. L.R. 72.1(c)(2) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties within 10 days a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Any party wishing to oppose such objections must file and serve all parties with its response in accordance with L.R. 72.1(c)(2). Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

2004 WL 1879983 (D.Minn.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Exhibit R151

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

FOURTH DIVISION

| | |
|---|---|
| THE ROTTLUND COMPANY, INC. d/b/a ROTTLUND HOMES, A MINNESOTA CORPORATION<br><br>Plaintiff<br><br>vs.<br><br>PINNACLE CORPORATION d/b/a TOWN & COUNTRY HOMES, AN ILLINOIS CORPORATION, TOWN & COUNTRY HOMES, INC., A MINNESOTA CORPORATION, BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., AN IOWA CORPORATION, AND THE BLOODGOOD GROUP, INC., AN IOWA CORPORATION<br><br>Defendants<br><br>and<br><br>TOWN & COUNTRY HOMES, INC., A MINNESOTA CORPORATION<br><br>Third-Party Plaintiff<br><br>vs.<br><br>BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., AN IOWA CORPORATION<br><br>Third-Party Defendant | No. 01-CV-1980<br><br>DEPOSITION OF JASON JORGENSON |

Reported by: Connie Overberg, RPR, CSR

A. Pat Ruelle.

Q. Is Mr. Ruelle an employee of Rottlund Homes of Iowa?

A. He is an employee of Rottlund Homes. When you say Iowa, I look at that as a division of the Rottlund Company of Minnesota also, and, yes.

Q. Do you know what claims Rottlund is alleging in this lawsuit?

A. Yes.

Q. What is your understanding of the claims that Rottlund is alleging in this lawsuit?

A. That our plans were copied.

Q. Which plans?

A. The Villa 2.

Q. How did you become aware of the lawsuit?

A. Just hearsay through the company, I guess, and recently when I have been deposed.

Q. When you say recently you have been deposed, are you talking about sitting here today?

A. Yeah.

Q. How long before your deposition was noticed were you aware that there was a lawsuit involving claims that the Villa 2 plans were copied?

A. I heard about it a while back. I can't tell you exactly when.

Q. From whom?
A. I can't remember.
Q. Somebody within Rottlund Company of Iowa?
A. Probably.
Q. Do you recall any of the information that you received about the lawsuit?
A. No. Just that there was one.
Q. Are you aware that Rottlund has been involved in similar lawsuits in Iowa?
A. Yes.
Q. What do you know about the lawsuits that Rottlund has been involved in in Iowa that are similar to this, claims that the plan was copied?
A. Very little. I wasn't involved. At that time as a superintendent I wasn't privy to information.
Q. Do you know any information?
A. Some.
Q. What do you know?
A. Just that there was a situation with both Rogers and Oaks, and that there is a confidentiality agreement I have heard that we can't talk about it.
Q. Who is Rogers?
A. I believe it is a company in Ankeny, Iowa, who builds town homes.

Q. Were the plans that were at issue in the Rogers matter plans for a villa product?
A. Yes.
Q. Were there more than one version of the villa product that is being built in Iowa?
A. Yes.
Q. How many?
A. Two I believe, maybe three. Can you clarify that?
Q. Are there particular marketing names that you give two or three versions of villa that are being built in Iowa?
A. They name the floor plans. The Villa 2 was the Chattum and Dunhill, and there have been several names for the original villas. They all start with an A or B.
Q. Always start with --
A. A or B signifying A unit or B unit.
Q. Would it be fair to say that the Villa 2 and the original villa are the two versions of villa product that are being built in Iowa?
A. I believe we have started with the original villa and upgraded through to the new villas, and then the Villa 2, so I think there is probably three versions.

Q. What product was at issue in the Rogers lawsuit?
A. It would have either been the original or the new villa.
Q. You don't know which?
A. No.
Q. And then in the Oaks litigation?
A. Same answer.
Q. Do you know if Rogers developed their plans for the product that they were building that Rottlund claimed was copied was designed in-house or by an architect?
A. I don't know.
Q. Do you know anything about how Rogers came up with the plan that they were building that was at issue in the lawsuit of Rottlund involving Rottlund?
A. No, I don't.
Q. Do you have any information how Oaks came up with the plan that they were building in the lawsuit involving Rottlund?
A. No.
Q. Do you know if Oaks was working with an architect or if they developed their plan in-house?
A. I don't know.
Q. Have you ever talked with anybody at

Bloodgood Sharp Buster Architects & Planners?
A. Not that I am aware of.
Q. Have you ever had any involvement in Rottlund developments anywhere other than the Des Moines Metro area?
A. No.
Q. Do you have knowledge of the facts and issues involved in the lawsuit that Rottlund has brought against Pinnacle, Town & Country and Bloodgood Sharp and Buster?
A. Very little.
Q. What do you know?
A. Specifically, I mean, in the facts of the trial I don't. I probably don't know any of them to be honest with you.
Q. When you said "very little," what were you referring to, do you know?
A. Just what I have been told preparing for the deposition.
Q. Were those conversations with your attorney or somebody within the Rottlund Company?
A. With an attorney.
Q. Do you know anything about this lawsuit other than what your attorney has told you?
A. Other than the fact that there are several

Rottlund employees now working for Town & Country and that their plans are very similar to ours, no.
Q. How did you come to know that several Rottlund employees are now working for Town & Country?
A. Because several of them are -- three of the employees worked for our division here in Iowa while I was working here and then went to work for them.
Q. Who are those three people?
A. Marc Harris, Joey Zorn, Chad Cooper.
Q. The last one was Chad Cooper?
A. Yes.
Q. What did Marc Harris do for Rottlund while you worked for him?
A. His title was either production manager or V.P. of operations, and so he was my supervisor as a superintendent.
Q. And Mr. Zorn, what did he do for Rottlund while you worked for him?
A. He started as an assistant superintendent and ended up as either a project manager or production manager -- I am not sure which -- and he was my supervisor when he left.
Q. And Mr. Cooper?

A. He started as an assistant superintendent and ended up as a superintendent when he left.

Q. Did Mr. Harris, Mr. Zorn and Mr. Cooper all go to work for Town & Country Homes in Minnesota?

A. Yes.

Q. Have you talked with Mr. Harris since he left Rottlund Company?

A. Yes.

Q. When?

A. He was at a Christmas party held by Midwestern Interiors here in Des Moines at which they have their employees from Minneapolis come to the same party, and Marc was invited to that party, so I met him and saw him there.

Q. What year was that?

A. That would have been last Christmas.

Q. Do you know when Mr. Harris left Rottlund?

A. I think it was 1999 in June.

Q. June of '99?

A. I believe so.

Q. Do you know what he went to do for Town & Country Homes?

A. Similar position as to what he had here, I believe.

Q. Did you talk to him while you were at this

Christmas party for Midwest Interiors?

A. Yes.

Q. What did you talk about?

A. Family.

Q. Anything related to work?

A. I believe he mentioned that he was looking at another opportunity. I don't know if he had already left Town & Country or was planning to leave or one of the two. I know he has left since then.

Q. You don't know when?

A. No.

Q. Have you talked with Mr. Zorn since he left Rottlund Homes?

A. Yes.

Q. When?

A. He called me maybe two weeks after he left and basically hinted as to the fact that are you willing to move or not to Minneapolis. He assumed that I wouldn't because he knew that I have a situation where my wife likes to live in Iowa near her mother so that was about it.

Q. He was asking you if you wanted an opportunity to work at Town & Country?

A. In a roundabout way, yes.

Q. When did Mr. Zorn leave Rottlund?

A. I can't remember exactly. I can't remember exactly. It would have been after Marc Harris. Probably six months to nine months later, something like that.
Q. End of '99, beginning of 2000?
A. It would have been after the summer of 2000, I believe.
Q. Did Mr. Zorn give you any details at all about what kinds of positions were open in Town & Country Homes?
A. He said that they had a big sales backlog and so his job would be to get things rolling, and so he would need all kinds of positions. Mostly supervisor positions I would believe.
Q. When you say big sales backlog, what do you mean by that?
A. He made it sound like there were hundreds of homes that needed to be built that were sold.
Q. Did he tell you anything about what kinds of homes, where the projects were, anything like that?
A. No, just that it was in the Minneapolis area.
Q. Anything else that you recall about your conversation with Mr. Zorn a couple of weeks after he

left Rottlund?
A. No.
Q. Have you talked to him since?
A. Yes.
Q. When?
A. I can't remember, but it has been between now and then at some point just to see how things were going.
Q. Did you talk with Mr. Zorn the second time, anything related to work?
A. No, not really.
Q. And Chad Cooper, have you talked with him since he left Rottlund Homes?
A. No.
Q. Do you know if Mr. Zorn is still with Town & Country?
A. I think he is, but I am not sure.
Q. Do you know if Mr. Cooper is still with Town & Country?
A. I believe he is.
Q. Do you know what Mr. Cooper's job is at Town & Country, what he left to go do?
A. He is a superintendent.
Q. While Mr. Harris was with Rottlund Company as the production manager, what kind of products was

he overseeing?

A. Can you repeat that?

Q. When Mr. Harris was with Rottlund as a production manager, what kind of products was he overseeing?

A. All of the products that we build in Iowa.

Q. Let me get a list of that. What are all of the products that are built in Iowa?

A. I am going to give you from the best of my memory. We have the lodge series, the craftsman series, the tradition series, the villas, gardens, garden town homes, vistas, cottages. I may have left some out.

Q. Lodge series. Those are single family?

A. Yes.

Q. And craftsman, those are town homes or single family?

A. Detached town homes.

Q. What do you mean by that?

A. They are built as a single family home with minimal side yard setbacks but built in an association type situation so they are town homes living in a single family type of house.

Q. Traditions, is that a single family?

A. Yes.

Q. And we have already talked about the different versions of villas that are built, gardens are town home?

A. Yes.

Q. Back-to-back or see-through?

A. Both. I am sorry. Gardens would all be back-to-back.

Q. And vistas?

A. Those are see-through or a row type town home.

Q. And cottages?

A. Cottages are similar to the craftsman. Detached town homes and the garden town homes are a row type of town home.

Q. The gardens and the garden town homes are two different things?

A. Yes.

Q. And so while Mr. Harris was the production manager for Rottlund, he would have overseen all projects for Rottlund that you would have just listed?

A. Yes.

Q. Are there any product lines on a list that you have given that have been discontinued in Iowa?

A. We are not currently building cottages.

Q. Anything else Rottlund of Iowa is still building currently today?
A. Yes.
Q. Do you have any knowledge of any other Rottlund employees other than Mr. Harris, Mr. Zorn and Mr. Cooper who are now or were at some point employees of Town & Country Homes?
A. I don't know names, but I know there are several from Rottlund of Minnesota that have gone to work for Town & Country.
Q. How do you know that?
A. I was told by Rottlund of Minnesota people. I can't remember which people.
Q. So you wouldn't know names or positions or when people left?
A. I know there is a land guy, somebody in purchasing, possibly superintendent, several.
Q. Is that the extent of your knowledge is there are several?
A. Yes.
Q. Anything else that you know about Rottlund employees that left to go work for Town & Country?
A. No.
Q. Off the record for a second.

(An off-the-record
discussion was held.)

MS. NEWMAN: Go ahead and go back on the record.

Q. (By Ms. Newman) Have you seen the Town & Country Homes product that is at issue in this lawsuit?

A. No.

Q. Have you seen plans of the Town & Country Homes product that is at issue in this lawsuit?

A. No.

Q. Have you seen any pictures of the Town & Country Homes product that is at issue in this lawsuit?

A. No.

Q. So how would you know it if the plans that Rottlund alleges are copied in this lawsuit are similar to Town & Country Homes plans?

A. I just have heard that that is what the litigation is about.

Q. You wouldn't have any knowledge related to that?

A. No.

Q. When you say you have heard that that is what the litigation is about, from whom did you hear

that?

A. From my attorney.

Q. Anybody else talk to you about that issue?

A. Just the hearsay I told you about before within the company. I can't remember names or dates.

Q. I have handed you what has been previously marked as Exhibit Number 182. I would like you to turn to Page 18 of this exhibit. You will see towards the bottom of the page your name there?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. This document was provided by Rottlund Company, Inc., as part of the procedures in this lawsuit, and Rottlund Company, Inc., was asked to identify people who have knowledge and what knowledge they have regarding this lawsuit. And there is a bullet point here that says, "Jason Jorgeson has knowledge of the facts and issues involved in this matter including, for example, knowledge related to the following: (1) Plaintiff's copyrighted works; (2) Defendants' access to Plaintiff's copyrighted works; and (3) the substantial similarity between Defendants' infringing works and Plaintiff's copyrighted works. Jason Jorgenson has such

knowledge since he was employed by Plaintiff as a Project Superintendent, and is currently employed as a project manager for Plaintiff, Iowa Division."
Did I read that correctly?
A. That's what it says.
Q. Mr. Jorgenson, do you have any knowledge of Plaintiff's copyright works?
A. I understand it is a company policy that we copyright our plans.
Q. Do you know for which projects Rottlund claims copyright protection?
A. I would understand that to be all of them.
Q. Do you know anything about Rottlund process or procedures in making registration applications to the copyright office?
A. Only that that is handled in Minnesota.
Q. Do you know anything else related to Plaintiff's copyrighted works?
A. No.
Q. Do you have any knowledge related to -- take one at a time -- Pinnacle's access to Rottlund copyright works?
A. No.
Q. Do you have any knowledge related to Town & Country's access to Plaintiff's copyrighted works?

A. Just that the employees that were in the Iowa Division had access, as I do, to all of our plans.

Q. Do you have any other information related to Town & Country Homes access to Plaintiff's copyrighted works?

A. No.

Q. Do you have any knowledge about Bloodgood Sharp Buster Architects & Planners access to Plaintiff's copyrighted works?

A. No.

Q. Any knowledge related to Bloodgood Group, Inc.'s, access to Plaintiff's copyrighted works?

A. No.

Q. Do you have any knowledge of the alleged substantial similarity between Rottlund's and Town & Country Homes products?

MR. KRUMMEN: I have an objection that there was an amended set of interrogatory responses subsequent to this set. You may answer.

A. Yeah. I haven't seen the plans for the Town & Country villas, and so if I had seen those I would be able to say yes, but since I haven't, I will have to say no.

Q. It is not only the plans. You haven't