UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

The Rottlund Company, Inc. d/b/a Rottlund Homes, a Minnesota corporation,

Plaintiff,

vs.

Pinnacle Corporation d/b/a Town & Country Homes, an Illinois Corporation; Town & Country Homes, Inc., a Minnesota Corporation; Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation; and The Bloodgood Group, Inc., an Iowa Corporation,

Defendants,

and

Town & Country Homes, Inc., a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

No.: 01-CV-1980 (DSD/SRN)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS BLOODGOOD SHARP BUSTER ARCHITECTS AND PLANNERS OF IOWA, INC. AND THE BLOODGOOD GROUP, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST PLAINTIFF ON NON-COPYRIGHT CLAIMS AND AFFIRMATIVE DEFENSES**

## INTRODUCTION

According to the Bloodgood Defendants, "Rottlund offers no substantive evidence whatsoever (nor, indeed, is there any substantive evidence to be offered) that tends to show that BSB did anything but independently create these products." (The Bloodgood Defendants' Memorandum Of Law In Support Of Their Motion For Partial Summary Judgment Against Plaintiff On Non-Copyright Claims And Affirmative Defenses ("Defendants' Mem."), p. 8.)[1] The following facts demonstrate that the Bloodgood Defendants are mistaken:

- BSB copied Rottlund's Villa designs when working on other projects and then relied on these other projects when assembling the Homestead Collection design;
- BSB toured Rottlund's Villa II townhomes to find "mistakes" in Rottlund's design and "improve" upon them;
- BSB followed Town & Country Homes' Minnesota Division President's explicit instruction to copy Rottlund's Villa II design;
- BSB had portions of Rottlund's copyrighted technical drawings in their files and used them to design the Homestead Collection;
- BSB collaborated with former Rottlund employees hired by the Town & Country Homes Defendants to work on the Defendants' Homestead Collection design red-line team; and
- BSB's copying resulted in a design that is so obviously similar to Rottlund's copyrighted Villa II plans and buildings that Town & Country Homes hoped that BSB had a co-license agreement with Rottlund.

It is simply not credible to argue, much less emphatically claim as an undisputed fact, that BSB independently created the Homestead Collection and Washington Square back-to-back townhomes. Accordingly, the Bloodgood Defendants' request for summary judgment on the issue of independent creation should be denied. In addition, the Court should deny their motion for summary judgment on Rottlund's Lanham Act and Deceptive Trade Practices Act claims.

[1] Rottlund will refer to Defendant The Bloodgood Group, Inc. ("BGI") and Defendant Bloodgood Sharp Buster Architects & Planners of Iowa, Inc. ("BSB") as the "Bloodgood Defendants."

## PROCEDURAL HISTORY

### I. Rottlund's Copyright Infringement Claims.

Rottlund alleged in its Seventh Amended Complaint that the Homestead Collection and Washington Square Back-to-Back townhome units "infringe upon the combination or gestalt of Plaintiff's copyright protected Villa II works of authorship in many respects . . . ". (Seventh Amended Complaint, ¶ 64.) Rottlund identified at least 70 component parts comprising the gestalt or total look and feel of the copyright protected Villa II townhome design and external elevations (both plans and structures). (*Id.*) Moreover, Rottlund alleged that the infringing townhome units "are substantially similar to the combination or gestalt of Plaintiff's copyright protected Villa II works of authorship . . . ". (*Id.*, ¶ 65.) Rottlund further alleged that the Defendants' Homestead Collection and Washington Square back-to-back townhomes are illegal derivatives which violate Rottlund's 17 U.S.C. §§ 102(a)(5) and (a)(8) copyrights. (Seventh Amended Complaint, ¶¶ 43, 80.)

### II. Rottlund's Lanham Act And Deceptive Trade Practices Act Claims.

Rottlund also alleged that the Town & Country Homes Defendants have "knowingly and intentionally made false and misleading statements, descriptions, or representations of fact in interstate commerce in connection with the sale of [the Homestead and Chateau Collection, and Washington Square Back-to-Back townhomes] through [their] advertising and promotional materials concerning the origin, source, characteristics, and/or design of [these townhomes]." (Seventh Amended Complaint, ¶¶ 134, 142, 181 and 189.) Rottlund further alleged that these false and misleading statements have actually caused, and are likely to cause, confusion, which has damaged Rottlund. (*Id.*, ¶¶ 135-137, 143-145, 182-184, and 190-192.) More specifically, Rottlund alleged that the Town & Country Homes Defendants' "failure to attribute to Plaintiff the authorship and copyright ownership of these copyright protected original works of

authorship, in connection with the sale of each [Homestead and Chateau Collection, and Washington Square Back-to-Back townhome] creates a false impression of the origin, source, characteristics, and/or design of [these townhomes]." (*Id.*, ¶¶ 138, 146, 185 and 193.)

On May 9, 2003, the Defendants moved to dismiss Rottlund's Lanham Act and Deceptive Trade Practices Act claims. (Doc. Nos. 182-1 and 182-2.) The Defendants argued these claims were duplicative of Rottlund's copyright infringement claims and claimed they were preempted by the Copyright Act. (Order, 7/21/03, pp. 11-13.) Rottlund argued that its Lanham Act and Deceptive Trade Practices Act claims were not preempted by, and were alternative to, its copyright infringement claims. (*Id.*, pp. 12-13.) Relying upon the well established precedent cited by Rottlund, the Court rejected the Defendants' preemption arguments without prejudice. (*Id.*, 16-18.) The Court stated the Defendants could renew their arguments regarding Rottlund's Lanham Act and Deceptive Trade Practices Act claims after the Court ruled on whether the Villa II gestalt was entitled to protection under the Copyright Act. (*Id.*)

## III. The Court's August 20, 2004 Report and Recommendation.

On August 20, 2004, the Court issued its Report and Recommendation and granted Rottlund's motion for summary judgment on several liability issues. *The Rottlund Co., Inc. v. Pinnacle Corp., et al*, No. CIV. 01-1980, 2004 WL 1879983 (D. Minn. Aug. 20, 2004)[2]. Among other things, the Report and Recommendation ruled, as a matter of law, as follows: (i) Rottlund owns valid, registered copyrights for its Villa technical drawings (*id.* at **7-14); (ii) the selection, arrangement, and combination of the elements expressed in Rottlund's technical drawings are afforded copyright protection (*id.* at **14-18); (iii) the Defendants had access to Rottlund's plans (*id.* at **19-22); (iv) the Homestead Collection, Washington Square, and

---

[2] All Westlaw decisions cited in this legal memorandum are attached as Exs. 146-150 to the Affidavit of David A. Davenport in Support of Plaintiff's Memorandum of Law in Opposition to Defendants BSB and BGI's Motion for Partial Summary Judgment ("Davenport Aff.").

Villa II plans have substantially similar ideas (*id.* at **22-24); and (v) expert evidence is not admissible to determine whether the Homestead Collection, Washington Square, and Villa II plans have substantially similar expression (*id.* at **23, 24-27).

In light of the Court's rulings, the arguments raised in Defendants' Mem. Section IV (pages 8-19) are moot. Accordingly, Rottlund will only address Sections I-III in this legal memorandum.[3]

## BACKGROUND FACTS

### I. Defendants' Access To, And Direct Copying Of, Rottlund's Plans And Structures.

BSB's architect Larry Moore was responsible for the initial design concepts for the Town & Country Homes Defendants' Homestead Collection townhomes. (*See* Davenport Aff., Ex. R27, 12:14-18.) According to Mr. Moore, before BSB assembled the Homestead Collection design, he researched the following previous BSB back-to-back townhome project files: (1) Midland Homes; (2) Jerry's Homes; and (3) Good Value Homes.[4] (*Id.*, Exs. R30, 12:24-13:6; R27, 15:18-16:5.) Mr. Moore had substantial involvement as an architect with the Midland Homes project. (*Id.*, Ex. R30, 13:25-14:10.) Mr. Moore testified that he consulted and reviewed the working drawings from these files before beginning to work on what is now the Defendants' Homestead Collection townhome design. (*Id.*, Ex. R30, 19:21-20:25.) In addition, Mr. Moore testified that the placement and arrangement of room locations and elements for the Homestead Collection came from his review of these prior project files. (*Id.*, Ex. R27, 15:18-16:5.) As

---

[3] Section IV is captioned, ROTTLUND HAS FAILED TO IDENTIFY ANY CHARACTERISTICS OF THE VILLA II WHICH IS SUBJECT TO COPYRIGHT PROTECTION. All of the legal arguments within this section were raised in Section IV of the Bloodgood Defendants' March 9, 2004 Amended Memorandum of Law Opposing Plaintiff's Motion for Partial Summary Judgment (pp. 22-33), and rejected by the Court in the August 20, 2004 Report and Recommendation. The Bloodgood Defendants must bring a motion to reconsider under Local Rule 7.1(g), show compelling circumstances, and obtain the Court's permission to revisit any of the moot arguments raised in Section IV of their legal memorandum in support of the pending motion.

[4] Unfortunately, BSB only produced source materials from its Midland Homes and Jerry's Homes' files; no source materials were produced for the Good Value Homes file.

explained below, BSB copied Rottlund's Villa designs when it assembled the prior Midland and Jerry's Homes townhome designs.

**A. <u>Midland Homes</u>.**

Mr. Moore testified that in 1994 he used Rottlund's Villa product plans when BSB assembled the Midland Homes back-to-back design. (*Id.*, Ex. R27, 229:12-230:11.) In fact, Mr. Moore signed a contract on behalf of BSB with Design Development, Inc., and instructed Design Development to assemble construction drawings "similar to the Rottlund Homes plans" he provided to Design Development. (*Id.*, Ex. R31.) Mr. Moore testified that he actually went so far as to give a "cut and paste job" of Rottlund's floor plans to Design Development. (*Id.*, Exs. R27, 229:8-16; Ex. R32.) A comparison of the Rottlund Homes floor plans produced from Design Development's files with the "cut and paste job" document Mr. Moore identified reveals that someone cut off Rottlund's copyright notice and logo, and assembled the "cut and paste" document using the floor plans in Rottlund's Villa marketing brochure. (*Id.*, Ex. R32 with Ex. R33, DDI000021-22.)[5] Specifically, Rottlund's lower level internal and external unit floor plans were cut out, copied, reversed, copied, inverted, copied, inverted and reversed, copied, and then assembled into an eight unit back-to-back floor plan configuration.[6] (*Id.*) Mr. Moore faxed this "cut and paste" document to BGI principal Doug Buster in Chicago, Illinois. (*Id.*, Ex. R140 at BSB06379-80.) Doug Buster is BGI's majority shareholder and testified that he works for BGI "every day." (*Id.*, Ex. R58, 59:24-60:2.)

---

[5] Rottlund's elevations and floor plans are protected by its New Villa copyrights, which were attached to, and referenced in, Rottlund's Seventh Amended Complaint. Through the carry-forward doctrine, the New Villa designs and structures are incorporated into, and protected by, Rottlund's Villa II copyrights. *See, e.g.*, *Raintree*, 862 F. Supp. at 1525-26 (where the same creator owns both the original and derivative copyrights, the derivative work carries forward all preexisting copyrights in and protections of the original work). Importantly, as Exhibit R33, DDI000021-22 demonstrates, Rottlund's elevations and floor plans contain a copyright notice.

[6] For instance, the distinctive marks on the garage of Rottlund's floor plan appear on every external unit in the eight unit cluster found in the "cut and paste" document. (*Id.*, Exs. R32 and R33, DDI000021.)

Similarly, a comparison of the Rottlund Villa elevation that Mr. Moore gave to Design Development with the elevation which BSB assembled for Midland Homes demonstrates BSB copied Rottlund's copyrighted design. (*Id.,* compare Ex. R33, DDI000023 with Ex. R34, DDI000309.) For example, the change from the three-over-three window design to a two-over-two window design evidences copying, and the remainder of the elevation duplicates the total look and feel of Rottlund's elevation. (*Id.*) Also, in the earlier draft of the Midland elevation, a handwritten note above the offset center gables states: "can we omit this offset?" (*Id.*, Ex. R35, BSB03484.) The offset was omitted and the center gables were changed to mirror Rottlund's single center gable design. (*Id.*, Ex. R34, DDI000309.) When considered in light of the check box for "copyright issue" on the first page of this version of the Midland Homes design, it is clear that BSB directly copied Rottlund's Villa design and was cognizant of this fact. (*Id.*, Ex. R35, BSB03482.) Mr. Moore subsequently wrote an internal memorandum, attached a copy of BSB's Midland Homes' design and Rottlund's design, and asked: "is our design enough 'departure' from Rottlund" to avoid copyright liability.[7] (*Id.*, Ex. R37.)

**B. <u>Jerry's Homes</u>.**

BSB architect Chris Jorgenson worked extensively with BSB architect Larry Moore on the Homestead Collection townhome designs. In or about late 1996 or early 1997, prior to any of BSB's work on the Homestead Collection, Mr. Jorgenson worked on a back-to-back townhome project for Jerry's Homes. (*Id.*, Ex. R38, 82:21-23.)[8] While working on the Jerry's Homes townhome project, Mr. Jorgenson received a facsimile from Jerry's Homes that included

---

[7] BSB claims it no longer has the Rottlund plans referenced in this internal memorandum. (*Id.*, Ex. R36, 62:9-21.)

[8] As noted above, Mr. Moore testified that he researched BSB's Jerry's Homes files before beginning to assemble the Defendants' Homestead Collection designs.

the floor plans and elevations for Rottlund's Villas of Meredith Pointe. (*Id.,* Ex. R39.)[9] Subsequently, BSB changed the name of the project for Jerry's Homes to the Bent Tree "Villas." (*Id.*, Ex. R40, 206:9-24.) Obviously, Jerry's Homes had these Rottlund materials before forwarding them to BSB, and likely used them during the design process.

### C. <u>The Defendants' "Villa Product" Project</u>.

In early 1998, TCM President Art Plante proposed that the Town & Country Homes Defendants start offering a back-to-back multi-family townhome design in Minnesota. (*Id.*, Ex. R41, 38:11-21.) Prior to this time, the Town & Country Homes Defendants did not offer a back-to-back multi-family townhome design in the Minnesota market and their Minnesota Division (TCM) was not profitable. (*Id.*, Ex. R42, 58:11-59:16; 73:6-11; 95:8-96:9.)[10]

On March 19, 1998, Pinnacle's in-house architect and Vice President of Product Development Steve Sandelin met with Doug Buster, a named partner of BSB and the majority shareholder of BGI, in Chicago, Illinois. (*Id.*, Ex. R45, PINN04622.) Mr. Buster made a "multi family presentation" to Mr. Sandelin. (*Id.*) Thereafter, it was decided that BSB, which BGI is the parent of, would help assemble the back-to-back multi-family townhome design. (*Id.*, Ex. R46, 34:13-22.)

On March 31, 1998, representatives from Town & Country Homes and BSB traveled to Minnesota to tour Rottlund's Villa II townhomes. (*Id.*, Exs. R47; R30, 37:10-12; R41, 7:7-23; R38, 26:23-27:3.) During this tour, members of the tour group took photographs of Rottlund's Villa II townhomes, and took at least one marketing brochure which contained pictures and floor plans of Rottlund's copyrighted Villa II design. (*Id.*, Exs. R41 at 9:10-11:10

---

9 As Exhibit R39 demonstrates, Rottlund's floor plans and elevations bear a copyright notice.

10 Remarkably, after losing money for at least four straight years, the Town & Country Homes Defendants' Minnesota operation essentially doubled their net income each year for at least four straight years after offering the Minnesota market the back-to-back multi-family townhome designs they copied from Rottlund. (*Id.*, Ex. R28, 67:8-14; Ex. R43 at 20.) Consequently, the Town & Country Homes Defendants' Minnesota operation now ranks as the sixth largest in Minnesota. (*Id.*, Ex. R44.)

and R38 at 28:17-29:22.) The Defendants produced numerous photographs of Rottlund's Villa product in discovery, and ultimately were forced to produce two Rottlund brochures containing the copyrighted Villa II floor plans and elevations at issue in this matter. (*Id.*, Exs. R48-R51.)

On or about April 6, 1998, BSB entered into a contract with the Town & Country Homes Defendants to provide architectural schematic design services for a "Villa Product" project. (*Id.*, Ex. R52.) The contract describes Defendants' "Villa Program" project as an eight unit, back-to-back, multi-family townhome. (*Id.*, D00235.) Pursuant to the contract, BSB provided schematic designs for two townhome units (interior and exterior), one eight unit cluster configuration, and a prototypical density site plan study. (*Id.*)

On April 29, 1998, BSB architect Larry Moore, along with Pinnacle's in-house architect Steve Sandelin and TCM President Art Plante, again toured Rottlund's Villa II townhomes. (*Id.*, Ex. R46, 150:21-24; 152:9-20.) Members of the tour group again took photographs and marketing brochures depicting Rottlund's copyrighted floor plans and elevations.[11] (*Id.*, Exs. R46, 158:8-159:24; R41, 102:19-104:5.) BSB architect Larry Moore admitted that BSB had access to Rottlund's Villa II design materials. (*Id.*, Ex. R27, 42:8-19.) Town & Country President Art Plante testified to still other tours that he took of Rottlund's Villa II product. (*Id.*, Ex. R41, 6:21-9:9 and 104:10-105:25.)

The Defendants toured Rottlund's Villa II townhomes to find "mistakes" with the designs. (*Id.*, Ex. R30, 39:22-41:1.) The goal of the tours was to fix these "mistakes" and "find opportunities to one-up" the competition. (*Id.*, 40:8-20.) According to Mr. Moore: "[we] see a

[11] While Pinnacle's in-house architect finally produced Pinnacle's copies of Rottlund's brochures after two years of discovery, Art Plant admitted that he "disposed of" much of the competitor brochures he gathered, and TCM never produced its copy of Rottlund's marketing brochure. (*Id.*, Ex. R54.) Importantly, as Exhibit R50 demonstrates, Rottlund's floor plans and elevations contain a copyright notice.

mistake they're making and we better it. If their rooms are too small, we make them bigger. If their closets are too small, we make them bigger. We better it." (*Id.,* 40:23-41:1.)

On May 5, 1998, a week after the Defendants' second tour of Rottlund's Villa II design, Larry Moore sent Steve Sandelin a "competition product survey for Minneapolis market." (*Id.*, Ex. R55.)[12] Unfortunately, the competition product survey would likely be in TCM President Art Plante's "file with the documentation pertaining to the design and development" of the Defendants' townhome, but the Town & Country Homes Defendants have not produced this important file and they admit that they cannot "recreate" the file even though it was sent to their counsel on July 16, 2001. (*Id.*, Exs. R54 and R56, 174:23-175:10.)

On May 18, 1998, through an internal BSB correspondence regarding "Town & Country, Villas," Chris Jorgenson stated "Doug Buster called and faxed these to me after talking with Steve Sandelin . . . Doug thought it might be good to call Art Plante and discuss with him what Steve is suggesting." (*Id.*, Ex. R57.) Doug Buster is BGI's majority shareholder and testified that he works for BGI "every day." (*Id.*, Ex. R58, 59:24-60:2.) Mr. Buster also testified that during his talk with Mr. Sandelin he was asked to review "Town & Country/BSB Minneapolis back-to-back townhouses" in order to help develop a back-to-back townhome design for the Chicago marketplace. (*Id.*, 58:2-58:8.) As the Court has previously recognized, after Mr. Buster worked on the project, he turned his designs over to BSB Illinois. A BGI graphic artist and a BGI technician also worked on the back-to-back townhome designs. (Order, 7/10/03 at p. 12.)

On June 23, 1998, after BSB completed the schematic design services provided under the April 6, 1998 contract with the Town & Country Homes Defendants, the Defendants entered into

---

[12] When deposed in his capacity as BSB's Rule 30(b)(6) representative, Mr. Moore testified that he could not recall anything about the contents of the competition product survey. (*Id.*, Ex. R30, 26:16-19; 30:19-25.) He later testified in his individual capacity that he could not testify with certainty that Rottlund's floor plans were not included in the attached survey. (*Id.*, Ex. R27, 157:8-24.)

a second contract. (Davenport Aff., Ex. R59.) Pursuant to the terms of this contract, BSB was to continue its work on the "Villa Product" and provide design development and construction document services to the Town & Country Homes Defendants. (*Id.*) This contract was revised on July 1, 1998. (*Id.*) Less than two weeks later, BSB sent TCM President Art Plante detailed designs entitled "The Villas" and received back from Mr. Plante "client redlines" which included revisions, a color photograph of Rottlund's Villa II product, a hand drawn sketch by Mr. Plante, and Mr. Plante's instruction to "see Rottlund product." (*Id.,* Ex. R60, BSB02035A.)

On June 7, 1999, BSB advised the Town & Country Homes Defendants that they needed a new name for the "The Villas" design because "Villas" was already being used. (*Id.*, Ex. R61.) Thereafter, the Town & Country Homes Defendants changed the name of their "Villa Product" design to the Homestead Collection. (*Id.*, Ex. R38, 107:18-21.)

Meanwhile, the Town & Country Homes Defendants hired Tim Johnson, an architect that previously worked in-house at Rottlund. (*Id.*, Ex. R42, 247:22-248:12.) While employed by Rottlund, Mr. Johnson worked on Rottlund's Villa II designs. (*Id.*, Ex. R62, 58:1-16.) The Town & Country Homes Defendants also hired three other former Rottlund employees that had access to Rottlund's Villa II designs when they worked for Rottlund: Dan Geegan, Marc Harris, and Joey Zorn.[13] (*Id.*, Exs. R151, 11:17-12:4, 13:19-25, 15:23-22:22, 25:6-27:3; R64, 36:9-23; R63, 13:24-14:9; R62, 58:1-16.) Each of these former Rottlund employees was an instrumental part of the Town & Country Homes Defendants' team "involved in the red lining process" for the Homestead Collection townhome designs. (*Id.*, Ex. R65.) Similarly, the Town & Country Homes Defendants successfully lured Rottlund's land development manager, Richard Palmiter,

[13] All of Rottlund's Villa II documents in Rottlund's offices have a copyright notice on them. (Davenport Aff., Ex. R63, 11:15-12:7.)

away from Rottlund and hired him as their land development manager for their Minnesota operation.[14]

On January 5, 2000, the Town & Country Homes Defendants began to develop the Homestead Collection back-to-back townhome designs in Aurora, Illinois. As explained in an interoffice memorandum:

> [t]he back-to-back townhomes for Homestead, Aurora will be developed from the working drawings originally prepared for Maple Grove, Minnesota. This product form lacks the direct competition found in the Minnesota market and therefore will not need to be all things to all people. We need to meet on a script to identify options for the Chicago plans before I can finalize the architect's scope of work."

(*Id.*, Ex. R69.) Once the Town & Country Homes Defendants finalized the outside architect's scope of work, Doug Buster was selected to perform that work. (*Id.*, Ex. R58, 133:25-134:24.) Mr. Buster performed this work when he simply "re-elevated" the Homestead Collection town houses for Pinnacle in a mere "day and a half or two." (*Id.*, Ex. R58, 69:11-25; 138:16-139:8.) Defendant BGI admits its involvement in the re-elevation of the Homestead Collection. (BGI's Answer to Seventh Amended Complaint, ¶ 250).[15] As the Court has previously held, whether BGI was sufficiently connected to the infringing conduct in this case is a question of fact. (Order, 7/10/03 at p. 12.) The Town & Country Homes Defendants then renamed the re-elevated

---

14 The Town & Country Homes Defendants' raid on Rottlund employees during the time they were copying Rottlund's Villa II designs included unsuccessful efforts to hire Michael Swanson, Rottlund's Vice President of Operations, Kathy Gardas, Rottlund's Director of Purchasing, Steve Meyers, Rottlund's townhome Sales Representative, Karen Albertson, Rottlund's Estimating Coordinator, and other Rottlund executives, all of whom had extensive experience working on and selling Rottlund's Villa II townhomes. (*Id.,* Ex. R66, 34:16-35:15; Ex. R64, 99:21-25; Ex. R67, 70:12-72:3; 84:21-86:24; Ex. R63, 18:24-19:23.) At one point, the Town & Country Homes Defendants sent a former Rottlund employee to a Rottlund office to request a list of all of Rottlund's vendors. (*Id.*, Ex. R64, 22:3-23:11.) Rottlund did not tolerate this questionable business practice and sent him back to Town & Country Homes empty handed. (*Id.,* 51:4-6.)

15 In sharp contrast to BGI's representations to this Court that BSB of Illinois, not BGI, did the work on the Homestead Collection revisions for the back-to-back townhomes in the Washington Square development in Aurora, Illinois (representations which were made when BSB and BGI opposed Rottlund's Motion for Leave to Amend Its Third Amended Complaint (Doc. No. 188)), BGI now affirmatively claims it independently created the Washington Square back-to-back product. (Compare Order, 7/10/03, pp. 9-10 with BGI's Answer to Seventh Amended Complaint, ¶ 250.) BGI's admission cannot be reconciled with its prior representations to this Court.

Homestead Collection townhomes the Washington Square Back-to-Back Townhomes. (Davenport Aff., Ex. R42, 191:3-12.)

Thereafter, in 2000 and 2001, the Town & Country Homes Defendants began to sell the Homestead Collection townhomes at the Centennial Crossing Development in Maple Grove, Minnesota. (*Id.*, Ex. R70.) During this time, the Town & Country Homes Defendants acquired property in Plymouth, Minnesota, and began to develop, along with BSB, the Homestead Collection at the Harvest Hills Development, which is on this property. (*Id.*, Ex. R71.)

On July 5, 2001, Rottlund wrote the Town & Country Homes Defendants a cease and desist letter and demanded that they stop infringing upon Rottlund's copyrighted Villa II designs. (*Id.*, Ex. R72, BSB01932-35.) On July 9, 2001, Pinnacle's in-house architect Steve Sandelin wrote to Larry Moore about "the back to back townhomes your firm designed for <u>our</u> (the Town & Country Homes Defendants') Centennial Crossing community." (*Id.,* BSB01931.) (emphasis added.)[16] Mr. Sandelin admitted the Defendants' designs were "obviously similar" to Rottlund's Villa II designs. (*Id.*) Mr. Sandelin then began to spin the Town & Country Homes Defendants' unlawful copying by sending a memorandum to BSB regarding "copyright infringement," and asked if BSB had a co-license agreement with Rottlund. (*Id.*) No co-license agreement exists.

On July 25, 2001, less than three weeks after the Defendants received a copy of Rottlund's cease and desist letter, TCM employee, and former Rottlund employee, Dan Geegan, sent a portion of Rottlund's copyrighted technical drawings, Registration No. 546-285, depicting the design and layout for Rottlund's sprinkler room to BSB architect Beth Miller. (*Id.*, compare

---

[16] In their marketing brochure for Minnesota, the Town & Country Homes Defendants also represent that they are one entity – "Town & Country Homes." (Davenport Aff., Ex. R112 at RCI000102, 108-109; Ex. R116 at 94:21-114:20.) On their business cards and on their letterhead, the Town & Country Defendants refer to their "Minnesota Division." (*Id.,* R124.) The July 16, 2001 response to Rottlund's cease and desist letter was on "Town & Country Homes Minnesota Division" letterhead, and was signed by "Art Plante, President Minnesota Division." (*Id.,* Ex. R54.)

Ex. R73, BSB01262-1263 with Ex. R74.) The Rottlund logo and copyright notice on Rottlund's technical drawings were cut off from the margin when it was photocopied. (*Id.*) Thereafter, on November 2, 2001, Dan Geegan and Beth Miller had further discussions concerning the sprinkler room designs for the Homestead Collection, and, according to Ms. Miller's notes, Mr. Geegan was "going to call an old arch[itect] friend to determine what they did in this situation."[17] (*Id.*, Ex. R75, BSB01227.)

On April 25, 2002, the Defendants still had not completed a sprinkler room design or layout for their Homestead Collection. Thus, BSB again received a facsimile concerning a sprinkler system design and layout. (*Id.*, Ex. R76.) Unbeknownst to Rottlund, BSB again received photocopied portions of Rottlund's copyrighted Villa II technical drawings, Registration No. 546-285, but this time the right hand margins on the attached pages were not fully deleted. (*Id.*, compare Ex. R76, BSB001022-23 with Ex. R74.) In the upper right hand corner of Exhibit R76, BSB001023, Rottlund's logo was scribbled out and the following copyright notice was scribbled over: "© Copyright 2000 The Rottlund Company, Inc." (*Id.*)

On July 3, 2002, TCM's in-house architect and former Rottlund in-house architect Tim Johnson sent BSB another facsimile concerning Rottlund's Villa II sprinkler system. (*Id.*, Ex. R77.) This time, someone completely cut off the right hand margin of this document, which attributes the design to Rottlund. (*Id.,* compare Ex. R77, BSB00975 with Ex. R74.) In addition, letters were added to the words "SPRINKLER" and "SCALE," and the scale was crossed out. (*Id.*) There are no genuine issues of material fact that the Homestead Collection construction documents contain material portions of Rottlund's Villa II design protected by Copyright

[17] Again, Dan Geegan worked for Rottlund and had access to Rottlund's Villa II design immediately prior to working for Town & Country Homes as a member of their Homestead Collection design red-line team. (*Id.*, Ex. R63, 11:15-12:7 and 13:24-14:19; Ex. R65.)

Registration No. 546-285.[18] (*Id.*, compare Ex. R18, RCI004161 and Ex. R74 with Ex. R79, BSB02898 and Ex. R80, BSB02921.)

In other words, there is substantial evidence that the Homestead Collection townhome plans and structures were directly copied from Rottlund's copyrighted Villa II plans and structures.

## II. The Defendants' Representations Concerning The Nature, Characteristics, Qualities And Origin Of Their Infringing Townhomes.

According to the Town & Country Homes Defendants, they won "the Twin Cities market with innovative, affordable home designs that meet today's lifestyles." (Davenport Aff., Ex. R125, PINN03201) In fact, this "Chicago-based national residential builder" aggressively claims its "innovative designs" for "middle-income buyers" results in "thoughtful home designs that have been carefully planned to meet the needs of today's diverse lifestyles." (*Id.*, PINN03201-02.) Thus, this Chicago-based entity concluded that expansion into the Twin Cities market was ripe because "the community lacked innovation and creativity in the design of homes for the average, middle income Twin Cities family." (*Id.*, PINN03202.) In early 1997, Town & Country Homes placed Art Plante at the head of its Minnesota division and his objective was to "offer complete, well-designed homes that include all the basics . . . (with options) so new home buyers can create their own personal home." (*Id.*, PINN03214.) As discussed below, Art Plante then led the Defendants' charge to copy Rottlund's Villa II designs and works, which are developed for and marketed to the same consumers the Town & Country Homes Defendants were aiming for with their "innovative designs." As the Court previously found, "Rottlund,

---

[18] Metro Fire Protection provided an affidavit that explains their limited involvement in the mechanical systems associated with the sprinkler system itself, and further explains that Rottlund, not Metro Fire Protection, Inc., designed the sprinkler room, including its placement, location and layout. (Doc. No. 335.) Mr. Dosch further clarified the fact that Rottlund owns the portion of its Villa II technical drawings depicting the placement, location, layout and design of its sprinkler room and sprinkler system. (Davenport Aff., Ex. R78, 39:4-41:7.)

Pinnacle, and TCM are all direct competitors in the design, development, construction, and sale of townhomes." *The Rottlund Co.*, 2004 WL 1879983, at *2.

As discussed above, on or about April 6, 1998, the Town & Country Homes Defendants contracted with BSB for a Villa Product project, which they agreed would be an eight unit, back-to-back, multi-family townhome. (*Id.*, Ex. R52.) Pursuant to the contract, BSB claimed to be the creator of the designs and retained any purported ownership/authorship rights in them, including copyrights. (*Id.*, D00238.) On August 26, 1999, BSB issued the infringing Homestead Collection construction documents from Iowa and transferred them for use at the Centennial Crossing development in Maple Grove, Minnesota. (*Id.*, Ex. R70.) On February 28, 2000, BSB contracted and transferred the infringing Homestead Collection designs from Iowa to the Washington Square development in Aurora, Illinois. (*Id.*, Ex. R133.) On November 29, 2000, BSB contracted and transferred the designs from Iowa to the Paulson Property/Harvest Hills development in Plymouth, Minnesota. (*Id.*, Ex. R134.) On January 18, 2001, BSB contracted and transferred the designs from Iowa to the Cornerstone Lake development in Lakeville, Minnesota. (*Id.*, Ex. R135.) On April 30, 2001, BSB contracted and transferred the designs from Iowa to the Stone's Throw/Springbrook development in Lakeville, Minnesota. (*Id.*, Ex. R136.) Also on April 30, 2001, BSB contracted and transferred the designs from Iowa to the Heritage Square/Providence Pointe development in Shakopee, Minnesota. (*Id.*, Ex. R137.)

According to BSB architect Chris Jorgensen, these various Homestead Collection designs were all kept in Iowa, and for each "jurisdictional transfer, those files were saved down to create the next version. So in that sense, if you want to call that cut and pasting" then it is. (*Id.*, Ex. R138 at 185:14-23.) In other words, on multiple occasions, these infringing "cut and paste" Homestead Collection designs were sent from Iowa to different states, Minnesota and Illinois,

yet Rottlund was never given credit as the original creator of the design from which the Homestead Collection was copied. In addition, as provided in the jurisdictional transfer contracts, BSB continued to claim that it was the creator of the designs. (*Id.*, Exs. R133 at BSB02481, R134 at BSB00949, R135 at BSB00933, R136 at D00874, R137 at D00844.)

Likewise, the Town & Country Homes Defendants never gave credit to Rottlund, either in their advertising and promotional material or in their various submissions to municipalities for community development approval. (*Id.*, Exs. R126, R128-132.) None of their submissions seeking community development approval from various municipalities gave any credit to Rottlund; rather, they gave such credit to BSB. For instance, the Town & Country Homes Defendants represented to the City of Plymouth, Minnesota, that the Homestead Collection product originated from and was "designed by the nationally renowned architectural firm of Bloodgood, Sharp, Buster." (*Id.*, *e.g.*, Ex. R131 at D16671.) Likewise, in their advertising and promotional material, the Town & Country Homes Defendants represented that the Homestead Collection design sets them apart from the "ordinary" townhomes offered in the market. (*Id.*, Ex. R126 at D01663.) Similarly, the Town & Country Homes Defendants' represented that the value of their Homestead Collection design is "the wide open spaces," (which they failed to disclose were copied from Rottlund's design). (*Id.*) In addition, the Town & Country Homes Defendants prominently displayed the Homestead Collection elevations and routinely stated that the value of their product is its innovative design. (*Id.*, D01727-1738.) Rather than crediting Rottlund as the originator of the designs from which the Homestead Collection designs were copied, these Defendants attempted to set their copied designs apart from Rottlund's Villa II designs by representing that they carefully designed the Homestead Collection designs to be

"fresh alternatives." (*Id.*, Ex. R127 at D16925.)[19] Further, Town & Country Homes' representations concerning the Homestead Collection design include their claims of copyright ownership of the design, and their representations concerning all the various design components which comprise the gestalt of the Homestead Collection townhomes which they claim originated from them.[20] (*Id.*, Ex. R129 at D00786, 788, 790, 792, 794, 796, 798, 800, 809.) Similar advertising occurred through the Town and Country Defendants' website, which shares a common link. (*Id.*, Ex. R141 at 9:19-17:2.)

## LEGAL ANALYSIS

### I. Summary Judgment Standard.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall only be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c) (2003); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is deemed "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "Material" facts are those which might affect the outcome of the litigation under the applicable law. *Id.*

### II. The Copyright Act Does Not Preempt Rottlund's Lanham Act Or Deceptive Trade Practices Act Claims.

#### A. Rottlund's Reverse Passing Off Claim Under The Lanham Act.

Section 43(a) of the Lanham Act prohibits parties, like Defendants, from using any false designation of origin or false or misleading descriptions or representations of fact, which, "in

[19] Attached as Exhibit R128 to the Davenport Affidavit are samples of representations the Town & Country Homes Defendants have made concerning the Chateau Collection, none of which credit Rottlund as the original designer of the product from which the Chateau Collection was illegally derived.

[20] The Town & Country Homes Defendants have made similar representations in connection with the infringing back-to-back townhomes in their Washington Square community in Aurora, Illinois. (Davenport Aff., Ex. R130.)

commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). Rottlund's Lanham Act claim is based on legal precedent recognizing that using a slightly modified product of another and identifying it as your own constitutes a false designation of origin in violation of the Lanham Act. *See*, *e.g.*, *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 780 (2nd Cir. 1994) (citing *Arrow United Indus., Inc. v. Hugh Richards, Inc.*, 678 F.2d 410 (2nd Cir. 1982)); *Attia v. Soc'y of the N.Y. Hosp.*, 201 F.3d 50, 59 (2nd Cir. 1999).

*Waldman* recognized that "[a] claim of reverse passing off is separate and distinct from a claim of copyright infringement." 43 F.3d at 781 (citing *Dodd v. Fort Smith Special Sch. Dist. No. 100*, 666 F. Supp. 1278 (W.D. Ark. 1987). Thus, the *Waldman* court permitted the plaintiff to pursue its reverse passing off claim under the Lanham Act and required the plaintiff to show, in addition to a false designation of origin causing confusion, the same level of substantial similarity required by the Copyright Act. *Id.* at 783; *see also Attia*, 201 F.3d at 59. Therefore, Rottlund is not preempted from pursuing its reverse passing off claim. *See also Arrow United Indus.*, 678 F.2d at 415 (finding that where one slightly modifies another's product and represents the product to be his own, reverse passing off occurs and is actionable because the manufacturer of the slightly modified product is misappropriating the talents of another).

The viability of Rottlund's reverse passing off Lanham Act claim is widely recognized. For instance, in *Maurizio v. Goldsmith*, No. 96 CIV. 4332, 2001 WL 1568428, *4 (S.D.N.Y. Dec. 5, 2001), the court recognized the viability of a reverse passing off claim like Rottlund's and explicitly rejected the very same argument that the Bloodgood Defendants make here. The *Maurizio* defendant argued that the plaintiff's Lanham Act claim "constitutes nothing more than

a reiteration of her claims under the Copyright Act and thus must be dismissed because it is duplicative of the copyright infringement cause of action." *Id.* The court disagreed and held:

> [w]hile the distinction between copyright infringement and the Lanham Act's concept of reverse passing off is somewhat murky . . . the two causes of action address different harms. In particular, '[t]hrough a copyright infringement action, a copyright owner may control who publishes, sells or otherwise uses a work. Through a Lanham Act action, an author may ensure that his or her name is associated with a work when the work is used.' Thus, it is possible that the misuse of one author's work by another author may result in different harms leaving two separate causes of action under both the Copyright Act and the Lanham Act.

*Id.* (emphasis added) (quoting *Waldman*, 43 F.3d at 781). In other words, Rottlund's copyright infringement claim addresses Rottlund's injuries flowing from the unauthorized use of its Villa II copyrights, and Rottlund's Lanham Act claim addresses Rottlund's injuries flowing from the use of Rottlund's designs without credit being given to Rottlund as the original creator. *See also Carell v. The Shubert Org., Inc.*, 104 F.Supp.2d 236, 259 (S.D.N.Y. 2000) ("harm caused by reverse passing off is that the originator of the product is 'involuntarily deprived of the advertising value of its name and of the goodwill that otherwise would stem from public knowledge of the true source of the satisfactory product'") (quoting *Rosenfeld v. W.B. Saunders, Div. of Harcourt Brace Jovanovich, Inc.*, 728 F. Supp. 236, 241 (S.D.N.Y.), *aff'd*, 923 F.2d 845 (2nd Cir. 1990)). Here, it is undisputed that Rottlund's Villa II design is its hallmark product that propelled Rottlund from being recognized as a good developer in the Twin Cities to the largest developer in the State of Minnesota, thus the Villa II designs and works are extremely valuable assets of Rottlund, just like the association of its name and goodwill with the Villa II designs and works. (Davenport Aff., Ex. R139, 41:20-44:19; 98:23-99:7; 104:14-22.)

While the "two claims are distinct, courts routinely rely on copyright law to guide Lanham Act analyses." *Maurizio*, 2001 WL 1568428, at *4; *see also Kaplan v. The Stock Mkt.*

*Photo Agency, Inc.*, 133 F.Supp.2d 317, 328 (S.D.N.Y. 2001) (dismissing plaintiff's false designation of origin Lanham Act claim because he failed to establish substantial similarity); *Scholastic, Inc. v. Stouffer*, 124 F.Supp.2d 836, 843 (S.D.N.Y. 2000) (holding that while a Lanham Act claim may "sound in copyright, or could be pled as a copyright claim, this does not preclude the assertion of trademark claims related to the alleged infringement"); *Carell*, 104 F.Supp.2d at 262 (refusing to dismiss a false designation of origin Lanham Act claim because "a Lanham Act claim is a viable alternative to a copyright action"); *Dodd*, 666 F. Supp. at 1284 (recognizing the viability of a false designation of origin Lanham Act claim where a copyright infringement claim is asserted but not viable); *Hartman v. Hallmark Cards, Inc.*, 639 F. Supp. 816, 823 (W.D. Mo. 1986) (applying the Copyright Act's substantial similarity test to a Lanham Act claim) (citing *Warner Bros., Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 246 (2d Cir. 1983)). Thus, Rottlund's reverse passing off Lanham Act claim is not duplicative of or preempted by its copyright infringement claims.

**B. <u>Rottlund's Deceptive Trade Practices Act Claim</u>.**

Deceptive Trade Practices Act claims require the same analysis as Lanham Act claims. *See Group Health Plan, Inc. v. Philip Morris, Inc.*, 68 F.Supp.2d 1064, 1069-70 (D. Minn. 1999). For the same reasons that the Copyright Act does not preempt Rottlund's Lanham Act claim, the Copyright Act does not preempt Rottlund's Deceptive Trade Practices claim.

Moreover, black letter law provides that "a state law claim that defendant made a false representation that defendant, rather than plaintiff, was the designer of a copyrightable design is not preempted by copyright law under Copyright Act § 301 since it is a legal claim that is significantly different in kind from copyright infringement." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 6:15 (2002) (citations omitted); *see also Donald Frederick Evans & Assocs., Inc. v. Cont'l Homes, Inc.*, 785 F.2d 897, 914 (11th Cir. 1986) (state

law claim that defendant falsely represented to potential buyers that its new houses and plaintiff's new houses were the same was not preempted by copyright law because claim requires a likelihood of confusion element that is not required by copyright law); *Warner Bros.,* 720 F.2d at 247 (passing off claim under state law is not a right equivalent to copyright and is not preempted under § 301); *Nester's Map & Guide Corp. v. Hagstrom Map Co.*, 796 F. Supp. 729, 736 (E.D.N.Y. 1992) (state law claims alleging likelihood of confusion are not equivalent to copyright claim because the claims contain an additional legal element); *Tracy v. Skate Key, Inc.*, 697 F. Supp. 748, 751 (S.D.N.Y. 1988) (state law passing off claim is "qualitatively different" from copyright claim and not preempted by the Copyright Act); *Myers v. Waverly Fabrics,* 479 N.E.2d 236, 227 U.S.P.Q. 55 (N.Y. 1985) (state law claim that defendant falsely represented that it, rather than plaintiff, was the designer of a copyrightable design is not preempted by copyright law); *Stillman v. Leo Burnett Co., Inc.,* 720 F. Supp. 1353, 1363 (N.D. Ill. 1989) ("when a copier misrepresents that he is the creator, nothing in the copyright laws prohibits the states from providing a remedy."). Thus, "state trademark law and federal copyright law are separate, distinct and non-conflicting bodies of law," which precludes preemption of the former by the latter. *McCarthy on Trademarks and Unfair Competition*, § 6:29 (citations omitted).

Accordingly, the Bloodgood Defendants' argument that the Copyright Act preempts Rottlund's Deceptive Trade Practices claim is misplaced.

## III. Genuine Issues Of Material Fact Exist Concerning Rottlund's Lanham Act and Deceptive Trade Practices Act Claims.

As discussed above, the same legal analysis applies to Rottlund's reverse passing off Lanham Act and Deceptive Trade Practices Act claims. *Group Health Plan*, 68 F.Supp.2d at 1069-70 (citing *Med. Graphics Corp. v. SensorMedics Corp.*, 872 F. Supp. 643, 649 (D. Minn. 1994). To establish its Lanham Act claim, Rottlund needs to demonstrate that: (1) the

Defendants made false or misleading statements about their townhomes in their commercial advertising;[21] (2) the statements actually deceived or have the tendency to deceive a substantial segment of the audience; (3) the deception is material because it is likely to influence buying decisions; (4) the advertised goods traveled in interstate commerce; and (5) injury or likelihood of injury as a result, either by diversion of sales or by injury to the goodwill Rottlund enjoys with the buying public. *Med. Graphics*, 872 F. Supp. at 649-50 (citations omitted). While the Bloodgood Defendants limit their arguments to elements (2) and (4) above, Rottlund will demonstrate that it can, in fact, make a *prima facie* showing of facts sufficient to establish each of the elements of these claims.

First, as discussed above, the Defendants have made many false and misleading statements about the origin of their townhomes in commercial advertising and these representations have caused injury to Rottlund. Namely, the Defendants represent that the designs at issue here belong to them because they are the creators of the designs. For instance, the Defendants represent the origin of the Homestead Collection, Chateau Collection and Washington Square back-to-back townhome designs emanates from their own original, innovative design talents; yet, the record demonstrates that the Defendants simply copied Rottlund's copyrighted designs and works and are passing the designs off as their own. This is classic reverse passing off in violation of the Lanham Act. *See*, *e.g.*, *Hartman*, 639 F.Supp. 816, 824 (W.D. Mo. 1986) (recognizing that a viable reverse passing off claim "alleges that the defendants have falsely passed off what are, in fact, allegedly plaintiff's products as belonging to

---

[21] Commercial advertising is: (1) commercial speech; (2) made by a defendant who is in commercial competition with the plaintiff; (3) made for the purpose of influencing consumers to purchase defendants' goods or services; and (4) disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within the industry. *See Group Health*, 68 F.Supp.2d at 1069. It is undisputed that the Town & Country Homes Defendants' representations at issue here constitute commercial speech, thus the Bloodgood Defendants do not argue otherwise in their moving papers.

them by pretending that they were the creators of those properties," but denying the claim because the products at issue were not substantially similar). Likewise, because none of the Defendants ever credit Rottlund as the originating source of these designs, they again misrepresent the origin of their designs and cause Rottlund injury – both in the form of lost sales and harm to goodwill. *See*, *e.g.*, *Carell*, 104 F.Supp.2d at 259 ("harm caused by reverse passing off is that the originator of the product is 'involuntarily deprived of the advertising value of its name and of the goodwill that otherwise would stem from public knowledge of the true source of the satisfactory product'") (quoting *Rosenfeld*, 728 F. Supp. at 241)); *Dodd*, 666 F.Supp. at 1284-85 (granting plaintiff an injunction based upon a Lanham Act reverse passing off claim because the defendant's representations that it was the creator of a book were false and likely to deceive and confuse consumers because the defendant had actually copied the plaintiff's book).

Second, the record demonstrates that the Defendants willfully misappropriated Rottlund's copyrighted designs and works, intentionally copied them, and then widely disseminated advertising and promotional material misrepresenting to the purchasing public that the designs were (1) the Defendants, and (2) originated from them. It is well established that actual consumer confusion is presumed as a matter of law where the advertisements and promotions at issue are, like those here, literally false. *See, e.g.*, *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002). Thus, the Bloodgood Defendants' argument that Rottlund must present survey evidence to show confusion is misplaced because Rottlund will be entitled to a presumption of confusion if the fact-finder concludes that the Defendants violated Rottlund's copyrights. In fact, when this presumption of confusion arises, it will be the Defendants who will need to rely on survey evidence to rebut Rottlund's proof of confusion, but none of the Defendants have such evidence. Moreover, in

architectural copyright infringement cases like this one, the likelihood of confusion test that courts would typically apply to evaluate whether misrepresentations are likely to confuse or deceive the purchasing public does not apply because these cases are "slightly different from the run-of-the-mill Lanham Act case, and, as it happens, much simpler" for purposes of analyzing consumer confusion. *Johnson v. Jones*, 149 F.3d 494, 503 (6th Cir. 1998). In short, Rottlund does not need survey evidence to satisfy elements (2) and (3) of its reverse passing off claim.

Third, in *Johnson v. Jones*, the plaintiff, just like Rottlund here, alleged that the defendants altered and used (i.e., copied) the plaintiff's 17 U.S.C. §§ 102(a)(5) and (8) copyrighted works. *Id.* at 496. In addition to his copyright infringement claims, the plaintiff in *Johnson*, just like Rottlund here, asserted a false design of origin claim pursuant to § 43(a) of the Lanham Act.[22] *Id.* The Sixth Circuit Court of Appeals affirmed the district court's summary judgment order finding the defendant architect liable for copyright infringement <u>and</u> Section 43(a) Lanham Act violations, because the architect wisely admitted that he copied the plaintiff's designs and the record established that the architect subsequently represented that the infringing architectural plans were his own designs. *Id.* at 500, 503.[23] On appeal, the infringer architect, just like the Bloodgood Defendants, argued that the plaintiff failed to satisfy the interstate commerce element of his Lanham Act claim because the house constructed from the infringing plans did not enter interstate commerce. (Compare *Id.* at 502 and Defendants' Mem. at pp. 6-7.) However, just like the Bloodgood Defendants, the appealing architect "fundamentally

---

[22] Notably, the plaintiff's copyright infringement claim was not pre-empted or duplicative of his Lanham Act claim.

[23] The Sixth Circuit also affirmed the district court's finding that despite being unable to recover attorney's fees under the Copyright Act, the plaintiff was able to recover his attorney's fees under the Lanham Act because the defendant's conduct was willful and deliberate. *Johnson*, 149 F.3d at 503-04. In fact, the only portion of the district court's summary judgment order that was not affirmed by the Sixth Circuit was the portion of the order which failed to require one of the infringing defendants to forfeit its gross revenues to the plaintiff since the defendant did not satisfy its burden to present competent evidence of deductible expenses after the plaintiff presented evidence of the defendant's gross revenues. *Id.* at 506-07.

misperceives the nature of this case, because he fails to grasp that the house is only part of the 'goods or services' at issue in this case." (*Id.* at 502.) (emphasis added). In the case at bar, the Homestead Collection, Chateau Collection and Washington Square back-to-back designs, which infringe Rottlund's technical drawings and architectural works copyrights, are at issue, just like the constructed buildings. Stated differently, Rottlund's claims and damages are not simply limited to the constructed infringing buildings, they are also based on infringing designs. 17 U.S.C. §§ 102(a)(5),(8).

As explained above, Larry Moore faxed the "cut and paste" Rottlund Villa floor plans from his Iowa office to Doug Buster in Illinois. (Davenport Aff., Ex. R32; Ex. R140 at BSB06379-80.) In addition, TCM faxed, from Minnesota, a portion of Rottlund's copyrighted designs to BSB in Iowa. (*Id.*, compare Ex. R73, BSB01262-1263 with Ex. R74; compare Ex. R77, BSB00975 with Ex. R74.) BSB subsequently sent a portion of Rottlund's copyrighted designs back to Town & Country Homes in Minnesota. (*Id.*, compare Ex. R18, RCI004161 and Ex. R74 with Ex. R79, BSB02898 and Ex. R80, BSB02921.)

Furthermore, the record contains evidence of many faxes of designs that rightfully belong to Rottlund, and jurisdictional transfers of these infringing designs from BSB in Iowa to TCM in Minnesota, and from BSB in Iowa to Pinnacle in Chicago, because BSB claimed and retained ownership of the designs the Defendants copied from Rottlund. As BSB architect Chris Jorgensen testified, these various Homestead Collection designs were all kept in Iowa, and for each "jurisdictional transfer, those files were saved down to create the next version. So in that sense, if you want to call that cut and pasting you can." (*Id.*, Ex. R138 at 185:14-23.) These infringing "cut and paste" Homestead Collection designs were then sent to different states.

For example, the April 1998 contract between BSB and the Town & Country Defendants provides that BSB owns the infringing Homestead Collection designs. (*Id.*, Ex. R52 at D00238.) On August 26, 1999, BSB issued the infringing construction documents from Iowa and transferred them for use at the Centennial Crossing development in Maple Grove, Minnesota. (*Id.*, Ex. R70.) On February 28, 2000, BSB contracted and transferred the infringing Homestead Collection designs from Iowa to the Washington Square development in Aurora, Illinois. (*Id.*, Ex. R133.) On November 29, 2000, BSB contracted and transferred the designs from Iowa to the Paulson Property/Harvest Hills development in Plymouth, Minnesota. (*Id.*, Ex. R134.) On January 18, 2001, BSB contracted and transferred the designs from Iowa to the Cornerstone Lake development in Lakeville, Minnesota. (*Id.*, Ex. R135.) On April 30, 2001, BSB contracted and transferred the designs from Iowa to the Stone's Throw/Springbrook development in Lakeville, Minnesota. (*Id.*, Ex. R136.) Also on April 30, 2001, BSB contracted and transferred the designs from Iowa to the Heritage Square/Providence Pointe development in Shakopee, Minnesota. (*Id.*, Ex. R137.) Furthermore, for each of these developments, several sets of revised designs were transferred from Iowa to Minnesota or Illinois. (*Id.*)

In short, the Homestead Collection and Washington Square back-to-back townhome design documents were circulated on multiple occasions between the Defendants in at least three different states: Minnesota, Iowa and Illinois. Thus, it should be undisputed that the advertised goods, the designs, traveled in interstate commerce.

Moreover, the record is clear that Pinnacle and TCM share, though a common link, a website based in Illinois that advertises the Homestead Collection town homes and other products. (*Id.*, Ex. R141 at 9:19-17:2.) These advertisements and promotions certainly travel in interstate commerce when Pinnacle prepares them in Chicago and they are circulated in

Minnesota through Pinnacle's Minnesota Division, TCM. Thus, the Town & Country Homes Defendants' advertising activity is itself in interstate commerce. *See McLain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. 232, 241-42 (1980) (interpreting interstate commerce requirements in connection with Sherman Act claim and noting that, in connection with federal statutory claims requiring a showing of interstate commerce [like the Lanham Act] Congressional authority under the Commerce Clause has long been interpreted to extend to activity that is either itself in interstate commerce or, if only local in nature, "has an effect on some other appreciable activity demonstrably in interstate commerce).

Likewise, there should also not be a dispute that the advertisements and promotions concerning the infringing designs have an effect on an activity in interstate commerce because these advertisements are widely disseminated through various media channels, including newspapers like the Minneapolis Star Tribune, trade journals and Parade of Homes brochures. (Davenport Aff., Exs. R126-R127, R129-R132.) These advertisements and promotions include external elevations of the Homestead Collection design, photographs of the interior of the Homestead Collection design, and depictions of the floor plan of the Homestead Collection design. (*Id.*, Exs. R126-R127, R129-R132.) This is true for the Chateau Collection and Washington Square back-to-back townhomes as well. (*Id.*, Ex. R128.) Furthermore, like *Johnson*, the interstate commerce element is satisfied here because the Town & Country Homes Defendants utilized numerous sub-contractors and distributed the designs at issue (called "bidding purposes" technical drawings) to these sub-contractors for bidding and construction purposes. 149 F.3d at 502. (Davenport Aff., Exs. R142-R145.) In sum, the interstate commerce element of Rottlund's reverse passing off claim is satisfied on four separate grounds: (1) the infringing designs have traveled in interstate commerce; (2) the infringing designs have had an

effect on activity in interstate commerce; (3) the advertisements and promotions themselves have traveled in interstate commerce; and (4) the advertisements and promotions themselves have had an effect on activity in interstate commerce.

As for confusion, here, as in *Johnson*, "the defendant has taken the plaintiff's product and represented it to be his own work." 149 F.3d at 503. As in *Johnson*, "[i]t is difficult to imagine how a designation of origin of a product could be more false, or could be more likely to cause confusion or mistake as to the actual origin of the product." (*Id.*) As this Court previously found, "Rottlund, Pinnacle and TCM are all direct competitors in the design, development, construction, and sale of townhomes." *The Rottlund Co.*, 2004 WL 1879983, at *2. Because Rottlund and the Town and County Defendants provide the same kinds of services, use similar marketing channels, and compete against each other with architectural designs, "[f]ew are the cases demonstrating a more obvious and imminent likelihood of confusion." (*Id.*)

The Eighth Circuit Court of Appeals adopted this reasoning last month in *Mid-List Press v. Nora*, 374 F.3d 690, 693 (8th Cir. 2004). Specifically, relying on *Johnson*, the Eighth Circuit affirmed Judge Doty's decision to grant the plaintiff an injunction because "[f]ew are the cases demonstrating a more obvious and imminent likelihood of confusion" than when a wrongdoer passes off the plaintiff's work as his own." (*Id.*) This same analysis applies here. Rottlund's in-house architect Tim Whitten testified that he spent at least a year designing Rottlund's Villa products, yet the Defendants simply copied Rottlund's Villa II design for Town & Country Homes' Centennial Crossing community. Thereafter, the Town & Country Homes Defendants used the design in many subsequent communities and continually misrepresented the origin of the design by representing the work to be their own, when, in fact, it is a copy of Rottlund's Villa II design. As a result, Rottlund was deprived of the advertising value of its name and the

goodwill that would otherwise stem from public knowledge that Rottlund is the true source of the infringing "innovative designs." *Carell*, 104 F.Supp.2d at 259. Pursuant to *Johnson* and *Mid-List*, Rottlund would be hard pressed to demonstrate a more obvious likelihood of confusion given the facts of this case.

In sum, Rottlund can establish *prima facie* claims for Lanham Act and Deceptive Trade Practice Act violations, thus the Court should deny the Bloodgood Defendants' motion because there are genuine issues of material fact in dispute.

## IV. The Bloodgood Defendants Did Not Independently Create The Homestead Collection Or Washington Square Back-to-Back Townhomes.

A plaintiff may prove copying through direct or circumstantial evidence. *See*, *e.g.*, *Donald Frederick Evans & Assocs. v. Cont'l Homes, Inc.*, 785 F.2d 897, 904-05 (11th Cir. 1986); *CSM Investors*, 840 F. Supp. at 1311. In most copyright infringement cases there is no direct evidence of copying. *Craig v. Dabrowski,* No. 98 C 405, 1999 WL 412581, at *8 (N.D. Ill. June 8, 1999) (citing *Selle v. Gibb,* 741 F.2d 896, 901 (7th Cir. 1984)). Accordingly, copying may be established through circumstantial evidence by proving two elements: (1) the defendant had access to plaintiff's work; and (2) the works are substantially similar. *Hartman v. Hallmark Cards, Inc.,* 833 F.2d 117, 120 (8th Cir. 1987); *CSM Investors*, 840 F. Supp. at 1311; *Kootenia Homes, Inc. v. Reliable Homes, Inc.,* No. CIV. 00-117, 2002 WL 15594, at *4 (D. Minn. Jan. 3, 2002).

As discussed below, Rottlund has presented substantial direct evidence that the Defendants copied Rottlund's Villa II drawings and works. Because Rottlund has also presented circumstantial evidence of copying (access and substantial similarity), a presumption of copying also arises and the Bloodgood Defendants may only rebut this presumption with "*strong, convincing and persuasive evidence*" that they independently created the Homestead Collection.

*Gund, Inc. v. Russ Berrie and Co., Inc.*, 701 F. Supp. 1013, 1025 (S.D.N.Y. 1988) (citing *Mode Art Jewelers, Co. v. Expansion Jewelry, Ltd.*, 199 U.S.P.Q. (BNA) 329, 340 (S.D.N.Y. 1977); 3 M. Nimmer, *Nimmer on Copyright* § 13,01[B], at 13-9; § 12.11[D], at 12-85-86 (1988) (emphasis added)); *see also Arthur Rutenberg Homes, Inc. v. Maloney*, 891 F. Supp. 1560, 1567 (M.D. Fla. 1995) (after plaintiff establishes access and substantial similarity, "[t]he burden shifts to the defendant to rebut this presumption by *persuasive evidence* of independent creation") (citing *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 829 (11th Cir. 1982) (emphasis added)).

According to the United States Supreme Court, if a work is copied from other works it is not independently created. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345 (1991). Thus, if two poets were to compose identical poems but each were ignorant of the other, then each poem may be independently created. (*Id.* at 345-46.) Consequently, unless the Bloodgood Defendants convincingly prove that the Homestead Collection plans were created ignorant of and without reliance on Rottlund's copyrighted designs and works, they cannot satisfy their heavy burden to present strong and persuasive evidence of independent creation. *Maloney*, 891 F. Supp. at 1567 (rejecting independent creation affirmative defense because infringers' contradictory testimony did not demonstrate that its plans were "created independently and without reliance on the copyrighted [work]"); *Original Appalachian Artworks*, 684 F.2d at 829-30 (affirming trial court's rejection of independent creation defense where the only evidence of independent creation, aside from a few differences in the works in question, was the infringer's self serving testimony that it did not copy, but was only inspired by, the copyrighted work); *Gund*, 701 F. Supp. at 1022 (granting injunction to plaintiff because defendant's evidence of independent creation was insufficient to rebut the presumption of

copying, in part, because defendant's argument that it used other products, rather than the plaintiff's, as "models" for its product negated independent creation).

The Bloodgood Defendants have the burden to prove by strong, convincing and persuasive evidence that they independently created the Homestead Collection. They have not satisfied this heavy burden. Moreover, Rottlund's direct and circumstantial evidence of copying, at a minimum, creates genuine issues of material fact precluding these Defendants from making this showing for purposes of summary judgment.

### A. The Defendants Directly Copied Rottlund's Villa II Plans And Buildings.

#### 1. BSB Copied Rottlund's Villa Designs When Working On Other Projects And Then Relied On These Other Projects When Assembling The Homestead Collection Design.

BSB architect Larry Moore, who assembled the concept designs for the Homestead Collection, testified that the "ideas on how to assemble room locations and elements and things like that" for the Homestead Collection townhome design came from three prior BSB back-to-back townhome projects: 1) Midland Homes; 2) Good Value Homes; and 3) Jerry's Homes. (Davenport Aff., Ex. R27, 15:20-16:5.) As discussed above, BSB's Midland Homes project was the result of an effort to produce back-to-back townhome construction drawings "similar to the Rottlund Homes plans" BSB provided to Design Development. (*Id.*, Ex. R31.) BSB even inquired internally whether its Midland Homes designs were "enough 'departure' from Rottlund['s]" back-to-back townhome designs. (*Id.*, Ex. R37.) Likewise, BSB had a copy of Rottlund's Villa townhome floor plans and elevations prior to completing final construction drawings for Jerry's Homes' "Bent Tree Villas," which was renamed Bent Tree "Villas" after BSB received Rottlund's designs during the design process. (*Id.*, Exs. R39; R40, 206:1-24.) Thus, when BSB architect Larry Moore admitted he consulted and relied upon prior BSB

projects to design the Homestead Collection – prior projects where BSB copied Rottlund's Villa designs – Mr. Moore admitted he copied Rottlund's copyrighted Villa design.

2. The Defendants Toured Rottlund's Villa II Townhomes To Find "Mistakes" In Rottlund's Design And "Improve" Upon Them.

As discussed above, the Defendants participated in multiple tours of Rottlund's product wherein they took pictures of Rottlund's copyrighted floor plan and obtained copies of Rottlund's marketing brochures depicting the copyrighted Villa II Chatham floor plan. "Copying the floor plan alone infringes the copyright." *The Value Group, Inc. v. Mendham Lake Estates, L.P.*, 800 F. Supp. 1228, 1233 (D.N.J. 1992) (finding infringement because a side by side comparison of floor plans demonstrated that many of the details of the two designs were the same, such as the placement, design and size of many windows); *Raintree*, 862 F. Supp. at 1526 (copyright holder can establish infringement by proving the defendant copied floor plans); *Kent v. Revere*, No. 84-798-CIV-ORL-18, 1985 WL 6453, at *6 (M.D. Fla. Oct. 28, 1985) (copying floor plans constitutes infringement). According to BSB's head architect, Mr. Moore, the Defendants toured Rottlund's Villa II townhomes to "better" Rottlund's Villa II design.[24] Mr. Moore's testimony is particularly revealing in light of the fact that the Defendants themselves referred to their design project as the "Villa Product" and "The Villas." (Davenport Aff., Exs. R59 at BSB00642, R60, R61.)

3. TCM's President Art Plante Directed BSB To Copy Rottlund.

As shown above, TCM President Art Plante affixed a copy of one of his Villa II photographs to a set of "client red-lines" for the Homestead Collection and instructed BSB to copy Rottlund's design. (*Id.*, Ex. R60, BSB02035A.) Mr. Plante even sketched Rottlund's

[24] Specifically, Mr. Moore testified that the purpose of the tours was to find "mistakes" that Rottlund was making with its back-to-back townhome designs, fix these "mistakes" and "find opportunities to one-up" Rottlund. (Davenport Aff., Ex. R30, 39:22-41:1.) According to Mr. Moore: "[we] see a mistake they're making and we better it. If their rooms are too small, we make them bigger. If their closets are too small, we make them bigger. We better it." (*Id.* at 40:23-41:1.)

design on the revisions and instructed BSB to "see Rottlund's product" to ensure that BSB understood the direction to copy Rottlund directly. (*Id.*)

4. <u>The Town & Country Homes Defendants Hired Rottlund's Former Employees For The Homestead Collection Design Red-line Team</u>.

The Town & Country Homes Defendants ensured the success of their endeavor to copy Rottlund by hiring former Rottlund employees who had access to, and worked on, Rottlund's Villa II plans and buildings while at Rottlund. In this regard, the Town & Country Homes Defendants hired Joey Zorn, Marc Harris, Chad Cooper, Dan Geegan and Tim Johnson to work on the "Villa Product." (*Id.*, Ex. R62, 58:1-22; Ex. R63, 13:21-14:9; Ex. R99; Ex. R151, 11:17-12:4, 13:19-25, 15:23-22:22, 25:6-27:3.) While at Town & Country, Joey Zorn, Marc Harris, and Dan Geegan were all members of the "Villa Product" design red-line team. (*Id.*, Ex. R65.) Tim Johnson, an architect formerly employed by Rottlund who had access to Rottlund's Villa II technical drawings, worked as TCM's in-house architect on the "Villa Product," and also red-lined designs. (*Id.* Ex. R99.) In fact, on July 3, 2002, Tim Johnson sent BSB a facsimile containing Rottlund's Villa II sprinkler room design, but the right hand margin of the document that attributes the design to Rottlund had been cut off. (*Id.*, compare Ex. R77, BSB00975 with Ex. R74.) Clearly, the Town & Country Homes Defendants directly copied Rottlund when they obtained and used a portion of Rottlund's copyrighted Villa II plans.

5. <u>The Defendants Had Portions Of Rottlund's Technical Drawings In Their Files And Used Them To Design The Homestead Collection</u>.

The Town & Country Homes Defendants and BSB had multiple copies of portions of Rottlund's copyrighted technical drawings, Registration No. 546-285, in their files. (Davenport Aff., Exs. R73, R76, R77.) As the documents demonstrate, someone cut off the margins that identify the copyrighted technical drawings as Rottlund's copyrighted materials. (*Id.*) The two Town & Country Homes' employees involved in this direct copying, Dan Geegan and Tim

Johnson, were both former Rottlund employees who had access to, and worked on, Rottlund's copyrighted Villa II designs. (*Id.*, Ex. R62, 58:5-22; Ex. R63, 13:24-14:9; Ex. R64, 36:9-25.) Several documents demonstrate that the Defendants were using Rottlund's technical drawings and directly copying them into the Homestead Collection designs. (*Id.,* compare Ex. R73, BSB01262-1263 with Ex. R74; Ex. R76, BSB001022-23 with Ex. R74; Ex. R18, RCI004161 and Ex. R74 with Ex. R79, BSB02898 and Ex. R80, BSB02921.) As noted above, one such document demonstrates that Rottlund's logo and copyright notice were scribbled out. (*Id.*, Ex. R76, BSB01023.) Regardless of who scribbled out the logo and notice, it is plainly obvious that it was done and an ethical architect should never cut and paste designs they know are not theirs and belong to others.

6. Pinnacle Hoped BSB Had A Co-License Agreement With Rottlund.

Pinnacle's in-house architect – Steve Sandelin – has over 22 years of experience in architecture and within a matter of days after receiving Rottlund's cease and desist letter he admitted that the Defendants' Homestead Collection design was "obviously similar" to Rottlund's Villa II design. (*Id.*, Ex. R72 at BSB01931.) *The Rottlund Co., Inc. v. Pinnacle Corp., et al.*, 222 F.R.D. 362, 364 (D. Minn. 2004). Mr. Sandelin's admission and Pinnacle's hollow hope that BSB had a co-license agreement with Rottlund to use Rottlund's copyrighted Villa II designs speaks volumes concerning the Defendants' successful copying of Rottlund's copyrights.

7. Rottlund's Liability Expert Found Direct Evidence Of Copying.

Expert evidence is permitted to help jurors determine whether a defendant directly copied a copyrighted design. *See, e.g.*, *Sturdza v. United Arab Emirates,* 281 F.3d 1287, 1300 (D.C. Cir. 2002). After careful study of all the facts in the record, and based upon his education, training and experience as an architect certified by the American Institute of Architects,

Mr. Desnick opined that the Defendants directly copied Rottlund's copyrighted Villa II plans and buildings. (Davenport Aff., Exs. R103-R106.)

### B. Independent Creation Should Not Be Found In Favor Of The Defendants As A Matter Of Law.

The Court's August 20, 2004 Report and Recommendation concluded that all the Defendants had access to Rottlund's copyrighted technical drawings. *The Rottlund Co.*, 2004 WL 1879983, at *19-22. It also found that a genuine issue of material fact exists concerning whether the Defendants' designs are substantially similar to Rottlund's Villa II designs. *Id.* at **22-24. Accordingly, the intertwined issue of independent creation, if it is not later resolved in Rottlund's favor as a matter of law, should be determined by the jury as well. *See*, *e.g.*, *Maloney*, 891 F. Supp. at 1567 (concluding that the infringing plans "are simply too similar to the [copyrighted plans] to be a product of either independent creation or coincidence"); *Gund*, 701 F. Supp. at 1022 (finding that the substantial similarity between the works at issue made it "impossible to conclude" the defendant independently created the infringing work).

## CONCLUSION

Based upon the foregoing, Rottlund respectfully requests that the Court deny the Bloodgood Defendants motion for partial summary judgment in its entirety.

Dated: August 26, 2004

s/ Craig S. Krummen
Craig S. Krummen, #0259081
David A. Davenport, #0285109
WINTHROP & WEINSTINE, P.A.
**Attorneys for Plaintiff**
225 South Sixth Street, Suite 3500
Minneapolis, MN 55402-4629
Telephone: (612) 604-6400
Facsimile: (612) 604-6800
ckrummen@winthrop.com

2134839v3