P R O C E E D I N G S

(Witness sworn.)

LARRY W. MOORE,

called as a witness, being first duly sworn, was examined and testified as follows:

ADVERSE EXAMINATION

09:09:23 BY MR. KRUMMEN:
09:09:25 Q. Morning, Mr. Moore.
09:09:26 A. Morning.
09:09:28 Q. You understand that this is a continued deposition from the two prior depositions we've taken; correct?
09:09:34 A. Correct.
09:09:35 Q. And in general I am allowed to ask you topic questions about documents that weren't produced prior to your last deposition. You understand that?
09:09:43 A. Okay.
09:09:43 Q. One topic I want to focus on is Midland Homes, and I believe where we were at in your last depositions, plural, is that you had supposedly created the design for a back-to-back townhome for Midland; is that right?
09:09:56 A. Correct. Umm-hmm.
09:09:58 Q. Did you independently create that design?

EXHIBIT A

A. Yes.
Q. When I asked you that question I want to know what you mean by "independently created" it. What source materials did you look at, for example, before you created the Midland Homes back-to-back townhome design?
A. That process was nine or ten years ago so I'm not sure I can -- I'll try to recall as best I can. Our client came to us with product information, program information that he wanted to compete with in the Des Moines area, and we -- through his market knowledge, he and we, I guess as a group, established a program for a back-to-back 8-plex townhouse product.
Q. Who was the client, what was his name?
A. His name is Ted Grob.
Q. Could you spell that last name for us?
A. G-R-O-B. That was -- at the time I believe his company name was Midland Homes.
Q. Today is it Savannah Homes?
A. Yes.
Q. Mr. Grob still in charge?
A. As far as I know, yes.
Q. Was he the owner of Midland?
A. I believe so.

09:29:52 sometimes, after, say, the design work or whatever,
09:29:56 at some point I'll just turn that over to somebody,
09:29:59 admin assistant and say, you know, put this in -- in
09:30:02 dead file.
09:30:04 Q. Were you ever worried that BSB, and/or Midland,
09:30:07 might be infringing upon Rottlund's copyright in
09:30:11 light of what you did with Exhibit 330, giving that
09:30:14 to Midland?
09:30:15 A. No.
09:30:15 MS. NEWMAN: Object to the form of the
09:30:16 question. Go ahead.
09:30:17 A. No, I had no concern about that there was a -- a
09:30:21 -- any kind of an infringement. Using this as a
09:30:23 guideline for scope, I didn't feel that was a
09:30:25 problem. We had no intentions of copying this, we
09:30:29 didn't copy this. If you look at the comparative
09:30:32 designs and resulting building you can see there are
09:30:35 substantial differences, so no, that wasn't -- that
09:30:38 wasn't a concern at the time this was created for the
09:30:40 purpose this was created for.
09:30:43 Q. What was the purpose for Exhibit 330 if it
09:30:45 wasn't to build something similar for Midland?
09:30:48 A. We were competing with Rottlund, we knew that.
09:30:51 Ted -- Ted wanted to compete with that product.
09:30:55 Q. With Rottlund's Villa product.

10:24:00 A. That's correct.
10:24:00 Q. Do you believe that that's complying with the highest ethical standards as an architect?
10:24:04 A. I know Linda and I worked in the highest ethical standards on that project, yes. We had no intentions, nor did we copy anything of Rottlund's.
10:24:12 Q. So you deny that you copied Rottlund's floor plan so you could drive the costs down for the tight-fisted Midland Homes owner?
10:24:19 MS. NEWMAN: Objection to the form of the question.
10:24:20 Q. You deny that.
10:24:22 A. I deny that.
10:24:24 Q. Thirty-five hundred dollars was --
10:24:25 A. I'd say that's insulting to Ted Grob.
10:24:28 Q. You called him tight-fisted, sir.
10:24:29 A. I didn't call him tight-fisted.
10:24:32 Q. You agreed with that characterization.
10:24:32 A. Well that's unfortunate if I did.
10:24:34 MS. NEWMAN: No, he did not.
10:24:34 Q. Well you -- the record will speak for itself.
10:24:36 A. Mr. Grob -- Mr. Grob is very -- he demands the -- we be very competitive on our fees I believe is what I said.
10:24:44 Q. And Mr. Grob gave you Rottlund's floor plans and

21

be a 2-unit building, 8-unit building, 12-unit building.
Q. The bid that you were providing of $3,500 is based on your understanding of the scope of it being an 8-unit building; is that correct?
A. Correct.
Q. It also says that that 8-unit building would have two unit types of approximately 1,200 and 1,300 square feet. Do you see that?
A. Yes.
Q. Why is that in the contract?
A. Again, that goes to scope. If it's a bigger unit type, it would cost more to draw.
Q. The next line says, "Similar to the Rottlund Home plans you provided in our meeting." Do you see that?
A. Yes.
Q. You weren't intending to suggest that the construction drawings or design development drawings that Design Development was going to generate would be similar to Rottlund Homes plans, did you?
A. No.
Q. There was no instruction from BSB that Design Development incorporate design

22

construction drawings for Midland Homes from Rottlund Homes plans, was there?
A. There was no instruction.
Q. As a matter of fact, your explicit understanding was that that would be "generated from the schematic design drawings provided by your office" -- meaning BSB?
MR. KRUMMEN: Foundation.
Q. (By Mr. Schwiebert) That's your understanding of the agreement?
A. My understanding of the agreement is that the schematic design provided by Bloodgood Architects was the units that were going to be drawn.
Q. That's what you used to perform your work?
A. Yes.
Q. There was no instruction to copy anything from Rottlund, was there?
A. No.
Q. In fact, you didn't copy anything from Rottlund, did you?
A. No.
Q. You make reference to the Rottlund Homes plans in your contract. Do you see that?

23

A. Yes.
Q. Is the similarity you're talking about the fact that the Rottlund Homes plans have eight units with two unit types of approximately 1,200 and 1,300 square feet?
A. Say that again.
Q. You say that it's similar to the Rottlund Homes plans?
A. Yes.
Q. There's been a lot of discussion among the lawyers trying to decompose this sentence. I'm trying to understand what you meant when you said it.
Is what you meant that the Rottlund Homes plans were similar in the sense that the scope of the project was an 8-unit building with two unit types approximately 1,200 and 1,300 square feet?
A. Yes.
Q. Did you intend to convey any other similarity between the work that Design Development, Incorporated, would be performing and the Rottlund Homes plans that were provided to you?
A. No.

24

Q. If you turn to what should be the three pages preceding this, it's DDI 21, 22 and 23.
A. Okay.
Q. Are these the Rottlund Homes plans that was provided to you in your meeting with Larry Moore?
A. Yes.
Q. Did you use these Rottlund Homes plans in designing the construction drawings for the Midland Homes project?
A. I guess explain when you say "designing."
Q. You converted the schematic design drawings from BSB into construction drawings; correct?
A. Correct.
Q. And Exhibit 375, are those schematic design drawings?
A. Correct.
Q. I want to make sure that you didn't use DDI 21, 22 and 23 as the schematic design drawings as part of your conversion of Exhibit 375, BSB schematic designs, into their construction documents. Does that make sense?
A. Yes. I did not use these for the construction drawings I produced for Midland



EXHIBIT B

**Supplemental Expert Disclosure of Albert Bloom, A.I.A.**

Since my original disclosure of August 15, 2003, additional evidence and issues have come to my attention. Attached as Appendix One is an updated list of documents and testimony I have considered in preparing this supplemental disclosure. This supplemental disclosure will address the new evidence and issues and is intended to supplement my original disclosure.

I have reviewed Tim Whitten's deposition testimony, wherein he indicated that there was no methodology by which the gestalts of two townhomes could be compared. See Tim Whitten's deposition at pages 82-83. I am unaware what definition Mr. Whitten, or Rottlund, gives to the term "gestalt." In this report, and in my initial report, I use the term "gestalt" to mean the total look and feel of the townhome, including individual design elements as well as how those elements are combined together. I have compared the gestalts of various townhomes because Rottlund has indicated that their only copyright claim in this litigation is that the gestalt of the Homestead Collection and the Chateau Collection is substantially similar to the gestalt of the Villa II. My comparison of the gestalts of these townhomes should not be construed as indicating that the gestalt theory of copyright infringement is legally viable.

As the factual investigation in this matter has not concluded, I reserve the right to amend, supplement or clarify my opinions based on information discovered after the date of this supplemental disclosure.

EXHIBIT C

**Chateau Collection v. Homestead Collection**
**8 Unit Building**

These two townhomes are not substantially similar. The following are some examples of the differences between the two townhomes.

**Exterior**

The overall massing of Chateau is different than the Homestead. Chateau uses double gables in the front which are pushed to the non-demising wall side of the garage as opposed to grouping the double gables at the demising wall. The window size and number are different within the double gables, as is the layout and size of the windows for the 2 story spaces. The use of the 'bay' configuration completely changes the form of the end corner of Chateau. The side elevations do not use a turned gable condition, but rather, a variance of roof forms which change the character of Chateau's end elevation. Chateau's entry roofs at the interior units cover the entire width of the entry niche and are not continuous with the garage roof as shown on Homestead. Transom glass is used over the entry doors and sliding glass doors at Chateau and the side elevation entry doors have shed roofs as opposed to gables. The brick wainscot is higher in Chateau and it is evident that the Chateau is more expensive to build than Homestead.

**Interior**

End Unit A v. End Unit 1482

First Floor

The entry sequence is different for these plans. The entry door swing and location of the entry closet in Chateau will direct vision to the dining/kitchen area while the Homestead's entry will direct the line of sight to the stair and living area. The spatial feel will be totally different when entering the Chateau with a 9 foot ceiling as opposed to Homestead with a 2 story space. The stair location in the Chateau is not a visual feature as it is in Homestead. The Chateau's dining area will have a completely different feel due to the circulation pattern to the kitchen and the absence of a sliding glass door from the dining are to the patio. The living area will feel totally different because of its different shape and size as well as the smaller volume ceiling space. Chateau's 'bay' is unique in this context and is the introduction of a unique form for this product type. The location of the fireplace in this 'bay' has a completely different orientation than Homestead and does not have built-ins on the side. The galley kitchen will appear visually different as will the location and orientation of the breakfast bar. There is not a breakfast area in Chateau and the circulation through a wide hall will feel different than Homestead. The powder room is a different shape and size and the Chateau does not have a furnace and water heater space on the first floor. Chateau is 34 feet wide and 33 feet deep, while Homestead is 33 feet wide and 35 feet deep.

<u>Second Floor</u>

Stairway access with a 'U' shaped stair at the side of the plan will feel different than Homestead's straight run stair which is centrally located. Access from the stair to the loft will feel and look different because of the stair location and length of travel to the loft. The 2 story volume space is shaped differently and is smaller than Homestead. Chateau's master bedroom and closet is

shaped differently and is a different size. The bathroom has the tub and shower in a separate room which will change the feel of the space. The shape and size of Chateau's loft as well as the overlook will feel different. The furnace and water heater in Chateau are in the 2nd floor utility room, as opposed to a first floor location in Homestead.

The overall gestalt of Chateau's Unit 'A' will feel completely different than Unit 1482 of the Homestead collection.

Interior Unit 'B' v. Interior Unit 1381

First Floor

Chateau's entry door opens in to a closet which will feel different than Homestead which opens adjacent to the closet and has a better sight line to the living/dining space. The 2 story volume opening in Chateau is a different length than 1381. The switchback stair at the rear of the unit will feel different than Homestead's centrally located straight run stair. The 'U' shaped kitchen and breakfast bar orientation will feel different than Homestead's modified 'U' with a corner sink. The optional fireplace and/or media niche locations are different. The powder room is a different shape and size than Homestead's. Chateau also includes a storage room which is not offered in Homestead.

Second Floor

Chateau's 'U' shaped stair will create a different feel accessing the second floor. The access to the bath is outside the master bedroom and the tub and water closet are in a separate

compartment. The loft location and access is different due to the stair configurations and there is a second floor mechanical room for the furnace and water heater adjacent to the washer/dryer. The gestalt of Chateau's Unit 'B' will feel different than Homestead's 1381.

End Unit 'C'

This is a front loaded entry plan which does not exist in the Homestead Collection.

The Chateau Collection has many differences from the Homestead Collection, some of which are listed here. Both townhomes combine standard features in standard arrangements. While the first floor zoning of spaces is similar in both plans, (and very typical of back to back townhomes), the overall gestalt between the two townhouses will feel completely different due to the spatial layouts of the plans and the exterior massing of the buildings.

In comparing the Homestead Collection with the Chateau Collection, there are a number of differences in the ways in which standard features, and standard arrangements of standard features, are expressed in each townhome. However, during the course of BSB's development of the Homestead Collection design, BSB and TCM considered a number of alternative layouts for these standard features, and some of the alternatives that were considered and rejected in the Homestead Collection are found in the Chateau Collection. As discussed in my initial report, this process of considering and rejecting design alternatives is part of the process of independent creation, and bolsters my conclusion that BSB independently created the Homestead Collection.

**Chateau Collection v. Villa II**
**8 Unit Building**

These two townhomes are not substantially similar. The following are some examples of the differences between the two townhomes.

**Exterior**

The overall building massing is different between Chateau and Villa II. Chateau uses a different gabling system for the front elevation which changes the profile and massing. The use and grouping of the windows within the gables, changes the feel of the building, as does the use of craftsman type window grids. Entry roofs for the interior units are wider and cover the entire entry recess. The end corner 'bay' is a unique feature to Chateau and the location and size of the windows completely changes the exterior feel of the elevation. The side elevations have a different feel because Chateau does not have turned gables, uses shed roofs rather than gabled roofs over entries and sliding doors, and has transom glass above entry doors and sliding glass doors.

**Interior**

End Unit 'A' v. End Unit 'C'

First Floor

Entering the Chateau's 9 foot ceiling will feel totally different than Villa II's 2 story volume space. Line of sight from the entry of Chateau is directed at the dining and kitchen area because of the entry door swing and closet location as opposed to Villa II where line of sight is directed to the 2 story living space and central stair. The circulation path to Chateau's 'U' shaped stair goes

past the kitchen through a wide hall and will have a totally different feel than Villa II's straight stair. The living area with 'bay' will live and feel as two spaces due to the location of the second floor above and the smaller area of 2 story volume. The fireplace in the bay is in a completely different location and will have a different feel. The dining room will feel and function differently because of the access to the kitchen and the lack of a sliding glass door to the patio. The galley kitchen in Chateau has a different shape and size than the Villa II's 'L' shaped kitchen with optional island. The Chateau's powder room is more square in layout than Villa II's elongated rectangle. Chateau is 34 feet wide and 33 feet deep, while Villa II is 32 feet wide and 34 feet deep.

Second Floor

The 'U' shaped stair access will look and feel different from Villa II's straight run stair. Access from the top of the stair to the loft will feel and look different because of the stair location and length of travel. The 2 story volume space is smaller and differently shaped in Chateau. Chateau's master bedroom and closet is shaped and sized differently than Villa II's. The bathroom has a separate room for the tub and water closet. The furnace and water heater are on the second floor along with the washer/dryer.

The overall gestalt of Chateau's Unit 'A' will feel completely different than Villa II's Unit 'C'.

Interior Unit 'B' v. Interior Unit 'D'

First Floor

The Chateau's 2 story volume space at the entry will feel totally different than Villa II's 9 foot ceiling. The switchback stair at the rear of the unit will feel totally different and will change the circulation pattern through the dining area. Chateau's 'U' shaped kitchen has a different feel than the Villa II's 'L' shaped kitchen with optional island. The breakfast bar will have a different feel facing the switchback stair as opposed to being open to the dining area. The fireplace and media niches are in different locations. The powder room is a different shape and size, and Chateau offers a storage room, while Villa II doesn't. The Chateau footprint is 33 feet deep, while the Villa II is 34 feet deep.

Second Floor

Chateau has a 2 story volume with a loft overlook while Villa II has no 2 story volume space. Shape, size and access to second bedroom is different in the Chateau. Shape, size and access to the master bedroom is different, and occurs from a hallway in the Chateau as opposed to from the exercise area in Villa II. Laundry is in a room in Chateau as opposed to a closet in Villa II. Chateau has the furnace and water heater in a room on the second floor. Access to the bath is from the outside in the master in the Chateau and the tub and water closet are in a separate compartment.

The gestalt of Chateau's Unit 'B' will feel different than Villa II's Unit 'D'.

**End Unit 'C'**

This is a front loaded entry plan which does not exist in the Villa II.

The Chateau Collection has many differences from the Villa II, some of which are listed above. While the first floor zoning of spaces is similar in both plans, the overall gestalt between the two townhomes will feel completely different due to the spatial layouts of the plans and the exterior massing of the buildings.

There are some similarities between the Villa II and the Chateau Collection, just as there are some similarities between the Villa II and the Homestead Collection. However, the similarities between these units are no more than one would expect given the design limitation facing back-to-back townhomes. It would be extremely difficult, if not impossible, to design a commercially successful back-to-back townhome that did not share some elements in common with the Villa II, the Chateau Collection, or the Homestead Collection. Additionally, as noted in my initial report, many of the elements which these townhomes share in common have been used by BSB (and other designers and builders) for years. <u>See</u> my initial report at pages 12-16. Furthermore, all of the elements which these townhomes share in common are standard features, including the standard arrangements of standard features found in both townhomes.

**Exterior Unit 'C' Villa II v. Interior Unit 1381 Homestead**

In his deposition on August 14, 2003, Tim Whitten testified that the interior unit of the Homestead Collection was a direct copy, with minor changes, of the Villa II end unit. See Tim Whitten's deposition at page 958. No transcript of this testimony was available to me at the time I authored my initial disclosure, and this testimony makes it necessary to compare the gestalt of the Villa II end unit with the gestalt of the Homestead Collection interior unit, a comparison I did not make in my initial report. These two townhome units are not substantially similar. The following are some examples of the differences between the two townhome units.

First Floor

Villa II's side entry as opposed to Homestead's front entry will totally change the perception and feel of the interior space. Villa II's side entry sight line is of a straight run stair and 2 story living room while Homestead's front entry sight line looks towards the rear wall of the living/dining area. The dining area of Villa II is larger than Homestead's, and the sliding glass door will totally change the perception of the size of the space. Villa II's kitchen has a sink oriented with a sight line to the sliding glass door which will make the space feel larger as opposed to Homestead's kitchen with a corner sink facing a wall. Villa II's kitchen is 'L' shaped with an optional island while the Homestead's kitchen has a different work triangle for appliances and has a separate breakfast area. The living rooms will have a completely different feel due to the position of windows on two walls in Villa II and the location of the optional fireplaces.

The entry sequence from the Villa II garage is directly into the kitchen while the Homestead has a short hallway. The stairway protrusion into the Villa II garage will change the physical

appearance and interior usability of the space due to headroom clearance. The articulation of the front wall of Homestead and the second floor set back over the garage, as opposed to a cantilevered second floor in the Villa II with a flat front wall, will change the feel of the exterior elevation.

Second Floor

The Villa II loft is in the front of the unit and overlooks the 2 story open space while the Homestead loft is to the rear and overlooks the 2 story open space to the front. These spaces will feel completely different due to the addition of side windows in the Villa II and the longer length of the railing at the loft.

The perception and feel of the hallway in Homestead adjacent to the stair leading to the loft will have a totally different feel than the hallway and circulation in the Villa II. The Homestead laundry is in a separate room as opposed to a closet. Villa II's bath has a separate shower and tub while Homestead has only a combination tub/shower as standard. Homestead has a separate compartment for the water closet with an optional door while Villa II has a low wall separating the water closet from the vanity.

The individual spaces are standard features which are assembled according to building code requirements for light, ventilation and egress and for functionality. While the layout of the individual spaces on the first floor fall into the same zones, the gestalt of these spaces will feel different due to the reasons listed here. The zoning in these units is no more than a standard arrangement of standard features.

**Jerry's Homes**

Bent Tree Villas 7/12/96 v. Longview Townhomes 3/11/97

Johnston, Iowa

Revisions to the working drawings included changing the name of the project to Longview Townhomes from Bent Tree Villas, moving the water heater in Unit 1 from the washer/dryer closet to the furnace closet, moving the entry closet into the dining area approximately 2 feet, and revising the foundation from a thickened slab to a frost wall under the house to garage separation wall.

As with the Homestead Collection, BSB went through the typical design process (as described in my initial disclosure) when creating the back to back townhome for Jerry's Homes. The progress of the design, receipt of comments from the builder, and revisions to the drawings are what one would expect in a case of independent creation. It is my opinion that BSB independently created this back to back townhome. As I indicated in my initial disclosure, it is common for builders to send their residential architects marketing materials from those builders' competitors. The receipt of these marketing materials is not evidence of copying, or an intent to copy. The fact that BSB, or its clients, have communicated ideas to each other, or to third parties, using these marketing materials has no bearing on the ethics of BSB or its architects. This practice is common among residential architects.

**Midland Homes, Inc. 11/2/94 Greystone T.H. v. New Villas A/B**

These two townhomes are not substantially similar. The following are some examples of the differences between the two townhomes.

**End Unit B v. End Unit A**

First Floor

The shape of the footprint is different with the Midland living room offset as opposed to a straight end wall in New Villa. The stair direction in these two plans are 90° from each other, creating a totally different feel to the space. The kitchen sink in Midland has a sight line to the sliding glass door which will visually expand the space, as opposed to New Villa's kitchen sink which faces a wall. Powder rooms are a different shape and size and Midland has a desk area adjacent to the garage access.

Second Floor

The Midland master is larger than the New Villa, and positioned over the garage as opposed to over the dining area. The landing and hallway in Midland will feel totally different than New Villa because of the angled direction from the head of the stair and the enclosure of walls. New Villa has a loft space which overlooks the open living area visually expanding the stair opening and the second floor, while Midland does not have a loft space. The perception of the volume living space will be totally different because Midland's stair is going up in the same direction as the volume ceiling in the living room, and New Villa's stair is going up at a right angle to the

direction of the volume and is not inside the volume space but under the second floor. The Midland second bedroom has a different shape and will have a different feel due to the length of the angled wall. Midland's bathroom has the tub and water closet in a separate compartment.

**Interior Unit A v. Interior Unit B**

First Floor

The stair location in Midland runs front to back adjacent to the garage, which is totally different from New Villa, which runs side to side adjacent to the rear wall. The kitchen layouts will feel totally different with New Villa's having a sight line to the front windows while Midland's looks into a wall. The Midland garage access enters into a small hallway while New Villa's enters directly into the kitchen. There is a mechanical room in New Villa while Midland has a closet for the furnace and water heater. The fireplace locations are on opposite sides of the living area and Midland has an open 2 sided fireplace as opposed to a front open fireplace.

Second Floor

The Midland master is much smaller than the New Villa's due to the stair location. Midland's master closet will feel much larger than New Villa's. Midland's bath has a separate compartment for the tub and water closet and a laundry area adjacent to the bath.

**Exterior**

The roof massing and use of materials on the side elevations will have a different feel because of New Villa's cantilevered bedrooms, use of a high brick wainscot, projected chimney chases,

steeper roof pitch and flat first floor footprint at the side wall. The front elevations are similar and like other back to back townhouses, but New Villa will feel bigger due to the steeper roof pitches for both the front to back shed roofs and the side to side gable roofs. New Villa also uses more brick accent material and has fireplace chases projecting through the roof as well as on the sides.

These two projects are similar only because they are back-to-back products. While the zoning of first floor spaces are in the same location, the stairs and entry sequences will feel different, and generate different second floors. As with the Homestead Collection, BSB went through the typical design process (as described in my initial disclosure) when creating the back to back townhome for Midland Homes. The progress of the design, receipt of comments from the builder, and revisions to the drawings are what one would expect in a case of independent creation. It is my opinion that BSB independently created this back to back townhome. As I indicated in my initial disclosure, it is common for builders to send their residential architects marketing materials from those builders' competitors. The receipt of these marketing materials is not evidence of copying, or an intent to copy. The fact that BSB, or its clients, have communicated ideas to each other, or to third parties, using these marketing materials has no bearing on the ethics of BSB or its architects. This practice is common among residential architects.

**Sprinkler Room**

The exterior sprinkler rooms as shown on both Town & Country's Homestead Collection and Rottlund's Villa II is a technical response to the need of housing the incoming sprinkler piping and providing easy access to the Fire Department in case of a fire. The room is utilitarian and is meant to provide adequate space for incoming piping and clearances to the system's functions. BSB does not have in house technical expertise in the design of fire sprinkler systems and relies on firms and vendors outside of their office for advice on such matters as the size of the sprinkler room, its location on the building and the physical layout of the sprinkler room for pipes and other mechanical equipment.

BSB responded to input from sources outside its office for the design and location of the sprinkler room.

1. The location of the sprinkler room on the building was determined by Pioneer Engineering, based on their site engineering drawings.
2. The minimum requirements for pipe clearances from walls and ceilings was provided by Metro Fire Protection, based on their experiences.
3. The access to the sprinkler room and required clearances to piping was a requirement of the local governing authorities and the building and fire codes.
4. The actual size and shape of the sprinkler room provided by Metro Fire Protection and/or Town and Country is of a size and shape that had been used successfully before. There was no reason to change the size or shape of this room to meet the technical requirements.

5. Other builders in the Minneapolis area such as Pulte (at Arboretum Woods) and Ryland (at Town Course Heights) are building townhouses which use this type of sprinkler room design.

Conclusion

BSB used information provided by sources outside their office to place and size the sprinkler room. This information was not copied from Rottlund. Chris Jorgenson, in his affidavit, points out fifteen differences between the BSB sprinkler room design and the Rottlund sprinkler room design. This is an amazing number of differences for such a small utilitarian, functional space. The shed or "dog house" style sprinkler room is a standard feature that has been used by a number of builders as a rational design response to the growing fire suppression requirements for multifamily housing.

The biographical information submitted on August 15, 2003 has not changed.

This opinion submitted by:

Albert H. Bloom, A.I.A.

BLOOM & FIORINO Architects, Inc.
1110 Jorie Blvd., Suite 300
Oak Brook, IL 60523

Albert H. Bloom, A.I.A.

Date: April 15, 2004



Received 04-15-2004 12:05 From-630 574 2506 To-MOORE COSTELLO& HART Page 002

# APPENDIX ONE

Marketing documents from Town and Country and Rottlund's townhomes;

Confidentiality Stipulation and Protective Order between Plaintiff and Defendants dated January 22, 2002;

Confidentiality Stipulation and Protective Order between Plaintiff, Defendants and Bloodgood Architects and Planners of Iowa, Inc. d/b/a Bloodgood Sharp Buster Architects and Planners of Iowa dated August 9, 2002;

Confidentiality Stipulation and Protective Order between Plaintiff, Defendants and Bloodgood Sharp Buster Architects and Planners dated October 11, 2002;

Second, Third, Fourth, and Fifth Amended Complaint;

Town and Country's plans prepared by BSB of Illinois for Washington Square Back to Back Townhomes in Aurora, IL;

Town and Country's plans prepared by BSB for the Homestead Collection, including redline plans;

Rottlund Homes' plans for the Original Villa;

Rottlund Homes' plans for the New Villa;

Rottlund Homes' for the Villa II;

Expert reports issued by experts in this matter, and the documents referenced therein;

Transcripts of the depositions in this matter, and the exhibits thereto;

All photographs of housing products produced by the parties and/or their attorneys in this matter;

Plans and other documents produced by Rottlund relating to products other than the Original Villa, New Villa, and Villa II;

Plans and other documents produced by TCM relating to products other than the Homestead Collection;

Plans and other documents produced by BSB and/or BGI relating to products other than the Homestead Collection;

All documents bearing a "Bloom" Bates label;

Those documents referenced in Al Bloom's Expert Report;

BSB's publications produced in this matter;

Trade publications;

Architectural reference materials (for example, *Architectural Graphic Standards)*.

Fax to Mike Wagenknecht from Art Plante regarding corrections to client redlines dated 08/07/00, BSB 01393 – 01409

BSB Transmittal – Next Day Air – To Art Plante from Michael J. Wagenknecht regarding Homestead Collection at Centennial Crossing changes per construction document revision date of 03/06/00 dated 08/07/00, BSB 01410 – 01433

Fax to Art Plante from Beth Miller regarding elevation studies with garages expanded dated 05/25/00, BSB 01444 – 01447

Fax to Art Plante from Beth Miller regarding garage revision and proposed front and side revision dated 05/24/00, BSB 01448 – 01451

E-mail to Art Plante from Beth Miller regarding area divisions and garage expansions dated 05/23/00, BSB 01452

Fax to Art Plante from Beth Miller regarding garage options dated 05/18/00, BSB 01453 – 01460

BSB Transmittal – Next Day Air – To Mark Kranz from Michael Wagenknecht regarding changes per construction document revision date 05/10/00, BSB 01467 – 01492

BSB Transmittal UPS Next Day Air – To Mark Kranz from Michael Wagenknecht regarding - Artwork showing changes to Plans 1381 and 1482 dated 04/05/00, BSB 01493 – 015

Homestead Collection at Centennial Crossing Plan 1381 – Set with Clouding dated 03/08/00, BSB 01541 – 01563

BSB Telephone Call Report - To Mike Wagenknecht from Mark Kranz - 03/02/00 @ 11.30 a.m. and 03/03/00 @ 2.45 p.m. regarding T&C Homestead Collection misc. matters dated 03/03/00, BSB 01564 – 01565

BSB Telephone Call Report – To Mike Wagenknecht from Mark Kranz regarding T&C/Homestead Collection - clouding and girder truss dated 03/03/00, BSB 01566

Memo to 12 people including Chris Jorgensen and Beth Miller from Art Plante regarding framewalks dated 03/01/00, BSB 01578 – 01581

BSB Telephone Call Report - To Mike Wagenknecht from Mark Kranz - 02/17/00 @ 2.30 p.m. and 4.00 p.m. regarding T&C Homestead Collection shelving and windows dated 02/17/00, BSB 01587

BSB Transmittal – Next Day Air – To Mark Kranz from Mike regarding Homestead Collection at Centennial Crossing Artwork Style Sheets dated 02/16/00, BSB 01591 – 1594

BSB Telephone Call Report – To Mike Wagenknecht from Mark Kranz @ 11:10 a.m. regarding T&C/Homestead Collection - Gas meters and A/C pads on Artwork dated 02/08/00, BSB 01599

BSB Transmittal – Next Day Air – To Art Plante from Michael Wagenknecht regarding Homestead Collection at Centennial Crossing – Changes dated 02/08/00, BSB 01600 – 01620

BSB Telephone Call Report – To Mark Kranz from Mike Wagenknecht @ 8.30 a.m. regarding T&C Homestead Collection – Vault Slope and Patio Doors/Windows dated 02/03/00, BSB 01642

BSB Telephone Call Report – To Art Plante from Chris Jorgensen and Mike Wagenknecht on 01/27/00 and 02/03/00 regarding miscellaneous items dated 02/03/00, BSB 01643

Letter to BSB from Aberjona Engineering, Inc. regarding calculations for Centennial Crossing dated 11/21/01, BSB 01725 – 01742

Fax to Art Plante and Mark Kranz from Chris Jorgensen regarding Villas/#38107 bedrooms dated 07/12/99, BSB 01830 – 01835

Fax to Art Plante and Mark Kranz from Chris Jorgensen regarding Villas/#38107 front elevation dated 06/22/99 BSB 01841 – 01842

Fax to Art Plante from Chris Jorgensen regarding Villas/#38107 upper floor plan options dated 07/01/99, BSB 01836 – 01840

BSB Transmittal – Next Day Air – To Art Plant from Chris Jorgensen regarding Villas/38107 CADD elevations dated 06/17/99, BSB 01843 – 01844

BSB Transmittal to Art Plante from Larry regarding Villa Townhouses dated 06/23/98, BSB 01858

T&C Concept Plan – A Main Floor undated, BSB 01859 – 01861

Fax to Art Plante from Larry Moore regarding revised unit A dated 06/16/98, BSB 01862 – 01865s

Letter to Larry Huff from Chris Jorgensen regarding T&C Homestead Collection at Centennial Crossing dated 10/25/00, BSB 01978

Fax to Chris Jorgensen from Marc Harris regarding detail with notation dated 10/20/00, BSB 01984 – 01985

Documents Bates labeled BSB 04462-4485;

Documents Bates labeled BSB IL 00352-00374;

City of Bloomington documents (BLOOMINGTON 001-012);

City of Eden Prairie documents (EDEN PRAIRIE 001-045);

Rottlund documents (RCI020644-20647);

Depositions of BSB/BGI employees (Grundmeier, Jorgenson, Moore, Sharp, Buster and Safin);

BSB contract with TCM dated 6/14/99 providing artwork services for Villa product (BSB 630);

Preliminary Report of Jeffrey A. Scherer;

Preliminary Report of Anthony Desnick;

Land Development Plan for the Hollander property in Maple Grove (DSU 8-36);

Bloodgood Sharp Buster Architects and Planners-Florida documents (BSB FL 000001-BSB FL 000044);

TCM plans ( D30321-30391);

Documents received from Tushie Montgomery Architects pursuant to subpoena (TM 1-929);

Villa II building plans for Rottlund's The Reserve in Plymouth, MN (RCI 1418-1437);

Documents Bates labeled BSB 1021-1024 and BSB 1260-1263;

Volume II and II of Jim Grundmeier (individual) dated February 17 and 18, 2004;

Volume I and II of Jim Grundmeier (30(b)(6)) dated September 2, 2003 and February 18, 2004;

Volume I and II of Chris Jorgenson (individual) dated September 3, 2003 and February 17, 2004;

Volume I and II of Larry Moore (individual) dated September 4, 2003 and February 17, 2004;

Volume I and II of Beth Miller (BSB) deposition dated September 3 and 4, 2003, including all exhibits;

Affidavit of Metro Fire Protection & Todd Dosch;

Volume I of Todd Dosch deposition dated February 25, 2004, including all exhibits;

Fax from Metro Fire Protection to Lori Meier dated 4/25/02 (BSB 1021-1024);

Midland Homes reduced drawings from 6/15/94-10/3/95 (BSB 2037-2041, 2048-2050, 3459-3486);

Midland Homes-Greystone project file (BSB 6249-6408 and 10172-10247);

Jerry's Homes- Bent Tree Villas/Longview reduced designs from 1/22/96-2/23/98 (BSB 3554-3471 and 3487-3553);

Jerry's Homes- Bent Tree Villas/Longview project file (BSB 3721-3852);

BGI production of Jerry's Homes documents (BGI 276-280);

Deposition Transcript of Timothy Whitten, Volume V, dated August 14, 2003;

Design Development Inc document (DDI000021-23);

Deposition exhibit 330;

Chateau Collection design documents from TCM's files (D34892-34934, D36365-36465 and D30357-30356);

Tushie Montgomery produced documents (TM 886-929);

Photographs taken March 29, 2004- April 8, 2004 by Moore, Costello & Hart, P.L.L.P. (MCH000686-46);

Photographs on CD produced from TCM from inspection of a Rottlund Homes villa model home (CD - D30491);

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,
Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF ANTHONY S. DESNICK
VOLUME I, Pages 1 - 218

(The following is the deposition of ANTHONEY S. DESNICK, taken pursuant to Notice of Taking Deposition, at the offices of Fredrikson & Byron, 4000 Pillsbury Center, 200 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:11 o'clock a.m., June 23, 2004.)

EXHIBIT D COPY

14:39:28 Good Value. And it was interesting to me that when
14:39:30 we looked back at Midland Homes and Jerry's Homes we
14:39:34 found one case materials in the file and the other
14:39:36 case the direct evidence of copying, we saw a
14:39:38 pasted-up copy of a Rottlund floor plan with their
14:39:41 title block removed from it in the file.
14:39:43 Q. Did you compare the Meredith Pointe villas to
14:39:47 the Midland BSB product?
14:39:49 A. I didn't, I didn't make that comparison.
14:39:52 Q. Again if there is direct copying, don't you
14:39:53 think they would be at least similar?
14:39:56 A. I was asked -- I wasn't asked to look at that
14:40:01 aspect of it at all. I was really asked to look at
14:40:03 how Midland, Good Value and Jerry's Homes were used
14:40:08 as source material for Homestead.
14:40:11 Q. Did you compare the Meredith Villa Pointe to the
14:40:14 Homestead?
14:40:16 A. You have to refresh my memory what Meredith at
14:40:20 Villa Pointe was.
14:40:20 Q. It's evidently the material you are referring to
14:40:23 in the Midland file.
14:40:24 A. Midland files, okay. To Homestead, no.
14:40:28 Q. Did you compare it to Chateau?
14:40:30 A. I didn't compare it to Chateau.
14:40:32 Q. Washington Square?

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

The Rottlund Company, Inc.,
d/b/a Rottlund Homes,
a Minnesota Corporation

Plaintiff,

vs.

Pinnacle Corporation,
d/b/a Town & County Homes,
an Illinois Corporation, and
Town & County Homes, Inc., a
Minnesota Corporation, Bloodgood Sharp
Buster Architects and Planners of Iowa,
Inc., an Iowa Corporation, and The
Bloodgood Group, Inc., an Iowa
Corporation,

Defendants.

No. 01-CV-1980 (DSD/SRN)

**AFFIDAVIT OF CHRIS JORGENSEN IN SUPPORT OF DEFENDANTS BLOODGOOD SHARP BUSTER ARCHITECTS AND PLANNERS OF IOWA, INC., AND THE BLOODGOOD GROUP, INC.'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT AGAINST PLAINTIFF**

**FILED UNDER SEAL**

STATE OF IOWA )
) ss.
COUNTY OF POLK )

Chris Jorgensen, being duly sworn, states:

1. I am employed by Defendant Bloodgood Sharp Buster Architects and Planners of Iowa, Inc. ("BSB").

2. Larry Moore, another BSB employee, designed the Homestead Collection for Defendant Town & Country Homes, Inc. ("TCM"). I served as Project Manager for the Homestead Collection project.

3. Prior to the commencement of this litigation, I had never seen the Rottlund technical drawings, including the technical drawings identified in Rottlund's copyright applications

EXHIBIT E

Received 03-08-2004 12:40 From-515 221 3272 To-MOORE COSTELLO& HART Page 002

and VAus. I have never copied any Rottlund product or drawing, including the materials identified in any of Rottlund's copyright applications or VAus.

4. During the product tour of numerous builders in the Twin Cities metropolitan area that I attended on March 31, 1998, I did not take any photographs of any Rottlund product, nor did I take any brochure for any Rottlund product. During that tour, I spent approximately 5 minutes, and certainly no more than 15 minutes, touring Rottlund's product.

5. BSB has produced timesheets which indicate that I spent approximately 64 hours in 1998 assisting in the design of the Homestead Collection. A copy of my timesheets reflecting time spent working on the Homestead Collection in 1998, 1999, and 2000 are attached as Exhibit H to the Affidavit of James Grundmeier.

6. The schematic design of the Homestead Collection townhome is the independent creation of Larry Moore. With the technical assistance of other employees, I created the Homestead Collection design development and construction drawings based on Larry Moore's schematic design, my expertise and experience, my knowledge of past products designed by BSB and BGI, TCM's redline changes, and the use of standard construction details. The construction drawings for the Homestead Collection is my original work and not a copy, or derivative, of any other townhome.

7. In 1996, Doug Sharp, an employee of BGI, designed a back-to-back townhome for Jerry's Homes in Iowa. As with the Homestead Collection, I served as the Project Manager for the Jerry's Homes project. With the technical assistance of other employees, I created the Jerry's Homes design development and construction drawings based on Doug Sharp's schematic design, my expertise and experience, my knowledge of past products designed by BSB and BGI, the client's requested changes, and the use of



Received 03-08-2004 12:40 From-515 221 3272 To-MOORE COSTELLO& HART Page 003

standard construction details. The Jerry's Homes construction drawings are my original work and not a copy, or derivative, of any other townhome.

8. The construction drawings for Jerry's Homes were first issued on July 12, 1996. The design of the Jerry's Homes construction drawings was complete at that time. On March 11, 1997, Jerry's Homes sent me a fax that included a Jerry & Ron Grubb brochure depicting the Breckenridge and a Rottlund brochure which depicted the Villas of Meredith Pointe in Urbandale, Iowa. Jerry's Homes was considering using BSB to provide artwork services, and faxed me these brochures for the sole purpose of giving me a sample of the type of artwork they were considering. A true and correct copy of the March 11, 1997 fax referenced above is attached hereto as Exhibit A.

9. After March 11, 1997, the construction drawings for the Jerry's Homes back-to-back townhome changed in the following ways:

   A. The name was changed from Bent Tree Villas to Longview Townhomes;

   B. The mechanical room and coat closet locations for the right-hand townhome unit were changed, such that the mechanical room was moved to where the coat closet generally used to be, and the coat closet was moved into the dining room; and

   C. The foundation between the house and garage was changed from a thickened slab to a frost footing.

Changes A and B above were requested by Jerry's Homes, and we initiated change C above. None of these changes had anything to do with the fax identified in Paragraph 8 above.



Received 03-08-2004 12:40 From-515 221 3272 To-MOORE COSTELLO& HART Page 004

10. Because of the minor, technical changes listed above, BSB issued another set of construction drawings. We then hand-wrote "voided" on our previous set of drawings to avoid confusion as to which drawings were to be used for purposes of construction.

11. The City of Maple Grove, where Centennial Crossing (TCM's first Homestead Collection development) was located, did not require back-to-back townhomes to utilize a fire suppression sprinkler system.

12. The construction drawings for the Homestead Collection townhomes for the Centennial Crossing development were first issued on August 26, 1999.

13. On July 7, 2000 BSB produced a set of final construction drawings for the Homestead Collection townhomes to be built at the Centennial Crossing development. Between July 7, 1998 and July 7, 2000, BSB produced 7 different sets of plans incorporating revisions and changes to the Homestead Collection. Reduced-size copies of the final plans dated July 7, 2000 are attached hereto as Exhibit B.

14. The construction drawings for the Homestead Collection townhomes intended for construction at the Harvest Hills development in Plymouth was not designed until after the design for the Homestead Collection townhomes intended for construction at Centennial Crossing was completed.

15. The exterior sprinkler riser room on the Homestead Collection townhomes for the Harvest Hills development in Plymouth is not substantially similar to the exterior sprinkler riser room utilized by the Villa II townhome. Important differences between the two sprinkler riser rooms include:

A. The plate height of the Villa II sprinkler room is 8 feet, 1 and 1/8 inches, whereas the plate height of the Homestead sprinkler room is 9 feet, 1 and 1/8 inches;
B. The Villa II sprinkler room roof slope is 8:12, whereas the Homestead Collection sprinkler room roof slope is 5:12;



Received 03-08-2004 12:40 From-515 221 3272 To-MOORE COSTELLO& HART Page 005

C. The Villa II sprinkler room has a 1 foot eave overhang, whereas the Homestead Collection has no eave overhang;
D. The Villa II sprinkler room rafters are 2 inches by 6 inches, whereas the Homestead Collection sprinkler room rafters as 2 inches by 8 inches;
E. The Villa II sprinkler room has an entirely sloped ceiling, whereas the Homestead Collection sprinkler room has a partially-sloped ceiling;
F. The Homestead Collection sprinkler room has a ceiling joist dimensioned 10 and ½ inches above the bottom chord of the floor trusses, whereas the Villa II has no such detail;
G. The Villa II sprinkler room walls use studs that are 2 inches by 4 inches, whereas the Homestead Collection sprinkler room walls use studs that are 2 inches by 6 inches;
H. The Villa II sprinkler room foundation walls utilize 8 inch concrete block, whereas the Homestead Collection sprinkler room foundation walls utilize poured in place concrete;
I. The Villa II sprinkler room floor slab sits approximately 4 inches below the finish floor for the rest of the Villa II townhome, whereas the Homestead Collection sprinkler room floor slab sits nearly flush with the finish floor for the rest of the Homestead Collection townhome;
J. The Villa II sprinkler room door is centered on the exterior wall, whereas the Homestead Collection sprinkler room door is offset;
K. The Villa II sprinkler room door is 2 feet wide, whereas the Homestead Collection sprinkler room door is 2 feet, 8 inches wide;
L. The Villa II sprinkler room riser is set back 18 inches from the exterior front wall of the sprinkler room, whereas the Homestead Collection sprinkler room riser is set back between 15 and 21 inches from the exterior front wall of the sprinkler room;
M. The Villa II sprinkler room riser is set back 15 inches from the exterior side wall of the sprinkler room, whereas the Homestead Collection sprinkler room riser is set back 23 inches from the exterior side wall of the sprinkler room;
N. The Villa II sprinkler room layout detail contains far more detailed piping information than the Homestead Collection sprinkler room layout detail; and
O. The Villa II sprinkler room has 2 inch rigid insulation on the exterior face of the foundation walls, whereas the Homestead Collection sprinkler room has 2 inch rigid insulation on the interior face of the foundation wall.

A true and correct copy of the final sprinkler room design details for the Homestead Collection at Harvest Hills is attached as Exhibit C. A true and correct copy of the final sprinkler room design details for The Villa II at the Reserve is attached as Exhibit D.

16. In 1998, I only participated in one product tour that included Rottlund's product, and that tour took place on March 31. I did not participate in any tour in Minneapolis on April 29,



Received 03-08-2004 12:40 From-515 221 3272 To-MOORE COSTELLO& HART Page 006

1998. My timesheet for that day, which is one of the timesheets attached as Exhibit H to the Affidavit of James Grundmeier, indicates that I was in Des Moines all day on April 29, 1998, working on projects for clients other than Town & Country Homes.

Further your affiant saith not.

Chris Jorgensen

Subscribed and sworn to before me this 8th day of March, 2004.

Notary Public, Polk County

MPLS:48621.1/16850-166

NANCY M. NELSON
Commission Number 182223
My Commission Expires
November 21, 2004



TOTAL P.07

Received 03-08-2004 12:40 From-515 221 3272 To-MOORE COSTELLO& HART Page 007

question. You can answer if you understand the meaning of the term --
THE WITNESS: No.
MS. NEWMAN: -- "gestalt."
A Yes. You'll have to explain what you mean by that.
BY MR. SCHWIEBERT:
Q Well, I don't think I understand the term, too, so let me ask a different question. Did BSB copy the look and feel of any Rottlund townhome when it came up with the Homestead Collection for TCM?
A No.
Q Did BSB copy any unique expressions contained in the Rottlund townhomes when it came up with the Homestead Collection for TCM?
A No.
Q In your opinion, were there any unique expressions in Rottlund's townhomes?
A I'm not familiar enough to really answer that adequately. But to my knowledge, no.
Q You testified earlier that you went on a tour of several competitors' townhomes; is that correct? And by -- I'm now talking you, Mr. Jorgensen, for this line of questioning.
A Yes, I did.
Q Okay. And in your opinion, did you see anything on



that tour that was new or different from products that BSB had already designed or seen in other markets?
A No, I did not.
Q Now, using "you," meaning BSB of Iowa, did BSB of Iowa tell Town & Country Homes, Inc., that it copied any plans from Rottlund?
A No.
Q And the reason you didn't tell them that is because you didn't do it?
A No, we did not.
Q Did BSB of Iowa tell Town & Country Homes, Inc., that it copied any expressions of any Rottlund townhome?
A We didn't tell them that. And we didn't do it.
Q Did BSB of Iowa tell Town & Country Homes that it copied the look and feel of any Rottlund townhome?
A No.
Q And the reason you didn't tell them that is because you didn't do it?
A No, we did not.
Q Did BSB of Iowa copy the unique expression of any third-party townhome when it came up with the Homestead Collection for TCM?
A No, we did not.



Q Does BSB have a policy against copying other architects' works?
A Certainly we do. I mean, we don't want our works copied, and we would not copy anyone else's work.
Q Would BSB copy the unique expression of another work if a client asked for it?
A No, we would not.
Q Why not?
A I guess, answering for BSB, I mean, it's not ethical. It's stealing someone else's work. There -- we -- we have a pride in -- in our own work being unique and would not want to be part of anything that was copied.
Q Did Town & Country Homes, Inc., of Minnesota ask BSB to copy any third party's plans as part of the development of the Homestead Collection?
A They did not as part of the Homestead Collection or any other project we've ever worked on with Town & Country.
Q Did Town & Country Homes, Inc., of Minnesota ask BSB of Iowa to copy any part of Rottlund's townhomes as part of the development of the Homestead Collection?
A Certainly not to my knowledge, no.
Q Your role on the Homestead Collection was project



manager; is that correct?
A Yes. At the time it was -- started, that was my role.
Q Okay. If Town & Country Homes had asked BSB of Iowa to copy part of Rottlund's townhomes as part of the development of Homestead Collection, would you be aware of it?
A Most likely I would be, yes.
Q Do you have any reason to believe that Town & Country Homes, Inc., of Minnesota ever asked BSB of Iowa to copy part of Rottlund's townhomes?
A No, I do not.
Q Did BSB of Iowa have a copy of the plans for Rottlund's townhomes prior to designing the Homestead Collection?
A Have a copy of?
Q The plan -- the architectural design plans.
A For?
Q Rottlund.
A For any Rottlund back-to-back townhome; is that your question?
Q That works.
A We may have had some information on a particular -- I mean, one of the exhibits shows that we did have some information on -- on another project with



EXHIBIT F

Page 293

A Nothing stands out in my memory of that. So, no, I don't think we were there very long.
Q Can you look at Exhibit 109, please. It's a color picture.
A (Complies.) Okay.
Q As you sit here today, do you have any idea what the interior space of the Rottlund home you actually toured was?
A Specifically, no.
Q Do you have any reason to believe that what you see in picture 109 is, in fact, what you saw on the inside of that townhome?
A I -- I don't specifically recall that much about specific units. So very well -- very well could have been we saw this, but I -- I couldn't say a hundred percent sure that I saw this exact view.
Q Could have been very different from this, in fact, correct?
A Could have been, yes.
Q Did you notice anything unusual or unique about the Rottlund home you saw that day?
A Nothing unique. There were similarities in that -- arrangement of that floor plan, their projects, that we saw to other projects. I mean, it sort of all ran together, but...

Page 294

Q You don't have any specific memory of any specific unique ideas about Rottlund's townhome?
A No.
Q Did you have any memory of any specific unique ideas when you designed Exhibits 115 and 116?
A I'm sorry?
Q I just want to make sure your memory hasn't changed from the time that you drew Exhibit 115 and 116 and today. I understand you're testifying, as you sit here today, you don't remember there being anything unique. At the time that you drew Exhibits 115 and 116, which are the schematic designs for Town & Country's townhome --
A Mm-hm.
Q -- did you have a memory of anything on the tour that was unique about Town & Country Homes -- or I'm sorry, about Rottlund's townhome?
A No.
Q Did you break for lunch on this tour?
A I'm sure we did.
Q Do you know -- do you know how long you had for lunch?
A No. But I know where we went. One thing I remember.
Q Was it a sit-down restaurant?

EXHIBIT G

Page 295

A Yeah. It's Famous Dave's.
Q Bar-B-Que?
A Yeah. First time I've ever been there.
Q Good food?
A Yeah.
Q So that probably has to come out of our total number of hours for the tour, too, right?
A Yes.
Q You talked about Art Plante's goals, during the meeting you had that morning. Do you remember what those goals were?
A Again, I think the -- one of the reasons that BSB was there was because of our -- well, the relationship we had with -- with the group in Chicago but also just because of the box-over-box idea.
One of the reasons we were there is because we had worked with Art on a design consultation for the single-family homes at the Grove. That's where we met Art. We did that work actually in Chicago. And so I think Art had a good feeling about that.
Art brought us in for the back-to-backs to incorporate the ideas of the -- the box-over-box, the efficiencies. The things we had done successfully for him in the single-family, he

Page 296

wanted those translated into the -- the back-to-back product.
So that -- that's the kind of goal information he gave us. And -- and he also talked about basic square footage, room count, just the basic program, that physical program that he wanted them to use.
Q And you referred to that earlier in your testimony as a verbal script; is that correct?
A Yeah.
Q And if you look at Exhibit 26, specifically Page 2 of 9.
A (Complies.) Yes.
Q This is the written script; is that correct?
A It's a lot of the written script, yes.
Q Okay. Were there any oral requests that TCM had in addition to this written script as it related to the Homestead Collection?
A Any oral -- oral things that just weren't -- just -- just in general -- you know, general efficiencies and look for opportunities for flexibility and, you know, capitalize upon space, things like that that -- again, the box-over-box idea.
Q Besides looking for general efficiency, opportunities and flexibilities, capitalizing on

**EXHIBIT H TO THE SUPPLEMENTAL AFFIDAVIT OF BEN PATRICK IN SUPPORT OF DEFENDANTS BLOODGOOD SHARP BUSTER ARCHITECTS AND PLANNERS OF IOWA, INC. AND THE BLOODGOOD GROUP, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST PLAINTIFF ON NON-COPYRIGHT CLAIMS AND AFFIRMATIVE DEFENSES**

This document is a place holder for Exhibit H which was filed under seal in conventional or physical form with the Clerk's Office.

Page 65

A Yes. It -- it doesn't tell me anything. I don't remember the conversation, I don't remember the interaction, and I have had no time to look at any information behind here.
BY MR. KRUMMEN:
Q Sir, you can have as much time as you need.
A (Reviewing.) Okay. There is a -- the back of this is GM Homes' villas, the Cyprus; GM Home villas, Cyprus II; and GM Homes' villas, the Cedar. They all appear to be back-to-back townhouse units, two-car. One is an end unit, one is an interior middle unit, and the other one is an end unit as well.
First statement (as read): "Town & Country, Villas. Doug Buster called and faxed these to me after talking with Steve Sandelin. Steve was wondering if we could incorporate a breakfast nook in the Villas for Town & Country.
"Doug thought it might be good to call Art Plante and discuss with him what Steve is suggesting. Art did call you today 11:40 AM but I didn't talk" -- "Art did call you today 11:40 AM but I did not talk with him. I can call Art if you don't have time. Call me to let me know."
This is a letter from Chris Jorgensen to Larry

Page 66

Moore. First of all, I've never seen this letter, and I've never seen the plans behind it, and I did not fax them to anybody. Sorry.
Q So you deny that you faxed to Larry Moore the three-page or four-page attachment to Exhibit 102?
MR. FARMER: Objection.
A It says --
MR. FARMER: Objection. Lack of foundation regarding this document.
MS. NEWMAN: Same objection.
A Yeah. It's from Chris Jorgensen to Larry Moore. It says, "Doug Buster called and faxed these to me after talking with Steve Sandelin." It may be that Steve Sandelin faxed these to Chris Jorgensen. I did not fax these to Chris, and I've never seen this plan. And I'm not familiar with GM Homes' villas, and, in 1998, I was not working on back-to-backs. Sorry.
BY MR. KRUMMEN:
Q Did you speak with Steve Sandelin about the possibility of incorporating a breakfast nook into the Town & Country villas?
A I had no recollection of that discussion. I wasn't working on back-to-backs in '98.
Q Did Mr. Sandelin ever ask you to copy GM Homes'

Page 67

breakfast nook into the Town & Country Homes of Minnesota villas?
A I --
MS. NEWMAN: Objection as to form. Go ahead.
A I have no recollection of that conversation ever happening, and that is not something we would do.
BY MR. KRUMMEN:
Q What was your -- strike the question.
What knowledge do you have, if any, regarding the referenced conversation between you and Mr. Larry Moore about Exhibit Number 102 before you?
A I have no recollection of this conversation, I have no recollection of this action, and I have no recollection of the discussion about back-to-backs until I received a copy of Iowa -- BSB Iowa's work for Town & Country through a design development stage way -- way after the need for this.
Q Who is Joe Safin?
A Joe Safin is our partner, who runs the Chicago office.
Q Was he involved in the jurisdictional transfer of the Town & Country Minnesota back-to-back designs to Town & Country of Illinois?
A Yes. He would have been.

Page 68

Q What involvement did he have?
MS. NEWMAN: Objection as to foundation. Go ahead.
A You'll have to ask Joe Safin that.
BY MR. KRUMMEN:
Q I certainly intend to. I'm just curious who worked on that at this point in time.
MR. FARMER: Object to form.
A I can tell you I worked on the elevation part. Who Joe had work on the rest of the project I do not know. He'll be ready for testimony on that himself.
BY MR. KRUMMEN:
Q Who prepared the contract that related to the jurisdictional transfer? Did you or did Mr. Safin?
A That would have been Mr. Safin.
Q Do you have any knowledge regarding the jurisdictional transfer contract?
A No. I have no knowledge whatsoever about the contract.
Q Were you involved in any way, shape or form in the jurisdictional transfer con- -- contract? And when I say that, I'm relating it to the transfer of the designs from Town & Country Minnesota to Town & Country Illinois.

Page 69

A My involvement was a process of working for the Illinois office at the time and redeveloping the exteriors to be put into the Chicago market. I had no involvement with the plans. I had no involvement with the transfer of the product. I had no involvement with any units, any co-change or any other aspect of work. Only conceptual design work for the elevation.
Q When you say, "conceptual design work for the elevation," what are you referring to?
A I re-elevated Town & Country/BSB Minneapolis back-to-back townhouses for the Chicago marketplace.
Q And when you say you re-elevated them, what does that mean?
A I looked at what they were building in Minneapolis. I -- I didn't feel it was the right product for the Chicago market. I believe I was requested also by Town & Country to relook at it for the Chicago market, and they gave it -- Joe Safin asked me to help out on the project in terms of coming up with a design to be used in the Chicago marketplace, which I did, and then turned my designs back over to BSB Illinois to incorporate into their jurisdictional transfer.

Page 70

(Deposition Exhibit Number 103 was marked for identification by the reporter.)
THE REPORTER: 103.
MR. FARMER: I'm sorry. 103?
THE REPORTER: 103.
MR. FARMER: Thank you.
BY MR. KRUMMEN:
Q Sir, I've handed --
MS. NEWMAN: Before we begin, this is a Pinnacle-identified document with attorneys' eyes only stamped on it, before we go any further.
MR. FARMER: We will permit use of this document during this examination.
MR. KRUMMEN: Thank you.
BY MR. KRUMMEN:
Q Exhibit 103 begins with PIN00003 and runs through -0022.
A Mm-hm.
Q And on the right-hand side, it says, "Washington Square Back to Back Towns, Town & Country Homes, Aurora, Illinois," and below that, it says, "Bloodgood Sharp Buster," correct?
A That's correct.
Q Are you familiar with this document?
A I am somewhat familiar with this document as a

Page 71

result of the Illinois BSB corporation developing it for Town & Country of Illinois.
Q And this would be what in terms of BSB's Illinois vernacular? Construction drawings? What -- what do you refer to this type of document as?
MR. FARMER: Object to form.
A It appears to be a progress set somewhere between design development and construction documents. It may be a 90 percent set of construction documents. I don't know. But it's beyond -- it's beyond design development. It may not be finalized working drawings.
BY MR. KRUMMEN:
Q What changes did you make to the elevations which appear on Exhibit Number 103?
A Well, this is -- I don't know what year this is in. '00 -- sometime prior to '00 anyway. I remember I had changed the overall roof structure from a gable to a hip. I had broken the scale of one of the units down to a smaller gable so that when they're combined, two large gables wouldn't running into each other.
I looked at the siding structure and worked on a process to develop a wider siding structure on the bottom and a narrower siding structure on the

Page 72

top. I probably looked at the pitch of the roof and -- and maybe the addition of the dormers.
I don't remember the Town & Country Minnesota version of this building, but at the time, we had been adding dormers to a lot of work throughout the country because of the neotraditional influence. And we may have added the dormers at that time. It may have come with dormers. I don't remember.
Generally I was probably trying to stretch the envelope to, you know, spend as much money on elevations as -- as we possibly could and still meet the market demand for Town & Country in the Aurora market.
Q In your opinion, are the elevations that appear before you substantially similar to the elevations that were transferred to you from the BSB Iowa group?
MR. FARMER: Objection. Foundation. Form. Calls for a legal conclusion.
MS. NEWMAN: Same objections.
MR. FARMER: Asks for --
A The honest answer to that is, these are similar to what I remember developing for the Aurora project. I have very little remembrance of the transferred product from Minnesota to Iowa, but I do remember

developing the hip roof, the gable treatments and the double gable widths and the additional smaller gables. That --

MS. NEWMAN: Doug, there's not a question in front of you.

THE WITNESS: Sorry.

THE REPORTER: Number 5.

MR. KRUMMEN: Did I give you two? Could you give one of those back to me, sir? I gave you my --

MS. NEWMAN: No, no. He wants this too.

MR. KRUMMEN: I gave you my copy.

MS. NEWMAN: There you go.

BY MR. KRUMMEN:

Q Before you is Exhibit 5. It is a document which begins BSB 02593 and runs through 02607 (sic).

A Mm-hm.

Q On the right-hand side, it says, "Homestead Collection at Centennial Crossing, Maple Grove, Minnesota" and "Bloodgood Sharp Buster Architects & Planners, Inc."

A Mm-hm.

Q Now, this was, in essence, part of the jurisdictional transfer that took place between BSB Iowa and BSB Illinois, correct?



MR. FARMER: Objection. Form.

MS. NEWMAN: Before we begin, mine goes through 2608, not 07.

MR. KRUMMEN: If I said 7, that's a good correction. Mine goes through 08 as well.

MS. NEWMAN: Okay.

MR. FARMER: I will object to the form and lack of foundation regarding this document.

A Can you repeat the question?

BY MR. KRUMMEN:

Q The Exhibit 5 was part of the material that was transferred in that jurisdictional transfer between BSB Iowa and BSB Illinois, correct?

MR. FARMER: Same objections.

MS. NEWMAN: Objection as to foundation. You can answer if you know.

A I -- I don't get involved at that part of it, so if -- if -- I couldn't answer whether it is or not. It appears to be a Minneapolis product by Town & Country. I reviewed -- when I first reviewed Minneapolis product, I was not reviewing it at design development stage. I was reviewing it at an earlier stage of -- conceptual stage, not at this stage. So I -- I didn't study these when I did the elevation change. My guess is, I worked off of the



elevation sheet on this building.

BY MR. KRUMMEN:

Q That's the -- that's going to set the table for the next series of questions.

A Uh-huh.

Q And they -- they are as follows: Are the elevations that appear in Exhibit 5 substantially similar to the elevations that appear in Exhibit 103?

MR. FARMER: Objection to form. Calls for a legal conclusion. Lack of foundation regarding Exhibit 5.

MS. NEWMAN: Same objections.

A Is the exhibit in cluster page C1A-4 or the elevations of Exhibit Number 5 the same as -- or similar to the elevations of Exhibit 103? Is that your question?

BY MR. KRUMMEN:

Q Yes, sir.

A Similar and yet different. There's a general structure and massing that I see is tremendous similarities. I -- let me get to the elevation page of Washington Square.

MR. FARMER: I'd also lodge an objection to the request for lay opinion.



THE WITNESS: What was your objection, Counsel?

MR. FARMER: A request for lay opinion.

THE WITNESS: Oh.

A Sorry. I can't find the elevation page here.

MS. NEWMAN: It's 0008.

A 008. The pages were sticking here.

In terms of the page structure, quite different, the page structure of the elevations. There's four elevations on the Washington Square. There's only two elevations on the Homestead Collection.

In terms of lay opinions, I -- of the building, I can see a similarity that there are probably two unit types developed here. One is an interior unit that is quite possibly a usable unit on the end.

The Washington Square back-to-back is actually a four-unit building shown, whereas the major difference of the Homestead Collection Minnesota product, it appears that this is an eight-unit back-to-back building, not a four-unit back-to-back building.

The Washington Square is quite different in its roof structure because of the hip addition,

which is a -- a change to the end of the building. The double gable on top of double gable and actually creating a triple gable that happens on the Homestead Collection is not found on the Washington Square, which is a major difference in the building.

The introduction of brick in the Homestead Collection is a major change that was made on the Washington Square, where the brick is removed and a wider horizontal siding on the lower half of the building is installed.

The upper half of the building is much, much different because of the narrow horizontal siding used on the upper half of Washington Square, whereas the original Homestead Collection used the same width siding throughout but had an accent siding, had accent gable ends that were used.

So the differences are the scale of the building, from an eightplex down to a fourplex. The individual detailing is different with the change of the siding, the reduction and elimination of the brick, the adding of the gable end to the Washington Square, the adding of the dormers to the Washington Square, adding actually more shutter material to Washington Square than the original



Homestead.

BY MR. KRUMMEN:

Q Are they substantially similar?

MS. NEWMAN: Same objection.

MR. FARMER: Object to form. Foundation. Requests for lay opinion and legal conclusion.

MS. NEWMAN: Same objections. Go ahead.

A That's -- I don't think it's a proper question. The similarities aren't the right question here, Counsel. They are -- they are different elevations, because I changed them from one elevation to another.

They are similar because I know that they came from the same elevation. But they are heavily changed for a Chicago look as compared to a Minneapolis look. So I would say that it is not similar, by any means.

BY MR. KRUMMEN:

Q Your testimony is, the elevations in Exhibit 5 are not substantially similar to the elevations in Exhibit 103?

MR. FARMER: Objection. Mischaracterizes what he just said.

A Yeah. I would say they are quite different because of the changes that I made for the Chicago



marketplace. Substantially different.

BY MR. KRUMMEN:

Q Substantially different, not substantially similar, correct?

MS. NEWMAN: Objection as to form. Go ahead.

A I think your question is confusing. They are different because I made them different.

BY MR. KRUMMEN:

Q Are they substantially similar?

A I don't --

MR. FARMER: Objection. Asked and answered. Foundation. And calls for a legal conclusion and lay opinion.

MS. NEWMAN: Same objection.

A I would say not. No, they are not.

MS. NEWMAN: Counsel, can we take a few-minute break?

MR. KRUMMEN: Is there a way to get through this one document and then do that? And I apologize. I'm one copy short on this, for whatever reason. So if you two would be kind enough to share.

(Deposition Exhibit Number 104 was marked for identification by the reporter.)



THE REPORTER: 104.

BY MR. KRUMMEN:

Q Sir, I've handed you what's been marked as Exhibit Number 104. In the bottom right-hand corner, it begins with Bates label D 00001 through D 00014.

A Uh-huh.

Q On the right-hand side, it says, "Rottlund Homes," and then it deals with "The Villas II 8 Unit Condominiums." Have I accurately characterized the exhibit before you?

A Yes.

Q Now, the question is, are the elevations that appear in Exhibit 104 substantially similar to the elevations that appear in Exhibit 5?

MR. FARMER: Object to form. Lack of foundation regarding this document. Calls for a legal conclusion, lay opinion. And I would just ask what topic under the BSB Illinois notice this line of questioning goes to.

BY MR. KRUMMEN:

Q You may answer.

MR. FARMER: You're not going to identify which topic of the BSB Illinois notice this line of questioning goes to, Mr. Krummen?

MR. KRUMMEN: You have no standing to