Court File No. 01-1980 / ROTTLUND / Pinnacle
Krummen Affidavit dated September 8, 2004

Exhibit R1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

THE ROTTLUND COMPANY, INC. D/B/A ROTTLUND HOMES, a Minnesota Corporation,
Plaintiff,
vs. No. 01-CV-1980(DSD/SRN)
PINNACLE CORPORATION D/B/A TOWN & COUNTRY HOMES, an Illinois Corporation, TOWN & COUNTRY HOMES, INC., a Minnesota Corporation, BLOODGOOD, SHARP, BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., an Iowa Corporation and THE BLOODGOOD GROUP, INC., an Iowa Corporation,
Defendants.
------------------------
TOWN & COUNTRY HOMES, INC., a Minnesota Corporation,
Third-Party Plaintiff,
vs.
BLOODGOOD, SHARP, BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., an Iowa Corporation,
Third-Party Defendant.

Videotaped deposition of PAUL ANDERSON taken before CYNTHIA A. SPLAYT, C.S.R., and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at Suite 295-E, One Pierce Place, in the City of Itasca, DuPage County, Illinois, commencing at 9:04 o'clock A.M. on the 10th day of December, A.D., 2003.

number for the Noggle farm, which is
also encompassing the Washington
Square community, correct?
A. Yes.
Q. The Noggle farm, that is,
also encompasses the Homestead parcel,
correct?
A. Yes.
Q. One is single family, that
would be the Homestead portion of the
Noggle farm, and the other is
multifamily, which is the Washington
Square portion of the Noggle farm,
correct?
A. Yes.
Q. Is there a third parcel of
land?
A. No.
Q. There are two product types
that are both deemed multifamily at
the Noggle farm, correct?
A. Yes.
Q. There's a manor back-to-back
townhome, but there's also a row

townhome, correct?
A. Yes.
Q. How can I figure out which particular page relates to the multifamily back-to-back and which particular page relates to the multifamily row townhomes?
A. That cannot be done with this document.
Q. So when you turned me up to I believe the page number was 80017, we have an aggregate multifamily number of units closed in the month of September of 2003, and when I say aggregate, I mean that includes both the back-to-back manor townhome sales and the row townhome sales that were occurring at this Washington Square parcel of the Noggle farm, correct?
A. Yes.
Q. Now, the next question is why doesn't Town & Country of Illinois break down its income statement to reflect sales of

Exhibit R2

UNITED STATES DISTRICT COURT DISTRICT O
FOURTH DIVISION No.:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -The Rottlund C
d/b/a Rottlund Homes, a MinnesotaCorporation,
Plaintiff,vs.
Pinnacle Corporationd/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,
Defendants,
and
Town & Country Homes, Inc.,
a Minnesota Corporation,
Third-Party Plaintiff,
vs.
Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa Corporation,
Third-Party Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
Videotaped
30(b)(6) Deposition of
BLOODGOOD SHARP BUSTER ARCHITECTS &
PLANNERS OF ILLINOIS, INC.
(Testimony of Douglas N. Buster)
Thursday March 6, 2003 9:03 a.m.

BY MR. KRUMMEN:
Q Any recollection of any conversations with Mr. Sandelin about the back-to-back idea?
MR. FARMER: Objection. Form.
A No. The only conversations I've had on back-to-back has been related to the transfer of Minneapolis product to the Chicago market. That's all.
BY MR. KRUMMEN:
Q I want to back up to early 1998 and ask you what your position was and which entity you worked for at BSB.
A I think at the time in '98 I would have still been a part of the Illinois corporation in terms of working for the Chicago office. And about '9- -- let's see. So about '99 I went to the headquarters function, representing the entire company.
Q So when you were speaking with Steve Sandelin about the front-to-back townhome referenced in Exhibit 101, you were working for BSB Illinois; is that true?
MS. NEWMAN: Objection as to foundation, form. Go ahead.
A I don't know the exact date. But any conversation I've had with Steve Sandelin was on front-load

through townhouses, not on back-to-back townhouses ever.

MR. KRUMMEN: And I'll move to strike as nonresponsive.

BY MR. KRUMMEN:

Q The question, sir, related to which hat you were wearing. Was it the BSB Illinois group that you were working for as of April 9, 1998, or was it someone else?

A On April 9, 1998, I would have been speaking to Steve Sandelin about front-load through townhouses, probably representing the Illinois group, but I may have also been functioning as a national representative as well because of the connection with Town & Country.

Q Now, what do you mean by "a national representative"?

A Meaning that I have an interest in all the company as the majority stockholder of our company.

Q But you didn't --

A I'll help any -- any office that needs my help at any time. I tend to help them, and that's been for a long time, not just since '99.

Q But as of April of 1998, you were not working for the parent company, The Bloodgood Group, Inc., were

you?
A I work for the parent company every day. But my billing was assessed through the Illinois corporation in 1998.
Q Where was your title held?
A My title at the time?
Q Correct.
A Been senior vice president.
Q Of BSB Illinois, correct?
A Of -- of -- no. Of Bloodgood Sharp Buster Architects and Planners, Inc. Had nothing to do with BSB Illinois, my title. My title has never been broken down to Illinois.
I have an office in Illinois. I represent the entire company. Even before going on to a headquarters function, I represented the entire company.
If I did work for one of the regions while I was involved with a region, I would bill intercompany, work to that region, whether it be Iowa or California or Florida. And if I did work for Chicago, I billed my time to Chicago.
Q Could you pull Exhibit 97 back out of the pile.
A (Complies.) Uh-huh.
Q As of April 9, 1998, which box did you work for?

MR. FARMER: Objection. Foundation.
A As of April 09, 1998, I worked for every one of those boxes.
BY MR. KRUMMEN:
Q As of April 9, 1998, which entity on Exhibit Number 97 did you hold position or positions with?
MR. FARMER: Objection. Foundation regarding this document.
A I don't know the legalities of your question. In April of 1998, my title was senior vice president of Bloodgood Sharp Buster Architects and Planning, Inc., and I had a senior vice president role in virtually all of these subsidiary companies of the parent company, The Bloodgood Group.
BY MR. KRUMMEN:
Q Including the Illinois entity, correct?
A Sure.
Q Why were you talking to Steve Sandelin about front-to-back townhome designs in or about April of 1998?
MS. NEWMAN: Objection as to form and foundation. Go ahead.
A As -- as if the question is related to why am I speaking to Steve Sandelin about front-to-back, front through -- front-loaded through townhouses

for the Minneapolis market? Is that your question?

BY MR. KRUMMEN:

Q It is.

A Because I was acting as a liaison to make sure that Steve Sandelin felt comfortable transferring Town & Country work to another group outside the Chicago area, because he had never worked with any of our other groups before.

Q What was your involvement, if any, subsequent to this conversation with Mr. Sandelin that occurred in or about April of 1998 --

MR. FARMER: Object to form.

BY MR. KRUMMEN:

Q -- as to Town & Country Minnesota townhomes, be they front-to-back, back-to-back or of any other type?

A I don't have any recollection whatsoever. I personally don't ever remember the meeting happening, because I assume that they decided to go to a back-to-back. I had talked to Steve Sandelin about front-load only. I've never had the conversation with Steve about back-to-back.

Q So as far as you can recall, the next interaction you personally had with respect to back-to-back townhomes and Town & Country Minnesota was when

A My involvement was a process of working for the Illinois office at the time and redeveloping the exteriors to be put into the Chicago market. I had no involvement with the plans. I had no involvement with the transfer of the product. I had no involvement with any units, any co-change or any other aspect of work. Only conceptual design work for the elevation.

Q When you say, "conceptual design work for the elevation," what are you referring to?

A I re-elevated Town & Country/BSB Minneapolis back-to-back townhouses for the Chicago marketplace.

Q And when you say you re-elevated them, what does that mean?

A I looked at what they were building in Minneapolis. I -- I didn't feel it was the right product for the Chicago market. I believe I was requested also by Town & Country to relook at it for the Chicago market, and they gave it -- Joe Safin asked me to help out on the project in terms of coming up with a design to be used in the Chicago marketplace, which I did, and then turned my designs back over to BSB Illinois to incorporate into their jurisdictional transfer.

(Deposition Exhibit Number 103 was marked for identification by the reporter.)

THE REPORTER: 103.

MR. FARMER: I'm sorry. 103?

THE REPORTER: 103.

MR. FARMER: Thank you.

BY MR. KRUMMEN:

Q Sir, I've handed --

MS. NEWMAN: Before we begin, this is a Pinnacle-identified document with attorneys' eyes only stamped on it, before we go any further.

MR. FARMER: We will permit use of this document during this examination.

MR. KRUMMEN: Thank you.

BY MR. KRUMMEN:

Q Exhibit 103 begins with PIN00003 and runs through -0022.

A Mm-hm.

Q And on the right-hand side, it says, "Washington Square Back to Back Towns, Town & Country Homes, Aurora, Illinois," and below that, it says, "Bloodgood Sharp Buster," correct?

A That's correct.

Q Are you familiar with this document?

A I am somewhat familiar with this document as a

result of the Illinois BSB corporation developing it for Town & Country of Illinois.

Q And this would be what in terms of BSB's Illinois vernacular? Construction drawings? What -- what do you refer to this type of document as?

MR. FARMER: Object to form.

A It appears to be a progress set somewhere between design development and construction documents. It may be a 90 percent set of construction documents. I don't know. But it's beyond -- it's beyond design development. It may not be finalized working drawings.

BY MR. KRUMMEN:

Q What changes did you make to the elevations which appear on Exhibit Number 103?

A Well, this is -- I don't know what year this is in. '00 -- sometime prior to '00 anyway. I remember I had changed the overall roof structure from a gable to a hip. I had broken the scale of one of the units down to a smaller gable so that when they're combined, two large gables wouldn't running into each other.

I looked at the siding structure and worked on a process to develop a wider siding structure on the bottom and a narrower siding structure on the

top. I probably looked at the pitch of the roof and -- and maybe the addition of the dormers.

I don't remember the Town & Country Minnesota version of this building, but at the time, we had been adding dormers to a lot of work throughout the country because of the neotraditional influence. And we may have added the dormers at that time. It may have come with dormers. I don't remember.

Generally I was probably trying to stretch the envelope to, you know, spend as much money on elevations as -- as we possibly could and still meet the market demand for Town & Country in the Aurora market.

Q In your opinion, are the elevations that appear before you substantially similar to the elevations that were transferred to you from the BSB Iowa group?

MR. FARMER: Objection. Foundation. Form. Calls for a legal conclusion.

MS. NEWMAN: Same objections.

MR. FARMER: Asks for --

A The honest answer to that is, these are similar to what I remember developing for the Aurora project. I have very little remembrance of the transferred product from Minnesota to Iowa, but I do remember

developing the hip roof, the gable treatments and the double gable widths and the additional smaller gables. That --

MS. NEWMAN: Doug, there's not a question in front of you.

THE WITNESS: Sorry.

THE REPORTER: Number 5.

MR. KRUMMEN: Did I give you two? Could you give one of those back to me, sir? I gave you my --

MS. NEWMAN: No, no. He wants this too.

MR. KRUMMEN: I gave you my copy.

MS. NEWMAN: There you go.

BY MR. KRUMMEN:

Q Before you is Exhibit 5. It is a document which begins BSB 02593 and runs through 02607 (sic).

A Mm-hm.

Q On the right-hand side, it says, "Homestead Collection at Centennial Crossing, Maple Grove, Minnesota" and "Bloodgood Sharp Buster Architects & Planners, Inc."

A Mm-hm.

Q Now, this was, in essence, part of the jurisdictional transfer that took place between BSB Iowa and BSB Illinois, correct?

MR. FARMER: Objection. Form.
MS. NEWMAN: Before we begin, mine goes through 2608, not 07.
MR. KRUMMEN: If I said 7, that's a good correction. Mine goes through 08 as well.
MS. NEWMAN: Okay.
MR. FARMER: I will object to the form and lack of foundation regarding this document.
A Can you repeat the question?
BY MR. KRUMMEN:
Q The Exhibit 5 was part of the material that was transferred in that jurisdictional transfer between BSB Iowa and BSB Illinois, correct?
MR. FARMER: Same objections.
MS. NEWMAN: Objection as to foundation. You can answer if you know.
A I -- I don't get involved at that part of it, so if -- if -- I couldn't answer whether it is or not. It appears to be a Minneapolis product by Town & Country. I reviewed -- when I first reviewed Minneapolis product, I was not reviewing it at design development stage. I was reviewing it at an earlier stage of -- conceptual stage, not at this stage. So I -- I didn't study these when I did the elevation change. My guess is, I worked off of the

elevation sheet on this building.

BY MR. KRUMMEN:

Q That's the -- that's going to set the table for the next series of questions.

A Uh-huh.

Q And they -- they are as follows: Are the elevations that appear in Exhibit 5 substantially similar to the elevations that appear in Exhibit 103?

MR. FARMER: Objection to form. Calls for a legal conclusion. Lack of foundation regarding Exhibit 5.

MS. NEWMAN: Same objections.

A Is the exhibit in cluster page C1A-4 or the elevations of Exhibit Number 5 the same as -- or similar to the elevations of Exhibit 103? Is that your question?

BY MR. KRUMMEN:

Q Yes, sir.

A Similar and yet different. There's a general structure and massing that I see is tremendous similarities. I -- let me get to the elevation page of Washington Square.

MR. FARMER: I'd also lodge an objection to the request for lay opinion.

THE WITNESS: What was your objection, Counsel?

MR. FARMER: A request for lay opinion.

THE WITNESS: Oh.

A Sorry. I can't find the elevation page here.

MS. NEWMAN: It's 0008.

A 008. The pages were sticking here.

In terms of the page structure, quite different, the page structure of the elevations. There's four elevations on the Washington Square. There's only two elevations on the Homestead Collection.

In terms of lay opinions, I -- of the building, I can see a similarity that there are probably two unit types developed here. One is an interior unit that is quite possibly a usable unit on the end.

The Washington Square back-to-back is actually a four-unit building shown, whereas the major difference of the Homestead Collection Minnesota product, it appears that this is an eight-unit back-to-back building, not a four-unit back-to-back building.

The Washington Square is quite different in its roof structure because of the hip addition,

which is a -- a change to the end of the building. The double gable on top of double gable and actually creating a triple gable that happens on the Homestead Collection is not found on the Washington Square, which is a major difference in the building.

The introduction of brick in the Homestead Collection is a major change that was made on the Washington Square, where the brick is removed and a wider horizontal siding on the lower half of the building is installed.

The upper half of the building is much, much different because of the narrow horizontal siding used on the upper half of Washington Square, whereas the original Homestead Collection used the same width siding throughout but had an accent siding, had accent gable ends that were used.

So the differences are the scale of the building, from an eightplex down to a fourplex. The individual detailing is different with the change of the siding, the reduction and elimination of the brick, the adding of the gable end to the Washington Square, the adding of the dormers to the Washington Square, adding actually more shutter material to Washington Square than the original

Homestead.

BY MR. KRUMMEN:

Q Are they substantially similar?

MS. NEWMAN: Same objection.

MR. FARMER: Object to form. Foundation. Requests for lay opinion and legal conclusion.

MS. NEWMAN: Same objections. Go ahead.

A That's -- I don't think it's a proper question. The similarities aren't the right question here, Counsel. They are -- they are different elevations, because I changed them from one elevation to another.

They are similar because I know that they came from the same elevation. But they are heavily changed for a Chicago look as compared to a Minneapolis look. So I would say that it is not similar, by any means.

BY MR. KRUMMEN:

Q Your testimony is, the elevations in Exhibit 5 are not substantially similar to the elevations in Exhibit 103?

MR. FARMER: Objection. Mischaracterizes what he just said.

A Yeah. I would say they are quite different because of the changes that I made for the Chicago

knowledge?
A Well, from experience, for one thing. From my traveling around the country, I've seen many back-to-back products, but I've seen also a multitude of other multifamily product types, and particularly in the Kimball Hill Talbot Mill case.
It was really a combination of knowing back-to-back as well as active, adult, multifamily product, flat villas, a ranch villa product, understanding how single-floor living works, understanding how to connect a ranch -- a flat-over-flat product to a townhouse product and make the roofs work.
So from my part, it was past experience. For others, it may have been an educational process of structures or connections but less on the design more than the technical. I probably led the design at that time.
Q Do you know whether, since that project was built, Kimball Hill has built any other back-to-backs in the Chicago area?
A I have no idea. They had been building back-to-backs for years, well from the early '80s, if not the '70s.
Q Now, you talked a bit about your work preparing

re-elevations --

A Mm-hm.

Q -- in connection with Washington Square.

A Yes.

MS. NEWMAN: You have to say yes.

A Yes.

BY MR. FARMER:

Q Thanks.

How did you get involved with that work?

A Well, I don't --

Q Who asked you to do it?

A Joe Safin. Joe Safin is the partner who runs the Chicago office. Joe generally gets me involved with multifamily for sure but generally would have not got me involved with a simpler product like a back-to-back, except for probably his schedule.

I may have gotten involved because the rest of the designers were tied up on existing commitments, but I remember Joe just simply asked me could I work on Town & Country's back-to-back re-elevation, as well as my past relationship with Town & Country people and the fact that I'd worked with them for so many years on so many different other product types.

Q Now, can you give me a time frame for when this

together today in this lawsuit?
A I've never seen or walked Rottlund product from their land. I have driven through Minneapolis with friends and other business things that we've done in Minneapolis and seen a Rottlund sign and seen that it was a Rottlund community.
I've never been in a Rottlund community, I've never walked a Rottlund community, and I did not have Rottlund material with me when I re-elevated or did Washington Square.
Q Had you had any discussions with Steve Sandelin or anybody else at the Pinnacle Lombard office regarding Rottlund product at the time you embarked upon the re-elevation?
A No. Word never came up.
Q Take me through what you did in terms of this re-elevation work. Number one, how long did it take you to do?
A Well, I'm generally considered extremely fast. I'm considered one of the fastest designers in -- in our office as well as in the industry. But since it was our own product that I was working from, it wasn't a reestablishment of a new.
I -- I probably took the existing elevation sheets off of the BSB Iowa drawings, laid them down

on my table to get the -- the scale element of the building, simply was able to recreate the massing so that I didn't have to start from scratch on the massing, but then pulled out the bottom sheet and just started to feel how the building looked and keep what I wanted to keep and not keep what I wanted to keep. My part on that generally takes a day and a half or two.

Q What do you mean by "recreate the massing"?

A Well, I first studied the building, keeping gables. And I didn't like that for Aurora. I thought Aurora could afford the -- the feel of the hip. And then breaking down the scale of the building, so I changed stuff from a gable to a hip.

Q Explain the term "massing."

A "Massing" is generally the scale, the mass of the building. It's how it tends to feel as you look at an architectural element. Generally what -- what we try to do in suburban multifamily work is break the scale of massing to lower on the ends, higher in the middle.

And if it's an extremely simple product and it -- it simply has a one-truss design across -- which every builder has in their portfolio. It's not a matter of being embarrassed about simple