Court File No. 01-1980 / ROTTLUND / Pinnacle
Krummen Affidavit dated September 8, 2004

Exhibit R3

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

- - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes, a Minnesota
Corporation,

Plaintiff,

vs.

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc.,
a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - -

Deposition of

ARTHUR H. COBB

Volume I

Friday, June 11, 2004

10:19 a.m.

A Sometime, as I recall, in the winter of 2002, 2003.
Q Who initially contacted you?
A I don't remember. It would have been an attorney at the Fredrikson firm, I think.
Q Do you recall what was discussed about the subject matter of this lawsuit?
A There was identification of the parties. There was a sentence or two of the nature of the claim, that Rottlund was making copyright claims or had made copyright claims or was expected to make copyright claims against Town & Country Homes and a related Illinois company, that Fredrikson was representing Town & Country Homes, that Holland & Knight was representing the Illinois company. And that's all I recall from an initial conversation.
Q Have you ever issued a report on damages in a copyright architectural related case before?
A I don't believe so. Copyright cases, yes, but not a copyright architectural case.
Q I'd like to just lay out your reports. If you have a copy, that's fine; if not, I'm going to ask the court reporter to mark it and have you identify all three of them for the record.

Q Let's talk about the damages provision in the copyright act. Are you generally familiar with the copyright act damages provision?
A Only very generally.
Q You don't purport to be an expert in the damages provision of the copyright act, do you?
A I do not.
Q But you did cite it in your May 14th, 2004, report, correct?
A Yes. Yes, I did.
Q Would you please turn to the section where you did cite the damages provision in the copyright act?
A Sure.
Q And you could perhaps identify for me which page that's on?
A Yeah, I'll find it. (Reviewing.) Did you already find the page?
Q I think it's 33, but let me know if I'm wrong.
A I just got 33 as well. You're correct.
Q On page 33 of your May 14th report, you cite the U.S. Code 504(b) of Chapter 17 U.S.C, correct?
A I don't know if it's U.S.C. 17, but I cite U.S. Code in Section 504.
Q Do you understand that there is more than one

methodologies under the copyright act, correct?
A We have. We've said that there were at least three.
Q And we've defined them as Rottlund's actual damages, that's the first one, correct?
A Yes.
Q The second one is the infringer's profits, correct?
A Yes.
Q And the third one is the reasonable royalty, correct?
A That's correct.
Q Now I want to ask the same question I asked before, but now specifically as it relates to each of those three methodologies. And the first question I have is: What do you believe Rottlund's actual damages are? What's your expert opinion regarding that question?
A I believe that Rottlund has not set forth a reasonable estimate of their damages in that regard. I believe that a reasonable estimate would result in a very low number, especially compared to the numbers that are currently set forth.
Q Do you have a number?

A No, I do not.

Q Second question is what do you believe the infringer's profits are in this matter?

A If there is a determination of liability and causation, it would depend on the measure that comes out of that. If infringer -- one of the problems that clouds this whole issue is the inclusion of the other products, which I find to be absolutely disingenuous. If there is such a finding, there's one consideration.

A next is if there are just the allegedly infringing products. If it's found that the total end unit total interior unit at each project is infringing, then there's another measure of the profits that infringer would generate on those.

If there's a finding related to apportionment and instead of looking at a whole building which has many components, parts, features and the like, that are generic, common, usual, standard, whatever words can assign, then there is a third level.

I think there are different amounts for each one of those. I don't know what the final finding would be. And it dramatically changes

And I understand that the other Rottlund products are at least allegedly subject to protection and therefore have some unique features and attributes that draw to them.

So that caused -- that causes me some concern about the causal link there, let alone the causal link of a sale of a property -- one of the other properties that is not subject to, is not infringing.

So I don't find the causal links that I would look for. So liability is somebody else's to determine. And obviously I have my observations of that just from going through the material.

The causal links here, I'm -- I would be unable to tell anybody -- if you hire me, if a judge hired me, I'm unable to tell anybody that I can really find good causal links here.

As I said when we first started, when I sit back and look at this having looked at real estate in this market and other markets in the United States since the 1970s, is it likely that there's one of these 104 or two of these 104 that if this project didn't exist, if Centennial didn't exist, may have gone into a Rottlund

development and looked at the Rottlund development and said, "You know, this is a little different location than what we were looking at, but this is just fine. This is a fine location we're looking at. We never went to the one that was a little bit better because it wasn't developed." That's not an unlikely scenario. I can't tell you that's not right.

I go the next step of that, are there one or two people that would have bought Rottlund's protected product who bought this? That's -- is that possible? Yes. Is that as likely as just buying generally? No.

So that's why I tell you I don't think it's zero. I think there is some prospect. I haven't made a calculation of it obviously. I can't tell you if it's a prospect that rises above a level of speculation.

But is it possible that there is some small group of individuals, families that bought the 104 units that but for the development existing or but for the infringing units infringing, if that's determined, would have bought a Rottlund, that's possible. And as you go across the other projects, that's possible.

Obviously some of the other projects are closer, same school district, for example, Town & Country project and a Rottlund project.

Q Have I heard you out?

A I'm not sure because it was a long time ago and I'm not sure I hit everything, but that's what comes to mind as we're discussing things.

Q I think if I understand what you're saying, there were two ways to look at Rottlund's actual damages as to the Centennial Crossing development. One way is Rottlund would have bought that land and developed it itself, correct?

A I believe so.

Q The second way is Rottlund didn't get that land but some of the purchasers of the Homestead Collection, for example, may have bought a Rottlund Villa II had Town & Country not built Homestead Collections at Centennial Crossing, correct?

A Either had not -- either Centennial Crossings hadn't been done or they hadn't bought Homestead Collection at Centennial.

Q Fair enough.

A Yeah. So what you said is correct. I just add

slightly to it.
Q And then in terms of the second methodology, I think you were saying you would concede it's possible maybe one or two out of the 104 Homestead Collection sales at Homestead at Centennial Crossing would have gone to Rottlund. You could envision that, but you're not certain?
A I wouldn't concede that. I envision that. I have not set out to calculate that or demonstrate that nor have I set out to find a method to do that. I don't know -- one of the things that's kind of -- sometimes parties are harmed and you just can't put your finger on how much it is or, or, or.
So that I can't sit here today and tell you how to come up with whether it's one or four, whatever the number is. And I don't know that you could come up with that. And it may be zero, but it certainly may not be zero.
Q But what you'd like to see is some kind of a survey of the Town & Country Homestead purchasers that says, "If I couldn't have purchased this Homestead Collection at Centennial Crossing from Town & Country, I would

have purchased a Rottlund Villa II unit," would that be the kind of evidence you're looking for?
A That would be at least a starting point or some point.
Q What other evidence can you envision that would lead you to not criticize Ms. Snelson for speculating or having no basis for her actual damages opinion as to the Centennial Crossings Homestead Collection Villa II damages?
A There's an awful lot of things that would fit that, the topic we're going at. I think there would be some meaning -- I haven't thought about this before, so I'm just doing this as we're going.
I think there would be some meaning as to a survey, either written or interview, of the 104 or even a sample of the 104. And sit down with them and say, "Where did you look at homes? What advertising?" And I'll show them some, because I want to prompt, "Did you see a Pulte ad? Did you see? Did you see? What were some of the criteria you were looking for when you were out looking for a home? Were you making a determination you only looked at two bedrooms? Did you make a determination of this price

good indication, may have a business meaning, that the opening and the sales enjoyed by Centennial are coming at the expense of Rottlund 10 or Rottlund 12.

Q 13?

A 13, Maple Lakes and Rush Creek. So there may be a way, and it may only be a starting point, it may not work. And there are other factors as who's advertising, promoting, and when and where; but there may be other things to look at that'll at least give a starting point and that starting point in and of itself may tell you what the next step or steps are.

And it may lead to the conclusion that there's just competitors in the marketplace and, you know, they're kind of going toe to toe, and both of them did whatever they were going to do.

Q Let's stick with the Maple Grove Centennial Crossing. And the first question I have for you is there were purchasers in Maple Grove based on what you know for the Homestead Collection, correct?

A Yes.

Q Approximately 104 of them, correct?

A At least 104.

Q There were also purchasers in Maple Grove for the Rottlund Villa II, correct?
A I believe so.
Q You'd agree that there was a demand for the Homestead Collection in Maple Grove, correct?
A Yes.
Q Was also a demand for the Villa II in Maple Grove, correct?
A Yes. I can't tell you if that demand is specific to the Homestead or specific to the Villa II. What I can tell you is that there's demand for the location, the price point, standard features, square footage, two bedroom, whatever the amenities are, which may be encapsulated in those two; but from my experience people don't buy because of the name of a product or totally an image of a product, but they're looking at more substantive issues.
But there certainly was demand and I think factual demand by the existing of sales that led to purchase of Homesteads and Villas in Maple Grove in the relevant time period.
Q And you'd also admit that we're not comparing a single-family home to a multiple-family home when we're comparing a Homestead to a Villa II,

Did I read that correctly?
A Yes, you did.
Q Next sentence says, quote, "Once a copyright holder establishes with reasonable probability the existence of a causal relationship between the infringement and a loss of revenue, the burden properly shifts to the infringer to show that this damage would have occurred had there been no taking of the copyrighted expression."
Did I read that correctly?
A Yes, you did.
Q What have you done to show that the damage Rottlund sustained would have occurred had there been no taking of Rottlund's Villa II copyrighted buildings and designs at Centennial Crossing in Maple Grove?
A First I started earlier in the sentence and I looked at causal relationship where it says "Once a copyright holder," Rottlund, "establishes with reasonable probability the existence of a causal relationship" --
Q And that relates to the four factors in the prior sentence, doesn't it, Mr. Cobb?
You're not lawyer, are you?
A No, I'm not.

Q Or a judge?
A No, I'm not.
Q Or a law school professor?
A No, I'm not.
Q And you've never seen this decision before?
A That's true.
Q And you come in here and you criticize Ms. Snelson for speculating when you have the burden, according to this particular case, correct?
A That's not how I read this.
Yes, I stand by criticisms of Ms. Snelson.
Q What have you done to --
MR. SCHWIEBERT: Please let him answer.
BY MR. KRUMMEN:
Q Please tell me what you've done to carry your burden, Mr. Cobb. You don't even know that you have a burden in this regard?
A As opposed to arguing, can you let me read this?
Q I want to know if you have the burden or if Ms. Snelson has it. And you said Ms. Snelson had it and you just got impeached, didn't you?
A I'm not sure if I did. Let me read this. I may have. And one thing that's interesting, when I

of approximately $207,000.
Q And then you went on and calculated some damages in terms of infringer's profits for the Chateau Collection, correct?
A Yes. And that's similar to the calculation for the Homestead with the understanding that as of yet we don't have the particular Chateau information so we're using the Homestead as a proxy, if you will, for Chateau, proxy to use as a measure of profitability.
Q I'd like to back all the way up to page 25 of your report.
A All right.
Q It's marked as Exhibit 412 for the record. And on page 25, I think briefly you indicated earlier that this at least as to the 2003 information came out of Town & Country Minnesota Division's year-end December 31, 2003, financial statements, correct?
A Yes.
Q And that particular methodology was used for the year-end 2002, the year-end 2001, and the 2000 year-end as well, correct?
A Yes.
Q And then you also must have had access to the

and 56?
A I don't -- I don't know -- first, I don't know when trial will be. I don't know the outcome of trial. And trial may include someone saying you're not building any more of these and you're not selling what you have unless you reconfigure them.
I'm not aware of what kind of response or I don't know what response Town & Country would have regarding building out the planned units. But in my understanding if and as Town & Country builds out those units and they are infringing, they certainly become the subject of damages. But the -- they don't exist. In this time frame they didn't exist.
Q Well, you don't know how many of those 130 units at Cornerstone Lakes have not even begun construction, do you?
A Not as I sit here today.
Q And I got to 130 by the 186 eligible for construction and the 56 that have been constructed, sold and closed?
A I get to the same amount.
Q All right. So now my question is if Town & Country has an asset in those 130 where

construction is started but they have not yet sold and closed, why didn't you calculate that asset as potential damage?

A Okay. One, because construction isn't complete; two, they're not sold; three, they're not closed; and four, if there's any reality to the total fit and feel, total gestalt, that doesn't exist for a property that is a foundation. That doesn't exist for a property that's a foundation with just stud walls up. Doesn't exist for a property that's just foundation, stud wall, sheathing. That phenomenon, if it's there and if it's genuine doesn't exist until a property is near completion.

Q Why didn't you calculate damages based upon the number of Homestead units that were either near completion or beyond?

A Because, you know, I'm working with the information available in a moving time period. And I know there was a trial date set in the past and I frequently hear "Here's the trial date," that means that's the trial date or the trial date's in the future and it's more likely that it's sometime in the future. We know these projects are ongoing.

For example, regarding Chateau we haven't gotten basic information yet because Town & Country prudently keeps its business records for the purpose of running its business, not for the purposes of litigation.

So it's our understanding that this report at some point in time would be updated.

Q Does Town & Country have any business records at all that would reflect which allegedly infringing units are near completion?

A As I would broadly define business records, yes. Certainly must be records that are demonstrating the deliveries of the various products and components that go into the homes. I don't know that there's a percent completion report that tracks an individual eight-plex let alone an individual unit's progress in terms of the formal accounting system.

Q Are you aware of any plans that Town & Country has to not construct the 130 Homestead units which you've referenced are currently being planned for Cornerstone Lake on page 18 of your report?

A Yes.

Q But not yet closed and sold as of the time you

many components to that home. One of the factors looked at in pricing is the costs of individual components.

One of the things that's considered is the overall profitability of the home. And there are often considerations made of profitability on a pro rata basis or a percentage basis related to individual costs or components of individual -- components of costs.

Q I want to let you finish, but I don't understand what you mean by a pro rata basis of costs. Could you explain that for me?

A Sure. I have $100 that I spent on a home and I sell it for 120. So there very often is an analysis, can be an analysis, should be an analysis saying as my costs go, I am able to price in the marketplace for a 20 percent margin from 100 to 120.

So as I start to look at individual components of cost, I will look at them and make considerations of them based on around 20 percent.

Q Does Town & Country add up all of its costs, add 20 percent and that's the way it determines its selling price?

A I don't know.
Q But that's the assumption you make in your damages calculation, correct?
A That's the analysis that I've made. We're rounding the numbers; but in general conversation, that's the analysis I made.
Q Are you aware of any generally accepted accounting principle or any FASB statement that would say you can fairly attribute costs against profit on a pro rata basis --
A No.
Q -- or profit against costs on a pro rata basis rather?
A No, it's not addressed one way or another in generally accepted accounting principles.
Q Have you ever allocated costs on a pro rata basis towards profit or derived profit on a pro rata basis from costs in any prior copyright infringement damages analysis that you've conducted?
A I believe so.
Q Which case?
A There was a case brought against Fallon McElligott by some other company. I don't remember who the plaintiff was.

Q Is that disclosed in your report anywhere?
A I don't believe so.
Q Are there any other cases where you conducted a damages methodology in a copyright matter and assumed profits are derived pro rata from costs?
A Not that I recall.
Q Do you have any of your prior reports or working papers for this, is it Fallon McElligott case?
A No, I don't.
Q Could you spell that last word for me?
A Perhaps. M-c-E-l-l-i-g-o-t (sic), I think.
Q Can I just refer to that as the Fallon case?
A Please.
Q The Fallon case was a copyright infringement case, as I understand it. Correct?
A Yes.
Q But it did not involve architectural works, correct?
A Did not.
Q So it's fair to say you've never in the past assumed in a copyright infringement case involving architectural works that profits are derived pro rata from costs?
A That's true.
Q So the only case that you're aware of in the

past that you've ever worked on involving copyright infringement where you did make a damages methodology assumption that profits were derived pro rata from costs is this Fallon case, correct?
A Yes.
Q Did the court exclude any portion of your damages opinion in the Fallon matter?
A No.
Q Did you --
A It never went to trial.
Q Did you offer deposition testimony in the Fallon matter?
A No.
Q Did you issue a report in the Fallon matter?
A I think so.
Q You may have; you may not have; but you're inclined to believe that you did?
A Yes.
Q And just to go back, I think I asked this but I didn't ask it specifically to Fallon: Do you have a copy of your report, if you generated one from the Fallon matter --
A No.
Q -- as you sit here today?

A No.
Q Do you know which law firm you worked with in the Fallon matter?
A Dorsey & Whitney.
Q Do you know which lawyer at Dorsey you worked with?
A Mark Easler (sp).
Q Do you recall roughly recall what year it was within five years on either side?
A I would guess, five, six, seven years ago. Mark Easler died. Very nice guy.
Q Do you recall who any of the supporting cast was on that litigation team?
A No.
Q Back to page 56 of your report.
A All right.
Q I want to make sure I understand this at a very high level. And what you've in essence done is you've taken every expense that Town & Country Homes of Minnesota has incurred in constructing and selling a Homestead Collection unit and you've deducted it from revenue, correct?
A Page 56?
Q Well, that's how you get to your 9 million and change number. The contribution in the earlier

pages, right?
A Pages 26, 27, 28 I've taken net sales, Homestead Collection sales, have occurred. And I took -- I subtracted from that the cost of sales, subdivision expenses, either added or subtracted, total other income or expense to get the $9,174,000.
Q And let's just stick with 9,174,000, shall we.
A Okay.
Q That's the contribution. Now, the question is on page 56 of your report -- and we're talking about just end units for Homestead Collections, right?
A Yes.
Q Are there any costs on page 56 that you have not already deducted from revenues generated by Homestead Collection end unit sales?
A On page 56?
Q Right.
A I don't believe so.
Q So what you've done is you've taken all of the expenses on page 56 and you've already deducted them from the revenues generated by end unit Homestead Collection sales, right?
A Already is not the right word, but each of the

A Yes.
Q To why you believe after expensing out everything on page 56 you're allowed to turn around and prorate and say, "Now I get to apportion what's protected by copyright law versus what isn't."
What's the basis for this apportion methodology that you use given that you've already deducted all the expenses out to get your contribution number of $9,174,000?
A Boy, that was long. But I think I can answer it. We determine the 9 million and that's contribution, stop. We are going to use it later.
Now, we're coming forward and saying so we started at the total Town & Country Homes level, page 25, and then we went to the Homestead Collection because we don't have Chateau yet. Homestead Collection 26, 27, 28.
Now we're coming to a -- we've gone total Homestead. Now we're going within Homestead. And within Homestead we're looking for measures of an allocation.
So we're looking to start to identify the costs now related to -- that may be related to

features, factors, subject to protection.
So we've listed out on page 56 for Centennial, Cornerstone, Harvest Hills, Providence Pointe, Springbrook and I'll just use Centennial, the lot costs, interior costs, and exterior costs. And that's at the top. Okay.
Q And I think I understand where you're going and I don't mean to interrupt, but I need to follow up on what's eligible for protection. What do you mean by that as it relates to page 56?
A And I'll get to that if I can follow up.
Q Sure.
A And if I don't, get me back in gear.
So then I'll explain the chart first and then I'll do the pieces. And then the next portion of the chart after the first double underline is taking the interior costs from above and identifying certain of the interior costs by category, by type, right.
So now to get to some of the methodology is what I understood you to be asking. We've looked at as the lot costs and the lot costs include, at least as a starting point the land. And I understand that land is not something that's protected. It's dirt, sod, what have

elements that are generic and standard and how those elements are costed and the nature and placement of those elements within construction.
Q Do you understand Rottlund's damages theory to be based upon an element-by-element analysis or on a total-look-and-feel analysis?
A Total. I have not seen any analysis not only of a component but of an individual unit or property.
Q And what analysis did you do, if any, to address damages that flow from a total-look-and-feel theory of damages?
A I think as we just went through on page 25 and then 26, 27, 28.
Q So the total-look-and-feel damages would amount to 9,100,000 and change, correct, total eligible anyway?
A Up to December 31, 2003, and excluding Chateau because I don't have Chateau amounts.
Q Basically we've only been talking about Homestead Collection all day, correct?
A You're right.
Q So your total-look-and-feel damages calculation would be the 9 million 100 plus thousand that you set forth on pages 26 through 28 of your

report; is that fair?
A Yes.
Q Then you go into page --
A That's my current estimate as we've discussed.
Q And that's good through December 31 of 2003 based upon Homestead units only which were sold and closed as of 12/31/03, correct?
A That's correct.
Q Now we come up to pages 56 through 58 of your report, maybe even 59. And now you've done an element-by-element damages analysis under the copyright act, correct?
A We started to look at individual elements. I wouldn't say we've done element by element, but we've looked at an apportionment.
Q Now, you're saying "we," and my question is: Does that mean you and the individuals that helped you at your office or does "we" refer to some group broader than that?
A It's limited to myself and my colleagues in my office.
Q What's the basis for your assumption that interior costs which are reflected on page 56 of your report and subdivided into common elements are not protected by the copyright act?

not covered by the copyright act?

A It's my understanding that the mirrors are plate glass mirrors that are at least generally rectangular in shape. It's my understanding that the shower doors are glass doors mounted on aluminum or similar, open and close, are items that are standard in home construction.

Q Maybe this sounds like an obvious question with an obvious answer, but are you telling me that you believe the copyright act does not cover standard features on an architectural building?

A No, I'm not telling you that. As we kind of started, at least early on, I can't sit here and tell you I'm an expert on the copyright act because I'm not, whether it's architectural or not.

Q But your analysis assumes that that's the case, correct?

A It does and one of the things I would anticipate doing is providing the jury with a method showing them individual items and showing them the method that they can include or exclude. They can exclude a garage door. They can include it.

There may be other items that are brought

out by you or in cross or by a lawyer representing Town & Country or the architectural firms and the jury may want to put in. So I'm as interested in the method as I am in the specifics.

Q There's got to be a basis for your damages methodology in order for a court to allow it to be presented to a jury, correct?

A That's my general understanding. I've seen some exceptions to that.

Q What's the basis for excluding all of these costs on page 56 as not recoverable under the copyright act?

A I think that that's -- that's a determination that the Court would make whether or not recoverable or not. In the event there is a determination that lot costs are not recoverable, here's a method of treating it.

Looking at and hoping that the law at least from time to time follows common sense and business and finance, lot costs are lot costs.

And I say as a matter of common sense how do you protect buying what was a farm two years ago or buying a vacated site? It's not part of -- of a design feature and something that as I

understand it is subject to copyright protection, but I'm not a copyright lawyer. I'm certainly not a judge. But I think these are from a business perspective, looking at this from developers and development issues I've looked at in the past, in the context of litigation or not, are lot costs considered something that's protectable or have some unique aspects or some creative design to it?

Now, interior costs, yeah, some of them can be. Are there interior costs that aren't? Yeah. The stud is covered up. The electrical wiring is covered up. Are there exterior costs that may be protected? May be a shape and a style.

It's my understanding the Foshay Tower is protected. I don't remember if it's a copyright or even a patent. And there can be a unique design and things to the exterior. I'm not aware of any particulars here that moved the exterior and as an example.

If you look at the exterior and you want to talk about total touch and feel, the Chateau units that I've been in the corners are angled at the corner. There's a different look to

them, even at a lay glance, especially at a common sense glance.

So may there be some exterior amounts, yes, there may be but --

Q Page 56 doesn't relate to the Chateau. We haven't gotten to that point, right?

A Yes.

Q I don't mean to interrupt. You may finish.

A No, that's all right. I was rambling.

Q Do you have any --

A I saw you nod your head.

Q Do you understand that the copyright act has a section that protects architectural buildings and that's separate from a section that protects architectural designs?

A I don't know.

Q Your damages methodology on pages 56 through 58 assumes that both the building provision of the copyright act, if there is such a thing, and the designs provision of the copyright act do not cover standard features, correct?

A Not specifically, no.

Q So if the copyright act has a designs provision which does protect standard features, the entire methodology on page 56 would have no basis,

regardless of the architectural or visual
impact.
So they are common to about every kind of
residential structure and common to many
commercial industrial structures as well.
Q Does the placement of garage doors visually
impact a home?
A I think that it does.
Q But yet --
A I included that in the placement of garages.
Q So your damages analysis filters out placement
of garage doors as a nonrecoverable expense
that's not -- not a nonrecoverable expense, but
a nonelement, meaning it's not protected by the
copyright act, correct?
A Yes and no. We filter out the cost of the
garage door, not the placement, but then turning
it around I can't tell you specifically how
we've put in the placement. And to the extent
the two are interrelated, yes, we've taken it
out and therefore have at least impacted the
interrelation of the placement.
Q I have the same question with respect to mirrors
and shower doors. Does the placement of mirrors
and shower doors affect the total look and feel

of a townhome?

A Not to my experience. It certainly can change -- mirrors especially can change the look of a property. It can change the visual impact of the dimensions. It can create visual interests by highlighting angles and the like.

So mirrors especially, from my experience, can have a significant impact on a living space. For example, a mirror in the right setting can make a room look much larger than it is.

Q Do you know who the liability expert is for Town & Country of Minnesota?

A No, not as I sit here.

Q So you haven't spoken with the liability expert at Town & Country of Minnesota and discussed with him what's protected by the copyright act and what isn't protected by the copyright act, have you?

A That's true. I don't even recall a conference call where there were other people where I didn't know who they were. I don't think that I've had contact with a liability expert.

Q Does your damages methodology rely at all upon the liability expert reports of Town & Country

Homes of Minnesota's liability expert?
A I don't know. I don't know -- I don't know what the liability expert is saying, doing, concluding.
Q So it's fair to say as of the time you put your opinions in your report on pages 56 through 58 of Exhibit Number 412, you didn't base your damages methodology upon a written report from a liability expert at Town & Country Homes of Minnesota; is that fair to say?
A I have not based my report on the writings, report or otherwise, for any discussions I've had in person, by phone, in any form with any liability expert who has been retained, related to or on behalf of Town & Country Homes.
Q Back to page -- or Pinnacle for that matter, correct?
A Or Pinnacle or the architectural firms.
Q So your damages reports are completely independent of what any of the liability experts have said in this case, correct?
A As best I know.
Q Back to page 56, you have a line item that states "Generic Features." Do you see that?
A Yes.

A Okay.
Q -- through page 58 of your report.
A All right.
Q Here we have the element-by-element damages analysis of your report from Homestead Collection in Minnesota, correct?
A Here we have the apportionment.
Q The apportionment. Have you conducted an apportionment analysis for the Chateau Collection --
A No.
Q -- as of the time you sit here today?
A No.
Q Do you intend to conduct an apportionment damages analysis on the Chateau Collection developments from Minnesota between now and trial?
A Yes.
Q Do you know when you intend to produce a final report as to the Chateau apportionment damages analysis?
A No.
Q Have you performed any form of an analysis on damages as it relates to the Homestead Collection units being sold in the Aurora,

Illinois, development?
A No.
Q And that would be true in terms of a total-look-and-feel damages analysis, correct? You haven't performed that as of the Aurora development that has Homestead Collection units in it?
MS. NEWMAN: Object to the form of the question, total look and feel.
BY MR. KRUMMEN:
Q Let me just reference pages of your report.
A That's okay. As we've been using the term, whether you like the term or not, I don't either, but I haven't made that collection at least as of yet related to Aurora.
Q Right. And let's just call it whatever you call it on pages 28 -- actually 26 through 28 of your report. And can I call it a contribution, a total contribution analysis. Would that be fair?
A Yes.
Q Have you performed a total contribution analysis for the Homestead Collection units which were constructed in Aurora, Illinois?
A No.
MR. SCHWIEBERT: Objection.

developer conceding the profits on one-third of their undertaking as a loss leader in the housing market -- it's getting little late in the day. Give me a second.
Q Differential and expected profit margins?
A No.
Q Okay. I'll let you finish.
A Ms. Snelson yesterday was, while being cross-examined, in effect said that, "Well, that would be reasonable, may be reasonable," whatever the words were, "because somebody may take it as a loss leader," and I don't find that genuine. And there was one other reason. I just can't bring it back to mind, so I'll move on.
Q May I try to refresh your recollection there?
A Please.
Q I will come back to the loss leader, but the question I have for you is you believe that Rottlund's estimated incremental profit margin off of these back-to-back townhome units that were constructed in Illinois, would have been approximately 16.4 percent, correct?
A I don't remember if that's my determination or if that's reflected in the Snelson report.
Q And I believe it's in the Snelson report, right?

A That's the number that is in my report set forth.
Q Or $25,107 per unit, correct?
A Yes.
Q Let's just stick with the 16.4 percent figure and maybe this will refresh the second point. If Town & Country of Illinois thought that it could make a 25 percent incremental profit margin off of the back-to-back townhomes sold in Aurora, Illinois --
A You've been successful.
Q -- why would that not be a reasonable trade for Town & Country of Illinois? Pay 16.4 percent of the expected incremental profit margin to gain 25 percent.
A Thank you. And that did refresh my memory. That was the second item. Moving from 16.5 to 22 still is not the kind of return that Town & Country had been generating as reflected in the Minnesota operations. And to my knowledge it is approximate to the kinds of returns generated.
So in my experience I don't envision a developer that would pay $25,000 of their profit which may increase by 9 percentage points, so go up another say 13, $14,000 and would take a 13

Equator," which isn't all of South America. "We're afraid of going south of the Florida Keys. We're never going down there and I don't care that they're down there selling." Just the proportion change and it does get stirred up.

So what do I think is the reasonable appropriate method here from what I understand is that you actually model a willing buyer and a willing seller. You don't just listen to your client say, "Give us a high number. We want our profit and nothing else."

And you sit there and you look at, "Okay. I'm here. I'm supposed to be objective. I'm not supposed to be an advocate. And I know there's a range of reason." And you walk around in that. But you look at somebody and say, "Okay. At the end of the day I've modeled a hypothetical negotiation. And I've considered the types of things -- and I didn't do it perfectly, but I considered the types of things that these people would be expected to negotiate. Here's where I end up."

It's not reflected here. It's not even close.

Q What's the appropriate damages number for the 72

back-to-back products built in Aurora, Illinois, using a licensing fee analysis?
A I haven't made a determination of what I think a reasonable licensing fee is. What I've determined is the licensing fee that's here is substantially outside of the range of reason.
Q You're telling me that $25,107 per unit is too high. I think that's what your report is saying. Right?
A Yes.
Q And you're saying I can't do anything better than say you would be arguably better off with a single dollar, right? It's somewhere between a dollar and $25,107 per unit; is that your testimony?
A It is someplace between a dollar and the 25,107.
Q Now let's back up to where your answer began a few minutes ago and you were telling me two fundamental issues you had with Ms. Snelson's rationale --
A Can I come back, because I don't want to be misled.
Q Absolutely.
A Within that range. I'm not telling you the best that I can do as I sit here is zero and the

25,000. When I start to look at splits, would a developer give away two-thirds of their profit if it goes to 25 percent? No. Would a developer look at apportionment and see the kinds of numbers down around 5,000? Yes.

And what I see based on considerations that I've made -- and I haven't gone through Georgia Pacific factors specifically myself. I've thought through them at least as a starting point. I think this amount is high by a factor of two. I think that analysis, the analysis that completed would start to indicate numbers half and less of what's presented here.

Q I think I heard you just say it wouldn't make sense for Town & Country of Illinois to give away two-thirds of their profit. Correct?

A (Moves head up and down.)

Q Now I want to focus in on this one-third two-thirds for the record's sake. And I think that you'll agree with me that there are two different product types being sold at the Aurora development, correct?

A That's my understanding.

Q And it doesn't matter what the other product type is for the next round of questions. It's

just that I think you've been telling me roughly one-third of the product units sold at the Aurora development are the back-to-back allegedly infringing units, right?
A I think that's right, but I can't tell you where I'm getting that number as I sit here right now.
Q And we can pull the Melissa Snelson report out if you want to, but I don't think it's necessary to quibble over that. And whether it's 251 total units and 72 back-to-back out of that 251 or --
A Someplace around a third.
Q Right. We'll just use one-third and two-thirds.
A Okay.
Q Why would Town & Country of Illinois be giving away two-thirds of their profit if they were allowed to build two different product types in Illinois and one-third of their profits came from the back-to-back and two-thirds of their profits came from this other product type?
A There are many alternatives. There are alternative sites that could be developed, where Town & Country would have an ability to make an acquisition of land and develop out another site

with the resources committed to the Washington Square. There's also an ability to construct Washington Square with other than allegedly infringing back-to-back units.
Q Just at a high level, and we're talking Aurora, if two-thirds of the units are not the allegedly infringing back-to-back units, you'll concede that two-thirds of the profits are still in play no matter what happens with the licensing agreement, correct?
A Generally, yes.
Q So now I'm asking you if we do work out a license agreement at 100 percent of Rottlund's expected profit margin on the back-to-back units, you're giving up 100 percent of Rottlund's incremental profit margin, right?
A Related to two-thirds, I don't think so.
Q Of the one-third?
A Yes, that's right.
Q Now, Rottlund's incremental profit margin for the back-to-back units is 16.4 percent. That's what your report says, correct?
A That's -- I don't disagree with that.
Q And you know that Town & Country of Illinois has an incremental profit margin of more than 16.4

percent on the back-to-back units that were
actually sold in Aurora, Illinois, correct?
A No, sold in Minnesota. Let's assume for
discussion that it's more in Illinois as well.
Q All right.
A Certainly willing to do that.
Q So your 20 percent margin or your 25 percent
even margin applies. You've not done the math
so we don't know for sure, right?
A That's right.
Q But let's use your 25 percent contribution.
A For purposes of discussion, that's fine.
Q Yeah. If you're Town & Country of Illinois and
you can make a hundred percent off of two-thirds
of 251 units and you can make 9 percent as
opposed to 25 percent on the remaining third of
the units, why wouldn't you engage in that deal?
A Because I can go south of Aurora and I can build
another project with different configurations
and I apply my seed money, my invest money is a
million dollars.
I'm putting that million dollars in and I'm
getting 25 percent on two-thirds and 9 percent
on a third. I can take my million dollars
across town or I can take it to Elgin or I can

take it to wherever, put the million dollars in and I get a 25 percent across the board or a 22 percent across the board.

Or as I sit down with Aurora I say, "I'm going to build two-thirds of this and one-third is not going to be back-to-back allegedly infringing, but it's going to be" -- let's assume for a minute that they want some level of density. "I'm going to build some four-plexes and I'm going to build a little apartment building at the end."

So there are alternatives. It's not the only development -- as I understand, it's not the only development that could have been undertaken in and around Aurora, let alone in and around Chicago.

Q Did Town & Country of Illinois have a back-to-back design that it could build off without infringing upon anyone else at the time it built out the Aurora development?

A I don't know. I can't tell you that specifically.

Q And you do know that Town & Country of Illinois built in Aurora and before it could build in Aurora, the Aurora city officials had to approve

a back-to-back design plus another product
design, correct?
MS. NEWMAN: Object to form of the
question. Calls for speculation.
A I don't know that one way or another.
BY MR. KRUMMEN:
Q Well, you know that's what was ultimately
approved because that's what was ultimately
built, correct?
A That's right.
Q Why are you not speculating when you say that
Aurora would have approved something other than
those two products?
A I'm not saying that they would have. We were
speaking hypothetically. There certainly is a
hypothetical there. The same as, you know, can
I sit here and tell you exactly where they would
have built elsewhere in Aurora? No, I can't.
But hypothetically if you look at this from
a business point of view and you say, assume
that Pinnacle's acting in a financially prudent
manner, you can build two-thirds and get 25
percent and a third and get 9 or you can apply
your money and your resources and your time and
your talents someplace else and get 24 percent

litigation damages expert? When did you get
into this business?
A "This business"?
Q When did you begin as a litigation consultant?
A In 1975 I was with Pricewaterhouse. I was asked to become involved in a patent case. So since sometime in 1975 I've been involved in one level or another in litigation support services.
Q So for approximately 28 or 29 years you have been involved in litigation support services, correct?
A Yes. Although I wish you hadn't said that. That's a long time. I was younger when I started.
Q Since the time you started working within litigation support services as you have defined that term, how many times has a court excluded from evidence at trial any of your purported opinions?
A I don't know.
Q More than once?
A Sure.
Q More than five times?
A Perhaps.
Q More than ten times?