# Exhibit R4

UNITED STATES DISTRICT COURT DISTRICT O

FOURTH DIVISION No.:

- - - - - - - - - - - - - - - - - - - - - - - - - - - -The Rottlund C

d/b/a Rottlund Homes, a MinnesotaCorporation,

Plaintiff,vs.

Pinnacle Corporationd/b/a Town & Country Homes,

an Illinois Corporation, and

Town & Country Homes, Inc.,

a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc.,

a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &

Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

Videotaped

30(b)(6) Deposition of

BLOODGOOD SHARP BUSTER ARCHITECTS &

PLANNERS OF IOWA, INC.

(Testimony of Chris A. Jorgensen)

Wednesday March 5, 2003 9:07 a.m.

they take place in Minnesota or were they predominantly over the telephone prior to the time that Exhibit 26 was authored?

MR. SCHWIEBERT: Objection. Form.

A Generally they were probably over the phone. There was a time prior -- prior to this proposal where myself and Larry Moore went up to Minneapolis and met with the client.

BY MR. KRUMMEN:

Q Now, you went up to Minneapolis and met with the client prior to April 6th of 1998, correct?

A Yes. I believe it was the end of March, first of -- first of April.

Q Was the purpose of that trip to discuss back-to-back townhomes or did you go up there for other reasons?

MR. FARMER: Objection to form.

MS. NEWMAN: Same objection.

A That certainly was one of the topics or perhaps the main topic. We would have -- we would have talked about our general projects on the single-family as well and -- and this townhouse program also.

BY MR. KRUMMEN:

Q Did you review any documents concerning back-to-back townhomes that Town & Country of

Minnesota may have had in mind, during that meeting?
A Reviewed documents?
Q That's right. Did they, for example, give you any brochures of competitors and say, "Here are some back-to-back townhomes that are doing well in the Minneapolis market"?
A Well, no. At that time we -- we toured some product in the -- in the marketplace and certainly had the opportunity to discuss this program and then the -- the competition in the marketplace as well.
Q So to make sure I understand the date, prior to the time this contract was drafted you went on a tour up in the Minneapolis area with the Town & Country of Minnesota people?
A Yes.
MR. FARMER: Objection. Foundation.
BY MR. KRUMMEN:
Q And did you tour back-to-back townhomes built by Town & Country of Minnesota's competitors?
A Yes.
Q Which competitors' townhomes did you tour during the March tour?
A The ones I generally recall are the ones I

mentioned earlier. It would -- would have been Centex, I believe Ryland and Rottlund, and I -- there was others. And there may have been product that was not back-to-back as well.

Q What was the purpose of that tour, as you understood it?

A To -- to become -- for -- for BSB to come -- become familiar with Town & Country's competition in the marketplace. Given that -- that we're -- we're here in Des Moines at times, we will do product tours with -- with -- with the client.

Q And why is that necessary from BSB Iowa's perspective?

MR. SCHWIEBERT: Objection. Foundation.

MS. NEWMAN: Same objection.

A Just to get a sense of what is being built in the marketplace from a cost construction standpoint. You know, that's an important factor in -- in designing a project for a client, that -- understanding that, what -- also what -- what the buyers are seeing and what -- what they are looking for in the marketplace.

BY MR. KRUMMEN:

Q I believe you testified earlier that you, Mr. Jorgensen, and Mr. Larry Moore participated in

this tour that occurred in late March or early April of 1998. Correct?
A Yes.
Q Did anyone else from BSB Iowa attend that tour?
A No.
Q Who on behalf of Town & Country of Minnesota attended?
A Art Plante and Bill Anner.
Q Do you know what Bill Anner's position was at Town & Country Minnesota at the time?
A Land development acquisition type of role. I'm not sure what his title was.
Q Was anyone else present on the March 1998 tour?
A Not that I recall.
Q Did anyone take a camera along on this tour?
A Not that I recall.
Q Did anyone pick up any brochures of the competitors or marketing materials from the competitors?
A I'm certain people looked at brochures. When you go into a model home, you'll -- one of the first things you'll do is look at the floor plans. A lot of times they'll have them up on the wall for -- for potential buyers and the public to -- to view, so sometimes that's not necessary.
But certainly from, you know, our viewpoint, I

mean, we -- we look at the -- the floor plans that they're offering. And then typically we would not take those with us. At least I wouldn't. And then we would walk the product.

Q What do you mean by "walk the product"?

A Walk through the models that the -- the -- the builder is offering to the public.

Q Now I want to get a little more specific here, and I'm going to confine the tour of the Rottlund product in March of 1998. For the next series of questions, they're confined to Rottlund.

Did you look at any Rottlund marketing materials during the March 1998 tour? And when I say, "you," I'm referring to Mr. Jorgensen.

A I may have looked at a brochure, yes.

Q Did Mr. Larry Moore look at any Rottlund marketing materials or brochures during the March 1998 tour?

A I couldn't say.

Q How about Mr. Art Plante?

A I couldn't say.

Q And the same question for Mr. Bill Anner.

A I couldn't say for certain.

Q Do you recall anyone taking any pictures, in that March of 1998 tour, of Rottlund's product?

A I don't recall, no.

give him pause.
A No. I mean, the product brochures are -- are public information. Certainly they're available and open to me as -- as they are to anyone.
BY MR. KRUMMEN:
Q And the Rottlund brochures were copyrighted, were they not? They had a copyright notice on them?
MS. NEWMAN: Objection.
MR. FARMER: Objection.
MS. NEWMAN: Foundation.
MR. FARMER: Foundation.
MS. NEWMAN: Calls for speculation. Form.
A Yeah. I don't know whether they did or not.
BY MR. KRUMMEN:
Q Regardless, you kept those in your Jerry's Homes file, correct?
MR. SCHWIEBERT: Objection. Foundation.
A Yes. They are there.
BY MR. KRUMMEN:
Q And Jerry's Homes' was a back-to-back townhome that you worked on in the year 1997, correct?
A Correct.
Q And here we are in the year 1998 and you're working on a back-to-back townhome for Town & Country

as a -- as a standard part of the design.
And on the second page, it -- it even refers to it in a manner that it's -- it's no charge. It wasn't -- it was probably something that was always part of the program, just clarifying it here that it'll be called out in the working drawings as an option as opposed to something that the buyer would get with the base design.
BY MR. KRUMMEN:
Q So as you sit here today, you suspect that the fireplace/media was already part of the earlier design work and now it's merely becoming an option?
MR. FARMER: Objection. Form.
MS. NEWMAN: Same objection.
MR. FARMER: Foundation.
A I don't know that for certain, no.
BY MR. KRUMMEN:
Q Let's look through page 2 on those no charges.
A Mm-hm.
Q Let's just --
A Yes.
Q -- stick with Plan 1482. It looks like we have no charge for the fireplace/media option, correct?
A Correct.
Q No charge for the shower option, correct?

foundation.

BY MR. KRUMMEN:

Q Is this the first time when BSB became aware that the villas project was going to be changed to the Homestead Collection project?

MR. FARMER: Objection. Form and foundation.

MS. NEWMAN: Same objections.

A I don't know.

BY MR. KRUMMEN:

Q Do you recall hearing that they were going to change the names of the villas project to Homestead Collection, prior to September 1 of 1999?

A I don't recall.

Q Do you recall anything about when the name change occurred?

A No, I don't.

Q But you do understand that the villas back-to-back project is now known as the Homestead back-to-back collection, correct?

A That's correct.

THE VIDEOGRAPHER: Off the record. Ending tape 1 at 11:16.

(Deposition Exhibit Number 82 was marked for identification by the reporter.)

Exhibit R5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
- - - - - - - - - - - - - - - - - - - - - - - - - - -
The Rottlund Company, Inc.d/b/a Rottlund Homes,
a Minnesota corporation, Plaintiff,
vs. Case No. 01-CV-1980Pinnacle Corpora
d/b/a Town & Country Homes,an Illinois Corporation, and
Town & Country Homes, Inc.,a Minnesota Corporation, and
Bloodgood Sharp BusterArchitects & Planners of Iowa,
Inc., an Iowa corporation, Defendants,
andTown & Country Homes, Inc.,
a Minnesota corporation, Third-Party Plaintiff,
vs.Bloodgood Sharp Buster
Architects & Planners of Iowa,Inc., an Iowa corporation,
Third-Party Defendant.- - - - - - - - - - - - - - -
DEPOSITION OF STEVEN A. KAHN, 30(b)(6) VOLUME II
(THIS TRANSCRIPT CONTAINS ATTORNEYS' EYES ONLY
PORTIONS AS INDICATED AT PAGES 364 AND 385.)

(The following is the continuation of the 30(b)(6) deposition of STEVEN A. KAHN, taken pursuant to Notice of Taking Deposition, at the offices of Winthrop & Weinstine, P.A., 225 South Sixth Street, Suite 3500, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:12 o'clock a.m., August 4, 2003.)

policy was prior to the year 2000?
A. I did not work there.
Q. Did you take any effort to figure out what the record-retention policy was as it related to copyright registrations prior to your employment with Rottlund?
A. No, I didn't.
Q. Sir, what was Rottlund's development capacity in January of 1997?
A. Can you please define "capacity"?
Q. Well Rottlund can only undertake so many developments at any one time; is that correct?
A. No, that's not correct.
Q. Is it your testimony, sir, that Rottlund could undertake an unlimited number of projects simultaneously?
A. It would not be unlimited, no.
Q. So there is some limit to the number of developments or projects that Rottlund could undertake simultaneously; is that correct?
A. That's correct.
Q. Okay. What was that limit --
What is that limit currently?
A. Well the limit is not based on a number of projects, the limit would be based upon the

availability of subcontractors and the availability of funds and the availability of land.
Q. And by "funds" you mean capital?
A. Yes, sir.
Q. Is there anything else that would limit the number of projects that Rottlund could undertake simultaneously?
A. The number -- Well yes. The number of sub -- of superintendents that we have.
Q. Anything else?
A. I can't think of anything else, no.
Q. How many superintendents did Rottlund have in January of 1997?
A. I can't answer that question, but what we -- what I can tell you is that each project has one superintendent, and depending upon the size, one assistant superintendent. Superintendents can be hired, and oftentimes we hire superintendents ba -- you know, based upon the projects that are slated on our schedule, so superintendents are somewhat variable in that we can go out and hire them as needed.
Q. Sir, how many superintendents did Rottlund have in January 1997?
A. I have no idea.

A. No.
Q. Do you know what the availability of land to build the Villa II's is currently?
A. No.
Q. But your testimony, sir, is that the one of the factors that would limit the capacity of Rottlund to engage in construction developments is the availability of land; is that correct?
A. That's correct.
Q. Do you have any other knowledge regarding the availability of land or its implications on Rottlund's capacity to build new projects or developments?
A. No.
Q. Did you take any steps to try and figure it out?
A. No.
Q. Did you take any steps to try and figure out what the availability of subcontractors were for any of the years from January of 1997 to present?
A. No.
Q. Did you take any steps to figure out the number of superintendents were for Rottlund for any of the years from January 1997 to present?
A. No.
Q. The final factor you listed as limiting the

capacity of Rottlund engaging in new developments was the availability of funds; is that correct?
A. That's correct.
Q. Does Rottlund currently have a revolving credit facility?
A. Yes, it does.
Q. Did Rottlund have a revolving credit facility in January of 1997?
A. Yes.
Q. Did Rottlund have a revolving credit facility for each of the years --
A. Yes, it did.
Q. -- between January 1997 to the present?
A. Yes.
Q. Okay. With the exception of the revolving credit facility, are there other ways in which Rottlund could obtain funds, as you characterized it, necessary to increase its capacity to engage in projects?
A. It could utilize methods of financing the land, such as land options. That's a practice widely used in the industry and one widely used by The Rottlund Company.
Q. Is there any other ways in which Rottlund would have access to funds, as you characterized it,

necessary to increase its capacity to engage in projects?

A. Between the period 1997 through 2002 Rottlund was a public company, it could have engaged in a secondary offer to raise capital, it could have leased assets which would have generated more capital for the company.

Q. If Rottlund engaged in a secondary offering between the years of 1997 and 2000, Rottlund would have had to have -- Well let me strike that.

Why is Rottlund no longer able to, after 2002, engage in secondary offerings to raise capital?

A. In March of 2002 Rottlund became a private company.

Q. And by "private company" you mean it bought back all the public stock?

A. That's correct.

Q. If Rottlund had raised money by secondary offerings between 1997 and 2000, Rottlund would have had to have bought back those additional stocks; is that correct?

A. That's correct.

Q. Which would have limited its current ability to engage in projects or developments; is that correct?

MR. KRUMMEN: I'll object to that as a

Q. And in the interim Rottlund has paid a -- you called it an interest spread, that's the same thing as the monthly option-continuation fee; is that correct?

A. That's correct. And presumably Tradition is borrowing at prime rate, so their profit is the 6.75 percent.

Q. Why doesn't Rottlund just borrow at prime?

A. Rottlund can borrow at prime, but we don't want to have all of this land on our balance sheet and tie up the capital. We're able to do many more projects by using land options.

Q. Which bear a cost of the interest spread.

A. That's correct.

Q. Rottlund also still has to have the capital to buy the individual lots in order to increase its capacity; is that correct?

A. Not really, because we buy the lots back when we close on the house. So we're buying the lot back at the same time the individual is buying the house from us, so we take that cash and then immediately give it back to Tradition.

Q. But Rottlund has to increase the amount of its lot prices to compensate for the interest spread; is that correct?

A. That's correct. And so does every other builder that does this.
Q. Do you know what the total amount that Rottlund paid in interest spreads last year was?
A. No.
Q. If you wanted to find out what the total amount that Rottlund paid in interest spreads from last year were, how would you do it?
A. I would have to add up each of the option-continuation fees. They're all -- All of that money is included in the land budget, it's not included in the profit and loss statement. And the only time it flows through the profit and loss statement is when the cost of an individual lot is sold.
Q. Are there limits in the number of years that each land option agreement can exist?
A. Can you repeat the question?
Q. Is there a limit on the duration of the land-option agreements?
A. Most of them have a duration anywhere from 24 to 48 months.
Q. Do you know how long the duration of the...
Well let me see if I can pick one. Do you know if there's a land option agreement for Club West?

A. There are numerous land-option agreements for Club West.
Q. So there can be more than one land-option agreement within an individual community, as you characterize them.
A. Well Club West is a -- We keep adding to Club West, we keep optioning additional parcels there.
Q. Meaning Rottlund keeps engaging in new purchase agreements to buy areas of land and engaging --
A. Yes.
Q. -- into land-option agreements with third-party intermediary companies, as you called them.
A. Yes.
Q. Is there just one revolving-credit agreement for Minnesota, Iowa and Florida?
A. Yes, there is.
Q. Is there a finite number of companies willing to engage in this type of land-option agreement?
A. We have never -- No, there --
The answer is there's not a finite number, but we have never had a problem in finding someone to do this for us.
Q. It just might be at a higher rate.
A. Yes.
Q. Do you know if there's a standard rate in the

order to meet this longstanding goal of product diversification?
A. I don't believe there are any goals established like that, no. There's more of a goal to continue to develop new products and -- and change out older products that may not continue to be as well accepted.
Q. Is that why Rottlund stopped building single-family product in Iowa?
A. No, we stopped building single-family product in Iowa because it was a -- not -- it was just not a profitable market for us in terms of single family. There were a lot of builders building single family and we were much stronger in the multifamily, so we just decided to stick with the multifamily.
Q. Same exhibit, changing to page 7, under the paragraph that's labeled "Employees." It indicates here that as of March 31, 1998 the company employed, it says, 248 persons.
A. Yes.
Q. That would be company-wide, so that would include Minnesota, Iowa, Indiana, New Jersey, so on and so forth?
A. Yes.
Q. Okay. Fifty-six are on-site sales personnel.

Rottlund alleges it would have built but for the alleged copyright infringement." Do you see that?
A. Yes.
Q. And you've been designated as the corporate witness to provide testimony as to that topic; correct?
A. Yes.
Q. In your last deposition you were asked: "What did you do to prepare to testify on the topic of each individual unit built by TCM that Rottlund alleges it would have built but for the alleged copyright infringement?" And your answer was: "Nothing."
Have you done anything since that deposition testimony was provided till today to -- to answer questions related to topic 45?
A. The -- The products that Rottlund would have built were provided to me by Tim Whitten and Tony Desnick, the architects, and then I prepared the financial analysis related to those products, which was provided prior to my last deposition.
So I -- Perhaps I didn't understand the question last time, but I'm -- I'm here -- I'm here to talk about the damages, but not nece -- but I can't talk about the specific products that were included in that damages analysis because that -- that list of

products and the comparison to TCM products was provided to me by the architects, by our own internal architect and our expert architect.

Q. Where is that list of units that Rottlund claims it would have built?

A. It was provided to me by my attorneys.

Q. Do you know if the list was provided to defense?

A. I don't know.

Q. So it's your testimony that you got a list of the products that Rottlund claims it would have built and then did financial analysis of actual damages based upon that list?

A. Yes.

Q. Have your calculations of the financial damages been produced?

A. Yes.

Q. Okay. Where are they?

A. Where are they? I don't know. I produced the reports.

Q. That's part, you're saying, of the Snelson report?

A. Yes.

Q. Do you recall what the products were that you analyzed?

A. They were Tra -- Traditions, Lodges, Villas.

Those are the ones I remember, but I -- there were several others that were included in the Snelson report and they -- they were comparable products to the TCM products.

Q. Would you take a look at Exhibit 179.

(Discussion off the record.)

Q. I'm just going back through your prior deposition testimony, and again on topic number 45 from Exhibit A attached to exhibit we've marked as 141, and you were asked: "What's the financial information of each individual unit that Rottlund alleges it would have built but for the infringement for each individual TCM unit in the Centennial Crossing development?" And your answer is: "It's the information that's in Exhibit 179."

So now you have Exhibit 179 in front of you. Can you tell me?

A. Well there must be -- there's other information because this isn't -- this doesn't include -- there's other analyses that I prepared, like for the single -- the single-family developments. This would be -- This would include part of the answer.

Q. So Exhibit Number 179 would be in partial answer to the financial information of each individual unit that Rottlund alleges it would have built but for the

infringement for each individual TCM unit in the Centennial Crossing development?
A. Yes.
Q. And the information contained in Exhibit 179 is only related to the Villa II product and not to the Traditions, Lodges and several others that you also analyzed?
A. That's correct. This analysis was done to show all of the products that were built in the communities where we built Villa II products, and I worked with Melissa Snelson and we prepared addition -- I prepared additional analyses which were forwarded on to Winthrop & Weinstein and then to her that included the -- the other types of products that I was a -- that we -- that I was asked to provide the information on.
Q. Would there be a cover sheet like this saying, you know, again an analysis and then it would list, for example, Traditions Community Profit Analysis, or Lodge Community Profit Analysis?
A. I don't know if it would have a formal cover sheet like this, but the financial analyses would be -- would be in a comparable form to this.
Q. And that would be true for each of the product types that you were given by either Mr. Whitten or

Mr. Desnick to analyze.
A. Yes.
MS. NEWMAN: Just go off the record for a minute.
(Discussion off the record.)
BY MS. NEWMAN:
Q. If Rottlund claims that it could have built each individual unit that was in fact built by TCM except for the alleged infringement, who would have been the superintendent on those projects?
A. I don't think we could answer that question today.
Q. Would Rottlund have had to hire additional superintendents in order to take on all the additional work?
A. Rottlund would have had to hire additional assistant superintendents because they would have promoted assistant superintendents to be superintendents.
Q. So additional hires of assistant superintendents would have had to have been made by Rottlund in order to accomplish the building of the units that it alleges could have been built but --
A. Yes.
Q. -- for the infringement.

prior to its conclusion.
Q. And when did that renegotiation occur?
A. I believe it was last -- I'm getting my years mixed up. It was two thousand -- It was sometime between 2001 and 2002, I don't remember exactly when. And we changed the swap agreement to expire December 31st, 2003 and reduced the rate to 8.34 percent, so I think it was the summer of 2002.
Q. So the original agreement went into play in July of 2000 and you believe it was renegotiated in the summer of 2002; correct?
A. Yes.
Q. Do you know whether Rottlund drew down, between July of 2000 and the summer of 2002's renegotiation, whether Rottlund drew down from that $15 million line of credit at 9.96 percent?
A. What -- What do you mean by "drew down" 15?
Q. Borrowed money against it. Was Rottlund borrowing money at --
A. Oh, absolutely.
Q. -- 9.96 percent in those two years?
A. Well the first $15 million was at that rate, and in those years the borrowings were not below $15 million.
Q. Sir, Ms. Newman asked you about comparable

Rottlund products that Rottlund would have built but for alleged infringement here and you testified, quote, the products that Rottlund would have built were provided to me by Tim Whitten and Tony Desnick, the architects, and then I prepared the analysis. What type of document did Mr. Whitten and Desnick provide you?
A. They didn't provide me any document, they I believe provided the information to Winthrop & Weinstine and they then asked me to prepare the financial analysis.
Q. So when you testified that the products were provided to you by Tim Whitten and Tony Desnick, --
A. The -- The attorneys.
Q. You later stated, quote, they were comparable products to TCM products. My question is: How do you know?
A. I'm trusting the experts.
Q. Well you've been designated as an expert in this case; correct?
A. I've been designated as an expert on the financial damages, not on the products itself.
Q. Have you ever been designated as an expert on any topic in any lawsuit ever before?
A. As an outside expert or an internal expert?

# Exhibit R6

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

- - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes, a Minnesota
Corporation,

Plaintiff,

vs.

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc.,
a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - -

Deposition of

JOSEPH D. KENYON

Friday, July 16, 2004

9:05 a.m.

Q Why didn't you just look at the financial
reports of BSB to find out what profits they
earned on the projects at issue in this matter?
A Because we always try to get an understanding of
the underlying economic data with respect to the
calculations.
Q Did you read the Rule 30(b)(6)deposition
transcript of James Grundmeier, dated
March 4, 2003?
A I don't remember reading that, no.
(Deposition Exhibit Number 434 marked for
identification by the reporter.)
BY MR. KRUMMEN:
Q Mr. Kenyon, I've put in front of you
Exhibit Number 434. It is pages 27 through 29
of Mr. Grundmeier's Rule 30(b)(6) deposition
transcript. I'll give you as much time as you
need to read through that and then I have some
questions.
A (Reviewing.) Okay.
Q Have you read that transcript portion before?
A Not that I recollect, no.
Q So the first time you found out that The
Bloodgood Group, Inc., has a profit-sharing
formula that drives what profits are distributed

back down to BSB of Iowa is when you just read this deposition transcript?

A I don't remember if I knew about that or not -- I don't know. I don't recollect having that conversation, but we could have.

Q Have you done anything to determine what the profit-sharing formula was The Bloodgood Group, Inc., used to determine whether or not BSB of Iowa's profits are similar under that formula to what you've calculated them to be?

MR. SCHWIEBERT: Objection. Form. Vague.

MS. NEWMAN: Same objection.

A I mean, I don't -- I don't understand why -- why a person would do that calculation.

BY MR. KRUMMEN:

Q Because that was the actual profits, correct?

A No. We calculated the actual profits, which are billings less incremental expenses. That's the profits.

Q The profits are what BSB, Inc. -- strike that.

The profits are what The Bloodgood Group, Inc., determined the profits are, correct?

A No. The profits are the revenues for the project less the incremental expenses. That's

the profits.
Q That's your definition of the profits under the copyright act?
A The infringer's profits, yes.
Q But The Bloodgood Group, Inc., apparently received some profits as well, correct?
A We didn't look at whether one group or the other group received any profits. We looked at the profits that the -- that -- that were made on the alleged infringing design.
Q You didn't look at the actual infringer's profits; you calculated your own?
A No. I cal- --
MR. SCHWIEBERT: Objection. Mischaracterizes his testimony.
MS. NEWMAN: Same objection and objection as to form. Argumentative. You can answer.
A We calculated the profits, the incremental profits, from the design of the infringed. I don't know what calculation you think we should have made, but we did the right calculation.
BY MR. KRUMMEN:
Q I'm asking you why you didn't use the defendant's internal accounting calculation of

profits.
A Because we calculate our own. That's why people hire us. We calculated the profits. We got all the billings and all the revenues and went to the time records and got all the time and calculated the -- the benefits that would be associated with the labor, subtracted that. There were even more incremental expenses I think we could have subtracted, but we didn't. And we calculated the profits. That's the way you do it.
Q So you're telling me that if there's a national accounting firm and the profits are determined at the central national office and then distributed back down to your firm, that's the wrong way to compute profits?
A If somebody asked me what the profit --
MS. NEWMAN: Objection.
THE WITNESS: I'm sorry.
MS. NEWMAN: Objection. Incomplete hypothetical. Vague. Form. You can answer if you understand.
A Again, if it was a similar type project, which is calculate the profits on a job, the answer is I wouldn't do that. I would look at the

Rottlund either decided not to bid on it, did not want to pay more money, didn't know about it, or knew about it and didn't want to bid on it.

That's what I know. So I didn't see anything to indicate that they actually would have built on those projects and they lost those projects because of the infringing product.

BY MR. KRUMMEN:

Q Did the infringing sales take away from any Rottlund sales of Villa II products in a comparable geographic vicinity?

A I'm not aware of that. I haven't seen any evidence of that. Apparently they're being sold. I have not seen any evidence that would indicate that the Villa II projects were not being sold as a result of the Homestead products.

Q The next opinion you have says, "The significant differences in pricing show Rottlund and TCM cater to two different market segments resulting in minimal lost sales." What does that mean?

A Well, we compared Rottlund and Town & Country units by similar locations and end units and interior units. Rottlund almost always had

lower selling prices on average.

Rottlund appears to buy -- Rottlund appears to be very picky in selecting land. They look for low-cost land and -- which also keeps their cost down so they can sell for a lower price. Town & Country appears to be willing to pay more for land.

So it looks as though the Rottlund Homes are usually cheaper by, you know, 20 grand, 25 grand, depends on the projects. And that appears to be a fairly significant difference compared to the salaries, at least that we saw in the discovery with respect to, you know, the typical market, which would be a young -- a single person or a young professional couple or a retired person.

It looks like Town & Country sells a more expensive product. And at least what I read, the market appears to be price sensitive.

Q What do you mean by "price sensitive"?

A That is is that, you know, you have a lot of first-time home buyers and people on lower incomes that are trying to get into a home, and price has an effect on whether they buy or not. And Rottlund looks like it's done a good job of

getting into a very low-priced home for
first-time home buyers and retirees.
Q Does the Villa II compete with the Homestead
Collection?
A Well, based on pricing, Rottlund looks like it
has a much cheaper price. I can't say that they
don't compete, because you've got all the issues
of competition, location. There's issues with
respect to design, style, but on price Rottlund
is able to produce a much lower-costed unit than
Town & Country, from what I've seen.
Q And I think that your economics background would
lead you to believe that a higher-priced unit is
going to lose sales to a lower-priced unit.
Correct?
A Yeah.
Q Is it --
A Should, yeah.
Q Is it your opinion that a lower-priced unit is
ever going to lose sales to a higher-priced
unit?
A Well, again, you know, you're just focusing on
one item. When it comes to townhomes,
location's a big deal, you know, near school
districts, is it close to work, do you like the

drive in, do you -- you know, there's a bunch of factors that go into it.

So you might be willing to pay more, but everything else being equal, all other items equal and price is the only factor, obviously lower price would get the sale.

Q So why did they compete in two different market segments because of significant differences in pricing, according to your opinion on page 2?

A Because they would -- they would cater to a little different income level, a different -- individuals with lower income.

Q Why wouldn't they cater to individuals with higher income that want a cheaper price?

MR. SCHWIEBERT: Objection to form. Vague.

MS. NEWMAN: Yes. Incomplete hypothetical. You may answer if you understand.

A They might. I mean, I can't say they wouldn't.

BY MR. KRUMMEN:

Q I want to know the basis for your opinion that significant differences in pricing show that Rottlund and TCM cater to two different market segments.

MS. NEWMAN: Feel free to refer to your

report if you need to do so in answering his questions.

MR. SCHWIEBERT: Also, objection. Asked and answered.

A Well, if you look at page 7 of the report, where we compare the average prices -- and we did additional analysis, just a summary of our analysis. But we looked at the end units and the similar end units to the interior units, and end units are generally more expensive than interior units.

We also looked at what appeared to be the -- the median income of a new home buyer, and also saw some information with respect to -- I can't remember if it was Harvest Hills or Centennial, with respect to -- with respect to the market they were looking at selling to.

But it seemed to be these folks in the $55,000 a year area -- seemed to be sort of the average for the new townhomes. And the differential in pricing, it looked to us, based on this level of income, trying to buy 150- to $200,000 home, that that could have a significant effect on whether the buyer would buy it or not.

And that -- that -- that the pricing alone would have a major effect on whether this first-time home buyer would buy the higher-priced unit versus the lower-priced unit. And if they're pushing themselves, they would try to buy it as cheap as they could buy it.

BY MR. KRUMMEN:

Q Which means that they would simply choose to buy the lower-priced Rottlund product, all other things being equal, right?

A Yes, although -- so they would buy there and somebody who had a higher income probably would buy the higher-priced unit. They could push themselves more and buy a higher-priced unit.

Q If the higher-priced unit isn't out there, why would a more income-laden buyer simply buy a lower-priced Rottlund product?

MS. NEWMAN: Objection to the form of the question. You can answer if you understand.

A Yeah. I don't fully understand your question. Please restate it.

BY MR. KRUMMEN:

Q The first city you have listed on page 7 is Plymouth, correct?

A Yes.
Q According to the last sentence in the first full paragraph on page 7, you're saying, "If TCM's design is similar to Rottlund's and is a significant factor, a consumer would simply choose the lower priced Rottlund product." Do you see that?
A Yes.
Q Now, my question is, there's a TCM development in Plymouth, correct?
A That's true.
Q There's a Rottlund product being developed in Plymouth, correct?
A That's true.
Q If TCM isn't there, why doesn't it logically follow that all of these buyers with the TCM higher-priced product would simply by the Rottlund lower-priced product?
MS. NEWMAN: Objection. Incomplete hypothetical. You may answer if you understand.
A Well, first of all, I'm not aware of Rottlund having -- having a bunch of unsold units that were lost to Town & Country. I haven't seen that anywhere in the information that I've read.

So your hypothetical, you know, has to -- as far as making a decision between a Town & Country home and a Rottlund home has to take into account all the different factors, not just price.

BY MR. KRUMMEN:

Q But, sir, that's what you're saying in the last sentence that we just read, "a consumer would simply choose the lower priced Rottlund product." That's what you wrote, correct?

A Again, if everything else is equal as far as the desire for location, whatever all the other factors are, and the consumer -- the average consumer price, everything else being the same, they would choose the lower-priced product, yes.

MS. NEWMAN: Mr. Krummen, may we take a short break?

MR. KRUMMEN: Sure. Let me clean out this opinion number 3 on page 2 and then we'll break.

MS. NEWMAN: Okay.

BY MR. KRUMMEN:

Q Just to reiterate where we're at, I'm on page 2 of your first report. It's marked as Exhibit 432. And we've talked about BSB's

different people looking at these units with respect to price, depending upon what their income is.

We also have the testimony in deposition of Roger Conhaim, who stated that also the difference would mean Rottlund and TCM were catering to different markets. We also relied somewhat on what he was saying.

But we looked at the differential of the amount paid between the two of these and looked at what the effect is of the payment and compared it to the median income of a new home buyer. It looked like it would have an effect on that home buyer.

BY MR. KRUMMEN:
Q What did you do to standardize the average selling price for time, if anything?
A We just calculated the average prices for the -- for the units. We did not -- we did not adjust it for time.
Q So if Rottlund's developments listed on page 7 are five years old and TCM's are two years old, you made no adjustment for inflation, correct?
A We haven't made adjustments for that, no.
Q Why didn't you do that?

A I can't tell you.
Q Do you think that adjustment should have been made?
A I don't know.
Q Is it important to you to analyze, as an accountant, time-contemporaneous sales?
A Only if there's major differences in selling prices.
Q And you've told me there is a material difference in selling prices, right?
A No. Material differences in selling prices over time for the same unit.
Q And you don't know whether there is or there is not, because you didn't perform the analysis, correct?
A I'll have to go back and look at it. I don't think so. But I'll have to go back and look at it.
Q Why do you say you don't think there were material differences in the selling prices over time?
A No. I don't know that. I'll have to go back and look at it. I can't remember what we did in that area. I'm just going to have to go back and look at it.

an option. But they seem like similar cars, so you have to look at the basic features between the two. I think this just represents the average price of the units sold.

Q Did you look at the basic features between the Homestead and the Villa II?

A I don't remember.

Q What did you do, if anything, to prove that the purchasers of the Homestead Collection in Plymouth would not have purchased Villa IIs in Plymouth?

A What did I do? Well, I don't understand your question.

Q Have you done any analysis to demonstrate that the purchasers of these Town & Country of Minnesota Homestead Collection sales in Plymouth would not have bought Rottlund Villa II products in Plymouth had Town & Country not been there with an infringing product?

MS. NEWMAN: Object to the form. Assumes that there was an infringing product, which is disputed in this case. But you can answer if you understand.

A Okay. The question is is what did I -- what did we do to determine that if Town & Country had

not built --
BY MR. KRUMMEN:
Q Correct.
A -- on that project, on that land, and Rottlund had built on the land, that Town & Country wouldn't have -- I'm sorry, that the customers would not have purchased the Rottlund?
Q Correct.
A I didn't do anything. I didn't look at that scenario, because it didn't appear that Rottlund ever would have built on that land. I mean, I saw nothing to indicate that they were going to build on that land. They didn't seem to have an interest in it.
Q Did you talk to any of the 66 purchasers of the Town & Country of Minnesota product and ask them if they would have bought a Rottlund Villa II product in Plymouth had they not purchased their Town & Country Homestead Collection unit?
A No.
Q Did you talk to any of the 104 purchasers of Town & Country's Homestead Collection products in Maple Grove and ask them if they would have purchased Rottlund's Villa II products in Maple Grove had Town & Country not been there with the

Homestead Collection?
A And again, is this -- you're saying the exact same land? Is that your question, exact same land?
Q My question is in Maple Grove in general.
A Just anywhere in Maple Grove?
Q That's right.
A No, I didn't ask that question.
Q Did you do anything to determine whether or not the purchasers who bought Town & Country's Homestead Collection in Maple Grove would not have bought a Rottlund Villa II in Maple Grove?
A Anywhere in Maple Grove?
Q That's right.
A No.
Q Same question with respect to Lakeville and Farmington.
A That is, did I ask a --
Q Did you --
A -- customer of -- who purchased a Town & Country home --
Q Didn't you do --
A -- would you have boughten a -- purchased a Villa II home anywhere --
Q In Farmington?

A -- in Farmington? No.
Q Did you do anything beyond interviewing them to determine whether or not any of those Lakeville Town & Country Homestead Collection purchasers would have bought a Rottlund Villa II in Farmington?
A No.
Q Same question with respect to Shakopee and Chanhassen. Did you do anything to determine whether or not the purchasers of the Homestead Collection product in Shakopee would have purchased Rottlund's Villa II product in Chanhassen?
A No.
Q I don't know if you answered my question. I apologize if this has been asked and answered, but I think I'll ask it broader this time. Did you do anything to determine whether or not the purchasers of the Homestead Collection products sold in Plymouth would have purchased a Rottlund Villa II product in Plymouth?
A No.
Q Did you do anything to determine whether or not the purchasers of the Town & Country Homestead Collection units in Maple Grove would have

purchased a Rottlund Villa II unit in Maple Grove?
A Again, anywhere in Maple Grove?
Q That's right.
A I think you're just asking the same questions over again. I think you asked these questions all before.
Q And I think you answered them as to specifically interviewing those people. And my question through the Maple Grove sweep this time is, putting interviews aside, did you do any analysis to try to determine whether or not the purchasers of the Homestead Collection product in Maple Grove would have bought a Rottlund Villa II product anywhere in Maple Grove?
A Any analysis. Well, I mean, again, we've done a comparative with respect to pricing between the two products, but, you know, we -- and I'm not aware of a bunch of Rottlund units that aren't selling because of the Villa II -- I'm sorry, because of the Homesteads that the Rottlund Villa IIs aren't selling.
But I have not done anymore consumer work with respect to the people who bought the Homestead Collection as to what they would have

done if they would have had a Villa II to select from, because I don't know what that hypothetical exists or not.

I'm still not aware of, one, Rottlund having the ability to -- or having a desire to purchase the land which Town & Country purchased. And secondly, I'm still not aware of what properties Rottlund has that they would have developed that weren't developed as a result of Town & Country, to really know what the comparison would be, because location again, of course, is a big issue.

But -- so I don't know what I would have asked the people with respect to those hypotheticals, but I have not interviewed these individuals to determine what their decisions would have been had a Villa II product been available someplace around that area. I didn't do that, no.

Q Moving on to your conclusion, you're saying, "it is unlikely Rottlund has lost any sales and, thus, accrued any actual damages." Is that a fair statement?

A Well, we had not seen any evidence to indicate, first, again, as I said before, that Rottlund

would have purchased the land or had any desire to purchase the land that Town & Country purchased, and still have not seen any other land that Rottlund could have developed, that didn't develop with respect to -- because of the Villa II, and have not seen anywhere where Rottlund did -- lost units and have units sitting in inventory they can't sell because of the Villa II.

As a result of that, I don't see any actual damages, at least that haven't proven with a reasonable degree of certainty.

Q I'm focusing on the words "it is unlikely Rottlund has lost any sales." Is it your opinion that they may have lost some or is it your opinion that they haven't lost any?

A I can't say that, you know, there couldn't be some -- a small number of sales. I mean, I can't say it absolute, but I'm just saying there's nothing to indicate it would be anything significant.

And it's possible that this -- there wouldn't be any, because, again, I have not seen any land that Rottlund has that they would develop for the Villa II they didn't develop. I

mean, I just haven't seen any evidence that would indicate that there is a lost sale.

But there's lots of units. I mean, there's 1000 units that were built that are alleged to be infringing by Rottlund through March of '04, 1000, 1100, you know. Could one of those have been lost to Town & Country? Maybe. I don't know. I just haven't seen the evidence of it that would indicate there was any significant actual damages.

Q Moving to page 8 of your report, you state that, quote, "Our research"--this is in the third paragraph--"indicates the old real estate adage that 'location, location, location' is the most important part of homebuying is accurate." Did I read that correctly?

A Yes.

Q What expertise do you have in interpreting whether or not the old real estate adage that "location, location, location" is the most important part of home buying is accurate?

A Interviewing real estate agents. But it actually goes back to my -- partially to my own education, taking course work on buying and selling a home before I purchase my -- my first