Exhibit R7

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.d/b/a Rottlund Homes,
a Minnesota corporation, Plaintiff,
vs. Case No. 01-CV-1980Pinnacle Corpora
d/b/a Town & Country Homes,an Illinois Corporation, and
Town & Country Homes, Inc.,a Minnesota Corporation, and
Bloodgood Sharp BusterArchitects & Planners of Iowa,
Inc., an Iowa corporation, Defendants,
andTown & Country Homes, Inc.,
a Minnesota corporation, Third-Party Plaintiff,
vs.Bloodgood Sharp Buster
Architects & Planners of Iowa,Inc., an Iowa corporation,
Third-Party Defendant.- - - - - - - - - - - - - - - -

DEPOSITION OF STEVEN J. MEYERS

(The following is the deposition of STEVEN J. MEYERS, taken pursuant to Agreement of Counsel, at the offices of Moore, Costello & Hart, Fifth Street Towers, 55 East Fifth Street, in the city of St. Paul, state of Minnesota, commencing at approximately 9:00 o'clock a.m., June 25, 2003.)

se, but generically I always have a brochure that has the name of the development on it, I have a kind of a plat map showing the locations of the different homes, and then in that particular one there were two floor plans so I had two floor plans that I would have put in that, and then I always sent -- I always put in -- I always have a sheet made up that shows basically the -- the price relative to some different financing scenarios and I like to show a buyer the down payment that would be required, the association fee, the estimated homestead taxes, you know, private mortgage insurance and basically the components of a price because I like to sell showing more so than anything else the numbers. Because if a person can't palate the numbers on a monthly basis, then they're a waste of my time and it's a waste of their time as well. So that's generally made up by a mortgage company that I work with.

Q. Was there any material that related specifically to -- And again let's back up when we're talking about the scenario in which I'm the potential customer walking in in January of 1998 to look at a Villa II home in Maple Grove, and with that as a premise I'll ask was there any material that was available to customers that described the Maple Grove

area in general?
A. On the wall Rottlund puts a -- a picture, and again, this is something they generically do, that -- that I don't necessarily recall that it was on the wall five years ago, but it has points of interest for the community, you know, as far as shopping centers, restaurants, trails, golf courses, that type of thing.
Q. When you moved from community to community during your tenure with Rottlund did you make it a point to learn about each of the communities in which you were stationed?
A. Not really.
Q. Why is that?
A. I sell a product relative to the value of the product and the cost of the product, the price per square foot, and I'm more interested in if the person has made it to my front door they know where they're at. Rather than -- than concerning myself with introducing them to a location that they perhaps are more familiar with than I am, I involve myself with the numbers and the details as far as price components. I like to sell the house to a buyer and show them, predominantly first-time homebuyers, show them how they do have potential to own something and

show them the after-tax cost, you know, benefits of owning a piece of property relative to what they're renting for. So I'm kind of more of -- I'm less of a emotional sales rep. I like to go by numbers. You might -- If you ask my boss, they jokingly say that I'm the guy that doesn't sell options because I could care less about them. I like to sell the unit, that way a buyer goes home and doesn't say, oh my God, I need 30, 40 grand's worth of toys in this thing and it trashs the sale. I'd just as soon tell them, you know, you could lay your own floor by buying a compound miter box and going this way.

Q. So it's your testimony, sir, that when someone's arrived at your door they've made some determination that the area in which they find themselves is one they deem liveable?

A. I assume they wouldn't be coming to see me if they didn't want to have an interest in that site.

Q. In your career selling condominiums, selling townhomes, have you ever tried to determine what it is that drives customers' buying decisions?

A. Price, value.

Q. Is location a factor?

A. Not necessarily. I had a guy at the site, I'm in Chaska right now, I had a guy that was in last

week who lives in Uptown, he works in Plymouth, and he was interested in basically getting a house at the beginning of a sales location because the prices are always the least expensive, you know, they start out lower and then they raise them as they build additional buildings. He was looking at an investment for two years, he was looking at keeping his capital gain, he was considering -- it was more of a drive than -- than perhaps he was making at the present by living in Uptown, but he was looking at the potential that the product offered him.
Q. So it's your testimony that location is not necessarily a factor in buying decisions with a townhome; correct?
A. It depends on the individual.
Q. For some individuals --
A. For some it may be vital.
Q. Is the same true for the school district in which you're -- you're showing product, that that could be a consideration, indeed an important consideration for some buyers?
A. I haven't had that an issue.
Q. So in your experience the school district in which your product sits has not been a factor for potential customers; correct?

Exhibit R8.1

UNITED STATES DISTRICT COURT DISTRICT O
FOURTH DIVISION No.:
- - - - - - - - - - - - - - - - - - - - - - - - - - - -The Rottlund C
d/b/a Rottlund Homes, a MinnesotaCorporation,
Plaintiff,vs.
Pinnacle Corporationd/b/a Town & Country Homes,
an Illinois Corporation, andTown & Country Homes, Inc.,
a Minnesota Corporation,
Defendants,
and
Town & Country Homes, Inc.,
a Minnesota Corporation,
Third-Party Plaintiff,
vs.
Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa Corporation,
Third-Party Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
30(b)(6) Deposition of
TOWN & COUNTRY HOMES, INC.
(Testimony of Arthur J. Plante)
Thursday, December 19, 2002
9:00 a.m. - 4:48 p.m. (pages 1 - 311)
Friday, December 20, 2002
9:11 a.m. - 10:13 a.m. (pages 311 - 351)

Deposition, taken before Myrina Kleinschmidt, a Notary Public in and for the County of Hennepin, State of Minnesota, held at the law offices of WINTHROP & WEINSTINE, P.A., 3000 Dain Rauscher Plaza, 60 South Sixth Street, Minneapolis, Minnesota.

WHEREUPON, the following proceedings were duly had:

(Oath administered by the reporter.)

WITNESS RESPONSE: I do.

TOWN & COUNTRY HOMES, INC.

Testimony of ARTHUR J. PLANTE,

a witness in the above-entitled proceedings, after having been first duly sworn, deposed under oath as follows:

EXAMINATION

BY MR. KRUMMEN:

Q Please state your name for the record.

A Arthur Plante.

Q Mr. Plante, have you ever toured a Rottlund Villa II townhome before?

A I've toured a number of competitors' townhomes. I believe that I have been in a Rottlund townhome.

Q When did you tour a Rottlund Villa II townhome?

A I've toured many competitors' townhomes since 1998.

MR. KRUMMEN: Move to strike as nonresponsive. Could you read my question back, please.

(The requested portion of the record was read by the reporter.)

A I believe that the first time I saw a Rottlund townhome--and I don't know if it was a Villa II--was in 1998, early 1998.

BY MR. KRUMMEN:

Q I believe you said the first time you saw a Rottlund townhome was in early 1998. Correct?

A Correct.

Q The question was, when did you tour a Rottlund Villa II townhome?

MS. PREBLE: Objection. Asked and answered.

MR. KRUMMEN: Half right.

A What's the difference between tour and see or view?

BY MR. KRUMMEN:

Q Did you go inside the Rottlund Villa II townhome that you saw in early 1998?

A Yes.

MS. PREBLE: Objection. Mischaracterizes prior testimony.

MR. PETERSEN: Same objection.

BY MR. KRUMMEN:

Q The answer?

THE WITNESS: Do I have to answer that?

MS. PREBLE: Yes. Go ahead and answer the question. Could you read back the last question, please.

(The record was read as follows: "Q Did you go Villa II townhome that you saw in

A I've been through Rottlund townhomes. I don't know if it was called a Villa II.

MR. KRUMMEN: Move to strike as nonresponsive.

BY MR. KRUMMEN:

Q You saw --

MS. PREBLE: Objection. Hang on. Counsel, that's the witness' answer. How do you think it's not responsive?

MR. KRUMMEN: We'll let the judge decide, Ms. Preble. You don't have a robe on.

BY MR. KRUMMEN:

Q But back to the question. You went inside the Rottlund townhome you saw in early 1998, correct?

A I go through models typically when I go to communities to look at competition.

MR. KRUMMEN: Move to strike as --
A So I --
MR. KRUMMEN: -- nonresponsive.
BY MR. KRUMMEN:
Q Did you go inside the Rottlund townhome that you saw in early 1998, yes --
A Yes.
Q -- or no?
A Yes.
Q Did you pick up any marketing brochures that Rottlund had generated when you toured that townhome?
A Possibly. I can't say for certain.
Q Do you have any basis to deny that you picked up a Rottlund brochure when you toured that townhome?
MS. PREBLE: Objection. This is a repetitive line of questioning. Asked and answered.
A For the past 20 years, it's been my business practice to pick up brochures routinely as I go through competitors' model homes. Whether I picked up a brochure at Rottlund, I'm not certain. It's very possible that I did. That would be fairly routine for what I ask for when I go into a model home: "Do you have a brochure you can provide?"

Something of that nature.

MR. KRUMMEN: Move to strike as nonresponsive. Could you read my question back, please.

MS. PREBLE: Objection. The witness has answered the question.

MR. PETERSEN: And objection. Argumentative. He's answered the question. What do you want?

MS. PREBLE: Read back the question, please.

(The record was read as follows: "Q Do you have you picked up a Rottlund brochure

MS. PREBLE: Counsel, the witness has answered the question. He's told you he doesn't recall whether or not he picked up that brochure. The question has been asked and answered. Please move on.

BY MR. KRUMMEN:

Q You may answer.

MS. PREBLE: Do you have anything else to add other than your previous answer?

A I don't know whether I picked one up or not.

BY MR. KRUMMEN:

Q So you have no basis --

A I can't say with certainty that I did or I can't say with certainty that I did not.
Q Now, listen to my question. My question was, do you have a basis to deny that you picked up a Rottlund brochure when you toured the Rottlund townhome in early 1998, yes or no? That's the question.
MS. PREBLE: Objection. Asked and answered. Go ahead.
A I have no basis to deny that I picked up --
BY MR. KRUMMEN:
Q Thank you, Mr. Plante. Moving on, are you familiar with the product known as the Homestead Collection?
A The Homestead Collection is a Town & Country name. Yes, I'm familiar with the Town & Country Homestead Collection.
Q What does Homestead Collection refer to?
A It refers to our back-to-back style townhome product.
Q Do you have specific names for the back-to-back units within the Homestead Collection?
A Yes, we do.
Q What are the names?
A We have a Bayview, we have a Starwood, we have a Broadmoor and a Savannah.

you name every product -- or project of which
you're aware where one might find either a Bayview,
a Starwood, a Broadmoor or a Savannah.
A The Bayview and the Starwood were built in
Centennial Crossing.
Q Where is that located?
A Maple Grove, Minnesota. The Bayview and the
Starwood are being built in Harvest Hills,
Plymouth, Minnesota. The Bayview and the Starwood
are being built in Providence Pointe, Shakopee,
Minnesota. The Broadmoor and Savannah are being
built in Cornerstone Lake.
Q Where is that located?
A In Lakeville, Minnesota. And also in Springbrook,
Lakeville, Minnesota.
Q Are there any other projects where Town & Country
is building back-to-back townhomes in Minnesota?
A No.
Q Are you familiar with a project known as Heritage
Square?
A I'm familiar with the name Heritage Square.
Q What --
A There is no current project named Heritage Square.
Q Where is Heritage Square located?
MS. PREBLE: Objection.

Mischaracterizes --
A It doesn't exist.
MS. PREBLE: Mischaracterizes testimony.
BY MR. KRUMMEN:
Q Tell me everything you know about Heritage Square.
A Heritage Square was a proposed name for what is now being called Providence Pointe.
MR. PETERSEN: I will object to that. Excuse me. I'm going to object to "everything you know." If you have specific questions, why don't you ask them. I think that's a better way to characterize a question.
MR. KRUMMEN: If you don't stop grading my questions, I'll start grading your objections, Mr. Petersen. You can object to form and you can object to substance.
MS. PREBLE: All right.
MR. KRUMMEN: But don't tell me how to ask my questions.
MS. PREBLE: Object to form of the question.
BY MR. KRUMMEN:
Q Back to the question. What is Heritage Square?
A Heritage Square was a name that was proposed for what is now Providence Pointe. It's a development

name that was proposed.
Q And Providence Pointe is where you're building Bayviews and Starwoods?
MS. PREBLE: Objection. Asked and answered. Go ahead.
A We're building Bayviews and Starwoods and several other products -- several other types of products in that development.
BY MR. KRUMMEN:
Q Are the Bayviews and Starwoods of the same square footage at Providence Point as they are at Harvest Hills?
A I'm not certain that they are.
Q Where would you look to find out?
A On a set of drawings or architectural plans.
Q Why was there initially proposed this project name of Heritage Square?
MS. PREBLE: Hold on a second. Can you tell me what topic this is relating to in the deposition notice?
MR. KRUMMEN: I'll go with number 1 on liability.
MS. PREBLE: Hold on a minute.
Topic number 1 states, "Architectural drafting processes or procedures used in connection with

given. That was the advice we proceeded forward with.

BY MR. KRUMMEN:

Q I want to separate out everything that you spoke with your counsel and heard from your counsel about the decision. But there must have been a business reason for suing BSB, correct, Mr. Plante?

MS. PREBLE: Objection. Argumentative as to "there must have been a business reason."

MR. PETERSEN: Same objection.

BY MR. KRUMMEN:

Q Well, was there a business reason for suing BSB?

A This is a significant litigation. We need to protect our interests. That's a business decision. It was also a legal recommendation.

Q Did you forward any of your designs for the back-to-back townhomes that BSB drafted to this architecture firm that I believe you referred to as Tushie & Montgomery?

A No, we have not.

Q In what phase is the design of the back-to-back townhomes with respect to Tushie & Montgomery?

A We would call it sketch design phase, concept phase, early development.

Q Is there any project on the boards at Town &

Country for which you'd like to implement these Tushie & Montgomery back-to-back designs?
A We're a home-building company. We have projects on the boards. We have two projects that we're considering using back to back.
Q Where are they located?
A One is in Chaska, Minnesota.
Q What's it called?
A It's called Traditions at Clover Ridge. There will be three products in that development, one of which will be a back-to-back style townhome.
Q Has construction started at Clover Ridge Traditions yet?
A No, it has not.
Q When does it begin?
A It's proposed to begin late 2003, assuming we purchase the property. We have not purchased the property at this time.
Q Where is the other project located?
A The other project is called Pinebrook, one word, and it's located in Brooklyn Park, Minnesota. Same scenario as Traditions, it is a property that has not been acquired as of yet. If it is acquired, construction would start sometime in late 2003, after development is completed.

meeting that you've already identified?
A I don't know.
Q Once a year? Once a month? Once a week? Can you give me a ballpark?
A I'd be speculating. But probably a couple times a year in the -- maybe the early years. 1997 I think we met -- we may have met twice. Subsequent years, I don't know. But there's -- there's a distance between our offices that makes it somewhat inconvenient to get together in person.
Q Whose decision was it to design a back-to-back townhome for Town & Country Minnesota?
A That was my decision.
Q When did you make that decision?
A I started thinking about that product in the spring of 1998, after beginning to observe the marketplace and seeing a high -- a high amount -- a very large amount of developments either completed or in process with that style of product. I felt that was a product that to compete in the market would be a necessary product.
Q Can you be more specific than thinking about this back-to-back townhome idea in the spring of 1998 and specificity with respect to date?
MS. PREBLE: Hold on just a second.

Q Well, for example, a duck with dirty feet didn't walk across a piece of paper and come up with what appears in Exhibit Number 27, correct, Mr. Plante?

MR. PETERSEN: Objection. Argumentative.

MS. PREBLE: Same objection.

BY MR. KRUMMEN:

Q Someone put some thought into this, and I'm trying to get behind that thought process. Where did your ideas come from?

A Well, ideas generally come from a combination of factors. Market data is the -- is usually where most builders start.

Q And what do you mean by "market data"?

A What's being built in the market today, what has been built in the market in the past.

Q By whom?

A By anybody that's in the home-building industry, builders, competing builders.

Q Okay. Now let's focus on competing builders as they existed in or about April of 1998. Who was building a back-to-back townhome that you were looking at?

MS. PREBLE: Objection as mischaracterizing prior testimony. Go ahead.

A As I recall, there were a number of home builders

building back-to-back style townhome products. Rottlund was one. Centex Homes was another. Orrin Thompson Homes, D.R. Horton, Pulte, BrightKeys Development, GM Homes. Those are some that come to mind. Most of the largest builders in the Minneapolis market had that style of product in their product offering.

BY MR. KRUMMEN:

Q So in or about April of 1998, you knew that Rottlund was building a back-to-back townhome product, correct?

A I knew that there were a number of buildings -- builders building back-to-back townhome product, including Rottlund.

Q And you had seen the Rottlund townhomes in or about that time?

MS. PREBLE: Objection as to assuming facts not in evidence.

A At some point in time in early 1998, I toured many or all of those competitors that I just mentioned, as a routine part of my job, to learn and understand the Minneapolis marketplace.

In addition, I toured single-family product and other types of product, but I was especially interested in this product as it seemed to be

selling well, a product that was well received by the consumer, one that provided good density in -- in development, and one that I thought was needed in the marketplace for affordability and to attract the largest number of potential home buyers.

BY MR. KRUMMEN:

Q Did you pick up any floor plans during your tours of Rottlund and other competitors' back-to-back townhomes?

A For the past 20 years I've made it my profession to pick up brochures, floor plans, marketing literature, anything that's available to the general public, when going into competitors' sales offices or model homes.

I don't recall whether I picked up a brochure for Rottlund or any of those other builders, but that would have been my typical -- would have been one of the typical things I asked for as I toured those competitors' communities.

Q Did you forward any Rottlund floor plans or marketing materials to BSB Iowa before this Monday, April 27, 1998, facsimile when preliminary concepts came to you?

MS. PREBLE: Objection. Misstates prior testimony. Assumes facts not in evidence.

MR. PETERSEN: Same objection.

A I don't know whether I sent any Rottlund townhome floor plans, brochures or any other builders' brochures to BSB prior to that date.

BY MR. KRUMMEN:

Q If you wanted to find out the answer to that question today, where would you look? Would that be in your correspondence file as well?

MR. PETERSEN: If anywhere.

A It could be. I generally kept a file for each project, as I described earlier. I generally tried to keep track of correspondence during that period of time of what might have been sent back and forth, or pertinent documents, like a contract, that were important to save and preserve.

BY MR. KRUMMEN:

Q Have you looked within the past year for correspondence to BSB that may have included a Rottlund floor plan or marketing brochure?

A I --

MS. PREBLE: Hold on. Again, you're asking whether Mr. Plante personally has looked? Is that the question?

MR. KRUMMEN: I'll start with that.

A I sent my entire file that was in my office, early

on in this litigation, to our counsel.

BY MR. KRUMMEN:

Q Including --

A I sent them everything that I had that I knew about at the time.

Q Including your correspondence file?

MS. PREBLE: Objection. What's the question? Asking when he sent or if he sent? And let me also object as to asked and answered about his correspondence file. We went through this this morning.

BY MR. KRUMMEN:

Q Are you including your correspondence file?

A I don't know if I included my correspondence file or not. There have been a number of requests for documents over many months, and, as I've obtained additional requests for documents, I've complied with those requests and looked in those files or those places and sent what was asked for.

Q Turning your attention now to BSB 01903. It's the third page of Exhibit 27.

A (Complies.)

Q The logo at the bottom states, "Concept Plan," and then it has Town & Country Homes, Minnesota Division's logo on it, correct?

A Correct.
Q And it also has Bloodgood Sharp Buster's logo on it, correct?
MR. PETERSEN: Objection as to what a logo is. I'm assuming that's the little squiggle in the corner. We can call it a logo if we all understand what we're talking about.
A I don't know if that's Bloodgood's logo or not. It's obviously their name. And it is our logo.
BY MR. KRUMMEN:
Q Why do we have a concept plan with both logos stamped on it, if you know?
A I don't know.
Q Did you prepare that or did Town & Country Homes Minnesota prepare that?
A Not that I'm aware of.
Q So Bloodgood prepared this concept plan with the two logos on it?
A I said I didn't prepare it, to my knowledge. I don't know if Bloodgood did it or not.
Q Did you have any input into Bloodgood before you received the concept plan which appears on 01903?
MS. PREBLE: Objection. Input as to?
MR. KRUMMEN: As to what Unit A's interior should look like.

A No. I don't typically tell the architect what it should look like. I tell them what -- what room counts I need, what features I might want to include and so forth.

That's why I hire an architect, because I don't know how to draw. So I look to them to draw the idea, the concept that I'm trying to convey to them in terms of what it is I'm trying to build, trying to create.

BY MR. KRUMMEN:

Q Did you send any of your competitors' floor plans for back-to-back townhomes to BSB Iowa and say, "Make Unit A's interior unit look like this" or words to that effect?

MS. PREBLE: Objection. Misstates prior testimony. Argumentative. Let me think.

MR. PETERSEN: Asked and answered.

MS. PREBLE: Asked and answered, yes. I knew I had another one.

A It's possible that I provided BSB with a representation of what was being built in the market at that time. That is fairly common, for builders and architects to tour competitors' models, look at brochures, talk to sales staff, look at buildings under construction.

This is what builders do. We're in the business of understanding our competitors so that we can understand the market and so that we can compete in that market. So I'm confident we had many discussions about the ideas and the concepts that I was trying to incorporate into this townhome design.

BY MR. KRUMMEN:

Q Why do you want a back-to-back townhome that looks like all of your competitors'? Why don't you want one that looks completely different?

MS. PREBLE: Objection.

MR. PETERSEN: Objection.

MS. PREBLE: Argumentative. Misstates testimony.

MR. PETERSEN: Assumes facts not in evidence.

MS. NEWMAN: Object as to the form of the question.

A Quite the contrary. I was looking to develop a back-to-back that was different, different than the competitors', that had design features that the competitors didn't offer.

Now, under the constraints of a back-to-back townhome design with two common walls, you're very

MS. PREBLE: Objection. Assumes facts not in evidence.

A I have no idea how many times I toured Rottlund or any other competitors' townhomes. I mentioned earlier that I've been in a number of competitors' townhomes, both at that time and since that time.

BY MR. KRUMMEN:

Q Did you tour Rottlund's townhome more than once?

MS. PREBLE: Objection. Asked and answered. He just answered that question.

A Possible. I may have looked at more than one community that that company builds, as I would any other competitor. It's my business to understand who's building what and in what locations at any given time, particularly those that we were either building in or interested in building in, where consumers and the home-buying public wants to live.

BY MR. KRUMMEN:

Q Have you ever taken any pictures of Rottlund's back-to-back townhome?

MS. PREBLE: Objection. Assumes facts not in evidence that he's been in a Rottlund townhome.

A During the years I've been in the home-building industry, I have taken pictures of builders'

products, floor plan ideas, fireplace walls, architectural elements, planter boxes, landscaping, exteriors, interiors, a variety of features in products, to have a concrete example of how things can be done and what looks appealing. Absolutely. Taken photography.

MR. KRUMMEN: Could you read my question back, please.

(The record was read as follows: "Q Have you ev Rottlund's back-to-back townhome?")

A Possibly.

BY MR. KRUMMEN:

Q Do you know --

A Probably.

Q Do you know roughly when you took the pictures?

MS. PREBLE: Objection.

MR. PETERSEN: Assuming that he took pictures.

A I don't. It's possible I took pictures during this period of time. I've taken pictures as recently as this weekend of builders' products in the marketplace.

BY MR. KRUMMEN:

Q Do you have any basis to deny that you took pictures of Rottlund's townhome in or about April

of 1998?

MS. PREBLE: Objection. Asked and answered. He's told you what he knows about whether or not he took pictures and when.

A I have no basis to deny that I took pictures.

BY MR. KRUMMEN:

Q Have you ever toured Rottlund's back-to-back townhome by yourself?

A I don't know.

Q Have you ever toured Rottlund's back-to-back townhome with other individuals?

A Possibly.

Q What do you recall?

A I will say that I have toured model homes in the marketplace both individually, on my own, and with people that worked for me and/or with architects that I work with. I've done it in all sorts of combinations. Whether I toured a Rottlund townhome individually or with a group, I can't be certain.

Q You have no recollection of touring a Rottlund townhome with a group of people?

MS. PREBLE: Objection. Asked and answered.

A During the early part of 1998, I recall that I took a tour in the marketplace with one of the fellows

who worked for me at the time, Bill Anner, and with Larry and Chris. We looked at a number of builders that were building homes in the Minneapolis market at that time.

Who we looked at, what day we looked at them, what time we looked at them, whether we went in them or not, whether we took pictures or not, I don't have a solid memory of all of that.

But as I said, for the past 20 years, it's been my practice to do this. This is what home builders do to understand the marketplace they're in and to understand their competitors.

BY MR. KRUMMEN:

Q Do you know when you toured townhomes with Bill Anner, Larry Moore, and Chris Jorgensen?

A I just said it. I said sometime in early 1998.

Q Was anyone else --

A Might have been spring of '98. I don't know the exact date.

Q Was anyone else present on this tour?

A Those are the -- those are the four that I can recall.

Q What was the purpose of the tour?

A To understand the market, to see what's being built in the market.

Q So Bill Anner and yourself were the two contact points for the Centennial Crossings development?
A Can you clarify what you mean by "contact points"?
Q The land acquisition people responsible for the property that led to the Centennial Crossing development.
A Bill was the primary contact person to the outside world on all land acquisition. However, all land acquisition had my involvement and my input and so forth.
Q When did Mr. Anner become aware that there was a property for sale that ultimately led to the Centennial Crossing, if you know?
MR. PETERSEN: Objection. If you know.
A I don't know when Mr. Anner became aware of it.
BY MR. KRUMMEN:
Q When did you first become aware that there was a property for sale and that property ultimately became known as what Town & Country Homes calls the Centennial Crossing development?
A Sometime in the summer of 1998, late summer of 1998, is what I recall.
Q And that was called the Hollander property, was it not?
A Correct.