Exhibits R8.2

Q Would you explain to me how Town & Country Homes went about purchasing the Hollander property?
A As I recall, there was a broker that represented the Hollander family, by the name of Lou Frillman.
MS. NEWMAN: Can you spell that?
THE WITNESS: F-r-i-l-l-m-a-n.
A And I believe that he was with Marquette Advisors. And we became aware of the property -- I became aware of the property when it was -- when we received a proposal from Mr. Frillman to bid on the purchase of the property.
BY MR. KRUMMEN:
Q Were there any requirements that related to your bid on the purchase of the Hollander property, that you know of?
A None that I know of.
Q Had it received a PUD concept plan approved by the city council prior to the time that you bid on the Hollander property?
A That's my recollection of what the documents stated from Mr. Frillman.
Q So you knew, based upon the PUD concept plan approved by the city council, what the density housing requirements were on the Hollander property, correct?

A Correct.
Q Do you recall what those density housing requirements were?
A I recall that there was a total of 381 units possible to develop on the property. The concept plan had a variety of different products shown. I don't recall any of the numbers of those breakdowns, but I know that it was possible to build up to 381 homes on the property.
Q Did Town & Country Homes' decision to design a back-to-back townhome have anything to do with the purchase of the Hollander property? Were they at all related?
A We began developing the back-to-back idea and program before we entered into negotiations to buy the Hollander property.
Q Did you start designing the back-to-back townhome at Town & Country Homes Minnesota before you knew the Hollander property was for sale?
A Yes.
Q Do you recall roughly how much time elapsed between when you started developing a back-to-back townhome and when you first found out that the Hollander property was for sale?
A Not precisely. It could have been a number of

months. It might have been longer.
Q The Hollander property ultimately became Centennial Crossing, correct?
A That's how we platted it. Correct.
Q Is that the first project where Town & Country Homes built a back-to-back townhome?
A Yes.
Q Is there a reason why Town & Country Homes built back-to-back townhomes at Centennial Crossing?
A Well, we had an interest in pursuing the back-to-back product, as I stated this morning. It was a product that we believed would sell in the marketplace. We were very interested in pursuing that market. We began sketch designs to anticipate being in that market with that product.
I don't recall if the site had any particular requirements to build back-to-back or any other particular product type. There was a mixture of products shown on the approved concept plan.
Q Did it have requirements to build eight unit structures anywhere on the concept plan, that you know of?
A I don't know. I'd have to see the concept plan to see that.
Q Back to the back-to-back townhomes built at

Centennial Crossing. What other eight-unit townhomes did Town & Country Homes have at the time it started negotiating for the Hollander property?
A I'm not certain that we did have any eight-unit buildings. We might have had one product that we built in Burnsville and Eagan. I'm not sure it went as big as eight units. I'm fairly confident it went to seven units. I don't know if it went to eight.
Q What was the name of that townhome?
A That was the townhome that was developed by LHB Architects. I don't know that we had a particular name for it. We probably had marketing names for each individual floor plan, but I don't know that we called it a particular collection or series name at that time.
Q Was it a see-through townhome as opposed to a back-to-back?
A Correct. There was no attachment at the rear walls, windows.
Q Did you have any other see-through townhome buildings that were in the design phase or completed with the design phase at the time you started negotiating for the Hollander property?
A Yes, we did.

Marquette or Town & Country Homes and the representatives of the Hollander estate?

A There were actually two purchase agreements executed.

Q What do you refer to those as?

A Purchase agreements.

Q Purchase agreement 1 and 2?

A Land contract, purchase agreement. I don't know the exact title of the documents. But we negotiated with the -- with Mr. Frillman. Bill Anner negotiated with Mr. Frillman, and we entered into the first purchase agreement either late '98 or 1999, early '99, somewhere in that time frame.

Within that purchase agreement, we had so many days to study the property and decide if we wanted to go forward with the purchase, commonly called a study period or a feasibility period.

At the end of that feasibility period, we made the business decision that the property was -- at the price offered -- that we had offered on the property, we just decided we couldn't make the numbers work. We decided that it was too big of a risk and elected to terminate our agreement with the Hollanders. We sent a notice to the Hollanders. Mary Ranum, our attorney, sent a

notice terminating that agreement.
Q Then I assume there was a follow-up purchase agreement?
A A number of months later, after Mr. Frillman and the Hollanders tried to seek other buyers for the property, we were either contacted or we contacted them. I'm not sure. But we eventually sat down and negotiated with them for a second time to acquire the property.
Q What was the purchase price for the property?
A There were several purchase prices, starting from the first purchase agreement to the final purchase agreement. I don't recall the exact numbers. I think the first purchase agreement was in either the 4 and a half or $5 million range.
Q Do you know what the final purchase agreement price was that Town & Country Homes executed?
A Not with certainty. But I believe it was in the low $4 million range, maybe 4.2 to 4 -- 4.2, 5.0, somewhere in that territory. But I'm not certain without looking at the contract.
Q That's fair. I don't think I have them either. But if we were to ask you for the two signed purchase agreements you previously testified to, do you believe they're still in the possession,

custody or control of Town & Country Homes and --
A I do.
Q -- you could put your hands on them?
A During the course of this litigation, I've looked at those documents.

MS. PREBLE: They've been produced, Counsel.

MR. KRUMMEN: Yeah, they may have been. I won't use them today, is what I'm driving at. But I do need a two-minute break to pick something up on my desk right now, so I'll be right back.

(A recess was taken from 1:21 p.m. to 1:25 p.m.)

BY MR. KRUMMEN:
Q We were working through Centennial Crossing. And there are back-to-back townhomes being built at several other Town & Country Homes developments, correct, or were built?
A Correct.
Q I believe you identified Harvest Hills in Plymouth. Correct?
A That's one.
Q Let's work through Harvest Hills at Plymouth. Was there a bid process similar to the bid process you just described for Centennial Crossing as it related to Harvest Hills?

A I don't think so. I'm not certain of what the property owner did before he met with us, but I don't recall seeing a bid package, if you will, on that property.
Q Who was the property owner, if you know?
A His name is Merrill Paulson.
Q How did Merrill Paulson get in touch with Town & Country Homes?
A It's my understanding and recollection that Merrill Paulson went into one of our model homes in Plymouth at the time, looked at our models, our product, and had a conversation with the salesperson about his like of the product.
And he may have asked who to call in our office to talk to about his property. But we ended up learning about Merrill Paulson through that encounter in one of our models.
Q Which product was he pleased with?
A That was our Premier Collection townhome product.
Q Did you build any Premier Collection products on Harvest Hills ultimately?
A Yes, we did.
Q Do you know if Mr. Paulson had other builders bidding on this Harvest Hills property?
A I don't know.

Q Which sales representative of yours did Merrill Paulson work through?
A I think it was Mike Kangas.
Q Could you spell that last name.
A K-a-n-g-a-s. That's my understanding of who was there at the time.
Q Do you know roughly when that occurred?
A Sometime in 1999.
Q Is there any documentation that you're aware of at Town & Country Homes which would reflect this bid process for Harvest Hills?
A Actually, let me go back and correct that. It might have been the year 2000 that we met with Merrill Paulson. I think it was the year 2000, somewhere early that year.
Q And I won't hold you to specific dates. Hopefully, I'll be able to find them in documents later. But are there any documents that would reflect this bid process for Harvest Hills that you're aware of which would exist at Town & Country Homes today?
MS. PREBLE: Hang on. Just objection as mischaracterizing testimony about a bid process.
A Yeah. I don't know that there was a bid process. As I recall, I met with Merrill Paulson. I believe Bill Anner was there. And we just negotiated --

talked about what he was looking for with his property. He described his property. He showed us drawings of his property, surveys, that kind of stuff.

And I recall having, you know, a conversation, "How much do you want for the property," "We'll be willing to pay this," you know, a discussion, negotiation, if you will, followed up by what we -- what we call a letter of intent.

It was our practice, and still is our practice, to try to summarize an understanding of an agreement in a short-form letter prior to a contract being tendered to a landowner for signature, you know, a contract from an attorney.

BY MR. KRUMMEN:

Q Do you know if the letter of intent still exists within Town & Country Homes' possession?

A I don't know. As a practice, we keep records on our land acquisitions. We try to keep copies of letters of intent and contracts and title policies and closing documents. I don't know if that exact document exists in that file.

Q And then subsequent to the letter of intent, there must have been a purchase agreement, correct?

A Correct.

Q Do you recall roughly when the purchase agreement was executed?
A I don't. But I think it's sometime early in -- in the year 2000.
Q Do you believe you could find that purchase agreement, if asked to do so, at Town & Country Homes?
A If there's a copy in our possession, which I have reason to believe there is.
Q Moving on to Cornerstone Lake, was there a bid process for the Cornerstone Lake property before you acquired it?
A I don't know if there was a bid process there or not.
Q Would you explain what you know about the negotiation process that led to Town & Country Homes' acquisition of the property which ultimately became Cornerstone Lake.
A In very vague terms, I believe that property was acquired sometime in 1998. That property owner was Dave Finnegan -- David Finnegan and, I think, his wife. I don't recall her name, but -- I never met his wife. And he was represented by a broker by the name of Bill Minnehan.
And somehow we were introduced. When I say,

"we," Bill Anner and/or myself, might have been Bill first followed by me. I don't recall. But we were introduced to Dave Finnegan and shown the property and discussed the same type of scenario in terms of how much did he want to sell it for, what would we be willing to pay. All of those kind of discussions took place.

Q Then there was a letter of intent, I assume?

A That would have been our practice, to tender that. Whether he signed it -- it was common -- it's very common in the Minnesota marketplace that sellers don't like signing letters of intent. Even though it's stated on there that it's not binding on either party, there's been a general reluctance for sellers to not sign those. So while we possibly tendered it, it might not have been signed or it might not exist today, but it's possible it does.

Q Then there's a purchase agreement subsequent to a possible letter of intent, correct?

A Correct.

Q Do you believe that you could find the purchase agreement and the letter of intent, if they exist, somewhere at Town & Country Homes?

A Yes.

Q Moving on to the next project, which is Providence

Pointe, basically the same drill. We'll start with the negotiation process. Please tell me what you know about the negotiation process for acquiring the land that led to the Providence Pointe development.

A I had two people involved in land acquisition at the time. One was Bill Anner, our vice president, and another was Beth, Beth Simenstad. And Beth was working for us during that time frame.

MS. NEWMAN: Do you have a spelling for Simenstad?

A I think it's S-i-m-o-n-s-t-a-d (sic).

BY MR. KRUMMEN:

Q Do you know who the seller of the property was?

A The seller was the Brown family. I think the father's name was Gene Brown and the son was Dave Brown. Dave Brown is a realtor and owns a real estate company in Shakopee.

Q Was there a bid process similar to the Centennial Crossing negotiation period or not as it related to Providence Pointe?

A Very possibly. I wasn't involved personally in those negotiations, but I recall a conversation -- a conversation or information coming to me from either Beth or Bill that everybody in town was

trying to buy the property. And when they met with the seller, he had a number of other offers from other builders already.
Q Was there a letter of intent?
A As I said earlier, it was our practice to prepare letters of intent and tender those to the seller. Whether there was one in this instance, I'm not sure.
Q Same question with respect to a purchase agreement?
A There would have eventually become a purchase agreement, yes.
Q Moving on to Springbrook, could you tell me what you know about the negotiation or bid process as it related to the property that ultimately became known as the Springbrook development.
A I believe that we started looking at that property sometime in the late '90s. It might have been '98 or '99. I'm not certain.
Q Who's "we"?
A "We," Town & Country Homes Minnesota.
Q Would include you and who else?
A Well, Bill Anner was my land vice president. It was Bill's responsibility to find property, meet with brokers, sellers and so forth. Once we -- once he found suitable property, then he would

normally talk to me about it, show me the property, take me out there, show me plans, whatever information he had.

Q Does Bill Anner still work for you?

A No, he does not.

Q When did he leave?

A He left in the summer or spring -- spring of 2001.

Q Do you know why he left?

A For a different opportunity.

Q With whom?

A Neumann Homes in Chicago, Illinois.

Q Back to Springbrook. Was there a letter of intent that you know of that related to the Springbrook property?

A I'm not certain if there was a letter of intent or not.

Q Was there a purchase agreement?

A Yes. We have never purchased and closed on a piece of property without having a purchase agreement in the time that I've been president of Minnesota.

Q Do you know who the seller of the Springbrook property was?

A I believe that the seller was Kenrick Development, something of that nature. Kenrick something.

Q I'm going to try to get a feel for any density

BY MR. KRUMMEN:
Q How many did they recommend?
A I don't recall the exact number.
Q Do you know what it ended up at?
A It ended at 166.
Q Okay. 166 homes were ultimately approved, correct?
A Correct.
Q And it was Town & Country Homes that wanted to build more than 166 homes --
A Absolutely.
Q -- is that a fair statement?
A That's a fair statement.
Q Because Town & Country makes more money the more homes it can put on a piece of land; is that true?
MR. PETERSEN: Objection. Characterization. Assumes a fact not in evidence.
A We're a home-building company. It's our business to acquire land, develop land, and build homes.
MR. KRUMMEN: Could you read my question back, please.
(The record was read as follows: "Q Because Tow
money the more homes it can put on
A It might generate more revenue. That doesn't necessarily mean we might make more money. We may have -- we may have to pay the seller more money

for higher density. It depends on the transaction and the terms of the contract. We would generate more sales revenue if we built more homes.

BY MR. KRUMMEN:

Q As to Harvest Hills in Plymouth, do you think that the Plymouth city officials would have allowed you to build all single-family homes at Harvest Hills?

MR. PETERSEN: Objection as to what the City would have allowed.

MS. PREBLE: Same objection. Calls for speculation. Lack of foundation. If you know.

A I don't know what the City would have allowed. We -- as I said earlier, we typically -- one of the first questions we want to ensure we know about a property is what is its guiding or what is its zoning or what is its likely guiding or zoning going to be if it isn't already guided and zoned.

It's my understanding that the property was either guided or zoned or would have been guided or zoned with alignment with the City's ultimate plan for the area in a multifamily type of zoning category.

BY MR. KRUMMEN:

Q Do you keep the guiding and zoning documents in your project files for communities such as Harvest

Hills?
A I don't know.
Q Do you have any kind of a business practice that relates to guiding and zoning requirements as it relates to specific projects, such as Harvest Hills?
MS. PREBLE: Hold on. Can you read the question back. I'm not sure I understand the question.
(The record was read as follows: "Q Do you have practice that relates to guiding relates to specific projects, such
MS. PREBLE: The question is, does he has a business practice about requirements or are you asking about documents?
MR. KRUMMEN: For document retention of those requirement documents.
A No, we don't. But as a part of due diligence when we look at property that we're considering purchasing, we make it our business to try to understand what the City might have available on those properties by meeting with the staff, the planning department. That might involve reviewing maps or -- or zoning books, so forth.
BY MR. KRUMMEN:

Q If you know, would the City of Plymouth have allowed Town & Country Homes to build all single-family homes at Harvest Hills?

MS. PREBLE: Again, objection. Calls for speculation. Lack of foundation. You can answer, if you know.

MR. PETERSEN: Same objection.

A I have no idea what they might have allowed for single-family homes.

BY MR. KRUMMEN:

Q Same question as to Lakeville and Cornerstone Lake. Would the City of Lakeville have allowed Town & Country Homes to build all single-family homes at the Cornerstone Lake project?

MS. PREBLE: Same objection.

MR. PETERSEN: Same objection.

A I don't know. We never -- we didn't pursue that angle. We were interested in building what the property was -- was guided and zoned for and/or what we felt the City would -- would consider.

BY MR. KRUMMEN:

Q As to Providence Pointe, are you aware -- strike the question.

Would the City of Shakopee have allowed Town & Country Homes to build all single-family homes at

Providence Pointe?

MS. PREBLE: Same objection.

MR. PETERSEN: Same objection.

A I don't know if they would have allowed it. We -- we have some single-family homes in Providence Pointe that were ultimately approved with the final plan.

BY MR. KRUMMEN:

Q And the final plan included both single-family and multifamily homes, correct?

A Correct.

Q And you understood that the City of Shakopee wanted a blend of single-family and multifamily homes at Providence Pointe development, correct?

MS. PREBLE: Objection. States facts not in evidence. Mischaracterizes prior testimony.

MR. PETERSEN: Same objection.

A During the course of the approvals for Providence Pointe, at least the meetings that I attended, it was obvious that the City wanted a unique plan for the site. They wanted a mixture of product for the site. They didn't want to see all one product. They wanted to see a number of different products.

BY MR. KRUMMEN:

Q And "a number" includes they wanted to see both

multifamily and single-family homes at your Providence Pointe development, correct?
A That's correct. Additionally, they wanted to see several variations of multifamily products.
Q Moving on to Springbrook and the Lakeville community. The question is: Lakeville also wanted a blend between single-family and multifamily homes for your Springbrook development, correct?
MS. PREBLE: Same objection as before. Calls for speculation. Lack of foundation.
A I don't know if that's what the City wanted for that property or not.
BY MR. KRUMMEN:
Q Who would know the answer to that at Town & Country Homes?
MR. PETERSEN: If anyone.
BY MR. KRUMMEN:
Q If anyone.
A Possibly Bill Anner. Bill would have been the land vice president in the early acquisition phases and might have had those dialogues with the City.
Q Cornerstone Lake and the City of Lakeville, it's true, is it not, that Lakeville wanted to see a blend of single-family and multifamily homes at your Cornerstone Lake development?

testimony that it was taken by Sandelin or our client.

MR. KRUMMEN: There absolutely is testimony. And I'd appreciate the lack of coaching. We'll let the record speak for itself.

BY MR. KRUMMEN:

Q But the question is, do you know who took the picture?

A I don't.

Q It was either you or Mr. Sandelin, though, correct?

A That's my speculation.

Q Why would that be speculation? Who else could have taken that picture?

A Anybody else that was on the tour that day.

Q Who else was on the tour?

MS. PREBLE: Objection. Asked and answered.

A Well, I said that earlier. I'm not certain of who was on what tour. There were a couple of tours -- there have been many tours since I've been in Minneapolis.

BY MR. KRUMMEN:

Q And there have also been individual tours that only you went on, correct?

A That's correct.

Q So do you have any way today to find out who took the picture of --
A I don't.
Q -- Rottlund's townhome?
A I don't.
Q Do you still have the picture of Rottlund's townhome in your file that you sent to BSB, with a duplicate?
MS. PREBLE: Hang on. The question is, does he have a picture in the file that he sent to BSB?
MR. KRUMMEN: In his files at Town & Country Homes today.
BY MR. KRUMMEN:
Q Do you have a picture of the picture you sent to BSB?
A A duplicate picture of that picture?
Q Either a duplicate -- maybe you got the original back. I have no idea.
A I don't think that I had a duplicate of that picture. I'm going off of memory, not comparing what I've sent as a part of document production in this litigation, and that exact picture, which I have seen during the course of preparing for this deposition. I have not been able to put the

pictures that I've sent and that one picture
together to compare that they are the same or that
I have a duplicate or not.
Q I believe earlier today, Mr. Plante, you were
talking about a purchase agreement for the
Centennial Crossing property, which was originally
known as the Hollander property. Do you recall
that testimony in general?
A In general, yes.
Q I'm working chronologically, so that's why I'm
circling back to it now.
MR. KRUMMEN: But could you mark that as
an exhibit, please.
(Exhibit 31 marked for identification by the
reporter.)
MR. KRUMMEN: Off the record.
(A discussion was had off the record.)
A (Reviewing.)
BY MR. KRUMMEN:
Q Okay. Let me identify this for the record,
Mr. Plante, and I have a few questions. But
Exhibit Number 31 is a "Purchase Agreement."
That's the caption. It is Bates labeled RCI000214
through -230. And in the top first paragraph, it
refers to the Hildur Hollander property. Have I

thus far accurately characterized the exhibit before you?
A Yes.
Q Now, earlier you said there were two purchase agreements for the Hollander property, correct?
A That's my recollection of what occurred, correct.
Q Now, do you have any way to tell me whether or not Exhibit Number 31 is the first purchase agreement or the second purchase agreement or neither?
A I don't know whether it's either purchase agreement. It's not signed by either party.
Q Which leads me to the next question: Was that first purchase agreement ultimately executed by both parties or all parties?
A It's my recollection that it was.
Q Okay. So I have a draft of something here and it doesn't relate -- well, we can't tie it to either the first or the second. That's fair. But we do have a purchase price, under paragraph 2.0, of $4.5 million, correct?
A That's what it says.
Q And I believe you told me earlier that you thought the ultimate purchase price was lower than $4.5 million but higher than $4 million. Correct?
A That's what I recall.

Q So this most likely is different than that final second purchase agreement that you testified to earlier, correct?
A Most likely it is different.
Q Would it be fair to say that that final purchase agreement for the Hollander property was executed -- the second agreement was executed after December of 1998? By looking at the document before you, does that refresh your recollection in that regard?
A I'm fairly certain that that's correct, that the second purchase agreement was executed sometime in 1999.
Q Do you have any knowledge as to why what's been marked as Exhibit Number 31 was filed with a district court administrator, according to the stamp in the upper right-hand corner?
A Well, I don't know for certain why it was filed with the court. This was an estate, as I recall. There were a number of heirs and family members involved in the estate. It might have had something to do with that.
Q Can you testify with any certainty as to when that second purchase agreement, the final one, would have been executed, after looking at Exhibit Number

BY MR. KRUMMEN:
Q Let me quickly identify it and then I'll give you as much time as you need. But Exhibit Number 40 is Bates labeled D 00868 through -877. It refers to the "Homestead Collection - Stone's Throw" in Lakeville, Minnesota. It's dated April 30, 2001. Have I thus far accurately characterized the exhibit before you?
A Yes.
Q We have another jurisdictional transfer under "Architectural Services" on page one, correct?
A Correct.
Q Could you explain, if you know, where we're coming from and where we're going to as it relates to this jurisdictional transfer?
A We're coming from Cornerstone Lake in Lakeville, Minnesota, to the property that is now called Springbrook, also in Lakeville, Minnesota.
Q And referred to on this document at least as Stone's Throw, correct?
A Correct.
Q Please turn to D 00871, the signature block.
A (Complies.)
Q Again, you signed on behalf of Town & Country Homes, correct?

There's no basement for storage. There's really not a lot of places to put stuff.

So we worked hard at trying to create storage, good storage, walk-in closets where possible, storage under stairs, which we have in the product today, a very large storage area under the stairs where people can put stuff that they don't have the ability to use a basement for or a garage that is not very large. So storage space was another important consideration that I saw as a weakness in the competitors.

Some builders didn't have pantries or coat closets, places to put basic living necessities of things people have. So we felt it was important to be distinctive and different, that we offer amenities that most buyers would want to have in a home.

Q Any other unique features that you can think of that you were wanting to have included in Town & Country's back-to-back product?

A Well, I talked about the light issue. The volume and the creation of the feeling of the maximum amount of space in the -- in the box, if you will, has always been one of our design criteria.

So upon entering the home, we want to make it

feel as big as possible by the way it's laid out so that when you enter you can see the longest possible vistas or views from the entry. So that was important criteria as well.

We want to make a home of that size in that it is fairly small in square footage -- we want to make it feel as big as it possibly can feel for the size that it is. So volumes, volume ceilings, two-story ceilings, options to offer volume in the upstairs of the bedrooms, one or both of the bedrooms, was important to us.

We also had some other room configurations that we thought were not offered in the market. We created a plan that had two master suites, two distinct owners' master suites that were both large bedrooms with private baths joining those bedrooms.

We felt there was a market for singles that might want to buy a home together, and both would want their own nice-sized bedroom area and private bath. And we created a floor plan option for the dual master option and additionally a third bedroom in that configuration with up to three baths.

So we were kind of very thoughtful about the options that we offered to give buyers flexibility and choice in what they could do to personalize

that individual home.
Q Any other unique features that you can think of that you were trying to offer for Town & Country's back-to-back product?
A There's probably many others that I could talk about. We -- I was also looking at it from a cost perspective. Our kitchens are the -- are similar layouts from interior to end. I was doing that for efficiency and cost.
This is a cost-effective product. We were obviously trying to -- we were trying to hit a price point, the lowest possible price point we could, and still make a profit and yet have an affordable product for renters and people coming out of apartments that can't afford anything else.
So we tried to design efficiencies into our plans for construction purposes but also give a good design at the same time.
MS. NEWMAN: Let me stop you there. I won't finish today. I know that I won't. And it would be helpful to me if we could break at this point so that I could begin tomorrow.
I don't want to give a real long estimate, but maybe another 25, 30 minutes would be the total, I would imagine, tomorrow. I hate to do that to you,

BY MS. NEWMAN:
Q Okay. Now that you've had a chance to take a look at Exhibit Number 47, let's identify what it is. It's a fax cover sheet with a date of November 29, 2000, on the front, from Bloodgood Sharp Buster, Chris Jorgensen there, to you; is that correct?
A Correct.
Q And the front page of this Exhibit 47 is 00942, and it ends in Bates label number 00941?
A Correct.
Q And what's attached as starting on the second page of Exhibit 47 is the contract for the Homestead Collection Paulson property in Plymouth, Minnesota; is that correct?
A Correct.
Q And the Paulson property eventually became known as Harvest Hills; is that right?
A That's right.
Q And I'm going to direct your attention to the second to the last page of this exhibit, exhibit page number 00940.
A Correct.
Q Okay. And this is a fax from you to Chris Jorgensen. Can you read what it says in "Comments."

A "Proposal as requested. Please let me know completion timetable for final drawings. Thanks. Art."

Q And then what's attached is the signature page on the contract that we've identified for the Harvest Hills property project?

A That's right.

MS. NEWMAN: I have no further questions. Thank you.

MR. PETERSEN: I have just a couple.

MR. KRUMMEN: That's fine.

EXAMINATION

BY MR. PETERSEN:

Q Mr. Plante, when you would take product tours of competitors' homes and products, would you ever go into the model itself?

A Yes.

Q And when you would enter the model, would you identify yourself?

A Yes.

Q How would you identify yourself?

A Well, my typical -- my typical approach is to go in and introduce myself as Art Plante: "Hi, I'm Art Plante, Town & Country Homes." I often kid around.

Exhibit R9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation, and
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation, and
The Bloodgood Group, Inc., an
Iowa corporation
Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF BERNARD J. ROTTER
August 29, 2003

(The following is the deposition of BERNARD J. ROTTER, taken pursuant to Notice of Taking Deposition, at the offices of Fredrikson & Byron, 4000 Pillsbury Center, 200 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:13 o'clock a.m., August 29, 2003.)

explanation for that thousand-dollar difference in my estimate.

Q. Do you know if the elevation changes that Tim Whitten made increased the cost of the product?

A. I do not.

Q. And you don't -- I know I've asked you this before, I just want to make sure. You don't remember any of the specific elevation changes that Mr. Whitten made.

A. Not specific.

Q. How many additional Villa II units could Rottlund have built and sold in 1997?

A. The only problem we've ever had with Villas is finding enough land to build Villas on. How many could we build? It's the easiest product that we build, it's very easy to add volume when it comes to Villas because we've built them for so many years, they're repetitious. Repetitious product's very easy. You don't have to rebid, you just put the product out there and build it. So how many more? How much land are you going to give me to build them on?

Q. Sir, my question: How many additional Villa II units could Rottlund have built and sold in 1997?

MR. KRUMMEN: Asked and answered.

Q. Okay. Let's turn to page 28.
A. Okay.
Q. The description --
The third bullet point on the left-hand side is talking about you; is that correct?
A. That's correct.
Q. Have you ever seen this paragraph before?
A. Yes.
Q. Okay. What I want to figure out is your knowledge as it relates to these topics.
A. Okay.
Q. So the first topic to which you are believed to have knowledge of facts and issues involved in this matter is "Plaintiff's capacity to take on additional sales from 1997 to present"; is that correct?
A. That's correct.
Q. Besides your previous testimony, do you have any other knowledge of facts or issues involved in this matter relating to plaintiff's capacity to take on additional sales from 1997 to present?
A. I know that we had the cap -- we have the capabilities and had the capabilities to build more Villa product from 1997 to present. The only reason we haven't is the unavailability or lack of land to do so.

Q. And what was David asked by Builders magazine as far as you know?
A. You'd really have to ask him. I don't know. It was just a comment, they wanted to run an article on Villa products and he decline -- he told me that he told them that --
Q. Builders magazine is a national publication?
A. Yes.
Q. Did he tell you why he declined?
A. No.
Q. He didn't tell you one way or the other?
A. You'd have to ask him.
(Interruption by the reporter.)
Q. Were you upset to find out that he was not going to take up the opportunity for free national publicity on this new product?
A. Not necessarily.
Q. You don't recall your reaction one way or the other?
A. I don't recall.
Q. So as you describe or use the term "Villa," what -- what does a product need to become a Villa? It needs garages?
A. It needs to look just like the product I originally designed or the ensuing products.

Q. Does the --
A. We've advertised Villas so long I think Villa is almost a name in -- almost a trade name in the Twin Cities, we've built so many. People know what they were, they followed us. People actually wait, and used to call and still do call to ask where our next Villa project's going to be, and they a lot of times have waited up to two years to buy one of our products.
Q. So it can be a Villa if it has a combination of one- and two-car garages; correct?
A. Among other --
Among other things.
Q. And it can be a Villa if it has all two-car garages; correct?
A. It can be.
Q. If you just drew one with only one-car garages, would it still be a Villa, as you use the term?
A. It could be, although it's much harder to do it with all one-car garages I would say.
Q. If you put three bedrooms in each of the units would it still be a Villa?
A. It could be.
Q. There's just no saying?
A. There's no way I could say without you showing

Exhibit R10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation, and
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation, and
The Bloodgood Group, Inc., an
Iowa corporation
Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF DAVID H. ROTTER
August 27, 2003

(The following is the deposition of DAVID H. ROTTER, taken pursuant to Notice of Taking Deposition, at the offices of Fredrikson & Byron, 4000 Pillsbury Center, 200 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:05 o'clock a.m., August 27, 2003.)

Q. Who?
A. That I've seen, GM Homes. I think Pulte's doing some, Centex is doing some product now.
Q. Other than GM Homes, Pulte and Centex, are you aware of any others?
A. I am, but I can't think of the names. There may be others.
Q. We talked or started to talk about products in the Twin Cities marketplace that compete with Rottlund's Villa II product. Do you recall generally that line of questioning?
A. Right.
Q. You identified condominiums, apartments, townhomes, single-family homes from a number of builders; correct?
A. Yeah, I just said a number of builders, it's just...
Q. It's not accurate to say that Rottlund's only competition for its Villa II product is the product being built by Town & Country Homes, Inc. of Minnesota; correct?
A. No, I would say the direct copying of our product and putting it into competition would be a problem.
Q. You'll agree, sir, that Town & Country Homes,

Inc. of Minnesota's back-to-back, slab-on-grade townhome does compete with your Villa II product; correct?
A. I would say it not only competes with our Villa product, it is our Villa product.
Q. You'd agree, sir, that other than that product there are a whole host of other products in the Twin Cities market that compete with your Villa II product; right?
A. I would say there are other products that compete with our -- with our sales and marketing, but they're not direct copies of the products that we have that I believe has been blatantly copied.
Q. In fact you'd agree that the back-to-back, slab-on-grade homes built by GM Homes, Pulte and Centex compete with your Villa II product; right?
A. They could. I don't have to agree with it.
Q. Does your company make any attempt to determine who its competition is in the marketplace?
A. It does.
Q. Does your company make any attempt to determine what products out there are competing with particular Rottlund products?
A. That would be up to Mr. Stutz, so I defer to him.