# Exhibit R11

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

THE ROTTLUND COMPANY, INC.,
d/b/a Rottlund Homes,
a Minnesota Corporation,
Plaintiff,

vs.

PINNACLE CORPORATION, d/b/a
Town & County Homes, an Illinois
Corporation; TOWN & COUNTRY HOMES,
INC., a Minnesota Corporation;
BLOODGOOD SHARP BUSTER
ARCHITECTS & PLANNERS OF IOWA, INC.,
an Iowa Corporation; and the
BLOODGOOD GROUP, INC., an Iowa
Corporation
Defendants.

No. 01-CV-198
(DSD/SRN)

---------------------------------------

TOWN & COUNTRY HOMES, INC., a
Minnesota Corporation,
Third-Party Plaintiff,

vs.

BLOODGOOD SHARP BUSTER
ARCHITECTS & PLANNERS OF IOWA, INC.,
an Iowa Corporation,
Third-Party Defendant.

Deposition of MIKE RYAN, called as a witness herein, pursuant to the applicable provisions of the Federal Rules of Procedure governing the taking of depositions, taken before Deborah Habian, CSR No. 084-002432 on December 11, 2003, at 9:07 o'clock a.m. at M & M Reporting Legal Services, One Pierce Place, Suite 295-E, Itasca, Illinois.

be accepted by the market, correct?
A. Well, I know reuse will be accepted because it's been done already. Whether the new product's accepted or not, obviously there's assumptions made, but -- but you never really know until you go to -- get to market.
Q. What kind of assumptions do you make at Town & Country before you truly know whether or not the market is going to accept a new product?
MR. MURDOCH: Objection to form. Are you still talking about back in 1993, today, Town & Country Minnesota, Town & Country Illinois, Mike Ryan personally?
MR. KRUMMEN: Let's start with '93.
THE WITNESS: Ninety -- so '93 -- ask that question again.
BY MR. KRUMMEN:
Q. Yeah, and maybe it's changed

A. It's either in the late '96 or early '97 time frame, I believe.

Q. Did Mr. Bill Ryan serve as the CEO of Town & Country Illinois at all times from 1994 up until his departure in that 1996/1997 time frame?

MR. MURDOCH: Objection to foundation.

THE WITNESS: I don't know. Officially title, I don't know about the title.

BY MR. KRUMMEN:

Q. I guess I'll ask it differently. He was the man in charge of Town & Country Illinois, regardless of his title, from 1994 up until the time he departed, correct?

A. Bill was President of Pinnacle from '94 to whenever he departed, yes.

Q. When Mr. Bill Ryan decided -- or strike the question.

How did it come about

that Bill Ryan departed from Town &
Country of Illinois? Did he decide
to leave or was he asked to leave?
A. I -- the discussion was
about changing the direction of the
company, and Bill was not in favor of
changing the direction of the company
and decided that he'd rather go do
his own thing and not stay with the
company, if I remember right.
Q. When you say "changing the
direction of the company", in general
what do you mean by that?
A. You know, back then, you
know, did we want to be in multiple
markets or just go back to being an
Illinois builder.
I don't remember all
the items that were involved, but it
probably was primarily growth versus
just being an Illinois builder.
Q. Was Bill Ryan pro growth or
was he pro staying in Illinois?
A. Pro growth.

Q. Did the other shareholders decide that they didn't want any further growth?
A. The answer to that is I'm not sure they really knew what they wanted except that the growth strategy wasn't going the way we liked it.
Q. Why do you say that?
A. It just wasn't -- well, it wasn't making any money --
Q. And when you say --
A. -- the -- the business outside of Chica -- out of Illinois.
Q. Which would include the Minnesota business, correct?
A. Yes.
Q. The only other division that Town & Country opened outside of Illinois was the Florida division, correct?
A. Correct.
Q. Do you know when the Florida division opened?
A. I don't know the timing of

part, he may have reported to you in part?

A. Correct.

Q. You're just not sure?

A. Correct.

Q. And then after Tom Crosson, we're into 1997, and Art Plant took over the Minnesota division at your request and reported directly to you, correct?

A. That's correct.

MR. KRUMMEN: Let's take a break.

VIDEOGRAPHER: We are now going off the record, and the time is 10:07 a.m.

(Break taken.)

VIDEOGRAPHER: We're now back on the record, and the time is 10:19 a.m.

BY MR. KRUMMEN:

Q. Mr. Ryan, I believe you indicated that sometime in 1997 you asked Mr. Art Plant to take over the

in terms of back-to-back, correct?
A. Um, sure.
Q. Okay. When did Town & Country of Illinois first get into the back-to-back townhome market? When was its first design introduced to potential customers? And I'm talking Illinois right now.
A. Oh, when did Illinois get into the back-to-back?
Q. Right.
A. It would have been on -- well, they've only done it once, I believe, and that's on the piece of property in Aurora, the Noggle Farm.
Q. That's also referred to as Washington Square, correct?
A. That's correct.
Q. And that's the only back-to-back townhome product that you're aware of that Town & Country of Illinois has ever built?
A. Yes.
Q. Now let's focus on Town &

Country of Minnesota. When did Town & Country of Minnesota first release a back-to-back design for potential designers?

A. I don't know the timing of it, but it would have been after Art moved up to Minnesota.

Q. So at the time Art Plant moved up to the Minnesota Town & Country division, it's fair to say that the Minnesota Town & Country division did not have a back-to-back townhome product design, correct?

A. The Minnesota company did not have a back-to-back prior to Art Plant, that's correct.

Q. And the Town & Country Illinois entity did not have a back-to-back townhome design before the time point where Art Plant went and took over the Minnesota division, correct?

A. That, I don't know, and that's just because it was founded in

1958 and I don't know prior to my coming into the company what they built.

Q. You were not aware of a back-to-back townhome design that could be reused in Minnesota at the time Art Plant took over the Town & Country Minnesota division?

A. That's correct.

Q. What discussions did you have, if any, with Art Plant concerning a back-to-back townhome design in or about 1997?

A. In '97, specifically I have no idea. But specific to the back-to-back product, some piece of property would have come in where Art put assumptions to it including the use of a back-to-back townhome, and that would have been my first discussion with him about it.

Q. So the -- whatever this piece of property was, if I understand you correctly, Art Plant

came to you and one of the products he was proposing that you should approve to be built on the piece of property was a back-to-back townhome product, correct?

A. Can you restate that question? I'm sorry.

Q. Sure. As I understand it, Art Plant came to you with a potential piece of property in mind, correct?

A. Yes.

Q. This is sometime after he started as Division President --

A. Yes.

Q. -- in '97?

A. Yeah.

Q. And he came to you with a proposal of what would be built on this piece of property should Town & Country of Minnesota acquire it, correct?

A. He suggested what he'd like to see built on the property,

correct.

Q. Was it more than one product or was it limited to a suggestion of back-to-back townhome products, if you recall?

A. Well, I don't remember which was the first -- if you could tell me which was the first piece? I don't remember offhand where we first used that product. I don't remember offhand.

Q. Do you --

A. I'd say it was probably in Maple Grove, but I don't remember exactly.

MR. KRUMMEN: Would you mark that, please?

(Exhibit No. 299 marked for ID)

THE REPORTER: This is 299.

BY MR. KRUMMEN:

Q. Sir, in front of you is Exhibit No. 299, and it starts with D

16396 and ends with D 16424. On the front it says, "Marquette Advisors development opportunity residential land, Maple Grove, Minnesota." Have I accurately identified Exhibit 299?

A. Yes, yes.

Q. Okay, I want to ask some questions, but I want to let you review that document. But the questions I'm going to focus on for now will relate to whether or not this particular property in Maple Grove is the one that you just testified to.

A. Okay. Is that a question?

Q. I'll give you a minute to review it, and then let me know what you're ready.

A. My recollection is the Hollander piece is the first piece we used the back-to-backs on.

Q. So if you go to the front page of Exhibit No. 299, in handwriting the word "Art" appears and

then it says "Hollander property" and it looks like "info", correct?
A. Correct.
Q. And that as far as you know, the Hollander property reference there, was the first parcel where Art Plant came to you and was proposing building a back-to-back townhome product, correct?
A. Correct.
Q. Do you know the reason for proposing that back-to-back product be built on the Hollander property?
A. You know, I don't remember exactly. I -- I think it was because the Village wanted diversity of product, but I don't really remember the reason for it.
Q. Were there any other reasons as to why -- as you sit here today you can recall as to why back-to-back product was proposed for this potential Hollander property land acquisition?

MS. NEWMAN: Same objections.

MR. KRUMMEN: Let's mark this as 299-A.

THE WITNESS: They would not have tried --

MR. MURDOCH: Just a minute, wait.

THE WITNESS: Oh, go ahead.

MR. MURDOCH: He's moving on.

(Exhibit No. 299-A marked for ID)

BY MR. KRUMMEN:

Q. Sir, you can keep the other exhibit in front of you as well, but I just got a foundation objection, so let's deal with that.

In front of you is Exhibit 299-A. It is a Town & Country Homes facimile cover sheet dated March 18th, 1999 to you from Bill Anner. It begins with D 17741

and runs through D 17750, correct?

A. That's correct.

Q. Would you turn to Page 2 of this document facimile that's addressed to you?

A. Okay.

Q. Now, you'll concede that this is the exact same page that we were just working off of on Exhibit No. 299, correct?

A. It looks like the same calculation.

Q. So, again, we're starting with the Hollander property density calculations and we have 93 acres gross, correct?

A. That's correct.

Q. And then we have three acres per unit, which someone characterized as low density, correct?

A. Correct.

Q. And then there's a calculation here that's basically figuring out a way to improve or to

make more dense the building structure configurations at the Hollander property, correct?

MR. MURDOCH:
Objection to form.

THE WITNESS: There is a calculation on how -- what the effect of the density credit percentages would be, yes.

BY MR. KRUMMEN:

Q. And I believe earlier you said with respect to the Maple Grove Hollander property, there may have been some sort of a diversity issue, correct?

A. Yes.

Q. And here we can see from the calculation that you're going to be allowed to build 14% more units if you hit the housing diversity guideline of Maple Grove, correct?

A. Correct.

Q. And you'll also get 10% more units if you meet the rental housing

guideline of Maple Grove, correct?

A. That's correct.

Q. So is it fair to say that with respect to the Hollander property in Maple Grove, Minnesota, Town & Country Minnesota was interested in making a more dense development in terms of the number of units as opposed to a less dense development?

MR. MURDOCH: Same objection as before.

THE WITNESS: Well --

MR. MURDOCH: And more or less than what? Objection to form. You can go ahead and answer.

THE WITNESS: My answer would be that I -- I -- I believe there was an issue of product diversity. I don't know if that was necessarily a decision to get more density or if that was being pushed by the municipality, that they wanted diversity.

I do know on the

knowledge concerning what that means?
A. I don't.
Q. Was Dahlgren, Shardlow & Uban involved in any way, shape or form with Town & Country Minnesota's ultimate acquisition of the Hollander property?
A. That name doesn't mean anything to me, but I don't know.
Q. Do you see on the May 27th, 1998 front page the Regarding line references to "Hollander Planned Unit Development concept plan"?
A. Yes.
Q. Did you ever receive a copy of the Hollander Planned Unit Development concept plan?
A. I don't know for sure. I might have.
Q. Could you turn the page to D 17744?
A. (Witness so doing).
Q. Do you see the first full paragraph, first sentence states,

"Overall, we plan to integrate 20 to 30 units of affordable housing that meet the 80% of the mean income level of the metropolitan area," the first sentence of the first full paragraph?

A. Yes.

Q. You understand in general what the affordable housing definition is that's referenced there, correct?

A. Yes.

Q. Would you explain that to me in layperson's terms, if you can?

A. I don't know how it's calculated, but they calculate -- somehow they come up with a number and say, If a townhome sells for 160,000 or below, it meets the affordability threshold. So the municipality comes up with some number.

Q. Now, do you know whether or not Town & Country of Minnesota ultimately built back-to-back townhomes on this Hollander piece of

property?

A. Yes.

Q. You know and the question is did Town & Country of Minnesota build back-to-back townhomes on this Hollander property?

A. Yes.

Q. Do you know what other products Town & Country built on this Hollander piece of property?

A. I think we had some single-family home sites, we had apartments and I believe we had our larger two-car garage townhome product on here.

Q. I want to talk about density briefly. And it's true, is it not, you can build a higher density if you develop with back-to-back townhomes as opposed to the single-family products that were being built at the Hollander property, correct?

A. Compared to single-family, yes.

Q. Is it also true that you can get greater density with back-to-back townhomes at the Hollander property as opposed to these two-car townhomes that you referenced?

MR. MURDOCH: The ones that he just referenced?

MR. KRUMMEN: At Hollander, that's right.

THE WITNESS: Yes, because it's small square footage, yes.

BY MR. KRUMMEN:

Q. And those two-car townhomes, we'll define those as side-by-side I assume, correct?

A. You -- sure.

Q. Okay ,so we built back-to-back townhome -- strike that.

Town & Country of Minnesota built back-to-back townhomes on the Hollander property that it acquired, correct?

A. Correct.

Q. Town & Country Minnesota also built single-family homes on the Hollander property that it acquired, correct?

A. They may have sold those lots off. I don't know if they built homes on those lots.

Q. Town & Country built apartments on the Hollander property that it acquired, correct?

A. No, sold, sold the apartment land.

Q. So the apartment piece of it was sold off before apartments were built, correct?

A. Right. We don't do apartments, and that's why we tried to down-zone that part of the plan. And so we ended up selling it off to an apartment building.

Q. And Town & Country built these two car side-by-side townhomes on the Hollander property, correct?

A. Correct.

Q. You're not certain, if I hear you correctly, as to whether or not Town & Country Minnesota ultimately built single-family homes on the Hollander parcel, correct?

A. Yeah, my recollection was that the number of home sites was fairly minimal and it didn't make sense to do a full product line, so we sold them off to, you know, some other builder.

Q. Let's compare the back-to-back townhomes with the two-car townhomes that, you know, were built at Hollander, at the Hollander property. Which one in general is cheaper to buy if you are a potential Town & Country Homes customer?

A. The back-to-backs.

Q. So if you have an affordable housing guideline at the Hollander property, that would be satisfied through the back-to-back townhome sales or through the two-car townhome

sales?

A. Well, it depends on what the threshold was. I don't know if it -- I don't know if it was achievable with the side-to-sides, but I'm assuming it was achieveable with the back-to-backs.

Q. Now, let's talk about this diversity credit which appears on D 17742 of Exhibit 299-A. As you sit here today, Mr. Ryan, you can identify with certainty two different product types that were built on the Hollander parcel by Town & Country Minnesota, one is the back-to-back townhomes, the second is the two car side-by-side townhomes, correct?

A. That's correct.

Q. So ultimately Town & Country of Minnesota did use the back-to-back townhomes to meet the diversity guideline because if you had only built two-car side-by-side townhomes, there would only be one product and,

therefore, no diversity, correct?

MR. MURDOCH:
Objection to form and foundation.

MS. NEWMAN: Same
objections.

THE WITNESS: If the
question is was that my only
alternative to get the diversity of
product, the answer would be no.

BY MR. KRUMMEN:

Q. But that was the alternative
proposed to the City?

A. That was the alternative
that -- that Art Plant and his team
decided to go with, yes.

MR. KRUMMEN: Let's
take another five or ten-minute break.

THE WITNESS: Okay.

VIDEOGRAPHER: We are
not going off the record, and the
time is 11:06 a.m.

(Break taken.)

VIDEOGRAPHER: We are
back on the record, and the time is

Country Minnesota's Maplewood
development, did that approve
back-to-back product?
A. I believe so, but I'm not
-- I'm not a hundred percent sure.
I believe so.
Q. And this Oak Crest
development that you identified now as
something other than the Maplewood
development --
A. Yes, yes.
Q. -- will that Oak Crest
development include back-to-back
product?
A. I believe so.
Q. You identified a
back-to-back product that might be
built on this new Chanhassen
development, if I heard you correctly.
Is that fair?
A. Yes.
Q. Has Town & Country of
Minnesota built any back-to-back
product on any other Chanhassen

development to your knowledge?

A. No.

Q. Let's move on to Town & Country Illinois, and the question is within the past five years, since 1998, has Town & Country of Illinois built any back-to-back product?

A. Yes.

Q. That's the Aurora Washington Square development we discussed earlier, correct?

A. Noggle Farm, yes, yes.

Q. Has Town & Country of Illinois in the past five years built any back-to-back product on any developments other than this Noggle Farm property?

A. No.

Q. As you sit here today, does Town & Country of Illinois to your knowledge have any plans to build back-to-back product at any community other than this Noggle Farm Washington Square community?

A. Well, that decision is Tom's and not mine, and I believe the answer today would be no. I don't believe he likes that product compared to his other townhome alternatives.

Q. At some point after you, meaning Town & Country of Minnesota, began building back-to-back product, you received a cease and desist letter from Rottlund's counsel, correct?

A. That's correct.

Q. Do you recall roughly when that occurred?

A. I don't know the date offhand.

Q. But it was addressed to you, Mr. Mike Ryan, correct?

A. I don't remember who it was addressed to.

Q. Do you remember ever reading it after it came in at Town & Country?

A. I remember seeing it and

MR. MURDOCH:
Objection to form. In terms of -- Craig, the question's only decision to proceed ab initio or whether a subsequent decision was made to continue with the process of constructing the town -- the back-to-backs after the cease and desist letter was made?
MR. KRUMMEN: Right.
BY MR. KRUMMEN:
Q. Let's start with where we're at in the chronology, and in Exhibit 11A, the attachment shows that a cease and desist letter was written to you dated July 5 of 2001, correct?
A. Correct.
Q. So we know that you have in your possession by the time July 16th of 2001 rolled around a copy of Rottlund's cease and desist letter, correct?
A. That's correct.
Q. Now we're up to December

16th of 2001, and Art Plant is apparently sending to an outside lawyer his file with documentation pertaining to the design and development of the Homestead Collection townhomes, correct?

A. I don't have that December 16th letter.

Q. If I said --

MR. MURDOCH: You said December. It should be July.

MR. KRUMMEN: Yes, that's a good --

THE WITNESS: July 16th.

MR. KRUMMEN: I thought I said July 16th, and that's what this Livenote says, but if I misspoke, I misspoke.

BY MR. KRUMMEN:

Q. As of July 16th, 2001 --

A. Yes.

Q. -- you received a copy of a letter to Dean Karau at Frederickson

& Byron which was authored by Art Plant, and the first sentence said, "Please find attached a file with the documentation pertaining to the design and development of our Homestead Collection townhomes." Do you see that?

A. Yes, yes.

Q. Now, with those two dates in mind, July 5, 2001 and July 16, 2001, can you tell me within a month or two when it was that you made the decision to proceed at Town & Country Homes' Minnesota division and continue building the Homestead Collection back-to-back townhomes?

A. Well, I -- I don't know the timing of that decision, but I'd say obviously the decision was immediate on existing communities, otherwise we had to shut them down, so that had to be immediate.

And when that decision was made on new communities that were

not open for sale at the time of that letter, I -- I'm not sure of.

Q. As to existing communities that you did not want to shut down, so you decided to continue building back-to-back product, what was your decision based upon to continue building?

Was it based upon what you believed to be no case of infringement against you or was it based upon the fact that you had to shut the communities down if you chose to --

A. It was --

Q. -- agree with Rottlund?

MR. MURDOCH: Just a minute. Objection to the question to the extent that it's asking for attorney-client privileged information.

So if the decision was based in part to any extent on any advice or information you received from Counsel, I'm going to instruct

you not to answer it.

THE WITNESS: Then --
then I won't answer because all these decisions were with Peter Brennan present.

BY MR. KRUMMEN:

Q. I'll ask a few more, not to harass you, but I have to figure out where the line is here --

A. Right.

Q. -- and then we'll move on. But the next question is did you as the person in charge ultimately of Town & Country Homes' Minnesota division ever say to anyone, I need to hear from an outside independent source as to whether or not infringement occurred before I can make a decision? Did you ever give a directive such as that?

MR. MURDOCH: I'm going to object to that to the extent that --

THE WITNESS: That

would have been with -- in meetings with Peter.

MR. MURDOCH: If it occurred.

MR. KRUMMEN: Did you --

THE WITNESS: Yeah, if it occurred.

BY MR. KRUMMEN:

Q. And if that happened -- the next question I'll get the same objection maybe, but I'm going to ask it anyway.

Did you ever receive back information from an independent outside source that said to you, There's absolutely no infringement in terms of the Homestead Collection back-to-back townhomes being built versus the Rottlund townhomes that are back-to-back?

MR. MURDOCH: I'll give the same objection. To the extent that you got an opinion like

that or you didn't get an opinion like that from outside counsel, it's privileged information.

BY MR. KRUMMEN:

Q. I don't want to limit it to outside counsel. It can come from an architecture firm, for example, but please answer.

A. Other than conversations with Peter, I'm not aware of any report that came to me.

Q. So I think we've covered the existing product, and the conclusion, whatever it was based upon, was to continue building the Homestead Collection back-to-back townhomes within the Minnesota division communities where they were currently being built, correct?

A. Can you ask that one more time?

Q. Sure. Sometime around July of 2001, you, Mike Ryan, made the decision to continue building

back-to-back Homestead Collection townhomes within the Minnesota division, correct?

A. That's correct.

Q. But then another decision I believe was in front of you, and that dealt with not the currently under construction communities but new communities where you hadn't broken ground yet, correct?

A. (Witness nodding.)

Q. I think earlier you told me there was existing communities that you'd have to shut down and then there was contemplated communities or --

A. Correct.

Q. Use whatever word you want to so we can communicate.

A. Correct.

Q. (Continuing) -- communities on the board, drawing board; would that be fair?

A. You know, whatever stage

they were in, not open for sale.

Q. Okay, not-open-for-sale communities, let's start there. Did you ever tell anyone to change the back-to-back townhome designs before any back-to-back townhomes would be built at these future communities that were not then under construction as of July of 2001?

A. Again, a lot of these discussions are -- were with Peter Brennan present, but --

MR. MURDOCH: Mike, the question is just a -- the question is just a yes or no, did you ever -- could you read it back?

THE WITNESS: Yeah, read the question again.

(Record read.)

THE WITNESS: Any discussion regarding the product and what should be done to the product regarding this case was all done through Peter Brennan, so --

BY MR. KRUMMEN:

Q. And that's as far as you'll go with an answer to that question today, correct?

A. Yeah.

Q. I don't think I'm going to invade a privilege here, but let me ask it.

Did the design change in terms of the back-to-back Homestead Collection design versus what was ultimately constructed in Chaska or Brooklyn Park with these new, not-under-construction communities?

A. Yes.

Q. Why?

MR. MURDOCH: Objection, that calls for privileged information.

THE WITNESS: It goes back to discussions through Peter.

BY MR. KRUMMEN:

Q. Back to Exhibit 41A. Do you see the July 16th, 2001 date?

mischaracterizes prior testimony.

THE WITNESS: The document's scribbled on.

BY MR. KRUMMEN:

Q. And you don't know who scribbled over the copyright notice, correct?

MS. NEWMAN: Same objections.

MR. MURDOCH: Objection to form and foundation.

THE WITNESS: That's correct.

BY MR. KRUMMEN:

Q. The next document I would like to cover with you, sir, is a document which was previously marked as Exhibit No. 90. And before we get there, I'd like to ask you if you know who Tim Johnson is?

A. I do.

Q. Who is Tim Johnson?

A. He coordinates the architecture for the Minnesota

company.

Q. So Mr. Tim Johnson works for Town & Country Homes' Minnesota division, correct?

A. That's correct.

Q. Do you know whether or not Tim Johnson formerly worked for Rottlund before joining Town & Country of Minnesota?

A. He did. I don't know if immediately before, but, yes, he did work for Rottlund.

Q. Do you know whether or not Tim Johnson worked on the designs for Rottlund's back-to-back townhome while he was employed by Rottlund and before he joined Town & Country Homes of Minnesota?

A. I don't know what Tim did for Rottlund.

Q. Exhibit 90 is before you, correct?

A. That's correct.

Q. And up in the upper

(Witness reviewing document).

This piece of property was going through zoning, and I believe -- I don't know if we knew it up front or if in the process the issue of the desire to have this affordable product came up.

So the question was can we just hold a hard line with the Village and say we're not doing affordable product, we can't afford to, or what -- what portion do we have to offer, you know, affordable product.

Q. What ultimately happened, if you know? Did you build affordable product at the Harvest Hills development at Plymouth?

A. You know, I don't remember, but I would say that -- we may have ended up with affordable product, yeah.

Q. Do you know what products were built by Town & Country Homes at

the Harvest Hills Plymouth development?

A. I believe there were two townhomes, the side-by-side and the back-to-back.

Q. Was the side-by-side that two-car garage townhome?

A. Yes, yep.

Q. And in terms of affordable housing, I think you've addressed this earlier, but let's talk about it in terms of the side-by-side two-car garage townhome versus the back-to-back townhome built at Harvest Hills in Plymouth. Are you with me so far?

A. Yes.

Q. Which of those two products were to be used in terms of affordable product, as you use that term in Exhibit 301?

MR. MURDOCH: Objection to form.

THE WITNESS: You

Q. As between those two products, which one would Town & Country Homes of Minnesota use to satisfy the affordable product issue that's reflected in Exhibit 301?

MR. MURDOCH: Objection to foundation.

THE WITNESS: Well, as I'm reading here, I think what happened was we wanted the one-car product to satisfy the affordability, but I think we got capped on density, so we decided, well, if we can keep the same number of units and use two larger townhome products, we might as well do that as long as we can still hit the affordability threshold that was set.

So it's kind of a -- we had a preference of the one-car, but I think the limit in the density made us go to all two-cars. And of those two-cars, the back-to-back would have been more affordable than the

side-to-sides, if that makes sense.

BY MR. KRUMMEN:

Q. I want to switch away from the Harvest Hills Plymouth development and into what we've touched on briefly earlier today, which is the back-to-back product that was built on what you referred to as the Noggle Farm, which is also Washington Square, correct?

A. Correct.

Q. Who made the decision to put back-to-back product on the Noggle Farm and allowed Town & Country of Illinois to build that product?

A. That decision -- let's see, what was the -- is there a date on that document? What was the date of that decision? I would say that was probably me.

Tom took over the running -- took over as President of the home building company, but he didn't take over responsibilities of

the land company right away, so I held onto the land company.

So I believe at the time Peter and I are the ones that took the Washington Square piece to contract and had to make the product decisions of what goes on that piece of property.

The Village -- I think we initially went in with two townhome products plus single-family, and the Village insisted on more diversity of products, so we went in with a third product line. So we had row house, back-to-back and side-to-sides on the townhome portion of that piece.

Q. I only have one copy, but I'm going to hand you to help you with the dates 287A. Again, I'll have to ask you to identify that one, but let me give you a moment to review it first. That will be the next exhibit --

A. Okay.

Q. -- but we'll stick with 287A.

A. Yeah, so this is -- Peter and I must have been making decisions still for the land company. It had not transferred to Tom yet.

Q. What's the date of Exhibit 287A?

A. May 20th of 1999.

Q. And Exhibit A concerns I guess your recommendation that you acquire the Noggle Farm, but you did express a concern about, "The margins are a little skinny," correct?

A. Correct.

Q. What did you mean by "the margins being a little skinny" in that document?

A. Well, the overall piece got tied up by a builder, whose name escapes me right now, and he couldn't acquire the entire parcel, so he was looking for somebody to pick up like,

let's say, it was half of the piece.

Financially he couldn't swing the whole thing or he didn't want the risk of the whole piece, but my recollection was it was a pretty quick decision like he was -- you know, had scheduled the closing already.

So we ran some numbers, and the numbers on all the products, the lot costs seemed a little pricey, but we felt it was still worth the risk, so we moved forward with it.

Q. And your attorney when I used that document earlier this week objected because not all of the sequential Bates numbers are in there, and I'll own that.

But do you recall what the five-year plan was that was initially attached to that memo and is referenced in Exhibit 287A?

A. Yeah, I used to do an Excel spread sheet that I called the

"five-year plan", and what that was -- Paul Anderson does project pro formas for us, but back in these days it took awhile it seemed like to get the pro formas back out.

And I had to make a quick buying decision, so what I would do is I would just map out the annual closings, multiply it by an average sale price and an assumed gross margin, and I could kind of very quickly tell how it fit in with the existing land pipeline and whether, you know, did we need land in two years or do we need land in three years and did this kind of fill the void, and so I'd run through a quick little exercise on a spread sheet. So that's what the "five-year plan" refers to.

Q. Now, I want to test your memory this time, and do you recall what the margins were on that "five-year plan"? Were they more or

less than 20% to the best of your knowledge as you sit here today?

A. You know, I don't -- I would say we were lucky to get 20%. I don't remember offhand, but I would say they were somewhere in the 20% range.

Q. Based on Exhibit 287A, I believe there's a reference to a multi-family product and a single-family product, correct?

A. That's correct.

Q. As of the time 287A was prepared, which was May 20th of 1999, did you know that you were going to build two different multi-family products on this Noggle Farm property or was your memo just referencing one multi-family product?

A. What's -- what was the date, at what point in time?

Q. I think the date is --

A. The date of this memo?

Q. -- May 20, 1999, correct.

A. You know, I don't know. I don't remember when the Village -- the initial intent was townhomes and single-family. I think we initially intended two townhomes plus one single-family.

It could have been all of one townhomes product, but I know the diversity issue came up with the Village and we ended up with three townhome products.

So I don't remember the -- the timing of it all, but -- but there definitely was a single-family and a townhome component on day one.

Q. To the best of your knowledge, when was the decision made to add the back-to-back townhomes to the Noggle Farm?

A. I don't remember if it was the third product line we had to add or if it was part of the original one or two products that were already in there. So I don't remember the

timing of it, but --
Q. Could you turn to the exhibit above that and tell me what the document Exhibit number is?
A. 302.
Q. Exhibit 302 is Bates labeled PINN 04286, and in the bottom right-hand corner we have a date of February 7th, 2001, correct?
A. Yes.
Q. At the top it says, "Washington Square margin analysis cost plus 22%", correct?
A. Yes.
Q. Washington Square was the multi-family piece of the Noggle Farm property which is referenced in Exhibit 287A, correct?
A. Correct.
Q. And ultimately you built two different multi-family products on the Washington Square portion, correct?
A. How many?
Q. I believe we had --

A. Oh, we zoned three, we sold off one and built two, yes.

Q. Okay, so Washington Square ultimately had two different townhome products as-built, correct?

A. That we built, right.

Q. That Town & Country Illinois built?

A. Yes.

Q. Correct. Now, those were Plan No. 34 per Exhibit 302, which was the Potomac plan name, the Farragut and the Georgetown. That would be one type of multi-family townhome, correct?

A. You know, this document's not mine. I've not seen that, but I would -- yes, I would assume that's one product and the two below are another product.

Q. And the Arlington and Garfield, do you know whether or not that's the back-to-back product?

A. I don't know them by name,

but I -- I don't know offhand.

Q. Now, if you look in the right-hand Gross Margin Percentage column, you'll see that for the Arlington we have a gross margin percentage slightly over 22% and for the Garfield it's also slightly over 22%, correct?

A. That's correct.

Q. Based on your knowledge of the Noggle Farm, would you characterize those gross margins, the 22.08% for the Arlington and the 22.03% for the Garfield --

MR. MURDOCH: No, you skipped one.

MR. KRUMMEN: I misspoke.

THE WITNESS: Yeah.

BY MR. KRUMMEN:

Q. The 21.09% for the Arlington, correct?

A. Correct.

Q. And the 22.08% for the

Garfield, correct?
A. Correct.
Q. Are those skinny margins as you used the term in Exhibit 287A?
A. Well, this particular document that you're looking at is not a pricing or margin based on market. This is a cost plus margin, which means we just take our cost and we mark up the prices enough to get a specified margin, which in this case somebody wanted 22.
In other words, they'd hand this to somebody and say, Run -- run the numbers out to a 22% margin back up from the -- start at 22 and back up and fill in all the numbers and let me see, for instance, what I'd have to sell townhomes for.
So it's just one way -- what I'm trying to get at is just because it says 22% here doesn't mean we thought we could get 22%. It's just an exercise to price everything

at 22% so somebody could see the sale prices and ask themselves if they're reasonable or not.

Q. As of February of 2001, were the selling prices on this document, Exhibit 302, reasonable for the Arlington and the Garfield back-to-back units?

A. You know, I don't know because at this point in time I'm removed from Illinois and I couldn't comment on -- on market pricing.

Q. Do you have any knowledge as you sit here today as to how well the back-to-back product is selling in Town & Country Illinois apostrophe S development?

A. You know, I don't know the numbers offhand. My guess is that -- it's hard to judge. The row houses, which are the three products up above, outsold the back-to-back product in this particular case, but the models were in the row houses.

Exhibit R12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

THE ROTTLUND COMPANY, INC.,
d/b/a Rottlund Homes, a
Minnesota Corp.,
Plaintiff,
vs
PINNACLE CORPORATION, d/b/a
TOWN & COUNTRY HOMES, an
Illinois Corp., TOWN &
COUNTRY HOMES, INC., a
Minnesota Corp., BLOODGOOD
SHARP BUSTER ARCHITECTS &
PLANNERS OF IOWA, INC., an
Iowa Corp., and THE
BLOODGOOD GROUP, INC., an
Iowa Corp.,
Defendants.

Case No. 01 CV 1980

------------------------------

TOWN & COUNTRY HOMES, INC.,
a Minnesota Corp.,
Third-Party Plaintiff,
vs
BLOODGOOD SHARP BUSTER
ARCHITECTS & PLANNERS OF
IOWA, INC., an Iowa Corp.,
Third-Party Defendant.

The deposition of TOM RYAN taken pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at One Pierce Place, Suite 295-E, Itasca, Illinois, commencing at 8:55 a.m, on the 9th of December 2003.

REPORTED BY TERRI A. CLARK
CSR LICENSE NO. 084-001957

Q. If I heard you earlier this morning correctly you were in Minnesota as the division president from January of 1993 for approximately two and a half to three years, correct?

A. Correct.

Q. Let's just start with the year 1993. And my question is was there net income at the Town & Country Minnesota division level or was there net loss?

A. I don't think there was net income for four, five years.

Q. So four or five years clearly includes the two and a half to three years that you spent in the Minnesota division, correct?

A. Yes.

Q. And so it's fair to say that there were no net income, there was no net income in the 1993 through 1995 time span, correct?

A. Correct, yes.

Pinnacle?
A. Yes.
Q. Did they have a density requirement, the City of Aurora?
A. I'm sure they did. I don't recall what it is.
Q. And their density requirement said you must build at least "X" number of units per acre, correct?
A. Basically, yes.
Q. Isn't that basically what you're referring to here in the June 10, 1992 letter that's marked as Exhibit 275? Not Aurora, but this "X" number of units per acre?
MR. MURDOCH: Objection to foundation and form.
THE WITNESS: With regard to what? I'm just missing what you're saying.
BY MR. KRUMMEN:
Q. Sure. I think Aurora told Town & Country of Illinois you must

Town & Country of Illinois tested this back-to-back product, if I heard you correctly earlier, and either planned or actually did build roughly 70 units of the back-to-back type; is that correct?

A. You said 72.

Q. Maybe I'm right, maybe you're right it's 70, but we will use 70 or thereabouts.

A. Okay.

Q. Do you know how many of those roughly 70 units have been sold as we sit here today?

A. I'll say almost all. It will be just a couple left maybe.

Q. How do you define sale, does that happen when a customer sits down and executes a purchase agreement or at some other time?

A. Purchase agreements, I believe that we have all but a couple sold.

Q. Then you told me that the row townhomes were roughly four times as many as the back-to-back townhomes in aggregate, correct?
A. Yes.
Q. But if I heard you correctly, that would make it roughly 280 row townhomes versus 70 back-to-back townhomes?
A. I'm sorry, three times. I said four.
Q. 210 row, give or take, versus 70 back-to-back at Washington Square?
A. Right.
Q. Then I heard you say that all but a couple of the back-to-back townhomes have sold, correct?
A. Correct.
Q. But you had maybe up to 30 or 40 row townhomes left, correct?
A. Correct.
Q. You'd admit that 30 to 40 is more than three times of two or