Exhibit R13

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

THE ROTTLUND COMPANY, INC., )d/b/a ROTTLUND HOMES, a Minnesota)
Corporation, ) Plaintiff, )
v. )PINNACLE CORPORATION )
d/b/a TOWN & COUNTRY HOMES, )an Illinois corporation, and )C
TOWN & COUNTRY HOMES, INC., )01-CV-1980 DSD/SRNa Minnesota Corpo
Defendants. )--------------------------------)
TOWN & COUNTRY HOMES, INC. )A Minnesota Corporation, )
Third-Party Plaintiff, )v. )
BLOODGOOD, SHARP, BUSTER )ARCHITECTS & PLANNERS OF IOWA, )
an Iowa Corporation. ) Third-Party Defendant. )

The deposition of STEVEN SANDELIN, called by the Rottlund Company, Plaintiff, taken pursuant to the provisions of the Federal Rules of Evidence and Civil Procedure pertaining to the taking of depositions, before KATRINA M. BEAUDIN, CSR, RMR, CRR, at M & M Reporting Inc., One Pierce, Suite 295-E, Itasca, Illinois, on the 16th day of December, 2002, at 9:14 a.m.

Q. Town & Country Homes, Inc., that is known as the Minnesota division?
A. I'm not sure.
Q. What is Town & Country Homes, Inc.?
A. Again, I'm not sure.
Q. Do you have a position with Town & Country Homes, Inc., correct?
A. A position with Town & Country Homes Chicago division which is Pinnacle Corporation.
Q. You have no position with any entity other than Pinnacle Corporation also known as Town & Country Homes of Chicago?
A. That's correct.
Q. I would like to get some terminology out on the table to begin with, have you ever heard of the Homestead Collection?
A. Yes.
Q. What is the Homestead Collection?
A. The Homestead Collection is in terms of our Minnesota office, the back to back townhomes that we designed for Maple Grove and other communities.
Q. Is that known as a two-story manor townhome?

Homestead or were there separate density requirements, if you know?

MR. FARMER: Again, let me just say we have identified Mr. Sandelin as a witness for over a dozen topics, this doesn't happen to be one of them.

BY MR. KRUMMEN:

Q. Do you know the answer to that question?

A. I do not know the exact answer to that question.

Q. Let me back up to Mr. Ryan -- Tom Ryan, you mentioned his title at Pinnacle was what?

A. Tom Ryan is our president of the Chicago division and coCEO of the company.

Q. Who is the other coCEO?

A. Michael Ryan.

Q. It was Mike Ryan's idea to initially build the Garfield and the Arlington here in Chicago, correct?

A. It was his suggestion, yes.

Q. But he was based at the time in Minnesota, correct?

A. He was based in our Chicago office.

Q. In charge of your Minnesota division,

correct?

A. That's correct.

Q. The president, right?

A. The president is actually another individual but Mike is in charge of those divisions, the president works for Mike Ryan.

Q. Today, back when the Garfield and Arlington concept was developed, I believe you said that Mike Ryan was the president of the Minnesota division?

A. I would like to correct myself, that's not true. He is the -- he is in charge of that division and the president works for Mike Ryan.

MR. FARMER: Just object to the foundation, if we can get a time frame for the conversations.

BY MR. KRUMMEN:

Q. You said it was about two years ago when this was developed, correct?

A. Correct.

Q. And at the time Mike Ryan was not the president of the Minnesota division, correct?

A. That's correct.

Q. He was the coCEO of the Chicago

division?

A. And Minnesota, yes.

Q. And do you know why Mr. Ryan wanted to build Garfield and Arlingtons that looked like the Broadmoor and the Savannah that was being built in Minnesota?

A. We were looking for new product and, you know, testing the market to see if this was a viable alternative for our product, our multifamily in Chicago.

MR. KRUMMEN: Off the record a second.

THE VIDEOGRAPHER: Going off the record. The time is approximately 9:29 a.m.

Back on the record. The time is approximately 9:30 a.m.

(Exhibit No. 1 marked.)

BY MR. KRUMMEN:

Q. Mr. Sandelin, for making my record, I'm handing you what's been marked as Exhibit No. 1 and down in the corner it states Washington Square back to back townhomes and then there is a logo for Town & Country Homes. Have I thus far accurately characterized the exhibit before you?

A. Yes.

from your visit, you collect them and we review them and bounce ideas off each other. It's not uncommon for any builder.

BY MR. KRUMMEN:

Q. And someone went through Rottlund's back to back townhomes and picked up a brochure, correct?

A. I believe so.

Q. Who went through Rottlund's back to back townhomes in or about early 1998 and picked up a brochure regarding their back to back townhomes, who did that?

A. I don't recall who that specific individual was or if it was all of us.

Q. So it is either Art Plante, Larry Moore or yourself, correct?

A. Yes.

Q. You cannot recall with any more specificity if it was one or all three of you?

A. I cannot recall what happened within those six communities we visited, who had picked up what.

Q. But you recall visiting Rottlund's back to back townhome community and you recall seeing

their Villa II products, right?
A. I could not tell you which one was theirs and which one was the other developers, it was a long day.
Q. But you, Mr. Sandelin, went through Rottlund's back to back Villa II townhomes in or about early 1998, correct?
A. Yes.
Q. And Mr. Plante went through Rottlund's Villa II townhomes in or about early 1998, correct?
A. I believe so, yes.
Q. And Mr. Larry Moore went through Rottlund's Villa II back to back townhomes in or about early 1998, correct?
A. I believe so, yes.
Q. Why did you go through Rottlund's back to back Villa II townhomes?
A. We chose every builder in town that was building that product type so we could see every version available at the time.
Q. And --
A. They were on the list.
Q. One or three of you picked up some

foundation. So far he never established he picked one up.

THE WITNESS: Again, I don't recall. You know.

BY MR. KRUMMEN:

Q. You may have, you may not have, you're not sure?

A. I'm not sure.

MR. FARMER: Excuse me, may not have picked one up or thrown one out?

MR. KRUMMEN: Let's ask it this way.

BY MR. KRUMMEN:

Q. Mr. Sandelin, you may have picked up a Rottlund Villa II brochure that day when you toured their product in Minnesota, correct?

A. Correct.

Q. And you may have thrown that out some time later, correct?

A. Correct.

Q. And do you recall specifically whether you did or you did not pick up a brochure of the Rottlund Villa II townhome that day when you toured their townhome?

A. I honestly can say I don't recall

picking one up or discarding it later.
Q. Do you recall whether or not Mr. Moore picked up a Rottlund Villa II back to back townhome brochure when you toured Rottlund's facility that day?
A. I do not know.
Q. Same question with respect to Mr. Plante?
A. I do not know.
Q. Focusing on this Rottlund tour, do you recall specifically when it occurred?
A. No, I don't recall specifically when it occurred.
Q. But it occurred sometime early in 1998, correct?
A. Yes, I'm assuming that it did. I don't remember.
MR. FARMER: Don't assume.
THE WITNESS: I don't remember the date.
BY MR. KRUMMEN:
Q. Someone -- someone decided to go tour Rottlund's Villa II townhome, correct?
MR. FARMER: Objection to the form.
THE WITNESS: Someone decided to put

make a presentation regarding the status or how did that come about?

MR. FARMER: Objection: Form.

THE WITNESS: More than likely it would be Mr. Ryan visiting Minnesota.

BY MR. KRUMMEN:

Q. Mr. Mike Ryan, correct?

A. Yes, I'm sorry.

Q. Now, Mr. Mike Ryan holds a Town & Country Minnesota office, correct?

A. No, Mr. Ryan -- I'm not sure I understand the question.

Q. Sure. Let's establish the offices that Mr. Mike Ryan held back in or about early 1998 through the end of 1998. What was his title on behalf of Pinnacle Corporation?

A. CEO.

Q. What was his title on behalf of Town & Country the Minnesota division?

A. I don't know his exact title, he was -- he was in charge of that division.

Q. So, like a president or a CEO, someone in charge of the Minnesota division?

A. He named a president to work that

interior of one of our units and Rottlund's marketing ad which had a small floor plan of their unit, and I could see there are similar elements between our two products, yes.

Q. You could see they were obviously similar, those are your words, correct?

A. Yes, yes.

Q. Once you knew that the Rottlund Villa II design was obviously similar to the Bayview, Starwood design, you became concerned, didn't you, Mr. Sandelin?

MR. FARMER: Object to the form. Use of the word "knew."

THE WITNESS: I was not concerned as much as I was curious to see what BSB Iowa would say to this.

BY MR. KRUMMEN:

Q. So you're not at all concerned once you conclude that the Rottlund design is obviously similar to the Town & Country Minnesota design, is that your testimony?

A. That's correct.

Q. And you're following up now on behalf of Pinnacle Corporation, right, you're the

vice-president of product development at Pinnacle, correct?

A. Correct.

Q. You wrote the letter to BSB Iowa to figure out the response to Rottlund's allegations, correct?

A. Correct.

Q. You didn't send that down to Town & Country Homes Minnesota and say "you guys deal with this," you took care of it at the Pinnacle Corporation level, correct?

A. Correct.

Q. Why didn't you send it down to the Minnesota division and say "this is your hot potato, you deal with it"?

A. Didn't I copy them on it?

Q. My question is why did you put pen to paper in responding to the BSB Iowa outfit, why didn't you make Minnesota respond to them?

A. I was the one that brought BSB Iowa to Minnesota and there was a certain amount of shock and outrage at the accusation and I went directly to BSB Iowa and just asked them if this made any sense.

Exhibit R14

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

THE ROTTLUND COMPANY, INC. d/b/a ROTTLUND HOMES, a Minnesota Corporation,

Plaintiff,

vs. No. 01-CV-1980

PINNACLE CORPORATION d/b/a TOWN & COUNTRY HOMES, an Illinois Corporation, TOWN & COUNTRY HOMES, INC., a Minnesota Corporation, BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., an Iowa Corporation, and THE BLOODGOOD GROUP, INC., an Iowa Corporation,

Defendants,

and

TOWN & COUNTRY HOMES, INC., a Minnesota Corporation,

Third-Party Plaintiff,

vs.

BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., an Iowa Corporation,

Third-Party Defendant.

The deposition of STEVE SANDELIN, called by the Plaintiff for examination, taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Susan Babicki, Certified Shorthand Reporter, Registered Professional Reporter, and Notary Public, at One Pierce Place, Itasca, Illinois, commencing at 9:03 a.m. on the 8th day of December,2003.

being assigned to it, no. My responsibilities were primarily Chicago.

Q. How about an informal assignment?

MR. FARMER: Objection to the form of that question.

THE WITNESS: I don't recall exactly how it came about that I was at that tour.

MR. KRUMMEN: Could you mark this as Exhibit 266?

(Exhibit No. 266 marked for identification.)

BY MR. KRUMMEN:

Q. Mr. Sandelin, in front of you is Exhibit No. 266.

Do you recognize that document?

A. 2266?

Q. Scratch out the first 2. It should just be 266. Thank you.

So it's Exhibit 266 now, correct, Mr. Sandelin?

Do you recognize Exhibit 266?

MR. FARMER: Take a minute and look through it.

THE WITNESS: Are we just speaking of the first page?

BY MR. KRUMMEN:

Q. Let's just start with the first page.

A. It's my daytimer.

Q. And you can take as much time as you want, but these are all different days from your daytimer, correct?

A. It appears so, yes.

Q. Let's start with the first page which is Bates labeled PINN 4548.

Do you see the reference in the right-hand column to Lakeville?

A. Yes.

Q. Is that a reference to a Minnesota project, sir?

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

THE ROTTLUND COMPANY, INC.,
d/b/a Rottlund Homes, a
Minnesota Corp.,
Plaintiff,
vs
Case No. 01 CV 1980
PINNACLE CORPORATION, d/b/a
TOWN & COUNTRY HOMES, an
Illinois Corp., TOWN &
COUNTRY HOMES, INC., a
Minnesota Corp., BLOODGOOD
SHARP BUSTER ARCHITECTS &
PLANNERS OF IOWA, INC., an
Iowa Corp., and THE
BLOODGOOD GROUP, INC., an
Iowa Corp.,
Defendants.

-----------------------------

TOWN & COUNTRY HOMES, INC.,
a Minnesota Corp.,
Third-Party Plaintiff,
vs
BLOODGOOD SHARP BUSTER
ARCHITECTS & PLANNERS OF
IOWA, INC., an Iowa Corp.,
Third-Party Defendant.

The CONTINUED deposition of STEVE SANDELIN taken pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at One Pierce Place, Suite 295-E, Itasca, Illinois, commencing at 4:00 p.m, on the 9th of December 2003.

REPORTED BY TERRI A. CLARK
CSR LICENSE NO. 084-001957

as a witness herein, having been first duly sworn, was examined upon oral interrogatories and testified as follows:

DIRECT EXAMINATION

Cont. By Mr. Krummen:

Q. Good afternoon, Mr. Sandelin. I believe to the right of you is a box full of materials. Will you identify what those materials are in general?

A. That is my product brochure file from my office.

Q. So the materials in the box that's in this room today came out of your office, correct?

A. Yes.

Q. Any particular place, were they in a drawer, were they in a filing cabinet, where were they?

A. They were in a lower drawer of my lateral file cabinet.

Q. Are there any other competition product brochures in your

office that were not brought to the deposition room here today?

A. No.

Q. I'd like to hand you the first exhibit. First of all, the original came out of the box and the copy is marked as Exhibit No. 288. I put the number 2 on the original just so that we know where it goes back in the box at the end.

But will you identify Exhibit No. 288, the original or the copy, however you see fit for the record, please.

A. It appears to be a Rottlund Homes piece of collateral, company newsletter.

Q. More specifically, it says on the front of Exhibit 288 that it's the Rottlund Homes Happenings, Volume 17, Issue 2, 1998; correct?

A. Yes.

Q. Then at the bottom you can either look at Exhibit 288 or the

original, it says P2 Apple Valley -
Prairie Crossing P3, the New Villas,
P4 single level townhome options;
correct?
A. Correct.
Q. Let's turn to page 2 of
Exhibit No. 288. Do you see that
this one refers to Apple Valley and
it speaks of featuring our new
tradition homes?
A. Page 2?
Q. That's right, of Exhibit
288.
A. Yes.
Q. You see on the bottom
right-hand corner it says page 2. If
you look at the original it folds
counter-intuitively, but you will see
a page 2 as well on the bottom
right-hand corner, correct?
A. Yes.
Q. In the upper right-hand
corner it speaks of the villa
townhomes from the 90's, correct?

A. Yes.
Q. And then it speaks to home to Apple Valley on the caption, correct?
A. Come home to Apple Valley, correct.
Q. Come home to Apple Valley, excuse me. And the development name below that is Prairie Crossing, correct?
A. Yes.
Q. Did you ever tour the Prairie Crossing Rottlund development?
A. Not that I recall.
Q. Where did this particular Exhibit 288 come from, how did it come to be in your files?
A. I don't recall.
Q. Did you tour any Rottlund product at Prairie Crossing?
A. No, I don't recall.
Q. Did you tour any Rottlund product anywhere in Apple Valley at any time?

A. Not that I recall.

Q. Would you turn the page to page 3 of either Exhibit 288, the copy or the original which is in front of you.

A. Yes.

Q. Do you see in the right-hand bottom fourth of page 3 of Exhibit 288 it says, "See Our New Villas Today?"

A. Yes.

Q. And then below that we have a picture of something, correct?

A. Yes.

Q. And you understand that to be Rottlund's villa product, correct?

MR. FARMER: Objection, foundation.

THE WITNESS: There is two sets of floor plans called out at a photo all under the topic of New Villas Today, yes.

BY MR. KRUMMEN:

Q. And the floor plans refer to

the New Villas Chatham, correct?
A. Yes.
Q. And also the Breckonridge for the New Villas, correct?
A. Correct.
Q. Turning the page to page 4 you have some information regarding the Garden Homes and the Craftsman Homes, correct?
A. Yes.
Q. Then on page 5 we have some information concerning grand openings, correct?
A. Yes.
Q. If you look down under Plymouth, the second entry it speaks to the Cornerstone Villas at Plymouth, correct?
A. Cornerstone Commons of Plymouth.
Q. You see the second Plymouth entry on the left-hand side?
A. Cornerstone Villas, yes.
Q. That's what the document

says, correct?
A. Correct.
Q. And then beneath that there is a reference to the Blaine Deacons Walk project, correct?
A. Correct.
Q. Have you ever toured the Plymouth Cornerstone Villas project of Rottlund?
A. No, not that I recall.
Q. Have you ever toured the Blaine Deacons Walk project of Rottlund?
A. Not that I recall.
Q. And you don't recall touring the Prairie Crossing development of Rottlund either, do you, sir?
A. I do not.
Q. Do you have any knowledge whatsoever concerning how it came about that Exhibit 288, the original copy made its way into your files?
MR. FARMER: Objection, asked and answered.

THE WITNESS: I do not recall how this got to my file.

BY MR. KRUMMEN:

Q. Turning to the last page do you see that there is a reference to Villa Townhomes on the right-hand side?

A. Yes.

Q. The first one talks about Prairie Crossing and Apple Valley, correct?

A. Yes.

Q. And as you sit here today you do not recall touring the Prairie Crossing Apple Valley Rottlund development, correct?

MR. FARMER: Objection, asked and answered.

THE WITNESS: I do not.

BY MR. KRUMMEN:

Q. The second one speaks to Walnut Grove Villa Homes in Chanhassen, correct?

A. Yes.

Q. The question is do you recall whether or not you have ever toured the Walnut Grove development of Rottlund in Chanhassen?

A. I do not.

Q. You may have, you may not, you're just not sure?

A. I don't recall touring this product.

Q. Do you deny ever touring Rottlund's Villa product?

MR. FARMER: Objection, argumentative.

THE WITNESS: I had no reason to believe I did.

BY MR. KRUMMEN:

Q. Did we not go through pictures and establish that on April 29th of 1998 you did indeed tour Rottlund's Villa 2 product?

A. Yes.

Q. So what's your basis for denying that you ever toured Rottlund Villa product?

A. You're asking me about Chanhassen and I don't know if I was ever at Walnut Grove in Chanhassen.

Q. Which Rottlund development did you tour on April 29th of 1998?

A. I don't recall the name.

Q. So it may have been Prairie Crossing and Apple Valley, correct?

A. I don't even recall. I don't know if that name is even on this list, I don't recall the name of the project we toured.

Q. When you speak of this list what are you referring to?

A. The three Villa townhome communities you just mentioned to me.

Q. Would you look at the first name on the list, it says Prairie Crossing and Apple Valley?

A. Yes.

Q. Now, the question is did you tour on April 29th of 1998 the Prairie Crossing Villa homes of Rottlund in Apple Valley?

A. I don't recall.

Q. You may have, you may not have, is that your testimony?

A. Yes.

Q. The second question is the Walnut Grove Villa Homes of Rottlund in Chanhassen that are listed, did you tour those Villa homes on April 29th of 1998?

A. I don't know.

Q. You may have, you may not have, you're just not sure, correct?

A. Correct.

Q. And then the final question with respect to this document is the Cornerstone Commons development of Rottlund at Plymouth, did you tour the Villa product there on April 29th of 1998?

MR. FARMER: Objection, foundation. I'll just note it says it's coming in October 1998 on the exhibit.

THE WITNESS: And I

don't know if we went to Plymouth at all.

BY MR. KRUMMEN:

Q. You may have, you may not have, you're just not sure?

A. Correct.

Q. Did you go to any of these developments subsequent to April 29th of 1998?

A. I don't remember.

Q. Are you familiar with the Rottlund development called Deacon Walk, sir?

A. I'm familiar with Deacons Walk, yes.

Q. Is Rottlund one of the developers there?

A. I don't know.

Q. Let me hand you another original competition brochure that came out of your file and mark the copy as Exhibit No. 289.

(WHEREUPON, Deposition Exhibit No. 289 was marked for

identification.)

Q. Sir, before you is both the original and a copy marked as Exhibit No. 289. Would you identify either the original or the copy Exhibit 289 for the record, who is that?

A. A community brochure for Deacons Walk.

Q. Who is the developer?

MR. FARMER: Objection, foundation.

THE WITNESS: I don't see. I see a brochure for Rottlund Homes within the original; however, I know there are other builders at Deacons Walk such as Town & Country Homes Minnesota.

BY MR. KRUMMEN:

Q. So working within the Rottlund Homes materials inside of Exhibit 289 do you see the page where it says Rottlund Homes and there is a business card of a Peggy Johnson and then on the right-hand side it says

"Deacons Walk, a Signature Golf Course
Community?"
A. Are we on the original?
Q. We are on --
A. Yes, I see that.
Q. And if you turn the page you'll see that this is a development in Blaine, Minnesota, correct? Just beyond the Peggy Johnson business card?
MR. FARMER: Where, are you on the map page?
THE WITNESS: Give me a minute.
BY MR. KRUMMEN:
Q. That's a Blaine development, correct?
A. Sienna Corporation, developer of Deacons Walk, Minneapolis, Minnesota.
Q. And then there is a flag up above the Deacons Walk with a map?
A. Yes.
Q. And it looks like it's in

Blaine, correct?

A. Yes.

Q. Could you go to the next page. Could you identify that for the record?

A. Rottlund Homes floor plan, the Astor.

Q. And then it's a front-back, the next page is an elevation of the Garden Home number 3, correct?

A. The elevation page, I'm sorry?

Q. That's right. It should be Garden Home 3.

A. Garden Home 3, correct.

Q. Then we have some more Rottlund materials, correct?

A. Correct.

Q. Now I'm after the next particular Rottlund brochure, which is part of Exhibit No. 289. Would you identify that for the record.

A. This brochure?

Q. That's right.

A. Rottlund Homes Happenings.
Q. Again, it's the Volume 17, Issue 2 of 1998, correct?
A. Yes.
Q. And at the bottom we have Apple Valley, Prairie Crossing and the New Villas references, correct?
A. Yes.
Q. If you turn in to page number 3 of this particular series of materials you see the reference to "See Our New Villas Today?"
A. Yes.
Q. And below that what do you find?
A. Floor plan, floor plans of the Chatham and Breckonridge.
Q. And also a photograph, correct?
A. And a photograph.
Q. So from the document we have a reference to the New Villas of Rottlund and then we have a photograph and floor plans for

Rottlund's Chatham and Rottlund's Breckonridge Villas, correct?
A. Yes.
Q. Where did this come from?
A. I don't know.
Q. How did it get into your files?
A. I'm not sure.
Q. Do you have any basis to deny that you picked up this particular Rottlund Homes brochure that has the Rottlund floor plans for the Chatham and Breckonridge Villa models?
MR. FARMER: Objection, argumentative.
THE WITNESS: I have no reason to deny that, no.
BY MR. KRUMMEN:
Q. Do you believe that you picked this up during the product tour of Rottlund's Villa product that occurred on April 29th, 1998?
A. I don't know exactly when I

received or located this document.
Q. Do you know why Exhibit No. 288 was in your files?
A. No.
Q. Do you know why Exhibit No. 289 was in your files?
A. Not specifically, no.
Q. In general do you know how Exhibit No. 289 made it into your files?
A. I can only speculate that Deacons Walk was a community, a master plan community that we were participating in.
Q. The "we" would be?
A. Town & Country Homes Minnesota.
Q. And when did your participation, meaning Town & Country Homes of Minnesota's participation begin at Deacons Walk?
A. I don't know specifically.
Q. The next three exhibits, if you will, Mr. Sandelin, I only have

Exhibit R15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,
Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF MELISSA C. SNELSON
VOLUME I, Pages 1 - 255

(The following is the deposition of MELISSA C. SNELSON, taken pursuant to Notice of Taking Deposition, at the offices of Fredrikson & Byron, 4000 Pillsbury Center, 200 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:17 o'clock a.m., June 10, 2004.)

available.
Q. And in your May 14th, 2004 rebuttal report, Exhibit 398, at page 19 -- do you have that in front of you?
A. Yes.
Q. In the first full paragraph there is a sentence that begins with "However," and it concludes with "it is necessary to assume that some type of negotiation and agreement would have occurred."
A. Yes.
Q. Did you make any assumptions about the type of negotiation that would have occurred?
A. My assumption is that Rottlund has informed me that they would not accept anything less than that license fee and so that would be a minimum stand on their license negotiation.
Q. Do you have an understanding as to whether or not -- Strike that.
Have you ever calculated a licensing fee in connection with a copyright dispute before?
A. Not in a copyright dispute.
Q. Have you ever calculated a license fee or hypothetical licensing fee as a measure of damages in any sort of intellectual property matter?
A. Yes. Reasonable royalty, yes.

Q. A reasonable royalty, all right. And do you have any understanding whether or not the use of a license as a proxy for damages in a copyright case needs to be a reasonable license?
A. I don't understand the question.
Q. So you don't know whether or not it would have to be a reasonable license or can be whatever the copyright holder demands?
MR. DAVENPORT: Objection, she said she doesn't understand the question.
THE WITNESS: I don't understand the question.
MR. MURDOCH: Can you read back the second question and then strike the first one and answer the second one if you find it acceptable and understandable.
(Record read.)
BY MR. MURDOCH:
Q. If Rottlund had advised you that it would not accept a license of anything less than a million dollars per unit, would you accept that as face value as a licensing fee which you could foresee as a measure of damages in this case?
A. Not -- I would not consider that a reasonable license for damages purposes, no.

Q. And if Rottlund had suggested that it would only accept half a million dollars per unit, would you consider that to be a reasonable license?
A. Specific to this case?
Q. Yes.
A. No, I wouldn't.
Q. What factors did you take into account when you determined, if you determined, that the price equal to the estimated incremental profit margin was a reasonable license fee?
A. I took into account the fact that those are the profits that Rottlund felt they could reasonably make on the sale of a copyrighted unit, and I took into account the fact that Town & Country Homes may be willing for several reasons to pay that amount, and I took into account the fact that Rottlund has various reasons why it would walk away from a license if its demands were not met.
Q. And the third factor, that Rottlund would walk away from a license if its demands were not met is inconsistent with the ability to assume that some type of negotiation must occur; right?
A. In some respects, yes.
Q. And so what you were doing is, you were assuming well if there is a negotiation this is as low as

Rottlund is going to go; right?
A. Correct.
Q. And then you did nothing to determine whether or not Town & Country would have been willing to go that high; right?
A. The fact that Town & Country built these homes that are infringing requires some amount of damages to be assumed or estimated. If Rottlund would not have negotiated anything lower than what I consider a reasonable fee, then I think it's sufficient to use that reasonable fee as a license, licensing fee.
Q. But the factors that you listed as causing you to believe that this was reasonable was Rottlund wouldn't offer anything lower, there are three hypothetical reasons that Town & Country would have accepted it, and you don't have any analysis or opinion as to whether or not those three hypothetical situations apply in this case; right?
A. I reviewed documents in this case that show that Pinnacle believed that this product was an important part of this development, that it was part of the plan that was submitted and approved for this piece of land in Aurora, Illinois, and so for those reasons, since they considered it an important part of their development, they may certainly be willing

to either take it at a small amount of profit, at no profit or even as a loss leader if they believe it's important to the development.

Q. Did you see anything that indicated to you Town & Country thought it was so important that they would take it as a lost leader or small level of profit?

A. I saw testimony that indicated that Town & Country or Pinnacle believed that putting these units on the face of their community was very important to them and that it was important to them that customers saw this type of product as they entered the community to encourage customers to enter the community and see other products. So yes, I believe they -- this was -- this product was, I believe, maybe a third of the total product in that development, so yes, if they believed it's that important and they intended to use it as a way to draw customers into the rest of the community, yes, that may indicate that they are willing to take it at little profit or no profit to sell the other two-thirds of the units.

Q. Is that the testimony of Tom Ryan you are referring to?

A. Yes.

Q. Did you review Mr. Ryan's complete deposition?

A. That's the proxy I'm using to calculate actual damages, yes.
Q. Okay. And nothing that Town & Country did prevented Rottlund from selling it's Gable townhomes at some other location in proximity to Centennial Crossing, did they?
A. My understanding is that the communities that Town & Country developed that are at issue here were approved by the cities in which they are -- in which they exist as packaged deals, if you will, and that they used a variety of products in these different communities, and without the Homestead Collection, part of their plan that had been submitted to the cities would not have existed. What I'm trying to do here is to say that if they had not infringed upon the villa townhomes, they would not have been able to develop these other products as well, and in order to determine a reasonable proxy of the type of profits that Rottlund could have made in the same circumstances, it is necessary to determine what a reasonably similar product would have been, a replacement style, if you will.
Q. And that's all part of the hypothetical Rottlund has put in the place of Town & Country at these specific developments; right?

A. For damages purposes, yes.

Q. There is this other aspect of your hypothetical damage model where Rottlund potentially had the opportunity to develop back-to-backs at a location in the same proximity but didn't because Town & Country was offering those sales. Remember we talked about that this morning?

A. Can you repeat that for me.

(Record read.)

A. Still kind of confused by the question.

Q. When I read your report, I understood your analysis to be this is what Rottlund would have made if they had developed these properties instead of Town & Country under your actual damage calculation, and you have told me that that is one hypothetical model that you constructed here for calculating their actual damages; right?

A. I think what my report is saying is quantifying, actual damages are quantifying the lost economic opportunity to Rottlund as a result of Town & Country's infringement of the Homestead -- or of the villa products. In order to calculate the entire lost economic opportunity, it's necessary to make some assumptions because Rottlund obviously didn't get the opportunity to build those units. In order

to complete the analysis, it's necessary to substitute Rottlund Homes -- it's necessary in order to complete the analysis to assume the specific development that Town & Country had; otherwise, there is no way to make the hypothetical analysis of lost actual profits.

Q. All right. But this morning when we were talking about this, we talked about Centennial Crossing and there were 104, I think, back-to-back units built at Centennial Crossing; right?

A. Yes.

Q. And you had a conversation with Mr. Stutz where he said we could have built those but Town & Country had already sopped up those sales and there was land available and we had the capacity and that's why we didn't build them in the same proximity; right?

A. Yes. You said they could have built those communities at that specific site or somewhere else.

Q. Right. Now with regard to the non-back-to-backs, -- all right? -- you don't have any opinion, do you, as to whether or not every sale of a Premier is soaking up a sale of a Gable townhome in that same location; right?

A. I'm not alleging that the Premier is infringing Gable's copyright, if that's what you are asking.

Q. No. I'm saying that the person who purchased the Premier is just as likely to purchase a Gable townhome and the presence of Town & Country reduces demand by one sale in that geographic location?

A. I'm trying to calculate the total lost opportunity to Rottlund based on the communities that Town & Country developed. When I talked to Mr. Stutz about whether they could have developed these communities, the question was a broad question of the community. It wasn't a question specifically about the villa product, it was a question about could you have developed these communities that Town & Country got approved using the Homestead Collection as a piece of its community. He indicated that, yes, they could have developed those communities, whether it was on that specific tract of land or another piece of land, they could have developed those communities that apparently the city was interested in developing, because they approved Town & Country's development.

Q. All right. Now but by including in your damage model the lost opportunity to sell the Gable townhome, the tradition single-family home, the other parts of community, that aspect of your damage calculation is only applicable to the hypothetical