Exhibit R16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation, and
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF TODD M. STUTZ (Individual)
VOLUME I, Pages 1 - 192

(The following is the deposition of TODD M. STUTZ, taken pursuant to Notice of Taking Deposition, at the offices of Fredrikson & Byron, 4000 Pillsbury Center, 225 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:18 o'clock a.m., August 7, 2003.)

Q. You think Town & Country's quality of construction is comparable to Rottlund's?
A. I think Town & Country uses a lot of the same vendors that we do and has copied a lot of our details.
Q. Do you think Town & Country's quality of construction is comparable to Rottlund's?
A. I think their construction is comparable to Rottlund's, yes.
Q. And it's also your belief that Rottlund and Town & Country use the same vendors?
A. I know that there are certain vendors that are in common.
Q. Who are they?
A. I don't recall their names.
Q. What products?
A. I don't recall.
Q. So you just generally have some feeling that the vendors for Town & Country and Rottlund are the same but you don't know on what products or what vendors?
A. I know that my purchasing people as well as my construction people have indicated that there are -- there is commonality in some vendors.
Q. Is there commonality in vendors between Rottlund and Centex?

boundaries. If, you know -- An example of that would be Maple Grove where you have the Osseo School District, which is perceived not as being as strong as a school district as being, for example, in the Wayzata School District, but it's the same municipality. So there is somewhat of a submarket, if that's the -- or another layer of consideration for a buyer above and beyond just being located within municipalities. There are certain geographical barriers, certainly the river in Minne -- you know, in Minneapolis-St. Paul is somewhat of a physical barrier but also a mental barrier in some respects in markets. But I don't -- Other than those factors I'm not sure what -- "submarkets," I'm not sure I understand the question.

Q. Well, okay. Of the places where you have devel -- where Rottlund has developed Villas between 1997 and today, and you listed ten of them, which two are the furthest apart?

A. The farthest apart from each other?

Q. Umm-hmm.

A. Wow. I would have to say probably from Hugo, which is our Victor Gardens development, to our Clover Ridge development in Chaska would be the farthest physical distance.

Q. And does Rottlund believe that the same group of buyers are looking at the Victor Gardens development and the Clover Ridge development?
A. Surprisingly enough I would say that some of the same buyers look at both those developments. It doesn't make any sense, but I have examples of people that, you know, will look at Inver Grove Heights and then end up buying in Plymouth. And I have -- You know, I can give you specific examples of that. And I have other buyers that will, you know, do exactly the same thing. Largely because the buyers of our Villa product or Town & Country's product are single, don't have children, aren't tied to school districts, aren't necessarily tied to church, aren't necessarily tied to friends because their friends are probably dispersed throughout the metropolitan area. And their buying decision is not geographically dependent in a lot of cases, and they're just looking at where their workplace is in some cases, but I think all of us know the resumes of the single, work-force-type buyer that would look at this product are very diverse and they move around a lot from job to job in most cases. And so it's amazing to me, but time and time again we're proved wrong when we say that a buyer of our Villa or our Gable Home, which has the

same buyer profile, as we discussed earlier, will look throughout the metropolitan area for a location to buy a home. That sort of is somewhat contrary to, for example, our Garden Home buyer which is an older, empty-nester retiree that has all those connections to church and to friends and family. They are more geographically dependent and location dependent and will generally buy in that area where they currently live. First-time homebuyer, single, young couple, in some cases no children, not tied to anything specifically will live anywhere.

Q. So does Rottlund believe that the majority of the target market for the Villa products bases its decision to purchase homes -- or on which home to purchase less on location than other target markets?

A. I would say in the case of the Villas the location for a buying decision is less of a factor than it is for other target markets, yes.

Q. Would it follow, then, that Villas that Rottlund offers anywhere in the metropolitan area compete with other Villas offered throughout the metropolitan area and all substitutes being offered by other builders throughout the metropolitan area?

A. I would say that's generally true. I think the easy way of saying it is that the target market of a

single or a young couple, as I explained, where there's not ties to some other factor, is less location dependent in making a decision. It doesn't mean it's not a part of their decision making, don't get me wrong, but I'm saying that in comparison to other target markets there's less of a decision-making factor.

Q. But the competition for buyers at one of Rottlund's developments in, for instance, Maple Grove is not limited to other developments in the Maple Grove area; is it?

A. No. No, I wouldn't say so.

Q. Those developments are competing --

Rottlund believes that those developments are competing for buyers with developments from throughout the metropolitan area.

A. In some -- In some cases, yes. I would say that still is -- I mean you have people that are -- will look at a Maple Grove/Plymouth area, that -- sort of that, we'll call it -- I guess we'll call it submarket, back to an earlier question, as sort of a general sort of submarket, and that's one of the decisions that they'll have is that they want to be in a submarket, but it doesn't mean that they won't go look at someplace else within the metropolitan

area, especially in that target market.
Q. Does Rottlund study itself or attempt to obtain information about movements of population within the metropolitan area?
A. We study where our buyers are coming from, yes.
Q. I didn't understand that answer. You study where the buyers are coming from?
A. We study where our buyers are coming from by product types.
Q. Where they lived prior to purchasing your product?
A. That is correct.
Q. Do you also seek to obtain any demographic information showing which towns or municipalities or areas of the metropolitan area are growing and which are staying the same and which are getting smaller?
A. Yes, we do. Yes.
Q. And does that -- do you use that information in determining where to seek out land?
A. Absolutely do.
Q. What's the source of that information?
A. A lot of information comes from the Metropolitan Council, which is the regional form of government here in the Twin Cities. Some of that information comes from the builders association, who have a staff

Villa II product. I think the stair location, the exterior entrance location in the Horton project -- product is different than the Villa II. And I don't recall necessarily the -- the rest of that particular plan other than I do -- other than I do recall saying that this product is very, very similar, if not substantially similar to our New Villa which was copyrighted in 1991.

Q. Is it your opinion that the New Villa that was copyrighted in 1991 is substantially similar to the Villa II as built at Rush Creek?

A. I would say that it is the genesis from which the Villa II product came from.

Q. That's not my question, sir. Me question is: Is it your opinion that the New Villa that was copyrighted in 1991 is substantially similar to the Villa II as built at Rush Creek?

A. I would say yeah, they are substantially similar.

Q. The New Villa had a single-car garage in the center?

A. Yes, it did.

Q. And an exterior entrance in the front?

A. Yes, it did.

Q. Similar to the D.R. Horton product which you

Q. What's the closest geographic proximity that Rottlund has had two Villa II projects they were building simultaneously?
A. I'd say the closest two would be Victor Gardens and Club West.
Q. Has Rottlund ever had two --
How far away are the Victor Gardens and the Club West developments?
A. I would say that they're -- I'd say they're ten miles apart, I suppose. It might be less than that. It might be more than that. I haven't usually driven directly from Hugo over to Blaine, so...
Q. Has Rottlund ever had two Villa II projects going on in the same community at the same time? Same city.
A. No, but actually I'd like to retract my earlier statement with regards to the closest two.
Q. You going to go with Plymouth and Maple Grove?
A. I'd say Plymouth and Maple Grove would be the two closest that we actually have been selling at the same time. I don't believe that we were under construction at the same time, but we were selling both those at the same time. And those projects are probably roughly four miles away from each other.
Q. Which Maple Grove project?

A. Maple Lakes. Actually under con --
So that would be selling in Maple Lakes and The Reserve at the same time roughly four miles apart from each other.
Q. But you weren't under construction on the two of them?
A. No, that's correct. Under construction I would say it probably would be the Victor Gardens and Club West example I gave you.
Q. And The Reserve and Rush Creek were not under construction at the same time?
A. It would -- It was really close. I suspect that we were probably finishing up and landscaping the last building at Maple Lakes when we were starting the first building at Plymouth. So...
Q. Maybe I have them backwards. Maple Lakes happened before The Reserve?
A. Yes, it did.
Q. Has Rottlund ever had two projects ongoing in the same city at the same time?
A. We've had two Villa projects under construction in the same city.
Q. What city was that?
A. White Bear Lake, as my testimony indicated earlier.

Q. I'm sorry. Villa II products. I'm just talking about 1997 to present.
A. Okay. Sorry.
Q. Has Rottlund ever had -- I appreciate -- My question was probably not worded well.
Has Rottlund ever had two Villa II projects ongoing in the same city at the same time?
A. When you say "ongoing," is that selling or construction?
Q. Let's do construction first.
A. Two Villa II projects under construction in the same city. The answer to that is no.
Q. Has Rottlund ever been selling Villa II's in two different locations in the same city at the same time?
A. As my testimony indicated earlier, we have two developments in the City of Blaine currently, one which we're currently selling in and one we'll be selling in next year. But presently, no, we do not have anything and haven't had anything since 1997 in the same city where we've been selling at the same time.
Q. In 1999 was Rottlund aware of any land in the City of Shakopee that would be suitable for Villa II's?

A. I don't recall the specific year, but we had had discussions with RH Development regarding a couple opportunities in the City of Shakopee, as well as with another entity which is located behind the Wal-Mart in Shakopee. We had considered that site that I think Ryland ultimately purchased. So there probably was three different properties that we looked at and reviewed at some level of detail and consideration of a site to accommodate Villa II's.

Q. Why didn't you buy the land?

A. Well I think Town & Country bought one of those sites, and the other two sites, one site was surrounded by two sides by electrical transmission wire, one side by underground gas pipe and it was just felt it wasn't a real desirable site, and then a freeway on the other side so it wasn't felt it was a desirable site. The other property at the time, it was early on, it was actually probably well before 1999, it was just felt that it was too expensive for the time period in which we were being considered to purchase the site for, similar to the Hugo property that we discussed earlier.

Q. Did Rottlund bid on the land in Shakopee where you believe Town & Country built its product?

A. I don't believe that we actually bid directly

for it because, as I indicated earlier, it was a site that was brought to us by RH Development and you would have to ask them if they bid on it on our behalf.

Q. In 1999 was Rottlund aware of any land, additional land in the City of Farmington it could have purchased to build Villa II's?

A. Again I -- the 1999 thing is a question. I know that, as I testified earlier, there was a property that we had worked on in the City of Farmington that ultimately Centex ended up buying and building similar product to our Villa II's on.

Q. Why didn't you buy that land?

A. Because we felt that the other property, which was the Wenzel property which ultimately ended up being Vermillion Grove, was a better location.

Q. But you could have done both; right?

A. We could have done both, absolutely.

Q. So why didn't you buy the land that Centex bought?

A. Because I didn't like the property.

Q. Why didn't you like the property?

A. Because I didn't like the location of it.

Q. But it was suitable for Villa II's?

A. Yeah, Centex was very successful there. Yes.

Q. Do you know how many back-to-back products Centex built at that location?
A. I have no idea.
Q. Rottlund aware of any land opportunities between 1997 and present in the City of Lakeville to build additional Villa II's?
A. I don't recall. I know that there are opportunities in Lakeville that we looked at, but I don't recall how many opportunities and the specific locations of those opportunities.
Q. But you understand there were opportunities for Villa II's?
A. The City of Lakeville during that time period had a moratorium on -- on townhomes and condominiums and so therefore, even though there may have been opportunities, we didn't really take them very serious because you couldn't have built them anyhow.
Q. But you understand that moratorium ended at some point?
A. I understand that that moratorium ended at some point, yes, but --
Q. After --
A. -- you're asking me about 1999 or that timeframe.
Q. I thought I made it easier. I'm now shifting to

1997 to present.
Between 1997 and present was Rottlund aware of land in the City of Lakeville to build additional Villa II's?
A. I was aware of some opportunities, I can't recall the specifics of those. You would have to ask Richard Palmiter regarding those opportunities he reviewed on my behalf and the company's behalf.
Q. And Rottlund decided not to buy that land.
A. I don't think we made any decision about what -- buying any -- not buying any land at all. I don't recall the opportunities, so it's hard to say whether or not we decided not to buy it. I know that we looked at opportunities, but the specifics of them I don't recall.
Q. Between 1997 and present is Rottlund aware of any land -- additional land in the City of Plymouth upon which it could have built Villa II's?
MR. KRUMMEN: Foundation.
A. I think we covered this before relative to the Merrill Paulson site, and certainly we recognized that as an opportunity to build on at some point, but the timing was unclear at the time that we were being asked to consider it.
Q. Any others?

A. There are other -- is other property that we recently had under purchase agreement, but because of the timing of it we cancelled that purchase agreement.
Q. What do you mean by 'the timing of it'?
A. The timing of it was that there was a piece of property between our property and the property we had under purchase agreement, and the person that was in between was totally unreasonable and no one was able to put it under purchase agreement, and unfortunately the sewer and water had to extend through their property and so therefore we let our purchase agreement lapse.
Q. Other land in the City of Plymouth upon which Rottlund is aware that it could have built additional Villa II's?
A. I know that we looked at other opportunities, but I don't know the specifics of those. You'd have to ask Mr. Palmiter regarding that.
Q. You just know that Rottlund didn't end up acquiring any of those other opportunities.
A. That's what I know, yes.
Q. Maple Grove, and I'll exclude the Hollander Estate. Are there any other properties in the City of Maple Grove that Rottlund was aware of between

1997 and present on which it could have built Villa II products?
A. Yes, there was other opportunities and we looked at other opportunities.
Q. And Rottlund concluded not to pursue those other opportunities where it could have built additional Villa II's?
A. No, we did pursue some of the other opportunities, but others, such as Ryland, or Centex, or Pulte, or Town & Country ultimately ended up with those opportunities.
Q. Woodbury. Between 1997 and present, land in Woodbury Rottlund was aware of where it could have built additional Villa II's?
A. Yes, and we pursued some of those opportunities, yes. As I indicated earlier in part of my testimony, there were opportunities that Pulte pursued and ultimately ended up with that we reviewed. There were other opportunities that we did end up with a -- other land in Woodbury in which we built Gables on, and Cottages and single-family homes, but nothing specific to Villa II's, no.
Q. The other land in Woodbury upon which you built Gables you could have built Villa II's; is that correct?

A. We could have built Villa II's on it, but the land was expensive and it allowed for a density that was higher than what the Villa II's were.

Q. So in those locations where the density allows or the land permits for a higher density, Rottlund elected to build Gables instead of Villa II's; is that correct?

A. Well as part of my earlier testimony, as I indicated, it only makes sense when you have a limited resource such as land, to maximize the potential of that land. So when land is guided and zoned to provide for a higher density than can be achieved by the Villa II's, it makes sense to develop a product that has a higher density than the Villa II's.

Q. But you could have built the Villa II's there in the land in Woodbury.

A. You know, I don't know if we could or not. You would really have to inquire with the city of whether or not they would allow that to occur there.

Q. Chaska? Any additional land opportunities in the City of Chaska Rottlund was aware of where it could have built Villa II's?

A. The only other property that I'm aware of in Chaska was a site that Pulte ended up purchasing in

the City of Chaska which they built a similar product to our Villa II's on which we did have some initial conversations with the landowner on. The other properties would be sites surrounding our Clover Ridge development in Chaska which would include a site that was developed by Dean, I can't remember his name -- by Lotus Development, which I'm not sure that's the name he was developing that under, but which is adjacent to the Clover Ridge development that we're developing, and then the Kerber family farm which is being developed by Town & Country adjacent to our Clover Ridge development.

Q. Why didn't Rottlund acquire the land that Pulte -- that Pulte ultimately acquired in Chaska?

A. I don't recall why the reason was. I know that we tried to make contact with the property owner there. I know that we had maybe some preliminary conversations with the property owner. But ultimately Pulte I believe paid more money than we were willing to pay for that piece of property.

Q. White Bear Lake? Land developments that Rottlund's aware of in White Bear Lake where it could have built additional Villa II's?

A. We built everything in White Bear Lake and there's no land in White Bear Lake left.