Court File No. 01-1980 / ROTTLUND / Pinnacle
Krummen Affidavit dated September 8, 2004

Exhibits R17.1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.d/b/a Rottlund Homes,

a Minnesota corporation, Plaintiff,

vs. Case No. 01-CV-1980Pinnacle Corpora

d/b/a Town & Country Homes,an Illinois Corporation, and

Town & Country Homes, Inc.,a Minnesota Corporation, and

Bloodgood Sharp BusterArchitects & Planners of Iowa,

Inc., an Iowa corporation, Defendants,

andTown & Country Homes, Inc.,

a Minnesota corporation, Third-Party Plaintiff,

vs.Bloodgood Sharp Buster

Architects & Planners of Iowa,Inc., an Iowa corporation,

Third-Party Defendant.- - - - - - - - - - - - - - - -

DEPOSITION OF TODD M. STUTZ 30(b)(6) VOLUME I,

(The following is the 30(b)(6) deposition of TODD M. STUTZ, taken pursuant to Notice of Taking Deposition, at the offices of Moore, Costello & Hart, 1400 Fifth Street Center, 55 East Fifth Street, in the city of St. Paul, state of Minnesota, commencing at approximately 9:25 o'clock a.m., May 29, 2003.)

A. Well in preparation of the bid worked very closely with Richard Palmiter, from our company at that time, on putting together the bid, so when I say "we" I say we from that perspective, but certainly I did it also.

Q. Did you put together any internal documents that formed the basis of Rottlund's bid for the Hollander property?

A. When we look at a piece of property, you know, we do a fairly, I guess, comprehensive economic analysis of how the whole site will come together which takes into consideration some of our product development costs of developing new plans. And in preparation of our bid there was probably some, you know, sketches or some, you know, just writings that occurred in preparation of the bid. And just we took into consideration the density, the product that we were building, whether or not there was any product development costs, what our development costs would be in the cost of construction of those units and then what the market would allow us to sell that product for.

Q. Does this comprehensive economic analysis have a name at Rottlund?

A. No, not really. No.

Q. Okay. Does it result in a -- a computer file being generated?
A. It does not result in a computer file being generated.
Q. Does it result in a piece of paper being generated?
A. More than likely a piece of paper being generated that probably disappears shortly thereafter because it's just, you know, your best guess at the time. You know, to guess what your costs are going to be for construction, to guess what your costs are going to be for development, to guess what the product is going to be able to sell for. When you actually get the site developed, at that -- you know, is all -- it's all, you know, predictions, it's all assumptions and, you know, we don't really keep a file that says here's the analysis that was completed.
Q. Why don't you keep the file?
A. There's no need to. It's all assumptions anyhow.
Q. Is the comprehensive economic analysis created on a computer system?
A. The only thing that would have been created on a computer system would have been the land-development

budget which takes into consideration the cost of developing the site. The cost of grading the property, the cost of putting the infrastructure in, any city fees that are imposed. I don't believe that there is one that exists for this property. Not unlike every other property we considered in 1998 or, you know, some time ago, there would be no reason to retain those files, especially on properties where we weren't successful.

Q. Did you perform the comprehensive economic analysis for the Hollander property?

A. I -- Yes. Yes.

Q. Okay. Did you create a land-development budget for -- as part of the comprehensive economic analysis for the Hollander property?

A. Usually the land-development budget is developed by people in our land development department. If they don't develop one then I develop something, and I don't recall what happened in this particular case. But we make certain assumptions. It's going to cost X amount of dollars to grade this property per acre, it's going to cost this much per unit based upon the unit types that we, you know, were proposing, to provide infrastructure to them. We know what the city fees are for assessments for sewer and water, we

Q. And who makes that decision?
A. I make that decision.
Q. And how do you make that decision?
A. Again we project out what our sales and closing objectives are, I sit down with the board of directors which includes Bud and David Rotter, and we go through what they see as our revenue and profit expectations for the coming years and we attempt to hit those targets.
Q. Which of the land closings listed on this list fall into that category, the long-term development that aren't included in the two-and-a-half-year goal?
A. Arbor Pointe property. Arbor Pointe property as a project still is ongoing, we began assembling land in that development in 1988. Deacon's Walk. Deacon's Walk is part of the Tournament Players Club in the City of Blaine, and that was for a period of time that was in excess of the two and a half years. Maple Lakes, which is a property we bought from Camas, Minnesota which is now Aggregate Industries. That property we still have not yet developed, and as you can see here we closed on that land in 1999, and it's not anticipated that land will be used until 2006.
Q. I don't mean to interrupt you, sir, but my

question is not which ones did it take you more than two and a half years to do, but which ones at the time you bought them fall into this category of what you described as long-term investments.

A. If you would have listened to my answer, which in the case of Maple Lakes, that land was bought in 1999, the majority of that land will not be used until 2006.

Q. Okay. Any others?

A. The Reserve. Again The Reserve is a project that we have portions of that project that will not be used -- we closed in 2001, we have a portion of the project that probably won't be developed until 2004-2005 and is being held as land for future needs.

Q. That's the $12 million option?

A. Yeah. That's probably about it.

Q. What does it mean on page 1 where it says that Rush Creek was "Optioned to Tradition 7/31/97"?

A. What that means is is that we entered into a purchase agreement with Contract Property Developers Corporation, which is CPDC, to purchase the Rush Creek property, and instead of closing on the property ourselves we assigned the purchase agreement with Contract Property Developers Corporation to Tradition. Tradition acquired the property and then

we had a option agreement entered into which provided us with an exclusive right to option land back in that development as we needed it for construction purposes.
Q. Is Tradition the name of an entity?
A. Tradition goes under a number of different names. Tradition Ventures, LLC is typically what it goes under. But yes, it is an entity that's owned by a separate party.
Q. It's not owned by the Rotters or anybody at Rottlund.
A. It is not, no.
Q. Okay.
A. It is owned by Robert Enebak.
Q. Rottlund has surely bid on more land projects than the ones that are listed on these two pages; is that correct?
A. Significantly more, yes.
Q. These are only the ones that you either purchased or optioned; right?
A. These are the ones either we purchased or optioned, that is correct.
Q. Do you know how many other land projects Rottlund has bid on besides the ones it actually purchased or optioned?

A. No.
Q. Do you know approximately how many?
A. No.
Q. More than a hundred?
A. It would just be a --
That's just a guess. I have no idea.
Q. But you're the person who makes the ultimate decision as to whether or not to bid on all of those?
A. If you're asking me to tell you over 14 -- a 14-year period of time how many land -- pieces of property that I've bid on, I can't tell you that.
Q. If you wanted to figure out the answer to that question as the president of Rottlund of Minnesota, and the executive vice-president of The Rottlund Company, Inc., how would you do that?
MR. KRUMMEN: We're on bids now?
A. There isn't a way to fig --
There would not be a way to figure that out. We don't retain records, you know, dating back to 1989, even back to 2000, for land that we've bid on that we've not been successful on.
Q. Why?
A. I mean you can probably ask the guy that just left the room, but the reason is is just some of those records, once -- we just are busy. I mean,

there's just -- there's no set retention policy that we have for land bids that we've submitted that we've not been successful on.
Q. Are there any land that Rottlund's purchased that's not on these two pages that you know of? In the relevant time period.
MR. KRUMMEN: I'm going to object as to the time period. I understand it to be January '97 through October of '02, and if that's the entire question, you may answer. Otherwise vague and ambiguous.
A. Based on my review of this document, it does not appear as if there was any land that we have acquired, purchased or optioned which is not contained within this document.
Q. What's the largest single parcel of land that Rottlund had purchased or optioned prior to April of 1998?
A. Approximately 450 acres --
Q. I'm sorry, I meant by price.
A. By price. Oh shit.
It's easier to tell you 450 acres in Inver Grove Heights. I would say that -- As contained on these sheets I would say that probably The Reserve in Plymouth at $12 million was the largest piece of

property that we had purchased, but we also assigned that purchase to Tradition Ventures, LLC so that we actually didn't pay $12 million for the land, they paid $12 million for the land.
Q. But that occurred in March of '01; is that correct?
A. That's correct.
Q. Prior to April of 1998 what was the largest purchase of land?
A. I would say it goes back to the City of Inver -- in the City of Inver Grove Heights our Arbor Pointe property which comprised 450 acres, and I don't have -- that was prior to 1993, which is the last date entered on this document. I would suspect that that probably is the largest single land purchase that we've had.
Q. As far as price?
A. As far as price, yes.
Q. Do you know if it was more than $3 million?
A. I think it was probably more than $3 million, yeah. But again I don't -- I don't have that information available to me at this time.
Q. Do you know what the backlog on sales of housing was in 1997?
A. I have no I --

I can tell you roughly what my backlog is today, but I don't know what the backlog was in 1997.
Q. If you wanted to figure out what the backlog was in 1997, how would you do it?
A. How would you do it?
Q. Umm-hmm. As the president of --
A. I'm not actually a hundred percent sure that I could figure out backlog. Backlog is -- by my definition is sold houses, noncontingent, that aren't closed. And you would have to pull out, if available, you know, a sales report that was during that duration of time to figure that out.
Q. Could you determine in 1997 the number or volume of lots which had not yet been sold?
A. I think a lot of the information you're asking me regarding -- probably is available as part of our annual report, given the fact that we were a public company so it's available to the public, but that would be as of the end of our fiscal year which previously was March 31st of each year, and that probably contains information on backlog as well as available lot inventory.
Q. And does it do that on a per-development basis?
A. It does not do it on a per-development basis, no.

Q. Did Rottlund have goals for its percentage of backlog during that period, 1997-1998?
A. We don't set specific goals as far as backlog. We set goals as far as sales and closings and revenue, as well as profitability projections, but we don't set backlog projections. Backlog is something that's very cyclical depending upon the time of year.
Q. Did Rottlund set goals in 1997 and 1998 for -- I'm done with this document, by the way, why don't we -- the number or value of unsold lots in its developments?
A. The value of unsold lots in its developments?
Q. Or the number? I mean, did you have a goal not to have more than so much land that was in developments that hadn't been sold yet?
A. No.
Q. What's Rottlund's guidelines concerning the number and types of projects it bids upon?
And sir, actually if I can just ask you to turn that [Ex. 146] over since Mr. Palmiter's going to come back in the room. Just turn over that exhibit.
A. He was involved always anyhow so it doesn't make any difference.
We generally look for land inventory within a given area, and if my former vice-president of land

development or Land Development Manager was to testify, he would indicate that there was sort of a line that we established around the metropolitan area, and that line was we're interested in land inventory that's with -- inside that line. Also from the standpoint that we're a product-driven company, in other words we develop product with the hope of duplicating that product in other locations, what we typically do is we find land that fits with product that we already have within our existing product inventory that's already been developed. So we don't have to go to the expense of, again, developing product for each location which we build.

(Mr. Palmiter returned to the room.)

Q. Does Rottlund own any land in Illinois?

A. We do not own any land in Illinois, no.

Q. Does Rottlund own any land in Lakeville?

A. We do not currently own any land in Lakeville.

Q. Does Rottlund own any land in Shakopee?

A. We do not currently own any land in Shakopee.

Q. Rottlund ever build a Villa II in Shakopee?

A. We've not built a Villa II in Shakopee.

Q. Rottlund ever build a Villa II in Lakeville?

A. We've not built a Villa II in Lakeville but we've built within very close proximity in the city

of Farmington a Villa II.
Q. Does Rottlund have set construction capacity goals for each year?
A. Again as I answered previously, we -- what we do set is sales and closing objectives, which gets us to a revenue objective, which translates to a profit projection, but we do not have set construction goals.
Q. Okay. If you wanted to know the sales and closing objective from 1997 and 1998, how would you figure it out?
A. If we wanted to go back and figure out what the goals were?
Q. (Nodding.)
A. First of all we'd have to find the information, whether or not it was still available within our files, but, you know, relative to those goals and objectives, you know, they're often driven based upon land inventory that's available to us, and so to the extent that those objectives are set, they would change if there was additional land available to us.
Q. Is there a report that comes out that lists the sales and closing objectives for each year, each month?
A. There's a report that shows what the sales and

closing objectives were at the beginning of the year and then how we're performing against that based upon actual sales and actual closings on a month-to-month basis.

Q. And those documents exist, those reports exist for each year since 1997?

A. When you say "exist," I'm not sure if they exist back to that period of time. I know that they exist for this year, 2003, but whether or not they still exist in the files someplace in our office I'd have to get back to you on that and research those files.

Q. Do you know if those documents have been converted into an electronic format?

A. The sales and closing objectives, as well as our sales report, is in electronic format.

Q. It's created in electronic format?

A. Yes.

Q. Do you know where at Rottlund, what computer that information would be on?

A. Well we have a fully-integrated computer system so it would be on the -- our main computer someplace, --

Q. Do you have backups to your --

A. -- our main drive.

Q. -- main computer?

drawing a paycheck with The Rottlund Company and with Rottlund Homes, no.
Q. Mr. Stutz, you worked with Mr. Palmiter on a daily basis; correct?
A. Yes. My testimony indicated that earlier, yes.
Q. And you wouldn't consider yourself asleep at the switch at any time during your tenure as president of The Rottlund Company; would you?
A. I would hope not.
Q. Let me ask, sir, have you conducted any investigation to determine whether Mr. -- and I mean you personally, Mr. Stutz, whether Mr. Palmer -- Palmiter usurped corporate opportunities while working with Rottlund?
A. We did review different land opportunities which are locations in which the product that Town & Country is building which infringed upon our copyright, we reviewed those locations, and some of those locations we did look at while Richard was -- Richard Palmiter, excuse me, was under the employment of The Rottlund Company and Rottlund Homes of Minnesota.
Q. Let's talk about some of those. You're familiar with the Town & Country Minnesota development Harvest Hills in Plymouth, Minnesota?

A. Yes.
Q. Do you know when Town & Country Minnesota acquired the land on which they built that development?
A. I do not, no. Not specific dates, no.
Q. Can you give me a ballpark estimate?
A. I would say that they probably purchased that property probably sometime in, you know, probably 2001.
Q. Now --
And what is that based upon?
A. Just based upon what the stage of the construction is and my review of the site. And it might have been an earlier date than that, but based upon the status of the construction, based upon our investigation, you know, that's probably approximately the date.
Q. Now as president of The Rottlund Company, Inc., were you aware that the piece of land that TCM acquired to build that development was up for sale at any time in the --
A. Actually I think the --
Q. -- last part of the century?
A. Yes, the seller of that property I believe was a person by the name of Merrill Paulson, and I may have

that incorrect, but from researching our files, and Merrill Paulson was a personal friend of the Rotter family.
Q. What file did you review to acquire that information?
A. The files that were in the land development department.
Q. Well did Rottlund bid on that piece of property?
A. We had discussions with the property owner at the time, but as I recall, the timing of that site was such that, for whatever reason, we didn't bid on it at that time.
Q. When did you review the documents containing Mr. Paulson's name most recently?
A. Most recently, I would say about probably two weeks ago.
Q. Now sir, that is a piece of land on which you just testified Rottlund did not submit a bid; correct?
A. We had discussions with Mr. Paulson with regards to that property, yes.
Q. But -- But number one, you didn't submit the bid; right?
A. We did not submit a bid, correct.
Q. Number two, you didn't obtain the land; correct?

MR. KRUMMEN: We'll stipulate that if he didn't submit a bid, he didn't obtain the land.
MR. FARMER: Mr. Krummen --
Q. You didn't obtain the land; correct?
A. We didn't submit a bid so they didn't give us the land.
Q. Correct. And as of two weeks ago it's your testimony that you reviewed a file relating to that land that Rottlund didn't bid for and didn't acquire; correct?
A. Your question was is most -- how recently did I look at that file, and that was two weeks ago, but I had looked at that file, you know, probably dating six months ago.
Q. Why does that file still exist, sir?
A. Because we simply just pulled out a file that existed in the land development department that said "Plymouth" on it and that was one of the pieces of information that was in that file.
Q. Did you testify earlier that The Rottlund Company does not retain records for properties on which it, A, doesn't submit bids, and two, doesn't win based on its bid? Is that accurate?
A. I don't think that's accurate. What I said is we don't have a retention policy necessarily that

indicates that we retain all the records and that there's any -- a semblance of any order of how we retain records. There is no -- You know, it just happened to be in the file.
Q. So there's no rhyme or reason as to what you keep regarding land bid documents; is that correct?
A. The best that we can figure out, no.
Q. Now Mr. Palmiter left your company in the summer of 2001; is that correct?
A. I think I testified I believe it was May or June of 2001.
Q. And as we sit here today do you have any reason to believe that Mr. Palmiter had any involvement in -- in a bid relating to the Harvest Hills piece of property?
A. Richard may have been involved in discussions with the property owner while he was under employment with The Rottlund Company, but involvement of, you know, a bid prior to leaving our company I would say that, no. And if he was, again I'd be disappointed in that fact.
Q. And let me ask the same question, you're familiar with a -- the same series of questions, excuse me. You're familiar with a piece of land on which Town & Country Minnesota has built the

Providence Park development in Shakopee?
A. Yes.
Q. Do you know when Town & Country Minnesota acquired the land for that project?
A. I -- I really don't know off the -- you know, again I think it's probably the same, 2000-2001 timeframe.
Q. Was that a piece of land that you were aware of was up for sale at that point in time?
A. I was generally aware of it by a developer by the name of R. H. Development. We have done -- Excuse me, R. H. Helmer or Ron Helmer, I should say, excuse me, Ron Helmer of Helmer Development had been looking at that piece and had discussions with the property owner, but at that time we did not pursue that opportunity.
Q. So you were aware of that piece of land at the time it was on the selling block; correct? You personally.
A. Yes, yeah.
Q. And you were aware personally of the Harvest Hills piece of land at the time it was up for sale; correct?
A. Yes.
Q. Let me ask the same question for the -- the

piece of land in Lakeville, Minnesota in which Town & Country Minnesota built the Cornerstone Lake development. Are you familiar with that development?
A. Yes.
Q. Sir, do you know when Town & Country Minnesota acquired that piece of land?
A. I honestly don't know, but I would say it's probably late 2001, early 2002.
Q. Were you aware that that piece of land was up for sale?
A. I was generally aware of that general area along Pilot Knob Road as far as land opportunities, but not specifically that site, no.
Q. And you don't know --
A. We never submitted a bid, we never obtained any specific information regarding that site.
Q. Do you have any reason to believe as we sit here today, that Mr. Palmiter knew that land was up for sale while a Rottlund employee if in fact it was, and failed to apprise you, his boss, of that fact?
A. No. Again I would be disappointed if that was the fact, but no, I don't have any reason to believe that.
Q. Sir, are you familiar with a development in Lakeville Minnesota called Springbrook?

A. Yes, I am.
Q. And you're aware -- or do you know when Town & Country Minnesota acquired that land?
A. I think it's probably the same answer, probably 2000-2001.
Q. Were you aware at that point in time that that land was up for sale?
A. I had general knowledge of land that's up for sale, you know, generally in that area, in fact we're bidding on a piece of property that's right adjacent to that piece.
Q. Well let's just focus on this piece right now.
A. Sure.
Q. Were you generally aware at that time that that land was up for sale?
A. Not the specific piece of property, no.
Q. Okay. Do you have any reason to believe as we sit here today that Mr. Palmiter, A, was a Rottlund employee at that time, B, knew that that piece of land was for sale, and C, failed to apprise you, as his boss, of that opportunity?
MR. KRUMMEN: Could I hear that question back?
Q. I'll tell you what, let me break it down and avoid a compound question.

didn't know where the files were with regards to additional land opportunities, and we didn't realize that there was files, if it just said City of Plymouth on it, that had additional land opportunities in it, and we found those after the -- after the statement was made.

Q. "Plaintiff further states that, in general, it bid on or submitted development proposals for most significant land development opportunities that arose in the Twin Cities from 1997 through the present..." Let me stop right there.

Sir, did I just walk you through four developments; Harvest Hills, Providence Park, Cornerstone Lake, Springbrook, which Rottlund did not bid on?

A. Well for some reason or another in some of these cases we didn't have the ability to bid on them in some cases or didn't have knowledge of them, but what this indicates is that we have, because we're the largest builder here it would only make sense that if you're a broker or a seller that has land that you would bring that to our attention.

Q. Well let me stop you. Did the developments I just walked you through, you were aware that each of those was on the selling block; correct?

A. I didn't --
MR. KRUMMEN: Object as mischaracterizing prior testimony. You may answer.
A. I had knowledge of the fact that some of these sites were available, not all of them necessarily. As I indicated, Cornerstone Lake we didn't even look at that piece of property. Certainly Harvest Hills we had knowledge of that property. Providence Park in Shakopee, as I indicated in my testimony, I had knowledge of that. And then Springbrook in Lakeville, not that specific site but general knowledge of that area.
Q. And it's accurate to say Rottlund didn't bid on any of those pieces of property; correct?
A. We did not submit a written bid on any of those properties, that is correct.
Q. Well is there another way to submit a bid in your line of work?
A. Well there's discussions over the phone, yeah. I mean what's the property offered for, does that meet with our criteria we think the land is worth based upon competitive analysis of that area, what other land sold for, for example.
Q. Did you submit a development proposal on any of those sites?

A. No.
Q. Did you consider those significant land-development opportunities? And I ask you that as the president of The Rottlund Company of Minnesota.
A. Did we consider these to be significant land opportunities. I would say that certainly the Harvest Hills project and the Providence Park project could be characterized as being significant development opportunities, yes.
Q. And why is it that the others you would not consider significant?
A. Well just because of the relative size.
Q. And is there a -- an order of magnitude you can give me that renders one development significant and another not?
A. I'd say something that's over a hundred units would be significant, under a hundred units is probably not as significant. But, I mean, all are good sites, all are sites with close proximity to sites that we already are building on.
Q. Sir, was today the first time you became aware that there was a second round of bidding for the Hollander property?
A. I don't know if necessarily it was the first

just late to the -- you know, to the dance.
Q. But what you do know is that by the spring of 1999 there were at least seven bids submitted for that piece of property; correct?
MR. KRUMMEN: Object as lack of foundation as to this witness with Exhibit 145, if that's your reference.
A. I can -- I can -- I can only testify to what this particular exhibit indicates relative to this property, and -- that you provided to me somewhere.
Q. One of the things it indicates, sir, is that as of the spring of 1999 Rottlund was not even a player in the competition for this piece of property; correct?
MR. KRUMMEN: Objection as mischaracterizing the document. Objection, lack of foundation.
A. Yeah, and I would say one of the reasons we weren't a player is -- is first of all, you've had an opportunity to meet Mr. Whitten, I also have two other architects back in my office as well as five people in my CADD department. I have a significantly higher overhead for product development than some of the people perhaps that are listed on this list, which would include Town & Country.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation, and
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF TODD M. STUTZ, 30(b)(6)
VOLUME II, Pages 292 - 511

(The following is the continuation of the 30(b)(6) deposition of TODD M. STUTZ, taken pursuant to Notice of Taking Deposition, at the offices of Moore, Costello & Hart, 1400 Fifth Street Center, 55 East Fifth Street, in the city of St. Paul, state of Minnesota, commencing at approximately 9:23 o'clock a.m., June 11, 2003.)

A. I -- I believe we had direct communication with them, but that communication was not by myself, it would have been by Richard Palmiter or one of his staff members at that time.

Q. Did you ever get reports about what the city requirements was -- were from Mr. Palmiter or one of his staff members?

A. I'm sure in our, you know, formulation of an offer for the property that that was a factor that we considered.

Q. As you sit here today do you have any recollection of any of those city requirements or any of your knowledge of what was discussed between Rottlund and the city?

A. I really don't, other than I know that the city at that time was looking for affordable housing in all of their developments given the fact that they had been the subject of a lawsuit regarding affordable housing within their community and not providing affordable housing. And so they were subject to a lot of criticism by the Metropolitan Council at that time. We had recently concluded a single-family development in which they had allowed us to do smaller lots than would typically be required by the city ordinances and we received some

criticism for that in that the buyers took what were to be somewhat affordable, single-family homes and purchased every option we offered and priced those new units up to a point where they were no longer considered to be affordable and so we were criticized for that. The fact that it was not a requirement of the city, but it was something that they were looking for within their community given the past lawsuit they had been involved in, as well as criticism from the Metropolitan Council. So affordable housing was a component or a factor that we considered in formulating our offer for the Hollander property.

Q. Is there any other specifics that you recall about city requirements other than the fact that the city was looking for affordable housing?

A. No, other than they were looking for, you know, a mix of type of housing as --

Q. But you knew that from the Dahlgren concept plan.

A. Yes, yes. Yes, we did, yeah.

Q. I'm just focusing on city requirements, I apologize. I want to make sure I understand.

A. On the city, okay. Yeah, I don't recall anything other than I -- you know, again I know -- you know, I know the city, as indicated by the