Court File No. 01-1980 / ROTTLUND / Pinnacle
Krummen Affidavit dated September 8, 2004

# Exhibits R17.2

elected to not acknowledge that a builder has the ability to copyright a product. It's unfortunate that others have elected to look at our success with that product offering and in essence copy our product to appeal to the same market.
Q. Do you believe that Centex is -- has elected to copy Rottlund's product?
A. I don't really have an answer to that at this time. I don't -- I haven't really, you know, conferred with legal counsel on whether or not that would be, you know, an infringing product.
Q. Can you identify the builders who are currently building product that, at least as you've just testified, you believe they've elected to copy?
A. I would say that they're building a product that could be viewed as being substantially similar to ours, yes.
Q. How about that list, then? What builders are building product that is substantially similar to Rottlund product?
A. I would say that there's nothing that is the same as what is alleged as part of this case that would come as close as what Town & Country is doing.
Q. I didn't ask really whether or not they came as close. I'm asking you to give me your list of every

then after further investigation we determined that that property was the same property that Town & Country had purchased and had developed Harvest Hills on.

Q. If one wanted to get the whole universe of documents that existed regarding at least what you have left on property that you've bid but haven't actually purchased, what would that be? Is it -- Is there a file? Is it called something?

A. Yeah, I think as my testimony indicated earlier, we don't have a specific retention policy on land that we may bid on or land that may come to us that we just choose to pass on. Like anything, when a staff member leaves you very often there's files in his office that are probably less than a -- you know, less than organized, and so when Mr. Palmiter left us those files either were thrown in the wastepaper basket, disappeared somehow, or was placed in one of our lateral files with somewhat of a disorganized fashion and you have to dig to be able to find, you know, what you're really looking for if you're looking for something. Otherwise those files just sit there dormant and no one will ever look at them.

Q. When you say in someone's lateral files or disorganized, is that a particular person's office,

or just all over the office? Just so I understand.
A. Yeah, no. The files that Mr. Palmiter had, he actually had an office and then we reconfigured office space and moved those files, after he left, that were at least available, as well as others, into this -- a lateral file in our land development department, which were sort of the, you know, files of land that we had looked at at some -- at one point, or submitted bids on, or whatever. And some of it's in there, some of it's not in there. I know that we lose pieces of property that we may have bid on that don't exist in there any more, just sort of -- You're welcome to come look at the files if you'd like to, but it's -- you know, it's just one drawer full of maybe half, you know, the drawer full of just different cities with, you know, Plymouth, Coon Rapids, Blaine, and what's in those files you have to pull the file out and look at it and then try to figure out what it is. And in this case we found there was a Plymouth file that had the Merrill Paulson information in it.
Q. So the volume would be about a half of a file drawer full of stuff that you know has been retained --
A. (Nodding.)

Q. -- that falls into the category of documents related to bids submitted on property that Rottlund didn't end up purchasing?
A. I think that it relates to property that we may not have bid on or, you know, information that we may have collected from a city. Very often we go meet with the City of Plymouth, for example, or Blaine, or whereever, and we obtain copies of city ordinances, copies of other development proposals that are going forward if they have that in an organized fashion, and we just -- it ends up in a file someplace and there's that kind of information in those files.
Q. So the half a file drawer that you were describing that contains documents contains not only bids or letters of intent that were submitted on properties not purchased by Rottlund, but also other information about opportunities.
A. Yes, I'd say that's true. Yes.
Q. Okay. Can you tell me what Rottlund projects are in close proximity to Town & Country projects where they're building their Homestead Collection?
A. Sure. Fire away?
Q. Fire at will.
A. Harvest Hills. We have a project called The Reserve, which is located in the City of Plymouth

which is a pretty short distance away from Harvest Hills.

We have a project located in the City of Chaska called Clover Ridge, and it's our understanding that Town & Country will be developing their Homestead Collection on that site. That's -- Their site is currently being graded with utilities being installed.

Q. Do you know what the Town & Country Homes site is called?

A. I don't know what they're calling it, no. It's o -- It's generally in the Clover Ridge/Clover Field development area, and I don't -- not sure what the name of it is. I referred to it earlier I think in a -- my deposition, I may have, as the Kerber property.

Q. I'm sorry, the what?

A. I think it's Kerber property.

Q. Can you spell that?

A. I believe it's K-E-R-B-E-R.

Q. Are there any other?

A. Yes, Cornerstone Lake.

Q. And that's in close proximity to what Rottlund --

A. To our Vermillion Grove development.

Q. What city is that in?

A. That's located in the -- Sorry.
Our development is located in the City of Farmington called Vermillion Grove. Their development called Cornerstone is located in the City of Lakeville. But again it's -- you know, it's in close proximity, probably -- I would say within probably three miles of our site.
Q. How far apart is the Kerber property from Rottlund's Clover Ridge project?
A. A hundred feet.
Q. How far apart is The Reserve project from Town & Country's Harvest Hills project?
A. I would say it's probably three miles also.
Q. Are there any others?
A. The Spring -- I can't remember the name. I want to call it Springbrook, located in the City of Lakeville being developed by Town & Country as their Homestead series is also in close proximity to our Vermillion Grove site in Farmington, and I'd say there is approximately probably five miles apart.
Q. Any others?
A. I would say that that would be it.
Q. Is the Town & Country Homes Centennial Crossing project in close proximity to any Rottlund project?
A. Yeah. The developments I discussed are ones

that are currently selling in or under way where there's direct competition currently where I know for a fact that we have lost buyers to Town & Country based upon discussions with my salespeople, and then also as reported as our weekly activity report.

Centennial Crossing is a development that's complete, and that was in close proximity to our Rush Creek development in Maple Grove. Both those developments are complete.

Q. How far apart was the Centennial Crossing development and the Rush Creek development?

A. I'd say approximately a -- probably a mile and a half.

Q. Does Rottlund have any project close to the Providence Pointe project, Shakopee?

A. The closest development we would have would be in the City of Chaska.

Q. How far apart is that?

A. I would say those are -- those are probably roughly ten miles apart from each other.

Q. Do you call that in close proximity then, or not?

A. I would say that generally the river itself, with the Minnesota River or the Mississippi does act as a little bit of a barrier in terms of perception

of market area and trade area. I would say there probably is not competition directly.
Q. When did Rottlund acquire the property that became its Reserve development?
A. We acquired that property in, I believe, 2001.
Q. And what type of product is being built in The Reserve?
A. The Reserve is roughly 1,000 housing units, and we are building our Villa II product, we're building our Tradition series single-family homes, we're building our Classic Row Townhomes, we're building our Gable Townhomes, we are building our Garden Homes, we are building our Garden Townhomes, we're building our Row Craftsman homes, as well as we'll be building a larger rambler townhome product which has not yet been developed. And then also have -- we sold off --
Q. Is that your new senior product, the larger rambler townhome?
A. No, no, no, Just be a rambler. It would be a rambler townhome, single level.
Q. Something different than the senior --
A. Something different, yes.
Q. -- housing. Okay.
A. Yes. And then also we sold off roughly, I

believe it was 368 units of apartments that were part of the property to North American Properties.
Q. So Rottlund isn't building those.
A. No. We acquired the land and we developed the land and then we sold that land off.
Q. When did Rottlund acquire the property that became its Clover Ridge development?
A. Also in 2001.
Q. By the way, do you know what month in 2001 Rottlund acquired The Reserve property?
A. Yeah, and The Reserve property that might have even been the latter part of 2000, when I think about it, but I don't -- I don't recall. I mean I don't --
Q. November/December 2000?
A. I don't recall specifically when we acquired it, no. Certainly we can provide that information to you.
Q. How would you get it?
A. I would pull out my closing book that shows when we closed on the property.
Q. And what type of product is being built in Rottlund's Clover Ridge development?
A. At Clover Ridge we're building our Tradition series single-family homes, we're building our Urban Row Townhomes, we're building our Garden Homes, and

we're building our Villa II homes.
Q. How many Villa II units are you building at The Reserve?
A. I don't recall the specific number, I wasn't prepared to testify on that today. Roughly a hundred units.
Q. Is all we'd need to do is look at the land plan for that to determine?
A. That would be correct, yes.
Q. Okay. Do you know how many Villa II units you're building at Clover Ridge?
A. Again it's roughly a hundred units.
Q. And again if we just looked at the land plan we'd be able to determine the exact number?
A. Yes, we would. Yes.
Q. And when did Rottlund acquire the property that became Vermillion Grove?
A. Vermillion Grove, again roughly the same timeframe, about 2 -- early 2000 -- late 2000, early 2001.
Q. What product is being built at Vermillion Grove?
A. Building our Garden Homes, our Garden Townhomes, our Villa II homes, and then in addition to that we developed single-family lots and sold those single-family lots off to other builders.

Q. So Rottlund isn't building any single families?
A. That's correct.
Q. Garden Homes is a townhome?
A. That's correct, yes.
Q. And when did Rottlund acquire --
Well let me first ask you, do you know how many Villa II units are being built at Vermillion Grove?
A. Approximately 150 units.
Q. When did Rottlund acquire the property that became its Rush Creek development?
A. I'd say we acquired that property in 1997.
Q. What type of product is being built at Rush Creek, or was built?
A. Yeah, I think I testified to that earlier, but our Villa II townhomes, our Village homes and our Lodge series single-family homes.
Q. Do you know how many Villa II units were built at Rush Creek?
A. Approximately 100.
Q. In responding to questions that were asked of you by Mr. Farmer you stated, and I'm looking just right at your deposition transcript so I'll tell you what you said. You said: "I have a significantly higher overhead for product development than some of the people perhaps that are listed on this list,

which would include Town & Country." And what I would like to know is: How do you know if you have a higher overhead for product development than Town & Country?
A. I guess there's two things. First of all, I know within this division that I'm the only large builder here that has three architects on staff as well as five CADD draftspeople on staff, and so that by itself I know that I have more people, you know. And associated compensation, as well as benefits, would say to me that I have a higher overhead for that. Also, if you're developing all new product that is the reason why you have to have that staff. If you're not developing all new product and you're taking some other -- someone else' product, like the Villa II product, and copying that product, the cost involved in doing that would be significantly less than starting from a bare piece of paper.
Q. Do you know, or is it your contention that Town & Country pays less for its product-development services, consultants, because they don't have them in-house, than Rottlund pays for its in-house people?
A. No, I think my testimony is the fact that if you're starting with a blank piece of pro -- piece of paper versus starting with someone else's product,

that it costs more to develop from a blank piece of paper than it does from someone else's product.

MR. FARMER: Would you read the question back, please?

(Record read by the reporter.)

MR. FARMER: Thank you.

Q. Do you know the answer to that question?

A. I think I already provided what my answer is to that question.

Q. So you don't know one way or another whether or not Town & Country's product-development costs are higher or lower than Rottlund's?

A. In my opinion it's common sense if you're starting from a blank piece of paper or if you're starting from someone else's documents, plans in developing product, that the blank piece of property should be more expens -- blank piece of paper is more expensive.

Q. And I know that that's a general statement. I'm asking in -- this specifically: Do you know or have any information that Town & Country's product-development costs have been less than Rottlund's product-development costs?

A. Besides a layperson's sort of common-sense approach to answering that question, I don't have any

specific facts or have not completed an analysis that would indicate that our expenses for developing product is less than what -- or more than what Town & Country's is.

Q. So you don't know what Town & Country has paid for its product-development services; is that correct?

MR. KRUMMEN: I'll object as calling for information that's been designated as attorneys' eyes only. You may answer the question.

A. I have not had an opportunity to review, because of its designation of attorneys' eyes only, the contract that may exist between Town & Country, Pinnacle, Bloodgood group or BSB of Iowa and what the financial consideration was for the development of the Homestead series for Town & Country.

Q. You're aware, aren't you, sir, that BSB gave permission to all the designated 30(b)(6) witnesses to view documents that were marked attorneys' eyes only?

A. I'm not aware of that. I have not looked at that contract.

Q. No one ever made you aware that the 30(b)(6) witnesses that were designated by Rottlund could view any document that BSB marked as attorneys' eyes only?

indication of anything that would tell me who took the photo, even in our files in the office. I would have to go back and find a bill or talk to my person in my ad -- you know, ad agency --
Q. Who would that be?
A. -- in-house. Jeff Anderson. He -- Jeff is -- as of a week ago is no longer with our company, but --
Q. Where did Jeff go?
A. Jeff started his own agency.
Q. In providing answers to some of the questions that were previously asked to you about sales and closing projections you indicated that you routinely provide that type of information to your lender. Who were you identifying? Who's your lender?
A. Our lender is Fleet Boston.
Q. Is that it, just one lender, or are there more?
A. Just one lender.
Q. Okay. Do you know what your financing or lending arrangements are with Fleet Boston, or is that something that Mr. Kahn knows about?
A. Mr. Kahn would be best to answer that question.
Q. Also in response to some questions that you were being asked about sales and closing objectives you indicated that they're often driven based upon land

inventory that's available and so to the extent that those objectives are set, they would change if there was additional land available to us. Is that accurate testimony?
A. That is accurate, yes.
Q. Can you explain what you meant by that?
A. What I meant by that is if we have more land available to us that's available that can come online to provide inventory to our company, that we will adjust our volume upwards to take into consideration that additional land inventory.
Q. So the more land you have in your inventory, the higher your sales and closing objectives are?
A. That would be correct, yes.
Q. Have you met your sales and closing objectives every year since 1997?
A. I don't believe so, no.
Q. What years have you failed to meet your sales and closing objectives?
A. I can only comment for the last -- the previous two years, that we hit our sales and closing objectives for the previous two years, and that would be fiscal year which ran from April 1st of 2002 through March 30 -- excuse me, April 1st of 2002 through December 31st of 2002, which was a nine-month

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation, and
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF TODD M. STUTZ, 30(b)(6)
VOLUME III, Pages 512 - 790

(The following is the continuation of the 30(b)(6) deposition of TODD M. STUTZ, taken pursuant to Notice of Taking Deposition, at the offices of Winthrop & Weinstine, P.A., 225 South Sixth Street, Suite 3500, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:05 o'clock a.m., August 5, 2003.)

Q. But you're not able to tell me as you sit here today what that additional capacity was, you just say that there was some additional capacity but you can't tell me how much.

A. Again, because there's so many variables involved in that -- that calculation, at this point I can't tell you, no.

Q. If Rottlund had the capacity to construct or develop more homes in 1998, why didn't it do that?

A. Because at that time, land inventory, for example, there may have not been a piece of land that we chose to purchase, or others, such as Town & Country, may have purchased that land. And so the available land inventory to build the product that we chose to build at that time wasn't available.

Q. According to the numbers listed on page 3 of Exhibit 187, this annual report, there are at least, let's just look at the total numbers on the bottom, 2,142 sites available for construction and development. Is that right?

A. Yeah, the 2,142 lots that are available for construction represent what's -- what's available in five different markets. The Minnesota market, which I've testified earlier to relative to my position being division president, had 911 lots available.

Q. Question, do you --
Let me just ask the question again, maybe you can change your answer. Do you know what other developments where Rottlund has built the Villa II products that it has been done in phases? I think you started with Vermillion Grove.
A. Vermillion Grove.
Q. Clover Ridge.
A. Clover Ridge.
Q. Rice Creek?
A. Rice Creek.
Q. Walnut Grove?
A. Walnut Grove was not a Villa --
Yep, Walnut Grove.
Q. Any others?
A. There's probably others but that's what just -- that's what comes to mind. Club West in Blaine.
Q. Which is still ongoing?
A. It's still ongoing.
Q. Do you know what phase they're in at Club West?
A. Third phase.
Q. Do you know how many of the phases included Villa II's?
A. Three phases.
Q. All three of them have included Villa II's.

A. Yes.
Q. Do you know how many total phases there are going to be for Club West?
A. Of Villa II's?
Q. Yes.
A. At this point there's probably four phases.
Q. Any other developments including Villa II's that have been done in phases?
A. In phases. I don't recall any other in phases, no.
Q. Rice Creek. Do you know when Rott --
Was Rice Creek a land purchase or an option?
A. Rice Creek was an option.
Q. Do you know when --
Did Rottlund assign the entirety of the land under the purchase agreement to an option partner, for lack of a better term?
A. Yes, we did.
Q. In all of the developments that you talked about having done in phases, are there any in which Rottlund acquired the land for a subsequent phase after it started construction?
A. I might want to retract regarding Rice Creek. I don't -- I guess I don't recall... I don't recall whether or not it was done in -- under an option or

A. I honestly don't recall, but it was 1999-2000 is sort of the general timeframe.
Q. And you don't remember what proportion of the Villa II's were in each phase.
A. I don't recall how the phasing worked here.
Q. Was Rush Creek built in two phases?
A. The Villa II area at Rush Creek I believe was built in one phase. Other portions of the development I believe were built in two phases.
Q. Do you know how many unsold lots for Villa II's currently exist in Vermillion Grove? "Lots" is probably the wrong term.
A. Units.
Q. Units. Do you know how many -- thanks -- how many unsold Villa II units exist at Vermillion Grove?
A. You know, I don't -- there's probably approximately 40, 50 units.
Q. Unsold.
A. Unsold.
Q. Do you know how many unsold Villa II units there are in the Club West development?
A. As my testimony indicated earlier, there's four phases at Club West. It depends upon what phase you want to pick.
Q. Currently.

A. But I think Phase I and Phase II are almost a hundred percent sold out. And then in Phase II I think there's approximately a hundred -- a hundred units.
Q. In Phase II?
A. In Phase, excuse me, III and IV.
Q. Per phase or total?
A. Total.
Q. So approximately 50 units in each phase?
A. I don't remember. You know, honestly I don't recall.
Q. But you believe there's approximately a total of a hundred Villa II units in Phase III and Phase IV?
A. That would be my guess at this point.
Q. Do you know how many Villa II's were built in Phase I of the Club West development?
A. No, I don't recall how the phasing worked there.
Q. Do you know the total number of Villa II's that have been built at Club West to date?
A. Again to the best of my recollection I believe it's roughly 120 units there.
Q. And that's between Phase I and Phase II.
A. That's correct, yes.
Q. Do you know when Rottlund began construction of pha -- of Villa II's in Phase I at Club West?

A. 2002.
Q. And there were 80 total available --
A. Approximately that number, yes.
Q. And only 50 of those 80 have actually been built and sold?
A. About 50 units have been sold, some which have not been built.
Q. And 30 remain unsold.
A. That's correct, roughly. Those are approximate numbers.
The other developments which we've already, I believe, discussed, would have been Clover Ridge in Chaska. Those would be the only other two in addition to the Club West development in Blaine and the Vermillion Grove development in Farmington. And we have one other development which we have a purchase agreement on which we have not yet closed on in the City of Blaine in a development called The Lakes, and that will include Villa II develop -- units also.
Q. When did Rottlund enter into the purchase agreement for The Lakes development in Blaine?
A. In early 2003, I believe.
Q. When Rottlund was bidding on the Hollander property did it already have an option partner lined

they weren't confused over the source of origin. Do you understand that?

A. I understand. I mean the source of origin is a concept I'm concerned with in what that means. Now, you know, does Town & Country do a good job of marketing their product in terms of merchandising it, signage, their collateral pieces, whether it's marketing pieces, wherever they advertise, in print or whatever media source they use? They do a good job of that and getting that Town & Country name out there. And I have no problem with that concept, that -- that people know that it is a Town & Country first and then they're selling a product and what is that product. The concern I get is when they get to the product and they're comparing that to our product that there's not enough differences in the product and so that the buyer is confused on what product they should purchase.

Q. Are you aware of anything that Town & Country has ever done which causes you to believe that Town & Country is attempting to pass itself off as Rottlund?

MR. KRUMMEN: Objection, vague.

A. I don't --

When you say pass yourself off as. No, I don't think -- I think that Town & Country feels they have

a good name and I don't think they're trying to change their typeface or change their logo or change their slogan or change anything about what Town & Country is about as a -- as a name. I don't -- I don't think that that's the case. I think it's a case of where they found a need to be successful in this marketplace and there was pressure put on them to be successful in this marketplace, and the easiest way to be successful in this marketplace is to copy the most successful product. That's my conclusion.

Q. The other people here that -- the names that you gave me here, Falk, Swanson and Danielle Kern, are -- are those each instances where that person has knowledge of either themselves or someone else being aware of the similarities between the products, or are they situations where they encountered someone who thought that a Town & Country product was a Rottlund product or vice versa?

A. In the case of Danielle Kern, she was our sales representative out at The Reserve in Plymouth, which competes directly with the Harvest Hills development of Town & Country in Plymouth. And she had indicated that, you know, that there was a very strong similarity between what she was selling and what Town & Country was selling. And that she was encountering

interest to us where we think we can be successful, that's the first thing we look at. My testimony earlier said in the case of land we have the ability to do option financing and a lot of our land, as provided as part of discovery that we currently have, is under option agreements, which requires very little capital investment. And land is key in this business and any builder, any developer will tell you that. So I've never, ever ran across a piece of land where I've really taken that in consideration.

Q. When deciding whether to bid on a certain piece of property does Rottlund consider its current available cash or cash equivalents?

A. Again that's not something that I as the division president really worries too much about. I'm sort of, maybe, you know, of the attitude that cash and credit facilities and all of those are things that can all be worked out, that there's not really an issue because of, you know, the way that we finance things through option agreements for land, the way we work with our vendors. If there is ability to get a return on an investment, and I think if -- you know, if you were to analyze where our return investments are as a company we probably have some of the highest, you know, in the industry. If

there's an ability to get a return, there's a way to get it done.

Q. You sometimes compete with your option partners for purchases of land; is that true?

A. In some cases, yeah. I mean they're -- We'll talk to them, but in some cases there may be land inventory that they may choose to purchase and maybe provide inventory to other builders, like Centex, for example, and so therefore, yeah, we at times compete.

Q. And just so I understand your testimony, Rottlund's practice is not to contact an option partner at the time of the bid.

A. That would be correct, yes.

Q. But yet it's your testimony that you don't consider Rottlund's own means to purchase outright in terms of available cash or credit facility when deciding whether or not to put in a bid?

A. I don't consider that, no. Because it -- You know, either we're going to purchase it with cash or we're going to use an option or a straw man.

(Interruption by the reporter.)

A. Or a straw man, I'm sorry, that's what we refer to it as, in purchasing the land. And there's always -- again, there's always a way to get a transaction done. And it may require a significant