Exhibit R32

**Supplemental Expert Disclosure of Albert Bloom, A.I.A.**

Since my original disclosure of August 15, 2003, additional evidence and issues have come to my attention. Attached as Appendix One is an updated list of documents and testimony I have considered in preparing this supplemental disclosure. This supplemental disclosure will address the new evidence and issues and is intended to supplement my original disclosure.

I have reviewed Tim Whitten's deposition testimony, wherein he indicated that there was no methodology by which the gestalts of two townhomes could be compared. See Tim Whitten's deposition at pages 82-83. I am unaware what definition Mr. Whitten, or Rottlund, gives to the term "gestalt." In this report, and in my initial report, I use the term "gestalt" to mean the total look and feel of the townhome, including individual design elements as well as how those elements are combined together. I have compared the gestalts of various townhomes because Rottlund has indicated that their only copyright claim in this litigation is that the gestalt of the Homestead Collection and the Chateau Collection is substantially similar to the gestalt of the Villa II. My comparison of the gestalts of these townhomes should not be construed as indicating that the gestalt theory of copyright infringement is legally viable.

As the factual investigation in this matter has not concluded, I reserve the right to amend, supplement or clarify my opinions based on information discovered after the date of this supplemental disclosure.

EXHIBIT NO. 389
6-9-04
P. MAHON

**Chateau Collection v. Homestead Collection**
**8 Unit Building**

These two townhomes are not substantially similar. The following are some examples of the differences between the two townhomes.

**Exterior**

The overall massing of Chateau is different than the Homestead. Chateau uses double gables in the front which are pushed to the non-demising wall side of the garage as opposed to grouping the double gables at the demising wall. The window size and number are different within the double gables, as is the layout and size of the windows for the 2 story spaces. The use of the 'bay' configuration completely changes the form of the end corner of Chateau. The side elevations do not use a turned gable condition, but rather, a variance of roof forms which change the character of Chateau's end elevation. Chateau's entry roofs at the interior units cover the entire width of the entry niche and are not continuous with the garage roof as shown on Homestead. Transom glass is used over the entry doors and sliding glass doors at Chateau and the side elevation entry doors have shed roofs as opposed to gables. The brick wainscot is higher in Chateau and it is evident that the Chateau is more expensive to build than Homestead.

**Interior**

End Unit A v. End Unit 1482

First Floor

The entry sequence is different for these plans. The entry door swing and location of the entry closet in Chateau will direct vision to the dining/kitchen area while the Homestead's entry will direct the line of sight to the stair and living area. The spatial feel will be totally different when entering the Chateau with a 9 foot ceiling as opposed to Homestead with a 2 story space. The stair location in the Chateau is not a visual feature as it is in Homestead. The Chateau's dining area will have a completely different feel due to the circulation pattern to the kitchen and the absence of a sliding glass door from the dining are to the patio. The living area will feel totally different because of its different shape and size as well as the smaller volume ceiling space. Chateau's 'bay' is unique in this context and is the introduction of a unique form for this product type. The location of the fireplace in this 'bay' has a completely different orientation than Homestead and does not have built-ins on the side. The galley kitchen will appear visually different as will the location and orientation of the breakfast bar. There is not a breakfast area in Chateau and the circulation through a wide hall will feel different than Homestead. The powder room is a different shape and size and the Chateau does not have a furnace and water heater space on the first floor. Chateau is 34 feet wide and 33 feet deep, while Homestead is 33 feet wide and 35 feet deep.

<u>Second Floor</u>

Stairway access with a 'U' shaped stair at the side of the plan will feel different than Homestead's straight run stair which is centrally located. Access from the stair to the loft will feel and look different because of the stair location and length of travel to the loft. The 2 story volume space is shaped differently and is smaller than Homestead. Chateau's master bedroom and closet is

shaped differently and is a different size. The bathroom has the tub and shower in a separate room which will change the feel of the space. The shape and size of Chateau's loft as well as the overlook will feel different. The furnace and water heater in Chateau are in the 2nd floor utility room, as opposed to a first floor location in Homestead.

The overall gestalt of Chateau's Unit 'A' will feel completely different than Unit 1482 of the Homestead collection.

Interior Unit 'B' v. Interior Unit 1381

First Floor

Chateau's entry door opens in to a closet which will feel different than Homestead which opens adjacent to the closet and has a better sight line to the living/dining space. The 2 story volume opening in Chateau is a different length than 1381. The switchback stair at the rear of the unit will feel different than Homestead's centrally located straight run stair. The 'U' shaped kitchen and breakfast bar orientation will feel different than Homestead's modified 'U' with a corner sink. The optional fireplace and/or media niche locations are different. The powder room is a different shape and size than Homestead's. Chateau also includes a storage room which is not offered in Homestead.

Second Floor

Chateau's 'U' shaped stair will create a different feel accessing the second floor. The access to the bath is outside the master bedroom and the tub and water closet are in a separate

compartment. The loft location and access is different due to the stair configurations and there is a second floor mechanical room for the furnace and water heater adjacent to the washer/dryer. The gestalt of Chateau's Unit 'B' will feel different than Homestead's 1381.

<u>End Unit 'C'</u>

This is a front loaded entry plan which does not exist in the Homestead Collection.

The Chateau Collection has many differences from the Homestead Collection, some of which are listed here. Both townhomes combine standard features in standard arrangements. While the first floor zoning of spaces is similar in both plans, (and very typical of back to back townhomes), the overall gestalt between the two townhouses will feel completely different due to the spatial layouts of the plans and the exterior massing of the buildings.

In comparing the Homestead Collection with the Chateau Collection, there are a number of differences in the ways in which standard features, and standard arrangements of standard features, are expressed in each townhome. However, during the course of BSB's development of the Homestead Collection design, BSB and TCM considered a number of alternative layouts for these standard features, and some of the alternatives that were considered and rejected in the Homestead Collection are found in the Chateau Collection. As discussed in my initial report, this process of considering and rejecting design alternatives is part of the process of independent creation, and bolsters my conclusion that BSB independently created the Homestead Collection.

**Chateau Collection v. Villa II**
**8 Unit Building**

These two townhomes are not substantially similar. The following are some examples of the differences between the two townhomes.

**Exterior**

The overall building massing is different between Chateau and Villa II. Chateau uses a different gabling system for the front elevation which changes the profile and massing. The use and grouping of the windows within the gables, changes the feel of the building, as does the use of craftsman type window grids. Entry roofs for the interior units are wider and cover the entire entry recess. The end corner 'bay' is a unique feature to Chateau and the location and size of the windows completely changes the exterior feel of the elevation. The side elevations have a different feel because Chateau does not have turned gables, uses shed roofs rather than gabled roofs over entries and sliding doors, and has transom glass above entry doors and sliding glass doors.

**Interior**

End Unit 'A' v. End Unit 'C'

First Floor

Entering the Chateau's 9 foot ceiling will feel totally different than Villa II's 2 story volume space. Line of sight from the entry of Chateau is directed at the dining and kitchen area because of the entry door swing and closet location as opposed to Villa II where line of sight is directed to the 2 story living space and central stair. The circulation path to Chateau's 'U' shaped stair goes

past the kitchen through a wide hall and will have a totally different feel than Villa II's straight stair. The living area with 'bay' will live and feel as two spaces due to the location of the second floor above and the smaller area of 2 story volume. The fireplace in the bay is in a completely different location and will have a different feel. The dining room will feel and function differently because of the access to the kitchen and the lack of a sliding glass door to the patio. The galley kitchen in Chateau has a different shape and size than the Villa II's 'L' shaped kitchen with optional island. The Chateau's powder room is more square in layout than Villa II's elongated rectangle. Chateau is 34 feet wide and 33 feet deep, while Villa II is 32 feet wide and 34 feet deep.

Second Floor

The 'U' shaped stair access will look and feel different from Villa II's straight run stair. Access from the top of the stair to the loft will feel and look different because of the stair location and length of travel. The 2 story volume space is smaller and differently shaped in Chateau. Chateau's master bedroom and closet is shaped and sized differently than Villa II's. The bathroom has a separate room for the tub and water closet. The furnace and water heater are on the second floor along with the washer/dryer.

The overall gestalt of Chateau's Unit 'A' will feel completely different than Villa II's Unit 'C'.

Interior Unit 'B' v. Interior Unit 'D'

First Floor

The Chateau's 2 story volume space at the entry will feel totally different than Villa II's 9 foot ceiling. The switchback stair at the rear of the unit will feel totally different and will change the circulation pattern through the dining area. Chateau's 'U' shaped kitchen has a different feel than the Villa II's 'L' shaped kitchen with optional island. The breakfast bar will have a different feel facing the switchback stair as opposed to being open to the dining area. The fireplace and media niches are in different locations. The powder room is a different shape and size, and Chateau offers a storage room, while Villa II doesn't. The Chateau footprint is 33 feet deep, while the Villa II is 34 feet deep.

<u>Second Floor</u>

Chateau has a 2 story volume with a loft overlook while Villa II has no 2 story volume space. Shape, size and access to second bedroom is different in the Chateau. Shape, size and access to the master bedroom is different, and occurs from a hallway in the Chateau as opposed to from the exercise area in Villa II. Laundry is in a room in Chateau as opposed to a closet in Villa II. Chateau has the furnace and water heater in a room on the second floor. Access to the bath is from the outside in the master in the Chateau and the tub and water closet are in a separate compartment.

The gestalt of Chateau's Unit 'B' will feel different than Villa II's Unit 'D'.

**<u>End Unit 'C'</u>**

This is a front loaded entry plan which does not exist in the Villa II.

The Chateau Collection has many differences from the Villa II, some of which are listed above. While the first floor zoning of spaces is similar in both plans, the overall gestalt between the two townhomes will feel completely different due to the spatial layouts of the plans and the exterior massing of the buildings.

There are some similarities between the Villa II and the Chateau Collection, just as there are some similarities between the Villa II and the Homestead Collection. However, the similarities between these units are no more than one would expect given the design limitation facing back-to-back townhomes. It would be extremely difficult, if not impossible, to design a commercially successful back-to-back townhome that did not share some elements in common with the Villa II, the Chateau Collection, or the Homestead Collection. Additionally, as noted in my initial report, many of the elements which these townhomes share in common have been used by BSB (and other designers and builders) for years. See my initial report at pages 12-16. Furthermore, all of the elements which these townhomes share in common are standard features, including the standard arrangements of standard features found in both townhomes.

**Exterior Unit 'C' Villa II v. Interior Unit 1381 Homestead**

In his deposition on August 14, 2003, Tim Whitten testified that the interior unit of the Homestead Collection was a direct copy, with minor changes, of the Villa II end unit. See Tim Whitten's deposition at page 958. No transcript of this testimony was available to me at the time I authored my initial disclosure, and this testimony makes it necessary to compare the gestalt of the Villa II end unit with the gestalt of the Homestead Collection interior unit, a comparison I did not make in my initial report. These two townhome units are not substantially similar. The following are some examples of the differences between the two townhome units.

First Floor

Villa II's side entry as opposed to Homestead's front entry will totally change the perception and feel of the interior space. Villa II's side entry sight line is of a straight run stair and 2 story living room while Homestead's front entry sight line looks towards the rear wall of the living/dining area. The dining area of Villa II is larger than Homestead's, and the sliding glass door will totally change the perception of the size of the space. Villa II's kitchen has a sink oriented with a sight line to the sliding glass door which will make the space feel larger as opposed to Homestead's kitchen with a corner sink facing a wall. Villa II's kitchen is 'L' shaped with an optional island while the Homestead's kitchen has a different work triangle for appliances and has a separate breakfast area. The living rooms will have a completely different feel due to the position of windows on two walls in Villa II and the location of the optional fireplaces.

The entry sequence from the Villa II garage is directly into the kitchen while the Homestead has a short hallway. The stairway protrusion into the Villa II garage will change the physical

appearance and interior usability of the space due to headroom clearance. The articulation of the front wall of Homestead and the second floor set back over the garage, as opposed to a cantilevered second floor in the Villa II with a flat front wall, will change the feel of the exterior elevation.

Second Floor

The Villa II loft is in the front of the unit and overlooks the 2 story open space while the Homestead loft is to the rear and overlooks the 2 story open space to the front. These spaces will feel completely different due to the addition of side windows in the Villa II and the longer length of the railing at the loft.

The perception and feel of the hallway in Homestead adjacent to the stair leading to the loft will have a totally different feel than the hallway and circulation in the Villa II. The Homestead laundry is in a separate room as opposed to a closet. Villa II's bath has a separate shower and tub while Homestead has only a combination tub/shower as standard. Homestead has a separate compartment for the water closet with an optional door while Villa II has a low wall separating the water closet from the vanity.

The individual spaces are standard features which are assembled according to building code requirements for light, ventilation and egress and for functionality. While the layout of the individual spaces on the first floor fall into the same zones, the gestalt of these spaces will feel different due to the reasons listed here. The zoning in these units is no more than a standard arrangement of standard features.

**Jerry's Homes**

Bent Tree Villas 7/12/96 v. Longview Townhomes 3/11/97

Johnston, Iowa

Revisions to the working drawings included changing the name of the project to Longview Townhomes from Bent Tree Villas, moving the water heater in Unit 1 from the washer/dryer closet to the furnace closet, moving the entry closet into the dining area approximately 2 feet, and revising the foundation from a thickened slab to a frost wall under the house to garage separation wall.

As with the Homestead Collection, BSB went through the typical design process (as described in my initial disclosure) when creating the back to back townhome for Jerry's Homes. The progress of the design, receipt of comments from the builder, and revisions to the drawings are what one would expect in a case of independent creation. It is my opinion that BSB independently created this back to back townhome. As I indicated in my initial disclosure, it is common for builders to send their residential architects marketing materials from those builders' competitors. The receipt of these marketing materials is not evidence of copying, or an intent to copy. The fact that BSB, or its clients, have communicated ideas to each other, or to third parties, using these marketing materials has no bearing on the ethics of BSB or its architects. This practice is common among residential architects.

**Midland Homes, Inc. 11/2/94 Greystone T.H. v. New Villas A/B**

These two townhomes are not substantially similar. The following are some examples of the differences between the two townhomes.

**End Unit B v. End Unit A**

First Floor

The shape of the footprint is different with the Midland living room offset as opposed to a straight end wall in New Villa. The stair direction in these two plans are 90° from each other, creating a totally different feel to the space. The kitchen sink in Midland has a sight line to the sliding glass door which will visually expand the space, as opposed to New Villa's kitchen sink which faces a wall. Powder rooms are a different shape and size and Midland has a desk area adjacent to the garage access.

Second Floor

The Midland master is larger than the New Villa, and positioned over the garage as opposed to over the dining area. The landing and hallway in Midland will feel totally different than New Villa because of the angled direction from the head of the stair and the enclosure of walls. New Villa has a loft space which overlooks the open living area visually expanding the stair opening and the second floor, while Midland does not have a loft space. The perception of the volume living space will be totally different because Midland's stair is going up in the same direction as the volume ceiling in the living room, and New Villa's stair is going up at a right angle to the

direction of the volume and is not inside the volume space but under the second floor. The Midland second bedroom has a different shape and will have a different feel due to the length of the angled wall. Midland's bathroom has the tub and water closet in a separate compartment.

**Interior Unit A v. Interior Unit B**

First Floor

The stair location in Midland runs front to back adjacent to the garage, which is totally different from New Villa, which runs side to side adjacent to the rear wall. The kitchen layouts will feel totally different with New Villa's having a sight line to the front windows while Midland's looks into a wall. The Midland garage access enters into a small hallway while New Villa's enters directly into the kitchen. There is a mechanical room in New Villa while Midland has a closet for the furnace and water heater. The fireplace locations are on opposite sides of the living area and Midland has an open 2 sided fireplace as opposed to a front open fireplace.

Second Floor

The Midland master is much smaller than the New Villa's due to the stair location. Midland's master closet will feel much larger than New Villa's. Midland's bath has a separate compartment for the tub and water closet and a laundry area adjacent to the bath.

**Exterior**

The roof massing and use of materials on the side elevations will have a different feel because of New Villa's cantilevered bedrooms, use of a high brick wainscot, projected chimney chases,

steeper roof pitch and flat first floor footprint at the side wall. The front elevations are similar and like other back to back townhouses, but New Villa will feel bigger due to the steeper roof pitches for both the front to back shed roofs and the side to side gable roofs. New Villa also uses more brick accent material and has fireplace chases projecting through the roof as well as on the sides.

These two projects are similar only because they are back-to-back products. While the zoning of first floor spaces are in the same location, the stairs and entry sequences will feel different, and generate different second floors. As with the Homestead Collection, BSB went through the typical design process (as described in my initial disclosure) when creating the back to back townhome for Midland Homes. The progress of the design, receipt of comments from the builder, and revisions to the drawings are what one would expect in a case of independent creation. It is my opinion that BSB independently created this back to back townhome. As I indicated in my initial disclosure, it is common for builders to send their residential architects marketing materials from those builders' competitors. The receipt of these marketing materials is not evidence of copying, or an intent to copy. The fact that BSB, or its clients, have communicated ideas to each other, or to third parties, using these marketing materials has no bearing on the ethics of BSB or its architects. This practice is common among residential architects.

**Sprinkler Room**

The exterior sprinkler rooms as shown on both Town & Country's Homestead Collection and Rottlund's Villa II is a technical response to the need of housing the incoming sprinkler piping and providing easy access to the Fire Department in case of a fire. The room is utilitarian and is meant to provide adequate space for incoming piping and clearances to the system's functions. BSB does not have in house technical expertise in the design of fire sprinkler systems and relies on firms and vendors outside of their office for advice on such matters as the size of the sprinkler room, its location on the building and the physical layout of the sprinkler room for pipes and other mechanical equipment.

BSB responded to input from sources outside its office for the design and location of the sprinkler room.

1. The location of the sprinkler room on the building was determined by Pioneer Engineering, based on their site engineering drawings.
2. The minimum requirements for pipe clearances from walls and ceilings was provided by Metro Fire Protection, based on their experiences.
3. The access to the sprinkler room and required clearances to piping was a requirement of the local governing authorities and the building and fire codes.
4. The actual size and shape of the sprinkler room provided by Metro Fire Protection and/or Town and Country is of a size and shape that had been used successfully before. There was no reason to change the size or shape of this room to meet the technical requirements.

5. Other builders in the Minneapolis area such as Pulte (at Arboretum Woods) and Ryland (at Town Course Heights) are building townhouses which use this type of sprinkler room design.

Conclusion

BSB used information provided by sources outside their office to place and size the sprinkler room. This information was not copied from Rottlund. Chris Jorgenson, in his affidavit, points out fifteen differences between the BSB sprinkler room design and the Rottlund sprinkler room design. This is an amazing number of differences for such a small utilitarian, functional space. The shed or "dog house" style sprinkler room is a standard feature that has been used by a number of builders as a rational design response to the growing fire suppression requirements for multifamily housing.

The biographical information submitted on August 15, 2003 has not changed.

This opinion submitted by:

Albert H. Bloom, A.I.A.

BLOOM & FIORINO Architects, Inc.
1110 Jorie Blvd., Suite 300
Oak Brook, IL 60523

Albert H. Bloom, A.I.A.

Date: April 15, 2004



Received 04-15-2004 12:05 From-630 574 2506 To-MOORE COSTELLO& HART Page 002

# APPENDIX ONE

Marketing documents from Town and Country and Rottlund's townhomes;

Confidentiality Stipulation and Protective Order between Plaintiff and Defendants dated January 22, 2002;

Confidentiality Stipulation and Protective Order between Plaintiff, Defendants and Bloodgood Architects and Planners of Iowa, Inc. d/b/a Bloodgood Sharp Buster Architects and Planners of Iowa dated August 9, 2002;

Confidentiality Stipulation and Protective Order between Plaintiff, Defendants and Bloodgood Sharp Buster Architects and Planners dated October 11, 2002;

Second, Third, Fourth, and Fifth Amended Complaint;

Town and Country's plans prepared by BSB of Illinois for Washington Square Back to Back Townhomes in Aurora, IL;

Town and Country's plans prepared by BSB for the Homestead Collection, including redline plans;

Rottlund Homes' plans for the Original Villa;

Rottlund Homes' plans for the New Villa;

Rottlund Homes' for the Villa II;

Expert reports issued by experts in this matter, and the documents referenced therein;

Transcripts of the depositions in this matter, and the exhibits thereto;

All photographs of housing products produced by the parties and/or their attorneys in this matter;

Plans and other documents produced by Rottlund relating to products other than the Original Villa, New Villa, and Villa II;

Plans and other documents produced by TCM relating to products other than the Homestead Collection;

Plans and other documents produced by BSB and/or BGI relating to products other than the Homestead Collection;

All documents bearing a "Bloom" Bates label;

Those documents referenced in Al Bloom's Expert Report;

BSB's publications produced in this matter;

Trade publications;

Architectural reference materials (for example, *Architectural Graphic Standards).*

Fax to Mike Wagenknecht from Art Plante regarding corrections to client redlines dated 08/07/00, BSB 01393 – 01409

BSB Transmittal – Next Day Air – To Art Plante from Michael J. Wagenknecht regarding Homestead Collection at Centennial Crossing changes per construction document revision date of 03/06/00 dated 08/07/00, BSB 01410 – 01433

Fax to Art Plante from Beth Miller regarding elevation studies with garages expanded dated 05/25/00, BSB 01444 – 01447

Fax to Art Plante from Beth Miller regarding garage revision and proposed front and side revision dated 05/24/00, BSB 01448 – 01451

E-mail to Art Plante from Beth Miller regarding area divisions and garage expansions dated 05/23/00, BSB 01452

Fax to Art Plante from Beth Miller regarding garage options dated 05/18/00, BSB 01453 – 01460

BSB Transmittal – Next Day Air – To Mark Kranz from Michael Wagenknecht regarding changes per construction document revision date 05/10/00, BSB 01467 – 01492

BSB Transmittal UPS Next Day Air – To Mark Kranz from Michael Wagenknecht regarding - Artwork showing changes to Plans 1381 and 1482 dated 04/05/00, BSB 01493 – 015

Homestead Collection at Centennial Crossing Plan 1381 – Set with Clouding dated 03/08/00, BSB 01541 – 01563

BSB Telephone Call Report - To Mike Wagenknecht from Mark Kranz - 03/02/00 @ 11.30 a.m. and 03/03/00 @ 2.45 p.m. regarding T&C Homestead Collection misc. matters dated 03/03/00, BSB 01564 – 01565

BSB Telephone Call Report – To Mike Wagenknecht from Mark Kranz regarding T&C/Homestead Collection - clouding and girder truss dated 03/03/00, BSB 01566

Memo to 12 people including Chris Jorgensen and Beth Miller from Art Plante regarding framewalks dated 03/01/00, BSB 01578 – 01581

BSB Telephone Call Report - To Mike Wagenknecht from Mark Kranz - 02/17/00 @ 2.30 p.m. and 4.00 p.m. regarding T&C Homestead Collection shelving and windows dated 02/17/00, BSB 01587

BSB Transmittal – Next Day Air – To Mark Kranz from Mike regarding Homestead Collection at Centennial Crossing Artwork Style Sheets dated 02/16/00, BSB 01591 – 1594

BSB Telephone Call Report – To Mike Wagenknecht from Mark Kranz @ 11:10 a.m. regarding T&C/Homestead Collection - Gas meters and A/C pads on Artwork dated 02/08/00, BSB 01599

BSB Transmittal – Next Day Air – To Art Plante from Michael Wagenknecht regarding Homestead Collection at Centennial Crossing – Changes dated 02/08/00, BSB 01600 – 01620

BSB Telephone Call Report – To Mark Kranz from Mike Wagenknecht @ 8.30 a.m. regarding T&C Homestead Collection – Vault Slope and Patio Doors/Windows dated 02/03/00, BSB 01642

BSB Telephone Call Report – To Art Plante from Chris Jorgensen and Mike Wagenknecht on 01/27/00 and 02/03/00 regarding miscellaneous items dated 02/03/00, BSB 01643

Letter to BSB from Aberjona Engineering, Inc. regarding calculations for Centennial Crossing dated 11/21/01, BSB 01725 – 01742

Fax to Art Plante and Mark Kranz from Chris Jorgensen regarding Villas/#38107 bedrooms dated 07/12/99, BSB 01830 – 01835

Fax to Art Plante and Mark Kranz from Chris Jorgensen regarding Villas/#38107 front elevation dated 06/22/99 BSB 01841 – 01842

Fax to Art Plante from Chris Jorgensen regarding Villas/#38107 upper floor plan options dated 07/01/99, BSB 01836 – 01840

BSB Transmittal – Next Day Air – To Art Plant from Chris Jorgensen regarding Villas/38107 CADD elevations dated 06/17/99, BSB 01843 – 01844

BSB Transmittal to Art Plante from Larry regarding Villa Townhouses dated 06/23/98, BSB 01858

T&C Concept Plan – A Main Floor undated, BSB 01859 – 01861

Fax to Art Plante from Larry Moore regarding revised unit A dated 06/16/98, BSB 01862 – 01865s

Letter to Larry Huff from Chris Jorgensen regarding T&C Homestead Collection at Centennial Crossing dated 10/25/00, BSB 01978

Fax to Chris Jorgensen from Marc Harris regarding detail with notation dated 10/20/00, BSB 01984 – 01985

Documents Bates labeled BSB 04462-4485;

Documents Bates labeled BSB IL 00352-00374;

City of Bloomington documents (BLOOMINGTON 001-012);

City of Eden Prairie documents (EDEN PRAIRIE 001-045);

Rottlund documents (RCI020644-20647);

Depositions of BSB/BGI employees (Grundmeier, Jorgenson, Moore, Sharp, Buster and Safin);

BSB contract with TCM dated 6/14/99 providing artwork services for Villa product (BSB 630);

Preliminary Report of Jeffrey A. Scherer;

Preliminary Report of Anthony Desnick;

Land Development Plan for the Hollander property in Maple Grove (DSU 8-36);

Bloodgood Sharp Buster Architects and Planners-Florida documents (BSB FL 000001-BSB FL 000044);

TCM plans ( D30321-30391);

Documents received from Tushie Montgomery Architects pursuant to subpoena (TM 1-929);

Villa II building plans for Rottlund's The Reserve in Plymouth, MN (RCI 1418-1437);

Documents Bates labeled BSB 1021-1024 and BSB 1260-1263;

Volume II and II of Jim Grundmeier (individual) dated February 17 and 18, 2004;

Volume I and II of Jim Grundmeier (30(b)(6)) dated September 2, 2003 and February 18, 2004;

Volume I and II of Chris Jorgenson (individual) dated September 3, 2003 and February 17, 2004;

Volume I and II of Larry Moore (individual) dated September 4, 2003 and February 17, 2004;

Volume I and II of Beth Miller (BSB) deposition dated September 3 and 4, 2003, including all exhibits;

Affidavit of Metro Fire Protection & Todd Dosch;

Volume I of Todd Dosch deposition dated February 25, 2004, including all exhibits;

Fax from Metro Fire Protection to Lori Meier dated 4/25/02 (BSB 1021-1024);

Midland Homes reduced drawings from 6/15/94-10/3/95 (BSB 2037-2041, 2048-2050, 3459-3486);

Midland Homes-Greystone project file (BSB 6249-6408 and 10172-10247);

Jerry's Homes- Bent Tree Villas/Longview reduced designs from 1/22/96-2/23/98 (BSB 3554-3471 and 3487-3553);

Jerry's Homes- Bent Tree Villas/Longview project file (BSB 3721-3852);

BGI production of Jerry's Homes documents (BGI 276-280);

Deposition Transcript of Timothy Whitten, Volume V, dated August 14, 2003;

Design Development Inc document (DDI000021-23);

Deposition exhibit 330;

Chateau Collection design documents from TCM's files (D34892-34934, D36365-36465 and D30357-30356);

Tushie Montgomery produced documents (TM 886-929);

Photographs taken March 29, 2004- April 8, 2004 by Moore, Costello & Hart, P.L.L.P. (MCH000686-46);

Photographs on CD produced from TCM from inspection of a Rottlund Homes villa model home (CD - D30491);

Exhibit R33

**Supplemental Expert Report**
Jeffrey A. Scherer, FAIA
May 14, 2004

In the matter of

The Rottlund Company, Inc. v.
Pinnacle Corporation and Town and Country Homes, Inc.
Court File No. 01-1980 DSD/SRN.

---

I have been asked by the Defendants Town and Country Homes and Pinnacle Corporation to provide a supplemental expert opinion in the matter of The Rottlund Company, Inc. v. Pinnacle Corporation and Town and Country Homes, Inc., Court File No. 01-1980 DSD/SRN. The purpose of this Supplemental Expert Report is to offer my opinion as to whether there is copyright infringement arising under the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq*. As a matter of record, I am setting forth my expert report related to the issue of copyright infringement only. I am not offering opinions regarding the claims under the Lanham Act or the Minnesota Uniform Deceptive Practices Act. My opinions are based on my experience as an architect and educator. My opinion is subject to amendment, supplementation, and revision should additional information or materials be made available to me. To determine whether there has been copyright infringement, I will examine the issues of *original works of authorship* and *independent creation*. Numbers bracketed as such [_] refer to the appendix item. (E.g., [1.03] refers to page 3 of appendix item 1.) Further this supplemental report is prepared in response to the *Supplemental Expert Report of Anthony Desnick, AIA,* and dated April 15, 2004.

This supplemental report by Mr. Desnick includes a *Supplemental Chronology*. It appears that the purpose of this supplemental chronology is to establish that the source of the ideas for the defendant's work product is the plaintiff's Villa II product. Mr. Desnick provides no evidence of direct copying. This chronology, in my opinion, ignores the basic issue: Are the objective details of the ideas embodied in the product of the defendants substantially similar to those of the plaintiff? As I stated in my August 15, 2003 expert report, it is common and acceptable practice for architects to understand their particular fields of design specialization by studying the marketplace, competitors' work and reviewing the literature. This process is normal and begins as early as their training in architectural school. It continues throughout the career of any successful architect and, in my opinion, marketplace builder. We know, for example, from the statement of Rottlund's president, Mr. Todd Stutz that Rottlund believes that acquiring this knowledge of the marketplace is an essential ingredient of a successful builder. He states "I think it is the policy of almost all builders to shop the competition, otherwise you don't stay in business very long." (Rule 30(b) (6) deposition of Todd Stutz, at 442). This process is, in my opinion, an important part of developing

EXHIBIT NO. 124
6-30-04
P. MAHON

ideas. Both parties in this case have used precedent to develop and differentiate their own ideas from those of their competitors. The detailed chronology as stated by Mr. Desnick seems to suggest willful taking of a copyrighted work through direct copying. This chronology illustrates, in my opinion, the defendant's attempt to understand the ideas of their competitor. In my opinion, the defendant has the right to understand the abstracted ideas of a) the eight-unit back-to-back town home, b) entries, c) gable roofs, d) garages, etc. How these ideas are ultimately expressed in the final product is the central issue. The plaintiffs have chosen to rely on the concept of "gestalt or combination of spaces" (see Desnick supplemental report page 11, section IV) as the basis for claiming copyright infringement. This basis, in my opinion, is an attempt to move the attention away from the literal and objective expression of the idea. If this focus away from the detailed objective details of the ideas is successful, it will, in my opinion, undermine the ability of any builder or architect to practice their expert craft or business. All eight-unit townhomes are likely to look substantially similar in the abstract at a great distance. By its nature, the further one moves away from a detailed analysis of architecture, the more similar buildings can seem. It also follows, in my opinion that the more detailed and developed the ideas, the more important it is for the expert to use that detail to determine the opinion in the matter of substantial similarity.

It is at this objective detailed level that I am stating my opinion. By their very nature, works of architecture are conceived on the abstract level but executed on the detailed idea level. It is at this detailed and objectively analyzed level that one can understand and demonstrate that there is more than one particular form of a design idea to solve similar abstract marketplace ideas such as townhomes. This applies equally to entryways, kitchen, living rooms, roof forms and all other abstract elements of a residence. Accordingly, it is my opinion, stated and illustrated in detail in my early report, that the Town and Country product is not substantially similar to the Rottlund product.

Set forth below are my opinions as to why the objective detailed ideas are not similar. It is in my role as an expert that I am demonstrating the differences of the objective details of the two products. The task of comparison can only be done, in my opinion, at this detailed level. Since these two products relied upon experts (architects) in their independent creation, it is the purpose of my expert opinion to demonstrate why the design ideas are marketedly different.

**Abstracting an Idea**

The act of studying the marketplace can take many forms. One way to study the market place would be to "shop the competition" (Rule 30(b) (6) deposition of Todd Stutz, at 442). To shop the competition, in my opinion, is simply the beginning stage of understanding the competitive market. Only after an analysis of the observations does the acquired knowledge becomes meaningful. "Cut and paste" (Ex. 330; Moore Depo. At 239-240) is an act or process used extensively in the early stages of idea formation by designers to abstract an idea and reconfigure it to test it in a new form. It is also important to note that idea formation as process is one that is based upon abstraction of knowledge that is collected. The use of floor plans, which are abstractions of a building, not the building itself, is much like using squares or boxes to test a relative size and shape in new or different configurations. Only after a careful analysis of the objective details can a conclusion as to difference be made. In much the same way after comparing the details of the elevations and plans we can begin to understand the whole to be different. Changes in proportioning in windows, overall building width, column sizes, and profile contribute to the overall whole being different to the degree that the two elevations cannot be mistaken for each other.

**Comparative Market Departure and Copyright**

Since products can be considered similar in an abstract sense the details become important in determining the marketability of the product itself. In such a competitive market the individual development of details is required to differentiate the product in the marketplace. The departure must be considered in abstract ways, often through plan analysis, elevation analysis, and comparing abstractions to the competitors. The departure is typically questioned in order to distinguish the product in a competitive environment where most building products are "off-the-shelf." In much the same way, the very nature of market driven design requires that a constant awareness of copyright issues be present. (Ex. 335 at BSB03482 and at BSB03484)

**Product Research**

Product brochures, which often include plans, elevations, images, etc., are often available to the public. The brochures themselves are comprised of abstract representation of the product but are not to be confused with the product itself. The abstractions in many ways are conceptual, which covers the broad sense of the product but does not take into account the whole with its details. When two products are created for a similar constituency with very restrictive market pressures, there will necessarily be similarities. Only after analyzing the objective details of the ideas in the works will one begin to see the major differences between them. Mr. Desnick failed to do this.

**Detailed and Objective Development of Ideas**

The act of creating a detail changes the understanding of the whole. Once rooms are made bigger things such as window placement, wall proportions, roof lines, spatial quality of the room, etc. will most definitely change and be perceived as different. "We see a mistake they're making and we better it. If their rooms are too small, we make them bigger. If their closets are too small, we make them bigger, we better it." (Moore Depo. Tr. at 40:23-41:1). This statement, in my opinion, reflects an analysis of the competitive market with the intent of creating an original product while remaining competitive within strict market constraints.

**Revisions—Details and Ideas**

The revisions of the side elevation and entry is based on discussions about the detail affecting the understanding of the whole and cost as written by Michael Wagenknecht, "We strongly believe that the window is needed for the two story column condition." (Ex. 84) The omission of the window on the end elevation creates differences between the schemes.

**Detailed Analysis**

It is important to be specific about the comparisons of objective details of the ideas embodied in the plans and elevations. I have conducted a thorough and detailed analysis of those ideas as exhibited in my preliminary expert report dated August 15, 2003. In my opinion, the objective details of the ideas are not substantially similar.

**Comparison of the Villa II and the Chateau Collection—Unit B Place**

Rottlund's Rush Creek and The Reserve (D00001-14 and RCI004150-4166) and the Chateau Collection of Town and Country (D30321-356 and D30357-391)

**Entry Door Location**

The entry doors in the central units in both schemes are located on the only available exterior wall, which is a condition that is created by the back to back configuration of units. This situation creates 3 possible locations for an entry door: one next to the garage, one in the middle of the living room, and one next to the adjoining unit. Placement of the entry next to the adjoining unit would associate the entry space more with the neighbor's unit. Placing the entry in the center of the living room affects the efficiency of the living room layout. Placing the entry near the units own garage creates a shorter walk and more efficient layout to the living space. This decision seems to be made from an efficiency and privacy standpoint. These elements are not substantially similar.

**Entry Cover**

In both schemes the entry is covered, which is a commonly practice for creating weather protection. The Villa II scheme shows a roof that extends in a continuous fashion from each side wall of the entry space, creating a one story exterior entry vestibule. In the Chateau Collection scheme the entry is covered only from the garage side wall to approximately the middle of the exterior of the living room wall. Since the Chateau Collections roof covers only a portion of the exterior space, the entry is associated with a two storey volume next to the actual entry, which is substantially different from the entry space created by the Villa II scheme. These elements are not substantially similar.

**Garage Location**

Although the garage locations are similar for both the Villa II scheme and The Chateau Collection scheme, the locations are a result of mirroring the plans in order to create efficiency in shared plumbing zones. This is a very common solution for back to back living unit design. The location of the garages in both schemes could realistically be derived from a simple analysis of: mirroring plans for efficiency, sharing common plumbing walls, and the desire for private entry into each unit. These elements are not substantially similar.

**Garage Roof**

The garage in the Chateau Collection protrudes farther from the entry door than the garage in the Villa II. The extension creates a larger sense of entry space in the Chateau Collection scheme than is present in the Villa II scheme. These elements are not substantially similar.

**Window Location**

There are several factors that constrain the window locations in both plans. Since a back to back configuration of the units is used in both schemes a limited amount of exterior wall is present in both schemes, making options limited. Residential building code also requires windows be placed within each sleeping unit. With the limited amount of exterior wall surface available, building code requirements and market forces that require windows in areas such as the living room it is completely understandable that both of these schemes have windows in each room that adjoins the exterior wall. In both schemes, constraints placed upon the design by such forces also require any bedroom, typically placed on the second floor for privacy issues, to be located adjacent to the only available exterior wall. These elements are not substantially similar.

**Kitchen and Bathrooms**

Both the Villa II and Chateau Collection schemes use the very common practice of sharing plumbing walls with the neighboring units to reduce cost and increase efficiency. The sharing of plumbing walls created by mirroring units leaves a very limited amount of options for placement of spaces such as kitchens and bathrooms. Bathrooms in both the Villa II scheme and the Chateau Collection scheme follow the common practice of being located on a shared plumbing wall, near garage entrance, and near the kitchen. Their similarity of the ideas stops at this abstract placement level.

The kitchens in both schemes are located on a shared plumbing wall, however the Villa II scheme is designed as an "L" shaped space and the Chateau Collection scheme uses the idea of a "U" shaped kitchen which results in two different types of spaces and uses. They are not similar by any stretch of the imagination. These elements are not substantially similar.

**Stair**

In the Chateau Collection scheme the stair is configured as a switch back design (D30327) which creates a small space in front of the "U" shaped kitchen counter. The Villa II scheme uses the idea of a stair design that runs along the back wall in a similar position as the stair in the Chateau Collection. This creates a different type of space, which associates the stair more with the dining room, as opposed to the Chateau Collection scheme, which associates the stair with the small space adjacent to the kitchen. These elements are not substantially similar.

**Upper Floors**

The upper floor plans exhibit little similarity in their overall sizes and layouts. The overall details, sizes, and layouts differ marketedly and are, therefore, not similar.

**Comparison of Rottlund Villa II Plan "C" (D 00006) and Town & Country Chateau Collection Plan "C" (D 30336)**

**Kitchen**

The kitchen in Town & Country Chateau Collection Plan "C" (D 30336) is a Galley type kitchen that is long and narrow with counter space on two sides. The kitchen in Rottlund Villa II Plan "C" (D 00006) is "L" shaped with an optional island. The overall configurations of these ideas are not substantially similar.

**Powder Room**

Rottlund Villa II Plan "C" (D 00006) has an isolated powder room and alternatively Town & Country Chateau Collection Plan "C" (D 30336) has a mud room that is accessed both from the garage and kitchen. The entry from the Garage in the Chateau Collections plan is through the mudroom and then through a small hall like space that is between the mudroom, kitchen, and powder room. The Entry from the garage in the Villa II plan is much more open and directly related to the kitchen. This difference in layout makes the kitchens appear entirely different, even though they reside in similar locations in the plans. The locations of the powder rooms and kitchens can be attributed to the proximity of the shared plumbing wall. These elements are not substantially similar.

**Dining Room**

The dining rooms in both the Villa II plan "C" and the Chateau Collections plan "C" are located as close as possible to the kitchens. The location is a common relationship that enables the dining room to function properly, a greater distance between dining and kitchen in either case would affect the marketability of the plan. The Chateau Collection's dining room has open views through the associated kitchen making them appear connected. The dining room of Rottlund's Villa II is separated from the kitchen by a 42" high counter, which underscores the idea of separate kitchen and dining area.

**Living Room Entry**

In both plans the living room is located near the entry space. The location of the entry and living room in the Chateau Collection's plan helps to keep the more public spaces near the front of the unit and more private spaces towards the inner parts of the unit. This is typical and common for residential design. The entry for the Villa II plan "C" is located near the dining room and what can be considered the end of the complex of units, creating an entry space between the living room and

dining room. The entry stairs to the second floor in the Villa II is perceived to be between the dining room and kitchen. Alternatively, the location of the entry space in the Chateau Collection's plan is associated solely with the living room and the idea of the stair is perceived to be at the edge of the living room only. These elements are not substantially similar.

### Second Floor

The plan for the second floor of Rottlund Villa II Plan "C" (D 00006) and Town & Country Chateau Collection Plan "C" (D 30336) is completely different except for the general location of the bathroom, which in both cases utilizes the shared plumbing wall. The overall layout, proportions, size and details of the bathrooms are different in every way. In the Rottlund Villa II plan the master bedroom is located in a similar location as the Town & Country's Chateau Collection's bedroom #2. The laundry room and stairs are in different locations, reflecting detailed ideas that have completely different spatial relationships. These elements are not substantially similar.

### Loft Space

Both the plans for the second floor of Rottlund Villa II Plan "C" (D 00006) and Town & Country Chateau Collection Plan "C" (D 30336) have a loft space. In the Town and Country Chateau Collection Plan the loft space runs parallel to the staircase in which case the stair runs between the loft and the living space. In the Rottlund Villa II Plan the loft space runs parallel to the living space and the stair is off to the end of the living space and loft space. The different configurations reflect differences in spatial ideas between the two products. These elements are not substantially similar.

### Exterior Elevations

The exterior elevations of Rottlund's Villa II Elevation (RC1004150) and Town & Country Chateau Collection Elevation (D 30322) have no proportions that are similar except the proportions of the garage doors, which are pre-manufactured "off the shelf" and standard in proportion. The elevations, garages and the faux chimneys are not substantially similar.

### Elevation Massing

The ideas embodied in the way the overall massing of the elevations are different. The Rottlund Villa II elevation is book ended by a double gable on the end units, which is approximately 32 feet in width with small gables towards the center of the elevation. The double gable configuration in the Villa II elevation helps create a heavier appearance at the ends of the elevation and a lighter appearance in the center. Alternatively, the Town & Country Chateau Collection's elevation is

heavier in the middle of the elevation due to two smaller sets of double gables closely situated next to each other; the double gables are about 19.5 feet in width. The idea of smaller gables on the end units of the Town & Country Chateau Collection's Elevation help lighten up the massing towards the end of the elevation. Both elevations use a configuration of standard type "lap" siding and "shake" siding in different locations and proportions. These elements are not substantially similar.

**Other Non-Related References**

**Elevations in Detail**

Mr. Desnick offers a false comparison between Midland Homes and Rottlund's New Villa. These are not the product at issue in the lawsuit. Although both have three gables on the second floor the overall sizes, details of trim work around windows, and proportions of window to wall space within each gable is considerably different. More specifically, the gables at the ends of Midland Homes 8-plex contain a clustering of a single three window unit with a faux arch and keystone above and the gables at the end. Rottlund Homes 8-plex uses a pair of two window units with simple moldings around the windows themselves. Both elevations use a common placement of a typical "off the shelf" round louver, Rottlund's 8-plex using one louver on each gable for a total of three and Midland Homes 8-plex using one louver total. Although these particular louvers are ornamental in nature, it is important to note that traditionally the louver itself is intended to function as a ventilation device for an attic and is most often placed at the highest point of an attic. The use of such ornament in this particular location can be traced back into history and is common practice. The Midland Homes elevation shows a gabled entry with faux arch and keystone above at each end unit of the complex as compared to a sloped roof that is continuous with the main roof of the Rottlund Homes 8-plex. The Midland Homes 8-plex also has a shorter roof line at the very edge of the elevation (above the outermost windows) which is considerably different from the Rottlund Homes 8-plex elevation that has a higher continuous ridge line over the end units.

**Window Placement**

Window placement within any sleeping unit is required by residential building code. When comparing the two elevations it seems logical that all rooms that have an exterior wall will have a window within them. Ensuring that windows are present in most rooms is not only important for the general health, safety and welfare of the public but it would become very difficult to meet market demand if there were no windows within the living room or dining room. Common practice also dictates that windows are placed in the center of the wall. The Rottlund elevation and Midland Home's elevation follow standard window placement concepts when executed in detail,

however, sizes and proportions vary between schemes. It is also important to note that, the 8-plex configuration, by its general abstract layout, limits the amount of available exterior wall. The physical constraint created by the general layout leaves little option for window placement.

**Conceptual Sprinkler Riser**

When looking at the overall layout of the eight unit plans the common spine running in the long direction down the middle of the complex presents itself as the most economical and straight forward location for sprinkler supply lines. When taken in an even larger context it makes sense that the sprinkler supply would enter at one of the ends of the complex because any adjoining complex could take advantage of the water supply coming off city's supply line near the street. Basically, the city's supply can be brought in between two eight-unit residential units, branched off in opposite directions and fed directly down the spine to each unit to ensure that the general, health, safety, and welfare of the public is protected. After reviewing each overall layout for Rottlund and Town and Country I have determined that the location of the sprinkler riser is determined by efficiency. Any other location in both schemes would require unneeded duplication of city water taps and more service lines than needed. Upon a detailed inspection of the sprinkler riser room in both schemes it is my opinion that the layout and design is standard in nature and is derived mainly by its ideal location, as discussed prior, and the governing fire protection codes that determine clearances, drainage, access, and equipment to be used. The fire safety code outlines this particular configuration and it is vital to the health, safety, and welfare of the public in both schemes. These utilitarian sprinkler rooms are not similar.

End of Supplemental Expert Report

Jeffrey A. Scherer, FAIA
May 14, 2004

**Appendix A – Materials Considered for Supplemental Expert Report of Jeffrey Scherer, FAIA**

1. Depositions and Exhibits:
   2-6, 11, 26, 41, 42, 43, 43A, 55A, 59, 60, 78, 81, 84, 87, 89A, 90, 95, 109, 110, 114, 128, 128A, 128, 129, 130, 225, 226, 228, 242, 245, 250, 251, 266, 267, 288, 289, 300, 314, 330, 335, 338, and 339
2. Deposition of Timothy Whitten, with accompanying exhibits
3. Deposition of Steve Sandelin, with accompanying exhibits (12/98-09/03)
4. Deposition of Linda Alfson, with accompanying exhibits
5. Excerpts from Steve Sandelin's 12/16/02 deposition
6. BSB's Rule 30(b)(6) depositions, with accompanying exhibits
7. Rottlund's Rule 30(b)(6) depositions, Timothy Whitten and Todd Stutz, deponents, with accompanying exhibits
8. Excerpts from the depositions of Art Plante (12/19/02), Beth Miller (09/03/03), Karen Albertson Steve Thies, Steve Swanson and Jason Jorgenson
9. Depositions of James Grundmeier (09/02/03 and 02/17/04) and Larry Moore (09/04/03 and (02/17/04), with accompanying exhibits
10. Copies of expert reports of A. Desnick, A. Bloom, D. Buster, L. Moore, J. Safin, C. Jorgensen, and J. Scherer

Exhibits:

| | | |
|---|---|---|
| D31355 | D33171-33173 | D35134-35142 |
| D31544 | D33188-33201 | D35156-35165 |
| D31578 | D33264-33270 | D35184-35185 |
| D33269 | D33266-33267 | D35201-35203 |
| D33299 | D33281-33284 | D35204-35205 |
| D33310 | D33285-33289 | D35212-35216 |
| D34163 | D33317-33318 | D35217-35223 |
| D34167 | D33320-33321 | D35224-35228 |
| D34826 | D34180-31481 | PINN01469 |
| D34944 | D34340-34345 | PINN04622 |
| D35198 | D34513-34535 | PINN04667 |
| D35199 | D34602-34606 | BSB01262 |
| D00001-00014 | D34607-34615 | BSB01587 |
| D16025-16029 | D34616-34618 | BSB01588 |
| D30321-30356 | D34619-34623 | BSB01589 |
| D30357-30391 | D34624-34628 | BSB01590 |
| D31370-31375 | D34629-34635 | BSB01621 |
| D31376-31382 | D34636-34637 | BSB01624 |
| D31393-31408 | D34638-34642 | BSB02593 |
| D31436-31437 | D34643-34647 | BSB02597 |
| D31491-31494 | D34648-34650 | BSB03754 |
| D31495-31496 | D34651-34656 | BSB04490.1 |
| D31498-31502 | D34657-34660 | BSB04498.1 |
| D31504-31505 | D34817-34820 | BSB04539-4551 |
| D33166-33170 | D34909-34919 | BSB012223 |
| | D35118-35122 | TM00172 |

TM00563
TM00569
TM00573
TM00693
TM00750
TM00759
TM00256-262
TM00322-327
TM00523-576
TM00535-536
TM00631-634
TM00635-639
TM00871-872
TM00873-879
TM00881-882
TM00886-895
TM00906-908
RCI001434
RCI009658
RCI001418-1437
RCI001603-1616
RCI021227-21238
RCI021227-21238
RCI002525-2532
RCI000300-301
RCI004150-4166
RCI009705-9723
DDI000002
DDI000021-25

End of Appendix A

THIS EXHIBIT HAS BEEN OMITTED

Exhibit R34

THIS EXHIBIT HAS BEEN OMITTED

Exhibit R35