Court File No. 01-1980 / ROTTLUND / Pinnacle
Krummen Affidavit dated September 8, 2004

EXHIBIT 129.2

# THE ROTTLUND COMPANY, INC. AND SUBSIDIARIES

Consolidated balance sheets
As of March 31
(In thousands, except per share data)

| | 2000 | 1999 |
|---|---|---|
| **ASSETS** | | |
| CASH AND CASH EQUIVALENTS | $ 8,087 | $ 6,558 |
| ESCROW AND OTHER RECEIVABLES | 2,447 | 2,607 |
| LAND, DEVELOPMENT COSTS AND FINISHED LOTS | 47,224 | 46,315 |
| RESIDENTIAL HOUSING COMPLETED AND UNDER CONSTRUCTION | 30,231 | 23,727 |
| PROPERTY AND EQUIPMENT, net | 867 | 941 |
| DEFERRED INCOME TAXES | 1,796 | 1,605 |
| OTHER ASSETS, net | 8,114 | 7,612 |
| | $98,766 | $89,365 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| LIABILITIES: | | |
| Revolving credit facility | $21,135 | $10,285 |
| Senior notes payable | 21,845 | 26,731 |
| Mortgage notes payable | 1,224 | 1,451 |
| Accounts payable | 10,785 | 8,905 |
| Accrued liabilities | 6,459 | 6,132 |
| Income taxes payable | 158 | 4,263 |
| Total liabilities | 61,606 | 57,767 |
| COMMITMENTS AND CONTINGENCIES (Note 6) | | |
| SHAREHOLDERS' EQUITY: | | |
| Preferred stock, $.10 par value, 10,000 shares authorized; 0 shares issued and outstanding | --- | --- |
| Common stock, $0.10 par value, 40,000 shares authorized; 5,804 and 5,773 shares issued and outstanding | 146 | 143 |
| Paid-in capital | 11,951 | 11,851 |
| Retained earnings | 25,063 | 19,604 |
| Total shareholders' equity | 37,160 | 31,598 |
| | $98,766 | $89,365 |

The accompanying notes are an integral part of these consolidated balance sheets.

**THE ROTTLUND COMPANY, INC. AND SUBSIDIARIES**

Consolidated statements of operations

For the years ended March 31
(In thousands, except per share data)

| | 2000 | 1999 | 1998 |
|---|---|---|---|
| NET SALES: | | | |
| Homes | $245,440 | $252,675 | $160,830 |
| Land | 15,394 | ---- | ---- |
| Total net sales | 260,834 | 252,675 | 160,830 |
| COST OF SALES: | | | |
| Homes | 208,449 | 215,074 | 139,284 |
| Land | 14,039 | --- | ---- |
| Gross margin | 38,346 | 37,601 | 21,546 |
| SELLING, GENERAL AND ADMINISTRATIVE EXPENSES | 26,409 | 26,112 | 20,541 |
| Operating income | 11,937 | 11,489 | 1,005 |
| INTEREST EXPENSE | 2,685 | 2,714 | 2,018 |
| Income (loss) before income taxes | 9,252 | 8,775 | (1,013) |
| INCOME TAX PROVISION (BENEFIT) | 3,793 | 3,598 | (415) |
| Net income (loss) | $ 5,459 | $ 5,177 | $ (598) |
| BASIC AND DILUTED EARNINGS (LOSS) PER SHARE | $ 0.94 | $ 0.90 | $ (0.10) |

The accompanying notes are an integral part of these consolidated financial statements.

# THE ROTTLUND COMPANY, INC. AND SUBSIDIARIES

Consolidated statements of shareholders' equity

For the years ended March 31
(In thousands)

| | Common stock | | Paid-in | Retained | |
|---|---|---|---|---|---|
| | Shares | Amount | Capital | Earnings | Total |
| BALANCE, March 31, 1997 | 5,716 | $138 | $11,656 | $15,025 | $26,819 |
| Net loss | — | — | — | (598) | (598) |
| Stock issued under employee stock purchase plan | 29 | 3 | 91 | — | 94 |
| BALANCE, March 31, 1998 | 5,745 | 141 | 11,747 | 14,427 | 26,315 |
| Net income | — | — | — | 5,177 | 5,177 |
| Stock issued under employee stock purchase plan | 28 | 2 | 104 | — | 106 |
| BALANCE, March 31, 1999 | 5,773 | 143 | 11,851 | 19,604 | 31,598 |
| Net income | — | — | — | 5,459 | 5,459 |
| Stock issued under employee stock purchase plan | 31 | 3 | 100 | — | 103 |
| BALANCE, March 31, 2000 | 5,804 | $146 | $11,951 | $25,063 | $37,160 |

The accompanying notes are an integral part of these consolidated financial statements.

**THE ROTTLUND COMPANY, INC. AND SUBSIDIARIES**

Consolidated statements of cash flows

For the years ended March 31
(In thousands)

| | 2000 | 1999 | 1998 |
|---|---|---|---|
| OPERATING ACTIVITIES: | | | |
| Net income (loss) | $ 5,459 | $ 5,177 | $ (598) |
| Adjustments to reconcile net income (loss) to net cash provided by (used for) operating activities- | | | |
| Depreciation and amortization | 724 | 790 | 626 |
| Deferred income taxes | (191) | (441) | 186 |
| Change in operating items: | | | |
| Escrow and other receivables | 160 | (87) | (1,008) |
| Land, development costs and finished lots | (909) | 932 | 1,989 |
| Residential housing completed and under construction | (6,504) | 3,405 | 5,457 |
| Other assets | (575) | (3,002) | (1,012) |
| Accounts payable | 1,880 | (2,648) | 2,264 |
| Accrued liabilities | 327 | 3,626 | (1,573) |
| Income taxes payable | (4,105) | 4,263 | (1,910) |
| Net cash provided by (used for) operating activities | (3,734) | 12,015 | 4,421 |
| INVESTING ACTIVITIES: | | | |
| Purchase of property and equipment, net | (577) | (370) | (1,054) |
| FINANCING ACTIVITIES: | | | |
| Proceeds from (repayments of) revolving credit facility, net | 10,850 | (4,725) | (175) |
| Repayments of senior notes payable | (4,886) | (4,194) | (2,943) |
| Proceeds from issuance of mortgage notes payable | 784 | 1,094 | 174 |
| Repayments of mortgage notes payable | (1,011) | (1,615) | (3,286) |
| Proceeds from stock issued under employee stock purchase plan | 103 | 106 | 94 |
| Net cash provided by (used for) financing activities | 5,840 | (9,334) | (6,136) |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 1,529 | 2,311 | (2,769) |
| CASH AND CASH EQUIVALENTS: | | | |
| Beginning of year | 6,558 | 4,247 | 7,016 |
| End of year | $ 8,087 | $ 6,558 | $ 4,247 |
| SUPPLEMENTAL CASH FLOW INFORMATION: | | | |
| Cash paid for interest, net of amounts capitalized | $ 2,685 | $ 2,714 | $2,025 |
| Cash paid for income taxes | $ 8,095 | $ --- | $2,022 |

The accompanying notes are an integral part of these consolidated financial statements.

# THE ROTTLUND COMPANY, INC. AND SUBSIDIARIES

Notes to consolidated financial statements
March 31, 2000 and 1999

## 1. Business description and summary of significant accounting policies

***Nature of business***

The Rottlund Company, Inc. (a Minnesota corporation) and its subsidiaries, collectively referred to as the Company, are engaged in the design, construction, marketing and sale of residential real estate. The Company's primary developments are in Minnesota, with additional development sites in Iowa, Florida, Indiana and New Jersey; accordingly, the Company's operations can be impacted significantly by the residential real estate market conditions in each of these geographic areas.

During fiscal year 2000 the Company substantially exited the Orlando and Ft. Myers, Florida, markets. The Company sold land, finished lots, residential housing under construction and various models with a carrying value of approximately $10,835,000 for $12,090,000. Certain of the sales were made to a former vice president of the Company. In management's opinion, such transactions were negotiated at terms equivalent to those used in transacting business with unrelated parties. Additionally, the Company sold land is certain other transactions for approximately $3,304,000.

The Company has generally been able to secure financing for its acquisition, development and construction activities, and management believes that such arrangements will continue to be available on terms satisfactory to the Company. However, there can be no assurance that continued financing for land acquisitions will be available or, if available, will be on terms satisfactory to the Company.

***Principles of consolidation***

The accompanying consolidated financial statements include the accounts of The Rottlund Company, Inc. and its wholly owned subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation.

***Use of estimates***

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Ultimate results could differ from those estimates.

***Revenue recognition***

Revenue from sales of properties is recognized upon a formal closing and conveyance of title to the buyer. Escrow receivables represent funds held in escrow because the Company is obligated to perform minor activities subsequent to a formal closing. Customer earnest money deposits received under binding purchase agreements are reflected as accrued liabilities until a formal closing.

***Cash and cash equivalents***

The Company considers all highly liquid investments purchased with original maturities of three months or less to be cash equivalents. As of March 31, 2000 and 1999, approximately $899,000 and $900,000, respectively, of cash and cash equivalents was restricted for customer earnest money deposits.

***Land, development costs and finished lots***

Direct costs related to land development, including land acquisition costs, improvement and construction costs for clearing and grading, roads and utility systems, architectural, surveying, engineering and legal fees, and real estate taxes, are capitalized as costs of land. The Company also capitalizes interest incurred in connection with land held for development up to the point it is deemed fully realizable upon sale. Interest of approximately $2,400,000, $[illegible],400,000 and $2,942,000 was capitalized in fiscal years 2000, 1999 and 1998, respectively. Aggregate development costs are allocated to finished lots and charged to cost of sales upon a formal closing and conveyance of title to the buyer.

***Residential housing completed and under construction***

Residential housing completed and under construction represents the direct costs of construction of single-family and multifamily home projects, excluding land costs. Residential housing is valued at the lower of cost or estimated fair value.

***Property and equipment***

Property and equipment are stated at cost. Additions and major renewals are capitalized, while maintenance and repairs are charged to expense as incurred. Depreciation is provided using accelerated methods, principally over three to five years for model home furnishings and five to seven years for furniture and equipment. Accumulated depreciation totaled $807,000 and $878,000 as of March 31, 2000 and 1999, respectively.

***Other assets***

Other assets consists primarily of the excess of the purchase price paid for business acquisitions over the net assets acquired, deferred financing costs and deposits for the option to acquire land. The excess of the purchase price paid for business acquisitions over the net assets acquired is being amortized over 20 years, with accumulated amortization of $294,000 and $220,000 as of March 31, 2000 and 1999, respectively. Deferred financing costs are amortized over the lives of the respective financing agreements, with accumulated amortization of $201,000 and $163,000 as of March 31, 2000 and 1999, respectively. Deposits for the option to acquire land are capitalized as land, development costs and finished lots at the time of exercise or are charged to expense upon expiration.

***Income taxes***

The Company recognizes deferred tax liabilities and assets for the expected future tax consequences of events that have been included in the financial statements or tax returns. Under this method, deferred tax liabilities and assets are determined based on the difference between the financial statement and tax bases of assets and liabilities using currently enacted tax rates.

***Product warranty***

The Company warrants its residential housing for periods of 10 and 15 years. The Company purchases insurance coverage for periods after two years. Warranty costs are estimated at the time of sale and adjusted annually to reflect ultimate experience. Product warranty costs are included in cost of sales in the accompanying consolidated statements of operations.

***Advertising***

The Company's advertising expense amounted to $2,038,000, $1,848,000 and $2,316,000 in fiscal years 2000, 1999 and 1998, respectively.

*Net earnings (loss) per share*

The Company adopted SFAS No. 128, "Earnings per Share," effective December 31, 1997. As a result, all prior periods presented have been restated to conform to the provisions of SFAS No. 128, which requires presentation of basic and diluted earnings per share. Basic earnings per share is computed by dividing net income available to common shareholders by the weighted average number of common shares outstanding during the year. Diluted earnings per share is computed under the treasury stock method and is calculated to reflect the dilutive effect of the Company's stock option plans. A reconciliation of these amounts is as follows (in thousands, except per share and antidilutive stock options data):

| | 2000 | 1999 | 1998 |
|---|---|---|---|
| Net income (loss) | $ 5,459 | $ 5,177 | $ (598) |
| Weighted average number of common shares outstanding: | | | |
| Basic | 5,804 | 5,773 | 5,745 |
| Dilutive effect of stock options | ---- | ---- | --- |
| Common and potential common shares outstanding: | | | |
| Diluted | $ 5,804 | $ 5,773 | $ 5,745 |
| Basic earnings (loss) per share | $ 0.94 | $ 0.90 | $ (0.10) |
| Diluted earnings (loss) per share | $ 0.94 | $ 0.90 | $ (0.10) |
| Antidilutive stock options | 705,378 | 838,102 | 535,102 |

Stock options were antidilutive because they had an exercise price greater than the average market price during the year or due to the net loss.

*Recently issued accounting pronouncements*

SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," as amended by SFAS No. 137, becomes effective for the years beginning after June 15, 2000. SFAS No. 133 requires that all derivatives be measured at fair value and recognized as assets or liabilities in the balance sheet. Changes in the fair value of derivatives should be recognized in either net earnings or comprehensive income, depending on the designated purpose of the derivative. The Company is currently analyzing the adoption of SFAS No. 133 and determining the effect, if any, on the Company's financial position and results of operations.

**2. Debt**

*Revolving credit facility*

The Company has an unsecured revolving credit agreement (the Credit Facility) that provides borrowings of up to $35 million, of which $5 million may be used for letters of credit. Borrowings under the Credit Facility are subject to a borrowing base calculation based on a defined percentage of land, development costs, finished lots and the working capital of the Company. Borrowings under the Credit Facility bear interest at the federal funds rate plus 0.5 percent (9.5 percent as of March 31, 2000). As of March 31, 2000, borrowings outstanding under the Credit Facility's line of credit totaled $21,135,000, and $8,865,000 was available for borrowing under the calculation described above. The Credit Facility expires in March 2002.

During fiscal years 2000, 1999 and 1998, the maximum balance outstanding under current and former revolving credit facilities was $32,815,000, $21,835,000 and $20,860,000, and the average balance was $23,818,000, $18,151,000 and $12,359,000, respectively. The weighted average interest rate during such years was 8.9 percent,

8.7 percent and 9.5 percent, respectively. The carrying amount of borrowings outstanding under the Credit Facility as of March 31, 2000 and 1999 approximates its fair value due to its current maturities and/or variable interest rates.

Subsequent to year-end, the Company increased the borrowings provided under the Credit Facility to $55 million. The Company utilized the increase in its facility to pay, in full, the obligations associated with Senior Notes (noted below), including $900,000 in early extinguishment payments.

***Senior notes payable***

In December 1994, the Company issued $25 million of 12.1 percent senior notes payable, and in February 1996, the Company issued an additional $10 million of 9.4 percent senior notes payable (collectively, the Senior Notes). Proceeds were used to retire certain mortgage notes payable and for working capital purposes. During fiscal year 2000, the Company paid an additional 0.5 percent of interest on each of the senior notes. Monthly payments of varying amounts are due on the Senior Notes through December 2003. As of March 31, 2000 and 1999, the fair value of the Senior Notes was approximately $24,713,000 and $28,914,000, respectively.

***Mortgage notes payable***

Mortgage notes payable are primarily for the acquisition and development of land, with fixed interest rates ranging from 8 percent to 9 percent and variable interest rates at prime plus 1.0 percent. These nonrecourse notes are collateralized by land, with a carrying cost of approximately $1,763,000 as of March 31, 2000, and mature at various dates through December 2001. The carrying amounts of mortgage notes payable approximate their fair value due to their current maturities and/or variable interest rates.

Scheduled annual maturities of the Senior Notes and mortgage notes payable as of March 31, 2000 are as follows (in thousands):

| Fiscal Year | Amount |
|---|---|
| 2001 | $ 6,419 |
| 2002 | 5,948 |
| 2003 | 6,371 |
| 2004 | 4,331 |
| 2005 | ---- |
| | $23,069 |

The Credit Facility contains various restrictive covenants including, among others, certain financial covenants relating to minimum consolidated tangible net worth and earnings levels, as well as funding, borrowing base requirements, payment of dividends and maximum land and construction limitations. The Company was in compliance with all financial covenants as of March 31, 2000.

## 3. Income taxes

The following summarizes the income tax provision (benefit) for the years ended March 31 (in thousands):

| | 2000 | 1999 | 1998 |
|---|---|---|---|
| Current: | | | |
| Federal | $3,568 | $3,575 | $(606) |
| State | 416 | 464 | 5 |
| Deferred | (191) | (441) | 186 |
| Provision (benefit) for income taxes | $3,793 | $3,598 | $(415) |



RCI000919

The components of deferred income taxes consist of the following as of March 31 (in thousands):

| | 2000 | 1999 |
|---|---|---|
| Inventory | $ 891 | $ 904 |
| Warranty reserves | 577 | 396 |
| Other | 281 | 134 |
| Other accrued liabilities | 47 | 171 |
| Deferred income tax asset | $ 1,796 | $ 1,605 |

A reconciliation of the Company's statutory federal income tax rate to the effective tax rate is as follows for the years ended March 31:

| | 2000 | 1999 | 1998 |
|---|---|---|---|
| Statutory federal rate | 34.0% | 34.0% | 34.0% |
| State income taxes, net of federal benefit | 6.0 | 6.0 | 6.0 |
| Other | 1.0 | 1.0 | 1.0 |
| Effective tax rate | 41.0% | 41.0% | 41.0% |

**4. Employee stock plans**

***Stock option plans***

The Company has a stock option plan (the Plan) which provides for the granting of options to designated employees, nonemployees and consultants of the Company to purchase up to an aggregate of 1,300,000 shares of common stock at an exercise price not less than the fair market value of the common stock on the dates the options are granted. The options become exercisable in equal amounts over a five-year period from the date of grant and expire ten years from the date of grant. Certain options granted during fiscal year 1999 have a vesting period of seven years, yet are accelerated if certain financial targets are met each year.

The Company also has a director stock option plan (DSOP), pursuant to which 100,000 shares of common stock have been reserved for the granting of stock options to the Company's outside directors. Under the DSOP, the Company granted initial options for the purchase of 1,000 shares to each of the two outside directors and thereafter will grant stock options for the purchase of 1,000 additional shares of common stock annually for each year of continued service on the board. Each option is granted at fair market value on the date of grant and is exercisable for a period of four years, commencing one year after the date of grant.

The following table summarizes activity in the stock option plans:

| | Number of shares | | Weighted average exercise |
|---|---|---|---|
| | The Plan | DSOP | price |
| Balance, March 31, 1997 | 575,636 | 4,000 | $6.26 |
| Canceled | (40,534) | --- | 6.37 |
| Balance, March 31, 1998 | 535,102 | 4,000 | 5.55 |
| Granted | 303,000 | 2,000 | 4.56 |
| Balance, March 31, 1999 | 838,102 | 6,000 | 5.31 |
| Granted | 100,675 | 2,000 | 6.05 |
| Canceled | (233,399) | --- | 4.67 |
| Balance, March 31, 2000 | 705,378 | 8,000 | $5.74 |
| Options exercisable as of March 31, 2000 | 548,972 | 6,000 | $5.84 |
| Shares available for future grants | 294,622 | 88,000 | |

Shares outstanding under the stock option plans as of March 31, 2000 have exercise prices ranging from $4.50 to $8.53 and a weighted average remaining contractual life of 6.3 years.

The Company follows the provisions of SFAS No. 123, "Accounting for Stock-Based Compensation." As permitted by SFAS No. 123, the Company has elected to continue to account for its stock option plans under the provisions of APB Opinion No. 25, "Accounting for Stock Issued to Employees," under which no compensation costs have been recognized. Because the measurement provisions of SFAS No. 123 have not been applied to options granted prior to April 1, 1995, the resulting pro forma compensation costs may not be representative of those to be expected in future years. Had compensation costs for these plans been recorded at fair value consistent with the provisions of SFAS No. 123, the Company's net income (loss) and earnings (loss) per share would have been as follows:

| | 2000 | 1999 | 1998 |
|---|---|---|---|
| Net income (loss) (in thousands): | | | |
| As reported | $5,459 | $5,177 | $(598) |
| Pro forma | 5,238 | 4,959 | (713) |
| Basic and diluted earnings (loss) per share: | | | |
| As reported | $ 0.94 | $ 0.90 | $(0.10) |
| Pro forma | 0.90 | 0.86 | (0.12) |

The weighted average fair value of stock options granted in fiscal year 2000 was $0.05.

The fair value of each option is estimated on the date of grant using the Black-Scholes option pricing model. The following assumptions were used to estimate the fair value of options granted in the fiscal years:

| | 2000 | 1999 | 1998 |
|---|---|---|---|
| Risk-free interest rate | 5.84%–6.38% | 4.33%–6.74% | 5.97%-6.11% |
| Expected life | 1–4 years | 5–10 years | 5-10 years |
| Expected volatility | 43% | 42% | 34%-36% |
| Expected dividend yield | None | None | None |



RCI000921

***Employee stock purchase plan***

The Company sponsors an employee stock purchase plan (the Purchase Plan). A total of 250,000 shares of common stock are reserved for issuance under the Purchase Plan. The Purchase Plan permits eligible employees to purchase common stock at 85 percent of the lower fair market value of the common stock at certain dates. During the years ended March 31, 2000, 1999 and 1998, employee contributions of approximately $102,000, $106,000 and $94,000, respectively, were used to purchase common stock under the terms of the Purchase Plan.

## 5. Retirement savings plan

The Company sponsors a 401(k) profit-sharing plan which covers all employees over the age of 20½ years who elect to participate. The Company may, at its discretion, make contributions to the 401(k) plan. All plan contributions vest in equal installments over a five-year period. The Company contributed $197,000, $191,000 and $80,000 to the 401(k) plan in fiscal years 2000, 1999 and 1998, respectively.

## 6. Commitments and contingencies

***Letters of credit and bonds***

Letters of credit are issued by banks, and bonds are issued by insurance companies on behalf of the Company during the ordinary course of business, as required by certain development agreements with municipalities. As of March 31, 2000, the Company had outstanding letters of credit totaling $2,846,000 and outstanding bonds totaling $3,863,000.

***Litigation***

The Company is party to certain claims arising in the ordinary course of business. In the opinion of management, based upon the advice of legal counsel, the outcomes of such claims are not expected to be material to the Company's financial position, results of operation or cash flows.

***Leases***

The Company is obligated under various noncancelable operating leases for office facilities and certain equipment. Rental expense under these agreements, excluding leaseback of model homes, was approximately $817,000, $728,000 and $714,000 in fiscal years 2000, 1999 and 1998, respectively.

Future minimum lease payments required under noncancelable operating lease agreements are as follows (in thousands):

| Fiscal year | Amount |
|---|---|
| 2001 | $ 505 |
| 2002 | 391 |
| 2003 | 358 |
| 2004 | 274 |
| 2005 | 147 |
| Thereafter | 132 |
| | $1,807 |

During fiscal year 1999, the Company entered into three agreements for the sale and leaseback of 21 of its model homes in Minnesota and New Jersey for approximately $3,602,000, which resulted in the recognition of an approximately $518,000 gain in fiscal year 1999. The lease term on the individual model homes is month-to-month, and rental expense for fiscal years 2000 and 1999 was approximately $453,000 and $335,000 respectively.

7. **Quarterly financial information (unaudited)**

The following is a condensed summary of quarterly results of operations for fiscal years 2000 and 1999 (in thousands, except per share data):

| | Net sales | Gross profit | Net income | Basic and diluted earnings per share |
|---|---|---|---|---|
| Fiscal year 2000: | | | | |
| First quarter | $ 49,587 | $ 7,143 | $ 316 | $0.05 |
| Second quarter | 62,813 | 9,213 | 1,148 | 0.20 |
| Third quarter | 60,777 | 8,648 | 1,078 | 0.19 |
| Fourth quarter | 87,657 | 13,342 | 2,917 | 0.50 |
| | $260,834 | $38,346 | $5,459 | $0.94 |
| Fiscal year 1999: | | | | |
| First quarter | $ 51,355 | $ 6,870 | $ 347 | $0.06 |
| Second quarter | 63,782 | 9,700 | 1,318 | 0.23 |
| Third quarter | 58,786 | 8,729 | 1,023 | 0.18 |
| Fourth quarter | 78,752 | 12,302 | 2,489 | 0.43 |
| | $252,675 | $37,601 | $5,177 | $0.90 |

The three months ended March 31, 2000, and December 31, 1999, include pre-tax land sales of $11,089,000, and $4,305,000, respectively.



RCI000923

## PART III

### Item 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

Information regarding the directors of the Company is incorporated herein by reference to the descriptions set forth under the caption "Election of Directors" in the Proxy Statement for Annual Meeting of Shareholders to be held September 7, 2000 (the "2000 Proxy Statement"). Set forth below are the names, ages and positions of the executive officers of the Company.

| | | |
|---|---|---|
| David H. Rotter | 53 | President, Secretary and Director |
| Bernard J. Rotter | 57 | Vice President, Treasurer and Director |
| Todd M. Stutz | 42 | Executive Vice President and Director |
| Lawrence B. Shapiro | 44 | Chief Financial Officer and Director |

The officers of the Company are elected annually and serve at the discretion of the Board of Directors. Lawrence B. Shapiro and Todd M. Stutz are employed pursuant to written employment agreements.

***Background of Executive Officers***

*David H. Rotter* is a founder of the Company and has been a member of its Board of Directors since its inception. He served as the Company's Vice President from 1973 through March, 1990, and has served as President from April, 1990, to the present. He has also served as the Company's Secretary since its inception. He is the brother of Bernard J. Rotter.

*Bernard J Rotter* has served as a Director, Vice President and Treasurer of the Company since July 1984. He is the brother of David H. Rotter.

*Todd M. Stutz* was elected a Director of the Company in August, 1992, and has served as Executive Vice President since June, 1991. He joined the Company in April, 1989, and served as its Land Development Manager until June, 1991. Between April, 1980, and March, 1989, he was employed by the Housing and Redevelopment Authority of the City of Columbia Heights, Minnesota, as Executive Director.

*Lawrence B. Shapiro* was elected Chief Financial Officer and a Director of the Company in August, 1992. Prior to that time, he served as the Company's Controller.

### Item 11. EXECUTIVE COMPENSATION

Information regarding executive compensation is incorporated herein by reference to the information set forth under the caption "Executive Compensation" in the 2000 Proxy Statement.

### Item 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

Information regarding security ownership of certain beneficial owners and management of the Company is incorporated herein by reference to the information set forth under the caption "Security Ownership of Certain Beneficial Owners and Management" in the 2000 Proxy Statement.

### Item 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

Information regarding certain relationships and related transactions with the Company is incorporated herein by reference to the information set forth under the caption "Certain Transactions" in the 2000 Proxy Statement.

## PART IV

**Item 14. EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K**

(a) **Documents filed with this report.**

(1) See index to consolidated financial statements on page 13 of this report.

(2) All supplemental schedules are omitted because of the absence of conditions under which they are required or because the information is shown in the Consolidated Financial Statements or notes thereto.

(b) **Reports on Form 8-K.** During the quarter ended March 31, 2000, the Company filed no reports on Form 8-K with the Securities and Exchange Commission.

(c) **Exhibits**

| Exhibit Number | Description |
|---|---|
| 3.1 | The Company's Restated Articles of Incorporation.[1] |
| 3.2 | The Company's Bylaws.[1] |
| 10.1 | The Rottlund Company, Inc. 1992 Stock Option Plan.[1] |
| 10.2 | The Rottlund Company, Inc. 1992 Director Stock Option Plan.[1] |
| 10.3 | The Rottlund Company, Inc. Employee Stock Purchase Plan.[1] |
| 10.4 | Form of Shareholders Agreement.[1] |
| 10.5 | Second Amended and Restated Credit Agreement with BankBoston, N.A., dated November 30, 1999. |
| 10.6 | First Modification of Second Amended and Restated Credit Agreement with Fleet National Bank and Bank United, dated April 21, 2000. |
| 10.7 | Employment Agreement with Todd M. Stutz, dated February 1, 1999.[2] |
| 10.8 | Change in Control Agreement of Todd M. Stutz, dated February 1, 1999.[2] |
| 10.9 | Employment Agreement with Lawrence B. Shapiro, dated February 1, 1999.[2] |
| 10.10 | Change in Control Agreement of Lawrence B. Shapiro, dated February 1, 1999.[2] |
| 11 | Computation of Per Share Earnings. |
| 21 | Subsidiaries of the Company. |
| 23 | Consent of Arthur Andersen LLP. |
| 27.1 | Financial Data Schedule. |

(1) Incorporated by reference to the Company's Registration Statement on Form S-1, Registration No. 33-51726 (the "Form S-1").

(2) Incorporated by reference to the Company's filing on Form 10-K for the year ended March 31, 1999.

## SIGNATURES

Pursuant to the requirements of section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

THE ROTTLUND COMPANY. INC.

Dated: June 29, 2000

By /s/ David H. Rotter
David H. Rotter
*President, Chief Executive Officer and Director*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ David H. Rotter<br>David H. Rotter | President, Chief Executive Officer and Director | June 29, 2000 |
| /s/ Bernard J. Rotter<br>Bernard J. Rotter | Vice President, Treasurer and Chairman of the Board | June 29, 2000 |
| /s/ Lawrence B. Shapiro<br>Lawrence B. Shapiro | Chief Financial Officer and Director (Principal Financial and Accounting Officer) | June 29, 2000 |
| /s/ Todd M. Stutz<br>Todd M. Stutz | Executive Vice President and Director | June 29, 2000 |
| Dennis Doyle | Director | |
| Scott D. Rued | Director | |

# SHAREHOLDER INFORMATION



## CORPORATE OFFICES

3065 Centre Pointe Drive
Roseville, Minnesota 55113
Telephone (651) 638-0500

## OFFICERS AND DIRECTORS

David H. Rotter - President
Bernard J. Rotter - Vice President
Todd M. Stutz - Executive Vice President
Lawrence B. Shapiro - Chief Financial Officer
Scott D. Rued - Vice President/CFO of Hidden Creek Industries
Dennis J. Doyle - President of Welsh Companies



## STOCK LISTING

The common stock of The Rottlund Company, Inc. is currently listed on the American Stock Exchange (AMEX), under the Symbol "RH."

## INVESTOR RELATIONS

Inquiries from securities analysts and others in the professional investment community should be directed to:

The Rottlund Company, Inc.
Lawrence B. Shapiro, CFO
3065 Centre Pointe Drive
Roseville, Minnesota 55113
Telephone: (651) 638-0500

## INDEPENDENT AUDITORS

Arthur Andersen & Co.
Minneapolis, Minnesota 55402



## CORPORATE COUNSEL

Gray, Plant, Mooty, Mooty & Bennett, P.A.
Minneapolis, Minnesota 55402

## STOCK TRANSFER AGENT

Norwest Bank Minnesota, N.A.
P.O. BOX 738
South St. Paul, Minnesota 55075-0738
Telephone: 1-800-468-9716



## TO OBTAIN EXHIBITS

The Company will furnish to each person whose proxy is being solicited any exhibit described in part IV, Item 14 of the form 10-K upon the payment, in advance, of fees based on the Company's reasonable expenses in furnishing such exhibit(s). Requests for copies of such exhibit(s) should be directed to Mr. Lawrence B. Shapiro, Chief Financial Officer, at the Company's principal address.

# 2000

Your Builder for Life

# ROTTLUND HOMES™

3065 Centre Pointe Drive Roseville, Minnesota 55113

EQUAL HOUSING OPPORTUNITY

RCI000928

Exhibit R130

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| The Rottlund Company, Inc. d/b/a Rottlund Homes, a Minnesota Corporation,<br>Plaintiff,<br>vs.<br><br>Pinnacle Corporation d/b/a Town & Country Homes, an Illinois Corporation, Town & Country Homes, Inc., a Minnesota Corporation, Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation, and The Bloodgood Group, Inc., an Iowa Corporation,<br>Defendants,<br>and<br><br>Town & Country Homes, Inc., a Minnesota Corporation,<br>Third-Party Plaintiff,<br>vs.<br><br>Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation,<br>Third-Party Defendant. | ) | No.: 01-CV-1980 (DSD/SRN)<br><br>**AFFIDAVIT OF MELISSA SNELSON**<br><br>**Partially Filed Under Seal** |

STATE OF MINNESOTA )
) ss
COUNTY OF HENNEPIN )

Melissa C. Snelson, being duly sworn, states:

1. I am a Certified Public Accountant and a partner of Stonehill Group, LLC, 150 South Fifth Street, Suite 3350, Minneapolis, Minnesota, 55402, a consulting firm providing services to businesses and counsel in the areas of claims, disputes and insolvency matters. I have been retained by The Rottlund Company, Inc., d/b/a Rottlund Homes ("Rottlund"), to provide an

opinion regarding Rottlund's damages resulting from Defendants Pinnacle Corporation d/b/a Town & Country Homes, an Illinois Corporation, and Town & Country Homes, Inc., a Minnesota Corporation ("Defendants"), alleged infringement of Rottlund's copyrights at issue in the above-entitled matter.

2. Attached hereto as Exhibit A is a true and correct copy of a document entitled "Calculation of Rottlund's Estimated Actual Damages by Community" which summarizes information contained in my prior expert disclosures. [FILED UNDER SEAL]

3. FURTHER YOUR AFFIANT SAYETH NOT.

Melissa C. Snelson

Subscribed and sworn to before me
this 1st day of September, 2004

NOTARY PUBLIC

NANCY A. SKLUZACEK
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES JAN. 31, 2005

(NOTARIAL SEAL)

2141373v1

Court File No. 01-1980 / ROTTLUND / Pinnacle
Krummen Affidavit dated September 8, 2004

# FILED UNDER SEAL

EXHIBIT A

EXHIBIT R130

# FILED UNDER SEAL

Exhibit R131

# THIS EXHIBIT HAS BEEN OMITTED

Exhibit R132

Court File No. 01-1980 / ROTTLUND / Pinnacle
Krummen Affidavit dated September 8, 2004

# FILED UNDER SEAL

EXHIBITS R133 – R134

Exhibit R135

UNITED STATES DISTRICT COURT DISTRICT O
FOURTH DIVISION No.:
- - - - - - - - - - - - - - - - - - - - - - - - - - - -The Rottlund C
d/b/a Rottlund Homes, a MinnesotaCorporation,
Plaintiff,vs.
Pinnacle Corporationd/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,
Defendants,
and
Town & Country Homes, Inc.,
a Minnesota Corporation,
Third-Party Plaintiff,
vs.
Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa Corporation,
Third-Party Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
Videotaped
30(b)(6) Deposition of
BLOODGOOD SHARP BUSTER ARCHITECTS &
PLANNERS OF IOWA, INC.
(Testimony of James Grundmeier)
Tuesday March 4, 2003 10:05 a.m.

Q Do you spend roughly an equivalent amount of time with each of the subsidiaries on an annual basis or you spend more time with the Iowa subsidiary?
A It varies somewhat by size of the group, type of projects they're working on right at the time, the personnel at the different groups. Some -- some communicate more than others.
Q Back to The Bloodgood Group, Inc., which you have your title with. Is there some kind of a profit-sharing or -- or revenue stream that flows up to The Bloodgood Group, Inc., from the subsidiaries?
A Yes.
Q Would you explain how that works, financially speaking.
A Each of the separate corporations would have their own income statement for their income, expenses, and bottom-line profits. And not being a financial person, I guess I'm not sure that I know -- I know how it appears to me, but I'm not sure of the -- the technical portions of that.
Q Well, does a certain percentage of the bottom-line profits flow upstream to The Bloodgood Group, Inc., from the subsidiaries?
MR. SCHWIEBERT: Objection. No

EXHIBIT 434

foundation.
A The Bloodgood Group, Inc., has a specific profit-sharing formula that is based on profits of the total parent corporation, which is a total of what the subsidiaries make. It's also based on the profits of each of those subsidiaries and based on some other factors.
BY MR. KRUMMEN:
Q So each of these subsidiaries has a bottom-line profit number. And does 100 percent of those profits initially come up to The Bloodgood Group, Inc.?
MS. NEWMAN: Objection as to foundation and form.
A Those profits come up to the parent corporation to fit into the profit-sharing formula.
BY MR. KRUMMEN:
Q And then you have a profit-sharing formula, and I assume that the profits are then distributed back downstream to the various subsidiaries based on something. Correct?
MR. FARMER: Objection. Form.
MS. NEWMAN: Same objection.
A The overall profits are distributed to all the various corporate entities.

BY MR. KRUMMEN:

Q How is the determination made as to which subsidiary is entitled to what amount of profits?

MS. NEWMAN: Objection as to foundation.

A That's determined by the formula.

BY MR. KRUMMEN:

Q What's the formula?

MS. NEWMAN: Same objection.

A It's not a specific -- it -- it's just changed somewhat for the year 2003, and we just had a discussion of it last Thursday and Friday. Is this really related to any of the questions I was supposed to answer?

MS. NEWMAN: With respect to the relationship of the corporations, I believe that that was one of the -- the topics. But --

THE WITNESS: Okay.

MS. NEWMAN: -- maybe Mr. Krummen could indicate what topic he's asking you.

MR. KRUMMEN: Sure. I'm asking about that, and I thought this is the revenue and profit guy.

BY MR. KRUMMEN:

Q So ultimately I get to figure out where all the revenues and profits off of the --

Exhibit R136

# WASHINGTON SQUARE -- MARGIN ANALYSIS -- COST-PLUS, 22%

| PLAN INFO | | | PRICE, PROMOTIONS, TOTAL REVENUES | | | | | HARD, LAND, TOTAL COSTS | | | | | | | | | GROSS MARGIN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PLAN # | PLAN NAME | SQ. FT. | BASE PRICE | SALES PRICE PER FT. | PROMO | 3 PTS. LTV PROMO | NET SALES REVENUES | HARD COST | 1% VAR. | HARD COST PER FT. | H.C. % OF PRICE | OTHER COSTS | CURRENT LOT COST | L.C. % OF PRICE | TOTAL COSTS | GROSS MARGIN DOLLARS | GROSS MARGIN % |
| 34 | Potomac | 1192 | $132,490 | $111.15 | $0 | $0 | $132,490 | $72,462 | $724.62 | $60.79 | 55.2% | $0 | $30,137 | 22.7% | $103,324 | $29,166 | 22.01% |
| 34 w/pc735 | Farragut | 1533 | $141,490 | $92.30 | $0 | $0 | $141,490 | $79,365 | $793.65 | $51.77 | 56.7% | $0 | $30,137 | 21.3% | $110,296 | $31,194 | 22.05% |
| 34 w/pc800 | Georgetown | 1533 | $140,990 | $91.97 | $0 | $0 | $140,990 | $78,899 | $788.99 | $51.47 | 56.5% | $0 | $30,137 | 21.4% | $109,825 | $31,165 | 22.10% |
| 31 | Arlington | 1381 | $141,490 | $102.45 | $0 | $0 | $141,490 | $79,563 | $795.63 | $57.61 | 56.8% | $0 | $30,137 | 21.3% | $110,496 | $30,994 | 21.91% |
| 32 | Garfield | 1482 | $148,490 | $100.20 | $0 | $0 | $148,490 | $84,720 | $847.20 | $57.17 | 57.6% | $0 | $30,137 | 20.3% | $115,704 | $32,786 | 22.08% |
| | | AVERAGE | $140,990 | $99.61 | $0 | $0 | $140,990 | $79,002 | $790.02 | $55.76 | 56.6% | $0 | $30,137 | 21.4% | $109,929 | $31,061 | 22.03% |

Points promotion calculated as 3 points on 90% of base selling price; adjust accordingly based on specific promotion

Gross Margin Percentage represents 1-(Total Costs/Net Sales Revenues)

Lot cost from Jeff Palmer, 1/24/01; SSA factored into lot cost

Hard cost from low-bid analysis, published 1/23/01

Hard cost of plan 31 and plan 32 averaged based on actual plan mix (31 plan -- 24 units in 4-unit bldg., 8 units in 6-unit bldg.; 32 plan -- 24 units in 4-unit bldg., 16 units in 6-unit bldg.

PENGAD 800-631-6989 # 302 DEPOSITION EXHIBIT AH 12/13/03

gross margin XLW

2/7/01

Exhibit R137

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

- - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes, a Minnesota
Corporation,

Plaintiff,

vs.

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc.,
a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - -

Discovery Conference
Wednesday, November 26, 2003
10:46 a.m.

They still have to prepare to ask the questions. They still have to ask the questions. They still have to get the responses and then ask their follow-up. There's no additional time at all being spent by Rottlund in asking any questions about these newly produced documents.

There's nothing further that -- that Rottlund is going to be incurring here. It would be the same no matter what time frame these documents were produced. And we object to having to pay Rottlund's attorney's fees in deposing these witnesses.

We understand the Court's order that the travel expenses and the expenses associated with conference rooms and hotels are not something that Rottlund should have to bear and therefore the witnesses will appear in Minneapolis. That's all the Court ordered. That's all that was discussed.

MAGISTRATE JUDGE NELSON: Ms. Newman, I don't recall the Court order having something to do with hotels and conference rooms. The Court order says Rottlund is entitled to ask about these tardily produced documents. They're

entitled to do now. And they're entitled to do it at your expense meaning the law firm's expense or the expense of your client.

It is not the case that there are no additional costs to having to take a second set of depositions; but more importantly, this is designed as a sanction for these late-produced unexcused documents.

Let me be very clear about how this is going to proceed: the court reporter costs, the videographer's costs, and the attorney's fees incurred in actually questioning the witnesses about these documents and the documents in context, that is the two and a half hours per witness that we have identified, ought to be fairly covered either by the firm or their client.

Wouldn't have happened but for this late -- these late-produced documents. They would have been incorporated in earlier depositions. There's a lot of extra time involved now, not to mention a lot of unnecessary time expended during the BSB depositions in the absence of those documents and these redactions that made no sense.

So is everyone very clear now on what the order is?

Plaintiffs, are you clear?

MR. KRUMMEN: Yes, Your Honor.

MAGISTRATE JUDGE NELSON: BSB, are you clear?

MS. NEWMAN: Yes, Your Honor.

MAGISTRATE JUDGE NELSON: We have 10 more minutes. Are we done with the November 6 letter?

MR. KRUMMEN: Your Honor, my suggestion is we cover bullet point number 2 of the November 6 letter and then maybe take everything else up on December 4.

We also have a court reporter that is a little bit constrained. She can go until 12:10, and then she also needs to leave.

So briefly the point number 2 on page 2 of Rottlund's November 6, 2003, letter references attachment C or Exhibit C. And what we have there is a list of things that are outstanding. The most critical of which include Chris Jorgensen, a key architect at BSB, and Larry Moore's time sheets that were not ever produced to us.