Court File No. 01-1980 / ROTTLUND / Pinnacle
Krummen Affidavit dated September 8, 2004

EXHIBIT R138.1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

---

The Rottlund Company, Inc.,
d/b/a Rottlund Homes,
a Minnesota Corporation,

Civil Action No. 01-CV-1980 DSD/SRN

Plaintiff,

v.

Pinnacle Corporation, d/b/a Town & Country Homes,
an Illinois Corporation and Town & Country Homes, Inc.,
a Minnesota Corporation, Bloodgood Sharp Buster
Architects & Planners of Iowa, Inc., an Iowa Corporation,
And The Bloodgood Group, Inc., an Iowa Corporation,

Defendants,

and

Town & Country Homes, Inc., a Minnesota Corporation,

Third-Party Plaintiff,

v.

Bloodgood Sharp Buster
Architects & Planners of Iowa, Inc.,
an Iowa Corporation,

Third-Party Defendant.

---

**PINNACLE CORPORATION'S MEMORANDUM IN OPPOSITION TO ROTTLUND'S MOTION FOR PARTIAL SUMMARY JUDGMENT FILED UNDER SEAL**

**NOT TO BE OPENED OR REVIEWED EXCEPT PURSUANT TO COURT ORDER**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

The Rottlund Company, Inc., d/b/a Rottlund Homes, a Minnesota Corporation,

Plaintiff,

v.

Pinnacle Corporation, d/b/a Town & County Homes, an Illinois Corporation, Town & County Homes, Inc., a Minnesota Corporation, Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation, and The Bloodgood Group, Inc., an Iowa Corporation,

Defendants,

and

Town & County Homes, Inc., a Minnesota Corporation,

Third-Party Plaintiff,

v.

Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

No.: 01-CV-1980 (DSD/SRN)

**PINNACLE CORPORATION'S MEMORANDUM IN OPPOSITION TO ROTTLUND'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**FILED UNDER SEAL**

## INTRODUCTION

Rottlund's motion asks this Court to enter partial summary judgment finding that (i) the copyrights on two of its technical drawings are valid; (ii) that Pinnacle Corporation ("Pinnacle") actually copied these technical drawings; (iii) that Pinnacle had access to these technical drawings; and (4) that the technical drawings for Pinnacle's Washington Square town homes and co-defendant Town & Country Homes, Inc.'s ("TCM") Homestead town homes are substantially similar to the copyrighted technical drawings. As explained herein, Rottlund's motion should be denied with respect to all four issues.

As an initial matter, however, this Court must determine whether Rottlund's underlying theory of infringement has any legal validity. If there is no legal basis for Rottlund's claim, the Court cannot consider the remaining issues Rottlund advances. Even if the Court gets beyond the fundamental infirmity of Rottlund's legal theory, genuine issues of material fact preclude summary judgment on the issues of validity, access and substantial similarity. Furthermore, Rottlund has produced no evidence whatsoever that Pinnacle engaged in "actual copying," so summary judgment on this issue must be denied with regard to Pinnacle.

## STATEMENT OF FACTS

### I. Rottlund's claimed copyrights

Rottlund's motion is expressly limited to its claims of infringement on the technical drawings bearing Registrations VAu 447-395 and VAu 546-285. The 447-395 copyright is entitled "Rush Creek Villa II, 8 unit w/no step." (Davenport Aff., Ex. D) The certificate of registration identifies it as a Technical Drawing and claims the work was completed in 1997. (*Id.*) Section 6 of the Certificate, dealing with derivative works, is labeled "NA" for "not applicable. (*Id.*) The 546-285 copyright is entitled "The Reserve Villa II 8 unit building." (Davenport Aff., Ex. E) Like the 447-395 copyright, the 546-285 copyright is identified as a

Technical Drawing as opposed to an Architectural Work. (*Id.*) Rottlund claims the work was completed in 2001. (*Id.*) Rottlund did not identify it to be a derivative work. (*Id.*)

The deposit materials for the 447-395 and 546-285 registrations generally depict eight-unit town home structures arranged in a four-by-four, back-to-back configuration. (Davenport Aff. Ex. F, G) The town homes have two unit styles: four exterior units on the corners of the building, and four interior units with three party walls and front exposures only. The floor plans are "mirrored" to create this configuration, so that all of the exterior units are identical to each other, as are all of the interiors. The significant difference between the 546-285 registration and the 447-395 registration is that the 546-285 plans depict a sprinkler room or shed at one end of the building. (*Compare* Davenport Aff., Ex. F, p. D00011; *with* Ex. G, p. RCI 004161)

Rottlund has admitted that the presence of this sprinkler room changes the "gestalt" of the design. (See Affidavit of Christopher J. Murdoch at Ex. A) Therefore, Rottlund's own admission, the defendant developments that do not have sprinkler rooms can only be accused of infringing the 447-395 registration. To succeed, Rottlund must show access and substantial similarity to the 447-395 deposit materials with regard to these developments. Evidence relating to the 546-285 deposit materials will be irrelevant to this inquiry.

## II. The Defendant Developments

### A. The Washington Square development in Aurora, Illinois.

Of the several town home developments accused of infringement, the only development built and constructed by Pinnacle is Washington Square in Aurora, Illinois. Rottlund has failed to offer any proof that Pinnacle owned, built, sold, or offered for sale, any of the Homestead town homes in Minnesota. All of the Minnesota town homes were developed and sold exclusively by co-defendant TCM.

Surprisingly, Rottlund has not even provided the Court with a copy of the plans for the Washington Square town homes to support its motion. Instead, Rottlund claims that BSB "simply 're-elevated' the Homestead Collection town houses for Pinnacle," and concludes that the plans for Washington Square are essentially identical to the Homestead plans. (Rottlund Mem., p. 8) Given that Rottlund has not provided any expert testimony to support its motion, and expects the Court to make its own side-by-side comparison of the plans at issue, Rottlund's failure to provide *anything* regarding Washington Square requires denial of Rottlund's motion as it relates to Washington Square. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Rottlund's characterization of Mr. Buster's deposition testimony is also extremely misleading. Immediately after his statement about "re-elevating" the plans, Mr. Buster testified as follows:

> Q What changes did you make to the elevations which appear on Exhibit Number 103?
>
> A Well, this is -- I don't know what year this is in. '00 -- sometime prior to '00 anyway. I remember I had changed the overall roof structure from a gable to a hip. I had broken the scale of one of the units down to a smaller gable so that when they're combined, two large gables wouldn't running into each other. I looked at the siding structure and worked on a process to develop a wider siding structure on the bottom and a narrower siding structure on the top. I probably looked at the pitch of the roof and -- and maybe the addition of the dormers.

(Murdoch Aff., Ex. B, 71:14 – 72:13)

Perhaps Rottlund does not want the Court to compare the 447-395 plans to the Washington Square plans because it knows that substantial differences exist between the designs. For example, the Washington Square town homes were only constructed in four-unit and six-unit configurations. (Murdoch Aff. Ex. C at 220:4 – 221:4) In contrast, the 447-395 plans describe an "8-unit w/no step" town home building. According to Bud Rotter, this fact alone renders Washington Square significantly different because four-unit buildings are not back-to-backs at all. (Murdoch Aff. Ex. C at 65:12 – 65:18)

The four- and six-unit configurations at Washington Square have elevations that are dramatically different than Rottlund's 447-395 plans. For example, both side elevations of Rottlund's 447-395 plan are:



(Davenport Aff., Ex. F at D00001). This looks nothing like one side elevation of the Washington Square plan for a four-unit town home building:



(Murdoch Aff., Ex. E at PIN 00008)

The front elevations, as well, are dramatically different. Rottlund's 447-395 plan depicts an eight unit structure:



(Davenport Aff., Ex. F at D00001)

Whereas Pinnacle's Washington Square front elevation shows only four units:



(Murdoch Aff., Ex. E at PIN 00008)

As the nonmovant, Pinnacle need not convince the Court that Washington Square and the 447-395 plans are different. Rather, Rottlund bears the burden of proving substantial similarity. To support that burden Rottlund has given the Court nothing: no expert testimony, no side-by-side comparisons, *not even a copy of the plans for Washington Square.* In light of the obvious and manifest differences in the elevations of the two buildings, Rottlund has failed to adduce evidence of substantial similarity with regard to Washington Square.

**B. The Homestead Collection** [1]

**1. Rottlund's motion requires a comparison of the architectural plans.**

Rottlund's Fifth Amended Complaint alleges that five separate Homestead developments in Minnesota infringe on either the 447-395 or the 546-285 registrations, yet in this motion it provides the Court copies of only two sets of Homestead plans. Contrary to Rottlund's helter-skelter approach, these projects must be distinctly addressed. The five alleged developments are (1) Centennial Crossing in Maple Grove, (Davenport Aff. Ex. TT); (2) Harvest Hills in Plymouth, (*Id.*, Ex. AAA); (3) Providence Point in Shakopee, (Murdoch Aff., Ex. F); (4) Cornerstone Lake in Lakeville, (*Id.*, Ex. G); and, (5) Springbrooke in Lakeville. (*Id.*, Ex. H) (*See also* Rottlund's Fifth Amended Complaint, ¶¶ 35-39) Of these developments, only Harvest Hills has sprinkler rooms. Centennial Crossing, Providence Point, Cornerstone Lake, and Springbrooke do not have sprinkler rooms, so any evidence relating to the 546-285 plans is irrelevant to these developments.

Nowhere in Rottlund's motion or its supporting materials is there a side-by-side comparison of the plaintiff's and the defendants' plans. Instead, Rottlund relies on largely irrelevant discovery material to conclude the "total look and feel" of the plans is substantially similar. For example, Rottlund attempts to rely on marketing brochures that contain photographs of furnished models to prove the technical drawings are substantially similar. (Rottlund Mem. at 11, 31; Davenport Aff., Ex. CCC, DDD) This comparison is immaterial for two reasons. First, Rottlund's motion is limited to its technical drawings and specifically excludes its copyright claims based on architectural works or buildings. Because the brochures depict as-built structures, neither the brochures nor the photographs they contain can establish that defendants' *plans* are substantially similar to Rottlund's plans. *National Medical Care, Inc. v. Espiritu*, 284

[1] Although Pinnacle did not sell or profit from The Homestead Collection, Rottlund has accused Pinnacle of contributory infringement relating to these developments.

F.Supp.2d 424, 435 (S.D.W. Va. 2003) ("[A]n as-built structure or feature cannot be an infringing copy of a technical drawing.")

Second, Rottlund has consistently refused to premise its claim on the similarity of specific elements, rooms or features. Instead, Rottlund claims the "gestalt" or "total look and feel" of the design has been infringed. This position renders any comparison of marketing brochures irrelevant because they only display similarities between specific rooms. The brochures do not depict any "gestalt" or demonstrate any substantial similarity between the "total look and feel" of the technical drawings.

Rottlund also prominently relies on a letter written by Pinnacle's Steve Sandelin in which he states that the back-to-back town homes at Centennial Crossing are "obviously similar" to "Rottlund's Villa product." (Rottlund Mem. at 1) Once again, however, this statement is irrelevant to the present motion because Mr. Sandelin is comparing buildings to buildings (or perhaps advertisement to advertisement). By limiting its motion to the technical drawings, Rottlund has restricted the Court's inquiry to a comparison of plans to plans. Mr. Sandelin's statement has no bearing on that analysis.

Moreover, Rottlund simply assumes that Mr. Sandelin's phrase "obviously similar" is legally probative. It is not. The defendant town homes can be "obviously similar" to Rottlund's town homes in ways that do not constitute infringement. *See Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) ("Not all copying, however, is copyright infringement."); *Saturday Evening Post Company v. Rumbleseat Press, Inc.*, 816 F.2d 1191, 1199 (7th Cir. 1987) ("The copyright laws do not forbid the making of close substitutes.")

No one disputes that the Homestead plans and the 447-395 and 526-285 plans both depict back-to-back buildings. They both contain units of approximately 1200 square feet. They

compete for the same buyers. None of these "obvious similarities," however, constitute copyright infringement.

**2. Rottlund's claims of substantial similarity are unsupported.**

**(a) Interior Units**

Fully one-half of the town homes in the 447-395 and 546-285 plans are interior units. Even though Rottlund premises its claim of infringement on the "designs as a whole," its motion virtually ignores the interior units, and by doing so, ignores one-half of the "total look and feel" of its plans. Even a superficial comparison of the plans reveals that the Homestead interior units are not at all similar to the interior units of the 447-395 and 546-285 plans.

Most notably, the interior units in the Homestead plans provide for a two-story living room with a loft area on the second floor, while the 447-395 and 546-285 plans do not depict any two-story volume spaces or lofts. (*Compare* Davenport Aff., Ex. G, p. RCI 004158, *with* Ex. TT at BSB 02315) In addition, the stairwells are in different locations: in the Homestead plans the staircase bisects the living room from the dining room, as opposed to the Rottlund plans, where the stairs are in the rear of the unit. (*Id.*) This difference leads to radically different floor plans on both the first and second floor. (*Id.*)

To patch over this substantial, perhaps fatal, difference between the Homestead plans and the Rottlund plans, Rottlund argues that the Homestead *interior* units are actually copies of the *exterior* units in the 447-397 and 546-285 plans. (Rottlund Mem. at 20: "[T]he Defendants' exterior and interior unit floor plans are both copies of the total arrangement of elements in Rottlund's copyrighted Villa II exterior unit Chatham floor plan.") This argument-of-necessity wreaks havoc on Rottlund's "gestalt" theory. In the same breath, Rottlund asserts the defendants have copied the "total look and feel" of its plan, and that the defendants drastically altered the plan by eliminating one-half of the designs.

Even if the Court accepts Rottlund's contention, it would require a side-by-side comparison of the interior Homestead unit with the exterior Rottlund unit. The many and obvious differences leap off the pages. The Homestead interior units only have windows in the front, whereas the exterior units have windows on two sides. (*Compare* Davenport Aff., Ex. G at RCI 004158, *with* Ex. TT at BSB 02315) The main entrance for Rottlund's exterior units is on the side of the building, opening between the living room and dining room. (*Id.*) In contrast, the entrance to the Homestead interior unit is in the front, opening into the living room only, with the dining area in the rear of the unit. (*Id.*) The exterior units have a patio off of the dining area, accessed by sliding glass doors -- not so for the Homestead interior units. The patio is in the front, off of the living room, and it has no sliding glass doors. (*Id.*)

**b. The exterior units**

Other than self-serving assertions that the "gestalts" of the 447-397 and 546-285 plans are substantially similar to the Homestead designs, Rottlund gives this Court virtually no guidance to compare the exterior units. Aside the from the technical drawings themselves, the only "evidence" of substantial similarity Rottlund offers is its Second Amended and Supplemental Objections and Answers to Defendant Town & Country Homes, Inc.'s Interrogatory Number 3. (Davenport Aff., Ex. SSS)

In a footnote, Rottlund claims that the Second Amended and Supplemental Interrogatory answer identifies "seventy-one similarities in the elements that comprise the "gestalt" or total look and feel of the two [sic] designs in question." (Rottlund Mem. at 11, n. 11) The problem here is that Rottlund's interrogatory answer does not identify similarities between the Homestead plans and the 447-395 or 546-285 plans. Instead, the interrogatory answer states that Rottlund "claims copyright protection for, among other things, the following combination or "gestalt" of

design elements and/or features." (Davenport Aff., Ex. SSS) The answer never even purports to compare these elements to the Homestead plans.

Some of the features for which Rottlund claims protection are highly suspect. For example, Rottlund identifies the proportions and layout of the optional fireplace, even though the plans call for a prefabricated, off-the-shelf, fireplace manufactured by Superior. (*Compare* Davenport Aff., Ex. SSS at 2, items e and f, *with* Ex. A at D0006; *see also* Murdoch Aff., Ex. I at 29:16 – 30:12, where Mr. Whitten testifies that he would not be surprised if Superior has its own copyrights on the design of its fireplace.) Others items for which Rottlund claims protection are plainly not protectible, such as the proportions of a two-car garage, (item t), or the decision to place a toilet in the owner's suite bathroom (*Id*., item eee).

Rottlund's interrogatory answer does not claim the seventy-one elements are similarities for good reason: the corresponding design features in the defendants' plans are not similar at all. For example, Rottlund separately identifies the placement, proportions and layout of the master bedroom/owner's suite and master bath as six of the claimed similarities that comprise the "gestalt" of its designs. (Davenport Aff., Ex. SSS at items ss – uu, xx – zz) The master suite in the Homestead plans, however, is not placed in the same location, it does not have the same layout, and its proportions are substantially different from the master suite in the 546-285 or 447-395 plans. The two rooms are actually in opposite corners of the second floor. (*Compare* Davenport Aff., Ex. G at RCI 004156 *with* Ex. TT at BSB 02323) Likewise, aside from the fact that they both contain a toilet, sinks and a bathtub, the master baths in the Homestead plans are not even remotely similar to the 546-285 plan or the 447-395 plan. (*Compare* Davenport Aff., Ex. G at RCI 004156 *with* Ex. TT. at BSB 02323) In fact, a side-by-side comparison of the Homestead plans with the 447-395 and 546-285 plans reveals that none of the seventy-one design ideas identified in Rottlund's interrogatory answer are expressed in the same manner.

c. **Expert testimony**

The preliminary and superficial plan comparisons set out above are sufficient to warrant denial of the instant motion. However, any legally sufficient comparison of these technical drawings requires skill and expertise. Filed herewith is the Affidavit and Preliminary Expert Report of Jeffrey A. Scherer, Pinnacle's retained expert. Mr. Scherer is an architect licensed to practice in nineteen states. (Scherer Aff., ¶ 1) He is a Fellow of the American Institute of Architects and former President of the Minnesota Chapter of the American Institute of Architects. (*Id.*)

Mr. Scherer has reviewed the plans at issue and compared several aspects of the designs, with particular emphasis on the elements identified in Rottlund's interrogatory answer. Mr. Scherer's report persuasively demonstrates that no substantial similarity exists. Indeed, in many of the very ways Rottlund claims they are alike (*e.g.*, the layout, proportion and placement of the living room, dining room, kitchen, gabled side entry, etc.), the Homestead designs are markedly dissimilar.

## III. Access

Because Rottlund has limited its motion to the technical drawings covered by the 447-396 and 546-295 registrations, it must prove the defendants had access to the technical drawings themselves. Rottlund has no such proof. Instead, it attempts to prove the defendants had access to all sorts of other things, but not to the technical drawings themselves. Access to these proxies for the technical drawings are insufficient to establish access to the 447-396 or 546-295 deposit materials on both factual and legal grounds.

### A. Product tours, photographs and brochures

When TCM decided to compete in the back-to-back market, representatives of both TCM and Pinnacle toured several developments in the Minneapolis area, took photographs of the

developments and picked up brochures if they were available. This is neither remarkable nor unusual among homebuilders. Rottlund itself has a company policy that *requires* its sales personnel to shop its competitors' products. (Murdoch Aff., Ex. J at 219:8 – 219:12) Rottlund's 30(b)(6) witness on the topic testified that "you don't stay in business very long" unless you tour and shop your competitors' products. (*Id.* at 442:8 – 442:12)

Touring and photographing model town homes, however, does not establish access to their technical drawings. It might establish access to separately copyrighted as-built structures, but not to the technical drawings. Thus, all of the evidence regarding product tours and photographs is irrelevant to this motion.

The defendant representatives also picked up brochures during its product tour, including two copies of the same "Rottlund Happenings" newsletter. (Davenport Aff., Ex. Z, AA) Rottlund argues that the brochure contains reduced schematics of Villa II floor plans, which Rottlund equates with access to the technical drawings, citing certain decisions from other jurisdictions. (Rottlund Mem. at 27) Pinnacle believes Rottlund misconstrues this case law, but as an evidentiary matter, Rottlund fails to offer any proof that the "floor plans" in these brochures are based upon, or even accurately reflect, the general layout of rooms and spaces in the 447-396 or 546-295 plans. In other words, there is no evidence linking these brochures to the registration materials.

On their face, the brochures refer to Rottlund's "New Villa," not its "Villa II." (Davenport Aff., Ex. Z, AA) The "floor plan" labeled "Breckenridge" depicts a one-car garage, whereas the 447-396 or 546-295 plans all depict two-car garages. (*Compare* Davenport Aff., Ex AA *with* Ex. F, G) In addition, the kitchen layout and bedroom placement for the "New Villa" is significantly different than the kitchen and bedroom layouts in either the 447-396 or 546-295 plan. (*Id.*) These brochures simply do not relate to the 447-396 or 546-295 plans.

**B. Jerry's Homes and Midland Homes**

Rottlund also relies upon brochures found in old files of TCM's architect BSB that relate to work BSB performed for Jerry's Homes and Midland Homes. (Rottlund Mem. at 3-4) At some point, BSB apparently received copies of Rottlund brochures for its Villa product. (*Id.*) As with the "Rottlund Happenings" brochures, Rottlund argues that these old Rottlund flyers in BSB's files establish access to the 447-395 or 546-285 deposit materials. Once again, however, these old flyers do not relate to, or depict any aspect of, the 447-395 or 546-285 copyrights or the Villa II. They relate to some other Villa product.

The Jerry's Homes' materials depict one-car garages and no side entries on the exterior units. (Davenport Aff., Ex. M) Again, these materials relate to either Rottlund's original Villa or its New Villa, but not the Villa II. As for Midland Homes, Rottlund has not produced any brochures, so there is no proof that BSB had any floor plans at all. Moreover, BSB's work for Midland Homes was performed in 1994, three years before Rottlund claims it completed its work on the 447-396 drawings, and seven years before Rottlund claims it completed work on the 546-295 drawings. (Davenport Aff., Ex D, E, and I) It is impossible, therefore, that anything BSB received while working for Midland homes gave it access to the technical drawings at issue here.

**C. The Metro Fire material**

When TCM was building its Homestead town homes at Harvest Hills in Plymouth, the owner of Metro Fire faxed a photocopy of a section of one page of the 546-295 drawings to TCM and BSB. (Murdoch Aff., Ex. K at 47: 12 – 48:13) Before sending the fax, Metro Fire blacked out all references to Rottlund and the copyright notices. (*Id.*) Metro Fire sent TCM this page to show where the stub-up for the water supply should be located. (*Id.* 62:16-63:6) Rottlund relies on this evidence to demonstrate access to its technical drawings. (Rottlund Mem. at 25-26)

This evidence falls short of the mark on several grounds. First, Rottlund has no proof these documents ever found their way into Pinnacle's hands. (They did not reach BSB until after the design work for Washington Square was complete, so there was no access through BSB.) Second, the fax pages relate only to the 546-285 plans. They have no probative value on the question of access to the 447-396 plans, which are the only plans at issue for Washington Square, Centennial Crossing, Providence Point, Cornerstone Lake or Springbrooke. Third, if the photocopies evidence access at all, it is limited to the layout of a sprinkler shed. The excerpts in no way demonstrate access to the 546-285 plans as a whole, or anything that might be considered or reveal the "gestalt" of those plans.

## IV. Independent Creation

Filed herewith are the affidavits of Larry Moore and Chris Jorgensen attesting to the fact that they independently created their designs for TCM's Homestead collection. Specifically, Mr. Moore states that he spent approximately 72.5 hours between April and July 1998 on design development drawings. (Murdoch Aff., Ex. L at ¶ 4) Mr. Moore avers that he had never seen the Rottlund technical drawings at issue here, and that he "did not refer to or use, in any way, any Rottlund plan, drawing, brochure, advertisement, or photograph" while designing the Homestead town homes. (*Id.*, ¶ 8) Mr. Jorgensen similarly attests to the facts that he spent approximately 68 hours assisting Mr. Moore in the creation of the Homestead town home designs, that he had never seen Rottlund's technical drawings before this lawsuit, and that BSB independently created the designs for the Homestead town homes "based on [its] expertise and experience as residential architects." (Murdoch Aff., Ex. M at ¶¶ 5, 7)

## V. Validity

In neither the 447-395 nor the 526-285 registration did Rottlund disclose that those works were derivative of earlier registrations. (Davenport Aff., Ex. D, E) Rottlund has now admitted,

however, that these technical drawings are derivative of both the New Villa and the Villa. (*See* Fifth Amended Complaint, ¶¶ 21-25)

There are significant questions in this case as to whether Rottlund successfully acquired all rights to the Original Villa and the New Villa designs. Architectural Forum Inc., not Rottlund, designed the Original Villa. Tim Whitten, as 30(b)(6) designee for Rottlund, testified that while he was employed by AFI, he designed the back-to-back town home product that Rottlund refers to as the "Original Villa." (Murdoch Aff., Ex. I at 48:12 – 48:16) Although Rottlund contends in its brief that Bud Rotter designed the Original Villa "with some assistance from Tim Whitten," (Rottlund Mem. at 3), Mr. Whitten testified on this topic as the corporate designee for Rottlund Company, and that testimony is binding on the corporation. *See* Fed. R. Civ. P. 30(b)(6). The contract between Rottlund and AFI, pursuant to which AFI created the Original Villa, expressly provides that AFI retained ownership of the copyrights in the products designed by AFI for Rottlund. (Murdoch Aff., Ex. N)

Rottlund claims to have acquired the rights to the Original Villa designs pursuant to a January 15, 1989 agreement between AFI and Rottlund. (Davenport Aff. Ex. B) AFI only assigned to Rottlund its copyright ownership of four specific Summerwood plans which AFI had prepared for Rottlund's use in a development in Brooklyn Park, Minnesota. All of the assigned plans were created in 1987. (Murdoch Aff., Ex. O)

Rottlund filed a second copyright registration for the Original Villa on October 1, 1993. (Murdoch Aff. Ex. P) The original application for this copyright listed the year in which creation of this work was completed as "1987," but the application was amended by the Copyright Office to read **1988** as the year in which creation of the work was completed. *Id.* The only reasonable conclusion is that the technical drawings submitted were dated 1988 and not 1987. Thus, the deposit material was the work of AFI that had not been transferred to Rottlund.

Rottlund attempted fix this problem <u>during this litigation.</u> In December of 2002, Rottlund purported to enter into an agreement with AFI to finally transfer the rights under the copyright laws to Rottlund. In addition to the obvious lack of any consideration, there are two enormous problems with this attempted patchwork fix. First, AFI was dissolved in 1996. (Murdoch Aff., Ex. Q at 9-10) Second, the December 2002 "agreement" is signed by <u>Tim Whitten</u>, Rottlund's architect, "on behalf of AFI." Even if AFI still existed as an entity in 2002, Tim Whitten's signature could only properly be on behalf of Rottlund, not AFI, and thus the agreement would not be binding on AFI.

## LEGAL ARGUMENT

Summary judgment is "not an acceptable means of resolving triable issues." *Evans v. Rudy-Luther Toyota, Inc.*, 39 F. Supp. 2d 1177, 1180 (D. Minn. 1999), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). The existence of a genuine issue of material fact will preclude summary judgment. Fed. R. Civ. P. 56(c)[2] Furthermore, the Court must construe all facts and all inferences drawn from those facts in favor of the nonmovant. *Prudential Ins. Co. v. National Park Medical Center, Inc.*, 154 F.3d 812, 818 (8th Cir. 1998).

Rottlund seeks "partial summary judgment" on the issues of validity, direct copying, access, and substantial similarity on its claims premised on the 447-396 and 546-285 copyrights. Underpinning all of these issues, however, is Rottlund's assertion that the protected aspect of the 447-396 and 546-285 plans is their "gestalt," by which Rottlund means the "total look and feel" of its plans, or the "combination of component parts" in its plans. (Rottlund Mem. at 17-18)

Although such generalized notions may be sufficient to establish validity, Rottlund's theory of infringement is legally untenable. Rottlund contends that infringement can occur if the

---

[2] A fact is "material" only if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).