Court File No. 01-1980 / ROTTLUND / Pinnacle
Krummen Affidavit dated September 8, 2004

# FILED UNDER SEAL

Exhibit R139-R140

Exhibit R141

Briefs and Other Related Documents

This case was not selected for publication in the Federal Reporter.

Please use FIND to look at the applicable circuit court rule before citing this opinion. (FIND CTA9 Rule 36-3.)

United States Court of Appeals,
Ninth Circuit.

**FLYING J, INC., a Utah corporation, Plaintiff--Appellee,**
**v.**
**CENTRAL CA KENWORTH, a California corporation; Tommy G. Pistacchio, Defendants--Appellants,**
**and**
**Ron Daggett, dba Daggett and Assoc.; Doy Gattlin, Defendants.**
**Flying J, Inc., a Utah corporation, Plaintiff--Appellant,**
**v.**
**Central Ca Kenworth, a California corporation; Tommy G. Pistacchio; Ron Daggett, dba Daggett and Assoc.; Doy Gattlin, Defendants--Appellees.**

**Nos. 00-17290, 00-17336.**
**D.C. Nos. CV-95-05030-REC-LJO, CV-95-05030-LJO.**
Argued and Submitted Feb. 11, 2002.
Decided Sept. 3, 2002.

Truck stop franchisor brought action alleging that competitor's franchisee wrongfully acquired its copyrighted architectural plans to build truck stop. The United States District Court for the Eastern District of California, Lawrence J. O'Neill, United States Magistrate Judge, granted judgment for franchisor. Franchisee appealed. The Court of Appeals held that: (1) market value of franchise fee was proper measure of actual damages for act of infringement; (2) copyright holder established causal link between act of infringement and award of lost franchise fees; (3) denial of injunction was not abuse of discretion; and (4) competing franchisor was not judicially estopped from asserting that its rights would have been adversely affected by issuance of subpoena against its franchisee.

Affirmed.

West Headnotes

**[1] Copyrights and Intellectual Property ⚿ 87(2)**
99k87(2)

Market value of franchise fee was proper measure of actual damages for act of infringement of its copyrighted architectural plan for truck stop; even though competitor asserted that lost franchise fee did not reflect value of use of architectural plans based on alleged design efficiencies, there was no evidence that copyrighted architectural plans were available, or could be valued, for less than price of franchise, and, consequently, value of plan could be measured by what willing buyer would have been reasonably required to pay to willing seller for copyright holder's work.

**[2] Copyrights and Intellectual Property ⚿ 87(2)**
99k87(2)

Copyright holder established causal link between act of infringement of its copyrighted architectural plan for truck stop and award of lost franchise fees as measure of actual damages, where copyright holder produced evidence that but for act of infringement, competitor would not have been able to secure plan unless it purchased copyright holder's franchise.

**[3] Copyrights and Intellectual Property ⚿ 86**
99k86

Denying copyright holder prospective equitable relief in form of injunction against competitor, for infringement of copyrighted architectural plan of truck stop, was not abuse of discretion, since copyright holder's damages expert failed to include calculations of future damages in his expert report and such failure

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

operated to prejudice of competitor. Fed.Rules Civ.Proc.Rule 37(c)(1), 28 U.S.C.A.

**[4] Estoppel ⇐ 68(2)**
156k68(2)

Competing truck stop franchisor was not judicially estopped from asserting that its rights would have been adversely affected by issuance of subpoena against its franchisee, for franchisee's infringement of copyrighted architectural plan of copyright holder, even though competing franchisor disclaimed its interest in litigation in prior motion to quash subpoena; franchisor was not party to action, copyright holder could not argue that use of judicial estoppel, as equitable doctrine, was required, and supposedly inconsistent position, that competing franchisor did have rights and interests at stake in litigation, was urged by court, not by competing franchisor.

***765** Appeal from the United States District Court for the Eastern District of California, Lawrence J. O'Neill, Magistrate Judge, Presiding.

Before D.W. NELSON, NOONAN, and HAWKINS, Circuit Judges.

MEMORANDUM [FN*]

FN* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by Ninth Circuit Rule 36-3.

****1** Flying J, Inc., brought this infringement and conversion action, alleging that the defendants wrongfully acquired copyrighted architectural plans to build a truck stop known as the Madera Travel Center ("MTC"). A jury found defendants Central California Kenworth, Inc. ("CCK"), Tommy Pistacchio, and Ron Daggett liable on the infringement and conversion claims, awarding as damages both lost franchise fees and MTC profits. On remittitur, the court struck MTC profits to avoid double recovery. The court also denied Flying J's motion to permanently enjoin the operation of the truck stop. CCK and Pistacchio (collectively "appellants") appeal, alleging that Flying J cannot recover damages for the use of a building constructed with copyrighted plans, and that the damages awarded are speculative. Flying J cross-appeals, alleging error in the denial of the permanent injunction.

The parties are familiar with the facts underlying the proceedings, and we do not recite them here. We have jurisdiction over these appeals under 28 U.S.C. § 1291 and affirm the rulings of the district court.

A. Actual Damages Award

[1] Appellants first argue that the actual damages award based on Flying J's lost franchise fees is unduly speculative, and impermissibly provides recovery for noninfringed items. This argument was raised below in appellant's renewed post-trial Rule 50(b) motion for judgment as a matter of law, and in its Rule 59 motion for a new trial. We review the district court's denial of appellants' renewed motion for judgment as a matter of law de novo. *See Johnson v. Paradise Valley Unified School Dist.*, 251 F.3d 1222, 1226 (9th Cir.2001). Judgment as a matter of law is proper if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict. *See Gilbrook v. City of Westminster*, 177 F.3d 839, 864 (9th Cir.1999). We review rulings on a motion for a new trial for an abuse of discretion. *See Far Out Prod., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir.2001).

We consider first whether the lost franchise fee measure of actual damages is speculative as a matter of law. Actual damages for infringement are measured according to "market value," which means "what a willing buyer would have been reasonably required to pay a willing seller for the plaintiff's work." *See Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 512 (9th Cir.1985) (*Frank I*). The district court properly relied on *Cream Records Inc. v. Jos. Schlitz Brewing Co.*, 754 F.2d 826, 827-28 (9th Cir.1983), and *Eales v. Environmental Lifestyles, Inc.*, 958 F.2d 876 (9th Cir.1992), to conclude that market value is a proper measure of actual damages for the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

infringement at issue here.

***766** The record testimony of Jay Call and Philip Adams supports Flying J's contention that the plans are nowhere available except through purchase of a Flying J franchise, and that the floor plans are an integral part of the value of the franchise to the franchisee. Evidence also showed that the price of a Flying J franchise was $75,000, plus one cent per gallon on fuel sales, plus five percent of non-fuel sales, and that these figures amounted to $3,740,391.00 from the date of infringement through the date of the jury's verdict. While a Flying J franchise fee commands benefits beyond the copyrighted floor plan, appellants' own damages expert did not assign specific valuations to the various elements of the Flying J franchise and was therefore barred from offering apportionment testimony. No other testimonial or documentary evidence was available to allow the jury to calculate a discounted franchise fee to value the plans. Just as in *Cream Records,* there was no evidence presented that the copyrighted architectural plans were available (or could be valued) for less than the price of a Flying J franchise. Given the state of the record on the apportionment issue, and the consistent acceptance in this circuit of market value as a measure of actual damages for copyright infringement, we conclude that the lost franchise fee actual damages award is not speculative as a matter of law.

****2** Appellants also argue that the lost franchise fee damages award inappropriately measures the value of "use" of the MTC structure, not the market value of the infringed floor plans; therefore the lost franchise fee award fails to appreciate the distinction between protections under patent and copyright law. We disagree. The lost franchise fees do not reflect the value of use of the architectural plans based on alleged design efficiencies, but the value of the plans as measured by "what a willing buyer would have been reasonably required to pay to a willing seller for the plaintiff's work," *Frank I,* 772 F.2d at 512. Such a market value is well established as a measure of actual damages available for acts of copyright infringement. *Id.; Eales,* 958 F.2d at 880 (9th Cir.1992).

[2] Finally, appellants argue that evidence adduced at trial failed to establish a causal link between the act of infringement and the award of lost franchise fees as a measure of actual damages. The jury was instructed that Flying J bore the burden of showing "with reasonable probability that the infringement was the cause of its loss of revenue." Flying J's damages expert determined a value of a Madera Flying J franchise by examining actual franchise revenue streams from comparable Flying J franchises. Consistent with *Frank I,* the court instructed the jury that the market value was the appropriate measure of actual damages. The jury's verdict reflects the conclusion that the lost franchise fees were an adequate valuation of the copyrighted plans, that the MTC was a Flying J facility, and that Flying J would have realized franchise fees if the plans used to build the MTC had been lawfully acquired. To establish a causal link it was only necessary that Flying J produce evidence that but for the act of infringement, appellants would not have been able to secure the plans unless they purchased a Flying J franchise. The evidence sufficiently establishes this nexus.

The court correctly applied the applicable law in allowing evidence of lost franchise fee actual damages evidence before the jury, and the record supports by substantial evidence the jury's decision to award the actual damages figure for the copyright violation. We therefore affirm the trial court's rulings with respect to ***767** appellants' post-trial motions concerning actual damages.

B. Infringer's Profits

Because we find no reason to disturb the court's actual damages award, appellants' arguments with respect to infringer's profits are moot. The court granted and Flying J accepted, appellants' motion for remittitur to strike the award of infringer's profits so as to avoid double recovery.

C. Denial of Flying J's Motion for Permanent

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Injunction

[3] Flying J cross-appeals, alleging that the district court erroneously denied an injunction that would prohibit continued operation of the MTC. Flying J first argues that the court committed factual error in concluding that Flying J suffers no harm from ongoing business at the MTC. Flying J contends that it suffers irreparable harm as long as the infringing MTC floor plan is operated under the name of its competitor, Pilot. Flying J distinguishes as a separate harm its continued loss of franchise fees beyond the date of the jury's judgment, after which no lost fees were awarded.

**3 The record does not support Flying J's claim of factual error. The court expressly recognized that Flying J may suffer future harms; it simply did not allow Flying J a remedy for them. Flying J's artful distinction regarding its future harms is an attempt to cast the injunction as a remedy not precluded by a Rule 37(c)(1) sanction against Flying J for discovery violations. The court prohibited evidence of future damages under Rule 37 because Flying J's damages expert failed to include calculations of future damages in his expert report and concluded that the failure operated to the prejudice of the defendants.

Certainly there is a difference between presenting evidence of future monetary damages and requesting an equitable remedy to allay future harm. However, it does not appear the court abused its discretion in concluding that the requested prospective equitable relief was an attempt to "end-run" a sanction prohibiting prospective legal relief.

[4] Flying J also argues that the court should not have denied the injunction on the ground that non-party Pilot's due process rights would be adversely affected. Flying J contends that Pilot had previously disclaimed its interest in the litigation in a prior motion to quash a subpoena, and judicial estoppel prevented the court from basing its denial of the injunction on a finding that Pilot would be adversely affected. The application of judicial estoppel here appears to be completely inapposite. First, Pilot is not a party to the litigation, and judicial estoppel seeks to prevent *parties* from asserting inconsistent positions to gain advantage. *See Hamilton v. State Farm Fire and Cas. Co.*, 270 F.3d 778, 782 (9th Cir.2001). Second, judicial estoppel is an equitable doctrine of the court and Flying J cannot argue that its use is required in this instance. Finally, the supposedly inconsistent position-that Pilot does indeed have rights and interests at stake in the litigation-is urged *by the court*, not by Pilot. Flying J offers no precedent to support its novel conception of judicial estoppel, and it does not appear that the court abused its discretion in denying the requested injunction to safeguard the rights and interests of the adversely affected non-party.

AFFIRMED.

Briefs and Other Related Documents (Back to top)

. 2001 WL 34097924 (Appellate Brief) Reply Brief of Appellee/Cross-Appellant Flying J, Inc. (Aug. 20, 2001)Original Image of this Document (PDF)

. 2001 WL 34097923 (Appellate Brief) Appellants' Reply Brief on Principal Appeal/ Answering Brief on Cross-Appeal (Aug. 07, 2001)Original Image of this Document (PDF)

. 2001 WL 34097922 (Appellate Brief) Brief of Appellee/Cross-Appellant Flying J Inc. (Jun. 22, 2001)Original Image of this Document with Appendix (PDF)

. 00-17290 (Docket)

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois.

**ZIP DEE, INC., Plaintiff,**
**v.**
**DOMETIC CORPORATION, Defendant.**

**No. 93 C 3200.**

June 11, 1997.

*MEMORANDUM OPINION AND ORDER*

SHADUR, Senior District Judge.

*1 In the most recent skirmish in a seemingly endless series of disputes between Zip Dee, Inc. ("Zip Dee") and Dometic Corporation ("Dometic"), the issue is whether Zip Dee may obtain discovery of communications between Dometic and its counsel that bear on Zip Dee's trademark infringement claim. That controversy is triggered by Dometic's confirmation that at trial it will rely, in order to defeat Zip Dee's claim that the alleged infringement was *willful*, on two admittedly non-privileged opinions of counsel obtained by Dometic when it acquired the assets of A & E Systems, Inc. ("A & E"), Dometic's predecessor in the business that involves the claimed infringement:

1. a letter of opinion from A & E's counsel that was one of the closing documents in connection with the acquisition; and 2. a letter from counsel for the investment banking firm involved in the acquisition, opining that no infringement was involved.

At the time of the May 28, 1997 presentment date of the most recent motion on the subject--Zip Dee's motion to enforce this Court's recent oral ruling on the subject--this Court invited counsel for the parties to submit memoranda dealing with the issue of the waiver or nonwaiver of any privilege covering communications between Dometic and its own counsel by reason of Dometic's stated reliance on the non-privileged opinions from outside counsel. Both sides have done so, and the issue is ripe for resolution.

Under established Federal Circuit principles, the "affirmative duty of due care to avoid infringement of the known [intellectual property] rights of others ... [u]sually ... includes seeking and obtaining competent legal advice before engaging in activity that may result in infringement" (*Electro Med. Sys., S.A. v. Cooper Life Sciences. Inc.*, 34 F.3d 1048, 1056 (Fed.Cir.1994)). Though an asserted infringer may invoke the attorney-client privilege to avoid disclosure of counsel's opinions (*id.* at 1056-57), that issue runs the risk of an adverse inference as to willfulness ( *id.*). But once a party has produced a favorable opinion as a defense to a willfulness claim (and here Dometic relies on the two outside legal opinions for that purpose), it cannot pick and choose among its disclosures by concealing any unfavorable opinions that it may have received.

On that score, Dometic's arguments that seek to insulate its later communications to and from its own counsel from discovery by Zip Dee ignore the basic nature of infringement as an *ongoing* violation of intellectual property rights of the owner of such rights--whether trademark, patent or copyright. If for example a trademark is infringed by a defendant's sale of its competing product, *each* sale of that product is an act of infringement. [FN1] And the significance of that fundamental proposition to the disposition of the present dispute may be demonstrated by a simple hypothetical scenario:

FN1. Much the same point was made in the context of willful infringement in the dissenting opinion in *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1574 (Fed.Cir.1996):

Based on the jury instruction and the finding of willful infringement, we know only that the jury believed that at some point in time during the long course of CBK's infringement, CBK's justifications and good faith defenses failed.

And it is of course irrelevant that the statement came in the course of dissent, because that notion of continuing infringement was not the source of any disagreement among the members of the panel.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1. Suppose that a company acquires a business involving the sale of allegedly trademark-infringing goods, receiving (as Dometic did here) opinions from lawyers other than its own--the seller's counsel and perhaps (as here) the investment banker's counsel as well--that the acquiring company later urges as demonstrating its bona fides, and hence as serving to defeat any claim that a later-decided-upon infringement was willful.

*2 2. Suppose that a month (or even a year or three years) after the acquisition, the acquiring company's own counsel analyzes the matter and advises the client that its product *does* infringe a valid mark of the trademark owner. [FN2]

FN2. This opinion should not be mistaken as announcing the proposition that a party always has an ongoing duty to keep inquiring of its counsel on the same subject. In that regard the *Construction Tech*, opinion referred to in n. 3 has identified at least one circumstance in which such a duty exists.

In that situation it would clearly be unfair and improper for an alleged infringer to apprise a jury, which is being asked to decide the issue of the willfulness or nonwillfulness of infringement (if infringement there were), that the claimed infringer's entry into the business that involved the asserted infringement was innocent in legal terms (having been undertaken in reliance on the original counsel's opinions), while at the same time the jury was kept in ignorance of the fact that at some later point the infringement had continued despite the receipt of contrary advice from counsel. Indeed, that situation would be even more egregious in the hypothesized scenario, where the later adverse opinion had emanated from the client's *own* lawyers rather than from lawyers who were representing third parties (and who were thus not counsel of the client's own choosing).

That example demonstrates the appropriateness of the concern tentatively voiced by this Court during the May 28 hearing: that it really should not matter to the analysis whether the earlier lawyers' opinions that the claimed infringer was prepared to disclose were or were not privileged communications. That is so because the obligation of full disclosure of all lawyers' opinions on the subject is not triggered by whether the disclosed opinions that are sought to be invoked to provide a safe harbor were themselves privileged, but is triggered instead by the purported infringer's very claim that willfulness was not present because it had undertaken its course of action with the advice of counsel. Zip Dee has come up with a Magistrate Judge's opinion making that point, *Mushroom Assocs. v. Monterey Mushrooms, Inc.*, 24 USPQ 2d 1767 (N.D.Cal.1992), while nothing that Dometic has adduced in its current memorandum undercuts that proposition. As suggested earlier, it is entirely possible that infringement may be nonwillful at one time and may become willful at some later time. [FN3]

FN3. Although not making exactly the same point, the recent decision in *Construction Tech., Inc. v. Cybermation. Inc.*, No. 91 CIV. 7474 JGK, 1997 WL 187339, at *24-*25 (S.D.N.Y. Apr. 14) also looks at the issue of a party's reliance on counsel's opinions as a defense to a willfulness claim--in that instance it was patent infringement that was involved, but the analysis is not different in the trademark field--as a subject of ongoing scrutiny.

Accordingly this Court grants Zip Dee's motion for a determination that Dometic has waived its ability to assert the attorney-client privilege as to any opinions of counsel that address infringement-related issues bearing on Zip Dee's claimed trademark. This Court of course recognizes that this ruling should not result in the declaration of an open season on Zip Dee's access to everything that Dometic and its lawyers have been saying to each other. To that end this Court is prepared to undertake appropriate procedures (one possibility might be for the in camera submission of the relevant documents) that will protect Dometic's legitimate interests in confidentiality, while at the same time affording Zip Dee the access to which it is entitled to establish a claim of willful infringement.

1997 WL 323814 (N.D.Ill.)

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Exhibit R142

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

FOURTH DIVISION

| | |
|---|---|
| THE ROTTLUND COMPANY, INC. d/b/a ROTTLUND HOMES, A MINNESOTA CORPORATION<br><br>Plaintiff<br><br>vs.<br><br>PINNACLE CORPORATION d/b/a TOWN & COUNTRY HOMES, AN ILLINOIS CORPORATION, TOWN & COUNTRY HOMES, INC., A MINNESOTA CORPORATION, BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., AN IOWA CORPORATION, AND THE BLOODGOOD GROUP, INC., AN IOWA CORPORATION<br><br>Defendants<br><br>and<br><br>TOWN & COUNTRY HOMES, INC., A MINNESOTA CORPORATION<br><br>Third-Party Plaintiff<br><br>vs.<br><br>BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., AN IOWA CORPORATION<br><br>Third-Party Defendant | No. 01-CV-1980<br><br>DEPOSITION OF STEVEN THIES |

Reported by: Connie Overberg, RPR, CSR

Q. Do you have any information about Town & Country's access to Plaintiff's copyrighted works?
A. Only that some of our ex-employees do work for them.
Q. Just so we have your complete knowledge on that topic, what former Rottlund employees are you aware of that went to work for Town & Country?
A. I am aware of Marc Harris, Joey Zorn, Chad Cooper.
Q. And Mr. Harris, Mr. Zorn and Mr. Cooper were all Rottlund employees out of the Iowa Division, correct?
A. There was also a vice president of architecture Tim Johnson works for -- I can't remember his last name.
Q. Tim Johnson is right.
A. Tim Johnson is somebody from the purchasing department, and a guy from the land -- I want to say Pommerant (sic).
Q. Richard Palmiter?
A. Palmiter. Those are the people that I am aware of.
Q. Did you personally know Tim Johnson?
A. I met and talked to him.
Q. About what?

Q. More than 10?

A. Does that count the divorce?

Q. Excluding the divorce.

A. Probably less than 10.

Q. How many times for Rottlund, do you know?

A. Counting this one?

Q. Counting this one.

A. Two or three. Counting, and maybe, you know, it may be more because of the Meadows litigation.

Q. In the past have you been on any mind altering drugs or any prescription medication that would affect your ability to remember events or recall events at the time?

A. Not to my knowledge.

Q. Have you ever been accused of a crime of moral interpretude?

A. No.

Q. In the Oaks litigation do you know the Judge's order dismissing the -- I am sorry -- the preliminary injunction? Do you know of that?

A. I know that under advice from my counsel that that whole proceeding had been sealed, and I am not to answer any questions about the Oaks litigation.

Exhibit R143

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,
vs. Case No. 01-CV-1980 (DSD/SRN)
Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation, and
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation, and
The Bloodgood Group, Inc., an
Iowa corporation
Defendants,
and
Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,
vs.
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF KAREN J. ALBERTSON
August 25, 2003

(The following is the deposition of KAREN J. ALBERTSON, taken pursuant to Notice of Taking Deposition, at the offices of Fredrikson & Byron, 4000 Pillsbury Center, 200 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:14 o'clock a.m., August 25, 2003.)

the product built by Rottlund known as the Villa?
A. Yes.
Q. As I understand it, the Villa has three iterations that are referred to as the Original Villa, the New Villa and the Villa II. Are you familiar with all three of those types of Villa?
A. No.
Q. Are those names that you've heard before?
A. When I started at Rottlund the Villa II, basically, was what we were building at the time. I know that there was a version prior to that, but I really had nothing to do with it.
Q. You're familiar with the Villa II.
A. Yes.
Q. Okay. What knowledge do you have that relates to the copyrighted nature of the Villa II?
A. Only that every document that Rottlund does is copyrighted, every plan that we do is copyrighted.
Q. This is a Rottlund policy.
A. Yes.
Q. How are you aware that that -- that there is such a policy?
A. General knowledge I suppose, and the fact that every plan that has ever been on my desk has been copyrighted.

Q. It isn't that it's somewhere in a Rottlund procedures manual or that someone drew you aside and specifically told you, you just remember hearing that all of Rottlund's plans are copyrighted. Is that about accurate?
A. Yes, and seeing that they all have the copyright logo on them.
Q. Have you ever helped in preparing a copyright for the Villa II?
A. No.
Q. Have you ever seen a copyright application for the Villa II product?
A. No.
Q. Has anyone ever described what Rottlund does in terms of copyrighting its Villa II?
A. No.
Q. Is it fair to say that the knowledge that you have that relates to plaintiff's copyrighted works is that you're aware that Rottlund copyrights its plans?
A. Yes.
Q. And that you're aware that that's general policy.
A. Yes.
Q. And that you don't have any specific knowledge regarding whether a particular plan was copyrighted

other than to say it's general policy that they would be.

MR. KRUMMEN: Objection, mischaracterizes her testimony. You may answer.

A. All I know is that we copyright everything. So whether a specific one is or isn't, I would say that we do on all of them.

Q. This paragraph says you have knowledge of the facts and issues involved in this matter including knowledge related to plaintiff's copyrighted works. Do you have knowledge of any other fact or issue that relates to this lawsuit?

A. Such as?

Q. I think I'm asking you. Are you aware of any other fact or issue that's relevant to this lawsuit?

A. Besides the Dan Geegan correlation, and there's also -- there was another person in my department, Jeff Corneia, that also left and went with Dan Geegan. I know that this is a copyright issue regarding the Villa product.

Q. Well let me stop you and let's talk about the two issues that you raised. Now you said you knew about the Dan Geegan correlation. Explain that to me. What is it about Dan Geegan?

A. Only that he was in my same position, had access

to the same information that I have access to, as well as Jeff Corneia, and they both have left Rottlund and worked for Town & Country.
Q. When you say they had access to the same information that you have access to, what information are we talking about?
A. Any of the -- the bidding documents, the plans, quantity takeoffs, pricing information, vendor information, anything.
Q. Same thing for Mr. Corneia.
A. Yes.
Q. So as I understand your testimony, you know, number one, that Rottlund's plans are typically copyrighted as a matter of general principle; you know, number two, that Dan Geegan and Jeff Corneia left Rottlund and began working for Town & Country Homes of Minnesota. Is there any other fact or issue that you know of that is relevant in this lawsuit?
A. No.
Q. Okay.
MR. PATRICK: I think that's all the questions I have for right now. Thank you.

EXAMINATION

BY MR. SCHWIEBERT:
Q. Ms. Albertson, we already met, I'll introduce

A. I guess yes.
Q. Do you have any specific memory of communities that have those back-to-back products?
A. No.
Q. And you don't remember when the first time you saw a back-to-back product was.
A. No.
Q. You just know they've been around for awhile.
A. Yes.
Q. Have you ever been inside a Town & Country back-to-back product?
A. I don't think so.
Q. Have you ever seen a Town & Country back-to-back product?
A. I don't think so.
Q. Have you ever heard of the Pinnacle Corporation?
A. No.
Q. Ever heard of Town & Country?
A. Yes.
Q. And you've heard of them because a couple of former Rottlund employees are now there.
A. I've --
I knew the name before I knew that, yes.
Q. Have you ever had any discussions with any employees of Town & Country Homes, Inc.?

A. Only when Dan Geegan left.
Q. Was that a discussion with Dan Geegan?
A. Yes.
Q. So this was at -- when he left Rottlund and before he started at Town & Country; is that right?
A. Yes.
Q. Do you remember what you discussed with Dan Geegan?
A. He implied that if I would like to go with him that that opportunity would be there.
Q. Did you ever interview with Town & Country?
A. No.
Q. How did he imply that that was true?
A. He basically said that, that if -- if I was interested, that he would see what could be done.
Q. That's your memory of exactly what he said, if you were interested he would see what he could do, or what could be done?
A. I guess I don't know the exact wording, but something along those lines, yes.
Q. Have any discussions with anyone else at Town & Country?
A. No.
Q. Have you ever had any discussions with anyone -- Well let me back up.

Exhibit R144

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

FOURTH DIVISION

| | | |
|---|---|---|
| THE ROTTLUND COMPANY, INC. d/b/a ROTTLUND HOMES, A MINNESOTA CORPORATION | ) | No. 01-CV-1980 |
| Plaintiff | ) | |
| vs. | ) | DEPOSITION OF JASON JORGENSON |
| PINNACLE CORPORATION d/b/a TOWN & COUNTRY HOMES, AN ILLINOIS CORPORATION, TOWN & COUNTRY HOMES, INC., A MINNESOTA CORPORATION, BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., AN IOWA CORPORATION, AND THE BLOODGOOD GROUP, INC., AN IOWA CORPORATION | ) | |
| Defendants | ) | |
| and | ) | |
| TOWN & COUNTRY HOMES, INC., A MINNESOTA CORPORATION | ) | |
| Third-Party Plaintiff | ) | |
| vs. | ) | |
| BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., AN IOWA CORPORATION | ) | |
| Third-Party Defendant | ) | |

Reported by: Connie Overberg, RPR, CSR

A. Pat Ruelle.

Q. Is Mr. Ruelle an employee of Rottlund Homes of Iowa?

A. He is an employee of Rottlund Homes. When you say Iowa, I look at that as a division of the Rottlund Company of Minnesota also, and, yes.

Q. Do you know what claims Rottlund is alleging in this lawsuit?

A. Yes.

Q. What is your understanding of the claims that Rottlund is alleging in this lawsuit?

A. That our plans were copied.

Q. Which plans?

A. The Villa 2.

Q. How did you become aware of the lawsuit?

A. Just hearsay through the company, I guess, and recently when I have been deposed.

Q. When you say recently you have been deposed, are you talking about sitting here today?

A. Yeah.

Q. How long before your deposition was noticed were you aware that there was a lawsuit involving claims that the Villa 2 plans were copied?

A. I heard about it a while back. I can't tell you exactly when.

Q. From whom?

A. I can't remember.

Q. Somebody within Rottlund Company of Iowa?

A. Probably.

Q. Do you recall any of the information that you received about the lawsuit?

A. No. Just that there was one.

Q. Are you aware that Rottlund has been involved in similar lawsuits in Iowa?

A. Yes.

Q. What do you know about the lawsuits that Rottlund has been involved in in Iowa that are similar to this, claims that the plan was copied?

A. Very little. I wasn't involved. At that time as a superintendent I wasn't privy to information.

Q. Do you know any information?

A. Some.

Q. What do you know?

A. Just that there was a situation with both Rogers and Oaks, and that there is a confidentiality agreement I have heard that we can't talk about it.

Q. Who is Rogers?

A. I believe it is a company in Ankeny, Iowa, who builds town homes.

Q. Were the plans that were at issue in the Rogers matter plans for a villa product?
A. Yes.
Q. Were there more than one version of the villa product that is being built in Iowa?
A. Yes.
Q. How many?
A. Two I believe, maybe three. Can you clarify that?
Q. Are there particular marketing names that you give two or three versions of villa that are being built in Iowa?
A. They name the floor plans. The Villa 2 was the Chattum and Dunhill, and there have been several names for the original villas. They all start with an A or B.
Q. Always start with --
A. A or B signifying A unit or B unit.
Q. Would it be fair to say that the Villa 2 and the original villa are the two versions of villa product that are being built in Iowa?
A. I believe we have started with the original villa and upgraded through to the new villas, and then the Villa 2, so I think there is probably three versions.

Q. What product was at issue in the Rogers lawsuit?
A. It would have either been the original or the new villa.
Q. You don't know which?
A. No.
Q. And then in the Oaks litigation?
A. Same answer.
Q. Do you know if Rogers developed their plans for the product that they were building that Rottlund claimed was copied was designed in-house or by an architect?
A. I don't know.
Q. Do you know anything about how Rogers came up with the plan that they were building that was at issue in the lawsuit of Rottlund involving Rottlund?
A. No, I don't.
Q. Do you have any information how Oaks came up with the plan that they were building in the lawsuit involving Rottlund?
A. No.
Q. Do you know if Oaks was working with an architect or if they developed their plan in-house?
A. I don't know.
Q. Have you ever talked with anybody at

Bloodgood Sharp Buster Architects & Planners?
A. Not that I am aware of.
Q. Have you ever had any involvement in Rottlund developments anywhere other than the Des Moines Metro area?
A. No.
Q. Do you have knowledge of the facts and issues involved in the lawsuit that Rottlund has brought against Pinnacle, Town & Country and Bloodgood Sharp and Buster?
A. Very little.
Q. What do you know?
A. Specifically, I mean, in the facts of the trial I don't. I probably don't know any of them to be honest with you.
Q. When you said "very little," what were you referring to, do you know?
A. Just what I have been told preparing for the deposition.
Q. Were those conversations with your attorney or somebody within the Rottlund Company?
A. With an attorney.
Q. Do you know anything about this lawsuit other than what your attorney has told you?
A. Other than the fact that there are several

Rottlund employees now working for Town & Country and that their plans are very similar to ours, no.

Q. How did you come to know that several Rottlund employees are now working for Town & Country?

A. Because several of them are -- three of the employees worked for our division here in Iowa while I was working here and then went to work for them.

Q. Who are those three people?

A. Marc Harris, Joey Zorn, Chad Cooper.

Q. The last one was Chad Cooper?

A. Yes.

Q. What did Marc Harris do for Rottlund while you worked for him?

A. His title was either production manager or V.P. of operations, and so he was my supervisor as a superintendent.

Q. And Mr. Zorn, what did he do for Rottlund while you worked for him?

A. He started as an assistant superintendent and ended up as either a project manager or production manager -- I am not sure which -- and he was my supervisor when he left.

Q. And Mr. Cooper?

A. He started as an assistant superintendent and ended up as a superintendent when he left.

Q. Did Mr. Harris, Mr. Zorn and Mr. Cooper all go to work for Town & Country Homes in Minnesota?

A. Yes.

Q. Have you talked with Mr. Harris since he left Rottlund Company?

A. Yes.

Q. When?

A. He was at a Christmas party held by Midwestern Interiors here in Des Moines at which they have their employees from Minneapolis come to the same party, and Marc was invited to that party, so I met him and saw him there.

Q. What year was that?

A. That would have been last Christmas.

Q. Do you know when Mr. Harris left Rottlund?

A. I think it was 1999 in June.

Q. June of '99?

A. I believe so.

Q. Do you know what he went to do for Town & Country Homes?

A. Similar position as to what he had here, I believe.

Q. Did you talk to him while you were at this

Christmas party for Midwest Interiors?
A. Yes.
Q. What did you talk about?
A. Family.
Q. Anything related to work?
A. I believe he mentioned that he was looking at another opportunity. I don't know if he had already left Town & Country or was planning to leave or one of the two. I know he has left since then.
Q. You don't know when?
A. No.
Q. Have you talked with Mr. Zorn since he left Rottlund Homes?
A. Yes.
Q. When?
A. He called me maybe two weeks after he left and basically hinted as to the fact that are you willing to move or not to Minneapolis. He assumed that I wouldn't because he knew that I have a situation where my wife likes to live in Iowa near her mother so that was about it.
Q. He was asking you if you wanted an opportunity to work at Town & Country?
A. In a roundabout way, yes.
Q. When did Mr. Zorn leave Rottlund?

A. I can't remember exactly. I can't remember exactly. It would have been after Marc Harris. Probably six months to nine months later, something like that.
Q. End of '99, beginning of 2000?
A. It would have been after the summer of 2000, I believe.
Q. Did Mr. Zorn give you any details at all about what kinds of positions were open in Town & Country Homes?
A. He said that they had a big sales backlog and so his job would be to get things rolling, and so he would need all kinds of positions. Mostly supervisor positions I would believe.
Q. When you say big sales backlog, what do you mean by that?
A. He made it sound like there were hundreds of homes that needed to be built that were sold.
Q. Did he tell you anything about what kinds of homes, where the projects were, anything like that?
A. No, just that it was in the Minneapolis area.
Q. Anything else that you recall about your conversation with Mr. Zorn a couple of weeks after he

left Rottlund?
A. No.
Q. Have you talked to him since?
A. Yes.
Q. When?
A. I can't remember, but it has been between now and then at some point just to see how things were going.
Q. Did you talk with Mr. Zorn the second time, anything related to work?
A. No, not really.
Q. And Chad Cooper, have you talked with him since he left Rottlund Homes?
A. No.
Q. Do you know if Mr. Zorn is still with Town & Country?
A. I think he is, but I am not sure.
Q. Do you know if Mr. Cooper is still with Town & Country?
A. I believe he is.
Q. Do you know what Mr. Cooper's job is at Town & Country, what he left to go do?
A. He is a superintendent.
Q. While Mr. Harris was with Rottlund Company as the production manager, what kind of products was

he overseeing?
A. Can you repeat that?
Q. When Mr. Harris was with Rottlund as a production manager, what kind of products was he overseeing?
A. All of the products that we build in Iowa.
Q. Let me get a list of that. What are all of the products that are built in Iowa?
A. I am going to give you from the best of my memory. We have the lodge series, the craftsman series, the tradition series, the villas, gardens, garden town homes, vistas, cottages. I may have left some out.
Q. Lodge series. Those are single family?
A. Yes.
Q. And craftsman, those are town homes or single family?
A. Detached town homes.
Q. What do you mean by that?
A. They are built as a single family home with minimal side yard setbacks but built in an association type situation so they are town homes living in a single family type of house.
Q. Traditions, is that a single family?
A. Yes.

Q. And we have already talked about the different versions of villas that are built, gardens are town home?
A. Yes.
Q. Back-to-back or see-through?
A. Both. I am sorry. Gardens would all be back-to-back.
Q. And vistas?
A. Those are see-through or a row type town home.
Q. And cottages?
A. Cottages are similar to the craftsman. Detached town homes and the garden town homes are a row type of town home.
Q. The gardens and the garden town homes are two different things?
A. Yes.
Q. And so while Mr. Harris was the production manager for Rottlund, he would have overseen all projects for Rottlund that you would have just listed?
A. Yes.
Q. Are there any product lines on a list that you have given that have been discontinued in Iowa?
A. We are not currently building cottages.

Q. Anything else Rottlund of Iowa is still building currently today?
A. Yes.
Q. Do you have any knowledge of any other Rottlund employees other than Mr. Harris, Mr. Zorn and Mr. Cooper who are now or were at some point employees of Town & Country Homes?
A. I don't know names, but I know there are several from Rottlund of Minnesota that have gone to work for Town & Country.
Q. How do you know that?
A. I was told by Rottlund of Minnesota people. I can't remember which people.
Q. So you wouldn't know names or positions or when people left?
A. I know there is a land guy, somebody in purchasing, possibly superintendent, several.
Q. Is that the extent of your knowledge is there are several?
A. Yes.
Q. Anything else that you know about Rottlund employees that left to go work for Town & Country?
A. No.
Q. Off the record for a second.

(An off-the-record discussion was held.)

MS. NEWMAN: Go ahead and go back on the record.

Q. (By Ms. Newman) Have you seen the Town & Country Homes product that is at issue in this lawsuit?

A. No.

Q. Have you seen plans of the Town & Country Homes product that is at issue in this lawsuit?

A. No.

Q. Have you seen any pictures of the Town & Country Homes product that is at issue in this lawsuit?

A. No.

Q. So how would you know it if the plans that Rottlund alleges are copied in this lawsuit are similar to Town & Country Homes plans?

A. I just have heard that that is what the litigation is about.

Q. You wouldn't have any knowledge related to that?

A. No.

Q. When you say you have heard that that is what the litigation is about, from whom did you hear

that?
A. From my attorney.
Q. Anybody else talk to you about that issue?
A. Just the hearsay I told you about before within the company. I can't remember names or dates.
Q. I have handed you what has been previously marked as Exhibit Number 182. I would like you to turn to Page 18 of this exhibit. You will see towards the bottom of the page your name there?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. This document was provided by Rottlund Company, Inc., as part of the procedures in this lawsuit, and Rottlund Company, Inc., was asked to identify people who have knowledge and what knowledge they have regarding this lawsuit. And there is a bullet point here that says, "Jason Jorgeson has knowledge of the facts and issues involved in this matter including, for example, knowledge related to the following: (1) Plaintiff's copyrighted works; (2) Defendants' access to Plaintiff's copyrighted works; and (3) the substantial similarity between Defendants' infringing works and Plaintiff's copyrighted works. Jason Jorgenson has such

knowledge since he was employed by Plaintiff as a Project Superintendent, and is currently employed as a project manager for Plaintiff, Iowa Division."

Did I read that correctly?

A. That's what it says.

Q. Mr. Jorgenson, do you have any knowledge of Plaintiff's copyright works?

A. I understand it is a company policy that we copyright our plans.

Q. Do you know for which projects Rottlund claims copyright protection?

A. I would understand that to be all of them.

Q. Do you know anything about Rottlund process or procedures in making registration applications to the copyright office?

A. Only that that is handled in Minnesota.

Q. Do you know anything else related to Plaintiff's copyrighted works?

A. No.

Q. Do you have any knowledge related to -- take one at a time -- Pinnacle's access to Rottlund copyright works?

A. No.

Q. Do you have any knowledge related to Town & Country's access to Plaintiff's copyrighted works?

A. Just that the employees that were in the Iowa Division had access, as I do, to all of our plans.
Q. Do you have any other information related to Town & Country Homes access to Plaintiff's copyrighted works?
A. No.
Q. Do you have any knowledge about Bloodgood Sharp Buster Architects & Planners access to Plaintiff's copyrighted works?
A. No.
Q. Any knowledge related to Bloodgood Group, Inc.'s, access to Plaintiff's copyrighted works?
A. No.
Q. Do you have any knowledge of the alleged substantial similarity between Rottlund's and Town & Country Homes products?
MR. KRUMMEN: I have an objection that there was an amended set of interrogatory responses subsequent to this set. You may answer.
A. Yeah. I haven't seen the plans for the Town & Country villas, and so if I had seen those I would be able to say yes, but since I haven't, I will have to say no.
Q. It is not only the plans. You haven't

# FILED UNDER SEAL

Exhibits R145 – R146