# EXHIBIT A

**This page is a placeholder for Exhibit A to the Supplemental Affidavit of Ben Patrick in Support of Defendants Bloodgood Sharp Buster Architects and Planners of Iowa, Inc. and The Bloodgood Group, Inc.'s Motion for Summary Judgment as to Damages. Exhibit A was filed conventionally under seal.**

# **EXHIBIT B**

**This page is a placeholder for Exhibit B to the Supplemental Affidavit of Ben Patrick in Support of Defendants Bloodgood Sharp Buster Architects and Planners of Iowa, Inc. and The Bloodgood Group, Inc.'s Motion for Summary Judgment as to Damages. Exhibit B was filed conventionally under seal.**

I haven't done the calculation to determine what that capacity is, although it would -- it would -- looks like it would take a significant portion of its outstanding credit line, but I haven't done that calculation yet. But it would be a concern.
Q Could you turn to your first expert report, which is marked as Exhibit 432.
A (Complies.) Yes.
Q Do you see under the caption "Methodology," you have a paragraph?
A Yes.
Q And it looks like you interviewed Jim Grundmeier, BSB's partner in charge of operations, correct?
A Yes.
Q You also interviewed Mary Brown, our BSB human resources director?
A Yes.
Q And Art Plante, a divisional president of TCM Minnesota, correct?
A Yes.
Q Did you take any notes when you interviewed these individuals?
A No.



Q How long did the interview with Jim Grundmeier last?
A Well, Jim Grundmeier, I can't remember if -- I can't remember if I was on a conversation with him or not. Mary Brown, I wasn't. I had a staff person assist with getting the costing information with respect to calculating the profits on the billings for the -- for the design of the Homestead projects.
And I can't remember my conversation with Jim Grundmeier. I know I didn't speak to Mary Brown. And Jim, I can't remember whether or not I spoke to him directly or whether my staff did.
Q What was the purpose of interviewing Jim Grundmeier?
A Well, we were trying to understand -- we were trying to calculate -- as I recollect--and my recollection's vague--is to try to get the information we need to calculate the profits that BSB earned from designing the alleged infringing products.
Q Why was that necessary?
A Because the law firm that hired us, they asked us to calculate the profits tha[t] ... developing the alleged infrin[ging] ...

EXHIBIT

tabbies

C



Q Why didn't you just look at the financial reports of BSB to find out what profits they earned on the projects at issue in this matter?
A Because we always try to get an understanding of the underlying economic data with respect to the calculations.
Q Did you read the Rule 30(b)(6)deposition transcript of James Grundmeier, dated March 4, 2003?
A I don't remember reading that, no.
(Deposition Exhibit Number 434 marked for identification by the reporter.)
BY MR. KRUMMEN:
Q Mr. Kenyon, I've put in front of you Exhibit Number 434. It is pages 27 through 29 of Mr. Grundmeier's Rule 30(b)(6) deposition transcript. I'll give you as much time as you need to read through that and then I have some questions.
A (Reviewing.) Okay.
Q Have you read that transcript portion before?
A Not that I recollect, no.
Q So the first time you found out that The Bloodgood Group, Inc., has a profit-sharing formula that drives what profits are distributed



back down to BSB of Iowa is when you just read this deposition transcript?
A I don't remember if I knew about that or not -- I don't know. I don't recollect having that conversation, but we could have.
Q Have you done anything to determine what the profit-sharing formula was The Bloodgood Group, Inc., used to determine whether or not BSB of Iowa's profits are similar under that formula to what you've calculated them to be?
MR. SCHWIEBERT: Objection. Form. Vague.
MS. NEWMAN: Same objection.
A I mean, I don't -- I don't understand why -- why a person would do that calculation.
BY MR. KRUMMEN:
Q Because that was the actual profits, correct?
A No. We calculated the actual profits, which are billings less incremental expenses. That's the profits.
Q The profits are what BSB, Inc. -- strike that.
The profits are what The Bloodgood Group, Inc., determined the profits are, correct?
A No. The profits are the revenues for the project less the incremental expenses. That's

the profits.
Q That's your definition of the profits under the copyright act?
A The infringer's profits, yes.
Q But The Bloodgood Group, Inc., apparently received some profits as well, correct?
A We didn't look at whether one group or the other group received any profits. We looked at the profits that the -- that -- that were made on the alleged infringing design.
Q You didn't look at the actual infringer's profits; you calculated your own?
A No. I cal- --
MR. SCHWIEBERT: Objection. Mischaracterizes his testimony.
MS. NEWMAN: Same objection and objection as to form. Argumentative. You can answer.
A We calculated the profits, the incremental profits, from the design of the infringed. I don't know what calculation you think we should have made, but we did the right calculation.
BY MR. KRUMMEN:
Q I'm asking you why you didn't use the defendant's internal accounting calculation of



profits.
A Because we calculate our own. That's why people hire us. We calculated the profits. We got all the billings and all the revenues and went to the time records and got all the time and calculated the -- the benefits that would be associated with the labor, subtracted that. There were even more incremental expenses I think we could have subtracted, but we didn't. And we calculated the profits. That's the way you do it.
Q So you're telling me that if there's a national accounting firm and the profits are determined at the central national office and then distributed back down to your firm, that's the wrong way to compute profits?
A If somebody asked me what the profit --
MS. NEWMAN: Objection.
THE WITNESS: I'm sorry.
MS. NEWMAN: Objection. Incomplete hypothetical. Vague. Form. You can answer if you understand.
A Again, if it was a similar type project, which is calculate the profits on a job, the answer is I wouldn't do that. I would look at the



specific billings with respect to that job and the costs to -- to complete that job. That's how you do it.
It wouldn't matter to me if our national office did anything. It's all right pocket/left pocket calculation, moving the money around. I would look at the profits on that specific job.
BY MR. KRUMMEN:
Q So if BSB of Iowa had to pay 50 percent of the profits you calculated to BGI, you still count that as BSB's profits?
A I wasn't asked to calculate the profits between any specific entity. I was asked to calculate the profits with respect to what was earned from designing the alleged infringing units.
Q And I don't dispute that. But that isn't what your report says, correct? What your report says is BSB's profits.
A We just looked at the total, just assumed they're the same. I mean, the profits are the profits.
Q That's an assumption, correct?
A Yeah. But the profits are the profits.
Q Well, BGI might have part of those profits as well. Your report says it's BSB's profits.



Would you like to correct your report?
A I don't know what the distinction is. Okay. We calculated the profits from the infringing project.
Q I'm going to give you an opportunity to clarify what you mean in your report. And one clarification would be you calculated the profits off of the infringing product. The other would be you calculated BSB's profits off of the infringing product. Which did you do?
MS. NEWMAN: Objection as to form. Go ahead and answer if you can.
A We've calculated the profits of designing the alleged infringing product.
BY MR. KRUMMEN:
Q The third person that's listed here as being interviewed is Art Plante, correct?
A Yes.
Q Did you interview Art Plante?
A I believe I had a telephone conversation with him. I just can't -- I don't think it was long, but I can't remember -- I can't remember what was discussed. It was a long time ago.
Q What was the purpose of speaking with Mr. Plante?