UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

| | |
|---|---|
| The Rottlund Company, Inc., d/b/a Rottlund Homes, a Minnesota Corporation,<br><br>Plaintiff,<br><br>v.<br><br>Pinnacle Corporation, d/b/a Town & County Homes, an Illinois Corporation, Town & County Homes, Inc., a Minnesota Corporation, Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation, and The Bloodgood Group, Inc., an Iowa Corporation,<br><br>Defendants,<br><br>and<br><br>Town & County Homes, Inc., a Minnesota Corporation,<br><br>Third-Party Plaintiff,<br><br>v.<br><br>Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation,<br><br>Third-Party Defendant. | No.: 01-CV-1980 (DSD/SRN)<br><br>PINNACLE CORPORATION AND TOWN & COUNTRY HOMES, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES<br><br>(ORAL ARGUMENT REQUESTED) |

When it affirmed Judge Doty's grant of summary judgment in *American Computer v. Boerboom International, Inc.* 967 F.2d 1208, 1211(8th

Cir. 1992), the Eighth Circuit relied on the well recognized principle that "the nonmoving party must establish that there is legally sufficient and significant probative evidence to present to the trier of fact." Indeed, Rule 56 requires that "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56.

Rottlund has failed to satisfy these basic evidentiary burdens. Instead, it has resorted to the time-worn, transparent trick of dumping a box of documents on the Court in the hope that it will abdicate its duty by concluding without analysis that "there must be a fact question in there somewhere." If this Court reviews Rottlund's supporting materials and testimony with even passing care, it will quickly recognize that the majority of Rottlund's exhibits do not support the factual propositions advance by Rottlund. Moreover, Rottlund has failed completely to offer any proof that the exhibits will ever be admissible at trial. Worse, many are third party documents that lack any indication that they are reliable. Rottlund has offered this Court nothing to assure it that the passing comments in these documents reflect fact, as opposed to conjecture.

As Judge Doty recently held in *Nokes v. United States Coast Guard*, 282 F.Supp.2d 1085, 1089 (D. Minn. 2003), "Inadmissible evidence cannot overcome a motion for summary judgment." *Citing, Fireman's Fund*

*Insurance Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir. 1993). Accordingly, this Court may not rely upon the following exhibits to create a question of fact sufficient to defeat defendants' motion for summary judgment: R36, R39, R53, R62, R75, R76, R78, R80, R81, R83, R96, R98, R99, R103, R104, R107, R108, R109, R113, R118 and R140.

Defendants' objections to these exhibits go well beyond basic foundation, authenticity and hearsay (all of which apply in spades). Most of these documents were generated by third parties. The documents in turn contain hearsay, speculation, and unsupported conclusions. Some are ambiguous and unclear. Rottlund had ample opportunity during the past three years to support, explain, or verify these facially unreliable documents, but it failed. As a result, it cannot use them now to defeat a well founded motion for summary judgment.

In the final analysis, Rottlund has failed to raise a trial issue of fact on several key issues. First, it has no support for its claim that a causal nexus or link exists between TCM's use of the Homestead or Chateau townhomes and its acquisition or development of the properties. Absent proof of this link, Rottlund cannot seek TCM's profits from the sale of non-accused housing units. Second, Rottlund has failed to establish that it lost any revenue due to TCM's sale of Homestead or Chateau townhomes. Unless Rottlund can show a loss of revenue as an initial matter, the Court never reaches its claim that the burden shifts. As a result, Rottlund's entire claim

for actual profits fails, and it is limited to a claim for infringer's profits. Third, Rottlund's claim for statutory damages, attorneys fees, and its allegations of willfulness fail as a matter of law.

## I. ROTTLUND HAS NOT CREATED A FACT ISSUE REGARDING DEFENDANTS' INDIRECT PROFITS ON NON-INFRINGING PRODUCTS.

To prop up its unsupportable claim for Defendants' profits on all of the non-accused products in the developments containing the accused products, Rottlund offers slight variations on a specious three-step argument. First, Rottlund offers hearsay assertions that each of the developments at issue had some combination of "density requirements," "affordability requirements," and "product/mix product diversity requirements." Second, Rottlund states that TCM used the Homestead Collection (and Pinnacle used its 4- and 6-unit back-to-back product) to meet those wholly undefined requirements (or, in some cases, guidelines) in each of the developments. Finally, Rottlund offers the unsupported and entirely speculative claim that TCM and Pinnacle would not have gotten municipal approval for the communities in question without using those back-to-back products.

Rottlund made a tactical decision not to depose officials from any of the communities in question. As a result, there is no testimony in the record from these officials about each community's municipal approval process, the guidelines and/or requirements each community may have had for the development in question, how those claimed guidelines or requirements

*actually affected* the approval process in each community, and -- most important – what role TCM's Homestead Collection played in securing approval for each of those developments. Instead, Rottlund asks this Court to speculate about the existence, definitions, and roles of density guidelines, affordability guidelines, and diversity guidelines for each of the individual communities at issue.

Rottlund's mountain of Bates-stamped paper does not create fact issues for any of these developments because Rottlund has not demonstrated the required "nexus" between the alleged infringement and the indirect profits from Defendants' sales of non-infringing products. *See Andreas v. Volkswagen of America, Inc.*, 336 F.3d 789, 796 (8th Cir. 2003); *Mackie v. Rieser*, 296 F.3d 909, 915 (9th Cir. 2002).

Rottlund's reliance on *Three Boys Music v. Bolton*, 212 F.3d 477 (9th Cir. 2000), and dicta from *On Davis v. The Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001), also misses the mark. The *Three Boys* court affirmed a jury verdict that awarded plaintiff 28% of the profits from sales of a record album that contained one infringing song, which was the album's lead single. *Three Boys*, 212 F.3d at 487. The *On Davis* dicta suggests that the publisher of a poetry anthology that contains one infringing poem bears the burden of proving what portion of the revenues from the anthology is not profit attributable to the infringing poem. *On Davis,* 246 F.3d at 160. (The *On Davis* case does not involve poems or poetry anthologies.)

In each of those examples, the infringing works (a song and a poem) were contained within and sold as parts of larger collections (an album and an anthology). In this lawsuit, the allegedly infringing work (a 4-, 6-, or 8-unit back-to-back building) comprises interior and exterior units, which are sold individually. Rottlund's analogy fails. Apportionment issues involving the record album and the poetry anthology bear no relation to Rottlund's attempt to shoehorn entire housing developments into a lawsuit over one townhouse product.[1] A review of the record concerning each development bears this out.

A. Centennial Crossing in Maple Grove

Rottlund begins building its rhetorical house of cards by making the unsupported claim that "the Homestead Collection was *the key* to [TCM's] proposal, as it satisfied [Maple Grove's] affordability guideline which helped [TCM] win the bidding contest and receive approval for [its] development proposal." (Rottlund Mem., p.11) Rottlund's only proof for this claim, however, is deposition testimony of Mike Ryan and a group of documents labelled "R53." Neither the testimony nor the exhibit supports the assertion

[1] In addition, Rottlund has misstated the law in its opposition brief. Rottlund claims that *Frank Music I*, 772 F.2d at 518-19, held that the copyright holder of a song that was used in a Las Vegas revue was "entitled to recover a portion of the casino's profits from its hotel operations and its gaming operations." (Rottlund Response Brief at 41.) The court said no such thing. Indeed, the appellate panel noted that the district court *did not even consider* indirect profits from the hotel and casino operations in determining what profits were attributable to the infringement. *Frank Music I*, 772 F.2d at 518. The *Frank Music I* court stated that such indirect profits *could* be a part of the trial court's calculus, but it did not hold that they necessarily must be. *Id.* at 519.

that the Homestead Collection was "the key" to TCM's ability to acquire and develop the Hollander property.

For example, the Mike Ryan testimony relied upon consists of Mr. Ryan reading from an unsigned document written by a third party, (Krummen Aff., R11, 119:23-120:6), and acknowledging that TCM built back-to-back townhomes in Maple Grove. (Id., 121:3-7) Nowhere does he lend support to the notion that the back-to-backs were necessary or required, much less "the key" to TCM's ability to acquire the property or get approval.

The only other evidence Rottlund offers for its bald assertion is Exhibit 53, a ten-page fax with a March 18, 1999 cover page. (Krummen Aff., R53) The third and fourth pages of that exhibit appear to be an unsigned draft of a letter from C. John Uban of Dahlgren, Shardlow, and Uban, Inc., dated May 27, 1998. (The same document Rottlund had Mr. Ryan read at his deposition, even though he had no recollection of ever seeing it.) Nothing in the record explains what the fifth through tenth pages of the fax are, who created them, who received them, whose handwriting is contained on them, etc. The fax is riddled with hearsay, and cannot even create a question of fact, much less support the claim that the Homestead Collection was "the key" to gaining municipal approval.

Notably absent from Rottlund's discussion of the TCM's acquisition of the Hollander property or the approval of TCM's development by Maple Grove is any evidence from Maple Grove officials explaining *why* Maple

Grove approved the project, whether it has density or diversity requirements, how TCM satisfied those requirements -- if they exist -- or whether they could have been satisfied by something other than the Homestead. After two and one half years of litigation, Rottlund has produced no more than its counsel's conjecture held together by a patchwork of hearsay and precatory guideline language to support it claim. This does not create a fact issue.

B. Providence Pointe in Shakopee

Rottlund makes the unsupported claim that "Town & Country used the infringing Homestead Collection to satisfy [Shakopee's] life cycle housing guidelines, density housing guidelines, and mixed-use housing guidelines." (Rottlund Mem. at 19; emphasis supplied.) Its only evidence is Ex. R88, which the Krummen Affidavit describes as "a true and correct copy of a memo attaching a proposed preliminary plat submitted to the City of Shakopee." (Krummen Aff., ¶ 88) The exhibit, however, contains no plat. Moreover, Rottlund never bothered to establish who prepared the exhibit, much less why it includes the information it does. Finally, nothing in the document (even if it is accepted without any foundation as true, accurate, and reliable) indicates that the Homestead was necessary to the development.

Thus, Rottlund again fails to offer any evidence to connect up (1) Shakopee's guidelines – whatever they may have been – with (2) TCM's *need* to use the Homestead Collection to satisfy those guidelines and (3) thereby gain Shakopee's approval. Moreover, nothing in the record explains – or even

hints at – the reasons for Shakopee's eventual approval of TCM's proposed development.

C. Harvest Hills in Plymouth

As it did with Maple Grove, Rottlund makes the unsupported claim that "the Homestead Collection was *the key* to obtaining [municipal] approval as it satisfied Plymouth's affordable housing, life cycle housing, and housing diversity guidelines, and satisfied the continued demand for entry level housing in Plymouth." (Rottlund Mem.at 16; emphasis supplied.) Again, Rottlund offers its counsel's conjecture rather than any admissible evidence from the City of Plymouth. For example, Rottlund asserts, "The City of Plymouth has affordable housing guidelines, life cycle housing guidelines, and housing diversity guidelines." (Rottlund Mem., p. 16) The only record citation is to page D16579 of R76. Nothing is offered to explain what this page is, or what it is based on, so there is no indication that it is reliable at all. Moreover, it only mentions "3 primary goals of the city housing needs." (Id.) It does not support the claim that Plymouth has any guidelines at all.

Whether Plymouth has actual guidelines or not, and whether the Homestead Collection was the key to gaining municipal approval, are easily provable facts. Rottlund could have obtained this information from the City of Plymouth, but it elected not to do so. Instead, Rottlund touts sheer speculation as fact, claiming that TCM would not have been able to build at Harvest Hills, but for its use of the Homestead Collection. The record, even

when viewed in a light most favorable to Rottlund, does not support this claim.

Other Rottlund record citations regarding Harvest Hills are equally troubling. For example, Rottlund cites exhibit R78 as proof that "the Homestead Collection was the key to obtaining [Plymouth's] approval . . . ." In addition to the myriad evidentiary, foundational, and authenticity problems with this document, the document does not indicate that *anything* was approved, nor does it explain the basis for the approval that had not happened as of the date of the unauthenticated, seemingly incomplete, hearsay agenda.

As further support for this same proposition, Rottlund offer Exhibit R-81, which the Krummen Affidavit identifies as a "true and correct" copy of a document entitled "Harvest Hills Townhome Affordability." Rottlund makes no effort to identify who wrote it, why it was written, what it is based upon, whether it is accurate, or even when it was written. Nor does Rottlund attempt to tell the Court, through admissible evidence or testimony, what the document means. Nevertheless, it is offered as part of the mountain of paper to support the claim that the Homestead Collection was the key to gaining approval from Plymouth.

D. Washington Square in Aurora

With respect to Pinnacle's Washington Square development in Aurora, Rottlund again asks the Court to make a staggering leap of faith by assuming

facts that are simply not in the record. Rottlund has not offered any admissible evidence from the City of Aurora to explain what its density or diversity requirements were, much less whether the city had actual requirements (as opposed to suggested guidelines).

More important, Rottlund has not offered any admissible evidence to indicate that the City of Aurora specifically conditioned its approval of Pinnacle's Washington Square development on Pinnacle's use of four- and six-unit back-to-back products. Rottlund made the tactical decision not to depose officials from the City of Aurora regarding these topics. Rottlund also claims that but for the use of the back-to-back product, Pinnacle never would have gotten village approval for Washington Square. (Rottlund Mem. at 15.) Nothing in the record supports such wild conjecture. Neither Exhibit R.71 nor R.72 explains what requirements or guidelines the City of Aurora may have had for the Washington Square development. Neither explains – or even hints at – the basis for the eventual approval the City of Aurora granted Pinnacle for this development. The Court should not speculate about a record Rottlund chose not to develop. Accordingly, there is no fact issue regarding Rottlund's unsupported claim that it is entitled to Pinnacle's profits from the sales of non-back-to-back products at its Washington Square development.

E. Traditions at Clover Ridge in Chaska and Pinebrook in Brooklyn Park

Rottlund's most attenuated argument for profits on non-accused products involves TCM's Chateau Collection, which it is building in Chaska and Brooklyn Park. The architectural firm that designed the Chateau Collection did not design the Homestead Collection. Rottlund elected not to depose the architect who designed the Chateau Collection.

Rottlund's counsel again supports its conjecture with a crazy-quilt of hearsay (*see, e.g.*, Krummen Aff., R-Ex. 99, 103-04, 108-09, 111-13). The record, even when viewed most favorably for Rottlund, does not create a fact question about whether the guidelines or requirements in Chaska and Brooklyn Park required TCM to use the Chateau Collection to gain municipal approval for the Traditions at Clover Ridge and Pinebrook developments. Rottlund had the opportunity to develop an evidentiary record to support that theory, but it failed to do so. Rottlund never deposed Ms. Fleming, Mr. Geegan, or anyone from Chaska or Brooklyn Park, preferring instead to rely on Bates stamps and speculation to create a fact question. Speculation cannot provide the basis for creating a fact question. *Yarborough v. DeVilbiss Air Power, Inc.*, 321 F. 3d 728, 730 (8th Cir. 2003). Therefore, this Court should enter summary judgment against Rottlund regarding Rottlund's claims for development-wide damages.

In short, Rottlund has failed utterly to establish that its construction and sale of Homestead or Chateau townhomes was necessary, integral, vital

or "the key" to it's ability to acquire and develop the properties in question as a whole. Without proof of this connection, it cannot establish that TCM's profits from the non-accused housing units are "attributable to the infringement." 17 U.S.C. § 504(b). This is not a matter of apportionment of profits from the sale of a single work that contains both infringing and non-infringing aspects. The development, construction and sale of the non-accused products was entirely separate from TCM's back-to-backs. Rottlund has failed to link them up.

## II. ROTTLUND HAS FAILED TO ESTABLISH ANY ACTUAL DAMAGES.

### A. Rottlund Has Failed To Identify Any Lost Villa II Revenue.

Neither party disputes that Rottlund carries the burden of proving "with reasonable probability the existence of a causal relationship between the infringement and a loss of revenue" to state a claim for actual damages. *See Robert R. Jones Associates, Inc. v. Nino Homes*, 686 F. Supp.160, 164 (E.D. Mich. 1987); Rottlund Mem., p. 47. Despite acknowledging its burden, Rottlund has produced no evidence that it lost any sales or revenue.[2] Therefore, it substitutes "lost development opportunities," arguing that

[2] At page 14 of its memorandum, Rottlund asserts, "Rottlund witnesses and the Town & Country Defendants' damages experts all testified that Rottlund lost Villa II sales to the infringing Homestead Collection." Consistent with a pattern that is extremely distressing, the record citations fail to support this claim. The "Rottlund witness" is Todd Stutz, who testified, "I know for a fact that we have lost buyers to Town & Country based upon discussions with my salespeople." (Krummen Aff., R17 at 414:2-3) Rottlund's counsel is seasoned enough to recognize this as inadmissible hearsay that the Court cannot consider. As for defendants' expert, Mr. Cobb testified that "it is possible" some small group of buyers would have purchased from Rottlund, but he "wouldn't concede that," sees no proof of it, and considers it "speculation." (Id, R3, 54:10-12, 55:16-18, 57:9)

Rottlund would have made the sales that defendants made, and claims every sale of a Homestead or Chateau by TCM caused Rottlund to lose revenue. (Rottlund Mem. p. 47)

Even if the Court accepts the notion that "lost opportunity" is equivalent to lost revenue, Rottlund has still failed to carry its burden, or introduce evidence sufficient to create a fact question, because it has failed to demonstrate that it had Villa II townhomes which went unsold or that it would have created more Villa II townhomes to sell to the defendants' customers. Rottlund never even attempts to fill these glaring holes in its damage theory and, as a result, its claim for actual damages fails.

1. Merely showing the existence of nearby competitive developments is insufficient.

Rottlund argues that it can satisfy its burden of showing lost revenue simply by proving that it had developments in competition with each of the defendants' developments. Relying on *Robert R. Jones*, Rottlund argues this evidence is sufficient to shift the burden to defendants to show purchasers of the Homestead or Chateau would not have purchased Villa IIs in the same geographic vicinity. (Rottlund Mem., p. 48)

This argument overlooks a key fact in the *Jones* case and a fundamental economic principle: Rottlund must demonstrate that it has Villa II townhomes at each of its competing developments that have gone unsold. Absent such proof, Rottlund cannot show any loss of revenue because it would have merely *substituted* one of the defendants' customers for one of

Rottlund's, with no net effect on revenue.[3] In *Jones*, this was not an issue because evidence existed that "each sale of a Riverside by Nino was the loss of an Aspen sale by Jones." *Jones,* 686 F.Supp. at 164. Quite clearly, the plaintiff in *Jones* had either lots or houses that went unsold because of the competition. No such proof exists here, none has been produced in discovery, and on the record before this Court, Rottlund's damage theory must be rejected.

2. Rottlund has failed to prove that it would have acquired the land developed by defendants.

As an alternative to its unprovable "lost actual sales" theory, Rottlund claims it lost the "opportunity" to develop the parcels TCM developed. In Rottlund's worldview, this "lost opportunity" is yet another proxy for lost revenue. To sustain this theory, Rottlund must prove that *but for* defendants' infringing conduct, Rottlund would have acquired the land in question. Putting aside the question whether TCM's infringing conduct enabled it to acquire the land in question, Rottlund must introduce some evidence indicating that it would have acquired the land if TCM had not.

Amazingly, Rottlund suggests that it does not need to prove this at all: "*Robert R. Jones* makes clear that Rottlund may recover actual damages without proving it bid on each and every property the Town & Country Defendants wrongfully acquired..." (Rottlund Mem., pp. 49-50) *Jones*, of

[3] Signficantly, Rottlund does not claim its prices were driven down by the competition or that it had greater expenses because its sales took longer. Rottlund's sole claim for actual damages is that it lost sales.

course, stands for nothing of the kind because the issue never came up. The plaintiff in *Jones* never suggested that it would have developed the property the defendant developed. Instead, the plaintiff in *Jones* argued it would have sold homes in its own development (a claim Rottlund cannot sustain here because it has no unsold Villa IIs in its developments). With unbelieveable chutzpah, Rottlund argues that because the plaintiff in *Jones* did not even make the claim, Rottlund does not need to prove it: "There is no evidence that the copyright owner in *Robert R. Jones* even negotiated for the properties where the infringing products were built; yet, the copyright owner recovered actual damages." (Rottlund Mem., p. 50) Nothing in *Jones* suggests that Rottlund is relieved from its obligation to demonstrate a causal connection between defendants' conduct and Rottlund's loss of an opportunity.

The fact is that there is no proof at all supporting Rottlund's assertion that it would have acquired the land parcels in question. The clearest example of this is the Hollander property in Maple Grove. Rottlund claims that TCM only slightly outbid Rottlund, thus implying that Rottlund would have acquired the land if TCM was not in the picture. (Rottlund Mem., pp. 52-3) This is false: Rottlund voluntarily dropped out of the bidding for the Hollander property before the final round. (Schwiebert Aff., Ex. L at 199-200 & Ex. M) Even if TCM failed to acquire the property, there was no prospect

that Rottlund would have because there were at least two other bidders who were in the final round, ahead of Rottlund.

Rottlund's evidence regarding the other land parcels is even weaker. It lamely claims that it "was aware of, and entered into informal negotiations for, *nearly* every other property at issue in this dispute but the Defendants purchased these properties first." Once again, however, the record citations simply do not support the claim that Rottlund would have acquired the land "but the Defendants purchased these properties first." Specifically, Rottlund relies on the testimony of Todd Stutz for this claim. In actuality, Mr. Stutz testified as follows:

- TCM's Cornerstone Lake in Lakeville: "We didn't even look at that piece of property." (Krummen Aff., R17 198:6-7)
- TCM's Springbrook in Lakeville: "Q: Were you generally aware at that time that that land was up for sale? A: Not the specific piece of property, no." (Id., 193:14-16)
- TCM's Harvest Hills in Plymouth: "We had discussions with the property owner at the time, but as I recall, the timing of that site was such that, for whatever reason, we didn't bid on it at that time." (Id., 188:9-12)
- TCM's Providence Point in Shakopee: "[We] had discussions with the property owner, but at that time we did not pursue the opportunity." (Id., 191:13-16)

Rottlund cannot in good faith claim that this testimony creates a triable issue of fact on its claim that Rottlund would have acquired these properties but for defendants' infringement. Worse, Rottlund offers no evidence whatsoever regarding TCM's acquisition of the land for Clover Ridge

in Chaska, or Pinebrook in Brooklyn Park. Finally, Rottlund omits the obvious fact that homebuilding in the Twin Cities is not a zero sum game involving just two competitors. As Todd Stutz candidly testified, "We did pursue some of the other opportunities, but others *such as Ryland, or Centex, or Pulte,* or Town & Country ultimately ended up with those opportunities." (Krummen Aff., R16, 160:8-11) (Emphasis supplied.)

There is simply nothing in the record before this Court to sustain Rottlund's assertion that it would have acquired the property developed by TCM. Absent such proof Rottlund has failed to carry its burden of proving a causal connection between TCM's development of those properties and a "lost opportunity" to Rottlund.

B. Rottlund Has Not Sustained It Burden Of Showing Actual Damages "Attributable To The Infringement" Relating To TCM's Sale Of Non-Infringing Homes.

Rottlund's claim for actual damages relating to the sale of non-infringing homes is even more attenuated than its theory relating to the Villa II. Specifically, Rottlund argues that it "offered comparable products to Town & Country's other products, such that Rottlund could have developed the entire community and obtained sales and profits from all the products Town & Country sold as a result of using the infringing Homestead Collection to acquire the development opportunity." (Rottlund Mem., p. 54) In other words, this speculative claim requires two links: (1) that TCM's use of an infringing design was necessary for it to acquire and develop the parcels; and

(2) that Rottlund would have acquired the parcels and developed them if the defendants had not. A failure of proof on either issue means that Rottlund cannot establish a causal connection between the alleged infringement and its claimed "loss of opportunity" relating to non-infringing homes.

As detailed immediately above, Rottlund has offered nothing to support its bald assertion that it would have acquired the properties at issue if defendants had not. Rottlund's "evidence" not only fails to raise a question of material fact, it actually contradicts the claims of counsel in their memorandum. Furthermore, there is simply no proof in the record before this Court that TCM necessarily had to use an infringing back-to-back design to acquire the properties at issue. Thus, as a simple matter of proof, Rottlund has failed to establish the necessary causal connection.

## III. STATUTORY DAMAGES, ATTORNEYS FEES, AND WILLFULNESS

### A. The Homestead Collection And Washington Square Back-To-Back Townhomes Were "Commenced" Before Rottlund's Registration Of Its Copyrights.

Rottlund does not dispute any of the following:

1. Statutory damages and attorney fees are unavailable where the infringement commenced before registration of the copyright. 17 U.S.C. § 412(c).

2. Infringement "commences" for the purposes of § 412 when the first act in a series of acts constituting infringement occurs. *Johnson*, 149 F.3d at 506.

3. For architectural copyright infringement, "commencement" is schematic design, not final construction drawings. *Cornerstone Home Builders, Inc. v. McAllister*, 311 F. Supp. 2d 1351, 1352 (M.D. Fla. 2004).

4. BSB began its schematic design of the Homestead Collection for TCM on April 6, 1998. (Schwiebert Aff. Damages, Ex E).

5. By the end of July, 1998, BSB had completed its schematic design and the Homestead Collection proceeded to the design development and construction document phases. (Schwiebert Aff. Damages, Ex F).

6. The copyright for Villa II Rush Creek technical drawings (VAu 447-395) was registered on June 22, 1999. The copyright for the Villa II architectural works (VAu 534-723) was registered on January 7, 2002. The copyright for the Villa II Reserve technical drawings (VAu 546-285) was registered on February 19, 2002.

Instead, Rottlund asserts, without legal support, that its copyright registration for its "New Villa" product ( VAu 268-404) somehow satisfies the requirements for 17 U.S.C. § 412 as to the copyright registrations at issue: VAu 447-395, VAu 534-723, and VAu 546-285. Rottlund's argument is both factually and legally incorrect.

First, Rottlund has not asserted infringement of VAu 268-404 by any of the defendants. Rottlund failed to provide any analysis of infringement regarding VAu 268-404 during discovery. Rottlund provided no expert reports regarding VAu 268-404. Orders from this Court have specified that the copyrights at issue are related exclusively to the Villa II. *See e.g.* Docket No. 174, at 2 ("Plaintiff is a Minnesota corporation that owns a copyrights on an architectural design plan for an eight-unit town home complex. The copyright specifically covers a technical drawing entitled Rush Creek Villa II,

8 unit w/no step. Plaintiff also owns a copyright for the architectural work itself.").

Moreover, this Court already resolved this issue in its Order dated March 29, 2004. (Docket No. 367). In response to Defendants' motion for a more definite statement regarding identification of which copyrights are allegedly infringed by each accused product, the Court held that "[t]he fifth amended complaint alleges . . . the copyrights at issue (Villa II copyrights). . ." (*Id.* at 7). Rottlund's current attempt to overcome the insurmountable problem of Rottlund's delayed registration of the Villa II copyrights, precluding statutory damages and attorney fees by belated claiming infringement of VAu 268-404, is directly contrary this Court's ruling that a more definite statement was not necessary because the copyrights at issue were clearly identified as the Villa II copyrights.

Rottlund's argument is incorrect as a matter of law. Registration for the purposes of availability of statutory damages and attorney fees under 17 U.S.C. § 412 is analyzed on a copyright-by-copyright basis. Rottlund cites two cases to support its view that a previous registration can circumvent the requirements of Section 412. Neither case, however, supports Rottlund's argument.

*Richmond Homes Mgmt, Inc. v. Raintree, Inc.*, 852 F. Supp. 1517 (W.D. Va. 1994), rev'd in part, 66 F.3d 316, 1995 WL 551274 (4th Cir. 1995),[4] did not

---

[4] The unpublished Fourth Circuit opinion reversed the finding that the two copyrights were owned by the same entity without discussion of the carry-forward doctrine.

involve the issue of registration prior to commencement or the issue of statutory damages. The *Richmond* court did not even discuss the mandatory registration requirement in denying plaintiff's motion for attorney's fees. *Id.* at 1530. (applying three-part analysis from *Fogerty v. Fantasy*, 510 U.S. 517, 114 S. Ct. 1023 (1994)). The portion of *Richmond* relied upon by Rottlund related to copyright validity, not damages. *Id.* at 1525. Moreover, the logic of the "carry forward" doctrine does not support Rottlund's attempt to convert the doctrine into a "carry back" doctrine for registration purposes. Interestingly, *Richmond* did hold that the Copyright Act damages "provision is premised on a theory of restitution and unjust enrichment, not punishment." *Id.* at 1528. Similarly, the *Richmond* court rejected the plaintiff's claim for actual damages because it "failed to introduce any evidence to establish that it would have sold a Louisa in place of each Rockford sold by Raintree." *Id.*

*Data General Corp. v. Grumman Sys. Support, Corp.*, 825 F.Supp. 361 (D. Mass. 1993) rejected the argument that Rottlund now seeks to have this Court adopt. *Id.* at 364 ("Courts applying § 412 have barred recovery unless the plaintiff has demonstrated that registration predated the infringement."). The copyright holder in *Data General* had copyrights on each version (or revision) of the software. *Id.* The Court analyzed each copyright individually and held that revisions 0.0 and 1.0 were infringed prior to registration "thereby barring an award of attorneys' fees with respect to those works." *Id.*

However, the *Data General* Court held that the plaintiff could "resubmit its application for attorneys' fees and must show that MV/ADEX revisions 2.0 through 7.0 were registered before they were infringed by Grumman." *Id.* Although the Court held that the plaintiff might be able to recover a portion of the attorneys' fees, "[a] final determination, however, depends on whether Data General can demonstrate that it is entitled to fees for *any* revision of MV/ADEX." *Id.* at 365 (emphasis in original). The Court did not, as Rottlund suggests, hold that a prior registration would permit attorneys' fees for infringement of a copyright that commenced prior to registration.

Finally, Rottlund provides absolutely no basis for its statement that "[t]he Homestead Collection floor plans infringe . . . upon Rottlund's New Villa floor plans. . . . " (Rottlund Br. at 64).[5] Rottlund has provided no disclosure containing such a comparison. Rottlund's expert did not compare the New Villa to the Homestead Collection. Moreover, Rottlund did not provide any such analysis in opposition to Defendants' motion for summary judgment regarding the Homestead Collection. Rottlund's unsupported statement does not manufacture an issue of material fact to avoid summary judgment on this issue.

Rottlund attempts to manufacture a fact issue by misdirecting the Court to issues of access. BSB began its schematic design of the Homestead Collection for TCM on April 6, 1998. (Schwiebert Aff. Damages, Ex E). By

---

[5] Rottlund does not make similar allegations regarding the back-to-back at Washington Square by Pinnacle or the Chateau Collection by TCM.

the end of July, 1998, BSB had completed its schematic design and the Homestead Collection proceeded to the design development and construction document phases. (Schwiebert Aff. Damages, Ex F). There is no factual dispute that these events occurred prior to Rottlund's registration of any of the three copyrights for the Villa II.

Finally, Rottlund makes a last-ditch effort to focus on the revisions to the plans relating to the fireplace. This is inconsistent with the law regarding commencement of architectural works. *Cornerstone*, 311 F. Supp. 2d at 1352. It is also inconsistent with Rottlund's "gestalt" theory of the case and this Court's Orders holding that Rottlund cannot assert liability based upon individual elements.

The fact that Washington Square has an entirely different elevation does not alter the analysis regarding Rottlund's requirement to register its copyrights prior to commencement of the architectural works in order to obtain statutory damages or attorneys' fees. Although the differences in elevation are sufficient to find that the Washington Square back-to-back townhomes are not substantially similar to the Villa II copyrights at issue, the architectural plans were "commenced" at the time that the schematic design for the Homestead Collection was created by BSB. The question is not, as Rottlund suggests, the same. Revisions to architectural plans, including modifications to the elevation do not constitute commencement of new allegedly infringing works. *Cornerstone*, 311 F. Supp. 2d at 1352.

Rottlund has failed to come forward with any evidence to create a material question of fact regarding the commencement of the Washington Square architectural work.

B. Rottlund's Statutory Damages are Limited to the Number of Copyrights that It Established were Infringed.

Without any legal support, Rottlund argues in a single sentence that its should be allowed to recover separate statutory damages for each allegedly infringing work by the Defendants. (Br. at 70). This is simply not the law. *Venegas-Hernandez v. Sonolux Records*, 370 F.3d 183 (1st Cir. 2004) ("[U]nder § 504(c) the total number of 'awards' of statutory damages that a plaintiff may recover in any given action against a single defendant depends on the number of *works* that are infringed and the number of individually liable *infringers* and is unaffected by the number of *infringements* of those works." (emphasis in original). Rottlund provides no explanation to support it theory which is directly contrary to the *Venegas-Hernandez* decision.

C. Notice Requirement and Willful Damages.

Rottlund's memorandum contain an extensive, and largely incorrect, analysis of willful damages.[6] This issue is not before the Court in the current motion. Rottlund has not filed a motion for summary judgment on damages, and resolution of the issue of willful damages is unnecessary for resolving the

[6] For example, as previously argued before the Court there is not a single case from the Eighth Circuit that holds that an alleged infringer has a duty to obtain a written opinion of counsel. None of the cases cited by Rottlund support such an obligation. To the extent that the Court imposes the obligation that exists in patent law, the Federal Circuit recently rejected any negative inference from failure to obtain an opinion or failure to waive the privilege and rely upon the opinion. *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GMBH v. Dana Corp.*, ___ F.3d. ___, 01-1357 (Fed. Cir. Sept. 13, 2004) (en banc).

legal questions presented in this motion for summary judgment regarding damages.

The issue before the Court is whether a notice requirement exists in order for Rottlund to recover damages under §504(c)(2). Copyright law uniformly supports this requirement. *See e.g., Jobete Music Co., Inc. v. Massey*, 788 F. Supp. 262, 266-67 (M.D. N.C. 1992) ("Based on case law precedent, the court finds that defendant Massey's conduct was not willful. Unlike the cited cases, there was no notification to Massey after the first infringement occurred. In other words, unlike the other cases, there was no warning by the ASCAP representative. Instead, defendant Massey was brought into court after her first known or documented infringement. Although the statute does not speak to warning, the case law seems to support such behavior on the part of ASCAP representatives."); *Broadcast Music, Inc. v. Coco's Dev.*, 212 U.S.P.Q. 714, 715, 1981 WL 1364 at *2 (N.D.N.Y. 1981) ("There is nothing in this record to suggest that defendant received prior notification from plaintiff that permitting a disc jockey to play records in the restaurant would infringe plaintiff's exclusive license or otherwise infringe the copyrights.").

Rottlund provides no authority that such a requirement does not exist. Instead, Rottlund argues that the *Video Views* court left to the jury the qusestion whether the infringer "passed the matter off as a nuisance." This inquiry does not dispute the factual predicate that notice is required *before*

this issue goes to the jury. In fact, the *Video Views* court declined to find willfulness *despite the notice letter* because the product accused in the notice letter was not the product that was found to infringe. Rottlund confuses the standard of care after notice (recklessness in not determining infringement) with the requirement that notice be provided by the copyright holder. *Video Views,* 925 F.2d at 1021 ("Willful" infringement requires evidence that "the infringer is provided oral or written notice of its infringing conduct by the copyright owner. . . .") (emphasis added).

Second, Rottlund confused access with notice of the registration from the copyright holder. Rottlund's arguments about access to material that may have been subsequently registered does not establish knowledge of the copyright registration (either directly from the copyright holder or indirectly).

Finally, Rottlund improperly attempts to pierce the corporate veil and argue that notice to Pinnacle should be imparted to TCM (and BSB). Rottlund had never pled, argued, or substantiated a piercing the corporate veil theory. Simply stated, Rottlund sent the letter to Pinnacle in Illinois. Rottlund never sent a notice letter to TCM or BSB. Rottlund is, therefore, precluded as a matter of law from obtaining a finding of willfulness.

There is no legal support for Rottlund's argument that willful infringement precludes apportionment of defendants' profits. Rottlund relies upon three cases, not from the Eighth Circuit or this district, which do support this proposed rule of law. *Knitwaves, Inc. v. Lollytogs, Ltd.*, 71 F.3d

996 (2nd Cir. 1995) did not hold that apportionment was not allowed because of a finding of willfulness. To the contrary, the *Knitwaves* Court held that "a customer buying a Lollytogs infringing top would have been forced to buy the matching bottom as well." *Id.* at 1010. In the section on willfulness, the Court held that its finding of willfulness "supported both its award of enhanced statutory damages . . . and its award of full attorney's fees" without any reference to apportionment. *Id.*

*ABKCO Music, Inc. v. Harrisongs Music, Ltd*, 508 F.Supp. 798 (S.D.N.Y. 1981) apportioned $1.6 million of the songs $2.1 millon earnings to the infringed elements of the copyrighted work. There was not a finding of willfulness or an exclusion of costs based upon such a finding. Finally, *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45 (2nd Cir. 1939) allowed for apportionment *despite its finding of willfulness. Id.* at 51 ("No new light has come, and we now hold that the borrowing was a deliberate plagiarism. It follows that they can be credited only with such factors as their bought and paid for; the actors, the scenery, the producers, the directors, and the general overhead.").

None of these cases support Rottlund's contention that the Court cannot find as a matter of law part of the revenue (such as the sales from the interior units) should be apportioned out of any potential damage award.

## CONCLUSION

For all of the foregoing reasons, this Court should enter an order granting defendants' motion for partial summary judgment on the issue of damages.

Dated: September 16, 2004

s/Darren B. Schwiebert
Daniel J. Maertens (#188311)
Cynthia Jokela Moyer (#211229)
Darren B. Schwiebert (#0260642)
FREDRIKSON & BYRON, P.A.
200 South Sixth Street #4000
Minneapolis, MN 55402
Tel. (612) 492-7312
Fax (612) 492-7077

ATTORNEYS FOR DEFENDANT
TOWN & COUNTRY HOMES, INC.

- AND –

Edward F. Ryan
Christopher J. Murdoch
Matthew I. Farmer
HOLLAND & KNIGHT LLP
131 South Dearborn Street, 30th Fl.
Chicago, IL 60603
Telephone: (312) 263-3600
Facsimile: (312) 578-6666

David Donna (#163624)
DONNA & DALY
1460 Buffet Way, Suite 150
Eagan, MN 55121
Telephone: (651) 406-4242
Facsimile: (651) 406-4243

ATTORNEYS FOR DEFENDANT
PINNACLE CORPORATION