# Exhibit R12

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

---

The Rottlund Company, Inc.
d/b/a Rottlund Homes, a Minnesota
corporation,

Plaintiff,

vs.

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois corporation, and
Town & Country Homes, Inc.,
a Minnesota corporation,

Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa corporation,

Third-Party Defendant.

---

Videotaped Deposition of
CHRIS A. JORGENSEN
Wednesday, September 3, 2003
8:04 a.m.

you referred to the Jerry's Homes townhomes as Longview Townhomes, correct? And that's as of July of 1996?

A. That's correct.

Q. It's also true as of October 8th, 1996, per the handwriting, correct?

A. That would be an assumption. But, yes, that appears to be true.

Q. Then on March 11th of 1997, you receive the fax, which is Exhibit 55A, from Jerry's Homes, and it attaches Rottlund's Villas townhome floor plans and elevations, correct?

A. Yes.

Q. And then per Exhibit Number 226, you changed the name to Bent Tree Villas --

MS. NEWMAN: Objection as to --

BY MR. KRUMMEN:

Q. -- for Jerry's Homes, correct?

MS. NEWMAN: Objection as to the form of the question as to who made that change. Go ahead.

THE WITNESS: Yeah. The -- it appears the drawings -- the -- the title on the drawings for the project was changed to the Bent Tree Villas around June 25th, 1997, the revision date on the drawings.

BY MR. KRUMMEN:

Exhibit R13

UNITED STATES DISTRICT COURT DISTRICT O
FOURTH DIVISION No.:
- - - - - - - - - - - - - - - - - - - - - - - - - - -The Rottlund C
d/b/a Rottlund Homes, a MinnesotaCorporation,
Plaintiff,vs.
Pinnacle Corporationd/b/a Town & Country Homes,
an Illinois Corporation, andTown & Country Homes, Inc.,
a Minnesota Corporation,
Defendants,
and
Town & Country Homes, Inc.,
a Minnesota Corporation,
Third-Party Plaintiff,
vs.
Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa Corporation,
Third-Party Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
Videotaped
30(b)(6) Deposition of
BLOODGOOD SHARP BUSTER ARCHITECTS &
PLANNERS OF IOWA, INC.
(Testimony of Larry W. Moore)
Thursday, March 6, 2003 (Volume I, pages 1 - 61)
Friday, March 7, 2003 (Volume II, pages 61 - 327)

Q Now, you identified DeMaria Building Company on your resume. You just testified that that's a form of back-to-back, correct?
A Correct.
Q Are there any others on this resume that are back-to-back or some form of back-to-back?
A (Reviewing.) I do not believe so.
Q Okay. How much involvement did you have with the DeMaria Building Company? I believe you identified it as retail on the first floor and back-to-back on the two above that?
A Correct.
Q How much involvement did you have in that project?
A Initial client contact, working with the program script the client brought to us, design. And pretty much at design -- the end of schematic design, it would start to transition to our project manager and his team.
Q What year was that, or years?
A I'm going to say the process started in 1999.
Q So that was after you were involved in the Town & Country Homestead Collection back-to-back?
A Correct.
Q So far we've identified projects you were involved with as, number one, Midland Homes; number two,

Good Value Homes; number three, Jerry's Homes; number four, DeMaria; and then Town & Country of Minnesota. All of those were projects that you worked on that involved some kind of back-to-back townhome, correct?

A Correct.

MS. NEWMAN: Object to the form of the question.

BY MR. KRUMMEN:

Q I believe you said that your involvement in the Mid- -- in the Midland Homes case was initial client contact. Correct?

A Correct.

Q Did you have any other involvement beyond the initial client contact?

A Well, after --

MR. FARMER: Objection. Asked and answered.

A Client contact, again, the -- working with the program the client brought to us, schematic design.

BY MR. KRUMMEN:

Q You'd call that something more than minimal involvement, as you used the term, correct?

A Yes.

Q How would you characterize your involvement in the

Midland Homes case? Would it be substantial
involvement?
MR. FARMER: Objection. Form.
MS. NEWMAN: Same objection.
A In the -- in the Midland Homes back-to-back
townhouses?
BY MR. KRUMMEN:
Q Yes, sir.
A That would be a substantial contribution to the
project.
Q And then on the Good Value Homes back-to-back
project, I believe you used the words "minimal
involvement." Correct?
A Yes.
Q Jerry's Homes back-to-back project, I believe you
used the worms -- the words "minimal involvement."
Correct?
A I would use the words "very minimal" on that
project.
Q Thank you. And then DeMaria, how would you
characterize your involvement in that project?
A Substantial.
Q And obviously substantial involvement in the Town &
Country back-to-back project, correct?
MR. FARMER: Objection. Form.

knowledge of what they do. I'm more familiar with
their product that's front-to-back.
Q I'm using Exhibit 101 sort of as a marker
chronologically, and the next question is not tied
to Exhibit 101, although that may help you in
answering it. When was the first time you
discussed a back-to-back townhome design with
anyone at Town & Country of Minnesota or anyone at
Town & Country of Illinois?
MR. FARMER: Object to the preamble.
A The first time would have been when Art Plante
contacted us about the possibility of doing that
work in probably March '98.
BY MR. KRUMMEN:
Q Did you take any notes or do you have any memoranda
regarding that initial contact?
A That I don't remember. It -- it would be in my
schematic file, if it existed.
Q What do you recall about that conversation?
A Quite -- quite little. Very little.
Q Do you recall anything about the conversation you
had sometime in March of 1998 with Mr. Plante about
the possibility of designing a back-to-back
townhome for Town & Country?
A What I do recall is that Art wanted us to come up

and discuss the program, and we talked about it. I mean, it was a back-to-back. We knew we were going to be doing that.

And I think he gave me enough preliminary information that -- that I researched our files. I went armed with the knowledge of -- of what we had done previously, the company, BSB.

Q You say you went armed with the information of what BSB had done previously. Do you mean with respect to back-to-back townhome projects?

A That's correct.

Q So in looking through the old files, is it fair to say you looked at the materials that related to, say, the Midland Homes back-to-back project you were involved with?

MR. FARMER: Object to form.

A I think I probably did.

BY MR. KRUMMEN:

Q And also the Good Value Homes that BSB of Iowa was involved with, back-to-back project?

A I would say I did, yes.

Q And you also looked through the Jerry's Homes back-to-back files that BSB of Iowa was involved with?

A That's correct.

Q But the DeMaria project didn't start until 1999, so you didn't look through those files, correct?
A That's correct.
Q Did you look through any other materials at BSB Iowa or anywhere else before you went up to speak with Art Plante?
A I may have. I really don't remember.
Q Did you speak with anyone from -- well, strike the question.
Are you familiar with an entity known as Tracy Cross Associates, Inc.?
A Yeah, I'm familiar with Tracy Cross Associates.
Q Have you worked with Tracy Cross in the past?
A Yes.
MS. NEWMAN: Objection as to form.
BY MR. KRUMMEN:
Q Let's -- when did you first begin working with Tracy Cross?
A I -- I'm -- I'm -- early '90s. I'm make -- making a guess.
Q Do you recall what the project was that you worked on that Tracy Cross -- well, strike the question.
Was it a project the first involvement you had with Tracy Cross or was it something else?
A It was a project.

identification by the reporter.)
THE REPORTER: 114.
BY MR. KRUMMEN:
Q Before you as Exhibit Number 114 is a transmittal from you to Steve Sandelin at Town & Country Homes. The date is Tuesday, May 5, 1998, and it relates to a villa townhomes project. Have I accurately characterized the exhibit thus far?
A Correct.
Q The bottom right-hand corner contains the Bates label BSB 01944, and under the "Remarks" you wrote, "Steve," colon, quote, "Competition product survey for Minneapolis area," period, end quote. Have I accurately read that?
A Yes.
Q What does the competition product survey language refer to in your transmittal?
A I do not remember this. I don't think we had any kind of a product or project survey that I remember.
Q How would you go about finding whatever it was that you transmitted to Mr. Sandelin in connection with this Tuesday, May 5, 1998, transmittal, as you sit here today?
MS. NEWMAN: Objection. Foundation. Calls for speculation. You can answer if you know.

MS. NEWMAN: Objection as to form.
MR. FARMER: Object. Form.
A No. But it has been, in the past, that we'd give an administrative assistant the responsibility of gathering information and then firing it off to somebody. So that could be a -- that could be a situation where I wouldn't necessarily know what was in the file, in the -- in the transmittal. I don't know if that's the case here.
BY MR. KRUMMEN:
Q Exhibit 114, the competition product survey referenced there, did it contain any materials from Tracy Cross Associates?
MS. NEWMAN: Objection. Asked and answered. And foundation. Form. Answer if you know.
A I don't know.
BY MR. KRUMMEN:
Q Do you have any knowledge regarding the competition product survey file that's referenced in Exhibit 114, as you sit here today?
MR. FARMER: Objection. Asked and answered.
MS. NEWMAN: Same objection.
A I do not know what that was.

A I believe so, yes. Late March.
Q So Mr. Plante contacted you in late March of 1998 and invited you to come up to Minnesota to discuss a back-to-back possibility program?
A Correct.
Q What happened next?
A Chris Jorgensen and I took a trip up to Minneapolis and met with Art and at least one of his group, in -- in their offices. We got up there, I think it was in the morning.
Q And you met with him before you signed the contract, correct?
A Correct.
Q Did you go on a tour of any of Town & Country of Minnesota's competitors when you were up there in March of 1998?
MR. SCHWIEBERT: Object. Form.
A Yes, we did.
MR. FARMER: Foundation as to the time of the trip.
BY MR. KRUMMEN:
Q Which competitors' products did you tour in March of 1998?
MR. FARMER: Same objection.
A There were several--we had quite a full day--spread

out all over the place. There's a number.

BY MR. KRUMMEN:

Q Do you recall any of the competitors whose products you toured?

A A few. Centex, Pulte -- I'm -- I think Pulte. Rottlund. There were a number of smaller builders that I'm just not familiar -- that familiar with. I believe Ryland. Those are the ones that come to mind.

Q Did you look at a Rottlund back-to-back townhome during your tour that occurred in March of 1998?

A Yes. Yes, we did.

Q Do you recall where it was located?

A No.

Q Did you take any notes of your tour of the Rottlund back-to-back townhome in March of 1998?

MR. FARMER: Object to foundation --

A No.

MR. FARMER: -- as to the time.

BY MR. KRUMMEN:

Q Did you take any pictures, videotapes of the Rottlund back-to-back townhome?

A No.

Q Did anyone else in your group do so?

A Not that I remember.

Q Did anyone else in your group take notes of the Rottlund back-to-back townhome that was toured in March of 1998?

MR. FARMER: Foundation objection as to time.

A Not that I remember.

BY MR. KRUMMEN:

Q Were any brochures picked up by anyone in the group during the tour of the Rottlund back-to-back townhome in March of 1998?

MR. FARMER: Same objection.

A I don't remember having any brochures to look at as we were riding from project to project. I just know that Chris and I did not pick up brochures.

BY MR. KRUMMEN:

Q Did either of you look at any competitor brochures during the tour that occurred of back-to-back townhomes in March of 1998?

MR. FARMER: Same objection.

A I don't recall any brochures, no, I don't.

BY MR. KRUMMEN:

Q Do you recall any Rottlund brochures that you looked at during the March of 1998 tour of Rottlund's back-to-back townhome?

MR. FARMER: Same objection.

A No.

BY MR. KRUMMEN:

Q Why was it necessary to look at Rottlund's back-to-back townhome in March of 1998?

MS. NEWMAN: Objection as to --

MR. FARMER: Objection. Foundation as to time frame and as to the necessity. Form of the question.

MS. NEWMAN: Objection as to form.

A We looked at a lot of products primarily to help us, BSB, get a feel for that market. I guess we liked to put ourselves in the buyer's shoes, go out, tour the product, see what I like to say is how sophisticated the market is, how -- what the interiors, the quality of the furnishings and -- and how they decorate the units. It tells you a lot about what the builder will expect as far as a -- a design of a product and just general feel. So we -- we kind of just shop it that way from the buyer's viewpoint.

BY MR. KRUMMEN:

Q Were there any other reasons for touring Rottlund's back-to-back townhome and other competitors in March of 1998?

MR. FARMER: Objection. Foundation as to

time frame.

A In -- in general, again, we just -- we'd like to see the products that are out there to see -- with our experience nationally, there are a lot of good trends and things that we can bring to any product. We like to understand if those are in the market or not.

Again, as I said, the buyer's perspective is important to us. We go in and we -- we look for mistakes. We look for obvious things that the -- the -- the -- the builders in that market are doing or not doing. Like I say, from our experience, we have a lot of opportunities to bring great ideas in from all over the country.

And generally we don't -- we don't study the competition. We're not there long enough. I mean, this is -- there's a lot of things we're doing in one day. It wasn't a full day either. But we look for opportunities to basically one-up the competition.

BY MR. KRUMMEN:

Q What do you mean by that?

A We see a mistake they're making and we better it. If their rooms are too small, we make them bigger. If their closets are too small, we make them

bigger. We better it.

Q What mistakes did Rottlund make in its back-to-back townhome which you toured in March of 1998?

MS. NEWMAN: Objection.

MR. FARMER: Objection. Foundation. Form.

MS. NEWMAN: Same -- same objections. Go ahead.

A I don't know that I noted anything specific. Again, we weren't studying individual units to that -- to that extent. Glaring errors we would look at. Nothing stands out in my mind from any specific product.

BY MR. KRUMMEN:

Q Did you meet with Mr. Plante or anyone else that represented Town & Country, after the March of 1998 tour?

MR. FARMER: Objection. Foundation as to time frame of the tour.

A After the tour, we went back to Des Moines, generated the proposal and then put that back in front of Art by mail, I'm sure, or fax, and then moved into schematic design after that. I don't remember that we had any more face-to-face meetings through the process.

Exhibit R14

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

---

The Rottlund Company, Inc.
d/b/a Rottlund Homes, a Minnesota
corporation,

Plaintiff,

vs.

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois corporation, and
Town & Country Homes, Inc.,
a Minnesota corporation,

Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa corporation,

Third-Party Defendant.

---

Videotaped Deposition of
LARRY MOORE
Thursday, September 4, 2003
9:40 a.m.

the Town & Country end.
Q. And in terms of your involvement with design development, was Steve Sandelin involved from the Town & Country end?
A. Specifically, I can't rem- -- I can't remember of any instance. But I -- I guess he probably was. I'd be guessing, but it --
Q. Do you know who was involved from the Town & Country end or anyone involved from the Town & Country end during the construction document phase for the Homestead Collection?
A. Other than the people I've already mentioned, no, I wouldn't know of any additional.
Q. Now, I believe you testified in your last deposition that you were the one that came up with the schematic designs for the Homestead Collection. Correct?
A. Correct.
Q. Were those designs derived from any other BSB of Iowa project?
A. They were derived from ideas that came out of our -- our marketing design file.
Q. Okay. Which marketing design file?
A. Which marketing design file? The design -- the design file -- the marketing design file in our

marketing department. That's one large collection of files for all of our company, for resource we have.

Q. And I think we covered that the last time, so let me get more specific this time. Did you look at any marketing designs from Sandburg Village, a development in Chicago, Illinois?

A. I don't recognize that name.

Q. How about a four-wheel -- a fourplex pinwheel built by Kimball Hill, did you look at that material when you were working on the schematic designs for the Homestead Collection?

A. I didn't specifically access it. But I know that project, so I didn't have to.

Q. And how is it that you know that Kimball Hill fourplex pinwheel project?

A. I've seen it in the design file, going through it for other projects.

Q. Was it built in the late '70s?

A. Couldn't tell you when it was built. I don't look at that data.

Q. Did it predate your start with BSB of Iowa, the design and construction of the Kimball Hill project? I'm talking about the pinwheel.

A. I don't know when it was built, so I don't

know if it predated it or not. I -- you know, I don't know.

Q. Let's get back to your earlier testimony. And I don't want to mischaracterize it, but I'm not sure if you looked at the Kimball Hill designs when you were working on the schematic design for the Homestead Collection or not. What happened in that regard?

A. In reference to the Kimball Hill?

Q. That's right. Did you look at the Kimball Hill designs when you were working on the schematic design phase for the Homestead Collection?

A. No, I don't think I did specifically for that.

Q. How about the Hemphill at Adare Farm designs, did you look at those when you were coming up with the schematic design for the Homestead Collection?

A. No, I don't think I did.

Q. How about the Coventry Court for Town & Country Homes, did you look at those designs when you came up with the Homestead Collection schematic design?

A. I don't remember those, no.

Q. How about the Streamwood project for Kirk

Corporation, did you look at those designs when you came up with the schematic design for the Homestead Collection?

A. I was familiar with those, but I did not access them.

Q. Now, let's -- I -- I think you said you were familiar with Kimball Hill's designs, and now you've told me you're familiar with the Streamwood designs, correct?

A. And -- and familiar in that I have seen them as I've gone through files, accessing them for -- for other marketing purposes. So I don't have a tremendous -- tremendous familiarity with it, but, yeah, I have seen those names.

Q. Okay. Did you derive the Homestead's schematic design from the Kimball Hill designs?

A. No.

Q. Did you derive the Homestead Collection schematic design from the Streamwood designs?

A. Specifically, no. Ideas came out of all of those projects, which, you know, were incorporated as far as ideas on how to assemble room locations and elements and things like that, so --

Q. When you say, "all of those projects," could you tell me which projects you're referring

to?
A. Well, specifically the ones that -- that I used and had in my files were Midland, Good Value Homes, Jerry's Homes. Those are the three I can remember off the top of my head.
Q. And those are the three that you gave me before. I think that there was a fourth back-to-back that you worked on, but it postdated your schematic design for the Homestead Collection. Let me make sure I get that right. DeMaria?
A. DeMaria.
Q. That was after the Homestead Collection, right?
A. Yes. Correct.
Q. Okay. So the ones you looked at were Midland, Good Value, and Jerry's Homes. DeMaria came later. Let me just keep working through this list, though. In terms of the Adare Farm and College Hill, did you have any reference point or opportunity to look at those designs --
A. Could I --
Q. -- during the schematic --
A. Could I --
Q. -- design process?
A. Excuse me. Could I see that list? Because

Q. It is -- it is substantially different. And the next question is, is the Homestead Collection substantially different than the Midland back-to-back townhome?

A. Yes.

Q. Is the Homestead Collection substantially different than the Jerry's Homes back-to-back townhome?

A. Yes.

Q. Why do you say that the Homestead Collection is substantially different than the Jerry's Homes back-to-back townhome?

MS. NEWMAN: Objection, form and foundation. Go ahead if you can make the comparison without those documents in front of you.

THE WITNESS: From what I can recall without the documents in front of me is that there are, once again, substantial differences to detailed items in the plan, to the elevations, materials, massing of the building, volumes, proportions of those. That's general. Without looking at drawings and comparing, you know, elements, I couldn't go into more break -- detail breakdown.

BY MR. KRUMMEN:

Q. Is the Homestead Collection more similar to

Midland or more similar to Rottlund's Villa II back-to-back townhomes?

MS. NEWMAN: Objection as to form and foundation. You can answer if you can do that without comparing documents.

MR. CARMICHAEL: Join in the objection as to the word "similar."

MS. NEWMAN: Go ahead.

THE WITNESS: I don't think you could categorize it more or less similar than -- than any one project. They all have their specific feel and collection, combination of elements that I think makes each one what it is; unique, if you want to call it that.

BY MR. KRUMMEN:

Q. Is the Homestead Collection more similar to Rottlund's Villa II back-to-back townhome or more similar to Jerry's Homes back-to-back townhome?

MS. NEWMAN: Same objections. Go ahead.

THE WITNESS: Since -- since we used our experience on the BSB projects, I would have to say it's more similar to -- to Jerry's Homes.

BY MR. KRUMMEN:

Q. So in your opinion, the Homestead Collection back-to-back townhome design is more

Value's back-to-back design versus Rottlund's Villa II design, correct?

MS. NEWMAN: Objection as to form and foundation. Go ahead.

THE WITNESS: Yeah, I would say it's more similar to Good Value.

BY MR. KRUMMEN:

Q. Now, you said you didn't have access to Rottlund's materials. Maybe I mischaracterized that, but is it your testimony that you didn't have access --

A. No.

Q. -- to anything of Rottlund's --

A. No. That's --

Q. -- when you designed the Homestead Collection?

A. That's not -- that's not a correct statement. We had access. We did not access them. We did not use them.

Q. When you say you had access, I believe that you told me in the last deposition that you toured Rottlund's Villa II during the schematic design phase for the Homestead Collection. Correct?

MS. NEWMAN: Objection as to the form of the question. I think it mischaracterizes the prior

MS. NEWMAN: Objection as to foundation.
You can answer if you know.
THE WITNESS: I don't know if it's been
produced in this -- since it's come to light, I
mean, for me to see that and refresh my memory.
I -- I don't know where that stands in this process.
BY MR. KRUMMEN:
Q. Can you sit here and testify with certainty
that the competition product survey you received
from Art Plante in May of '98 did not have any
Rottlund materials in it?
A. Nothing I saw -- nothing I saw had Rottlund
materials in it here.
MR. KRUMMEN: Move to strike the question.
Could you read back my prior one, please.
THE REPORTER: Your last question?
MR. KRUMMEN: Move to strike the response.
If you could read back my last question, please.
(The requested portion of the record was
read by the reporter.)
MS. NEWMAN: Objection as to form. Go
ahead and answer if you know.
THE WITNESS: I can't say for certainty
what -- what was in it exactly.
BY MR. KRUMMEN:

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,
Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF LARRY W. MOORE
VOLUME II, Pages 215 - 378

(The following is the deposition of LARRY W. MOORE, taken pursuant to Notice of Taking Deposition, by videotape, at the offices of Winthrop & Weinstine, 225 South Sixth Street, Suite 3500, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:09 o'clock a.m., February 17, 2004.)

produce. Because at the time they were giving us the price the design wasn't done. So I think this was put together to say, here's the scope of what you have to do; it's a building of this size, it's a building of this many units and the units repeat, and that way Design Development was able to give us a price on what their services would cost.

Q. So you gave Exhibit 330 to Design Development, Inc.?

A. That's --

I believe that to be correct.

Q. So you gave Design Development, Inc. what you've admitted are Rottlund floor plans at the inception of this Midland townhome design process; is that fair?

A. As a guide or as a program guide for them to establish scope, yes.

Q. Did you give Design Development, Inc. any floor plans other than what appears in front of you as Exhibit 330 which you understand belonged to Rottlund at the time?

A. No, I don't believe I did, but I don't remember. I don't remember there was anything else.

Q. We've ruled Design Development, Inc. out as the candidate for pasting together these individual floor plans of Rottlunds which appear on Exhibit 330;

correct?

A. I would rule them out, yeah.

Q. Can you rule yourself out, Mr. Moore?

A. No, can't.

Q. So as we sit here today you may have pasted together Rottlund's floor plans and created Exhibit 330; correct?

MS. NEWMAN: Objection, asked and answered. You may answer again.

A. There's a possibility I -- yeah, that was my work.

Q. Have you endeavored to find out whether indeed you did create Exhibit 330 or not?

A. No, there's no way I could -- nine or ten years ago there's no way I could know that for sure.

Q. But you could check your files to see if there were any other, I guess, documents which would refresh your recollection; correct?

A. The files have been checked.

Q. You have checked those files personally?

A. No, I handed those files over to the people in our office who had that responsibility --

Q. So --

A. -- for this process.

Q. Have you looked through, prior to today's

Exhibit R15

EXHIBIT 104


ROTTLUND HOMES
RUSH CREEK
MAPLE GROVE, MN
THE VILLAS II
8 UNIT CONDOMINIUMS
A1
FRONT ELEVATION
SIDE ELEVATION
GAS METER DETAIL
ELEC METER DETAIL
D 00061


ROTTLUND HOMES
RUSH CREEK
MAPLE GROVE, MN
THE VILLAS II CONDOMINIUMS
A1.1
FRONT ELEVATION
SIDE ELEVATION
UNIT SIDE ELEVATION
COLUMN DETAIL
BRACKET DETAIL


ROTTLUND HOMES
RUSH CREEK
MAPLE GROVE, MN
THE VILLAS II
8 UNIT CONDOMINIUMS
A2
FOUNDATION PLAN
BUILDING LONGITUDINAL SECTION


ROTTLUND HOMES
RUSH CREEK
MAPLE GROVE, MN
THE VILLAS II CONDOMINIUMS
UNIT 'D'
UNIT 'C'
UNIT FOUNDATION PLANS
BUILDING CROSS SECTION THRU 'C' UNITS
BUILDING CROSS SECTION THRU 'D' UNITS
A3
D 00004


ROTTLUND HOMES
RUSH CREEK
MAPLE GROVE, MN
THE VILLAS II
8 UNIT CONDOMINIUMS
A4
ROOF PLAN


ROTTLUND HOMES
RUSH CREEK
MAPLE GROVE, MN
THE VILLAS II CONDOMINIUMS
A5
D 00006


ROTTLUND HOMES
RUSH CREEK
MAPLE GROVE, MN
THE VILLAS II CONDOMINIUMS
UNIT "C" SECTION
UNIT "C" SECTION
UNIT "C" ENTRY/STAIR SECTION
OPTIONAL STAIR SECTION
A6
D 00007


ROTTLUND HOMES
RUSH CREEK
MAPLE GROVE, MN
THE VILLAS II CONDOMINIUMS
A7
D 00608


ROTTLUND HOMES
RUSH CREEK
MAPLE GROVE, MN
THE VILLAS II CONDOMINIUMS
A8
UNIT "D" STAIR SECTION
OPTIONAL STAIR SECTION
UNIT "D" ENTRY SECTION
UNIT "D" SECTION
UNIT "D" SECTION
D 00009


ROTTLUND HOMES
RUSH CREEK
MAPLE GROVE, MN
THE VILLAS II CONDOMINIUMS
EAVE DETAIL
FOUNDATION AT HOUSE/GARAGE
RAKE DETAIL
CANTILEVER DETAIL
PARTY WALL AT GARAGE SLABS
FOUNDATION AT EXT. WALL
PARTY WALL AT DRAFTSTOP
PARTY WALL AT PARALLEL TRUSS
PARTY WALL AT HOUSE SLABS
PARTY WALL AT PERPENDICULAR TRUSS
PARTY WALL AT HOUSE/GARAGE SLAB
A9
D 00010


ROTTLUND HOMES
RUSH CREEK
MAPLE GROVE, MN
THE VILLAS II CONDOMINIUMS
THRESHOLD DETAIL AT PATIO
THRESHOLD DETAIL AT ENTRY
HALF WALL CAP DETAIL
STONE SILL DETAIL
EAVE DETAIL AT 'C' UNIT ENTRY COLUMN
PRIVACY WALL ELEVATION
PARTY WALL AT CRAFTSTOP
PARTY WALL AT 'C' AND 'D' UNITS
A10
D 00931


ROTTLUND HOMES
RUSH CREEK
MAPLE GROVE, MN
THE VILLAS II CONDOMINIUMS
OPTIONAL BATH ELEC. PLAN
UNIT "C" UPPER LEVEL ELEC. PLAN
UNIT "C" MAIN LEVEL ELEC. PLAN
E1
D 00012


ROTTLUND HOMES
RUSH CREEK
MAPLE GROVE, MN
THE VILLAS II CONDOMINIUMS
OPTIONAL POWDER ROOM/LIGHTING ELEC. PLAN
OPTIONAL BATH ELEC. PLAN
UNIT "D" UPPER LEVEL ELEC. PLAN
UNIT "D" MAIN LEVEL ELEC. PLAN
E2
D 09013

D 00014

# FILED UNDER SEAL

Exhibits R16 – R19

Exhibit R20

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

THE ROTTLUND COMPANY, INC. d/b/a ROTTLUND HOMES, a Minnesota Corporation,

Plaintiff,

vs.

No. 01-CV-1980

PINNACLE CORPORATION d/b/a TOWN & COUNTRY HOMES, an Illinois Corporation, TOWN & COUNTRY HOMES, INC., a Minnesota Corporation, BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., an Iowa Corporation, and THE BLOODGOOD GROUP, INC., an Iowa Corporation,

Defendants,

and

TOWN & COUNTRY HOMES, INC., a Minnesota Corporation,

Third-Party Plaintiff,

vs.

BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., an Iowa Corporation,

Third-Party Defendant.

The deposition of STEVE SANDELIN, called by the Plaintiff for examination, taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Susan Babicki, Certified Shorthand Reporter, Registered Professional Reporter, and Notary Public, at One Pierce Place, Itasca, Illinois, commencing at 9:03 a.m. on the 8th day of December, 2003.

A. No, I don't.
Q. What was your first involvement with the back-to-back town home project for the Minnesota division?
A. I don't recall exactly what my -- what or when my first involvement came to be. The initial involvement I think I had was to find, you know, an architectural firm that would be able to develop this product for us.
Q. Who asked you to find an architectural firm to develop a back-to-back town home product for the Minnesota division?
A. As I recall, Art Plant had asked me if I would want to recommend anybody.
Q. Did you recommend anyone?
A. I recommended BSB Architects.
Q. Why did you recommend BSB?
A. We had been having poor

Larry Moore and Art Plant on Wednesday, April 29th, 1998?

A. I don't recall.

Q. Was that the day of the product tour?

A. I think it was.

Q. So on Wednesday, April 29th, 1998, to the best of your knowledge, you went on a back-to-back product tour with Larry Moore and Art Plant in Minneapolis, correct?

A. Yes.

THE VIDEOGRAPHER: We're now going off the record. The time is 11:19 a.m., and this concludes tape one of the deposition of Steve Sandelin.

(A short break was taken.)

THE VIDEOGRAPHER: We're now back on the record. The time is 11:21 a.m., and this is the beginning of tape two in the deposition of Steve Sandelin.

Counsel, proceed.

BY MR. KRUMMEN:

Q. So, Mr. Sandelin, if I understand your testimony thus far correctly, on April 28th, 1998, you went on a tour of Minneapolis back-to-back town home product, Larry Moore went along, and Art Plant went along, correct?

A. I believe so, yes.

Q. What was the purpose of the tour?

A. To look at local competition for Town & Country Homes, Minnesota.

Q. What do you mean by "look at local competition"?

A. The other developers in the area, what they were building, and what we might want to consider building.

Q. Did you look at Rottlund Homes villa two product during the April 29th, 1998 tour?

A. I believe so, yes.

Q. Why did you look at Rottlund's villa two product?
A. They were a competitor of ours. We wanted to see the product types that they were building, how successful they were.
Q. And as of April 29th, 1998, Town & Country Minnesota did not have a back-to-back product that it could build, correct?
A. I believe that's so, yes.
Q. In fact, no Town & Country division had a back-to-back product that it could build as of April 29th, 1998, correct?
MR. FARMER: Objection, foundation.
THE WITNESS: As far as I know, yes.
BY MR. KRUMMEN:
Q. So the purpose of the tour was to initiate this design process for the back-to-back town home product that Art Plant wanted to build

through the Minnesota division of Town & Country; is that fair?

MR. FARMER: Objection, form, misstates prior testimony as to what the purpose was.

THE WITNESS: That was one of our objects, yes.

BY MR. KRUMMEN:

Q. Was anyone else present on this tour besides Larry Moore, Art Plant, and yourself?

A. I think maybe Chris Jorgenson of BSB's office was there.

Q. Anyone else?

A. I don't recall anybody else specifically.

Q. Was anyone else from Town & Country Illinois present on the April 29th, 1998 product tour?

A. I think I was the only one.

Q. Now, if you took pictures during the Wednesday, April 29th, 1998 product tour, what would happen to those pictures?

A. I believe that was for a different photo, though.

Q. That's correct.

But it had the little date encrypter; you'll concede that point, right?

A. Absolutely, yes.

Q. So what we do know is there was a camera on the tour that occurred on April 29th of 1998 and it put little date encrypters on the photographs, correct?

A. Yes.

Q. And we also know that Exhibit 267 carries the Bates label of Pinnacle, correct?

A. Yes.

Q. That's what the "PINN" stands for, correct?

A. Yes.

Q. So all of the photographs in Exhibit No. 267 came out of your file, correct, sir?

A. Yes.

Q. Now, do you have any basis to deny that you were the one that took the picture which appears on PINN 2618, the bottom half of that particular page?

MR. FARMER: Objection, form.

BY MR. KRUMMEN:

Q. With the date encrypter of April 28th, 1998?

MR. FARMER: Objection, form, asked and answered. He's testified he doesn't recall.

THE WITNESS: Again, I'll say I don't recall taking this picture. We typically share photographs. I'm sure I don't have the only date encrypter camera.

I don't recall taking this picture, sir.

BY MR. KRUMMEN:

Q. Do you have any basis to deny that you took this picture?

A. No.

# FILED UNDER SEAL

Exhibit R21