Court File No. 01-1980 / ROTTLUND / Pinnacle
Krummen Affidavit dated September 21, 2004

Exhibit R39

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

FOURTH DIVISION

| | |
|---|---|
| THE ROTTLUND COMPANY, INC. d/b/a ROTTLUND HOMES, A MINNESOTA CORPORATION<br><br>Plaintiff<br><br>vs.<br><br>PINNACLE CORPORATION d/b/a TOWN & COUNTRY HOMES, AN ILLINOIS CORPORATION, TOWN & COUNTRY HOMES, INC., A MINNESOTA CORPORATION, BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., AN IOWA CORPORATION, AND THE BLOODGOOD GROUP, INC., AN IOWA CORPORATION<br><br>Defendants<br><br>and<br><br>TOWN & COUNTRY HOMES, INC., A MINNESOTA CORPORATION<br><br>Third-Party Plaintiff<br><br>vs.<br><br>BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., AN IOWA CORPORATION<br><br>Third-Party Defendant | No. 01-CV-1980<br><br>DEPOSITION OF JASON JORGENSON |

Reported by: Connie Overberg, RPR, CSR

A. Pat Ruelle.

Q. Is Mr. Ruelle an employee of Rottlund Homes of Iowa?

A. He is an employee of Rottlund Homes. When you say Iowa, I look at that as a division of the Rottlund Company of Minnesota also, and, yes.

Q. Do you know what claims Rottlund is alleging in this lawsuit?

A. Yes.

Q. What is your understanding of the claims that Rottlund is alleging in this lawsuit?

A. That our plans were copied.

Q. Which plans?

A. The Villa 2.

Q. How did you become aware of the lawsuit?

A. Just hearsay through the company, I guess, and recently when I have been deposed.

Q. When you say recently you have been deposed, are you talking about sitting here today?

A. Yeah.

Q. How long before your deposition was noticed were you aware that there was a lawsuit involving claims that the Villa 2 plans were copied?

A. I heard about it a while back. I can't tell you exactly when.

Q. From whom?
A. I can't remember.
Q. Somebody within Rottlund Company of Iowa?
A. Probably.
Q. Do you recall any of the information that you received about the lawsuit?
A. No. Just that there was one.
Q. Are you aware that Rottlund has been involved in similar lawsuits in Iowa?
A. Yes.
Q. What do you know about the lawsuits that Rottlund has been involved in in Iowa that are similar to this, claims that the plan was copied?
A. Very little. I wasn't involved. At that time as a superintendent I wasn't privy to information.
Q. Do you know any information?
A. Some.
Q. What do you know?
A. Just that there was a situation with both Rogers and Oaks, and that there is a confidentiality agreement I have heard that we can't talk about it.
Q. Who is Rogers?
A. I believe it is a company in Ankeny, Iowa, who builds town homes.

Q. Were the plans that were at issue in the Rogers matter plans for a villa product?

A. Yes.

Q. Were there more than one version of the villa product that is being built in Iowa?

A. Yes.

Q. How many?

A. Two I believe, maybe three. Can you clarify that?

Q. Are there particular marketing names that you give two or three versions of villa that are being built in Iowa?

A. They name the floor plans. The Villa 2 was the Chattum and Dunhill, and there have been several names for the original villas. They all start with an A or B.

Q. Always start with --

A. A or B signifying A unit or B unit.

Q. Would it be fair to say that the Villa 2 and the original villa are the two versions of villa product that are being built in Iowa?

A. I believe we have started with the original villa and upgraded through to the new villas, and then the Villa 2, so I think there is probably three versions.

Q. What product was at issue in the Rogers lawsuit?
A. It would have either been the original or the new villa.
Q. You don't know which?
A. No.
Q. And then in the Oaks litigation?
A. Same answer.
Q. Do you know if Rogers developed their plans for the product that they were building that Rottlund claimed was copied was designed in-house or by an architect?
A. I don't know.
Q. Do you know anything about how Rogers came up with the plan that they were building that was at issue in the lawsuit of Rottlund involving Rottlund?
A. No, I don't.
Q. Do you have any information how Oaks came up with the plan that they were building in the lawsuit involving Rottlund?
A. No.
Q. Do you know if Oaks was working with an architect or if they developed their plan in-house?
A. I don't know.
Q. Have you ever talked with anybody at

Bloodgood Sharp Buster Architects & Planners?
A. Not that I am aware of.
Q. Have you ever had any involvement in Rottlund developments anywhere other than the Des Moines Metro area?
A. No.
Q. Do you have knowledge of the facts and issues involved in the lawsuit that Rottlund has brought against Pinnacle, Town & Country and Bloodgood Sharp and Buster?
A. Very little.
Q. What do you know?
A. Specifically, I mean, in the facts of the trial I don't. I probably don't know any of them to be honest with you.
Q. When you said "very little," what were you referring to, do you know?
A. Just what I have been told preparing for the deposition.
Q. Were those conversations with your attorney or somebody within the Rottlund Company?
A. With an attorney.
Q. Do you know anything about this lawsuit other than what your attorney has told you?
A. Other than the fact that there are several

Rottlund employees now working for Town & Country and that their plans are very similar to ours, no.
Q. How did you come to know that several Rottlund employees are now working for Town & Country?
A. Because several of them are -- three of the employees worked for our division here in Iowa while I was working here and then went to work for them.
Q. Who are those three people?
A. Marc Harris, Joey Zorn, Chad Cooper.
Q. The last one was Chad Cooper?
A. Yes.
Q. What did Marc Harris do for Rottlund while you worked for him?
A. His title was either production manager or V.P. of operations, and so he was my supervisor as a superintendent.
Q. And Mr. Zorn, what did he do for Rottlund while you worked for him?
A. He started as an assistant superintendent and ended up as either a project manager or production manager -- I am not sure which -- and he was my supervisor when he left.
Q. And Mr. Cooper?

A. He started as an assistant superintendent and ended up as a superintendent when he left.

Q. Did Mr. Harris, Mr. Zorn and Mr. Cooper all go to work for Town & Country Homes in Minnesota?

A. Yes.

Q. Have you talked with Mr. Harris since he left Rottlund Company?

A. Yes.

Q. When?

A. He was at a Christmas party held by Midwestern Interiors here in Des Moines at which they have their employees from Minneapolis come to the same party, and Marc was invited to that party, so I met him and saw him there.

Q. What year was that?

A. That would have been last Christmas.

Q. Do you know when Mr. Harris left Rottlund?

A. I think it was 1999 in June.

Q. June of '99?

A. I believe so.

Q. Do you know what he went to do for Town & Country Homes?

A. Similar position as to what he had here, I believe.

Q. Did you talk to him while you were at this

Christmas party for Midwest Interiors?
A. Yes.
Q. What did you talk about?
A. Family.
Q. Anything related to work?
A. I believe he mentioned that he was looking at another opportunity. I don't know if he had already left Town & Country or was planning to leave or one of the two. I know he has left since then.
Q. You don't know when?
A. No.
Q. Have you talked with Mr. Zorn since he left Rottlund Homes?
A. Yes.
Q. When?
A. He called me maybe two weeks after he left and basically hinted as to the fact that are you willing to move or not to Minneapolis. He assumed that I wouldn't because he knew that I have a situation where my wife likes to live in Iowa near her mother so that was about it.
Q. He was asking you if you wanted an opportunity to work at Town & Country?
A. In a roundabout way, yes.
Q. When did Mr. Zorn leave Rottlund?

A. I can't remember exactly. I can't remember exactly. It would have been after Marc Harris. Probably six months to nine months later, something like that.
Q. End of '99, beginning of 2000?
A. It would have been after the summer of 2000, I believe.
Q. Did Mr. Zorn give you any details at all about what kinds of positions were open in Town & Country Homes?
A. He said that they had a big sales backlog and so his job would be to get things rolling, and so he would need all kinds of positions. Mostly supervisor positions I would believe.
Q. When you say big sales backlog, what do you mean by that?
A. He made it sound like there were hundreds of homes that needed to be built that were sold.
Q. Did he tell you anything about what kinds of homes, where the projects were, anything like that?
A. No, just that it was in the Minneapolis area.
Q. Anything else that you recall about your conversation with Mr. Zorn a couple of weeks after he

left Rottlund?
A. No.
Q. Have you talked to him since?
A. Yes.
Q. When?
A. I can't remember, but it has been between now and then at some point just to see how things were going.
Q. Did you talk with Mr. Zorn the second time, anything related to work?
A. No, not really.
Q. And Chad Cooper, have you talked with him since he left Rottlund Homes?
A. No.
Q. Do you know if Mr. Zorn is still with Town & Country?
A. I think he is, but I am not sure.
Q. Do you know if Mr. Cooper is still with Town & Country?
A. I believe he is.
Q. Do you know what Mr. Cooper's job is at Town & Country, what he left to go do?
A. He is a superintendent.
Q. While Mr. Harris was with Rottlund Company as the production manager, what kind of products was

he overseeing?
A. Can you repeat that?
Q. When Mr. Harris was with Rottlund as a production manager, what kind of products was he overseeing?
A. All of the products that we build in Iowa.
Q. Let me get a list of that. What are all of the products that are built in Iowa?
A. I am going to give you from the best of my memory. We have the lodge series, the craftsman series, the tradition series, the villas, gardens, garden town homes, vistas, cottages. I may have left some out.
Q. Lodge series. Those are single family?
A. Yes.
Q. And craftsman, those are town homes or single family?
A. Detached town homes.
Q. What do you mean by that?
A. They are built as a single family home with minimal side yard setbacks but built in an association type situation so they are town homes living in a single family type of house.
Q. Traditions, is that a single family?
A. Yes.

Q. And we have already talked about the different versions of villas that are built, gardens are town home?

A. Yes.

Q. Back-to-back or see-through?

A. Both. I am sorry. Gardens would all be back-to-back.

Q. And vistas?

A. Those are see-through or a row type town home.

Q. And cottages?

A. Cottages are similar to the craftsman. Detached town homes and the garden town homes are a row type of town home.

Q. The gardens and the garden town homes are two different things?

A. Yes.

Q. And so while Mr. Harris was the production manager for Rottlund, he would have overseen all projects for Rottlund that you would have just listed?

A. Yes.

Q. Are there any product lines on a list that you have given that have been discontinued in Iowa?

A. We are not currently building cottages.

Q. Anything else Rottlund of Iowa is still building currently today?
A. Yes.
Q. Do you have any knowledge of any other Rottlund employees other than Mr. Harris, Mr. Zorn and Mr. Cooper who are now or were at some point employees of Town & Country Homes?
A. I don't know names, but I know there are several from Rottlund of Minnesota that have gone to work for Town & Country.
Q. How do you know that?
A. I was told by Rottlund of Minnesota people. I can't remember which people.
Q. So you wouldn't know names or positions or when people left?
A. I know there is a land guy, somebody in purchasing, possibly superintendent, several.
Q. Is that the extent of your knowledge is there are several?
A. Yes.
Q. Anything else that you know about Rottlund employees that left to go work for Town & Country?
A. No.
Q. Off the record for a second.

(An off-the-record discussion was held.)

MS. NEWMAN: Go ahead and go back on the record.

Q. (By Ms. Newman) Have you seen the Town & Country Homes product that is at issue in this lawsuit?

A. No.

Q. Have you seen plans of the Town & Country Homes product that is at issue in this lawsuit?

A. No.

Q. Have you seen any pictures of the Town & Country Homes product that is at issue in this lawsuit?

A. No.

Q. So how would you know it if the plans that Rottlund alleges are copied in this lawsuit are similar to Town & Country Homes plans?

A. I just have heard that that is what the litigation is about.

Q. You wouldn't have any knowledge related to that?

A. No.

Q. When you say you have heard that that is what the litigation is about, from whom did you hear

that?

A. From my attorney.

Q. Anybody else talk to you about that issue?

A. Just the hearsay I told you about before within the company. I can't remember names or dates.

Q. I have handed you what has been previously marked as Exhibit Number 182. I would like you to turn to Page 18 of this exhibit. You will see towards the bottom of the page your name there?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. This document was provided by Rottlund Company, Inc., as part of the procedures in this lawsuit, and Rottlund Company, Inc., was asked to identify people who have knowledge and what knowledge they have regarding this lawsuit. And there is a bullet point here that says, "Jason Jorgeson has knowledge of the facts and issues involved in this matter including, for example, knowledge related to the following: (1) Plaintiff's copyrighted works; (2) Defendants' access to Plaintiff's copyrighted works; and (3) the substantial similarity between Defendants' infringing works and Plaintiff's copyrighted works. Jason Jorgenson has such

knowledge since he was employed by Plaintiff as a Project Superintendent, and is currently employed as a project manager for Plaintiff, Iowa Division."
Did I read that correctly?
A. That's what it says.
Q. Mr. Jorgenson, do you have any knowledge of Plaintiff's copyright works?
A. I understand it is a company policy that we copyright our plans.
Q. Do you know for which projects Rottlund claims copyright protection?
A. I would understand that to be all of them.
Q. Do you know anything about Rottlund process or procedures in making registration applications to the copyright office?
A. Only that that is handled in Minnesota.
Q. Do you know anything else related to Plaintiff's copyrighted works?
A. No.
Q. Do you have any knowledge related to -- take one at a time -- Pinnacle's access to Rottlund copyright works?
A. No.
Q. Do you have any knowledge related to Town & Country's access to Plaintiff's copyrighted works?

A. Just that the employees that were in the Iowa Division had access, as I do, to all of our plans.

Q. Do you have any other information related to Town & Country Homes access to Plaintiff's copyrighted works?

A. No.

Q. Do you have any knowledge about Bloodgood Sharp Buster Architects & Planners access to Plaintiff's copyrighted works?

A. No.

Q. Any knowledge related to Bloodgood Group, Inc.'s, access to Plaintiff's copyrighted works?

A. No.

Q. Do you have any knowledge of the alleged substantial similarity between Rottlund's and Town & Country Homes products?

MR. KRUMMEN: I have an objection that there was an amended set of interrogatory responses subsequent to this set. You may answer.

A. Yeah. I haven't seen the plans for the Town & Country villas, and so if I had seen those I would be able to say yes, but since I haven't, I will have to say no.

Q. It is not only the plans. You haven't

Exhibit R40

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

FOURTH DIVISION

| | |
|---|---|
| THE ROTTLUND COMPANY, INC. d/b/a ROTTLUND HOMES, A MINNESOTA CORPORATION<br><br>Plaintiff<br><br>vs.<br><br>PINNACLE CORPORATION d/b/a TOWN & COUNTRY HOMES, AN ILLINOIS CORPORATION, TOWN & COUNTRY HOMES, INC., A MINNESOTA CORPORATION, BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., AN IOWA CORPORATION, AND THE BLOODGOOD GROUP, INC., AN IOWA CORPORATION<br><br>Defendants<br><br>and<br><br>TOWN & COUNTRY HOMES, INC., A MINNESOTA CORPORATION<br><br>Third-Party Plaintiff<br><br>vs.<br><br>BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., AN IOWA CORPORATION<br><br>Third-Party Defendant | No. 01-CV-1980<br><br>DEPOSITION OF STEVEN THIES |

Reported by: Connie Overberg, RPR, CSR

Q. Do you have any information about Town & Country's access to Plaintiff's copyrighted works?
A. Only that some of our ex-employees do work for them.
Q. Just so we have your complete knowledge on that topic, what former Rottlund employees are you aware of that went to work for Town & Country?
A. I am aware of Marc Harris, Joey Zorn, Chad Cooper.
Q. And Mr. Harris, Mr. Zorn and Mr. Cooper were all Rottlund employees out of the Iowa Division, correct?
A. There was also a vice president of architecture Tim Johnson works for -- I can't remember his last name.
Q. Tim Johnson is right.
A. Tim Johnson is somebody from the purchasing department, and a guy from the land -- I want to say Pommerant (sic).
Q. Richard Palmiter?
A. Palmiter. Those are the people that I am aware of.
Q. Did you personally know Tim Johnson?
A. I met and talked to him.
Q. About what?

Q. More than 10?
A. Does that count the divorce?
Q. Excluding the divorce.
A. Probably less than 10.
Q. How many times for Rottlund, do you know?
A. Counting this one?
Q. Counting this one.
A. Two or three. Counting, and maybe, you know, it may be more because of the Meadows litigation.
Q. In the past have you been on any mind altering drugs or any prescription medication that would affect your ability to remember events or recall events at the time?
A. Not to my knowledge.
Q. Have you ever been accused of a crime of moral interpretude?
A. No.
Q. In the Oaks litigation do you know the Judge's order dismissing the -- I am sorry -- the preliminary injunction? Do you know of that?
A. I know that under advice from my counsel that that whole proceeding had been sealed, and I am not to answer any questions about the Oaks litigation.

# FILED UNDER SEAL

Exhibit R41

Exhibit R42

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation, and
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation, and
The Bloodgood Group, Inc., an
Iowa corporation
Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF KAREN J. ALBERTSON
August 25, 2003

(The following is the deposition of KAREN J. ALBERTSON, taken pursuant to Notice of Taking Deposition, at the offices of Fredrikson & Byron, 4000 Pillsbury Center, 200 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:14 o'clock a.m., August 25, 2003.)

the product built by Rottlund known as the Villa?
A. Yes.
Q. As I understand it, the Villa has three iterations that are referred to as the Original Villa, the New Villa and the Villa II. Are you familiar with all three of those types of Villa?
A. No.
Q. Are those names that you've heard before?
A. When I started at Rottlund the Villa II, basically, was what we were building at the time. I know that there was a version prior to that, but I really had nothing to do with it.
Q. You're familiar with the Villa II.
A. Yes.
Q. Okay. What knowledge do you have that relates to the copyrighted nature of the Villa II?
A. Only that every document that Rottlund does is copyrighted, every plan that we do is copyrighted.
Q. This is a Rottlund policy.
A. Yes.
Q. How are you aware that that -- that there is such a policy?
A. General knowledge I suppose, and the fact that every plan that has ever been on my desk has been copyrighted.

**8/25/2003 Albertson, Karen J. (Rottlund Empl, Estimating Coordinator)**

Q. It isn't that it's somewhere in a Rottlund procedures manual or that someone drew you aside and specifically told you, you just remember hearing that all of Rottlund's plans are copyrighted. Is that about accurate?

A. Yes, and seeing that they all have the copyright logo on them.

Q. Have you ever helped in preparing a copyright for the Villa II?

A. No.

Q. Have you ever seen a copyright application for the Villa II product?

A. No.

Q. Has anyone ever described what Rottlund does in terms of copyrighting its Villa II?

A. No.

Q. Is it fair to say that the knowledge that you have that relates to plaintiff's copyrighted works is that you're aware that Rottlund copyrights its plans?

A. Yes.

Q. And that you're aware that that's general policy.

A. Yes.

Q. And that you don't have any specific knowledge regarding whether a particular plan was copyrighted

other than to say it's general policy that they would be.

MR. KRUMMEN: Objection, mischaracterizes her testimony. You may answer.

A. All I know is that we copyright everything. So whether a specific one is or isn't, I would say that we do on all of them.

Q. This paragraph says you have knowledge of the facts and issues involved in this matter including knowledge related to plaintiff's copyrighted works. Do you have knowledge of any other fact or issue that relates to this lawsuit?

A. Such as?

Q. I think I'm asking you. Are you aware of any other fact or issue that's relevant to this lawsuit?

A. Besides the Dan Geegan correlation, and there's also -- there was another person in my department, Jeff Corneia, that also left and went with Dan Geegan. I know that this is a copyright issue regarding the Villa product.

Q. Well let me stop you and let's talk about the two issues that you raised. Now you said you knew about the Dan Geegan correlation. Explain that to me. What is it about Dan Geegan?

A. Only that he was in my same position, had access

to the same information that I have access to, as well as Jeff Corneia, and they both have left Rottlund and worked for Town & Country.

Q. When you say they had access to the same information that you have access to, what information are we talking about?

A. Any of the -- the bidding documents, the plans, quantity takeoffs, pricing information, vendor information, anything.

Q. Same thing for Mr. Corneia.

A. Yes.

Q. So as I understand your testimony, you know, number one, that Rottlund's plans are typically copyrighted as a matter of general principle; you know, number two, that Dan Geegan and Jeff Corneia left Rottlund and began working for Town & Country Homes of Minnesota. Is there any other fact or issue that you know of that is relevant in this lawsuit?

A. No.

Q. Okay.

MR. PATRICK: I think that's all the questions I have for right now. Thank you.

EXAMINATION

BY MR. SCHWIEBERT:

Q. Ms. Albertson, we already met, I'll introduce

A. I guess yes.

Q. Do you have any specific memory of communities that have those back-to-back products?

A. No.

Q. And you don't remember when the first time you saw a back-to-back product was.

A. No.

Q. You just know they've been around for awhile.

A. Yes.

Q. Have you ever been inside a Town & Country back-to-back product?

A. I don't think so.

Q. Have you ever seen a Town & Country back-to-back product?

A. I don't think so.

Q. Have you ever heard of the Pinnacle Corporation?

A. No.

Q. Ever heard of Town & Country?

A. Yes.

Q. And you've heard of them because a couple of former Rottlund employees are now there.

A. I've --

I knew the name before I knew that, yes.

Q. Have you ever had any discussions with any employees of Town & Country Homes, Inc.?

A. Only when Dan Geegan left.
Q. Was that a discussion with Dan Geegan?
A. Yes.
Q. So this was at -- when he left Rottlund and before he started at Town & Country; is that right?
A. Yes.
Q. Do you remember what you discussed with Dan Geegan?
A. He implied that if I would like to go with him that that opportunity would be there.
Q. Did you ever interview with Town & Country?
A. No.
Q. How did he imply that that was true?
A. He basically said that, that if -- if I was interested, that he would see what could be done.
Q. That's your memory of exactly what he said, if you were interested he would see what he could do, or what could be done?
A. I guess I don't know the exact wording, but something along those lines, yes.
Q. Have any discussions with anyone else at Town & Country?
A. No.
Q. Have you ever had any discussions with anyone -- Well let me back up.

# FILED UNDER SEAL

Exhibit R43

Exhibit R44

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

| | |
|---|---|
| The Rottlund Company, Inc. d/b/a Rottlund Homes, a Minnesota Corporation,<br><br>Plaintiff,<br>vs.<br><br>Pinnacle Corporation d/b/a Town & Country Homes, an Illinois Corporation, and Town & Country Homes, Inc., a Minnesota Corporation.<br><br>Defendants,<br>and<br><br>Town & Country Homes. Inc., a Minnesota Corporation,<br><br>Third-Party Plaintiff,<br><br>v.<br><br>Bloodgood Sharp Buster Architects & Planners of Iowa. Inc.. an Iowa Corporation,<br><br>Third-Party Defendant. | No.: 01-CV-1980 (DSD/SRN)<br><br>**PLAINTIFF'S AMENDED SUPPLEMENTAL OBJECTIONS AND ANSWERS TO DEFENDANT TOWN & COUNTRY HOMES, INC.'S INTERROGATORY NUMBERS 3 THROUGH 8** |

TO: ABOVE-NAMED DEFENDANT TOWN & COUNTRY HOMES, INC. AND THEIR COUNSEL OF RECORD, DEAN R. KARAU, ROBIN PREBLE, CYNTHIA JOKELA MOYER, DARREN B. SCHWIEBERT, FREDRICKSON & BYRON, P.A., 4000 PILLSBURY CENTER, 200 SOUTH SIXTH STREET, MINNEAPOLIS, MINNESOTA 55402.

Plaintiff, The Rottlund Company, Inc., submits the following Amended Supplemental Objections and Answers to Defendant Town & Country Homes, Inc.'s ("TCM") Interrogatory Numbers 3 through 8. These Amended Supplemental Objections and Answers do not constitute, in any way, a waiver of Plaintiff's objections to any other discovery propounded by TCM.

Exhibit 134
Date: 5-28-03
Debby J. Campeau
Stirewalt & Associates

**INTERROGATORY NO. 3:** Identify and describe in detail each and every design element and/or feature in the Technical Drawings for which Plaintiff claims copyright protection in this litigation: identify all persons with knowledge of such alleged design elements and/or features: and identify all documents relating to or reflecting such alleged design elements and/or features.

**ANSWER:** Plaintiff incorporates its Supplemental Initial Disclosures and in answer to Interrogatory No. 1, states that, pursuant to Rule 33 of the Federal Rules of Civil Procedure, information responsive to this interrogatory may be derived or ascertained from the business records Plaintiff has produced (RCI00001 – 27; RCI000148 – 207; RCI000262 – 272; RCI000274 – 276; RCI000289 – 760; RCI001245 – 1248; RCI001354; and RCI001418 - 1575) and the burden of deriving or ascertaining the answer is substantially the same for the Defendant as it is for the Plaintiff, and that it claims copyright protection for, among other things, the following combination or gestalt of design elements and/or features:

a. placement of gabled side entries;

b. layout of gabled side entries;

c. proportions of gabled side entries;

d. placement of optional fireplace;

e. layout of optional fireplace;

f. proportions of optional fireplace;

g. architectural detail above optional fireplace, including recessed drywall arch;

h. placement of recessed shelving next to optional fireplace;

i. placement of tile and trim design adjacent to optional fireplace;

j. placement of loft;

k. layout of loft;

l. proportions of loft;

m. architectural detail of loft including railings, spindles, banisters, and molding;

n. placement of second story window in living room;

o. placement of first story windows in living room;

p. proportions of first story windows in living room;

q. placement of garage;

r. layout of garage;

s. placement of garage entry into kitchen area;

t. proportions of garage;

u. placement of living room;

v. proportions of living room;

w. layout of living room;

x. placement of dining room;

y. proportions of dining room;

z. layout of dining room;

aa. placement of stair well;

bb. proportions of stair well;

cc. layout of stair well;

dd. placement of kitchen;

ee. proportions of kitchen;

ff. placement of kitchen pantry;

gg. proportions of kitchen pantry;

hh. layout of shelving in kitchen pantry;

ii. placement of kitchen cabinet peninsula breakfast bar area in dining room;

jj. proportions of kitchen cabinet peninsula breakfast bar area in dining room;

kk. layout of kitchen cabinet peninsula breakfast bar area in dining room;

ll. placement of exterior patio;

mm. proportions of exterior patio;

nn. layout of exterior patio;

oo. entry way from exterior patio into dining room area directly adjacent to living room area;

pp. placement of powder room;

qq. proportions of powder room;

rr. layout of powder room, including single sink and toilet with no tub or shower;

ss. placement of master bedroom/owner's suite;

tt. proportions of master bedroom/owner's suite;

uu. layout of master bedroom/owner's suite;

vv. window placement in master bedroom/owner's suite;

ww. proportions of windows in master bedroom/owner's suite;

xx. placement of owner's suite bathroom;

yy. proportions of owner's suite bathroom;

zz. layout of owner's suite bathroom;

aaa. placement of double sink in owner's suite bathroom;

bbb. proportions of double sink in owner's suite bathroom;

ccc. layout of double sink in owner's suite bathroom;

ddd. placement of toilet in owner's suite bathroom;

eee. layout of toilet in owner's suite bathroom;

fff. placement of bathtub in owner's suite bathroom;

ggg. layout of bathtub in owner's suite bathroom;

hhh. placement of second bedroom;

iii. proportions of second bedroom;

jjj. layout of second bedroom;

kkk. window placement in second bedroom;

lll. proportions of windows in second bedroom; and

mmm. roof configuration.

**INTERROGATORY NO. 4:** Identify and describe in detail each and every design element and/or feature in the Architectural Work for which Plaintiff claims copyright protection in this litigation; identify all persons with knowledge of such alleged design elements and/or features; and identify all documents relating to or reflecting such alleged design elements and/or features.

**ANSWER:** Plaintiff incorporates its answer to Interrogatory No. 3 herein.

**INTERROGATORY NO. 5:** Identify and describe in detail each and every design element and/or feature of the town homes in each Minnesota development project referenced in the Amended Complaint which Plaintiff claims is substantially similar to a design element and/or feature in the Technical Drawings; identify all persons with knowledge of such alleged substantial similarity; and identify all documents relating to or reflecting such alleged substantial similarity.

**ANSWER:** Plaintiff incorporates its answer to Interrogatory No. 3 herein. Plaintiff further states that pursuant to Rule 33 of the Federal Rules of Civil Procedure, information responsive to this interrogatory may be derived or ascertained from the business records Defendants and Third-Party Defendant have produced thus far (D00015 – 38; D00116 – 261; D00265 – 309; D00340 – 630; D00696 – 809; D00949 – 1244; D01622 – 1751; D00014A; PIN00001 – 24; PIN00465 – 490; PIN00511 – 521; PIN00526 – 585; and BSB00601 – 4805) and the burden of deriving or ascertaining the answer is substantially the same for the Defendant as it is for the Plaintiff. Plaintiff reserves the right, as with each and every other discovery response it has provided in this case thus far, to further supplement its response herein upon further discovery and/or at the time of its expert report.

**INTERROGATORY NO. 6:** Identify and describe in detail each and every design element and/or feature of the town homes in the Illinois development project referenced in the Amended Complaint which Plaintiff claims is substantially similar to a design element and/or feature in the Technical Drawings; identify all persons with knowledge of such alleged substantial similarity; and identify all documents relating to or reflecting such alleged substantial similarity.

**ANSWER:** Plaintiff incorporates its answer to Interrogatory No. 5 herein.

**INTERROGATORY NO. 7:** Identify and describe in detail each and every design element and/or feature of the town homes in each Minnesota development project referenced in the Amended Complaint which Plaintiff claims is substantially similar to a design element and/or feature in the Architectural Work; identify all persons with knowledge of such alleged substantial similarity; and identify all documents relating to or reflecting such alleged substantial similarity.

**ANSWER:** Plaintiff incorporates its answer to Interrogatory No. 5 herein.

**INTERROGATORY NO. 8:** Identify and describe in detail each and every design element and/or feature of the town homes in the Illinois development project referenced in the Amended Complaint which Plaintiff claims is substantially similar to a design element and/or feature in the Architectural Work; identify all persons with knowledge of such alleged substantial similarity; and identify all documents relating to or reflecting such alleged substantial similarity.

**ANSWER:** Plaintiff incorporates its answer to Interrogatory No. 5 herein.

AS TO INTERROGATORY ANSWERS 3-8:

Dated: 12/10, 2002.

On behalf of Plaintiff

By [signature] EX.V.P.
Timothy Whitten
Executive Vice President

AS TO INTERROGATORY OBJECTIONS:

Dated: Dec. 10, 2002.

**WINTHROP & WEINSTINE, P.A.**

By: ______________________
Craig S. Krummen, #259081
David A. Davenport, #285109

3000 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, Minnesota 55402
Telephone: (612) 347-0700
Facsimile: (612) 347-0600

***Attorneys for Plaintiff The Rottlund Company, Inc.***

idmsmpl#533663v1

Exhibit R45

0001

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

The Rottlund Company, Inc., dba Rottlund Homes, Plaintiff, -vs- Pinnacle Corporation, dba Town & County Homes, a Minnesota corporation; Bloodgood Group, Inc., an Iowa corporation; Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa corporation, Defendants.

CV 01-01980 (DSD/SRN)

St. Paul, Minnesota
April 29, 2004
1:45 p.m.

---

BEFORE THE HONORABLE SUSAN R. NELSON
UNITED STATES MAGISTRATE JUDGE
(CIVIL MOTIONS)

APPEARANCES:

For the Plaintiff: CRAIG S. KRUMMEN
DAVID A. DAVENPORT
Winthrop & Weinstine
225 South Sixth Street, #3500
Minneapolis, Minnesota, 55402-4629

For Defendant Pinnacle: CHRISTOPHER J. MURDOCH
MATTHEW I. FARMER
Holland & Knight
131 S. Dearborn Street, 30th Floor
Chicago, Illinois 60603
DAVID A. DONNA
Donna & Daly
1460 Buffet Way, #150
Eagan, Minnesota 55121

For Defendant Town & Country: DARREN BRAYER SCHWIEBERT
Fredrikson & Byron
200 South 6th St., #4000
Minneapolis, Minnesota 55402-1425

step and is therefore not permitted, the appendix to the Scherer report is the evidence from which Town and Country would attack the second step.

His report would lay the foundation for those appendixes, the comparison of, if the Court determines this, the expression. So even if his report, the Court grants the motion to strike, the appendix which is attached to his report is a comparison of -- if the court determines this way -- the expression. So it becomes part of the evidence in addition to what I did was attack the 15 points they try to allege for the second step, it would also form the basis for the evidence on behalf of Town and Country the expression is not substantially similar.

Does that make sense? He's laid the foundation for --

THE COURT: You take his appendix and you make it your argument?

MR. SCHWIEBERT: Yes, Your Honor. We make it the evidence upon which we attack the second step. Even if his opinion from that appendix is excluded by the Court, he lays the foundation for the appendix itself. What the appendix shows is if the Court determines that's expression, that the expressions are not substantially similar.

THE COURT: But that's -- it's not really