Court File No. 01-1980 / ROTTLUND / Pinnacle
Krummen Affidavit dated September 21, 2004

Exhibit R46.1

# Preliminary Expert Report

Jeffrey A. Scherer, FAIA

August 15, 2003

❖

In the matter of

The Rottlund Company, Inc. v.
Pinnacle Corporation and Town and Country Homes, Inc.
Court File No. 01-1980 DSD/SRN.

# Preliminary Expert Report

Jeffrey A. Scherer, FAIA

August 15, 2003

In the matter of

The Rottlund Company, Inc. v.

Pinnacle Corporation and Town and Country Homes, Inc.

Court File No. 01-1980 DSD/SRN.

---

*Qualifications*

I am an architect licensed to practice in sixteen states. I am a founding principal at Meyer, Scherer & Rockcastle, Ltd. (1981-present), a Fellow of the American Institute of Architects, and I was an adjunct faculty member of the University of Minnesota College of Architecture and Landscape Architecture, where I taught Professional Practice, Ethics and Design from 1979 to 1998. I also served as President of the Minnesota Chapter of the American Institute of Architects in 2002. Meyer, Scherer & Rockcastle, Ltd., was selected by *Almanac of Architecture & Design 2001* as one of the 100 Leading U.S. Architecture Design Firms. A complete copy of my current Curriculum Vitae is included in the Appendix.

I have been asked by the Defendants Town and Country Homes and Pinnacle Corporation to provide an expert opinion in the matter of The Rottlund Company, Inc. v. Pinnacle Corporation and Town and Country Homes, Inc., Court File No. 01-1980 DSD/SRN. The purpose of this Preliminary Expert Report is to offer my opinion as to whether there is copyright infringement arising under the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq*. As a matter of record, I am setting forth my expert report related to the issue of copyright infringement only. I am not offering opinions regarding the claims under the Lanham Act or the Minnesota Uniform Deceptive Practices Act. My opinions are based on my experience as an architect and educator. My opinion is subject to amendment, supplementation, and revision should additional information or materials be made available to me. To determine

whether there has been copyright infringement, I will examine the issues of *original works of authorship* and *independent creation*. Numbers bracketed as such [_] refer to the appendix item. (E.g., [1.03] refers to page 3 of appendix item 1.)

Since the early 16th century, architects have enjoyed perpetuating the notion that their own acts of genius spring forth from some mystical and original internal fountainhead. While this claim may bolster their self-worth and help them promote their ideas in the realm of commerce, it is, in my opinion, simply not true. To further complicate matters, society has placed high regard on those that possess the apparent ability to create something from nothing. Witness the phenomenal success during the last decade of Frank Gehry, whose Guggenheim Museum in Bilbao, Spain has attracted world-wide attention. In addition, it is further assumed that an *Original Work of Authorship* is only the result of an individual working closely and autonomously with an Owner for the purpose of producing an original work. This is rarely the case. Architects like Frank Lloyd Wright, Frank Gehry, and Bruce Goff are (and were) such creative individuals that they can be identified by their buildings. The designs at issue in this lawsuit bear no such signature stamp.

Like the vast majority of works of architecture that are produced for the developer-client, they are the result of a person (the architect) interacting with another person (the Owner—Developer) based on a consensual economic, market and aesthetic set of values. In the case of for-sale housing, these values are, in themselves, based on the Owner's and the Architect's understanding of the design problem; the budget (which establishes the design, materials, and construction techniques to be used); the value proposition of the community; the marketplace, and other legal parameters such as building and zoning codes.

Architectural works are created using a traditional system of ideation, programming, conceptualization, design, documentation, and construction administration—all coming from the client's statement of need. Rarely do architects work in complete isolation from the real world. Rarely do they sit confined in a room and dream up a project from "scratch." This is especially true of projects like the ones at issue here, which are defined by the marketplace. I have not seen anything in the designs of the Plaintiff or the Defendants that suggests the projects were created in a vacuum—void of any input from the marketplace.

The idea stage is where a person, in this case an architect, formulates, often in a pure abstract manner, the "something" that is imagined. For example, if I say I have "an idea for an eight-unit town home," then I am expressing a notion, as yet not memorialized in written form, for a town home consisting of eight units. This idea, however, is not specific unless I specifically condition it further. I could say, for example, that I have "an idea for an eight-unit town home where all of the units are combined into one larger unit." The point being that this ideation is a crucial element in the process of creating a work of architecture. It is also noted that architects and developers routinely and actively maintain their currency in their respective fields of endeavor by reading publications, attending seminars, visiting built work, discussing designs with their peers, and staying abreast of developments related to their core expertise and interests. It is crucial for an architect to understand ideas that are in public circulation if the architect is to practice and refine his or her craft. It is, from my perspective as an architect an educator, the reason that an idea itself can not be protected.

For example, the Plaintiff, Rottlund Homes, instructs its employees to "regularly 'shop' competition to become knowledgeable of their products, prices, promotions, performance and activities, and report such findings to the Sales Manager." (Exhibit RC1009176). As stated by Rottlund's president, Mr. Todd Stutz, "I think

it is the policy of almost all builders to shop the competition, otherwise you don't stay in business very long." (Rule 30(b)(6) deposition of Todd Stutz, at 442. ) That said, it is simply not credible to suggest that Rottlund's architect would avoid learning about the competition's offerings in order to practice his craft in a cocoon – particularly because the architect is the person responsible for creating competitive product for that marketplace. This process is central to the business of developer housing. The Defendants (like the Plaintiff) do their best to stay current in their respective markets. That does not mean that either party copies the expression of the ideas that they observe during their respective reconnaissance. Whether ideas are shared on paper or shared verbally, they are still, in my opinion, shared ideas. Sharing does not constitute copying unless the final built product is substantially similar to an original work.

The <u>programming stage</u> establishes in more detail a written account of the elements required for the project. The details would typically include the number of housing units, the elements -- such as living room, bathroom, and bedroom -- within each housing unit, the total number of units, the size of each unit, and other parameters such as budget, client's vision, and marketing targets. During this stage, the parties typically generate a list of design elements that will form the building blocks for the next stage. These building blocks can be described in terms of function, size and relationship.

For example, a hypothetical two-bedroom town home could be described in the following manner:

*Provide a two-story town home with the following:*
*First Floor*
*1) Living Room*
*2) Dining Room*
*3) Kitchen*
*4) Laundry*
*5) Guest half-bath*
*6) Garage*

*Second Floor*
*7) Master Bedroom with separate bathroom*
*8) Second Bedroom*
*9) Study or home office space*
*10) Shared bathroom*

This program could also describe the area requirements for each space, or it could identify functional requirements, such as the number and type of beds, the furniture for individual living spaces, the number of people to be accommodated at a dining table, the size of closets, etc. Given the nature of speculative developments, these program statements are predicated on what the market expects. For this reason, superfluous, expensive, or "inventive" elements are typically not included unless specific buyers choose to modify, at their own additional expense, the standard elements. This market-driven definition of spaces and their relationships obviously limits the number of possibilities or variables that an architect can investigate during the next phase – the conceptual phase. While there may be a theoretically unlimited number of "mathematical" variations, the practical number of variations is small. This is an important consideration in this case. In addition, the developer will likely base this program on his or her observations as to what will "sell" in the particular locale. If, for example, a three-bedroom, two-bath, double-car garage with a living room, a dining room, and a

home office is what the public wants, then any intelligent developer will work hard to meet this demand.

During the conceptual phase, the architect diagrammatically arranges the program elements. It is at this point that the architect begins to visualize the three-dimensional form of the building — a form closely tied to the requirements of the program and the marketplace. It is in this phase that the architect can firmly demonstrate his or her creative abilities. By coupling past experience with an educated awareness of logical living requirements in the market, the architect will prepare sketches that let the client know how the program elements can meet the balanced needs of function, cost, and style. The client and the architect may discuss some or all of these elements. (In developer housing, the "dialogue" between the architect and buyer frequently takes the form of sales and marketing feedback, and not just one-on-one discussion.) It is the architect's job to juggle these oft-competing elements in an effort to satisfy the market. It is in this phase that the architect will stress the process of imagining the solution to fit the restriction of the location, the budget, and market requirements. Once a concept is agreed upon, the architect can move into the design phase.

The design phase typically consists of a schematic design phase and a design development phase. The schematic design phase is the "broad-brush" phase where plan elements are arranged,.the building is massed, and the site arrangements are drawn. From these drawings, the architect and client can develop a budget, the developer can scrutinize the designs and confirm the overall feasibility of the project with the designer. In the case of developer housing, marketing staff will often get involved to determine whether the design is saleable and will work in the targeted market area. Once the feasibility (balance of design, function, and cost) is determined, the architect will then be authorized to refine the design by studying proportions, materials, engineering, and constructability. The architect will often

review designs with local planning and code authorities during the design phase. After all of this is accomplished, the architect will likely be authorized to prepare the construction documents, bid the project, and observe the work during construction.

Throughout the process, architects, owners, and buyers combine their education, experience, and observations to make informed decisions. Architects rely upon their knowledge of contemporary and historical architecture, information they have acquired from seminars and other educational opportunities, the published work of others, and their own talent. Owners make use of market research, competitive analyses (including visits to competitors' product), regional and national conferences, experience, and their own entrepreneurial instincts. This market awareness is not only normal, but it is essential in the world of for sale developer housing. Knowing and being aware of the ideas of others is one way developers and architects can assure themselves that they are responding to the needs of the buyers. Buyers (the potential homeowners) make decisions based upon location, price, quality, and the built work (in some cases relying on model homes). It is my opinion that the Plaintiff's and Defendants' architects relied upon the tools at their disposal and responded to the input from their clients in independently creating their designs.

In my twenty years of teaching design at the University Of Minnesota College Of Architecture (1979-1998), I always stressed that an architect's duty to society is to balance what Marcus Vitruvius Pollio -- the 1st century, Greek-trained, Roman author of *De Architectura*, the only surviving classical treatise on architecture, which was used from the 1st century through the Renaissance -- called Firmness, Commodity and Delight. Firmness represents the design's structural integrity; Commodity refers to the arrangement of spaces to serve a functional need; and Delight describes the quality of the architecture. This fundamental triad is present

in all architectural commissions. Architectural creation is (and in my opinion always will be) a cultural continuum. For example, architects are trained to know the most appropriate and logical living arrangements. Yet in this case, we are faced with a specific, market-driven reality that requires further examination. In theory, the Architect-Client (or Developer) relationship presents a range of possibilities for balancing the Firmness, Commodity and Delight of a design project. At the most generous end of the spectrum, a client would say to the architect, "I want this function on this site -- but I will trust you to decide everything -- including what it looks like, how much it will cost and what it is made of." This example is rare because it is premised upon unlimited resources and complete trust. At the other end of the spectrum, the architect is faced with an exacting set of financial, aesthetic, and functional requirements. The world of developer housing at issue in this case exists at this much more restricted end of the design spectrum.

Figure 1: Design Latitude Restrictions



The diagram above illustrates this issue of design latitude. The converging lines reflect how "givens" in the marketplace necessarily narrow the architect's choices. These limits are dictated by the price the buyer is willing to pay, the developer's required profit margin, and fixed costs such as land development. It is noted, however, that Firmness (Structure) and Commodity (Function) remain relatively the same. Codes and engineering principles dictate that buildings at either end of the spectrum are built to a minimal standard. Likewise, the functional needs, such as living rooms, bathrooms, kitchens and bedrooms, remain the same. The latitude for the architect within the final sphere, Delight (Design), is logically restricted since the developer has a fixed budget. This restriction is further defined by the consumer demands on the developer's product offering — such as traditional aesthetics and materials. Since these traditional design expectations also fall, through consensual cultural frameworks, within a very narrow aesthetic range, the architect's creative opportunities are most limited in this architectural building type.

In this case, each developer decided the following elements met the demands of this marketplace:

| Firmness (Structural) | Commodity (Function) | Delight (Design) |
|---|---|---|
| Wood framed structure, slab-on-grade | Kitchen, dining, living, bathroom, 2-car garage, master bedroom and bath, bedroom, laundry, shared bath, and spare room | Gabled roofs, double-hung windows, protected entrances and siding with masonry base. |

The similarities end with these basic elements, but it is essential to the profession of architecture that architects have such basic ideas and elements at their collective

disposal for the ideation, conceptual, and design phases of their work. To provide legal protection for this logical arrangement of basic elements by cloaking it in the nebulous language of "Gestalt" would chill the architectural marketplace and unfairly hamper developers of mass-produced housing.

Having discussed the basic design process, it is now time to look at how each party used design elements to create its own marketable product. Because each architect was working at the narrow (and most restricted) end of the design spectrum, Mr. Desnick's examination of "similarities" warrants careful scrutiny. When two architects in the same marketplace have little "wiggle room" to solve the age-old problem of "Firmness, Commodity, and Delight," the more likely it is that their projects will appear to be similar. If the marketplace demands a garage, a living room, a dining room and a kitchen on the first floor, there are only so many ways these basic elements can realistically be arranged. These arrangements are governed by logic, hygiene, cultural convention, and practicality. If we agree (as I believe Rottlund must) that the idea of an eight-unit, back-to-back row of town homes is not protectable, then I would contend that the arrangement of the basic elements of the interior is also not protectable. In any event, the sworn testimony of the BSB architects supports my opinion that they independently created their own plan arrangement. This unoriginal plan arrangement is also evident in other developments in the Twin Cities metropolitan area. See, for example, the attached printout from the Centex Homes "Berkshire" model. Except for the location of the stair, the locations of the four ground floor elements (dining room, living room, kitchen, and garage) have the same relationships.

These relationships grow out of the following logical and functionally associative premises:

1. The entrance from the garage to the kitchen is both necessary and logical for unloading groceries, getting into and out of a car during inclement weather, accessing trash, etc.
2. The kitchen should relate directly to the dining room to facilitate eating, clearing dishes, social interaction with guests and family members, etc.
3. The front door should directly access the living room — the traditional place of greeting and welcoming someone into the home.

The following diagram illustrates this:



These are but a few of the logical associative relationships that pre-determine, in my opinion, the arrangement of spaces. It is the nature of market-driven housing that restricts the options available to the architect. While there may be, as stated above, a high number of "theoretical" permutations (some of which might even be considered reasonable design solutions), it is my opinion that the arrangements used by both parties are the best and most responsive to the needs of the market and the demands of functionality and practicality.

Market expectations also weigh heavily on the question of originality. What is meant by this statement? Simply that the more intense the pressures of affordability and marketability become, the more likely that architects will rely on precedents and tradition to satisfy the developer's need to attract potential buyers. In effect, the marketplace for affordable suburban housing discourages *Original Works of Authorship* that are born from the "genius" of an individual. Developers court potential buyers by presenting traditional continuity rather than by striving to be original. The architect's "originality," therefore, comes in his or her ability to balance the function, aesthetics and budget with integrity and honesty. In my opinion, the Defendants independently arrived at this balance in an honest manner. Their documents reflect a process of iterative design creation that was intended to satisfy the restrictive demands of the marketplace. Plaintiff's Villa II design is another example of how an architect performs this balancing act.

The historical tradition of the townhouse (home) grew directly out of the need to maximize the relationship between the number of dwelling units per acre while retaining some of the psychological and physical attributes of a single family home. Since the mid-eighteenth century London terrace houses, the idea of a unit of replication has been useful in the creation of higher densities within our cities. As this need to increase densities emerged, architects were able to create a solution that relied on: a) common (or party) walls between dwelling units; b) independent

exterior entries; and c) multiple-story solutions that were served by private stairways. Once the physical envelope (or the ratio of the footprint to the assigned site area) was established, the architect had to devise ways to: a) accommodate personal modes of transportation (using ideas that range from early examples of detached carriage houses to modern integrated automobile garages); b) allow for daylight and fresh air (using breezeways, windows, vents, etc.); and c) provide protection from the elements (using roofs, walls, etc.).

The townhouse is essentially an attempt to offer the buyer the safety, identity, and comfort of a single-family home while reducing the financial burden of land costs and building maintenance. These features are consistent (with obvious variants) among all townhouse (home) projects. The townhouse is a useful building type for creating higher densities in our cities. After the idea of geometrically combining volumes into compact arrangements was standardized and accepted by the marketplace -- as early as the mid 18th century in places like Boston, Philadelphia and New York -- the resulting similarity of the solutions was inevitable. In 1840, Akroyd's Model Colony at Copley, Halifax and Leeds, for example, provided eight back-to-back town homes. Issues of proper ventilation for the mid-units prevented this type of variant from being widely accepted. However, today's mechanical ventilation solutions have largely eliminated this problem. The success of this model highlights the balance that the townhouse must create between affordability, personalization, and identification.

The internal allocation of space is determined by the location of the designated entry point, the garage, the width and depth of the town home, the location of windows, the developer's perceived need in the marketplace, and the home's affordability. The very nature of the town home creates certain inherent limitations on how these internal spaces can be allocated, given the need for a logical relationship between elements and access to daylight. For example, it is

common to pair a) the kitchen with space for dining, b) living areas with entertainment space and c) bedrooms with bathrooms. These pairings, combined with the overall marketability of the town home, create inevitable relationships that will be similar in many town homes. Besides these rational pairings, the market, site limitations and budget will help determine the a) number of units (and their geometric combination) comprising a development, b) the size of the units, c) number of bedrooms, d) the materiality of the buildings and e) special features such as entertainment units, laundries, fireplaces and extra storage. Each town home will, of course, have spaces for living, dining, sleeping, working, cleaning, studying and entertaining. These basic building blocks are not, in my opinion, eligible for individual copyrighting nor, as I understand it, is Rottlund claiming such protection in this lawsuit. As such, I will not address them in this report. All of the rooms contained within these town homes are essential to the use or purpose of a home.

In the case of the Defendants' work, I have listed below my understanding of their independent creation based on the comparisons of design process exhibits:

Exhibit D00235- (Program)

The plan is directly based on the overall program square footages (as provided by the developer). They provide the required areas in their plans which are based on the minimum sizes of rooms. Meeting this requirement leaves little room for circulation and thus creates a fairly specific set of adjacencies for the rooms. Given that the garage is in the most rational and logical place, the resulting arrangements are, in my opinion, inevitable and illustrated in the design process documents. Point 9 specifically states "All plans will feature efficient layouts with simplistic volumes and economical construction techniques." I take this to mean, simply, that the progression and evolution of the architectural decisions will be dictated by these goals and reflected in these documents.

Exhibit D00223-24, BSB01891- (Plans)

1. One design shows an angled stair. Later, it was decided to change this to a "straight on" stair. This stair evolution is logical and expected when judged against the stated criteria of ease of construction and economy. Meeting these criteria is an obligation of architects doing work for developers who are providing product defined by the marketplace. It is likely the reason that the Plaintiff eventually added a third-bedroom option (in lieu of the loft) to its Villa II design.
2. The trading of locations of the laundry area for the mechanical room resulted in the main level bathroom being relocated to the corner adjacent to the garage. This resulting location is inevitable if the architect was to maintain the requirement of a compact floor plan. The relocation of the mechanical room also limits the quantity of ductwork required because it can feed both levels through the floor of the second level.
3. From the "D" series plans, it appears that the architect is looking at alternate ways of dealing with the fireplace. The central location of the fireplace allows for the economical construction of matched pairs of millwork pieces (shelves) on either side—rather than two different pieces.
4. The stair is moved over storage areas in kitchen, which creates more room in the living room and better storage for the kitchen.
5. Shifting the master bedroom from one corner to the other seems a logical way to distance the master bedroom from the street and garage and provide a better view. This creates an end unit with a different character than that of the interior unit. In addition this creates more options for "super master suites"
6. The architects frequently use a 45 degree angled door for the master bedroom to create a more open feeling and connection from the stair to the upstairs loft space without removing too much wall space from the master

bedroom. This design idea can also be found in much of their previous work. (E.g., D00524, D00627, D00515.)

Exhibit BSB01849, BSB01651- (Roof plans)

The hipped-roof plan (BSB01849) demonstrates the quantity of corners and complexity of angles required to construct a hipped roof. The more developed design (BSB1651) simplifies these ends to gables, which, in turn, simplify the roof framing and roofing construction to meet the programmatic and economic goals. The end result of this design idea can be seen in previous projects done by BSB (E.g., BSB01906 and BSB01949.)

Exhibit BSB01893, D00195, D01651- (Elevations)

1. Cost effective modifications to the design, at this stage in the evolution of the project, include:
    a. reduction in quantity of windows
    b. changing from stone to brick
    c. removing brackets and frieze boards from the roof edge and overhang
    d. eliminating some trim around garages
    e. changing entry shed roof to a more standard gable
    f. removal of window trim in gabled end,
    g. changing the roof framing from a hip to a gabled end at the end unit. This is a design idea seen in previous projects done by BSB, as shown in BSB01906 and BSB01949.
2. The shingle siding is added, despite the likely additional costs, to convey (in my opinion) a sense of tradition. This sparse use of a traditional (and real—versus vinyl) material is an important ingredient in the design vocabulary of traditional housing.

3. The gabled roofs on the end units are an economical solution for framing, yet they convey a traditional housing scale. This is an important element in establishing "curb appeal" for the potential buyer.

Exhibit D00148- (design options list)
This document relates to the plans BSB01891. It illustrates that all the options presented keep the master bedroom in its current location. This gives this unit a very adaptable and therefore marketable appeal as demonstrated in plans BSB01830 thru BSB01840.

D00046 and D00047 are images of fireplaces from other projects that resemble the fireplace in this project.

These documents (along with the testimony of BSB's witnesses) illustrate how the Defendants' architects independently created their own designs. The town homes for all parties contain conventionally sized rooms. All of the rooms are rectangular and do not posses any distinguishing features that would identify them as original. Each room is served by conventional window arrangements and types (commercially available to all architects and builders), standard trim, molding, and in the case of the loft area, hand railing and balustrade. There are no distinguishing or original geometric configurations or plan arrangements that convey imagination or originality. The key distinction here is the one between independent acts of creation and originality. It is my opinion that each town home is an independent act of creation yet their final designs are so dependent on conventional, traditional forms that the town homes are simply not original. This is not intended to be an architectural critique of the resulting form—rather a simple statement of fact that the town homes, as defined by market expectations, rely heavily on tradition and marketplace expectations. Having stated this, I will now explain why these two unoriginal town homes are not substantially similar.

I begin by examining Mr. Desnick's list of comparable elements, which is found on pages 9-14 of his Preliminary Expert Report, dated May 31, 2003. I will then follow with a detailed, tabular listing of the reasons I believe the units are not substantially similar.

Overall Comments

The following compares Unit "C" of Villa II in Maple Grove (Rottlund exhibit RCI000006) and Plan 1529 of Homestead Collection Springbrook (Town and Country exhibit D01650). [1.01-1.24, and 1.37-1.40]

Placement of the Gabled Roof Covered Entry [1.22]

The use of a gabled roof over an entry is so ingrained in the architectural vocabulary of "entry" and "porch" that to assert that it is an original creation would endanger the ability of any architect to ever use this basic building block of architecture — one that has been firmly rooted in the tradition of residential architectural since at least the age of the Parthenon (see above comments on Firmness, Commodity and Delight). In addition, the use of a gabled roof, per se, is a functional feature and is not subject to copyright. However, the manner in which each architect independently created his own expression of the traditional gable -- within the narrow restriction mentioned above -- establishes that they are not substantially similar.

Placement of Gabled Side Entries [1.17]

In my opinion, there is no imagination, vision, or original thought expressed in the placement of the gabled side entries. Their location is not, in and of itself, an original act of authorship. The architectural expression of the entrance is common and based on clear historical precedents. The entrances are simply where they need to be to service the home.

Placement of the Optional Fireplace [1.09, 1.39]

The location of a pre-manufactured fireplace in the center of a wall, opposite the exterior walls containing the windows is based on function — itself a conscious design solution. Each company placed its fireplace along this wall. This is the best and most logical choice -- one made by the Defendants, the Plaintiff, and many other architects faced with the question of where to put a fireplace and media unit in a conventionally rectangular living room. This similarity does not amount to stealing the idea from the Plaintiff. The central location, however, is the only decision that is the same in each case.

Layout and Proportions of the Optional Fireplace [1.40]

The expert report of Mr. Desnick states that "the most striking similarity is found in the promotional photographs each company has used in selling the unit designs." In my opinion, the similarities end with the decisions to place the fireplaces symmetrically on the wall and to logically use the resulting space on either side for practical uses that maximize the efficiency of the town home. Given that the living room in town homes is not overly generous (especially in the price range of the parties' offerings), the resulting space for furniture arrangement and access to daylight precludes the fireplace and storage areas from being placed in any other location. As for the "arched niche" above the mantel, this architectural feature has been employed by architects as far back as John Wood the Younger in Bath, England -- especially in the townhouses at the Royal Crescent built in the 18th century. I find no basis to justify this being seen as an original work of authorship. Had the architect used originality in detailing or forming this niche, then there might be a basis for me to think otherwise. The walls containing the fireplace, media center and bookshelves differ measurably and are not substantially similar.

Second Floor Loft [1.14]

The ability to articulate space with a double-high volume is an essential ingredient in the design vocabulary of any architect. The second floor loft, adjacent to this volume, is placed, logically in both cases, to maximize the access to daylight. Mr. Desnick states that "the railing design is important because it represents a significant part of the wall design above the fireplace and media/book shelves." The term "significant" in this case cannot, in my opinion, be construed to mean original or substantially similar. Firstly, the railing is a standard, off-the-shelf (code compliant) railing that is anchored in a conventional and typical manner. Second, there is no evidence of original thought or imagination regarding the design or arrangement of the railing. The spacing and height of the railing meets code requirements. The spindle design is from stock, off-the-shelf products. I see nothing in this case but two architects, acting independently, placing a single-run, conventional (and presumably cost-effective) off-the-shelf railing at the furthest edge of an upper, conventionally-shaped room (called a loft). If these railings are found to be substantially similar, then the ability for any architect to ever use or place a commercially available railing in compliance with code requirements would be severely limited. I do not believe this is the purpose of copyright protection. The finding by Mr. Desnick that each unit has a centered electrical floor outlet is, in my opinion, overreaching for similarity. The need for and placement of electrical outlets is a functional requirement and does not rise to the level of copyright infringement.

Second Floor Living Room Windows [1.20]

Mr. Desnick's construct that the path of light and shadows is somehow indicative of an original act of creation may be true if the light were passing through an original opening custom-designed to create its own spatial experience. In this case, there is no similarity of window placement or shape and the windows are sized to meet daylight and design requirements independently established by each architect with his clients. The positioning and juxtaposition of the windows is merely a

function of placing the opening in the best location for the room. They are not substantially similar.

Placement of the First Floor Living Room Windows [1.20, 1.21, 1.22, 1.23]
Again, each developer has taken conventional, catalogue windows and placed them in the remaining open walls of the living room. The similarity of the path of the light and shadow is a function of solar orientation and path — not a result of the Defendant infringing on a copyright. The windows are markedly different. Mr. Desnick is simply overreaching.

Garage [1.10, 1.11, 1.19]
It is essential to the function of a garage (especially in this marketplace and climate) that it provide a convenient and logical entrance to the town home. This similarity is simply a result of functional necessity—not intentional infringement. If the location of the garage and the resulting, logical placement of the door were construed to be an infringement, then every garage that I am aware of would be an infringement. This would severely and unfairly limit the ability of an architect to meet basic functional demands of their clients.

First Floor Powder Room [1.10, 1.11]
It is desirable to have the powder room serve the rear entry from the garage and be located in an area where other plumbing is located. I do not agree with Mr. Desnick's statement that this placement "can result in unpleasant sounds and odors invading the eating area." Ventilation and sound-proofing can mitigate the resulting environmental effects of a bathroom. The efficient use of a common plumbing wall is also a contributing factor in the placement of the powder room. In this case, the bathroom is efficiently and logically placed to enable homeowners to benefit from a powder room conveniently located next to the rear entry, which allows them to clean up after outdoor activities, use the restroom while cooking,

and without traipsing through the house. Citing this as a "mistake" to imply that the bathroom location was "copied" is, in my opinion, not credible.

Living / Dining Rooms

As mentioned above, the placement of the kitchen off of the garage, the dining room adjacent to the kitchen, and the living room adjacent to the dining room is fundamentally a spatial relationship that is a result of logic and function, and not, in my opinion, copying. The detailed overlay drawing [1.02] illustrates that the rooms are different sizes, the stairs enter the rooms in different places [1.05], the openings between the two rooms are different widths, and the entry closets are placed in different locations. There is no evidence that they are substantially similar.

Dining Room Patio

The functional arrangement of a patio door in the center of the dining room wall is logical and conventional — as is the use of commercially standard sliding doors. This functional accessibility to an outside patio is common and routine in many town homes — including those pre-dating the Plaintiff's designs.

Second Floor: Bedrooms, Lofts and Bathrooms [1.12 and 1.13]

A detailed overlay drawing [1.13] illustrates that the rooms are different sizes, the stairs enter the hallways in different places, the openings between the rooms are different widths, and closets are placed in different locations. Other differences are:

- Rottlund has the laundry closet opening off of the corridor; Defendants have placed the laundry in a separate room with additional hanging closet space.
- Rottlund has a walk-in closet for the second bedroom; Defendants have a closet located along the wall and accessible from the room.

- Rottlund has two separate closets for the master bedroom (nearly 16 linear feet); Defendants have one walk-in closet with approximately 11 linear feet.
- Rottlund has the toilet in the master bedroom placed in the open; Defendants have chosen to enclose the toilet in a room (with optional door).
- Rottlund has a linen closet in the master bathroom; Defendants have none (Defendants do have a linen closet in the hallway in unit 1450).

The only architectural element that is used in both plans is the 45 degree wall mentioned in Mr. Desnick's report. This angled wall is a common and widely used device used to maximize the efficiency of a plan. It enables architects to access spaces more easily. [1.12]

Roof Configuration and Elevations [1.37]

The rotation of the gabled end is a common design device used by architects to reduce the mass of the roof form. This common form is used, for example, in Colonial and Shaker Community designs. The back-to-back eight-unit town home is wide in the front-to-back dimension. If this turned gable were considered protectable and thus not useable by other architects, then architects would be severely restricted in their ability to design a roof structure that would meet their own aesthetic requirements. The back-to-back eight-unit town home is an idea that, in my opinion, is not protectable. Given this, there are two logical ways that this end wall could be framed—extending the gable to the wall or turning the gable as done by both the Plaintiff and the Defendant. Centex Homes, which also builds eight-unit back-to-back town homes in the Twin Cities market, illustrates both options on its website. (A printout of these pages is included in the Appendix.) The option is also visible in exhibit BSB 01949 (Defendants' architects). I see no rational reason that this roof framing device could be considered an original act of authorship. It is simply part of the common currency of design used by architects throughout the world.

The elevations show other considerable differences [1.37, 1.22]:

- The extended garage of the Defendants' homes is framed with an 8/12 pitch roof—matching their turned gable. This shed roof is a distinctive and differentiating design element of Defendants' homes. Rottlund has chosen to visually minimize the dominance of the garage in their façades. The centrally-paired double garages in the Defendants' units have an 8/12 roof return at each entry; the Rottlund double garage has a sloping shed roof, which visually extends over the entries.
- The bedroom and the loft of the Defendants' homes extend proud of the main body of the building—creating a three-step gable receding from the proudest point; the Rottlund home has only extended the bedroom creating a two-step gable.
- Defendants have used a brick veneer to a level of 4'-6" above the main floor—to the mid-point of the ground floor windows. This extends across the entire elevation of the units. Rottlund used simulated stone at the bottom of the window sill (about 30 inches) and has chosen to return the stone only to the line of the first garage along the main elevation and only to the front door along the side elevation.
- Rottlund has symmetrically placed two small gabled dormers between its two-step gabled ends; Defendants have created a tripartite arrangement with one gable placed symmetrically along the façade — and including a two-step asymmetrical gable to mirror the foremost gable at either end.
- Defendants have placed one large window in the foremost gable; Rottlund has chosen to place two smaller windows. In both cases, these windows are conventional, off-the-shelf units available commercially to anyone.

Overall Comments: Mid Units [1.29, 1.30, 1.31, 1.32, 1.33, 1.34, 1.35, 1.36] The following compares Unit "D" of Villa II in Maple Grove and Plan 1450 of Homestead Collection Springbrook.

First Floor

| Elements | Rottlund | Town and Country |
|---|---|---|
| Stair [1.26, 1.27, 1.28, 1.31, 1.32] | Located against the party wall | Located in roughly the same location as their Unit 1529; mid unit between the kitchen and the garage |
| Kitchen [1.29, 1.30] | L-shaped kitchen with walkway to one side | Galley Kitchen with hallway bisecting the kitchen. Kitchen has a breakfast area |
| Half Bath [1.11] | None | Located in same location as Unit 1529 at the garage entry |
| Entry 1.26, 1.27, 1.28, 1.31, 1.32] | Located tight against the side wall | Located off-set with an entry closet |

Second Floor

| Elements | Rottlund | Town and Country |
|---|---|---|
| Stair [1.35] | Located against the party wall | Located in center of unit; stair arrives central to hallway |
| Master Bedroom [1.36] | Rectangular room with its axis parallel to the front of the town home. | Rectangular room with its axis perpendicular to the front of the town home |
| Master Closets [1.33] | Two separate closets | One closet |
| Master Bath [1.33] | Separate shower and bath; open toilet | Combined shower and bath; enclosed toilet. |
| Laundry [1.33] | Located in closet | Located in separate room with individual closet |
| Entry to bedrooms [1.33] | Straight walls | Rotated square (90 degrees) to provide efficient entry with minimum hallway |

Mr. Desnick has identified 55 elements or compositions to suggest that the Defendants' designs are substantially similar to the Plaintiff's design. Mr. Desnick has again overreached. Mr. Desnick contends that the "Gestalt" of the parties' designs is substantially similar. "Gestalt" traditionally refers to a configuration of patterns or elements so unified as a whole that it cannot be described merely as a sum of its parts. In this case, Mr. Desnick twists the term to justify his conclusion that the two town homes are substantially similar. It is a fundamental principle of design that an architect's work is judged by its originality, not the vague application of a term from psychology. To hold otherwise would result in architects racing to the United States Copyright Office to claim protection for the "Gestalt" of basic living arrangements. The effect of this would drastically impair an architect's ability to design moderately priced, marketplace town homes.

In my opinion, the basis for establishing an *Original Work of Authorship* is the manner in which the architect brings his own imagination and creative decision-making to bear upon a design problem. As shown on the detailed overlay of each plan the units are not substantially similar, even though each architect has used many of the same commercially available elements. [1.02, 1.13]

Any apparent convergence of designs is not a result, in my opinion, of the Defendants' architect infringing on the Plaintiff's designs; rather, it is the result of two different architects working independently within a market system that naturally leads to conformity through the influences of traditional buyer expectations, code and zoning requirements, social conventions (living arrangements), budget restraints, and constructability. Other influences include expectations of the buyer in regards to style, materials, practical functional arrangements, and convenience.

If Plaintiff's architect had arranged these elements in a configuration so unified (or original) that the town home could not be described as a sum of its parts, then it would be easier to establish originality. The fact that they are different in their "parts" supports my opinion that they are not similar in their "whole." While the sheer number of elements identified by Mr. Desnick may tempt one to infer that the elemental similarities are so overwhelming that they support the claim of substantial similarity, they do not. For example:

1. Simply placing a gabled roof over an entry does not convey similarity; it conveys only a desire to protect the entrance from the weather with a standard building element. If the Plaintiff's architect had invented an original distinguishing element at the front door, clearly identified as a Rottlund product, then it would be easier to conclude substantial similarity. In this case, it is impossible to establish that the source of the Defendants' architect's inspiration is anything other than a commonly used and economical architectural element. Apart from the traditional gable form, the entrances are different as follows:

   Rottlund
   Stone base columns support the roof structure. The columns above the stone base are wide and tapered. The peak of the gable extends well above the second floor level. The fascia framing on the gable runs parallel to the roof line until it intersects the horizontal soffit line. The column width/height ratio is 1:4. The entrance width ratio is 1:2. [1.18]

   Defendants
   Columns are pre-manufactured single-unit elements with no masonry base. The gable extends only slightly above the second-floor level. The fascia trim extends to a triangularly framed accent board flanking either side of the

columns. The column width/height ratio is 1:11. The entrance width ratio is 1:7.5. [1.17]

2. The use of a manufactured fireplace in a shape predetermined by the manufacturer does not justify the claim that the proportion of the fireplace is substantially similar. Had the Plaintiff's architect used an unconventional or custom fireplace, it would have been easier to trace the source of the design and thus establish substantial similarity. [1.09]

3. The design, proportion, and detailing of the loft is purported to be substantially similar. The decision by both architects to provide a two-story living space overlooked by an upstairs room protected by off-the-shelf railings is a functional choice and should not be construed as evidence of substantial similarity. It is a device commonly used throughout the Twin Cities and other housing markets. Should this Court hold that the idea of a rectangular two-story living space can be copyrighted, then the freedom to practice architecture would be severely limited. It is my opinion that this is not the intent of the copyright laws.

4. Placement of individual rooms such as the dining room, living room, stairways, and kitchen is only similar in the abstract location in the plan. Given the conventional aspects of a townhouse, cited above, it is logical, functional, and inevitable that the kitchen will be located adjacent to the garage, the dining room adjacent to the kitchen, and the living room adjacent to the dining room. The similarities stop at these geographical locations. The Rottlund homes have an "L" shaped kitchen while the Defendants' kitchen is a galley kitchen. [1.07] The Defendants have a space for a breakfast area; Rottlund does not. The dining room is accessed from the center in the Defendants' home; it is accessed along the edge of the

Rottlund home. The wall opposite the windows contains all of the living/dining storage options (the closet is adjacent to the media/bookshelf units); the Rottlund home has the optional closet adjacent to the front door.

Ethical Rules

For his final unwarranted salvo, Mr. Desnick cites the American Institute of Architect's Code of Ethics and Professional Conduct. He states that "BSB Architects violated the letter and spirit of Rule 4.108 when they copied Rottlund's Villa II copyrighted work." As a Fellow and past President of the American Institute of Architects (Minnesota Chapter), I can state that BSB architects did in fact "maintain and advance their knowledge of the art and science of architecture, respect the body of architectural accomplishment, and contribute to its growth. Learned and uncompromised professional judgment should take precedent [sic] over any other motive in the pursuit of the art and science of architecture" (As quoted by Mr. Desnick from Canon 1.) I find no evidence that BSB's architects violated Rule 4.108 by copying or reproducing the copyrighted works of other architects or design professionals. What I did find was that BSB architects:

- Have worked for over ten years in understanding the complexities and restrictions of developer for sale multi-family housing,
- Worked diligently to be creative within the narrow restrictions of this type of architectural product. This includes knowing how to independently create traditional forms and construction methods in such a way that their designs are marketable and affordable,
- Maintained and advanced their knowledge of the art and science of architecture by being fully informed of what other professionals are doing in their chosen field of architectural practice. The citation by Mr. Desnick that exhibit BSB2035A shows that the Defendants were copying the Rottlund gabled entry could only be supported if the designs were

substantially similar. Even though it appears that Mr. Desnick is suggesting that this is the "smoking gun" that clearly shows the Defendants' architects infringed on the Plaintiff's design, it is my opinion that the Defendants' architects were keeping abreast of what was going on in the marketplace and solving a real-world need in a conventional way. As stated elsewhere, the Plaintiff also kept abreast of the competition. As Mr. Desnick knows (he was a student of mine at the University of Minnesota), architects routinely search out, study, and display precedents in their particular field of expertise. If they did not, then architectural publications would cease to exist and cameras would have a much smaller market. The issue is whether the resulting entry structures are substantially similar. I have stated elsewhere why they are not.

Conclusion

Mr. Desnick states that he agrees with "the conclusion of Town and Country's Vice President of Product Design, Steve Sandelin, that the two products are 'obviously similar.'" I too agree that these products have obvious superficial similarities. The questions before us are whether Defendants' units are substantially similar to Rottlund's design, and whether Rottlund's design is an original one. Using identical commercially available products in logical and functional ways does not in my opinion make these town homes original or substantially similar. Using traditional forms in entirely different ways, such as the gabled entry, does not make the town homes original or substantially similar. Using gabled roofs, common to marketplace town homes, does not make them original or substantially similar. That both units have kitchens does not make them substantially similar. That two builders operating in the same market use logical plan arrangements containing similar elements, proportions, and roof configurations does not make the designs substantially similar.

In my opinion, whatever similarity exists between these two products is not a result of conscious or unethical copyright infringement but rather a product of a design process and independent creation born out of the marketplace, tradition and convention. If I, as an architect, use a fireplace manufactured by a third party, place it in the center of a living room wall and flank it by bookshelves (knowing as I do that the arrangement has been used countless times before), have I intentionally created a substantial similarity with every other architect's similar living room wall layout? It may be "obviously similar," but it is my opinion that this act does not rise to the level of copyright infringement -- no matter how many aggressive builders send checks and registration forms to the United States Copyright Office. On the other hand, if I, through my imagination and talent, create a new fireplace and invent a bookshelf system that is clearly an original creation, then I would expect to protect that copyright.

What are the implications for the ability of an architect to practice if the Plaintiff is successful? This case is important to architects:

- In the arena of developer multi-family housing, the range of design latitude that an architect has is very limited. If the application of conventional forms, products and construction techniques cited by the Plaintiff as evidence of infringement is deemed protectable, then the ability for an architect to practice his profession will be severely curtailed. The court, in my opinion, needs to give clear direction as to what I, as an architect, can and cannot use to create architecture. This case has important implications—especially in this highly competitive and market-driven sector of architecture.
- Architects must have the right to use conventional framing techniques (e.g., gables) to enclose their buildings. This form is so traditional, economical

and practical that to deny its use would badly damage the practice of architecture.

- Architects must have the right to continue to place gabled structures over entrances to protect the entrance from the elements and signify where the front door is located. Since the entrances are distinctly different in this case, the argument that the generic gable form is protected would deny architects a basic building block in their design vocabulary.
- Architects and builders in the Twin Cities and elsewhere will certainly feel a chilling effect if this Court decides to protect the amorphous "Gestalt" of a most conventional entry-level town home.

It is my conclusion that these town homes are not substantially similar. This report has been prepared and is submitted by:

Jeffrey A. Scherer, FAIA
Founding Principal, Meyer, Scherer & Rockcastle, Ltd.
August 15, 2003