Court File No. 01-1980 / ROTTLUND / Pinnacle
Krummen Affidavit dated September 21, 2004

Exhibit R47

# Expert Disclosure of Albert Bloom, A.I.A.

I have been involved with the design of residential housing since my graduation from the University of Arizona in 1970. My career has covered all aspects of housing, including custom residences, high rise apartments, townhouses, mid rise apartments, single family production housing and multi-family production housing. Currently, I am president of Bloom and Fiorino Architects, Inc. located in the Chicago suburb of Oak Brook, Illinois. My present professional responsibilities include the conceptual design of various housing types, including multi-family and townhouse units for a wide range of merchant builders.

Licensed as an architect in Illinois in 1974, I have had extensive design and marketing experience in the development of all forms of housing for merchant builder clients. Along with my builder clients, we have started with a blank sheet of paper and worked together to produce designs that solve marketplace as well as community needs based on a defined set of criteria. A current copy of my Curriculum Vitae is attached as Appendix A.

My opinions are based on my many years experience in dealing with home builders, residential marketing surveys, architects, home buyers and my knowledge of the residential marketplace.

The factual investigation in this matter has not been completed and it is my understanding that numerous depositions will be taking place through the months of August and September. Accordingly, I reserve the right to amend, supplement or clarify my opinions based on those facts.

EXHIBIT NO. 388
6-9-04
P. MAHON

## History of Back to Back Townhouses

My recollection of back to back product goes back to the late 1960's and early 1970's in motel architecture. Holiday Inns and Red Roof Inns used this concept with units that entered from the parking area without an internal corridor. This concept allowed for a more efficient building because it did not have a common space corridor. With the rising popularity of road travel, these motel units dotted the countryside alongside the emerging interstate highways. In the same time frame, rental apartment units had a surge in the market. There were numerous schemes where the back to back concept was utilized with direct front door access from a greenbelt or garden area. Early schemes used exterior stairs to enter the second floor units. Concepts like this are evidenced in Sandburg Village, a large urban development located in Chicago, Illinois, and in many suburban apartments. In the early 1970's the product evolved further into condominiums.

As part of my investigation, I have contacted some of my colleagues and discussed the origins and design concepts of back to back townhouses being done by production builders. As far as I was able to ascertain, the back to back townhouse concept surfaced in California in the early 1970's. My discussions in mid July of 2003 with architect Barry Berkus have indicated widespread use of this concept in Southern California, Arizona, Texas and Colorado by numerous builders during the 70's and early 80's. The concept evolved as a response to the design challenge of creating an affordable product for first time buyers at a higher density to mitigate the higher cost of land. The product flourished with numerous design variations using no garages, attached 1 car garages and some with 2 car garages. The use of the loft space overlooking a sloped-volume living area was extensively used. The product worked its way east and surfaced in Chicago in the early 70's as a garageless pinwheel design townhouse with a loft overlook bedroom that attracted a singles and young married first time buyer market. Designed by the Midwest office of B.A. Berkus Associates,

the project known as Strawberry was built in North Chicago in 1972. A similar concept was developed at Heather Ridge in Mundelein in 1974. The pinwheel concept lost its appeal due to the lack of attached garages and the ability of homebuyers to afford more space.

The concept then morphed into different configurations and presented itself as back to back townhouses with garages in a 4 plex pinwheel solution that was built by Kimball Hill at College Hill and Bright Ridge in the late 70's; Hemphill at Adare Farm in 1981; Town and Country Homes at Conventry Court in 1980; and Kirk Corporation in Streamwood in 1983. Some of these concepts involved the use of loft space overlooking a vaulted living room (Adare Farm and College Hill) and others made use of 2 story boxes with attached garages. The product was successful as it provided an affordable alternative to renters and offered more features than the earlier configurations.

BSB has significant history with the back to back concept dating to some back to back plan service concept drawings shown in Professional Builder in 1984 as well as designs in 1982 for Hansen and Horn in Indianapolis and in 1984 for Lou Draper in Chicago. BSB's designs for individual client merchant builders include Kimball Hill Homes at Talbot's Mill in 1986, Good Value Homes in Minnesota in 1992, Midland Homes in Cedar Rapids in 1994, and Jerry's Homes in Johnston, Iowa in 1996. From the early pinwheel designs without garages that were done for the plan service in the mid 80's through the designs of the late 80's for Kimball Hill and up to today, BSB has shown a knowledge of the design parameters, limitations and solutions for the back to back townhouse concept.

<u>Conclusions</u>

BSB has been a part of the design history of back to back townhouses since the 1980's and has consistently moved forward with new design concepts for volume space, loft overlooks, improved elevation massing, 2 story volume spaces, big box solutions and

innovative internal architectural space planning. Many of BSB's designs for back to back townhouses predate Rottlund's Original Villa, New Villa, and Villa II designs.

## An Outline for the Design Process

This is the criteria and process that architects need before starting a design program. This information can be supplied by the builder client, a marketing firm, it can be assembled as local knowledge from an awareness of the builder market, or some combination of all of the above.

1. Buyer Profile
    - A. Single/married/children, etc.

2. Program Criteria
    - A. Room Count
        - 1. Bedrooms
        - 2. Living/Dining/Kitchen/Family/Loft/Garage/Etc.
        - 3. Bathrooms
            - A. Number/amenities, i.e. whirlpool tubs, double vanities, showers, etc.
    - B. Square Footage of Unit
    - C. Width and Depth Constraints
    - D. Land Plan and Density Considerations

3. Cost
    - A. Construction Cost
    - B. Price Point for Buyer
        - 1. Alternates/options, i.e. fireplaces, additional baths, additional bedrooms, etc.

4. Building Codes
    - A. Occupancy Type
        - 1. Residential
            - A. Single Family
            - B. Townhouses
            - C. Multi-Family
    - B. Construction Type
        - 1. Wood frame
        - 2. Masonry
        - 3. Others
    - C. Building Limitations
        - 1. Area
        - 2. Height
        - 3. Separation to other buildings
    - D. Other Requirements
        - 1. Exiting (ingress and egress)

2. Stair location
3. Light and ventilation for specific rooms
4. Fire protection, i.e. separation/fire walls

5. Definition of Product Type
   A. Single Family
   B. Townhouse
   C. Multi-Family
   D. Determine Which Product Type Meets the Requirements of the Criteria

6. Marketplace
   A. Identify Competing Product in the Geographic Area
   B. Review Competing Product in the Geographic Area
      1. Site visits
      2. Sales data
      3. Brochures
      4. Local HBA
      5. Internet
   C. Analysis of New Product
      1. Size
         A. Square Footage
         B. Bedroom Count
         C. Features
      2. Price
         A. Value per sq. ft.
         B. Price points

7. Design
   A. Final Definition of Program Criteria
      1. Product type
      2. Square footage
      3. Room count
      4. Cost
      5. Buyer profile
      6. As the program criteria becomes more defined it will limit the number of viable design solutions.
         A. Sq. footage
         B. Room Count
         C. Width and length
   B. Concept Drawings
      1. Setting program requirements down in graphic format (plans, elevations, sections)
      2. Interaction with client and revisions to graphics with client input to reach a mutually agreeable design solution
   C. Development Drawings
      1. Refine and augment the concept drawings
      2. Interaction and revisions
   D. Working Drawings
      1. Construction drawings (technical)
         A. Bidding

B. Permits
C. Construction

8. Construction
   A. Review of Project During Construction
      1. Ascertain whether it meets the design intent
      2. Revise problem conditions
      3. Revisions to drawings at client's request

9. Post Construction
   A. Review finished unit and evaluate successes and failures
   B. Revise unwanted conditions for next phase

<u>Conclusions</u>

Without this criteria and process, a design will flounder and take substantially more time to bring to fruition because the definition of the program requirements is not fixed. The speed of the design process relies on several factors including the knowledge of the designer with regard to experience in the type of product in the marketplace, the prompt review of design drawings by the client, and the client's development schedule, i.e., if a site is not available to the client, the process will take longer. Cost is also a major consideration in the design process, especially at the lower price points. When considering price points in the market, the buyer profile is critical. If the sale price of a unit exceeds the buyer's ability to purchase the unit, that unit's absorption in the market will suffer. In designing units for consumers at the lower end of the market ($120,000 to $150,000), care must be exercised to insure that the price point does not appreciably exceed the target. If this same unit (based on square footage, room count and amenities) is priced at $170,000, another group of consumers with a different buyer profile must be considered.

## BSB Design Process for the Homestead Collection

1. BSB and Town & Country met in Minneapolis in March 1998 to discuss program criteria for new product that Town & Country wanted BSB to design.
2. BSB and Town & Country went on a one-day tour of back to back townhouse type product in the Minneapolis area visiting townhouse developments being built by Centex, Rottlund, Orin Thompson, GM Homes and others. Product was reviewed in situ by BSB, and BSB took no product literature, photographs, notes, or brochure plans.
3. On April 6, 1998 BSB contracted with Town & Country to provide schematic design services for 2 attached product types.
4. The Scope of Services in BSB's contract outlined the square footage requirements, room count, garage criteria, bath conditions, cluster configuration, elevation criteria and density study.
5. From early April through early July of 1998, BSB submitted several design concepts to Town & Country for review.
6. Town & Country sent BSB marketing materials, including brochure plans, from other builders (Bright Keys, Orin Thompson, GM Homes) for review.
7. BSB started schematic design for the proposed product and during April, May and June of 1998 was faxing concept ideas for floor plans and elevations to Town & Country for review and comment.
8. Numerous revisions to the schematic plans were made during this time frame. A dialogue existed between BSB and Town & Country where Town & Country would respond to the graphic design solutions with comments that BSB would then incorporate into further design studies.
9. The process took approximately 3 months to complete until both architect and client were satisfied that the designs were a mutually agreeable solution.

10. Subsequent to the completion of design services, BSB submitted a contract to Town & Country for further architectural services including design development and contract document services.
11. As BSB worked through the design development and contract documents, further revisions were made to the plans based on Town & Country's input.
12. Revisions to the drawings were made on a fairly continuous basis from 1999 through 2000.

This design process was a logical and studied effort by both BSB and Town & Country to take a written program and work through the evolution of initial schematic design concepts through the final contract documents. Working together and using each other's strengths and expertise, BSB and Town & Country were able to generate a product that met the needs of the market based on the initial program using a rational design process.

Conclusions

BSB has a design consultation process that compresses the design time line from a 3 to 4 week process into 4 days. They have used this process for numerous projects and clients for over 20 years. By using several designers and working with highly structured program criteria in the client's office, a concept program, including floor plans and elevations, can be developed and presented in less than a week. This intense process involves the client's key people who are providing input at schematic design and then reviewing the drawings while the design team provides their expertise. Hand drawn sketches on the conference table provide alternate solutions to designs. While this process shortens the design time line, it usually does not decrease the total number of hours necessary to reach mutually agreeable design solutions.

In the case of the Homestead Collection, BSB went through a typical design process which started with a review of the competitive market followed by a written program,

development of concept design studies, refinement of design through design development, and then production of final contract documents. Design was so important that design revisions were being made during the contract document phase. While the schematic design process appears to have taken about 3 months total, Larry Moore's time cards indicate about 85 hours of professional time and Chris Jorgenson's time cards indicate about 40 hours. This totals about 125 hours of design time for 2 unit plan types and one building type. In my experience, the total time for design for a project of this scope should be around the 70-hour mark. There was obviously more time involved by BSB than I would think normal, indicating that more design effort was required to reach an acceptable solution.

## Touring Product

Architects who are involved with residential home design are constantly reviewing the marketplace to see how our designs are perceived as well as to review the designs of our competitors. In the Chicago area one of the major newspapers has a "Festival of Homes" portion of the Real Estate section 2 or 3 times a year. Most builders subscribe to this section, and it gives a good overview of what is being built in the marketplace. Architects usually take several field trips to walk models and drive through communities. My firm reviews projects that we have designed as well as other architects' work to see how they really look and to see how the competition has answered the call for design solutions. This market overview gives residential designers an awareness of product and design acceptance in the field. Going from subdivision to subdivision, architects gain valuable information on buyer preferences regarding design features. I spend a good amount of time with the sales people at each community and most of them are willing to share their field experience with me. Having been involved in teaching courses for a good portion of the sales and marketing community through our local Home Builders Association, I know many of the sales associates at the job sites. Their willingness to share buyer preference data is an indication of

a networking fraternity that only wishes to produce a better design for the entire marketplace. As I travel throughout the country, I find similar circumstances in other communities with sales people that are not familiar with me. The ability to see residential product and share ideas with other homebuilders and design professionals enhances our ability to design better homes that truly meet the needs of the home buyer. While a product tour in situ is the best way to see what is available in the marketplace, there are other avenues to approach market awareness. The internet is one way of glimpsing an overview of builder portfolios in the market. Newspapers, trade publications and seminars also have a role in providing information on trends and hot topics in design and sales.

There are also parades or tours of homes that attract not only professionals but the homebuying public. Minneapolis has a Parade of Homes offered twice a year which attracts both homebuyers and professionals. For those in the industry, there are sometimes private tours for a limited number of homebuilders, marketers, and designers. These are usually well appreciated by the host builder and design professionals, as it denotes a special place of honor to be recognized as a project that is worthy to be on tour. Award functions are also a way to observe product, either as a judge or in reading about the award recipients. Residential clients expect their design professionals and their own personnel to understand the marketplace and to realize that this knowledge will be used as part of the design process. The gathering of information, including brochures, floor plans, marketing materials, photographs and other information is an important part of the process.

It is common practice among architects and builders to use competitor's marketing brochures and/or photographs to transmit information regarding positive or negative features that exist in the marketplace. Architecture is a graphic and visual art, and the transfer of ideas works better in a graphic format. Our clients will send brochure floor plans of similar product with notations regarding features or areas that either met the marketplace needs or

were deficient. These visual clues will help program definition and lead to exploration of design alternatives. Some of these ideas might involve the use of bedrooms as lofts or home offices, or the use of a cathedral or coffered ceiling in certain areas, or an expanded utility room that can also be used as a hobby room. This exchange of ideas and concepts within the residential building industry is a common and accepted practice.

<u>Conclusions</u>

The touring of product and the gathering of information about the product is typical and necessary to adequately review market conditions and prepare for the design process. Product tours have been sponsored by the ULI (Urban Land Institute), NAHB (National Association of Home Builders), marketing professionals and the AIA (American Institute of Architects) in areas including Southern California, Florida, Las Vegas, Colorado Springs, Chicago and Washington to name some of the organizations and sites. These tours are encouraged as a way of sharing ideas and promoting housing which will better meet the home buyer's needs. BSB has participated in many of these product tours for over 25 years. Product tours is a task expected of designers, builders, as well as sales and marketing people to see product that may be your competition, not to copy a competitor's designs, but to improve your own.

## <u>Villas</u>

A dictionary definition of villa is paraphrased as "a country residence or estate…" Historically, the Villa D'este and Hadrian's Villa bring to mind the luxuries of bygone eras. Evoking an upper crust feeling, this name has been used in countless communities by marketing wizards for years, throughout the country, including projects in Minnesota that were built by builders other than Rottlund.

**Conclusions**

The term "villa" has been in use since Roman times and has a connotation of luxury. It has been used to describe residential projects as a marketing tool. Lexington Homes, one of BSB's clients, used the name Park Villas to describe their 4-plex attached product designed by Doug Buster in 1989.

## Turned Gables

The use of a turned gable or hip configuration at the end of a townhouse building is not a unique concept. The design logic for this turned gable is simple: when dealing with long facades, it helps to break down the mass of the building and create a visual termination point for the eye. The historical concept for the turned gable appears to have originated in France and England in the late 17th and early 18th century as evidenced in A History of Architecture by Sir Bannister Fletcher. Used in chateaux and palace architecture, it terminated the composition and provided extensions or wings to enclose the main façade.

The first time I saw this concept in contemporary architecture was in 1983 in Lakewood, Colorado. The project, called San Francisco West by Pulte Homes, had eight and ten unit, narrow-module townhouses strung together with various facades and articulated movement at the front. Even though only twenty feet wide, the 160-200 foot long building was imposing. Being only 20 feet away from its neighbor could have created a devastating effect. By turning the roof of the end unit so that it formed a gable facing the front and an eave on the end wall had the dramatic effect of lowering the mass of the building while adding additional interest to the street façade.

Centex Homes also used the turned gable concept in 1983 at the Hampton's Townhouses in Elk Grove Village, Illinois. In six unit townhouse buildings which were approximately 120 feet long, Centex turned the roof on the end units to visually end the mass and reduce the scale of the end walls. I have seen this technique used many times since and

have incorporated this design feature in many of my own townhouse designs, including the Country Homes of Lake Arlington Towne in Arlington Heights, Illinois in 1986. BSB has used this concept of lowering the end massing of townhouse buildings in many of their designs including Gregg's Landing in Vernon Hills, Illinois, for Zale Homes in 1997, Lexington Homes Conventry in 1993 (both prepared by BSB of Illinois), and in some of their plan service designs dating from a 1984 article in Professional Builder Magazine. On a July 2003 field trip to the Minneapolis area, I saw the use of turned gables at end townhouse conditions in Coon Rapids built by Good Value Homes and designed by BSB, and Oak Creek Builders. The numerous developments of back to back townhouses in the Minneapolis metro area had a strong support of the turned gable or hipped end condition.

### Conclusions

The turned gable and hipped roof concept of changing the mass of the ends of a long structure while creating visual interest have been in use for over 400 years. It is still in use for many projects in both Illinois and Minnesota for the same reasons that made it a design feature in France during the late 1600's. To claim it as a unique attribute of a single designer is false and history does not support this claim.

## Powder Rooms

Powder rooms are a design response to a market condition that allows guests to use a water closet and lavatory that is not the homeowner's primary bath. Usually located on the first floor of a 2-story home, it also has the convenience of use by the homeowner without having to go upstairs. Powder rooms take different shapes and sizes in production housing and their design is a function of space and location in the plan. One design has both the fixtures on the same wall, which generates an enclosed space of 5 feet by 5 feet (25 sq. ft.). Another arrangement is to place the fixtures on opposite walls and to narrow the width of the room to about 3 feet with a depth of 7 feet (21 sq. ft.). Both of these designs have had

widespread use for production housing. There are other modifications of these designs, but these two are the most prevalent. A review of both Rottlund's and Town & Country's product indicates the use of the same type of powder room in the same general location in the plan.

The locations of both of these powder rooms might have been improved given different design criteria. In fact, BSB did have different powder room designs throughout their preliminary design drawings. The shotgun powder room was ultimately selected. The actual shape of the powder room is common to architects and builders across the country. I have seen it in many applications and have used this powder room concept in both affordable and upscale housing. Architectural Graphic Standards depicts the powder room layout used by both BSB and Rottlund as a standard layout. The biggest difference between the powder room designs of BSB and Rottlund is that BSB recognized that it was not the best condition to have a powder room door enter directly into the kitchen. BSB attempted to soften this condition by creating a small hall which the door opens into, creating a partial visual blind. Rottlund did not recognize this problem with their design solution.

### Conclusion

Given the rational design process that BSB followed, as evidenced by Larry Moore's design study progression, it is clear that BSB explored other shapes and sizes of powder room configurations before settling on this particular design. The design and location of this powder room was not a mistake; it was a compromise to gain floor space that was thought to be more valuable, i.e., the breakfast area.

## Fireplace Elevations

My memory of fireplace elevations dates back to the mid-1970's when I was introduced to the variations of fireplace fronts as well as fireplace "space." I worked mostly with pre-fabricated wood-burning fireplaces devising different materials and mantle designs

to enhance a major focal point in a room. Designs became bolder with the addition of log boxes to store wood and bookcases or shelving to provide storage to the side of the fireplace. But there were problems with creating dual focal points for the fireplace and the television. The designs evolved, creating a single focal point which contained both the fireplace and the television/entertainment centers. Into the 80's and 90's, fireplaces started to be designed with complete entertainment centers, including TV, VCR, stereo and media storage areas. As the combination fireplace and entertainment centers grew wider to accommodate the functional needs of large screen televisions and other electronic equipment, the exterior wall started to suffer from a lack of windows. By moving this entertainment feature inside the room, creating a media/focus wall, the exterior wall was given better opportunity for greater fenestration. With the use of direct vent fireplaces, designers were able to open up areas above the fireplaces for recesses and even fixed glass. The use of arches, sculpted drywall, niches, shelves, columns and overhangs has produced a myriad of design solutions for the original fireplace front. The pictures from BSB's files from the late 80's to the mid 90's show a wealth of solutions for fireplace, storage and entertainment walls. BSB used the concept of integrated fireplaces and entertainment centers with articulated drywall openings before it appeared in any Rottlund design.

My office has used this combination of fireplace and entertainment center since the late 1980's for clients such as Kimball Hill at Fielding Place in Barrington, IL and Fisher Farms in Geneva, IL as well as for many other of our residential clients such as Wiseman-Hughes Enterprises, Lakewood Homes and Terrestris Development Company.

## Conclusions

Based on my observations and experience in the residential marketplace, all major builders in the Chicago area, and in many other markets, are using some form of fireplace/media center. These designs are integrated with the fireplace fronts as a designed

element. The gestalt of all of these design solutions are very similar. The particular fireplace/media designs for both Rottlund's and BSB's plans are in fact similar, but they are a common design solution for the residential marketplace and a design feature that BSB has been using since the 1980's.

## Rottlund's Fourth Amended Complaint

Paragraph 63 of the Fourth Amended Complaint lists 66 items that Rottlund contends infringe on their copyrighted Villa II. These items generally fall into three categories:

1. Interior or exterior spaces that Rottlund claims infringe upon the placement, layout and proportions of Rottlund's Villa II. These spaces or areas include: Loft, garage, living, dining, stair, kitchen, patio, powder room, master bedroom, master bath and second bedroom.
2. Exterior elevation features that Rottlund claims infringe upon the placement and layout of Rottlund's Villa II. These features include: gabled side entries, placement of windows, and roof configuration.
3. Features that Rottlund claims infringe upon the placement, layout and features of Rottlund's Villa II. These features include: fireplaces and surrounding details, detailing of railings and moldings, pantry, peninsula breakfast bar, bathtubs, vanity sinks, and toilets.

### Interior Townhouse Unit

### First Floor

The physical layout of the living, dining, kitchen, garage and utility spaces is virtually the same in the Rottlund and BSB plans, as well as in most other back to back townhouse plans, as a rational design solution. The room sizes are similar with the exception of the kitchens, which are substantially different. The gestalt of the overall space is completely different. The stair in the Rottlund unit is at the rear wall of the living/dining area

while the BSB stair is located at the rear of the garage. The kitchens will also visually read differently as the Rottlund kitchen is more square with no open area for a breakfast area. The BSB kitchen is narrower, has a corner sink and a defined breakfast area. Additionally, the BSB unit has a pantry, which the Rottlund plan does not. The biggest difference, however, is that the standard BSB plan has a 2 story volume in the living area with a loft overlooking the open living area. This will totally change the gestalt of the unit. Even when this space is filled in as an optional second floor plan, the gestalt will remain dissimilar due to the placement of the stair, the kitchen/breakfast proportion and arrangement and the sense of entry created in the BSB plan. The entry difference occurs in the BSB unit as a small bump out at the front door adjacent to an entry closet while the Rottlund plan merely enters the unit with a door in the front wall onto a small vinyl flooring area. The garages are in the same location in both plans as a functional area with access to the kitchen or breakfast area; a functional design arrangement used in thousands of home designs. BSB's plan layout is similar to previous projects they have designed including Hansen & Horn, Jerry's Homes, Midland and others.

<u>Second Floor</u>

The second floor plans of both units have bedrooms, baths, closets and an open space. The floor plans are not similar except for the room count. The Rottlund plan has the stair against a common rear wall with an internal exercise area next to the stair. Circulation occurs through this exercise area to the bedrooms and bath with the washer/dryer located in a closet off the open space. The bedrooms align at the front wall of the plan in order to provide windows. The main bath and optional baths are to the rear in a functional location. The BSB plan differs because the stair location in the center of the plan allows for circulation through a hallway to bedrooms and open space (loft). An enclosed washer/dryer room is located off this hall and the main bath is located at the rear in a functional location. The gestalt of these

spaces is totally different. The creation of the hall will develop a different perception of the spaces. The proportions of the rooms are different as well. Rottlund's master bedroom is wider than it is deep, while the BSB master bedroom is deeper than it is wide. The loft space in the BSB plan overlooks the living area and will create a sense of drama that is absent in the Rottlund unit. The BSB plan has alternate second floor plans, which fill in the 2-story volume and provide additional bedroom area (3rd bedroom), dual master bedrooms or super master bedrooms. Both Rottlund and BSB offer optional bathroom configurations and alternate secondary baths in standard configurations that I have seen numerous times. But even here, there are subtle differences which will change the gestalt. Rottlund's 2 bath scheme uses a standard 3 fixture bath for both the master and hall bath while BSB 2 bath scheme uses a 3 fixture layout for the hall bath but offers 5 fixtures as an option for the master bath.

Exterior Elevations

The main roof massing with a front to back pitch is similar if not the same for both interior units and represents an efficient and cost effective way to provide shelter. This roof form has been used in almost every townhouse configuration with a pitched roof. While the units are very similar in width, the two facades are quite different. Rottlund uses a small gable over a bedroom window to break up the mass of the main front to back roof with some accent siding. They stack double windows at the living room and second bedroom framed with shutters. BSB actually projects the front wall of the master bedroom at different dimensions to articulate the façade, provide a transition for alternate use of featured siding, and develop a double gable roof which enhances the massing of the interior units. Another difference is the extension of the shed roof at the garage to cover the entry on BSB's building, while Rottlund's design uses two different shed roofs which does not extend the sight line as well as the BSB solution. The materials on both buildings is the same with the

use of vinyl siding, both horizontal and featured; shutters, trim, and either brick or stone accents. These materials are standards in the homebuilding industry and are present in almost every production housing development done today.

## Features

The features in both plans are standard in the residential marketplace and are very common. To base a copyright infringement claim on a railing design or a double vanity bowl seems extremely far fetched. The raised breakfast bar shown in both plans is another common feature that has had widespread use in housing design. The complaint mentions infringement on a pantry design, including the number of shelves. This is a closet. A small closet for storing foodstuff. As a point of fact, Rottlund's interior plan does not show a pantry closet. As for the fireplaces, both plans call for a pre-fab fireplace which is open on 3 sides and has a shelf above the chamber and some tile or marble trim around the opening. BSB's design is a little more stylized with the shelf portion being stepped while Rottlund's version is flat. Once again, these designs are typical of pre-fab fireplace designs designed by residential architects and by BSB prior to Rottlund's design for Villa II.

## Conclusions

The interior townhouses for both Rottlund and BSB are dissimilar in many significant respects. While the first floors are similar in functional layout, their gestalt will be completely different due to the stair location, spatial feeling, and differences in circulation and second floor layouts. In both the Rottlund and BSB plans, the functional layout of the spaces is a standard layout for back to back townhouse designs.

**Exterior Townhouse Unit**

**First Floor**

The physical layout of the living, dining, kitchen, garage and service areas is virtually the same in the Rottlund and BSB plans, and other back to back townhouse plans, as a rational design solution. The room sizes are similar with the exception of the kitchens, which are different. Rottlund's kitchen is more of a square shape with an optional island and no defined breakfast area, while BSB's kitchen is narrower with a defined breakfast area at the back of the kitchen adjacent to the utility area. The garage space in the Rottlund unit has the stair penetrating the space at the rear with a low sloping ceiling that will make walking by this area impossible if a car is parked on that side of the garage, and very difficult if there is no car, due to the severely reduced headroom. The Rottlund garage is approximately 17 feet wide which is not a functional dimension for a 2-car garage and the circulation required to move around the cars. BSB's garage is about 19 feet wide which is still tight but usable. The original FHA minimum property standards indicated the minimum width of a 2-car garage at 18'-4". Comments regarding the kitchen layouts are similar to the interior unit. The difference is that the Rottlund unit now has a pantry closet in the kitchen area, but this is in a different location and different size than the BSB unit. The gestalt of these spaces will be similar with the exception of the kitchens and garages. The access points for ingress and egress from the exterior (front door), garage access, and sliding door to the patio are in similar locations and relate to the function of the spaces. These arrangements are commonplace and are in the same locations in many back to back townhouse designs. BSB's floor plan is similar to the floor plan done for Good Value Homes which was built before Rottlund's Villa II product.

Second Floor

The standard 2nd floor plans each have 2 bedrooms, a loft area and a shared bath. The Rottlund unit chose to locate the master bedroom with a side orientation while the BSB unit located the master with a front orientation. Both units access the bath from the hall and through a dressing area. The Rottlund unit has 5 fixtures while the BSB unit has 3 standard with 4 as an option. Both plans offer upgrades for 2 baths, but BSB's plan has an option for a double bowl vanity while Rottlund's does not. The only major difference in these plans is that BSB has a laundry room while Rottlund has the washer/dryer in a closet. The gestalt of this standard plan is similar with regards to layout and circulation. The differences become more pronounced in the optional 2nd floor layouts. BSB chose to offer alternate plan functions including a 3-bedroom scheme by using the loft space as a bedroom. Moving on from there, BSB produced 4 additional schemes which generated a dual master plan, a super master plan, a 3BR with loft plan and a 3 BR plan with master sitting area. Rottlund chose not to offer these options. BSB recognized the need in the marketplace to offer different plans to better meet the needs of the homebuyer with different lifestyles. The gestalt of these 2nd floor options is totally different from the Rottlund solution because Rottlund did not offer them.

Exterior Elevations

Both end units use a turned gable to provide a roof form. This roof form is in common usage for townhouse buildings and BSB has used this design on other townhouse projects. As an architectural design feature, it creates a visual ending for the building and brings the end wall mass down, creating a lower end wall condition. The front massing of the façade is different as the Rottlund plan uses a cantilevered floor over the garage to create a double gable effect, while BSB created a triple gable by variating the front wall into three planes. BSB also held the front 2nd floor wall back to provide a short shed roof at the garage,

a technique that helps to lower the 2 story massing. The fenestration of the front façade is completely different between Rottlund and BSB. The use of triple windows in the master and living area by BSB indicate their concern for providing light in these spaces and creating a visual pattern by using different window configurations. Rottlund used a combination of single and double windows to create a less sophisticated pattern. The use of window grids also varies, with Rottlund using a 6 over 6 pattern while BSB chose a 6 over zero pattern. The side or entry elevations have very similar massings generated by the roof forms. The entries provide shelter by means of gabled roof forms supported by columns. Rottlund's columns have stone bases with sloping wood columns rising to the eaves in a craftsman/bungalow type design that recalls many turn of the century designs from California to the East Coast. BSB chose to use straight built-up wood columns, which have been used in many of BSB designs. The gable roof entry design has been used extensively in residential housing to add stature to the entry and lead the eye to the entry. This common gabled roof design has been extensively used to create a sense of visual entry. General size and location of the windows is very similar in both side facades with the subtle difference of the window grids and Rottlund's use of an additional window over the front door. The use of materials is the same with the exception of Rottlund's use of stone as a wainscot and BSB's omission of masonry on the side façade.

<u>Features</u>

Most of the features in both plans have the same similarities and commonalities found in residential design. The fireplace options have the most similar features and locations in the plans. The use of a built-in space adjacent to the fireplace or over it has had great popularity with homebuyers and many different types of usage and design have been shown in model homes. BSB has been an innovator in this type of interior architectural design for many years and the use of fireplace fronts, built-ins, materials and arched recesses

have been well used by BSB and others to describe this focal point. BSB's designs predate designs done by Rottlund.

## Conclusions

The gestalt of Rottlund's and BSB's exterior unit are similar. In reviewing the available facts, it is my opinion that the BSB plans were developed using a rational, logical design process which took into account the program criteria, client direction and landplan constraints to design these back to back townhouses. With their many years of experience, BSB knew the problems and advantages of the back to back product. The Homestead Collection is only the latest in a long series of design work which BSB has been pursuing since the early 1980's. It is also my opinion that BSB's Homestead Collection is no closer in gestalt to Rottlund's Villa II than it is to other designs in the marketplace, including Oak Creek Builders and Good Value Homes in Champlin, Minnesota. If all these designs were placed next to each other, the gestalt of all of them will be similar.

## Ethics

I have been aware of the Bloodgood organization for over 20 years. BSB's designs and philosophy have been widely published in trade publications such as Professional Builder, Builder, and Multi-Family News. BSB has been a major force in the residential design industry for over 35 years. Its portfolio of designs traverses the country from major metropolitan centers to small towns. It has high exposure to builders and other industry professionals because of its publications, seminars, and presence at national homebuilder events, including the NAHB Builder's Show and the Midwest Builder's Show. It has been an innovator in residential design by developing new concepts in both single and multi-family housing. Its treatment of all aspects of design from floor planning to the use of volume space and exterior elevation treatments are done with a high degree of skill and sensitivity. BSB's volume of work has received high praise in the industry, winning many design awards in both

local and national venues. It also receives high praise from its clients, and BSB designs traditionally have been well received by the homebuying public. I have worked with Doug Buster on projects involving mutual clients and have found him to be a person with high professional skill and integrity. I know that Doug carries his integrity, both personally and professionally, to his company and instills these traits to all the professionals on his staff. With the depth of their experience, and the knowledge they possess regarding residential design, BSB has no need to copy another's work.

## Conclusions

1. BSB has designed back to back townhouses since the early 1980's, including projects with sloped volume living rooms and 2 story volumes with loft overlooks.

2. BSB has been a leader and industry force in all forms of residential projects, including multi-family and back to back townhouses.

3. BSB designs have been widely published in professional trade magazines and used in seminar discussions at home builder events, including two seminars in the Minneapolis area and the NAHB Builder's Show.

4. BSB followed a logical progression for the design program for Town & Country in Minnesota for back to back townhouses, including:

    A. Toured competing product in the Minnesota market with client to review existing projects;
    B. Description of Scope of Services for product criteria;
    C. Production of design drawings illustrating graphic solutions to the project criteria for plans and elevations;
    D. Communication with Town & Country, both by writing and graphics, to revise initial design concepts to reach a mutually agreeable design solution;
    E. Spent over 120 hours in design services to reach this solution over a period of three months;
    F. Provided design development and working drawing documents to further enhance the design drawings; and
    G. Made further design revisions to the working drawings to refine the product.

5. BSB has acted with the requisite standard of care in their services with Town & Country by providing design and working drawing services for this project as would other architects in the Minnesota area providing similar services.

6. BSB provided a design solution for back to back townhouses based on a defined set of program criteria, using their vast experience in the residential design field, and working with their client independently and without copying Rottlund's design.

7. BSB independently created the Homestead Collection from design concepts that they had worked with for over 20 years. These floor plan and elevation concepts were all developed prior to Rottlund's Villa product.

This opinion submitted by:

Albert H. Bloom, AIA
BLOOM & FIORINO Architects, Inc.
1110 Jorie Blvd., Suite 300
Oak Brook, IL 60523

Albert H. Bloom, AIA
Date: August 15, 2003

# APPENDIX A

## CIRICCULUM VITAE

**Albert H. Bloom, AIA**

**BLOOM AND FIORINO ARCHITECTS, INC., Oak Brook, Illinois**

**1989-Present**
**Position:** President
**Responsibilities:** Client Marketing
Conceptual Design
Project Management
Expert Witness Testimony

Founded in March 1989 by Albert H. Bloom, Michael S. Fiorino and Margie Arito, Bloom and Fiorino Architects, Inc. specializes in architectural design for the residential and light commercial construction industry. We are performing various services for many of the major Chicago area builders as well as other midwest builders.

**BALSAMO/OLSON GROUP, INC., Oakbrook Terrace, Illinois**

**1981-1989**
**Position:** Executive Vice President
Director of Residential Architecture

**Responsibilities:** Client Marketing
Business Management
Conceptual Design

Works included Concept House IV, numerous mixed-use developments (Lake Arlington Towne, Haverford, Cobblers Crossing, and Lincoln Meadows). Design of over 2,000 apartment units in 2-, 3- and 6 story buildings. Tripling of firm's volume of business and profit.

**JOHNSTON ASSOCIATES, Park Ridge, Illinois**

**1974-1981**
**Position:** Office Manager
Chief Architect
**Responsibilities:** Project Management
Business Management
Design
Production

Works included numerous single family and townhouse developments for various builders/developers such as U.S. Home, Town & Country Homes and Lexington Development Corporation. Starting and developing a new company.

**BERKUS GROUP, Rosemont, Illinois**

**1972 – 1974**
**Position:** Office Manager
Project Architect
**Responsibilities:** Project Management
Business Management
Production

Works included multi-use projects, single family and townhouse developments throughout the Midwest for this nationally known architectural firm.

**DUBIN, DUBIN, BLACK & MOUTOUSSAMY, Chicago, Illinois**

**1970-1972**
**Position:** Draftsman
Job Captain
**Responsibilities:** Production
Job Budgeting and Scheduling

Works included mid-rise and high-rise residential buildings done for FHA and IHDA and various other small commercial work.

## EDUCATION

University of Arizona, Bachelor of Architecture, 1970
Northwestern University, Graduate Business Courses 1971-1972

## LICENSES

Licensed Architect: Illinois 1974
Florida 1981
Colorado 1982
Michigan 1986
Minnesota 1994
Ohio 1999

## PROFESSIONAL AFFILIATIONS/ACTIVITIES

National Council Architectural Registration boards

American Institute of Architects – Chicago Chapter

National Association of Home Builders

Home Builders Association of Illinois

Home Builders Association of Greater Chicago – 1981 – Present

- Court of Honor Recipient 2002
- Co-Chairman of HBAGC Key Awards Committee for Design Excellence 1985, 1986, 1987, 1988 and 1994
    - Associate of the Year Award 1986, 1987, 1988
    - Member of Executive Committee 1989, 1990, 1993, 1994, 2001, 2002
    - Member of Tech and Codes Committee 1992, 1993, 1994, 1995, 2000
    - Chairman of Tech and Codes Committee 1996
    - Life Director
    - Treasurer 1993
    - Co-Chairman of Governmental Affairs 2001
    - Board of Directors – Southwest Chapter – 2002
    - Chairman of Business Management Committee – 1992

## AWARDS AND PROFESSIONAL RECOGNITION

- Recipient of over 20 awards for residential design excellence for work in Illinois, Florida, Michigan and Colorado

- Designer of Concept House IV for the Chicagoland Housing Foundation with national recognition in 1986

- Speaker on residential design at the National Convention of Home Builders, Atlanta, Georgia 1988

- Instructor of Building Technology for the Graduate Builder's Institute 1987

- Recipient of "Best in American Living Award" 1991

- Builder's Choice Design Award 1996

- Member of Habitat for Humanity design team for Westmont, Illinois duplex design

- Member of Community Housing Association of DuPage for Glen Ellyn townhouse design

## PUBLICATIONS FOR THE PAST 10 YEARS

Approximately 12 articles written for the Home Builder's Association of Chicago's periodical Building America's Dream in 1996 regarding tech and code issues such as building code revisions, stair geometry, sprinklers, and other technical issues.

## COMPENSATION

My current billing rate for this matter is $225.00 per hour.

**TRIAL TESTIMONY AND/OR DEPOSITIONS IN THE PAST 4 YEARS**

A. I am currently engaged as an expert witness in two slip and fall cases
   1. Grehl v. Insignia
   2. Riesenfeld v. Chicago Zoological Society

   At this time I have not offered a written opinion or been involved with a deposition.

B. I was subpoenaed to give trial testimony in Schuster v. Mitco et. al. in November 2001.

# FILED UNDER SEAL

Exhibits R48 – R51

Exhibit R52

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

---

The Rottlund Company, Inc.
d/b/a Rottlund Homes, a Minnesota
Corporation,

Plaintiff,

vs.

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc.,
a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

---

Volume I

Deposition of

Albert H. Bloom, A.I.A.

Wednesday, June 9, 2004

8:09 a.m.

Q. What documents did you look at in coming up with that opinion?

A. I looked at the plans that were provided for the Homestead Collection, and I looked at the New Villa II plans that Rottlund or Tim Whitten had prepared. I also reviewed files that were provided from BSB regarding the procedure and the timeline of the design process that they went through with Town & Country.

Q. So you were asked to examine the plans to determine whether or not there was copying? That was one of the materials you were asked to review?

A. Yes.

Q. Did anyone ask you to examine whether or not there was similarity of ideas between the Villa II and the Homestead Collection?

A. Yes.

Q. Are there similarity of ideas between the Villa II and the Homestead Collection?

A. Yes.

Q. When you say there are similarity of ideas between the Villa II and the Homestead Collection, what do you mean?

A. They're very similar in concept. They're both back-to-back townhouse products. They have end units or exterior units. They also have interior units. They're

slab-on-grade construction. They're two-car garages. They have similar scope as far as the room counts go in living, dining, kitchen, bedrooming, loft spaces, and there's a similarity as far as the gross mass of the building size.

Q. Were you also asked to examine whether or not there was similarity of expression between the Villa II and the Homestead Collection?

A. I don't know what you mean by "expression."

Q. As expressed on these plans that you looked at, were you asked to examine how the Homestead Collection was expressed on the plans that you looked at versus how the Villa II was expressed on the plans that you looked at?

A. No.

Q. You have no opinion as to whether or not the expression of the Villa II and the expression of the Homestead Collection are similar; is that correct?

A. That's correct.

Q. How do you explain the difference between examining similarity of ideas and examining similarity of expression?

A. I don't know what you mean by "expression."

Q. So, in your opinion, your entire report relates to similarity of ideas?

Exhibit R53

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

---

The Rottlund Company, Inc.
d/b/a Rottlund Homes, a Minnesota
Corporation,

Plaintiff,

vs.

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc.,
a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

---

Deposition of
Jeffrey A. Scherer, FAIA
Wednesday, June 30, 2004
9:06 a.m.

Q. Sure. Do you have Exhibit 423 in front of you?
A. Right.
Q. There's a page number, and it says 31 of 33.
A. Right.
Q. Could you turn to the page immediately preceding that with no page number on it?
A. Right. Okay.
Q. Do you see where there's a "Conclusion" section?
A. Correct.
Q. You're talking about the Town & Country Homestead versus the Villa II, correct?
A. Correct.
Q. And you agree that the products have obvious superficial similarities, correct?
A. I agreed with the statement of Mr. Desnick, that the two products are obviously similar, yes.
Q. And then you state, "The questions before us are whether Defendants' units are substantially similar to Rottlund's design, and whether Rottlund's design is an original one." Correct?
A. That's correct.
Q. Is Rottlund's design an original one, as you used the terms on page 30 of your report?
MR. SCHWIEBERT: Objection, asked and answered.

Country reveal that they're not substantially similar.

BY MR. KRUMMEN:

Q. Were you asked to look at what the general ideas are in terms of the Villa II?

MR. FARMER: Again, objection, vague, unless you define the term.

MR. SCHWIEBERT: It's beyond the scope.

A. I was asked to look at the objective details of the design ideas.

BY MR. KRUMMEN:

Q. You were not asked to look at the general ideas themselves between the Villa II and Homestead Collection, correct?

MR. FARMER: Objection, form. What do you mean by "general ideas"?

A. I was specifically asked to look at the objective details of the design ideas.

BY MR. KRUMMEN:

Q. Is the Villa II a residential product?

A. I believe that Villa II is designed and marketed for residential use.

Q. Is the Homestead Collection a residential product?

A. I believe that the Homestead Collection is designed and marketed for residential use.

Q. Is the Chateau Collection a residential product?

A. I believe the Chateau Collection is designed and marketed for residential use.

Q. Is the Villa II a multifamily product?

MR. PATRICK: Objection, vague. Whose definition of multifamily? City? State? Builder?

A. The Villa II product, as I was asked to look at it, contains units which have living rooms, dining rooms, and kitchens and bedrooms as one legal bounded entity by party walls. And in the case of the Villa II that I was asked to look at, there are eight of those individual units together. If eight would serve to be a definition of multifamily, then I would characterize the Villa II as a building that would house multiple families.

BY MR. KRUMMEN:

Q. Is the Homestead Collection a multifamily product?

MR. PATRICK: Same objection.

A. The Homestead Collection has individual units that contain garages, kitchens, dining rooms and living rooms and bedrooms, and those individual units are assembled together, as in this case eight units. And I think that the assemblage of more than one residential unit owned by different people next to each other would

be -- could be characterized as a building that has multiple families within it.

BY MR. KRUMMEN:

Q. Is the Chateau Collection a multifamily product?

MR. PATRICK: Same objection.

A. I would answer that the Chateau Collection is a -- is a building that contains multiple housing units.

BY MR. KRUMMEN:

Q. Is it a multifamily product?

MR. PATRICK: Same objection.

MR. SCHWIEBERT: Asked and answered.

A. I believe whenever a builder or an architect chooses to gain together more than one individual unit and market those assemblage of units to more than one family, that the common definition to the marketplace would be that they are multifamily.

BY MR. KRUMMEN:

Q. You wrote in your report that the Villa II was a townhome, correct?

A. The Villa II is self-characterized as a townhome.

Q. You wrote in your report the Homestead Collection is a townhome, correct?

A. The Rottlund Company and Town & Country both refer to their products as townhomes, and I took their individual definitions at face value.

Q. And in your second report, which you characterized the Supplemental Expert Report, which is Exhibit 424, you referred to the Chateau Collection as a townhome, correct?

A. I believe that Town & Country chose to designate Chateau Collection as a townhome.

Q. Is the Villa II a back-to-back product?

MR. FARMER: Objection to form, vague.

A. The Villa II and the Town & Country product both, as I said earlier, assemble individual living units together side by side and back to back with common party walls.

BY MR. KRUMMEN:

Q. Is the Homestead Collection a back-to-back product?

A. The Town & Country home --

MR. FARMER: Objection, form, vague.

A. The Town & Country company, at least in my objective analysis of it, have decided that they can assemble their individual living units together side by side and back to back.

BY MR. KRUMMEN:

Q. Is the Chateau Collection a back-to-back product?

MR. FARMER: Same objection.

A. I believe that Chateau Collection relies on the

same technique of assembling their living units side by side and back to back.

BY MR. KRUMMEN:

Q. Is the Villa II a slab-on-grade product?

MR. SCHWIEBERT: Objection, relevance, beyond the scope.

A. The Villa II product, Rottlund Company appears to have chosen not to build a residential unit with the basement, and therefore in this case, it -- the logical way in which that residential unit is structured is to place the first floor directly on the ground.

BY MR. KRUMMEN:

Q. Is the Homestead Collection a slab-on-grade product?

A. The Homestead Collection, as developed by Town & Country, includes the placement of the first floor, structural floor slab directly on the ground.

Q. Is the Chateau Collection a slab-on-grade product?

A. The Chateau Collection relies on the conventional technique of placing the ground floor slab directly on the ground.

Q. Is the Villa II a two-story product?

A. Rottlund Company, in the plans that I analyzed, relied on placing the bedrooms on the second floor

immediately above the dining, living room, kitchen and garage.

Q. Is the Homestead Collection a two-story product?

A. The Homestead Collection relied on placing the bedrooms on the second floor.

Q. Is the Chateau Collection a two-story product?

A. The Chateau Collection relied on placing the sleeping quarters on the second floor.

Q. Does the Villa II have an attached garage?

A. The Villa II has a garage that is connected to the unit by -- by a common wall with the living area, and if the connection by a common wall is accepted as a definition of attached, then it is attached.

Q. Is the Homestead Collection an attached garage product?

A. The Homestead Collection relies on the common design idea of abutting a garage to a common wall with a living area in order for -- as was done at the Rottlund project, an individual to move directly from the garage into the house, and by having a common wall with a living room and the living quarters, then that garage could be characterized as attached.

Q. Is the Chateau Collection an attached garage product?

A. The Chateau Collection relies on a conventional

design idea of being able to park your car within a structure that allows for the occupant of that car to go through a common wall into the kitchen, breakfast area, and by using a common wall, I believe in that case also you could characterize that as attached.

Q. Is there more than one way to build a residential multifamily back-to-back, slab-on-grade, two-story multifamily townhome with an attached garage?

MR. FARMER: Objection, beyond the scope of his report.

MR. PATRICK: Also irrelevant.

A. The task set before me was to objectively look at the details of the design ideas of the Villa II product and the Town & Country product and to determine whether or not those two products were substantially similar. I was not asked to broaden the scope of my comparison to speculate on whether or not there were other ways in which that could be done.

BY MR. KRUMMEN:

Q. How many libraries have you designed in your career?

A. I believe my curriculum vitae, which is attached to my expert report, lists all of my -- all of my experience at the date that this expert report was submitted.