**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**Civil No. 01-1980 (DSD/SRN)**

**The Rottlund Company, Inc.**
**d/b/a/ Rottlund Homes, a Minnesota Corporation**

**Plaintiff,**

**v.**

**Pinnacle Corporation**
**d/b/a/ Town & Country Homes,**
**an Illinois Corporation, and**
**Town & Country Homes, Inc.,**
**a Minnesota Corporation, Bloodgood Sharp Buster Architects and Planners of Iowa, Inc., an Iowa Corporation, and The Bloodgood Group, Inc., an Iowa Corporation,**

**Defendants,**

**and**

**Town & Country Homes, Inc.,**
**a Minnesota Corporation,**

**Third-Party Plaintiff,**

**v.**

**Bloodgood Sharp Buster**
**Architects & Planners of Iowa, Inc.,**
**an Iowa Corporation**

**Third-Party Defendant.**

**<u>REPORT AND RECOMMENDATION</u>**

Craig S. Krummen, Esq., and David Davenport, Esq., on behalf of Plaintiff

Darren B. Schwiebert, Esq., on behalf of Defendant Town & Country Homes, Inc.

Christopher Murdoch, Esq., on behalf of Defendant Pinnacle Corp.

Holly J. Newman, Esq., on behalf of Defendant Bloodgood Sharp Buster and The Bloodgood Group, Inc.

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-entitled matter came before the undersigned United States Magistrate Judge on Defendants' Motion for Summary Judgment and Partial Summary Judgment Against Plaintiff on Damages (Doc. No. 491). This matter has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

Defendants Town & Country Homes ("TCM") and Bloodgood Sharp Buster Architects and the Bloodgood Group ("the Bloodgood Defendants") move for partial summary judgment on issues related to Plaintiff's damages claims. The Bloodgood Defendants move for summary judgment that, as a matter of law: (1) Plaintiff has not produced evidence showing it is entitled to recover actual damages for alleged infringement under 17 U.S.C. § 504(b); (2) if Plaintiff is able to recover actual damages, it should not be entitled to recover "duplicative infringer's profit damages;" (3) Plaintiff's actual damages are no more than $410.75 per Homestead Collection unit; (4) any recovery by Plaintiff of alleged infringer's profit damages against the Bloodgood Defendants is subject to a reduction in the amount of not less than $46,776 in deductible expenses; (5) Plaintiff is not entitled to recover infringer's profits or actual damages relating to products other than the allegedly infringing products; and (6) Plaintiff is not

entitled to money damages for its claims under the Minnesota Uniform Deceptive Trade Practices Act.

Defendant TCM seeks summary judgment that, as a matter of law: (1) Plaintiff is not entitled to statutory damages because the allegedly infringing townhomes, the Homestead Collection and Washington Square townhomes, were "commenced" before Plaintiff's copyright registrations; (2) Plaintiff is not entitled to damages for willful infringement under 17 U.S.C. § 504(c)(2) because it failed to provide written notice to Defendant TCM; (3) if Plaintiff is entitled to statutory damages, such damages are limited to $90,000; (4) Plaintiff has failed to provide evidence to satisfy the "but for" test for its actual damages claim; (5) Plaintiff has failed to establish its indirect actual damages claim; (6) Plaintiff has failed to establish its "value of use" or reasonable royalty claim against Defendant Pinnacle; (7) Plaintiff has failed to establish its claim for profits on unsold townhomes; (8) Defendants TCM and Pinnacle are entitled to a reduction of damages for elements of profit attributable to factors other than the copyrighted work; and (9) Plaintiff has failed to establish Defendant's indirect profits on non-infringing products.

## I. BACKGROUND

In light of prior reports and recommendations addressing earlier summary judgment motions which provide detailed factual backgrounds, the Court incorporates those prior factual recitations by reference, and merely describes herein the facts directly relevant to the specific issues raised in this Report & Recommendation.

In its damages report, Plaintiff's expert, Melissa Snelson, concluded that Plaintiff's actual damages for all home products sold by TCM in the eight developments at issue is approximately $51,700,000. (Krummen Aff., Ex. R65 at 6.) She determined lost profits on the allegedly infringing

town homes built and/or planned by Defendants of $21,400,000; lost licensing fees in the Washington Square development of $6,300,000; and lost profits on additional (non-infringing) home products of approximately $24,000,000. Id. at 4.

Ms. Snelson concluded that as to damages for infringer's profits, the total revenues earned or reasonably expected to be earned by TCM in the eight developments is approximately $353,900,000. (Id. at 9.)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A dispute about a material fact, one that may affect the outcome under the governing law, is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

A moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and it must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). All evidence will be viewed in the light most favorable to the nonmoving party. E.g., Liberty Lobby, 477 U.S. at 255.

## III. DISCUSSION

The remedies for infringement under the Copyright Act provide:

> (a) In General. – Except as otherwise provided by this title, an infringer of copyright is liable for either –
>
> (1) the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or
>
> (2) statutory damages, as provided by subsection (c).

17 U.S.C. § 504(a). Thus, given the clear language of the statute, a copyright infringer is liable for either actual damages and profits or statutory damages. The Court addresses each below.

**A. Statutory Damages**

The Copyright Act provides for an award of statutory damages:

> (c) Statutory Damages. –
>
> (1) Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just. For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work.
>
> (2) In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200. The court shall remit statutory damages in any case where an infringer believed and had reasonable grounds for believing that his or her use of the copyrighted work was a fair use under section 107. . . .

17 U.S.C. § 504(c). The copyright owner may, at his or her discretion, elect to recover statutory

damages instead of actual damages and profits. Melvin B. Nimmer & David Nimmer, Nimmer on Copyright, § 14.01[b] at 14-6 (2004). "Such election may be made at any time before final judgment is rendered." Id.

However, 17 U.S.C. § 412(1) provides that "no award of statutory damages or of attorney's fees, as provided in sections 504 and 505, shall be made ... [if] infringement of copyright in an unpublished work commenced before the effective date of its registration." 17 U.S.C. § 412(1); see also Johnson v. Jones, 149 F.3d 494, 505 (6th Cir. 1998). The Johnson court noted that this provision of the statute ensures that an infringer of an unpublished work will be subject to the punitive effects of §§ 504(c) and 505 only if the infringer had constructive notice that the work was protected by a valid copyright. Id. Constructive notice of a valid copyright is presumed upon registration and "every court to consider this question has come to the same conclusion; namely, that infringement 'commences' for the purposes of § 412 when the first act in a series of acts constituting continuing infringement occurs." Id. at 505-506.

Defendant TCM contends that the Homestead Collection and Washington Square townhomes were "commenced" before Plaintiff's registration of its copyrights, therefore, statutory damages are unavailable. (TCM's Mem. in Supp. Summ. J. at 8.) Furthermore, TCM argues that Rottlund cannot recover damages for "willful infringement" because Rottlund failed to provide TCM with written notice of alleged infringement. Id. at 10. Finally, TCM argues that even if statutory damages are available to Plaintiff, such damages are limited to $90,000. Id. at 11.

**1. Registration of Copyrights**

Plaintiff registered its copyrights in the Original Villa, New Villa and Villa II technical drawings.

This case involves alleged violations of three copyrights: the Villa II technical drawings (registration number VAu 447-395); the Villa II architectural works (VAu 534-723); and The Reserve technical drawings (VAu 547-285). (Seventh Am. Complaint at ¶¶ 17-20.) Plaintiff applied for a certificate of registration for the Original Villa works of authorship in August, 1989 (Seventh Am. Complaint, ¶ 13) and in October, 1993 (id. ¶ 10), both of which resulted in the issuance of certificates of registration. In October 1993, Plaintiff also applied for, and later received, a certificate of registration for the New Villa works of authorship, which it claims were related to the Original Villa product. Id., ¶¶ 15-16. In June 1999, Plaintiff applied for a certificate of registration for its Villa II design plans. Id. at ¶ 18. Plaintiff contends that this product was related to its Original Villa and New Villa products. Id. at ¶ 17. The certificate of registration was issued on June 22, 1999. Id. at ¶ 18. In January 2002, Plaintiff applied to register the Villa II works of authorship constructed pursuant to the technical drawing as an architectural work under 17 U.S.C. § 102(a)(8), and the certificate of registration was issued on January 7, 2002. Id. at ¶ 19. Finally, Plaintiff's Villa II designs in The Reserve development were issued copyright registration on February 19, 2002, conferring copyright protection for the architectural designs to Plaintiff. Id. at ¶ 20. Plaintiff contends that, as the owner of the original material protected by both the Original Villa and New Villa copyrights, any derivative works, such as the Villa II, carry forward all preexisting copyrights in the original work. Id. at ¶¶ 21-26; see also Pl.'s Mem. in Opp. at 62.

**2. "Commencement" of Infringement**

Defendant TCM contends that BSB began its schematic design of the Homestead Collection on April 6, 1998. (Schwiebert Aff., Ex. E.) By the end of July, 1998, BSB had completed the schematic

design, Defendant TCM alleges, and proceeded to the design, development and construction document phases of the project. (Id., Ex. F.) In addition, Defendant TCM notes that each subsequent Homestead Collection project resulted from a "jurisdictional transfer" of the original work, rather than a new, from-scratch architectural design. (Id. , Ex. G and Ex. H at 11-13.)

"[C]ourts have found that the first steps of architectural infringement, including tracing architectural floor plans and re-labeling architectural drawings, commence the infringing conduct and not the completion of construction plans . . . ." Cornerstone Home Builders, Inc. v. McAllister, 311 F.Supp.2d 1351, 1352 (M.D. Fla. 2004).

The issue before this Court then is whether, as a matter of law, Defendant's alleged acts of infringement "commenced" prior to Plaintiff's applicable copyright registration. First, the parties dispute whether Plaintiff's copyrights at issue have "carried forward" Plaintiff's original registrations, which date back to 1993. Plaintiff points to the testimony of its fact and Rule 30(b)(6) witnesses, who testified that its registered New Villa technical drawings are substantially similar to Rottlund's next generation Villa II technical drawings. (Krummen Aff., Ex. R20 at 42; Ex. R16 at 139.) Genuine issues of material fact, therefore, exist which preclude this Court from finding, as a matter of law, that Plaintiff's Villa II copyrights do not carry forward or are not substantially similar to the subject of the original copyright registrations.

As to the issue of when the alleged infringement "commenced," numerous fact issues also exist. Merely by way of example, Plaintiff argues that in 1994, after Plaintiff registered its New Villa designs with the Copyright Office, BSB architect Larry Moore signed a contract with Design Development, Inc., instructing them to produce construction drawings "similar to the Rottlund Homes plans you

provided in our meeting." (Krummen Aff., Ex. R22.) Mr. Moore testified that he may have cut and pasted together Plaintiff's floor plans and given such a document to Design Development. (Id., Ex. R23 at 220, Ex. R24.) Plaintiff directs the Court to compare Plaintiff's floor plans produced from Design Development's files (id., Ex.R25 at DDI000021-22) with the "cut and paste" document (id., Ex.24), showing that someone cut off Plaintiff's copyright notice and logo, and assembled the "cut and paste" document using the floor plans in Plaintiff's marketing brochure. Subsequently, Mr. Moore questioned whether the BSB eight-plex townhome design was "enough [of a] 'departure' from Rottlund['s]" eight-plex design. (Id., Ex. R28.)

Plaintiff also points to evidence showing that when BSB architect Chris Jorgenson worked on a back-to-back townhome project known as Jerry's Homes in 1997, he received a facsimile that included the floor plans and elevations for Plaintiff's Villa of Meredith Pointe, a New Villa product that was registered with the Copyright Office in 1993. (Id., Exs. R4 at 82; R30 .) Mr. Moore testified that when he assembled the Homestead Collection plans, he looked through the Midland Homes, Good Value Homes and Jerry's Homes files. (Id., Ex. R44 at 20.) In addition, Mr. Moore stated that he incorporated ideas from those three earlier projects into his work on the Homestead Collection, specifically in terms of "ideas on how to assemble room locations and elements and things like that." (Id., Ex. R23 at 15-16.)

In light of the genuine issues of material fact in dispute, this Court cannot conclude, as a matter of law, that statutory damages are unavailable to Plaintiff. Rather, the jury must determine whether Plaintiff's plans were registered before Defendants "commenced" any alleged infringement. The Court, therefore, recommends that Defendants' summary judgment motion be denied as it pertains to Plaintiff's

claim for statutory damages.

**3. Willfulness**

"Once a plaintiff has proven that he or she owns the copyright on a particular work, and that the defendant has infringed upon those 'exclusive rights' "--that is, he has proven the two key elements of copyright infringement, which are not at issue here--"the defendant is liable for the infringement and this liability is absolute." Cass County Music Co. v. C.H.L.R., Inc., 88 F.3d 635, 637 (8th Cir. 1996) ((quoting Pinkham v. Sara Lee Corp., 983 F.2d 824, 829 (8th Cir. 1992)). An infringer's state of mind, however, may be relevant to the award of damages. Id. Whether the alleged infringement is unknowing or innocent, rather than knowing or willful may bear on the amount of statutory damages awarded, but not on liability. Id. In addition, whether the infringement is willful is a factor courts may consider in determining whether to award attorneys' fees and costs. See Cross Keys Publishing Co., Inc. v. LL Bar T Land & Cattle Co., Inc., 887 F.Supp. 219, 224 (E.D. Mo. 1995); Unicity Music, Inc. v. Omni Communications, Inc., 844 F.Supp. 504, 510 (E.D. Ark. 1994). This Court has held that one issue to consider in determining appropriate damages is whether the infringer's state of mind was willful, knowing or innocent. See Tempo Music, Inc. v. Christenson Food & Mercantile Co., 806 F.Supp. 816, 819 (D. Minn. 1992).

While neither the Copyright Act nor its legislative history define "willfulness," commentators and courts have defined willfulness under the Act as "with knowledge that the defendant's conduct constitutes copyright infringement." M. Nimmer & D. Nimmer, Nimmer on Copyright, § 14.04[B][3]; RSO Records, Inc. v. Peri, 596 F.Supp. 849, 859 (S.D.N.Y. 1984). The burden is on the copyright holder to establish that the infringer acted willfully. Original Appalachian Artworks v. J.F. Reichert,

Inc., 658 F.Supp. 458, 463 (E.D. Pa. 1987).

Defendant TCM argues that it never received notice from Plaintiff that its activities were allegedly infringing upon Plaintiff's copyrights (TCM Def.'s Mem. Supp. Summ. J. at 10.), an argument which TCM has previously raised and which this Court has addressed in its October 6, 2004 Order. Defendant TCM believes that Plaintiff's July 5, 2001 notice of infringement letter to Michael Ryan (Schwiebert Aff., Ex. K) constitutes inadequate notice.

As one legal authority has noted regarding notice to support a finding a willfulness:

> Language in some of the legislative history supports the interpretation that the knowledge underlying willfulness must in fact be possessed by the person responsible for the infringing conduct. Under that interpretation, it would not suffice to impute knowledge by an agency relationship with another employee, who in fact was notified of, or was otherwise aware of, the possible infringement.

M. Nimmer & D. Nimmer, Nimmer on Copyright, § 14.04[b][3].

As the Court has previously stated, it is not persuaded by TCM's argument that Plaintiff failed to provide notice of infringement. On July 5, 2001 Plaintiff sent a cease and desist letter to Michael Ryan at Town & Country Homes in Lombard, Illinois. (Schwiebert Aff., Ex. K) At that time, Mr. Ryan was CEO of Town & Country's Minnesota Division. Steve Sandelin, Vice President of Product Development of the Illinois Division, also received a copy of the letter. (Krummen Aff., Ex. R91) Just four days later, on July 9, 2001, Mr. Sandelin forwarded a copy of the letter to BSB architect Larry Moore. (Id., Ex. R61.) The July 9, 2001 cover letter noted that the Villa product was "obviously similar" to the Homestead Collection built at Centennial Crossing. Id. As Plaintiff notes, Defendant BSB signed all of the jurisdictional transfers that took the Homestead Collection to other Minnesota communities, as well as to Aurora, Illinois, so it knew that the Homestead Collection was being used at

the other developments. (Pl.'s Mem. in Opp. at 76, citing Krummen Aff., Exs. R69, R73, R82, R85, R86 and R100.)

As set forth in this Court's October 6, 2004 Order, Mr. Ryan cannot be said to have had an attenuated relationship with TCM, as he was the CEO of its Minnesota division. Mr. Ryan received the notice and it was circulated to Mr. Sandelin. (See id., Ex. R91.) The Court therefore denies Defendant TCM's motion for summary judgment seeking a ruling that, as a matter of law, Plaintiff failed to provide the necessary written notice to recover damages for "willful" infringement.

**4. Statutory Damages Limits**

Defendant TCM seeks a ruling that if Plaintiff is successful in establishing liability and elects statutory damages, that Plaintiff's damages are limited to $90,000. (Def. TCM's Mem. Supp. Summ. J. at 11.) The applicable remedies statute provides that a copyright owner may recover "with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, . . . a sum of not less than $750 or more than $30,000 as the court considers just." 17 U.S.C. § 504(c).

TCM's argues that, "under § 504(c) the total number of 'awards' of statutory damages that a plaintiff may recover in any given action against a single defendant depends on the number of *works* that are infringed and the number of individually liable *infringers* and is unaffected by the number of *infringements* of those works." ((Def. TCM's Mem. in Supp. Summ. J. at 11, quoting Venegas-Hernandez v. Sonolux Records, 370 F.3d 183 (1st Cir. 2004)). The Court agrees. However, for the Court to rule upon a statutory damages "ceiling" of $90,000 would require the Court to assume a finding of no willfulness, as a matter of law, thereby precluding the higher damages amount triggered by

a finding of willfulness. (See 17 U.S.C. § 504(c)(2). Genuine issues of material fact preclude the Court from reaching a conclusion as to willfulness. It is for the jury to make such a determination, and should they find willfulness, the statutory damages limit pursuant to 17 U.S.C. § 504(c)(2) could indeed be higher than the $90,000 limit sought by Defendant TCM.

**B. Actual Damages**

Pursuant to 17 U.S.C. § 504(b), a "copyright owner is entitled to recover the actual damages suffered by him or her as the result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." The Eighth Circuit, discussing the theory behind an award of actual damages, has stated:

> The Copyright Act allows recovery of actual damages, in addition to the infringer's profits, in recognition that some types of infringement inflict more harm to the copyright owner than the benefit reaped by the infringer, for example, where the infringer's minimal use forecloses a broader market, see Cream Records Inc. v. Jos. Schlitz Brewing Co., 754 F.2d 826, 827-28 (9th Cir. 1985), or where the copyright owner's provable profit margin is greater than the infringer's, see Robert R. Jones Assocs., Inc. v. Nino Homes, 858 F.2d 274, 281 (6th Cir. 1988).

Pfanenstiel Architects, Inc. v. Chouteau Petroleum Co., 978 F.2d 430, 432 (8th Cir. 1992). "The infringer's profits are awarded to the copyright holder 'to prevent the infringer from unfairly benefitting from a wrongful act.'" Andreas v. Volkswagen of America, Inc., 336 F.3d 789, 795 (8th Cir. 2003) (citations omitted).

As set forth in the report of its damages expert, Melissa Snelson, Plaintiff argues that its actual damages consist of the following:

> (1) Rottlund's lost profits on Villa II town home units resulting from the sale of Town & Country Homes' infringing Homestead Collection town home units in Minnesota; (2)

> Rottlund's lost profits on Villa II town home units resulting from the sale of Town & Country Homes' infringing Chateau Collection town home units in Minnesota; (3) Rottlund's lost licensing fees on infringing town home units sold and/or planned in Town & Country Homes' Washington Square development in Aurora, Illinois; (4) Rottlund's estimated lost profits on other home products that would have been built and sold within the communities where infringing Homestead Collection town home units were sold by Town & Country Homes; and (5) Rottlund's estimated lost profits on other home products that would have been built and sold within the communities where infringing Chateau Collection town home units were sold by Town & Country Homes.

(Krummen Aff., Ex. R65 at 3.) Ms. Snelson testified that ". . .the actual damages are the value of the lost opportunity to Rottlund for the sale of its own copyrighted homes." (Schwiebert Aff., Ex. N at 44.)

**1. Plaintiff's Actual Damages**

The general method of measuring actual damages is by "reference to the loss in the fair market value of the copyright, often measured by the profits lost as a result of the infringement." Data General Corp. v. Grumman Systems Support Corp., 36 F.3d 1147, 1170 (1st Cir. 1994). "The basic rule for computing injury to the market value of the copyrighted work arising out of infringement is to inquire what revenue would have accrued to plaintiff but for the infringement." M. Nimmer & D. Nimmer, Nimmer on Copyright, § 14.02[A][1] at 14-10. Courts have held, however, that the fair market test is not the proper standard by which to determine actual damages for infringement of architectural plans. See, e.g., Robert R. Jones Assocs., Inc. v. Nino Homes, 858 F.2d 274, 277 (6th Cir. 1988).

Instead, Jones holds, that in an architectural copyright infringement case where a house is constructed that is identical to the house in the copyrighted plans, the measure of damages is the profits the copyright holder would have made on houses it would have sold but for the defendant's infringement. Id. at 280-81. Two courts following Jones have likewise held that the proper measure

for actual damages in an architectural copyright infringement action is lost profits suffered by plaintiff from a home constructed pursuant to the infringing plans. Arthur Rutenberg Homes, Inc. v. Maloney, 891 F.Supp. 1560 (M.D. Fla. 1995); Intown Enterprises, Inc. v. Barnes, 721 F.Supp. 1263, 1267 (N.D.Ga. 1989). In Intown Enterprises, the defendant urged the court to limit the plaintiff's recoverable damages to the value of the architectural plans themselves and exclude from any damage award the damages caused by the use of the plans to construct the house. 721 F.Supp. at 1266. The court held that such a limitation would frustrate the intent of the Copyright Act to provide protection for architectural plans, noting: "Architectural plans 'by their very nature may be copied only for purposes of use and not for purposes of explanation, so that to deny liability by reason of copying is in effect even if not in theory to deny copyrightability to the work.'" Id., citing Nimmer on Copyright, § 2.18[C]1; Jones, 858 F.2d at 279, n.3.

To establish proximate cause for actual damages, the plaintiff must demonstrate that the existence and amount of the loss was a natural and probable consequence of the infringement. Data General, 36 F.3d at 1171. While a plaintiff may seek compensation for both direct and indirect losses, as long as they are not unduly speculative, it "need not prove its loss of revenue with mathematical precision." Id.

Plaintiff compares its actual damages theory of lost development opportunities to that in Jones. Citing the Jones court's application of the "but for" test, Plaintiff argues that it need not show it made a bid on specific property in order to satisfy its burden of proof for actual damages. Instead, it is enough to show the existence of purchasers and a demand for the particular kind of property in the relevant geographic area. (See Pl.'s Mem. Opp. at 48.)

Jones involves facts similar to those pled in this case. Jones concerned a copyright suit between a custom house builder and a second builder, its president, and the architectural firm employed by the second builder. 858 F.2d at 275. Jones hired an architect to prepare a complete set of architectural drawings, including floor plans and elevations, for a house which was eventually called the "Aspen." After receiving the architectural plans, Jones constructed two model homes in accordance with the plans, and distributed brochures containing abridged floor plans to potential buyers. Id. Later, a potential customer informed Jones that a competing developer was constructing houses very similar to the "Aspen" in a development less than three miles from Robert R. Jones' subdivision. Jones located the building plans filed by defendant, concluded that his plans had been copied, registered his complete architectural drawings and floor plans, and instituted legal action.

The district court concluded that defendants had infringed upon Jones' copyright and found that, had defendant Nino Homes not sold seven houses which were built according to the infringing copies, Jones would have sold seven additional houses. Id. at 276. Using this actual damages theory, the court awarded actual damages of $298,870, of which $212,550 represented presumed profits not earned by plaintiff because of defendant Nino Homes' infringement.[1] The Sixth Circuit affirmed the standard by which actual damages were calculated, as opposed to the fair market value of the architectural plans at the time of the infringement, although it found the amount of the award excessive and modified the district court's decision in that regard. Id. at 277.

[1]The Sixth Circuit noted, however, that it might not necessarily reach the same result were the houses "substantially similar," rather than identical, to the house depicted in the copyrighted plans. The court therefore limited its holding to the facts before it. Jones, 858 F.2d at 280, n. 5.

The leading case in this Circuit addressing the proof required to recover actual damages under 17 U.S.C. § 504(b) is Pfanenstiel. In Pfanenstiel, the copyright owner established that the defendant architects had infringed on its architectural drawings copyrights for "fast lube" automobile service shops. 978 F.2d at 431. The Eighth Circuit stated, however, that there was no evidence that the defendant's infringing use of the plaintiff's drawings in Kansas City deprived the plaintiff "of any business other than the infringing use itself – the furnishing of the drawings to Chouteau for the architect's fee on the projects." Id. at 432. To be awarded actual damages, the court held, plaintiff needed to prove that its profits on this business would have been greater than defendant's profits of $3,000, which the district court awarded. Id. Instead, the plaintiff sought to prove actual damages by presenting testimony concerning the architectural fee it would have charged to build the two shops and also to design and draw a third building which was not built. This figure was based on the average of the units the plaintiff built in Kansas City and how much it had spent on units in Dallas and St. Louis. Id. The court found this evidence insufficient:

> There was no evidence establishing [plaintiff's] normal profit margin for comparable work or even demonstrating that the $20,000 represented profit and not gross revenue. There was no evidence that Chouteau would have paid such a fee, when M & S's entire architectural fee for this work had been less than $11,000. There was no evidence demonstrating that the $20,000 figure did not include a portion of the unpaid PAI fees previously billed to AmeriTen, which would be allowable damages for M & S's infringement. Based upon this barren record, we agree with the district court that PAI's claim of actual damages over and above the infringer's profits was simply too speculative to support such an award.

Id. at 432.

Defendant TCM argues that Plaintiff fails to establish the requisite causal nexus, asserting that but for the alleged infringement, Plaintiff's sales would be the same. (Def. TCM's Mem. Supp. Summ.

J. at 12.) Most notably absent from the record, Defendants argue, is any evidence that Plaintiff attempted to bid on the land acquired by TCM where the Homestead and Chateau Collections have been built. Id. Defendants contend that, as in Pfanenstiel, Plaintiff here cannot make out a case for actual damages based on townhomes it might have built, on land it might have owned. (See Bloodgood Defs.' Mem. Supp. Summ. J. at 4-6.) Instead, the Bloodgood Defendants argue that, absent evidence that the Defendants' allegedly infringing Homestead Collection diminished the value of Plaintiff's Villa II townhomes, or the value of Plaintiff's Villa II copyright, Plaintiff's recovery is limited to Defendants' profits – not Plaintiff's lost profits. Id. at 7.

The legal authorities are in agreement that Plaintiff must establish that its loss resulted from the alleged infringement. In that regard, this Court does not find that the Jones decision conflicts with this Circuit's holding in Pfanenstiel. Both cases require a plaintiff to demonstrate a causal connection. In Pfanenstiel, however, the Eighth Circuit does not analyze the point for which the parties cite to Jones, which is that a causal nexus can be established by showing that had an infringer not sold houses built according to infringing plans, the plaintiff would have sold additional houses. Jones, 858 F.2d at 276.

Like the copyright owners in both Pfanenstiel and Jones, Plaintiff premises its actual damages upon the notion that but for the alleged infringement of its designs, it would have sold more Villa II townhomes. For example, in support of its claim for actual damages, Plaintiff argues that if Defendant TCM did not have the infringing product: (1) Rottlund would have acquired the Hollander property and made Villa II sales; (2) Rottlund would have made Villa II sales in its Maple Lakes development in Maple Grove; and/or (3) Rottlund would have made Villa II sales at other developments in close geographic proximity to Maple Grove. (Pl.'s Mem. in Opp. at 14.)

**a. Calculation of Actual Damages**

As to Plaintiff's underlying actual damages assumption, however, the Eighth Circuit did not address architect Pfanenstiel's underlying theory, namely, that his actual damages figure of $20,000 represented the fee he would have charged to build two buildings in the relevant geographical area and to design and draw a third building which was not built. 978 F.2d 432. Rather, the court took issue with the sufficiency of Pfanenstiel's evidence regarding the calculation of damages, particularly his failure to establish his normal profit margin for comparable work, or even that the $20,000 figure represented profit and not gross revenue. Id. As to this component of establishing actual damages, the Court finds that Plaintiff has presented sufficient evidence showing the way in which it has arrived at its actual damages estimate of $21,400,000.

Plaintiff's expert, Melissa Snelson, calculated lost profits on Villa II town homes by multiplying the number of allegedly infringing TCM townhome units sold in Minnesota by the incremental profit per unit that Plaintiff would have earned, but for the alleged infringement. (Krummen Aff., Ex. R65 at 3.) Citing Defendants' documents, Ms. Snelson indicated that TCM sold 514 units of the allegedly infringing Homestead Collection and 31 units of the allegedly infringing Chateau Collection. Id. An additional 240 Homestead Collection units and 69 Chateau Collection units planned or under construction within the same TCM developments were also included in Ms. Snelson's analysis.[2] Id.

To arrive at the lost profit amount, Ms. Snelson applied Plaintiff's estimated average revenue per Villa II townhome unit to the number of "lost units" to arrive at lost revenues of approximately

[2]Whether these future units or unsold units may be included in the damages calculation is an issue addressed separately herein.

$130,700,000. Id. She then applied Plaintiff's incremental profit margin to the lost revenues. Id. at 4. Only the costs that vary with the changes in the sales volume at issue are deducted from sales, whereas fixed costs (e.g., research and development, many components of marketing and advertising costs, and most components of administrative costs) were not considered in the incremental profits calculation. Id.

Ms. Snelson first analyzed Plaintiff's gross profit on Villa II town home sales between January 1, 1998 and December 31, 2003 and concluded that during that period, the average gross profit on Villa II townhomes was approximately 23.2%. Id. She then analyzed Plaintiff's profit and loss statement for FY 1999-FY 2003 to determine incremental operating costs that should be deducted from the gross profit on Villa II home sales; she determined that Plaintiff's average incremental operating costs during that time period were approximately 6.8% of revenues. Subtracting the 6.8% incremental operating costs from the average gross profit on Villa II townhomes of 23.2%, Ms. Snelson arrived at an incremental profit margin of 16.4%

To arrive at the lost profits figure of $21,400,000 on the 854 allegedly infringing townhomes built and/or planned, Ms. Nelson used the lost profits revenue base of $130,700,000, multiplied by the incremental profit margin of 16.4%. Id.

**b. Causal Nexus for Actual Damages**

Turning to whether Plaintiff has established a causal nexus to support its theory of actual damages, Plaintiff presents a variety of evidence. For example, Plaintiff notes that in early 1998, several real estate consultants and brokers worked on a development opportunity in Maple Grove, Minnesota, located on a piece of real estate known as the Hollander property. (Krummen Aff., Ex. R36, D16417-18.) The City of Maple Grove approved a mixed use, diversified, residential housing

concept plan for developing the property involving 220 units of townhouse and/or duplex housing, and 69 units of single family housing. (Id. at D16397, D16400, D16419.) In July 1998, the development opportunity progressed to formal bidding and both Plaintiff and TCM received invitations to bid. (Id. at D16397.) Maple Grove officials required the property to be developed with density housing, affordable housing and diverse housing. (Id. at D16423.)

Both Rottlund and TCM submitted bids to acquire the property. In its effort to obtain the bid, TCM represented that it could meet certain of the City's requirements for affordable housing through its townhome product. (Id., R53 at D17744-45.) TCM's Mike Ryan testified that as to the Hollander property, a back-to-back townhome would presumably meet affordable housing requirements, whereas he was uncertain as to whether a side-to-side townhome would. (Id., Ex. R11 at 124-25.) Rottlund submitted its second and final bid for the property in September 1998, but was unwilling to raise the price beyond its original offer. (Id., Ex. R54.) At the same time, TCM also submitted its second round bid for the Hollander property, but was unwilling to raise the price beyond their prior offer. (Id., Ex. R55.) In April 1999, TCM terminated their purchase agreement to acquire the Hollander property, noting that they "had less time than originally anticipated to reach a comfort level with the City." (Id., R56 at D01810.) In approximately August 1999, Plaintiff asserts that TCM first issued its allegedly infringing Homestead Collection drawings. (Pl.'s Mem. in Opp. at 10, citing Krummen Aff., Ex. R68 at BSB02314.)

TCM ultimately entered into a new purchase agreement and acquired the property, pursuant to the approval of probate court. See Estate of Hildur P. Hollander, No. C8-99-1085, 2000 WL 54398

(Minn. App. Jan. 25, 2000).[3] TCM, later calling the property Centennial Crossing, first built its back-to-back Homestead Collection townhomes on this property. (Krummen Aff., Ex. R8 at 148-151; R61 at BSB 01931-32.)

Plaintiff avers that TCM was able to build other products at Centennial Crossing because the Homestead Collection satisfied the City's requirements for a multi-product community. (Pl.'s Mem. in Opp. at 11.) As discussed above, the Homestead Collection satisfied Maple Grove's desire for housing affordability and "housing diversity"(Krummen Aff., Ex. R11 at 100, 120-22; Ex. R53), and fulfilled the eight-plex townhome niche depicted on the City's illustrative site plan. (Id., Ex. R36 at D16412.) TCM's 30(b)(6) witness could not identify any other eight-unit townhome the company had which would have fulfilled the City's concept plan for eight- unit structures. (Id., Ex. R8 at 151-52.)

Plaintiff also points to a TCM-authored preliminary plat proposal to Shakopee officials regarding the Heritage Square/Providence Pointe development. (Id., Ex. R88.) In the document, TCM notes that the development, which includes the allegedly infringing Homestead Collection, will contain "life cycle" housing, consisting of: (1) entry level, affordable townhomes; (2) larger townhomes; (3) move-up single family homes; and (4) one-level homes for retirees. (Id. at D16984-86.)

---

[3]Plaintiff contends, and cites to the testimony of its witness Todd Stutz, that one reason it was out of contention for the property was that it had substantially higher overhead for developing its copyrighted Villa products. (Pl.'s Mem. in Opp. at 11, citing Krummen Aff., Ex. R17 at 419, 201.) Mr. Stutz testified that Rottlund had higher overhead than TCM, for example, because it had three architects on staff, in addition to five CADD draftspeople, and "if you're developing all new product that is the reason why you have to have that staff. If you're not developing all new product and you're taking some other – someone else's product, like the Villa II product, and copying that product, the cost involved in doing that would be significantly less than starting from a bare piece of paper." Id. , Krummen Aff., Ex. R17 at 419.

Plaintiff states that it offers comparable products, as set forth, for example, in its Farmington brochure advertising products so that prospective homeowners may: (1) start out as a first-time buyer in a Villa home; (2) move up to a single family Lodge home; and (3) simplify with a one-level Garden town home. (Id., R84 at D39283.) As noted, Plaintiff contends that it needed only four things to develop communities during the applicable time period: (1) land; (2) monetary resources; (3) internal superintendents and assistant superintendents; and (4) outside subcontractors. (Id., Ex. R5, 211-12.) Of these constraints, Rottlund's owner has testified that "The only problem we've ever had with Villas is finding enough land to build Villas on." (Id., Ex. R9, 172, 179.) Plaintiff has presented evidence that the allegedly infringing TCM communities were developed in close geographical proximity to Plaintiff's projects and competed directly with Plaintiff's ongoing developments. (Id., Ex. R17, 411-15.) Thus, Plaintiff contends that but for Defendants' infringement, it would have supplied the market's demand.

Plaintiff argues that in addition to the Hollander/Centennial Crossing property, in which Plaintiff made initial bids, that it has another basis for claiming actual damages: "head-to-head lost sales in nearby developments." (Pl.'s Mem. Opp. at 12.) In support of its argument, Plaintiff cites to documents from the files of third parties, such as Edina Realty. Defendants strongly contest the admissibility of much of this evidence on grounds of foundation, authenticity and hearsay. (See, e.g., Def. TCM's Reply Mem. Supp. Summ. J. at 3.) While mindful of Judge Doty's statement that "inadmissible evidence cannot overcome a motion for summary judgment," Nokes v. United States Coast Guard, 282 F.Supp.2d 1085, 1089 (D. Minn. 2003), the Court finds that as to Plaintiff's actual damages – specifically, as to its proof of a causal nexus – in light of the foregoing discussion and the record before it, Plaintiff has presented enough admissible evidence to create a genuine dispute of

material fact. Accordingly, the Court need not address Defendants' arguments with respect to admissibility of certain specific documents. The Court thus recommends that, as it pertains to the actual damages claim for Plaintiff's lost profits, that Defendants' motion be denied.

**C. Infringer's Profits**

**1. Method of Calculation/Double-Counting**

As to the relationship between actual damages based on Plaintiff's lost profits and damages based on infringer's profits:

> The profits in fact accrued by the defendant are not necessarily equal to the profits that the plaintiff would have derived but for the infringement. Because of different costs, production and selling techniques, and good will, the defendant's actual profits may either exceed or be less than the plaintiff's lost profits. If plaintiff's lost profits are less than defendant's actual profits, plaintiff may recover its lost profits under the rubric of actual damages, and may further recover the difference between its lost profits and defendant's actual profits under the rubric of defendant's profits. A plaintiff may not recover its full lost profits plus all of the defendant's profits, for this would constitute a forbidden double recovery.

M. Nimmer & D. Nimmer, Nimmer on Copyright, §14.02[A][1]; see also, Hamil America, Inc. v. GFI, a Division of Goldtex, Inc., 193 F.3d 92, 108 (2d Cir. 1999) (approving district court's determination that plaintiff could not recover both for its hypothetical sales to shared customers and for defendant's actual sales to those same customers), cert. denied, 528 U.S. 1160 (2000).

The Bloodgood Defendants request summary judgment, holding that, as a matter of law, that if Plaintiff is entitled to recover actual damages under 17 U.S.C. § 504(b), it is not entitled to recover duplicative infringer's profit damages. This Court agrees that duplicative damages are not allowed, but a more complete statement of the law is that if plaintiff is entitled to recover actual damages suffered as a result of infringement, it may recover any profits realized by the infringing party that are not included in

actual damages. See Harris Market Research v. Marshall Marketing and Communications, Inc., 948 F.2d 1518 (10th Cir. 1991). The Bloodgood Defendants also cite to the "anti-doubling rule" noted in Deltak, Inc. v. Advanced Systems, Inc., 767 F.2d 357, 363 (7th Cir. 1985), arguing that Plaintiff may not recover both the amount of its

alleged lost profits and lost "value of use" damages. (Bloodgood Defs.' Mem. Supp. Summ. J. at 9.) Deltak simply reiterates the proposition noted above, i.e., that a copyright owner may not recover its own lost sales and the infringer's profits if that results in double-counting of the same economic transaction, usually a sale to a third-party customer. 767 F.2d at 363 (emphasis added). The Court agrees with this statement of the law and grants the Bloodgood Defendants' summary judgment motion, in part, and as modified herein, that if plaintiff is entitled to recover actual damages suffered as a result of infringement, it may recover any profits realized by the infringing party that are not included in actual damages.

The Bloodgood Defendants further contend, citing Deltak, that Plaintiff may not recover actual damages based on both alleged lost profits and alleged lost "value of use" damages. (Bloodgood Defs.' Mem. Supp. Summ. J. at 9.) Courts have held that the value of an infringer's use is a permissible basis for estimating actual damages. See Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp., 562 F.2d 1157, 1174 (9th Cir. 1977). In Deltak, the plaintiff sold kits teaching data processing skills and the kits included a pamphlet listing various data-processing tasks, cross-referencing to related Deltak publications for sale. 767 F.2d at 358. Defendant-competitor ASI exactly copied the descriptions of the tasks from Deltak's entire pamphlet, but substituted its own publications for Deltak's. It then distributed fifteen of the infringing pamphlets to mutual customers in an

unsuccessful attempt to woo them away from Deltak. Id. at 358-59. At trial, ASI was found liable for infringement, but because of the failure of ASI's marketing campaign, it earned no additional profits and Deltak lost no prospective sales. On that basis, Deltak was denied any recovery. Id. at 359-60. The Seventh Circuit, however, held that ASI had engaged in a marketing campaign for which it had expended funds, that it willfully used an infringing pamphlet to facilitate the campaign, and that it reduced its own campaign costs by paying no royalty to the copyright owner for the infringing material. Id. at 361-363. In light of those facts, the court adopted a new test: "Each of the copies ASI distributed had a value of use to it equal to the acquisition costs saved by infringement instead of purchase, which ASI was then free to put to other uses." Id. at 361. Because there were no actual lost profits at issue in Deltak, that case does not stand for the authority that the Bloodgood Defendants suggest, namely, that a plaintiff may not recover both value of use damages and actual profit loss damages. That question was not before the Deltak court. The Court finds that Deltak is inapposite for the proposition for which the Bloodgood Defendants cite and denies the Bloodgood Defendants' motion for summary judgment that, as a matter of law, Plaintiff may not recover actual lost profits and value of use damages.

Next, as to calculating damages, at the motions hearing, the Bloodgood Defendants argued that actual damages for Defendants' profits should be individual for each Defendant. The Bloodgood Defendants contend that, unlike TCM and Pinnacle, they are not directly liable for infringement and to arrive at actual damages, Plaintiff must first obtain damages from defendants' profits, and then turn to Plaintiff's actual damages (for which there is joint and several liability) for any additional, non-duplicative damages. The Bloodgood Defendants further contend that Plaintiff's actual damages

recovery is limited to $410.75 per Homestead Collection unit.

First, the Bloodgood Defendants' counsel conceded at oral argument that no case law supported their contention that actual damages are to be recovered first from the defendants' profits, and then from the plaintiff's lost profits. To the contrary, the Copyright Act provides: "The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b).

The Copyright Act clearly allows Plaintiff to elect which of the damages theories it will use to recover its damages amount. Plaintiff is entitled to recover either its actual damages, or its actual damages and the excess profits enjoyed by the infringer. For example, borrowing from some of the hypothetical figures referenced in the parties' memoranda, if Plaintiff makes an average profit of $22,306.75 per Villa II unit, as the Bloodgood Defendants claim, then Plaintiff may elect to recover this entire amount at trial. Alternatively, if the infringers' profits are, for example, $23,000 per infringing unit, then Plaintiff may recover its actual damages, plus the excess of approximately $700 in profits enjoyed by the infringers. The Plaintiff's actual damages are, however, not limited to $410.75 per unit (which the Bloodgood Defendants claim is the difference between Plaintiff's profits earned on Villa II units and TCM's profits on Homestead Collection Units) because no legal authority provides for such a methodology. Moreover, the Court notes that even as to the underlying figures, there exists a dispute as to genuine issues of material fact. The Court therefore recommends the denial of the Bloodgood Defendant's motion for summary judgment that, as a matter of law, Plaintiff's actual damages are limited to $410.75 per Homestead Collection unit sold by TCM.

**2. Gross Revenue and Causal Nexus**

The Eighth Circuit has held that as to infringer's profits, the Plaintiff bears the burden of establishing a nexus between the infringement and the infringers' direct or indirect profits.[4] Andreas, 336 F.3d at 796. Once that nexus is established, if an infringer's profits are attributable to factors in addition to the use of the plaintiff's work, an apportionment of profits is proper. Id. "The burden of proving apportionment (i.e., the contribution to profits of elements other than the infringed property), is the defendant's." Id. , citing Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 518 (9th Cir. 1985). Regarding the plaintiff's burden of proof in establishing defendant's profits, the Eighth Circuit has held:

> In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses *and the elements of profit attributable to factors other than the copyrighted work*." § 504(b) (emphasis added). "[W]here some of the defendant's profits result from the infringement and other profits are caused by different factors, . . . , the burden of proof is on the defendant . . . [to] prove not only 'his or her deductible expenses' but also 'the element of the profit attributable to factors other than the copyrighted work.'" H.R. Rep. No. 94-1476, § 504, at 161 (quoting § 504(b)). "Any doubt as to the computation of costs or profits is to be resolved in favor of the plaintiff. If the infringing defendant does not meet its burden of proving costs, the gross figure stands as the defendant's profits." Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 514 (9th Cir. 1985).

Andreas, 336 F.3d at 795 (emphasis in original).

As to the requirement that Plaintiff establish Defendants' gross revenue, Plaintiff's damages expert has calculated that the lowest infringers' profits figure that Defendants may present to a jury is

[4] The Andreas court defined a case involving indirect profits as one in which the infringers do not sell the actual copyrighted work, but use the copyrighted work to sell another product. See 336 F.3d at 796.

approximately $48,000,000 of profits from developments where the allegedly infringing Homestead and Chateau Collections were constructed.[5] (Krummen Aff, Ex. R67 at 2-3 and Ex. 3.) If the jury finds that TCM engaged in intentional infringement, overhead deductions are excluded, and Plaintiff presents an estimated infringers' profit figure of $85,000,000. Defendant TCM's damages expert, Arthur Cobb, presents a different analysis and calculation, concluding that TCM's profits from 419 Homestead Collection units totaled $9,100,000 through December 31, 2003. (Id., Ex. R126 at 26.) Plaintiff disputes Mr. Cobb's omission of profits from the Washington Square units in Illinois, profits from the Chateau Collection and profits from non-infringing products which Plaintiffs contend are attributable to infringement. (Pl.'s Mem. Opp. at 36.) As the rival expert reports and exhibits attached thereto best demonstrate, genuine issues of disputed material fact abound regarding the correct assessment of Defendants' gross revenue. This Court cannot therefore hold that, as a matter of law, Plaintiff has failed to establish Defendants' gross revenue.

As to whether Plaintiff has satisfied the causal nexus between infringement and defendants' profits, leading Eighth Circuit authority is Andreas. Andreas involved a copyright suit between the plaintiff-copyright owner and Volkswagen of America, doing business as Audi of America, and McKinney & Silver ("M & S"), Volkswagen/Audi's advertising agency. 336 F.3d at 791. Plaintiff owned a copyrighted artwork entitled "Angels of Mercy," which included the following text: "Most people don't know that there are angels whose only job is to make sure you don't get too comfortable & fall asleep & miss your life." To launch the release of Audi's TT coupe into the United States

[5]The Court acknowledges that the expert reports of all parties are being supplemented and that these figures may change at trial.

market, M & S prepared a series of television commercials, one of which, entitled "Wake Up," featured an Audi TT coupe, surrounded in a garden by angelic- looking neoclassical statues. A voice-over stated: "I think I just had a wake-up call, and it was disguised as a car, and it was screaming at me not to get too comfortable and fall asleep and miss my life." Id. at 791-92.

The jury returned a verdict for the plaintiff, awarding him $115,000 actual damages, $280,000 for M & S's profits from the infringement and $570,000 for Audi's profits from the infringement. Id. at 792. Following the jury verdict, the court granted Audi's Rule 50(b) motion and vacated the jury's $570,000 award.

On appeal, none of the parties challenged the finding of infringement or the award of plaintiff's actual damages, instead, the plaintiff argued that he met his burden of establishing a causal connection between the infringement and Audi's profits from the TT coupe. While the district court had concluded that Andreas failed to prove that the infringed words resulted in the sale of any TT coupe, the Eighth Circuit held that the plaintiff met his burden of establishing a causal nexus between the infringement and Audi's profits:

> Andreas introduced more than mere speculation that the Wake Up commercial contributed to sales of the TT coupe. The infringement was the centerpiece of a commercial that showed nothing but the TT coupe. The evidence established that Audi enthusiastically presented the commercial to its dealers as an important and integral part of its launch of the TT coupe into the U.S. market; sales of the TT coupe during the period that the commercial aired were above Audi's projections; the three commercials received high ratings on the Allison-Fischer surveys that rated consumer recall of the commercials; and Audi paid M & S a substantial bonus based on the success of the commercials. Reading this evidence in the light most favorable to the verdict, the commercial did more than merely "contribute[] somehow to the sales of the TT coupe. . . . We conclude the jury had enough circumstantial evidence to find that the commercial contributed to the profitable introduction of the TT coupe, which shifted the burden to Audi of showing what effect other factors had on its profits.

Id. at 796-97 (citations omitted). While the Eighth Circuit acknowledged that the offending commercial probably did not contribute to every purchase of a TT coupe during the applicable time period, the court rejected "the notion that Andreas was required to put a TT buyer on the stand to testify that she bought the car because of the commercial in order to meet his burden of a causal connection. Once a nexus was shown as established above, Andreas was required under the statute only to establish Audi's gross revenue from the TT coupe." Id. at 797.

In this case, the Court concludes that Plaintiff has presented sufficient evidence to create a genuine issue of material fact. As discussed, *supra*, Plaintiff has offered evidence in support of its damages theory sufficient to support a causal nexus. Plaintiff has presented evidence that Defendants touted the innovative qualities of their allegedly infringing townhomes, using such claims in advertisements and presentations to obtain customers. This is not unlike defendant Audi in Andreas, who utilized the allegedly infringing ad copy to successfully sell its TT coupe. Prior to the allegedly infringing Homestead Collection, Plaintiff has presented evidence that TCM did not have an eight-plex townhome product – the very product desired by at least one city in its future developments. (Krummen Aff., Ex. R8 at 151-52.) Perhaps best illustrated by TCM's profits from the allegedly infringing products – whether the numbers estimated by Plaintiff's expert or Defendants' – the allegedly infringing products have been profitable for Defendants. Defendants' summary judgment motion as to an insufficient causal nexus to support Plaintiff's damages for infringer's profits should therefore be denied.

**3. Damages for Profits on Unsold/Future Townhomes**

Defendant TCM seeks summary judgment that, as a matter of law, Plaintiff cannot include within its damages' estimate damages for profits on townhomes that have not yet been built or sold. (Def. TCM's Mem. Supp. Summ. J. at 16.) TCM argues that, as a threshold matter, such claimed "profits" do not yet exist; therefore, Plaintiff cannot recover "profits" that have not actually been earned by TCM. Defendant TCM's damages expert opines that 419 infringing units have been sold, and because they have been sold, only this number of units is subject to Plaintiff's damages claim for Defendants' profits. (Krummen Aff., Ex. R126 at 26.) Plaintiff argues that the construction of infringing townhomes, not their sale, triggers Plaintiff's entitlement to damages for Defendants' profits. (Pl.'s Mem. in Opp. at 57.)

There must be a rational basis to award profits of an infringer. Rainey v. Wayne State University, 26 F.Supp.2d 963, 971 (E.D. Mich. 1998). "Damages must be based on credible evidence, not speculation." Sunset Lamp Corp. v. Also Corp., 749 F.Supp. 520, 524 (S.D.N.Y. 1990). TCM asserts that certain events may prevent these future or unsold townhomes from ever being built or sold, including the entry of an injunction in this case, or a decision by Defendants not to build the townhomes, if liable for their profits. (Def. TCM's Mem. Supp. Summ. J. at 16-17.) The Court finds that Plaintiff's inclusion of these unbuilt/unsold units in its damages calculation is too speculative, as these units do not yet represent a portion of profits and are subject to the various uncertainties noted by TCM. Therefore, the Court recommends granting Defendants' motion for summary judgment that profits on unsold or future townhomes may not be included in the damages' claim for Defendants' profits. If, at a later time, these properties are built and sold, at which time Defendants realize a profit, Plaintiff is free to seek a legal remedy.

**4. Indirect Damages on Non-Infringing Products**

One element of Plaintiff's damages claim is for lost profits for other non-accused home products that would have been built and sold within the communities where the allegedly infringing Homestead and Chateau Collection townhomes were sold. (Krummen Aff., Ex. R65 at 2-3). Plaintiff explains that its in-house architect, with the help of its liability expert, studied the non-infringing products TCM sold at the developments where allegedly infringing products were sold. (Krummen Aff., Ex. R5 at 367-71; 388-89.) They concluded that Rottlund offered comparable products such that it could have developed the entire community and obtained sales and profits from all the products TCM sold as result of the alleged infringement. (Id., Ex R15 at 149-52.)

Rottlund's damages expert opines that TCM used the allegedly infringing Homestead Collection to acquire developments, sell the Homestead Collection and other products, and, in effect, usurp Plaintiff's economic opportunity to sell the following comparable Rottlund products: Gable Town Homes, New Urban Town Homes, Lodge Single Family Homes and Traditions Single Family Homes. (Id., Ex. R67 at Exs. 4, 7, 8, 9, 10.)

In Sunset Lamp, the Court held that a copyright owner's damages for a competitor's infringement of a lamp intended by the plaintiff as a "door opener" for an entire line of lamps, was not limited to lost profits on the infringed lamp, but could also include damages for sales which it had lost on other noninfringed lamps. 749 F.Supp. at 524. The court stated:

> Plaintiff claims that it will be able to show at trial its lost profits on other items that are directly attributable to [defendant's] infringement of the floor lamp. At this stage, such a showing appears difficult, but not inconceivable. Plaintiff will have to demonstrate by credible evidence a relationship between sales of non-infringed items and sales of the infringed floor lamp, and further show which sales were prevented as a result of

defendants' infringement.

Id. at 524-25. While the Eighth Circuit in Andreas declined to apply Sunset Lamp's "door opener" theory for recovering profits on other items, the court noted that the infringement in Sunset Lamp went to the "door opener" product being sold, not to an advertisement for the door opener product, which would be the case if applied in Andreas. 336 F.3d at 800. Andreas's evidence regarding sales of the TT coupe did not tie the infringing words in the commercial to sales of other Audi models, therefore, the court ruled that evidence of profits from models other than the TT coupe was properly excluded. Id. The Court finds that the situation here is more like that in Sunset Lamp, where the infringing product is not an advertisement limited to one particular product. Rather, evidence here indicates that the original allegedly infringing product, the Homestead Collection, was "jurisdictionally transferred" to create the other allegedly infringing products. (Schwiebert Aff. , Ex. G and Ex. H at 11-13.)

The Court turns next to the question of whether Plaintiff has presented sufficient evidence to demonstrate a nexus, such that but for the alleged infringement, Rottlund would have built all of the additional non-accused products. Plaintiff's counsel argued at the motions hearing that because the municipalities in which the allegedly infringing homes were built have density guidelines, requiring a complete package of housing products, but for the alleged infringement, Defendants would never have been able to acquire those properties and build complete housing packages. Instead, Plaintiff would have fulfilled that demand.

Defendant counters that Plaintiff's evidence of municipalities' guidelines or requirements is

inadmissible hearsay or is not authenticated.[6] For example, while Plaintiff offers as evidence third-party "competition shop" documents written by Edina Realty for TCM, in which Edina Realty describes Rottlund products that directly compete against TCM's comparable products in Plymouth and Maple Grove (Krummen Aff., Exs. R75, R62), Defendants challenge their admissibility.[7]

Setting aside the contested documents, Plaintiff also points to a TCM-authored preliminary plat proposal to Shakopee officials regarding the Heritage Square/Providence Pointe development. (Id., Ex. R88.) In the document, TCM notes that the development, which includes the allegedly infringing Homestead Collection, will contain "life cycle" housing, consisting of: (1) entry level, affordable townhomes; (2) larger townhomes; (3) move-up single family homes; and (4) one-level homes for retirees. (Id. at D16984-86.)

---

[6]The Court expressed its concern at the motions hearing as to some of Defendants' objections. For example, Defendant TCM challenges the admissibility of a June 2001 document (Krummen Aff., Ex. R76), which purports to be a written speech given by Art Plante, TCM's Minnesota Division President before the City of Plymouth Planning & Zoning Committee. It begins, "Intro. Good evening everyone. . . Mr. Chairman, members of the Planning Commission and city staff. My name is Art Plante. I am the president of the Minnesota division of Town & Country Homes, and I have been with the Minnesota operation for the last four years." (Id. at D16570.) In the document, Mr. Plante refers to the Homestead Collection's ability to fulfill "life cycle housing." (Id. at D16574.) When asked about this document at his deposition, Mr. Plante – the obvious person to authenticate and lay foundation for the document – refused to confirm or deny that he used the document as part of his presentation (Plante Dep. of 9/2/04 at 249), or that he told the Plymouth committee that TCM would develop two different housing products, one of which was the Homestead Collection (Id. at 254.) In fact, when asked if he told the Plymouth Committee that TCM planned to satisfy life cycle housing by building the Homestead and Premier Collections, Mr. Plante demurred, "The document has information on it. I don't know exactly what I said to the City." (Id. at 255-56.) Mr. Plante's counsel propounded several foundation objections and objected to the characterization of the document as a script. (Id., e.g., at 247-25; 249.)

[7]By way of status conferences, this Court is aware that Plaintiff is attempting to gather necessary authentication for certain of these documents, however, such authentication is not before this Court at this time.

Plaintiff states that it offers comparable products, as set forth, for example, in its Farmington brochure advertising products so that prospective homeowners may: (1) start out as a first-time buyer in a Villa home; (2) move up to a single family Lodge home; and (3) simplify with a one-level Garden town home. (Id., R84 at D39283.) As noted, Plaintiff contends that it needed only four things to develop communities during the applicable time period: (1) land; (2) monetary resources; (3) internal superintendents and assistant superintendents; and (4) outside subcontractors. (Id., Ex. R5, 211-12.) Of these constraints, Rottlund's owner has testified that "The only problem we've ever had with Villas is finding enough land to build Villas on." (Id., Ex. R9, 172, 179.) Plaintiff has presented evidence that the allegedly infringing TCM communities were developed in close geographical proximity to Plaintiff's projects and competed directly with Plaintiff's ongoing developments. (Id., Ex. R17, 411-15.)

The Court finds that Plaintiff has presented enough admissible evidence to demonstrate that there are genuine issues of material fact in dispute. Accordingly, the Court recommends the denial of Defendants' motions for summary judgment as to Plaintiff's damages claims for non-infringing products.

**5. Licensing**

Plaintiff includes within its actual damages claim, a figure for its lost licensing fees on allegedly infringing townhome units sold and/or planned in the Washington Square development in Aurora, Illinois. (Krummen Aff., Ex. R65 at 2.) Plaintiff bases its estimated damages upon information that as of March 2004, TCM had constructed and sold 72 units in the Washington Square development. (Schwiebert Aff., Ex. D at 10.) Ms. Snelson bases the cost per license upon representations from Rottlund that it would have sold TCM such a license at a price equal to Rottlund's estimated incremental profit margin per unit, multiplied by the number of units to be constructed by TCM.

(Krummen Aff., Ex. R65 at 5.) Plaintiff therefore calculates lost licensing fees in the Washington Square Development in the amount of $1,800,000. (Schwiebert Aff, Ex. D at 10.)

TCM argues that the "what the owner would have charged" theory is insufficient. Courts have held, however, that a defendant "cannot expect to pay the same price in damages as it might have paid after freely negotiated bargaining, or there would be no reason scrupulously to obey the copyright law." See Iowa State Univ. Research Found., Inc. v. American Broadcasting Cos., 475 F.Supp. 78, 83 (S.D.N.Y. 1979), aff'd, 621 F.2d 57 (2d Cir. 1980).

Defendants contend, citing On Davis v. The Gap, Inc., 246 F.3d 152 (2d Cir. 2001), that the correct measure of damages for lost licensing fees is the fair market value. Davis involved an action brought by the creator of nonfunctional jewelry worn over the eyes in the manner of eyeglasses, against the clothing retailer, The Gap. It was undisputed that The Gap, without Davis's permission, ran an advertisement of a person wearing Davis's eyewear. Id. at 156. Plaintiff sought $2.5 million in unpaid licensing fees. The Second Circuit addressed Plaintiff's claims:

> We recognize that awarding the copyright owner the lost license fee can risk abuse. Once the defendant has infringed, the owner may claim unreasonable amounts as the license fee – to wit Davis's demand for $2.5 million. The law therefore exacts that the amount of damages may not be based on "undue speculation." . . . The question is not what the owner would have charged, but rather what is the fair market value. In order to make out his claim that he has suffered actual damage because of the infringer's failure to pay the fee, the owner must show that the thing taken had a fair market value. But if the plaintiff owner has done so, and the defendant is thus protected against an unrealistically exaggerated claim, we can see little reason not to consider the market value of the uncollected license fee as an element of "actual damages" under § 504(b).

Id. at 166.

The Davis decision, however, does not state that fair market value is necessarily limited to

what the plaintiff has obtained in previous licensing agreements. For instance, Davis testified that on one occasion, he was paid a royalty of $50 for a *Vibe* magazine publication of a photo of a person wearing his eyewear. 246 F.3d at 161. Rather than establish $50 as Davis's fair market value, the Second Circuit stated, "if Davis could show at trial that the Gap used the image in a wider circulation that *Vibe*, that might justify a finding that the market value for the Gap's use of the eyewear was higher than $50. Therefore, to the extent the district court dismissed the case because Davis's evidence of the market value of the license fee was too speculative, we believe this was error." Id.

Thus, Defendants argue the only evidence regarding the fair market value of copyrights at issue in a market where Plaintiff has not built, or is no longer building townhomes, is a license agreement in Indiana. (Schwiebert Aff., Ex. O.) Defendants argue that because Plaintiff does not compete in the Illinois market, the terms of the Indiana license agreement must inform the Court as to Plaintiff's damages for recovery of lost licensing fees here. Defendant further contends that, to the extent that Rottlund recovers any of Pinnacle's actual profits for the Washington Square back-to-back townhomes, the amount of Pinnacle profits recovered must be reduced by any reasonable license fee awarded. (Def. TCM's Mem. Supp. Summ. J. at 16, citing Baker v. Urban Outfitters, 254 F.Supp.2d 346, 358 (S.D.N.Y. 2003). On its face, the Indiana license agreement is silent as to any fees. (Schwiebert Aff., Ex. O.)

The facts before this Court, however, are quite different from the facts of Davis, where the plaintiff and defendant were certainly not direct business competitors. To grant Defendants' motion, the Court would be limiting Plaintiff's lost licensing fees to an agreement in another market area (Indiana versus Illinois), at an earlier time (April 2000). Although these could certainly be important factors in

determining the value of a license agreement and/or the fair market value, they are not dispositive. Moreover, the Court sees nothing on the face of the licensing agreement to indicate the amount paid, if any, by the licensee. (Id.) The Court finds that genuine issues of material fact preclude it from ruling that, as a matter of law, Plaintiff's licensing fee damages against Pinnacle are limited to the fair market value of the Indiana licensing agreement.

### 6. Apportionment of Damages

Under 17 U.S.C. § 504(b), "the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." "The burden of proving apportionment (i.e., the contribution to profits of elements other than the infringed property), is the defendant's." Andreas, 336 F.3d at 796, citing Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 518 (9th Cir. 1985). Moreover, any doubt as to the computation of costs or profits is to be resolved in the plaintiff's favor. Id. at 795. "If the infringing defendant does not meet its burden of proving costs, the gross figure stands as the defendant's profits." Id., citing Frank Music, 772 F.2d 505 at 514. Faulting the district court for placing "the detriment of any speculation on Andreas, rather than on Audi," the Eighth Circuit in Andreas emphasized that Audi carried the "highly fact-specific" burden of allocating its profits between the infringement and other factors – a question whose determination "should have been left to the jury." Andreas, 336 F.3d at 797-98. The Eighth Circuit further stated, in concluding that the jury's award to Andreas was not overly speculative:

> We recognize that it is difficult to establish the portion of profits attributable to an infringement in cases where the infringed material is used in an advertisement for another product, but Congress put the burden of establishing "elements of profit attributable to factors other than the copyright work" on the defendant. Further, Congress did not distinguish between direct and indirect profits cases in allocating the

> burden of proof between establishing *the fact* that an infringement contributed to a defendant's profits and *the extent* to which the infringement contributed to the profits.

Id. at 799.

Moreover, allocation of profits may be very difficult where an infringer commingles infringing and non-infringing elements: "An infringer who commingles infringing and noninfringing elements 'must abide by the consequences, unless he can make a separation of the profits so as to assure to the injured party all that justly belongs to him.'" Harper & Row Publishers, Inc. v. Metro-Goldwyn Pictures Corp., 471 U.S. 539 (1985) (citations omitted).

Defendant TCM thus argues that excluding lot costs, common elements, generic features and exterior cost, the total pool for potential TCM profits on Homestead Collections is $2,251,000 and the total pool for potential TCM profits on end units is $1,139,000. (Def. TCM's Mem. Supp. Summ. J. at 17, citing Schwiebert Aff, Ex. P at 54-58.) TCM also states, "Identification of specific individual elements would permit further apportionment of the profits to those specific individual elements." (Id. at 58-59.)

In terms of apportionment, TCM argues that profits from the sale of the interior units is "attributable to factors other than the copyrighted work," and should therefore be eliminated from Defendants' profits damages calculation. (Def. TCM's Mem. Supp. Summ. J. at 17.) According to TCM, Plaintiff admits that it does not allege that the interior units of the accused products are substantially similar to the interior units of the Villa II. (Id., citing Schwiebert Aff., Ex. Q at 903-906.) Plaintiff's "admission," on which TCM bases its argument that profits from interior units should be apportioned out, is based on deposition testimony from Plaintiff's architect, Timothy Whitten. When

asked if it was Rottlund's contention that its interior units were substantially similar to Defendant's, Mr. Whitten responded, "We're not contending that the interior unit of the Rottlund plan is substantially similar to the interior unit of the Homestead plan." (Id. at 904-05.) This testimony could be interpreted to mean simply that Mr. Whitten was not offering an opinion about the substantial similarity of individual elements of the allegedly infringing townhomes.

In a similar vein, the Bloodgood Defendants argue that its expenses related to creating the Homestead Collection must be deducted from any profits recovered by Plaintiff. (Bloodgood Defs.' Mem. Supp. Summ. J. at 11.) The Bloodgood Defendants assert that the gross billings for work done on the Homestead Collection and Washington Square totaled $187,941. Setting aside the issue of deductible expenses, as an initial matter, the parties strongly contest the amount of total billings. Plaintiff notes that BSB's architect Chris Jorgenson submitted a sworn affidavit that the total billings BSB sent to TCM concerning only the Homestead Collection were $192,396.19. (Pl.'s Mem. Opp. at 59, citing Krummen Aff., Ex. R131 at ¶¶ 2, 29.) Plaintiff contends that this figure did not include $24,700 in billings for the Aurora, Illinois development. (Id., comparing R131 at ¶ 2 and Ex. 1-6 with Ex. R69.) Plaintiff's memorandum offers further critique of the Bloodgood Defendants' expenses and apportionment, but the Court finds that sufficient evidence of a material dispute of fact has been presented.

The Court concludes that as to issues of apportionment, material issues of fact preclude a specific dollar amount determination of apportionment, as well as apportioning out Defendants' profits as they pertain to the interior units of the allegedly infringing properties. As the Eighth Circuit stated in Andreas, the allocation of profits between infringement and other factors is "highly fact-specific" and, at

least in that case, was best left to the jury. Andreas, 336 F.3d at 797-98. Based on the strongly contested material facts before it, the Court recommends the denial of the Bloodgood Defendants' motion that, as a matter of law, if Plaintiff is entitled to recover profits from the Bloodgood Defendants, that recovery be limited to the amount of $141,165. Likewise, the Court recommends that TCM's motion on summary judgment for apportionment of profits be denied.

**D. Minnesota Uniform Deceptive Trade Practices Act**

The Bloodgood Defendants argue that Plaintiff cannot recover money damages for its claims under the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43. Plaintiff alleges violations under that Act attributable to Defendants TCM and Pinnacle. (Seventh Am. Complaint, ¶¶ 148, 195.) Plaintiff argues first, that as these allegations are not against the Bloodgood Defendants, they have no standing to challenge these claims; and second, that monetary damages are available under Minn. Stat. § 325D.44.

Minnesota state courts have concluded that money damages are unavailable under the Deceptive Trade Practices Act, noting:

> the legislature granted to the courts the discretion to only award an injunction against such deceptive trade practices, specifically limiting this relief 'under principles of equity.' Generally, injunctive relief is afforded when other legal remedies are inadequate, . . ., but the legislature has allowed such relief against deceptive trade practices regardless of damages or other remedies available at law.

Dennis Simmons D.D.S. v. Modern Aero, Inc., 603 N.W.2d 336, 339 (Minn. App. 1999); see also Alsides v. Brown Institute, Ltd., 592 N.W.2d 468, 476 (Minn. App. 1999) (stating, "the sole statutory relief for deceptive trade practices is injunctive relief.")

Plaintiff, however, points to federal authority which it contends acknowledges the availability of

money damages under the Minnesota Deceptive Trade Practices Act. ((Pl.'s Mem. Opp. at 79, citing Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1502-03 (8th Cir. 1992), cert. denied, 506 U.S. 1080 (1993)).

First, as to the question of standing, the Bloodgood Defendants stated at the motions hearing that they merely seek a ruling that there are no claims of contribution or indemnity against them for violation of the Minnesota Deceptive Trade Practices Act.

In terms of remedies, the statute provides:

> A person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable. Proof of monetary damage, loss of profits, or intent to deceive is not required. . . .

Minn. Stat. § 325D.45, subd. 1 (emphasis added). The statute further permits the award of costs and attorneys' fees to the prevailing party.

The chief case cited by Plaintiff, Amerinet, does not state that monetary damages are available under the Deceptive Trade Practices Act. Rather, in that case, the Eighth Circuit simply noted that the plaintiff alleged two counts of business disparagement, one under common law and the other under Minn. Stat. § 325D.44, "which are essentially the same." (Cf., Pl.'s Mem. Opp. at 79: "The Eighth Circuit has stated that special damages are recoverable under both Minnesota common law and under Minn. Stat. § 325D.44 for deceptive trade practices, because the two are 'essentially the same.'") The Eighth Circuit did not address the more fundamental question before us here, as to whether monetary damages are available under the statute. Moreover, while Minnesota appellate decisions may not be "binding," upon this court, see Bureau of Engraving, Inc. v. Federal Ins. Co., 5 F.3d 1175, 1176 (8th

Cir. 1993), they are certainly instructive authority, particularly when they squarely address the instant issue.

In light of the above, the Court finds that because the Minnesota Deceptive Trade Practices Act does not provide for an award of monetary damages (other than costs and attorneys' fees), the Court recommends granting the Bloodgood Defendants' motion that Plaintiff is not entitled to money damages for its claims under the Minnesota Deceptive Trade Practices Act. The Act limits Plaintiff's damages to injunctive relief and a claim for costs and attorneys' fees.

**THEREFORE, IT IS HEREBY RECOMMENDED that:**

**1.** Defendants' Motion for Partial Summary Judgment Against Plaintiff on Damages (Doc. No. 491) be **DENIED, in part, and GRANTED, in part**, consistent with this Report & Recommendation.

Dated: October 25, 2004

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. L.R. 72.1(c)(2) any party may object to this Report and Recommendation by filing

with the Clerk of Court, and serving all parties within 5 days a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Any party wishing to oppose such objections must file and serve all parties with its response within five days thereafter. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.