**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**The Rottlund Company, Inc. d/b/a/ Rottlund Homes, a Minnesota Corporation**

**Plaintiff,**

**v.**

**Pinnacle Corporation d/b/a/ Town & Country Homes, an Illinois Corporation, and Town & Country Homes, Inc., a Minnesota Corporation, Bloodgood Sharp Buster Architects and Planners of Iowa, Inc., an Iowa Corporation, and The Bloodgood Group, Inc., an Iowa Corporation,**

**Defendants,**

**and**

**Town & Country Homes, Inc., a Minnesota Corporation,**

**Third-Party Plaintiff,**

**v.**

**Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation**

**Third-Party Defendant.**

**Civil No. 01-1980 (DSD/SRN)**

**REPORT AND RECOMMENDATION**

Craig S. Krummen, Esq., and David Davenport, Esq., on behalf of Plaintiff

Darren B. Schwiebert, Esq., on behalf of Defendant Town & Country Homes, Inc.

Christopher Murdoch, Esq., on behalf of Defendant Pinnacle Corp.

Holly J. Newman, Esq., on behalf of Defendant Bloodgood Sharp Buster and The Bloodgood Group, Inc.

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-entitled matter came before the undersigned United States Magistrate Judge on Defendants' Motion for Summary Judgment (Doc. No. 406). This matter has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

Portions of Defendants' collective motion for summary judgment have been previously ruled on by this Court in its August 20, 2004 Report & Recommendation. Therefore, in this Report & Recommendation, the Court addresses the remaining issues, namely, that Defendants move for summary judgment that, as a matter of law: (1) the Chateau Collection drawings do not infringe the Villa II technical drawings; (2) the Homestead Collection, Washington Square, and Chateau Collection as-built structures do not infringe the Villa II as-built structure; and (3) Defendants are not liable to each other on grounds of contributory infringement or vicarious liability.

## I. BACKGROUND

In light of this Court's prior reports and recommendations addressing earlier summary judgment motions which provide detailed factual backgrounds, the Court incorporates those prior factual recitations by reference, and merely describes herein the facts directly relevant to the specific issues

raised in this Report & Recommendation. Most directly relevant is this Court's August 20, 2004 Report & Recommendation, adopted by Judge Doty in his October 19, 2004 Order.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A dispute about a material fact, one that may affect the outcome under the governing law, is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

A moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and it must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). All evidence will be viewed in the light most favorable to the nonmoving party. E.g., Liberty Lobby, 477 U.S. at 255.

## III. DISCUSSION

### A. Infringement of Villa II Drawings: Chateau Collection

Plaintiff alleges that Defendant TCM's Chateau Collection is a revised, enhanced or renamed version of the allegedly infringing Homestead Collection (Seventh Am. Complaint, ¶¶ 75-82), which, Plaintiff argues, renders it an illegal derivative. (Pl.'s Mem. Opp. at 5.) Defendant TCM, however, contends that the Chateau Collection plans "are not related in any way to the Homestead Collection,"

other than that TCM built them both. (Defs.' Mem. Supp. Summ. J. at 3.)

On March 12, 2002, TCM submitted a "proposal for a new residential community called Traditions at Clover Field" to the City of Chaska. (Davenport Aff., Ex. R86.) On April 15, 2002, TCM submitted a revised proposal to the City of Chaska, proposing to develop the Homestead Collection townhomes in addition to the Traditions Collection of single family homes and the Courtyard Collection of multi-family homes in the Chaska housing development. (Id., R87.) TCM hired Tushie Montgomery Architects to assist them with the revisions and entered into contracts with the architects, requiring them to review "all available information completed for the project." (Id., Exs. R96-R98.) Plaintiff's former in-house architect, Tim Johnson executed the contracts with Tushie Montgomery. (Id., Exs. R96-R99.) The City of Chaska passed and adopted a resolution on May 20, 2002, approving the TCM development as a whole. (Id., R88.)

Similarly, on August 1, 2002, TCM submitted its "proposed Pinebrook community" plan to the City of Brooklyn Park. (Id., Ex. R89.) It proposed developing a community comprised of Homestead Collection townhomes. (Id.) The City of Brooklyn Park approved the proposal for development in October 2002. (Id., Ex. R90.)

The TCM Defendants ultimately made some revisions to the Homestead Collection in Chaska and Brooklyn Park, identifying these changes to the respective city officials. For example, on October 18, 2002, the TCM Defendants explained their changes to a Brooklyn Park representative as follows: "We basically added a porch to the end as opposed to just a stoop, added dormers at the ends and kept the shutters on the ends." (Id., Ex. R91.) Similarly, they informed Brooklyn Park that they had made some "enhancements" to the "revised architectural elevations." (Id., Exs. R92 and R93.)

The TCM Defendants described these“enhancements” to the City of Brooklyn Park:

> The attached architectural elevations show the enhancements. Gables were added to break up the mass of the roofline and end elevations. Two different end unit styles/floor plans are now offered. One style features an entrance from the end with an angled living room/bedroom area, while the other enters from the same side as the private doorway without the angle while still offering a porch on the end elevation.

(Id., Exs. R90 and R94.) . Likewise, in an April 2003 memorandum to the City of Chaska, the TCM Defendants described the revisions as “architectural enhancements on the back-to-back product (Homestead Collection) at Traditions.” (Id., Ex. R95.) The revised townhomes in both Brooklyn Park and Chaska were renamed the Chateau Collection. The TCM Defendants aver that Tushie Montgomery designed the Chateau Collection built by TCM at Pinebrook Commons in Brooklyn Park and at Traditions at Clover Ridge in Chaska. (Schwiebert Aff., Exs. F & G.)

**1. Scope of Infringement/Copying and Access**

In their memorandum, Defendants challenge the validity of Plaintiff’s “gestalt,”or “total look and feel” theory and the scope of Plaintiff’s copyrights. At the time of Defendants’ briefing, the Court had not yet entered its August 20, 2004 Report & Recommendation, which addressed this issue and ruled that “the particular manner in which an architect expresses unprotectible elements by selecting, arranging, and combining them is protectible.” The Rottlund Co., Inc. v. Pinnacle Corp., 01-CV-1980, 2004 WL 1879983 at *(D. Minn. Aug. 20, 2004), adopted by J. Doty in Order of October 19, 2004. The Court held that “the selection, arrangement, and combination of the elements expressed in the technical drawings are sufficiently original and detailed to be afforded copyright protection.” Id. at *14. Therefore, Defendants’ argument for summary judgment on Plaintiff’s “gestalt,” or “total look and feel” theory, in this motion is denied as moot.

As to the Chateau Collection drawings and the issue of copying, Defendants do not appear to raise specifically direct copying or access. In any event, the Court's analysis here remains the same as in its August 20, 2004 Report & Recommendation. (See Rottlund, 2004 WL 1879983 at **18-21.) Namely, the Court finds that genuine issues of material fact preclude a finding at this stage of direct copying, but that, as a matter of law, Defendants had reasonable opportunity to view the Villa II technical drawings. (See id. at **21-23.)

**2. Substantial Similarity**

As the Eighth Circuit has held, substantial similarity requires a similarity "not only of the general ideas but of the expressions of those ideas as well." Hartman v. Hallmark Cards, Inc., 833 F.2d 117, 120 (8th Cir. 1987). Similarity of ideas is first examined extrinsically, focusing on objective similarities in the details of the works. If there is substantial similarity in ideas, similarity of expression is evaluated using an intrinsic test depending on the response of the ordinary, reasonable person to the forms of expression. Id.

Applying the same analysis used by this Court in its August 20, 2004 Report & Recommendation, a comparison of the Villa II plans and the Chateau Collection reveals that there is a similarity of ideas. (See Davenport Aff., Ex. R6.) The type of work involved is similar: both are architectural drawings; the subject matter is similar: both are residential, back-to-back townhomes. Moreover, this Court has previously concluded that as to the Homestead Collection and the Villa II drawings, under the extrinsic analysis, the drawings are substantially similar. Describing its revisions of the Homestead Collection to the City of Brooklyn Park (i.e., the Chateau Collection), Defendant TCM itself has acknowledged:

> The project density, layout and type of housing remains unchanged. The revised product continues to be a two-story, slab-on-grade, back-to-back townhome product and maintains a similar base price of $160-$170,000. Front doors and/or porch features will face the public streets and existing residential areas for the majority of the project, while the garages will be viewed and accessed from private internal driveways.

(Id., Ex. R90 at 33269) (emphasis added).

Notably, the changes to the plans are described by TCM as follows: "The attached architectural elevations show the enhancements. Gables were added to break up the mass of the roofline and end elevations. Two different end unit styles/floor plans are now offered." (Id.) Defendants themselves characterize the changes as "enhancements."

As to the intrinsic analysis, whether the drawings' expression is similar depends upon the response of an ordinary, reasonable person. Hartman, 833 F.2d at 120. Summary judgment at this stage is "not favored." Id. Considering the Villa II drawings and the Chateau Collection drawings, this Court finds that a reasonable juror could find that the selection, arrangement and coordination of elements in the drawings is substantially similar, but a reasonable juror would not be compelled to so find. Therefore, the Court finds that genuine issues of material fact preclude granting Defendants' motion for summary judgment that the Chateau Collection drawings do not, as a matter of law, infringe Plaintiff's copyrights.

**B. Infringement of the As-Built Villa II: As-Built Homestead Collection, As-Built Washington Square and As-Built Chateau Collection**

As to copying and access, Defendants argue that the Court should rule as a matter of law that there is no proof of actual copying by Pinnacle of deposit materials for the 447-395 and 526-285 copyright registrations. (Defs.' Mem. Supp. Mot. Summ. J. at 27.) The Court's August 20, 2004

analysis of actual copying and access (see Rottlund, 2004 WL 1879983 at **18-21) is equally applicable to the as-built structures. As noted above with respect to the Chateau Collection drawings, and as previously held with respect to the Homestead Collection and Washington Square drawings (see id. at **21-23) , the Court finds that genuine issues of material fact preclude a finding at this stage of direct copying, but that, as a matter of law, Defendants had reasonable opportunity to view the Villa II technical drawings. Moreover, the evidence in the record shows that Defendants had access to the as-built units: for example, BSB architect Larry Moore, along with Pinnacle's in-house architect Steve Sandelin and TCM President Art Plante toured Rottlund's Villa II town homes. (Davenport Aff., Ex. R46 at 150, 152.) Members of the group took photographs and marketing brochures depicting Plaintiff's copyrighted floor plans and elevations. (Id. at 158-159; Ex. R41 at 102-104.)

The primary focus of Defendants' summary judgment motion, however, centers on whether the TCM Defendants' as-built townhomes are substantially similar to Plaintiff's as-built Villa II townhomes. At the motions hearing, Defendants stated that the extrinsic test analysis for the as-built works involves the same analysis as applied to the architectural drawings. Plaintiff does not dispute this, nor does the Court, which finds that the Eighth Circuit makes no distinction between the type of "work" in its substantial similarity analyses. See, e.g., Taylor Corp. v. Four Seasons Greetings, LLC, 315 F.3d 1039, 1043 (8th Cir. 2003); Schoolhouse, Inc. v. Anderson, 275 F.3d 726, 729 (8th Cir. 2002); Hartman, 833 F.2d at 120.

Applying the extrinsic test requires focusing on the similarity of ideas. A comparison of the Villa II as-built structure with the Homestead Collection, Washington Square and Chateau collection as-built structures reveals that the type of work involved is similar: all are back-to-back, slab-on-grade

townhomes. Certain elements overlap in the analysis of both the architectural designs and the as-built structures. For example, TCM's expert, Jeffrey Scherer noted that the following "elements" pertain to both the Villa II and the Homestead Collection (not differentiating between the plans and the as-built structures): "wood framed structure, slab-on-grade [with] kitchen, dining, living, bathroom, 2-car garage, master bedroom and bath, bedroom, laundry, shared bath, and spare room; gabled roofs, double-hung windows, protected entrances and siding with masonry base." (Davenport Aff., Ex. R108 at 9.) Again, Mr. Scherer did not explicitly confine his comments to just the architectural plans or to just the as-built structures, when opining, "I too agree that these products have obvious superficial similarities." (Id. at 30.)

As with the application of the extrinsic test to the Chateau Collections plans, discussed above, as well as the Homestead Collection and Washington Square plans addressed by this Court in its August 20, 2004 Report & Recommendation, the Court finds that to engage in a more greatly detailed analysis would invade the intrinsic stage of analysis in which the similarity of expression is evaluated. The Court thus concludes that a comparison of the as-built structures reveals that there is a similarity of ideas in the extrinsic analysis and Defendants are not entitled to summary judgment on this basis.

As to the intrinsic step, i.e., the response of a reasonable, ordinary person, Hartman, 833 F.2d at 120, this analysis involves extremely close questions of fact. A reasonable juror could look at the as-built structures at issue and conclude that they are substantially similar, or a reasonable juror could reach the opposite conclusion. Therefore, the Court recommends that summary judgment be denied.

**C. Vicarious Liability**

Vicarious liability exists "[w]hen the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials." Peer Internat'l Corp. v. Luna Records, 887 F.Supp. 560 (S.D.N.Y. 1995); accord, Rottlund v. Scott Larson Co., Inc., 02-CV-1238, 2004 WL 742054, *5 (D. Minn. 2004).[1]

Defendants argue that this court should rule, as a matter of law, that they are not liable for vicarious liability. (Defs.' Mem. in Supp. Mot. Summ. J. at 22.) TCM argues that there is no evidence in the record showing that it possessed the right and ability to supervise the allegedly infringing conduct of Pinnacle, BSB or Bloodgood. (Id. at 21-22.) A separate analysis is required for: (1) TCM and Pinnacle's vicarious liability as to each other; (2) BGI and BSB's vicarious liability as to each other; and (3) TCM/Pinnacle's vicarious liability as to the Bloodgood Defendants.

**1. TCM and Pinnacle's Vicarious Liability as to Each Other**

Plaintiff points to specific evidence in support of its contention that TCM and Pinnacle have the "right and ability to supervise, coalescing with an obvious direct financial interest in the exploitation of copyrighted materials." Pinnacle and TCM both pay an "equity fee" to a third company called TCH, Inc. (Davenport Aff., Ex. R116 at 8-10.) The directors set this fee and Pinnacle, TCH, Inc. and TCM all have the same directors, the same officers and the same shareholders – six members of the Ryan family. (Id. at 14, 23-24, 26-27.) Pinnacle and TCM have "inter-company" transactions or payments

[1]The Court notes that in a different context, it addressed similar "control" factors between the parties in its Order of July 13, 2004. There, the Court granted the Bloodgood Defendants' motion to dismiss Plaintiff's damages theory that sought to hold the Bloodgood Defendants jointly and severally liable for its alleged co-infringers' profits.

made directly from one company to the other which involve a "myriad of items." (Id., Ex. R117 at 46-48.)

Referring to financial statements for nearly the same time period, Plaintiff notes that in one calendar year, TCM spent approximately $2.48 million in litigation expenses. (Davenport Aff., Ex. R119, D43159.) Comparing that figure to TCM's overall profit for that year, Plaintiff claims that TCM spent nearly 35% of its profit defending a suit in which both TCM and Pinnacle are named defendants. In contrast, Plaintiff points to Pinnacle's financial statements, which lump all legal fees into one line item (id., Ex. R117 at 264), and which indicate that for a nine-month period (as opposed to the twelve-month period described above for TCM), Pinnacle's reported total legal fees were just $271,000. (Id., Ex. R120 at PINN07952.) Plaintiff contends that this further underscores the interrelationship between TCM and Pinnacle, who, Plaintiff believes, are "exercising their right and ability to supervise and coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials." (Pl.'s Mem. Opp. at 47.)

Despite Defendant's general representations to the contrary, the Court concludes that Plaintiff has presented evidence sufficient to create genuine issues of material fact as to vicarious liability between TCM and Pinnacle. Accordingly, the Court recommends that Defendants' motion for summary judgment as to vicarious liability between TCM and Pinnacle be denied.

**2. BGI and BSB's Vicarious Liability as to Each Other**

Plaintiff points to an organizational chart indicating that BGI supervises and controls BSB. (Davenport Aff., Ex. R121.) Doug Buster, BGI's majority shareholder, testified that BSB is one of BGI's corporations. (Id., Ex. R122 at 7.) Mr. Buster indicated that from 1998 to the present, he

represented the entire company every day. (Id. at 59-61, 63-69, 71-73.) BSB's Rule 30(b)(6) witness testified that all of BSB's profits are directed to BGI. (Id., Ex. R123 at 27-35.) BGI uses a "special profit sharing formula" to direct a portion of those profits back to BSB and all other related Bloodgood companies, although the witness could not recall what factors were used to determine the profit sharing amounts from 1998-2002 – the time period in which BSB was working on the allegedly infringing Homestead Collection designs. (Id. at 32-33, 35.)

The Court finds that Plaintiff has presented sufficient evidence to create genuine issues of material fact as to vicarious liability between BGI and BSB. The Court therefore recommends that Defendants' motion for summary judgment as to vicarious liability between BGI and BSB be denied.

### 3. Defendants TCM/Pinnacle and the Bloodgood Defendants

TCM contends that the only evidence in the record is that it hired BSB as its architects to design the plans for the Homestead Collection. (Defs.' Mem. Supp. Mot. Summ. J. at 22.) TCM argues that there is no evidence, however, that it possessed an "obvious and direct financial interest" in the allegedly exploited copyrighted materials by the Bloodgood Defendants. While Plaintiff does not necessarily concede the issue of vicarious liability between the TCM Defendants and the Bloodgood Defendants, it does not address it in its memorandum.

The Court finds that there is no evidence before it showing the requisite 'right and ability to supervise coalescing with an obvious and direct financial interest in the exploitation of copyrighted materials' between the two "groups," i.e., the TCM Defendants and the Bloodgood Defendants. Accordingly, the Court recommends that Defendant's motion for summary as to vicarious liability

between the TCM Defendants and the Bloodgood Defendants be granted.

**D. Contributory Infringement**

Defendants argue that there is no evidence in the record demonstrating that any one of them contributed to the allegedly infringing conduct of any other Defendant. (Id. at 21-22.) The standard for liability under the theory of contributory infringement is that "one who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another. . ." is jointly and severally liable for the infringement. Peer Internat'l Corp., 887 F.Supp. at 565; see also Rottlund, 2004 WL 742054 at *6 (for plaintiff to establish contributory infringement, it must show that the particular defendant: (1) induced, caused, or materially contributed to the infringing conduct of another, and (2) knew of the infringing activity.) The key requirements, therefore, are knowledge and participation. Demetriades v. Kaufmann, 690 F.Supp. 289, 292-93 (S.D.N.Y. 1988). At least one court has held that constructive knowledge, which may be inferred from the facts, creates a question of fact, making summary judgment for contributory infringement inappropriate. See Nationwide Educational Dev. Corp. v. Rex Communications, Inc., 88 CIV 4957 JFK, 1990 WL 64595 at *5 (S.D.N.Y. May 3, 1990) (triable issue of fact remained concerning whether the low price of the book at issue should have prompted defendants to suspect something was amiss regarding the book.)

Plaintiff argues that the evidence demonstrates at least a fact issue for the jury. For example, Plaintiff notes that BGI and Pinnacle met in March 1998 to begin planning the development of townhomes in Minnesota. Later, Pinnacle, TCM and BSB traveled to Minnesota and toured Plaintiff's townhomes. Rottlund v. Pinnacle, 01-CV-1980, 2004 WL 1494579, *4 (D. Minn. June 30, 2004). According to BSB's architect Larry Moore, the Defendants intended to "improve" upon existing

designs, which Plaintiff interprets to mean that Defendants intended to "copy" existing designs. (Pl.'s Mem. Opp. Mot. Summ J. at 44.)

Plaintiff also notes that Pinnacle insures TCM, its Minnesota Division, under the same insurance policies that it purchases to insure itself. (Davenport Aff., Ex. R114, see e.g., D1403, 1405, 1421, 1536, 1538-42.) Likewise, BGI insures BSB. (Id., Ex. R115 at BGI528.) As to TCM and Pinnacle, Plaintiff further notes that in their marketing brochure for Minnesota, the TCM Defendants represent that they are one entity – "Town & Country Homes." (Davenport Aff., Ex. R112 at RCI000102, 108-09; Ex. R116 at 94-114.) Their business cards and letterhead refer to their "Minnesota Division." (Id., Ex. R124.) The July 16, 2001 response to Rottlund's cease and desist letter was on "Town & Country Homes Minnesota Division" letterhead, and was signed by "Art Plante, President Minnesota Division." (Id., Ex. R54.) In addition, Plaintiff notes that the TCM Defendants' payroll is processed from Pinnacle's Illinois office, their human resources and accounting departments are in Illinois, financial reporting occurs in Illinois, and insurance, computer information, executive financial services and executive management services are all provided from Pinnacle's Illinois office. (Id., Ex. R116 at 89-94.) Thus, Plaintiff argues that these facts refute any argument that there are no genuine issues of material fact concerning Pinnacle's knowledge of and participation in TCM's conduct (and vice versa) and BGI's knowledge of and participation in BSB's conduct (and vice versa).

As to contributory infringement between TCM and Pinnacle, the Court finds that genuine issues of material fact preclude summary judgment. The same is true as to contributory infringement between BGI and BSB and as to contributory infringement between the TCM Defendants and the Bloodgood Defendants. Plaintiff has presented evidence in support of the requisite knowledge and participation

sufficient to create genuine issues of material fact. Accordingly, the Court recommends that Defendants' motion for summary judgment on contributory infringement be denied.

**THEREFORE, IT IS HEREBY RECOMMENDED that:**

**1.** Defendants' Motion for Summary Judgment (Doc. No. 406) be **GRANTED, in part, and DENIED, in part.**

Dated: October 28, 2004

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. L.R. 72.1(c)(2) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties within 5 days a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Any party wishing to oppose such objections must file and serve all parties with its response within five days thereafter. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.