# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

The Rottlund Company, Inc.,
d/b/a Rottlund Homes,
a Minnesota Corporation

Plaintiff,

vs.

Pinnacle Corporation,
d/b/a Town & County Homes,
an Illinois Corporation, and
Town & County Homes, Inc., a
Minnesota Corporation, Bloodgood Sharp
Buster Architects and Planners of Iowa,
Inc., an Iowa Corporation, and The
Bloodgood Group, Inc., an Iowa
Corporation,

Defendants.

No. 01-CV-1980 (DSD/SRN)

**AFFIDAVIT OF LARRY MOORE IN SUPPORT OF DEFENDANTS BLOODGOOD SHARP BUSTER ARCHITECTS AND PLANNERS OF IOWA, INC., AND THE BLOODGOOD GROUP, INC.'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT AGAINST PLAINTIFF**

**FILED UNDER SEAL**

STATE OF IOWA )
) ss.
COUNTY OF POLK )

Larry Moore, being duly sworn, states:

1. I am employed by Defendant Bloodgood Sharp Buster Architects and Planners of Iowa, Inc. ("BSB").

2. I designed the Homestead Collection for Defendant Town & Country Homes, Inc. ("TCM"). Chris Jorgensen, another BSB employee, served as project manager for the Homestead Collection project.

3. BSB has produced timesheets which indicate that I spent approximately 72.5 hours in 1998 from the start of the project in April through July when the first set of design development drawings were issued on the Homestead Collection project. A copy of my

timesheets that reflect time spent on the Homestead Collection project are attached as Exhibit G to the Affidavit of James Grundmeier.

4. My timesheet for the week ending April 3, 1998, indicates that I spent 14.5 hours on the Homestead Collection townhome project. I spent 7 hours traveling round trip from Des Moines to Minneapolis and 6.5 hours meeting with Art Plante and others at TCM, and touring the Twin Cities townhome market to see the products and trends in the Minneapolis metropolitan market.

5. While designing the Homestead Collection, I only referred to plans from projects for past BSB clients, such as Good Value Homes, Jerry's Homes, and Midland Homes. I only referred to plans that were housed in BSB's marketing files. I did not review any of the contents of the Good Value Homes, Jerry's Homes, or Midland Homes project files.

6. Prior to the commencement of this litigation, I had never seen the Rottlund technical drawings, including the technical drawings identified in Rottlund's copyright applications and VAus. I have never copied the materials identified in any of Rottlund's copyright applications or VAus.

7. While producing my original schematic designs for the Homestead Collection, I did not refer to or use, in any way, any Rottlund plan, drawing, brochure, advertisement, or photograph.

8. During the product tour I attended in Minneapolis in 1998, I did not take any photographs of any Rottlund product, nor did I take any brochure for any Rottlund product. During that tour, I spent approximately 5 minutes, and certainly less than 15 minutes, touring Rottlund's products. I did not learn anything new about back-to-back townhomes as a

result of this product tour, nor did I see any new features or design ideas that BSB had not explored before.

9. The schematic design of the Homestead Collection townhome was my independent creation. I created the Homestead Collection based on my expertise and experience as a residential architect and my knowledge of past products designed by BSB and BGI. The schematic design for the Homestead Collection is my original work and is not a copy, or derivative, of any other townhome.

10. Prior to July 7, 1998, I produced a number of conceptual drawings for the Homestead Collection town home. Reduced-size copies of these plans are attached hereto as Exhibit A.

11. On July 7, 1998, BSB produced the first set of design development drawings depicting the Homestead Collection. Reduced-size copies of these plans are attached hereto as Exhibit B.

12. In 1998, I only participated in one product tour that included Rottlund's product, and that tour took place on March 31. I did not participate in any tour in Minneapolis on April 29, 1998.

Further your affiant saith not.

Larry Moore

Subscribed and sworn to before me this 8th day of March, 2004.

Notary Public, Polk County

MPLS-48606 1/16350-166

NANCY M. NELSON
Commission Number
My Commission Expires
November 21, 2004

Exhibit B

UNITED STATES DISTRICT COURT DISTRICT O

FOURTH DIVISION No.:

- - - - - - - - - - - - - - - - - - - - - - - - - - - -The Rottlund C

d/b/a Rottlund Homes, a MinnesotaCorporation,

Plaintiff,vs.

Pinnacle Corporationd/b/a Town & Country Homes,

an Illinois Corporation, andTown & Country Homes, Inc.,

a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc.,

a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &

Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

Videotaped

30(b)(6) Deposition of

BLOODGOOD SHARP BUSTER ARCHITECTS &

PLANNERS OF IOWA, INC.

(Testimony of Larry W. Moore)

Thursday, March 6, 2003 (Volume I, pages 1 - 61)

Friday, March 7, 2003 (Volume II, pages 61 - 327)

Q Now, you identified DeMaria Building Company on
your resume. You just testified that that's a form
of back-to-back, correct?
A Correct.
Q Are there any others on this resume that are
back-to-back or some form of back-to-back?
A (Reviewing.) I do not believe so.
Q Okay. How much involvement did you have with the
DeMaria Building Company? I believe you identified
it as retail on the first floor and back-to-back on
the two above that?
A Correct.
Q How much involvement did you have in that project?
A Initial client contact, working with the program
script the client brought to us, design. And
pretty much at design -- the end of schematic
design, it would start to transition to our project
manager and his team.
Q What year was that, or years?
A I'm going to say the process started in 1999.
Q So that was after you were involved in the Town &
Country Homestead Collection back-to-back?
A Correct.
Q So far we've identified projects you were involved
with as, number one, Midland Homes; number two,

Good Value Homes; number three, Jerry's Homes; number four, DeMaria; and then Town & Country of Minnesota. All of those were projects that you worked on that involved some kind of back-to-back townhome, correct?

A Correct.

MS. NEWMAN: Object to the form of the question.

BY MR. KRUMMEN:

Q I believe you said that your involvement in the Mid- -- in the Midland Homes case was initial client contact. Correct?

A Correct.

Q Did you have any other involvement beyond the initial client contact?

A Well, after --

MR. FARMER: Objection. Asked and answered.

A Client contact, again, the -- working with the program the client brought to us, schematic design.

BY MR. KRUMMEN:

Q You'd call that something more than minimal involvement, as you used the term, correct?

A Yes.

Q How would you characterize your involvement in the

Midland Homes case? Would it be substantial involvement?

MR. FARMER: Objection. Form.

MS. NEWMAN: Same objection.

A In the -- in the Midland Homes back-to-back townhouses?

BY MR. KRUMMEN:

Q Yes, sir.

A That would be a substantial contribution to the project.

Q And then on the Good Value Homes back-to-back project, I believe you used the words "minimal involvement." Correct?

A Yes.

Q Jerry's Homes back-to-back project, I believe you used the worms -- the words "minimal involvement." Correct?

A I would use the words "very minimal" on that project.

Q Thank you. And then DeMaria, how would you characterize your involvement in that project?

A Substantial.

Q And obviously substantial involvement in the Town & Country back-to-back project, correct?

MR. FARMER: Objection. Form.

knowledge of what they do. I'm more familiar with their product that's front-to-back.

Q I'm using Exhibit 101 sort of as a marker chronologically, and the next question is not tied to Exhibit 101, although that may help you in answering it. When was the first time you discussed a back-to-back townhome design with anyone at Town & Country of Minnesota or anyone at Town & Country of Illinois?

MR. FARMER: Object to the preamble.

A The first time would have been when Art Plante contacted us about the possibility of doing that work in probably March '98.

BY MR. KRUMMEN:

Q Did you take any notes or do you have any memoranda regarding that initial contact?

A That I don't remember. It -- it would be in my schematic file, if it existed.

Q What do you recall about that conversation?

A Quite -- quite little. Very little.

Q Do you recall anything about the conversation you had sometime in March of 1998 with Mr. Plante about the possibility of designing a back-to-back townhome for Town & Country?

A What I do recall is that Art wanted us to come up

and discuss the program, and we talked about it. I mean, it was a back-to-back. We knew we were going to be doing that.

And I think he gave me enough preliminary information that -- that I researched our files. I went armed with the knowledge of -- of what we had done previously, the company, BSB.

Q You say you went armed with the information of what BSB had done previously. Do you mean with respect to back-to-back townhome projects?

A That's correct.

Q So in looking through the old files, is it fair to say you looked at the materials that related to, say, the Midland Homes back-to-back project you were involved with?

MR. FARMER: Object to form.

A I think I probably did.

BY MR. KRUMMEN:

Q And also the Good Value Homes that BSB of Iowa was involved with, back-to-back project?

A I would say I did, yes.

Q And you also looked through the Jerry's Homes back-to-back files that BSB of Iowa was involved with?

A That's correct.

Q But the DeMaria project didn't start until 1999, so you didn't look through those files, correct?
A That's correct.
Q Did you look through any other materials at BSB Iowa or anywhere else before you went up to speak with Art Plante?
A I may have. I really don't remember.
Q Did you speak with anyone from -- well, strike the question.
Are you familiar with an entity known as Tracy Cross Associates, Inc.?
A Yeah, I'm familiar with Tracy Cross Associates.
Q Have you worked with Tracy Cross in the past?
A Yes.
MS. NEWMAN: Objection as to form.
BY MR. KRUMMEN:
Q Let's -- when did you first begin working with Tracy Cross?
A I -- I'm -- I'm -- early '90s. I'm make -- making a guess.
Q Do you recall what the project was that you worked on that Tracy Cross -- well, strike the question.
Was it a project the first involvement you had with Tracy Cross or was it something else?
A It was a project.

identification by the reporter.)

THE REPORTER: 114.

BY MR. KRUMMEN:

Q Before you as Exhibit Number 114 is a transmittal from you to Steve Sandelin at Town & Country Homes. The date is Tuesday, May 5, 1998, and it relates to a villa townhomes project. Have I accurately characterized the exhibit thus far?

A Correct.

Q The bottom right-hand corner contains the Bates label BSB 01944, and under the "Remarks" you wrote, "Steve," colon, quote, "Competition product survey for Minneapolis area," period, end quote. Have I accurately read that?

A Yes.

Q What does the competition product survey language refer to in your transmittal?

A I do not remember this. I don't think we had any kind of a product or project survey that I remember.

Q How would you go about finding whatever it was that you transmitted to Mr. Sandelin in connection with this Tuesday, May 5, 1998, transmittal, as you sit here today?

MS. NEWMAN: Objection. Foundation. Calls for speculation. You can answer if you know.

MS. NEWMAN: Objection as to form.
MR. FARMER: Object. Form.
A No. But it has been, in the past, that we'd give an administrative assistant the responsibility of gathering information and then firing it off to somebody. So that could be a -- that could be a situation where I wouldn't necessarily know what was in the file, in the -- in the transmittal. I don't know if that's the case here.
BY MR. KRUMMEN:
Q Exhibit 114, the competition product survey referenced there, did it contain any materials from Tracy Cross Associates?
MS. NEWMAN: Objection. Asked and answered. And foundation. Form. Answer if you know.
A I don't know.
BY MR. KRUMMEN:
Q Do you have any knowledge regarding the competition product survey file that's referenced in Exhibit 114, as you sit here today?
MR. FARMER: Objection. Asked and answered.
MS. NEWMAN: Same objection.
A I do not know what that was.

A I believe so, yes. Late March.
Q So Mr. Plante contacted you in late March of 1998 and invited you to come up to Minnesota to discuss a back-to-back possibility program?
A Correct.
Q What happened next?
A Chris Jorgensen and I took a trip up to Minneapolis and met with Art and at least one of his group, in -- in their offices. We got up there, I think it was in the morning.
Q And you met with him before you signed the contract, correct?
A Correct.
Q Did you go on a tour of any of Town & Country of Minnesota's competitors when you were up there in March of 1998?
MR. SCHWIEBERT: Object. Form.
A Yes, we did.
MR. FARMER: Foundation as to the time of the trip.
BY MR. KRUMMEN:
Q Which competitors' products did you tour in March of 1998?
MR. FARMER: Same objection.
A There were several--we had quite a full day--spread

out all over the place. There's a number.
BY MR. KRUMMEN:
Q Do you recall any of the competitors whose products you toured?
A A few. Centex, Pulte -- I'm -- I think Pulte. Rottlund. There were a number of smaller builders that I'm just not familiar -- that familiar with. I believe Ryland. Those are the ones that come to mind.
Q Did you look at a Rottlund back-to-back townhome during your tour that occurred in March of 1998?
A Yes. Yes, we did.
Q Do you recall where it was located?
A No.
Q Did you take any notes of your tour of the Rottlund back-to-back townhome in March of 1998?
MR. FARMER: Object to foundation --
A No.
MR. FARMER: -- as to the time.
BY MR. KRUMMEN:
Q Did you take any pictures, videotapes of the Rottlund back-to-back townhome?
A No.
Q Did anyone else in your group do so?
A Not that I remember.

Q Did anyone else in your group take notes of the Rottlund back-to-back townhome that was toured in March of 1998?

MR. FARMER: Foundation objection as to time.

A Not that I remember.

BY MR. KRUMMEN:

Q Were any brochures picked up by anyone in the group during the tour of the Rottlund back-to-back townhome in March of 1998?

MR. FARMER: Same objection.

A I don't remember having any brochures to look at as we were riding from project to project. I just know that Chris and I did not pick up brochures.

BY MR. KRUMMEN:

Q Did either of you look at any competitor brochures during the tour that occurred of back-to-back townhomes in March of 1998?

MR. FARMER: Same objection.

A I don't recall any brochures, no, I don't.

BY MR. KRUMMEN:

Q Do you recall any Rottlund brochures that you looked at during the March of 1998 tour of Rottlund's back-to-back townhome?

MR. FARMER: Same objection.

A No.

BY MR. KRUMMEN:

Q Why was it necessary to look at Rottlund's back-to-back townhome in March of 1998?

MS. NEWMAN: Objection as to --

MR. FARMER: Objection. Foundation as to time frame and as to the necessity. Form of the question.

MS. NEWMAN: Objection as to form.

A We looked at a lot of products primarily to help us, BSB, get a feel for that market. I guess we liked to put ourselves in the buyer's shoes, go out, tour the product, see what I like to say is how sophisticated the market is, how -- what the interiors, the quality of the furnishings and -- and how they decorate the units. It tells you a lot about what the builder will expect as far as a -- a design of a product and just general feel. So we -- we kind of just shop it that way from the buyer's viewpoint.

BY MR. KRUMMEN:

Q Were there any other reasons for touring Rottlund's back-to-back townhome and other competitors in March of 1998?

MR. FARMER: Objection. Foundation as to

time frame.

A In -- in general, again, we just -- we'd like to see the products that are out there to see -- with our experience nationally, there are a lot of good trends and things that we can bring to any product. We like to understand if those are in the market or not.

Again, as I said, the buyer's perspective is important to us. We go in and we -- we look for mistakes. We look for obvious things that the -- the -- the -- the builders in that market are doing or not doing. Like I say, from our experience, we have a lot of opportunities to bring great ideas in from all over the country.

And generally we don't -- we don't study the competition. We're not there long enough. I mean, this is -- there's a lot of things we're doing in one day. It wasn't a full day either. But we look for opportunities to basically one-up the competition.

BY MR. KRUMMEN:

Q What do you mean by that?

A We see a mistake they're making and we better it. If their rooms are too small, we make them bigger. If their closets are too small, we make them

bigger. We better it.

Q What mistakes did Rottlund make in its back-to-back townhome which you toured in March of 1998?

MS. NEWMAN: Objection.

MR. FARMER: Objection. Foundation. Form.

MS. NEWMAN: Same -- same objections. Go ahead.

A I don't know that I noted anything specific. Again, we weren't studying individual units to that -- to that extent. Glaring errors we would look at. Nothing stands out in my mind from any specific product.

BY MR. KRUMMEN:

Q Did you meet with Mr. Plante or anyone else that represented Town & Country, after the March of 1998 tour?

MR. FARMER: Objection. Foundation as to time frame of the tour.

A After the tour, we went back to Des Moines, generated the proposal and then put that back in front of Art by mail, I'm sure, or fax, and then moved into schematic design after that. I don't remember that we had any more face-to-face meetings through the process.

Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

---

The Rottlund Company, Inc.
d/b/a Rottlund Homes, a Minnesota
corporation,

Plaintiff,

vs.

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois corporation, and
Town & Country Homes, Inc.,
a Minnesota corporation,

Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa corporation,

Third-Party Defendant.

---

Videotaped Deposition of
LARRY MOORE
Thursday, September 4, 2003
9:40 a.m.

the Town & Country end.

Q. And in terms of your involvement with design development, was Steve Sandelin involved from the Town & Country end?

A. Specifically, I can't rem- -- I can't remember of any instance. But I -- I guess he probably was. I'd be guessing, but it --

Q. Do you know who was involved from the Town & Country end or anyone involved from the Town & Country end during the construction document phase for the Homestead Collection?

A. Other than the people I've already mentioned, no, I wouldn't know of any additional.

Q. Now, I believe you testified in your last deposition that you were the one that came up with the schematic designs for the Homestead Collection. Correct?

A. Correct.

Q. Were those designs derived from any other BSB of Iowa project?

A. They were derived from ideas that came out of our -- our marketing design file.

Q. Okay. Which marketing design file?

A. Which marketing design file? The design -- the design file -- the marketing design file in our

marketing department. That's one large collection of files for all of our company, for resource we have.

Q. And I think we covered that the last time, so let me get more specific this time. Did you look at any marketing designs from Sandburg Village, a development in Chicago, Illinois?

A. I don't recognize that name.

Q. How about a four-wheel -- a fourplex pinwheel built by Kimball Hill, did you look at that material when you were working on the schematic designs for the Homestead Collection?

A. I didn't specifically access it. But I know that project, so I didn't have to.

Q. And how is it that you know that Kimball Hill fourplex pinwheel project?

A. I've seen it in the design file, going through it for other projects.

Q. Was it built in the late '70s?

A. Couldn't tell you when it was built. I don't look at that data.

Q. Did it predate your start with BSB of Iowa, the design and construction of the Kimball Hill project? I'm talking about the pinwheel.

A. I don't know when it was built, so I don't

know if it predated it or not. I -- you know, I don't know.

Q. Let's get back to your earlier testimony. And I don't want to mischaracterize it, but I'm not sure if you looked at the Kimball Hill designs when you were working on the schematic design for the Homestead Collection or not. What happened in that regard?

A. In reference to the Kimball Hill?

Q. That's right. Did you look at the Kimball Hill designs when you were working on the schematic design phase for the Homestead Collection?

A. No, I don't think I did specifically for that.

Q. How about the Hemphill at Adare Farm designs, did you look at those when you were coming up with the schematic design for the Homestead Collection?

A. No, I don't think I did.

Q. How about the Coventry Court for Town & Country Homes, did you look at those designs when you came up with the Homestead Collection schematic design?

A. I don't remember those, no.

Q. How about the Streamwood project for Kirk

Corporation, did you look at those designs when you came up with the schematic design for the Homestead Collection?

A. I was familiar with those, but I did not access them.

Q. Now, let's -- I -- I think you said you were familiar with Kimball Hill's designs, and now you've told me you're familiar with the Streamwood designs, correct?

A. And -- and familiar in that I have seen them as I've gone through files, accessing them for -- for other marketing purposes. So I don't have a tremendous -- tremendous familiarity with it, but, yeah, I have seen those names.

Q. Okay. Did you derive the Homestead's schematic design from the Kimball Hill designs?

A. No.

Q. Did you derive the Homestead Collection schematic design from the Streamwood designs?

A. Specifically, no. Ideas came out of all of those projects, which, you know, were incorporated as far as ideas on how to assemble room locations and elements and things like that, so --

Q. When you say, "all of those projects," could you tell me which projects you're referring

to?

A. Well, specifically the ones that -- that I used and had in my files were Midland, Good Value Homes, Jerry's Homes. Those are the three I can remember off the top of my head.

Q. And those are the three that you gave me before. I think that there was a fourth back-to-back that you worked on, but it postdated your schematic design for the Homestead Collection. Let me make sure I get that right. DeMaria?

A. DeMaria.

Q. That was after the Homestead Collection, right?

A. Yes. Correct.

Q. Okay. So the ones you looked at were Midland, Good Value, and Jerry's Homes. DeMaria came later. Let me just keep working through this list, though. In terms of the Adare Farm and College Hill, did you have any reference point or opportunity to look at those designs --

A. Could I --

Q. -- during the schematic --

A. Could I --

Q. -- design process?

A. Excuse me. Could I see that list? Because

Q. It is -- it is substantially different. And the next question is, is the Homestead Collection substantially different than the Midland back-to-back townhome?

A. Yes.

Q. Is the Homestead Collection substantially different than the Jerry's Homes back-to-back townhome?

A. Yes.

Q. Why do you say that the Homestead Collection is substantially different than the Jerry's Homes back-to-back townhome?

MS. NEWMAN: Objection, form and foundation. Go ahead if you can make the comparison without those documents in front of you.

THE WITNESS: From what I can recall without the documents in front of me is that there are, once again, substantial differences to detailed items in the plan, to the elevations, materials, massing of the building, volumes, proportions of those. That's general. Without looking at drawings and comparing, you know, elements, I couldn't go into more break -- detail breakdown.

BY MR. KRUMMEN:

Q. Is the Homestead Collection more similar to

Midland or more similar to Rottlund's Villa II back-to-back townhomes?

MS. NEWMAN: Objection as to form and foundation. You can answer if you can do that without comparing documents.

MR. CARMICHAEL: Join in the objection as to the word "similar."

MS. NEWMAN: Go ahead.

THE WITNESS: I don't think you could categorize it more or less similar than -- than any one project. They all have their specific feel and collection, combination of elements that I think makes each one what it is; unique, if you want to call it that.

BY MR. KRUMMEN:

Q. Is the Homestead Collection more similar to Rottlund's Villa II back-to-back townhome or more similar to Jerry's Homes back-to-back townhome?

MS. NEWMAN: Same objections. Go ahead.

THE WITNESS: Since -- since we used our experience on the BSB projects, I would have to say it's more similar to -- to Jerry's Homes.

BY MR. KRUMMEN:

Q. So in your opinion, the Homestead Collection back-to-back townhome design is more

Value's back-to-back design versus Rottlund's Villa II design, correct?

MS. NEWMAN: Objection as to form and foundation. Go ahead.

THE WITNESS: Yeah, I would say it's more similar to Good Value.

BY MR. KRUMMEN:

Q. Now, you said you didn't have access to Rottlund's materials. Maybe I mischaracterized that, but is it your testimony that you didn't have access --

A. No.

Q. -- to anything of Rottlund's --

A. No. That's --

Q. -- when you designed the Homestead Collection?

A. That's not -- that's not a correct statement. We had access. We did not access them. We did not use them.

Q. When you say you had access, I believe that you told me in the last deposition that you toured Rottlund's Villa II during the schematic design phase for the Homestead Collection. Correct?

MS. NEWMAN: Objection as to the form of the question. I think it mischaracterizes the prior

MS. NEWMAN: Objection as to foundation. You can answer if you know.

THE WITNESS: I don't know if it's been produced in this -- since it's come to light, I mean, for me to see that and refresh my memory. I -- I don't know where that stands in this process.

BY MR. KRUMMEN:

Q. Can you sit here and testify with certainty that the competition product survey you received from Art Plante in May of '98 did not have any Rottlund materials in it?

A. Nothing I saw -- nothing I saw had Rottlund materials in it here.

MR. KRUMMEN: Move to strike the question. Could you read back my prior one, please.

THE REPORTER: Your last question?

MR. KRUMMEN: Move to strike the response. If you could read back my last question, please.

(The requested portion of the record was read by the reporter.)

MS. NEWMAN: Objection as to form. Go ahead and answer if you know.

THE WITNESS: I can't say for certainty what -- what was in it exactly.

BY MR. KRUMMEN:

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,
Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF LARRY W. MOORE
VOLUME II, Pages 215 - 378

(The following is the deposition of LARRY W. MOORE, taken pursuant to Notice of Taking Deposition, by videotape, at the offices of Winthrop & Weinstine, 225 South Sixth Street, Suite 3500, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:09 o'clock a.m., February 17, 2004.)

produce. Because at the time they were giving us the price the design wasn't done. So I think this was put together to say, here's the scope of what you have to do; it's a building of this size, it's a building of this many units and the units repeat, and that way Design Development was able to give us a price on what their services would cost.

Q. So you gave Exhibit 330 to Design Development, Inc.?

A. That's --

I believe that to be correct.

Q. So you gave Design Development, Inc. what you've admitted are Rottlund floor plans at the inception of this Midland townhome design process; is that fair?

A. As a guide or as a program guide for them to establish scope, yes.

Q. Did you give Design Development, Inc. any floor plans other than what appears in front of you as Exhibit 330 which you understand belonged to Rottlund at the time?

A. No, I don't believe I did, but I don't remember. I don't remember there was anything else.

Q. We've ruled Design Development, Inc. out as the candidate for pasting together these individual floor plans of Rottlunds which appear on Exhibit 330;

correct?
A. I would rule them out, yeah.
Q. Can you rule yourself out, Mr. Moore?
A. No, can't.
Q. So as we sit here today you may have pasted together Rottlund's floor plans and created Exhibit 330; correct?
MS. NEWMAN: Objection, asked and answered. You may answer again.
A. There's a possibility I -- yeah, that was my work.
Q. Have you endeavored to find out whether indeed you did create Exhibit 330 or not?
A. No, there's no way I could -- nine or ten years ago there's no way I could know that for sure.
Q. But you could check your files to see if there were any other, I guess, documents which would refresh your recollection; correct?
A. The files have been checked.
Q. You have checked those files personally?
A. No, I handed those files over to the people in our office who had that responsibility --
Q. So --
A. -- for this process.
Q. Have you looked through, prior to today's

# FILED UNDER SEAL

Exhibit D