Exhibit E

UNITED STATES DISTRICT COURT DISTRICT O

FOURTH DIVISION No.:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -The Rottlund C

d/b/a Rottlund Homes, a MinnesotaCorporation,

Plaintiff,vs.

Pinnacle Corporationd/b/a Town & Country Homes,

an Illinois Corporation, and

Town & Country Homes, Inc.,

a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc.,

a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &

Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

Videotaped

30(b)(6) Deposition of

BLOODGOOD SHARP BUSTER ARCHITECTS &

PLANNERS OF ILLINOIS, INC.

(Testimony of Douglas N. Buster)

Thursday March 6, 2003 9:03 a.m.

BY MR. KRUMMEN:

Q Any recollection of any conversations with Mr. Sandelin about the back-to-back idea?

MR. FARMER: Objection. Form.

A No. The only conversations I've had on back-to-back has been related to the transfer of Minneapolis product to the Chicago market. That's all.

BY MR. KRUMMEN:

Q I want to back up to early 1998 and ask you what your position was and which entity you worked for at BSB.

A I think at the time in '98 I would have still been a part of the Illinois corporation in terms of working for the Chicago office. And about '9- -- let's see. So about '99 I went to the headquarters function, representing the entire company.

Q So when you were speaking with Steve Sandelin about the front-to-back townhome referenced in Exhibit 101, you were working for BSB Illinois; is that true?

MS. NEWMAN: Objection as to foundation, form. Go ahead.

A I don't know the exact date. But any conversation I've had with Steve Sandelin was on front-load

through townhouses, not on back-to-back townhouses ever.

MR. KRUMMEN: And I'll move to strike as nonresponsive.

BY MR. KRUMMEN:

Q The question, sir, related to which hat you were wearing. Was it the BSB Illinois group that you were working for as of April 9, 1998, or was it someone else?

A On April 9, 1998, I would have been speaking to Steve Sandelin about front-load through townhouses, probably representing the Illinois group, but I may have also been functioning as a national representative as well because of the connection with Town & Country.

Q Now, what do you mean by "a national representative"?

A Meaning that I have an interest in all the company as the majority stockholder of our company.

Q But you didn't --

A I'll help any -- any office that needs my help at any time. I tend to help them, and that's been for a long time, not just since '99.

Q But as of April of 1998, you were not working for the parent company, The Bloodgood Group, Inc., were

you?
A I work for the parent company every day. But my billing was assessed through the Illinois corporation in 1998.
Q Where was your title held?
A My title at the time?
Q Correct.
A Been senior vice president.
Q Of BSB Illinois, correct?
A Of -- of -- no. Of Bloodgood Sharp Buster Architects and Planners, Inc. Had nothing to do with BSB Illinois, my title. My title has never been broken down to Illinois.
I have an office in Illinois. I represent the entire company. Even before going on to a headquarters function, I represented the entire company.
If I did work for one of the regions while I was involved with a region, I would bill intercompany, work to that region, whether it be Iowa or California or Florida. And if I did work for Chicago, I billed my time to Chicago.
Q Could you pull Exhibit 97 back out of the pile.
A (Complies.) Uh-huh.
Q As of April 9, 1998, which box did you work for?

MR. FARMER: Objection. Foundation.
A As of April 09, 1998, I worked for every one of those boxes.
BY MR. KRUMMEN:
Q As of April 9, 1998, which entity on Exhibit Number 97 did you hold position or positions with?
MR. FARMER: Objection. Foundation regarding this document.
A I don't know the legalities of your question. In April of 1998, my title was senior vice president of Bloodgood Sharp Buster Architects and Planning, Inc., and I had a senior vice president role in virtually all of these subsidiary companies of the parent company, The Bloodgood Group.
BY MR. KRUMMEN:
Q Including the Illinois entity, correct?
A Sure.
Q Why were you talking to Steve Sandelin about front-to-back townhome designs in or about April of 1998?
MS. NEWMAN: Objection as to form and foundation. Go ahead.
A As -- as if the question is related to why am I speaking to Steve Sandelin about front-to-back, front through -- front-loaded through townhouses

for the Minneapolis market? Is that your question?

BY MR. KRUMMEN:

Q It is.

A Because I was acting as a liaison to make sure that Steve Sandelin felt comfortable transferring Town & Country work to another group outside the Chicago area, because he had never worked with any of our other groups before.

Q What was your involvement, if any, subsequent to this conversation with Mr. Sandelin that occurred in or about April of 1998 --

MR. FARMER: Object to form.

BY MR. KRUMMEN:

Q -- as to Town & Country Minnesota townhomes, be they front-to-back, back-to-back or of any other type?

A I don't have any recollection whatsoever. I personally don't ever remember the meeting happening, because I assume that they decided to go to a back-to-back. I had talked to Steve Sandelin about front-load only. I've never had the conversation with Steve about back-to-back.

Q So as far as you can recall, the next interaction you personally had with respect to back-to-back townhomes and Town & Country Minnesota was when

A My involvement was a process of working for the Illinois office at the time and redeveloping the exteriors to be put into the Chicago market. I had no involvement with the plans. I had no involvement with the transfer of the product. I had no involvement with any units, any co-change or any other aspect of work. Only conceptual design work for the elevation.

Q When you say, "conceptual design work for the elevation," what are you referring to?

A I re-elevated Town & Country/BSB Minneapolis back-to-back townhouses for the Chicago marketplace.

Q And when you say you re-elevated them, what does that mean?

A I looked at what they were building in Minneapolis. I -- I didn't feel it was the right product for the Chicago market. I believe I was requested also by Town & Country to relook at it for the Chicago market, and they gave it -- Joe Safin asked me to help out on the project in terms of coming up with a design to be used in the Chicago marketplace, which I did, and then turned my designs back over to BSB Illinois to incorporate into their jurisdictional transfer.

identified earlier. And when I say "they," I'm
talking about the elevations for Exhibit 5 and
Exhibit 104. Correct?
A Okay.
MR. FARMER: Objection. Form.
MS. NEWMAN: Same objection.
A What's the question again?
BY MR. KRUMMEN:
Q Would they both fall under your characterization of
outdated back-to-back eight-unit townhomes?
MR. FARMER: Objection to form.
MS. NEWMAN: Same objection.
A My opinion of back-to-back is that it is an old
product. It is a product that is built in cities
that do not have aggressive multifamily programs.
It is a product that is very old and very
familiar throughout the entire design industry. It
is a product that has been built from California to
Florida, all through the Chicago area, long before
I ever came to Chicago and long before we ever came
to Minneapolis.
It is an old product. It is somewhat of an
outdated product, and it's being built in -- in
markets that are not aggressive. Either in
Minneapolis or in Aurora, in terms of their

multifamily product offering, it is not needed to be aggressive. So yes, it is a very old product in all cases.

BY MR. KRUMMEN:

Q So you agree that both elevations in Exhibits 5 and 104 are old and outdated eight-unit structures, but you believe that they're substantially different, correct?

MS. NEWMAN: Objection. Form.

MR. FARMER: Objection to form. Foundation. Mischaracterizes earlier testimony.

A First --

MS. NEWMAN: Same objections.

A First of all, you misrepresented eight-unit structures. The -- the first exhibit that I reviewed was our four-unit structure for Aurora. It was not an eight-unit structure.

BY MR. KRUMMEN:

Q I think my question was confined to Exhibit 5 and 104, sir.

A From --

MR. FARMER: Same objections.

A From my opinion of being in the Chicago market and working around the entire country on multifamily product, in both cases it is an old product, very

knowledge?
A Well, from experience, for one thing. From my traveling around the country, I've seen many back-to-back products, but I've seen also a multitude of other multifamily product types, and particularly in the Kimball Hill Talbot Mill case.
It was really a combination of knowing back-to-back as well as active, adult, multifamily product, flat villas, a ranch villa product, understanding how single-floor living works, understanding how to connect a ranch -- a flat-over-flat product to a townhouse product and make the roofs work.
So from my part, it was past experience. For others, it may have been an educational process of structures or connections but less on the design more than the technical. I probably led the design at that time.
Q Do you know whether, since that project was built, Kimball Hill has built any other back-to-backs in the Chicago area?
A I have no idea. They had been building back-to-backs for years, well from the early '80s, if not the '70s.
Q Now, you talked a bit about your work preparing

re-elevations --
A Mm-hm.
Q -- in connection with Washington Square.
A Yes.
MS. NEWMAN: You have to say yes.
A Yes.
BY MR. FARMER:
Q Thanks.
How did you get involved with that work?
A Well, I don't --
Q Who asked you to do it?
A Joe Safin. Joe Safin is the partner who runs the Chicago office. Joe generally gets me involved with multifamily for sure but generally would have not got me involved with a simpler product like a back-to-back, except for probably his schedule.
I may have gotten involved because the rest of the designers were tied up on existing commitments, but I remember Joe just simply asked me could I work on Town & Country's back-to-back re-elevation, as well as my past relationship with Town & Country people and the fact that I'd worked with them for so many years on so many different other product types.
Q Now, can you give me a time frame for when this

together today in this lawsuit?
A I've never seen or walked Rottlund product from their land. I have driven through Minneapolis with friends and other business things that we've done in Minneapolis and seen a Rottlund sign and seen that it was a Rottlund community.
I've never been in a Rottlund community, I've never walked a Rottlund community, and I did not have Rottlund material with me when I re-elevated or did Washington Square.
Q Had you had any discussions with Steve Sandelin or anybody else at the Pinnacle Lombard office regarding Rottlund product at the time you embarked upon the re-elevation?
A No. Word never came up.
Q Take me through what you did in terms of this re-elevation work. Number one, how long did it take you to do?
A Well, I'm generally considered extremely fast. I'm considered one of the fastest designers in -- in our office as well as in the industry. But since it was our own product that I was working from, it wasn't a reestablishment of a new.
I -- I probably took the existing elevation sheets off of the BSB Iowa drawings, laid them down

on my table to get the -- the scale element of the building, simply was able to recreate the massing so that I didn't have to start from scratch on the massing, but then pulled out the bottom sheet and just started to feel how the building looked and keep what I wanted to keep and not keep what I wanted to keep. My part on that generally takes a day and a half or two.

Q What do you mean by "recreate the massing"?

A Well, I first studied the building, keeping gables. And I didn't like that for Aurora. I thought Aurora could afford the -- the feel of the hip. And then breaking down the scale of the building, so I changed stuff from a gable to a hip.

Q Explain the term "massing."

A "Massing" is generally the scale, the mass of the building. It's how it tends to feel as you look at an architectural element. Generally what -- what we try to do in suburban multifamily work is break the scale of massing to lower on the ends, higher in the middle.

And if it's an extremely simple product and it -- it simply has a one-truss design across -- which every builder has in their portfolio. It's not a matter of being embarrassed about simple

Exhibit F

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

THE ROTTLUND COMPANY, INC.,
d/b/a Rottlund Homes,
a Minnesota Corporation,
Plaintiff,

vs.

PINNACLE CORPORATION, d/b/a
Town & County Homes, an Illinois
Corporation; TOWN & COUNTRY HOMES,
INC., a Minnesota Corporation;
BLOODGOOD SHARP BUSTER
ARCHITECTS & PLANNERS OF IOWA, INC.,
an Iowa Corporation; and the
BLOODGOOD GROUP, INC., an Iowa
Corporation
Defendants.

No. 01-CV-198
(DSD/SRN)

------------------------------------

TOWN & COUNTRY HOMES, INC., a
Minnesota Corporation,
Third-Party Plaintiff,

vs.

BLOODGOOD SHARP BUSTER
ARCHITECTS & PLANNERS OF IOWA, INC.,
an Iowa Corporation,
Third-Party Defendant.

Deposition of MIKE RYAN, called as a witness herein, pursuant to the applicable provisions of the Federal Rules of Procedure governing the taking of depositions, taken before Deborah Habian, CSR No. 084-002432 on December 11, 2003, at 9:07 o'clock a.m. at M & M Reporting Legal Services, One Pierce Place, Suite 295-E, Itasca, Illinois.

A. It's either in the late '96 or early '97 time frame, I believe.

Q. Did Mr. Bill Ryan serve as the CEO of Town & Country Illinois at all times from 1994 up until his departure in that 1996/1997 time frame?

MR. MURDOCH: Objection to foundation.

THE WITNESS: I don't know. Officially title, I don't know about the title.

BY MR. KRUMMEN:

Q. I guess I'll ask it differently. He was the man in charge of Town & Country Illinois, regardless of his title, from 1994 up until the time he departed, correct?

A. Bill was President of Pinnacle from '94 to whenever he departed, yes.

Q. When Mr. Bill Ryan decided -- or strike the question.

How did it come about

that Bill Ryan departed from Town & Country of Illinois? Did he decide to leave or was he asked to leave?

A. I -- the discussion was about changing the direction of the company, and Bill was not in favor of changing the direction of the company and decided that he'd rather go do his own thing and not stay with the company, if I remember right.

Q. When you say "changing the direction of the company", in general what do you mean by that?

A. You know, back then, you know, did we want to be in multiple markets or just go back to being an Illinois builder.

I don't remember all the items that were involved, but it probably was primarily growth versus just being an Illinois builder.

Q. Was Bill Ryan pro growth or was he pro staying in Illinois?

A. Pro growth.

Q. Did the other shareholders decide that they didn't want any further growth?

A. The answer to that is I'm not sure they really knew what they wanted except that the growth strategy wasn't going the way we liked it.

Q. Why do you say that?

A. It just wasn't -- well, it wasn't making any money --

Q. And when you say --

A. -- the -- the business outside of Chica -- out of Illinois.

Q. Which would include the Minnesota business, correct?

A. Yes.

Q. The only other division that Town & Country opened outside of Illinois was the Florida division, correct?

A. Correct.

Q. Do you know when the Florida division opened?

A. I don't know the timing of

part, he may have reported to you in part?

A. Correct.

Q. You're just not sure?

A. Correct.

Q. And then after Tom Crosson, we're into 1997, and Art Plant took over the Minnesota division at your request and reported directly to you, correct?

A. That's correct.

MR. KRUMMEN: Let's take a break.

VIDEOGRAPHER: We are now going off the record, and the time is 10:07 a.m.

(Break taken.)

VIDEOGRAPHER: We're now back on the record, and the time is 10:19 a.m.

BY MR. KRUMMEN:

Q. Mr. Ryan, I believe you indicated that sometime in 1997 you asked Mr. Art Plant to take over the

Country of Minnesota. When did Town & Country of Minnesota first release a back-to-back design for potential designers?

A. I don't know the timing of it, but it would have been after Art moved up to Minnesota.

Q. So at the time Art Plant moved up to the Minnesota Town & Country division, it's fair to say that the Minnesota Town & Country division did not have a back-to-back townhome product design, correct?

A. The Minnesota company did not have a back-to-back prior to Art Plant, that's correct.

Q. And the Town & Country Illinois entity did not have a back-to-back townhome design before the time point where Art Plant went and took over the Minnesota division, correct?

A. That, I don't know, and that's just because it was founded in

1958 and I don't know prior to my coming into the company what they built.

Q. You were not aware of a back-to-back townhome design that could be reused in Minnesota at the time Art Plant took over the Town & Country Minnesota division?

A. That's correct.

Q. What discussions did you have, if any, with Art Plant concerning a back-to-back townhome design in or about 1997?

A. In '97, specifically I have no idea. But specific to the back-to-back product, some piece of property would have come in where Art put assumptions to it including the use of a back-to-back townhome, and that would have been my first discussion with him about it.

Q. So the -- whatever this piece of property was, if I understand you correctly, Art Plant

Country Minnesota's Maplewood development, did that approve back-to-back product?

A. I believe so, but I'm not -- I'm not a hundred percent sure. I believe so.

Q. And this Oak Crest development that you identified now as something other than the Maplewood development --

A. Yes, yes.

Q. -- will that Oak Crest development include back-to-back product?

A. I believe so.

Q. You identified a back-to-back product that might be built on this new Chanhassen development, if I heard you correctly. Is that fair?

A. Yes.

Q. Has Town & Country of Minnesota built any back-to-back product on any other Chanhassen

development to your knowledge?
A. No.
Q. Let's move on to Town & Country Illinois, and the question is within the past five years, since 1998, has Town & Country of Illinois built any back-to-back product?
A. Yes.
Q. That's the Aurora Washington Square development we discussed earlier, correct?
A. Noggle Farm, yes, yes.
Q. Has Town & Country of Illinois in the past five years built any back-to-back product on any developments other than this Noggle Farm property?
A. No.
Q. As you sit here today, does Town & Country of Illinois to your knowledge have any plans to build back-to-back product at any community other than this Noggle Farm Washington Square community?

mischaracterizes prior testimony.

THE WITNESS: The document's scribbled on.

BY MR. KRUMMEN:

Q. And you don't know who scribbled over the copyright notice, correct?

MS. NEWMAN: Same objections.

MR. MURDOCH: Objection to form and foundation.

THE WITNESS: That's correct.

BY MR. KRUMMEN:

Q. The next document I would like to cover with you, sir, is a document which was previously marked as Exhibit No. 90. And before we get there, I'd like to ask you if you know who Tim Johnson is?

A. I do.

Q. Who is Tim Johnson?

A. He coordinates the architecture for the Minnesota

company.

Q. So Mr. Tim Johnson works for Town & Country Homes' Minnesota division, correct?

A. That's correct.

Q. Do you know whether or not Tim Johnson formerly worked for Rottlund before joining Town & Country of Minnesota?

A. He did. I don't know if immediately before, but, yes, he did work for Rottlund.

Q. Do you know whether or not Tim Johnson worked on the designs for Rottlund's back-to-back townhome while he was employed by Rottlund and before he joined Town & Country Homes of Minnesota?

A. I don't know what Tim did for Rottlund.

Q. Exhibit 90 is before you, correct?

A. That's correct.

Q. And up in the upper

# FILED UNDER SEAL

Exhibit G

# FILED UNDER SEAL

Exhibit H

# FILED UNDER SEAL

Exhibit I

# FILED UNDER SEAL

Exhibit J

# FILED UNDER SEAL

Exhibit K

# FILED UNDER SEAL

Exhibit L

# FILED UNDER SEAL

Exhibit M

# FILED UNDER SEAL

Exhibit N

# FILED UNDER SEAL

Exhibit O

# FILED UNDER SEAL

Exhibit P

# FILED UNDER SEAL

Exhibit Q

Exhibit R

# PROPOSAL FOR PROFESSIONAL SERVICES

## PROTOTYPE TOWNHOME PLAN
## PINEBROOK DEVELOPMENT
## BROOKLYN PARK, MINNESOTA

**October 8, 2002**
**Revised January 23, 2003; Revised February 12, 2003**

Having met and discussed the project with Tim Johnson of Town & Country Homes, Tushie-Montgomery & Associates, Inc., proposes the following scope of work as a recommended procedure for the development of a prototype townhome plan located in Brooklyn Park, Minnesota.

**PROJECT DESCRIPTION:**

Proposed development of an approximate 8.12 acre site to accommodate 50 units of back-to-back townhomes in multiple four (4), six (6), eight (8), ten (10), and twelve (12) unit buildings, two (2) stories in height with at-grade garages and a pitched wood truss roof. Building exterior shall be vinyl siding, brick, or cultured stone. Site parking shall be at grade. Building structure shall be woodframe. The building is being designed as a market rate, for sale, building that will have some affordable units.

**SCOPE OF SERVICES:**

The professional services of TUSHIE-MONTGOMERY & ASSOCIATES, INC., shall be as follows:

I. **PROGRAMMING AND ARCHITECTURAL DESIGN PHASE:**

A. **Programming** - Review all available information completed for the project by the Owner. Discuss the overall development with the Owner and finalize the program for completion of the project.

B. **Unit Plans** - Prepare up to three (3) typical unit plans with up to *two (2)* variations *and up to three (3) options* for second floor living spaces for the buildings based upon Owner recommendations and requirements from Market Research completed by the Owner. Unit plans based upon criteria set forth by Owner in Memo dated November 11, 2002 and attached.

D. **Floor Plans** - Using the program requirements and schematic design unit plans prepare overall building floor plans for both levels of each building (4 unit, 6 unit, 8 unit, 10 unit, and 12 unit buildings).

E. **Elevations** - using the Schematic Design floor plans prepare exterior design elevations for each building (4 unit, 6 unit, 8 unit, 10 unit, and 12 unit buildings), including exterior building materials and building heights.

F. Make necessary revisions during the Design Phase to reflect Owner input.

G. Prepare exterior wall sections as required and building section.

H. Revise design documents to incorporate identified cost savings and maintenance efficiency items.

I. Attend required meetings to review and present architectural plans with the Owner and the City Staff.

## II. ARCHITECTURAL CONSTRUCTION DOCUMENTS:

A. Make recommendations on the selection of materials and finalize all design drawings.

B. Mechanical and electrical designs and drawings shall be prepared by the subcontractors registered engineers and are not the responsibility of the Architect. The Architect shall assist the Owner in coordinating these activities with the subcontractors and their engineers to correspond with the Architectural Documents.

C. Provide any necessary structural design for the building. (Proposal included for your review). Structural engineering fees are in addition to Architectural fees.

D. Prepare a set of construction drawings for the project which shall include:

**Floor Plans -**
**(4, 6, 8, 10, 12 Unit Buildings)**
**(3) Unit Plans**
**Exterior Elevations**
**Interior Elevations**

**Building Sections**
**Stair & Wall Sections & Details**
**Building Details**
**Structural Plans, Details and Sections**

E. Assist the Owner in filing the required architectural documents for the approval of governmental authorities having jurisdiction over the project, and meeting with those officials to review the project.

## III. BIDDING AND NEGOTIATION: (Hourly as shown in "TOTAL FEES ANTICIPATED").

Following the Owner's approval of the construction documents, assist the Owner in letting and receiving Subcontractor bids for the project by distributing drawings to the Owner and answering subcontractor questions.

## IV. CONSTRUCTION PHASE: (Hourly as shown in "TOTAL FEES ANTICIPATED").

A. Review shop drawings, samples and other submissions of the contractor.

B. Answer contractor questions.

C. Make once per month visits to the site to be familiar generally with the progress and quality of the Work.

D. Process changes in the project.

E. Review pay requests submitted by Contractors.

F. Prepare a final punch list for the project.

V. **INTERIOR DESIGN SERVICES:** (Hourly as shown in "TOTAL FEES ANTICIPATED").

A. Furniture, furnishings and equipment:

1. Interior Design Services for the selection and specifying of all colors, materials and finished surfaces anticipated in the Contract Documents.

2. Design, specify, bid and order all interior furniture and furnishings not previously anticipated in the Contract Documents.

3. Prepare alternative presentation material boards to illustrate the color, texture and quality of the materials being considered.

4. Provide assistance to the Owner in coordinating schedules for delivery and installation of all furniture and furnishings and equipment.

5. Review the final placement and inspection for damage, quality and function to determine that the installed furniture, furnishings and equipment are in accordance with the requirements of the Contract Documents.

**TO BE PROVIDED BY THE OWNER:**

**The Owner shall provide:**

1. All background information the Owner may have available related to this project and necessary instructions and input regarding the program requirements.

2. Existing site plans and building lines, as-built drawings of existing buildings, soils reports, tree surveys, environmental studies, traffic studies, other topographical and utility maps and information the Owner has and, if necessary, measured drawings of existing structures. The Architect shall be entitled to rely upon the completeness and accuracy of this information, surveys and reports furnished by the Owner. This information shall be provided to the Architect in electronic format compatible with the latest version of Intergraph Microstation.

3. A designated representative from whom the Architect will receive instructions and authorization.

4. Full responsibility for estimating construction costs and keeping the construction cost within budget. The Architect shall not have any responsibility for estimating or guaranteeing the cost of construction.

5. Civil, mechanical, electrical and plumbing design and engineering services.

TM 00324

6. Prompt written notice to the Architect if the Owner becomes aware of any fault or defect in the project or non-conformance with the Contract Documents.

7. Project specifications, criteria drawings and material selections.

**TIME:**

TUSHIE-MONTGOMERY & ASSOCIATES, INC. shall begin the Work immediately upon being authorized and shall complete all tasks in this proposal within the schedule established by the Owner *as shown below*. Any deviation from the proposed schedule by the Owner shall postpone completion of the Drawings by the same amount of time of postponement.

Timeline:

| | |
|---|---|
| Design Development | Jan 1- Feb 14 |
| Civil Engineering | Concurrently by Others |
| Site Design | Concurrently by Others |
| Landscape Design | Concurrently by Others |
| 3-D Modeling | Feb 10- Feb 14 |
| Owner Revisions | Feb 14- Feb 21* (orig. set for 2/28) |
| TMA Revisions | Feb 24- Feb 28 |
| Submit to City of Brooklyn Park | March 3 |
| Planning Commission | April 9 |
| City Council | April 28 |
| Construction Documents | March 7- April 21 |
| Owner Review | April 21- April 30 |
| Complete Const. Documents | May 1- May 12 |
| Bidding & Negotiation | May 12- May 30 |
| Building Permit Submittal/Review | May 12- May 30 |

**TOTAL FEES ANTICIPATED:**

The total cost of all services recommended in this proposal shall be as follows:

| | | |
|---|---|---|
| I. | Architectural Design & City Approval Phase | $12,000.00 |
| II. | Construction Documents<br>Re-use of Drawings on other projects shall constitute a $200/unit re-use fee | 50,000.00 ($1,000/unit) |
| III. – IV. | Bidding and Construction Phases | Hourly as Additional Services as Requested by Owner |
| V. | Interior Design Services | Hourly as Additional Services as Requested by Owner |
| VI. | Structural and Engineering Services - | See Attached |

Plus normal reimbursable costs of printing, CAD plots, reproduction, postage, travel, colored renderings, computer plotting and mileage.

**ADDITIONAL SERVICES:**

| | |
|---|---|
| Principals | $ 180/Hour |
| Senior Associate | $ 126/Hour |
| Associate | $ 110/Hour |
| Architect or Landscape Architect | $ 100/Hour |
| Architect Draftsperson | $ 90/Hour |
| Interior Designer | $ 100/Hour |
| Interior Designer Intern | $ 90/Hour |

**Hour rates may change at the beginning of each calendar year.**

**ENGINEERING SERVICES:**

Tushie-Montgomery & Associates, Inc. does not employ professional Engineers on their in-house staff. All Engineering services recommended in this proposal shall be provided by the Architect through a consultant relationship with one or more Engineering firms experienced in the type of work contemplated in this proposal.

**LIMITS OF LIABILITY:**

In recognition of the relative risks, rewards and benefits of the project to both the Owner and Architect, the risks have been allocated such that the Owner agrees, to the fullest extent permitted by law, to limit the Architect's liability to the Owner and to all the Owner's contractors and subcontractors on the project for any and all claims, losses, costs, damages, or claims expenses from any cause or causes, so that the total aggregate liability of the Architect to all those named shall not exceed the Architect's total fee for services rendered on this project. Such causes include, but are not limited to, negligence, professional errors or omissions, strict liability, breach of contract or warranty.
This proposal if good for thirty (30) days. If acceptable, a signed copy will be our authorization to proceed. If the Scope of Services in this proposal in not exactly as you would like it, we would be happy to adjust it and revise the fee accordingly. A standard contract will be prepared with this proposal as its basis.

Respectfully submitted,

**TUSHIE-MONTGOMERY & ASSOCIATES, INC.**

~~Gary Tushie,~~ Jeffrey Wrede,
~~President~~ Assoc. Architect

**AUTHORIZATION:**
**Town & Country Homes**

BY: Timothy Johnson

ITS: Dir. of Architecture

TM 00326

Exhibit S

# PROPOSAL FOR PROFESSIONAL SERVICES

## TRADITIONS AT CLOVER RIDGE DEVELOPMENT
## CHASKA, MINNESOTA

**January 23, 2003-REVISED FEBRUARY 12, 2003**

Having met and discussed the project with Tim Johnson of Town & Country Homes, Tushie-Montgomery & Associates, Inc., proposes the following scope of work as a recommended procedure for the development of a prototype townhome plan located in Chaska, Minnesota.

**PROJECT DESCRIPTION:**

Proposed development of two sites comprising approximately 2.75 acres and 2.0 acres to accommodate 50 units of back-to-back townhomes in multiple four (4) and six (6) unit buildings, two (2) stories in height with at-grade garages and a pitched wood truss roof. Building exterior shall be vinyl siding, brick, or cultured stone. Site parking shall be at grade. Building structure shall be woodframe. The building is being designed as a market rate, for sale, building that will have some affordable units.

**SCOPE OF SERVICES:**

The professional services of TUSHIE-MONTGOMERY & ASSOCIATES, INC., shall be as follows:

**I. PROGRAMMING AND ARCHITECTURAL DESIGN PHASE:**

A. **Programming** - Review all available information completed for the project by the Owner. Discuss the overall development with the Owner and finalize the program for completion of the project.

B. **Unit Plans** – Re-use three (3) proto-typical unit plans with up to *two (2)* variations for second floor living spaces for the buildings based upon Pinebrook Development project located in Brooklyn Park, MN.

Any changes to existing plans (as directed by Owner or City officials) shall be *estimated as an Additional Services lump sum fee and agreed to by the Owner prior to work to be done.*

C. **Floor Plans** – Re-use proto-typical floor plans based upon Pinebrook Development project located in Brooklyn Park, MN.

Any changes to existing floor plans (as directed by Owner or City officials) shall be *estimated as an Additional Services lump sum fee and agreed to by the Owner prior to work to be done.*

D. **Elevations** - Re-use proto-typical elevations based upon Pinebrook Development project located in Brooklyn Park, MN.

Any changes to existing elevations (as directed by Owner or City officials) shall be *estimated as an Additional Services lump sum fee and agreed to by the Owner prior to work to be done.*

E. Re-use proto-typical exterior wall sections as required and building section based upon Pinebrook Development project located in Brooklyn Park, MN.

Any changes to existing floor plans (as directed by Owner or City officials) shall be *estimated as an Additional Services lump sum fee and agreed to by the Owner prior to work to be done.*

F. Revise design documents to incorporate identified cost savings and maintenance efficiency items as directed by Owner. Changes shall be *estimated as an Additional Services lump sum fee and agreed to by the Owner prior to work to be done.*

G. Attend required meetings to review and present architectural plans with the Owner and the City Staff. Meeting(s) shall be *estimated as an Additional Services lump sum fee and agreed to by the Owner prior to work to be done.*

## II. ARCHITECTURAL CONSTRUCTION DOCUMENTS:

A. All changes to Construction Documents as they relate to changes made by Owner or City Staff comments to re-use plans and elevations shall be *estimated as an Additional Services lump sum fee and agreed to by the Owner prior to work to be done.*

B. Make recommendations on the selection of materials and finalize all design drawings.

C. Mechanical and electrical designs and drawings shall be prepared by the subcontractors registered engineers and are not the responsibility of the Architect. The Architect shall assist the Owner in coordinating these activities with the subcontractors and their engineers to correspond with the Architectural Documents.

D. Provide any necessary structural design for the building. (Proposal included for your review). Structural engineering fees are in addition to Architectural fees.

E. Prepare a set of construction drawings for the project which shall include:

| | |
|---|---|
| **Floor Plans -** | **Building Sections** |
| **(4 and 6 Unit Buildings)** | **Stair & Wall Sections & Details** |
| **(3) Unit Plans** | **Building Details** |
| **Exterior Elevations** | |
| **Interior Elevations** | **Structural Plans, Details and Sections** |

F. Assist the Owner in filing the required architectural documents for the approval of governmental authorities having jurisdiction over the project, and meeting with those officials to review the project.

## III. BIDDING AND NEGOTIATION: (Hourly as shown in "TOTAL FEES ANTICIPATED").

Following the Owner's approval of the construction documents, assist the Owner in letting and receiving Subcontractor bids for the project by distributing drawings to the Owner and answering subcontractor questions.

TM 00439

IV. **CONSTRUCTION PHASE:** (Hourly as shown in "TOTAL FEES ANTICIPATED").

A. Review shop drawings, samples and other submissions of the contractor.

B. Answer contractor questions.

C. Make once per month visits to the site to be familiar generally with the progress and quality of the Work.

D. Process changes in the project.

E. Review pay requests submitted by Contractors.

F. Prepare a final punch list for the project.

V. **INTERIOR DESIGN SERVICES:** (Hourly as shown in "TOTAL FEES ANTICIPATED").

A. Furniture, furnishings and equipment:

1. Interior Design Services for the selection and specifying of all colors, materials and finished surfaces anticipated in the Contract Documents.

2. Design, specify, bid and order all interior furniture and furnishings not previously anticipated in the Contract Documents.

3. Prepare alternative presentation material boards to illustrate the color, texture and quality of the materials being considered.

4. Provide assistance to the Owner in coordinating schedules for delivery and installation of all furniture and furnishings and equipment.

5. Review the final placement and inspection for damage, quality and function to determine that the installed furniture, furnishings and equipment are in accordance with the requirements of the Contract Documents.

**TO BE PROVIDED BY THE OWNER:**

**The Owner shall provide:**

1. All background information the Owner may have available related to this project and necessary instructions and input regarding the program requirements.

2. Existing site plans and building lines, as-built drawings of existing buildings, soils reports, tree surveys, environmental studies, traffic studies, other topographical and utility maps and information the Owner has and, if necessary, measured drawings of existing structures. The Architect shall be entitled to rely upon the completeness and accuracy of this information, surveys and reports furnished by the Owner. This

information shall be provided to the Architect in electronic format compatible with the latest version of Intergraph Microstation.

3. A designated representative from whom the Architect will receive instructions and authorization.

4. Full responsibility for estimating construction costs and keeping the construction cost within budget. The Architect shall not have any responsibility for estimating or guaranteeing the cost of construction.

5. Civil, mechanical, electrical and plumbing design and engineering services.

6. Prompt written notice to the Architect if the Owner becomes aware of any fault or defect in the project or non-conformance with the Contract Documents.
7. Project specifications, criteria drawings and material selections.

**TIME:**

TUSHIE-MONTGOMERY & ASSOCIATES, INC. shall begin the Work immediately upon being authorized and shall complete all tasks in this proposal within the schedule established by TMA *and Owner and shown below*. Any deviation from the proposed schedule by the Owner shall postpone completion of the drawings by the same amount of time of postponement.

Timeline:

| | |
|---|---|
| Design Development | Completed with Pinebrook Development |
| Civil Engineering | Concurrently by Others |
| Site Design | Concurrently by Others |
| Landscape Design | Concurrently by Others |
| 3-D Modeling | Completed with Pinebrook Development |
| Submit to City of Chaska | Owner Has obtained approvals |
| Revise Construction Documents from Pinebrook Development | April 21- May 5 |
| Owner Review | May 5-May 9 |
| Complete Const. Doc. Revisions | May 12-May 16 |
| Bidding & Negotiation | May 19-June 2 |
| Building Permit Submittal/Review | May 19-June 2 |

**TOTAL FEES ANTICIPATED:**

The total cost of all services recommended in this proposal shall be as follows:

I. Architectural Design & City Approval Phase
Changes to plans and elevations — Hourly as Additional Services

II. Construction Documents

| | | |
|---|---|---|
| | Re-Use Fee | $200.00 per unit |
| | Changes to plans and elevations | Hourly as Additional Services |
| III. – IV. | Bidding and Construction Phases | Hourly as Additional Services as Requested by Owner |
| V. | Interior Design Services | Hourly as Additional Services as Requested by Owner |
| VI. | Structural and Engineering Services - | See Attached |

Plus normal reimbursable costs of printing, CAD plots, reproduction, postage, travel, colored renderings, computer plotting and mileage.

**ADDITIONAL SERVICES:**

| | |
|---|---|
| **Principals** | **$ 180/Hour** |
| **Senior Associate** | **$ 126/Hour** |
| **Associate** | **$ 110/Hour** |
| **Architect or Landscape Architect** | **$ 100/Hour** |
| **Architect Draftsperson** | **$ 90/Hour** |
| **Interior Designer** | **$ 100/Hour** |
| **Interior Designer Intern** | **$ 90/Hour** |

**Hour rates may change at the beginning of each calendar year.**

**ENGINEERING SERVICES:**

Tushie-Montgomery & Associates, Inc. does not employ professional Engineers on their in-house staff. All Engineering services recommended in this proposal shall be provided by the Architect through a consultant relationship with one or more Engineering firms experienced in the type of work contemplated in this proposal.

**LIMITS OF LIABILITY:**

In recognition of the relative risks, rewards and benefits of the project to both the Owner and Architect, the risks have been allocated such that the Owner agrees, to the fullest extent permitted by law, to limit the Architect's liability to the Owner and to all the Owner's contractors and subcontractors on the project for any and all claims, losses, costs, damages, or claims expenses from any cause or causes, so that the total aggregate liability of the Architect to all those named shall not exceed the Architect's total fee for services rendered on this project. Such causes include, but are not limited to, negligence, professional errors or omissions, strict liability, breach of contract or warranty. This proposal if good for thirty (30) days. If acceptable, a signed copy will be our authorization to proceed. If the Scope of Services in this proposal in not exactly as you would like it, we would be happy to adjust it and revise the fee accordingly. A standard contract will be prepared with this proposal as its basis.

Respectfully submitted,

**TUSHIE-MONTGOMERY & ASSOCIATES, INC.**

Jeffrey Wrede,
Associate

**AUTHORIZATION:**
**Town & Country Homes**

**BY:** Timothy Johnson

**ITS:** Dir. of Architecture