UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| The Rottlund Company, Inc. d/b/a Rottlund Homes, a Minnesota Corporation,<br>Plaintiff,<br>vs.<br><br>Pinnacle Corporation d/b/a Town & Country Homes, an Illinois Corporation, Town & Country Homes, Inc., a Minnesota Corporation, Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation, and The Bloodgood Group, Inc., an Iowa Corporation,<br>Defendants,<br>and<br><br>Town & Country Homes, Inc., a Minnesota Corporation,<br><br>Third-Party Plaintiff,<br>vs.<br><br>Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation,<br><br>Third-Party Defendant. | ) | No.: 01-CV-1980 (DSD/SRN)<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE EVIDENCE OF THE SALE OF ITS INDIANA DIVISION ASSETS AS EVIDENCE OF THE FAIR MARKET VALUE OF PLAINTIFF'S VILLA II PRODUCT** |

## INTRODUCTION

Rottlund seeks full compensation for the damages it has suffered as a result of the Defendants' conduct. Thus, among other things, Rottlund seeks to recover approximately $1.8 million in licensing fees it lost because the Town & Country Homes Defendants unlawfully constructed and sold infringing town homes in their Washington Square community in Aurora, Illinois. The evidence reveals that if the Town & Country Homes Defendants had sought to negotiate a license agreement with Rottlund, rather than simply steal Rottlund's copyrighted

Villa II designs, Rottlund would have been willing to negotiate a one-time license agreement that would have allowed the Town & Country Homes Defendants to construct and sell the infringing town home product in their Washington Square community in exchange for a license agreement that would require the Town & Country Homes Defendants to pay, to Rottlund, Rottlund's incremental profit margin per unit sold. The evidence also reveals that this licensing fee is entirely reasonable because the Town & Country Homes Defendants used the infringing seventy-two townhome units to gain approval to construct, and ultimately sell, an additional 179 housing units in the Washington Square community. (Affidavit of David A. Davenport in Support of Plaintiff's Motion in Limine to Exclude Evidence of the Sale of its Indiana Division Assets as Evidence of the Fair Market Value of Plaintiff's Villa II Product ("Davenport Aff."), Ex. A at 132:24-134:12.) Thus, Rottlund respectfully suggests that the jury will find its lost license fee claim reasonable in light of the facts of this case.

However, according to the Town & Country Homes Defendants, Rottlund's effort to be fully compensated for the damages it has suffered is unreasonable because Rottlund, in connection with the sale of its Indiana division assets, "granted a royalty-free license agreement for the copyrights on the Villa II." (Pinnacle Corporation and Town & Country Homes, Inc.'s Mem. in Support of Motion for Summary Judgment Regarding Damages [Doc. No. 498], p. 15.) Thus, according to the Town & Country Homes Defendants, Rottlund is not being reasonable when it asks to receive a lost license fee because the fair market value of its Villa II designs is zero. Because Rottlund did not grant a royalty free license for its Villa II copyrights, in Indiana or otherwise, the evidence concerning the sale of Rottlund's Indiana division assets does not support the Defendants' arguments regarding the fair market value of Rottlund's Villa II designs. Thus, Rottlund respectfully requests that the Court issue an order precluding the Defendants

from offering the sale of Rottlund's Indiana division assets as evidence of the fair market value of its Villa II designs.

## FACTUAL BACKGROUND

Rottlund has granted only one license to its Villa II product in the past. (Davenport Aff., Ex. B at 964:2-5.) Rottlund granted this license to The Augusta Group in or about July 2000 when it sold its Indiana division assets to The Augusta Group. (*Id.*, Ex. C at 103:3-104:6, 105:5-106:22, 164:12-168:24; Ex. D at 375:9-376:11, 377:12-379:10; Ex. E at 115:12-117:6; Ex. F.) The License Agreement that accompanied the contractual documents memorializing Rottlund's sale of its Indiana division assets to The Augusta Group does not include a discrete dollar amount related to the value of the license given to The Augusta Group because the value of the license was included in the total value of the assets Rottlund sold to The Augusta Group, which are memorialized in other documents. (*Id.*, Ex. F; Ex. C at 164:6-166:2, 166:24-167:21.)

Each witness who has testified about the sale of Rottlund's Indiana division assets, and the License Agreement given to The Augusta Group in connection therewith, has provided unrebutted testimony on this issue. For instance, Rottlund's President – David Rotter – provided the following testimony:

> Q. What knowledge do you have regarding plaintiff's license agreement?
>
> A. We issued a -- That we issued a license agreement to our -- actually it was the division president who formed a company called Augusta Homes, and he received a license agreement to license products that we were building already in Indianapolis. We had land that was under construction and under contract that he was stepping into, and they were product-specific projects. And as part of the transaction of buying the -- that division of the company he wanted to have the ability to build the product, and also we had customers that we had previously sold under Rottlund that we had to complete, so it was -- it was encompassed in the transaction of the sale of the entire division that he would get a license, otherwise the deal would have been dead, so...

* * *

> Q. Is the license agreement to which you referred the only license agreement that you're aware of that Rottlund has entered into . . . relating to its Villa product?
>
> A. It's the only license agreement that I know of that we've entered into that I'm aware of on the Villa product, and it includes beyond the Villa product as to some other products that are copyrighted . . . I was just going to say there were other products that they were building, our Cottages and our Gardens which are also copyrighted, and we -- he had land laid out in front of him that -- and plus he was buying land predicated on this going forward that was part of the package. So for him to have the land without having the ability to build it was impossible, so that's the reason for the licensing agreement.
>
> * * *
>
> Q. And again that license agreement was part and parcel of an asset sale; correct?
>
> A. Right. It was -- It was kind of the complete package. It was selling the asset, and the only way to continue with -- there would be no advantage for him to buy it if he couldn't build the product. He had land in front of him that we had built product, he had customers that we had to make sure he took on some service obligations for us, and he had also run the company.
>
> Q. Without that license agreement the deal wouldn't have gone through; correct?
>
> A. I'd say absolutely it wouldn't go anywhere.

(Davenport Aff., Ex. C at 103:3-20, 105:5-106:3, 106:10-22.)

Rottlund's Chief Financial Officer and Rule 30(b)(6) designee – Steve Kahn – provided similar testimony:

> Q. Now the licensing agreement you just discussed relating to the sale of Rottlund Homes of Indiana, you said that was part of a global sales agreement; correct?
>
> A. There -- It was not part of the sales agreement of the sale of Indiana. There were separate documents, but when the purchase price for Indiana was established, that license agreement would have anticipated a purchase pri -- a, you know, a value. That license agreement, you know, was also to protect Rottlund from Rottlund Homes of Indiana using -- or taking those products and selling them to somebody else.

* * *

Q. Now what did the buyer purchase? He purchased homes that were built but not sold; correct?

A. He purchased homes that were built that weren't sold, he purchased work in process and he purchased land, and he -- and he purchased the right to continue to build that product.

Q. And absent a licensing agreement as part of that transaction the new buyer would have been presumably in violation of copyright laws had he attempted to buy those homes; right? Excuse me. To sell those homes to the public in Indiana; correct?

A. I'm not familiar with the copyright laws in Indiana, but since -- since we owned the copyrights, I would presume the answer to be yes.

Q. And do you know whether the licensing agreement related to a specific Rottlund product or more generally to all of the products that Rottlund Homes of Indiana was selling at that time?

A. I believe it related to all of the homes that Rottlund Homes of Indiana was selling at the time.

(*Id.*, Ex. D at 377:12-24 and 378:12-379:6.)

Likewise, Rottlund's Chairman of the Board and Vice President – Bernard Rotter – provided the following testimony:

Q. Okay. There has been some discussion in some of the other depositions about a license that was granted to the Augusta Group, LLC when Rottlund chose to exit the Indianapolis market . . . Were you involved in the negotiation of that license agreement in any way?

A. Only in the approval of it. I didn't negotiate it.

Q. Do you know how much money Rottlund wanted for its -- or got for its granting of a license to Augusta, LLC?

A. I -- I don't believe there was a monetary quantifiable sum. It was part of an overall settlement to -- to exit the market and -- It sounds like you know quite a bit about this business, so -- And if you don't -- If you do exit a market it's always best to exit on friendly terms, and if you can definitely exit with an ex-employee or keep your business in -- in place, so to speak, as you're winding down, you're much better off doing that. If you leave the market and just close up shop it's

> very, very expensive to do it. And I know that we've had discussions over granting them a license to use the product there for a period of time. But we looked at it as our exposure, just even handling our warranty and doing the final build out on the customers we already contracted with, to have that process go smoothly, it's hard to put a price tag on it, but just a couple lawsuits can get you into millions of dollars if you're outside the market and not paying attention. So fortunately all the markets we've exited we've exited cleanly and haven't had a lot of problems with, and so that was part of that entire package, to walk away from a lot of exposure, to give up something we thought had a lot of value in the future, and we -- we really still think it does. But it was a concession to make of doing the right thing for the customers that we had under construction, and people we had constructed for to make sure their warranty work was being taken care of.

(*Id.*, Ex. E at 115:12-117:6.)

Despite this unrebutted testimony that the fair market value of Rottlund's Villa design cannot be ascertained from the License Agreement or the contracts memorializing the sale of Rottlund's Indiana division assets to The Augusta Group in July 2000, the Town & Country Homes Defendants intend to offer the License Agreement as evidence that Rottlund's Villa II designs have no fair market value and, thus, Rottlund is not entitled to any lost licensing fees:

> The only evidence regarding the fair market value of the copyrights at issue in a market where Rottlund was not, or no longer, building townhomes is the license agreement in Indiana. Rottlund granted a royalty-free license agreement for the copyrights on the Villa II .

(Pinnacle Corporation and Town & Country Homes, Inc.'s Mem. in Support of Motion for Summary Judgment Regarding Damages [Doc. No. 498], p. 15.)

Because this argument is unsupported by any reasonable interpretation of the record, the Court should exclude all evidence concerning Rottlund's sale of its Indiana division assets, including the License Agreement, as evidence of the fair market value of Rottlund's Villa II designs.

# LEGAL ANALYSIS

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401 (2004). "Evidence which is not relevant is not admissible." Fed. R. Evid. 402. Relevant evidence may not be admissible "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

## A. The Sale Of Rottlund's Indiana Division Assets Is Not Relevant To Rottlund's Lost License Fee Claim.

As discussed above, all of the evidence in this case establishes that the value of the license sold to The Augusta Group was included in the overall asset purchase of the Indiana division. (Davenport Aff., Ex. C at 103:3-104:6, 105:5-106:22, 164:6-168:24; Ex. D at 375:9-376:11, 377:12-379:10; Ex. E at 115:12-117:6; Ex. F.) In fact, the License Agreement relates to several products within Rottlund's intellectual property portfolio, not just the Villa II designs. (*Id.*, Ex. F.) Thus, the License Agreement provides no probative value whatsoever concerning the fair market value of Rottlund's Villa II designs, thus it cannot be relevant to Rottlund's lost license fee claim. Moreover, because the Town & Country Homes Defendants' argument – "Rottlund granted a royalty-free license" – is factually unsupported, the License Agreement sold to The Augusta Group has no tendency to make the existence of any facts relevant to Rottlund's damages claim more or less probable. Consequently, the Court should exclude all evidence of the sale of Rottlund's Indiana division assets as evidence of the fair market value of Rottlund's Villa II designs.

**B. Alternatively, The Minimal Probative Value Of The Sale Of Rottlund's Indiana Division Assets Is Substantially Outweighed By The Danger Of Unfair Prejudice, Confusion Of The Issues Or Misleading The Jury.**

*Assuming arguendo* that the License Agreement Rottlund sold to The Augusta Group in or about July 2000 has any relevance to Rottlund's lost license fee claim, the Court should still exclude the evidence because any probative value it may have is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, or misleading the jury.

For example, if the Town & Country Homes Defendants are permitted to waive the License Agreement around in front of the jury and argue, without factual support, that the License Agreement represents a "royalty-free" agreement for Rottlund's Villa II designs, the jury may confuse the facts with the arguments of counsel. Specifically, all of the testimony concerning the License Agreement establishes that it was a "part and parcel of an asset sale" to The Augusta Group and "without the license agreement the deal wouldn't have gone through." (Davenport Aff., Ex. C at 106:10-22.) In other words, the assets of Rottlund's Indiana division were not individually itemized as assumed by the Town & Country Homes Defendants' misplaced argument. Moreover, because "the deal wouldn't have gone through" without the License Agreement, it cannot be seriously argued that the Villa II designs have no value. *(Id.)* Thus, while the License Agreement does not include a specific line item delineating the value of each of the three Rottlund designs covered therein, there are no facts to suggest that the value of the Villa II design is zero. Consequently, the Town & Country Homes Defendants' arguments to the jury are not supported by the evidence and would confuse the issues, mislead the jury, and result in unfair prejudice to Rottlund. As a result, the Court should exclude all evidence of the sale of Rottlund's Indiana division assets as evidence of the fair market value of Rottlund's Villa II designs.

## CONCLUSION

For the foregoing reasons, Rottlund respectfully requests that the Court grant its instant motion.

Dated: November 1, 2004

s/David A. Davenport
Craig S. Krummen, #0259081
David A. Davenport, #0285109
Winthrop & Weinstine, P.A.
**Attorneys for Plaintiff**
225 South Sixth Street, Suite 3500
Minneapolis, MN 55402-4629
Telephone: (612) 604-6400
Facsimile: (612) 604-6800
ckrummen@winthrop.com
ddavenport@winthrop.com

2147859v1