# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,
Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF MELISSA C. SNELSON
VOLUME I, Pages 1 - 255

(The following is the deposition of MELISSA C. SNELSON, taken pursuant to Notice of Taking Deposition, at the offices of Fredrikson & Byron, 4000 Pillsbury Center, 200 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:17 o'clock a.m., June 10, 2004.)

what the impact on your actual damage calculation
would be if an injunction were entered?
A. That's not an opinion I've been asked to provide
at this time.
Q. And you don't have an opinion right now as to
what the actual damages would be if Town & Country
just voluntarily stopped selling back-to-back
townhomes?
A. Not at this time.
Q. And you don't have an opinion at this time as to
what the impact would be on your actual damage
calculation if the planned but unbuilt back-to-backs
were unbuilt for whatever reason?
A. I'm sorry, is that a different question than the
one you just asked?
Q. Yes. The first one is if they are enjoined, the
second one is if they voluntarily don't do it and the
third one is if they remain unbuilt for any reason.
A. I guess I don't understand how that's different
from the second question, remaining unbuilt and stop
building, I don't see the difference.
Q. So your answer is the same, then; right?
A. My answer is the same.
Q. Okay. And then let's talk about the lost
licensing fee at Washington Square. As I understand

it, you estimate the -- you have been told that Rottlund would have sold a license to Town & Country at a price equal to Rottlund's estimated incremental profit margin per unit multiplied by the number of units to be constructed by Town & Country Homes; right?

A. Yes, I'm informed that's the only way.

Q. Have you been given any information which leads you to believe that Town & Country would have accepted that license arrangement?

A. No. As far as I know that license arrangement wasn't proposed so I have no idea what Town & Country's response would have been.

Q. Do you have anything at all in your training as a certified public accountant and litigation consultant that anyone would accept a proposed license which gives all their profits to somebody else?

A. Yes, in certain circumstances the parties would agree to that.

Q. Can you tell me a couple examples of circumstances where that would occur?

A. Sure. If the license that I'm proposing is equal to Rottlund's estimate of incremental profit margins, not all of Town & Country's profits. There

is a difference there. So one circumstance would be if Town & Country believes they can make higher profits than Rottlund was making on it, then they would have some incremental profit margin between the license and their profits. That's one possibility. Another possibility is if they were willing to -- if Town & Country Homes was willing to make zero profit or have a lost leader, if you will, in the Homestead Collection units or the Washington Square back-to-back units in order to make their proposed community a success and in order to promote the sales of other products. Those are three examples.

Q. Did you do any sort of research or analysis to determine whether or not any of these three examples are applicable to this case?

A. I don't think I have sufficient information to make full judgments on any of those, I don't think Pinnacle provided all of that information.

Q. Well regardless of -- regardless of the reason, you didn't do an analysis on it; right?

A. Well if I don't have the documents, then I can't do it, no.

Q. I think that was a double negative. Did you do that analysis?

A. No, I did not. The documents were not

Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,
vs.

Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois corporation, and
Town & Country Homes, Inc.,
a Minnesota corporation, and
Bloodgood Sharp Buster
Architects & Planners of Iowa, Inc.,
an Iowa corporation,
Defendants,
and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,
vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa, Inc.,
an Iowa corporation,

Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF TIMOTHY M. WHITTEN
30(b)(6)
VOLUME 5, Pages 822 - 967

(The following is the deposition of TIMOTHY M. WHITTEN, 30(b)(6), taken pursuant to Notice of Taking Deposition at the offices of Fredrikson & Byron, 4000 Pillsbury Center, 200 South Sixth Street, Minneapolis, Minnesota commencing at 9:13 a.m. on August 14, 2003.)

Indiana, is that correct?
A I would have to read the document to answer that. Do you want me to review that?
Q Let's mark it as an exhibit.
MR. SCHWIEBERT: Is that a clean one?
(Exhibit 206 marked.)
A It appears that it says that the copyrighted plans to have a license agreement would be the Villa, the Garden Homes and the Cottage.
Q When it references the Villa is that the New Villa, Villa II or Original Villa?
A I don't know. It just says Villa. It would have to be a question to the people that drafted it on their intent.
Q Do you know who drafted the license agreement that's been marked as Exhibit 206?
A I do not.
Q I think I heard you say earlier in your testimony that you had some conversations with people within Rottlund regarding the license agreement that we've marked as Exhibit 206?
A Yeah. My answer to the question was just license agreements in general. I was curious if there was any other license agreements that I wasn't aware of besides Indiana and the answer I received

was there was not.
Q So the only license that Rottlund has ever granted to a Villa product is the one that's been marked as Exhibit 206?
A That's my understanding.
Q How much money did Augusta Group LLC pay to Rottlund for the license on the Villa product?
A I do not know that.
Q Who within Rottlund would have that information?
A I think either Bud Rotter or Dave Rotter.
Q And that's not part of the discussion that you had related to the Indiana license which we've marked as Exhibit 206?
A No.
Q Was there anything other than your query about whether or not there were other licenses that was discussed in preparation for your deposition today to answer questions about licenses that were granted by Rottlund?
A No, that was about all.
Q You just checked to make sure that there was one and only one and that's Exhibit 206?
A That's my understanding.
Q And you don't know how much the Augusta

Group paid for the license to any of the plans listed, Villa, Garden or Cottage?

A I do not know.

Q May I see that for a minute? Okay.

The license agreement which we've marked as Exhibit 206 expires in 2010?

A Yes.

Q Do you know why that date was chosen?

A I do not.

Q I don't have anything further. Thank you.

A Okay.

(Deposition concluded at 2:44 p.m.)

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,
vs. Case No. 01-CV-1980
Pinnacle Corporation (DSD/SRN)
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation, and
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation, and
The Bloodgood Group, Inc., an
Iowa corporation
Defendants,
and
Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,
vs.
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF DAVID H. ROTTER
August 27, 2003

(The following is the deposition of DAVID H. ROTTER, taken pursuant to Notice of Taking Deposition, at the offices of Fredrikson & Byron, 4000 Pillsbury Center, 200 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:05 o'clock a.m., August 27, 2003.)

A. No, I don't -- we don't -- I don't get that information till much further up the pipe.
Q. Did you become aware at some point that Rottlund did not obtain that property?
A. I don't know. I can't tell you that.
Q. It was just never on your radar screen; is that accurate?
A. No, I said I don't have the information, not that it's not on my radar screen.
Q. You weren't involved --
A. I'd appre --
Q. Go ahead, sir.
A. I'd appreciate if you keep your questions a little less curt.
Q. You weren't involved, sir, in Rottlund's decision not to revise its bid on the Hollander property when given the opportunity; correct?
A. That's correct.
Q. Were you aware, at the time the opportunity was presented, that Rottlund had an opportunity to revise its bid for the Hollander property?
A. I'm not aware.
Q. On page 28 of Exhibit 220 it states that you were believed to have knowledge of the facts and issues relating to "Plaintiff's license agreement."

Do you see that?
A. Yes.
Q. What knowledge do you have regarding plaintiff's license agreement?
A. We issued a --
That we issued a license agreement to our -- actually it was the division president who formed a company called Augusta Homes, and he received a license agreement to license products that we were building already in Indianapolis. We had land that was under construction and under contract that he was stepping into, and they were product-specific projects. And as part of the transaction of buying the -- that division of the company he wanted to have the ability to build the product, and also we had customers that we had previously sold under Rottlund that we had to complete, so it was -- it was encompassed in the transaction of the sale of the entire division that he would get a license, otherwise the deal would have been dead, so...
Q. Did you negotiate that particular license agreement with the licensee?
A. The license agreement as far as negotiate, no, it was just part of a couple -- it was worked with our attorneys that drafted the documents. We just

had to make sure that we had a license agreement that he would defend and not -- knew that they were copyrighted plans and he had certain obligations to us if he modifies the plans to keep us posted on it so we can keep up, and if he finds anyone building it, he will go after them.
Q. When you're referring to "he," who is he?
A. He is -- is the -- is Denny Yovanovich at Augusta Homes.
Q. Denny Yovanovich?
A. Yovanovich.
Q. How do you spell that?
A. It's -- I think --
Do you have a copy of the agreement, by any chance? If you don't you're going to have to look up the spelling, because I can't spell his last name.
Q. Where's Augusta building?
A. In the MSA of Indianapolis, Indiana.
Q. Are you aware of any of those homes being built in Ohio?
A. Ohio?
Q. Right.
A. Any of Augusta's homes being built in Ohio?
Q. Any of the Villa product being built by Augusta in Ohio.

A. No. Augusta I don't think is in Ohio. They're only in Indianapolis. It's a limited liability corp. I don't think it's a -- Unless there's another Augusta Homes.

Q. Is the license agreement to which you referred the only license agreement that you're aware of that Rottlund has entered into --

A. It's the only --

Q. Let me finish the question.

A. Sorry.

Q. -- relating to its Villa product?

A. It's the only license agreement that I know of that we've entered into that I'm aware of on the Villa product, and it includes beyond the Villa product as to some other products that are copyrighted.

Q. Is it the only license --

Oh, I'm sorry, go ahead. I didn't mean to cut you off.

A. I was just going to say there were other products that they were building, our Cottages and our Gardens which are also copyrighted, and we -- he had land laid out in front of him that -- and plus he was buying land predicated on this going forward that was part of the package. So for him to have the land

without having the ability to build it was impossible, so that's the reason for the licensing agreement.

Q. Is that license agreement the only license agreement that you're aware of that Rottlund has entered into, period, as a licensor of its copyrighted designs?

A. I believe so, yes, I don't think -- I don't recall any other that we have.

Q. And again that license agreement was part and parcel of an asset sale; correct?

A. Right. It was -- It was kind of the complete package. It was selling the asset, and the only way to continue with -- there would be no advantage for him to buy it if he couldn't build the product. He had land in front of him that we had built product, he had customers that we had to make sure he took on some service obligations for us, and he had also run the company.

Q. Without that license agreement the deal wouldn't have gone through; correct?

A. I'd say absolutely it wouldn't go anywhere.

MR. FARMER: Why don't we take a lunch break, if that's all right.

MR. KRUMMEN: Sure.

A. Oh, some of the -- when we first started in the business some of the split-entry product.

Q. How about in the last ten years; everything Rottlund built been really, really unique?

A. Well we think it is.

Q. Why don't you take a look at what's been marked as Exhibit 206. It's turned upside down and it's right in front of you there. After you've had a chance to review it, my question for you is do you recognize this exhibit?

A. Yes, I do.

Q. This is the license agreement between The Rottlund Company and The Augusta Group, LLC?

A. That's correct.

Q. This is the one that you testified earlier to was entered into between Rottlund and the buyer of The Rottlund Company in Indiana?

A. Yes.

Q. Do you know who prepared the document, the license agreement, Exhibit 206?

A. I don't know if it was Briggs Morgan. One of the -- One of the local attorneys here. I'm not sure which one.

Q. There isn't any dollar figures listed in this license agreement, so my question for you is what was

the -- what did Augusta Group, LLC have to give Rottlund in order to obtain a license for the plans that are listed under the recitals here?

A. The Augusta Group purchased, when they purchased the company, it was in -- this is incorporated as part of the total purchase, it's not a separate piece. Other than it had to be set up as a separate piece to protect the customers that Rottlund had that were already in the subdivisions and needed to be completed and some land that we had that they purchased that was under contract that was developed specifically for these products. So to create the opportunity for him to purchase, who also was a former -- former division president of ours and we offered it to him first with the condition that he would be able to use our product in that marketplace. And so it was en -- it was encompassed in the entire transaction, it wasn't a separate piece, as such, and we did that for two reasons. One of them, the deal wouldn't have gone forward without it because he wouldn't have been able to use the land that we had in inventory. Secondly, he was taking on responsibility for customer service. And the other part of it is the future developments that he had online were going to be replications of some of these

products that I knew about, and he's a good person and I trust him and I wanted him to be successful.
Q. How much in total did Rottlund get for the sale of its Indiana operations?
A. I don't have that. I don't know the exact dollar amount.
Q. Do you know --
A. It was an asset sale, so I can't tell you.
Q. Do you have an approximate amount?
A. No, I do not.
Q. Do you know if it was more than a million dollars?
A. No, I don't.
Q. Do you know if it was more than a hundred thousand dollars?
A. No, I do not.
Q. Where would we get that information?
A. You would have to talk to Mr. Kahn.
Q. Were there any discussions internally at Rottlund about how much you'd need to include above and beyond the assets that were being sold to compensate Rottlund for the license?
A. Pardon me?
Q. Were there any discussions internally at Rottlund about how much you would need to include

above and beyond the value of the assets that were being sold to compensate Rottlund for this license agreement?

MR. KRUMMEN: Object to the form of the question.

A. No, there was no discussion on that. There was -- would have been no sale without the integration of the license agreement with the transaction because of the houses that were already under construction, and also the future developments that were online that used the same product. There wouldn't have been anything to sell.

Q. Was there any attempt at Rottlund to try to put a value or a dollar figure on what the license would be?

A. No, it was a total negotiation of the product and the -- and the assets all in one bundle, and also having -- I believe he's responsible for taking on some of the service warranty of the product before that time period. We wanted to make it clean and very neat and very uncomplicated.

Q. If the idea was to protect the land that was already approved, if you will, for Rottlund product or already --

A. Umm-hmm.

Q. -- under construction, how come this license goes until June 30, 2010?

A. The agreement was I was not concerned with the timeframe. We talked about it, he said I don't know how long it's going to take me to finish these projects, I don't want to be hamstrung with a short period of time. I trusted him, I've known him for a couple years, he's a good person. He said, can I have ten years? I said, that's okay. We have a lot of trust.

Q. You anticipated that the Augusta Group, though, would only use their license for purposes of building out what was already either approved or under development.

A. But it was broader than that. It allowed him to continue the operation. I wanted him to become successful.

Q. So this license also allows Augusta to continue to build in new developments, ones that weren't under consideration at the time of the transfer of assets?

A. Yes, he can, according to the license.

Q. Do you know if -- if Augusta Group has done that?

A. No, I don't.

Q. Do you still talk with Mr. --

A. I talk to him about --
Q. How about we just call him "Dennis," his last name is hard to pronounce.
A. Yovanovich.
I talked to him a couple months ago. He is doing well. He's making a few dollars, and he's building some double bungalows right now and some single family to fill in, because the marketplace has been -- the Indianapolis marketplace, according to him, has been rather stiff.
Q. You indicated that when you were in Chicago you made it a point to introduce yourself to the people at Town & Country Homes because you'd learned that they had a interest or a plan to come to Minnesota?
A. Umm-hmm.
THE REPORTER: Your answer, please?
A. Yes.
THE WITNESS: I'm sorry.
Q. Why?
A. Why?
Q. Yeah.
A. Well because anyone that's coming to your town, if it's another builder, and you're certainly, if you're out in their area and you see them and you happen to see their product and you find out they're

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,

Plaintiff,

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation, and
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,

Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,

Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF STEVEN A. KAHN, 30(b)(6)
VOLUME II, Pages 204 - 400

(THIS TRANSCRIPT CONTAINS ATTORNEYS' EYES ONLY
PORTIONS AS INDICATED AT PAGES 364 AND 385.)

(The following is the continuation of the 30(b)(6) deposition of STEVEN A. KAHN, taken pursuant to Notice of Taking Deposition, at the offices of Winthrop & Weinstine, P.A., 225 South Sixth Street, Suite 3500, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:12 o'clock a.m., August 4, 2003.)

Q. There was no analysis done to determine if Rottlund had the ability to purchase, just optioned.
A. No, there wasn't. No.
Q. Have you ever been involved in the negotiation of any license agreements for any license from Rottlund Company to any third party related to its Villa product?
A. No.
Q. Do you know if Rottlund's ever done that, entered into a license agreement with any third party related to its Villa product?
A. I believe Rottlund has entered into a license agreement with the purchaser of Rottlund Homes of Indiana.
Q. Any others that you're aware of?
A. No.
Q. What knowledge do you have about the license agreement for the purchaser of the Indiana --
A. I know the agreement exists, it was part of the global purchase price. There is not a separate price assigned to the license of the products. I believe a copy of that license agreement has been provided to you.
Q. Were you involved in figuring out what the purchase price ought to be for the Indianapolis

operations?
A. Indianapolis was sold about three months prior to my joining the company.
Q. Okay. I wasn't sure about the right date because the year is right, I think, in terms of when you started.
So that's not something you were involved with?
A. No.
Q. Who at Rottlund was involved in that transaction?
A. Larry Shapiro and David Rotter.
MS. NEWMAN: Okay. Subject to some additional follow-up I'll turn it over to you, Matt, give you some time here at the end of the day.

EXAMINATION

BY MR. FARMER:
Q. Mr. Kahn, you just testified that Rottlund hired seven to eight new assistant superintendents each year for the last several years; is that accurate?
A. I think that's accurate, yes.
Q. What's the basis for that statement?
A. What's the basis for that statement?
Q. Yes.
A. My knowledge of the company.
Q. Okay. You testified that you don't know whether

they've hired additional superintendents during that same timeframe; correct?

A. Because we don't hire superintendents, we only promote superintendents.

Q. And these seven or eight new assistants who've been hired each year for the last several years, can you give me the parameters of the timeframe in which you're providing that answer here?

A. Probably for the last three years.

Q. So 2000 to 2003.

A. 2003, yes.

Q. Now the licensing agreement you just discussed relating to the sale of Rottlund Homes of Indiana, you said that was part of a global sales agreement; correct?

A. There --

It was not part of the sales agreement of the sale of Indiana. There were separate documents, but when the purchase price for Indiana was established, that license agreement would have anticipated a purchase pri -- a, you know, a value. That license agreement, you know, was also to protect Rottlund from Rottlund Homes of Indiana using -- or taking those products and selling them to somebody else.

Q. Now this license agreement --

Well let's back up. Rottlund was trying to get rid of its operations in Indiana, correct, they were trying to get out of that market in its entirety; correct?
A. Yes.
Q. The only way they could do that --
Well the way that Rottlund decided to do it was to sell its assets in that state; correct?
A. Yes.
Q. Who was the buyer?
A. The buyer was the former general manager.
Q. Now what did the buyer purchase? He purchased homes that were built but not sold; correct?
A. He purchased homes that were built that weren't sold, he purchased work in process and he purchased land, and he -- and he purchased the right to continue to build that product.
Q. And absent a licensing agreement as part of that transaction the new buyer would have been presumably in violation of copyright laws had he attempted to buy those homes; right? Excuse me. To sell those homes to the public in Indiana; correct?
A. I'm not familiar with the copyright laws in Indiana, but since -- since we owned the copyrights, I would presume the answer to be yes.

Q. And do you know whether the licensing agreement related to a specific Rottlund product or more generally to all of the products that Rottlund Homes of Indiana was selling at that time?
A. I believe it related to all of the homes that Rottlund Homes of Indiana was selling at the time.
Q. Do you know when that -- this agreement was negotiated, sir?
A. It was completed in the summer of 2000. I don't know the period of time over which it was negotiated.
Q. Let's talk about Rottlund's Indiana operation for a few minutes. When did Rottlund get into the Indiana market?
A. I don't know offhand.
Q. Now sir, you're aware generally that statements in an annual report need to be accurate; correct?
A. Yes.
Q. Would you take a look at the annual report 2000, Exhibit 189.
A. Umm-hmm.
Q. Now I understand, sir, that you had no involvement in preparing this report; correct?
A. Correct.
Q. This report predated your affiliation with Rottlund; right?

A. Yes.
Q. Would you turn to page 4, Bates stamp RCI 000901.
A. Umm-hmm.
Q. You see the fifth paragraph down from the top, final sentence, "The Company does not license its home designs to other builders and vigorously pursues infringers"?
A. Yes.
Q. You have no reason to believe that statement was not accurate at the time this document was prepared and filed; do you?
A. No, I don't.
Q. Sir, before I got sidetracked I asked you when Rottlund got into the Indiana market.
A. I believe in the first paragraph here it would probably tell you that, the company began building home -- homebuilding operations in the Indianapolis, Indiana and Orlando and Tampa, Florida during the year ended March 31, 1996.
Q. So at some point between April of -- of '95 and March of '96 Rottlund --
A. Yes.
Q. -- got involved in the Indiana market; correct?
A. Correct.

# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation, and
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation, and
The Bloodgood Group, Inc., an
Iowa corporation
Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF BERNARD J. ROTTER
August 29, 2003

(The following is the deposition of BERNARD J. ROTTER, taken pursuant to Notice of Taking Deposition, at the offices of Fredrikson & Byron, 4000 Pillsbury Center, 200 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:13 o'clock a.m., August 29, 2003.)

would have read in Builder magazine about Bloodgood?
A. No.
Q. Are you now familiar with any of Bloodgood's designs done for anyone other than Town & Country?
A. No.
Q. Are you familiar with any designs that Bloodgood has done for Town & Country?
A. I -- You know, I honestly don't know what Bloodgood has done for Town & Country.
Q. That's fair. I just need to know if you know.
A. No.
Q. Okay. There has been some discussion in some of the other depositions about a license that was granted to the Augusta Group, LLC when Rottlund chose to exit the Indianapolis market.
A. Umm-hmm.
Q. Is that a "yes"?
A. Yes. I'm sorry.
Q. Are you --
Were you involved in the negotiation of that license agreement in any way?
A. Only in the approval of it. I didn't negotiate it.
Q. Do you know how much money Rottlund wanted for its -- or got for its granting of a license to

Augusta, LLC?

A. I -- I don't believe there was a monetary quantifiable sum. It was part of an overall settlement to -- to exit the market and -- It sounds like you know quite a bit about this business, so -- And if you don't -- If you do exit a market it's always best to exit on friendly terms, and if you can definitely exit with an ex-employee or keep your business in -- in place, so to speak, as you're winding down, you're much better off doing that. If you leave the market and just close up shop it's very, very expensive to do it. And I know that we've had discussions over granting them a license to use the product there for a period of time. But we looked at it as our exposure, just even handling our warranty and doing the final buildout on the customers we already contracted with, to have that process go smoothly, it's hard to put a price tag on it, but just a couple lawsuits can get you into millions of dollars if you're outside the market and not paying attention.

So fortunately all the markets we've exited we've exited cleanly and haven't had a lot of problems with, and so that was part of that entire package, to walk away from a lot of exposure, to give

up something we thought had a lot of value in the future, and we -- we really still think it does. But it was a concession to make of doing the right thing for the customers that we had under construction, and people we had constructed for to make sure their warranty work was being taken care of.

Q. When you exited the New Jersey market and two of the places where you were building in Florida, were there similar license agreement arrangements?

A. In -- Let's take them one at a time.

New Jersey actually, no, there weren't any license agreements there.

Q. How come not in New Jersey?

A. New Jersey we really just did single-family homes and we bought a home builder there, it's sort of like different than every place else. They had their own product lines when we got there, we assisted and designed new product for them, but for the most part we bought a builder that had his own -- had a business going and we just enhanced that business. And we weren't doing any multifamily there. And we sold assets out to -- to some other folks and -- and had some people in place to complete most of our construction. It was an expensive way to exit, but that's -- that's how we moved out of New

# FILED UNDER SEAL

Exhibit F