# Exhibit I

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

---

The Rottlund Company, Inc.
d/b/a Rottlund Homes, a Minnesota corporation,

Plaintiff,

vs.

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois corporation, and
Town & Country Homes, Inc.,
a Minnesota corporation,

Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa corporation,

Third-Party Defendant.

---

Videotaped Deposition of
LARRY MOORE
Thursday, September 4, 2003
9:40 a.m.

Corporation, did you look at those designs when you came up with the schematic design for the Homestead Collection?

A. I was familiar with those, but I did not access them.

Q. Now, let's -- I -- I think you said you were familiar with Kimball Hill's designs, and now you've told me you're familiar with the Streamwood designs, correct?

A. And -- and familiar in that I have seen them as I've gone through files, accessing them for -- for other marketing purposes. So I don't have a tremendous -- tremendous familiarity with it, but, yeah, I have seen those names.

Q. Okay. Did you derive the Homestead's schematic design from the Kimball Hill designs?

A. No.

Q. Did you derive the Homestead Collection schematic design from the Streamwood designs?

A. Specifically, no. Ideas came out of all of those projects, which, you know, were incorporated as far as ideas on how to assemble room locations and elements and things like that, so --

Q. When you say, "all of those projects," could you tell me which projects you're referring

to?

A. Well, specifically the ones that -- that I used and had in my files were Midland, Good Value Homes, Jerry's Homes. Those are the three I can remember off the top of my head.

Q. And those are the three that you gave me before. I think that there was a fourth back-to-back that you worked on, but it postdated your schematic design for the Homestead Collection. Let me make sure I get that right. DeMaria?

A. DeMaria.

Q. That was after the Homestead Collection, right?

A. Yes. Correct.

Q. Okay. So the ones you looked at were Midland, Good Value, and Jerry's Homes. DeMaria came later. Let me just keep working through this list, though. In terms of the Adare Farm and College Hill, did you have any reference point or opportunity to look at those designs --

A. Could I --

Q. -- during the schematic --

A. Could I --

Q. -- design process?

A. Excuse me. Could I see that list? Because

Q. It is -- it is substantially different. And the next question is, is the Homestead Collection substantially different than the Midland back-to-back townhome?

A. Yes.

Q. Is the Homestead Collection substantially different than the Jerry's Homes back-to-back townhome?

A. Yes.

Q. Why do you say that the Homestead Collection is substantially different than the Jerry's Homes back-to-back townhome?

MS. NEWMAN: Objection, form and foundation. Go ahead if you can make the comparison without those documents in front of you.

THE WITNESS: From what I can recall without the documents in front of me is that there are, once again, substantial differences to detailed items in the plan, to the elevations, materials, massing of the building, volumes, proportions of those. That's general. Without looking at drawings and comparing, you know, elements, I couldn't go into more break -- detail breakdown.

BY MR. KRUMMEN:

Q. Is the Homestead Collection more similar to

Midland or more similar to Rottlund's Villa II back-to-back townhomes?

MS. NEWMAN: Objection as to form and foundation. You can answer if you can do that without comparing documents.

MR. CARMICHAEL: Join in the objection as to the word "similar."

MS. NEWMAN: Go ahead.

THE WITNESS: I don't think you could categorize it more or less similar than -- than any one project. They all have their specific feel and collection, combination of elements that I think makes each one what it is; unique, if you want to call it that.

BY MR. KRUMMEN:

Q. Is the Homestead Collection more similar to Rottlund's Villa II back-to-back townhome or more similar to Jerry's Homes back-to-back townhome?

MS. NEWMAN: Same objections. Go ahead.

THE WITNESS: Since -- since we used our experience on the BSB projects, I would have to say it's more similar to -- to Jerry's Homes.

BY MR. KRUMMEN:

Q. So in your opinion, the Homestead Collection back-to-back townhome design is more

Value's back-to-back design versus Rottlund's Villa II design, correct?

MS. NEWMAN: Objection as to form and foundation. Go ahead.

THE WITNESS: Yeah, I would say it's more similar to Good Value.

BY MR. KRUMMEN:

Q. Now, you said you didn't have access to Rottlund's materials. Maybe I mischaracterized that, but is it your testimony that you didn't have access --

A. No.

Q. -- to anything of Rottlund's --

A. No. That's --

Q. -- when you designed the Homestead Collection?

A. That's not -- that's not a correct statement. We had access. We did not access them. We did not use them.

Q. When you say you had access, I believe that you told me in the last deposition that you toured Rottlund's Villa II during the schematic design phase for the Homestead Collection. Correct?

MS. NEWMAN: Objection as to the form of the question. I think it mischaracterizes the prior

MS. NEWMAN: Objection as to foundation. You can answer if you know.

THE WITNESS: I don't know if it's been produced in this -- since it's come to light, I mean, for me to see that and refresh my memory. I -- I don't know where that stands in this process.

BY MR. KRUMMEN:

Q. Can you sit here and testify with certainty that the competition product survey you received from Art Plante in May of '98 did not have any Rottlund materials in it?

A. Nothing I saw -- nothing I saw had Rottlund materials in it here.

MR. KRUMMEN: Move to strike the question. Could you read back my prior one, please.

THE REPORTER: Your last question?

MR. KRUMMEN: Move to strike the response. If you could read back my last question, please.

(The requested portion of the record was read by the reporter.)

MS. NEWMAN: Objection as to form. Go ahead and answer if you know.

THE WITNESS: I can't say for certainty what -- what was in it exactly.

BY MR. KRUMMEN:

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,
vs. Case No. 01-CV-1980 (DSD/SRN)
Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,
Defendants,
and
Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,
vs.
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF LARRY W. MOORE
VOLUME II, Pages 215 - 378

(The following is the deposition of LARRY W. MOORE, taken pursuant to Notice of Taking Deposition, by videotape, at the offices of Winthrop & Weinstine, 225 South Sixth Street, Suite 3500, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:09 o'clock a.m., February 17, 2004.)

produce. Because at the time they were giving us the price the design wasn't done. So I think this was put together to say, here's the scope of what you have to do; it's a building of this size, it's a building of this many units and the units repeat, and that way Design Development was able to give us a price on what their services would cost.
Q. So you gave Exhibit 330 to Design Development, Inc.?
A. That's --
I believe that to be correct.
Q. So you gave Design Development, Inc. what you've admitted are Rottlund floor plans at the inception of this Midland townhome design process; is that fair?
A. As a guide or as a program guide for them to establish scope, yes.
Q. Did you give Design Development, Inc. any floor plans other than what appears in front of you as Exhibit 330 which you understand belonged to Rottlund at the time?
A. No, I don't believe I did, but I don't remember. I don't remember there was anything else.
Q. We've ruled Design Development, Inc. out as the candidate for pasting together these individual floor plans of Rottlunds which appear on Exhibit 330;

correct?
A. I would rule them out, yeah.
Q. Can you rule yourself out, Mr. Moore?
A. No, can't.
Q. So as we sit here today you may have pasted together Rottlund's floor plans and created Exhibit 330; correct?
MS. NEWMAN: Objection, asked and answered. You may answer again.
A. There's a possibility I -- yeah, that was my work.
Q. Have you endeavored to find out whether indeed you did create Exhibit 330 or not?
A. No, there's no way I could -- nine or ten years ago there's no way I could know that for sure.
Q. But you could check your files to see if there were any other, I guess, documents which would refresh your recollection; correct?
A. The files have been checked.
Q. You have checked those files personally?
A. No, I handed those files over to the people in our office who had that responsibility --
Q. So --
A. -- for this process.
Q. Have you looked through, prior to today's

# FILED
# UNDER SEAL

Exhibit J

# FILED
# UNDER SEAL

Exhibit K

Exhibit L

BLOODGOOD SHARP BUSTER
ARCHITECTS & PLANNERS, INC.

JOB

DATE 8 July

Jim -

TED GROB'S 8-PLEX

Exhibit 338
Date: 2-17-04
Debby J. Campeau
Strewalt & Associates

- OUR DESIGN
- HIS REDLINES & REDESIGN
- ROTTLUND PRODUCT

1. YOUR OPINION - IS OUR DESIGN ENOUGH "DEPARTURE" FROM ROTTLUND (DESIGN OF THIS 8-PLEX NOT 8-PLEX CONCEPT, ROTTLUND CAN'T © CONCEPT

BSB 10208

2. ANY THOUGHTS ON TED'S REVISIONS ?

LM.

3001 Grand Avenue
Des Moines, IA 50312
515/283-0404

18436 N. Florida Ave. Suite 101
Tampa, FL 33613
813/265-4808

400 Capitol Mall 9th Floor
Sacramento, CA 95814
916/449-3979

3436 N. Kennicott Suite 260
Arlington Heights, IL 60004
708/253-0404

Exhibit M

UNITED STATES DISTRICT COURT DISTRICT O

FOURTH DIVISION No.:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -The Rottlund C

d/b/a Rottlund Homes, a MinnesotaCorporation,

Plaintiff,vs.

Pinnacle Corporationd/b/a Town & Country Homes,

an Illinois Corporation, andTown & Country Homes, Inc.,

a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc.,

a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &

Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

Videotaped

30(b)(6) Deposition of

BLOODGOOD SHARP BUSTER ARCHITECTS &

PLANNERS OF IOWA, INC.

(Testimony of Larry W. Moore)

Thursday, March 6, 2003 (Volume I, pages 1 - 61)

Friday, March 7, 2003 (Volume II, pages 61 - 327)

knowledge of what they do. I'm more familiar with their product that's front-to-back.

Q I'm using Exhibit 101 sort of as a marker chronologically, and the next question is not tied to Exhibit 101, although that may help you in answering it. When was the first time you discussed a back-to-back townhome design with anyone at Town & Country of Minnesota or anyone at Town & Country of Illinois?

MR. FARMER: Object to the preamble.

A The first time would have been when Art Plante contacted us about the possibility of doing that work in probably March '98.

BY MR. KRUMMEN:

Q Did you take any notes or do you have any memoranda regarding that initial contact?

A That I don't remember. It -- it would be in my schematic file, if it existed.

Q What do you recall about that conversation?

A Quite -- quite little. Very little.

Q Do you recall anything about the conversation you had sometime in March of 1998 with Mr. Plante about the possibility of designing a back-to-back townhome for Town & Country?

A What I do recall is that Art wanted us to come up

and discuss the program, and we talked about it. I mean, it was a back-to-back. We knew we were going to be doing that.

And I think he gave me enough preliminary information that -- that I researched our files. I went armed with the knowledge of -- of what we had done previously, the company, BSB.

Q You say you went armed with the information of what BSB had done previously. Do you mean with respect to back-to-back townhome projects?

A That's correct.

Q So in looking through the old files, is it fair to say you looked at the materials that related to, say, the Midland Homes back-to-back project you were involved with?

MR. FARMER: Object to form.

A I think I probably did.

BY MR. KRUMMEN:

Q And also the Good Value Homes that BSB of Iowa was involved with, back-to-back project?

A I would say I did, yes.

Q And you also looked through the Jerry's Homes back-to-back files that BSB of Iowa was involved with?

A That's correct.

Q But the DeMaria project didn't start until 1999, so you didn't look through those files, correct?
A That's correct.
Q Did you look through any other materials at BSB Iowa or anywhere else before you went up to speak with Art Plante?
A I may have. I really don't remember.
Q Did you speak with anyone from -- well, strike the question.
Are you familiar with an entity known as Tracy Cross Associates, Inc.?
A Yeah, I'm familiar with Tracy Cross Associates.
Q Have you worked with Tracy Cross in the past?
A Yes.
MS. NEWMAN: Objection as to form.
BY MR. KRUMMEN:
Q Let's -- when did you first begin working with Tracy Cross?
A I -- I'm -- I'm -- early '90s. I'm make -- making a guess.
Q Do you recall what the project was that you worked on that Tracy Cross -- well, strike the question.
Was it a project the first involvement you had with Tracy Cross or was it something else?
A It was a project.

identification by the reporter.)

THE REPORTER: 114.

BY MR. KRUMMEN:

Q Before you as Exhibit Number 114 is a transmittal from you to Steve Sandelin at Town & Country Homes. The date is Tuesday, May 5, 1998, and it relates to a villa townhomes project. Have I accurately characterized the exhibit thus far?

A Correct.

Q The bottom right-hand corner contains the Bates label BSB 01944, and under the "Remarks" you wrote, "Steve," colon, quote, "Competition product survey for Minneapolis area," period, end quote. Have I accurately read that?

A Yes.

Q What does the competition product survey language refer to in your transmittal?

A I do not remember this. I don't think we had any kind of a product or project survey that I remember.

Q How would you go about finding whatever it was that you transmitted to Mr. Sandelin in connection with this Tuesday, May 5, 1998, transmittal, as you sit here today?

MS. NEWMAN: Objection. Foundation. Calls for speculation. You can answer if you know.

MS. NEWMAN: Objection as to form.
MR. FARMER: Object. Form.
A No. But it has been, in the past, that we'd give an administrative assistant the responsibility of gathering information and then firing it off to somebody. So that could be a -- that could be a situation where I wouldn't necessarily know what was in the file, in the -- in the transmittal. I don't know if that's the case here.
BY MR. KRUMMEN:
Q Exhibit 114, the competition product survey referenced there, did it contain any materials from Tracy Cross Associates?
MS. NEWMAN: Objection. Asked and answered. And foundation. Form. Answer if you know.
A I don't know.
BY MR. KRUMMEN:
Q Do you have any knowledge regarding the competition product survey file that's referenced in Exhibit 114, as you sit here today?
MR. FARMER: Objection. Asked and answered.
MS. NEWMAN: Same objection.
A I do not know what that was.

A I believe so, yes. Late March.
Q So Mr. Plante contacted you in late March of 1998 and invited you to come up to Minnesota to discuss a back-to-back possibility program?
A Correct.
Q What happened next?
A Chris Jorgensen and I took a trip up to Minneapolis and met with Art and at least one of his group, in -- in their offices. We got up there, I think it was in the morning.
Q And you met with him before you signed the contract, correct?
A Correct.
Q Did you go on a tour of any of Town & Country of Minnesota's competitors when you were up there in March of 1998?
MR. SCHWIEBERT: Object. Form.
A Yes, we did.
MR. FARMER: Foundation as to the time of the trip.
BY MR. KRUMMEN:
Q Which competitors' products did you tour in March of 1998?
MR. FARMER: Same objection.
A There were several--we had quite a full day--spread

out all over the place. There's a number.

BY MR. KRUMMEN:

Q Do you recall any of the competitors whose products you toured?

A A few. Centex, Pulte -- I'm -- I think Pulte. Rottlund. There were a number of smaller builders that I'm just not familiar -- that familiar with. I believe Ryland. Those are the ones that come to mind.

Q Did you look at a Rottlund back-to-back townhome during your tour that occurred in March of 1998?

A Yes. Yes, we did.

Q Do you recall where it was located?

A No.

Q Did you take any notes of your tour of the Rottlund back-to-back townhome in March of 1998?

MR. FARMER: Object to foundation --

A No.

MR. FARMER: -- as to the time.

BY MR. KRUMMEN:

Q Did you take any pictures, videotapes of the Rottlund back-to-back townhome?

A No.

Q Did anyone else in your group do so?

A Not that I remember.

Q Did anyone else in your group take notes of the Rottlund back-to-back townhome that was toured in March of 1998?

MR. FARMER: Foundation objection as to time.

A Not that I remember.

BY MR. KRUMMEN:

Q Were any brochures picked up by anyone in the group during the tour of the Rottlund back-to-back townhome in March of 1998?

MR. FARMER: Same objection.

A I don't remember having any brochures to look at as we were riding from project to project. I just know that Chris and I did not pick up brochures.

BY MR. KRUMMEN:

Q Did either of you look at any competitor brochures during the tour that occurred of back-to-back townhomes in March of 1998?

MR. FARMER: Same objection.

A I don't recall any brochures, no, I don't.

BY MR. KRUMMEN:

Q Do you recall any Rottlund brochures that you looked at during the March of 1998 tour of Rottlund's back-to-back townhome?

MR. FARMER: Same objection.

A No.

BY MR. KRUMMEN:

Q Why was it necessary to look at Rottlund's back-to-back townhome in March of 1998?

MS. NEWMAN: Objection as to --

MR. FARMER: Objection. Foundation as to time frame and as to the necessity. Form of the question.

MS. NEWMAN: Objection as to form.

A We looked at a lot of products primarily to help us, BSB, get a feel for that market. I guess we liked to put ourselves in the buyer's shoes, go out, tour the product, see what I like to say is how sophisticated the market is, how -- what the interiors, the quality of the furnishings and -- and how they decorate the units. It tells you a lot about what the builder will expect as far as a -- a design of a product and just general feel. So we -- we kind of just shop it that way from the buyer's viewpoint.

BY MR. KRUMMEN:

Q Were there any other reasons for touring Rottlund's back-to-back townhome and other competitors in March of 1998?

MR. FARMER: Objection. Foundation as to

time frame.

A In -- in general, again, we just -- we'd like to see the products that are out there to see -- with our experience nationally, there are a lot of good trends and things that we can bring to any product. We like to understand if those are in the market or not.

Again, as I said, the buyer's perspective is important to us. We go in and we -- we look for mistakes. We look for obvious things that the -- the -- the -- the builders in that market are doing or not doing. Like I say, from our experience, we have a lot of opportunities to bring great ideas in from all over the country.

And generally we don't -- we don't study the competition. We're not there long enough. I mean, this is -- there's a lot of things we're doing in one day. It wasn't a full day either. But we look for opportunities to basically one-up the competition.

BY MR. KRUMMEN:

Q What do you mean by that?

A We see a mistake they're making and we better it. If their rooms are too small, we make them bigger. If their closets are too small, we make them

bigger. We better it.
Q What mistakes did Rottlund make in its back-to-back townhome which you toured in March of 1998?
MS. NEWMAN: Objection.
MR. FARMER: Objection. Foundation. Form.
MS. NEWMAN: Same -- same objections. Go ahead.
A I don't know that I noted anything specific. Again, we weren't studying individual units to that -- to that extent. Glaring errors we would look at. Nothing stands out in my mind from any specific product.
BY MR. KRUMMEN:
Q Did you meet with Mr. Plante or anyone else that represented Town & Country, after the March of 1998 tour?
MR. FARMER: Objection. Foundation as to time frame of the tour.
A After the tour, we went back to Des Moines, generated the proposal and then put that back in front of Art by mail, I'm sure, or fax, and then moved into schematic design after that. I don't remember that we had any more face-to-face meetings through the process.

Exhibit N

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation, and
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation, and
The Bloodgood Group, Inc., an
Iowa corporation
Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF KAREN J. ALBERTSON
August 25, 2003

(The following is the deposition of KAREN J. ALBERTSON, taken pursuant to Notice of Taking Deposition, at the offices of Fredrikson & Byron, 4000 Pillsbury Center, 200 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:14 o'clock a.m., August 25, 2003.)

the product built by Rottlund known as the Villa?
A. Yes.
Q. As I understand it, the Villa has three iterations that are referred to as the Original Villa, the New Villa and the Villa II. Are you familiar with all three of those types of Villa?
A. No.
Q. Are those names that you've heard before?
A. When I started at Rottlund the Villa II, basically, was what we were building at the time. I know that there was a version prior to that, but I really had nothing to do with it.
Q. You're familiar with the Villa II.
A. Yes.
Q. Okay. What knowledge do you have that relates to the copyrighted nature of the Villa II?
A. Only that every document that Rottlund does is copyrighted, every plan that we do is copyrighted.
Q. This is a Rottlund policy.
A. Yes.
Q. How are you aware that that -- that there is such a policy?
A. General knowledge I suppose, and the fact that every plan that has ever been on my desk has been copyrighted.

Q. It isn't that it's somewhere in a Rottlund procedures manual or that someone drew you aside and specifically told you, you just remember hearing that all of Rottlund's plans are copyrighted. Is that about accurate?
A. Yes, and seeing that they all have the copyright logo on them.
Q. Have you ever helped in preparing a copyright for the Villa II?
A. No.
Q. Have you ever seen a copyright application for the Villa II product?
A. No.
Q. Has anyone ever described what Rottlund does in terms of copyrighting its Villa II?
A. No.
Q. Is it fair to say that the knowledge that you have that relates to plaintiff's copyrighted works is that you're aware that Rottlund copyrights its plans?
A. Yes.
Q. And that you're aware that that's general policy.
A. Yes.
Q. And that you don't have any specific knowledge regarding whether a particular plan was copyrighted

other than to say it's general policy that they would be.

MR. KRUMMEN: Objection, mischaracterizes her testimony. You may answer.

A. All I know is that we copyright everything. So whether a specific one is or isn't, I would say that we do on all of them.

Q. This paragraph says you have knowledge of the facts and issues involved in this matter including knowledge related to plaintiff's copyrighted works. Do you have knowledge of any other fact or issue that relates to this lawsuit?

A. Such as?

Q. I think I'm asking you. Are you aware of any other fact or issue that's relevant to this lawsuit?

A. Besides the Dan Geegan correlation, and there's also -- there was another person in my department, Jeff Corneia, that also left and went with Dan Geegan. I know that this is a copyright issue regarding the Villa product.

Q. Well let me stop you and let's talk about the two issues that you raised. Now you said you knew about the Dan Geegan correlation. Explain that to me. What is it about Dan Geegan?

A. Only that he was in my same position, had access

to the same information that I have access to, as well as Jeff Corneia, and they both have left Rottlund and worked for Town & Country.
Q. When you say they had access to the same information that you have access to, what information are we talking about?
A. Any of the -- the bidding documents, the plans, quantity takeoffs, pricing information, vendor information, anything.
Q. Same thing for Mr. Corneia.
A. Yes.
Q. So as I understand your testimony, you know, number one, that Rottlund's plans are typically copyrighted as a matter of general principle; you know, number two, that Dan Geegan and Jeff Corneia left Rottlund and began working for Town & Country Homes of Minnesota. Is there any other fact or issue that you know of that is relevant in this lawsuit?
A. No.
Q. Okay.
MR. PATRICK: I think that's all the questions I have for right now. Thank you.

EXAMINATION

BY MR. SCHWIEBERT:
Q. Ms. Albertson, we already met, I'll introduce

A. I guess yes.
Q. Do you have any specific memory of communities that have those back-to-back products?
A. No.
Q. And you don't remember when the first time you saw a back-to-back product was.
A. No.
Q. You just know they've been around for awhile.
A. Yes.
Q. Have you ever been inside a Town & Country back-to-back product?
A. I don't think so.
Q. Have you ever seen a Town & Country back-to-back product?
A. I don't think so.
Q. Have you ever heard of the Pinnacle Corporation?
A. No.
Q. Ever heard of Town & Country?
A. Yes.
Q. And you've heard of them because a couple of former Rottlund employees are now there.
A. I've --
I knew the name before I knew that, yes.
Q. Have you ever had any discussions with any employees of Town & Country Homes, Inc.?

A. Only when Dan Geegan left.
Q. Was that a discussion with Dan Geegan?
A. Yes.
Q. So this was at -- when he left Rottlund and before he started at Town & Country; is that right?
A. Yes.
Q. Do you remember what you discussed with Dan Geegan?
A. He implied that if I would like to go with him that that opportunity would be there.
Q. Did you ever interview with Town & Country?
A. No.
Q. How did he imply that that was true?
A. He basically said that, that if -- if I was interested, that he would see what could be done.
Q. That's your memory of exactly what he said, if you were interested he would see what he could do, or what could be done?
A. I guess I don't know the exact wording, but something along those lines, yes.
Q. Have any discussions with anyone else at Town & Country?
A. No.
Q. Have you ever had any discussions with anyone -- Well let me back up.

Exhibit O

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

FOURTH DIVISION

| | |
|---|---|
| THE ROTTLUND COMPANY, INC. d/b/a ROTTLUND HOMES, A MINNESOTA CORPORATION<br><br>Plaintiff<br><br>vs.<br><br>PINNACLE CORPORATION d/b/a TOWN & COUNTRY HOMES, AN ILLINOIS CORPORATION, TOWN & COUNTRY HOMES, INC., A MINNESOTA CORPORATION, BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., AN IOWA CORPORATION, AND THE BLOODGOOD GROUP, INC., AN IOWA CORPORATION<br><br>Defendants<br><br>and<br><br>TOWN & COUNTRY HOMES, INC., A MINNESOTA CORPORATION<br><br>Third-Party Plaintiff<br><br>vs.<br><br>BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., AN IOWA CORPORATION<br><br>Third-Party Defendant | No. 01-CV-1980<br><br>DEPOSITION OF JASON JORGENSON |

Reported by: Connie Overberg, RPR, CSR

A. Pat Ruelle.

Q. Is Mr. Ruelle an employee of Rottlund Homes of Iowa?

A. He is an employee of Rottlund Homes. When you say Iowa, I look at that as a division of the Rottlund Company of Minnesota also, and, yes.

Q. Do you know what claims Rottlund is alleging in this lawsuit?

A. Yes.

Q. What is your understanding of the claims that Rottlund is alleging in this lawsuit?

A. That our plans were copied.

Q. Which plans?

A. The Villa 2.

Q. How did you become aware of the lawsuit?

A. Just hearsay through the company, I guess, and recently when I have been deposed.

Q. When you say recently you have been deposed, are you talking about sitting here today?

A. Yeah.

Q. How long before your deposition was noticed were you aware that there was a lawsuit involving claims that the Villa 2 plans were copied?

A. I heard about it a while back. I can't tell you exactly when.

Q. From whom?
A. I can't remember.
Q. Somebody within Rottlund Company of Iowa?
A. Probably.
Q. Do you recall any of the information that you received about the lawsuit?
A. No. Just that there was one.
Q. Are you aware that Rottlund has been involved in similar lawsuits in Iowa?
A. Yes.
Q. What do you know about the lawsuits that Rottlund has been involved in in Iowa that are similar to this, claims that the plan was copied?
A. Very little. I wasn't involved. At that time as a superintendent I wasn't privy to information.
Q. Do you know any information?
A. Some.
Q. What do you know?
A. Just that there was a situation with both Rogers and Oaks, and that there is a confidentiality agreement I have heard that we can't talk about it.
Q. Who is Rogers?
A. I believe it is a company in Ankeny, Iowa, who builds town homes.

Q. Were the plans that were at issue in the Rogers matter plans for a villa product?
A. Yes.
Q. Were there more than one version of the villa product that is being built in Iowa?
A. Yes.
Q. How many?
A. Two I believe, maybe three. Can you clarify that?
Q. Are there particular marketing names that you give two or three versions of villa that are being built in Iowa?
A. They name the floor plans. The Villa 2 was the Chattum and Dunhill, and there have been several names for the original villas. They all start with an A or B.
Q. Always start with --
A. A or B signifying A unit or B unit.
Q. Would it be fair to say that the Villa 2 and the original villa are the two versions of villa product that are being built in Iowa?
A. I believe we have started with the original villa and upgraded through to the new villas, and then the Villa 2, so I think there is probably three versions.

Q. What product was at issue in the Rogers lawsuit?
A. It would have either been the original or the new villa.
Q. You don't know which?
A. No.
Q. And then in the Oaks litigation?
A. Same answer.
Q. Do you know if Rogers developed their plans for the product that they were building that Rottlund claimed was copied was designed in-house or by an architect?
A. I don't know.
Q. Do you know anything about how Rogers came up with the plan that they were building that was at issue in the lawsuit of Rottlund involving Rottlund?
A. No, I don't.
Q. Do you have any information how Oaks came up with the plan that they were building in the lawsuit involving Rottlund?
A. No.
Q. Do you know if Oaks was working with an architect or if they developed their plan in-house?
A. I don't know.
Q. Have you ever talked with anybody at

Bloodgood Sharp Buster Architects & Planners?
A. Not that I am aware of.
Q. Have you ever had any involvement in Rottlund developments anywhere other than the Des Moines Metro area?
A. No.
Q. Do you have knowledge of the facts and issues involved in the lawsuit that Rottlund has brought against Pinnacle, Town & Country and Bloodgood Sharp and Buster?
A. Very little.
Q. What do you know?
A. Specifically, I mean, in the facts of the trial I don't. I probably don't know any of them to be honest with you.
Q. When you said "very little," what were you referring to, do you know?
A. Just what I have been told preparing for the deposition.
Q. Were those conversations with your attorney or somebody within the Rottlund Company?
A. With an attorney.
Q. Do you know anything about this lawsuit other than what your attorney has told you?
A. Other than the fact that there are several

Rottlund employees now working for Town & Country and that their plans are very similar to ours, no.

Q. How did you come to know that several Rottlund employees are now working for Town & Country?

A. Because several of them are -- three of the employees worked for our division here in Iowa while I was working here and then went to work for them.

Q. Who are those three people?

A. Marc Harris, Joey Zorn, Chad Cooper.

Q. The last one was Chad Cooper?

A. Yes.

Q. What did Marc Harris do for Rottlund while you worked for him?

A. His title was either production manager or V.P. of operations, and so he was my supervisor as a superintendent.

Q. And Mr. Zorn, what did he do for Rottlund while you worked for him?

A. He started as an assistant superintendent and ended up as either a project manager or production manager -- I am not sure which -- and he was my supervisor when he left.

Q. And Mr. Cooper?

A. He started as an assistant superintendent and ended up as a superintendent when he left.
Q. Did Mr. Harris, Mr. Zorn and Mr. Cooper all go to work for Town & Country Homes in Minnesota?
A. Yes.
Q. Have you talked with Mr. Harris since he left Rottlund Company?
A. Yes.
Q. When?
A. He was at a Christmas party held by Midwestern Interiors here in Des Moines at which they have their employees from Minneapolis come to the same party, and Marc was invited to that party, so I met him and saw him there.
Q. What year was that?
A. That would have been last Christmas.
Q. Do you know when Mr. Harris left Rottlund?
A. I think it was 1999 in June.
Q. June of '99?
A. I believe so.
Q. Do you know what he went to do for Town & Country Homes?
A. Similar position as to what he had here, I believe.
Q. Did you talk to him while you were at this

Christmas party for Midwest Interiors?
A. Yes.
Q. What did you talk about?
A. Family.
Q. Anything related to work?
A. I believe he mentioned that he was looking at another opportunity. I don't know if he had already left Town & Country or was planning to leave or one of the two. I know he has left since then.
Q. You don't know when?
A. No.
Q. Have you talked with Mr. Zorn since he left Rottlund Homes?
A. Yes.
Q. When?
A. He called me maybe two weeks after he left and basically hinted as to the fact that are you willing to move or not to Minneapolis. He assumed that I wouldn't because he knew that I have a situation where my wife likes to live in Iowa near her mother so that was about it.
Q. He was asking you if you wanted an opportunity to work at Town & Country?
A. In a roundabout way, yes.
Q. When did Mr. Zorn leave Rottlund?

A. I can't remember exactly. I can't remember exactly. It would have been after Marc Harris. Probably six months to nine months later, something like that.

Q. End of '99, beginning of 2000?

A. It would have been after the summer of 2000, I believe.

Q. Did Mr. Zorn give you any details at all about what kinds of positions were open in Town & Country Homes?

A. He said that they had a big sales backlog and so his job would be to get things rolling, and so he would need all kinds of positions. Mostly supervisor positions I would believe.

Q. When you say big sales backlog, what do you mean by that?

A. He made it sound like there were hundreds of homes that needed to be built that were sold.

Q. Did he tell you anything about what kinds of homes, where the projects were, anything like that?

A. No, just that it was in the Minneapolis area.

Q. Anything else that you recall about your conversation with Mr. Zorn a couple of weeks after he

left Rottlund?
A. No.
Q. Have you talked to him since?
A. Yes.
Q. When?
A. I can't remember, but it has been between now and then at some point just to see how things were going.
Q. Did you talk with Mr. Zorn the second time, anything related to work?
A. No, not really.
Q. And Chad Cooper, have you talked with him since he left Rottlund Homes?
A. No.
Q. Do you know if Mr. Zorn is still with Town & Country?
A. I think he is, but I am not sure.
Q. Do you know if Mr. Cooper is still with Town & Country?
A. I believe he is.
Q. Do you know what Mr. Cooper's job is at Town & Country, what he left to go do?
A. He is a superintendent.
Q. While Mr. Harris was with Rottlund Company as the production manager, what kind of products was

he overseeing?
A. Can you repeat that?
Q. When Mr. Harris was with Rottlund as a production manager, what kind of products was he overseeing?
A. All of the products that we build in Iowa.
Q. Let me get a list of that. What are all of the products that are built in Iowa?
A. I am going to give you from the best of my memory. We have the lodge series, the craftsman series, the tradition series, the villas, gardens, garden town homes, vistas, cottages. I may have left some out.
Q. Lodge series. Those are single family?
A. Yes.
Q. And craftsman, those are town homes or single family?
A. Detached town homes.
Q. What do you mean by that?
A. They are built as a single family home with minimal side yard setbacks but built in an association type situation so they are town homes living in a single family type of house.
Q. Traditions, is that a single family?
A. Yes.

Q. And we have already talked about the different versions of villas that are built, gardens are town home?
A. Yes.
Q. Back-to-back or see-through?
A. Both. I am sorry. Gardens would all be back-to-back.
Q. And vistas?
A. Those are see-through or a row type town home.
Q. And cottages?
A. Cottages are similar to the craftsman. Detached town homes and the garden town homes are a row type of town home.
Q. The gardens and the garden town homes are two different things?
A. Yes.
Q. And so while Mr. Harris was the production manager for Rottlund, he would have overseen all projects for Rottlund that you would have just listed?
A. Yes.
Q. Are there any product lines on a list that you have given that have been discontinued in Iowa?
A. We are not currently building cottages.

Q. Anything else Rottlund of Iowa is still building currently today?
A. Yes.
Q. Do you have any knowledge of any other Rottlund employees other than Mr. Harris, Mr. Zorn and Mr. Cooper who are now or were at some point employees of Town & Country Homes?
A. I don't know names, but I know there are several from Rottlund of Minnesota that have gone to work for Town & Country.
Q. How do you know that?
A. I was told by Rottlund of Minnesota people. I can't remember which people.
Q. So you wouldn't know names or positions or when people left?
A. I know there is a land guy, somebody in purchasing, possibly superintendent, several.
Q. Is that the extent of your knowledge is there are several?
A. Yes.
Q. Anything else that you know about Rottlund employees that left to go work for Town & Country?
A. No.
Q. Off the record for a second.

(An off-the-record
discussion was held.)
MS. NEWMAN: Go ahead and go back on the record.
Q. (By Ms. Newman) Have you seen the Town & Country Homes product that is at issue in this lawsuit?
A. No.
Q. Have you seen plans of the Town & Country Homes product that is at issue in this lawsuit?
A. No.
Q. Have you seen any pictures of the Town & Country Homes product that is at issue in this lawsuit?
A. No.
Q. So how would you know it if the plans that Rottlund alleges are copied in this lawsuit are similar to Town & Country Homes plans?
A. I just have heard that that is what the litigation is about.
Q. You wouldn't have any knowledge related to that?
A. No.
Q. When you say you have heard that that is what the litigation is about, from whom did you hear

that?

A. From my attorney.

Q. Anybody else talk to you about that issue?

A. Just the hearsay I told you about before within the company. I can't remember names or dates.

Q. I have handed you what has been previously marked as Exhibit Number 182. I would like you to turn to Page 18 of this exhibit. You will see towards the bottom of the page your name there?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. This document was provided by Rottlund Company, Inc., as part of the procedures in this lawsuit, and Rottlund Company, Inc., was asked to identify people who have knowledge and what knowledge they have regarding this lawsuit. And there is a bullet point here that says, "Jason Jorgeson has knowledge of the facts and issues involved in this matter including, for example, knowledge related to the following: (1) Plaintiff's copyrighted works; (2) Defendants' access to Plaintiff's copyrighted works; and (3) the substantial similarity between Defendants' infringing works and Plaintiff's copyrighted works. Jason Jorgeson has such

knowledge since he was employed by Plaintiff as a Project Superintendent, and is currently employed as a project manager for Plaintiff, Iowa Division."

Did I read that correctly?

A. That's what it says.

Q. Mr. Jorgenson, do you have any knowledge of Plaintiff's copyright works?

A. I understand it is a company policy that we copyright our plans.

Q. Do you know for which projects Rottlund claims copyright protection?

A. I would understand that to be all of them.

Q. Do you know anything about Rottlund process or procedures in making registration applications to the copyright office?

A. Only that that is handled in Minnesota.

Q. Do you know anything else related to Plaintiff's copyrighted works?

A. No.

Q. Do you have any knowledge related to -- take one at a time -- Pinnacle's access to Rottlund copyright works?

A. No.

Q. Do you have any knowledge related to Town & Country's access to Plaintiff's copyrighted works?

A. Just that the employees that were in the Iowa Division had access, as I do, to all of our plans.

Q. Do you have any other information related to Town & Country Homes access to Plaintiff's copyrighted works?

A. No.

Q. Do you have any knowledge about Bloodgood Sharp Buster Architects & Planners access to Plaintiff's copyrighted works?

A. No.

Q. Any knowledge related to Bloodgood Group, Inc.'s, access to Plaintiff's copyrighted works?

A. No.

Q. Do you have any knowledge of the alleged substantial similarity between Rottlund's and Town & Country Homes products?

MR. KRUMMEN: I have an objection that there was an amended set of interrogatory responses subsequent to this set. You may answer.

A. Yeah. I haven't seen the plans for the Town & Country villas, and so if I had seen those I would be able to say yes, but since I haven't, I will have to say no.

Q. It is not only the plans. You haven't

# FILED UNDER SEAL

Exhibit P

Exhibit Q

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

FOURTH DIVISION

| | |
|---|---|
| THE ROTTLUND COMPANY, INC. d/b/a ROTTLUND HOMES, A MINNESOTA CORPORATION<br><br>Plaintiff<br><br>vs.<br><br>PINNACLE CORPORATION d/b/a TOWN & COUNTRY HOMES, AN ILLINOIS CORPORATION, TOWN & COUNTRY HOMES, INC., A MINNESOTA CORPORATION, BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., AN IOWA CORPORATION, AND THE BLOODGOOD GROUP, INC., AN IOWA CORPORATION<br><br>Defendants<br><br>and<br><br>TOWN & COUNTRY HOMES, INC., A MINNESOTA CORPORATION<br><br>Third-Party Plaintiff<br><br>vs.<br><br>BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., AN IOWA CORPORATION<br><br>Third-Party Defendant | No. 01-CV-1980<br><br>DEPOSITION OF STEVEN THIES |

Reported by: Connie Overberg, RPR, CSR

Q. Do you have any information about Town & Country's access to Plaintiff's copyrighted works?
A. Only that some of our ex-employees do work for them.
Q. Just so we have your complete knowledge on that topic, what former Rottlund employees are you aware of that went to work for Town & Country?
A. I am aware of Marc Harris, Joey Zorn, Chad Cooper.
Q. And Mr. Harris, Mr. Zorn and Mr. Cooper were all Rottlund employees out of the Iowa Division, correct?
A. There was also a vice president of architecture Tim Johnson works for -- I can't remember his last name.
Q. Tim Johnson is right.
A. Tim Johnson is somebody from the purchasing department, and a guy from the land -- I want to say Pommerant (sic).
Q. Richard Palmiter?
A. Palmiter. Those are the people that I am aware of.
Q. Did you personally know Tim Johnson?
A. I met and talked to him.
Q. About what?

Q. More than 10?
A. Does that count the divorce?
Q. Excluding the divorce.
A. Probably less than 10.
Q. How many times for Rottlund, do you know?
A. Counting this one?
Q. Counting this one.
A. Two or three. Counting, and maybe, you know, it may be more because of the Meadows litigation.
Q. In the past have you been on any mind altering drugs or any prescription medication that would affect your ability to remember events or recall events at the time?
A. Not to my knowledge.
Q. Have you ever been accused of a crime of moral interpretude?
A. No.
Q. In the Oaks litigation do you know the Judge's order dismissing the -- I am sorry -- the preliminary injunction? Do you know of that?
A. I know that under advice from my counsel that that whole proceeding had been sealed, and I am not to answer any questions about the Oaks litigation.

# FILED UNDER SEAL

Exhibits R - V