Court File No. 01-1980 / ROTTLUND / Pinnacle
Mahowald Affidavit (MIL – Bloom) November 1, 2004

Exhibit A.1

Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.

**THE ROTTLUND COMPANY, INC. d/b/a/ Rottlund Homes, a Minnesota Corporation Plaintiff,**
**v.**
**PINNACLE CORPORATION d/b/a/ Town & Country Homes, an Illinois Corporation, and**
**Town & Country Homes, Inc., a Minnesota Corporation, Bloodgood Sharp Buster Architects and Planners of Iowa, Inc., an Iowa Corporation, and The Bloodgood Group, Inc., an Iowa Corporation, Defendants,**
**and**
**TOWN & COUNTRY HOMES, INC., a Minnesota Corporation, Third-Party Plaintiff,**
**v.**
**BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., an Iowa Corporation Third-Party Defendant.**

**No. Civ.01-1980 DSD/SRN.**

Aug. 20, 2004.

Craig S. Krummen, and David Davenport, on behalf of Plaintiff.

Darren B. Schwiebert, on behalf of Defendant Town & Country Homes, Inc.

Christopher Murdoch, on behalf of Defendant Pinnacle Corp.

Holly J. Newman, on behalf of Defendant Bloodgood Sharp Buster and The Bloodgood Group, Inc.

*REPORT AND RECOMMENDATION*

NELSON, Magistrate J.

*1 The above-entitled matter came before the undersigned United States Magistrate Judge on Plaintiff The Rottlund Company's (Rottlund) Motion for Partial Summary Judgment on Liability Issues of Validity, Direct Copying, Access, and Substantial Similarity Concerning Plaintiff's § 102(a)(5) Copyrighted Technical Drawings (Doc. No. 333); Plaintiff's Motion to Strike the Affidavit of Jeffrey Scherer (Doc. No. 369); Defendant Bloodgood Sharp Buster Architects and Planners of Iowa, Inc. and the Bloodgood Group, Inc.'s (hereinafter collectively BSB) Motion for Partial Summary Judgment on Copyright Validity (Doc. No. 350); and Defendants' Motion for Partial Summary Judgment (Doc. Nos. 382, 384, and 406). These matters have been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

This is in large measure a copyright infringement case involving claims of infringement of technical drawings and architectural works as-built structures, 17 U.S.C. § 102(a)(5) and (a)(8). Rottlund claims it holds copyrights in technical drawings (§ 102(a)(5)) and the as-built structures (§ 102(a)(8)) of three townhomes: the Original Villa, the New Villa, and the Villa II. Rottlund claims Defendants infringed the Villa II copyrights, which carry forward the Original and New Villa copyrights.

The Court briefly explains the content of the various motions and what will be addressed by this report and recommendation. Plaintiff's motion requests summary judgment on the validity of its technical drawing copyrights and a finding that Defendant TCM's Homestead Collection (Davenport Aff. Ex. TT (Centennial Crossing) and Ex. AAA (Harvest Hills)) technical drawings and Defendant Pinnacle's Washington Square (Krummen Aff. Ex. R) technical drawings infringe Plaintiff's Villa II (Davenport Aff. Ex. F (Rush Creek) and Ex. G (The Reserve)) technical drawing copyrights. Defendant BSB's motion requests a finding that all of Plaintiff's copyrights (technical drawings and as-built structures) are invalid. Defendants' collective motion

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

seeks a finding that the Homestead Collection, Washington Square, and Chateau Collection technical drawings and as-built structures do not infringe Plaintiff's Villa II technical drawings or as-built structure copyrights, and a finding that the contributory infringement and vicarious liability claims fail. In this report and recommendation, the Court considers Plaintiff's motion, BSB's motion, and that portion of Defendants' collective motion that deals with infringement of the Homestead Collection and Washington Square technical drawings. In a separate report and recommendation, the Court will consider the Defendants' collective motion regarding whether the Chateau Collection technical drawings infringe the Villa II technical drawings; whether the Homestead Collection, Washington Square, and Chateau Collection as-built structures infringe the Villa II as-built structure; and the contributory infringement and vicarious liability claims.

*2 Rottlund, Pinnacle, and TCM are all direct competitors in the design, development, construction, and sale of townhomes. BSB is an architectural firm utilized by TCM and Pinnacle.

I. FACTUAL BACKGROUND

A. *Part I*

Sometime in 1985 or 1986, Bud Rotter of Rottlund was asked by a developer to build a housing structure on a 12 acre parcel that was zoned for apartments. (Davenport Aff. Ex. EEE, at 40-47) (explaining Bud Rotter's discovery of the back to back idea). Mr. Rotter initially turned down the request, but the developer was persistent. So, Mr. Rotter, having a long time interest in designing but no formal training, began to formulate a design he thought might fit the parcel. Mr. Rotter knew that he had to fit 12 units per acre but was not sure how that configuration would work. Mr. Rotter started with a square and eventually came up with an idea. He took his sketch to a draftsman at Rottlund, Don Kangas. Mr. Kangas drew a quarter inch scale plan of the 12 unit building, which Mr. Rotter described as an accordion. Mr. Rotter ran some material and supply cost numbers, which seemed affordable. Mr. Rotter met with his partners to discuss the potential of moving forward on the project. The risk/reward assessment was favorable so Mr. Rotter searched for an architect.

Tim Whitten of Architectural Forum Inc. (AFI) was selected as the architect. *Id.* at 46; Ex. FFF, at 748:16-750:6, 753:10-19. Mr. Rotter and Mr. Whitten met in 1986 on a couple of occasions to discuss Mr. Rotter's ideas. [FN1] The discussions resulted in an agreement that Mr. Whitten would work on designing a back-to-back townhome for Rottlund. (Patrick Aff. Ex. A, at 24:4- 26:9). AFI and Rottlund executed a written agreement on April 21, 1986 regarding the design and presentation of Rottlund's 12 unit townhouse. (Davenport Aff. Ex. HHH). AFI agreed to, inter alia, "[r]ework" two plans and design a "new" elevation. *Id.* Mr. Whitten then began the design process and would periodically submit his work to Mr. Rotter for feedback. *E.g.*, (Patrick Aff. Ex. A, at 28:25- 29:6, 30:11-31:20).

FN1. There appears to be a factual dispute about whether Mr. Rotter brought any designs to his meeting with Mr. Whitten. Mr. Rotter says he showed Mr. Whitten drawings, which is supported by the fact that later contracts indicate AFI produced its drawings "from Rottlund drawings," (Davenport Aff. Ex. III), but Mr. Whitten says he does not remember Mr. Rotter presenting any drawings. *Compare* (Davenport Aff. Ex. EEE, at 46:20- 22), *with* (Patrick Aff. Ex. A, at 25:12-14).

Mr. Whitten's work for Rottlund's 12 unit townhome became known as the Original Villa and was first used in a development known as Summerwood. (Davenport Aff. Ex. JJ, at 48:12-23). The design process progressed. On May 12, 1987, AFI and Rottlund executed another written agreement regarding Rottlund's 12 unit townhouse design (the Original Villa) for the Summerwood development. *Id.* Ex. III. The May 12 contract provided that AFI would: Produce working drawings base from Rottlund's drawings, to include: 1. Final building plan. 2. Building elevation (1 style).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

3. Overall section necessary for construction. 4. Main & upper level plans. 5. Footing layout. 6. Stair sections. 7. Electrical layout. 8. Roof plan. 9. Interior elevation of bathroom, kitchen & necessary features. 10. Necessary details for construction consistent with normal builder practice.

*3 *Id.*

The May 12 agreement also stated that AFI "retains ownership of all ideas, concepts and working drawings and the right to publish and shall not sell the above to other clients." *Id.* Despite this language, it is undisputed that AFI and Rottlund orally agreed that AFI "would assign the ownership of the [Original Villa] plans to The Rottlund Company from AFI." (Krummen Aff. Ex. S, Mazzara Dep ., at 141:25-142:1, 137:17-143:3, 145:22-149:4); [FN2] (Davenport Aff. Ex. JJ, Whitten Dep., at 71:18-73:10). Although the timing of the oral agreement is a bit unclear, it appears to have occurred shortly after the May 12, 1987 agreement or "once [AFI] began to do a number of-of Villa developments." (Krummen Aff. Ex. S, at 148:13-149:25); see also *id.* at 164:16-165:17. The oral agreement was memorialized in a written agreement on January 15, 1989. (Davenport Aff. Ex. JJJ); *see also* (Krummen Aff. Ex. S. 145:22-147:17) ("Q: So did this oral agreement-was this oral agreement reached shortly before you entered into the written agreement that you're discussing? A: That would be correct."). The 1989 written agreement transferred all copyright ownership and other interests in the Original Villa drawings to Rottlund. It provides:

FN2. Gerald Mazzara was AFI's President.

Whereas pursuant to an agreement by and between AFI and ROTTLUND on or about May 12, 1987, AFI developed certain architectural plans (hereinafter "Plans") including:
1. Front and Rear Elevation, dated 11/3/87
2. Footing and Foundation Plan, dated 11/3/87
3. Unit "A" Second Floor Plan, dated 11/3/87
4. Unit "B" Second Floor Plan, dated 11/3/87
to be used by ROTTLUND for a development known as Summerwood, Brooklyn Park. AFI was compensated for its development of the Plans, and continues to receive continuing fees dependent upon the number of units built in accordance with the Plans. At the time of the May 12, 1987 Agreement AFI retained the right to the right of publication of the Plans without specific recital of ownership of the other rights in the Plans. *AFI hereby transfers any and all right, title and interest in its rights to the Plans under the Copyright laws to ROTTLUND.* ROTTLUND shall have for its own use, and for its successors and assigns, all rights in the Plans as defined above which AFI may have held had this AGREEMENT and sale not been made. Rottlund hereby transfers to AFI an exclusive license to the right of publication of the Plans.

(Davenport Aff. Ex. JJJ) (emphasis added).

On September 1, 1989, Rottlund registered the Summerwood (Original Villa) technical drawings. (Davenport Aff. Ex. B). The Summerwood (Original Villa) copyright registration is VAu 159-813. *Id.* Rottlund listed AFI as the author of the Summerwood and stated that AFI assigned the interest to Rottlund. *Id.*

Tim Whitten left AFI sometime around 1990 and formed Whitten Associates, Inc. Whitten Associates, Inc. consisted only of Tim Whitten and his wife who is not an architect. (Krummen Aff. Ex. V, at 64:7-12). In 1991, Rottlund contacted Mr. Whitten to create the next generation of Villa townhome. *Id.* at 63:21-64:21. Mr. Whitten and Rottlund orally agreed that Rottlund would own all rights in the New Villa prepared by Mr. Whitten. *Id.* at 139:23-140:5; (Davenport Aff. Ex. JJ, at 71:18-24). To solidify this oral agreement, Mr. Whitten, on behalf of Whitten Associates, Inc., and Rottlund signed a written agreement in 2002 [FN3] memorializing the previous oral agreement that Rottlund owns all interests in the New Villa designs. (Davenport Aff. Ex. LLL).

FN3. In 1995, Tim Whitten joined Rottlund as Vice President of architecture, but Whitten Associates, Inc. remains an active corporation.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*4 On October 1, 1993, Rottlund applied for and received copyright registration for the New Villa technical drawings, VAu 268-404. (Davenport Aff. Ex. C (registration); Krummen Aff. Ex. W (deposit/source materials)). [FN4] Rottlund listed itself as the author of the New Villa and checked that it was a "work made for hire." *Id.* Rottlund did not indicate that the New Villa was a derivative of the Summerwood (Original Villa). *Id.* Also on October 1, 1993, Rottlund applied for a copyright on a technical drawing titled the Original Villas, VAu 268-380. (Patrick Aff. Ex. F). [FN5] Rottlund listed itself as the author of the Original Villa and checked that it was a "work made for hire." *Id.*

FN4. John Dierbeck, Rottlund's Vice President of Sales and Marketing, filled out the application.

FN5. John Dierbeck, Rottlund's Vice President of Sales and Marketing, filled out the application.

Tim Whitten joined Rottlund in 1995. (Krummen Aff. Ex. V, at 141:24-142:23). As a Rottlund employee, Mr. Whitten designed the final Villa townhome in 1997, the Villa II. Rottlund obtained a copyright in the Villa II technical drawings in June 1999, VAu 447-395. (Davenport Aff. Ex. D, The Rush Creek Villa II), [FN6] and in February 2002, VAu 546-285. *Id.* Ex. E (The Reserve Villa II). [FN7] Rottlund listed itself as the author and checked that it was a "work made for hire." *Id.* Exs. D and E. Rottlund did not indicate that the Villa II was a derivative of the Original Villa or New Villa. *Id.*

FN6. John Dierbeck, Rottlund's Vice President of Sales and Marketing, filled out the application.

FN7. Todd Stutz, a Rottlund executive, filled out the application.

In 2002, Rottlund obtained architectural work copyrights, 17 U.S.C. § 102(a)(8), for its Original Villa (VAu 539-993), New Villa (VAu 554-948), and Villa II (VAu 534-723) townhomes. (Krummen Aff. Ex. T, Y, CC). On each, Rottlund listed itself as the author, checked that the work was a "work made for hire," and did not indicate that the work was a derivative.

After this litigation commenced, Rottlund submitted supplementary copyright applications for the New Villa and the Villa II technical drawing and architectural works copyrights. (Krummen Aff. Ex, X, AA, BB (technical drawing supplements); Ex. Y and CC (architectural works supplements)). The supplementary applications stated that the New Villa technical drawings and architectural works are derivatives of the Original Villa, and the Villa II technical drawings and architectural works are derivatives of the Original Villa and the New Villa. The Reserve Villa II technical drawing supplement also identified it as a derivative of the Rush Creek Villa II. The Copyright Office issued supplementary copyright registrations. *Id.*

B. *Part II*

In 1994, or after the Original Villa and New Villa were created, Defendant BSB was working on drawings for Midland Homes. BSB outsourced some of the drawings to another entity named Design Development, Inc. (Newman Aff. Ex. K, at 253:22- 258:19). BSB and Design Development met, at which time BSB architect Larry Moore gave Design Development a copy of Rottlund's floor plans. (Davenport Aff. Ex. I); (Krummen Aff. Ex. A) (Dep.Ex. 330). Moore testified that BSB had a copy of Rottlund's floor plan for one of Rottlund's Villa products. (Krummen Aff. Ex. B, at 225:3-10). Moore explained that what Krummen Aff. Ex. A appears to be "is a, what I'll call a cut-and-paste job" and a scenario in which it (Krummen Aff. Ex. A) came into being "would be that if there was a brochure of Rottlund units, that Xeroxes were made and then a-this was pasted or taped together to form what an 8-plex building would be like." (Krummen Aff. Ex. B, at 226:13-23). Moore believes he or BSB gave the cut and paste Rottlund floor plan to Design Development. *Id.* at 229:8-11. That is consistent with the following letter from Design Development to Larry Moore recapping the parties' meeting:

*5 As a follow-up to our meeting last Friday, I would like to review the services that

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Design Development Inc. is proposing for your company on the Midland Homes 8 plex townhome project. The services will involve producing construction drawings per schematic design drawings provided by your office. The project will be a two story wood frame building with slab on grade foundation. The building will be contain [sic] eight units, with two unit types of approximately 1200 and 1300 square feet *similar to the Rottlund Homes plans you provided in our meeting.*
*Id.* (emphasis added).

Larry Moore claims he did not instruct Design Development to produce drawings similar to Rottlund's but only gave the Rottlund drawings to Design Development so that it could have an idea about the scope of the project. (Krummen Aff. Ex. B, at 228:23-229:7); (Newman Aff. Ex. K, at 254:14-255:4). Later, while apparently working on the Midland Homes's project, Larry Moore hand wrote a note that provided: ". Our Design. . His Redlines & Redesign. . Rottlund Product. 1. Your opinion-is our design enough 'departure' from Rottlund (design of this 8-plex, not 8-plex concept, Rottlund can't Copr. concept." (Davenport Aff. Ex. K). BSB cannot find the Rottlund product apparently attached to this memo. *Id.* Ex. L.

In 1996, BSB designed a back-to-back townhome for Jerry's Homes. (Jorgensen Aff. ¶ 7). The construction drawings were completed on July 12, 1996. *Id.* ¶ 8. Later, on March 11, 1997, Jerry's Homes sent BSB architect Chris Jorgensen a fax that contained a Rottlund brochure for the Villas of Meredith Pointe floor plan. (Davenport Aff. Ex. M). [FN8] Chris Jorgensen states that the Rottlund brochures were faxed to him solely to give him a sample of the artwork that Jerry's Homes was considering. (Jorgensen Aff. ¶ 8). Subsequent to receiving the fax, BSB slightly altered its construction drawings for Jerry's Homes (name change, mechanical room and coat closet moved, foundation between the house and garage was changed), but Jorgensen maintains that the changes had nothing to do with the fax containing Rottlund materials. *Id.* ¶ 9.

FN8. Defendants state that this appears to be an Original Villa or New Villa townhome. (Pinnacle, Mem. in Opp'n to Mot. for Summ. J., at 13); (BSB's Mem. in Opp'n to Mot. for Summ. J., at 5 n. 1).

TCM hired BSB to design a back-to-back townhome in 1998, which was named the "Villa Product." (Davenport Aff. Ex. O, at 19:21-20:7; Ex. P, at 38:11-21; Ex. BB). In preparing for the TCM project, Larry Moore reviewed and obtained ideas from his Midland Homes file and the Jerry's Homes marketing file. [FN9] *Id.* at 20:8-25; Ex. FF 15:18-16:5. In March 1998, Moore and Jorgensen of BSB and Art Plante of TCM toured a variety of townhomes in Minnesota including Rottlund's Villa II. *Id.* Ex. W, at 26:23-28:8. Moore explained that the purpose of the tours he takes is to look at the products from the perspective of a buyer and see how he might be able to improve the products. [FN10]

FN9. Moore states that the Jerry's Homes marketing file, as opposed to the project file, did not contain the Rottlund materials that were faxed to Jorgensen in March 1997. (Newman Aff. Ex. E, at 104:8-106:11; 314- 315:9).

FN10. Specifically, Moore explained as follows: In-in general, again, we just-we'd like to see the products that are out there to see-with our experience nationally, there are a lot of good trends and things that we can bring to any product. We like to understand if those are in the market or not.
Again, as I said, the buyer's perspective is important to us. We go in and we-we look for mistakes. We look for obvious things that the-the-the builders in the market are doing or not doing.... But we look for opportunities to basically one-up the competition.... We see a mistake they're making and we better it. If their rooms are too small, we make them bigger. If their closets are too small, we make them bigger. We better it.
(Davenport Aff. Ex. O, at 40:2-12, 40:18-20, 40:23-41:1).

Another tour of townhomes occurred on April 29, 1998. There is some dispute about who participated in the tour. Moore and Jorgensen claim they did not participate, (Moore Aff. ¶ 12; Jorgensen Aff. ¶ 16), but testimony from Steve Sandelin, Pinnacle's in-house architect,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

suggests they did. *Id.* Ex. U, at 150:21-24, 152:9-13. In any event, there is no dispute that TCM's president, Art Plante, and Pinnacle's in-house architect, Steve Sandelin, toured Rottlund's Villa II. *Id.* Ex. U, at 150:21-24, 152:9-13. Photographs were taken during the tour. *Id.* Ex. P, at 102:19-104:5; Ex. U, at 158:8-159:254; Ex. X. Defendants have produced copies of Rottlund brochures, including brochures with floor plans from Sandelin's files. *Id.* Ex. Y, Z, and AA.

***6** A few weeks later, May 5, 1998, Moore sent Sandelin a "competition product survey for Minneapolis market." *Id.* Ex. EE. It is unknown what was included in the competition product survey. *Id.* Ex. O, at 26:10-19; Ex. FF, at 157:1-25.

By June 23, 1998, BSB had completed the schematic designs for TCM's Villas product, and the parties executed a second contract related to design development and construction drawings. *Id.* Ex. GG. BSB sent TCM's Art Plante a sent of drawings thereafter. *Id.* Ex. HH. TCM returned the drawings to BSB on July 13, 1998 with TCM's "redlines." *Id.* (BSB 02034). On one of the drawings, TCM attached a photo of Rottlund's Villa II, sketched a drawing, and wrote "see Rottlund product." *Id.* (BSB 02035A). In early June 1999, after BSB informed it that the "Villas" name was already used, TCM changed the name of its back-to-back townhome from the Villa to the Homestead Collection. *Id.* Ex. II.

TCM has hired a number of former Rottlund employees and has failed in its bid to hire others. *E.g., Id.* EX. KK, at 58:5-22; Ex. LL, at 36:9-25; Ex. MM, at 13:24-14:9; Ex. OO, at 34:16-35:25. Tim Johnson was an architect at Rottlund. *Id.* Ex. JJ, at 143:2-22. While at Rottlund, Tim Johnson worked on the design development of Rottlund's Villa II project. *Id.* Ex. JJ, at 143:23-25. Sometime thereafter, TCM hired Tim Johnson as an architectural coordinator. *Id.* Ex. Q, at 247:18-248:12. Dan Geegan, Marc Harris, and Joey Zorn are other former Rottlund employees that TCM hired. *Id.* Ex. KK, at 58:5-22. While at Rottlund, Geegan had access to "the bidding documents, the plans, quantity takeoffs, pricing information, vendor information, anything ." *Id.* Ex. MM, at 13:22-14:9; (Krummen Aff. Ex. G).

In January 2000, Pinnacle began developing a back-to-back townhome product for Aurora, Illinois that was to based on TCM's Homestead Collection. *Id.* Ex. RR. Doug Buster of BSB helped adapt the Homestead Collection for Aurora, Illinois by re-elevating the Homestead Collection. *Id.* Ex. SS, at 59:16-60:22, 69:11-15, 138:16-139:8. The Pinnacle back-to-back townhomes have become known as Washington Square.

TCM began selling the Homestead Collection townhomes in Maple Grove, Minnesota in 2000. *Id.* Ex. TT. This development is known as Centennial Crossing. TCM also used the Homestead Collection townhomes in a development called Harvest Hills in Plymouth, Minnesota. *Id.* Ex. UU (TCM contract with BSB for Plymouth, Minnesota development). On July 5, 2001, Rottlund sent Town & Country Homes a cease and desist letter claiming that the Homestead Collection is substantially similar to certain of Rottlund's designs. *Id.* Ex. A. Pinnacle's in-house architect, Steve Sandelin, forwarded the letter to BSB, *wrote that the designs are "obviously similar,"* and *inquired whether BSB had a co-ownership agreement with Rottlund. Id.* (emphasis added).

***7** While TCM was developing the Harvest Hills townhomes (a version of the Homestead Collection) in July 2001, its employee Dan Geegan sent a drawing for a design and layout of a sprinkler room to BSB architect Beth Miller. *Id.* Ex. VV. The sprinkler room drawings Geegan sent were a portion of Rottlund's Villa II (The Reserve) technical drawings, VAu 546-285-the margin identifying the drawings as Rottlund's was simply cut off. *Compare id.* Ex. VV, *with* Ex. WW. A few months later, Beth Miller drafted a note about the sprinkler system and said that Geegan "is going to call an old arch. friend to determine what they did in this situation." *Id.* XX. On April 25, 2002, Todd Dosch of Metro Fire Protection, Inc., sent BSB

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

a fax of Rottlund's sprinkler room drawings. *Id.* YY. Prior to sending the drawings, Dosch scribbled out Rottlund's logo and copyright notice. *Id.;* (Newman Aff. Ex. M, at 47).

II. DISCUSSION

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A dispute about a material fact, one that may affect the outcome under the governing law, is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

A moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and it must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). All evidence will be viewed in the light most favorable to the nonmoving party. *E.g., Liberty Lobby,* 477 U.S. at 255.

The oft stated test to prevail on a copyright infringement claim requires a plaintiff to prove (1) ownership of a valid copyright and (2) copying of original expression. *Feist Publ'n, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282 (1991); *Moore v. Columbia Pictures Indus., Inc.,* 972 F.2d 939, 941 (8th Cir.1992). The test can be easily stated, but its application is not always so.

A. *Ownership of a Valid Copyright*

Defendants [FN11] argue that Rottlund does not own the copyrights in the Original Villa and the New Villa, that the copyrights in the Original Villa and New Villa are invalid for fraudulently failing to identify the true author, and that the copyrights in the New Villa and Villa II are invalid for fraudulently failing to disclose that they are derivatives. The Court finds Defendants' arguments without merit. Rottlund is entitled to summary judgment of validity of its registered technical drawing copyrights. BSB's motion for summary judgment of invalidity should be denied.

FN11. Not all Defendants make the same arguments regarding ownership and validity of the copyrights. TCM and Pinnacle simply respond to Rottlund's motion for summary judgment on ownership and validity. BSB has itself brought a motion for summary judgment on validity.

*8 A certificate of registration constitutes prima facie evidence of ownership of a valid copyright. 17 U.S.C. § 410(c); *Hamil Am., Inc. v. GFI,* 193 F.3d 92, 98 (2d Cir.1999). Defendants may rebut this presumption, but they have not.

1. Ownership

Ownership of a copyright "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). Under the "work for hire" provisions, 17 U.S.C. §§ 201(b) and 101, employers are considered authors. Importantly, copyright protection ... "exists whether or not it is ever registered," *Arthur Rutenberg Homes, Inc. v. Drew Homes, Inc.,* 29 F.3d 1529, 1531 (11th Cir.1995), as it "subsists from the moment the work is 'fixed in any tangible medium of expression." ' *S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081, 1085 (9th Cir.1989). Section 408(a) [FN12] of the Copyright Act "makes clear that registration is a separate issue from the existence of the copyright itself." *Drew Homes,* 29 F.3d at 1531.

FN12. This section provides in pertinent part:
a) Registration Permissive.-At any time during the subsistence of the first term of copyright in any published or unpublished work in which the copyright was secured before January 1, 1978, and during the subsistence of any copyright secured on or after that date, the owner of copyright or of any exclusive right in the work may obtain registration of the copyright claim.... *Such registration is not a condition of copyright protection.*
17 U.S.C. § 408(a) (emphasis added).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Ownership issues of the copyrights in this case are quite similar to those in *Arthur Rutenberg Homes, Inc. v. Drew Homes, Inc.*, 29 F.3d 1529 (11th Cir.1995). Here, Bud Rotter of Rottlund had an idea about a new townhome and may have made some sketches himself and with the help of a Rottlund draftsman. Rottlund, however, engaged the services of Tim Whitten at AFI to produce the actual architectural technical drawings. Bud Rotter offered his advice, insight, and comments throughout the process, but it was Tim Whitten that drew the drawings. Under today's case law, AFI-Mr. Whitten's employer-appears to be the author of the Original Villa technical drawings. [FN13] Thus, copyright and ownership of the Original Villa initially vested in AFI. 17 U.S.C. § 201; *see Drew Homes*, 29 F.3d at 1530.

FN13. Rottlund makes reference to the idea that it might be a joint author but makes no real argument in support thereof; nor does Rottlund make any argument in support of authorship by work for hire.

Initially, the parties' May 12, 1987 agreement provided that AFI "retain[ed] ownership of all ideas, concepts and working drawings and the right to publish." Whatever ownership interests this agreement encompassed, [FN14] the undisputed evidence demonstrates that AFI and Rottlund orally agreed that AFI assigned all interests, copyright or otherwise, in the Original Villa drawings to Rottlund. (Krummen Aff. Ex. S, Mazzara Dep., at 141:25-142:1, 137:17-143:3, 145:22-149:4); (Davenport Aff. Ex. JJ, Whitten Dep., at 71:18- 73:10). Thus, shortly after the 1987 agreement and when AFI began to do a number of Villa developments for Rottlund, Rottlund held, at a minimum, "a contractual right by oral assignment to the copyright in the [Original Villa] drawings." *Drew Homes*, 29 F.3d at 1530-31. At this point, Rottlund could register the Original Villa copyright. *E.g., id.* at 1532-33 ("Chrysalis [the builder] was not required to have written evidence of the assignment from Heise [the architect] as a prerequisite to application for and the issuance of a valid copyright registration."); *Billy-Bob Teeth, Inc. v. Novelty, Inc.*, 329 F.3d 586, 589-92 (7th Cir.2003) (explaining oral transfer to corporation in May 1996, registration of copyright by corporation in 1999, and nunc pro tunc written assignment *during trial* in 2001).

FN14. "The Copyright Act expressly distinguishes between ownership in the work copyrighted and ownership in the copyright for a work...." *Donald Frederick Evans and Assoc., Inc. v. Continental Homes, Inc.*, 785 F.2d 897, 904 n. 10 (11th Cir.1986) (citing 17 U.S.C. § 202); *see also United States v. Smith*, 686 F.2d 234, 240 (5th Cir.1982).

*9 The Copyright Act's statute of frauds, 17 U.S.C. § 204, does not give effect to otherwise binding oral transfers of copyright ownership. *See, e.g., Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 36 (2d Cir.1982). 17 U.S.C. § 204 provides: "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed...." As many courts have recognized, "the chief purpose of section 204(a), (like the Statute of Frauds), is to resolve disputes between copyright owners and transferees and to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses or copyright ownership." *Imperial Residential Design, Inc. v. Palms Dev. Group, Inc.*, 70 F.3d 96, 99 (11th Cir.1995) (per curiam); *compare, e.g., In re Guardianship of Huesman*, 354 N.W.2d 860, 863 (Minn.App.1984). Thus, it is well settled that AFI's oral assignment of ownership of the Original Villa copyright interests could be confirmed by a later writing to satisfy § 204. *Billy-Bob Teeth*, 329 F.3d at 591 ("As the statute indicates, an oral assignment may be confirmed later in writing."); *Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1428 (9th Cir.1996) ("[C]ase law holds that under some circumstances a prior oral grant that is confirmed by a later writing becomes valid as of the time of the oral grant, even if the writing is subsequent to the initiation of litigation on the copyright infringement."); *Drew Homes*, 29 F.3d at 1532 ("Many courts have held that the requirements of 17 U.S.C. § 204(a) can be satisfied by an oral assignment later ratified or confirmed by a written memorandum of the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

transfer."); *Eden Toys,* 697 F.2d at 36 ("[T]he 'note or memorandum of the transfer' need not be made at the time when the license is initiated; the requirement is satisfied by the copyright owner's later execution of a writing which confirms the agreement."). Contemporaneity is not required, *e.g., Eden Toys,* 697 F.2d at 36, and that the written note occurs during litigation or even during trial is of no consequence. *E.g., Billy-Bob Teeth,* 329 F.3d at 589; *Kaplan Co., Inc. v. Panaria Intern., Inc.,* No. 96- 7973, 1998 WL 603225, at *2 (S.D.N.Y. Sept. 11, 1998) ("[A] writing, even if signed after litigation commenced, can serve to satisfy the requirements of § 204.").

The 1989 written agreement between AFI and Rottlund satisfies the writing requirement of § 204. (Davenport Aff. Ex. JJJ). The 1989 Agreement explained the parties' understanding of the previous 1987 written agreement: "At the time of the May 12, 1987 Agreement AFI retained right to the right of publication of the Plans without specific recital of ownership of the other rights in the Plans." *Id.* AFI then, in conformity with the oral agreement testified to, "transfer[ed] any and all right, title and interest in its rights to the Plans under the Copyright laws to ROTTLUND." *Id.*

*10 BSB argues that this agreement only transferred copyright ownership in the four plans specifically listed in the 1989 agreement. [FN15] The Court rejects that reading of the 1989 agreement as contrary to its literal terms and the undisputed intent of the parties. The agreement provides: "Whereas pursuant to an agreement by and between AFI and ROTTLUND on or about May 12, 1987, AFI developed certain architectural plans (hereinafter "Plans") including: [four specific plans listed] to be used by Rottlund for a development known as Summerwood, Brooklyn Park." (Davenport Aff. Ex. JJJ). The "Plans," as defined by the 1989 agreement, are all those plans/drawings AFI developed pursuant to an agreement by and between AFI and Rottlund on or about May 12, 1987. Were the "Plans" limited to the four specific drawings, the "(hereinafter 'Plans')" clause would have been placed after the listing of the specific plans. If any ambiguity exists, the intent of the persons signing the 1989 agreement on behalf of the transferor (AFI) was clearly that all interests in all Original Villa plans were transferred to Rottlund. [FN16] (Krummen Aff. Ex. S, Mazzara Dep., at 141:25-142:1, 137:17-143:3, 145:22-149:4); (Davenport Aff. Ex. JJ, Whitten Dep., at 71:18-73:10). *See Sunham Homes Fashions, LLC v. Pem-Am., Inc.,* No. 02-6284, 2002 WL 31834477, at *7 (S.D.N.Y. Dec. 17, 2002) ("[A]s the transfers do not contain merger clauses, the Court is permitted to examine extrinsic evidence in considering them.") *(citing P.C. Films Corp. v. MGM/UA Home Video, Inc.,* 138 F.3d 453 (2d Cir.1998); *Bourne v. Walt Disney Co.,* 68 F.3d 621 (2d Cir.1995)); *see also Donnay v. Boulware,* 144 N.W.2d 711, 716 (Minn.1966). Indeed, should any doubt about the intent of the 1989 agreement remain, Gerald Mazzara, who signed the 1989 agreement as the President of AFI, along with Tim Whitten, who was with AFI at the time of the 1989 agreement, and Bernard Rotter of Rottland executed a memorandum of understanding in 2002 that states that once the Original Villa drawings were completed, AFI transferred all interest, copyright or otherwise, in the Original Villa drawings to Rottlund. (Davenport Aff. Ex. KKK). Thus, the oral assignment coupled with the 1989 writing satisfies the writing requirement of 17 U.S.C. § 204. Rottlund owns the Original Villa copyrights.

FN15. Not inconsequentially, at this point, Rottlund already *owned* all the Original Villa copyrights, but needed a writing signed by AFI for the *Copyright Act* to recognize its ownership.

FN16. Testimony from Jack Buxell was for whatever reason not presented, but Gerald Mazzara, then President of AFI who signed the 1989 agreement, and Tim Whitten, then with AFI, agree that AFI transferred all interests in the Original Villa designs.

Defendants also argue that because the creation date listed in the copyright registration for VAu 268-380 is 1988, those drawings could not have been part of the drawings assigned to Rottlund by the 1989 Agreement. Nothing has been presented that

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

suggests that all drawings created pursuant to the 1987 contract had to be completed in 1987; thus, the fact that some of the drawings created for purposes of the 1987 contract were actually completed in 1988 is consistent with the assignment of all drawings by way of the 1989 Agreement. That is also exactly what all parties involved intended.

Finally, Defendants argue that the 2002 memorandum of understanding does not satisfy § 204 because, at the time it was executed, AFI had dissolved and its former officers could not bind the dissolved corporation. This argument misses the mark. The 2002 writing is not necessary to satisfy 17 U.S.C. § 204 given the 1989 writing. The 2002 writing is, however, helpful to solidify the parties' intent, which is unmistakably clear-Rottlund was to own all the copyrights in the Original Villa.

***11** Significantly and independently dispositive, "[e]ven if all this were not true, [Defendants], nevertheless, would lose on this point. [They] simply do[ ] not having standing under § 204." *Billy-Bob Teeth,* 329 F.3d at 592. From what the Court can gather, Rottlund is not now claiming ownership in the Original Villa through the "work for hire" doctrine but solely by assignment. Section 204, as noted, "is in the nature of a statute of frauds and is designed to resolve disputes among copyright owners and transferees." *Id.; accord, e.g., Imperial Residential,* 70 F.3d at 99. Thus, "where there is no dispute between the copyright owner and the transferee about the status of the copyright, it would be unusual and unwarranted to permit a third-party infringer to invoke section 204(a) to avoid suit for copyright infringement." *Imperial Residential,* 70 F.3d at 99; *accord Eden Toys,* 697 F.2d at 36. That there is no dispute between Rottlund and the individuals making up AFI is undisputed. [FN17] Accordingly, in these circumstances, the cases are legion holding that a third-party infringer lacks standing to invoke § 204. *Billy-Bob Teeth,* 329 F .3d at 592; *Imperial Residential,* 70 F.3d at 99; *Eden Toys,* 697 F.2d at 36; *John G. Danielson, Inc. v. Winchester-Conant Prop., Inc.,* 186 F.Supp.2d 1, 12-13 (D.Mass.2002); *Films by Jove, Inc. v. Beroy,* 154 F.Supp.2d 432, 477-78 (E.D.N.Y.2001) (collecting cases); *Great Southern Homes, Inc. v. Johnson & Thompson Realtors,* 797 F.Supp. 609, 611 (M.D.Tenn.1992).

FN17. "[A] corporation cannot literally discuss anything with anyone." *Billy-Bob Teeth,* 329 F.3d at 592. Hence, agreement of the principals involved on each side of transaction is relied on.

A similar analysis applies to the New Villa technical drawings. Rottlund engaged the services of Tim Whitten, by then of Whitten Associates, Inc., to design the New Villa. At the time Mr. Whitten agreed to design the New Villa, he also orally agreed that Rottlund would own all rights, copyright or otherwise, in the New Villa drawings. (Krummen Aff. Ex. V, at 139:23-140:14); (Davenport Aff. Ex. JJ, at 71:18-24). Thus, Whitten Associates and Rottlund are in complete accord that Rottlund owns the New Villa technical drawing copyrights, and Defendants lack standing to challenge the assignment . [FN18] Nevertheless, in 2002, Whitten Associates, Inc. and Rottlund executed a written agreement stating that, at the time the New Villa drawings were completed, Whitten Associates, Inc. understood and agreed that all interest, copyright or otherwise, in the New Villa drawings were transferred to Rottlund. This writing plainly satisfies 17 U.S.C. § 204. There is no concern that Whitten Associates, Inc. is dissolved or that Tim Whitten is not authorized to sign on behalf of Whitten Associates, Inc. [FN19] This is so because absolutely no evidence has been presented otherwise. Indeed, the Court may take judicial notice of the fact that the Minnesota Secretary of State lists Whitten Associates, Inc. as an active domestic corporation and in good standing with the state of Minnesota in 2004. Whitten Associates, Inc. consists only of Tim Whitten and his wife who is not an architect. Rottlund owns the New Villa copyrights.

FN18. That Rottlund and Whitten Associates, Inc. agreed that Rottlund owns the New Villa drawings makes sense as Rottlund owned the Original Villa and was the only entity that could make a derivative.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

The theory that it would be anomalous to permit a third party to contest this assignment is especially compelling in this circumstance where the transfer is between Tim Whitten of Whitten Associates, Inc.-the only other "associate" being Mr. Whitten's wife-and Rottlund where Tim Whitten is currently employed. *See Magnuson,* 85 F.3d at 1429 ("The logic of *Eden Toys* is particularly compelling in this case, where the conveyance is between John Magnuson as CEO of Columbus, and John Magnuson as owner of John Magnuson Associates.").

FN19. At the time of the writing, Tim Whitten was employed by Rottlund, but signed the transfer agreement on behalf of the entity he created, Whitten Associates, Inc. This arrangement is hardly of concern. Individuals in today's commercial world commonly sit in positions of authority at more than one entity.

***12** BSB submits that the writing memorializing Whitten Associates' assignment in 2002 failed to expressly assign accrued causes of action and, because the alleged infringement had already occurred, Rottlund cannot sue for infringement of the New Villa. The Court disagrees. First, Rottlund is suing for infringement of the Villa II. Second, Whitten Associates orally granted Rottlund ownership in the copyrights and all other interests in the New Villa designs at the time they were made in 1991 or prior to the alleged infringement, and "a prior oral grant that is confirmed by a later writing becomes valid *as of the time of the oral grant, even if the writing is subsequent to the initiation of litigation on the copyright infringement." Magnuson,* 85 F.3d at 1428; *accord Drew Homes,* 29 F.3d at 1533 (" '[I]f a prior oral grant is subsequently confirmed in writing, this will validate the grant *ab initio* as of the time of the oral grant." ') (*quoting Great Southern Homes,* 797 F.Supp. at 612). Even if the Court were to accept BSB's argument, it would simply permit Rottlund to obtain such a writing from Tim Whitten and Whitten Associates and proceed. *See Billy-Bob Teeth,* 329 F.3d at 589, 592 ("So to straighten things out, during trial of this matter, on May 31, 2001, White, as owner, signed a nunc pro tunc copyright assignment, assigning his works to Billy-Bob Teeth, Inc.").

There is no dispute that Rottlund owns the Villa II technical drawing copyrights. Tim Whitten joined Rottlund in 1995 as Vice President of Architecture. While a Rottlund employee and in the scope of that employ, Tim Whitten produced the Villa II technical drawings. Rottlund owns any copyrights in the Villa II (Rush Creek/Reserve or otherwise). 17 U.S.C. § 201(b).

2. Validity

Rottlund registered its copyrights in the Original Villa, New Villa, and Villa II technical drawings. The registrations constitute prima facie evidence of validity placing the burden on Defendants to prove otherwise. *E.g., Hamil Am.,* 193 F.3d at 98 (ordering the burden of proof and holding that failure to accurately name author did not prejudice defendants and was not grounds for invalidating registration). As noted, Defendants claim Rottlund's copyrights are invalid due to fraud on the Copyright Office.

Defendants assert that Rottlund's claim of authorship in its registrations of the Original Villa and New Villa was fraudulent. As a matter of law, it was not. Here, all the copyright registrations, except the first (Davenport Aff. Ex. B, VAu 159-813), [FN20] claim Rottlund is the author by way of the "work for hire" doctrine. Rottlund's dealings with AFI began in the late 1980s. During this time period, a "claim of authorship by 'work-for-hire' apparently reflected the common practice at the time where drawings were created for an employer by an 'independent contractor." ' *Drew Homes,* 29 F.3d at 1530. Indeed, laymen, or even those learned in the law, filling out a copyright registration, might understandably assume that work of this sort was work for hire. This might have been the correct assumption under the 1909 Act and early interpretations of the 1976 Act, as some interpretations encompassed a broad range of relationships as a work for hire, not merely formal employees. *See generally Easter Seal Soc'y for Crippled Children and Adults of Louisiana, Inc. v. Playboy, Inc.,* 815 F.2d 323, 327-334 (5th Cir.1987) (reviewing both Acts and the varying tests for "work for hire" that had

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.