# Exhibit C

**Supplemental Expert Disclosure of Albert Bloom, A.I.A.**

Since my original disclosure of August 15, 2003, additional evidence and issues have come to my attention. Attached as Appendix One is an updated list of documents and testimony I have considered in preparing this supplemental disclosure. This supplemental disclosure will address the new evidence and issues and is intended to supplement my original disclosure.

I have reviewed Tim Whitten's deposition testimony, wherein he indicated that there was no methodology by which the gestalts of two townhomes could be compared. See Tim Whitten's deposition at pages 82-83. I am unaware what definition Mr. Whitten, or Rottlund, gives to the term "gestalt." In this report, and in my initial report, I use the term "gestalt" to mean the total look and feel of the townhome, including individual design elements as well as how those elements are combined together. I have compared the gestalts of various townhomes because Rottlund has indicated that their only copyright claim in this litigation is that the gestalt of the Homestead Collection and the Chateau Collection is substantially similar to the gestalt of the Villa II. My comparison of the gestalts of these townhomes should not be construed as indicating that the gestalt theory of copyright infringement is legally viable.

As the factual investigation in this matter has not concluded, I reserve the right to amend, supplement or clarify my opinions based on information discovered after the date of this supplemental disclosure.

EXHIBIT NO. 389
6-9-04
P. MAHON

**Chateau Collection v. Homestead Collection**
**8 Unit Building**

These two townhomes are not substantially similar. The following are some examples of the differences between the two townhomes.

**Exterior**

The overall massing of Chateau is different than the Homestead. Chateau uses double gables in the front which are pushed to the non-demising wall side of the garage as opposed to grouping the double gables at the demising wall. The window size and number are different within the double gables, as is the layout and size of the windows for the 2 story spaces. The use of the 'bay' configuration completely changes the form of the end corner of Chateau. The side elevations do not use a turned gable condition, but rather, a variance of roof forms which change the character of Chateau's end elevation. Chateau's entry roofs at the interior units cover the entire width of the entry niche and are not continuous with the garage roof as shown on Homestead. Transom glass is used over the entry doors and sliding glass doors at Chateau and the side elevation entry doors have shed roofs as opposed to gables. The brick wainscot is higher in Chateau and it is evident that the Chateau is more expensive to build than Homestead.

**Interior**

End Unit A v. End Unit 1482

First Floor

The entry sequence is different for these plans. The entry door swing and location of the entry closet in Chateau will direct vision to the dining/kitchen area while the Homestead's entry will direct the line of sight to the stair and living area. The spatial feel will be totally different when entering the Chateau with a 9 foot ceiling as opposed to Homestead with a 2 story space. The stair location in the Chateau is not a visual feature as it is in Homestead. The Chateau's dining area will have a completely different feel due to the circulation pattern to the kitchen and the absence of a sliding glass door from the dining are to the patio. The living area will feel totally different because of its different shape and size as well as the smaller volume ceiling space. Chateau's 'bay' is unique in this context and is the introduction of a unique form for this product type. The location of the fireplace in this 'bay' has a completely different orientation than Homestead and does not have built-ins on the side. The galley kitchen will appear visually different as will the location and orientation of the breakfast bar. There is not a breakfast area in Chateau and the circulation through a wide hall will feel different than Homestead. The powder room is a different shape and size and the Chateau does not have a furnace and water heater space on the first floor. Chateau is 34 feet wide and 33 feet deep, while Homestead is 33 feet wide and 35 feet deep.

Second Floor

Stairway access with a 'U' shaped stair at the side of the plan will feel different than Homestead's straight run stair which is centrally located. Access from the stair to the loft will feel and look different because of the stair location and length of travel to the loft. The 2 story volume space is shaped differently and is smaller than Homestead. Chateau's master bedroom and closet is

shaped differently and is a different size. The bathroom has the tub and shower in a separate room which will change the feel of the space. The shape and size of Chateau's loft as well as the overlook will feel different. The furnace and water heater in Chateau are in the 2nd floor utility room, as opposed to a first floor location in Homestead.

The overall gestalt of Chateau's Unit 'A' will feel completely different than Unit 1482 of the Homestead collection.

Interior Unit 'B' v. Interior Unit 1381

First Floor

Chateau's entry door opens in to a closet which will feel different than Homestead which opens adjacent to the closet and has a better sight line to the living/dining space. The 2 story volume opening in Chateau is a different length than 1381. The switchback stair at the rear of the unit will feel different than Homestead's centrally located straight run stair. The 'U' shaped kitchen and breakfast bar orientation will feel different than Homestead's modified 'U' with a corner sink. The optional fireplace and/or media niche locations are different. The powder room is a different shape and size than Homestead's. Chateau also includes a storage room which is not offered in Homestead.

Second Floor

Chateau's 'U' shaped stair will create a different feel accessing the second floor. The access to the bath is outside the master bedroom and the tub and water closet are in a separate

compartment. The loft location and access is different due to the stair configurations and there is a second floor mechanical room for the furnace and water heater adjacent to the washer/dryer. The gestalt of Chateau's Unit 'B' will feel different than Homestead's 1381.

End Unit 'C'

This is a front loaded entry plan which does not exist in the Homestead Collection.

The Chateau Collection has many differences from the Homestead Collection, some of which are listed here. Both townhomes combine standard features in standard arrangements. While the first floor zoning of spaces is similar in both plans, (and very typical of back to back townhomes), the overall gestalt between the two townhouses will feel completely different due to the spatial layouts of the plans and the exterior massing of the buildings.

In comparing the Homestead Collection with the Chateau Collection, there are a number of differences in the ways in which standard features, and standard arrangements of standard features, are expressed in each townhome. However, during the course of BSB's development of the Homestead Collection design, BSB and TCM considered a number of alternative layouts for these standard features, and some of the alternatives that were considered and rejected in the Homestead Collection are found in the Chateau Collection. As discussed in my initial report, this process of considering and rejecting design alternatives is part of the process of independent creation, and bolsters my conclusion that BSB independently created the Homestead Collection.

**Chateau Collection v. Villa II**
**8 Unit Building**

These two townhomes are not substantially similar. The following are some examples of the differences between the two townhomes.

**Exterior**

The overall building massing is different between Chateau and Villa II. Chateau uses a different gabling system for the front elevation which changes the profile and massing. The use and grouping of the windows within the gables, changes the feel of the building, as does the use of craftsman type window grids. Entry roofs for the interior units are wider and cover the entire entry recess. The end corner 'bay' is a unique feature to Chateau and the location and size of the windows completely changes the exterior feel of the elevation. The side elevations have a different feel because Chateau does not have turned gables, uses shed roofs rather than gabled roofs over entries and sliding doors, and has transom glass above entry doors and sliding glass doors.

**Interior**

End Unit 'A' v. End Unit 'C'

First Floor

Entering the Chateau's 9 foot ceiling will feel totally different than Villa II's 2 story volume space. Line of sight from the entry of Chateau is directed at the dining and kitchen area because of the entry door swing and closet location as opposed to Villa II where line of sight is directed to the 2 story living space and central stair. The circulation path to Chateau's 'U' shaped stair goes

past the kitchen through a wide hall and will have a totally different feel than Villa II's straight stair. The living area with 'bay' will live and feel as two spaces due to the location of the second floor above and the smaller area of 2 story volume. The fireplace in the bay is in a completely different location and will have a different feel. The dining room will feel and function differently because of the access to the kitchen and the lack of a sliding glass door to the patio. The galley kitchen in Chateau has a different shape and size than the Villa II's 'L' shaped kitchen with optional island. The Chateau's powder room is more square in layout than Villa II's elongated rectangle. Chateau is 34 feet wide and 33 feet deep, while Villa II is 32 feet wide and 34 feet deep.

Second Floor

The 'U' shaped stair access will look and feel different from Villa II's straight run stair. Access from the top of the stair to the loft will feel and look different because of the stair location and length of travel. The 2 story volume space is smaller and differently shaped in Chateau. Chateau's master bedroom and closet is shaped and sized differently than Villa II's. The bathroom has a separate room for the tub and water closet. The furnace and water heater are on the second floor along with the washer/dryer.

The overall gestalt of Chateau's Unit 'A' will feel completely different than Villa II's Unit 'C'.

Interior Unit 'B' v. Interior Unit 'D'

First Floor

The Chateau's 2 story volume space at the entry will feel totally different than Villa II's 9 foot ceiling. The switchback stair at the rear of the unit will feel totally different and will change the circulation pattern through the dining area. Chateau's 'U' shaped kitchen has a different feel than the Villa II's 'L' shaped kitchen with optional island. The breakfast bar will have a different feel facing the switchback stair as opposed to being open to the dining area. The fireplace and media niches are in different locations. The powder room is a different shape and size, and Chateau offers a storage room, while Villa II doesn't. The Chateau footprint is 33 feet deep, while the Villa II is 34 feet deep.

<u>Second Floor</u>

Chateau has a 2 story volume with a loft overlook while Villa II has no 2 story volume space. Shape, size and access to second bedroom is different in the Chateau. Shape, size and access to the master bedroom is different, and occurs from a hallway in the Chateau as opposed to from the exercise area in Villa II. Laundry is in a room in Chateau as opposed to a closet in Villa II. Chateau has the furnace and water heater in a room on the second floor. Access to the bath is from the outside in the master in the Chateau and the tub and water closet are in a separate compartment.

The gestalt of Chateau's Unit 'B' will feel different than Villa II's Unit 'D'.

**<u>End Unit 'C'</u>**

This is a front loaded entry plan which does not exist in the Villa II.

The Chateau Collection has many differences from the Villa II, some of which are listed above. While the first floor zoning of spaces is similar in both plans, the overall gestalt between the two townhomes will feel completely different due to the spatial layouts of the plans and the exterior massing of the buildings.

There are some similarities between the Villa II and the Chateau Collection, just as there are some similarities between the Villa II and the Homestead Collection. However, the similarities between these units are no more than one would expect given the design limitation facing back-to-back townhomes. It would be extremely difficult, if not impossible, to design a commercially successful back-to-back townhome that did not share some elements in common with the Villa II, the Chateau Collection, or the Homestead Collection. Additionally, as noted in my initial report, many of the elements which these townhomes share in common have been used by BSB (and other designers and builders) for years. See my initial report at pages 12-16. Furthermore, all of the elements which these townhomes share in common are standard features, including the standard arrangements of standard features found in both townhomes.

**Exterior Unit 'C' Villa II v. Interior Unit 1381 Homestead**

In his deposition on August 14, 2003, Tim Whitten testified that the interior unit of the Homestead Collection was a direct copy, with minor changes, of the Villa II end unit. See Tim Whitten's deposition at page 958. No transcript of this testimony was available to me at the time I authored my initial disclosure, and this testimony makes it necessary to compare the gestalt of the Villa II end unit with the gestalt of the Homestead Collection interior unit, a comparison I did not make in my initial report. These two townhome units are not substantially similar. The following are some examples of the differences between the two townhome units.

First Floor

Villa II's side entry as opposed to Homestead's front entry will totally change the perception and feel of the interior space. Villa II's side entry sight line is of a straight run stair and 2 story living room while Homestead's front entry sight line looks towards the rear wall of the living/dining area. The dining area of Villa II is larger than Homestead's, and the sliding glass door will totally change the perception of the size of the space. Villa II's kitchen has a sink oriented with a sight line to the sliding glass door which will make the space feel larger as opposed to Homestead's kitchen with a corner sink facing a wall. Villa II's kitchen is 'L' shaped with an optional island while the Homestead's kitchen has a different work triangle for appliances and has a separate breakfast area. The living rooms will have a completely different feel due to the position of windows on two walls in Villa II and the location of the optional fireplaces.

The entry sequence from the Villa II garage is directly into the kitchen while the Homestead has a short hallway. The stairway protrusion into the Villa II garage will change the physical

appearance and interior usability of the space due to headroom clearance. The articulation of the front wall of Homestead and the second floor set back over the garage, as opposed to a cantilevered second floor in the Villa II with a flat front wall, will change the feel of the exterior elevation.

Second Floor

The Villa II loft is in the front of the unit and overlooks the 2 story open space while the Homestead loft is to the rear and overlooks the 2 story open space to the front. These spaces will feel completely different due to the addition of side windows in the Villa II and the longer length of the railing at the loft.

The perception and feel of the hallway in Homestead adjacent to the stair leading to the loft will have a totally different feel than the hallway and circulation in the Villa II. The Homestead laundry is in a separate room as opposed to a closet. Villa II's bath has a separate shower and tub while Homestead has only a combination tub/shower as standard. Homestead has a separate compartment for the water closet with an optional door while Villa II has a low wall separating the water closet from the vanity.

The individual spaces are standard features which are assembled according to building code requirements for light, ventilation and egress and for functionality. While the layout of the individual spaces on the first floor fall into the same zones, the gestalt of these spaces will feel different due to the reasons listed here. The zoning in these units is no more than a standard arrangement of standard features.

**Jerry's Homes**

Bent Tree Villas 7/12/96 v. Longview Townhomes 3/11/97

Johnston, Iowa

Revisions to the working drawings included changing the name of the project to Longview Townhomes from Bent Tree Villas, moving the water heater in Unit 1 from the washer/dryer closet to the furnace closet, moving the entry closet into the dining area approximately 2 feet, and revising the foundation from a thickened slab to a frost wall under the house to garage separation wall.

As with the Homestead Collection, BSB went through the typical design process (as described in my initial disclosure) when creating the back to back townhome for Jerry's Homes. The progress of the design, receipt of comments from the builder, and revisions to the drawings are what one would expect in a case of independent creation. It is my opinion that BSB independently created this back to back townhome. As I indicated in my initial disclosure, it is common for builders to send their residential architects marketing materials from those builders' competitors. The receipt of these marketing materials is not evidence of copying, or an intent to copy. The fact that BSB, or its clients, have communicated ideas to each other, or to third parties, using these marketing materials has no bearing on the ethics of BSB or its architects. This practice is common among residential architects.

**Midland Homes, Inc. 11/2/94 Greystone T.H. v. New Villas A/B**

These two townhomes are not substantially similar. The following are some examples of the differences between the two townhomes.

**<u>End Unit B v. End Unit A</u>**

<u>First Floor</u>

The shape of the footprint is different with the Midland living room offset as opposed to a straight end wall in New Villa. The stair direction in these two plans are 90° from each other, creating a totally different feel to the space. The kitchen sink in Midland has a sight line to the sliding glass door which will visually expand the space, as opposed to New Villa's kitchen sink which faces a wall. Powder rooms are a different shape and size and Midland has a desk area adjacent to the garage access.

<u>Second Floor</u>

The Midland master is larger than the New Villa, and positioned over the garage as opposed to over the dining area. The landing and hallway in Midland will feel totally different than New Villa because of the angled direction from the head of the stair and the enclosure of walls. New Villa has a loft space which overlooks the open living area visually expanding the stair opening and the second floor, while Midland does not have a loft space. The perception of the volume living space will be totally different because Midland's stair is going up in the same direction as the volume ceiling in the living room, and New Villa's stair is going up at a right angle to the

direction of the volume and is not inside the volume space but under the second floor. The Midland second bedroom has a different shape and will have a different feel due to the length of the angled wall. Midland's bathroom has the tub and water closet in a separate compartment.

**Interior Unit A v. Interior Unit B**

First Floor

The stair location in Midland runs front to back adjacent to the garage, which is totally different from New Villa, which runs side to side adjacent to the rear wall. The kitchen layouts will feel totally different with New Villa's having a sight line to the front windows while Midland's looks into a wall. The Midland garage access enters into a small hallway while New Villa's enters directly into the kitchen. There is a mechanical room in New Villa while Midland has a closet for the furnace and water heater. The fireplace locations are on opposite sides of the living area and Midland has an open 2 sided fireplace as opposed to a front open fireplace.

Second Floor

The Midland master is much smaller than the New Villa's due to the stair location. Midland's master closet will feel much larger than New Villa's. Midland's bath has a separate compartment for the tub and water closet and a laundry area adjacent to the bath.

**Exterior**

The roof massing and use of materials on the side elevations will have a different feel because of New Villa's cantilevered bedrooms, use of a high brick wainscot, projected chimney chases,

steeper roof pitch and flat first floor footprint at the side wall. The front elevations are similar and like other back to back townhouses, but New Villa will feel bigger due to the steeper roof pitches for both the front to back shed roofs and the side to side gable roofs. New Villa also uses more brick accent material and has fireplace chases projecting through the roof as well as on the sides.

These two projects are similar only because they are back-to-back products. While the zoning of first floor spaces are in the same location, the stairs and entry sequences will feel different, and generate different second floors. As with the Homestead Collection, BSB went through the typical design process (as described in my initial disclosure) when creating the back to back townhome for Midland Homes. The progress of the design, receipt of comments from the builder, and revisions to the drawings are what one would expect in a case of independent creation. It is my opinion that BSB independently created this back to back townhome. As I indicated in my initial disclosure, it is common for builders to send their residential architects marketing materials from those builders' competitors. The receipt of these marketing materials is not evidence of copying, or an intent to copy. The fact that BSB, or its clients, have communicated ideas to each other, or to third parties, using these marketing materials has no bearing on the ethics of BSB or its architects. This practice is common among residential architects.

**Sprinkler Room**

The exterior sprinkler rooms as shown on both Town & Country's Homestead Collection and Rottlund's Villa II is a technical response to the need of housing the incoming sprinkler piping and providing easy access to the Fire Department in case of a fire. The room is utilitarian and is meant to provide adequate space for incoming piping and clearances to the system's functions. BSB does not have in house technical expertise in the design of fire sprinkler systems and relies on firms and vendors outside of their office for advice on such matters as the size of the sprinkler room, its location on the building and the physical layout of the sprinkler room for pipes and other mechanical equipment.

BSB responded to input from sources outside its office for the design and location of the sprinkler room.

1. The location of the sprinkler room on the building was determined by Pioneer Engineering, based on their site engineering drawings.
2. The minimum requirements for pipe clearances from walls and ceilings was provided by Metro Fire Protection, based on their experiences.
3. The access to the sprinkler room and required clearances to piping was a requirement of the local governing authorities and the building and fire codes.
4. The actual size and shape of the sprinkler room provided by Metro Fire Protection and/or Town and Country is of a size and shape that had been used successfully before. There was no reason to change the size or shape of this room to meet the technical requirements.

5. Other builders in the Minneapolis area such as Pulte (at Arboretum Woods) and Ryland (at Town Course Heights) are building townhouses which use this type of sprinkler room design.

Conclusion

BSB used information provided by sources outside their office to place and size the sprinkler room. This information was not copied from Rottlund. Chris Jorgenson, in his affidavit, points out fifteen differences between the BSB sprinkler room design and the Rottlund sprinkler room design. This is an amazing number of differences for such a small utilitarian, functional space. The shed or "dog house" style sprinkler room is a standard feature that has been used by a number of builders as a rational design response to the growing fire suppression requirements for multifamily housing.

The biographical information submitted on August 15, 2003 has not changed.

This opinion submitted by:

Albert H. Bloom, A.I.A.

BLOOM & FIORINO Architects, Inc.
1110 Jorie Blvd., Suite 300
Oak Brook, IL 60523

Albert H. Bloom, A.I.A.

Date: April 15, 2004



Received 04-15-2004 12:05 From-630 574 2506 To-MOORE COSTELLO& HART Page 002

# APPENDIX ONE

Marketing documents from Town and Country and Rottlund's townhomes;

Confidentiality Stipulation and Protective Order between Plaintiff and Defendants dated January 22, 2002;

Confidentiality Stipulation and Protective Order between Plaintiff, Defendants and Bloodgood Architects and Planners of Iowa, Inc. d/b/a Bloodgood Sharp Buster Architects and Planners of Iowa dated August 9, 2002;

Confidentiality Stipulation and Protective Order between Plaintiff, Defendants and Bloodgood Sharp Buster Architects and Planners dated October 11, 2002;

Second, Third, Fourth, and Fifth Amended Complaint;

Town and Country's plans prepared by BSB of Illinois for Washington Square Back to Back Townhomes in Aurora, IL;

Town and Country's plans prepared by BSB for the Homestead Collection, including redline plans;

Rottlund Homes' plans for the Original Villa;

Rottlund Homes' plans for the New Villa;

Rottlund Homes' for the Villa II;

Expert reports issued by experts in this matter, and the documents referenced therein;

Transcripts of the depositions in this matter, and the exhibits thereto;

All photographs of housing products produced by the parties and/or their attorneys in this matter;

Plans and other documents produced by Rottlund relating to products other than the Original Villa, New Villa, and Villa II;

Plans and other documents produced by TCM relating to products other than the Homestead Collection;

Plans and other documents produced by BSB and/or BGI relating to products other than the Homestead Collection;

All documents bearing a "Bloom" Bates label;

Those documents referenced in Al Bloom's Expert Report;

BSB's publications produced in this matter;

Trade publications;

Architectural reference materials (for example, *Architectural Graphic Standards)*.

Fax to Mike Wagenknecht from Art Plante regarding corrections to client redlines dated 08/07/00, BSB 01393 – 01409

BSB Transmittal – Next Day Air – To Art Plante from Michael J. Wagenknecht regarding Homestead Collection at Centennial Crossing changes per construction document revision date of 03/06/00 dated 08/07/00, BSB 01410 – 01433

Fax to Art Plante from Beth Miller regarding elevation studies with garages expanded dated 05/25/00, BSB 01444 – 01447

Fax to Art Plante from Beth Miller regarding garage revision and proposed front and side revision dated 05/24/00, BSB 01448 – 01451

E-mail to Art Plante from Beth Miller regarding area divisions and garage expansions dated 05/23/00, BSB 01452

Fax to Art Plante from Beth Miller regarding garage options dated 05/18/00, BSB 01453 – 01460

BSB Transmittal – Next Day Air – To Mark Kranz from Michael Wagenknecht regarding changes per construction document revision date 05/10/00, BSB 01467 – 01492

BSB Transmittal UPS Next Day Air – To Mark Kranz from Michael Wagenknecht regarding - Artwork showing changes to Plans 1381 and 1482 dated 04/05/00, BSB 01493 – 015

Homestead Collection at Centennial Crossing Plan 1381 – Set with Clouding dated 03/08/00, BSB 01541 – 01563

BSB Telephone Call Report - To Mike Wagenknecht from Mark Kranz - 03/02/00 @ 11.30 a.m. and 03/03/00 @ 2.45 p.m. regarding T&C Homestead Collection misc. matters dated 03/03/00, BSB 01564 – 01565

BSB Telephone Call Report – To Mike Wagenknecht from Mark Kranz regarding T&C/Homestead Collection – clouding and girder truss dated 03/03/00, BSB 01566

Memo to 12 people including Chris Jorgensen and Beth Miller from Art Plante regarding framewalks dated 03/01/00, BSB 01578 – 01581

BSB Telephone Call Report - To Mike Wagenknecht from Mark Kranz - 02/17/00 @ 2.30 p.m. and 4.00 p.m. regarding T&C Homestead Collection shelving and windows dated 02/17/00, BSB 01587

BSB Transmittal – Next Day Air – To Mark Kranz from Mike regarding Homestead Collection at Centennial Crossing Artwork Style Sheets dated 02/16/00, BSB 01591 – 1594

BSB Telephone Call Report – To Mike Wagenknecht from Mark Kranz @ 11:10 a.m. regarding T&C/Homestead Collection - Gas meters and A/C pads on Artwork dated 02/08/00, BSB 01599

BSB Transmittal – Next Day Air – To Art Plante from Michael Wagenknecht regarding Homestead Collection at Centennial Crossing – Changes dated 02/08/00, BSB 01600 – 01620

BSB Telephone Call Report – To Mark Kranz from Mike Wagenknecht @ 8.30 a.m. regarding T&C Homestead Collection – Vault Slope and Patio Doors/Windows dated 02/03/00, BSB 01642

BSB Telephone Call Report – To Art Plante from Chris Jorgensen and Mike Wagenknecht on 01/27/00 and 02/03/00 regarding miscellaneous items dated 02/03/00, BSB 01643

Letter to BSB from Aberjona Engineering, Inc. regarding calculations for Centennial Crossing dated 11/21/01, BSB 01725 – 01742

Fax to Art Plante and Mark Kranz from Chris Jorgensen regarding Villas/#38107 bedrooms dated 07/12/99, BSB 01830 – 01835

Fax to Art Plante and Mark Kranz from Chris Jorgensen regarding Villas/#38107 front elevation dated 06/22/99 BSB 01841 – 01842

Fax to Art Plante from Chris Jorgensen regarding Villas/#38107 upper floor plan options dated 07/01/99, BSB 01836 – 01840

BSB Transmittal – Next Day Air – To Art Plant from Chris Jorgensen regarding Villas/38107 CADD elevations dated 06/17/99, BSB 01843 – 01844

BSB Transmittal to Art Plante from Larry regarding Villa Townhouses dated 06/23/98, BSB 01858

T&C Concept Plan – A Main Floor undated, BSB 01859 – 01861

Fax to Art Plante from Larry Moore regarding revised unit A dated 06/16/98, BSB 01862 – 01865s

Letter to Larry Huff from Chris Jorgensen regarding T&C Homestead Collection at Centennial Crossing dated 10/25/00, BSB 01978

Fax to Chris Jorgensen from Marc Harris regarding detail with notation dated 10/20/00, BSB 01984 – 01985

Documents Bates labeled BSB 04462-4485;

Documents Bates labeled BSB IL 00352-00374;

City of Bloomington documents (BLOOMINGTON 001-012);

City of Eden Prairie documents (EDEN PRAIRIE 001-045);

Rottlund documents (RCI020644-20647);

Depositions of BSB/BGI employees (Grundmeier, Jorgenson, Moore, Sharp, Buster and Safin);

BSB contract with TCM dated 6/14/99 providing artwork services for Villa product (BSB 630);

Preliminary Report of Jeffrey A. Scherer;

Preliminary Report of Anthony Desnick;

Land Development Plan for the Hollander property in Maple Grove (DSU 8-36);

Bloodgood Sharp Buster Architects and Planners-Florida documents (BSB FL 000001-BSB FL 000044);

TCM plans ( D30321-30391);

Documents received from Tushie Montgomery Architects pursuant to subpoena (TM 1-929);

Villa II building plans for Rottlund's The Reserve in Plymouth, MN (RCI 1418-1437);

Documents Bates labeled BSB 1021-1024 and BSB 1260-1263;

Volume II and II of Jim Grundmeier (individual) dated February 17 and 18, 2004;

Volume I and II of Jim Grundmeier (30(b)(6)) dated September 2, 2003 and February 18, 2004;

Volume I and II of Chris Jorgenson (individual) dated September 3, 2003 and February 17, 2004;

Volume I and II of Larry Moore (individual) dated September 4, 2003 and February 17, 2004;

Volume I and II of Beth Miller (BSB) deposition dated September 3 and 4, 2003, including all exhibits;

Affidavit of Metro Fire Protection & Todd Dosch;

Volume I of Todd Dosch deposition dated February 25, 2004, including all exhibits;

Fax from Metro Fire Protection to Lori Meier dated 4/25/02 (BSB 1021-1024);

Midland Homes reduced drawings from 6/15/94-10/3/95 (BSB 2037-2041, 2048-2050, 3459-3486);

Midland Homes-Greystone project file (BSB 6249-6408 and 10172-10247);

Jerry's Homes- Bent Tree Villas/Longview reduced designs from 1/22/96-2/23/98 (BSB 3554-3471 and 3487-3553);

Jerry's Homes- Bent Tree Villas/Longview project file (BSB 3721-3852);

BGI production of Jerry's Homes documents (BGI 276-280);

Deposition Transcript of Timothy Whitten, Volume V, dated August 14, 2003;

Design Development Inc document (DDI000021-23);

Deposition exhibit 330;

Chateau Collection design documents from TCM's files (D34892-34934, D36365-36465 and D30357-30356);

Tushie Montgomery produced documents (TM 886-929);

Photographs taken March 29, 2004- April 8, 2004 by Moore, Costello & Hart, P.L.L.P. (MCH000686-46);

Photographs on CD produced from TCM from inspection of a Rottlund Homes villa model home (CD - D30491);