Exhibit D.2

Only the Westlaw citation is currently available.

United States District Court, D. Maryland.

**NELSON-SALABES, INC.**
**v.**
**MORNINGSIDE HOLDINGS of Satyr Hill, L.L.C., Morningside Development, LLC, and G. Nevill Turner**

**No. Civ.B-98-2226.**

Feb. 16, 2001.

*OPINION*

BLACK, Senior J.

*1 Plaintiff, Nelson-Salabes, Inc. brings this action against defendants Morningside Holdings of Satyr Hill, L.L.C., Morningside Development, LLC, and G. Nevill Turner for copyright infringement. More specifically, Nelson-Salabes alleges that the defendants copied the footprint and front exterior elevation from architectural designs and plans created by Nelson-Salabes for the development of an assisted living facility. [FN1] This case was tried by the Court from October 10, 2000 through October 12, 2000. Following the submission of post-trial briefs by the parties, the Court heard closing argument on October 19, 2000. This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

FN1. Plaintiff also filed a motion for permanent injunctive relief. The Court, however, denied plaintiff's motion on the first day of trial because the completion of the building rendered plaintiff's claim moot. Additionally, the Court granted defendants' pretrial request to dismiss its counterclaim with prejudice.

I.

Nelson-Salabes is an architectural firm based in Maryland. In the spring of 1996, Nelson-Salabes was hired by a local real estate development and construction company, The Strutt Group, to provide architectural work for a proposed assisted living facility, Satyr Hill Catered Living ("Satyr Hill"), located in Baltimore County, Maryland. On June 5, 1996, John Hollick, Vice President of Nelson-Salabes, sent Kim Strutt a letter agreement pursuant to which Nelson-Salabes agreed to develop a schematic building footprint on an hourly basis. Strutt never signed the agreement. Nonetheless, both parties performed fully under the contract.

The following month, Strutt retained Nelson-Salabes to perform the architectural work for the next phase of the project, the Design Phase. On July 24, 1996, Hollick sent Strutt another letter agreement outlining the services that Nelson-Salabes would perform for the Design Phase. Among other things, Nelson-Salabes agreed to develop the exterior elevations and attend the zoning exception hearing. All assisted living facilities in Baltimore County, such as the Satyr Hill site, require a special exception to the zoning laws. The special exception process entails submitting development plans prepared by the architect and civil engineer, attending meetings with community members, and attending a hearing on the matter. Again, Strutt did not sign the letter agreement. Nonetheless, Nelson-Salabes performed the services outlined in the Design Phase letter agreement, and in consideration Strutt paid Nelson-Salabes $18,250.

Pursuant to the Design Phase letter agreement, Nelson-Salabes created four drawings depicting the footprint, floor plans, and elevations of the Satyr Hill site. As designed by Nelson-Salabes, the Satyr Hill site has a three-story building configured in "Y" shape. The front elevation features an octagonal shaped silo in the center, where two arms of the "Y" intersect. The first floor of the silo serves as an entrance. A porte-cochere extends from the entrance to a traffic circle in front of the building. The second and third floors of the silo serve as common areas and contain large windows. The first floor of the vertical element is brick, and the remainder of the building is vinyl siding. Both ends of the front elevation contain a vertical element protruding from the building with bay windows and a gable roof. There are also vertical elements with gable roofs located between the silo and the ends of the building. These elements protrude from the building and aesthetically break up the length of the building.

*2 The Strutt Group's civil engineer, Colbert Matz Rosenfelt, Inc. ("Colbert Matz"), incorporated

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Nelson-Salabes's drawings into its development plan. The development plan was then submitted to Baltimore County as part of Strutt's application for a special exception. Baltimore County granted the exception on April 7, 1997.

On February 14, 1997, Nelson-Salabes sent Strutt a third letter proposal offering to provide the design and working drawings for the remaining phases of the project. The letter agreement sets forth the services to be performed by Nelson-Salabes and concludes with the statement, "If the above is acceptable, we will prepare a Standard AIA Agreement." The letter agreement was signed only by Hollick and was revised on September 29, 1997, to exclude mechanical and electrical engineering from the scope of work.

On September 29, Nelson-Salabes also sent Strutt a revised AIA contract. The AIA contract is a form created by the American Institute of Architects which contains standard terms and conditions between architects and their clients. Architects then tailor the document to specific projects. Article 6 of the AIA Agreement provides, in relevant part:

> The Architect's Drawings, Specifications or other documents shall not be used by the Owner or others on other projects, for additions to this Project, or for completion of this Project by others unless the Architect is adjudged to be in default under this Agreement, except by agreement in writing and with appropriate compensation to the Architect.

On October 7, 1997, Strutt instructed Nelson-Salabes to stop working on the project. Strutt's potential partner for the project, Gary Raffel, had backed out. Raffel was the only one with expertise operating assisted living facilities and his absence created too great a risk for Strutt. Strutt then asked Hollick if he knew of anyone who might be interested in purchasing the project.

Hollick solicited potential purchasers for the Satyr Hill site, including defendant G. Nevill Turner. Turner is the managing agent for defendant Morningside Development, LLC and defendant Morningside Holdings of Satyr Hill, L.L.C. Turner was particularly interested in the Satyr Hill site because it had an approved development plan.

On November 18, 1997, Turner sent Strutt a letter of intent to purchase two sites, including the Satyr Hill site. Turner was aware that Nelson-Salabes created the development plans for Strutt. In fact, Nelson-Salabes sent Turner its Design Development proposal for the Satyr Hill project as well as its latest billing for the project. Turner eventually decided to purchase the Satyr Hill site for $900,000. Morningside Holdings of Satyr Hill would actually own the property and Morningside Development would develop it. The closing occurred on December 22, 1997.

In January 1998, Turner and Salabes then met to discuss Nelson-Salabes's continued involvement in the project. Turner testified that he wanted the Satyr Hill site to conform with the Morningside prototype for assisted living centers, specifically the Morningside at Friendship assisted living center. According to Turner, this would require a massive redrawing. Turner informed Salabes of his various concerns at the meeting, and Salabes indicated that Nelson-Salabes would make any desired changes in the plans. After the meeting, however, Salabes was concerned that Turner did not want to proceed with Nelson-Salabes as the architect. Shortly thereafter, Salabes called Turner, and Turner confirmed Salabes's suspicions. Salabes testified that he instructed Turner that Turner could proceed with another architect, but if he did so, he could not use Nelson-Salabes's design, including the footprint and elevations. Further, Nelson-Salabes's attorney subsequently wrote Turner a letter to inform him that none of the design concepts or design documents prepared by Nelson-Salabes should be used without the express written consent of Nelson-Salabes. On February 13, 1998, Nelson-Salabes submitted its certificate of registration of a copyright for its schematic designs of the Satyr Hill project.

***3** Instead of retaining Nelson-Salabes as the architect, Turner entered into a design build contract with Hamil Commercial, Inc. ("Hamil"). Hamil then employed EDG Architects ("EDG") to perform the architectural work for the project. Turner had previously used Hamil and EDG to design and build the Morningside at Friendship assisted living center. Turner gave Hamil a copy of Nelson-Salabes's plans and the approved development plan, which Hamil then gave to EDG. Turner also met with Phillip Gibbs, a contractor from Hamil, and Donald Tucker, an architect from EDG, to discuss the Satyr Hill plans. Turner asked EDG to design Satyr Hill to conform with Morningside's model and the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Friendship assisted living facility. Importantly, however, Turner also instructed EDG not to change the plans to such a degree that EDG's design did not fit within the approved plan. Turner knew that substantial changes would require a new special exception, which would be time-consuming and costly. According, to Turner, EDG rolled up the Nelson-Salabes plans after the meeting and never used them again.

EDG designed the building according to Turner's instructions. EDG's design was then incorporated by Colbert Matz into a First Amended Development Plan and a Second Amended Development Plan, which were submitted to Baltimore County for approval. As stated on the amended development plans, the reasons for the amendments included "minor footprint revisions" and "minor changes to architectural elevations of buildings." Both of the amended plans were approved and the building was constructed.

On July 13, 1998, Nelson-Salabes filed a one-count complaint, alleging that the defendants infringed Nelson-Salabes's copyright by copying the footprint and exterior elevations from the architectural designs and plans created by Nelson-Salabes.

II.

A. *Copyright Infringement*

The owner of a copyright has the exclusive right to reproduce the copyrighted work and prepare derivative works. *See* 17 U.S.C. § 106. When the copyright owner's exclusive rights are violated, 17 U.S.C. § 501 provides a cause of action for copyright infringement. To prevail in a copyright infringement action, a plaintiff must establish: (1) ownership of a valid copyright, and (2) unauthorized copying of the protected work by the defendant. *Towler v. Sayles,* 76 F.3d 579, 581 (4th Cir.1996).

1. *Ownership of a Valid Copyright*

Architectural works, including buildings and architectural plans or drawings, are subject to copyright protection. *See* 17 U.S.C. §§ 101, 102(a)(5) and (8). Further, the production of a registration certificate made with the United States Copyright Office constitutes *prima facie* evidence of the validity of the copyright. 17 U.S.C. § 410(c); *see M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 434, (4th Cir.1986). Here, Nelson-Salabes presented a certificate of registration for its architectural work for the Satyr Hill site. Consequently, the burden shifts to the defendants to rebut plaintiff's *prima facie* case of validity. *See* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.01 [A], at 13-7; *M. Kramer Mfg. Co.,* 783 F.2d at 434.

***4** The defendants assert that neither the footprint of the building, nor the elevations are copyrightable. More specifically, defendants assert that the Y-shaped footprint is neither original nor an expression of artistic merit. Rather, they argue that it is utilitarian and within the public domain. According to the defendants, the "Y" shape is commonly used for architectural structures and, in this case, was dictated by zoning regulations, building codes, and physical attributes of the site. Similarly, the defendants assert that the various elements of the front elevation, such as brick, siding, gables, the octagonal entrance, and bay windows are common features of similar buildings in the area. Defendants further assert that the height of the building and the elevations were dictated by the Baltimore County zoning ordinance.

The Court agrees that Nelson-Salabes's use of certain individual features, such as the bay windows or the octagonal entrance, is neither original nor an expression of artistic merit. Nonetheless, "[t]he mere fact that component parts of a collective work are neither original to the plaintiff nor copyrightable by the plaintiff does not preclude a determination that the combination of such component parts as a separate entity is both original and copyrightable." *Id.* at 438. Moreover, 17 U.S.C. § 101 provides that an "architectural work" includes "the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features." 17 U.S.C. § 101.

Here, the Court finds that Nelson-Salabes's combination of common features such as a Y-shaped footprint, bay windows, the octagonal silo entrance, and gables created a unique design. To be sure, Paul Seiben, plaintiff's expert in architecture, testified that he had never seen the same combination of elements used by Nelson-Salabes on any other building. Further, the footprint and front elevation used by Nelson-Salabes were not the only feasible designs. Consequently, the Court further finds that

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

the defendants have failed to rebut the *prima facie* validity of plaintiff's copyright, and that Nelson-Salabes's selection and arrangement of common architectural features is unique and exhibits artistic expression. Therefore, the Court further finds that Nelson-Salabes owns a valid copyright in its architectural work for the Satyr Hill site.

2. *Copying*

The second prong of an infringement action requires the plaintiff to prove copying. See *Towler,* 76 F.3d at 581. As is typically the case, the Court finds that the plaintiff has failed to offer sufficient evidence of direct copying. Nonetheless, the plaintiff may raise a presumption of copying by proving through circumstantial evidence (1) that the defendants had access to the copyrighted work and (2) that the alleged copy is substantially similar to the original work. *See Keeler Brass Co.,* 862 F.2d 1063, 1065 (4 th Cir.1988). Access to the copyrighted designs in this case is not disputed. The Strutt Group provided Turner with a copy of Nelson-Salabes's plans for the Satyr Hill site as well as a copy of the approved development plan incorporating Nelson-Salabes's design. Turner even discussed the plans with Hamil and EDG.

*5 With respect to the second element, substantial similarity, the Fourth Circuit uses a two-prong test to assist the trier of fact in determining whether both works contain the same ideas and express those ideas in a substantially similar manner. *See Towler v. Sayles,* 76 F.3d 579, 583-84 (4 th Cir.1996). "First, a plaintiff must show--typically with the aid of expert testimony--that the works in question are extrinsically similar because they contain substantially similar ideas that are subject to copyright protection." *Towler,* 76 F.3d at 583. Here, the plaintiff's experts testified that the defendants' design contained numerous design elements that were substantially similar to the design elements in plaintiff's design. For example, both designs contained an octagonal silo as the main entrance, bay windows, protruding gables, and sun porches. Further, the design elements were the same dimensions. And, plaintiff's expert had not seen such close similarities without both buildings being designed by the same architect. In response, the defendants assert that they made substantial changes to Nelson-Salabes's design, including changes to the footprint and front elevation. In particular, the defendants assert that the changes to the interior of the building caused the footprint and elevations to change. Specific differences cited by the defendants include: the use of metal roofing instead of fiberglass roofing, windows of a different size and in different locations, elimination of the porte-cochere, different gable vents, different roofs on the bay windows, different brick elevation, and the elimination of shutters.

The Court finds that the plaintiff has proved that extrinsically the two designs are substantially similar. In particular, the Court finds that both works contain the same unique combination of design elements including the use of an octagonal entrance, protruding gables, and bay windows on the ends of the building. The Court recognizes that differences do exist between the two designs. Nonetheless, "[i]t is entirely immaterial that, in many respects, plaintiff's and defendant's works are dissimilar, if in other respects, similarity as to a substantial element of plaintiff's work can be shown." 4 Nimmer, *supra,* § 13.03[B][1][a], at 13-53. Further supporting the Court's conclusion is the fact that Turner told his architect that he wanted the design to fit within the approved plan. It is also undisputed that only minor changes could be made to the plan or it would require a new special exception. Moreover, the defendants noted on their amended development plans that they only made "minor" changes to the footprint and elevations. Accordingly, the Court finds that the plaintiff has satisfied the first prong of the test.

The second prong of the substantial similarity test requires the plaintiff to prove that the work's intended audience could conclude that the ideas are expressed in a substantially similar manner. *Towler,* 76 F.3d at 583-84. In other words, whether both works have the same "total concept and feel." *See id.* at 584. Comparing a photograph of the defendants' design, as constructed, to a computer generated depiction of the plaintiff's design, the Court finds that the two designs are strikingly similar in total concept and feel. Again, certain differences between the designs slightly affect the feel, such as the use of different windows, the use of brick instead of siding in certain areas, and different roofs on the bay windows. Despite these differences, however, the two designs still have the same overall feel based on the same combination of the unique features, including the octagonal silo

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

entrance, the bay windows on the ends, and the protruding gables. Although the defendants purport to base their design on Morningside's prototype, the total concept of the Satyr Hill site much more closely resembles the plaintiff's design than any of its own, including the defendants' assisted living center at Friendship. Accordingly, the Court finds that the plaintiff has satisfied the second prong and have established a *prima facie* case of copying. [FN2]

FN2. The Court reaches the same result regardless of whether the intended audience is an ordinary layperson or a person with specialized expertise. Sufficient evidence was produced for the Court, as fact finder, to conclude that the expression of the ideas in the defendants' and plaintiff's works were substantially similar. Further, plaintiff's expert, Seiben, produced sufficient evidence for the Court to conclude that an expert in architecture would reach the same conclusion.

***6** To rebut the presumption of copying raised by the plaintiff's *prima facie* case, defendants assert the defense of independent creation. To support its contention, the defendants point to testimony of Donald Tucker, a principal in EDG, who stated that he did not use Nelson-Salabes's plans when designing the building. Rather, Tucker asserted that he based the design of the Satyr Hill site on Morningside's model and its assisted living center at Friendship. The Court, however, is not persuaded by the defendants' argument. It is simply unbelievable that the defendants could look at plaintiff's design and then independently design a substantially similar building containing the same combination of features and in the same proportions. The Court recognizes that the defendants may have incorporated many of the individual features in its other buildings. Nonetheless, the evidence demonstrates that the Satyr Hill design clearly resembles Nelson-Salabes's design more closely than any of the defendants' own designs.

B. *Implied Nonexclusive License*

Notwithstanding the Court's finding that the defendants copied plaintiff's architectural designs, the defendants nonetheless assert that they are not liable for infringement because Nelson-Salabes granted them a nonexclusive license to use the plans. According to the defendants, such a license is implied based upon Nelson-Salabes's failure to contractually prohibit the use of the designs despite its knowledge that Strutt intended to sell the approved development plan containing plaintiff's designs if he could not obtain financing. In response, Nelson-Salabes asserts that there is no implied nonexclusive license because it never acknowledged that Strutt could use the drawings without Nelson-Salabes's involvement as the architect, and that Nelson-Salabes tendered an AIA document to Strutt expressly prohibiting such conduct. Nelson-Salabes further asserts that even if it granted Strutt a nonexclusive license, he could not transfer the license to the defendants.

A nonexclusive license permits the licensee to use the copyrighted work in a particular manner and creates an affirmative defense to copyright infringement. *See I.A.E., Inc. v. Shaver,* 74 F.3d 768, 775 (7 th Cir.1996). A nonexclusive license may "be granted orally, or may even be implied ... [w]hen the totality of the parties' conduct indicates an intent to grant such permission." 3 Nimmer, *supra,* § 10.03[A][7], at 10-42.

In *I.A.E., Inc. v. Shaver,* a case that is factually similar to the present case, the Seventh Circuit set forth several factors to guide the judicial inquiry as to whether an implied nonexclusive license exists. 74 F.3d at 776. In *Shaver,* an architect, Paul Shaver, created schematic design drawings for an air cargo/hanger building pursuant to a letter agreement entered into by Shaver and a joint venture ("Joint Venture"). *Id.* at 770. Shaver delivered the drawings to the Joint Venture with notice of copyright and under the belief that, once the drawings were approved, he would perform the architectural work for the remaining phases of the project. *Id .* at 771. The Joint Venture, however, employed another architect to perform the remaining work. *Id.* Shaver then wrote a letter to the Airport's Executive Director indicating that he was no longer involved in the project and stating "[w]e trust that our ideas and knowledge exhibited in our work will assist the Airport in realizing a credible and flexible use Cargo/Hanger facility." *Id.* Shaver enclosed copies of his drawings with the letter. *Id.* I.A.E, a member of the Joint Venture, then sought a declaratory judgment that it had a right to use the drawings and that it did not infringe Shaver's copyright. *Shaver,* 74 F.3d at 771. To determine whether Shaver granted I.A.E an implied nonexclusive license, the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

court considered various factors, including: the language of the copyright registration certificate, the letter agreement, the deposition testimony, and the delivery of the copyrighted material without warning that its further use would constitute copyright infringement. *Id.* at 776 (citation omitted). Applying these factors, the court held that the evidence supported the existence of a license to use Shaver's drawings to construct the air cargo building. *Id.* at 777.

***7** Here, the defendants assert that the evidence similarly supports a finding that an implied nonexclusive license was granted. More specifically, the defendants point out that here, like in *Shaver,* the architectural work was completed in components, and that Nelson-Salabes did not have a contractual right to remain the architect through the completion of the project. The defendants further assert that, despite Nelson-Salabes's knowledge that Strutt would sell the development plan if he could not obtain financing, neither contract contained language prohibiting the transfer of the development plan or completion of the project using another architect. In fact, the defendants contend that Nelson-Salabes did not assert a copyright claim on the designs until after the defendants purchased the property. According to the defendants, these facts are sufficient to support a finding that Nelson-Salabes intended to grant Strutt and Morningside a nonexclusive license.

The Court, however, disagrees. While the facts of this case are similar to the facts in *Shaver,* there is a critical difference. In *Shaver,* after the architect ended his involvement, he sent a copy of the plans to the Airport Executive Director and expressed his intent regarding the continued use of the plans. 74 F.3d at 771. Here, by contrast, there is no such expression of intent by Nelson-Salabes. Rather, the Court is left to infer Nelson-Salabes's intent based on its silence regarding its copyright protection. The Court is satisfied that these facts do not support a finding that Nelson-Salabes granted Strutt a nonexclusive license. The Court further finds that because Nelson-Salabes never granted Strutt a nonexclusive license, Strutt obviously could not assign such a right to the defendants. Nor is there any evidence suggesting that Nelson-Salabes granted a nonexclusive license directly to any of the defendants. [FN3] Accordingly, the Court finds that the defendants did not have an implied nonexclusive license to use Nelson-Salabes's designs.

FN3. Prior to purchasing the Satyr Hill site, Turner received a copy of the most recent proposal between Strutt and Nelson-Salabes which referenced an AIA agreement. Turner testified that he was familiar with AIA agreements, which provide, among other things, that an architect's work cannot be used without written permission. Turner further testified that Strutt told him that he never signed the AIA agreement. Nonetheless, Turner's knowledge was sufficient to put him on notice that Nelson-Salabes was asserting copyright protection for its designs.

C. *Estoppel*

Defendants next argue that Nelson-Salabes should be estopped from pursuing a copyright infringement action against them because Nelson-Salabes intentionally misled Turner into believing he could use the plans. "Equitable estoppel may deprive a plaintiff of an otherwise meritorious copyright infringement claim." *Service & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 689 (4 th Cir.1992) (citations omitted). To establish an estoppel defense, defendant must show: (1) that the plaintiff must know the facts of the defendant's infringing conduct, (2) that the plaintiff intends that the defendant will act on his conduct or that the defendant has the right to believe that the plaintiff so intended, (3) that the defendant is ignorant of the true facts, and (4) that the defendant relied on the plaintiff's conduct to his injury. *See* 4 Nimmer, *supra,* § 13.07 at 13-275-276.

Here, the defendants appear to assert that (1) Nelson-Salabes knew that Turner intended to use the development plan, potentially without Nelson-Salabes as the architect, (2) that the defendants had a right to believe that Nelson-Salabes would not assert that the architectural designs were protected by a copyright, (3) that the defendants did not know that Nelson-Salabes claimed a copyright on the use of the designs, and (4) the defendant would not have purchased the Satyr Hill site for the same amount of money had it known about the copyright protection. In response, Nelson-Salabes asserts that its failure to warn the defendants of its intellectual property rights does not preclude it from bringing an action for copyright infringement.

***8** The Court finds that the defendants have failed

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

to show that estoppel is appropriate. Prior to purchasing the Satyr Hill site, Turner received a copy of a contract between Strutt and Nelson-Salabes that referenced an AIA Agreement. Based on Turner's familiarity of AIA Agreements, the Court finds that Turner should have been on notice that Nelson-Salabes would assert copyright protection over its designs. Further, after Turner informed Salabes that he did not want to use Nelson-Salabes as the architect for the project, Salabes told Turner that he could not use Nelson-Salabes's designs. Therefore, the Court finds that the defendants knew that Nelson-Salabes did not consent to the copying of its designs. The Court further finds that the defendants have not proffered sufficient evidence for the Court to conclude that Nelson-Salabes intended or expected the defendants to rely to their detriment on its earlier silence regarding its intellectual property rights. Accordingly, the Court finds that Nelson-Salabes is not estopped from asserting their copyright infringement claim.

III.

Remaining is the issue of damages. The plaintiff seeks damages in the amount of $2,513,941.00, plus prejudgment interest and attorneys' fees. [FN4] This figure represents $127,089.00 in actual damages, $487,354.00 in profits made by Morningside Development, and $1,899,498.00 in profits made by Morningside Holdings of Satyr Hill. Alternatively, plaintiff seeks statutory damages for willful violations. The plaintiff further asserts each of the three defendants is jointly and severally liable for the entire award. In response, the defendants assert that Nelson-Salabes has failed to prove that it was injured, and therefore, is not entitled to any damages.

FN4. In accordance with Local Rule 109, the Court will address the issue of attorney's fees following the entry of judgment.

A successful plaintiff in an infringement action is entitled to recover both actual damages and any additional profits of the infringer. More specifically, 17 U.S.C. § 504(b) provides:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.

A. *Actual Damages*

Beginning with actual damages, Nelson-Salabes asserts that its damages consist of the value of the infringed drawings. According to the plaintiff, the value of its drawings is $127,089, which represents the amount of money that it would have earned to complete the Satyr Hill project.

The Court will deny plaintiff's request for actual damages because its theory of damages is speculative. First, the Court finds that Nelson-Salabes did not have a contractual right to remain the architect on the project. Therefore, the amount of money it would have received to complete the project is not an accurate measure of its damages. The proper measure of damages appears to be the additional amount of profit that Nelson-Salabes would have received had it sold to defendants the right to use the footprint and front elevation in connection with another architect's completion of the project. Currently, the record reflects what Strutt paid to use the footprint and elevation *solely* for the purpose of obtaining the special exception. Further, Turner testified that the value of the special exception was approximately $500,000. Nonetheless, neither these figures, nor plaintiff's damages calculation is sufficient to correctly determine the actual damages suffered by the plaintiff. Further, any damage suffered by the plaintiff is likely accounted for in defendants' profits. Accordingly, the Court will deny plaintiff's claim for actual damages.

B. *Defendants' Profits*

***9** The second element of plaintiff's remedy for infringement is the defendants' profits. Under 17 U.S.C. § 504(b), a plaintiff is entitled to "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." Further, "[i]n establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Here, the plaintiff seeks profits from defendant Morningside Holdings of Satyr Hill and from defendant Morningside Development. As to Morningside Holdings of Satyr Hill, the plaintiff asserts that gross revenue is measured by the appraised value of the Satyr Hill site. The plaintiff's expert appraiser presented two appraisal values, one representing the "upon completion" value and one representing the "future stabilized value." [FN5] Turner testified that the assisted living center had not yet stabilized; therefore, the Court finds that the "upon completion" value is the appropriate appraisal. Using this value, the plaintiff asserts that Morningside Holdings of Satyr Hill's gross revenue is $8,600,000.

FN5. The "upon completion" value represents the market value of the fee simple interest in the Satyr Hill site, as a going concern including personal property and business value, effective August 1, 1998. The "future stabilized" value represents the market value of the fee simple interest in the Satyr Hill site, as a going concern including personal property and business value after the first full year of stabilization.

From the gross revenue, the Court will subtract Morningside Holdings's deductible expenses. The plaintiff concedes that Morningside Holdings incurred deductible expenses in the amount of $8,000,502. Additionally, Turner testified that Morningside Holdings incurred further expenses, including contingency costs and interest. Nonetheless, the Court, finds that the defendants' have proffered little, if any, evidence to corroborate Turner's testimony regarding the additional expenses. Consequently, the Court will not deduct these expenses from Morningside Holdings of Satyr Hill's gross revenue. Morningside Holdings's profit, therefore, is its gross revenue of $8,600,000 less its deductible expenses of $8,000,502, or $599,498.

The defendants, nonetheless, assert that the plaintiff is not entitled to any of this profit because the profit is not attributable to the infringing activity. More specifically, the defendants appear to argue that if its profits are apportioned, no portion of the profit would be attributable to the front elevation or footprint. In support of their contention, the defendants' expert appraiser testified that architectural design is not an important factor in determining the value of an assisted living center. Nonetheless, the Court finds that aesthetics, including the front elevation and footprint, do contribute to the value of the Satyr Hill site. Yet, the defendants have not proffered sufficient evidence to permit the Court to fairly apportion the profits between those profits attributable to the copyrighted work and those profits attributable to other aspects of the assisted living center.

Based on the record before it, the only profit that is clearly not attributable to the defendants' infringement is profit associated with personal property. The plaintiff's expert appraiser included $600,000 for personal property in his overall appraisal value. Yet, the defendants' actual personal property expenses only amount to $354,568.35. Therefore, plaintiff's calculation includes a $245,431.65 profit on personal property. The Court will exclude this amount from Morningside Holding of Satyr Hill's profit. The Court will not, however, further apportion the defendants' profits because the defendants have failed to meet their burden of providing the Court with a rational division which the Court could use to further apportion the profits. *See Twin Peaks Productions, Inc. v. Publications Intern., Ltd.*, 996 F.2d 1366, 1382 (2 nd Cir.1993) (no apportionment where the defendant did not carry its burden of suggesting a rational division of profits); *see also Walker v. Forbes, Inc.*, 28 F.3d 409, 414 (4 th Cir.1994) (in performing the apportionment, the benefit of the doubt must always be given to the plaintiff). Accordingly, the Court finds that Morningside Holdings of Satyr Hill realized profits attributable to its infringing activity in the amount of $345,066.45.

***10** With respect to Morningside Development's profits, the plaintiff established gross revenues of $487,354.00, which represent a development fee paid to Morningside Development by Morningside Holdings of Satyr Hill. At trial, the defendants established that Morningside Development paid Strutt $96,383.00 of this amount as part of the land purchase price. [FN6] The Court is satisfied that this payment is a deductible expense. Accordingly, the Court finds that Morningside Development realized profits in the amount of $390,971.00. The Court further finds that all of Morningside Development's profit is attributable to its infringing activity. In total, therefore, the defendants realized profits attributable to its infringement in the amount of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

$736,037.45.

FN6. Turner also sought to testify about other expenses, but the Court excluded the testimony because the defendants failed to produce any evidence of such expenses during the discovery process.

The plaintiff asserts that the defendants are jointly and severally liable for this amount. The defendants, however, assert that Turner is not personally liable because there is no evidence that he profited from the infringement and there is insufficient evidence to "pierce the corporate veil."

If a corporation commits an act of infringement, its employees may escape personal liability if the employees were simply carrying out required duties which did not require the exercise of discretion or judgment. *See* 3 Nimmer, *supra,* § 12.04[A][3][d] at 12-92. Under certain situations, however, employees may not be able to escape personal liability. For example, corporate officers will be personally liable for infringement if (1) they use the corporation as an instrument to carry out the wilful and deliberate infringement, (2) if they are a dominant influence in the corporation and determined the policies that result in the infringement, or (3) if they derive financial benefit from the infringing activity. *See* 3 *id.* § 12.04[A][3][d] at 12-94-95. Here, Turner is the managing agent for both Morningside Holdings of Satyr Hill and Morningside Development. Further, Turner appears to have directed every aspect of the Satyr Hill project, including the decision to use Nelson-Salabes's front elevation and footprint designs. Moreover, Turner made this decision despite Nelson-Salabes's admonition not to use its designs without permission. Based on this evidence, the Court finds that Turner is liable as a direct and willful infringer.

As such, Turner is jointly and severally liable for Nelson-Salabes's actual damages. Nonetheless, individual defendants are generally "not jointly liable for the total profits realized by all of the defendants, but are rather individually liable for their own respective profits." 3 Nimmer, *supra,* § 12.04 [C][3] at 12-124.3. Defendants may, however, be jointly liable for the total profits "among noninnocent infringers, or among defendants engaged in a partnership, joint venture, or similar enterprise." *Id.* at 124.4. Again, Turner, along with the other defendants, are not innocent infringers and they did engage in a partnership, joint venture or similar enterprise. Accordingly the Court finds that the each of the defendants is jointly and severally liable for the entire award of $736,037.45. [FN7]

FN7. The plaintiff has also requested prejudgment interest. Ordinarily, where, as here, a statute is silent on the issue of prejudgment interest, it is committed to the sound discretion of the trial court. *See Coliseum Cartage Co., Inc. v. Rubbermaid Statesville, Inc.,* 975 F.2d 1022, 1026 (4 th Cir.1992). In this case, the Court finds that the damages and profits awarded to Nelson-Salabes will compensate it for its loss and discourage the defendants from further infringement. The Court further finds, in its discretion, that an award of prejudgement interest will serve no purpose. Accordingly, the Court will deny plaintiff's request.

VI.

***11** For all of the foregoing reasons, the Court will enter Judgment in favor of plaintiff, Nelson-Salabes, Inc. in the amount of $736,037.45, with costs. Judgment will be entered in accordance with this Opinion.

2001 WL 419002 (D.Md.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Only the Westlaw citation is currently available.

United States District Court, W.D. Virginia,
Charlottesville Division.

**RICHMOND HOMES MANAGEMENT, CORP., Plaintiff,**
**v.**
**RAINTREE, INC., Defendant.**

**Civ. A. No. 93-0047.**

March 9, 1994.

W. Todd Benson, Bondurant & Benson, P.C., Thomas Ogburn Bondurant, Jr., Richmond, VA, for plaintiff.

George Howard Dygert, George H. Dygert & Associates, Charlottesville, VA, for defendant.

*MEMORANDUM OPINION*

MICHAEL, District Judge.

***1** Plaintiff, Richmond Homes Management Corp. ("Richmond Homes"), has moved the Court to enjoin Raintree both preliminarily and permanently from infringing its copyrighted architectural design materials. After hearing oral argument on the motion for a preliminary injunction on March 1, 1994, the parties agreeing to rely on the arguments presented and the affidavits and exhibits filed with the pleadings, the Court finds appropriate the entry of a preliminary injunction for the reasons stated herein.

I. *FACTS*

Richmond Homes designs architectural plans and brochures containing the layouts of residential homes and offers packages for the construction thereof. Richmond Homes created the house plans and architectural work for brochures advertising a house entitled "The Louisa" for which Plaintiff obtained copyright certificates in May, 1992. In July, 1992, Richmond Homes of Henrico, Inc., a licensed subsidiary of Plaintiff, constructed a speculative "Louisa" home at Lake Monticello, near Charlottesville, Virginia, for public viewing and distributed brochures of the floor plans to potential customers.

Raintree, Inc. is also a designer of architectural plans for residential homes and competes with Richmond Homes in the same market and geographical area. In late 1992, Raintree constructed for customer Robert McCormick a residential home entitled the "The Rockford" and is presently continuing to build Rockfords. Claiming that Raintree has built and is building Plaintiff's design, the Louisa, under the guise of a design styled by Raintree as the Rockford, Plaintiff filed this complaint for intentional copyright infringement under 17 U.S.C. § 101 *et seq.*

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and the federal copyright laws to entertain the request of Richmond Homes for a preliminary and permanent injunction against Raintree in order to prevent Raintree from infringing its copyrights to the Louisa architectural plans and brochures. Plaintiff also requests an accounting for lost profits as a result of each infringement, $257,500 in damages, plus attorneys fees and costs.

II. *DISCUSSION*

***2** In this circuit, whether to grant a preliminary injunction must be determined by applying the test articulated in *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir.1977). Under *Blackwelder* and its progeny, the court considers: 1) the likelihood of irreparable harm to the plaintiff if an injunction is not granted; 2) the likelihood of harm to the defendant if an injunction issues; 3) the likelihood of plaintiff's success on the merits, and 4) the public interest. *Id.* at 193-96. Once the plaintiff demonstrates a clear showing of irreparable injury, the court balances the relative harms to each party. Where the balance tips in plaintiff's favor, the court can enter the preliminary injunction if the plaintiff also raises serious questions addressing the merits. The stronger the balance tips in favor of the plaintiff, the lighter the plaintiff's burden in making a showing on the merits. *See, e.g., Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 812-13 (4th Cir.1992); *Doe v. Shenandoah Co. Sch. Bd.*, 737 F.Supp. 913 (W.D.Va.1990).

A. *Irreparable Injury and Success on the Merits*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Plaintiff contends that it has endured and will continue to suffer irreparable injury unless the Court prevents Raintree from infringing its copyrighted work, the Louisa. Richmond Homes alleges injury in each sale of the Rockford, the plans for which Plaintiff asserts are identical to those of the Louisa. [FN1] Courts have held that a prima facie showing of copyright infringement establishes a presumption that the copyright owner has suffered irreparable harm. *Service & Training, Inc. v. Data General Corp.*, 963 F.2d 680, 690 (4th Cir.1992) (prima facie case also raises presumption that plaintiff can show probable success on the merits); *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1254 (3d Cir.1983), *cert. dismissed,* 464 U.S. 1033 (1984); *West Publications Co. v. Mead Data Central, Inc.*, 799 F.2d 1219, 1229 (8th Cir.1986), *cert. denied,* 107 S.Ct. 962 (1987); *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 611-12 (1st Cir.1988); *see also Wainwright Sec., Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 94 (2d Cir.1977) (prima facie showing of infringement obviates need for detailed account of irreparable injury since such injury is presumed), *cert. denied,* 434 U.S. 2014 (1978). Thus, the Court undertakes to evaluate whether the Plaintiff has made a sufficient showing that Raintree has infringed its copyrights through the construction and sale of the Rockford, merging to some degree the typically separate inquiries into the likelihood of irreparable harm and the probable success on the merits.

In order to establish a prima facie case of copyright infringement, Richmond Homes must demonstrate that it owns a valid copyright in protected work which the Defendant has copied without authorization. *See, e.g., Keeler Brass Co. v. Continental Brass Co.*, 862 F.2d 1063, 1065 (4th Cir.1988); *Raffoler, Ltd. v. Peabody & Wright, Ltd.*, 671 F.Supp. 947 (E.D.N.Y.1987). The Plaintiff may establish infringement through direct evidence of Raintree's copying of its architectural plan, *see, e.g., Feist Publications, Inc. v. Rural Telephone Servs. Co.*, 111 S.Ct. 1282 (1991), and need not prove that the entire architectural design was copied as long as it demonstrates that a material and substantial part of the design was copied, even though the part may be small, *see MacMillan Co. v. I.V.O.W. Corp.*, 495 F.Supp. 1134, 1146 (D.Vt.1980) (citation omitted).

*3 Infringement is ordinarily proved by circumstantial evidence, however, with evidence that the owner holds a valid copyright, that the defendant had access thereto and that there exists substantial similarity in the ideas of the two works and in a protectable expression of the ideas. *See Dawson v. Hinshaw Music, Inc.*, 905 F.2d 731, 732 (4th Cir.1990); *Atari, Inc. v. Amusement World, Inc.*, 547 F.Supp. 222, 227 (D.Md.1981). By making an initial showing of copying through proof of access and substantial similarity, the plaintiff raises a presumption of copyright infringement after which the defendant must produce evidence to rebut the presumption. *Keeler Brass,* 862 F.2d at 1065. The defendant can satisfy its burden, for example, with evidence that it has devised a work of independent creation. [FN2] The burden of persuasion remains with the plaintiff to establish by a preponderance its proposition that defendant actually copied the material if the defendant succeeds in rebutting the initial presumption. *Id.* at 1066.

1. Validity of the copyright

Title 17, United States Code § 410(c) presumes the originality and validity of a copyright where the owner obtains a certificate of registration within five years after the first publication of the work. To obtain copyright protection, the holder of the certificate must show that the original architectural work displays creativity and was independently created by the author, regardless of how simple the design. *Value Group, Inc. v. Mendham Lake Estates, L.P.*, 800 F.Supp. 1228, 1232 (D.N.J.1992) (citing *Feist Publications, Inc. v. Rural Telephone Servs.*, 111 S.Ct. 1282, 1287 (1991)). Protection of an original copyrighted work also extends to derivative works, 17 U.S.C. §§ 103(a), 106(2), which are defined as works "based upon one or more preexisting works.... [and] consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship," *see id.* § 101. Copyright protection does not extend, however, to standard features or to ideas themselves but only to the particular expression thereof. *Id.* § 102.

Richmond Homes registered its architectural plans and brochures for the Louisa and received its certificates of copyright in May, 1992. Raintree

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

does not dispute the validity of the Plaintiff's certificates here but does contest the Plaintiff's ability to copyright the common features of the Louisa, such as its rooms, windows or fireplace. Agreeing that such items by themselves are not entitled to protection, the Court must still protect against infringement the particular design and the architectural plans of the Louisa in which Richmond Homes holds valid copyrights. The validity of such copyrights having thus been established, the Court proceeds to the second part of the analysis to determine if Richmond Homes has provided adequate proof of copying.

2. Copying of the Louisa

***4** Richmond Homes proffers as direct evidence of Defendant's copying the statement of Rubin, a former Raintree employee, who testified in deposition that Raintree directed him to input the architectural plans and elevation of the Louisa into Raintree's computer. Rubin testified that Raintree president, Jared Lake, instructed him to enter the layout of the Louisa and Lake's handdrawn sketch based upon the preferences of Raintree customer, Robert McCormick, who had previously discussed designs with Richmond Homes. Raintree disputes Plaintiff's contention, arguing that Rubin stated that he neither designed the Rockford nor knew from where Raintree obtained its graphic depiction of the Rockford. [FN3] However, the Court presumes the veracity of a statement by an individual testifying under oath during deposition. Accordingly, the Court finds Richmond Homes has made a satisfactory showing of copying by way of direct evidence.

Having determined that the Plaintiff has produced sufficient evidence of copying by Raintree, the Court need not review whether Richmond Homes has also established proof of copying with evidence of access to and substantial similarity of Plaintiff's designs. Nevertheless, the Plaintiff has produced circumstantial evidence indicating that Raintree gained access to the floor plans of the Louisa through customers who contacted both Richmond Homes and Raintree. The evidence indicates that customer Robert McCormick first visited Richmond Homes to obtain information on Plaintiff's designs and then went to Raintree and conveyed his preference for an architectural design matching that of the Louisa. Furthermore, Plaintiff submits evidence that customer Gary Smith furnished Defendant with a brochure of the Louisa plan which he had obtained from Richmond Homes of Henrico, Plaintiff's subsidiary. Accordingly, Richmond Homes claims that it has shown access and that Raintree created "The Rockford" after obtaining the brochures and information from Richmond Homes customers.

Access may be established by proof that the defendant had an opportunity to view or copy the plaintiff's work. *Ganz Bros. Toys v. Midwest Importers of Cannon Falls, Inc.*, 834 F.Supp. 896, 901 (E.D.Va.1993) (citation omitted); *see also Robert R. Jones Assocs., Inc. v. Nino Homes,* 686 F.Supp. 160, 162 (E.D.Mich.1987) (finding access to copyrighted floor plans where companies built homes in same neighborhood and plaintiff opened model homes for public viewing), *modified on other grounds,* 858 F.2d 274 (6th Cir.1988). The plaintiff may also establish access where a work has been widely disseminated. *Atari,* 547 F.Supp. at 227. In the case at bar, Richmond Homes has succeeded in making a strong preliminary showing of Raintree's ability to view and copy Plaintiff's work. Indeed, evidence that customer Smith handed to Raintree a copy of Plaintiff's advertising brochure and that customer McCormick conveyed to Raintree his preference for the design of the Louisa substantiate Plaintiff's contention that Raintree had an ability to and did copy its protected materials. Furthermore, Plaintiff had constructed a speculative Louisa home at Lake Monticello, where Raintree was also building homes, thus providing Raintree with the opportunity to view the Louisa. Finding it more likely than not that Raintree copied and had access to Plaintiff's design of the Louisa, the Court directs its inquiry to the final element of Plaintiff's prima facie case.

3. Substantial similarity

***5** The Court examines the substantial similarity between the design of the Louisa and that of the Rockford by inquiring whether an ordinary observer would regard as the same the aesthetic appeal of the two architectural plans. *See Peter Pan Fabrics v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960). As proof that an ordinary observer cannot distinguish on the whole the two plans, Plaintiff offers the statement of McCormick who testified in deposition that he believed he owned a

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Louisa when in fact Raintree constructed for him a Rockford. Indeed, to the naked eye, both architectural plans contain the same long double-A frame on the housefront, double windows, dual air vents of octagonal shape and family room located in the forefront of the house.

Defendant disputes the similarities proffered by Plaintiff, however, arguing that there exist significant differences in the plans of each house, namely in room size, location of fireplace and room arrangement and location. Defendant suggests that Plaintiff's architectural design is not so unique so as to be found only in the Louisa. Rather, Raintree asserts that the design of the Louisa can be found substantially in many other colonial style homes on the market.

In *Ganz Bros., supra,* the court expanded the *Peter Pan* standard for determining substantial similarity, stating the inquiry as " 'not whether there are differences in detail between the copyrighted and accused items when subjected to minute scrutiny, but whether the accused item is so similar to plaintiff's that an ordinary lay person would conclude that one copied from the other.' " 834 F.Supp. at 901 (citation omitted). The test focuses on the reasonable observer's "overall impression" of the two items submitted for comparison rather than on a specific comparison of the two products through a concentration on unique differences. *Id.* While protection extends only to the copyrighted expression of the idea, and not to the idea itself, *Atari,* 547 F.Supp. at 228, [FN4] the court must ascertain whether the common aspects of expression are forms of expression which cannot be eluded in any version of the underlying idea, *id.* at 229.

Defendant attempts to blur the features which are noticeably similar in the two plans, contending that Plaintiff's designs are not capable of protection because they are not unique to the idea of a colonial style house. Although the idea of a colonial style house is not itself protectable, the specific layout designed by Richmond Homes, that is the particular expression of the Louisa design--the long double-A frame outlining the front as advertised in the real estate listing; the different slopes to the roof both in front and in back; the double windows; the octagonal-shaped air vents; the placement of the family room in the front of the house, etc.--constitutes an expression of an idea which this Court shall protect against infringement. One would be constrained to say that the common forms of expression in the two designs are those which cannot be avoided in any reproduction of the idea. Although counsel for Richmond Homes conceded at oral argument that each Louisa (and each Rockford for that matter) contains some deviation from the original architectural plan, albeit because each home is designed to accommodate the homeowner's individual needs, counsel maintained that the Plaintiff constructs each Louisa by starting with the same floor plan design in which Plaintiff holds the copyright. Accordingly, by viewing the designs on the whole, the Court believes that the ordinary observer is likely to conclude that the aesthetic appeal of each is the same. This finding of substantial similarity tends to suggest that Raintree copied the Louisa to design the Rockford.

***6** In a closely analogous case, two companies designed and constructed homes in the same geographical area and market. *See Value Group, Inc. v. Mendham Lake Estates, L.P.,* 800 F.Supp. 1228, 1230 (D.N.J.1992). The plaintiff, which held valid copyrights in architectural plans and brochures, after having denied the defendant's request for a copy of the plans, subsequently filed suit for an injunction against the defendant for infringement. *Id.* The defendant admitted to using a photograph of the plaintiff's design to create its own plans, and the court found sufficient evidence of access to the copyrighted material. *Id.* at 1233. The court adjudged the floor plan designs substantially similar to constitute infringement in and of itself, notwithstanding the indistinguishable nature of the details in each design. *Id.* Because the plaintiff had established a prima facie case of infringement, or at least a likelihood of success on the merits, the court presumed irreparable harm. The court entered the preliminary injunction without requiring the plaintiff to make a specific showing of harm, acknowledging injury to the plaintiff in the loss of its competitive position in the market. *Id.* at 1234 (citations omitted). [FN5]

This Court agrees with the reasoning expressed by the *Value Group* court and finds that the evidence in the case here supports a conclusion that Raintree copied the Louisa. Because Richmond Homes has made a strong showing of copying both through direct evidence and circumstantial evidence, demonstrated by proof of access to Plaintiff's work

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

and the substantial similarity in the two designs, the Court holds that the Plaintiff has established a prima facie case of copyright infringement. The Court thus presumes the presence of irreparable injury to the Plaintiff [FN6] and also holds that Plaintiff has demonstrated a substantial likelihood of success on the merits. The Court will briefly undertake to balance the respective harms to the parties and to evaluate the public interest.

B. *Harm to Raintree*

Raintree argues that it will suffer great harm in the form of incalculable lost profits should the preliminary injunction issue. [FN7] However, balancing of the relative hardships is not determinative of the court's decision whether to grant an injunction. *Value Group,* 800 F.Supp. at 1234- 35. While the Court acknowledges that an injunction will prevent Raintree from constructing or continuing to build Rockfords, the Court finds that the balance of harms tips decidedly in Plaintiff's favor. Any hardship to Raintree can be alleviated by requiring Richmond Homes to post a security bond, pursuant to Fed.R.Civ.P. 65(c), in the amount of $20,000 in order to protect Raintree against any wrongful determination. Although neither party has produced evidence suggesting the profit realized on the sale of each Rockford or on the number of Rockfords which can be completed per month, the Court estimates that Raintree can build no more than two Rockfords per month at a profit of approximately $10,000 each. Thus, a $20,000 security bond should provide Raintree with adequate protection prior to and during the trial on the merits while the preliminary injunction is in effect.

C. *Public Interest*

*7 The infringement of copyrighted material serves no public interest in the opinion of this Court and of other courts which have held likewise. *See, e.g., Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 612 (1st Cir.1988) (citations omitted); *Value Group,* 800 F.Supp. at 1234. Determining that the public interest will be served by the granting of an injunction, the Court will enter an Order enjoining Raintree from infringing the copyrights of Richmond Homes to the architectural plans and brochures of the Louisa.

An appropriate Order will this day issue.

For the reasons stated in the accompanying Memorandum Opinion, it is this day

ADJUDGED AND ORDERED as follows:

1. The motion of Richmond Homes for a preliminary injunction against Raintree shall be, and it hereby is, granted.

2. Defendant, its officers, agents and employees, shall be, and they hereby are, prohibited from constructing or contracting to build any residential home which infringes the copyrights of the Plaintiff in "The Louisa" as indicated in the accompanying Memorandum Opinion.

3. This Order shall be effective only in the event that the Plaintiff posts with the Clerk of the Court a security bond in the amount of twenty thousand dollars ($20,000), for the protection of the Defendant pursuant to Fed.R.Civ.P. 65(c).

FN1. Furthermore, Richmond Homes insists that Raintree has initiated an advertising campaign against it by publicizing the fact that Plaintiff has filed a lawsuit and claiming that the Plaintiff has failed to sell one Louisa. The parties also dispute Raintree's intention in hiring a private investigator, Plaintiff contending that Raintree hired the investigator to uncover dirt on Frank Brown, an agent for Plaintiff's subsidiary, Richmond Homes of Henrico. The Court will not undertake to ascertain the validity of such assertions, here, finding unnecessary such undertaking to determine the existence of irreparable injury.

FN2. One court has held that where two works are so strikingly similar as to preclude the possibility of an independent creation, copying may be proved by substantial similarity alone without evidence of access. *See Direct Marketing of Virginia, Inc. v. E. Mishan & Sons, Inc.,* 753 F.Supp. 100 (S.D.N.Y.1990). Because Richmond Homes has made a sufficient showing of copying through both direct and circumstantial evidence here, the Court need not decide whether proof of substantial similarity alone would satisfy the Plaintiff's burden.

FN3. Raintree requests the Court to doubt Rubin's credibility in light of his termination for

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

unsatisfactory performance in March, 1993.

FN4. The *Atari* court elaborated that "when an idea is such that any use of that idea necessarily involves certain forms of expression, one may not copyright those forms of expression, because to do so would be in effect to copyright the underlying idea." *Id.*

FN5. The *Value Group* court also held that the plaintiff had shown actual injury through the construction by the defendant, the sole competitor in the same market, of substantially similar homes. The court noted perceptively that "[o]nce a particular architectural design is utilized in competing communities, the viability of that design, and, in fact, of the project itself, becomes doubtful." *Id.*

FN6. Defendant argues that Richmond Homes could be compensated, if at all, by a remedy at law, through a calculation of lost profits. However, this Court is inclined to follow other courts which have presumed irreparable injury where the plaintiff establishes a prima facie case of copyright infringement.

FN7. Noticeably, Raintree contradicts itself here because it previously argued against the appropriateness of a preliminary injunction on the ground that Plaintiff could be compensated by a calculation of lost profits. The Court rejected Raintree's previous argument and declines to accept it here.

1994 WL 98922 (W.D.Va.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.