# Exhibit E

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

-----------------------------------------------------

The Rottlund Company, Inc.
d/b/a Rottlund Homes, a Minnesota
Corporation,

Plaintiff,

vs.

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc.,
a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

-----------------------------------------------------

Volume I

Deposition of

Albert H. Bloom, A.I.A.

Wednesday, June 9, 2004

8:09 a.m.

APPEARANCES:

FOR PLAINTIFF THE ROTTLUND COMPANY, INC.:
MR. CRAIG S. KRUMMEN
Attorney at Law
WINTHROP & WEINSTINE, P.A.
Suite 3500
225 South Sixth Street
Minneapolis, Minnesota 55402

FOR DEFENDANT PINNACLE CORPORATION:
MR. MATTHEW I. FARMER
Attorney at Law
HOLLAND & KNIGHT, LLC
131 South Dearborn Street
30th Floor
Chicago, Illinois 60603

FOR THIRD-PARTY PLAINTIFF TOWN & COUNTRY HOMES:
MR. DARREN B. SCHWIEBERT
Attorney at Law
FREDRIKSON & BYRON, P.A.
4000 Pillsbury Center
200 South Sixth Street
Minneapolis, Minnesota 55402-1425

FOR THIRD-PARTY DEFENDANT BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC.:
MS. HOLLY J. NEWMAN
Attorney at Law
MOORE, COSTELLO & HART, P.L.L.P.
701 Fourth Avenue South #1350
Minneapolis, Minnesota 55415-1823

I N D E X

EXAMINATION

By Mr. Krummen - Page 4
By Ms. Newman - Page 265

EXHIBITS:



| Number | Description | Page |
|---|---|---|
| 388 | Expert Disclosure of Albert Bloom | 27 |
| 388A | Documents considered by Al Bloom | 27 |
| 389 | Supplemental Expert Disclosure of Albert Bloom, A.I.A. | 29 |
| 390 | Second Supplemental Expert Disclosure of Albert Bloom, A.I.A., June 4, 2004 | 29 |
| 391 | brochure plans | 30 |
| 392 | 2/17/04 transcript of James Grundmeier | 117 |
| 393 | Main Floor Plan, BSB 04483-4489 | 194 |
| 394 | Mainfloor ABC, BSB 03746-47 | 197 |
| 395 | 2/26/03 letter from Moore, Costello to David Davenport and attachments | 214 |
| 109A | color photograph | 177 |
| 110A | color photograph | 177 |



* * * * *

THE ORIGINAL IS IN THE POSSESSION OF KRUMMEN, ATTORNEY AT LAW

* * * * *

Deposition of ALBERT H. BLOOM, A.I.A., taken pursuant to Notice of Taking Deposition and taken before Patrick J. Mahon, a Notary Public in and for the County of Hennepin, State of Minnesota, at the law offices of Winthrop & Weinstine, P.A., Suite 3500, 225 South Sixth Street, Minneapolis, Minnesota.

WHEREUPON, the following proceedings were duly had:

(Oath administered by the reporter.)

WITNESS RESPONSE: I do.

ALBERT H. BLOOM, A.I.A.,

a witness in the above-entitled proceedings, after having been first duly sworn, deposed under oath as follows:

EXAMINATION

BY MR. KRUMMEN:

Q. Good morning, Mr. Bloom. I introduced myself earlier. As you know, I'm Craig Krummen, and you understand that I represent Rottlund in this matter, correct?

A. Yes.

Q. When were you retained?

A. About a year ago.

Q. What were you asked to do?

A. Basically provide expert opinions regarding the

copyright infringement that Rottlund was pursuing against BSB.

Q. When you say you were asked to provide expert opinions, can you be more specific?

A. Specifically to review the documents that BSB provided and to formulate an opinion as to whether or not they were independently created or whether I felt that there was some essence of copying.

Q. What do you mean by "some essence of copying"?

A. Basically whether or not they copied Rottlund's designs.

Q. What documents were you provided with?

A. Initially or totally?

Q. When did you first form your opinions?

A. I believe it was starting about a year ago in July of 2003 and I believe I issued my first opinion in late summer.

Q. From the time you were retained until when you issued your opinion in August of '03, did your opinions ever change?

A. No.

Q. So you concluded from that first set of documents you received that BSB had independently created the Homestead Collection; is that correct?

A. Yes.

Q. What documents did you look at in coming up with that opinion?

A. I looked at the plans that were provided for the Homestead Collection, and I looked at the New Villa II plans that Rottlund or Tim Whitten had prepared. I also reviewed files that were provided from BSB regarding the procedure and the timeline of the design process that they went through with Town & Country.

Q. So you were asked to examine the plans to determine whether or not there was copying? That was one of the materials you were asked to review?

A. Yes.

Q. Did anyone ask you to examine whether or not there was similarity of ideas between the Villa II and the Homestead Collection?

A. Yes.

Q. Are there similarity of ideas between the Villa II and the Homestead Collection?

A. Yes.

Q. When you say there are similarity of ideas between the Villa II and the Homestead Collection, what do you mean?

A. They're very similar in concept. They're both back-to-back townhouse products. They have end units or exterior units. They also have interior units. They're

slab-on-grade construction. They're two-car garages. They have similar scope as far as the room counts go in living, dining, kitchen, bedrooming, loft spaces, and there's a similarity as far as the gross mass of the building size.

Q. Were you also asked to examine whether or not there was similarity of expression between the Villa II and the Homestead Collection?

A. I don't know what you mean by "expression."

Q. As expressed on these plans that you looked at, were you asked to examine how the Homestead Collection was expressed on the plans that you looked at versus how the Villa II was expressed on the plans that you looked at?

A. No.

Q. You have no opinion as to whether or not the expression of the Villa II and the expression of the Homestead Collection are similar; is that correct?

A. That's correct.

Q. How do you explain the difference between examining similarity of ideas and examining similarity of expression?

A. I don't know what you mean by "expression."

Q. So, in your opinion, your entire report relates to similarity of ideas?

MS. NEWMAN: -- to the form of the argumentative as argumentative. Mr. Krummen, let's be polite here today.

MR. KRUMMEN: You're the one lodging the objections, Miss Newman. I don't understand how we can get a working definition of "expression."

MS. NEWMAN: Why don't you give one and then this witness will be able to answer your questions. He's already indicated that he doesn't understand what you mean by that phrase.

MR. KRUMMEN: He's been coached to opine along those lines. Now, if you want to get out Webster's and figure out what "expression" means, I'd be happy to do that. Otherwise, I'm free to ask this witness what "expression" means to him, and if the answer is nothing, he'll have to live with that.

BY MR. KRUMMEN:

Q. Mr. Bloom, what does the word "expression" mean to you?

A. "Expression" is a concept that -- I guess the generation of some sort of genre, I don't know. I really don't know what you're talking about.

Q. You have no idea what the word "expression" means?

A. No.

A. No.
Q. So you come into this deposition room knowing what "ideas" are but not what "expression" means, correct?
A. Yes.
Q. Where did you glean your understanding of what "ideas" means?
A. From my education and experience.
Q. Can you be more specific than that?
A. I -- just by virtue of the fact of practicing as an architect.
Q. Is the Homestead Collection a residential townhome?
A. Yes.
Q. Is it a multifamily residential townhome?
A. Actually, it is.
Q. Is the Homestead Collection a back-to-back residential multifamily townhome?
A. Yes.
Q. Is the Homestead Collection a slab-on-grade residential multifamily back-to-back townhome?
A. Yes.
Q. Is the Homestead Collection a two-story residential multifamily back-to-back slab-on-grade townhome?

A. Yes.
Q. And is the Homestead Collection a two-story residential multifamily back-to-back slab-on-grade townhome with an attached garage?
A. Yes.
Q. As to all those elements, would you admit that the Villa II is exactly the same at the idea stage?
A. Yes.
MR. FARMER: Objection, foundation.
MR. SCHWIEBERT: Objection to the form of the question.
BY MR. KRUMMEN:
Q. What does the term "substantially similar" mean to you?
A. It means that they are very much alike in their ideas and in the concept.
Q. Can you be more specific than "very much alike"?
A. They would be so similar it would be difficult to tell them apart.
Q. Where did that definition come from?
A. From me.
Q. Did you look up the word "substantially similar," or what was the source of your opinion that "substantially similar" means they're so similar it would be difficult to tell them apart?

"concept"?

A. "Ideas" are the iterations of concepts that are brought down to a more finite detail. The "concept" is the overall idea and iteration of something that in just gross form would wind up being similar.

Q. Can you use the Homestead Collection and give me an example of a concept?

A. The concept of the Homestead Collection is a back-to-back townhouse, two-story slab-on-grade building with certain living spaces and certain criteria that are given into the floor plan and elevations.

Q. Would you give me an example with the Homestead Collection of what you mean by "ideas"?

A. Ideas are more specific in the size of rooms, the placement, the layouts of kitchens, utility rooms, bathrooms, placement defenestration, entry sequences, circulation patterns.

Q. What do you mean by "independent creation" when you use that phrase in your expert report?

A. Independent creation is starting with a set of criteria, written program definition and developing concepts throughout a period of time, interaction with a client or another outside source to review and refine the concepts and production of a final set of documents that would be suitable for building.

Q. Is it possible to copy, if you start with the set of criteria that says, for example, copy Rottlund?

A. Would you repeat that?

Q. Sure. I believe you said that independent creation begins with starting with a set of criteria. Did I hear you correctly?

A. Yes.

Q. Now, if the criteria is copy Rottlund, could you independently create something but also copy?

MR. FARMER: Objection, form.

MS. NEWMAN: Same objection.

A. I don't think so, no.

BY MR. KRUMMEN:

Q. Why is that?

A. Given a set of criteria, starting with the proverbial blank sheet of paper, you would develop a program based on that criteria that would generate certain forms and certain ideas which would be transmitted on paper for a final design.

Q. So part of starting with a set of criteria would be beginning with a blank sheet of paper, correct?

A. Yes.

Q. And any sort of suggestion that you copy Rottlund would not be starting with a blank sheet of paper in your opinion?

MR. SCHWIEBERT: Objection to the form of the question.

MS. NEWMAN: Same objection.

A. No. I mean, it would be starting based on the program criteria with a blank sheet of paper, yes.

BY MR. KRUMMEN:

Q. So if you started with a blank sheet of paper and the criteria that you first write down is copy Rottlund, is that still independent creation as you define the phrase?

MR. FARMER: Objection, asked and answered.

A. I don't understand what you mean by "copy Rottlund."

BY MR. KRUMMEN:

Q. I don't understand what you mean by a blank sheet of paper and working towards a set of criteria. So let's begin with where you're at. What do you mean by "a set of criteria"?

A. Criteria that would be given as far as program parameters, specifically square footage, dimensional size, room count, options, that type of criteria, even a land plan, cost considerations, density considerations, access considerations, and perhaps even lifestyle considerations of the people that might be inhabiting the units.

Q. What if a client comes to an architect and says: I want the criteria to be make Rottlund's product for me, would that be independent creation?

A. No.

Q. What if a client came to an architect and said: Here are Rottlund's elevations and floor plans, make something similar for me, would that be independent creation?

MR. FARMER: Objection, foundation.

A. The independent creation would come from a standard of the program criteria to review other people's work. Whether it's Rottlund's or something else would be a function of describing the marketplace and would not necessarily be copying.

BY MR. KRUMMEN:

Q. Before we get to the word "copying," I want to finish with independent creation. And I guess the question is, if someone came to you and said: I want to build a back-to-back slab-on-grade multifamily townhome product with an attached garage but it needs to look like this picture of Rottlund's, would that be independent creation if you started at that point with Rottlund's picture and went from there?

MR. FARMER: Objection, improper hypothetical.

MS. NEWMAN: Same objection.
MR. FARMER: It's not been created yet.
A. No, it wouldn't be.
BY MR. KRUMMEN:
Q. That would not be independent creation because the starting point was a picture of Rottlund's, correct?
A. Yes.
Q. Did that happen with the Homestead Collection?
A. I don't believe so, no.
Q. And what's your opinion based upon?
A. Looking at the design drawings that were produced by BSB transmitted to Town & Country and the back-and-forth transmittal of information from Town & Country, looking at and reviewing them, giving comments back to BSB, and BSB modifying their designs to come up with the final product.
Q. Did BSB tour Rottlund's back-to-back townhome product before it designed the Homestead Collection?
A. I believe they did, yes.
Q. Did they tour it on more than one occasion?
A. I don't believe so.
Q. Is it possible to independently create the Homestead Collection but still tour Rottlund's Villa II product on at least one occasion prior to designing the Homestead Collection?

representatives took of Rottlund's Villa II product before the Homestead Collection was designed?
A. No.
Q. Have you seen any brochures of Rottlund's Villa product that were taken by Town & Country representatives before the Villa -- or excuse me, the Homestead Collection was designed?
A. I have seen brochures of Rottlund's Villa II product. I'm not sure who took them or where they came from.
Q. Is it possible to independently create the Homestead Collection if you have access to Rottlund's Villa II brochures during the design process?
A. Yes.
Q. Why is that?
A. Because you're dealing with once again a set of project criteria that may be similar or may be the same as what Rottlund is doing, but you're starting from an independent creation and responding to the market demands.
Q. What do you mean "you're starting from independent creation and responding to the market demands" if you have pictures of Rottlund's floor plans in your files?
MR. FARMER: Objection to form.

MS. NEWMAN: Same objection.

A. Yes.

BY MR. KRUMMEN:

Q. What is the standard feature as you used that phrase in your expert report?

A. Standard features, as I would define them, are design functions, speaking architecturally, that are so common in the marketplace they are used in virtually every residence in some fashion or another. Examples of those would be a bathroom arrangement, a kitchen layout, the idea of having a dining area adjacent to a kitchen, the idea of having an entry in a certain point in the plan to better utilize the spatial layouts of the various spaces, functionality as far as access from one space to another, specifically a garage into a hard surfaced area like a kitchen or a mud room. Standard features also would include closeting, bathrooms, utility functions, construction techniques, and as far as elevations go, exteriors, windows, placement of windows, standardized roof forms for sloped roofing, different uses of materials, brick, siding, location of doors and access points based on streetscape, and that's a start. There are many more.

Q. Are there any nonstandard features in the Homestead Collection?

A. I don't believe so.
Q. So in your opinion, everything in the Homestead Collection is a standard feature?
A. Yes.
Q. How about the Villa II? Are there any nonstandard features in the Villa II?
A. No.
Q. Every feature in the Villa II has a standard feature in your opinion?
A. Yes.
Q. Are there any back-to-back townhomes anywhere in the country that you're aware of that have anything beyond standard features?
A. I believe the Chateau Collection has something that approaches a nonstandard feature in their bay window iteration in their living room.
Q. So the only non- -- well, is the only nonstandard feature as you define that phrase in the Chateau Collection the bay window in the living room?
A. Yeah, I would say so.
Q. So other than the bay window in the living room, everything in the Chateau Collection is a standard feature?
A. Yes.
Q. Where does your definition of "standard feature"

"substantially similar" means.

Q. Well, you defined it for me earlier, correct?

A. "Substantially similar"?

Q. Right.

A. Okay, if I did, then I would say that they're -- they are not -- they are substantially similar, yes.

Q. I'd like to move on to some of your other opinions, and it gets at the early pages of Exhibit 388, your first disclosure. Do you see on page 2, you make reference to Holiday Inns and Red Roof Inns on the second line?

A. Yes.

Q. Why is that important?

A. Just to show that this type of product, this back-to-back situation, was at a historical precedent.

Q. Could you park inside one of your Holiday Inn units and what you have seen in reference here in your report? Is there a garage attached?

A. No.

Q. Same question for the Red Roof Inns.

A. No.

Q. Moving down to the reference rental apartment units, do you see that?

A. Yes.

Q. Why did you make reference to rental apartment

A. I believe they're very similar to the College Hill and Bright Ridge.

Q. In what respect?

A. Their form of the building, the one-car garages, the two-story function, the way the building went together.

Q. Now, you speak to some of the concepts involved the use of loft space overlooking a vaulted living room, correct?

A. Yes.

Q. Do you have any pictures of either Adare Farm or College Hill and how that worked?

A. I don't think I do, no.

Q. Then, you speak to others making use of two-story boxes with attached garages, correct?

A. Yes.

Q. Do you have any pictures that would explain how the two-story boxes worked with connection or with attached garages?

A. No, I don't.

Q. We work down into the next paragraph, and there's a reference to Hansen & Horn, correct?

A. Yes.

Q. Why is that reference in your report?

A. I believe that was a project that was done by BSB

back in the early '80s.
Q. Is this additional, I guess, morphing of the back-to-back design concept or did you reference the Hansen & Horn back-to-back for some other purpose?
A. No, it's based --
MR. FARMER: Objection to form.
A. It was basically the same concept of a back-to-back townhouse, yes.
BY MR. KRUMMEN:
Q. And you put it in here now because BSB worked on it?
A. Yes.
Q. And why is that significant?
A. To indicate that they've had a long history in dealing with this particular type of a product.
Q. Would you concede that BSB, the entity, doesn't design things like the Hansen & Horn back-to-back product; individual architects do, correct?
A. Yes.
Q. Do you know whether or not the architects that worked on the Homestead Collection that were employed by BSB, did they work on the Hansen & Horn back-to-back project, as well?
A. I don't know that.
Q. Do you think that's an important fact?

A. No.

Q. Why not?

A. I think that the fact that BSB, whichever architect designed Hansen & Horn, did so at a certain point in time based on a certain set of criteria that met client -- client desires and client needs. The fact that that same architect may or may not have designed the Homestead Collection I don't think is important.

Q. The question is, why is it important that BSB worked on the Hansen & Horn back-to-back product in 1982?

MR. FARMER: Objection, asked and answered.

A. Only to show that the firm, not the individual architect, but the firm had a history of using this type of a townhouse concept.

BY MR. KRUMMEN:

Q. Do you know who the BSB individual architect is that worked on the Homestead Collection?

A. I believe it was Larry Moore.

Q. Do you know whether or not Larry Moore worked on the Hansen & Horn back-to-back product?

A. I don't know, but I would say probably not.

Q. Do you know whether or not Larry Moore consulted any of the designs or other materials that related to the Hansen & Horn back-to-back product prior to working

on the Homestead Collection design?
A. I don't believe he did.
Q. Then, you have a reference on page 3 to Lou Draper in Chicago, and the question is, why did you make reference to Lou Draper?
A. Same issue, showing back-to-back product that BSB had designed.
Q. And here, you're saying that they designed the Lou Draper product in 1984, correct?
A. Yes.
Q. Did Larry Moore work on the Lou Draper product?
A. I don't believe so.
Q. Did Larry Moore reference any of the Lou Draper materials prior to working on the Homestead Collection design?
A. Not that I'm aware of, no.
Q. Do you know which materials Mr. Larry Moore referenced prior to working on the Homestead Collection back-to-back design?
A. I believe, according to his deposition, he reviewed the Midland drawings, Good Value Homes, and Jerry's Homes.
Q. Do you know whether or not Midland was designed before or after Rottlund hit the market with its Original Villa product?

MR. SCHWIEBERT: Objection to the form of the question.

A. Do you know what? I'm not sure. I don't know.

BY MR. KRUMMEN:

Q. Do you know whether or not Good Value was designed before or after Rottlund hit the market with its Original Villa product?

MR. SCHWIEBERT: Object to the form of the question.

A. The Original Villa product?

BY MR. KRUMMEN:

Q. Yes, sir.

A. Okay. Do you know what? I don't know for sure. I couldn't tell you. I believe I reference that as a date in my initial disclosure, but I just don't remember the exact date.

Q. Do you know whether or not Jerry's Homes was -- designed that back-to-back product prior to the time that Rottlund hit the market with its Original Villa product?

MR. SCHWIEBERT: Object to the form of the question.

A. No, I believe I do have the date, but I just don't remember.

BY MR. KRUMMEN:

Q. Why did you reference the Good Value Homes back-to-back project in your report?

A. Let's see, I believe that was because it was done in Minnesota, and I believe it was an example of a back-to-back townhouse that was fairly well-documented at the time.

Q. What do you mean by "fairly well-documented at the time"?

A. I think other people were building similar product, whether it was here in Minnesota or perhaps in Chicago.

Q. Who was building similar product?

A. I don't know. I think it was a product, though, that was available in the marketplace.

Q. Was Rottlund building a similar product as of the time the Good Value Homes design was created in 1992?

A. I believe they were, yeah.

Q. Do you know of anyone else who built a back-to-back in or about 1982 here in Minnesota other than Rottlund?

MS. NEWMAN: I believe you misspoke. I think you said '82. Do you mean '92?

MR. KRUMMEN: Yeah, let's leave the date out.

BY MR. KRUMMEN:

Q. Do you know whether or not anyone other than Rottlund was building a back-to-back product here in Minnesota at the time the Good Value Homes back-to-back design was generated?

A. I don't know.

Q. Why did you make reference to the Midland back-to-back design in your report?

A. It was another example of work that BSB had done with a back-to-back concept.

Q. And that's important because?

A. They have gone --

MR. FARMER: Objection, form.

A. They have gone through the design process for this back-to-back product in other instances.

BY MR. KRUMMEN:

Q. Did you look through the process that BSB went through in generating the Midland back-to-back design?

A. Yes, I did.

Q. What materials did you look at in that regard?

A. I looked at preliminary design sketches that were prepared, I believe, by Larry Moore and, once again, the time iterations and revisions with the meetings and interfacing between the client and the architect, the development of the design over a period of time, and then the final production drawings.

Q. Did you look through the design process materials for the Good Value design, as you've just described them, before or after you issued this report, which is marked as Exhibit 388 and dated on the last page as August 15 of 2003?

A. I don't believe I saw any preliminary design work for Good Value.

Q. Prior to issuing this report, which is marked as 388, correct?

A. Right.

Q. Did you see any Midland materials before you issued this report, which is marked as 388? And what I mean by that is how you defined those design process materials, the back and forth with the client?

A. I saw sketches that Larry Moore had done based on the program requirement that was submitted by Midland, I'm assuming, and I saw variations that were done over a period of time to bring the design into a mutually agreeable design decision between the client and the architect.

Q. Did that review occur before you issued your August 15, 2003, report?

A. I believe it did.

Q. Did you review any Midland materials after you reviewed -- you issued your August 15, 2003, report?

"The services will involve producing construction drawings per the schematic design drawings provided by your office." And by "your office," I'm assuming that they meant -- that she meant Bloodgood.

Q. Do you see the last sentence in the first paragraph?

A. Yes.

Q. Could you read that for the record?

A. "The building will contain eight units, with two unit types of approximately 1200 and 1300 square feet similar to the Rottlund Homes plans you provided in our meeting."

Q. Is that program criteria, as you defined the phrase?

A. Yes.

Q. So here, we have an instance where the program criteria was to build an 8-plex back-to-back townhome similar to the Rottlund Homes plans, correct?

A. Yes.

MR. SCHWIEBERT: Objection, mischaracterizes the document.

MS. NEWMAN: Same objection.

BY MR. KRUMMEN:

Q. Your answer?

A. Yes, it does. That's part of it.

24, and you can see that the handwritten 1,200 square feet matches the reference in the final line of the first paragraph to approximately 1200 square feet, correct?

A. Yes.

Q. And, again, similar to the Rottlund Homes plans, correct?

A. Yes.

Q. That is program criteria as you used the phrase, correct?

A. Yes.

Q. Now, do you still have Exhibit Number 72 in front of you, the AIA ethical standards?

A. Yes, I do.

Q. Do you believe that Mr. Moore or Ms. Alfson violated Rule 4.108, which states, "Members shall neither copy nor reproduce the copyrighted works of other architects or design professionals" when they entered into this May 9th, 1994, contract which references a Midland project that is to be similar to the Rottlund Homes plans that were shared?

MR. FARMER: Objection, relevance and beyond the scope of this expert's testimony.

MR. SCHWIEBERT: Mischaracterizes the document.

Bloom.

A. Inconsequential? I'm -- I'm having a hard trouble with "inconsequential." There are similarities with these two programs, and I would say that the Rottlund product is one type of a building, and the Midland product is another. There are similarities, but there are also differences.

BY MR. KRUMMEN:

Q. Did the differences between the Rottlund elevation, which appears in Exhibit 374, and the elevation for the Midland, which appears in Exhibit 376, do the differences so outweigh the similarities in your opinion as to render the similarities inconsequential?

MR. FARMER: Objection, beyond the scope of this witness's expert opinion issued in this lawsuit.

A. I -- I would say they're not inconsequential, no.

BY MR. KRUMMEN:

Q. Sir, you did offer an opinion as to whether or not these two designs are substantially similar, correct?

A. I believe I did.

MR. KRUMMEN: So I move to strike all of Mr. Farmer's misplaced objections so we don't confuse the jury.

BY MR. KRUMMEN:

question is, is the total look and feel of those similar?

A. They're similar, yes.

Q. Do the differences in the total look and feel between 109A and 110A so outweigh the similarities as to make the similarities inconsequential?

MR. FARMER: Object to the -- calling for an improper legal conclusion.

A. Inconsequential? I couldn't say, but there are certain differences between these two that -- these two standard features that -- that are similar, yes.

BY MR. KRUMMEN:

Q. When you say "standard features," you've already characterized everything in the Homestead Collection as a standard feature, correct?

A. Yes.

Q. You've also characterized everything in the Villa II as a standard feature, correct?

A. That's correct.

Q. Is the total look and feel of Exhibit 109A a standard feature?

MR. FARMER: Object to the -- calling for the total look and feel of one piece of a brochure as irrelevant in this lawsuit.

BY MR. KRUMMEN:

Q. You may answer.
A. Could you repeat the question again?
Q. Let me ask it this way. You've reviewed the elevations of Rottlund's Villa II, correct?
A. Yes.
Q. Is the total look and feel of Rottlund's elevations a standard feature as you use that phrase?
A. Yes, I believe it is.
Q. Do you believe that the total look and feel of Rottlund's Villa II elevation is a standard feature?
A. Yes.
Q. Where have you seen that standard feature and its exact same form used anywhere else in the marketplace anywhere in the world?
MR. FARMER: Objection to form. To which standard feature?
MS. NEWMAN: Go ahead.
A. It's a combination of standard features put together with windows, doors, siding, roofs that has had -- different projects have been built using those standard features. It's a combination of standard features put together.
MR. KRUMMEN: Could you read my last question back?
(Last question read back by Reporter.)

Q. Have they done so with any back-to-back products?
A. Yes.
Q. Which back-to-back products did your firm design that has a total look and feel that you would characterize as a standard feature?
A. The Kimball Hill project in Lake Arlington town.
Q. Any others?
A. That's the only back-to-back that I can think of offhand. Well, Town & Country. Those were not done specifically by my firm today. They were done by me several years ago while working for other firms.
Q. You say Town & Country. Was that that Conventry --
A. Conventry Court, yes.
Q. Any others that had a standard feature total look and feel as you define the phrase?
MR. FARMER: I'm going to object to the lack of foundation. He hasn't defined the phrase. Object to lack of foundation, the question.
A. Probably the Strawberry project.
BY MR. KRUMMEN:
Q. Is that a back-to-back?
A. Yes.
Q. And your firm designed it?
A. I was with the firm that designed it, yes.

Q. Are there any other back-to-backs that either your firm or some entity you were affiliated with designed that you would characterize as having a total look and feel that's a standard feature?
A. No.
Q. So we're down to the Kimball Hill back-to-back project, the Town & Country Conventry project and the Strawberry project that have standard feature total look and feels, correct?
A. Yes.
Q. When you say standard feature total look and feel, is it your opinion that the Kimball Hill total look and feel is the same as Rottlund's total look and feel --
A. No.
Q. -- as to those two back-to-backs?
A. No.
Q. So there's a different standard feature total look and feel being depicted in Kimball Hill's back-to-back as opposed to Rottlund's Villa II back-to-back?
A. Yes.
Q. So now we have multiple standard feature total look and feels; is that your opinion?
A. Yes, it is.

Q. So the Kimball Hill back-to-back townhome has a total look and feel which is a standard feature, correct?

A. Yes.

Q. But the Kimball Hill back-to-back townhome total look and feel, which you've articulated as a standard feature, is different than all the other back-to-backs we've talked about today. And let me list those quickly. It's different than the Town & Country Conventry back-to-back total look and feel, correct?

A. Yes.

Q. And it's different than the Strawberry back-to-back total look and feel, correct?

A. Yes.

Q. It's different than the Homestead Collection back-to-back total look and feel, correct?

A. Yes.

Q. And the Kimball Hill is also different than the Rottlund Villa II total look and feel, correct?

A. Yes.

Q. And finally, the Kimball Hill back-to-back standard feature that you've articulated is different than the Chateau Collection total look and feel, correct?

A. Yes.

Q. So we have seven by my count different back-to-back projects out there right now. And what I'd like to ask you is to please identify for me all of the standard feature total look and feel back-to-back products that are out there that are the same as the total look and feel standard feature that appears on Rottlund's Villa II.

MR. FARMER: Would you read that back, please?

(Last question read back by Reporter.)

MR. FARMER: Object to the form of the question.

MS. NEWMAN: Same objection.

A. I'm not quite sure what you're asking me.

BY MR. KRUMMEN:

Q. You said that Rottlund's Villa II total look and feel is a standard feature, correct?

A. Yes.

Q. Where can I find the same standard feature back-to-back product? Who makes it?

MR. SCHWIEBERT: Objection, asked and answered.

A. Centex, Pulte. I believe Ryland has a product. I believe there was one mentioned, GM Homes.

MS. NEWMAN: If you need to review your

report you can do so, as well

A. In the Minneapolis area, yeah. Can I take a look at my report?

BY MR. KRUMMEN:

Q. Sure.

A. Thank you.

Well, those are the ones -- those are the ones that I remember. I would be willing to go with those.

Q. So to summarize, I believe that you've testified Rottlund's Villa II has a total look and feel which you characterize as a standard feature, correct?

A. Yes.

Q. And you believe that Centex's back-to-back product has the same standard feature total look and feel as Rottlund's Villa II.

A. Yes.

Q. You also believe that Pulte's back-to-back product has the same standard feature total look and feel as Rottlund's Villa II.

A. Yes.

Q. You also believe that Ryland's back-to-back product has the same total look and feel standard feature as Rottlund's Villa II?

A. Yes.

Q. And finally, you gave me GM Homes, and you

believe that the GM Homes' back-to-back product has the same standard feature total look and feel as Rottlund's Villa II?

A. Yes.

Q. Is Town & Country's Homestead Collection -- strike that.

Does Town & Country's Homestead Collection have the same standard feature total look and feel that Rottlund's Villa II has?

A. Yes.

Q. Now I'd like to work into the Strawberry back-to-back product. And I believe you characterized the Strawberry back-to-back product as having a standard feature total look and feel, correct?

A. Yes.

Q. My question is, does the Homestead Collection's standard feature total look and feel, is that total look and feel the same as the Strawberry standard feature total look and feel?

A. No.

Q. The answer would be the same if I asked you about the Villa II versus Strawberry, correct?

A. Yes.

Q. Now, the next question is, does the Homestead Collection's standard feature total look and feel, as

you've used that phrase, have the same total look and feel as the Town & Country Conventry back-to-back product?
A. No.
Q. Is the answer the same if -- well, let me ask it this way. Is the standard feature total look and feel, as you've described the term, for the Villa II the same as the standard total look and feel feature, standard feature which you described for Strawberry, is that the same?
A. No.
Q. Is the standard feature total look and feel you've identified for the Homestead Collection the same as the standard feature total look and feel you've identified for the Kimball Hill back-to-back product?
A. No.
Q. Is the Villa II standard feature total look and feel that you've identified the same as the standard feature total look and feel that you've identified for the Kimball Hill back-to-back product?
A. No.
Q. In your report you identified a Hansen & Horn back-to-back product, correct?
A. Yes.
Q. That appears on page 3, correct, of your August

locations.

Q. In fact, the doors on the Rottlund Villa II product are located as a side entry to the outside units, correct?

A. Yes.

Q. And the doors to the Kimball Hill's elevation are front entry doors, correct?

A. Yes.

Q. And in one of your reports, you basically said that's a very significant difference, correct?

A. Yes.

MR. FARMER: Objection to the form.

BY MR. KRUMMEN:

Q. So I'm back to the question which is, what similarities would you expect to see in any two back-to-back products located across the country? And I believe earlier you said the doors would be similar. And we've just gone through an example where they're not.

MR. FARMER: Objection to form.

A. Actually --

MR. FARMER: Objection to the form, mischaracterizes. You went through the placement of the doors, not the doors themselves.

MS. NEWMAN: Same objection. Go ahead.

A. Yeah, the doors are entry doors. They are 3 foot by 6, 8 doors. The garage doors are either single or double doors. I wasn't talking about the placement per se of the doors, I was talking about the physical doors.

BY MR. KRUMMEN:

Q. I believe you said the location of functional spaces would be similar, correct?

A. Yes.

Q. Isn't a door entryway a functional space as you used the term?

A. Yes, but I don't think I delineated that. I think I was talking about specifically a dining adjacent to a kitchen.

Q. Well, your record will speak for itself, but my list says first you spoke about the placement of the windows, then you spoke about the location of functional spaces, then you spoke about the exterior form of the building, and then you listed off four standard features. Would you like to change your testimony as to the location of functional spaces being similar amongst all back-to-back product?

A. I'm not sure what I said.

MR. FARMER: And I'll object, mischaracterizes when you say expect to find similarities, not that they would necessarily be similar