Exhibit F

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

---

The Rottlund Company, Inc.
d/b/a Rottlund Homes, a Minnesota
corporation,

Plaintiff,

vs.

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois corporation, and
Town & Country Homes, Inc.,
a Minnesota corporation,

Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa corporation,

Third-Party Defendant.

---

Videotaped Deposition of
LARRY MOORE
Thursday, September 4, 2003
9:40 a.m.

APPEARANCES:

FOR PLAINTIFF THE ROTTLUND COMPANY, INC.:

MR. CRAIG S. KRUMMEN
Attorney at Law
WINTHROP & WEINSTINE, P.A.
Suite 3500
225 South Sixth Street
Minneapolis, Minnesota 55402

FOR DEFENDANT PINNACLE CORPORATION:

MR. CHRISTOPHER W. CARMICHAEL
Attorney at Law
HOLLAND & KNIGHT, LLC
131 South Dearborn
30th Floor
Chicago, Illinois 60603

FOR THIRD-PARTY PLAINTIFF TOWN & COUNTRY HOMES:

MS. CYNTHIA JOKELA MOYER
Attorney at Law
FREDRIKSON & BYRON, P.A.
4000 Pillsbury Center
200 South Sixth Street
Minneapolis, Minnesota 55402-1425

FOR THIRD-PARTY DEFENDANT BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC.:

MS. HOLLY J. NEWMAN
Attorney at Law
MOORE, COSTELLO & HART, P.L.L.P.
701 Fourth Avenue South #1350
Minneapolis, Minnesota 55415-1823

ALSO PRESENT:

MR. DAVID HELLBERG
Videographer
FIDELITY VIDEO SERVICES, INC.

* * * * *

I N D E X

EXAMINATION

By Mr. Krummen - Pages 7, 200, 211
By Ms. Moyer - Page 176
By Mr. Carmichael - Page 183
By Ms. Newman - Page 207

EXHIBITS:

| Number | Description | Page |
|---|---|---|
| 253 | Grape candy | 26 |
| 254 | Lemon candy | 26 |
| 255 | 8/29/03 affidavit by Larry Moore | 97 |
| 256 | BSB Response to Plaintiff's Discovery Requests | 102 |
| 257 | 8/31/98 transmittal from Chris Jorgensen to Doug Buster, Bates BSB 01938 | 134 |
| 258 | 5/14/98 from Chris Jorgensen to Steve Sandelin, Bates BSB 01942 and attachments | 140 |
| 259 | 7/8/98 transmittal from Jorgensen to Plante, Bates BSB 01847 and attachments | 165 |
| 260 | Memo from Beth Miller to Art Plante, Bates BSB 01452 | 168 |
| 261 | 6/17/99 transmittal from Chris Jorgensen to Art Plante, Bates on top page BSB 01650, and attachments | 170 |
| 262 | 6/26/98 transmittal from BSB to Steve Sandelin, Bates on top page BSB 01660, and attachments | 171 |
| 263 | Transmittal from BSB to Art Plante, top page Bates BSB 01364, and attachments | 175 |
| 264 | E-mails from Darren Schwiebert to Ben Patrick, 7/9/03, and from Ben Patrick to Darren Schwiebert, | |

| | | |
|---|---|---|
| | 6/30/03 | 207 |
| 265 | 5/1/98 fax from Art Plante to Larry Moore and attachments, 4/30/98 fax from Plante to Moore and attachments, Bates D 00265-276 | 207 |
| 66A | 6/24/98 transmittal from Chris Jorgensen to Art Plante, Bates BSB 01661, & attachments | 174 |
| 70A | 7/7/98 transmittal from Jorgensen to Plante, Bates BSB 01848 & attachments | 167 |
| 73A | 7/17/98 cover transmittal, Bates BSB 01939, and attachments, Bates BSB 02021-2022 | 137 |
| 122A | 5/30/98 fax from Larry Moore to Steve Sandelin and attachments | 138 |
| 122B | 5/29/98 fax from Moore to Art Plante, top page is Bates BSB 01941 | 139 |

Deposition of LARRY MOORE, taken pursuant to Notice of Taking Deposition and taken before Patrick J. Mahon, a Notary Public in and for the County of Hennepin, State of Minnesota, at the Marriott Hotel, 1250 74th Street, West Des Moines, Iowa.

WHEREUPON, the following proceedings were duly had:

THE VIDEOGRAPHER: On the record. Beginning the videotaped deposition of Larry Moore, taken by the plaintiff in the matter of The Rottlund Company, Incorporated, doing business as Rottlund Homes, plaintiff, versus Pinnacle Corporation, et al., defendants, in the United States District Court, District of Minnesota, number 01-CV-1980, held in the Marriott Hotel, 74th Street, West Des Moines Iowa, on September 4th, 2003, at approximately 9:40 a.m.

My name is David Hellberg, representing the firm of Fidelity Video Services, Incorporated, Des Moines, Iowa, and I am a certified court videographer. The certified court reporter is Pat Mahon, with the firm of Twin West Reporting, Wayzata, Minnesota.

Counsel may now introduce themselves.

MR. KRUMMEN: Craig Krummen on behalf of plaintiff The Rottlund Company, Inc.

the Town & Country end.
Q. And in terms of your involvement with design development, was Steve Sandelin involved from the Town & Country end?
A. Specifically, I can't rem- -- I can't remember of any instance. But I -- I guess he probably was. I'd be guessing, but it --
Q. Do you know who was involved from the Town & Country end or anyone involved from the Town & Country end during the construction document phase for the Homestead Collection?
A. Other than the people I've already mentioned, no, I wouldn't know of any additional.
Q. Now, I believe you testified in your last deposition that you were the one that came up with the schematic designs for the Homestead Collection. Correct?
A. Correct.
Q. Were those designs derived from any other BSB of Iowa project?
A. They were derived from ideas that came out of our -- our marketing design file.
Q. Okay. Which marketing design file?
A. Which marketing design file? The design -- the design file -- the marketing design file in our

marketing department. That's one large collection of files for all of our company, for resource we have.

Q. And I think we covered that the last time, so let me get more specific this time. Did you look at any marketing designs from Sandburg Village, a development in Chicago, Illinois?

A. I don't recognize that name.

Q. How about a four-wheel -- a fourplex pinwheel built by Kimball Hill, did you look at that material when you were working on the schematic designs for the Homestead Collection?

A. I didn't specifically access it. But I know that project, so I didn't have to.

Q. And how is it that you know that Kimball Hill fourplex pinwheel project?

A. I've seen it in the design file, going through it for other projects.

Q. Was it built in the late '70s?

A. Couldn't tell you when it was built. I don't look at that data.

Q. Did it predate your start with BSB of Iowa, the design and construction of the Kimball Hill project? I'm talking about the pinwheel.

A. I don't know when it was built, so I don't

know if it predated it or not. I -- you know, I don't know.

Q. Let's get back to your earlier testimony. And I don't want to mischaracterize it, but I'm not sure if you looked at the Kimball Hill designs when you were working on the schematic design for the Homestead Collection or not. What happened in that regard?

A. In reference to the Kimball Hill?

Q. That's right. Did you look at the Kimball Hill designs when you were working on the schematic design phase for the Homestead Collection?

A. No, I don't think I did specifically for that.

Q. How about the Hemphill at Adare Farm designs, did you look at those when you were coming up with the schematic design for the Homestead Collection?

A. No, I don't think I did.

Q. How about the Coventry Court for Town & Country Homes, did you look at those designs when you came up with the Homestead Collection schematic design?

A. I don't remember those, no.

Q. How about the Streamwood project for Kirk

Corporation, did you look at those designs when you came up with the schematic design for the Homestead Collection?

A. I was familiar with those, but I did not access them.

Q. Now, let's -- I -- I think you said you were familiar with Kimball Hill's designs, and now you've told me you're familiar with the Streamwood designs, correct?

A. And -- and familiar in that I have seen them as I've gone through files, accessing them for -- for other marketing purposes. So I don't have a tremendous -- tremendous familiarity with it, but, yeah, I have seen those names.

Q. Okay. Did you derive the Homestead's schematic design from the Kimball Hill designs?

A. No.

Q. Did you derive the Homestead Collection schematic design from the Streamwood designs?

A. Specifically, no. Ideas came out of all of those projects, which, you know, were incorporated as far as ideas on how to assemble room locations and elements and things like that, so --

Q. When you say, "all of those projects," could you tell me which projects you're referring

to?

A. Well, specifically the ones that -- that I used and had in my files were Midland, Good Value Homes, Jerry's Homes. Those are the three I can remember off the top of my head.

Q. And those are the three that you gave me before. I think that there was a fourth back-to-back that you worked on, but it postdated your schematic design for the Homestead Collection. Let me make sure I get that right. DeMaria?

A. DeMaria.

Q. That was after the Homestead Collection, right?

A. Yes. Correct.

Q. Okay. So the ones you looked at were Midland, Good Value, and Jerry's Homes. DeMaria came later. Let me just keep working through this list, though. In terms of the Adare Farm and College Hill, did you have any reference point or opportunity to look at those designs --

A. Could I --

Q. -- during the schematic --

A. Could I --

Q. -- design process?

A. Excuse me. Could I see that list? Because

I -- your pronunciations are throwing me.

Q. Sure.

A. I would like to read those.

Q. Well, let me ask you this: Have you seen the expert disclosure of BSB's expert witness, Albert Bloom?

A. Yes.

Q. And these are just projects that he's referencing in his expert report. But if you want to see the disclosure, I only have one copy. And why don't I circle --

A. It's just the pronunciations I'm not familiar with.

Q. I'm -- I've circled and I'll have you pronounce what's in that circled text. A-d-a-r-e, is that Adare Farm?

A. Adare Farm, yeah.

Q. Did you look at Adare Farm designs when you came up with the Homestead Collection schematic design?

A. No. I don't remember that one.

Q. And what's the second one that's circled?

A. College Hill.

Q. Did you look at the College Hill designs when you came up with the schematic design for the

Homestead Collection?

A. No, I don't think I did.

Q. Do you know why Mr. Bloom is referencing Adare Farm and Coventry Court as things that BSB of Iowa has done in the past if you never referenced those prior to working on the schematic design for the Homestead Collection?

MS. NEWMAN: Objection as to the form of the question, foundation. You can answer if you know.

THE WITNESS: No, I don't. I don't know.

BY MR. KRUMMEN:

Q. Do you know why he's referencing Sandburg Village in connection with things that BSB had done in the past, in his expert report?

A. Just --

MS. NEWMAN: Same objections. Go ahead.

THE WITNESS: Oh, I'd be speculating. Just that its product that's been done similar to the back-to-back concept.

BY MR. KRUMMEN:

Q. And why is it similar, sir?

A. Similar in that it's a type of townhouse unit that's -- that's not unique. It's an example that's been around for a long time.

Q. What do you mean by "unique"?
A. What do you mean by unique. It's a common idea of a townhouse cluster concept. There are several forms of townhouse concepts.
Q. What forms of townhouse -- I'll -- I'll let you finish, but my follow-up is if you could give me the forms of townhouse concepts.
A. I'll say there's cluster townhouses. There's front-to-back townhouses. There's back-to-back townhouses. I guess I can't think of a -- com- -- combo townhouse, which would be combination townhouses and flats. Those are a few of the --
Q. Are there any others that you know of?
A. That I can recall at the moment, no. There are probably some others -
Q. Is --
A. -- other terminologies.
Q. Is a pinwheel a cluster as you use those terms?
A. I tend to call a pinwheel a cluster. But I think pinwheel is a good -- good terminology also.
Q. So we could add another category of forms to this forms list, and that would be pinwheel?
A. Yeah.

Q. What's the difference between a pinwheel and a cluster as you use those terms?

A. A cluster, in my mind, tends to be an arrangement of the townhouses that either interlock or are grouped together rather than just purely side by side. The pinwheel indicates that they tend to more or less what I'll say is hinge around a center point and have maybe multiple orientations.

Q. Is it your testimony that the pinwheel form of a townhome is obviously similar to a back-to-back form of --

MS. NEWMAN: Object --

BY MR. KRUMMEN:

Q. -- a townhome?

MS. NEWMAN: Object to the form of the question. You can answer if you know.

THE WITNESS: Well, there are similarities. I mean, townhouses -- any -- any town -- townhouse shares common walls. Depends on how many common walls units -- units share or are common to different units. So there's -- there's -- there's similarities there.

BY MR. KRUMMEN:

Q. Are there differences?

A. Yes.

Q. Do the differences make the similarities inconsequential?

MS. NEWMAN: Object to the form of the question. Go ahead.

THE WITNESS: I don't know.

BY MR. KRUMMEN:

Q. Do the similarities make the differences inconsequential?

MS. NEWMAN: Same objection. Vague, as well. Go ahead.

THE WITNESS: I don't know if I understand the question.

BY MR. KRUMMEN:

Q. Sure. Do the similarities between a back-to-back townhome form and a pinwheel form make the differences inconsequential?

MS. NEWMAN: Object as to form. Go ahead.

THE WITNESS: When you say, "inconsequential," do you mean so that there's not much difference in them?

BY MR. KRUMMEN:

Q. That's correct.

A. It doesn't matter?

Q. That's right.

A. Not necessarily.

Q. Do the differences between the back-to-back and the pinwheel forms make the similarities inconsequential?

MS. NEWMAN: Same objections as to form. You can answer if you understand his question.

THE WITNESS: I -- I don't understand enough to answer the question.

BY MR. KRUMMEN:

Q. Let me ask it this way: Is the Homestead Collection substantially similar to Rottlund's Villa II back-to-back townhome?

A. No.

Q. Why not?

A. There are -- there are vast differences in room sizes and orientation of rooms in the upper floors. There are basic differences in garage sizes; placement of stair, entry; style of the exterior of the units; massing of the building; proportions of the exterior; proportions of the rooms.

Q. Anything else?

A. I'm sure there are lots of things. I can't think of any. If I had a set of drawings, I would be glad to compare them for you.

Q. Have you made that comparison in the past?

A. Done some of that, yeah.
Q. Okay. And you don't recall anything else other than the room sizes; room orientations; placement of stair, entry; styling; massing; proportions of exterior. And what was the last one you gave me? Was it proportions of the interior?
A. Yeah, I think so. No. I would have to go through with a list, with the drawings side by side and make a detailed list for you to say that that was a complete list. Now, that's --
Q. Mr. Bloom concluded that the gestalt of Rottlund's in BSB's exterior unit are similar. Do you agree with that conclusion?
MS. NEWMAN: Object to the form of the question. If you're going to ask him something specific as to a document, I'd ask you to let him see it and see it in context.
BY MR. KRUMMEN:
Q. Sure. Here's page 23. Could you read the first highlighted sentence into the record.
A. "The gestalt of Rottlund's and BSB's exterior unit" -- "exterior unit are similar."
Q. Do you agree with that sentence?
A. I -- I can understand the comment, but I personally think there's a -- there's a large

difference between the styles of the units and how they feel and the overall -- the overall feel and concept of the buildings.

Q. So you agree with BSB's expert or you disagree with BSB's expert when he wrote, "The gestalt of Rottlund's and BSB's exterior unit are similar"?

A. I don't -- he -- he's -- I don't understand "gestalt," so that's a word that I'm going to -- I don't know. If you can explain "gestalt" to me enough so that I understand it, I'll be happy to answer that.

The feeling of the unit, the -- the feeling of the exterior, the character of the exterior of these buildings is -- is substantially different, in my mind.

Q. What's your definition of "substantially different"?

A. The roof lines are different.

Q. No. When you say, "substantially different," that's -- what does that mean? If -- if I -- if you told me, for example, that this piece of candy is substantially different than this piece of candy, my question is, what do you mean by "substantially different"?

MR. CARMICHAEL: Object as to form.
BY MR. KRUMMEN:
Q. Let's take it out of the arena of designs. I want to know what your definition of "substantially different" is.
MS. NEWMAN: I'll object --
MR. CARMICHAEL: Same objection.
MS. NEWMAN: I'll join. Go ahead.
THE WITNESS: Substantially different -- define "substantially." Similarities -- similarities can exist of common elements. There are windows in both. There are roof shingles on both. There are walls on both, siding on both.
But each one of those components, put all together, creates a substantially different collective element. So comparing the two, there's substantial difference when you look at the overall compositions.
BY MR. KRUMMEN:
Q. And my question is, what do you mean by "substantially different"?
MS. NEWMAN: Object to the form. You can answer if you know.
BY MR. KRUMMEN:
Q. You started out by telling me that

Exhibit G

## Deposition Correction Sheet

TITLE: The Rottlund Company v. Pinnacle Corporation, et al.

WITNESS: Deposition of Albert H. Bloom, A.I.A.
Dated: June 9, 2004

| PAGE | LINE | DESIRED CHANGE | REASON FOR CHANGE |
|---|---|---|---|
| 257 | 1 | by 6 foot, 8 inches | Clarify meaning |
| 7 | 25 | No | Misunderstood question |
| 9 | 24 | No I don't know what you mean by that term | Misunderstood question |
| 13 | 7 | No | Misunderstood question |
| 21 | 2 | Yes | Misspoke |
| 58 | 5 | they are not - they are <u>not</u> substantially similar, <u>no</u> | Misspoke |
| 67 | 19 | Yes, I do | Misspoke |
| 74 | 5-6 | Yes | Misspoke |
| | | See also attachment "A" | |

10/30/04
Date

[signature]
Signature of Witness

INSTRUCTIONS (to Attorney Newman):

*Return the signed Deposition Correction Sheet to Attorney Krummen, who is already in possession of the original transcript, cc. a copy to Twin West Reporting, LLC. Retain a copy for your records. This must be completed by July 18, 2004.

(Copy To:) Twin West Reporting, LLC
326 South Broadway #218
Wayzata, MN 55391

MPLS:50534.1/16850-166

EXHIBIT NO. 131
6-30-04
P. MAHON

AL BLOOM ERRATA SHEET – ATTACHMENT A

| Page | Line | Change | Reason for change |
|---|---|---|---|
| 87 | 18 | No | Misunderstood Question |
| 89 | 10 | Yes- Square footage is a program criteria | Misunderstood question |
| 100 | 15 | The differences outweigh the similarities | Misunderstood question |
| 109 | 5 | I do not know if I have | Misspoke |
| 190 | 15 | Yes. Both have collections of standard features arranges in stand ways, but they are not the same | Misunderstood question |
| 190 | 19 | Yes. Both have collections of standard features arranges in stand ways, but they are not the same | Misunderstood question |
| 190 | 23 | Yes. Both have collections of standard features arranges in stand ways, but they are not the same | Misunderstood Question |
| 191 | 3 | Yes. Both have collections of standard features arranges in stand ways, but they are not the same | Misunderstood question |
| 191 | 9 | Yes. Both have collections of standard features arranges in stand ways, but they are not the same | Misunderstood question |

6/30/04 [signature]

Exhibit H

Deposition of ALBERT H. BLOOM, A.I.A., taken pursuant to Notice of Taking Deposition and taken before Patrick J. Mahon, a Notary Public in and for the County of Hennepin, State of Minnesota, at the law offices of Winthrop & Weinstine, P.A., Suite 3500, 225 South Sixth Street, Minneapolis, Minnesota.

WHEREUPON, the following proceedings were duly had:

(Oath administered by the reporter.)

WITNESS RESPONSE: I do.

ALBERT H. BLOOM, A.I.A.,

a witness in the above-entitled proceedings, after having been first duly sworn, deposed under oath as follows:

EXAMINATION

BY MR. SCHWIEBERT:

Q. Mr. Bloom, my name is Darren Schwiebert, and I represent Town & Country Homes, Inc.

(Exs. 430 & 431 were marked for identification.)

Q. I placed what the court reporter has marked as two deposition exhibits, and they're Exhibit 430 and 431. Exhibit 430 is the transcript from the first part of your deposition, of which this is a continuation. Exhibit 431 is your signed deposition correction sheet. Have I accurately characterized these?

A. Yes.

Q. Okay. What I'm going to do, just so there's no confusion, is, I'm going to go through the questions as you were asked in Exhibit 430 that appear with the answers in Exhibit 431 and ask you the same question to make sure that your correct answer, your actual opinion, appears in the record. So beginning on page 257.

A. Yes.

Q. And I won't read the objections, but the understanding is that the objections are part of what appeared before you gave your answer. The question is, "So I'm back to the question which is, what similarities would you expect to see in any two back-to-back products located across the country?" And I believe earlier you said the doors would be similar, and you've gone through an example where they're not. There's some objections. And your answer is --

MR. KRUMMEN: Asked and answered. Secondly, you're asking him to read his answer that he gave or you're asking him to read a correct answer?

MR. SCHWIEBERT: I want his testimony.

MR. KRUMMEN: Then or now?

MR. SCHWIEBERT: His opinion.

MR. KRUMMEN: I object to the form of the question. I don't understand what you're asking,

whether you're asking him to read what he said under oath or you're asking him to change what he said under oath.

BY MR. SCHWIEBERT:

Q. Do you understand the question?

A. I believe you're asking me to read the answer that -- that I have given based on the deposition correction sheet.

Q. That's correct.

A. "Yeah, the doors are entry doors. They are 3 foot by 6 foot, 8 inches doors."

Q. Okay. Page 7 on Exhibit 430, "So, in your opinion, your entire report relates to similarity of ideas?"

A. Actually --

MR. KRUMMEN: Object to the form of the question. Again, I don't understand what you're asking him to say.

A. The answer is, "No."

BY MR. SCHWIEBERT:

Q. Page 9, "You have no idea what the word 'expression' means?"

MR. KRUMMEN: Same objection.

A. "No, I don't know what you mean by that term."

BY MR. SCHWIEBERT:

Q. "As to all those elements, would you admit that the Villa II is exactly the same at the idea stage?"
MR. KRUMMEN: Same objection.
A. "No."
BY MR. SCHWIEBERT:
Q. "Have you seen any pictures that Town & Country representatives took of Rottlund's Villa II product before the Homestead Collection was designed?"
MR. KRUMMEN: I don't understand what you're asking. Is this a new question or is this the old question? Object to the form.
A. "Yes."
BY MR. SCHWIEBERT:
Q. This one we're going to have to do with a little bit of lead-in. I'll start on line 1 of page 58. "Well, you defined it for me earlier, correct?"
MR. KRUMMEN: Same objection. I'm not sure where you're at.
MR. SCHWIEBERT: Page 58, line 1.
MR. KRUMMEN: Of what?
MR. SCHWIEBERT: Of Exhibit 431.
BY MR. SCHWIEBERT:
Q. Do you understand where I am, sir?
MR. KRUMMEN: So you're asking him to change his testimony?

MR. SCHWIEBERT: I'm just simply asking for his accurate answers.

MR. KRUMMEN: No. Please read the answer you gave, sir. That's my objection.

A. "'Substantially similar'?"

BY MR. SCHWIEBERT:

Q. "Right."

MR. KRUMMEN: I'll object to the form. There's no question pending.

A. "Okay, if I did, then I would say that they are not -- they are not substantially similar, no."

BY MR. SCHWIEBERT:

Q. "Do you have any pictures that would explain how the two-story boxes worked with connection or with attached garages?"

MR. KRUMMEN: Could you give us a page and line?

MR. SCHWIEBERT: Page 67, line 16.

MR. KRUMMEN: Of his sworn transcript. You're asking him to change his testimony; that's my objection.

A. "Yes, I do."

BY MR. SCHWIEBERT:

Q. Page 73, line 25, "Did you look through the design process materials for the Good Value design, as

you've just described them, before or after you issued this report, which is marked as Exhibit 388 and dated on the last page as August 15 of 2003?"

MR. KRUMMEN: Object to the form of the question. Object that any different answer will now impeach the witness himself, is inconsistent with his prior answer.

A. "Yes."

BY MR. SCHWIEBERT:

Q. Page 87, line 15, "So here, we have an instance where the program criteria was to build an 8-plex back-to-back townhome similar to the Rottlund Homes plans, correct?"

MR. KRUMMEN: Object to the form of the question. Objection to the extent that any different answer will necessarily impeach the witness and respectfully request that the witness be instructed about suborning perjury.

A. "No."

BY MR. SCHWIEBERT:

Q. Page 89, "That is program criteria as you used the phrase, correct?"

MR. KRUMMEN: Object to the extent that this is perjury.

A. "Yes- Square footage is a program criteria."

BY MR. SCHWIEBERT:

Q. Page 100, "Did the differences between the Rottlund elevation, which appears in Exhibit 374, and the elevation for the Midland, which appears in Exhibit 376, do the differences so outweigh the similarities in your opinion as to render the similarities inconsequential?"

MR. KRUMMEN: Object to the extent you're asking the witness to impeach his prior sworn testimony.

A. "The differences outweigh the similarities."

BY MR. SCHWIEBERT:

Q. Page 109. And I'm actually going to back up to page 108 so the transcript makes sense, line 25, "According to the document, it says there are three attachments, 'Our Design, His Redlines & redesign' and the 'Rottlund Product,' correct?"

A. "Yes."

MR. KRUMMEN: Object to the extent that the witness is being asked to impeach himself.

BY MR. SCHWIEBERT:

Q. "Have you ever seen those three attachments?"

MR. KRUMMEN: Rule 106, rule of completeness. I ask that his prior answers be read in addition to his impeaching answers.

A. "I do not know if I have."

BY MR. SCHWIEBERT:

Q. 190, beginning at line 12, "And you believe that Centex's back-to-back product has the same standard feature total look and feel as Rottlund's Villa II."

MR. KRUMMEN: Object to the extent that the prior answer is not being read into the record under the rule of completeness, object to the extent the witness is being asked to impeach himself.

A. "Yes. Both have collections of standard features arranged in standard ways, but they are not the same."

BY MR. SCHWIEBERT:

Q. And you "believe that Pulte's back-to-back product has the same standard feature total look and feel as Rottlund's Villa II."

MR. KRUMMEN: Object to the extent that this answer is inconsistent with his prior sworn testimony. Under the rule of completeness, I would respectfully request the prior answer be read before he impeaches himself.

A. "Yes. Both have collections of standard features arranged in standard ways, but they are not the same."

BY MR. SCHWIEBERT:

Q. And you "believe that Ryland's back-to-back product has the same total look and feel standard feature as Rottlund's Villa II?"

MR. KRUMMEN: Same objections.
A. "Yes. Both have collections of standard features arranged in standard ways, but they are not the same."
BY MR. SCHWIEBERT:
Q. "And finally, you gave me GM Homes, and you believe that GM Homes' back-to-back product has the same standard feature total look and feel as Rottlund's Villa II?"
MR. KRUMMEN: Object under the rule of completeness and respectfully request that the prior inconsistent answer be read before the witness's -- before the witness impeaches himself.
A. "Yes. Both have collections of standard features arranged in standard ways, but they are not the same."
BY MR. SCHWIEBERT:
Q. "Does Town & Country's Homestead Collection have the same standard feature total look and feel that Rottlund's Villa II has?"
MR. KRUMMEN: Object. Under Rule 106, I respectfully request that the prior answer, which was sworn, too, be read into the record before this witness impeaches himself.
A. "Yes. Both have collections of standard features arranged in standard ways, but they are not the same."
BY MR. SCHWIEBERT:

Q. Mr. Bloom, do the answers you provided to the questions I asked today accurately reflect your opinion?

A. Yes, they do.

MR. SCHWIEBERT: I have no further questions.

FURTHER EXAMINATION

BY MR. KRUMMEN:

Q. Mr. Bloom, did you meet with any attorneys to prepare this errata sheet?

A. Yes, I did.

Q. Who did you meet with?

A. Ms. Newman.

Q. When did you meet with Ms. Newman?

A. Today.

Q. Did Ms. Newman encourage you to change your testimony?

A. No.

Q. Nevertheless, you decided to change your prior sworn testimony on several occasions here today, correct?

A. Yes.

MR. KRUMMEN: I have no further questions.

MS. NEWMAN: Mr. Bloom, you have the right again to review and make changes to your deposition transcript, if necessary, and, again, I would advise you

to exercise that right.

THE WITNESS: I do.

MR. NEWMAN: Okay.

(Deposition concluded at 6:16 p.m.)

STATE OF MINNESOTA)
) ss.
COUNTY OF HENNEPIN)

I hereby certify that I reported the Deposition of ALBERT H. BLOOM, A.I.A., and that the witness was by me first duly sworn to tell the whole truth;

That the testimony was transcribed under my direction and is a true record of the testimony of the witness;

That the cost of the original has been charged to the party who noted the deposition, and that all parties who ordered copies have been charged at the same rate for such copies;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality;

That the right to read and sign the deposition by the witness was not waived.

WITNESS MY HAND AND SEAL this 14th day of July, 2004.

____________________________________

Patrick J. Mahon
Registered Merit Reporter
Certified Realtime Reporter

Deposition Correction Sheet

TITLE: The Rottlund Company, Inc. v. Pinnacle Corporation, et al.

WITNESS: Deposition of ALBERT H. BLOOM, A.I.A.
Dated: June 30, 2004

| PAGE | LINE | DESIRED CHANGE/REASON FOR CHANGE |
| --- | --- | --- |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |

______________________ ______________________
Date Signature of Witness

INSTRUCTIONS (to Attorney Newman):

*Return the signed Deposition Correction Sheet to Attorney Krummen, who is already in possession of the original transcript, cc. a copy to Twin West Reporting, LLC. Retain a copy for your records. This must be completed by August 15, 2004.

(Copy To:) Twin West Reporting, LLC
326 South Broadway #218
Wayzata, Minnesota 55391

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

---

The Rottlund Company, Inc.
d/b/a Rottlund Homes, a Minnesota
Corporation,

Plaintiff,

vs.

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc.,
a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

---

Volume II

Deposition of

Albert H. Bloom, A.I.A.

Wednesday, June 30, 2004

6:05 p.m.

APPEARANCES:

FOR PLAINTIFF THE ROTTLUND COMPANY, INC.:
MR. CRAIG S. KRUMMEN
MR. DAVID A. DAVENPORT
Attorneys at Law
WINTHROP & WEINSTINE, P.A.
Suite 3500
225 South Sixth Street
Minneapolis, Minnesota 55402

FOR DEFENDANT PINNACLE CORPORATION:
MR. MATTHEW I. FARMER
Attorney at Law
HOLLAND & KNIGHT, LLC
131 South Dearborn Street
30th Floor
Chicago, Illinois 60603

FOR THIRD-PARTY PLAINTIFF TOWN & COUNTRY HOMES:
MR. DARREN B. SCHWIEBERT
Attorney at Law
FREDRIKSON & BYRON, P.A.
4000 Pillsbury Center
200 South Sixth Street
Minneapolis, Minnesota 55402-1425

FOR THIRD-PARTY DEFENDANT BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC.:
MS. HOLLY J. NEWMAN
Attorney at Law
MOORE, COSTELLO & HART, P.L.L.P.
701 Fourth Avenue South #1350
Minneapolis, Minnesota 55415-1823

I N D E X

EXAMINATION

By Mr. Schwiebert - Page 275

By Mr. Krummen - Page 284

EXHIBITS:



| Number | Description | Page |
|---|---|---|
| 430 | Mr. Bloom's Vol. I dep transcript | 275 |
| 431 | errata sheet to Mr. Bloom's Vol. I dep | 275 |



* * * * *

THE ORIGINAL IS IN THE POSSESSION
OF CRAIG KRUMMEN, ATTORNEY AT LAW

* * * * *