# Exhibit E

Minneapolis
London
Washington, DC
*Affiliates:*
Mexico City
Warsaw
Montreal
Toronto
Vancouver

1100 International Centre
900 Second Avenue South
Minneapolis, MN 55402-3397
(612) 347-7000
FAX (612) 347-7077
www.fredlaw.com

FREDRIKSON & BYRON, P.A.
*Attorneys and Advisors*

Dean R. Karau
(612) 347-7178
dkarau@fredlaw.com

July 17, 2001

**VIA FACSIMILE (612-347-0600)**
**& U.S. MAIL**

Ryan F. Urness, Esq.
Winthrop & Weinstine, P.A.
3000 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, Minnesota 55402

Re: Rottlund Company, Inc./Town & Country Homes

Dear Mr. Urness:

I am one of the attorneys representing Town & Country Homes, and write in response to your July 5, 2001, letter to Michael Ryan.

Your letter and attachments are unclear about which designs Rottlund believes are proprietary and for which it claims cognizable rights. It is also unclear which Town & Country features Rottlund claims infringe the alleged copyrightable designs. Therefore, please provide a detailed explanation of designs in which Rottlund is claiming rights and the Town & Country features that Rottlund alleges infringe those rights. Also, please provide a copy of Rottlund's copyright registration(s) for the designs that it claims are being infringed.

As an owner of intellectual property, Town & Country takes seriously allegations of infringement. Therefore, we look forward to promptly receiving from you sufficient information to evaluate Rottlund's claim of infringement.

Sincerely,

Dean R. Karau

DRK:seb:2536465

cc: Cynthia Jokela Moyer, Esq.
Jay Erstling, Esq.

RECEIVED
JUL 17 2001
CRAIG S. KRUMMEN

Exhibit F

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---------------------------------------------

The Rottlund Company, Inc.,

Plaintiff,

vs. Case No. 01-1980

Pinnacle Corporation, et.al.,

Defendants.

---------------------------------------------

THE HONORABLE SUSAN R. NELSON

United States Magistrate Judge

* * * *

TRANSCRIPT OF PROCEEDINGS

* * * *

Date: February 23, 2004

Reporter: Leslie R. Pingley

how you want to handle that.

Right now we're just going to have a regular dispositive motion deadline and we're not going to do bundling. Bundling can lead to troubles and so right now I think we'll consider plaintiff's motion, you folks can decide how you want to handle the rest and we'll go from there. All right.

This is a deadline so you can bring a motion any time before a deadline, okay?

All right. Any other thoughts or questions about the scheduling?

MR. DAVENPORT: Not from the plaintiff, Your Honor.

THE COURT: Okay. Now, I want to address an issue that will take about 15 minutes, so I think I am going to raise it. It's connected to the status conference issue regarding the documents of Fredrikson and I want to talk about it in conjunction with the pending motion to depose Dean Karau.

This is my proposal, it's more than

a proposal, this is my order, because it is unclear to this Court whether all of the TCM and Pinnacle documents which were forwarded -- and BSB documents which were forwarded to Fredrikson in the early hours of this litigation have actually been produced in this case, I am going to order in lieu of the Karau depositions, so I am going to deny the motion to take Dean Karau's deposition. I am going to deny it without prejudice because we're going to do this in stages, so I am going to deny it without prejudice.

And the first stage is I am going to ask Mr. Schwiebert to put together all client documents, that is documents forwarded under many of these transmittals that we have seen so much in this litigation to Mr. Karau or to Ms. Preble or to anybody else at Fredrikson. I don't want letters between your clients and you that clearly seek legal advise or clearly attorney-client privileged. I am

looking for documents that were forwarded, Art Plante's file, BSB's file, Sandalin's files, all those files that we know were, in fact, forwarded to Mr. Karau.

I want those documents produced in camera, all of them, because what I am not certain of is whether some documents were forwarded to Fredrikson from TCM or Pinnacle and then they were no longer in TCM or Pinnacle's possession at the time of production because when I asked the question were the documents attached to the Art Plante memo produced I get the response Art Plante's files were produced. That doesn't answer my question.

Am I being clear about this? Let me just say it one more time. Mr. Schwiebert looks confused.

MR. SCHWIEBERT: I apologize, Your Honor.

THE COURT: No problem. I just want to be clear about this.

To ensure that all documents that

were forwarded by any of the defendants to Mr. Karau because he received documents from all three defendants, have been produced in this litigation, I want to see them in camera from Fredrikson's files and when I say documents I'm talking about documents originally in the possession of the three defendants that were forwarded under these transmittal letters to Fredrikson, because my concern is that at the time then that the productions were made all those documents may not have existed at the clients. I may be wrong about that. I don't know if I am wrong about that, but it seems to me that will alleviate some of the plaintiffs's concerns and at least for now will, in my view at least, obviate the need for Mr. Karau's deposition.

Mr. Schwiebert, do you have a question?

MR. SCHWIEBERT: I just want to make sure I understand. You're looking for the transmittal letters and their

attachments to the extent those still exist in Fredrikson?

THE COURT: Fredrikson wouldn't have tossed anything, so all that stuff must exist.

MR. SCHWIEBERT: I'm just suggesting you're not talking about every document that we have -- are you talking about every document that we have collected from Art Plante or are you talking about things that were forwarded from Art Plante to Fredrikson as attached to particular exhibits? Does that make sense?

THE COURT: Are you suggesting that there were other documents that you have in your files that were forwarded to you from your clients other than the transmittals that we have seen?

MR. SCHWIEBERT: As part of our document production in this case, yes. We have gone to our client --

THE COURT: Well, to the extent -- no. To the extent that you

have produced those documents in this case, I don't need to see them again. Okay?

MR. SCHWIEBERT: You're looking for documents that have not been produced that are in Fredrikson's file.

THE COURT: Well, not exactly. I am not being very clear.

With respect to the three famous transmittal letters I'll call them, one BSB documents, Chris Jorgenson documents, one with the Sandalin documents and one with the Art Plante documents, I want to see what that package looked like when it hit Fredrikson, okay? Okay, clear?

MR. SCHWIEBERT: I just want to ask a question.

THE COURT: Sure.

MR. SCHWIEBERT: If we are unable to reproduce that package as it got to Fredrikson, is that what you want in the affidavit? I am not trying to be coy. I have reason to believe that at least with one of those we are

unable to do that. It is not --

THE COURT: Well, then I need an affidavit explaining that it because it would be highly unusual to discard any of your client's files in the pendency of litigation, so I would certainly need to understand why that's the case.

MR. SCHWIEBERT: Well, the Art Plante transmittal that you're talking about happened before the litigation was pending.

THE COURT: Well, sure.

MR. SCHWIEBERT: Art Plante and, I just want to clarify this because it came up earlier, Town & Country Minnesota, Inc. and Art Plante are clients of Fredrikson and have been for some time.

THE COURT: Right.

MR. SCHWIEBERT: So although we represented Pinnacle at the time they were our client.

I do not believe that we can recreate the attachments that were attached to that Art Plante letter. I

am just being honest. I don't -- it's not maintained in the file in such a way that you can say it's that.

THE COURT: Well, then I need that in a --

MR. SCHWIEBERT: I can submit an affidavit explaining --

THE COURT: I guess I need an explanation for why on earth that wouldn't be the case, yes.

MR. SCHWIEBERT: Okay. I know what the BSB one is. We have talked about that a bunch of times, fine.

What's the third transmittal? I don't understand.

THE COURT: There's a transmittal from Pinnacle, is there not?

MALE SPEAKER: There is the -- I think it's BSB 1980 and it makes reference to Mr. Plante's files that were sent. There's a reference to Chris Jorgenson's files. We do not know whether Mr. Karau contacted Mr. Jorgenson after Mr. Plante

Exhibit G

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

THE ROTTLUND COMPANY, INC.,
d/b/a Rottlund Homes,
a Minnesota Corporation,
Plaintiff,

vs.

PINNACLE CORPORATION, d/b/a
Town & County Homes, an Illinois
Corporation; TOWN & COUNTRY HOMES,
INC., a Minnesota Corporation;
BLOODGOOD SHARP BUSTER
ARCHITECTS & PLANNERS OF IOWA, INC.,
an Iowa Corporation; and the
BLOODGOOD GROUP, INC., an Iowa
Corporation
Defendants.

No. 01-CV-198
(DSD/SRN)

-------------------------------------

TOWN & COUNTRY HOMES, INC., a
Minnesota Corporation,
Third-Party Plaintiff,

vs.

BLOODGOOD SHARP BUSTER
ARCHITECTS & PLANNERS OF IOWA, INC.,
an Iowa Corporation,
Third-Party Defendant.

Deposition of MIKE RYAN, called as a witness herein, pursuant to the applicable provisions of the Federal Rules of Procedure governing the taking of depositions, taken before Deborah Habian, CSR No. 084-002432 on December 11, 2003, at 9:07 o'clock a.m. at M & M Reporting Legal Services, One Pierce Place, Suite 295-E, Itasca, Illinois.

MR. MURDOCH:
Objection to form. In terms of -- Craig, the question's only decision to proceed ab initio or whether a subsequent decision was made to continue with the process of constructing the town -- the back-to-backs after the cease and desist letter was made?

MR. KRUMMEN: Right.

BY MR. KRUMMEN:

Q. Let's start with where we're at in the chronology, and in Exhibit 11A, the attachment shows that a cease and desist letter was written to you dated July 5 of 2001, correct?

A. Correct.

Q. So we know that you have in your possession by the time July 16th of 2001 rolled around a copy of Rottlund's cease and desist letter, correct?

A. That's correct.

Q. Now we're up to December

16th of 2001, and Art Plant is apparently sending to an outside lawyer his file with documentation pertaining to the design and development of the Homestead Collection townhomes, correct?

A. I don't have that December 16th letter.

Q. If I said --

MR. MURDOCH: You said December. It should be July.

MR. KRUMMEN: Yes, that's a good --

THE WITNESS: July 16th.

MR. KRUMMEN: I thought I said July 16th, and that's what this Livenote says, but if I misspoke, I misspoke.

BY MR. KRUMMEN:

Q. As of July 16th, 2001 --

A. Yes.

Q. -- you received a copy of a letter to Dean Karau at Frederickson

& Byron which was authored by Art Plant, and the first sentence said, "Please find attached a file with the documentation pertaining to the design and development of our Homestead Collection townhomes." Do you see that?

A. Yes, yes.

Q. Now, with those two dates in mind, July 5, 2001 and July 16, 2001, can you tell me within a month or two when it was that you made the decision to proceed at Town & Country Homes' Minnesota division and continue building the Homestead Collection back-to-back townhomes?

A. Well, I -- I don't know the timing of that decision, but I'd say obviously the decision was immediate on existing communities, otherwise we had to shut them down, so that had to be immediate.

And when that decision was made on new communities that were

not open for sale at the time of that letter, I -- I'm not sure of.

Q. As to existing communities that you did not want to shut down, so you decided to continue building back-to-back product, what was your decision based upon to continue building?

Was it based upon what you believed to be no case of infringement against you or was it based upon the fact that you had to shut the communities down if you chose to --

A. It was --

Q. -- agree with Rottlund?

MR. MURDOCH: Just a minute. Objection to the question to the extent that it's asking for attorney-client privileged information.

So if the decision was based in part to any extent on any advice or information you received from Counsel, I'm going to instruct

you not to answer it.

THE WITNESS: Then -- then I won't answer because all these decisions were with Peter Brennan present.

BY MR. KRUMMEN:

Q. I'll ask a few more, not to harass you, but I have to figure out where the line is here --

A. Right.

Q. -- and then we'll move on. But the next question is did you as the person in charge ultimately of Town & Country Homes' Minnesota division ever say to anyone, I need to hear from an outside independent source as to whether or not infringement occurred before I can make a decision? Did you ever give a directive such as that?

MR. MURDOCH: I'm going to object to that to the extent that --

THE WITNESS: That

would have been with -- in meetings with Peter.

MR. MURDOCH: If it occurred.

MR. KRUMMEN: Did you --

THE WITNESS: Yeah, if it occurred.

BY MR. KRUMMEN:

Q. And if that happened -- the next question I'll get the same objection maybe, but I'm going to ask it anyway.

Did you ever receive back information from an independent outside source that said to you, There's absolutely no infringement in terms of the Homestead Collection back-to-back townhomes being built versus the Rottlund townhomes that are back-to-back?

MR. MURDOCH: I'll give the same objection. To the extent that you got an opinion like

that or you didn't get an opinion like that from outside counsel, it's privileged information.

BY MR. KRUMMEN:

Q. I don't want to limit it to outside counsel. It can come from an architecture firm, for example, but please answer.

A. Other than conversations with Peter, I'm not aware of any report that came to me.

Q. So I think we've covered the existing product, and the conclusion, whatever it was based upon, was to continue building the Homestead Collection back-to-back townhomes within the Minnesota division communities where they were currently being built, correct?

A. Can you ask that one more time?

Q. Sure. Sometime around July of 2001, you, Mike Ryan, made the decision to continue building

back-to-back Homestead Collection townhomes within the Minnesota division, correct?

A. That's correct.

Q. But then another decision I believe was in front of you, and that dealt with not the currently under construction communities but new communities where you hadn't broken ground yet, correct?

A. (Witness nodding.)

Q. I think earlier you told me there was existing communities that you'd have to shut down and then there was contemplated communities or --

A. Correct.

Q. Use whatever word you want to so we can communicate.

A. Correct.

Q. (Continuing) -- communities on the board, drawing board; would that be fair?

A. You know, whatever stage

they were in, not open for sale.

Q. Okay, not-open-for-sale communities, let's start there. Did you ever tell anyone to change the back-to-back townhome designs before any back-to-back townhomes would be built at these future communities that were not then under construction as of July of 2001?

A. Again, a lot of these discussions are -- were with Peter Brennan present, but --

MR. MURDOCH: Mike, the question is just a -- the question is just a yes or no, did you ever -- could you read it back?

THE WITNESS: Yeah, read the question again.

(Record read.)

THE WITNESS: Any discussion regarding the product and what should be done to the product regarding this case was all done through Peter Brennan, so --

BY MR. KRUMMEN:
Q. And that's as far as you'll go with an answer to that question today, correct?
A. Yeah.
Q. I don't think I'm going to invade a privilege here, but let me ask it.
Did the design change in terms of the back-to-back Homestead Collection design versus what was ultimately constructed in Chaska or Brooklyn Park with these new, not-under-construction communities?
A. Yes.
Q. Why?
MR. MURDOCH: Objection, that calls for privileged information.
THE WITNESS: It goes back to discussions through Peter.
BY MR. KRUMMEN:
Q. Back to Exhibit 41A. Do you see the July 16th, 2001 date?

Exhibit H

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

THE ROTTLUND COMPANY, INC., )d/b/a ROTTLUND HOMES, a Minnesota)
Corporation, ) Plaintiff, )
v. )PINNACLE CORPORATION )
d/b/a TOWN & COUNTRY HOMES, )an Illinois corporation, and )C
TOWN & COUNTRY HOMES, INC., )01-CV-1980 DSD/SRNa Minnesota Corpo
Defendants. )---------------------------------)
TOWN & COUNTRY HOMES, INC. )A Minnesota Corporation, )
Third-Party Plaintiff, )v. )
BLOODGOOD, SHARP, BUSTER )ARCHITECTS & PLANNERS OF IOWA, )
an Iowa Corporation. ) Third-Party Defendant. )

The deposition of STEVEN SANDELIN, called by the Rottlund Company, Plaintiff, taken pursuant to the provisions of the Federal Rules of Evidence and Civil Procedure pertaining to the taking of depositions, before KATRINA M. BEAUDIN, CSR, RMR, CRR, at M & M Reporting Inc., One Pierce, Suite 295-E, Itasca, Illinois, on the 16th day of December, 2002, at 9:14 a.m.

Homestead or were there separate density requirements, if you know?

MR. FARMER: Again, let me just say we have identified Mr. Sandelin as a witness for over a dozen topics, this doesn't happen to be one of them.

BY MR. KRUMMEN:

Q. Do you know the answer to that question?

A. I do not know the exact answer to that question.

Q. Let me back up to Mr. Ryan -- Tom Ryan, you mentioned his title at Pinnacle was what?

A. Tom Ryan is our president of the Chicago division and coCEO of the company.

Q. Who is the other coCEO?

A. Michael Ryan.

Q. It was Mike Ryan's idea to initially build the Garfield and the Arlington here in Chicago, correct?

A. It was his suggestion, yes.

Q. But he was based at the time in Minnesota, correct?

A. He was based in our Chicago office.

Q. In charge of your Minnesota division,

correct?
A. That's correct.
Q. The president, right?
A. The president is actually another individual but Mike is in charge of those divisions, the president works for Mike Ryan.
Q. Today, back when the Garfield and Arlington concept was developed, I believe you said that Mike Ryan was the president of the Minnesota division?
A. I would like to correct myself, that's not true. He is the -- he is in charge of that division and the president works for Mike Ryan.
MR. FARMER: Just object to the foundation, if we can get a time frame for the conversations.
BY MR. KRUMMEN:
Q. You said it was about two years ago when this was developed, correct?
A. Correct.
Q. And at the time Mike Ryan was not the president of the Minnesota division, correct?
A. That's correct.
Q. He was the coCEO of the Chicago

division?

A. And Minnesota, yes.

Q. And do you know why Mr. Ryan wanted to build Garfield and Arlingtons that looked like the Broadmoor and the Savannah that was being built in Minnesota?

A. We were looking for new product and, you know, testing the market to see if this was a viable alternative for our product, our multifamily in Chicago.

MR. KRUMMEN: Off the record a second.

THE VIDEOGRAPHER: Going off the record. The time is approximately 9:29 a.m.

Back on the record. The time is approximately 9:30 a.m.

(Exhibit No. 1 marked.)

BY MR. KRUMMEN:

Q. Mr. Sandelin, for making my record, I'm handing you what's been marked as Exhibit No. 1 and down in the corner it states Washington Square back to back townhomes and then there is a logo for Town & Country Homes. Have I thus far accurately characterized the exhibit before you?

A. Yes.

make a presentation regarding the status or how did that come about?

MR. FARMER: Objection: Form.

THE WITNESS: More than likely it would be Mr. Ryan visiting Minnesota.

BY MR. KRUMMEN:

Q. Mr. Mike Ryan, correct?

A. Yes, I'm sorry.

Q. Now, Mr. Mike Ryan holds a Town & Country Minnesota office, correct?

A. No, Mr. Ryan -- I'm not sure I understand the question.

Q. Sure. Let's establish the offices that Mr. Mike Ryan held back in or about early 1998 through the end of 1998. What was his title on behalf of Pinnacle Corporation?

A. CEO.

Q. What was his title on behalf of Town & Country the Minnesota division?

A. I don't know his exact title, he was -- he was in charge of that division.

Q. So, like a president or a CEO, someone in charge of the Minnesota division?

A. He named a president to work that

# Exhibit I

Motions, Pleadings and Filings

United States District Court,
D. Minnesota.

Dennis W. FISCHER and Judith Fischer, and
Western National Insurance Group,
Plaintiffs,
v.
RHEEM MANUFACTURING COMPANY,
Robertshaw Controls Company, and Reliant Energy
Resources Corporation. d/b/a Reliant Energy
Minnegasco, Defendants.

**No. Civ.011739(PAM/RLE).**

May 13, 2004.

Bradley L. Doty, Stempel & Assoc, Hopkins, MN, for Plaintiff.

James L. Haigh, Peter G. Van Bergen, Cousineau McGuire & Anderson, George W. Flynn, Hal A. Shillingstad, Flynn Gaskins & Bennett, Minneapolis, MN, for Defendants.

MEMORANDUM AND ORDER

MAGNUSON, J.

***1** This matter is before the Court on Defendant Robertshaw Controls Company's Motion in Limine. This Motion seeks sanctions for spoliation of evidence against Plaintiff Western National Insurance Company. For the reasons that follow, the Motion is granted.

BACKGROUND

On March 10, 1999, a fire destroyed the home of Plaintiffs Dennis W. Fischer and Judith Fischer. Plaintiff Western National Insurance Company ("Western National") insured the home at the time of the fire. Less than a week after the fire, Western National's investigators determined that the probable cause of the fire was a natural gas water heater located in the basement of the home. Defendant Rheem Manufacturing Company ("Rheem") designed, manufactured, and distributed the water heater. Defendant Robertshaw Controls Company ("Robertshaw") designed, manufactured, and distributed the gas control valve connected to the water heater. Defendant Reliant Energy Resources Corporation d/b/a Reliant Energy Minnegasco ("Reliant") was responsible for the natural gas delivery system into the home, including the gas meter and regulator.

After Western National's investigators determined the probable cause of the fire, Western National hired a company to demolish the fire scene. More than two months later, Western National notified Robertshaw that its gas control valve was the likely cause of the fire. At that time, all that remained of the fire scene was the foundation of the house, the water heater and control valve, and some wiring that was above the water heater. [FN1]

FN1. Reliant preserved the natural gas service regulator from the fire scene, but subsequently lost this evidence.

The majority of the claims in the lawsuit have been settled. The only claims that remain are Western National's claims against Robertshaw. In this Motion, Robertshaw seeks to preclude Western National from introducing any evidence at trial derived from the fire scene, including opinions and testimony from Western National's retained experts or from the state fire marshal. Robertshaw argues that this sanction is appropriate because Western National did not preserve the fire scene to allow Robertshaw to investigate the scene.

Western National admits that it did not preserve the fire scene but contends that its failure to preserve the scene itself did not prejudice Robertshaw. According to Western National, it preserved the relevant evidence from the fire scene: the water heater and the gas control valve from the water heater. In the event the Court determines that sanctions are appropriate, however, Western National asks that the Court only give a negative inference instruction, rather than the sanction Robertshaw seeks.

DISCUSSION

The Court has broad authority to impose sanctions

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

for the spoliation of evidence. Patton v. Newmar Corp., 538 N.W.2d 116, 119 (Minn.1995). Sanctions for spoliation are not limited to bad-faith destruction of evidence, but are appropriate when the party destroying the evidence "knew or should have known" that the evidence was "relevant to imminent litigation." Dillon v. Nissan Motor Co., 986 F.2d 263, 267 (8th Cir.1993). The Court must examine "the nature of the item lost in the context of the claims asserted and the potential for remediation of the prejudice" caused to the opposing party. Patton, 538 N.W.2d at 119.

***2** In this case, there is no dispute that Western National knew or should have known that the fire scene itself was relevant to potential litigation. Western National's Director of Special Investigations, Nancy Jacobson, testified that the fire scene is a valuable piece of evidence, (Shillingstad Aff. Ex. B at 91 (Jacobson Dep.)), and courts recognize that "a fire scene itself is the best evidence of the origin and the cause of the fire." Hoffman v. Ford Motor Co., 587 N.W.2d 66, 71 (Minn.Ct.App.1998). Thus, the Court must examine the prejudice to Robertshaw from Western National's failure to preserve the fire scene and determine whether the prejudice is sufficient to warrant the sanctions Robertshaw seeks.

Western National argues that, in this instance, there is no prejudice to Robertshaw from the destruction of the fire scene. According to Western National, Robertshaw need only establish that its control valve was not defective, and thus Robertshaw's inability to investigate other potential causes of the fire is immaterial. Western National's argument amounts to an argument that half a defense is better than no defense at all.

Although it may be true that Robertshaw's only substantive burden is to rebut Western National's claim that the control valve was defective, Robertshaw also bears a persuasive burden. One of the elements of a prima facie case of products liability is that the product at issue caused the injury. Gerhard v. Bell Helicopter Textron, 759 F.Supp. 552, 554 (D.Minn.1991) (Devitt, J.). Because Robertshaw did not have the chance to examine the fire scene, Robertshaw cannot argue to the jury that something other than the water heater caused the fire. The only firsthand evidence the jury will hear as to causation is Western National's experts, and of course those experts all believe that the fire started in the water heater and specifically in the control valve for the water heater. Robertshaw's inability to rebut the evidence of causation is clearly prejudicial to Robertshaw's defense of this action. *See* Hoffman, 587 N.W.2d at 71 (noting that, because of destruction of fire scene, defendant "would be confronted with the challenge of meeting probative and convincing firsthand evidence with sketchy, relatively speculative secondhand evidence").

Because the Court determines that Robertshaw has been prejudiced by Western National's spoliation of evidence, the Court must consider what sanctions would constitute an appropriate remedy for that prejudice. The Court does not agree with Western National that a negative inference instruction is all that is necessary in this case. Such an instruction is no substitute for firsthand evidence of the cause of the fire. Rather, the Court agrees with Robertshaw that Western National should be precluded from relying on evidence obtained from the fire scene, including its experts' opinions and the opinions of the state Fire Marshal. Although it is a severe sanction, it is the only sanction that truly levels the playing field in this instance. *See* Dodd v. Leviton Mfg. Co., No. CX-02-1570, 2003 WL 21147151, at *1 (Minn.Ct.App. May 20, 2003) (finding exclusion of evidence to be appropriate remedy for destruction of fire scene).

***3** Certainly, it is not always possible to preserve a fire scene until every possible tortfeasor has inspected the scene. When a fire destroys a building, it is in the insured's interest to demolish the fire scene as quickly as possible so that a new building may be constructed on the site. In this instance, however, it is clear that Western National knew very shortly after the fire that the Robertshaw control valve was a likely cause of the fire. In such a situation, it is incumbent on the insurance company to provide notice to the potential tortfeasor and to allow that tortfeasor the opportunity to conduct its own investigation of the fire scene. *See* Dodd, 2003 WL 21147151, at *5 (finding that trial court properly gave significant weight to insurer's failure to provide notice to potential tortfeasor until months after insurer knew that tortfeasor's product was a likely cause of the fire). Western National's failure to give such notice to Robertshaw prejudiced Robertshaw's defense of this matter to such an extent that the only appropriate sanction is to preclude Western National from relying on the evidence gleaned from the fire scene.

CONCLUSION

For the foregoing reasons and based on all the files, records, and proceedings herein, the Court concludes

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

that the prejudice to Robertshaw from the destruction of the fire scene warrants the exclusion of all evidence gleaned from that fire scene. Accordingly, IT IS HEREBY ORDERED that Defendant's Motion in Limine to exclude evidence (Clerk Doc. No. 36) is GRANTED.

2004 WL 1088328 (D.Minn.), 64 Fed. R. Evid. Serv. 553

Motions, Pleadings and Filings (Back to top)

• 0:01CV01739 (Docket) (Sep. 24, 2001)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.