# Exhibit A.2

created the teeth. So, during the trial, White, as the author, executed an assignment of the copyright to Billy-Bob Teeth, Inc. The district court held that Billy-Bob Teeth, Inc. could not show ownership in the copyright because it was not in existence at the time White made the teeth so it could not be a work for hire, and found the assignment ineffective. The Seventh Circuit reversed. The Seventh Circuit agreed that "Billy-Bob, Inc. cannot claim that the teeth are works made for hire" because "the corporation did not exist when the teeth were authored." 329 F.3d at 591. In fact, on appeal, Billy-Bob Teeth, Inc. conceded that "[t]he work-made-for-hire provisions are not relevant to th[e] case." *Id* . Nonetheless, the Seventh Circuit explained that "[a]n error on the registration is not fatal to Billy-Bob's case" and recognized, quoting *Urantia Foundation v. Maaherra,* 114 F.3d 955, 963 (9th Cir.1997), that " 'case law is overwhelming that inadvertent mistakes on registration certificates do not ... bar infringement actions." ' 329 F.3d at 591. The court went on to hold that the assignment, during trial, from White to Billy-Bob Teeth, Inc. gave the corporation ownership of the copyright.

FN23. In *Urantia,* the defendant argued that the plaintiff intentionally claimed work for hire so as not "to reveal to the Copyright Office that the 'authors' were celestial beings because the Copyright Office would have rejected the application." 114 F.3d at 963. That argument was rejected because the deposit materials identified the "celestial beings" that authored the work.

The test for fraud on the Copyright Office has not been met for a more basic reason. "Absent intent to defraud and prejudice, inaccuracies in copyright registrations do not bar actions for infringement." *Harris v. Emus Records Corp.,* 734 F.2d 1329, 1335 (9th Cir.1984); *accord S.O.S., Inc.,* 886 F.2d at 1086. For purposes of this case, the work for hire designation is relevant only because it is a means of conferring authorship, and authorship confers ownership. 17 U.S.C. § 201. Rottlund, however, is already the owner of the Original Villa and New Villa technical drawing copyrights by assignment. Thus, the allegedly erroneous work for hire designation is immaterial and caused no prejudice to Defendants. *See Datastorm Technologies, Inc. v. Excalibur Communications, Inc.,* 888 F.Supp. 112, 114 (N.D.Cal.1995) ("[E]nforcement of a copyright is precluded only if the inaccuracies were entered with the intent to defraud and the infringing party was prejudiced by such inaccuracies.").

The same result holds for Defendants' argument that Rottlund practiced fraud on the Copyright Office by not designating the New Villa and Villa II copyrights as derivative works. There is nothing in the record that suggests the failure was intentional or fraudulent other than Defendants' allegation and speculation. The error was immaterial. Rottlund submitted supplementary copyright applications for the New Villa and the Villa II technical drawing and architectural works copyrights. (Krummen Aff. Ex. X, AA, BB (technical drawing supplements); Ex. Y and CC (architectural works supplements)). The supplementary applications clarified that the New Villa was a derivative of the Original Villa, and the Villa II was a derivative of the New Villa and Original Villa. *Id.* To invalidate the copyright registration, the knowing misstatement must have been one that might have occasioned the rejection of the application. *Eckes v. Card Prices Update,* 736 F.2d 859, 861 (2d Cir.1984). Here, when presented with supplementary applications designating the New Villa and Villa II as derivatives, the Copyright Office issued the supplementary registrations. (Krummen Aff. Ex. X, AA, BB, (technical drawing supplements); Ex. Y and CC (architectural works supplements)). *See S.O.S., Inc.,* 886 F.2d at 1083, 1086 (finding no prejudice from failure to designate software as a derivative); *Twentieth Century Fox Film Corp. v. Marvel Enter., Inc.,* 220 F.Supp.2d 289, 298 (S.D.N.Y.2002) (holding that "Fox's failure to identify its logos as derivative does not affect the validity of Fox's copyright registrations" because "the Court has found that Fox's logos would have been copyrightable regardless of whether Fox advised the Copyright Office that its works were based on Marvel's"). No prejudice has been shown.

***14** Defendants have failed to rebut the presumption of ownership of valid copyrights. No reasonable juror could find for them on their "fraud on the Copyright Office" theory given the undisputed facts in the record. Rottlund owns the technical drawing copyrights, and they are valid. Rottlund's motion for summary judgment of validity of its technical drawing copyrights should be granted. Although the above discussion nearly compels the granting of summary judgment in Rottlund's favor of ownership and validity of the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*architectural works copyrights* as well, Rottlund has not brought that motion, but the above discussion certainly requires denial of BSB's motion for summary judgment of invalidity of the architectural work copyrights.

B. *Copyrightable Expression: Scope of the Copyrights*

Facts and ideas are not entitled to copyright protection; anyone may copy either freely. *Feist Pub., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 344, 350 111 S.Ct. 1282 (1991). "The question at what point an idea, too vague or abstract to warrant copyright protection, becomes sufficiently concrete or detailed to constitute protected expression is the endlessly baffling subject of Judge Learned Hand's famous abstractions discussion in *Nichols*, 45 F.2d at 121." *Sparaco v. Lawler, Matusky, Skelly, Engineers, LLP*, 303 F.3d 460, 469 (2d Cir.2002). That task "is particularly acute when the work of 'authorship' is of a functional nature, as is a plan for the accomplishment of an architectural or engineering project." *Attia v. Soc'y of New York Hosp.*, 201 F.3d 50, 55 (2d Cir.1999).

Rottlund has listed some seventy elements that it claims, in their placement, layout, and proportions, comprise the total look and feel or gestalt of its two technical drawings. (Am.Compl.¶ 64); (Davenport Aff. Ex. SSS). [FN24] Importantly, Rottlund does not claim protection in any one individual element but asserts that its selection, arrangement, and coordination of the elements is protectible.

FN24. These elements include, for example, the use of gabled side entries, a fireplace, a loft, a living room, first and second story windows, dining room, breakfast bar, patio, powder room, and sprinkler room.

The Court "filters out" the *use of* individual elements of Rottlund's drawings. The use of, for instance, gabled entries, lofts, or fireplaces in this case represent mere ideas that others may utilize without consequence. *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1297 (D.C.Cir.2002) ("In and of themselves, domes, wind-towers, parapets, and arches represent ideas, not expression."); *CSM Investors, Inc. v. Everest Dev., Ltd.*, 840 F.Supp. 1304, 1310 (D.Minn.1994) ("Thus, the use of standard structural elements and the concept of a one-story office showroom are not copyrightable."); *Nelson-Salabes Inc. v. Morningside Holdings*, No. 98-2226, 2001 WL 419002, at *4 (D.Md. Feb. 16, 2001) ("The Court agrees that Nelson-Salabes's use of certain individual features, such as the bay windows or the octagonal entrance, is neither original nor an expression of artistic merit.") *vacated in part on other grounds by* 284 F.3d 505 (4th Cir.2002). The question is what is left? Defendants would have the Court find that nothing protectible remains after filtering the individual elements; the drawings merely being sheets of paper shareable amongst architects and builders to copy at will. That would be acceptable if no expression remains in the drawings for copyright "encourages others to build freely upon the ideas and information conveyed by a work." *Feist*, 499 U.S. at 350. As urged by Rottlund, however, the Court finds that the selection, arrangement, and combination of the elements expressed in the technical drawings are sufficiently original and detailed to be afforded copyright protection. *Sturdza*, 281 F3d at 1296 ("Considering the works as a whole is particularly important because protectible expression may arise through the ways in which artists combine even unprotectible elements."); *CSM*, 840 F.Supp. at 1310 ("The court concludes that the combination and arrangement of elements and the particular building design embodied in Everest's plans and drawings are sufficiently original to be afforded copyright protection."); *Nelson-Salabes*, 2001 WL 419002, at *4 ("[T]he Court finds that Nelson-Salabes's combination of common features such as a Y-shaped footprint, bay windows, the octagonal silo entrance, and gables created a unique design."); *Richmond Homes Mgmt. Inc. v. Raintree, Inc.*, 862 F.Supp. 1517, 1523 (W.D.Va.1994) *reversed in part on other grounds by* 66 F.3d 316 (4th Cir.1995).

***15** The Court discusses three cases that inform its decision. The first is *Attia v. Soc'y of New York Hosp.*, 201 F.3d 50 (2d Cir.1999). Attia alleged that the defendants copied his drawings for the renovation of the New York Hospital. The Hospital, located adjacent to F.D.R. Drive in Manhattan, had considered renovation for years and initially was set on a proposal to fill in existing courtyard space as opposed to utilizing air rights over F.D.R. Drive. A new Hospital board member requested Attia to formulate an alternative. Attia "developed a concept centered on a new building that would be

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

constructed on a platform over the F.D.R. Drive. He prepared a series of architectural drawings and sketches to present this concept, which he collected in a booklet...." 201 F.3d at 52. Attia's plan became the Hospital's preferred solution, and the Hospital arranged for Attia and another architect, TCA, to develop the plan. Attia and TCA's relationship soured. So, the Hospital had a contest to select the architect that would design the renovation. Attia's team was not selected, but TCA's team (HOK/TCA) was. HOK/TCA spent years designing the plans and ultimately submitted schematic design drawings to the Hospital. Attia saw the proposal-erecting a new building over F.D.R. Drive-in the New York Times and brought suit claiming the drawings infringed his drawings. The Second Circuit's decision hinged on the protectability of Attia's drawings; specifically, the idea/expression dichotomy. The Court explained that determining when one moves from copying ideas to copying expression "often turns on the level of abstraction or generalization of the works being compared." *Id.* at 54. With architectural plans, the Court noted:

> As a generalization, to the extent that such plans include generalized notions of where to place functional elements, how to route the flow of traffic, and what methods of construction and principles of engineering to rely on, these are "ideas" that may be taken and utilized by a successor without violating the copyright of the original "author" or designer. On the other hand, to the extent that the copier appropriates not only those ideas but the author's personal expression of them, infringement may be found.
> *Id.* at 55.

The Second Circuit then explained that Attia's plans were at such a generalized level of abstraction that the elements and even arrangement of the elements represented mere concepts or ideas, very valuable, but not protectible:

> The failure of Plaintiff's claim lies in the principles outlined above. Plaintiff's "Option 1A" booklets do undoubtedly contain creative ideas on how to extend New York Hospital over the F.D.R. Drive in a manner that would connect the Hospital's existing buildings with the new structure. However, the drawings in his booklets are highly preliminary and generalized; they describe Plaintiff's proposed design at a very general level of abstraction. Defendants' schematic design drawings, in contrast, which HOK/TCA prepared over several years of work on the Hospital's commission, constitute a detailed expression of how to effectuate the Major Modernization Program by constructing over the F.D.R. Drive and restructuring existing buildings.
> ***16** The issue we must decide is whether the similar elements that Defendants assertedly copied from Plaintiff's drawings were protected matter. Without doubt there are similarities between Plaintiff's drawings and Defendants' architectural plans. However, even assuming (as we must and do) that the similarities result from copying, we conclude there was no infringement, because the similarities do not go beyond the concepts and ideas contained in Plaintiffs' drawings.
> *Id.*

After considering Attia's drawings, which themselves stated the purpose was to " 'suggest an *idea*" ' and " 'demonstrat[e] a *concept*," ' the Court again emphasized the drawings "are barely a first step toward the realization of a plan. How these and other ideas would be expressed or realized in a finished plan is not even approached in Plaintiff's drawings." *Id.* at 56. Finally, the Court specifically distinguished cases such as *CSM* where the architectural plans consisted of detailed drawings that would enable construction. *Id.* at 56-57.

The Second Circuit revisited the issue of copyright protection for architectural drawings in *Sparaco v. Lawler, Matusky, Skelly, Engineers, LLP,* 303 F.3d 460 (2d Cir.2002). Plaintiff Sparaco was hired by two architectural firms to develop a "site plan" for an assisted living facility. As the Court explained, "[a] site plan is a development plan for a plot of land. It specifies existing land conditions, including topography, boundaries, and physical structures, and can also specify the proposed improvements to the site." 303 F.3d at 462. Sparaco completed the site plan, submitted it to the city, and it was approved. The plan depicted (1) existing physical characteristics of the site and (2) proposed physical improvements to the site. The developer, NMF, later removed the architect from the project and hired a new construction and architectural firm. Changes were made to the building that required the new architects to change Sparaco's site plan. Sparaco offered to make the changes for a fee, but NMF declined and gave the task to another architect. The eventual site plan used " 'was

basically a copy of the approved A.R. Sparaco plan with several minor changes." ' 303 F.3d at 464. Sparaco sued claiming the defendants copied his site plan. The district court initially found some protection for Sparaco's plan, but after the Second Circuit's decision in *Attia,* held that the site plan was not entitled to protection. The Second Circuit vacated the judgment in part. The Court held that the individual facts of the first part of the site plan, that depicting existing physical characteristics, was not protectible because the existing physical features represent facts; on this score, however, the Court explained that a particularly original manner in selecting the unprotected information could be protected. 303 F.3d at 467. As for the part of the site plan that depicted proposed physical improvements, the Court found it protectible expression. *Id.* at 469. In the Second Circuit's view, "the site plan was significantly different from Attia's proposal of ideas for the expansion of the hospital. Sparaco's site plan specifies more than vague, general indications of shape and placement of the elements. It provides detailed specifications for preparation of the site." *Id.* at 468. The Court held:

> ***17** Recognizing that the site plan was not an architectural plan for a building but only a plan for the preparation of a site, we conclude that it did not consist only of the kinds of general ideas that we ruled in *Attia* were not protected from copying. It included specific expression and realization of those ideas, with the consequence that copying could constitute an infringement of copyright.
> *Id.* at 469.

What can be learned from *Attia* and *Sparaco,* is the general principle [FN25] that plans or drawings that merely propose use of conceptual elements are not protectible because, at that general level of abstraction, such plans represent ideas, but where the plans stretch beyond "vague general notions relating to placement of elements," *id.* at 468, and express in detail the manner in which to capitalize on the ideas, copyright affords protection.

FN25. The Second Circuit was careful to explain that its holdings do not mean that "technical drawings cannot achieve protected status unless they are sufficiently complete and detailed to support actual construction," but simply that Sparaco's drawings crossed the continuum into expression. 303 F.3d at 469; *see also Attia,* 201 F.3d at 57 ("In distinguishing these cases, we do not mean to suggest that, in the domain of copyrighted architectural depictions, only final construction drawings can contain protected expression. And we express no view whether, in other circumstances, an architect's sketches of visual elements (for example, Frank Lloyd Wright's preliminary sketches of the facade of the Guggenheim Museum) might include the type of expressive content entitled to copyright protection.").

Next, in *Sturdza v. United Arab Emirates,* 281 F.3d 1287 (D.C.Cir.2002), the United Arab Emirates (UAE) held a competition for the design of its new embassy. Sturdza and another architect, Demetriou, submitted designs. Sturdza won. Over the next couple of years, Sturdza submitted designs to the UAE, the UAE requested changes, and Sturdza complied. Just when Sturdza and the UAE were about to execute a contract, communication broke off. Sturdza later found out that the UAE was going to use a design by Demetriou. Sturdza thought Demetriou's design copied her's and sued for copyright infringement. The district court " 'filter[ed] out' those elements of Sturdza's design it viewed as unprotectible ideas: 'domes, wind-towers, parapets, arches, and Islamic patterns." ' 281 F.3d at 1297. As the district court explained, "Sturdza's *expression of these elements,* but not her use of them, *is protectible." Id.* (emphasis added). The D.C. Circuit agreed. *Id.* The district court, however, found that Sturdza's expression of the elements was not similar to Demetriou's expression of the same elements. *Id.* The D.C. Circuit disagreed and analyzed the expression of the elements individually and the combination of the "overall look and feel" of the elements and found that a jury could find them substantially similar. *Id.* at 1298-99.

*Sturdza* is important because it recognizes that even when filtering out the use of individual elements such as domes and arches as representing ideas, the particular manner in which an architect expresses those generally unprotectible elements *is* protectible. It follows that the particular manner in which an architect expresses unprotectible elements by selecting, arranging, and combining them is protectible. *Id.* at 1296 ("Considering the works as a whole is particularly important because protectible expression may arise through the ways in which artists combine even unprotectible elements.").

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Finally, the *CSM* case bears heavily on the undersigned's analysis, and it is carefully followed. The idea of an 8-unit back-to-back, slab on grade townhome is separate from the expression of that idea in Rottlund's detailed plans. *CSM,* 840 F.Supp. at 1310 ("The idea of an office showroom is separate from the expression of that idea in the Everest plans."). Rottlund has expressed its idea of how to combine a variety of elements for a back-to-back townhome in detailed plans clearly enabling the construction of its townhomes. Defendants may independently design their own townhome, and they argue they have, but they cannot copy Rottlund's design. *Id.* ("While Everest cannot prevent anyone from innocently building a similar office showroom, it can prevent others from deliberately copying the originality of its plans."). [FN26]

FN26. By stating that Defendants can independently create their own townhome that is similar to Rottlund's, the Court is not suggesting that innocent or subconscious copying is permitted. It is not. *E.g ., ABKCO Music, Inc. v. Harrisongs Music, Ltd.,* 722 F.2d 988, 998-99 (2d. Cir.1983).

***18** Rottlund's designs are also original. "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist,* 499 U.S. at 345. No evidence has been presented that Rottlund copied its drawings from another. Rather, the drawings owe their origin to the thoughts and creative spark of Tim Whitten and Bernard Rotter. *See id.* at 346-47. The degree of creativity required "is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be." *Id.* at 345; *see also Alfred Bell & Co. v. Catalda Fine Arts,* 191 F.2d 99, 103 (2d. Cir.1951) ("Originality in this context 'means little more than a prohibition of actual copying.' No matter how poor artistically the 'author's' addition, it is enough if it be his own.") (footnote omitted). Rottlund's Villa II drawings make the grade. Indeed, the Villa II, carrying forward the Original and New Villa copyrights, represents a creative effort on the part of Tim Whitten and Bernard Rotter to develop a product that would satisfy, among other things, size and market constraints. *See CSM,* 840 F.Supp. at 1310 (rejecting the argument that the "plans lack originality because the design of the project was dictated by geographic and legal constraints imposed on the development of the site" because "the adaptations to the site in the Everest plans reflect Everest's creativity and thus are copyrightable").

C. *Copying*

"Copying may be proven either by direct evidence or by demonstrating circumstantial evidence establishing 'access and 'substantial similarity' of the two works." ' *Nelson v. PRN Prod., Inc.,* 873 F.2d 1141, 1142 (8th Cir.1989).

1. Direct Evidence of Copying

Rottlund submits that there is ample direct evidence of copying in this case. First, it argues that BSB architect Larry Moore admitted that he relied on earlier projects--Midland Homes and Jerry's Homes projects--when designing the Homestead Collection, and that files from those earlier projects contained actual floor plans for Rottlund's Original Villa or New Villa townhomes. In fact, in connection with designing Midland Homes, Rottlund underscores the fact that Moore asked in an internal memo if the designs were enough of a "departure" from Rottlund's. Second, prior to designing the Homestead Collection, Rottlund notes that Defendants toured Rottlund's Villa II townhome on more than one occasion, took photos and obtained Rottlund brochures. Rottlund points out that, in the redline process of the Homestead Collection, TCM president Art Plante attached a photo of a Rottlund product with an inscription referencing the Rottlund product. Finally, Rottlund notes that BSB and TCM had copies of the sprinkler room technical drawing for the Villa II (The Reserve), VAu 546-285, and Dan Geegan and Tim Johnson, former Rottlund employees, were involved in obtaining these drawings.

***19** Defendants submit that the facts Rottlund relies on do not relate to direct copying of the technical drawings at issue, VAu 447-395 and 546-285, with the exception of the sprinkler room drawings for VAu 546-285. As for the sprinkler room drawings, Defendants assert, correctly, that infringement of individual elements in this case cannot be the basis for liability.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Although Rottlund's arguments might raise eyebrows, Defendants are entitled to all inferences. The Court finds that genuine issues of material fact preclude a finding at this stage of direct copying.

2. Access

Rottlund argues that there is significant evidence of access in this case. Former Rottlund employees, who personally had access to the Villa II designs now work for TCM. Defendants have possession of Rottlund floor plans, took multiple tours of Rottlund's Villa II townhome, and took photographs of Rottlund's Villa product. Finally, Rottlund alleges that Larry Moore has admitted that BSB had access. Specifically, Rottlund explains that Tim Johnson, while a Rottlund employee, worked on the Villa II designs, and other former Rottlund employees, such as Dan Geegan, also had access to the Villa II designs while in Rottlund's employ. Citing a long line of cases, including *Imperial Homes Corp. v. Lamont,* 458 F.2d 895 (5th Cir.1972), *Donald Frederick Evans and Assoc., Inc. v. Continental Homes, Inc.,* 785 F.2d 897, 904-05 (11th Cir.1986), and *Robert R. Jones Assoc., Inc. v. Nino Homes,* 858 F.2d 274, 277 n. 2 (6th Cir.1988), (Pl.'s Mem. in Supp. of Mot. for Summ. J., at 26 n. 16), Rottlund submits that access to its Villa II abridged floor plans in brochures, (Davenport Aff. Ex. Z and AA), constitutes access to the technical drawings. *See Donald Frederick,* 785 F.2d at 904 (rejecting the defendants' argument that "because they did not have access to the technical working drawings, which are the documents described in the copyright registration, they did not copy the protected works").

Defendants argue that all of the evidence regarding product tours and photographs is irrelevant because it does not constitute access to the technical drawings. *But see Kootenia Homes, Inc. v. Reliable Homes, Inc.,* No. 00-1117, 2002 WL 15594, at *5 (D.Minn. Jan. 3, 2002) ("[Eventual homeowner's] tour minimally suffices to create a factual issue as to the extent of Defendants' access to the Hoeffel Home design."). Defendants assert that floor plans in brochures cannot constitute access to the technical drawings deposited with the Copyright Office, and Defendants submit that the brochures in question, (Davenport Aff. Ex. Z and AA), are not of the Villa II. Defendants further argue that access to the Rottlund materials in BSB's Midland Homes' and Jerry Homes' files is irrelevant, again because those files do not contain technical drawings. Defendants, at least TCM and BSB, admit that they had access to the sprinkler room technical drawings for the Villa II (The Reserve), VAu 546-285, but state that that does not constitute access to the entire technical drawing. Finally, TCM argues that hiring former Rottlund employees does not establish access to the technical drawings.

***20** Access is established by showing Defendants "had an 'opportunity to view or to copy" ' Rottlund's technical drawings. *Moore v. Columbia Pictures Indus., Inc.,* 972 F.2d 939, 942 (8th Cir.1992); *accord, e.g., Nino Homes,* 858 F.2d at 277 ("Access merely means an opportunity to view the protected material."). Rottlund must demonstrate a "reasonable possibility" of access, a bare or metaphysical possibility will not suffice. *Moore,* 972 F.2d at 942.

The Court finds that Defendants had a reasonable opportunity to view Rottlund's technical drawings. It remains undisputed that, while an in-house architect for Rottlund, Tim Johnson worked on the design development of Rottlund's Villa II project. (Davenport Aff. Ex. JJ, at 143:23-25). Thus, not only did Tim Johnson have the opportunity to view the technical drawings, he personally helped create them. Tim Johnson then moved to TCM where he is the coordinator of architecture. *Id.* Ex. Q, at 247:18-248:12. This plainly constituted direct access to the technical drawings; the Court need not rely on circumstantial evidence. *See Taylor Corp. v. Four Seasons Greetings, LLC,* 315 F.3d 1039, 1042 (8th Cir.2003) ("It is undisputed that Four Seasons had direct access to at least four of Taylor's six designs, because the three artists who created the designs [while employed by Taylor] later created the alleged infringing designs for Four Seasons [while employed by Four Seasons]."); *Control Data Sys., Inc. v. Infoware, Inc.,* 903 F.Supp. 1316, 1321 (D.Minn.1995) ("The prior employment with Control Data and the access to manuals containing the NOS source code demonstrate a reasonable possibility that Defendant had an opportunity to review the copyrighted material."); *Costello, Erdlen & Co., Inc. v. Winslow, King, Richards & Co.,* 797 F.Supp. 1054, 1056, 1062 (D.Mass.1992) ("[I]t can reasonably be assumed that Winslow had access to other Costello guides during his employment."); *Saenger Org., Inc. v. Nationwide Ins. Licensing*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*Assoc., Inc.*, 864 F.Supp. 246, 249 (D.Mass.1994) (explaining that the parties did not dispute access where the individual defendant "was employed by [plaintiff] from July 15, 1986 to September 15, 1992 during which time he 'worked on, and assisted' in developing these texts [the copyright work]"). Moreover, another former Rottlund employee, Dan Geegan, now with TCM, had a clear opportunity to view Rottlund's Villa II designs while a Rottlund employee. Karen Albertson testified that she is the current Rottlund estimating coordinator and has been since about 2000. (Krummen Aff. Ex. G., at 9:3-20). Ms. Albertson testified that the previous estimating coordinator for Rottlund was Dan Geegan. *Id.* at 9:21-10:1). Ms. Albertson explained that, as Rottlund's estimating coordinator, Dan Geegan "had access to the same information that I have access to" such as "[a]ny of the-bidding documents, the plans, quantity takeoffs, pricing information, vendor information, anything." *Id.* at 13:25-14:9). *See Chere Amie, Inc. v. Windstar Apparel, Corp.*, 191 F.Supp.2d 343, 350 (S.D.N.Y.2001) ("Access is uncontested since the former Obvious Employees certainly had access to the Sleepwear Designs during their employment with that company."). [FN27] Still other former Rottlund employees, Marc Harris and Joey Zorn, joined TCM, and it is reasonable to assume that they at least had an opportunity to view the Villa II drawings during their employment with Rottlund. (Davenport Aff. Ex. KK, at 58:5-22.).

FN27. The undersigned recognizes that some of the cases cited in this section are in the context of a motion for preliminary injunction, but the Court finds that the logic of the holdings can be securely extended to the standard for access on summary judgment where similar facts are undisputed. Indeed, in most of the cases the defendant did not even dispute access where its employee(s) formerly worked for the plaintiff.

***21** Access to both versions of the Villa II is established. According to Defendants, "[t]he only alleged difference between the 546-285 registration [Villa II-the Reserve] and the 447-395 registration [Villa II-Rush Creek] is that the former includes a room at one end of the building containing the required sprinkler pipes." (Defs.' Mem. in Supp. of Mot. for Partial Summ. J., at 4) (Doc. No. 409). Both TCM and BSB had physical possession of the technical drawings for the sprinkler room of the Villa II. *Compare* Davenport Aff. Ex. VV at BSB01262-63, Ex. YY, at BSB001022-23, *and* Ex. ZZ, at BSB00975-76, *with* Ex. WW.

TCM argues that there is no evidence that any former Rottlund employees "utilized [their] knowledge ... in the development of the Centennial Crossings or Harvest Hills technical drawings." (TCM's Mem. in Opp'n to Mot. for Summ. J., at 24). TCM submits that the only evidence is a letter from Geegan to BSB indicating that Geegan, Harris, and Zorn were involved in the red lining process for Harvest Hills, but this was after the Centennial Crossing drawings were completed. First, a plaintiff simply need not prove a defendant utilized its knowledge of the protected work to constitute access, a mere reasonable *opportunity to view* will suffice. Indeed, proof of actual viewing much less utilizing knowledge gained from viewing is not even necessary. *See, e.g., Moore,* 972 F.2d at 942 ("[Plaintiff] can establish access by showing that the defendants had an 'opportunity to view or to copy' his work."); *Herzog v. Castle Rock Entm't,* 193 F.3d 1241, 1249 (11th Cir.1999) ("[S]ome courts have defined access as the actual viewing and knowledge of plaintiff's work by the defendant. This circuit, however, regards a 'reasonable opportunity to view' as access."); *see also Am. Greetings Corp. v. Easter Unlimited, Inc.*, 579 F.Supp. 607, 613-14 (S.D.N.Y.1983) (finding access "in the formative stages" of development). Second, proof that Geegan, Zorn, or Harris were directly involved in designing both of TCM's townhomes is not necessary. It is sufficient that TCM, through these former Rottlund employees, had an opportunity to view the protected works. Further, Defendants do not dispute that Tim Johnson was involved in the design process of TCM's townhomes.

TCM's access to Rottlund's technical drawings reaches the other Defendants. A "Plaintiff may prove access by showing that a third person with creative input for the designer has had access to the copyrighted work." *Kootenia,* 2002 WL 15594, at *5; *c.f. Kamar Intern., Inc. v. Russ Berrie and Co.*, 657 F.2d 1059, 1062 (9th Cir.1981) (" '[E]vidence that a third party with whom both the plaintiff and defendant were dealing had possession of plaintiff's work is sufficient to establish access by the defendant...." '); 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, § 13.02[A], at 13-

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

17. Here, BSB was TCM's architect. TCM and BSB had multiple discussions about the design of TCM's townhomes, and TCM participated in redlining the designs of its townhomes. Thus, TCM's clear access is reasonably imputed to its architect for the Homestead Collection townhomes. *See Arthur Rutenberg Corp. v. Parrino,* 664 F.Supp. 479, 481 (M.D.Fla.1987) (finding that "Joseph Parrino's [the homeowner] access to the 'Inverness' plans is fairly attributable to Precision [the architect]"). [FN28]

FN28. The Court notes that BSB architect Larry Moore testified, in response to a question as to whether he had access to Rottlund's materials, that, "We had access. We did not access them. We did not use them." (Davenport Aff. Ex. FF, at 42:8-19).

***22** Likewise, BSB designed Pinnacle's Washington Square townhome by adapting TCM's Homestead Collection townhomes. [FN29] (Davenport Aff. Ex. RR; Ex. SS, at 59:16-60:22, 69:11-15, 138:16-139:8). The key feature between TCM and Pinnacle is "the close relationship linking the intermediary and the alleged copier." *Moore,* 972 F.2d at 944. [FN30] Pinnacle's in-house architect, Steve Sandelin, was involved in the design of TCM's Homestead Collection from the very beginning-actually recommending BSB as the architect. (Davenport Aff. Ex. U, at 34:2-22). As has been explained in previous Orders of this Court, June 30, 2004 Order, at 6 (Doc. No. 418), Pinnacle's Sandelin commented on or gave input on TCM's Homestead Collection designs. Sandelin toured Rottlund's Villa II with TCM representatives and possibly representatives from BSB. Ultimately, while designs for TCM's Centennial Crossing townhome were finishing up, Pinnacle decided that it would design a back-to-back townhome for Aurora, Illinois "from the working drawings originally prepared for Maple Grove, Minnesota (TCM's Centennial Crossing townhome). (Davenport Aff. Ex. RR; TT). Faced with this relationship between the parties, the Court finds that TCM was in a position to transmit its information to Pinnacle. Thus, the inferential chain reaches Pinnacle.

FN29. TCM and Pinnacle are not totally unrelated entities. Pinnacle does business as Town & Country Homes, and TCM is the allegedly separate Minnesota division of Town & Country Homes.

FN30. The concept of an intermediary usually is found in cases where a party sends a musical recording or literary work to a company and, through an inferential chain, access is established as to the copier. Nimmer, § 13.02[A], 13-17-24. The circumstances here are analogous.

When a reasonable opportunity to view is established, it is appropriate not just to find a mere inference of access but to deem access established. As Nimmer explains:

> It would seem clearer and more just in terms of the plaintiff's burden of proof to regard a reasonable opportunity to view as access in itself and not merely as creating an inference of access. This approach is consistent with what is perhaps the more prevailing definition of access, i.e., the opportunity to copy. The trier of fact may conclude that the person who created defendant's work had, but did not avail himself of, the opportunity to view, but this conclusion properly goes to the ultimate issue of copying, and not to the subordinate issue of access.

Nimmer, § 13.02[A], at 13-16 (footnotes omitted).

Plaintiff is entitled to a finding of summary judgment on access--that Defendants had a reasonable opportunity to view the Villa II technical drawings.

2. Substantial Similarity

The Eighth Circuit Court of Appeals has directed that *"Hartman v. Hallmark Cards, Inc.,* 833 F.2d 117, 120 (8th Cir.1987), indites the law in this Circuit pertaining to substantial similarity." *Nelson v. PRN Prod., Inc.,* 873 F.2d 1141, 1143 (8th Cir.1989). *Hartman* provides:

> There must be substantial similarity "not only of the general ideas but of the expressions of those ideas as well." First, similarity of ideas is analyzed extrinsically, focusing on objective similarities in the details of the works. Second, if there is substantial similarity in ideas, similarity of expression is evaluated using an intrinsic test depending on the response of the ordinary, reasonable person to the forms of expression.

***23** 833 F.2d at 120.

Thus, at the extrinsic step, district courts in this Circuit are required to consider the similarity of ideas, all of which are unprotectible. *Id.; Taylor*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*Corp. v. Four Seasons Greetings LLC,* 171 F.Supp.2d 970, 975 (D.Minn.2001) ("First, an 'extrinsic' analysis is performed to determine whether the general idea of the two works is substantially similar."). The extrinsic test looks at such matters as " 'the type of artwork involved, the materials used, the subject matter, and the setting for the subject." ' *Nelson v. PRN Prod., Inc.,* 873 F.2d at 1143 (*quoting Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1164 (9th Cir.1977)). Expert evidence is admissible at this stage of analysis (and only at this stage). *Id.*

A comparison of the Villa II plans and the Homestead Collection and Washington Square plans reveals that there is a similarity of ideas. The type of work involved is similar: both are architectural drawings. The subject matter is similar: both depict residential, back-to-back townhomes. The materials used are similar. As TCM and Pinnacle's expert, Jeffery Scherer, states, each plan utilizes similar ideas of structure, function, and design: wood framed structure, slab-on-grade; kitchen, dining, living, bathroom, 2-car garage, master bedroom and bath, bedroom, laundry, shared bath, and spare room; gabled roofs, double-hung windows, protected entrances, and siding with masonry base. (Scherer Aff. Ex. A, at 9). [FN31] Further, although concluding that the plans are not "substantially similar," Scherer nevertheless admits that the plans utilize "similar elements, proportions, and roof configurations." *Id.* at 30. Finally, BSB's expert, Albert Bloom, testified on this very topic:

FN31. The Court notes that Pinnacle states Mr. Scherer's report and analysis of the plans, although only explicitly dealing with the Villa II and the Homestead Collection, applies with equal force to Pinnacle's Washington Square product. (Defs.' Mem. in Supp. of Mot. for Partial Summ. J., at 27) (Doc. No. 409).

Q: Are there similarity of ideas between the Villa II and the Homestead Collection?
A: Yes.
Q: When you say there are similarity of ideas between the Villa II and the Homestead Collection, what do you mean?
A: They're very similar in concept. They're both back-to-back townhouse products.
They have end units or exterior units. They also have interior units. They're slab-on-grade construction. They're two-car garages. They have similar scope as far as the room counts go in living, dining, kitchen, bedrooming, loft spaces, and there's a similarity as far as the gross mass of the building size.

(Davenport Aff. in Opp'n to Defs.' Mot. for Summ. J., Ex. R101, at 6:17-7:5)

Thus, TCM, Pinnacle, and BSB's own experts agree that the designs share similarity in the details of the objective ideas. This Court finds this level of comparison of ideas to be appropriate under the precedent of this Circuit. To tread into greater levels of detail as Defendants propose, would be to approach a comparison of the expressive coordination and arrangement of ideas, which is clearly saved for the intrinsic stage of the analysis. This conclusion is consistent with *CSM* where the Court, considering the extrinsic test, explained:

***24** A comparison of the objective details of the Everest plans and the two sets of CSM plans shows there is a similarity of ideas between them. Both Everest and CSM proposed and designed a rectangular office showroom for the Roseville site.

840 F.Supp. at 1311.

Whether the drawings' expression is similar, the intrinsic test, depends on the response of an ordinary, reasonable person. *Hartman,* 833 F.2d at 120. In other words, "[i]nfringement of expression occurs only when the total concept and feel of the works in question are substantially similar." *Id.* at 120-21; *see also Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir.1960) (explaining the test as whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same"). Summary judgment at this stage "is not favored." *Id.* at 120; *accord, e.g., Sturdza,* 281 F.3d at 1298 (explaining that " '[b]ecause substantial similarity is customarily an extremely close question of fact, summary judgment has traditionally been frowned upon in copyright litigation" ') (quoting *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 977 (2d Cir.1980)).

Considering the drawings at issue (the Villa II Rush Creek and Reserve and the Homestead Collection Centennial Crossing and Harvest Hills and the Washington Square), the Court finds that a reasonable juror could find that the total look and

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

feel of how the drawings selected, arranged, and coordinated the elements is substantially similar, but a reasonable juror would not be compelled to so find. Thus, no party is entitled to summary judgment on the issue of substantial similarity (the intrinsic analysis) of the Villa II and Homestead Collection and Washington Square technical drawings.

D. *Motion to Strike the Scherer Affidavit*

At this point, it is appropriate to discuss the propriety of Jeffery Scherer's expert report. Oral argument was heard on Rottlund's motion on two separate days, due to the length of argument. Rottlund moved to strike the Scherer report after the first hearing but before the second under Rule 56(e) and Federal Rules of Evidence 104(a) and 702. TCM and Pinnacle argue that Rottlund's motion is untimely because it should have been submitted with Rottlund's reply brief and Rottlund never mentioned a dispute with Mr. Scherer's affidavit at the first hearing. This Court is unpersuaded by TCM and Pinnacle's argument. Timeliness of a motion to strike an affidavit is left to the district court's discretion. *Nat'l Union Fire Ins. Co. v. Siliconix, Inc.*, 726 F.Supp. 264, 268 (N.D.Cal.1989). There is no rule requiring a motion to strike to be submitted with a reply brief, although that might be preferable. Contrary to TCM and Pinnacle's argument, Rottlund did object to or contest the Scherer report during the first day of argument; though it did not formally move to strike until after the hearing. Although initially claiming that much of their argument would have to be redone, that concern did not materialize and TCM and Pinnacle have not suffered prejudice due to the timing of the motion. Moreover, even in the absence of Rottlund's motion, the weight given to Scherer's report would be the same.

***25** TCM and Pinnacle also argue that Rottlund's motion should be denied because Rottlund's previous position in the litigation was that expert testimony is necessary for the extrinsic test, and the Court ordered Rottlund to provide a list of the elements of Rottlund's drawings that it claimed were protectible with expert disclosures. There is no dispute that expert testimony is admissible in regard to the extrinsic test. That is not, as explained below, the basis for the motion to strike. In addition, Rottlund's theory of protectible expression does not involve use of individual elements; in other words, Rottlund is not claiming protection for any one element so there is nothing to identify. Rather, Rottlund's protectible expression consists of the selection, arrangement, and coordination of the individual elements, and it has provided Defendants a list of the elements that have been expressively selected, arranged, and coordinated. Further, the Court has engaged, *supra,* in the requisite filtering or analysis of how Rottlund's drawings are protectible.

With regard to the contents of the Scherer report, the Court disregards much of it. Rottlund argues that Scherer's report impermissibly offers an opinion on copyright infringement in general and seeks to redefine the standards for originality and independent creation. TCM and Pinnacle submit that Scherer's report is admissible on the issue of substantial similarity.

One thing is clear: "Although expert opinion evidence is admissible in connection with the first step of the substantial similarity analysis to show *similarity of ideas,* analytical dissection and expert opinion are not called for under the second step in which substantial *similarity of expression* is measured by a different standard--the response of the ordinary, reasonable person." *Hartman,* 833 F.2d at 120 (emphasis added). Thus, expert opinion evidence is admissible under the extrinsic test (ideas), and it is not admissible under the intrinsic test (expression). The Court considers the Scherer affidavit, to the extent it discusses similarity of ideas, but, when Scherer evaluates how individual elements are expressed, the Court finds that such an analysis moves too far into expression; thereby invading the province of the jury. The point at which Scherer purportedly evaluates the townhomes, he simply states that he is going to explain why the townhomes are not "substantially similar." (Scherer Aff. Ex. A, at 17). [FN32] Opining generally on substantial similarity is something Scherer clearly may not do. Substantial similarity is a legal test with two prongs-extrinsic and intrinsic-and the extrinsic prong is the only prong that accepts expert opinion evidence. While Scherer does not always explicitly say he is evaluating expression (the Court does not expect one with no legal training to appreciate the difficult idea/expression dichotomy, and TCM/ Pinnacle argue that Scherer's evaluation should be cloaked with the description of comparing objective

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

details of the ideas as opposed to comparing expression), it is telling that at some points he does. For instance, in evaluating the placement of the gabled roof, Scherer tells the Court that use of the gabled roof "is not subject to copyright," but also that "the manner in which each architect independently created his own *expression* of the traditional gable-within the narrow restriction mentioned above-establishes that they are not substantially similar." (Scherer Aff. Ex. A, at 18) (emphasis added).

FN32. Scherer states that the purpose of his report "is to offer my opinion as to whether there is copyright infringement arising under the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*" (Scherer Aff. Ex. A, at 1). Elsewhere, Scherer affirmatively states "I would contend that the arrangement of the basic elements of the interior is also not protectible." *Id.* at 10. The Court will not consider Scherer's " 'attempt to tell the court what result to reach ." ' *Dow Corning Corp. v. Safety Nat'l Cas. Corp.*, 335 F.3d 742, 752-53 (8th Cir.2003); *see also Kostelecky v. NL Acme Tool/NL Indus., Inc.*, 837 F.2d 828, 830 (8th Cir.1988) (explaining the principle that expert opinion evidence that simply tells the jury what result to reach is not helpful).

***26** With regard to originality, the Scherer report reads more like an amicus brief. "The touchstone for the admissibility of expert testimony is whether it will assist or be helpful to the trier of fact." *McKnight by and through Ludwig v. Johnson Controls, Inc.*, 36 F.3d 1396, 1408 (8th Cir.1994). The Eighth Circuit has recognized that "[b]ecause the judge and not a witness is to instruct the factfinder on the applicable principles of law, exclusion of opinion testimony is appropriate if the terms used have a separate, distinct, and special legal meaning." *Hogan v. Am. Tel. & Tel. Co.*, 812 F.2d 409, 411- 12 (8th Cir.1987) (*citing Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509-10 (2d Cir.1977) and *Torres v. County of Oakland*, 758 F.2d 147, 151 (6th Cir.1985)). Scattered throughout the report, Scherer offers his opinions concerning originality. (Scherer Aff. Ex. A, 1-2) ("To determine whether there has been copyright infringement, I will examine the issues of *original works of authorship* ....") (emphasis in original); *id.* at 2 ("[I]t is further assumed that an *Original Work of Authorship* is only the result of an individual working closely and autonomously with an Owner *for the purpose* of producing an original work.") (emphasis in original); *id.* at 12 ("In effect, the marketplace for affordable suburban housing discourages *Original Works of Authorship* that are born from the 'genius' of an individual.") (emphasis in original); *id.* at 17 ("All of the rooms are rectangular and do not posses any distinguishing features that would identify them as original."); *id.* ("There are no distinguishing or original geometric configurations or plan arrangements that convey imagination or originality."). The Court finds that the Scherer report's discussion of originality would be unhelpful to the fact finder. *See EZ Dock, Inc. v. Schafer Sys., Inc.*, 2003 WL 1610781, at *7 (D.Minn. Mar. 8, 2003) ("[I]ssues of law are not properly the subject of expert testimony. It is the *Court's* duty to instruct the jury on the applicable principles of patent law...."). Regardless of what Scherer thinks original means, "original" for purposes of copyright law has a distinct, special legal meaning. The Supreme Court has outlined the special meaning of original:

> To qualify for copyright protection, a work must be original to the author. Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, "no matter how crude, humble or obvious" it might be. Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying.

***27** *Feist*, 499 U.S. at 345.

Scherer's report relies on his own standard for originality. *Contra Richmond Homes*, 862 F.Supp. at 1526 ("There is no requirement in copyright law that the plans be particularly unusual; they simply must be original. Mass-produced house floor plans are commonly protected."). The Court, of course, will evaluate originality based on the standard set by the Supreme Court. The Court disregards Scherer's discussion of originality for it is unhelpful.

On the other hand, some of Scherer's discussion about how architects operate and what processes they utilize to develop a drawing may be helpful.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Thus, for purposes of this motion, the Court will only disregard the inadmissible portions of the Scherer affidavit and will consider the admissible portions. *See Lee v. Nat'l Life Assurance Co.*, 632 F.2d 524, 529 (5th Cir.1980). The Court will not strike the entire Scherer report but will leave it to the trial judge to determine if a jury should consider particular testimony. *See In re St. Jude Med., Inc. Silzone Heart Valves Prod, Liability Litig.*, No. MDL 01- 1396, 2004 WL 45503, at *16 (D.Minn. Jan. 5, 2004).

The Court does not need to reach the issue of independent creation at this point, and, therefore, does not address the Scherer report's analysis of independent creation.

Based upon the foregoing and all the files, records, and proceedings herein,

IT IS HEREBY RECOMMENDED that:
1. Plaintiff The Rottlund Company's (Rottlund) Motion for Partial Summary Judgment on Liability Issues of Validity, Direct Copying, Access, and Substantial Similarity Concerning Plaintiff's § 102(a)(5) Copyrighted Technical Drawings (Doc. No. 333) should be GRANTED in part and DENIED in part.
2. Plaintiff's Motion to Strike the Affidavit of Jeffrey Scherer (Doc. No. 369) should be DENIED without prejudice.
3. Defendant Bloodgood Sharp Buster Architects and Planners of Iowa, Inc. and the Bloodgood Group, Inc.'s (hereinafter collectively BSB) Motion for Partial Summary Judgment on Copyright Validity (Doc. No. 350) should be DENIED.
4. Defendants' Motion for Partial Summary Judgment (Doc. Nos. 382, 384, and 406) should be DENIED in part. In a separate report and recommendation, the Court will consider the Defendants' collective motion regarding whether the Chateau Collection technical drawings infringe the Villa II technical drawings; whether the Homestead Collection, Washington Square, and Chateau Collection as-built structures infringe the Villa II as-built structure; and the contributory infringement and vicarious liability claims.

Under D. Minn. L.R. 72.1(c)(2) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties within 10 days a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Any party wishing to oppose such objections must file and serve all parties with its response in accordance with L.R. 72.1(c)(2). Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

2004 WL 1879983 (D.Minn.)

Motions, Pleadings and Filings (Back to top)

.0:01CV01980(Docket)
(Oct. 30, 2001)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.