# Exhibit D

columns. The column width/height ratio is 1:11. The entrance width ratio is 1:7.5. [1.17]

2. The use of a manufactured fireplace in a shape predetermined by the manufacturer does not justify the claim that the proportion of the fireplace is substantially similar. Had the Plaintiff's architect used an unconventional or custom fireplace, it would have been easier to trace the source of the design and thus establish substantial similarity. [1.09]

3. The design, proportion, and detailing of the loft is purported to be substantially similar. The decision by both architects to provide a two-story living space overlooked by an upstairs room protected by off-the-shelf railings is a functional choice and should not be construed as evidence of substantial similarity. It is a device commonly used throughout the Twin Cities and other housing markets. Should this Court hold that the idea of a rectangular two-story living space can be copyrighted, then the freedom to practice architecture would be severely limited. It is my opinion that this is not the intent of the copyright laws.

4. Placement of individual rooms such as the dining room, living room, stairways, and kitchen is only similar in the abstract location in the plan. Given the conventional aspects of a townhouse, cited above, it is logical, functional, and inevitable that the kitchen will be located adjacent to the garage, the dining room adjacent to the kitchen, and the living room adjacent to the dining room. The similarities stop at these geographical locations. The Rottlund homes have an "L" shaped kitchen while the Defendants' kitchen is a galley kitchen. [1.07] The Defendants have a space for a breakfast area; Rottlund does not. The dining room is accessed from the center in the Defendants' home; it is accessed along the edge of the



EXHIBIT NO. 453A
6-30-04
P. MAHON

Rottlund home. The wall opposite the windows contains all of the living/dining storage options (the closet is adjacent to the media/bookshelf units); the Rottlund home has the optional closet adjacent to the front door.

Ethical Rules

For his final unwarranted salvo, Mr. Desnick cites the American Institute of Architect's Code of Ethics and Professional Conduct. He states that "BSB Architects violated the letter and spirit of Rule 4.108 when they copied Rottlund's Villa II copyrighted work." As a Fellow and past President of the American Institute of Architects (Minnesota Chapter), I can state that BSB architects did in fact "maintain and advance their knowledge of the art and science of architecture, respect the body of architectural accomplishment, and contribute to its growth. Learned and uncompromised professional judgment should take precedent [sic] over any other motive in the pursuit of the art and science of architecture" (As quoted by Mr. Desnick from Canon 1.) I find no evidence that BSB's architects violated Rule 4.108 by copying or reproducing the copyrighted works of other architects or design professionals. What I did find was that BSB architects:

- Have worked for over ten years in understanding the complexities and restrictions of developer for sale multi-family housing,
- Worked diligently to be creative within the narrow restrictions of this type of architectural product. This includes knowing how to independently create traditional forms and construction methods in such a way that their designs are marketable and affordable,
- Maintained and advanced their knowledge of the art and science of architecture by being fully informed of what other professionals are doing in their chosen field of architectural practice. The citation by Mr. Desnick that exhibit BSB2035A shows that the Defendants were copying the Rottlund gabled entry could only be supported if the designs were

substantially similar. Even though it appears that Mr. Desnick is suggesting that this is the "smoking gun" that clearly shows the Defendants' architects infringed on the Plaintiff's design, it is my opinion that the Defendants' architects were keeping abreast of what was going on in the marketplace and solving a real-world need in a conventional way. As stated elsewhere, the Plaintiff also kept abreast of the competition. As Mr. Desnick knows (he was a student of mine at the University of Minnesota), architects routinely search out, study, and display precedents in their particular field of expertise. If they did not, then architectural publications would cease to exist and cameras would have a much smaller market. The issue is whether the resulting entry structures are substantially similar. I have stated elsewhere why they are not.

Conclusion

Mr. Desnick states that he agrees with "the conclusion of Town and Country's Vice President of Product Design, Steve Sandelin, that the two products are 'obviously similar.'" I too agree that these products have obvious superficial similarities. The questions before us are whether Defendants' units are substantially similar to Rottlund's design, and whether Rottlund's design is an original one. Using identical commercially available products in logical and functional ways does not in my opinion make these town homes original or substantially similar. Using traditional forms in entirely different ways, such as the gabled entry, does not make the town homes original or substantially similar. Using gabled roofs, common to marketplace town homes, does not make them original or substantially similar. That both units have kitchens does not make them substantially similar. That two builders operating in the same market use logical plan arrangements containing similar elements, proportions, and roof configurations does not make the designs substantially similar.

Exhibit E

**Supplemental Expert Report**
Jeffrey A. Scherer, FAIA
May 14, 2004

In the matter of

The Rottlund Company, Inc. v.
Pinnacle Corporation and Town and Country Homes, Inc.
Court File No. 01-1980 DSD/SRN.

---

I have been asked by the Defendants Town and Country Homes and Pinnacle Corporation to provide a supplemental expert opinion in the matter of The Rottlund Company, Inc. v. Pinnacle Corporation and Town and Country Homes, Inc., Court File No. 01-1980 DSD/SRN. The purpose of this Supplemental Expert Report is to offer my opinion as to whether there is copyright infringement arising under the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq*. As a matter of record, I am setting forth my expert report related to the issue of copyright infringement only. I am not offering opinions regarding the claims under the Lanham Act or the Minnesota Uniform Deceptive Practices Act. My opinions are based on my experience as an architect and educator. My opinion is subject to amendment, supplementation, and revision should additional information or materials be made available to me. To determine whether there has been copyright infringement, I will examine the issues of *original works of authorship* and *independent creation*. Numbers bracketed as such [_] refer to the appendix item. (E.g., [1.03] refers to page 3 of appendix item 1.) Further this supplemental report is prepared in response to the *Supplemental Expert Report of Anthony Desnick, AIA*, and dated April 15, 2004.

This supplemental report by Mr. Desnick includes a *Supplemental Chronology*. It appears that the purpose of this supplemental chronology is to establish that the source of the ideas for the defendant's work product is the plaintiff's Villa II product. Mr. Desnick provides no evidence of direct copying. This chronology, in my opinion, ignores the basic issue: Are the objective details of the ideas embodied in the product of the defendants substantially similar to those of the plaintiff? As I stated in my August 15, 2003 expert report, it is common and acceptable practice for architects to understand their particular fields of design specialization by studying the marketplace, competitors' work and reviewing the literature. This process is normal and begins as early as their training in architectural school. It continues throughout the career of any successful architect and, in my opinion, marketplace builder. We know, for example, from the statement of Rottlund's president, Mr. Todd Stutz that Rottlund believes that acquiring this knowledge of the marketplace is an essential ingredient of a successful builder. He states "I think it is the policy of almost all builders to shop the competition, otherwise you don't stay in business very long." (Rule 30(b) (6) deposition of Todd Stutz, at 442). This process is, in my opinion, an important part of developing

EXHIBIT NO. 424
6-30-04
P. MAHON

ideas. Both parties in this case have used precedent to develop and differentiate their own ideas from those of their competitors. The detailed chronology as stated by Mr. Desnick seems to suggest willful taking of a copyrighted work through direct copying. This chronology illustrates, in my opinion, the defendant's attempt to understand the ideas of their competitor. In my opinion, the defendant has the right to understand the abstracted ideas of a) the eight-unit back-to-back town home, b) entries, c) gable roofs, d) garages, etc. How these ideas are ultimately expressed in the final product is the central issue. The plaintiffs have chosen to rely on the concept of "gestalt or combination of spaces" (see Desnick supplemental report page 11, section IV) as the basis for claiming copyright infringement. This basis, in my opinion, is an attempt to move the attention away from the literal and objective expression of the idea. If this focus away from the detailed objective details of the ideas is successful, it will, in my opinion, undermine the ability of any builder or architect to practice their expert craft or business. All eight-unit townhomes are likely to look substantially similar in the abstract at a great distance. By its nature, the further one moves away from a detailed analysis of architecture, the more similar buildings can seem. It also follows, in my opinion that the more detailed and developed the ideas, the more important it is for the expert to use that detail to determine the opinion in the matter of substantial similarity.

It is at this objective detailed level that I am stating my opinion. By their very nature, works of architecture are conceived on the abstract level but executed on the detailed idea level. It is at this detailed and objectively analyzed level that one can understand and demonstrate that there is more than one particular form of a design idea to solve similar abstract marketplace ideas such as townhomes. This applies equally to entryways, kitchen, living rooms, roof forms and all other abstract elements of a residence. Accordingly, it is my opinion, stated and illustrated in detail in my early report, that the Town and Country product is not substantially similar to the Rottlund product.

Set forth below are my opinions as to why the objective detailed ideas are not similar. It is in my role as an expert that I am demonstrating the differences of the objective details of the two products. The task of comparison can only be done, in my opinion, at this detailed level. Since these two products relied upon experts (architects) in their independent creation, it is the purpose of my expert opinion to demonstrate why the design ideas are marketedly different.

**Abstracting an Idea**

The act of studying the marketplace can take many forms. One way to study the market place would be to "shop the competition" (Rule 30(b) (6) deposition of Todd Stutz, at 442). To shop the competition, in my opinion, is simply the beginning stage of understanding the competitive market. Only after an analysis of the observations does the acquired knowledge becomes meaningful. "Cut and paste" (Ex. 330; Moore Depo. At 239-240) is an act or process used extensively in the early stages of idea formation by designers to abstract an idea and reconfigure it to test it in a new form. It is also important to note that idea formation as process is one that is based upon abstraction of knowledge that is collected. The use of floor plans, which are abstractions of a building, not the building itself, is much like using squares or boxes to test a relative size and shape in new or different configurations. Only after a careful analysis of the objective details can a conclusion as to difference be made. In much the same way after comparing the details of the elevations and plans we can begin to understand the whole to be different. Changes in proportioning in windows, overall building width, column sizes, and profile contribute to the overall whole being different to the degree that the two elevations cannot be mistaken for each other.

**Comparative Market Departure and Copyright**

Since products can be considered similar in an abstract sense the details become important in determining the marketability of the product itself. In such a competitive market the individual development of details is required to differentiate the product in the marketplace. The departure must be considered in abstract ways, often through plan analysis, elevation analysis, and comparing abstractions to the competitors. The departure is typically questioned in order to distinguish the product in a competitive environment where most building products are "off-the-shelf." In much the same way, the very nature of market driven design requires that a constant awareness of copyright issues be present. (Ex. 335 at BSB03482 and at BSB03484)

**Product Research**

Product brochures, which often include plans, elevations, images, etc., are often available to the public. The brochures themselves are comprised of abstract representation of the product but are not to be confused with the product itself. The abstractions in many ways are conceptual, which covers the broad sense of the product but does not take into account the whole with its details. When two products are created for a similar constituency with very restrictive market pressures, there will necessarily be similarities. Only after analyzing the objective details of the ideas in the works will one begin to see the major differences between them. Mr. Desnick failed to do this.

**Detailed and Objective Development of Ideas**

The act of creating a detail changes the understanding of the whole. Once rooms are made bigger things such as window placement, wall proportions, roof lines, spatial quality of the room, etc. will most definitely change and be perceived as different. "We see a mistake they're making and we better it. If their rooms are too small, we make them bigger. If their closets are too small, we make them bigger, we better it." (Moore Depo. Tr. at 40:23-41:1). This statement, in my opinion, reflects an analysis of the competitive market with the intent of creating an original product while remaining competitive within strict market constraints.

**Revisions—Details and Ideas**

The revisions of the side elevation and entry is based on discussions about the detail affecting the understanding of the whole and cost as written by Michael Wagenknecht, "We strongly believe that the window is needed for the two story column condition." (Ex. 84) The omission of the window on the end elevation creates differences between the schemes.

**Detailed Analysis**

It is important to be specific about the comparisons of objective details of the ideas embodied in the plans and elevations. I have conducted a thorough and detailed analysis of those ideas as exhibited in my preliminary expert report dated August 15, 2003. In my opinion, the objective details of the ideas are not substantially similar.

**Comparison of the Villa II and the Chateau Collection—Unit B Place**

Rottlund's Rush Creek and The Reserve (D00001-14 and RCI004150-4166) and the Chateau Collection of Town and Country (D30321-356 and D30357-391)

**Entry Door Location**

The entry doors in the central units in both schemes are located on the only available exterior wall, which is a condition that is created by the back to back configuration of units. This situation creates 3 possible locations for an entry door: one next to the garage, one in the middle of the living room, and one next to the adjoining unit. Placement of the entry next to the adjoining unit would associate the entry space more with the neighbor's unit. Placing the entry in the center of the living room affects the efficiency of the living room layout. Placing the entry near the units own garage creates a shorter walk and more efficient layout to the living space. This decision seems to be made from an efficiency and privacy standpoint. These elements are not substantially similar.

Entry Cover

In both schemes the entry is covered, which is a commonly practice for creating weather protection. The Villa II scheme shows a roof that extends in a continuous fashion from each side wall of the entry space, creating a one story exterior entry vestibule. In the Chateau Collection scheme the entry is covered only from the garage side wall to approximately the middle of the exterior of the living room wall. Since the Chateau Collections roof covers only a portion of the exterior space, the entry is associated with a two storey volume next to the actual entry, which is substantially different from the entry space created by the Villa II scheme. These elements are not substantially similar.

Garage Location

Although the garage locations are similar for both the Villa II scheme and The Chateau Collection scheme, the locations are a result of mirroring the plans in order to create efficiency in shared plumbing zones. This is a very common solution for back to back living unit design. The location of the garages in both schemes could realistically be derived from a simple analysis of: mirroring plans for efficiency, sharing common plumbing walls, and the desire for private entry into each unit. These elements are not substantially similar.

Garage Roof

The garage in the Chateau Collection protrudes farther from the entry door than the garage in the Villa II. The extension creates a larger sense of entry space in the Chateau Collection scheme than is present in the Villa II scheme. These elements are not substantially similar.

Window Location

There are several factors that constrain the window locations in both plans. Since a back to back configuration of the units is used in both schemes a limited amount of exterior wall is present in both schemes, making options limited. Residential building code also requires windows be placed within each sleeping unit. With the limited amount of exterior wall surface available, building code requirements and market forces that require windows in areas such as the living room it is completely understandable that both of these schemes have windows in each room that adjoins the exterior wall. In both schemes, constraints placed upon the design by such forces also require any bedroom, typically placed on the second floor for privacy issues, to be located adjacent to the only available exterior wall. These elements are not substantially similar.

Kitchen and Bathrooms

Both the Villa II and Chateau Collection schemes use the very common practice of sharing plumbing walls with the neighboring units to reduce cost and increase efficiency. The sharing of plumbing walls created by mirroring units leaves a very limited amount of options for placement of spaces such as kitchens and bathrooms. Bathrooms in both the Villa II scheme and the Chateau Collection scheme follow the common practice of being located on a shared plumbing wall, near garage entrance, and near the kitchen. Their similarity of the ideas stops at this abstract placement level.

The kitchens in both schemes are located on a shared plumbing wall, however the Villa II scheme is designed as an "L" shaped space and the Chateau Collection scheme uses the idea of a "U" shaped kitchen which results in two different types of spaces and uses. They are not similar by any stretch of the imagination. These elements are not substantially similar.

Stair

In the Chateau Collection scheme the stair is configured as a switch back design (D30327) which creates a small space in front of the "U" shaped kitchen counter. The Villa II scheme uses the idea of a stair design that runs along the back wall in a similar position as the stair in the Chateau Collection. This creates a different type of space, which associates the stair more with the dining room, as opposed to the Chateau Collection scheme, which associates the stair with the small space adjacent to the kitchen. These elements are not substantially similar.

Upper Floors

The upper floor plans exhibit little similarity in their overall sizes and layouts. The overall details, sizes, and layouts differ marketedly and are, therefore, not similar.

Comparison of Rottlund Villa II Plan "C" (D 00006) and Town & Country Chateau Collection Plan "C" (D 30336)

**Kitchen**

The kitchen in Town & Country Chateau Collection Plan "C" (D 30336) is a Galley type kitchen that is long and narrow with counter space on two sides. The kitchen in Rottlund Villa II Plan "C" (D 00006) is "L" shaped with an optional island. The overall configurations of these ideas are not substantially similar.

**Powder Room**

Rottlund Villa II Plan "C" (D 00006) has an isolated powder room and alternatively Town & Country Chateau Collection Plan "C" (D 30336) has a mud room that is accessed both from the garage and kitchen. The entry from the Garage in the Chateau Collections plan is through the mudroom and then through a small hall like space that is between the mudroom, kitchen, and powder room. The Entry from the garage in the Villa II plan is much more open and directly related to the kitchen. This difference in layout makes the kitchens appear entirely different, even though they reside in similar locations in the plans. The locations of the powder rooms and kitchens can be attributed to the proximity of the shared plumbing wall. These elements are not substantially similar.

**Dining Room**

The dining rooms in both the Villa II plan "C" and the Chateau Collections plan "C" are located as close as possible to the kitchens. The location is a common relationship that enables the dining room to function properly, a greater distance between dining and kitchen in either case would affect the marketability of the plan. The Chateau Collection's dining room has open views through the associated kitchen making them appear connected. The dining room of Rottlund's Villa II is separated from the kitchen by a 42" high counter, which underscores the idea of separate kitchen and dining area.

**Living Room Entry**

In both plans the living room is located near the entry space. The location of the entry and living room in the Chateau Collection's plan helps to keep the more public spaces near the front of the unit and more private spaces towards the inner parts of the unit. This is typical and common for residential design. The entry for the Villa II plan "C" is located near the dining room and what can be considered the end of the complex of units, creating an entry space between the living room and

dining room. The entry stairs to the second floor in the Villa II is perceived to be between the dining room and kitchen. Alternatively, the location of the entry space in the Chateau Collection's plan is associated solely with the living room and the idea of the stair is perceived to be at the edge of the living room only. These elements are not substantially similar.

**Second Floor**

The plan for the second floor of Rottlund Villa II Plan "C" (D 00006) and Town & Country Chateau Collection Plan "C" (D 30336) is completely different except for the general location of the bathroom, which in both cases utilizes the shared plumbing wall. The overall layout, proportions, size and details of the bathrooms are different in every way. In the Rottlund Villa II plan the master bedroom is located in a similar location as the Town & Country's Chateau Collection's bedroom #2. The laundry room and stairs are in different locations, reflecting detailed ideas that have completely different spatial relationships. These elements are not substantially similar.

**Loft Space**

Both the plans for the second floor of Rottlund Villa II Plan "C" (D 00006) and Town & Country Chateau Collection Plan "C" (D 30336) have a loft space. In the Town and Country Chateau Collection Plan the loft space runs parallel to the staircase in which case the stair runs between the loft and the living space. In the Rottlund Villa II Plan the loft space runs parallel to the living space and the stair is off to the end of the living space and loft space. The different configurations reflect differences in spatial ideas between the two products. These elements are not substantially similar.

**Exterior Elevations**

The exterior elevations of Rottlund's Villa II Elevation (RC1004150) and Town & Country Chateau Collection Elevation (D 30322) have no proportions that are similar except the proportions of the garage doors, which are pre-manufactured "off the shelf" and standard in proportion. The elevations, garages and the faux chimneys are not substantially similar.

**Elevation Massing**

The ideas embodied in the way the overall massing of the elevations are different. The Rottlund Villa II elevation is book ended by a double gable on the end units, which is approximately 32 feet in width with small gables towards the center of the elevation. The double gable configuration in the Villa II elevation helps create a heavier appearance at the ends of the elevation and a lighter appearance in the center. Alternatively, the Town & Country Chateau Collection's elevation is

heavier in the middle of the elevation due to two smaller sets of double gables closely situated next to each other; the double gables are about 19.5 feet in width. The idea of smaller gables on the end units of the Town & Country Chateau Collection's Elevation help lighten up the massing towards the end of the elevation. Both elevations use a configuration of standard type "lap" siding and "shake" siding in different locations and proportions. These elements are not substantially similar.

Other Non-Related References

Elevations in Detail

Mr. Desnick offers a false comparison between Midland Homes and Rottlund's New Villa. These are not the product at issue in the lawsuit. Although both have three gables on the second floor the overall sizes, details of trim work around windows, and proportions of window to wall space within each gable is considerably different. More specifically, the gables at the ends of Midland Homes 8-plex contain a clustering of a single three window unit with a faux arch and keystone above and the gables at the end. Rottlund Homes 8-plex uses a pair of two window units with simple moldings around the windows themselves. Both elevations use a common placement of a typical "off the shelf" round louver, Rottlund's 8-plex using one louver on each gable for a total of three and Midland Homes 8-plex using one louver total. Although these particular louvers are ornamental in nature, it is important to note that traditionally the louver itself is intended to function as a ventilation device for an attic and is most often placed at the highest point of an attic. The use of such ornament in this particular location can be traced back into history and is common practice. The Midland Homes elevation shows a gabled entry with faux arch and keystone above at each end unit of the complex as compared to a sloped roof that is continuous with the main roof of the Rottlund Homes 8-plex. The Midland Homes 8-plex also has a shorter roof line at the very edge of the elevation (above the outermost windows) which is considerably different from the Rottlund Homes 8-plex elevation that has a higher continuous ridge line over the end units.

Window Placement

Window placement within any sleeping unit is required by residential building code. When comparing the two elevations it seems logical that all rooms that have an exterior wall will have a window within them. Ensuring that windows are present in most rooms is not only important for the general health, safety and welfare of the public but it would become very difficult to meet market demand if there were no windows within the living room or dining room. Common practice also dictates that windows are placed in the center of the wall. The Rottlund elevation and Midland Home's elevation follow standard window placement concepts when executed in detail,

however, sizes and proportions vary between schemes. It is also important to note that, the 8-plex configuration, by its general abstract layout, limits the amount of available exterior wall. The physical constraint created by the general layout leaves little option for window placement.

Conceptual Sprinkler Riser

When looking at the overall layout of the eight unit plans the common spine running in the long direction down the middle of the complex presents itself as the most economical and straight forward location for sprinkler supply lines. When taken in an even larger context it makes sense that the sprinkler supply would enter at one of the ends of the complex because any adjoining complex could take advantage of the water supply coming off city's supply line near the street. Basically, the city's supply can be brought in between two eight-unit residential units, branched off in opposite directions and fed directly down the spine to each unit to ensure that the general, health, safety, and welfare of the public is protected. After reviewing each overall layout for Rottlund and Town and Country I have determined that the location of the sprinkler riser is determined by efficiency. Any other location in both schemes would require unneeded duplication of city water taps and more service lines than needed. Upon a detailed inspection of the sprinkler riser room in both schemes it is my opinion that the layout and design is standard in nature and is derived mainly by its ideal location, as discussed prior, and the governing fire protection codes that determine clearances, drainage, access, and equipment to be used. The fire safety code outlines this particular configuration and it is vital to the health, safety, and welfare of the public in both schemes. These utilitarian sprinkler rooms are not similar.

End of Supplemental Expert Report

Jeffrey A. Scherer, FAIA
May 14, 2004

## Appendix A – Materials Considered for Supplemental Expert Report of Jeffrey Scherer, FAIA

1. Depositions and Exhibits:
   2-6, 11, 26, 41, 42, 43, 43A, 55A, 59, 60, 78, 81, 84, 87, 89A, 90, 95, 109, 110, 114, 128, 128A, 128, 129, 130, 225, 226, 228, 242, 245, 250, 251, 266, 267, 288, 289, 300, 314, 330, 335, 338, and 339
2. Deposition of Timothy Whitten, with accompanying exhibits
3. Deposition of Steve Sandelin, with accompanying exhibits (12/98-09/03)
4. Deposition of Linda Alfson, with accompanying exhibits
5. Excerpts from Steve Sandelin's 12/16/02 deposition
6. BSB's Rule 30(b)(6) depositions, with accompanying exhibits
7. Rottlund's Rule 30(b)(6) depositions, Timothy Whitten and Todd Stutz, deponents, with accompanying exhibits
8. Excerpts from the depositions of Art Plante (12/19/02), Beth Miller (09/03/03), Karen Albertson Steve Thies, Steve Swanson and Jason Jorgenson
9. Depositions of James Grundmeier (09/02/03 and 02/17/04) and Larry Moore (09/04/03 and (02/17/04), with accompanying exhibits
10. Copies of expert reports of A. Desnick, A. Bloom, D. Buster, L. Moore, J. Safin, C. Jorgensen, and J. Scherer

Exhibits:

D31355
D31544
D31578
D33269
D33299
D33310
D34163
D34167
D34826
D34944
D35198
D35199
D00001-00014
D16025-16029
D30321-30356
D30357-30391
D31370-31375
D31376-31382
D31393-31408
D31436-31437
D31491-31494
D31495-31496
D31498-31502
D31504-31505
D33166-33170
D33171-33173
D33188-33201
D33264-33270
D33266-33267
D33281-33284
D33285-33289
D33317-33318
D33320-33321
D34180-31481
D34340-34345
D34513-34535
D34602-34606
D34607-34615
D34616-34618
D34619-34623
D34624-34628
D34629-34635
D34636-34637
D34638-34642
D34643-34647
D34648-34650
D34651-34656
D34657-34660
D34817-34820
D34909-34919
D35118-35122
D35134-35142
D35156-35165
D35184-35185
D35201-35203
D35204-35205
D35212-35216
D35217-35223
D35224-35228
PINN01469
PINN04622
PINN04667
BSB01262
BSB01587
BSB01588
BSB01589
BSB01590
BSB01621
BSB01624
BSB02593
BSB02597
BSB03754
BSB04490.1
BSB04498.1
BSB04539-4551
BSB012223
TM00172

TM00563
TM00569
TM00573
TM00693
TM00750
TM00759
TM00256-262
TM00322-327
TM00523-576
TM00535-536
TM00631-634
TM00635-639
TM00871-872
TM00873-879
TM00881-882
TM00886-895
TM00906-908
RCI001434
RCI009658
RCI001418-1437
RCI001603-1616
RCI021227-21238
RCI021227-21238
RCI002525-2532
RCI000300-301
RCI004150-4166
RCI009705-9723
DDI000002
DDI000021-25

End of Appendix A

# Exhibit F

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

---

The Rottlund Company, Inc. d/b/a Rottlund Homes, a Minnesota Corporation,

Plaintiff,

vs.

Pinnacle Corporation d/b/a Town & Country Homes, an Illinois Corporation, and Town & Country Homes, Inc., a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc., a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

---

Deposition of
Jeffrey A. Scherer, FAIA
Wednesday, June 30, 2004
9:06 a.m.

create the Homestead Collection?
A. I believe it's possible for any architect to independently create a work of architecture even though they may have studied precedence of all kinds.
Q. Did Town & Country look at Rottlund's Villa II before it designed the Homestead Collection?
A. I don't know. I believe they were aware of the Villa II.
Q. Did Town & Country's Minnesota president tour Rottlund's Villa II product before the Homestead Collection was designed?
A. I don't recall.
Q. Did Town & Country's architect, Steve Sandelin, tour Rottlund's Villa II before the Homestead Collection was designed?
A. I don't recall that.
MR. SCHWIEBERT: Objection, the question is vague.
BY MR. KRUMMEN:
Q. Did Town & Country's architect, Steve Sandelin, take any pictures of Rottlund's Villa II product before the Homestead Collection was designed?
MR. SCHWIEBERT: Objection, vague, mischaracterizes Mr. Sandelin's role.
A. I don't recall.

BY MR. KRUMMEN:

Q. Did Town & Country's architect, Mr. Sandelin, take any brochures of Rottlund's Villa product prior to the time the Homestead Collection was designed?

MR. SCHWIEBERT: Objection, vague, mischaracterizes Mr. Sandelin's role.

A. I don't recall whether he did or not.

BY MR. KRUMMEN:

Q. Did Town & Country's Minnesota president Art Plante take any pictures of Rottlund's Villa II before the Homestead Collection was designed?

MR. SCHWIEBERT: Objection, vague, mischaracterizes the legal entity.

A. I don't know the answer to that question.

BY MR. KRUMMEN:

Q. Do the answers to any of those questions matter for your definition of independent creation?

A. Independent creation is, as I've defined it, and -- the ability of someone to understand the precedence in terms of a marketplace or in terms of a house or in terms of an office building, in my opinion, is part of the process to be informed about what is going on in the marketplace.

Q. Mr. Scherer, would you rather be Rottlund's expert witness in this case or Town & Country's?

scope of his opinions in this case.

MR. SCHWIEBERT: Vague to the extent that you haven't defined what an unoriginal plan element is.

A. I believe that the Rottlund plan demonstrates that Rottlund, as does the Town & Country plan demonstrate, that they clearly understand and have their finger on the pulse of how people live, how people work, how people cook, how people entertain, and how people expect their living needs to be met. And each of those companies, I believe, arranged the plan elements in a way that they felt best demonstrated their understanding and the needs of those potential homeowners. I can't speak to anything other than the facts that those arrangements of those plans in both cases, I believe, assembled those design ideas in a very -- in a way that addresses those problems very well.

BY MR. KRUMMEN:

Q. You seem to be reluctant to testify as to whether or not either plan is original or unoriginal. Is that a fair characterization?

MR. FARMER: Objection, argumentative, misstates his testimony.

A. My responsibility was to review and compare two plans. I -- I'm not a lawyer, and if one were to be able to answer the question that you've asked about

originality, I believe to do it fairly and objectively, one would have to analyze the plans of several hundred thousand townhomes around the country to determine if -- if, in fact, it was original. But what I was asked to do is to look at whether the two plans were substantially similar or not, and that's what I thought I did.

BY MR. KRUMMEN:

Q. Do you still have your preliminary report, which is Exhibit 422, in front of you, sir?

A. Yes.

Q. Could you turn to page 10? Do you see the first full paragraph two-thirds of the way down, you wrote, quote, "If we agree (as I believe Rottlund must) that the idea of an eight-unit, back-to-back row of townhomes is not protectable, then I would contend that the arrangement of the basic elements of the interior is also not protectable," end quote. Did you write that?

A. I did.

Q. Then you go on to say, "In any event, the sworn testimony of the BSB architects supports my opinion that they independently created their own plan arrangement." Is that a fair reading of your report?

A. You've read it correctly.

Q. Would you read the next sentence of your report

I'm aware of it -- perhaps I'm not fully informed -- but as I'm aware of it, the architects who choose a window from Marvin generally work from the options within the size ranges that they're able to produce based on maximum sizes or minimum sizes.

Q. Does the Homestead Collection townhome contain anything other than standard elements?

MR. PATRICK: Same objection.

A. I think that the Homestead Collection and the Rottlund townhome both used standard elements in solving their design problem.

BY MR. KRUMMEN:

Q. Is there anything in the Homestead Collection which you would not characterize as a standard element?

MR. SCHWIEBERT: Objection, beyond the scope of this expert's report and opinion.

A. In my responsibility to look objectively at the details of the solution in both the Homestead and the Rottlund home, I took into consideration within each of those objective details of the design ideas the elements that were used to solve that particular problem. And, for example, as we've talked about earlier before lunch, the use of a standard fireplace in the context of that solution is the use of a standard element.

BY MR. KRUMMEN:

Q. You understand I'm asking you if there's anything other than standard elements in the Homestead Collection, correct?

A. In the -- I don't believe in the Homestead Collection or in the Town & Country townhome the designers relied on any elements or products that weren't standardly available.

Q. What do you mean by "standardly available"?

A. To be purchased in this marketplace.

Q. Do you know the catalog we can order up the total look and feel of the Rottlund fireplace/media center?

MR. SCHWIEBERT: Objection, beyond the scope of this expert's report. Objection, vague, using an undefined term.

A. When I objectively looked at the fireplace for Rottlund and the fireplace for Town & Country, I took into consideration as best I could those things which the individual architects used to solve that problem. I've cited those things, including the location of the fireplace, the use of a traditional radiused arch, the use of a premanufactured fireplace, and my conclusion based on that analysis is that the -- my objective conclusion was that the two fireplace design ideas are not substantially similar.

BY MR. KRUMMEN:

Country reveal that they're not substantially similar.
BY MR. KRUMMEN:
Q. Were you asked to look at what the general ideas are in terms of the Villa II?
MR. FARMER: Again, objection, vague, unless you define the term.
MR. SCHWIEBERT: It's beyond the scope.
A. I was asked to look at the objective details of the design ideas.
BY MR. KRUMMEN:
Q. You were not asked to look at the general ideas themselves between the Villa II and Homestead Collection, correct?
MR. FARMER: Objection, form. What do you mean by "general ideas"?
A. I was specifically asked to look at the objective details of the design ideas.
BY MR. KRUMMEN:
Q. Is the Villa II a residential product?
A. I believe that Villa II is designed and marketed for residential use.
Q. Is the Homestead Collection a residential product?
A. I believe that the Homestead Collection is designed and marketed for residential use.

Q. Is the Chateau Collection a residential product?

A. I believe the Chateau Collection is designed and marketed for residential use.

Q. Is the Villa II a multifamily product?

MR. PATRICK: Objection, vague. Whose definition of multifamily? City? State? Builder?

A. The Villa II product, as I was asked to look at it, contains units which have living rooms, dining rooms, and kitchens and bedrooms as one legal bounded entity by party walls. And in the case of the Villa II that I was asked to look at, there are eight of those individual units together. If eight would serve to be a definition of multifamily, then I would characterize the Villa II as a building that would house multiple families.

BY MR. KRUMMEN:

Q. Is the Homestead Collection a multifamily product?

MR. PATRICK: Same objection.

A. The Homestead Collection has individual units that contain garages, kitchens, dining rooms and living rooms and bedrooms, and those individual units are assembled together, as in this case eight units. And I think that the assemblage of more than one residential unit owned by different people next to each other would

be -- could be characterized as a building that has multiple families within it.

BY MR. KRUMMEN:

Q. Is the Chateau Collection a multifamily product?

MR. PATRICK: Same objection.

A. I would answer that the Chateau Collection is a -- is a building that contains multiple housing units.

BY MR. KRUMMEN:

Q. Is it a multifamily product?

MR. PATRICK: Same objection.

MR. SCHWIEBERT: Asked and answered.

A. I believe whenever a builder or an architect chooses to gain together more than one individual unit and market those assemblage of units to more than one family, that the common definition to the marketplace would be that they are multifamily.

BY MR. KRUMMEN:

Q. You wrote in your report that the Villa II was a townhome, correct?

A. The Villa II is self-characterized as a townhome.

Q. You wrote in your report the Homestead Collection is a townhome, correct?

A. The Rottlund Company and Town & Country both refer to their products as townhomes, and I took their individual definitions at face value.

Q. And in your second report, which you characterized the Supplemental Expert Report, which is Exhibit 424, you referred to the Chateau Collection as a townhome, correct?

A. I believe that Town & Country chose to designate Chateau Collection as a townhome.

Q. Is the Villa II a back-to-back product?

MR. FARMER: Objection to form, vague.

A. The Villa II and the Town & Country product both, as I said earlier, assemble individual living units together side by side and back to back with common party walls.

BY MR. KRUMMEN:

Q. Is the Homestead Collection a back-to-back product?

A. The Town & Country home --

MR. FARMER: Objection, form, vague.

A. The Town & Country company, at least in my objective analysis of it, have decided that they can assemble their individual living units together side by side and back to back.

BY MR. KRUMMEN:

Q. Is the Chateau Collection a back-to-back product?

MR. FARMER: Same objection.

A. I believe that Chateau Collection relies on the

same technique of assembling their living units side by side and back to back.

BY MR. KRUMMEN:

Q. Is the Villa II a slab-on-grade product?

MR. SCHWIEBERT: Objection, relevance, beyond the scope.

A. The Villa II product, Rottlund Company appears to have chosen not to build a residential unit with the basement, and therefore in this case, it -- the logical way in which that residential unit is structured is to place the first floor directly on the ground.

BY MR. KRUMMEN:

Q. Is the Homestead Collection a slab-on-grade product?

A. The Homestead Collection, as developed by Town & Country, includes the placement of the first floor, structural floor slab directly on the ground.

Q. Is the Chateau Collection a slab-on-grade product?

A. The Chateau Collection relies on the conventional technique of placing the ground floor slab directly on the ground.

Q. Is the Villa II a two-story product?

A. Rottlund Company, in the plans that I analyzed, relied on placing the bedrooms on the second floor

immediately above the dining, living room, kitchen and garage.

Q. Is the Homestead Collection a two-story product?

A. The Homestead Collection relied on placing the bedrooms on the second floor.

Q. Is the Chateau Collection a two-story product?

A. The Chateau Collection relied on placing the sleeping quarters on the second floor.

Q. Does the Villa II have an attached garage?

A. The Villa II has a garage that is connected to the unit by -- by a common wall with the living area, and if the connection by a common wall is accepted as a definition of attached, then it is attached.

Q. Is the Homestead Collection an attached garage product?

A. The Homestead Collection relies on the common design idea of abutting a garage to a common wall with a living area in order for -- as was done at the Rottlund project, an individual to move directly from the garage into the house, and by having a common wall with a living room and the living quarters, then that garage could be characterized as attached.

Q. Is the Chateau Collection an attached garage product?

A. The Chateau Collection relies on a conventional

design idea of being able to park your car within a structure that allows for the occupant of that car to go through a common wall into the kitchen, breakfast area, and by using a common wall, I believe in that case also you could characterize that as attached.

Q. Is there more than one way to build a residential multifamily back-to-back, slab-on-grade, two-story multifamily townhome with an attached garage?

MR. FARMER: Objection, beyond the scope of his report.

MR. PATRICK: Also irrelevant.

A. The task set before me was to objectively look at the details of the design ideas of the Villa II product and the Town & Country product and to determine whether or not those two products were substantially similar. I was not asked to broaden the scope of my comparison to speculate on whether or not there were other ways in which that could be done.

BY MR. KRUMMEN:

Q. How many libraries have you designed in your career?

A. I believe my curriculum vitae, which is attached to my expert report, lists all of my -- all of my experience at the date that this expert report was submitted.

Exhibit G

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

-----------------------------------------------

The Rottlund Company, Inc.,

Plaintiff,

vs. Case No. 01-1980

Pinnacle Corporation, et.al.,

Defendants.

-----------------------------------------------

THE HONORABLE SUSAN R. NELSON

United States Magistrate Judge

* * * *

TRANSCRIPT OF PROCEEDINGS

* * * *

Date: February 23, 2004

Reporter: Leslie R. Pingley

So if what the Court is suggesting if a party can show that a document or deposition testimony was revealed to the other side after the last round of depositions, I don't know how the Court could cut that off, but if they are going to retool expert depositions that don't comply with 26(a)(2)(b) all of the Defendants have failed to do that, then we still want to move with our dobber challenges on what used to exist and what was an abundant failure to abide by the rules. That's where Rottlund is coming from.

THE COURT: Okay. I think that's the answer. The answer is that I will permit supplemental expert disclosures, but they are strictly limited to expert opinion dependent on, and you have to establish this in the supplemental expert disclosure, dependent on facts developed after the deadline for the last expert disclosures so that we're not retooling our original expert reports this way.

# FILED
# UNDER SEAL

Exhibit H