UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| The Rottlund Company, Inc. d/b/a Rottlund Homes, a Minnesota Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>Pinnacle Corporation d/b/a Town & Country Homes, an Illinois Corporation, Town & Country Homes, Inc., a Minnesota Corporation, Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation, and The Bloodgood Group, Inc., an Iowa Corporation,<br><br>Defendants,<br><br>and<br><br>Town & Country Homes, Inc., a Minnesota Corporation,<br><br>Third-Party Plaintiff,<br><br>vs.<br><br>Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation,<br><br>Third-Party Defendant. | No.: 01-CV-1980 (DSD/SRN)<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY AND REPORTS OF JOSEPH D. KENYON PURSUANT TO RULES 104(a) AND 702 OF THE FEDERAL RULES OF EVIDENCE** |

## INTRODUCTION

Plaintiff The Rottlund Company, Inc. d/b/a Rottlund Homes ("Rottlund") moves to exclude certain portions of the testimony and reports of Joseph D. Kenyon, Defendant Bloodgood Sharp Buster Architects and Planners of Iowa, Inc.'s ("BSB") expert witness. In particular, Rottlund seeks to exclude those portions of Kenyon's reports and any testimony regarding Kenyon's opinions regarding the apportionment of TCM's profits and his opinions on Rottlund's actual damages.[1] Kenyon's proffered opinions on these topics are inadmissible for various reasons. First, Kenyon's opinions are entirely conclusory because they are based upon wholly speculative and unreliable methodologies, and an unreasonable connection between the purported factual basis and Kenyon's opinions. Second, Kenyon seeks to provide opinions in fields and on subjects that are outside is area of training, experience and expertise. Third, Kenyon's proffered opinions contradict well-settled law regarding copyright infringement damages. For all of these reasons Kenyon's "expert" opinions are inadmissible and should be excluded from the trial of this matter.

## LEGAL ARGUMENT

### I. General Principles.

#### A. Rules 104(a) and 702 of the Federal Rules of Evidence.

The proponent of proposed expert testimony bears the burden of demonstrating that the testimony is admissible. *EZ Dock, Inc. v. Schafer, Sys., Inc.*, No. Civ. 98-2364, 2003 WL 1610781, at *1 (D. Minn. Mar. 8, 2003)[2] (citing *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 592 & n.10 (1993); *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987); *Lauzon v.*

---

[1] Kenyon's Accountants' Report dated August 15, 2003 ("Kenyon Prelim. Report") is attached to the Affidavit of Philip R. Mahowald in Support of Plaintiff's Motion *in Limine* to Exclude Expert Testimony and Reports of Joseph D. Kenyon ("Mahowald Aff.") as Exhibit A and Kenyon's Supplemental Accountant's Report dated April 15, 2004 ("Kenyon Supplemental Report") is attached as Exhibit B.

[2] Unreported decisions cited herein other than *Rottlund Homes* are attached in alphabetical order as Exhibit C to the Affidavit of Philip R. Mahowald ("Mahowald Aff.").

*Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001)). Rule 104(a) provides that the court shall determine, as a preliminary question, the admissibility of expert testimony. Fed. R. Evid. 104(a) (2004); *EZ Dock*, 2003 WL 1610781, *1 (barring expert Arthur H. Cobb's opinion on lost profits).

Rule 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise . . . ." Fed. R. Evid. 702. Courts evaluate the admissibility of expert testimony pursuant to Rule 702 for relevance and reliability. *Bonner v. ISP Technologies, Inc.*, 259 F.3d 924, 929 (8th Cir. 2001); *J.B. Hunt Transp., Inc. v. Gen. Motors Corp.*, 243 F.3d 441, 444 (8th Cir. 2001) (court must ensure expert opinions are relevant to the tasks at hand); *EFCO Corp. v. Symons Corp.*, 219 F.3d 734, 739 (8th Cir. 2000) (courts are afforded wide latitude and will only be reversed for abuse of discretion when they decide whether expert opinion testimony is relevant and admissible).[3] The requirement that expert testimony assist the trier of fact to understand the evidence or determine a fact in issue is a relevancy requirement. *Bonner*, 259 F.3d at 929. If the proffered expert testimony will not assist the trier of fact to understand the evidence or determine a fact in issue it is not relevant and, therefore, is not admissible. Fed. R. Evid. 402 ("Evidence which is not relevant is not admissible.").

---

[3] Courts consider a number of non-exclusive factors, such as "(1) whether the theory of technique can be (and has been) tested, (2) whether the theory has been subjected to peer review and publication, (3) the known or potential rate of error, and (4) whether the theory has been generally accepted." *EZ Dock,* 2003 WL 1610781, at *2 (quoting *Peitzmeier v. Hennessy Indus.*, 97 F.3d 293, 297 (8th Cir. 1996) (quoting *Daubert*, 509 U.S. at 593-94)). Other factors pertinent to assessing the reliability of expert testimony have evolved from *Daubert*'s progeny, including "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled our other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *EZ Dock,* 2003 WL 1610781, at *2 (quoting *Lauzon*, 270 F.3d at 687).

## II. THE COURT SHOULD EXCLUDE KENYON'S OPINIONS REGARDING THE INFRINGERS' PROFITS BECAUSE THEY ARE BASED ON FAULTY, UNRELIABLE AND SPECULATIVE APPORTIONMENT METHODOLOGIES.

Defendant BSB cannot demonstrate that Kenyon's proffered opinion testimony is admissible. The proposed testimony of Kenyon is deficient as a matter of law because it is essentially guesswork rather than expert testimony supported by reliable facts and a solid foundation of knowledge, skill, training or experience. Kenyon's apportionment methodologies lack sufficient facts and data, have never been tested or subject to peer review and publication, and there is no evidence in the record that his methodology has been generally accepted by anyone other than Kenyon and Defendants. In addition, Kenyon's methodologies employ no standards or controls, and he cannot testify about a known or potential rate of error to any of his apportionment methodologies. Lastly, all of his opinions were developed expressly for purposes of testifying in this case rather than being developed independent of this litigation. In short, Kenyon's apportionment methodology fails to meet nearly every factor courts consider when evaluating the admissibility of proffered expert testimony, and should therefore be excluded from trial.

### A. To Apportion Infringers' Profits, Defendants Must Prove The Elements of Profit Attributable To Factors Other Than The Copyrighted Work.

Defendants seek to introduce Kenyon's apportionment methodologies to prove the elements of the infringer's profits attributable to factors other than the copyrighted work. The Copyright Act provides that a copyright owner is entitled to recover actual damages as well as "any profits of the infringer that are attributable to the infringement." 17 U.S.C. § 504(b). The infringer's profits are awarded to the copyright owner "to prevent the infringer from unfairly benefiting from a wrongful act." *Andreas v. Volkswagen of Am., Inc.,* 336 F.3d 789, 795 (8th Cir. 2003) (quoting H.R.Rep. No. 94-1476, § 504, 94th Cong., 2d Sess. at 161 (1976), *reprinted*

*in* 1976 U.S.C.C.A.N. 5659, 5777); *Arthur Rutenberg Corp. v. Dawney,* 647 F. Supp. 1214, 1216 (M.D. Fla. 1986) (same). The Copyright Act "makes clear that there is no gain to be made from taking someone else's intellectual property without their consent." *Walker v. Forbes, Inc.*, 28 F.3d 409, 412 (4th Cir. 1994). To achieve this legal principle, Congress required that all of the infringer's profits be disgorged and awarded to the copyright owner to ensure that the infringer did not unfairly benefit from a wrongful act. *See* 1976 Act Notes of House Comm. on the Judiciary, 94th Cong., report on copyrights 1476 (Comm. Print 1976); *Kleier Adver. Co., Inc. v. James Miller Chevrolet, Inc.*, 722 F. Supp. 1544, 1545 (N.D. Ill. 1989) (Congress intended to award the copyright owner the infringer's profits to deny the infringer any unjust enrichment).

"In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses *and the elements of profit attributable to factors other than the copyrighted work.*" *Andreas,* 336 F.3d at 795 (citing § 504(b)) (emphasis in original); *Fishing Concepts, Inc. v. Ross,* 226 U.S.P.Q. 692, 696 (D. Minn. 1985) (same). Accordingly, "where some of the defendant's profits result from the infringement and other profits are caused by different factors, . . . the burden of proof is on the defendant . . . [to] prove not only 'his or her deductible expenses' but also 'the element of the profit attributable to factors other than the copyrighted work.'" *Andreas,* 336 F.3d at 795 (quoting H.R.Rep. No. 94-1476, § 504, at 161 (quoting § 504(b))). '"Any doubt as to the computation of costs or profits is to be resolved in favor of the plaintiff. The Defendants must adduce evidence of "specific valuations" of the allocated factors. *See Flying J, Inc. v. Cent. CA Kenworth,* Nos. 00-17290 and 00-17336, 2002 WL 2022061, at **1 (9th Cir. Sept. 30, 2002).

The Supreme Court has held that "an infringer who commingles infringing and noninfringing elements 'must abide by the consequences, unless he can make a separation of the profits so as to assure to the injured party all that justly belongs to him.'" *Harper & Row Publishers, Inc. v. Nation Enters., Inc.,* 471, U.S. 539, 567, 105 S. Ct. 2218, 2234 (1985) (quoting *Sheldon v. Metro-Goldwyn Pictures Corp.,* 309 U.S. 390, 406, 60 S. Ct. 681, 687 (1940)). If non-infringing factors are so intertwined with infringing factors that it is impossible to apportion profits, then no apportionment is appropriate. *See Bus. Trends Analysts, Inc. v. Freedonia Group, Inc.,* 887 F.2d 399, 407 (2d Cir. 1989); *see also Belford, Clarke & Co. v. Scribner,* 144 U.S. 488, 508, 12 S. Ct. 734, 740 (1892) ("The rule is well settled, that, although the entire copyrighted work be not copied in an infringement, but only portions thereof, if such portions are so intermingled with the rest of the piratical work that they cannot well be distinguished from it, the entire profits realized by the defendants will be given to the plaintiff."); *Callaghan v. Myers,* 128 U.S. 617, 665-66, 9 S. Ct. 177, 191 (1888) (same).

Once the plaintiff demonstrates a nexus between the infringement and either direct profits or indirect profits, the burden then shifts to the defendant to prove apportionment (i.e., the contribution to profits of elements other than the infringed property). *Andreas,* 336 F.3d at 796 (citing *Frank Music I,* 772 F.2d at 518).

In this case, Rottlund claims that defendants infringed the "total look and feel" of Rottlund's Villa II town home. The Defendants, however, endeavor to isolate and exclude design elements from the total look and feel. The Defendants cannot establish and prove that individual design elements are not part of the total look and feel of the infringing Homestead Collection and Chateau Collection town homes, and therefore Defendants cannot apportion any of their profits. *See, e.g.*, *Twin Peaks Productions, Inc. v. Publications Intern., Ltd.*, 996 F.2d

1366, 1382 (2d Cir. 1993) (no apportionment where the defendant did not carry its burden of suggesting a rational division of profits); *Nelson-Salabes, Inc. v. Morningside Holdings, L.L.C.*, No. Civ. B-98-2226, 2001 WL 419002, at **9-10 (D. Md. 2001) (holding that defendants' failed to proffer sufficient evidence to permit the court to fairly apportion profits between those profits attributable to the copyrighted work and those profits attributable to other aspects of the assisted living center; rejecting defendants' arguments that no profits could be attributed to infringing front elevation design or footprint based on experts testimony that architectural design was not an important factor in determining the value of an assisted living center), *aff'd in part, vacated in part on other grounds sub nom. Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505 (4th Cir. 2002).

In this motion, Rottlund challenges the methodology Kenyon employs to reach his conclusions regarding the apportionment of profits attributable to Defendants' use of the infringing Homestead Collection and Chateau Collection designs. Because Defendants cannot separate the individual design elements or features from the total look and feel of the infringing town home products, the Court could exclude Kenyon's proffered apportionment analysis on this basis alone. *Id.* However, assuming, *arguendo*, that Defendants are allowed to apportion profits derived from individual design elements that comprise the total look and feel of the infringing town homes, the particular apportionment analysis proffered by Kenyon should be excluded as it is speculative and unreliable. Kenyon has failed to provide a rational basis upon which to make a reasonable approximation of the claimed apportionment of profits. *See Sheldon*, 309 U.S. at 408 (expert must provide a rational basis upon which to make a reasonable approximation).

**B. Kenyon provides no reasonable basis for evenly weighting the 20 factors Rottlund personnel believe customers consider when buying a home.**

Kenyon claims to base his first methodology for apportionment on the deposition of Todd Stutz, who identified in his deposition twenty factors[4] that Rottlund believes customers consider when purchasing a home. (Mahowald Aff., Ex. A (Kenyon Prelim. Report) at 8-9 (citing Transcript of Rule 30(b)(6) Deposition of Todd Stutz dated May 29, 2003 (Stutz Dep. Vol. I)[5] at 250-268).) Without any plausible rationale, Kenyon then gives each of these twenty factors "equal weight" to conclude that product design would only account for five percent (5%) of all of Town & Country's profits. (Mahowald Aff., Ex. A (Kenyon Prelim. Report) at 9.)

During his deposition, Kenyon acknowledged that he had no basis whatsoever to give each of these factors equal weight. (Mahowald Aff., Ex. E (Transcript of Deposition of Joseph D. Kenyon dated July 16, 2004 ("Kenyon Dep.") at 74:13-75:10.) When asked to explain why he gave each of the twenty factors equal weight, Kenyon explained, "[b]ecause we had no other basis to do it." (*Id.* at 75:2-3.) He then conceded, "I don't think there's a statistical component

---

[4] Kenyon lists the following:

1. Geographic area.
2. School districts.
3. Access to freeways.
4. Projected job growth.
5. Natural amenities.
6. Demographics of existing residents.
7. Product design.
8. Perceived value.
9. Price.
10. Standard features.
11. Option pricing.
12. Flexibility of builder to customize home to meet buyer's needs.
13. Promotions being offered.
14. Special financing incentives.
15. Product workmanship.
16. Reputation of the builder.
17. Relationship between the buyer and the salesperson.
18. Quality of merchandising.
19. Exterior design.
20. Advertising materials.

(Mahowald Aff., Ex. B at 8.)

[5] Excerpts from the Stutz Dep. Vol. I are attached to the Mahowald Affidavit as Exhibit D.

to this." (*Id.* at 75:4-10.) Kenyon further acknowledged that his apportionment methodology was developed solely for this litigation (*id.* at 80:12-20), had not been subject to peer review (Mahowald Aff. Ex. E at 76:3-20), did not have a discernable rate of error (*id.* at 76:21-77:9), and had no controls (*id.* at 77:10-79:14). Not surprisingly, Kenyon admitted that he could not identify any periodical or other expert that agreed with his theory of assigning five percent equal weight to the twenty factors. (*Id.* at 79:16-80:10.)

Kenyon's first apportionment methodology should be excluded from trial because he has failed to provide any basis for arbitrarily giving equal weight to the 20 factors identified by Mr. Stutz. *See Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 354-55 (S.D.N.Y. 2003) (granting motion in limine to exclude expert damage calculation that was speculative and without basis); *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984) (upholding district court's exclusion of expert testimony as derived from irrelevant bases); *Johnson Elec. N. Am., Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 281 (S.D.N.Y. 2000) (excluding expert testimony and noting that the proposed expert's inclusion of unfounded and irrelevant calculations "alone destroys the validity of his conclusions"); Fed. R. Evid. 702 (expert testimony must be the product of reliable principles and methods). "A court may conclude that there is simply too great an analytical gap between the data and the opinion offered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 147, 146, 118 S. Ct. 512, 519 (1997). His opinion, resting on nothing more than the *ipse dixit* of Kenyon himself, is meaningless and inadmissible. *Id.* ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). Because Kenyon's assessment is unsupported and completely arbitrary, it is not sufficiently reliable to be admitted in evidence. *See Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d

1176, 1183 (8th Cir. 1997) (holding that a judge must exclude an expert opinion that is unsupported); *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 714-15 (8th Cir. 2001) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)) (court must act as "gatekeeper" to ensure that expert bases his/her opinion upon a reliable foundation). Whatever "small aid [Kenyon's] testimony might" arguably provide is far outweighed by "the unfair prejudice which might . . . result [] because of the aura of reliability and trustworthiness" that accompanies an expert's testimony. *United States v. Purham*, 725 F.2d 450, 454 (8th Cir. 1984).

**C. Evidence regarding the NAR survey should be excluded because there is no evidence that the database is relevant or reliable.**

Kenyon also bases his apportionment analysis on the 2002 National Association of Realtors' Profile of Home Buyers and Sellers (the "NAR Survey").[6] Table I-9 of the NAR Survey sets forth twelve (12) "Factors Influencing Housing Change." (Mahowald Aff., Ex. F at SDK 00014.) Kenyon restates the results from Table I-9 in his Preliminary Report.[7] (Mahowald Aff., Ex. A at 9.) Because a "product design" factor was not listed in the survey results, and because the lowest "percent influenced" result of the twelve listed factors was two percent (2%), Kenyon concludes that product design "must influence less than 2% of buyers." (*Id.*; Ex. B

[6] The NAR Survey is attached to the Mahowald Affidavit as Exhibit F.

[7] Those factors listed by Kenyon were as follows:

| Factor Influencing Homebuying | Percent Influenced |
|---|---|
| Neighborhood | 74 |
| Price | 58 |
| Work | 29 |
| School | 29 |
| Friends/Family | 23 |
| Parks/Recreation Facilities | 15 |
| Shopping Center | 11 |
| Planned Community | 9 |
| Entertainment | 8 |
| Potential Rental Income | 6 |
| Public Transportation | 4 |
| Health Facilities | 2 |

(Mahowald Aff., Ex. A at 9.)

(Kenyon Supp. Report) at 4.) When questioned during his deposition, however, Kenyon conceded that he did not know whether "design was even one of the items listed to elicit a response." (Mahowald Aff. Ex. E (Kenyon Dep.) at 88:24-89:2.) Kenyon's opinion that product design must influence less than 2% of buyers is not just an analytical gap between the survey data and his opinion, but rather outright speculation as Kenyon himself admits he does not know whether respondents were even polled about product design. Kenyon's speculative analysis is sufficient reason to exclude his proffered opinions and testimony from the trial.

In applying the standards of Rule 702 to survey evidence, the Eighth Circuit Court of Appeals has formulated a five-factor test of reliability.[8] The proponent must show "(1) that a proper 'universe' was examined and a representative sample chosen; (2) that the persons conducting the sample were experts; (3) that the data were properly gathered and accurately reported; (4) that the sample design [and execution] met the standards of objective surveying and statistical techniques; and (5) that the interviewers, as well as the respondents, were unaware of the purpose of the survey." *Lutheran Mut. Life Ins. Co. v. United States*, 816 F.2d 376, 378 (8th Cir. 1987). Kenyon's expert testimony concerning the NAR Survey cannot hope to meet this standard of admissibility; in fact, the survey cannot satisfy even *one* of the five factors of reliability.

1. The NAR Survey's Sample is Unrepresentative.

To supply reliable information about a population, a survey sample must be representative of that population. *Lutheran Mutual*, 816 F.2d at 378; *Harold's Stores, Inc. v. Dillard Dept. Stores*, 82 F.3d 1533, 1544 (10th Cir. 1996); *Reference Guide* at 242. In the NAR Survey, the population to be examined included all home buyers, and not simply purchasers of

[8] Although the court was utilizing the version of Rule 702 existing before its 2000 amendment, the analysis remains the same; under both versions, the court is to test for reliability.

town homes. (Mahowald Aff., Ex. F (NAR Survey) at 15 ; Ex. E (Kenyon Dep.) at 101-04.) In fact, just eight percent (8%) of the respondents to the NAR Survey from the Midwest were identified as purchases of a broad category that included apartments, condos, co-ops, town or row houses, 2-3 family homes (duplex/triplex).[9] (*Id.*; Ex. E (Kenyon Dep.) at 101-104.) The NAR survey clearly did not use a sample representative of its target population (purchasers of the town homes at issue here), and no effort is made to control for this defect. Standing alone, this shortcoming is sufficient grounds to preclude Kenyon from offering the survey in evidence. *Harold's Stores, Inc. v. Dillard Dep't Stores*, 82 F.3d 1533, 1544 (10th Cir. 1996) ("The district court should exclude the survey 'when the sample is clearly not representative of the universe it is intended to reflect.'") (quoting *Bank of Utah v. Commercial Sec. Bank*, 369 F.2d 19, 27 (10th Cir. 1966)); *Dick's Sporting Goods, Inc. v. Dick's Clothing & Sporting Goods, Inc.*, No. 98-1653, 1999 WL 639165, at *5 (4th Cir. Aug. 20, 1999) (survey inadmissible because it "excluded substantial portions of the relevant population"); *Soden v. Freightliner Corp.*, 714 F.2d 498, 504-05 (5th Cir. 1983); *Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F. Supp. 1454, 1467 (D. Kan. 1996) (survey "fatally underinclusive" when it fails to survey a relevant portion of the population that could likely affect results). The NAR survey is irrelevant, unreliable and unhelpful in this case because only a small fraction of the respondents to the NAR Survey could possibly be considered representative of the purchasers of the town homes at issue here.

[9] The demographics of the NAR Survey respondents were also significantly different than the typical Villa II purchaser in other categories such as marital status, income, number of children, and percentage of first time home buyers. (Mahowald Aff., Ex. F (NAR Survey) at 7-9 ; Ex. E (Kenyon Dep.) at 96-100.)

2. There is no evidence that the persons conducting the samples were experts.

There is no evidence about the individual or persons who designed the NAR survey. Kenyon testified that he did not know anything about who conducted the survey. (Mahowald Aff. Ex. E at 104-109.) Kenyon played no role in the NAR Survey, nor is there any evidence that *any* expert designed, conducted or interpreted the survey results, although such qualification is required by the Eighth Circuit and the Reference Guide on Survey Research. *Lutheran Mutual*, 816 F.2d at 378 (person conducting survey should be expert); *see also* Shari Seidman Diamond, *Reference Guide on Survey Research*, *in Reference Manual on Scientific Evidence* at 238 (Federal Judicial Center, 2d ed., 2000) (hereinafter "*Reference Guide*")[10] ("In all cases, the expert must demonstrate an understanding of survey methodology, including sampling . . .").

3. There is no evidence that the survey data was properly gathered and accurately reported.

Kenyon admits that he has know knowledge about they survey methods used in connection with the NAR Survey, the specific questions asked, whether the questions were leading or biased, whether proper survey interview protocol was followed, or what standards or controls were used in connection with the NAR Survey. (Mahowald Aff. Ex. E at 104-109.) To admit a survey into evidence, the Eighth Circuit expressly requires that its data be properly gathered and meet "the standards of objective surveying statistical techniques." *Lutheran Mut.*, 816 F.2d at 378. The *Reference Guide on Survey Research* states that a method should be employed to ensure the survey is "implemented in an unbiased fashion and according to instructions." *Reference Guide* at 267.[11] Furthermore, data entry should be checked for

[10] The Reference Guide can be viewed online at http://www.fjc.gov/newweb/jnetweb.nsf/pages/16.

[11] The procedures outlined in the Reference Guide on Survey Research list several measures to judge a survey's accuracy: monitoring inspections, re-inspecting samples, comparing inspections done by each inspector, and checking samples of data entries against their sources. *Reference Guide* at 267-68.

completeness, reliability, and accuracy. *Id*. at 268. Such verification processes are especially necessary considering the numerous opportunities for error in a survey, yet there is no evidence that any of them were utilized in connection with the NAR survey. The NAR survey simply cannot meet this standard of competence and objectivity because there is absolutely no evidence in the record as to the methodology employed in conducting the survey. Kenyon admits he has no knowledge as to how the survey was conducted, how the questions for the survey were selected, how the survey was performed, how the data from the survey was processed, whether any survey data was uncollected or unprocessed, and what assumptions, if any, were made by NAR when it issued the results of its survey, or whether NAR performed the survey in an unbiased, thorough manner. That Kenyon has no knowledge if such procedures, much less whether any or all of them were employed during the NAR survey, only serves to highlight the survey's lack of reliability.

4. <u>There is no evidence that the sample design and execution met the standards of objective surveying and statistical techniques</u>.

As set forth above, Kenyon has know knowledge of what questions were asked, why they were asked, how they were formulated. In short, the NAR survey had nothing to do with ascertaining what motivated purchasers of any town home products, much less the town home products at issue in this case. The NAR survey is too unreliable to pass the test of Rule 702. This Court should thus preclude any evidence or expert testimony related to the NAR survey offered by Kenyon or any other witness.

**C. Kenyon's Analysis Of Rottlund Homes Survey Should Be Excluded From Evidence Because He Is Not Qualified To Give A Statistical Opinion, And His Opinion Is Grossly Misleading.**

Kenyon also opines that no more than 20% of profits should be allocated to infringing elements based on the results of surveys Rottlund conducted of its customers. (Mahowald Aff.,

Ex. A (Kenyon Prelim. Report) at 9; Ex. B (Kenyon Supp. Report) at 4; Ex. G (Rottlund Survey Form).) Kenyon's proffered apportionment methodology based on the Rottlund surveys is flawed, as fundamental matter, because Kenyon extrapolates from surveys of *Rottlund's* customers to opine that only twenty percent of *Town & Country's* buyers based their decision on infringing design elements. In addition, Kenyon's analysis and opinion suffers from the same defects that irreparably undermined Kenyon's first two apportionment theories.

Kenyon testified that his Rottlund survey apportionment analysis is based solely on the responses to questions 2 and 3 in the "General Comments" section of the Rottlund survey. (Mahowald Aff., Ex. G (Rottlund Survey Form) at 3; Mahowald Aff. Ex. E at 119-20.) Question 2 asked respondents to rank the features they liked best about their Rottlund home on a scale of importance, using 1 as the most important and 7 as the least important. Seven response boxes were provided, six of which were preselected with "Floor Plan," "Master Bath," "Kitchen," "Use of Space," "Quality," "Family Room," with "Other" as the seventh. (Mahowald Aff. Ex. G.) Question 3 asked respondents to rank the reasons they purchased a Rottlund home using a scale of importance, using 1 as the most important and six as the least important. Six response boxes were provided, five of which were preselected with "Liked the Design/Plan," "Better Quality," "Reputation," "Liked the Location/Neighborhood," "More Value for the Money," with "Other" as the sixth. (Mahowald Aff., Ex. G (Rottlund Survey Form) at 3.) For both questions, Kenyon tabulated the total number of responses to the survey questions and weighted the responses. He then multiplied the number of responses for each question by the arbitrarily assigned weight. The totals of all responses were added together, and Kenyon then calculated the percentage of each response in relation to the total responses. (Mahowald Aff., Ex. K.) The results for

question 3 are listed on the first page of Exhibit K, and the results for question 2 are listed on the second.

Kenyon testified that he first tabulated the responses to question 3, which asked respondents to rank the reason they purchased a Rottlund home. (Mahowald Aff. Ex. E at 119-20.) Kenyon essentially tabulated the responses, and then assigned a weight to the rank listed by the respondents:

| Rank | Weight |
| --- | --- |
| 1 | 5 |
| 2 | 4 |
| 3 | 3 |
| 4 | 2 |
| 5 | 1 |

(Mahowald Aff. Ex. E at 120-24.) Applying this analysis, Kenyon determined that the 28.4% of the respondents purchased their Rottlund home because of the design. (Mahowald Aff. Ex. K.)

Kenyon then tabulated the responses to Question 2, once again using a weighted average. Based on the responses, Kenyon added to additional "features" to the six listed in question 2: "Design Features" and "Customizing Capabilities." The totals of all responses were added together, and Kenyon then calculated the percentage of each response in relation to the total responses. (Mahowald Aff., Ex. K.) For reasons not disclosed in his reports, and which he was unable to explain in his deposition, Kenyon designated the "Quality," "Family Room," and "Customizing Capabilities" features as "non-infringing" and subtracted or "backed off" the weighted totals from those features. (*Id.*; Ex. E 177-180) He concluded that 72.2 percent of the design features were related to the infringement. (*Id.*) He then multiplied the 72.2 percent weighted average from question two by the 28.4 percent weighted average from question 3 to achieve his apportionment figure. According to Kenyon, "no more than 20% of the profits should be allocated to the allegedly infringing elements." (*Id.* at 180:13-181:2.)

When asked why he assigned the particular weights to the ranking, Kenyon said he had used the methodology before for "strategic planning" to rank people's preferences, and "I've just had very good luck with it." (*Id.* at 124:10-20.) Kenyon admitted that this was the first time he had ever used this particular weighted average system to calculate damages. (*Id.* at 124:21-125:9.) He further admitted that he never interviewed any Rottlund survey respondent to ask them whether the weighted average system accurately reflected his or her purchase decision—i.e. if on a scale of 1 to 5 there was only 20 percent difference between their liking the design plan and their desire to achieve more value for the money. (*Id.* at 126:23-127:9.) He testified that he did not know why Rottlund identified the available responses it did, admitted that he had no knowledge of whether Rottlund was trying to ascertain or attribute a specific weight to any given response, or whether any respondents would weight their responses in accordance with his weighted average system. (*Id.* at 127:10-128:3.) He even admits that he uses the weighted average system just to achieve some sort of apportionment. (*Id.* at 130:24-131:2.)

When asked to explain why he believes his methodology would provide a "rational basis" for an apportionment calculation, Kenyon states that "[t]his is an approach I've used, and it works pretty good to help rank things such as this." (*Id.* at 131:7-13.) Kenyon acknowledged that the decision to weight responses and the amount of weight attributed to the responses was determined by him alone (*id.* at 171:15-18), that he could not point to any treatise or publication to support his apportionment methodology (*id.* at 131:14-23), that no error rate can be calculated for either his weighting system or his conclusion that 20 percent of the profits should be allocated to the allegedly infringing elements (*id.* at 135:1-14), that he has never published his theory of weighting survey response for peer review (*id.* at 134:15-21), and that he developed his opinion expressly for the purpose of testifying in this case (*id.* at 136:3-10).

Kenyon's apportionment methodology using the Rottlund Homes survey should be excluded for the same reasons as his prior methodologies – it's an arbitrary and wholly speculative methodology devised by Kenyon solely for this litigation to artificially decrease the amount of Town & Country's profits. *Baker*, 254 F. Supp. 2d at 354-55 (granting motion in limine to exclude expert damage calculation that was speculative and without basis); *Shatkin*, 727 F.2d at 208 (upholding district court's exclusion of expert testimony as derived from irrelevant bases); *Johnson Elec.*, 103 F. Supp. 2d at 281 (excluding expert testimony and noting that the proposed expert's inclusion of unfounded and irrelevant calculations "alone destroys the validity of his conclusions"); Fed. R. Evid. 702 (expert testimony must be the product of reliable principles and methods). Kenyon's arbitrary and unsupported analysis is meaningless and inadmissible because it is riddled with insurmountable analytical gaps and rest exclusively on the *ipse dixit* of Kenyon himself. *Gen. Elec.*, 522 U.S. at 146; *Arkwright*, 125 F.3d at 1183; *Wheeling*, 254 F.3d at 714-15.

**D. Kenyon's Apportionment Analysis Based On The Deposition Testimony Of Roger Conhaim Should Be Excluded.**

The last purported basis for Kenyon's apportionment analysis is the conclusory and speculative testimony of Roger Conhaim that 85 percent of the buying decision for a home is base on location and price. *See* Mahowald Aff., Ex. A (Kenyon's Prelim. Report) at 9; Ex. B (Kenyon's Supp. Report) at 4. Mr. Conhaim, who has not been designated as an expert witness by any party, merely expresses his "opinion" that location and price represent 85 percent of the buying decision. (Mahowald Aff., Ex. H (Conhaim Dep. Tr.) at 126:1-127:6.) As with Kenyon's own opinions regarding what he deems to be "design" elements, the record is devoid of any factual basis for Mr. Conhaim's self-described opinion. Kenyon's conclusory

apportionment analysis based on Mr. Conhaim's unsupported statement should be excluded from trial.

**E. Kenyon's Analysis Of The Contents Of The NAR and Rottlund Homes Surveys Should Be Excluded From Evidence Because He Is Not Qualified To Give A Statistical Opinion, And His Opinion Is Grossly Misleading.**

As explained above, Kenyon's testimony concerning the NAR Survey and the Rottlund Homes survey should be excluded from evidence, as it can only be based on the inadmissible surveys. Fed. R. Evid. 702 (expert's testimony only admitted if "based on sufficient facts or data" and is "the product of reliable principles and methods"). Kenyon's testimony should also be excluded because he has not "applied [his purported] principles and methods reliably to the facts of the case." *Id.*

1. Kenyon's Testimony Should be Excluded Because He Is Not an Expert in Statistics.

The *Reference Guide on Survey Research* states that "[i]n all cases" the expert who analyzes the survey data must demonstrate an understanding of "statistical analysis." *Reference Guide* at 238. The NAR database would require no less, as the raw field data is meaningless until variables are controlled for, sources of error identified, and final conclusions drawn. This task is one for a statistician. Kenyon admits he is not an expert in statistics, and there is no indication in his report that he has received any formal education in statistical analysis. (Mahowald Aff. Ex. E (Kenyon Dep.) at 15:11-17:2.) Nevertheless, he arbitrarily draws conclusions regarding whether particular survey responses address design issues, and arbitrarily assigns a weight to the response groupings to reach his rate of apportionment. (Mahowald Aff., Ex. A (Kenyon Prelim. Report) at 9; Ex. B (Kenyon Supp. Report) at 4.) Kenyon offers no basis – statistical or otherwise – for the weight he assigns to the survey responses to draw his rate of apportionment. Kenyon is simply not qualified to draw such statistical conclusions. It is a well-

settled principal that an expert may only give opinion testimony concerning matters within his field of expertise. When an expert drifts into areas outside his expertise, his testimony must be excluded. *Weisgram v. Marley Co.*, 169 F.3d 514, 517 (8th Cir. 1999), *aff'd,* 528 U.S. 440, 120 S. Ct. 1011 (2000) (expert in fire causation not an electrical expert, and therefore may not testify that electric heater malfunctioned); *IMPACT v. Firestone*, 893 F.2d 1189, 1195 (11th Cir. 1990) (testimony of political scientist as to statistical disparity in employment action properly excluded, as he was not a statistician). Therefore, Kenyon's interpretation of the NAR survey should be excluded because he is not qualified to conduct such a statistically-driven analysis.

2. Kenyon's Interpretation of the NAR Survey Is Flawed and Misleading, and Would Not Assist the Jury.

Even if Kenyon were qualified to conduct his statistical analysis, it would be properly excluded because his analysis is so misleading, as described above. Courts have long recognized that "statistics are so manipulable that some skepticism may be justified when set in the evidentiary context of a whole case." *Coates v. Johnson & Johnson*, 756 F.2d 524, 539 (7th Cir. 1985). Kenyon's methodologies for apportionment of profits are just such a manipulable statistics. Factors and responses are excluded and weighted solely at Kenyon's whim, without any explanation or plausible rationale. Therefore, because Kenyon is not qualified to give an interpretation of the NAR Survey or Rottlund Homes data, and because his interpretation is grossly misleading, Rottlund requests that he be barred from so testifying.

**III. THE COURT SHOULD EXCLUDE KENYON'S OPINIONS REGARDING ROTTLUND'S ACTUAL DAMAGES RESULTING FROM THE INFRINGEMENT BECAUSE THEY ARE CONTRARY TO APPLICABLE LAW.**

Kenyon's actual damages analysis should be excluded because it places on Rottlund the *Defendants'* burden of proving that purchasers of Town & Country's infringing town homes would not have purchased Rottlund's town homes in the same geographic vicinity. Instead,

Kenyon attacks what he perceives to be Rottlund's lack of capacity to build the number of infringing units constructed an sold by TCM. (Affidavit of Philip R. Mahowald ("Mahowald Aff.) Ex. A (Kenyon's Accountants' Report dated August 15, 2003 ("Kenyon Prelim. Report")) at 4-6, 7 (opining that Rottlund could not have developed the properties at issue); Ex. B (Kenyon's Supplemental Accountant's Report dated April 15, 2004 ("Kenyon Supplemental Report")) at 2-3.) Although Kenyon's selective disregard of the testimony of Rottlund's witnesses is sufficient reason to exclude his opinion, the more fundamental flaw with his analysis is that it distorts and contradicts the applicable law regarding actual damages for infringement of architectural works.

### A. The Measure Of Actual Damages In An Architectural Copyright Infringement Action Is The Lost Profits Suffered By Plaintiff From A Town Home Constructed Pursuant To The Infringing Plans In The Same Geographic Vicinity.

Pursuant to the Copyright Act, the copyright owner is entitled to recover the "actual damages suffered by him or her as a result of the infringement." 17 U.S.C. § 504(b). "[O]nce a copyright holder establishes with reasonable probability the existence of a causal connection between the infringement and a loss of revenue, the burden properly shifts to the infringer to show that this damage would have occurred had there been no taking of copyrighted expression." *Harper & Row Publishers,* 471 U.S. at 567, 105 S. Ct. at 2234 (citing 3 Nimmer § 14.02, at 14-7 to 14-8.1).

In terms of actual damages, Rottlund will show that it lost entire development opportunities to Town & Country because of the infringing Homestead Collection. As an architectural copyright infringement case, the proper measure for actual damages is lost profits suffered by Rottlund from a home constructed pursuant to the infringing plans. *See* Report and Recommendation dated October 25, 2004 (Doc. 586) (10/25/04 R&R) at 14-15 (citing *Robert R.*

*Jones Assocs., Inc. v. Nino Homes*, 858 F.2d 274, 280-81 (6th Cir. 1988), *aff'ing in relevant part* 686 F. Supp. 160 (E.D. Mich. 1987); *Arthur Rutenberg Homes, Inc. v. Maloney*, 891 F. Supp. 1560 (M.D. Fla. 1995); *Intown Enterprises, Inc. v. Barnes*, 721 F. Supp. 1263, 1267 (N.D. Ga. 1989)). Rottlund's actual damages theory approved by the Eighth Circuit in *Andreas v. Volkswagen of America, Inc.,* 336 F.3d 789, 795-96 (8th Cir. 2003).

In *Robert R. Jones,* the district court clearly and succinctly explained the prerequisites for recovering actual damages in an architectural works copyright infringement case just like this one. 686 F. Supp. at 164-65. *Robert R. Jones* involved two homebuilders "engaged in direct competition" that constructed and sold houses in subdivisions situated in the same geographical proximity – approximately two miles apart. *Id*. at 162, 164. After the plaintiff established the necessary liability elements for infringement of its copyrighted architectural drawings, the court turned to the issue of damages. *Id.* at 164.

The court recognized that no one could be certain that the defendants' infringing homes would have been purchased from plaintiff had no infringing product been put on the market. *Id.* Nevertheless, the court reasonably found that because "there were purchasers and a demand for this particular kind of house in this geographic area," the plaintiff successfully established the reasonable probability of the existence of a causal relationship between the infringement and a loss of revenue. *Id.* The court also explicitly noted that even though plaintiff "might not have made every one of [defendant's] sales," the burden shifted to defendants to prove that purchasers of their infringing homes would not have purchased plaintiff's homes in the same geographic vicinity. *Id.* Because the defendants failed to carry their burden to establish that purchasers of defendant's homes would not have purchased plaintiff's homes in the same geographic vicinity, it was "presumed [plaintiff] would have sold [the seven homes] absent the infringement." *Id.*

The Sixth Circuit Court of Appeals affirmed the court's rationale, and stated the evidence satisfied the nexus for recovering actual damages. 858 F.2d at 281; *see also Ford Motor Co. v. B&H Supply, Inc.,* 646 F. Supp. 975, 991-92 (D. Minn. 1986) (awarding plaintiff the "actual economic profit" it would have made if defendants had not sold infringing product even though court "necessarily engage[d] in some degree of speculation in establishing lost sales due to sales of infringing product"); *Maloney*, 891 F. Supp. at 1568-69 (awarding actual damages to plaintiff in copyright infringement case involving architectural plans equal to the profits the plaintiff would have realized had the plaintiff constructed and sold the residence at issue); *Cornerstone Home Builders, Inc. v. McAllister,* 303 F. Supp. 2d 1317, 1321 (M.D. Fla. 2004) (same); *accord Pfanenstiel Architects, Inc. v. Chouteau Petroleum Co.,* 978 F.2d 430, 432 (8th Cir. 1992) ("The Copyright Act allows recovery of actual damages . . . in recognition that some types of infringement inflict more harm to the copyright owner than the benefit reaped by the infringer, for example, where the infringer's minimal use forecloses a broader market") (citation omitted).

**B. Kenyon's Capacity Analysis Contradicts Applicable Law And Ignores The Applicable Burden of Proof and Distorts The Evidence In The Record.**

Kenyon's proffered actual damages opinion sidesteps the applicable law. Rather than address whether there were purchasers and a demand for the town homes at issue in the geographic area where the parties competing developments were located, much of Kenyon's analysis focuses on whether Rottlund had the capacity to build all of the infringing town homes. (Mahowald Aff. Ex. A (Kenyon Prelim. Report) at 4-6, 7; Ex. B (Kenyon Supplemental Report) at 2-3.) In doing so, he ignores the testimony of Rottlund witnesses such as Steve Kahn, Rottlund's Chief Financial Officer, who testified that Rottlund needed only four things to develop communities where Town & Country's infringing town homes were constructed: 1) land; 2) monetary resources; 3) internal superintendents and assistant superintendents; and 4)

outside subcontractors. (Mahowald Aff., Ex. I (Transcript of Rule 30(b)(6) Deposition of Steven Kahn dated August 4, 2003 ("Kahn Dep.") at 211:8-212:22. Of these constraints, Rottlund's owner has testified that "The only problem we've ever had with Villas is finding enough land to build Villas on." (*Id.*, Ex. J (Transcript of Rule Deposition of Bernard Rotter dated August 29, 2003 ("B. Rotter Dep.") at 172:11-22, 179:17-25.)

While Kenyon acknowledges this testimony, he nevertheless draws his own contradictory conclusion that "Rottlund would have had capacity issues with respect to attempting to build the alleged infringing units in addition to what it was already constructing." (Mahowald Aff., Ex. B (Kenyon Supp. Report) at 3.) Kenyon's conclusory opinions that Rottlund lacked capacity to build the infringing town homes, resting on nothing more than the *ipse dixit* of Kenyon himself, are meaningless and inadmissible. *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 143, 146, 118 S. Ct. 512, 519 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *see also Arkwright Mut. Ins. Co.*, 125 F.3d at 1183 (holding that a judge must exclude an expert opinion that is unsupported); *Wheeling*, 254 F.3d at 714-15 (citing *Kumho Tire*, 526 U.S. at 141 (court must act as "gatekeeper" to ensure that expert bases his/her opinion upon a reliable foundation)); *De Jager Const., Inc. v. Schleininger*, 938 F. Supp. 446, 449 (W.D. Mich. 1996) (expert's seeking to "weave a story" by deliberately ignoring evidence in the record was factor in excluding opinion regarding damages or fraud).

## CONCLUSION

For the foregoing reasons, the Court should grant Rottlund's motion in limine and exclude the expert reports and proffered testimony of BSB's expert Joseph D. Kenyon from the trial. Whatever "small aid [Kenyon's] testimony might" arguably provide is far outweighed by

"the unfair prejudice which might . . . result [] because of the aura of reliability and trustworthiness" that accompanies an expert's testimony. *Purham*, 725 F.2d at 454.

Dated: November 1, 2004

**s/Philip R. Mahowald**
Craig S. Krummen, #0259081
Philip R. Mahowald, #0274902
David A. Davenport, #0285109
WINTHROP & WEINSTINE, P.A.
**Attorneys for Plaintiff**
225 South Sixth Street, Suite 3500
Minneapolis, MN 55402-4629
Telephone: (612) 604-6400
Facsimile: (612) 604-6800
pmahowald@winthrop.com

2150470v1