# Exhibit A

SCHECHTER
DOKKEN
KANTER
CERTIFIED PUBLIC ACCOUNTANTS • ADVISORS

August 15, 2003

Holly J. Newman, Esq.
Ben Patrick, Esq.
Moore, Costello & Hart, P.L.L.P.
701 Fourth Avenue South, Suite 1350
Minneapolis, MN 55415-1823

Schechter Dokken Kanter Andrews & Selcer Ltd
Suite 1600
100 Washington Avenue South
Minneapolis, MN
55401-2192
Phone 612-332-5500
Fax 612-332-1529
E-mail info@sdkcpa.com
www.sdkcpa.com

Re: The Rottlund Company, Inc. v. Pinnacle Corporation d/b/a Town & Country Homes, et al.

# ACCOUNTANTS' REPORT

## INTRODUCTION

You have asked us to do the following:

- Determine the profits earned by Bloodgood Sharp Buster Architects & Planners of Iowa, Inc. ("BSB") as a result of work it performed related to certain of Town & Country Homes, Inc.'s ("TCM") products.
- Analyze the profits TCM earned on those certain products.
- Analyze the factors that would affect The Rottlund Company, Inc., d/b/a Rottlund Homes' ("Rottlund") ability to make sales of the products at issue here.
- Analyze Pinnacle Corporation's ("Pinnacle") profits on its products.
- Critique and comment on the report of Melissa C. Snelson.

We understand that, as of the date of this report, certain documents had been requested of TCM and Rottlund but not yet provided. This report is preliminary in as much as some of the topics discussed herein could be and most likely will be impacted by this information. We reserve the right to update this report should the requested information be provided.

## METHODOLOGY

Our opinions are based on our education, training and experience as well as the documents we read and analyzed (see Appendix I). In addition, we interviewed Jim Grundmeier, BSB Partner in Charge of Operations, Mary Brown, BSB Human Resource Director and Art Plante, Divisional President of TCM Minnesota. We also toured the following developments:

- Rottlund's Club West in Blaine, Minnesota
- Rottlund's Maple Lakes in Maple Grove, Minnesota
- TCM's Centennial Lakes in Plymouth, Minnesota

EXHIBIT
tabbies
432

- TCM's Springbrook in Lakeville, Minnesota
- Centex's Club West in Blaine, Minnesota

## CONCLUSION

Based on the analysis and procedures we performed as well as our training, knowledge and experience we believe:

- BSB's profits relating to the projects at issue were no more than $141,200.
- Rottlund could not have built the projects at issue and thus is not entitled to any actual damages.
- The significant differences in pricing show Rottlund and TCM cater to two different market segments resulting in minimal lost sales.
- TCM's profits must be allocated between allegedly infringing elements and non-infringing elements.
- The portion of TCM's profits that relate to allegedly infringing elements does not exceed 20%.
- The royalty rate applicable to Pinnacle's development does not represent a reasonable royalty rate.
- Ms. Snelson's report inappropriately includes units not alleged to be infringing.
- Ms. Snelson has not considered Rottlund's capacity to build the allegedly lost units or Rottlund's mitigation efforts.

## BACKGROUND

BSB, an architectural firm founded in 1966, specializes in the planning and design of residential housing and communities. It has designed various types of housing across the United States.

TCM is a family owned and operated residential housing developer and builder. TCM believes it offers affordable value, flexible floorplans and outstanding locations. One of the types of units it builds is referred to as a back-to-back unit.

TCM determined and provided various criteria to be included in the design of a back-to-back unit to BSB. BSB then set forth designing a back-to-back unit that met TCM's criteria. The design eventually became known as the Homestead Collection and was built in the following developments:

- Centennial Crossings in Maple Grove, Minnesota
- Harvest Hills in Plymouth, Minnesota
- Providence Pointe in Shakopee, Minnesota
- Cornerstone Lake in Lakeville, Minnesota
- Springbrook in Lakeville, Minnesota

Pinnacle is a developer in Illinois that used a different back-to-back unit designed by BSB in its Washington Square development.

Rottlund started in the Twin Cities in 1973. The Twin Cities remains its headquarters although it has expanded to Iowa and Florida. Rottlund designs, builds and markets attached and detached townhomes and condominiums along with detached single family homes. Rottlund markets its homes under Rottlund Homes and David Bernard Builders and Developers.

Rottlund had previously designed a back-to-back unit which eventually became known as the Villa II. Rottlund alleges that TCM's Homestead Collection design is "substantially similar to the combination or gestalt" of Rottlund's Villa II design.[1] Rottlund has brought suit against TCM and BSB alleging, among other things, copyright infringement. TCM has brought a third-party suit against BSB as designers of the Homestead Collection for indemnity and contribution. BSB denies any wrongdoing.

**BSB PROFITS**

If found liable, the damages assessed against BSB and in favor of Rottlund should be no more than the profits BSB earned performing services for TCM plus Rottlund's actual damages, if any, or, in the alternative, statutory damages.[2] For purposes of our calculation, BSB's profits are determined in a three-step process. First, determine the billings or revenues received from TCM related to the projects at issue. Second, determine the expenses BSB incurred to generate these billings. Third, subtract the expenses from the billings to determine profits. This process is discussed in the following sections.

**Billings**

We understand BSB designed the plans under substantially fixed fee agreements plus out-of-pocket costs.[3] We received and summarized the invoices BSB sent to TCM. The invoices consist of charges for services provided as well as out-of pocket expenses as follows:

| | |
|---|---|
| Total Billings | $187,941 |
| Reimbursed Expenses | (7,963) |
| Net Service Charges | $179,978 |

**Expenses**

Net service charges must be reduced by the expenses incurred. Under generally accepted accounting principles, these expenses would include direct costs as well as indirect costs and an allocation of overhead. For purposes of our calculation, however, we have only considered direct labor and benefits. We have not considered any other variable expenses or an allocation of overhead. This results in BSB's calculated profits being overstated for these purposes.

[1] Complaint, para. 45.
[2] We understand Rottlund is not seeking any damages from BSB but, rather, believes BSB is liable for a portion of the damages assessed against TCM. Rottlund has not set forth the portion of damages for which it believes BSB should be liable.
[3] Some hourly work was performed.

We received from BSB timesheets for individuals that performed work relating to the projects at issue here as well as their actual pay rates. We summarized the timesheets to determine the total hours worked by each employee. We then applied the appropriate pay rate for each employee to determine the wage or salary cost.

We also received from BSB a summary of benefits paid, net of employee cost, on behalf of each employee that performed work relating to the projects at issue here. We determined that, on average, benefits are 21% of wages and salaries.

Thus, total payroll costs are as follows:

| | |
|---|---|
| Wages or Salaries | $32,077 |
| Benefits | 6,736 |
| Payroll Costs | $38,813 |

**Profits**

Having determined BSB billings and expenses (even though understated), its profits from the work it provided for TCM were as follows:

| | |
|---|---|
| Net Service Charges | $179,978 |
| Payroll Costs | (38,813) |
| Profit | $141,165 |

## COPYRIGHT DAMAGES

If copyright infringement is proven, the plaintiff is allowed to recover one of three possible damages:

1. Plaintiff's (Rottlund's) profits lost as a result of the alleged infringement ("actual damages"),
2. Defendants' (TCM, BSB and Pinnacle) profits earned as a result of the alleged infringement ("infringer's profits"), or
3. Statutory damages.

Rottlund's and TCM's profits are discussed in the following sections. We understand no claim has been made for statutory damages, therefore, we have not addressed this damage category in our report.

## ROTTLUND'S ACTUAL DAMAGES

We believe Rottlund's actual damages are not the appropriate measure of damages because Rottlund could not or would not have made the sales at issue here. In order for Rottlund to recover any actual damages, it must establish, among other things, that it would have made the sales TCM made. We believe Rottlund could not have made these sales because, among other

things, Rottlund did not attempt to purchase the land on which TCM's developments were built and the pricing of Rottlund's and TCM's developments are materially different. In addition, Rottlund has included inappropriate units in its estimate of damages. Each of these is discussed in the following sections.

**Ability to Build**

By and large, Rottlund chose not to purchase the land on which the developments at issue have been built. Rottlund either did not know about the development, chose not to submit a bid or did not submit a competitive bid. Rottlund did not consider these facts when calculating its damages. Each of the developments at issue are discussed in the following sections.

Harvest Hills (Plymouth, Minnesota)

Rottlund knew that the development was available for sale because the seller, Merrill Paulson, was a personal friend of the owners of Rottlund. Rottlund found out that the land did not have sewer and water available to it. Due to timing, Rottlund did not submit a bid on the property.[4]

Providence Pointe (Shakopee, Minnesota)

Rottlund learned of Providence Pointe from Ron Helmer of Helmer Development. Rottlund did not pursue the opportunity because the quoted purchase price and the type of development designed for the land did not fit with what Rottlund felt the market was at the time.[5]

Springbrook (Lakeville, Minnesota)

Rottlund did not know about the Springbrook development. However, Rottlund did bid on a piece of property that was adjacent to the Springbrook property.[6] In addition, we understand that, in the past, Rottlund has abandoned developments where its standard plans would need to be changed. We further understand Lakeville has certain requirements which would necessitate changes to Rottlund's standard Villa plans. Thus, it is likely that even if Rottlund had known about the Lakeville properties, Rottlund would not have attempted to purchase the development.

Cornerstone Lake (Lakeville, Minnesota)

Rottlund did not know about the Cornerstone Lake development and thus did not submit a bid for the site.[7]

[4] Todd Stutz deposition, pp. 186-189, 197-201.
[5] Stutz deposition, pp. 190-191.
[6] Stutz deposition, pp. 192-193.
[7] Stutz deposition, p. 192.

Centennial Crossing (Maple Grove, Minnesota)

Rottlund submitted a bid on this property.[8] However, Rottlund declined to increase its bid in order to remain competitive stating, "we are not interested in modifying the terms and conditions of the original proposal. The price we are willing to pay will remain the same. In addition, we are not interested in a joint venture proposal."[9] Rottlund felt that its bid of $4 million was already overpaying for the property based on the market and what it had paid for similar sites in Maple Grove.[10] Other bidders submitted revisions to their initial bids.

Ultimately, the Court approved a revised TCM offer stating "the offer by Town & Country is in the best interests of the estate because its net price to the estate is the third highest, however it is preferable to the two ostensibly higher offers because it is not subject to contingencies…"[11] The final purchase price for the property was $4.5 million.[12]

The documents we analyzed indicate TCM was not known to the city to be the developer until after the land was purchased.[13] After TCM had been named as the developer, a staff report to the Maple Grove Planning Commission said, "[t]he homes to be constructed will be similar to those constructed in other Town & Country townhome projects in the City. The townhomes will all be two-story units with two-stall garages."[14] TCM described the homes to be constructed as "very similar to those that have been constructed on Town & Country's two other Maple Grove townhome communities, The Grove at Elm Creek Townhomes … and the Oaks at Weaver Lake …"[15] The documents we have analyzed did not indicate that TCM obtained the property as a result of the allegedly infringing design.

Washington Square (Aurora, Illinois)

We are not aware that Rottlund is active in this area of the country. As a result, Rottlund could not have made these sales.

**Differences in Pricing**

The selling price of a housing unit has a significant impact on the potential customers it will draw. The number of units sold and average selling prices for TCM's and Rottlund's townhome developments by city are:

---

[8] Stutz deposition, pp. 64-77, 248-249.
[9] Stutz deposition, Exhibit 144.
[10] Stutz deposition, p. 249.
[11] Order Authorizing, Approving, Directing and Confirming Acceptance by the Personal Representative of Offer to Purchase the Maple Grove Property (MarqAdv00146-00149).
[12] Stutz deposition, p. 32.
[13] TCM was stated as developer in the July 26, 1999, Maple Grove Planning Commission meeting minutes. We believe this is the first time TCM is named as developer.
[14] Staff Report to the Planning Commission by Dick Edwards, Centennial Crossings dated July 26, 1999 (DSU00111-DSU00113).
[15] Centennial Crossing by Town & Country Homes (DSU00114-DSU00115).

| | TCM | | Rottlund | |
|---|---|---|---|---|
| City | Units | Average Price | Units | Average Price |
| Plymouth | 66 | $191,197 | 151 | $160,365 |
| Maple Grove | 104 | $160,432 | 128 | $141,297 |
| Blaine | | | 57 | $164,719 |
| Shoreview | | | 160 | $140,442 |
| Lakeville | 38 | $172,056 | | |
| Farmington | | | 59 | $155,985 |
| Shakopee | 56 | $171,898 | | |
| Chanhassen | | | 168 | $127,155 |
| Average[16] | | $172,228 | | $144,849 |

The average selling price of TCM's townhomes at issue here was $172,228. The average selling price of Rottlund's townhomes was $144,849. TCM's townhomes, on average, were $27,379, or almost 19% more expensive. This is a significant difference, especially considering the median income of a new homebuyer is about $55,000 and is equivalent to the price of a moderate new car.[17] Roger Conhaim, a residential marketing and planning analyst, in his deposition, stated this difference would mean Rottlund and TCM are catering to different markets.[18] On a 30 year mortgage at 6%, the payment for an average TCM unit, excluding additional real estate taxes and insurance, is more than $164 higher each month. If TCM's design is similar to Rottlund's and is a significant factor, a consumer would simply choose the lower priced Rottlund product.

**Conclusion**

Rottlund could not have developed the properties at issue here. Also, the significant difference in pricing shows Rottlund and TCM are drawing from two different customer bases. Since Rottlund's average unit is significantly less, it is unlikely its customer base significantly overlaps TCM's. As a result, it is unlikely Rottlund has lost any sales and, thus, accrued any actual damages.

**TCM'S PROFITS**

To date, we do not have sufficient information to calculate TCM's profits on the units it built. Such information would be the starting point of any analysis we would perform. We understand information has been requested but not yet received.

[16] Weighted average of all developments.
[17] 2000 and 2002 National Association of Realtors Profile of Home Buyers and Sellers, Table I-5.
[18] Roger Conhaim deposition, pp. 37-38.

Any award of TCM's profits must relate to the alleged infringing element. Any profits earned that do not relate to the infringing element but, rather, are the result of other factors should not be included. Thus, it is necessary to allocate the profits earned by TCM between allegedly infringing elements and non-infringing elements. We expect to perform such an allocation once the information is received. Nonetheless, our preliminary research and procedures show there are many other elements that affect a customer's buying decision and, therefore, should be allocated a portion of the profits earned by TCM on the projects at issue.

**Other Factors Affect Buying**

If, for argument's sake, one believes TCM has obtained customers as a result of some infringing elements, it is not appropriate to award to Rottlund all profits TCM earned on a unit sale because the design is not the only factor considered by customers when purchasing a home.[19] Based on our research, design is just one of many considerations.

Our research indicates the old real estate adage that "location, location, location" is the most important part of homebuying is accurate. The design of the home is significantly less important. As a result, we believe a negligible portion of TCM's profits should be allocated to the infringing design.

Rottlund believes factors cutomers consider when purchasing a home include, among others, the following:[20]

1. Geographic area.
2. School districts.
3. Access to freeways.
4. Projected job growth.
5. Natural amenities.
6. Demographics of existing residents.
7. Product design.
8. Perceived value.
9. Price.
10. Standard features.
11. Option pricing.
12. Flexibility of builder to customize home to meet buyer's needs.
13. Promotions being offered.
14. Special financing incentives.
15. Product workmanship.
16. Reputation of the builder.
17. Relationship between the buyer and salesperson.
18. Quality of merchandising.
19. Exterior design.
20. Advertising materials.

---

[19] For example, non-infringing elements of the townhome including such mundane items as the kitchen sink, carpeting in the living room and door handles may be allocated a portion of the profits.
[20] Stutz deposition, Vol. I, pp.250-268, Vol. II, pp. 176-189 and Rottlund 2001 Annual Report.

Thus, if each of Rottlund's factors are given equal weight, then Product design would account for merely 5% of all profits.[21]

Our preliminary research shows homebuyers are influenced by the following factors:[22]

| **Factor Influencing Homebuying** | **Percent Influenced[23]** |
|---|---|
| Neighborhood | 74 |
| Price | 58 |
| Work | 29 |
| School | 29 |
| Friends/Family | 23 |
| Parks/Recreation Facilities | 15 |
| Shopping Center | 11 |
| Planned Community | 9 |
| Entertainment | 8 |
| Potential Rental Income | 6 |
| Public Transportation | 4 |
| Health Facilities | 2 |

Product design is not listed in this independent research. Thus, it must influence less than 2% of buyers.[24]

Mr. Conhaim, the marketing analyst, stated in his deposition that 85% of the buying decision for a home is based on location and price.[25] The remaining 15% would be comprised of all other factors, including design. Assuming, for argument's sake, that the only other factor is product design, then it should be allocated no more than 15% of profits.

Rottlund has produced surveys purporting to set forth reasons why customers purchased its units. While it remains to be seen whether these surveys are valid, they show, based on a weighting of the responses provided, it appears that no more than 20% of profits should be allocated to the alledgedly infringing elements.

After consideration of these studies, at this time, we believe no more than 20% of profits should be allocated to the allegedly infringing elements. Our analysis is continuing and we may update our opinion related to the allocation of TCM's profits between allegedly infringing elements and non-infringing elements.

---

[21] Assuming 100% of Product design is infringing.
[22] 2002 National Association of Realtors Profile of Home Buyers and Sellers, Table I-9.
[23] Do not add to 100% since more than one response was permitted.
[24] Planned Community received 9 out of the total 268 points awarded, or 3.4%.
[25] Conhaim deposition, p. 123.

**PINNACLE'S PROFITS**

We understand Pinnacle used the allegedly infringing design in the Washington Square development in Aurora, Illinois. Rottlund claims it is entitled to a royalty equivalent to the profits it would have earned had it built these units. However, in order to determine a reasonable royalty rate, it is necessary to determine what rate would have been established in a hypothetical negotiation between the parties. The courts often rely upon the factors set forth in the Georgia-Pacific case to select a specific royalty rate.[26] One of the factors discusses the hypothetical negotiations as follows:

> The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

The royalty rate used in Rottlund's claim appears to consider only what the licensor (Rottlund) would accept. It does not represent what the licensee (TCM) would pay. As a result, the royalty rate is significantly overstated as the royalty rate would leave the hypothetical licensee with no profit.

To date, we have not been provided information related to the profits Pinnacle earned on these units. We reserve the right to update this report when, or if, such information becomes available.

**SNELSON REPORT**

Melissa C. Snelson prepared a report on Rottlund's behalf in which she purports to calculate the damages to which Rottlund is entitled. Ms. Snelson's report is flawed for, among other things, the reasons set forth in the following sections.

**Differences in Pricing**

As previously discussed, we believe the difference in price is significant and demonstrates TCM and Rottlund have substantially different customer bases. Ms. Snelson merely concludes TCM's and Rottlund's products are competitive. She cites no studies, surveys or testimony to support her conclusion that people who bought the TCM product would have bought the Rottlund product.

**Lost Profits on Additional Home Products**

Ms. Snelson has included damages not just for the townhome designs at issue here but for single family homes and other townhomes not alleged to be infringing. Her justification is that "each of Town & Country Homes' developments at issue were approved as a whole, meaning that Town & Country Homes could not gain approval of the other housing products built in these

---

[26] Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116 (1970); aff'd, 446 F.2d 205 (1971).

developments without the inclusion of the Infringing Town Home Units."[27] As previously detailed for Centennial Crossings, Ms. Snelson's premise is fatally flawed because, at least for Centennial Crossings, the layout of the development had been approved even before TCM was awarded the property. As to the other developments, we have seen no evidence to support Ms. Snelson's conclusion. Thus, TCM's allegedly infringing design was not a factor and the non-infringing units, such as single family homes and non-back-to-back townhomes, should not be included in any damage calculation.

**Rottlund's Capacity**

Rottlund, like all businesses, is limited in the resources it has. It has only, among other things, so many employees, so much working capital and so much access to financing. It can undertake only so many developments at any given time. Ms. Snelson's calculations imply that, in addition to all the units it actually built, Rottlund would have built all of TCM's units. We have seen no evidence that Ms. Snelson has considered whether Rottlund had the capacity to build the units at issue here.

**Mitigation**

As a result of not building the TCM units, Rottlund was able to undertake other projects which effectively mitigated, or minimized, its damages. We have seen no evidence that Ms. Snelson has considered Rottlund's mitigation efforts in her analysis.

**QUALIFICATIONS AND COMPENSATION**

This report was prepared by Joseph D. Kenyon, CPA/ABV, CFE and David G. Kiwus, CPA, CMA, CFE whose qualifications, publications and cases in which testimony has been offered are more fully set forth in the attached Appendices II and III, respectively. Mr. Kenyon's hourly rate is $275 and Mr. Kiwus' hourly rate is $195. Compensation for Mr. Kenyon and Mr. Kiwus is not dependent on the outcome of this litigation.

**STATEMENT OF LIMITING CONDITIONS**

We reserve the right to update this report based on future events and circumstances which may become known to us in connection with the above referenced matter or for additional information we may receive.

If counsel asks, we will undertake additional work to respond to other parties' evidence and to reports or testimony of any experts other parties may offer. In making such response, we may prepare additional reports and/or exhibits to respond to other parties evidence or experts' reports and testimony. During deposition or trial, we may also refer to exhibits prepared or used by other parties' experts.

---

[27] Snelson report, p. 10.

This report was prepared in connection with the aforementioned matter and is not to be used for any other purpose.

Respectfully Submitted;

Schechter Dokken Kanter
Andrews & Selcer Ltd

Joseph D. Kenyon, CPA/ABV, CFE
Shareholder

David G. Kiwus, CPA, CMA, CFE
Senior Manager

**Appendix I**

## Documents Considered

1. Second Amended Complaint.
2. Third-Party Complaint dated May 21, 2002.
3. Separate Answer and Counterclaims of Bloodgood Sharp Buster Architects and Planners of Iowa, Inc.
4. Letter Brief submitted by Pinnacle Corporation dated September 18, 2002.
5. Letter Brief submitted by Town & Country Homes dated September 18, 2002.
6. Plaintiff's Supplemental Legal Memorandum in Opposition to Defendant Town & Country Homes, Inc.'s Motion to Compel Discovery dated September 18, 2002.
7. Deposition Transcripts of:
    a. Steven A. Kahn taken June 13, 2003, rough drafts taken August 4, 2003, and August 13, 2003.
    b. John A. Falk taken June 26, 2003.
    c. Arthur J. Plante taken December 19, 2002 and December 20, 2002.
    d. Kathleen M. Gardas taken June 26, 2003.
    e. Steven J. Meyers taken June 25, 2003.
    f. Todd M. Stutz taken May 29, 2003, and rough drafts taken June 11, 2003, August 5, 2003, and August 7, 2003.
    g. Timothy M. Whitten taken May 28, 2003, May 30, 2003, and rough draft taken June 12, 2003.
    h. Paul J. Anderson taken December 20, 2002.
    i. Roger Conhaim rough draft taken August 13, 2003.
    j. Stephen Swanson taken July 31, 2003.
    k. Peter Torseth rough draft taken August 14, 2003.
8. Bloodgood Sharp Buster timesheets for selected employees.
9. Bloodgood Sharp Buster Employer 401k Contributions for selected employees.
10. Bloodgood Sharp Buster Benefit Invoices for selected employees.
11. Household Income 1999.
12. Bloodgood Sharp Buster Engagement Letters with Town & Country.
13. Town & Country website information and brochures.

14. Bloodgood Sharp Buster website.
15. Rottlund website information and brochures.
16. The 2002 National Association of Realtors Profile of Home Buyers and Sellers.
17. The 2000 National Association of Realtors Profile of Home Buyers and Sellers.
18. Townhouse Survey Report.
19. Various magazine and journal articles.
20. Expert Report of Melissa C. Snelson dated May 30, 2003.
21. Bloodgood Sharp Buster Invoices.
22. Bloodgood Sharp Buster Employee Review Summary for selected employees.
23. Bloodgood Sharp Buster Summary of Benefits Paid for selected employees.
24. Bloodgood Sharp Buster Time Record List for selected employees.
25. Town & Country Activities List.
26. Pinnacle Activities List.
27. Town & Country Vendor List.
28. Pinnacle Vendor List.
29. Town & Country Rebate Information.
30. Pinnacle Rebate Information.
31. Various Maple Grove Planning Commission Minutes.
32. Various Staff Reports to the Planning Commission.
33. Various Maple Grove City Council Minutes.
34. Various Requests for Council Action.
35. Various City of Maple Grove Resolutions and Ordinances.
36. Various Site Improvement Performance Agreement.
37. Various City of Maple Grove Correspondence.
38. Various Town & Country Correspondence.
39. Various Dahlgren Shardlow & Uban Correspondence.
40. Miscellaneous Correspondence.
41. Proforma Projection – Centennial Crossings, Harvest Hills, Washington Square, Providence Pointe, Springbrook, Cornerstone Lakes.

42. Subdivision Income Statements – Centennial Crossings, Harvest Hills, Washington Square, Providence Pointe, Springbrook, Cornerstone Lakes.

43. List Jobs Report – Signature Collection – Centennial Crossings.

44. List Jobs Report – Homestead Collection – Centennial Crossings, Harvest Hills, Providence Pointe.

45. List Jobs Report – Premier Collection – Centennial Crossings, Harvest Hills.

46. List Jobs Report – Courtyard – Providence Pointe.

47. List Jobs Report – Village – Providence Pointe.

48. List Jobs Report – Single Family – Providence Pointe.

49. Gross Profit Report – Signature Collection – Centennial Crossings.

50. Gross Profit Report – Homestead Collection – Centennial Crossings, Harvest Hills, Providence Pointe.

51. Gross Profit Report – Premier Collection – Centennial Crossings, Harvest Hills.

52. Gross Profit Report – Courtyard – Providence Pointe.

53. Gross Profit Report – Village – Providence Pointe.

54. Gross Profit Report – Single Family – Providence Pointe.

55. Historical Job Cost Report – Signature Collection – Centennial Crossings.

56. Historical Job Cost Report – Homestead Collection – Centennial Crossings, Harvest Hills, Providence Pointe.

57. Historical Job Cost Report – Premier Collection – Centennial Crossings, Harvest Hills.

58. Historical Job Cost Report – Courtyard – Providence Pointe.

59. Historical Job Cost Report – Single Family – Providence Pointe.

60. Historical Job Cost Report – Village – Providence Pointe.

61. Estimate Detail Report – Signature Collection – Centennial Crossings.

62. Estimate Detail Report – Homestead Collection – Centennial Crossings, Harvest Hills, Providence Pointe.

63. Estimate Detail Report – Premier Collection – Centennial Crossings.

64. Estimate Detail Report – Washington Square, Springbrook, Cornerstone Lakes.

65. Estimate Detail Report – Village – Providence Pointe.

66. Estimate Detail Report – Courtyard – Providence Pointe.

67. Historical Job Report – Washington Square, Springbrook, Cornerstone Lakes.

68. List Job Report – Washington Square, Springbrook.

69. Gross Profit Report – Washington Square, Springbrook, Cornerstone Lakes.

70. Finance, Job Cost & Sales Manual – Washington Square.

71. Plan Sales Price – Washington Square.

72. Sold/Closed Listing – Harvest Hills, Providence Pointe, Cornerstone Lakes.

73. Selected Villa II Community Profit Analysis January 1, 1999-December 31, 2002.

74. Job Cost Detail Report – Villas - Victor Gardens, Clover Ridge, Club West, Maple Lakes, Prairie Crossing, Rush Creek, Vermillion Grove, The Reserve, Cornerstone, Walnut Grove, Rice Creek.

75. The Rottlund Company Villa Development Margin Report.

76. The Rottlund Company Income Statements.

77. Rottlund Homes Annual Report 1997-2001.

78. The Rottlund Company, Inc. 10-Q – June 30, 1997, September 30, 1997, December 31, 1997, June 30, 1998, September 30, 1998, December 31, 1998, June 30, 1999, December 31, 1999, June 30, 2000, September 30, 2000, December 31, 2000, June 30, 2001, September 30, 2001, December 31, 2001.

79. The Rottlund Company, Inc. Consolidated Financial Statements for the year ended March 31, 2002.

80. Pinnacle Corporation d/b/a Town & Country Homes Financial Statements 1997-2001.

81. Town & Country Minnesota Division Financial Statements 1997-2001.

82. The Rottlund Company Gross Profit Reports.

83. The Rottlund Company Job Process Control Report.

84. Various documents related to Hollander Property received from Marquette Advisors.

85. Various documents related to Hollander Property received from Dahlgren Shardlow & Uban.

86. Various documents related to Hollander Property received from John Oliver & Associates.

Appendix II

**JOSEPH D. KENYON, CPA/ABV,CFE**

**SCHECHTER DOKKEN KANTER ANDREWS & SELCER LTD**

**EXPERIENCE HIGHLIGHTS:**

Mr. Kenyon has over twenty five years of experience in accounting, auditing and tax practice and is a Shareholder of Schechter Dokken Kanter. His industry experience, relating to both privately and publicly held companies, includes manufacturers, multi-location retailers, wholesale distributors, convenience food store chains, beauty salon chains, restaurant chains, franchisors and franchisees, non-profit organizations, leasing companies and hotels. Mr. Kenyon provides litigation support services to legal counsel and their clients. These services include developing economic damage studies (e.g. commercial litigation, trademark and patent infringement, business interruption, wrongful death, etc.) or rebutting them, forensic accounting, fraud investigations, business valuations, expert testimony, assistance with discovery and analyses of documents and financial data. He also has experience in dealing with companies in bankruptcy or work out situations.

**EDUCATION:**

University of Minnesota, B.S. in Accounting with distinction – 1973

University of Minnesota, Master of Business Taxation – 1989

**CERTIFICATION:**

Certified Public Accountant (CPA) – Minnesota – 1976

Certified Fraud Examiner (CFE) – 1997

Accredited in Business Valuation (ABV) – 1998

**PROFESSIONAL & CIVIC ACTIVITIES:**

American Institute of Certified Public Accountants (Member of Council, 10/1/90 - 9/30/94)

Minnesota Society of Certified Public Accountants (Past President and Member of Board of Directors, 4/1/91-3/31/92; Past Chair – Professional Ethics, Community Service and Editorial Committees, Legislative Affairs)

Institute of Management Accountants

National Association of Forensic Economists

American Bankruptcy Institute

Institute of Business Appraisers (Past President and Board member, North Central Chapter)

Association of Certified Fraud Examiners

ADR Section of Minnesota State Bar Association (Chair – Elect)

Association of Insolvency and Restructuring Advisors

Turnaround Management Association (Board member, and Treasurer local chapter)

Board advisor to several charitable organizations

Licensing Executives Society (U.S.A. & Canada), Inc.

**SPEAKING ENGAGEMENTS/ DISCUSSION LEADER:**

"The Ten Most Important Items to Consider in the Valuation of a Closely Held Business" – 9th Annual Management and Business Advisors Conference sponsored by the Minnesota Society of Certified Public Accountants

"Calculating Non-Patent Intellectual Property Damages" - Economic Damages Seminar - sponsored by the Minnesota Institute of Legal Education – Course Chair

Financial Investigations Seminar – sponsored by the Minnesota Institute of Legal Education – Course Chair

Minnesota State Bar Association: 20th Annual Family Law Institute – "Proving and Calculating Net Income: Analyzing Schedule C/K-1"

"Calculating Damages in Intellectual Property Disputes," Legal Services Niche Forum, Polaris International

Asset Valuation Seminar sponsored by the Minnesota Institute of Legal Education

Proof of Damages Seminar sponsored by the Minnesota Trial Lawyers Association

Annual Seminar sponsored by the North Central Chapter of the Institute of Business Appraisers

National Spring Conference of the Minnesota Council of Accounting Educators.

23rd Annual Workshop on Accounting Practices sponsored by the University of Minnesota

Civil Litigation Section sponsored by the Hennepin County Bar Association

Annual Management Advisory Services Conference sponsored by the Minnesota Society of Certified Public Accountants

Conference on Managerial Accounting and Decision Making sponsored by the Minnesota Society of Certified Public Accountants

Annual Tax Institute for Public Accountants sponsored by the University of Minnesota

Minnesota Society of Certified Public Accountants – Continuing Professional Education Courses

Annual Workshop on Accounting Practices sponsored by the University of Minnesota

Midwest Business Administration Association, Chicago, Illinois

National Accounting Firm – Various Courses in Statistical Sampling Techniques and Auditing Methods

North Central Chapter of the Institute of Business Appraisers: Seventh Annual Business Valuation Seminar – Recent Federal Tax Court Developments, Estate and Gift Tax Valuations

Associated Regional Accounting Firms: 1998 Niche Conference – "Wage Loss Calculations Workshop"

**SPEAKING ENGAGEMENTS/ DISCUSSION LEADER CONTINUED**

*"A Model for Determining a Reasonable Present Value Discount Rate,"* Maine Lawyers Review, coauthored with Randall E. Dunham, CPA, March 1997

*"Business Acquisitions-Giving it up for the Government,"* Minnesota Business and Opportunities, coauthored with Richard Ledin, CPA, November 1996

*"CPA Experts,"* Minnesota Lawyer, September 20 – October 20, 1991

*"Computation of Economic Damages in Commercial Litigation,"* Footnote*, Minnesota Society of Certified Public Accountants, April 1991

*"Avoid the Minimum Tax in Your Business,"* Business Line, Marquette Bank, Minneapolis, Minnesota, 1988

*"A Code of Ethics - The Mark of a Professional,"* The Competent Professional Advisor, Minnesota Society of Certified Public Accountants, coauthored with Dean Barr, 1986

**CASES WHERE TESTIMONY WAS PROVIDED:**

Diesel Power Equipment, Inc., a Nebraska Corporation v. ADDCO, Inc., a Minnesota Corporation

IDS Life Insurance Company; IDS Life Insurance Company of New York; American Centurion Life Assurance Company; and American Express Asset Management Group, Inc. v. ALTO Loan Trust; Chase Manhattan Bank USA, N.A. f/k/a Chase Manhattan Bank Delaware, as Trustee for ALTO Loan Trust; and ING Capital Advisors, LLC f/k/a ING Capital Advisors, Inc.

Four Seasons Automotive Services, Inc. v. The Estate of Evadene L. Habinger, a Nevada Probate Estate, and Gerald W. Tank d/b/a Gerald W. Tank Realty, a Minnesota Resident/Sole Proprietorship, successor in tenant to MinVada Corporation, a Nevada Corporation.

Patrick T. Manion, Jr. v. Boat Dealers Alliance, Inc.

Mag Instrument, Inc. v. Bison Sportlights, Inc., Stephen Halasz, Christopher Halasz, and DOES 1-10

HomePlus Insurance Agency, Inc., Securian Financial Group, Inc. and Minnesota Life Insurance Company v. E.W. Blanch Holdings, Inc.

Heidi Ott A.G. and Heidi Ott v. Target Stores, Inc., Dayton Hudson Corporation, The Brass Key, Inc., Unimax Toys Limited, Unimax Toys (USA), Inc. and John Pellegrene

Canal Capital Corp v. Valley Pride Pack, Inc. a/k/a Pine Valley II, Inc.

Sheldon Jacobs v. Luke and Jack Wiley

Diane L. Shea v. Sidney Esensten; Jeffrey A. Arenson; Family Medical Clinic, P. A.

Paul Batterman, et al., v. Alliant Techsystems, Inc.

Gary Olson v. Snap Products, Inc. and Samuel McInnis

**CASES WHERE TESTIMONY WAS PROVIDED CONTINUED:**

E. Ray Carter and Carter Electric Corporation v. Engineered Products Company and Al Roach Sales, Incorporated

E. Ray Carter and Carter Electric Corporation v. Engineered Products Company and Al Roach Sales, Incorporated

Volunteers of America Assisted Living Communities of Minnesota Nonprofit Corporation d/b/a Elder Homestead v. County of Hennepin

Supervalu, Inc. et al. v. Northland Constructors of Duluth, Inc., et al.

In re the Marriage of Eileen Carney and Clifford Carney – State of Minnesota, County of Scott

James Czaja, v. Plastic Specialties and Technologies, Inc. a Delaware corporation; Fred W. Brolling, Carl L. McHattie, and K and B Liquidating Corp., a Minnesota corporation

Soil Teq, Inc. v. TCI Tyler Limited Partnership and Bowen-Tyler Corp.

Cassandra Burney, Dorothy Kelsey, and Gregory A. Stevenson, on behalf of themselves and all other similarly situated v. Thorn Americas, Inc., a Delaware corporation; Thorn EMI North America Holdings, Inc., a Delaware corporation

United States of America v. Dennis M. Forcelle

SIP-TOP, Inc. v. Ekco Group, Inc. and Ekco Housewares, Inc.
Robert Hollway v. Minnesota Vikings Football Club, Inc. and Roger Headrick

Schoeneckers, Inc. f/k/a Business Incentives, Inc. v. Robert Van Buskirk and Maritz, Inc.

Brent A. Ecklund and Ann Marie Ecklund v. Insure America of Minnesota, Inc., Richard C. Aune, Brooklyn Insurance Agency, Inc. and John Doe, Inc.

Aquapoly Equipment Company, a Minnesota corporation v. Dennis McNevin, Donald Qually and Q.Mc. Plastics Machinery, Inc., a Minnesota corporation, d/b/a QMC Plastic Machinery, Inc., and QMC Equipment, Inc., a Minnesota corporation

Butler General Store, Inc., f/k/a Judy's Gift Shop, Inc. v. James K. Binger and United Properties Brokerage and Management Company, a Division of The Northland Company

Barbara Starks and Irene Muldrow, on behalf of themselves and all others similarly situated v. Rent-A-Center and WRS of Minnesota, Inc.; Capital Minnesota Rents, Inc., a Kansas corporation; Rent-A-Center of America, Inc., a Kansas corporation, and Thorn EMI (USA) Inc., a Delaware corporation

Kavouras, Inc. v. Control Data Corporation

Anoka Motors v. Colonial Penn

The King Companies, Inc., d/b/a International Leasing Company v. American Marketing Corporation; Cross Check, Inc.; Credit Card Systems of America; Intercontinental Resources; Bankcard, Ltd.; Paul Green; Timothy LaBadie; and Jeffrey Rifkin

Marshall Foods, Inc., and David J. Weiner v. Jack Gold, Gold & Gold, and Gloria Shimer

**Appendix III**

**DAVID G. KIWUS, CPA, CMA, CFE**

**SCHECHTER DOKKEN KANTER ANDREWS & SELCER LTD**

**EXPERIENCE HIGHLIGHTS:**

Mr. Kiwus is a senior manager with Schechter Dokken Kanter. He has more than 15 years of accounting, auditing, tax and consulting services experience. He has worked with clients in manufacturing, professional services, medical, national motel chain, national post-secondary schools, high tech industries, restaurants, not-for-profit and other organizations. Mr. Kiwus provides litigation services to legal counsel and their clients. These services include providing expert testimony, resolution of fraud matters, developing economic damage studies, forensic and investigative accounting, assistance with discovery, management of large databases, and analyses of documents and financial data. Mr. Kiwus has prepared numerous economic damages studies relating to, among other matters, business interruptions, wrongful terminations, breach of contract and fraudulent misrepresentations. He has assisted clients with the review, design, and implementation of internal controls. Mr. Kiwus has assisted and advised clients with the purchase and sale of companies. He also has experience in preparing prospective financial statements.

**EDUCATION:**

College of St. Thomas
- B.A. in Business Administration – Accounting
- B.A. in Economics

**CERTIFICATIONS:**

Certified Public Accountant: Minnesota – 1990
Certified Management Accountant – 1992
Certified Fraud Examiner – 1996

**PROFESSIONAL AND CIVIC ACTIVITIES:**

Association of Certified Fraud Examiners
- Past President – Twin Cities Chapter
- Distinguished Achievement Award Recipient

Minnesota Society of Certified Public Accountants
- Member – Professional Standards Council
- Past Chair – Professional Ethics Committee (Outstanding Committee)
- Past Chair – Management Consulting Services Committee
- Ad hoc Fraud Committee

Institute of Business Appraisers
- Board Member and Past Officer – North Central Chapter

American Institute of Certified Public Accountants

Institute of Management Accountants

Association of Insolvency and Restructuring Advisors

Turnaround Management Association
- Member – Pro Bono Committee, Minnesota Chapter

**SPEAKING ENGAGEMENTS:**

The Supreme Court of Minnesota, Child Support, Court Services Division – Proving and Calculating Net Income: Analyzing Schedule C/K-1

Minnesota Institute of Legal Education: Economic Damages – Fraud Damages

University of Minnesota, Guest Lecturer – What Happened to the Truth

University of St. Thomas, Guest Lecturer – Forensic Accounting and Fraud Examination

Association of Governmental Accountants, Southern Wisconsin Chapter –Finding and Proving Financial Fraud Cases

Minnesota Institute of Legal Education: Financial Investigations – Anatomy of an Investigation: The Good, Bad and the Ugly

American Woman's Society of Certified Public Accountants of Minnesota – Easy Come, Easy Go: Fraud Lessons to Live By

North Central Chapter of the Institute of Business Appraisers: Tenth Annual Business Valuation Seminar – Financial Statement Analysis

Association of Governmental Accountants, Indianapolis Chapter – Finding and Proving Financial Fraud Cases

Minnesota Society of Certified Public Accountants – Avoid an Ethics Investigation – How Independent Are You?

American Accounting Association: Midwest Region 1999 Meeting – Fraud and Forensic Accounting

Minnesota State Bar Association: 20th Annual Family Law Institute – Proving and Calculating Net Income: Analyzing Schedule C/K-1

Metropolitan State University, Guest Lecturer – Forensic Accounting and Fraud Examination

Olmsted County Family Law Section – Issues in Determining the Appropriate Level of Child Support for Self-employed Individuals

Association of Certified Fraud Examiners, Twin Cities Chapter – Calculating Intellectual Property Damages

University of Minnesota, Guest Lecturer – Forensic Accounting and Fraud Examination

State of Minnesota, Office of Administrative Hearings: Child Support Seminar – Issues in Determining the Appropriate Level of Child Support for Self-employed Individuals

Associated Regional Accounting Firms: 1998 Niche Conference – Wage Loss Calculations Workshop

**SPEAKING ENGAGEMENTS CONTINUED:**

North Central Chapter of the Institute of Business Appraisers: Eighth Annual Business Valuation Seminar – Considerations of Off-Balance Sheet Risks and Uncertainties in Valuation

Association of Certified Fraud Examiners, Twin Cities Chapter – Finding Missing Income and Assets

Corporate Commission of the Mille Lacs Band of Ojibwe: Keeping Your Business in Business – Maintenance, Growth and Expansion of a Business

Minnesota Society of Certified Public Accountants: Third Annual MEGA Conference and Expo – Forensic Accounting v. Fraud Examination

University of Minnesota: 26th Annual Workshop on Accounting Practices and Managing an Accounting Practice – An Overview of Corporate Bankruptcy

North Central Chapter of the Institute of Business Appraisers: Seventh Annual Business Valuation Seminar – Fraud and Ethical Considerations in Business Valuation

Hennepin County Bar Association – Guide to Using Financial Statements

Minnesota State Bar Association – Professional Skills Training

National Institute for Trial Advocacy – Professional Skills Training

North Central Chapter of the Institute of Business Appraisers – Finding Missing Income

Various firm, professional, and community presentations

**ARTICLES PUBLISHED:**

*"Forensic Accounting Offers Practice Development Opportunities"*, Footnote*, Minnesota Society of Certified Public Accountants, September 2002

*"An Ounce of Prevention Is Worth a Pound of Sanctions"*, Footnote*, Minnesota Society of Certified Public Accountants, July 2001.

*"Detecting Fraud: We're Not in Kansas Anymore"*, Footnote*, Minnesota
Society of Certified Public Accountants, December 1996

**CASES WHERE TESTIMONY WAS PROVIDED:**

Woodland Development Corporation v. City of Andover – State of Minnesota, County of Anoka – Breach of Contract

John A. Feddema v. Gene H. Storms General Agency – State of Minnesota, County of Hennepin – Age Discrimination and Breach of Contract

**CASES WHERE TESTIMONY WAS PROVIDED CONT.:**

Russell Adams and Layland Lee Struble v. Bombardier Capital Rail, Inc. – Payment under a Phantom Stock Plan

Kathy Allegrezza v. William and Jon Farhrenkamp – State of Minnesota, County of Scott – Wrongful Death

Allen G. Vevang v. SCI Minnesota Funeral Services, Inc. d/b/a Werness Brothers Funeral Chapel – United States District Court, District of Minnesota, Fourth Division – Age Discrimination

James Lignell and Charles A. Schall v. Universal Hospital Services, Inc. United States District Court, Fourth Division – Age Discrimination

Damon A. Ewing v. Watt/Peterson, Inc. – United States District Court, District of Minnesota, Fourth Division – Disability discrimination

In re the Marriage of Eileen Carney and Clifford Carney – State of Minnesota, County of Scott

Met-Con Companies, Inc. and its constituent or related companies, John W. Benton, Paul Bossman, Kenneth Gergen, Gregory A. Kendizor, Donald Meyer, James P. Miller, Duane Storch, Kenneth Storm and Robert Teske, v. International Association of Bridge, Structural and Ornamental Iron Workers, Twin Cities Local Union No. 512, AFL-CIO, Wilfred Anderson, Donald E. Eldridge, Richard Frahm, Richard A. Garley, James E. Seiler, Gordon Struss, Charles E. Witt, Robert J. Yurch – United States District Court, District of Minnesota, Third Division – Lost Profits and Punitive Damages

Ronald Johnson v. Carrier Corporation – United States District Court, District of Minnesota, Fourth Division – Age Discrimination

United States of America v. Dennis M. Forcelle – United States District Court, District of Minnesota, Fourth Division – Alleged theft of precious metals by former officer

Exhibit B

SCHECHTER
DOKKEN
KANTER
CERTIFIED PUBLIC ACCOUNTANTS • ADVISORS

Schechter Dokken Kanter Andrews & Selcer Ltd
Suite 1600
100 Washington Avenue South
Minneapolis, MN
55401-2192
Phone 612-332-5500
Fax 612-332-1529
E-mail info@sdkcpa.com
www.sdkcpa.com

April 15, 2004

Holly J. Newman, Esq.
Ben Patrick, Esq.
Moore, Costello & Hart, P.L.L.P.
701 Fourth Avenue South, Suite 1350
Minneapolis, MN 55415-1823

Re: The Rottlund Company, Inc. v. Pinnacle Corporation d/b/a Town & Country Homes, et al.

# SUPPLEMENTAL ACCOUNTANTS' REPORT

## INTRODUCTION

You have asked us to supplement our report dated August 15, 2003 ("Previous Report"), for certain additional information received or to clarify information contained in it. This report is meant to be read in conjunction with the Previous Report.

## METHODOLOGY

Additional documents we read and analyzed are listed in Appendix I.

## BACKGROUND

See our Previous Report for the background.

## BSB PROFITS

In our Previous Report, we provided total profits Bloodgood Sharp Buster Architects & Planners of Iowa, Inc. ("BSB") earned as a result of work it performed related to certain Town & Country Homes, Inc. ("TCM") products. You have asked us to provide the portion that relates to Centennial Crossings. The breakdown of profitability between Centennial Crossings and other developments is as follows:

EXHIBIT
433

| | Total | Centennial Crossings | Other Developments |
|---|---|---|---|
| Total Billings | $187,941 | $60,031 | $127,910 |
| Reimbursed Expenses | (7,963) | (3,223) | (4,740) |
| Net Service Charges | 179,978 | 56,808 | 123,170 |
| Wages or Salaries | 32,077 | 12,291 | 19,786 |
| Benefits | 6,736 | 2,581 | 4,155 |
| Payroll Costs | 38,813 | 14,872 | 23,941 |
| Profit | $141,165 | $41,936 | $99,229 |

## ROTTLUND'S CAPACITY

Rottlund's position is that it could have built all of TCM's units as well as the units Rottlund had undertaken. However as mentioned in our Previous Report, like all businesses, Rottlund has a limited capacity. Rottlund's capacity is limited by its available employees, land opportunities, and the competitive market.

If Rottlund built all of TCM's units, it would be building an additional five developments in Minnesota and one development in Illinois. For each project additional salespeople, customer care representatives, supervisors, and assistant supervisors would be needed. According to Steven Kahn, Rottlund's Chief Financial Officer, "… each project has one superintendent, and depending upon the size, one assistant superintendent."[1] Rottlund generally does not hire superintendents, rather it promotes from within. It typically takes two to three years for an assistant superintendent to be promoted.[2] This lag would limit Rottlund's ability to immediately take on additional developments. Rottlund currently does not have any staff in Illinois and would have to, among other things, hire staff before it would be able to undertake the development.[3]

Land is also a limiting factor since, "[l]and drives [Rottlund's] capacity."[4] Rottlund did not expand its production of Villa II units because of a lack of land inventory.[5] However, when looking at land opportunities, Rottlund tries to buy all land inventories that make business sense.[6] Based upon the evidence, it appears that if Rottlund wanted to construct additional Villa II units, it did not have land available to do so.

For competitive purposes, Rottlund tries to stage the timing of its offering of Villa products so the developments in close proximity are not on the market at the same time.[7] Since 1997,

---

[1] Deposition of Kahn taken August 4, 2003. p. 212.
[2] Deposition of Michael Swanson p. 51.
[3] A few things Rottlund would have to do include incorporate and register in the state, become licensed and develop contacts with subcontractors.
[4] Deposition of Stutz p. 661.
[5] Deposition of Stutz p. 576.
[6] Deposition of Stutz p. 672.
[7] Deposition of Stutz p. 67.

Rottlund has not had any of its Villa II products for sale in the same city at the same time.[8] By undertaking TCM's units, Rottlund would have had Villa products competing in the same market at the same time, contrary to its marketing strategy.

Due to the need for additional employees, availability of land and the competitive market, it still appears that Rottlund would have had capacity issues with respect to attempting to build the alleged infringing units in addition to what it was already constructing.

We are not aware of any evidence that Rottlund had bid for most of the properties on which TCM built the Homestead collection. Aside from the unsupported representations from Rottlund's personnel, we are not aware of any evidence that Rottlund had capacity to build the units in dispute.

**ALLEGED INFRINGER'S PROFIT AND APPORTIONMENT**

In our Previous Report, we mentioned:

> Any award of TCM's profits must relate to the alleged infringing element. Any profits earned that do not relate to the infringing element but, rather, are the result of other factors should not be included. Thus, it is necessary to allocate the profits earned by TCM between allegedly infringing elements and non-infringing elements.[9]

Damages for copyright infringement include "... any profits of the infringer that are attributable to the infringement."[10] This would include gross revenues resulting from the alleged infringement reduced by related costs and other "... elements of profit attributable to factors other than the copyrighted work."[11] That is, where the alleged infringer's profits "... are not the natural and probable consequences of the infringement alone, but are also the result of other factors which either add intrinsic value to the products or have independent promotional value...apportionment is required."[12]

The copyright owner is not entitled to recover all of the alleged profits merely because the infringer fails to establish with certainty the portion attributable to the non-infringing elements.[13] The division of profits between portions attributable to the infringement and those attributable to other sources does not require "... mathematical exactness."[14]

---

[8] Deposition of Stutz p.154.
[9] Accountants' Report dated August 15, 2003, p. 8.
[10] U.S.C. §504(b).
[11] *Id.*
[12] *Data General Corporation. v. Grumman Systems Support Corporation*, 36 F.3d 1147, 1175 (1st Cir. 1994).
[13] *John G. Danielson v. Winchester-Conant Properties, Inc.*, 322 F.3d 26, (1st Cir. 2003) citing *Orgel v. Clark Boardman Co.*, 301 F.2d 119, 121 (2d Cir. 1962).
[14] *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 322 F.3d 26, (1st Cir. 2003) citing *Abend v. MCA, Inc.*, 863 F.2d 1465, 1480 (9th Cir. 1988).

In our Previous Report, we discussed a number of other factors, besides the unit's design, that significantly affect the buyer's decision to select a specific residence and location. A number of these factors are included in Rottlund's customer survey which requests a ranking of reasons the customer bought a Rottlund home. The reasons include: (1) design/plan, (2) location/ neighborhood, (3) more value for the money, (4) better quality, (5) other (fill in the blank answer) and (6) reputation.

To assist the court with its analysis of damages, we described four methodologies for apportioning the profits to non-infringing factors as follows:

1. Rottlund personnel cited 20 factors they believe customers consider when buying a home, only one of the factors is design. If design is evenly weighted and 100% of the design is assumed to be infringing, then merely 5% of profits would be attributable to the allegedly infringing elements.

2. The National Association of Realtors' 2002 Profile of Home Buyers and Sellers appears to indicate that less than 2% of homebuyers are influenced by design. Thus, a negligible amount of profits would be attributable to the design of the alleged infringing units.

3. Testimony by a marketing analyst indicated that 85% of the buying decision is based on location and price and 15% relates to all other elements. Thus, no more than 15% of profits would be attributable to the infringing elements if they were the sole component of the "other elements."

4. Rottlund produced surveys (described above) that indicated that no more than 20% of profits should be allocated to the allegedly infringing elements. Since then, additional surveys have been produced which support this conclusion.

We believe these methodologies provide ways to assist the court with its apportionment of profits.

## TCM'S PROFITS

You have asked us to determine the profitability of TCM's units and specifically the profitability between interior and exterior units. As of our Previous Report, we did not have sufficient information to determine the profitability of TCM's units. Since then, we have been provided additional information.

Incremental profits are determined by multiplying the allegedly infringing sales by the incremental profit percentage (gross margin less operating costs). Using the amounts included in Melissa Snelson's and Cobb's reports, the incremental profit between interior and exterior units is as follows:

| | End Units | Interior Units | Total |
|---|---|---|---|
| Sales | $24,583,157 | $21,067,133 | $45,650,290[15] |
| Incremental Profit %[16] | 16.8% | 13.8% | |
| Incremental Profit | $ 4,129,970 | $ 2,907,264 | $ 7,037,234 |

If incremental profits are apportioned assuming 100% of the design is infringing, damages are as follows:

| | End Units | Interior Units | Total |
|---|---|---|---|
| Incremental Profit | $4,129,970 | $2,907,264 | $7,037,234 |
| Maximum Apportionment | 20% | 20% | 20% |
| Maximum Damages | $ 825,994 | $ 581,453 | $1,407,447 |

## REPORT OF COBB & ASSOCIATES, LTD

We have also read the expert opinion of Cobb. We do not believe any of its conclusions or opinions are in conflict with ours. Cobb attempts to assist the court with a methodology for apportioning profits based upon the allocation of production costs between infringing and non-infringing properties of the alleged infringing units. We have attempted to provide some methodologies which focus on the factors affecting the buyer's decision to purchase a specific property. These are simply different approaches which attempt to measure the same thing—the portion of profits which relate to the infringing characteristic of the units.

## CHATEAU COLLECTION

We understand Rottlund has been allowed to provide an analysis relating to the Chateau Collection. We further understand that BSB had no involvement with the design of this unit and, thus, has no liability for these units. If, however, BSB becomes liable for any amounts relating to the Chateau Collection, we reserve the right to respond to or conduct our own analysis.

## QUALIFICATIONS AND COMPENSATION

This report was prepared by Joseph D. Kenyon, CPA/ABV, CFE and David G. Kiwus, CPA, CMA, CFE whose qualifications, publications, cases in which testimony has been offered and compensation are more fully set forth in our Previous Report.

[15] Calculated from Report of Cobb & Associates, Ltd. dated August 15, 2003, p. 17. Ms. Snelson appears to exclude at least one unit.

[16] We determined that gross margin for end units is about three percentage points higher than for interior units, thus, we have weighted Snelson's gross margin percentage (Snelson Report p. 9) accordingly. We also subtracted Snelson's operating costs of 6.9% (Snelson Report, p. 9).

**STATEMENT OF LIMITING CONDITIONS**

We reserve the right to update this report based on future events and circumstances which may become known to us in connection with the above referenced matter or for additional information we may receive.

If counsel asks, we will undertake additional work to respond to other parties' evidence and to reports or testimony of any experts other parties may offer. In making such response, we may prepare additional reports and/or exhibits to respond to other parties' evidence or experts' reports and testimony. During deposition or trial, we may also refer to exhibits prepared or used by other parties' experts.

This report was prepared in connection with the aforementioned matter and is not to be used for any other purpose.

Respectfully Submitted,

Schechter Dokken Kanter
Andrews & Selcer Ltd

Joseph D. Kenyon, CPA/ABV, CFE
Shareholder

David G. Kiwus, CPA, CMA, CFE
Senior Manager

Appendix I

## Documents Considered

1. Deposition Transcripts of:
    a. Steve Sandelin taken December 8, 2003.
    b. Mike Ryan taken December 11, 2003.
    c. William Ryan taken December 10, 2003.
    d. Paul Anderson taken December 10, 2003.
    e. Richard Palmiter taken December 16, 2003.
    f. Todd M. Stutz August 5, 2003 and August 7, 2003.
    g. Tom Ryan taken December 9, 2003.
    h. Douglas Buster taken March 6, 2003.
    i. Michael A. Swanson taken August 18, 2003.
    j. Timothy Whitten taken June 12, 2003 and August 6, 2003.
2. Rottlund Homes Annual Report 1993-1994.
3. Rottlund Weekly Activity Summary Reports 2000 through July 6, 2003.
4. The Rottlund Company, Inc. and Subsidiaries Audited Consolidated Financial Statements for the nine-month period ended December 31, 2002 and year ended March 31, 2002.
5. Land Development Department Accomplishments and Goals 1993-1997 and 1999-2001.
6. Rottlund Homes Sales Manual effective February 14, 2003.
7. Rottlund Homes Monthly Specials July 1, 2001 to June 26, 2003.
8. Various Rottlund Closing Forecasts by Month.
9. Various Rottlund Sales Forecasts by Month.
10. Various Rottlund Monthly Closings Margins Report Budgets.
11. Various Rottlund Monthly Sales Margins Report Budgets.
12. Various Rottlund Projected Income schedules.
13. Various Rottlund Consolidated 40 Month Planning schedules.
14. Various Rottlund 40 Month Strategic Plan schedules.
15. Rottlund Minnesota Division Project Cash Flow as of July 1, 2000.

16. Various Rottlund Homes Service Recap schedules.
17. Various The Rottlund Company, Inc. Development Status schedules.
18. Various The Rottlund Company, Inc. Model Home Inventory schedules.
19. Various Rottlund Customer Service Results.
20. Various The Rottlund Company, Inc. Subsidiary Performance schedules.
21. Various Rottlund Executive Summary schedules.
22. Various Rottlund Capital Invested Balance schedules.
23. Various Rottlund Schedules of Single and Multifamily Sales by Year.
24. Various Permits by Builder.
25. Various Rottlund Land Budgets.
26. Various The Rottlund Company, Inc. Sales Projections.
27. Various The Rottlund Company, Inc. Backlog Comparisons.
28. Rottlund Sales Report as of June 4, 1999.
29. Various Rottlund Vision 2000 reports including financial reports by division.
30. Various Rottlund-Minneapolis Net Income schedules.
31. The Rottlund Company, Inc. Budgets for nine months ending December 31, 2002.
32. Various Rottlund Walk-Thru Averages schedules.
33. Various The Rottlund Company, Inc. Consolidated Statements.
34. Rottlund Homes Company Analysis by Piper Jaffrey dated November 1993.
35. Various Rottlund Business Vision schedules.
36. The Rottlund Company Job Cost Detail-Minneapolis.
37. The Rottlund Company Job Process Control Report.
38. Rottlund Home Plans Closed in Selected Communities dated December 31, 2003.
39. Rottlund Sales and Unit Analysis by Development as of December 31, 2003.
40. Rottlund Homes of Minnesota Remaining Lots per Community as of December 31, 2003.
41. Rottlund Land Closing for Open Projects January 1997 to present.
42. Rottlund Land Performa 2001 through 2005.
43. Various newspaper articles.

44. Various Market Studies.
45. Various Permit Reports.
46. Letter from David Massopust to Richard Palmiter dated June 2, 1998.
47. Various Rottlund Customer Surveys.
48. Fifth Amended Complaint.
49. Order for Rottlund Homes, Inc vs. The Oaks Development Co. dated July 13, 1999.
50. Plaintiff's Responses to Defendant Town & Country Homes, Inc.'s Requests to Admit and Interrogatories (Set III).
51. Expert Disclosure of Albert Bloom, A.I.A. dated August 15, 2003.
52. Expert Report of Cobb & Associates, Ltd. dated August 15, 2003.
53. Gross Profit and List Job reports.