Court File No. 01-1980 / ROTTLUND / Pinnacle
Mahowald Affidavit (MIL – Kenyon) November 1, 2004

Exhibit C.2

Briefs and Other Related Documents

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA4 Rule 36 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Fourth Circuit.

DICK'S SPORTING GOODS, INCORPORATED,
Plaintiff-Appellant,
and
Gary Shank, d/b/a Dick's Sporting Goods,
Incorporated, Plaintiff,
v.
DICK'S CLOTHING AND SPORTING GOODS,
INCORPORATED; Richard's Clothing And
Sporting Goods, Incorporated, d/b/a Dick's Clothing
and Sporting Goods,
Incorporated, Defendants-Appellees.

**No. 98-1653.**

Argued March 3, 1999.
Decided Aug. 20, 1999.

Appeal from the United States District Court for the District of Maryland, at Baltimore, No. CA-96-320-L; Benson E. Legg, District Judge.

Richard Michael McMahon, Sr., Scally, Scally & McMahon, P.C., Upperco, Maryland, for Appellant.

Steven Keith Fedder, Rudnick & Wolfe, Washington, D.C., for Appellees.

ON BRIEF: Caroline E. Petro, Rudnick & Wolfe, Washington, D.C., for Appellees.

Before TRAXLER, Circuit Judge, VOORHEES, United States District Judge for the Western District of North Carolina, sitting by designation, and FABER, United States District Judge for the Southern District of West Virginia, sitting by designation.

OPINION

VOORHEES.

****1** Plaintiff-Appellant, Dick's Sporting Goods, Inc. sued Defendant-Appellee Dick's Clothing & Sporting Goods, Inc. alleging trade name infringement and unfair competition. [FN1] Dick's Clothing & Sporting Goods, Inc. filed a counterclaim against Dick's Sporting Goods, Inc. alleging infringement of its federally licensed trade name, "Dick's Clothing & Sporting Goods, Inc." *See* 15 U.S.C. § 1051, *et seq.* The district court granted Dick's Clothing & Sporting Goods, Inc.'s motion for summary judgment on the complaint and on its counterclaim. We affirm.

FN1. Appellant also alleged intentional infliction of emotional distress and conversion. Upon motion of Appellee, the district court dismissed those claims. Appellant has not appealed those dismissals.

I. *FACTS*

Dick's Sporting Goods, Inc. ("Sporting") is a small retail sporting goods business founded in 1971 by Richard Shank. At all times, Sporting operated out of a single location on Stemmers Run Road in Essex, Maryland. The store sold hunting and fishing gear including clothing, hunting and fishing licenses, bait, archery equipment, guns, and ammunition. In May 1998, Sporting closed its store.

In January 1948, Richard Stack founded Dick's Clothing & Sporting Goods, Inc. ("Clothing") and opened its first store in Binghamton, New York. As of 1995, Clothing operated approximately 51 stores across several states including New York, Connecticut, Pennsylvania, Massachusetts, Illinois, Ohio, Kentucky, New Jersey, Michigan, and Maryland. Clothing's stores sell general sports apparel, sporting goods, and children's apparel.

On May 9, 1988, Clothing applied to the United States Patent and Trademark Office seeking registration for the trade name "Dick's Clothing & Sporting Goods, Inc." On June 27, 1989, Clothing's proposed trade name was published in the federal register. On September 19, 1989, the United States

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Patent and Trademark Office issued registration number 1557325 for "Dick's Clothing & Sporting Goods." In 1994, the trade name "Dick's Clothing & Sporting Goods" became incontestible under the Lanham Act. At no time has Sporting contested the trademark sought by Clothing or obtained a federally registered trademark of its own.

On October 6, 1995, Clothing opened retail stores in the State of Maryland. Upon seeking to register as a foreign corporation with the state, Clothing learned that Sporting had filed articles of incorporation with the Maryland State Department of Assessment and Taxation in July 1995, gaining incorporation as "Dick's Clothing & Sporting Goods, Inc." Sporting sought and gained incorporation in the name of "Dick's Clothing & Sporting Goods, Inc." although the record contains no evidence that Sporting had ever conducted business in that name. Thereafter, Clothing registered with the state as "Richard's Sporting & Goods, Inc. a/k/a Dick's Clothing and Sporting Goods, Inc." Although Sporting concedes that it incorporated a shell entity, it denies infringing upon Clothing's federally registered trade name and contends that it registered the shell corporation preemptively merely to avoid confusion of its business name with that of Clothing.

****2** To promote the opening of its Maryland stores, Clothing organized an advertising campaign in which it employed the names "Dick's" and "Dick's Sporting Goods." Sporting claims that it was barraged with over 7,500 misdirected telephone calls and a plethora of misdirected mail as a result of Clothing's advertising campaign. In addition, Sporting asserts that several customers visited its store believing they were visiting Clothing's store.

We review *de novo* the holding of the district court that Sporting failed to demonstrate that its trade name, "Dick's" or "Dick's Sporting Goods" had acquired secondary meaning in the minds of a substantial portion of the consuming public as of 1989, the year in which Clothing registered its trademark.

## II. *STANDARD OF REVIEW*

We review a district court's grant of summary judgment *de novo* and apply the same standards employed by the district court. *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1127-28 (4th Cir.1987). Summary judgment is appropriate only where there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In other words, to grant summary judgment the court must determine that no reasonable jury could find for the nonmoving party on the evidence before it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In passing on a summary judgment motion, the court must view the record and draw inferences most favorably to the opposing party." *Pignons S.A. de Mecanique v. Polaroid Corp.*, 657 F.2d 482, 486 (1st Cir.1981).

## III. *TRADEMARK PROTECTION AND CLASSIFICATION*

Section 43(a) of the Lanham Act, prohibiting the use of false descriptions, representations, or designations of origin, has been construed to protect against trademark, service mark, and trade name infringement even though the mark or name has not been federally registered. 15 U.S.C. § 1125(a); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir.1986). In order to prevail in an action for trademark infringement and unfair competition under sections 32(1) and 43(a) of the Lanham Act, respectively, "a complainant must demonstrate: (1) that it has a valid, protectable trademark; and (2) that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 930 (4th Cir.1995); *see also* 15 U.S.C. § 1114(1).

In the instant appeal, Sporting merges the above requirements in its arguments to the Court despite the fact that the district court did not hinge its ruling on a finding of likelihood of confusion. Rather, the district court found that Sporting did not own common law rights to the trade name, "Dick's" or "Dick's Sporting Goods" in that Sporting had failed to demonstrate that the trade name had acquired secondary meaning in the minds of the consuming public by 1989, the year Clothing registered its trademark. For this reason, the district court was not required to examine the issue of likelihood of confusion. *See Spartan Food Systems, Inc. v. HFS Corp.*, 813 F.2d 1279, 1284 (4th Cir.1987); *Thompson Medical Co. v. Pfizer*, 753 F.2d 208, 216 (2d Cir.1985). Such an inquiry would have been superfluous because a determination that a mark is ineligible for protection establishes that consumers do not associate that mark with a particular source.

****3** The Lanham Act affords nationwide trademark

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

protection to registered users, regardless of the area in which the registrant actually uses the mark. 15 U.S.C. § 1072; *Armand Subway, Inc. v. Doctor's Associates, Inc.*, 604 F.2d 849, 849 (4th Cir.1979). However, the protection is only potential in areas where the registrant does not do business. A competing user could use the mark in those areas until the registrant extended its business to the area in question. Thereupon, the registrant would be entitled to exclusive use of the mark in that area unless the prior user could show that it acquired a local, common law right to the mark before the date of the mark's registration. 15 U.S.C. § 1065; *see also Armand Subway*, 604 F.2d at 849-50; *First Bank v. First Bank System, Inc.*, 84 F.3d 1040, 1044 (8th Cir.1996). Accordingly, Clothing may prevent Sporting from using the trade name "Dick's" or "Dick's Sporting Goods" in the Baltimore, Maryland area unless Sporting can show that it acquired a local, common law right in the trade name by 1989.

The protection accorded trademarks is directly related to the mark's distinctiveness. In *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir.1976), the Court classified the word "marks" into four categories: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *Id.* at 9. If a term is generic (the common descriptive name for a thing), then it is ineligible for trademark protection as the public has an inherent right to call a product by its generic name. *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 119, 59 S.Ct. 109, 83 L.Ed. 73 (1938). If terms are suggestive (words partially descriptive and partially fanciful), arbitrary (common words applied in unfamiliar ways), or fanciful (words invented solely for their use as trademarks), then the association between the mark and its source is presumed and the mark is eligible for trademark protection. *Abercrombie & Fitch*, 537 F.2d at 9-11.

However, if a mark is merely descriptive, then proof of secondary meaning in the marketplace is required for the mark to be eligible for protection. *Thompson Medical*, 753 F.2d at 212-13 & n. 9. Both surnames and first names are regarded as descriptive terms and, therefore, one who claims federal trademark rights in a name must prove that the name has acquired a secondary meaning. *Tonawanda Street Corp. v. Fay's Drug Co.*, 842 F.2d 643, 648-49 (2d Cir.1988). "Secondary meaning" is defined as "the consuming public's understanding that the mark, when used in context, refers not to what the descriptive word ordinarily describes, but to the particular business that the mark is meant to identify." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 125 (4th Cir.1990). In the case of a trade name, secondary meaning is "[t]he power of a name ... to symbolize a particular business." *Ideal Toy Corp. v. Kenner Products Div'n of General Mills Fun Group, Inc.*, 443 F.Supp. 291, 305 n. 14 (S.D.N.Y.1977). If a trade name has not acquired secondary meaning, the purchaser will not make an association with a particular producer and thus will not be misled by an identical or similar mark.

A. *Secondary Meaning*

**4 Proof of secondary meaning entails a rigorous evidentiary standard. "The burden of proving secondary meaning is on the party asserting it, whether he is the plaintiff in an infringement action or the applicant for federal trademark registration." *Yamaha Int'l. Corp. v. Hoshino Gakki Co., Ltd.*, 840 F.2d 1572, 1578-79 (Fed.Cir.1988); *accord 815 Tonawanda Street Corp. v. Fay's Drug Co., Inc.*, 842 F.2d 643, 647-48 (2d Cir.1988) (noting that the burden of proving secondary meaning is on the party seeking to obtain legal protection for its mark). Moreover, a certificate of registration constitutes prima facie evidence of the validity of the registered mark and relieves the holder of the burden of proving secondary meaning. 15 U.S.C. § 1057(b) (1997); *Qualitex Co. v. Jacobson Products Co., Inc.*, 13 F.3d 1297, 1301 (9th Cir.1994), *rev'd on other grounds*, 514 U.S. 159, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995). The burden of proof, therefore, is on Sporting to prove that it is entitled to common law trademark protection.

The Second Circuit has promulgated six factors adopted by this Court as relevant to, though not dispositive of, secondary meaning: (1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use. *Thompson Medical*, 753 F.2d at 217; *Perini*, 915 F.2d at 125. "In assessing the existence of secondary meaning, no single factor is determinative ... and every element need not be proved. Each case, therefore, must be resolved by reference to the relevant factual calculus." *Thompson Medical*, 753 F.2d at 217.

B. *Evaluation of the Evidence*

Sporting concedes that the district court properly relied upon *Perini* as the relevant law. In support of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

its claim, Sporting proffered the following evidence to the district court: (1) a trade name survey conducted by Robert L. Mead ("Mead Report"); (2) the expert witness opinion of Gary D. Krugman ("Krugman Opinion"); (3) its gross sales and advertising figures for the years 1984 through 1989; (4) fifteen customer affidavits; (5) sixty five customer checks made payable to "Dick's"; (6) details regarding a waterfowl calling seminar organized in 1982; and (7) a 1982 newspaper article mentioning its store in reporting on the increasing use of decoys by Maryland hunters. For the reasons explained below, we affirm the district court's grant of summary judgment to Clothing on the complaint and on Clothing's counterclaim.

Evaluating Sporting's evidence separately, the Court will first address the Mead Report. The Mead Report is a telephone survey conducted by the staff of Robert L. Mead on November 26 and 27, 1996. Mead's staff interviewed 200 men over the age of 25 who had lived in the Baltimore area for more than three years and who expressed an interest in hunting or fishing. Mead submits that 48 of these men were licensed hunters and 22 of them associated the name "Dick's" with Sporting's store. In addition, Mead reports that 32% of 126 men who bought hunting and/or fishing licenses (i.e., 40 individuals) associated the name "Dick's" with Sporting's store. Finally, Mead claims that 56% of 18 gun permit buyers (i.e., 10 individuals) associated the name "Dick's" with Plaintiff's store.

****5** In the proceedings below, Clothing moved to exclude the Mead Report from evidence. In a Memorandum dated March 31, 1998, the district court found that the Mead Report fell short of establishing secondary meaning for the following reasons: (1) it failed to address the relevant time period (1989); (2) it focused unjustifiably on license and gun permit buyers; and (3) it excluded substantial portions of the relevant population. Mem. at 9. Consequently, the district court discounted Mead's findings, but did not rule on the report's admissibility.

Survey evidence is admissible as an exception to the hearsay rule only if the survey is "material, more probative on the issue than other evidence and if it has guarantees of trustworthiness." *Harold's Stores, Inc., et al. v. Dillard Dept. Stores, Inc.*, 82 F.3d 1533, 1544 (10th Cir.1996) (citing *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 522 (10th Cir.1987)); *accord* 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 901(b)(9)[03] at 901- 140 (1995) ("The admissibility of survey or sampling results depends upon two factors: necessity and trustworthiness."). "A survey is trustworthy if it is shown to have been conducted according to generally accepted survey principles." *Brunswick Corp.*, 832 F.2d at 522. "The survey should sample an adequate or proper universe of respondents." *Harold's Stores*, 82 F.3d at 1544 (citing *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir.1980)). "[T]hat is, the persons interviewed must adequately represent the opinions which are relevant to the litigation." *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980). The dis-trict court should exclude the survey "when the sample is clearly not representative of the universe it is intended to reflect." *Harold Stores*, 82 F.3d at 1544 (citing *Bank of Utah v. Commercial Sec. Bank*, 369 F.2d 19, 27 (10th Cir.1966), *cert. denied*, 386 U.S. 1018, 87 S.Ct. 1374, 18 L.Ed.2d 456 (1967)).

After careful review of the Mead Report, this Court finds that the district court would have abused its discretion had it admitted the report into evidence. *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir.1997) (noting that hearsay is inadmissible in summary judgment proceedings save affidavits and depositions). An analysis of the Mead Report reveals that its findings are unreliable for purposes of establishing secondary meaning. For example, only 126 of the 200 men surveyed were aware of a store named "Dick's" in the Baltimore area, and only 19 of the original 200 men surveyed identified goods sold by "Dick's" as hunting or fishing equipment. Mead Report at 10. In addition, only 21 individuals overall (i.e., 10.5% of the original 200) identified Essex, Maryland as the location of a "Dick's" store in the Baltimore area. *Id.*

****6** In addition, the fact that the Mead Report excluded men under the age of 25 and all women regardless of age from its sample of 200 individuals contributes to its unreliability. The report's unreliability is corroborated by the findings of Marshall G. Greenberg, Ph.D., who found that nearly 38% of all prospective buyers of hunting and fishing gear and guns were female and 9% of all prospective buyers were males between the ages of 18 and 24. Greenberg Op. at 3. Dr. Greenberg's survey also revealed that awareness of Sporting's store was extremely low. In 1997, fewer than 2% of 414 potential customers in the Baltimore area were aware of Sporting's store on an unaided basis, and only 9.9% of potential customers indicated awareness of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

the store after its location was disclosed. J.A. at 489.

Dr. Greenberg also discovered that only 1.7% of Sporting's potential customers indicated an awareness of Sporting's store prior to February 1995. *Id.* Based upon this evidence, the district court reasoned that the only reasonable inference was that there was low awareness of Sporting's store among potential consumers in 1989. This Court agrees. For the foregoing reasons, we find the Mead Report to be inadmissible hearsay and note that the record fails to contain any other consumer study linking Sporting's trade name to its Essex, Maryland store.

The opinion of trademark attorney Gary D. Krugman also fails to bolster Sporting's claim that its trade name had acquired secondary meaning by 1989. On October 3, 1996, Krugman opined in an expert witness report that the mark "Dick's Sporting Goods" had acquired secondary meaning and was entitled to protection from an infringing mark or name likely to cause confusion. Krugman Report at 8. Krugman based his opinion upon the fact that Sporting had been selling and advertising sporting goods for "some 25 years" and upon the "substantial sales volume" enjoyed by Sporting "for at least the last six years...." *Id.* This Court is unpersuaded by Krugman's opinion and finds that it lacks the foundation necessary to render it probative of secondary meaning for the following reasons.

First, Krugman concedes in his deposition that he failed to familiarize himself with the sporting goods market prior to rendering his opinion. Second, he admits that he failed to consider any consumer studies or other pertinent information relevant to the sporting goods industry, the sporting goods market, or Sporting's prospective buyers. Third, he admits that he did not attempt to ascertain the amount of money expended by Sporting on advertising, the frequency of Sporting's advertising, or the effectiveness of Sporting's advertising. Fourth, he concedes that he did not consider media coverage of any kind. Finally, Krugman admits that in evaluating Sporting's "substantial sales volume," he obtained no information regarding the total sales volume of sporting goods in the Baltimore area or elsewhere, but simply believed that annual gross profits of $100,000 must be "substantial." Krugman Dep. at 97-100. In short, Krugman failed adequately to evaluate the factors articulated by this Court in *Perini* as relevant to secondary meaning. As a result, his opinion that the trade name "Dick's Sporting Goods" had acquired secondary meaning must be rejected. Even if this Court were to accept Krugman's opinion, he has presented no evidence that Sporting's trade name acquired secondary meaning as of the year in question, 1989.

**7 Likewise, Sporting's advertising expenditures fail to establish that its trade name had acquired secondary meaning in the minds of a substantial portion of the consuming public by 1989. In accordance with *Perini,* the district court properly held that "substantial advertising expenditures may establish a retailer's name in the market and, under appropriate circumstances, support an inference that such advertising had been successful at creating name recognition among a significant portion of the consuming public." Mem. at 12. In the instant case, however, Sporting spent only $14,206.00 on advertising from 1984 to 1989. Of that amount, Sporting spent less than one thousand dollars annually from 1987 to 1989. Based upon this evidence, the district court held that Sporting may have been a "healthy local retail store" but that its advertising expenditures did not suggest "the kind of campaign that would create secondary meaning in a trade name." Mem. at 13-14.

On appeal, Sporting argues that the district court failed to consider its advertisements featured in the Yellow Pages and on the cover of a retail sporting goods catalog. However, it is clear that the district court not only considered Sporting's Yellow Pages advertisements, but also Sporting's advertisements featured in local brochures. Finding that Sporting has presented no evidence that its advertising expenditures exceeded a total of $14,206.00 for the years 1984 through 1989, inclusive of costs for advertising in the Yellow Pages or otherwise, this Court concludes that Sporting's advertising expenditures were *de minimis.*

Even if this Court were to conclude that Sporting's advertising expenditures were significant, Sporting has failed to show that its expenditures were effective in causing consumers in the Baltimore, Maryland geographic area to associate the trade name "Dick's" or "Dick's Sporting Goods" with Sporting's business. *See* FM 103.1, Inc. v. Universal Broadcasting of New York, Inc., et al., 929 F.Supp. 187, 196 (D.N.J.1996) ("Large advertising or promotional expenditures do not contribute to establish a secondary meaning unless the moving party explains how its efforts were effective in causing the relevant group of consumers to associate the mark with itself."). "While evidence of advertising may be relevant,"the mere expenditure

of money is not, in itself, determinative of the actual result in buyers' minds." 2 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 15:51 (4th ed.1997).

A third factor cited by *Perini* as relevant to the establishment of secondary meaning is sales success. The record in this case shows that Sporting failed to achieve a level of sales from which secondary meaning may be inferred. For example, a national survey submitted by Sporting shows that Marylanders spent approximately $111 million on fishing equipment and $78 million on hunting equipment in any given year. [FN2] By contrast, Sporting's tax returns reflect gross sales of $641,976 in 1984, $658,782 in 1985, $684,765 in 1986, $609,664 in 1987, $557,358 in 1988, and $558,177 in 1989. The district court held that these figures revealed that Sporting's sales "were a small portion of total sales of hunting and fishing equipment in Maryland," and, therefore, "did not suggest the kind of market penetration which would reasonably support an inference of secondary meaning." Mem. at 13- 14. For the following reasons, this Court concurs with the finding of the district court.

FN2. 1991 National Survey of Fishing, Hunting and Wildlife Associated Recreation (J.A. at 754). Although 1991 is the only year for which the parties have submitted information of this kind, the Court finds that it is reasonable to assume that annual fluctuations, if any, have not been significant.

****8** Sporting argues that it enjoyed substantial sales for over 18 years in the retail sporting goods industry prior to Clothing's registration of its trade name. While one may concede that Sporting maintained a thriving local business during the years in question, its sales simply do not constitute a significant portion of the $111 million and $78 million Marylanders spent on fishing and hunting equipment, respectively. Indeed, the record reflects that Sporting's sales decreased from $684,765 in 1986 to $558,177 in 1989, nearly twenty percent. Moreover, Sporting's gross sales decreased from $509,206 in 1990 to $367,562 in 1994. In other words, from its high water mark in 1986, Sporting's sales diminished by nearly half without any competition from Clothing. Based upon this evidence, this Court cannot find that Sporting's gross sales support a reasonable inference that the trade name "Dick's" or "Dick's Sporting Goods" had acquired secondary meaning in the minds of actual or prospective consumers by 1989.

As evidence of unsolicited media coverage, Sporting asserts that it received frequent, unsolicited media attention on the radio and in var-ious Baltimore newspapers prior to 1990. Specifically, Sporting argues that its business was featured in the *Sun Paper, News American, Bill Burton's Reports,* and in *Fishing in Maryland.* Clothing argues that this Court should exclude Sporting's allegations of unsolicited media attention because Sporting failed to disclose any publicity, other than paid advertising, in its response to interrogatories. Clothing also asserts that Sporting never supplemented or corrected its response. Because Clothing's arguments are persuasive, we find that evidence of Sporting's alleged incidents of unsolicited media coverage is not properly before this Court. Moreover, we note that the district court's order of November 24, 1997, did not grant Sporting leave to supplement the record with evidence of unsolicited media coverage.

Therefore, the only evidence concerning unsolicited media coverage properly before this Court is public attendance at a waterfowl calling seminar organized by Sporting in 1982 and a newspaper article mentioning the Sporting's store on January 17, 1982. After careful consideration, the Court concludes that neither event is probative of secondary meaning. First, both events occurred well before 1989. Second, the record is devoid of evidence indicating that Sporting organized any other seminar or was featured in any other newspaper articles after 1982. Accordingly, the only reasonable inference is the one reached by the district court: that these events were isolated incidents. Had Sporting's trade name acquired secondary meaning by 1989, one would have expected similar events to have occurred after 1989. The fact that future events did not occur undermines Sporting's claim of secondary meaning and tends to indicate that Sporting did not enjoy widespread recognition in the minds of the consuming public, as alleged.

****9** As additional evidence of secondary meaning, Sporting asserts that Clothing attempted to plagiarize its mark, a fifth factor relevant to secondary meaning under *Perini.* From this proposition, Sporting also argues that the district court erred in refusing to shift the burden of proof to Clothing to show a lack of secondary meaning. For the following reasons, we conclude that these arguments must fail.

In trademark infringement cases, "the courts have

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

held that evidence of deliberate copying establishes a prima facie case of second-ary meaning, subject to rebuttal by the defendant, with the defendant bearing the ultimate burden of proof once deliberate copying is proven." M. Kramer Mgf. Co. v. Andrews, 783 F.2d 421, 449 (4th Cir.1986); Audio Fidelity, Inc. v. High Fidelity Recording, Inc., 283 F.2d 551, 558 (9th Cir.1960) (quoting My-T Fine Corp. v. Samuels, 69 F.2d 76, 77 (2d Cir.1934) (L.Hand, Jr.)), *cert. denied,* 371 U.S. 934 (1962). "The rationale for this presumption is that when a defendant copies the trademark of a competitor, it is likely that he intended to appropriate some commercial advantage or benefit that his competitor derived from the use of the mark." M. Kramer Mfg., 783 F.2d at 449; Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc., 659 F.2d 695, 704 (5th Cir.1981) (quoting American Chicle Co. v. Topps Chewing Gum, Inc., 208 F.2d 560, 563 (2d Cir.1953) (L.Hand, J.)), *cert. denied,* 457 U.S. 1126 (1982).

A review of the record evidence compels the conclusion that Clothing did not deliberately copy Sporting's alleged common law trade name. Generally, intentional copying must involve more than simply using the same name. For example, in Polo Fashions, Inc. v. Extra Special Productions, Inc., 451 F.Supp. 555 (S.D.N.Y.1978), the district court held that while the defendant could not be enjoined from using the descriptive name "Polo" on its clothing products, it had engaged in intentional copying by labeling its clothing "POLO by Marco Polo" and utilizing the image of a polo player in a manner strikingly similar to that used in the plaintiff's "POLO BY RALPH LAUREN" clothing line. Therefore, the fact that Clothing utilizes the trade name "Dick's" to promote its sporting goods merchandise does not, standing alone, support a finding of intentional copying.

Moreover, the record reveals no evidence that Clothing intended to palm off the reputation or goodwill of Sporting by employing the trade name "Dick's" or "Dick's Sporting Goods." The fact that Clothing has been in business for over 40 years and operates in excess of 50 retail stores nationwide renders Sporting's argument weak from the outset. Because no evidence exists that Clothing intentionally copied Sporting's trade name, the district court properly refused to shift the burden to Clothing to show a lack of secondary meaning.

****10** As to the final *Perini* factor, length and exclusivity of the mark's use, the district court found that Sporting had been "neither specific nor consistent in identifying the area for which it claims to have acquired common law rights to its trade name." Mem. at 7. Sporting does not contest this finding but attempts to minimize its failure to do so:

> The Sporting accepts this point as to the lack of consistent identification up to the point in time of Sporting's Cross Motion for Summary Judgment filed June 24, 1997. The market area claimed by the Sporting was well defined by specific by (sic) zip code in that document.

Sporting's Br. at 32.

Contrary to this argument Sporting did not assert in its Cross Motion for Summary Judgment that its use of the trade name "Dick's" or "Dick's Sporting Goods" had been *exclusive* in any geographic region. Rather, Sporting argued in that document only that its use of the trade name had been *continuous.* It was not until Sporting filed its Supplemental Memorandum in Support of its Motion for Summary Judgment on January 16, 1998, that it argued that its use had been both continuous and exclusive in the Baltimore, Maryland area. Sporting also argued that Clothing had an affirmative duty to rebut Sporting's claim of exclusivity. Supplemental Mem. in Supp. of Plaintiff's Motion for Summary Judgment at 11. Sporting's argument is unpersuasive for the following reasons.

In Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the district court had entered summary judgment for the defendant. The D.C. Circuit Court reversed because the defendant had failed to support its motion for summary judgment with evidence tending to negate the plaintiff's claim. The Supreme Court reversed, upholding the district court's entry of summary judgment. As a leading treatise on federal procedure explains, under *Celotex,* "the moving party on a summary judgment motion need not produce evidence, but simply can argue that there is an absence of evidence by which the nonmovant can prove his case." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 2720, at 10 (2d ed. Supp.1994); *see* Celotex, 477 U.S. at 325 ("[T]he burden on the moving party may be discharged by 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case."); *accord* Cray Communications, Inc. v. Novatel Cmptr. Systems, Inc., 33 F.3d 390 (4th Cir.1994). In sum, it is clear under *Celotex* and *Cray* that Clothing bears no

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

burden of production. Instead, Clothing may simply assert, as it has done, that Sporting has presented insufficient evidence to establish secondary meaning.

****11** Moreover, this Court notes that the district court's order of November 24, 1997, did not grant Sporting leave to present evidence regarding exclusivity. That order granted Sporting limited leave to supplement the summary judgment record with evidence of the following only:

1. Copies of newspaper advertisements from 1989;
2. Copies of Plaintiff's tax returns for the years 1985 to 1989;
3. An affidavit from an attendee to a waterfowl conference; and
4. Supplemental affidavits from 18 affiants already contained in the record.

J.A. at 572.

Notwithstanding the district court's order, Sporting argued in its Supplemental Memorandum that its use of the trade name "Dick's" or "Dick's Sporting Goods" had been exclusive. Specifically, Sporting paints the picture that it guarded its trade name by compelling a competing business, Dick's Sports Center, Inc., to cease using the trade name "Dick's." As a result, Sporting contends, the competitor went out of business. Supp. Mem. at 8-9. In other words, Sporting would have this Court believe that but for a short interval of time, it alone utilized the trade name "Dick's" in the Baltimore, Maryland geographic region. To the contrary, records from the Maryland Department of Assessments and Taxation reveal that Dick's Sports Center, Inc. conducted business in the State of Maryland for 11 years and was dissolved for failure of its owner to file a personal property tax return. J.A. at 798. Because Dick's Sports Center, Inc. utilized the trade name "Dick's" simultaneously with Sporting from 1985 to 1996, Sporting's claim of exclusivity must fail. Although Sporting utilized the trade name "Dick's" for many years, length of use and exclusivity are not synonymous.

Sporting also argues on appeal that the district court "abused its discretion by refusing to allow [it] discovery of supplemental proof of name recognition offered to show secondary meaning as of 1989...." Sporting's Br. at 33. A review of the record shows that Sporting argued in its original Motion for Summary Judgment that its trade name had acquired secondary meaning as of 1995--the year Clothing opened its first store in Maryland. Clothing argued in response that Sporting's proof of secondary meaning was inadequate in that it had failed to proffer evidence of secondary meaning as of the relevant year, 1989. Following a telephone conference with the parties, the district court entered the order of November 24, 1997, granting Sporting limited leave to supplement the summary judgment record with the specific items noted heretofore. Sporting now asserts that the district court erred in refusing to allow it to supplement the record with the following additional evidence: (1) consumer studies; (2) expert witness reports; (3) the market area claimed by Sporting; and (4) "a review of any additional factors." Sporting's Br. at 33.

This Court finds that the district court acted within its discretion in refusing to allow Sporting to start over from square one. "District courts enjoy nearly unfettered discretion to control the timing and scope of discovery...." Hinkle v. City of Clarksburg, 81 F.3d 416, 426 (4th Cir.1996). In fact, had the district court allowed Sporting to supplement the summary judgment record more extensively, it may have abused its discretion. In *Cray Communications, Inc. v. Novatel Cmptr. Systems, Inc.*, 33 F.3d 390 (4th Cir.1994), this Court affirmed the exercise of the district court's discretion in refusing to consider new evidentiary matters and reasoned:

> ****12** Novatel contends, in essence, that dismissal of its fraud claim because of its counsel's mistake imposes an unjust penalty on the client. As Justice Harlan once explained, such contentions are "wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of [its lawyer]...." Keeping this suit alive merely because plaintiff should not be penalized for the omissions of his own attorney would be visiting the sins of plaintiff's lawyer upon the *defendant*.

*Id.* at 395 (emphasis in original).

Similarly, in the instant case, it appears that Sporting's failure to submit cogent evidence in its original motion for summary judgment may have been attributable to oversight. It is well settled law and undisputed by Sporting that the appropriate date for proof of secondary meaning in this case is 1989, the date Clothing obtained federal registration of its trademark. *See Armand's Subway, Inc. v. Doctor's Assocs.*, 604 F.2d 849, 849-50 (4th Cir.1979) (noting that registration constitutes constructive notice to competing users). Accordingly, the district court granted Sporting only limited leave to supplement the summary judgment record and did not abuse its discretion in refusing to allow Sporting to reopen the entire record.

Because Sporting has failed to satisfy any of the factors relevant to secondary meaning under *Perini,* we find that Sporting's trade name is ineligible for trademark protection. Sporting's evidence of 65 customer checks made payable to "Dick's" and 15 customer affidavits does not change our conclusion. No reasonable juror could find that 65 checks and 15 affidavits connote that a substantial portion of the consuming public associated the trade name "Dick's" or "Dick's Sporting Goods" with Sporting's business as of 1989. We note that none of the checks proffered by Sporting were written before the year 1996, and only some of the affiants claim to have patronized Sporting's store on or before 1989. For these reasons, Sporting's checks and affidavits are insufficient to establish secondary meaning. Indeed, none of Sporting's admissible evidence, considered separately or in the aggregate, suffices to establish secondary meaning under *Perini.*

Finally, we address Sporting's argument that the doctrine of reverse confusion is applicable to lower or shift Sporting's burden of proving secondary meaning. "Reverse confusion occurs when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services." *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 474 (3d Cir.1994). To date, this Court has not adopted the doctrine of reverse confusion. However, even if we were we to adopt the doctrine, it would not apply to the instant case because Sporting is not a "trademark holder." In *DeCosta v. Viacom International, Inc.,* 981 F.2d 602 (1st Cir.1992), the United States Court of Appeals for the First Circuit discussed the leading case on reverse confusion, *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 561 F.2d 1365 (10th Cir.1977), *cert. dismissed,* 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978), and noted that only a "*trademark holder* could base a claim on ... 'reverse confusion.' " *DeCosta,* 981 F.2d at 608 (emphasis added). In other words, the doctrine of reverse confusion is a damages theory, expanding the relief available to a plaintiff who has already established exclusive right to its trade name. Because Sporting has failed to establish that its trade name acquired secondary meaning in the minds of a substantial portion of the consuming public as of 1989, Sporting is not a "trademark holder" and cannot avail itself of the doctrine of reverse confusion.

****13** Because Sporting has failed to establish that its trade name acquired secondary meaning in the minds of the consuming public by 1989, we affirm the district court's denial of summary judgment to Sporting on the Complaint and grant of summary judgment to Clothing on the Complaint and on Clothing's counterclaim.

*AFFIRMED*

188 F.3d 501 (Table), 1999 WL 639165 (4th Cir.(Md.)), Unpublished Disposition

Briefs and Other Related Documents (Back to top)

• 98-1653 (Docket) (May. 08, 1998)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

C
Briefs and Other Related Documents

This case was not selected for publication in the Federal Reporter.

Please use FIND to look at the applicable circuit court rule before citing this opinion. (FIND CTA9 Rule 36-3.)

United States Court of Appeals,
Ninth Circuit.

FLYING J, INC., a Utah corporation,
Plaintiff--Appellee,
v.
CENTRAL CA KENWORTH, a California corporation; Tommy G. Pistacchio,
Defendants--Appellants,
and
Ron Daggett, dba Daggett and Assoc.; Doy Gattlin,
Defendants.
Flying J, Inc., a Utah corporation,
Plaintiff--Appellant,
v.
Central Ca Kenworth, a California corporation; Tommy G. Pistacchio; Ron Daggett, dba Daggett and Assoc.; Doy Gattlin,
Defendants--Appellees.

**Nos. 00-17290, 00-17336.**
**D.C. Nos. CV-95-05030-REC-LJO,**
**CV-95-05030-LJO.**
Argued and Submitted Feb. 11, 2002.
Decided Sept. 3, 2002.

Truck stop franchisor brought action alleging that competitor's franchisee wrongfully acquired its copyrighted architectural plans to build truck stop. The United States District Court for the Eastern District of California, Lawrence J. O'Neill, United States Magistrate Judge, granted judgment for franchisor. Franchisee appealed. The Court of Appeals held that: (1) market value of franchise fee was proper measure of actual damages for act of infringement; (2) copyright holder established causal link between act of infringement and award of lost franchise fees; (3) denial of injunction was not abuse of discretion; and (4) competing franchisor was not judicially estopped from asserting that its rights would have been adversely affected by issuance of subpoena against its franchisee.

Affirmed.

West Headnotes

**[1] Copyrights and Intellectual Property 87(2)**
99k87(2) Most Cited Cases
Market value of franchise fee was proper measure of actual damages for act of infringement of its copyrighted architectural plan for truck stop; even though competitor asserted that lost franchise fee did not reflect value of use of architectural plans based on alleged design efficiencies, there was no evidence that copyrighted architectural plans were available, or could be valued, for less than price of franchise, and, consequently, value of plan could be measured by what willing buyer would have been reasonably required to pay to willing seller for copyright holder's work.

**[2] Copyrights and Intellectual Property 87(2)**
99k87(2) Most Cited Cases
Copyright holder established causal link between act of infringement of its copyrighted architectural plan for truck stop and award of lost franchise fees as measure of actual damages, where copyright holder produced evidence that but for act of infringement, competitor would not have been able to secure plan unless it purchased copyright holder's franchise.

**[3] Copyrights and Intellectual Property 86**
99k86 Most Cited Cases
Denying copyright holder prospective equitable relief in form of injunction against competitor, for infringement of copyrighted architectural plan of truck stop, was not abuse of discretion, since copyright holder's damages expert failed to include

calculations of future damages in his expert report and such failure operated to prejudice of competitor. Fed.Rules Civ.Proc.Rule 37(c)(1), 28 U.S.C.A.

**[4] Estoppel ⟹68(2)**
156k68(2) Most Cited Cases
Competing truck stop franchisor was not judicially estopped from asserting that its rights would have been adversely affected by issuance of subpoena against its franchisee, for franchisee's infringement of copyrighted architectural plan of copyright holder, even though competing franchisor disclaimed its interest in litigation in prior motion to quash subpoena; franchisor was not party to action, copyright holder could not argue that use of judicial estoppel, as equitable doctrine, was required, and supposedly inconsistent position, that competing franchisor did have rights and interests at stake in litigation, was urged by court, not by competing franchisor.

***765** Appeal from the United States District Court for the Eastern District of California, Lawrence J. O'Neill, Magistrate Judge, Presiding.

Before D.W. NELSON, NOONAN, and HAWKINS, Circuit Judges.

MEMORANDUM [FN*]

FN* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by Ninth Circuit Rule 36-3.

**1 Flying J, Inc., brought this infringement and conversion action, alleging that the defendants wrongfully acquired copyrighted architectural plans to build a truck stop known as the Madera Travel Center ("MTC"). A jury found defendants Central California Kenworth, Inc. ("CCK"), Tommy Pistacchio, and Ron Daggett liable on the infringement and conversion claims, awarding as damages both lost franchise fees and MTC profits. On remittitur, the court struck MTC profits to avoid double recovery. The court also denied Flying J's motion to permanently enjoin the operation of the truck stop. CCK and Pistacchio (collectively "appellants") appeal, alleging that Flying J cannot recover damages for the use of a building constructed with copyrighted plans, and that the damages awarded are speculative. Flying J cross-appeals, alleging error in the denial of the permanent injunction.

The parties are familiar with the facts underlying the proceedings, and we do not recite them here. We have jurisdiction over these appeals under 28 U.S.C. § 1291 and affirm the rulings of the district court.

A. Actual Damages Award

[1] Appellants first argue that the actual damages award based on Flying J's lost franchise fees is unduly speculative, and impermissibly provides recovery for noninfringed items. This argument was raised below in appellant's renewed post-trial Rule 50(b) motion for judgment as a matter of law, and in its Rule 59 motion for a new trial. We review the district court's denial of appellants' renewed motion for judgment as a matter of law de novo. *See Johnson v. Paradise Valley Unified School Dist.*, 251 F.3d 1222, 1226 (9th Cir.2001). Judgment as a matter of law is proper if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict. *See Gilbrook v. City of Westminster*, 177 F.3d 839, 864 (9th Cir.1999). We review rulings on a motion for a new trial for an abuse of discretion. *See Far Out Prod., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir.2001).

We consider first whether the lost franchise fee measure of actual damages is speculative as a matter of law. Actual damages for infringement are measured according to "market value," which means "what a willing buyer would have been reasonably required to pay a willing seller for the plaintiff's work." *See Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 512 (9th Cir.1985) (*Frank I* ). The district court properly relied on *Cream Records Inc. v. Jos. Schlitz Brewing Co.*, 754 F.2d 826, 827-28 (9th Cir.1983), and *Eales v. Environmental Lifestyles, Inc.*, 958 F.2d 876 (9th Cir.1992), to conclude that market value is a proper measure of actual damages for the infringement at issue here.

***766** The record testimony of Jay Call and Philip Adams supports Flying J's contention that the plans

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

are nowhere available except through purchase of a Flying J franchise, and that the floor plans are an integral part of the value of the franchise to the franchisee. Evidence also showed that the price of a Flying J franchise was $75,000, plus one cent per gallon on fuel sales, plus five percent of non-fuel sales, and that these figures amounted to $3,740,391.00 from the date of infringement through the date of the jury's verdict. While a Flying J franchise fee commands benefits beyond the copyrighted floor plan, appellants' own damages expert did not assign specific valuations to the various elements of the Flying J franchise and was therefore barred from offering apportionment testimony. No other testimonial or documentary evidence was available to allow the jury to calculate a discounted franchise fee to value the plans. Just as in *Cream Records,* there was no evidence presented that the copyrighted architectural plans were available (or could be valued) for less than the price of a Flying J franchise. Given the state of the record on the apportionment issue, and the consistent acceptance in this circuit of market value as a measure of actual damages for copyright infringement, we conclude that the lost franchise fee actual damages award is not speculative as a matter of law.

****2** Appellants also argue that the lost franchise fee damages award inappropriately measures the value of "use" of the MTC structure, not the market value of the infringed floor plans; therefore the lost franchise fee award fails to appreciate the distinction between protections under patent and copyright law. We disagree. The lost franchise fees do not reflect the value of use of the architectural plans based on alleged design efficiencies, but the value of the plans as measured by "what a willing buyer would have been reasonably required to pay to a willing seller for the plaintiff's work," *Frank I,* 772 F.2d at 512. Such a market value is well established as a measure of actual damages available for acts of copyright infringement. *Id.; Eales,* 958 F.2d at 880 (9th Cir.1992).

[2] Finally, appellants argue that evidence adduced at trial failed to establish a causal link between the act of infringement and the award of lost franchise fees as a measure of actual damages. The jury was instructed that Flying J bore the burden of showing "with reasonable probability that the infringement was the cause of its loss of revenue." Flying J's damages expert determined a value of a Madera Flying J franchise by examining actual franchise revenue streams from comparable Flying J franchises. Consistent with *Frank I,* the court instructed the jury that the market value was the appropriate measure of actual damages. The jury's verdict reflects the conclusion that the lost franchise fees were an adequate valuation of the copyrighted plans, that the MTC was a Flying J facility, and that Flying J would have realized franchise fees if the plans used to build the MTC had been lawfully acquired. To establish a causal link it was only necessary that Flying J produce evidence that but for the act of infringement, appellants would not have been able to secure the plans unless they purchased a Flying J franchise. The evidence sufficiently establishes this nexus.

The court correctly applied the applicable law in allowing evidence of lost franchise fee actual damages evidence before the jury, and the record supports by substantial evidence the jury's decision to award the actual damages figure for the copyright violation. We therefore affirm the trial court's rulings with respect to ***767** appellants' post-trial motions concerning actual damages.

B. Infringer's Profits

Because we find no reason to disturb the court's actual damages award, appellants' arguments with respect to infringer's profits are moot. The court granted and Flying J accepted, appellants' motion for remittitur to strike the award of infringer's profits so as to avoid double recovery.

C. Denial of Flying J's Motion for Permanent Injunction

[3] Flying J cross-appeals, alleging that the district court erroneously denied an injunction that would prohibit continued operation of the MTC. Flying J first argues that the court committed factual error in concluding that Flying J suffers no harm from ongoing business at the MTC. Flying J contends that it suffers irreparable harm as long as the infringing MTC floor plan is operated under the name of its competitor, Pilot. Flying J distinguishes as a separate harm its continued loss

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

of franchise fees beyond the date of the jury's judgment, after which no lost fees were awarded.

****3** The record does not support Flying J's claim of factual error. The court expressly recognized that Flying J may suffer future harms; it simply did not allow Flying J a remedy for them. Flying J's artful distinction regarding its future harms is an attempt to cast the injunction as a remedy not precluded by a Rule 37(c)(1) sanction against Flying J for discovery violations. The court prohibited evidence of future damages under Rule 37 because Flying J's damages expert failed to include calculations of future damages in his expert report and concluded that the failure operated to the prejudice of the defendants.

Certainly there is a difference between presenting evidence of future monetary damages and requesting an equitable remedy to allay future harm. However, it does not appear the court abused its discretion in concluding that the requested prospective equitable relief was an attempt to "end-run" a sanction prohibiting prospective legal relief.

[4] Flying J also argues that the court should not have denied the injunction on the ground that non-party Pilot's due process rights would be adversely affected. Flying J contends that Pilot had previously disclaimed its interest in the litigation in a prior motion to quash a subpoena, and judicial estoppel prevented the court from basing its denial of the injunction on a finding that Pilot would be adversely affected. The application of judicial estoppel here appears to be completely inapposite. First, Pilot is not a party to the litigation, and judicial estoppel seeks to prevent *parties* from asserting inconsistent positions to gain advantage. *See Hamilton v. State Farm Fire and Cas. Co.*, 270 F.3d 778, 782 (9th Cir.2001). Second, judicial estoppel is an equitable doctrine of the court and Flying J cannot argue that its use is required in this instance. Finally, the supposedly inconsistent position-that Pilot does indeed have rights and interests at stake in the litigation-is urged *by the court,* not by Pilot. Flying J offers no precedent to support its novel conception of judicial estoppel, and it does not appear that the court abused its discretion in denying the requested injunction to safeguard the rights and interests of the adversely affected non-party.

AFFIRMED.

Briefs and Other Related Documents (Back to top)

- 2001 WL 34097924 (Appellate Brief) Reply Brief of Appellee/Cross-Appellant Flying J, Inc. (Aug. 20, 2001)Original Image of this Document (PDF)
- 2001 WL 34097923 (Appellate Brief) Appellants' Reply Brief on Principal Appeal/Answering Brief on Cross-Appeal (Aug. 07, 2001)Original Image of this Document (PDF)
- 2001 WL 34097922 (Appellate Brief) Brief of Appellee/Cross-Appellant Flying J Inc. (Jun. 22, 2001)Original Image of this Document with Appendix (PDF)
- 00-17290 (Docket) (Nov. 21, 2000)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

**Westlaw Attached Printing Summary Report for MAHOWALD, PHILIP 1479747**

| | |
|---|---|
| Date/Time of Request: | Saturday, October 30, 2004 08:53:00 Central |
| Client Identifier: | 10150.3/PRM/CSK |
| Database: | KEYCITE-HIST |
| Citation Text: | 45 Fed.Appx. 763 |
| Service: | KeyCite |
| Lines: | 44 |
| Documents: | 1 |
| Images: | 0 |

(C) 2004. Copyright is not claimed as to any part of the original work prepared by a U.S. government officer or employee as part of that person's official duties. All rights reserved. No part of a Westlaw transmission may be copied, downloaded, stored in a retrieval system, further transmitted or otherwise reproduced, stored, disseminated, transferred or used, in any form or by any means, except as permitted in the Westlaw Subscriber Agreement, the Additional Terms Governing Internet Access to Westlaw or by West's prior written agreement. Each reproduction of any part of a Westlaw transmission must contain notice of West's copyright as follows: "Copr. (C) 2004 West, a Thomson business. No claim to orig. U.S. govt. works." Registered in U.S. Patent and Trademark Office and used herein under license: KeyCite, Westlaw and WIN. WIN Natural Language is protected by U.S. Patent Nos. 5,265,065, 5,418,948 and 5,488,725.