Exhibit E.1

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes, a Minnesota
Corporation,

Plaintiff,

vs.

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc.,
a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

Deposition of

JOSEPH D. KENYON

Friday, July 16, 2004

9:05 a.m.

APPEARANCES:

FOR PLAINTIFF THE ROTTLUND COMPANY, INC.:

MR. CRAIG KRUMMEN
Attorney at Law
WINTHROP & WEINSTINE, P.A.
Suite 3500
225 South Sixth Street
Minneapolis, Minnesota 55402

(Also Present: Ms. Melissa Snelson, Stonehill)

FOR THIRD-PARTY PLAINTIFF TOWN & COUNTRY HOMES:

MR. DARREN SCHWIEBERT
Attorney at Law
FREDRIKSON & BYRON, P.A.
4000 Pillsbury Center
200 South Sixth Street
Minneapolis, Minnesota 55402-1425

FOR THIRD-PARTY DEFENDANT BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC.:

MS. HOLLY NEWMAN
Attorney at Law
MOORE, COSTELLO & HART, P.L.L.P.
701 Fourth Avenue South #1350
Minneapolis, Minnesota 55415-1823

* * * * *

INDEX

EXAMINATION:

By Mr. Krummen - Page 4

EXHIBITS:



| Number | Description | Page |
|---|---|---|
| 432 | Accountants' Report prepared by Mr. Kenyon and his office | 4 |
| 433 | Supplemental Accountants' Report | 4 |
| 434 | James Grundmeier 3/4/2003 deposition transcript excerpt | 39 |
| 435 | The 2002 National Association of Realtors Profile of Home Buyers and Sellers. Document Nos. SDK 00001 - 00060 | 87 |
| 436 | Customer surveys performed by Rottlund. Document Nos. RCI007950 - RCI007953 | 117 |
| 437 | Mr. Kenyon's schedules relating to the calculation of the apportionment percentage used in his report | 150 |



* * * * *

THE ORIGINAL IS IN THE POSSESSION
WINTHROP & WEINSTINE, P.A.

* * * * *

Deposition, taken pursuant to Notice and taken before Myrina Kleinschmidt, a Notary Public in and for the County of Hennepin, State of Minnesota, held at the law offices of Winthrop & Weinstine, P.A., Minneapolis, Minnesota.

WHEREUPON, the following proceedings were duly had:

(Deposition Exhibits 432 and 433 were marked for identification by the reporter.)

(Oath administered by the reporter.)

WITNESS RESPONSE: I do.

JOSEPH D. KENYON,

a witness in the above-entitled, after having been first duly sworn, deposed under oath as follows:

EXAMINATION

BY MR. KRUMMEN:

Q Please state your name for the record.

A My name is Joseph D. Kenyon.

Q Mr. Kenyon, I briefly introduced myself earlier. As you know, my name is Craig Krummen and I represent Rottlund in this matter. Thank

A No. I'm familiar with it from past experience working on cases. But I'm not a lawyer, no.
Q Do you hold yourself out to be an expert with respect to the copyright act?
A No. I'm familiar with it, both from attending courses, teaching courses, and doing research with respect to this case. But again, I'm not an attorney. I just have a general understanding of the law and probably a number of cases.
Q Do you purport to be an expert in designing opinion surveys?
A I've assisted our office years ago doing that, but I do not consider myself expert in that area.
Q Do you consider yourself to be an expert in interpreting opinion surveys?
A It depends on the survey and it depends on what you mean by "interpretation." The answer is maybe, but certainly not yes for all circumstances.
Q What expertise do you have in interpreting opinion surveys?
A Again, when I was a staff person I'd assist in what's called their management advisory services

when we were a national firm. I assisted them in doing one of those, a consumer survey, you know.

Some of the results were pretty self-explanatory. So, you know, I didn't think it needed really any great expertise, except you had to be able to read the English language and understand the sampling method and the questions.

Q So in the past you have experience interpreting one consumer survey?

A Well, I have relied on consumer surveys in work that I've done, but as far as -- no. The answer's no. I've had to interpret consumer surveys. And to the extent I didn't understand them, I talked to the individual who did the survey. So, you know, I mean, I understood it when I was done.

Q Are you an expert in interpreting consumer surveys?

MS. NEWMAN: Objection. Asked and answered. You can answer it again.

A Again, I won't hold myself out expert interpreting all consumer surveys, but I have interpreted them or, to the extent that I didn't

understand it, I talked to the person and got an understanding so I could interpret them.

BY MR. KRUMMEN:

Q What knowledge, education or past experience do you have in interpreting consumer surveys?

A Again, I assisted our MAS department as a staff person with respect to doing a survey, looked at the results and assisted in preparing portions of the results, read the draft of the -- of the survey afterwards. And I was involved in all parts of it. But again, reading it, a lot of it was just self-explanatory. You just had to be able to read it, and the answers were pretty obvious.

Q So would a jury need your assistance in interpreting obvious results if they can read?

MS. NEWMAN: Objection. Incomplete hypothetical.

A It depends on what the -- it depends on what the issues are. I don't think I'm being asked to come in and interpret consumer surveys. I am being asked to look at surveys that were done, and it's something that I believe we can rely upon with respect to doing an issue of apportionment.

But I think -- I think some of this stuff will be self-explanatory to the jury. I'm just going to be laying out my findings with respect to the information that was available.

BY MR. KRUMMEN:

Q And what makes you an expert to lay out your findings with respect to the surveys mentioned in your reports?

A I'm using it as a methodology to apportion infringing versus noninfringing elements to the profits earned from Town & Country on the alleged infringing projects -- projects. I'm providing an empirical database and a calculation which I'm hoping to assist the Court with.

Q What expertise allows you to perform that analysis?

A The ability to gather data, summarize it, mathematically calculate what it tells us, and be able to communicate that to a third party.

Q You mentioned you're going to focus on infringing elements versus noninfringing elements, correct?

A Yeah. I'm not sure if I'm using quite the right words legally. I'm trying to apportion, look at

home; with a number of real estate agents who came in and talked about all sorts of different issues with respect to real estate, both buying and selling phase; also from things we had read in the -- in discovery.

But there's some other stuff that -- we've had a lot of documents. I can't remember all of them. I believe there's other documents we have that talk about the importance of location as being -- actually that price of being a paramount importance. I can't remember what all those are as I sit here right now.

Q Next you list out 20 factors that you believe Rottlund believes are things that customers consider when purchasing a home, correct?

A Yes.

Q Are you ranking these in order of importance?

A I think these are ranked just the way they were given by Stutz.

Q Did Mr. Stutz rank them in order of importance?

A I don't know.

Q You ultimately attribute that because there are 20 you're going to equally weigh them and give 5 percent to each of the 20, correct?

A In this calculation we did, yes.

Q Why?
A Because we had no other basis to do it. In this case we just gave it equally.
Q Do you think that's fair given your knowledge of statistics?
A Well, I don't know if there's a statistical basis to it. We just didn't have any other way of -- I don't think there's a statistical component to this. We just had no other way of weighting it, so we weighted each equally.
Q Perform any analysis to try to test whether or not equal weight was appropriate?
A Well, later on when we look at the National Association of Realtors Profile of Home Buyers and look at Conhaim, the marketing analyst's testimony, you see really it looks like location and price are the most influential factors and should be weighted the highest.
But that just -- we go on to our next factors and that's where we list those. We did not try to weight those factors higher for this first calculation. We just did a simple equally weighted average.
Q So the equal weighting of the 20 factors listed on page 8 of your report is where we're at,

correct?
A Yes.
Q My next question is, did you subject this equal weighting theory to peer review?
A Peer review.
Q Have you published your equal weighting theory of these 20 factors that drive Rottlund's Villa II purchasers' decisions or Town & Country Homestead Collection purchasers' decisions?
MS. NEWMAN: Object to the form of the question as to what you have published. You've got a written report in front of you. You can answer if you understand.
A I have not written an article aside from this that publishes this methodology.
BY MR. KRUMMEN:
Q Has your equal weighting theory been subjected to peer review by anyone outside of your firm or outside of this litigation?
A I have not asked anybody else to look at it.
Q What's the potential rate of error for your equal weighting theory of the 20 factors that appear on page 8?
A What's my potential error? What do you mean by that?

Q What is the potential rate of error that 5 percent is the appropriate weight for each of the 20 factors?

A Again, what do you mean by that, potential rate of error? You trying to do it on a statistical basis?

Q That's right.

A There's not a statistical sample here. I don't know if you could calculate one.

Q Do you have any controls in this group to determine whether or not Todd Stutz's opinion is on the money or completely off?

MS. NEWMAN: Objection to the form of the question, controls of this group. He's already testified that this is not a statistical based analysis. You may answer if you understand the question.

A All I'm listing is what the president of Rottlund considers to be the factors that a customer considers when purchasing a home. This is what your client thinks is important.

BY MR. KRUMMEN:

Q No. You said that these all are equally weighted. And my question is, have you done any kind of a standard or control analysis to

determine whether or not 5 percent is the appropriate weight? Because he didn't tell you, did he, sir, that these are equally weighted?

MR. SCHWIEBERT: Objection to the form of the question.

MS. NEWMAN: Same objection. You may answer if you know.

A He did not discuss that in his deposition.

BY MR. KRUMMEN:

Q So what standards or controls did you use to determine whether or not 5 percent equal weighting was appropriate?

MR. SCHWIEBERT: Objection to the form of the question.

A I don't understand what you mean by standards and controls.

BY MR. KRUMMEN:

Q Did you subject this to any type of a secondary analysis to see if someone else agrees with the 5 percent equal weighting average?

MR. SCHWIEBERT: Objection to the form of the question.

MS. NEWMAN: Same objection.

A I still don't understand what you mean, a separate -- I mean, ask somebody else's opinion

what do you think? Is that what you're asking me?

BY MR. KRUMMEN:

Q Sure. Did you go to anyone outside of this lawsuit and say, "Here's my theory. Here are 20 factors that drive Rottlund's customers purchasing, and I think they're all equally weighted"? Did you ever test that out against anybody else's opinion?

MR. SCHWIEBERT: Objection to the form of the question.

MS. NEWMAN: Same objection. Already asked and answered too.

A I did not.

BY MR. KRUMMEN:

Q Do you know whether or not your theory of 5 percent equal weighting for these 20 factors is generally accepted within the real estate community?

A I'm sorry. I didn't understand the first part of your question. Please restate it.

Q You've assigned 5 percent equal weight to each of the 20 factors listed on page 8, correct?

A Effectively. We listed average. We just looked at the design compared to the 20 factors.

Q Can you point me to any periodical or expert that agrees with 5 percent equal weighting that's an expert in the scientific community, which in this case would be the real estate industry?

MR. SCHWIEBERT: Objection to the form of the question.

MS. NEWMAN: Same objection. You may answer.

A No.

BY MR. KRUMMEN:

Q Did you develop your 5 percent equal weighting theory in connection with this lawsuit or did that opinion grow out of research you've done independent of this litigation?

MR. SCHWIEBERT: Objection to the form of the question.

MS. NEWMAN: Same objection.

A It was a simple calculation done based upon the information that we had in this case.

BY MR. KRUMMEN:

Q So you can't point me to any independent research you've done on the 5 percent equal weighting theory, correct?

MR. SCHWIEBERT: Objection to the form

of the question.
A Again, I've told you what we've done. We've done a simple -- simple average, looking at these at all equal weight for this specific piece of our opinion. That's what we did.
BY MR. KRUMMEN:
Q Do you feel that you've unjustifiably extrapolated from any accepted premise to form an unfounded conclusion?
MS. NEWMAN: Object to the form of the question. Vague. What --
A Yeah.
MS. NEWMAN: What are you talking about? What conclusion? What extrapolation?
BY MR. KRUMMEN:
Q Your ultimate conclusion is because there are 20 factors, they each get 5 percent equal weight, correct?
A I'm saying is if Rottlund's factors are given equal weight --
Q And my question is, why are you assuming if?
A I'm explaining that this is my assumption.
Q And what's that assumption based upon?
A I'm just explaining this is the assumption. If Rottlund factors are given equal weight, the

product design would account for merely 5 percent of all products.

Q And where does the equal weight assumption come from, sir?

A I'm disclosing that. That's what I'm doing.

Q You're saying if and I'm asking you for the basis for the if.

MR. SCHWIEBERT: Objection. Asked and answered three times.

MS. NEWMAN: Same objection. You may answer again.

A Again, as I'm explaining what I did, I said if they're given equal weight, this is the calculation. Product design would account for merely 5 percent of all products.

BY MR. KRUMMEN:

Q If you give product design 100 percent weight, why would that be any better of an assumption or worse of an assumption versus equal weight?

MR. SCHWIEBERT: Objection to the form of the question.

MS. NEWMAN: Same objection.

A Because you wouldn't give it 100 percent. Just the mere fact that it's been listed that -- there's at least 20 items that the customer

considers when purchasing a home. It wasn't
listed as just design, so that wouldn't be
appropriate.

BY MR. KRUMMEN:

Q So in your opinion, it's 5 percent, and what's
it based upon?

A Again, I've done a calculation that says if each
of Rottlund's factors are given equal weight,
then the product design would account for merely
5 percent of all the products.

Q What's the basis for the assumption other than
simple math, sir?

MR. SCHWIEBERT: Objection. Asked and
answered four times.

MS. NEWMAN: Same objection. You may
answer it again.

A I've answered the question.

BY MR. KRUMMEN:

Q Why not give design 95 percent of the weight?

MR. SCHWIEBERT: Object to the form of
the question.

A It would make no sense. Look at the rest of
research that we have done.

BY MR. KRUMMEN:

Q Is there any alternative explanation as to why

you might give design more weight or less weight
other than simple math?
MR. SCHWIEBERT: Objection to the form
of the question.
A I don't understand the question.
BY MR. KRUMMEN:
Q Sure. I want to know what you did other than
simple math to explain your 5 percent equal
weighting.
A We gave -- we just gave them equal weight and
did our calculation.
Q Another explanation would be they shouldn't be
equally weighed, correct?
A Another explanation could be, they aren't
equally -- they should not be equally weighed.
They should be weighed in some other manner.
Q What have you done to rule out the possibility
that they should not be equally weighted?
A Again, I've explained what we've done here.
We've simply given them equal weight and did the
calculation.
Q So you haven't accounted for an alternative
explanation that they should not be equally
weighted, correct?
A I haven't --

MS. NEWMAN: Object to the form of the question. Are you specific to this one calculation or the remainder of the report? Because this witness has already testified to there was further research done. Answer if you understand his question.
A Well, please restate your question.
BY MR. KRUMMEN:
Q Your other research would indicate that these are not to be equally weighed, correct?
A Again, for this calculation is we gave them equal weight. Here's what the percentage is if they're given equal weight. Then we lay out other analysis we've done, and this would indicate that yes, certain factors probably have more influence than other factors.
Q So your other research indicates that equal weighting is the wrong approach, correct?
MR. SCHWIEBERT: Objection. Mischaracterizes his testimony.
MS. NEWMAN: Same objection. You may answer.
A Again, it was a simple calculation. So if the factors are given equal weight, here's what the product design would represent, 5 percent of all

profits. We do go on and say here's other things that affect the buyer's decision, and I think you have to look at all of it with respect to our opinion, all of what we've laid out here.

BY MR. KRUMMEN:

Q Can you point me to any other portion in your report where you've done additional research which supports a theory that the 20 factors listed on page 8 of your report should be given equal weight?

A No.

Q On page 9 of your report, you footnote on footnote 22, "2002 National Association of Realtors Profile of Home Buyers and Sellers," correct?

A Yes.

Q How did you go about obtaining a 2002 National Association of Realtors Profile of Home Buyers and Sellers?

A I don't remember. We may have gotten that through Inform, a research group at the public library.

Q Did you make that particular survey available for my review?

A I don't know if it was produced or not.

(Deposition Exhibit Number 435 marked for identification by the reporter.)

BY MR. KRUMMEN:

Q Sir, in front of you is Exhibit 435. It starts with the Bates label SDK 00001 and it ends with SDK 00060. Have I accurately identified this exhibit thus far?

A I believe so.

Q Do you recognize the exhibit in front of you?

A Yes.

Q Could you identify it for the record, please?

A This appears to be The 2002 National Association of Realtors Profile of Home Buyers and Sellers.

Q So back to your report, which is marked as Exhibit 432, on page 9, footnote 22 refers to "2002 National Association of Realtors Profile of Home Buyers and Sellers," correct?

A Yes.

Q And that's the same thing that appears in front of you as Exhibit 435?

A I believe so, yes.

Q Why did you review The 2002 National Association of Realtors Profile of Home Buyers and Sellers and use it in your report?

A Because it helped us try to identify what the

factors were that influenced the home buying, which we thought was important with respect to the issue of apportionment.
Q When you say factors that influence home buying, what are you referring to?
A The factors that are listed in page 9 of our report.
Q Where do they come from as it relates to The 2002 National Association of Realtors Profile?
A I believe this is where we got it from.
Q Do you know one way or the other?
A I believe it's listed on SDK 00014.
Q It's Table I-9 --
A Yes.
Q -- of Exhibit 435, correct?
A Yes.
Q Have you ever seen the survey that went out to the respondents, which is reflected in Table I-9?
A Did I see the actual survey that went out?
Q Yes, sir.
A I can't remember if it was attached to the back of this or not, but I don't believe so, no.
Q So you don't know whether or not design was even one of the items listed to elicit a response,

correct?

A I don't know, no.

Q But in your conclusion you say that design must have affected less than 2 percent of the decision, correct?

A Yes.

Q Do you think there's a bit of a gap between not knowing whether or not design was even listed to concluding that design influenced a home buyer's decision on less than 2 percent of the buyers?

MR. SCHWIEBERT: Objection to the form of the question.

MS. NEWMAN: Same objection.

A Please restate your question.

MR. KRUMMEN: Could you read that question back, please.

(The requested portion of the record was read by the reporter.)

A You'll have to forgive me. I didn't understand, even. Restate it to me.

BY MR. KRUMMEN:

Q You're relying upon the 2002 survey results, which are reflected in Table I-9 of Exhibit Number 435, correct?

A Yes.

Q You're using it to reach the following conclusion on page 9, quote, "Thus, it," which is a reference to product design, correct?
A Yes.
Q (As read), "Must influence less than 2 percent of the buyers", end quote, correct?
A Yes.
Q But you don't even know whether or not in a survey you're citing to the respondents were asked whether or not product design influenced their decision, correct?
A I didn't see the questionnaire. I don't know what they were asked.
Q How many Villa II purchasers responded to the 2002 National Association of Realtors survey?
A I have no idea.
Q How many Homestead Collection buyers responded to the 2002 National Association of Realtors survey?
A I don't know.
Q How many Chateau collection purchasers responded to the 2002 National Association of Realtors survey?
A I don't know.
Q Do you believe that the population studied in

the 2002 National Association of Realtors survey has any bearing on the products at issue in this case?

A I think you have a survey which wasn't prepared for purposes of litigation that talks about what influences home buying, and I think it's an important piece of information to be included in our analysis for apportionment purposes.

Q Could you turn to SDK 00019 of Exhibit 435.

A (Complies.) Yes.

Q What's the number one information source used in a home search, according to the survey?

A Based on what it says here, real estate agent.

Q So 79 percent of the respondents said they used a real estate agent, correct?

A Certainly talked to one, yes.

Q How many? What percentage of the Villa II purchasers used a real estate agent to make their buying decision?

A I don't know.

Q What percentage of the purchasers of the Homestead Collection used a real estate agent to make their buying decision?

A I don't know.

Q What percentage of the Chateau collection used a

real estate agent to make their decision to purchase?
A I don't know.
Q Would you turn to SDK 00018 of Exhibit 435.
A (Complies.) Yes.
Q You see there's a query there about the method of home purchase?
A Yes.
Q And 69 percent of the 2001 respondents purchased their home through a real estate agent or broker?
A Yes.
Q 15 percent of the respondents in 2001 purchased their home directly from the builder?
A Yes.
Q What percentage of the Villa II buyers purchased through a real estate agent or broker?
A I don't know.
Q What percentage of the Homestead Collection buyers purchased through a real estate agent or broker?
A I don't know.
Q What percentage of the Chateau collection buyers purchased through a real estate agent or broker?
A I don't know.

Q Does Rottlund typically make sales through real estate agents and brokers or do they typically make sales directly from Rottlund to the home purchaser?

MR. SCHWIEBERT: Objection. No foundation. Beyond the scope of this expert's report.

MS. NEWMAN: Same objections. You may answer if you know.

A I don't know what percentage again.

BY MR. KRUMMEN:

Q What percentage of the Homestead Collection purchasers purchased directly from Town & Country?

A I don't know what that percentage is.

Q What percentage of the Chateau collection purchasers purchased directly from Town & Country?

A I don't know.

Q Would you turn to the beginning portion of Exhibit 435, more specifically SDK 00004.

A (Complies.) Okay.

Q Do you see the last sentence in the second to the last paragraph, which starts out, "The Profile allows Realtors and other real estate

professionals to better determine who their clients are"?
A Yes.
Q Do you understand Rottlund and Town & Country to fall within that grouping?
MR. SCHWIEBERT: Objection to the form of the question. Vague.
A I mean, I think what they're doing here is they're talking about people who are trying to buy a house or -- I can't remember if it also includes selling a house. Been a while since I've read it.
I mean, I think it's summarizing home buyers. I think -- I think you're putting up a wall between those home buyers who principally use realtors versus other home buyers as if they're a significantly different group when it comes to factors influencing their home buying. I don't know why that would be true.
BY MR. KRUMMEN:
Q Was this survey conducted in Minnesota or nationwide?
A I don't remember. But I'm sure it was nationwide.
Q Was this survey conducted on behalf of realtors

or on behalf of design build firms such as
Rottlund and Town & Country?
A Well, since it was, you know, performed by
the -- on behalf of the National Association of
Realtors, obviously there was a bias to help the
realtors with information.
Q What is the rate of error for this survey?
A If it's -- I don't know. It may be in here, may
not be. I don't know.
Q What was the response rate for the survey?
A It may be in here again. I don't know what that
is.
Q For 2001, according to the survey, what was the
typical home purchased?
A I'd have to go back and look at this.
Q Turn to SDK 00006 of Exhibit 435.
A (Complies.) Yes.
Q Could you read the fourth bullet point for the
record.
A "The typical home purchased was an existing
single-family detached house located in the
suburbs."
Q Did you try to adjust the results of this survey
to reflect the fact that the products at issue
in this lawsuit are not single-family detached

houses?
A I don't know how you would do that or whether you would even do that.
Q Turn to SDK 00008 of Exhibit 435.
A (Complies.)
Q Do you see where it says in the third paragraph, "In 2001 the typical home buyer was 36 years old and married. The household had two wage earners and a combined household income of $71,300"? Do you see that?
A Yeah. Just barely, but yes.
Q Is that the profile of the Villa II purchaser?
A Not the average purchaser, no.
Q Is that the profile of a Homestead Collection purchaser?
A Not the average, no.
Q Could you turn to SDK 00009.
A (Complies.) Yes.
Q Do you see under the income summary on the left-hand side, it says, "Homebuyers in the Northeast and West had slightly higher household incomes compared to households in other regions of the country"?
A I'm sorry. Where's that? Down at the bottom here?

Q It's the first sentence in the last paragraph.
A Okay.
Q Did you try to adjust for differences in income across the country?
A No. Again, I don't know how you would do that or whether that even would have an effect on the answer to the survey.
Q What's the average number of children for a Villa II purchaser?
A I don't know. My understanding is that the high proportion of people buying them don't have children.
Q What's the average -- well, strike that.
What's the percentage of home buyers of the Villa II that are unmarried?
A I don't know. But it's a large market, I'm sure.
Q So you're saying that a large percentage of the Villa II home buyers are unmarried?
A I understand they're single for that type of home. A large portion of them are single.
Q Is a large portion of the Town & Country Homestead Collection product single?
A Again, from what I've read, a large proportion of it is, yes.

Q Could you turn to SDK 00010, the next page --
A Yes.
Q -- of Exhibit 435. And do you see the first paragraph, second sentence says, "over two thirds of all homebuyers were married couples. Seven percent of homebuyers were unmarried couples"? Do you see that?
A No. Where's it at?
Q It's the first paragraph on the left-hand side of SDK 00010.
A Okay.
Q Could you read that first paragraph into the record, please.
A "Historically, homebuyers have been married couple households. This tradition continued in 2001: over two thirds of all homebuyers were married couples. Seven percent of homebuyers were unmarried couples."
Q Does the survey's report that seven percent of home buyers were unmarried couples fit the facts of this case?
MR. SCHWIEBERT: Objection to the form of the question. Vague.
MS. NEWMAN: Also, foundation.
A Again, I don't know what the exact percentage of

unmarried is for these back-to-backs, although it's a large percentage. But again, I don't know how you make an adjustment for that and I don't know whether that any adjustment would have an effect on the answers, whether or not the mix is different here than the mix for the Villa II and Homestead Collection.

BY MR. KRUMMEN:

Q What percentage of first-time buyers purchased Villa II products?

A I don't know what that percentage is, although it's part of their market. First-time home buyers are the folks -- part of the market that caters -- that the Villa II and the Homestead caters to.

Q What percentage of first-time purchasers comprise the population that buy a Homestead Collection?

A I can't give you that percentage.

Q In general, you understand it to be entry level, correct?

A Part of what they cater to are entry-level buyers, first-time home buyers, or retirees.

Q Same question with respect to the Chateau collection, do you know what percentage of the

Chateau collection purchasers are first-time home buyers?

A No.

Q Could you turn to page 9 of the report, which is SDK 00011 of Exhibit 435.

A (Complies.)

Q Do you see where the percentage --

A I'm sorry. Where are we at?

Q Sure. We're on -- if you want to use the page numbers of the report, it's page 9 of Exhibit 435, in the upper right-hand corner.

A Yes.

Q Do you see where the percentage of first-time buyers is 37 percent in the midwest?

A Okay.

Q Do you know whether or not the percentage of first-time buyers for the Villa II is higher or lower than 37 percent?

A I don't know.

Q Same question with respect to the Chateau collection.

A I don't know.

Q Same question with respect to the -- did I say Homestead -- Chateau is the third one.

A I don't know.