Exhibit E.2

Q Turn to page 13 of this report. Do you see in the second paragraph on the left-hand side, the last sentence says in terms of this survey, "Around 87 percent of homes purchased in 2001 were single-family homes"? Correct?
A That's what it says here, yes.
Q So that also means that 87 percent of the respondents here did not buy back-to-back townhomes, correct?
A I don't know if that's true or not.
Q Why is that, sir?
A I mean, I don't know if -- if the respondents that discussed the factors influencing home buyers percentage influenced, if that is identical or not. I just don't know that.
Q Could you look at Table I-11 same page, SDK 00015 of Exhibit 435.
A Yes.
Q Do you see in terms of the survey for the United States, 87 percent responded that they bought detached single-family homes?
A That's true.
Q 13 percent bought other, correct?
A True.
Q Would you read the definition of "Other"

directly below.

A (As read), "Includes apartment/condos/co-ops, town or row houses, 2 to 3 family homes (duplex/triplex)" -- "triplex)," however you pronounce it, "and other."

Q So isn't it fair to say that back-to-back townhomes must fall into this category of "Other," which is only 13 percent of the respondents?

A It would be reasonable to assume that, yes.

Q And you'd agree that an apartment is not a back-to-back townhome, correct?

A That's true.

Q You'd also agree that a condo is not a back-to-back townhome?

A I don't know. I mean, I read in the -- I read in the questionnaires that people were mad because they were being classified by lenders as condos, so I don't know if that definition -- I don't know if that's true or not.

Q Would you consider a two- to three-family home a back-to-back townhome?

A I don't know what that exactly means.

Q Are we litigating over duplexes in this lawsuit?

MR. SCHWIEBERT: Objection.

Foundation.

A I'm not aware that --

BY MR. KRUMMEN:

Q Are we litigating over triplexes in this lawsuit?

MR. SCHWIEBERT: Objection. Foundation.

A Again, I'm not aware of that.

BY MR. KRUMMEN:

Q So whatever "Other" refers to--and it's only 13 percent of the respondents to this survey--you'd agree that the back-to-back townhomes at issue in this lawsuit fall into that 13 percent, correct?

MS. NEWMAN: Objection to the form of the question.

A It would be reasonable to assume the back-to-backs would fall under that percentage.

BY MR. KRUMMEN:

Q And you'd also concede that the back-to-back portion is less than 13 percent because the 13 percent also includes apartments and two- to three-family homes, correct?

A It would be reasonable to assume that, yes.

Q Do you see that in the midwest the "Other" is

only 8 percent?
A Yes.
Q Do you think it's fair to extrapolate from less than 8 percent of the respondents in this survey to the products at issue in this lawsuit?
MS. NEWMAN: Object to the form of the question. Go ahead.
A I found nothing to indicate that the answers that were laid out here and the factors that influence the buying, home buying, were any different between detached single-family homes and other types of homes.
BY MR. KRUMMEN:
Q Can you point me to an area of the report where they actually tried to figure out whether or not responses were different from purchasers of back-to-back townhomes versus single-family detached homes?
A I don't remember seeing that.
Q Back to your area of expertise. And my question is, what expertise do you have that you're using to interpret the survey which appears before you as Exhibit 435?
MS. NEWMAN: Objection. Asked and answered. You may answer it again.

A Well, based on what I've described previously this morning, and it is quite common for myself and other people who are doing the work that I do to rely on surveys such as this. This is what I've done.

BY MR. KRUMMEN:

Q Do you know what standards or controls were used in connection with this 2002 National Association of Realtors survey?

A No. It's done by a well-recognized organization for the use of its members. It was not prepared for litigation. It is the type of thing that somebody who does the kind of work that I do would rely upon, and that's what I've done.

Q Do you think that the sample chosen in this 2002 survey is representative of back-to-back townhomes?

A I have nothing to indicate that it wouldn't be.

Q What do you have to tell you that it is?

A Again, they're included in here. This is buyers of homes. I don't see why there would be anything dramatically different motivating a buyer that would make this -- the results of this survey and the selection -- the areas that we selected and used to be significantly

different than the sample that was selected here for the 2002 National Association of Realtors study.

Q Was the 2002 National Association of Realtors study analyzed in accordance with accepted statistical principles?

A I can only assume it was. When I was with a national firm, we used to do analysis for the National Restaurant Association, the national hotel association, and the national convenience food store association. Any time we did those calculations, because I had to talk to people in our departments who did that, they did follow those standards.

Q What does that have to do with the 2002 National Association of Realtors survey before you?

A Because I would assume that it would be performed at the same standards, because that -- my experience has been, at least with our firm, when we did it for national associations, national associations wanted them to be done in a manner that they could rely on the results.

And I would believe to be able to be done in a manner that they could -- where they could rely on results, they would have expectations

that it would be done at the standards that they were -- done in a manner they could be relied upon.

Q Did you read anything in this 2002 National Association of Realtors survey that said it was analyzed in accordance with accepted statistical principles?

A I don't remember that. I don't remember if I did or didn't.

Q The survey itself that was sent out by the National Association of Realtors, do you know whether or not the questions were clear?

A Again, I haven't seen the questionnaire. I'm assuming they were clear, but -- because it's a reputable organization, but I don't know. I didn't see the questions.

Q Did you analyze the survey to determine whether or not the questions were leading?

A No. But I doubt they -- well, I don't know. No, I did not analyze that. I don't think there's any reason why they would be leading. Again, it was not done -- this was not a study performed for litigation purposes.

It was a study used by the National Association of Realtors for their members, and I

don't know what bias they would put into it that would affect at least the small section we used of it for our opinion.

Q Do you know what the qualifications were for the people that conducted the actual survey and did the interviewing?

A No, I don't.

Q Do you know whether or not proper interview procedures were followed in connection with this survey?

A No, I don't. But again, I'm relying on the fact that this is a reputable organization. It's a national survey. It's a survey that's done annually. I would expect them to have a certain amount of rigors with respect to how they use it, how they perform the survey.

And again, it is a -- it is a survey that is commonly used -- the type of survey commonly used like -- by people who do the sort of work that I do.

Q What process was used to ensure that the 2002 National Association of Realtors survey was objective?

A I have no reason to believe that it wasn't anything but objective.

Q What reason do you have to believe that it was objective? What process was used?

A Because again, it is done by a national association, a reputable industry association. I don't understand why -- I don't know why it would be biased.

And clearly it wasn't performed for the purposes of this litigation. It was performed for the use of its members. I don't see why there would be any bias in there that would certainly be intended.

Q Its members are realtors, correct?

A Its members are -- yes, its members are realtors.

Q And Rottlund sells directly to customers. It bypasses realtors, correct?

MR. SCHWIEBERT: Objection. No foundation.

MS. NEWMAN: Same objection.

A I don't know that.

BY MR. KRUMMEN:

Q Town & Country also sells directly to buyers. It doesn't use realtors with the Homestead Collection, correct?

MR. SCHWIEBERT: Objection. No

foundation.

MS. NEWMAN: Same objection.

A I don't know that.

BY MR. KRUMMEN:

Q Why do you believe that the National Association of Realtors is a reputable organization?

MR. SCHWIEBERT: Objection. Asked and answered several times.

A Because at least my experience has been there's a number of national associations and you don't survive as a big national association if you're not reputable. You just aren't being used by your members.

BY MR. KRUMMEN:

Q What firsthand knowledge do you have regarding the reputability of the National Association of Realtors?

A I don't have any firsthand knowledge. I've never been to the National Association of Realtors board meetings. It is a significant association. I have relied for a small portion of the report on their study. There's nothing to indicate that this is not a reputable organization.

Q On page 9 of your report, which is marked as

Exhibit 432, you make a reference to Roger Conhaim, correct?
A Yes.
Q Who is Roger Conhaim?
A He's a marketing analyst who works with Town & Country Homes, among other companies, I believe.
Q Do you know Mr. Conhaim outside of this lawsuit?
A No, I don't.
Q Have you ever spoken with Mr. Conhaim before?
A I don't believe so.
Q Is Mr. Conhaim some form of expert, in your opinion?
A Based on his background, it does appear that he has expertise, yes.
Q In what area?
A In marketing townhomes and other real estate.
Q So you'd characterize Mr. Conhaim as an expert?
A He certainly has the characteristics of being an expert in certain areas, yes.
Q Was he disclosed as a testifying expert in this lawsuit, do you know?
MR. SCHWIEBERT: Objection. No foundation.
MS. NEWMAN: Same objection.
A I don't know -- I'm sorry. I don't know if he

was disclosed or not. But I looked at his background in the deposition. It appeared he certainly had the background to be able to give an opinion with respect to what we have listed here.

BY MR. KRUMMEN:

Q Did Mr. Conhaim ever say, "I'm going to offer an expert opinion as to what factors lead to buying decisions for homes"?

A I don't know.

Q Have you done any testing to determine whether or not Mr. Conhaim was right or wrong when he said that 85 percent of a buying decision for a home was based on location and price?

A It was not inconsistent with the 2002 National Association of Realtors study that ranked a neighborhood, which I consider location and price, as being very high factors in the decision. But I have -- as part of my opinion, I've relied upon what he has testified to.

Q What percentage did your weighting give to location and price?

A What -- you mean going back to this equal -- these equal factors?

Q Yes, sir.

A In that calculation we used -- gave everything equal weight.
Q So did you give 10 percent to location and price?
A Again, it was all given equal weight for that calculation.
Q Do you see a conflict between your equal weighting and Mr. Conhaim's opinion?
A A conflict. Well, we did not weight it. We gave it equal weighting. He weights -- clearly he weights location and pricing as the most important.
Q Can you reconcile those two?
A Again, we just simply did a calculation, laid out what we've done here. I can't reconcile the two.
Q The final piece that you've put forward here in the report concerning factors that affect buying is a Rottlund survey, correct?
A That's true.
Q Where did you get the Rottlund survey?
A I've got the Rottlund -- the Rottlund survey came through discovery.
Q Do you know which Villa products it relates to?
A I did. I can't tell you which ones we have

listed. I can't tell you which ones those are.
Q Do you know which developments the Rottlund survey relates to?
A I can't remember as we sit here now.
Q Why is it important to look at Rottlund's purchasers' responses?
A Well, we thought it was important to get the information from Rottlund for a number of different reasons: One is, it was not a survey done for litigation purposes. It was a survey Rottlund did to determine why people purchased this units, plus also get additional information.
It was a contemporaneous record prepared by buyers after they've closed. It is summarized and used by Rottlund in the ordinary course of business. So to us it appeared to be a very good basis to try to come up with an empirical calculation as to what effect design has in the buying decision versus other factors.
And I thought that would be the best -- I mean, using Rottlund's information was a very good source of trying to assist us with this issue of apportionment; that is, what portion of the profits of the alleged infringing product

relates to the infringing elements versus all the other reasons people buy townhomes, including back-to-backs.

Q You concluded that based on the Rottlund survey 20 percent of the respondents said design was important to them. Is that your conclusion?

A Well, what we did is, we took really two sets of surveys. We had first a hundred and then we received a little over a hundred. Then we received another set of surveys, a little over a hundred. And we went through there and summarized up all of the answers with respect to those things that influenced their buying decision.

We also summarized up all those issues with respect to what pieces of the parts of design did they like under the design, the kitchen, living room, quality of product, and whatever.

And we used those studies and weighted the ranking so that if somebody said they had really -- like one out of five or one out of six, depends on the survey, we went through and weighted those, giving a 1 a much greater weighting than a 2.

Each one we mathematically weighted came

with a weighted average to determine when you looked at the pool of all of the things that Rottlund thought that the customer considered in buying, that it appeared approximately 20 percent of the profits got down to what related to the -- apparently what would be the alleged infringing portion of the units.

Q You produced the working papers which explained this weighting process that you came up with?

A I don't know.

Q Do you have those at your office?

A Yes.

Q Could we get a copy of those over the lunch hour so we can go through and understand how you determined to weight these?

A Yeah. I don't know. I can...

Q Do you want to stop for five minutes and make a call and see if you can get four copies of your work papers so that you can explain to me how you weighted these responses?

MS. NEWMAN: Object to the form of the question that he needs them to explain anything to you. Go ahead.

BY MR. KRUMMEN:

Q Well, you definitely considered these working

papers in coming up with a weighting average, correct?
A That's true.
Q So why didn't you produce those to me?
A I wasn't asked to produce those.
MR. KRUMMEN: Let's take a five-minute break, and I'll encourage you to make that call. Otherwise, we'll have to have a motion about it.
(A recess was taken from 11:30 until 11:47 a.m.)
(Deposition Exhibit Number 436 marked for identification by the reporter.)
BY MR. KRUMMEN:
Q Sir, before we broke we were talking about the Rottlund survey, correct?
A Yes.
Q And I've put in front of you as Exhibit 436 a single document which starts with RCI007950 and runs through RCI007953.
A Yes.
Q Do you know what kind or type of a document Exhibit 436 is?
A We understand this is the consumer -- customer surveys performed by Rottlund.
Q And it's just a single survey before you as

Exhibit 436, correct?
A I believe so, yes.
Q It's the same type of survey that you testified to earlier when you got a wave of approximately a hundred surveys the first time and then additional surveys later, correct?
A Yes.
Q I'd like to walk through your expert report and tie it to Exhibit 436 as an example only. But in your report on page 9, you're talking about, "Rottlund has produced surveys purporting to set forth reasons why customers purchased its units." Could you show me on Exhibit 436 the portion of the Rottlund survey example that you think purports to set forth reasons why customers purchased Rottlund's units?
A We did summarize two things, on page 3.
Q Which is RCI007952 of Exhibit 436, correct?
A True. Yes.
Q Okay. Please continue.
A The very first thing is is step 3, "the reason you purchased a Rottlund home," where it says (as read), "Please rank your response on a scale of importance, using: 1, the most important and 6, the least important." It's these numbers we

summarized to get a weighted average with respect to the reasons people purchased a Rottlund home.
Q Did you use the survey in any other way -- strike the question.
Did you use, under "General Comments" on page 3 of the survey, which is marked as Exhibit 436, any information which appears below number 2, "Rank the features you like best about your Rottlund home"?
A We list -- I'm sorry. Where are you at?
Q I'm on page 3 of the survey. And you directed me to "Rank the reason you purchased a Rottlund home," correct?
A Yes.
Q Did you use the features survey which appears immediately above that, in any way, shape, or form?
A We also used that, yes, as a separate analysis.
Q So let's start in whatever order you want to, but which of those would you like to address first?
A 3, question 3.
Q And before we get to question 3, those were the only two portions of the Rottlund survey that

you focused on, correct, rank the features and rank the reason?
A Yes.
Q Okay. We're going to start with number 3, which is rank the reason, then, and please continue.
A Okay. We did an Excel spreadsheet. We entered in, for each of the surveys that we had, the numbers. We have columns, as I recollect, for "Design/Plan," "Location/Neighborhood," "Better Quality," "More Value for the Money," "Reputation," and "Other," and then made notes as to "Other."
And we input these numbers, the rankings, in Excel spreadsheet along with -- each one was Bates stamped. It also -- I believe we have listed the project.
And with the first group, we're something over a hundred. We listed those. And then what we did is, we weighted the number so that -- a lot of people didn't include -- a lot of people didn't answer "Other." They just left that blank. Some did.
So basically we -- although we listed everything, we focused really on the top five and basically weighted -- as I recollect this,

weighted for at least the first hundred and some, weighted 1, five times 1; weighted a 2, four times 2; weighted a 3, I think, three times 3; weighted a 4, four times 2; and weighted a 5 as five times 1, to weight the 1 the most important and least weight the least important.

We added those up and used the accumulated points to determine a weighting and a percentage of a hundred percent. Generally that gave the higher ratings, probably the most important highest weighting on an average, and used that to come up with a percentage with respect to the customers -- the reasons the customer purchased a home based on that analysis of points.

Q I'd like to use an example with Exhibit 436. And to help me understand what you did, assume that there's only one survey in the entire study and it's Exhibit 436. Could you show me how your ranking would work with the results that work in 436 and what the percentage would end up being as to design?

A I'll have to look at my work papers. I can't remember how we -- how we divided it afterwards. I remember the weighting --

Q Maybe we could just --

A Number 1, the weighting -- in this case, 1 would get weighted 5.
Q So we'll start with this individual. Ranked liked the design as the most important, correct?
A Yes.
Q So you came up with a five-point system to multiply by that one, correct?
A Well, actually -- actually it's the -- I think we did that. We reversed it. We gave it -- I'm going to have to look at my papers. We reversed it and I think it's 6. We would give that one five. 1 would actually get five, so they got the highest points. 1 would actually get five, 2 would actually get four, 3 would get three, 4 would get two, and 5 would get one.
Q Why not rank 6?
A Well, we didn't have -- there was so many missing out of 6 that we just dropped off that column 6. I think we just used five -- in this -- the next group had more of 6s filled out, but I think we just used the top five, because there just weren't enough -- I don't think there was any biasing. We just used five.
Q No. I think you may have misspoken.
A Okay.

Q I'm focusing on section 3, which actually has seven boxes, correct?
A No. It's got six boxes.
Q Six boxes. But "Other" is the sixth box, right?
A Yeah. But -- yes. A lot of people, though, didn't answer "Other," so we had a lot of missings. There weren't as many items for that. So as I recollect --
Q Did "Other" get thrown out?
A No, not "Other." It would just be unanswered. A lot of them didn't answer it, so it's only where we had a number. If there was a number, it was included. Like, for instance, if everybody used 1, we'd include -- we gave 1 equal rating, because everybody ranked everything as 1. Some people just put down 1 for everything.
I'd have to go back and look at the column, but there's a lot of people who only answered five. And oftentimes it was the "Other" they didn't answer, but sometimes they just gave no weighting, to like "Reputation" or, you know, certain things. They just didn't complete them all.
Q So how did you account for incomplete forms?

A Where they ranked it and gave it a number, we gave that a weighting. And if it was blank, that was considered zero.
Q You determined that a 1 should be given a 5 in this ranking system, correct?
A Mm-hm.
MS. NEWMAN: You have to say yes.
A Oh, yes.
BY MR. KRUMMEN:
Q What was the basis for that decision?
A This is a methodology that I've used and has been shown to me when I'm doing strategic planning and we want to come up with priorities.
This is a method for ranking people's -- people's preferences, and it has been very effective to summarize up when lots of people have different rankings. I've just had very good luck with it. And I've used that methodology here.
Q How many damages surveys analyses have you performed using this weighted averaging system, a 1 equals a 5 and a 5 equals a 1?
MS. NEWMAN: This particular weighted average system or that system in any form?

Object to as vague.

BY MR. KRUMMEN:

Q This particular one.

A This very particular one with these types of questions?

Q Correct.

A This is the first. I've used it before in other matters, but -- I mean, this is a very unique case, so...

Q So here, if I understand your testimony thus far, first, we have to assign your points system to the responses on page 3 of the survey. Correct?

A Yes.

Q And "Design/Plan" here gets five points, right?

A Yes.

Q Because the customer ranked that as number one most important, correct?

A Yes.

Q "More Value for the Money" you assigned four points, correct?

A I believe so, yes.

Q Because the customer said that that was second most important to them, correct?

A Yes. Yes.

Q My question is, how did you determine that there's only a one-point difference between liking the design and more value for the money in a scale of 1 to 5?

A I'm telling you what we did. This is -- this is a way I've used to weight things like this before. I don't think it's biased. I think it's -- what happens is, it gives greater weight to the items that are considered the most important and less weight to the items that are less important.

Q Is there a particular name for this methodology you use for weighting?

A There may be. I just -- goes back so far I can't remember.

Q Is there a statistical textbook or any economics type textbook that would support this methodology?

A There may be. I learned it from somebody, and I've used it a number of times, and it's worked out very well, but I can't quote as to where the source was originally.

Q Did you interview a single former -- well, a single Rottlund survey respondent and ask them if on a scale of 1 to 5 there was only a 1

percent or a 20 percent difference between their liking the design plan and their desire to achieve more value for the money?
A No. I've relied on Rottlund -- this is the way Rottlund set up their questionnaire. This is the way Rottlund asked them to score it. And I'm using the way that Rottlund asked the question and the ranking system that Rottlund used as my starting point.
Q Well, Rottlund asked them to rank it, correct?
A Yes.
Q Where did Rottlund ask them to score their responses?
A They just asked me to rank it, and I started with the ranking.
Q So there's no weighting that Rottlund's eliciting from these survey respondents, correct?
A I don't know what they do with them after this.
Q So as far as you know, the respondent on Exhibit 436 bought the townhome for the sole purpose of the design plan and then he just had to finish up the survey so he ranked the rest of it, correct?
MR. SCHWIEBERT: Objection. No

foundation.

MS. NEWMAN: Same objection.

A I don't know that.

BY MR. KRUMMEN:

Q Do you know what a push survey is?

A I'm not familiar with that term, no.

Q One way to ask a question in a survey is to say, "What did you like the most about the Rottlund home, correct --

A Yeah.

Q -- and then fill in the blank?

A Yeah.

Q Here we have a methodology that leads you through a forced ranking of at least five factors and then there's a fill in the blank at the end, correct?

A Yes.

Q Isn't Rottlund pushing the result towards, you must fill out six boxes, whether it's all about design or plan or all about something else?

MR. SCHWIEBERT: Object to the form of the question.

MS. NEWMAN: Go ahead.

A I'm assuming, the way this is set up is, Rottlund is interested in each of these points.

Rottlund is interested as to the design plan, how that influenced him. Rottlund's interested about the location in the neighborhood. Rottlund's interested about did they think quality is important. Rottlund was interested about more value for the money. Rottlund was interested about reputation.

I mean, they're asking this specifically. They think this is important to ask. It's to be used by them in determining how better they should serve their customer.

I -- you know, I don't -- I don't understand what bias they would put into this. These -- we have designed for our own -- I've helped -- I'm head of marketing at my firm and we've tried to put together consumer questionnaires for our clients. And you try to list down those items that you think, based on your experience, should be important so you can change the way you're doing things.

And Rottlund, who is a savvy marketer and a savvy producer, I believe has put down those things they think are the most important. And here they are. And they've asked their customers to rank them and then used this, I'm

assuming, to improve their business.

BY MR. KRUMMEN:

Q What have you done to test your weighting theory with respect to the Rottlund survey?

A Test my weighting, what do you mean by that?

Q If I asked you, "How do you know it's accurate," what would your response be?

MR. SCHWIEBERT: Objection to the form of the question.

MS. NEWMAN: Same objection. Go ahead.

A I don't know what you mean by "accurate." Accurate -- I mean, what I'm doing is, I'm using it to try to turn these rankings into some -- using this empirical data to try to determine a number as to how much of the design plan -- how much -- how much of the reasons people bought the home related to the design and the plan.

I -- I -- it's obvious that there's a lot of reasons people buy back-to-back townhomes. It's -- it's clear from all that we've read and no matter how you try to pick apart any of these surveys, there's a lot of reasons people buy a back-to-back townhome.

And I'm trying to put together an empirical database to allow me to determine some sort of

an apportionment calculation, because I think it's appropriate. And this has provided a reasonable basis for this.
(Mr. Davenport enters the proceedings briefly and leaves.)
BY MR. KRUMMEN:
Q Why is it a reasonable basis to assign your point system and weight these Rottlund surveys the way you've weighted them?
A Because I think it's a -- because based on my experience, this is not a biased approach. This is a approach that I've used, and it works pretty good to help rank things such as this.
Q You say it works pretty well. Can you point me to a treatise or a publication to support that opinion?
A It's based on my experience. Other people have used it, showed it to me. I've used it. It's worked well when it comes to ranking things such as this where people are trying to score what they think's important. I don't know. It's an excellent methodology that works in the real world. I can't point to a treatise on it.
Q Well --
A Other people have used it. They showed me how

to use it. I've used it. I've had good luck with it. It's my personal experience and other people's experience who have used it.

Q Ultimately you're concluding that 20 percent of the respondents believe that design was what drove their purchasing decision, correct?

A Yes. At the end, yes.

Q What if I said to you I think you're dead wrong and it's a hundred percent? How could we test your theory that 20 percent's the right number?

A We're going to go through the mathematics of how I've done it. And I've taken data produced by Rottlund in the ordinary course of business. I've tried to take that data and quantify it so that I can use it as a basis for apportionment.

I'm going to lay out what I've done, and I'm sure you're going to lay out whatever flaws you think there is in it, and the trier of fact is going to have to decide how they want to use it.

Q Or a judge is going to have to decide that it's junk science, correct?

MS. NEWMAN: Object to the form of the question. Argumentative. Please restate your question.

BY MR. KRUMMEN:

Q Well, a judge can exclude this because it's unreliable, correct, Mr. Kenyon?

MR. SCHWIEBERT: Objection. No foundation. Beyond the scope of this expert's report.

MS. NEWMAN: Same objections. You may answer only if you understand what a judge would rule. Do not speculate.

A I have no idea what a judge would do.

BY MR. KRUMMEN:

Q If you were asked to inform the judge whether or not your weighting theory of Rottlund's surveys can be tested, what's your answer?

MR. SCHWIEBERT: Objection to the form of the question.

MS. NEWMAN: Same objection. Go ahead.

A I'm going to say it's a common methodology. I've seen other people use it. I have used it. It works well for ranking, about issues that people think are important and things similar to this.

And in my experience it's not -- it would not be junk science. It is used in the real world. It has been effective, in my estimation, and here's how it's done. And a judge will have

to make whatever decision they think's appropriate.

BY MR. KRUMMEN:

Q How can the judge test whether or not your weighting is correct in that you conclude 20 percent of the profits should be allocated to the allegedly infringing elements?

MR. SCHWIEBERT: Objection to the form of the question. Asked and answered.

MS. NEWMAN: Same objection. Go ahead.

A Because I'm going to lay out how it was calculated in my methodology. And that's all I can do.

BY MR. KRUMMEN:

Q Have you published your weighting theory of Rottlund's survey responses and allowed peers to address whether or not your theory is correct or incorrect?

(Office staff enters, hands documents to Mr. Krummen, and leaves.)

A No. I have not published anything on this specific calculation. Again, it is something that I have used and other people have used in the real world.

BY MR. KRUMMEN: