# Exhibit E.3

Q What's the rate of error for your weighting system?
A Nobody calculates a rate of error when they do this approach.
Q What's the rate of error as to your conclusion that 20 percent of the profits should be allocated to the allegedly infringing elements when you're making that conclusion based upon this survey results?
MR. SCHWIEBERT: Objection. Asked and answered.
MS. NEWMAN: Same objection. Go ahead.
A An error rate is not calculated when you do this sort of analysis.
BY MR. KRUMMEN:
Q Did you use any standards or controls to determine whether or not your 20 percent conclusion is the correct one based on this survey?
A Again, the way I've done this is, people don't do that. I'm going to show how I've done the calculation and my weighting, and this is the result based on data provided by Rottlund Homes.
Q Can you point me to any copyright cases that have accepted the technique or theory you're

using for this weighted averaging?
A I don't know if one exists or not.
Q You did develop your opinion regarding this
Rottlund survey weighting expressly for the
purpose of testifying, correct?
A I had to come up with a methodology of taking
this data and quantifying it into a percentage
used for apportionment. That's part of what I
had to do. That's how I -- we'll be getting
into how I've done that.
Q And you did that while you were retained by BSB
as a damages expert, not on your spare time,
correct?
A That wasn't on my spare time. It was as a
damages expert.
Q How do you know that your 20 percent conclusion
is not an unfounded conclusion?
A We'll go through what I did. I'm going to
explain it to the Court. And it's to assist the
Court. If the Court doesn't accept it, well,
then I guess I didn't do my job. If the Court
accepts it, then they will use it however they
think's appropriate.
Q Did you try to account for alternative
explanations as to the meaning of Rottlund's

surveys?

A I've used the literal words on the survey just as I assumed that the people filling out the survey would use the literal words the best they can understand it. And I'm using that again to try to determine that -- what percentage of the profits would be attributable to things other than the infringing -- the infringing -- the infringement, I guess, and I think this is a reasonable method of doing it. Each case is unique.

Q Is there any other way of weighting the Rottlund survey responses beyond the way that you use to weight the Rottlund survey responses?

A I don't know. I've used the methodology based on my experience that I think is the most reasonable under the circumstances. Could there be another way of doing it? I suppose. This is the one that I think is a reasonable approach.

Q Why are you analyzing Rottlund Villa II purchasers' responses as opposed to Town & Country purchaser responses?

A First of all, because it's Rottlund's data, and this is information Rottlund prepares in its ordinary course of business. It relates to the

Villa II.

My understanding is is that at least part of the allegations is that the Homestead and the other back-to-backs are basically--I don't know--the same gestalt look and feel, whatever, and that people would look at those as interchangeable.

And I think it's probably the best place to start, would be using Rottlund data, because this is what Rottlund uses. And if the homes are very similar between Villa II and the alleged infringing homes, I don't know what the difference would be.

I think it's good that we can use the Rottlund data itself, again prepared in the ordinary course of business, their customers. This is the stuff Rottlund thinks is important. I think it's a good starting point.

Q On page 7 of your report you said that, "Rottlund and TCM are catering to different markets," correct?

A With respect to the prices, the pricing income.

Q So why don't you survey TCM's market as opposed to Rottlund's before you determine how important design is to TCM purchasers?

A Again, I think -- I think it is important to use the Rottlund data, because Rottlund is alleging basically all profits generated both by the alleged infringing units and any other units sold in developments that are related to these alleged infringing units, all are profits that are due to infringement.

And I think it's important to look at the Rottlund home analysis where Rottlund is identifying there's a bunch of issues that relate to why an individual purchases a Rottlund home.

I think that's a very important thing to look at as part of the overall issue of liability, overall calculation of damages. And again, I think that's one of the reasons the Rottlund study is a good starting point.

Q But the issue is what would Town & Country's customers think of design, correct?

A My understanding is is that Rottlund is effectively saying that the Villa IIs and these other alleged infringing projects are interchangeable.

Q But you disagree with that?

A With respect to price. But also I'm -- again, I

mean, I'm trying to apportion profits and this is -- this is to assume that the Court says, "Yes, you have copyright infringement. Yes, there are damages."

And I am looking at the issue of now what portions would relate to the copyrighted features versus all the other reasons that people purchase a home.

Q Let's try to establish where the lost profits are coming from. They're coming from people that purchased Town & Country's Homestead Collection, not from people that purchased the Villa II, correct?

A Well, again, we have to go back to the type of damages. We -- first of all, the actual damages. The actual damages, as I understand it -- and I'm certainly not quite clear how it works after -- based on later testimony.

But apparently these were -- the alleged damages -- or actual damages, alleged actual damages, was to represent monies that Rottlund would have been able to make but for the infringement.

And I -- and I haven't seen that there really are -- is any actual damages yet, but I

think that's what the first step is. And, you know -- and I'm not a complete -- I don't have complete understanding of the copyright law. I mean, I have a basic understanding of it, but I'm not an attorney.

And my understanding is is that if there is issues of damages with respect to copyright, is that -- part of what you do is you look at what portion of the -- of the lost profits relate to the infringing aspect versus other reasons that profits are generated. And that's what I'm trying to do here.

And how that's done has to be done probably differently for actual. I'm not sure if it's done differently for actual or not. But the issue of profits, you have to take out those that relate to infringing versus those that are noninfringing. And anyway, that's what I'm trying to do. Sorry.

Q But you sampled the wrong population, correct?

A No. I think it's a fine population.

Q The issue is what was important to Town & Country's purchasers, not what was important to Rottlund's purchasers, correct?

A Again, as I got back to actual damages, Rottlund

is saying, "We lost all those sales. We would have gotten those sales. We would have received profits from Villa IIs that would have been sold instead of the Homesteads" or whatever the items were, plus all the profits and anything else they can think of that was in proximity.

Q Do you agree with that?

A What?

Q What you just said about Rottlund's view of the world.

MS. NEWMAN: Objection to --

A Do I agree --

MS. NEWMAN: Objection --

A -- with Rottlund's --

MS. NEWMAN: -- to the form of the question. Go ahead.

A I'm sorry. I don't understand your question.

BY MR. KRUMMEN:

Q I don't understand why you're not sampling the Town & Country purchasers if you think that it's a different market. Could you explain to me why you did this study on Rottlund's purchasers as opposed to Town & Country's?

A Again --

MR. SCHWIEBERT: Objection. Form of

the question. Asked and answered several times.

MS. NEWMAN: Go ahead.

A Again, I am looking at assuming that the Court would say, "Yes, you've infringed. Now let's calculate damages." I'm trying to calculate what -- what portion of the damages relate to the infringing versus noninfringing attributes. That's what I'm trying to do. And I think it -- I think the Rottlund data is fine data to do that.

BY MR. KRUMMEN:

Q Did you interview anyone at Rottlund to find out what weight they place on a number 1 response as opposed to a number 6 response to the survey?

MR. SCHWIEBERT: Objection. Relevance.

A No. I wouldn't have access to those people to do that.

BY MR. KRUMMEN:

Q Isn't it important to understand what the author of the survey had in mind when crafting the questions before you can assign weights to survey responses?

A Again, I'm using data that is performed in the ordinary course of business, by customers who actually have purchased a Villa II home, which

is the alleged infringing design, laying out all the reasons that they purchased a Rottlund home.
Q Do you know what a confounding variable is?
A I don't recollect what that is, no.
Q Do you believe that quality and design are at all related?
A I can't tell you. I -- they're listed here. A person has to make a decision between quality on its own versus design plans. So in this questionnaire they're asking to have it broken up separately, to treat them as separate issues.
Q But you don't know whether or not Rottlund thinks quality and design are related, do you?
A Rottlund on their questionnaire has broken it up between design and quality.
Q Do you know whether or not in this survey respondent's mind there's a link between design and more value for the money?
A Again, I don't know what's in the consumer's mind. Rottlund believes these are the attributes they should -- they want to ask a customer about why they purchased a home, and they've listed these separately. And the customers are trying to rank each of these.
Q And you're concluding that because Rottlund

listed six different boxes they think there's no interrelationship between any of these reasons you purchased a Rottlund home?

MS. NEWMAN: Object to form. Calls speculation. Lack of foundation. You can answer if you know.

A I don't know what Rottlund thinks.

BY MR. KRUMMEN:

Q Do you, sir, in your expert opinion, believe that better quality is completely unrelated to design?

MR. SCHWIEBERT: Objection. Beyond the scope of this expert's report.

A I don't know. I don't have a separate opinion with respect to quality and expert design. I didn't look at that.

BY MR. KRUMMEN:

Q Do you, sir, think, in your expert opinion, that there's no relationship between the design and perceived value for the money?

MR. SCHWIEBERT: Objection. Beyond the scope of this expert's report.

MS. NEWMAN: Also the form. Go ahead.

A Again, I wasn't asked to look at that. I am looking at the attributes Rottlund thinks is

important and how they've asked their customers to rank those.

BY MR. KRUMMEN:

Q You also looked at the features you liked best about the Rottlund home responses on these Rottlund surveys, correct?

A Yes.

Q And on Exhibit 436, which is the example of the Rottlund survey we're working through, on page 3 we have item number 2, "Rank the features you like best about your Rottlund Home," correct?

A Yes.

Q This particular customer put "Floor Plan" number 1, correct?

A Yes.

Q Do you believe that there's any link between "Use of Space" and "Floor Plan"?

A I don't know.

Q Do you believe there's any link between a "Kitchen" and a "Floor Plan"?

A I don't know. Again, these are the areas that have been listed by Rottlund and they've asked their customers to rank individually.

Q Do you believe there's any link between a "Floor Plan" and a "Family Room"?

A I don't know. Again, I'm looking at what Rottlund is asking their customers.
Q Do you think there's any link between "Quality" and a "Floor Plan"?
A I don't know. Again, I'm looking at the questions that Rottlund's asking its customers.
Q Do you believe that the questions on the Rottlund survey are clear?
A Reasonably so.
Q Do you believe the questions on the Rottlund survey are leading?
A I found nothing to indicate that they were leading, no.
Q Well, they force a respondent to answer as to six specific items, correct?
A Well, I mean, from what I see here is Rottlund thinks these are important issues to get ranking on and they've listed these here and have left another spot, "Other," for anything else anybody else wants to put down. But I believe Rottlund thinks this is what -- the most important questions they should ask, and that's what I'm using for my analysis.
Q Does this survey, the Rottlund survey, follow proper interview procedures, in your opinion?

A My understanding, it's given to the customers. They fill it out and return it. I don't think there's an interview. It's just the customers complete the survey.
Q Do you think the questions are framed in a fair and objective manner?
A I'm not aware of Rottlund biasing the questions. This is what Rottlund uses to try to improve their operations, as I understand it.
Q Well, Rottlund, for example, could have put in "Rank the features you like best," the Fireplace/Media Niche," correct?
A If they thought that was important, they could have listed that, yes.
Q But they had some subjective decision making in not listing that as one of the elements under topic 2, correct?
A For some reason they just decided these were the most important.
Q Have you heard a Rottlund employee testify that the ones listed are the most important?
A I'm not aware of anybody asking that question.
Q If these were the ones that were most important, can you explain why there would be an "Other" blank left on the survey?

MS. NEWMAN: Objection. Form of the question. Calls for speculation. Lack of foundation. You may answer if you know.
A Well, my experience is you always add "Other," because there might be something you're not aware of that people think's important.
BY MR. KRUMMEN:
Q So every single survey you've ever seen has a blank "Other" line item in it?
MR. SCHWIEBERT: Objection. Mischaracterizes his testimony.
MS. NEWMAN: Same objection.
MR. SCHWIEBERT: Argumentative.
A Not every -- every -- not every questionnaire, no.
BY MR. KRUMMEN:
Q Couldn't Rottlund just fill out a question and leave one blank down there and ask, "What is the feature you like best about your Rottlund home"?
MR. SCHWIEBERT: Objection. Beyond the scope of this expert's report. Calls for speculation.
MS. NEWMAN: Same objection. You may answer if you know.
A I don't know what they would have done. This is

what they did.

BY MR. KRUMMEN:

Q If this was an open-ended "Other" blank with no other items listed, would it be more objective or less objective, in your expert opinion?

A I don't know.

MR. SCHWIEBERT: Objection. Beyond the scope of this expert's report.

MS. NEWMAN: Go ahead.

A I don't know. I'm just using what they, Rottlund, has put down as what they think's important and they want to ask their customers.

BY MR. KRUMMEN:

Q Sir, I'd like to mark this next exhibit for the record and then we'll take a lunch break so you can take as much time as you need to interpret it.

(Deposition Exhibit Number 437 marked for identification by the reporter.)

BY MR. KRUMMEN:

Q I've handed you what's been marked as Exhibit Number 437. I only got the number of copies I've distributed. Can you identify the contents of Exhibit 437 for the record?

A These appear to be our schedules relating to the

calculation of the apportionment percentage we used in our report.

Q I'll give you the lunch hour and however much additional time you think you need to review the contents of Exhibit 437. And when we come back, I'd like to walk through and make sure I understand your weighting process and methodology. How much time do you think you need to review these documents so we can determine when to come back?

A I don't know. Let's shoot for an hour. I just have to -- I have to look at these and I have to -- actually I want to call somebody in my office who helped me do this, to make sure I understand it.

MR. KRUMMEN: Sure. It's approximately 12:25 right now. Why don't we come back at 1:45. That will give you an hour and 20 minutes.

THE WITNESS: Okay.

MR. KRUMMEN: Thank you.

(A luncheon recess was taken from 12:25 until 1:57 p.m.)

BY MR. KRUMMEN:

Q Mr. Kenyon, we're back on the record. And

you've produced to me just before the lunch
break your working papers supporting your
Rottlund survey calculations, correct?
A That's true.
Q We've marked those working papers as
Exhibit 437, correct?
A I believe so, yes.
Q Do you have any other working papers related to
your interpretation of the Rottlund survey?
A I don't believe so, except for the actual
surveys themselves.
Q I'd like you to also get in front of you
Exhibit 433, which is your second report,
correct?
A That's true.
Q Your second report, which is marked as
Exhibit 433, is dated April 15 of 2004, correct?
A That's true.
Q Would you turn to page 4 of Exhibit 433, your
second report.
A (Complies.) Yes.
Q Do you see the fourth bullet point on page 4 of
your report that says, quote (as read),
"Rottlund produced surveys (described above)
that indicated that no more than 20 percent of

profits should be allocated to the allegedly
infringing elements"? Did I read that
correctly?
A That's true.
Q Then you go on to say that, "Since then,
additional surveys have been produced which
support this conclusion," correct?
A That's true.
Q Do you have the additional survey results in the
working papers which are marked as Exhibit 437?
A Yes. They're included here.
Q I'm going to ask you, in a pen, to write numbers
1 through however many pages we have on
Exhibit 437 so that we can flip back and forth.
There's no Bates number on that, correct,
Exhibit 437?
A Yes. The only thing I'd like to do is make sure
we've got -- that my package is in the same
sequence as yours.
Q Sure.
A So the very first one I see you have 54, the
first paper clip package in the right upper --
Q I do.
A -- as the count. Okay. Then let me just -- let
me go to the next one, because then I'll -- the

next package?

Q Right.

A Once I have those in order, then we'll go just through and number them together. Let's see, you've got 45 number --

Q I do.

A Okay. And then the next one, the next package, 99?

Q That's right.

A Okay. Now I'll number those.

Q Sure.

(Witness and attorneys numbering the pages at this time.)

A I have 29.

BY MR. KRUMMEN:

Q I do as well. Maybe we should go through the three packets that you've given me. And the first packet of Exhibit 437 starts on page 1, correct? The design count is 54 in the upper left-hand corner on page 1?

A Yes.

Q The second packet starts on page 10, correct, in the upper left-hand corner? Design count is 45?

A Yes.

Q And then the third packet starts on page 28, and

the design count in the upper left-hand corner
is 99, correct?
A Yes.
Q Let's start with the first packet, which is
beginning on page 1, and in the upper left-hand
corner it has the design count of 54. Do you
see that?
A Yes.
Q Is this first packet that starts on page 1 of
Exhibit 437 the basis for the first sentence of
topic 4 on page 4 of your report, which is
marked as Exhibit 433?
A Actually I think it's page 10, the second
packet, now that we've numbered all these. But
I think it's the second packet that has page 10,
19.9 and a P1 at the bottom. I believe this is
the first set of -- of surveys that we received.
Q And then the second set starts on page 1 of
Exhibit 437, correct?
A Yes.
Q Is the second set consistent or inconsistent
with the first set of survey results?
A What do you mean "consistent"?
Q For example, does it still support your
conclusion that no more than 20 percent of the

profits should be allocated to the allegedly
infringing elements?
A The original was 19.9, the second was 20.5, and
then an average between the two is 20.2, and we
just round it to 20. So I believe it -- yeah,
it does. I mean...
Q Your averaging analysis starts on page 28 of
Exhibit 437, correct?
A Yes. It's the combined analysis.
Q Let's start with page 1 of Exhibit 437. And
this would be the second survey series of
results, correct?
A I believe so.
Q I want to get an idea as to how you weighted all
of those. So let's walk through the design line
item at the very top of the page, and we'll
start with the numbers 1, 2, 3, 4, and 5. How
did you choose those numbers, sir? And it goes
through 6, I should add.
A That is the order that the -- at least it was a
reasonable order that looked like the items were
listed on the survey close to that. But, you
know, since they don't -- actually weren't
numbered, this is partially -- we made a
judgment to list them that way.

Basically if you go down the -- go down the survey, it really goes 1, 2, 3, 4, 5, 6 by going down the survey and up, so it's just the order. We try to follow the survey order.
Q Here's where I'm getting a little bit confused. We're starting with the count, correct? And under the number 1, it says there are 54 design responses with a 1, correct?
A Yeah. There's -- I'm sorry. Yeah. You're right. It's a -- 54 of them were ranked 1.
Q 54 of 116 respondents ranked "Design" number one --
A Yes.
Q -- in the Rottlund survey, correct?
A Yes.
Q 28 of 116 Rottlund respondents ranked "Neighborhood" number 1, correct?
A True.
Q 5 of the 116 Rottlund respondents named "Quality" as number 1, correct?
A True. So the same -- it goes all the way down the line for that column.
Q Sure. And let me finish the line and then this will make sense for the next series of questions. But 25 of the 116 Rottlund

respondents ranked "Value" number 1, correct?
A True.
Q And 4 of the 116 respondents ranked "Reputation" as number 1, correct?
A Four, yes.
Q Why don't we have 116 responses for how the Rottlund survey respondents ranked the number two most important item?
A Because this is -- these are the numbers that the customers listed. Some customers didn't list numbers for all of them. Some customers listed 1 for everything. They thought they were all important. So we gave them all 1s. We used the ranking of the customers.
Q And only eight customers actually filled out all six boxes, correct?
A True.
Q What did you do, if anything, to account for the fact that only 8 customers filled out all 6 boxes, whereas 116 customers filled out the number one most important box?
A We dropped off the 6. We just didn't use the number 6. Because the sample size was so small, we just didn't include that in our calculations.
Q Let's go 1 through 5 now. And we've just

established that 116 Rottlund respondents
answered with respect to what the number one
most important thing was to them, correct?
A What they ranked as 1. It was the number they
had in the box.
Q But only 79 of those same 116 respondents ranked
what was the number five most important thing to
them, correct?
A True.
Q What did you do, if anything, to account for the
fact that approximately 37 less people answered
box number 5 as opposed to answered box number 1
out of a total of 116 people?
A We just ranked the number. We believed that
gave us an indication of what people thought was
important or not important. The way we've done
it inasmuch as a significant people --
significant number of people listed "Design" as
first or second, that it would -- if anything,
would provide a conservative result with respect
to the percentage of design -- how important
people thought design was.
So design is weighted very heavily in the
sample. So we decided just to leave it and use
the numbers as the people have completed them in

the forms.

Q Well, "Neighborhood" also has a fair number of number 1s, correct?

A True. Sure. Yeah, location and price. I wouldn't doubt that, yes.

Q 28 people said that the neighborhood was the number one most important thing, correct?

A Yes.

Q And 10 people said that the neighborhood was the number five most important thing, correct?

A That's true.

Q So why are you not overweighting neighborhood with respect to the same kind of analysis you performed for design?

A Well, we decided to use the numbers that the customers listed. And if the customers thought everything was 1 or 1 -- they only cared about the first 2, we used those, because that was an indication to them what they thought was important and the things afterwards weren't important.

So we have used the numbers the way the customer has completed it and did not try to make any sort of arbitrary adjustment to those numbers.

Q But there is an adjustment that's underweighing what the fifth most important thing is, because 37 less customers responded as to number 5, correct?

A No. 30 less customers didn't rank anything as 5. For instance, some people ranked everything as 1. We had -- we had several where they ranked everything as 1. They liked everything 1. So we gave everything a 1 rather than throwing that out.

Some people completed only portions of it, and we've used those amounts because we basically would figure that would be zero. We ranked it zero, didn't matter to them. So it's weighted the way they've listed as zero.

Q What did you do to rule out the possibility that there should be 37 more design responses in your survey?

A That there should be 37 more design responses?

Q That's right.

A I don't understand your question.

Q 116 people filled out the survey, correct?

A No, no, no, no. That isn't -- look across. The number of surveys would go crosswise. Go across. It would be 99 -- it's around 90

surveys, 99, 97, 91. It's about that, because this is the number of surveys that are consistent. I believe it's the number of 1s. More people listed 1 -- certain items as 1 more than once, so you get a larger number there.
Q So there were multiple number 1 responses within the same survey?
A Yeah. They thought everything was -- yeah. Some people thought three things were 1, so we gave all those equal weighting as 1. Design might have been 1, neighborhood 1, so we left it as 1 and weighted as 1.
But if you go off to the right, you'll see that the sample size, although very little, because people didn't always complete the form for all items, they ran around 99. Reputation was apparently not a big issue to people, down to 89. But that's the number -- approximately the number of sample items that we used.
Q What did you do to account for the fact that perhaps multiple people entered neighborhood as the number one most important thing to them along with design?
A Say that again.
Q If you have two number 1 responses by the same

recipient, what did you do to adjust your survey
weight for that fact?
A We weighted them both number 1. We gave --
we -- if they thought both were number 1, they
ended up as a count of number 1. That's why
number 1 -- a number of people ranked more than
one thing number 1, so we've included that as 1.
Q So some people interpreted the survey to say, "I
can rank multiple things as number one most
important to me," but others interpreted the
survey to say, "I can't rank more than one thing
as number one most important to me," correct?
A Well, we didn't interpret that way. We said --
most people ranked it -- other people basically
said, "There are certain things we all thought
were the most important." I gave them all 1s.
I wouldn't rank it. So we've used that number.
Q Let me get at it this way: If there are 99
respondents -- do you see that number 99?
A Yes.
Q Does that mean there are 99 respondents?
A I can't remember. I'm assuming so, but I have
to go back and count up the number.
Q If there are 99 respondents, then some people
must have put multiple number 1s within their

survey response, correct?
A Well, that's true. And they did.
Q And others did not, correct?
A That's true.
Q So your sample pool is interpreting the instructions differently, correct?
A It's not interpretation of the instructions. The sample is trying to weight what people's preferences are. And if they said three things were ranked 1, we've given that weighting to it. We're going to rank it as a 1.
Q So in the end you have 99 respondents and 116 number 1 answers, correct?
A I don't know what our total number of responses are. But I'm assuming the responses are probably close to, you know, 90s, and we have 116 ranked as 1, yes.
Q And you have 90 some respondents--you don't know how many exactly--but only 79 number 5 answers, correct?
A That they ranked anything 5. They would have left it just blank or they ranked it 1, so it didn't end up as 5. They didn't go through 1 through 5.
Q What statistical significance is there, if any,

if you have 116 number 1 responses but only 79 number 5 responses out of the same sample set?
A I'm not aware of it having any statistical significance. What we're doing is we're trying to determine what the ranking priority is of the customers and we're using their numbers to do it.
Q Just sticking with the first set of respondents -- which is summarized in part on page 1 of Exhibit 437, correct?
A The second group, yes.
Q The second set of respondents?
A Yes.
Q What percent receiving ranked by factor is attributable to design?
A Say that question again.
Q Sure. Looking under the number one most important response, what percentage of the population picked design?
A As what? 1?
Q Correct.
A From what we can say here of -- I'm sorry. The question again: Of the population, the percentage that selected design as number 1?
Q That's right.

A Probably 54 percent.
Q So 54 percent of the respondents of the survey, which is summarized on page 1 of Exhibit 437, said that design was the number one most important thing to them, correct?
A I believe so, yes.
Q Given that testimony, how do you reconcile that fact with your conclusion that only 20 percent of the purchase decision was driven by design?
A Because you have to weight the fact -- the other factors. You have to weight all the other factors. Design isn't the only factor, but it was the most important. So what we're trying to do is weight the combination of factors the customer is considering when they make this decision.
Q Why do you feel that weighting is appropriate when you know a healthy majority believes the design is the number one most important thing to them?
A Because they also think location's important, they also think quality is important, they also think value is important, they also think reputation is important, some of them.
Q Did you ask them that?

A I did not ask them that. I did not have access to these individuals. I don't know who they were.

Q So if a respondent filled out design as the number one most important thing to them and they just checked the rest of the boxes because they felt they had to and it had no importance to them, you've done nothing to sanitize your data for that possibility, correct?

MS. NEWMAN: Objection to the form of the question. Incomplete hypothetical. Mischaracterizes testimony. You can answer if you know.

A If the individuals did not put anything down, we gave it no weight. If they just had design was 1 and nothing else, we gave it no weight. If they listed that there's other factors, yes, we gave that weight, because we believe these individuals are affected by the other research we've done by issues such as price, location, quality. It is something that affects their decision. So we're trying to calculate what the weighting is and we're using this -- this data to do that.

BY MR. KRUMMEN: