Exhibit E.4

Q What percentage of the respondents felt the design was either number one, number two, or number three most important out of the six boxes?
A Out of -- out of this group, the top three, something in the range of 90 something -- something over 90 percent.
Q About 93 percent, correct?
A 92. Maybe it's 93. 92.
Q Well, which is it?
A Just a minute.
Q I want to know how you get there, just so that I understand.
A 92.9.
Q So 92.9 percent of the respondents said that design was either number one, number two or number three most important to them as opposed to number four, number five, or number six, correct?
A That's true.
Q What did you do at all with respect to your analysis to reflect the fact that 93 percent of them put design in the top half?
A Again, this is to rank all of the factors that they considered. Design is not the only factor.

Q I'd like to make sure I understand this not only on a macro basis but on a micro basis. Do you still have Exhibit 436 in front of you, which is an example of the --
A Yes, I do.
Q -- Rottlund survey?
A Yes, I do.
Q Could you turn to page 3 of Exhibit 436.
A (Complies.) Yes.
Q Do you see the topic 3, "Rank the reason you purchased a Rottlund Home"?
A Yes.
Q Now, this particular respondent said the number one most important reason was that he or she liked the design/plan, correct?
A That's true.
Q Number 2 was more value for the money, correct?
A That's true.
Q Number 3 is the location/neighborhood, correct?
A That's true.
Q 4 is "Better Quality"?
A Yes.
Q 5 is "Other: Liked the lot," correct?
A I believe so.
Q And 6 is "Reputation," correct?

A That's true.

Q Now I want you to walk me through your methodology and tell me what percent, if you were only analyzing this survey result alone, would you attribute profits allocated to allegedly infringing elements to?

A You can't do it that way.

Q Why not?

A Because you're going to -- you have to look at the overall sample to do that. The way our samples works, the answer would be a hundred percent of the people ranked it 1, a hundred percent of the people ranked it 2, a hundred percent of the people ranked it 3, a hundred percent of the people ranked it 4. I mean, that's by looking at one -- looking at only one, that's the results you'd get.

We use it to weight the total group to determine what the ranking is by looking at all of the -- all of the folks. It's the results with respect to the total population of the items sampled.

Q Let's weight this single respondent. And I understand you can't get me to a percentage, but --

A No. I can't weight it, though. You're asking me to do something I can't do. This methodology isn't geared to do that. It's not based on one. I can't weight one. I have to weight the group.
Q You're reversing points, correct, on page 1 of Exhibit 437?
A I'm reversing points, yes. That's -- I have a section here that does that.
Q That's part of your weighting analysis, correct?
A That's true.
Q Aren't you, in essence, just saying on a micro level, "I'm going to give five points to anyone who picks number 1 as design"?
A Yes. But when it's all done, the results are going to be a hundred percent of the people -- the way we've used it, a hundred percent of the people ranked it 1, a hundred percent of the people who use it, 2.
I mean, we then take it and use it with the factoring, the weighting, to come up with the total population of those -- the sample as to how they ranked these things.
Q At the end of the day, whether it's design or value or reputation or anything else that's

number 1, that gets how many points per response
as a number 1 response?
A It gets five points if it's number 1.
Q How many points does a number 2 response get?
A Four points.
Q How many points does a number 3 response get?
A Three points.
Q How many points does a number 4 response get?
A Two points.
Q How many points does a number 5 response get?
A One point.
Q How many points does a number 6 response get?
A We don't give them any, because they were such a
small group.
Q Who made the determination that a number 1
response was worth five points and a number 6
response was worth zero points?
A I can't remember. I'm sure it was me.
Q What was the basis for your conclusion that a
number 1 response is entitled to five points and
a number 6 response is entitled to zero points?
A Again, this is a methodology which I have used
and has been taught to me as a way of ranking
priorities between individuals, and that's the
way it's done.

Q Do you know the name of this particular methodology?

MS. NEWMAN: Objection. Asked and answered. You may answer it again.

A I don't know what the name is. It was never described to me with a name. I've just been showed how to use it.

BY MR. KRUMMEN:

Q Have you ever read it in a textbook that you can point me to?

A I don't know if it's in a textbook or not.

Q Who taught this methodology to you?

A Who taught it? I don't remember. I have -- it's used by a couple different strategic planners. But I -- you know, I don't know where it originally came from.

Q Why didn't you assign 50 points to the number one most important item, 40 points to the number two most important item, 30 points to number three, 20 points to number two, 10 points to number five and zero to six -- I misspoke. 20 to number four?

A I think if you did that, you'd get the same answers, because you add just a zero on, so all the numbers would be in the same proportion.

Q What if you assigned 50 points to number one but only four points to number two, 3 points to number three, two points to number two and one point to number five? Would you get a different result then?
A Mathematically, sure.
Q So what's the basis for your rationale that these hold in proportion to one another?
A Because this is the way I understand the methodology's performed. I didn't try to bias it any way or the other. This is the way that I've done it before where I've had to do ranking, and I think it's a reasonable approach.
Q If 54.5 percent ranked design as number one most important to them, why is it unfair to say at least 54.5 percent of the purchasers made a decision based on design?
A Because the reality is, the decision is made on more factors than design and that, yes, design appears to be important, but a lot of other factors have to be considered. And it's that that I'm trying to determine, these other factors, which are real factors.
Q If 93 percent of the respondents say that design is either number one, number two or number three

most important to them out of six ranks, why do you believe you're accurate in saying that only 20 percent of them are driven by a design consideration in purchasing a back-to-back townhome?
A Because they may rank it highly, but it's not the only decision factor that they consider.
Q And how do you get from 93 percent ranking it in the top half of the factors survey to only 20 percent being driven to a decision based on design?
A By the weighting of all the factors that are listed in the Rottlund survey, and a small bit of weighting relating to the features, infringing versus noninfringing features, the best we could determine.
Q Now, let's talk infringing versus noninfringing features. What do you mean by that, sir?
A We did a similar weighting of the ranking of the features of question 2.
Q So you're back on Exhibit 436, the example, correct?
A Yep.
Q And on the third page of the survey, the second topic is, "Rank the features you like best about

your Rottlund Home," correct?
A Yes.
Q This particular respondent said that the "Floor Plan" was number 1, correct?
A Yes.
Q This particular respondent then ranked "Kitchen" as number 2, correct?
A Yes.
Q "Use of Space" was number 3, correct?
A Yes.
Q Number 4 is "Quality," correct?
A Yes.
Q Number 5 is "Family Room," correct?
A Yes.
Q Number 6 is "Master Bath," correct?
A Yes.
Q And then the seventh box is "Other," and this person put "Windows," correct?
A Yes.
Q How do you rank the features along with the reason if there are six boxes for reason and seven boxes for features?
A I'm sorry. The question again?
Q You'd concede that the respondents have seven choices when it comes to the features, correct?

A Yeah. We have seven columns. There's a -- page 2 of our analysis is that analysis.
Q So we're going to go to page 2 of Exhibit 437 for this second wave of surveys that you're summarizing, correct?
A Yes. Yes.
Q Now, could you walk me through how a floor plan fits into your overall conclusions?
A This calculation's really very similar to page 1 where we calculate the weighted average of each of these characteristics, which is our -- listed by the customers--it's what they like the best--and from that just try to determine the percentage that would relate to items that would be potentially noninfringing, and basically down below started a hundred percent, assuming all design is infringing, and backing off the percentage that relates to quality as a -- quality is a different issue than the design.
And we also backed off customizing capabilities. We backed off family room. And I can't recollect why we backed off family room. We may have believed at that time it was a noninfringing factor. I just can't remember what we did on that.

Q Why did you consider the family room response to be a noninfringing response but the kitchen response to be an infringing response?
A Yeah. I don't remember. I'm sorry. I just looked at that and I -- I don't -- I can't remember as an example of -- you know, not all of the design is infringing, and it was to identify -- try to identify an item that may not be infringing. And I just cannot remember why that adjustment was made.
Q But by backing out the family room respondents, you lowered the total pool from 100 percent by 10.3 percent, correct?
A That's true, yes.
Q So you don't know why you threw out 10.3 percent of the responses, correct?
A As I sit here now, no, I don't.
Q And you don't know why you threw out the family room responses but kept in the kitchen responses, correct?
A Yeah. I don't -- I don't know.
Q Why are there eight columns on your summary sheet, page 2 of Exhibit 437?
A I think in the later -- this is -- this is the second set of surveys. I think the later

surveys had more questions. I think you'll see the later surveys had more boxes. I think the survey you have is the older version of the survey. I think they added things after that.
Q So there's one additional box in the --
A I believe so.
Q -- earlier wave of surveys, correct?
A Well, later. This is the -- this is the second --
Q The later survey. I misspoke. I'm sorry.
So we're still working through page 2 of Exhibit 437. And 52.4 percent gave a number one most important ranking to the floor plan, correct?
A That's true.
Q 18.3 percent gave the number one most important feature to the use of space, correct?
A That's true.
Q Is it your opinion that use of space is completely unrelated to design?
A I -- I'm not removing it, but I don't -- I mean, it's not being removed, and I don't have an opinion on that.
Q How does the 18.3 percent use of space response rate fit into your overall conclusions on 20

percent being driven by design?
A If you look down just overall to understand what we've done here versus that -- that percentage is just informational, the one we just looked at.
What we do is, we look at -- looked at -- assuming a hundred percent of anything with respect to the features you liked about the home related to design when they answered the design question, we backed off -- tried to back off those things that didn't appear to be related to the infringement.
So we started at a hundred percent and backed off those who looked at quality. We backed off the family room, and we backed off customization. That 72 percent then goes forward to page 1.
Q Why?
A Because we're trying to weight it for the infringing. Again, we're trying to apportion the amount that's infringing. And the weighted average that we had for design was 28.4 percent, and we multiplied by the 72 percent. So take into account that a portion of the people who put down design may be talking about things that

aren't infringing. Yes, we try to adjust for that.

Q Let me make sure I understand what you just told me. On the survey itself, Rottlund is asking customers to rank as topic number 3 whether they like the design or not, correct?

A Just say, "I like the design plan."

Q Now, is that question independent or dependent, in your opinion, on topic number 2, "Rank the features you like best about your Rottlund Home"?

MS NEWMAN: Objection to the form. Foundation. You can answer if you know.

A I don't know if they're independent or dependent. We've assumed they're interrelated. That is is that the features are synonymous with design and that we have to look at design in trying to identify at least the noninfringing portions of the design so that we can again calculate the apportionment.

BY MR. KRUMMEN:

Q What's the basis for your assumption that Features on the Rottlund survey are synonymous with design?

A Well, floor plan, use of space, master bath,

kitchen, and family room all seem to be issues that relate to design plan. They all appear to be windows, you know. These questions appear to relate directly with design plan.
Q But you backed the family room out?
A Yes, we did. But I'm saying --
Q So --
A -- but I'm -- you know, I'm saying I can't remember why, but we did, yes.
Q Well, are you changing your analysis as you sit here today? And what I mean by that is, is the family room synonymous with design or is it not synonymous with design?
MS. NEWMAN: Objection to the form of the question. Lack of foundation. Beyond the scope of this expert's testimony. But you can go ahead and answer if you know.
A I don't know if family room is synonymous -- whatever your word for design. I don't know, but it appears to be a subcategory of design in this questionnaire, at least appeared to us.
BY MR. KRUMMEN:
Q I think you told me features were synonymous with design, according to you. Correct?
A Well --

MS. NEWMAN: Objection to the form of the question. Beyond the scope of this expert's expert opinion. You may answer if you have an opinion.
A I'm only using the definitions. I have no independent knowledge. I'm only using the definitions included on this questionnaire.
BY MR. KRUMMEN:
Q Where do you see a definition that defines features as synonymous with design?
A It appears, in our judgment, when you look at the subcategories under features under 2, that those are design type issues, floor plan, use of space.
Q Let me stop you with floor plan. And I'll hear you out, but I want to know why you think that floor plan is related to design. What's the basis for that opinion?
A Sounds like it to me. I mean, my judgment.
Q You're a damages expert, correct?
A Yes, I'm a damages expert.
Q Why do you know more than the average person about why floor plan is part of design or is not part of design?
MS. NEWMAN: Object to the form of the

question. He never said that. Mischaracterizes his testimony. You can answer if you know.

A I'm telling you what I've assumed.

BY MR. KRUMMEN:

Q And I'm asking for the basis for your assumption.

A I don't think it's an unrealistic assumption.

Q Do you need expertise in damages to make the assumption that floor plan is part of design?

A For the methodology we've used, I have to make some assumptions with respect to apportioning noninfringing and infringing factors with respect to why a consumer buys an alleged infringing home. And to do that, I have to make some assumptions. I'm telling you one of the assumptions that I've made.

Q I'm asking you for the basis of your assumption. Is it based on your expertise as a damages witness? And what I mean by the assumption is, you're assuming that floor plan is part of design.

MR. SCHWIEBERT: Objection. Asked and answered.

MS. NEWMAN: Same objection. You may answer again.

A It appears, based on reading this questionnaire, is that the factors, features they like best about the Rottlund home, relate to design and plan. So we've analyzed those in addition to the reasons you purchased a Rottlund home.

BY MR. KRUMMEN:

Q So quality does or does not relate to design?

A Well, no. We don't believe that relates to design. That's why we backed it out.

Q And what's the basis for backing quality off of your assessment as to whether or not features are related to design?

A Because it appeared to us that this first question was interrelated to question 2, that there's a connection between the two in the -- filling this out.

These schedules are filled out by lay people and I'm looking at it. If I had to fill this thing out, and it's a judgment we made looking at this that these factors appeared to be ones related to design and that we've used as part of our calculation.

Q Your sheet tells me that half of the factors under the "Features" list of Rottlund's survey relate to design, correct?

A Half the --
Q There are six things listed by Rottlund as features on Exhibit 436, item 2, page 3, correct?
A Eight things.
Q Let's look at page 3, topic 2. Are you with me on Exhibit 436?
A Oh, I'm sorry. I didn't know you were there. Okay. Where are we at?
Q We're on Exhibit 436, the Rottlund survey --
A Yes.
Q -- page 3. Are you with me?
A Yes.
Q Now, if you look at item 2, Rottlund lists out six things, correct? A floor plan is one.
A That's true. You don't have to go through them. That's true.
Q All right. So we have six?
A Plus "Other."
Q Plus "Other." But you're not including or excluding "Other," correct?
A I don't remember what we did with "Other." If there was a ranking of "Other," we included it. If there was no ranking of "Other," we didn't.
Q So we have six things that Rottlund specified as

it relates to features, correct?
A Yeah. Under the old survey. The newer survey they appear to add a couple more items.
Q Well, let's work with the six before you on Exhibit 436. Are you with me so far?
A Yes.
Q Because these are the ones that tie to page 2 of Exhibit 437, your working papers.
A No, they don't. That's what I'm trying to point out to you. They don't relate. They're different. It's apples and oranges.
Q Let's go to page 10, then, and page 11.
A (Complies.) Okay.
Q Better yet, let's go to page 29. This is your average, correct? Page 29 of your working papers.
A This is the combination of -- as I believe, the combination of the two surveys.
Q So whatever Exhibit 436 falls into, survey one or survey two, it's part of page 29 of your working papers, correct?
A True. It's part of the first group.
Q Now, we have six things listed by Rottlund on Exhibit 436, correct?
A Yes, plus "Other."

Q For the features, correct?
A Yes.
Q And you're backing out three of the six things that Rottlund names, correct?
A I don't understand. Backing out three of the...
Q Looking at page 29 --
A Again, as far as -- as far as -- as far as backing out, with respect to this, this information, the stuff that's included on Exhibit 436, we're backing out two items. We're backing out quality and we're backing out the family room.
Q So we've --
A Customizing isn't in here. That's a different -- that's only being backed out because that's in the second set of surveys.
Q So let's focus on quality and family room.
A That's true. Okay.
Q Who made the determination that the quality feature has nothing to do with design?
A We did.
Q What was the basis for the determination that quality has nothing to do with design?
A That's a determination we made that it wasn't.
Q Who made the determination that the kitchen was

a feature that dealt with design?
A We did.
Q Who made the determination that the family room was not a feature that dealt with design?
A We did. I just can't remember what the basis was for that one.
Q What's the basis for including the kitchen as part of design and excluding family room as part of design?
A I can't tell you.
Q But by backing out family room, per page 29 of your working papers, which are Exhibit 437, you lowered the features total by 10.1 percent, correct?
A That's true.
Q You can't explain to me where 10 percent of the responses went or what the basis was for backing them out?
A I wish I could. I just can't remember.
Q Why didn't you rank the design issue independent of the features issue?
A I don't understand your question.
Q Why didn't you just stop with your weighting and come up with your percentages based on the design section of the survey alone?

A Which is the design section of the survey? What are you defining as design section?

Q I believe design is listed out in "Rank the reason you purchased a Rottlund Home," topic 3. Correct?

A Oh. Well, I don't consider that design. That's all the reasons that a person purchased a Rottlund home.

Q Why aren't you just analyzing the reasons they purchased the Rottlund home as opposed to trying to combine the ranking of the features with the reasons?

A Because we're trying to determine -- trying to determine apportionment of profits between infringing versus noninfringing, and finding a way of trying to determine what effect the infringing -- not just design but the infringing portion of the design has on the buyer's decision to buy, and eventually profits to be generated by this sale between infringing and noninfringing.

Q On page 28 of your report we can see that if you would have analyzed the design issue alone, you would have concluded that 27.9 percent of the Rottlund respondents said that they bought

because of the design, correct?
A Well, I think you're mischaracterizing. The -- if we just ranked alone the reasons people purchased a Rottlund home and did not try to adjust for the fact that design might be broader than infringing design, then we would have used 27.9 percent.
Q And you drove that number down from 27.9 percent to 20.2 percent, correct?
MR. SCHWIEBERT: Objection to the form of question.
MS. NEWMAN: Same objection. Go ahead.
A We made an adjustment, trying to back out the noninfringing.
BY MR. KRUMMEN:
Q And in backing out noninfringing portions of the design, you concluded that the kitchen was part of the design, but the family room was not part of the design, correct?
A Apparently.
Q And you can't explain to me why that's true?
A No, I can't. I'd have to go back and look at it. I just -- I can't remember why.
Q Can you think of any other way to interpret the Rottlund survey results beyond the way in which

you've interpreted them?
MR. SCHWIEBERT: Objection. Beyond the scope of this expert's report.
MS. NEWMAN: Also to the form as vague and ambiguous. You can answer if you know. Don't speculate.
A I -- I did it the way I thought it should be done. I don't know if there's other ways. This is what I think is a reasonable way of using this information, to attempt to assist the Court with an apportionment between infringing and noninfringing.
BY MR. KRUMMEN:
Q Did you consider any alternative methodologies for interpreting the Rottlund surveys beyond what appears in front of me as Exhibit 437?
A The only alternative was, before we reversed the points, design was at a much lower percentage. And I wanted to make sure we did it -- we did the points to be the most conservative with respect to the apportionment.
So we used the reversed points rather than the original points to -- between the two approaches of allocating points, that we use the most conservative, so the highest apportion of

percentage was used.
Q Well, why would you do it any other way, sir?
A You asked me what else I considered. I'm just telling you we decided not to use that.
Q Well, why would you give the least weight to the number 1 response?
A It is a different way of doing the calculation. It's just a matter of how you weight it. And since we had to come up with a percentage, weighting it the higher number makes more sense. You asked me what I considered. I'm telling you what I considered and I discarded it.
Q Did you consider any alternatives to your methodology beyond giving the number 1 ranking the least amount of points?
A I don't believe so. I don't -- I don't -- I just didn't see any other way of analyzing this information. This seemed to me to be the best way of doing it.
Q When you say to you it's the best way of interpreting the survey, what expertise do you have in interpreting surveys beyond the one survey you were involved with previously in your career?

MS. NEWMAN: Objection. Asked and answered. You can answer that again.
A Well, I mean, I've gone through all that with you. What we're doing here is trying to take empirical data, data that Rottlund has prepared, or at least obtained from its customers, and trying to use that to do an apportionment, which I think has to be done with respect to infringing versus noninfringing elements, and how we should apportion the profits. And I think this is a very reasonable basis to do that with, best information that we could find, and I think it's a reasonable approach.
BY MR. KRUMMEN:
Q Going back to your first report, which is Exhibit 432 --
A (Complies.)
Q -- I see that on page 3 you did an analysis of BSB's profits. Correct?
A Yes.
Q Why?
A Because we were asked to.
Q You state that, "If found liable, the damages assessed against BSB and in favor of Rottlund should be no more than the profits BSB earned

# Deposition Correction Sheet

**TITLE: The Rottlund Company, Inc. d/b/a Rottlund Homes, a Minnesota Corporation vs. Pinnacle Corporation d/b/a Town & Country Homes, an Illinois Corporation, and Town & Country Homes, Inc.**

**WITNESS: JOSEPH D. KENYON – Dated: July 16, 2004**

| PAGE | LINE | DESIRED CHANGE/REASON FOR CHANGE |
|---|---|---|
| 7 | 3 | "damages infringes" should be "damages, infringer's" |
| 7 | 4 | "the" should be "these" |
| 9 | 16 | "fraud" should be "Fraud" |
| 9 | 17 | "examiner" should be "Examiner" |
| 12 | 19 | "an actual" should be "a national" |
| 13 | 8 | "the sample" should be "the book value amounts of the sample" |
| 15 | 25 | "their" should be deleted |
| 17 | 10 | "was involved" should be "was not involved" |
| 17 | 24 | "doing an" should be "dealing with the" |
| 18 | 9 | "it as a methodology" should be "them as part of a methodology" |
| 19 | 15 | "product" should be "element" |
| 46 | 3 | "wasn't" should be "was" |
| 46 | 9 | "back-to-back" should be "back-to-backs" |
| 55 | 10 | "lower costed" should be "lower cost" |
| 57 | 7 | "just" should be "this is just" |
| 71 | 2 | "what" should be "whether" |
| 74 | 10 | "that price" should be "that and price" |
| 76 | 5 | "review." should be "review?" |
| 81 | 12 | "Yeah." should be "Yeah, it's a vague question." |

8/16/04
Date

Signature of Witness

# Deposition Correction Sheet

**TITLE: The Rottlund Company, Inc. d/b/a Rottlund Homes, a Minnesota Corporation vs. Pinnacle Corporation d/b/a Town & Country Homes, an Illinois Corporation, and Town & Country Homes, Inc.**

**WITNESS: JOSEPH D. KENYON – Dated: July 16, 2004**

| PAGE | LINE | DESIRED CHANGE/REASON FOR CHANGE |
|---|---|---|
| 81 | 19 | "I'm saying" should be "What I'm saying," |
| 107 | 14 | ", but --" should be deleted |
| 127 | 14 | "me" should be "them" |
| 159 | 9 | "True." should be "True, although the number of respondents was closer to 99." |
| 163 | 22 | "I" should be "I'd" |
| 167 | 16 | "it" should be "the non-design factors" |
| 174 | 22 | "that" should be "what" |
| 201 | 10 | "and" should be "for" |
| 224 | 22 | "of careful" should be "of being careful" |
| 226 | 4 | "Maybe some" should be "Maybe they could have built some units" |

8/16/04
Date

Signature of Witness