UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION
No.: 01-CV-1980 (DSD/SRN)

---------------------------------------------------

The Rottlund Company, Inc. d/b/a Rottlund Homes, a Minnesota Corporation,

Plaintiff,

vs.

Pinnacle Corporation d/b/a Town & Country Homes, an Illinois Corporation, and Town & Country Homes, Inc., a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc., a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

---------------------------------------------------

Volume I

Deposition of

Albert H. Bloom, A.I.A.

Wednesday, June 9, 2004

8:09 a.m.

00118

Larry Moore to the AIA, correct?

A. Yes.

Q. And he said, "That would be a company decision," correct?

A. Yes.

Q. And then I asked him if he intends to bring up the question at the company level, and he said, "I might," correct?

A. Yes.

Q. Does that give you pause at all in terms of a lack of an endorsement from Jim Grundmeier, his boss, as to whether or not Larry Moore acted ethically in this situation?

MS. NEWMAN: Objection to the form of the question --

MR. FARMER: Objection, beyond his --

MS. NEWMAN: -- mischaracterizes the witness's testimony.

MR. FARMER: Beyond the scope of --

A. I felt that -- no, I felt that Mr. Grundmeier was aware of Larry Moore's concern regarding the potential for a copyright infringement, and I'm assuming that Mr. Grundmeier had reviewed the material that Moore had sent him, and had offered an opinion, verbal or otherwise, to Mr. Moore regarding this. So as far as whether this

00121

yeah. So he is involved from that standpoint.

BY MR. KRUMMEN:

Q. So as of today, if Mr. Grundmeier was to go to the BSB board, he'd be reporting not only Larry Moore but himself, correct?

MR. FARMER: Objection, beyond the scope of this expert's opinion.

A. I really couldn't say.

BY MR. KRUMMEN:

Q. The question is, did Mr. Grundmeier violate the standard of care, as you understand it, when he hasn't taken this to the board's attention yet as to whether or not to report Larry Moore to the AIA?

MR. FARMER: Objection, foundation regarding the standard of care.

MS. NEWMAN: Same objection. Go ahead.

A. Regarding the standard of care? I don't think so. Regarding BSB's individual company policies, I have no idea.

BY MR. KRUMMEN:

Q. Why didn't Jim Grundmeier violate the standard of care in not bringing the Midland documents to the BSB board's attention and soliciting their input as to whether or not it should be reported to the AIA?

MR. FARMER: Objection, beyond the scope.

00244

A. Basically because he is a managing partner, I believe, in the firm.

BY MR. KRUMMEN:

Q. Is it possible that a Bloodgood Sharp Buster employee would have integrity that doesn't match Doug Buster's integrity?

A. It's possible.

Q. Do you believe that Mr. Larry Moore's integrity is up to the standards that you lay out here in terms of Doug Buster's integrity?

MR. FARMER: Objection, lack of foundation, far beyond the scope of his opinion.

MS. NEWMAN: Same objections. You can answer if you know.

A. I really don't know, but based on his testimony, I would say that he acted ethically.

BY MR. KRUMMEN:

Q. What does Doug Buster's integrity have to do with Larry Moore's integrity, if anything?

A. Just by virtue of the fact that Doug Buster is one of the heads of the firm.

Q. And that is relevant for purposes of addressing Mr. Moore's integrity as to why?

MR. FARMER: Objection, calls for a legal conclusion.

00246
process and what he did in the form of drawings and how he communicated with Town & Country.

Q. And beyond the process of designing the Homestead Collection for Town & Country, what did you ask or what did Mr. Larry Moore tell you that related to his integrity?

A. Basically that he had been dealing with Town & Country, he had a set of program criteria he was designing and sending things back and forth to Town & Country in Minnesota to get their opinions and revisions and working back and forth in that -- in that process.

Q. And how does this back-and-forth between Larry Moore and Town & Country relate to Larry Moore's integrity, if at all?

A. Only that he was acting ethically as an architect.

Q. And what's the basis for your opinion that he acted ethically in the back-and-forth exchange of materials with Town & Country in connection with the Homestead Collection project?

A. Just based on my personal experience.

Q. Did you ask Mr. Larry Moore any questions about the process he went through in the Midland Homes design?

A. No, I didn't.

Q. Do you have an opinion one way or another as to

00247

whether or not Larry Moore acted with integrity when he designed the Midland Homes back-to-back product?

MR. FARMER: Objection, beyond the scope of his expert opinion in this case.

A. Yes, based on his testimony, I believe he did act ethically.

BY MR. KRUMMEN:

Q. What in particular did he testify to that led you to believe he acted ethically when Mr. Larry Moore designed the Midland back-to-back product?

A. In looking at the design documents that were provided from BSB's office and his testimony regarding the back-and-forth situation between Midland Homes and himself, I believe that he acted ethically in the design of the Midland Homes project.

Q. Could you give me an example of something that would need to be in the materials of the Midland Homes product design process that would lead you to conclude that someone such as Larry Moore did not act with integrity?

MR. FARMER: Would you read that question back, please?

(Last question read back by Reporter.)

MS. NEWMAN: Objection --

MR. FARMER: Objection.

**H**

United States District Court; S.D. New York.

DELMAN FABRICS INC., Plaintiff,
v.
HOLLAND FABRICS, INC. and MARTIN LEVINE, Defendant.

**No. 84 Civ. 2512-CSH.**

May 17, 1984.

HELFAT AND HELFAT 120 Broadway New York, New York 10271, for plaintiff; Bernard A. Helfat, Esq. of counsel.

FOGEL, SPIEGLER & FEINGERTZ 450 Seventh Avenue New York, New York 10123, for defendants; Martin W. Fogel, Esq. of counsel.

MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

*1 This case is before the Court on plaintiff's motion for preliminary injunction, Fed.R.Civ.P. 65(a), respecting claims of copyright infringement, 17 U.S.C. § 501 et seq. An evidentiary hearing has been held. The following constitutes the Court's findings of fact and conclusions of law.

I.

Plaintiff Delman Fabrics Inc. is a New York corporation engaged in the business of converting greige goods into printed textiles for apparel. Plaintiff's president, Della Reiman, has been in the textile business since 1950. She is a designer of patterns, and has also been employed as a salesperson of textiles to apparel manufacturers.

The corporate defendant, Holland Fabric, Inc., is a competitor of Delman. The individual defendant, Martin Levine, is president of Holland.

Delman holds Copyright Registration No. VA 134-641 in respect of a fabric design entitled 'Sargeant.' The registration is dated September 6, 1983. It recites that Delman is the author of the work; that it was created in 1983; and first published in the United States on August 22, 1983.

A sample of Delman's 'Sargeant' fabric, with notice of copyright printed on the selvage (or border), was received as an exhibit at the hearing (PX 4).

Ms. Reiman testified that she created this distinctive pattern, which makes dramatic use of a chevron design, in June of 1983. Reiman testified further that, following a series of preliminary sketches, an engraving sketch was sent by Delman to Dansk Transfertryk A/S, an engraver in Denmark. Dansk printed some 30,000 yards of the material, returning these quantities to Delman in July and August, 1983. Delman immediately began to market the pattern in the United States. In January 1984, Delman contracted with the Baldauf Mill in Tennessee to print additional quantities of the pattern. About 20,000 yards have been printed by this mill.

Delman has sold this pattern to four principal customers: Cotton City Industries; Leslie Palmer; Case Fashions; and Lady Page. Lesser quantities have been sold to other, smaller clients, and some export shipments have been made to Canada and Australia.

Delman commenced this action for infringement when Reiman learned, in April 1984, that defendant Holland was marketing an identical design.

Levine, in his testimony, does not deny that his corporation is doing so. The case for defendants is that Levine makes a regular series of trips to Europe looking for designs to purchase. Levine testified that Holland currently has about 600 designs in its line; 99% of these are purchased from designers in Europe.

According to Levine, many talented and prolific designers maintain their studios in the Italian city of Como. In April, 1983 Levine was on a European

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

[redacted]

buying trip. He called at a number of studios in Como. One of these was the Avantgard Studio, whose address is Via Rusconi, 10. Such studios display their wares by hanging drawings of designs on the wall. Levine testified that while in the Avantgard Studio in April, he observed and purchased two designs. One of these drawings became DX A at the hearing. The design is identical to Delman's copyrighted 'Sargeant' design. The parties are in agreement that the designs are identical. They also agree that, in the circumstances, the possibility of independent creation simply does not arise. Accordingly, it would appear to follow that somebody copied this design from somebody.

***2** Levine argues that he and the corporate defendant could not have copied a design created by Ms. Reiman in June, 1983 because he had purchased the same design in Italy in April, 1983. In corroboration of that purchase, defendants offered into evidence certain documents.

The first of these, already referred to, is the drawing of the design, DX A. There is a stamp on the back of that exhibit. It reads 'Avantgard disegni per tessuti,' followed by a Como street address and telephone number. Underneath that stamp, someone has written in pencil '17.40.' The '7' has a line drawn through its stem, in the European fashion.

Next, defendant offered a copy of an invoice from Avantgard Studio, DX D. The invoice is on Avantgard Studio letterhead, is dated at Como '11 Aprile 1983,' is addressed to defendant Holland, and is in the amount of $300. That amount is arrived at by the notation 'No. 2 Disegni,' under which phrase two numbers appear, as follows: ' 1740/1963 .' The invoice further recites that the price for each design is $150. At the bottom of the invoice a typed instruction appears, as follows:

> 'IMPORTANT: Please, pay our invoice by: STUDIO AVANTGARD c/o UNION BANK OF SWITZERLAND Corso San Gottardo, 27 6830--CHIASSO--SWITZERLAND'

Underneath this instruction, there is a stamped 'PAID' marking, within which are the handwritten, inked notations: '5/6/85' and '#6440.' Levine testified that the 'PAID' stamp had been affixed by his bookkeeper, who had also written in Holland's check number and its date.

Defendants' position at the hearing was that the penciled '17.40' notation on the back of the drawing, DX A, corresponded to the '1740' reference on the invoice; and that the invoice furnished corroboration that Levine had, in fact, purchased the drawing from Avantgard Studio in Como in April of 1983.

Counsel for plaintiff suggested with vigor that these documents had been fabricated. Counsel suggested that there was no telling when the Avantgard stamp had been placed on the back of the drawing; that anyone could write '17.40' in pencil on the back of the drawing; and that the copy of the purported invoice from Avantgard to Holland could have been manufactured and postdated.

In these circumstances, I thought it best to call for the production of the original invoice, and Holland's cancelled check. Those documents have been furnished by defendants. They may be deemed marked defendants' exhibits C and D on the hearing record.

The original of the invoice fully conforms to the copy.

The cancelled check is on an account maintained by defendant Holland at the Bank of Commerce branch at 462 Seventh Avenue, New York, N.Y. It bears number 6440, is dated May 6, 1983, and is drawn to the order of 'Studio Avantgard.' The check is in the amount of $300. The upper left-hand corner recites that it is delivered for payment for '2 Designs.' The check is signed by defendant Levine. The first endorsement on the back of the check is stamped: 'Pagate all'ordine della UNIONE DI BANCHE SVIZZERE.' A handwritten endorsement follows: '+ Studio Avantgard.' An unknown individual then endorsed the check. The bank stamps indicate that the check cleared through the 'Union Bank of Switzerland, 6830 Chiasso,' on an undisclosed date. It cleared through the Federal Reserve Bank, New York and Citibank, N.A., New York, and was marked 'paid' by the Bank of Commerce all on May 27, 1983.

***3** Levine testified further that he brought the drawing of the design back to New York with him, but did not submit it to an American engraver for reproduction until December, 1983. He explained

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

the delay by saying that he regarded the design as more suitable for a later fashion season. The evidence shows that defendant Holland has ordered a significantly lesser amount of material printed with this design than has plaintiff. Plaintiff has adduced no evidence that defendant is selling the design to plaintiff's own customers at reduced rates. There is no evidence from which I could find that, following the introduction of defendant's fabric into the market, plaintiff's sales declined.

II.

In the present posture of the case, the issue is whether on this record plaintiff is entitled to a preliminary injunction.

In copyright infringement cases involving fabric designs, the Second Circuit has said that '[a]n injunction pending the outcome of trial . . . should issue if plaintiff can show a reasonable probability of prevailing on the merits.' Novelty Textile Mills v. Joan Fabrics Corp., 558 F.2d 1090, 1094 (2d Cir. 1977), quoting Concord Fabrics, Inc. v. Marcus Bros. Textile Corp., 409 F.2d 1315, 1317 (2d Cir. 1969). The Court in Novelty Textile Mills also quoted and followed the statement in American Metropolitan Enterprises of New York, Inc. v. Warner Bros. Records, Inc., 389 F.2d 903, 905 (2d Cir. 1968) that:

> '[a] copyright holder in the ordinary case may be presumed to suffer irreparable harm when his right to the exclusive use of the copyrighted material is invaded.' 558 F.2d at 1094.

In evaluating the reasonable probability of plaintiff's prevailing on the merits, we start with the proposition that '[i]n order to prove infringement a plaintiff must show ownership of a valid copyright and copying by the defendant.' Novelty Textile Mills, supra, at 1092. A party establishes the prima facie validity of its copyright by introducing into evidence the Copyright Office certificate of registration which, if timely obtained, 'constitute[s] prima facie evidence of the validity of the copyright and of the facts stated in the certificate.' 17 U.S.C. § 410(c) (Copyright Act of 1976). But that is not an end to the inquiry on the issue of validity. In Durham Industries, Inc. v. Tomy Corp., 630 F.2d 905, 908 (2d Cir. 1980), the Second Circuit cautioned:

> 'It is clear, however, that a certificate of registration creates no irrebutable presumption of copyright validity. Where other evidence in the record casts doubt on the question, validity will not be assumed.'

The key issue on validity of copyright is whether or not the work was original with the copyright holder. That is so because 'the element of originality . . . is necessary to support a valid copyright,' Durham Industries, Inc., at 908- 09.

The ebb and flow of the burden of proof in such cases was usefully summarized in Original Appalachian Art Works v. Toy Loft, 489 F.Supp. 174, 179 (N.D.Ga. 1980), aff'd, 684 F.2d 821 (11th Cir. 1982):

> *4 'Procedurally, then, the plaintiff has the burden of proving the validity of his copyright; by obtaining a copyright certificate the plaintiff is entitled to a prima facie presumption of copyright validity (and the burden shifts to the defendant to prove lack of originality); upon proof by the defendant of the plaintiff's access to similar prior works, the burden of proving originality shifts back to the plaintiff. See M.M. Business Forms Corp. v. Uarco, Inc., 347 F.Supp. 419, 425 (S.D.Ohio 1972) aff'd, 472 F.2d 1137 (6th Cir. 1973). Once the plaintiff has established the validity of his copyright, he can prove infringement by showing that the person who composed the defendant's work had access to the copyrighted work and that the defendant's work is substantially similar to the plaintiff's.'

In the case at bar, defendants' access to plaintiff's design is apparent, plaintiff having begun marketing its fabric in August, 1983. And, as noted, defendants concede that the designs are identical. The controlling issue is that of originality.

On that issue, the defendants have offered proof not so much of the plaintiff's 'access to similar prior works,' as of defendants' purchase of an identical work several months before plaintiff claims to have created the design in question. But defendants' proof, if ultimately accepted, would be equally fatal to plaintiff's claim of originality. I hold that defendants' proof is sufficient to shift the burden of proving originality back upon the plaintiff.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

I must reach that conclusion unless I am prepared to disregard all of the defendants' documentary evidence as fabricated; or I am persuaded that the documents, even if genuine, do not prove what defendants say they prove.

As to the genuineness of the Avantgard Studio invoice of April 11, 1983 and defendant Holland's check in payment thereof, no ground for suspicion arises. I have described in detail stigmata appearing on these documents. The bank endorsements on the check--writings which lay entirely outside the control of the defendants--prove beyond peradventure of doubt that on May 6, 1983, defendant Levine wrote a corporation check to the order of Avantgard Studio, in the amount of $300, for '2 Designs.' Nor is three reason to doubt that the check was in payment of the Avantgard Studio invoice of April 11, 1983. The check found its way through the banking system in accordance with the specific instructions printed on the invoice; and the timing is right.

I therefore conclude that, in all likelihood, in April of 1983 Levine purchased two designs from Avantgard Studio, and paid for those purchases by means of the check in evidence. Furthermore, I conclude, at least on the present state of the record, that this was a legitimate purchase, not engineered for the purpose of laying down a smoke screen over defendants' prior copying of plaintiff's original work. I reach that conclusion because Ms. Reiman does not claim to have created the 'Sargeant' design until June of 1983.

***5** It does not necessarily follow from all this that the drawing of the design in question, DX A, was in fact one of the two designs which Levine purchased from Avantgard in April, 1983. Defendants say that proposition is proved by the number '1740' which appears on the invoice, and is echoed by the penciled notation '17.40' (written in the European fashion) on the back of the drawing, appearing underneath an Avantgard stamp. Plaintiff responds that anyone can wield a stamp and write with a pencil, and the back of the drawing contains no independent indication of when or where or by whom these particular stigmata were affixed. All that may be conceded. But plaintiff is still left to argue that defendants retained documents of a prior, legitimate transaction in order to conceal a subsequent infringement, not even in contemplation when the original documents were generated. The scheme, in plaintiff's contemplation, must run something like this. Defendant Levine observes plaintiff's design some time in August or September 1983, after plaintiff first markets it in the United States. Levine admires the design. He copies it. To disguise the copying, he searches through his files, comes up with the Avantgard Studio invoice reflecting purchase of design '1740' the preceding April and the check in payment of that invoice, writes '17.40' on the back of his infringing copy to make it appear as if that design was covered by the invoice, and then stamps 'Avantgard' on the back of the infringing copy. If it be said that the stamp and the penciled notation were affixed in Como, plaintiff would presumably respond that Avantgard, valuing Levine's custom, acted as a willing co-conspirator and assisted in the fabrication of documents.

All this is possible. But is it likely? More specifically, does it translate into that 'reasonable probability of prevailing on the merits' which plaintiff must show to obtain a preliminary injunction? I hold that it does not.

That is not to say that other mysteries do not exist on the present state of the record. As the Court observed in Original Appalachian Art Works, supra, a traditional way for a defendant to attack the validity of plaintiff's copyright is to offer proof 'of the plaintiff's access to similar prior works.' There is no such proof on the present record. Counsel for defendants argued in summation that Ms. Reiman could have seen advertisements of this design in trade publications. On the present record, the argument is pure speculation. But it is early on. Such proof may be adduced when opportunity for full inquiry and discovery is given. Similarly, further proof focusing upon Avantgard Studio may serve to corroborate or to undermine the present posture of the defendants.

I have considered the other proof offered by plaintiff. Ms. Reiman produced a letter dated April 27, 1984 from the sales manager of the Danish engraver. PX 1. Reiman, in preparation for this litigation, telephoned Denmark and asked the engraver to corroborate her account of events. I received the letter in evidence over hearsay

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

objections because the exigencies of a preliminary injunction hearing permit some relaxation of the rules of evidence. But the letter, while reflecting that the engraver did the work plaintiff contends it did, is not probative on the issue of originality. The letter recites that the engraver worked 'from original artwork supplied by Delman Fabrics.' All this can be taken to show is that plaintiff sent artwork to the engraver. The engraver is not in a position to know whether that artwork was plaintiff's original creation.

*6 Peter Layton, plaintiff's sales manager, testified that he first saw the 'Sargeant' design in plaintiff's offices just before the design was sent to Denmark for engraving. But what Layton saw was a final drawing; he had not actually been 'present at the creation' in the sense of observing Reiman performing preliminary sketches. This is not surprising, since Reiman testified and I accept that she does most of her creative work at home. But Layton's testimony falls short of proving originality.

Counsel in summation argued at some length as to whether or not the drawing, DX A, would have survived in its present, relatively pristine form if it had been used for engraving purposes. The question arises because Levine testified that, in December 1983, he sent that drawing to his own engraver for processing of material. Counsel for plaintiff argued that the engraving process would have substantially altered the appearance and condition of the drawing. Counsel for defendant said that was not so. I disregard both arguments, because counsel cannot testify. I do note, however, that plaintiff's witness Layton, an engraver himself and former general manager of the Baldouf Mill in Tennessee, was not asked to testify on the point.

As noted, further inquiry may flesh out the proof on pertinent issues. But I conclude that on the controlling issue of originality, the plaintiff has not on the present record demonstrated that requisite probability of prevailing on the merits to sustain a preliminary injunction.

I am reinforced in that conclusion by the total absence, again on the present record, of any specific economic harm suffered by plaintiff as a result of defendant Holland's sales of the fabric. Of course, where specific damage is shown, the case is quite different. In Novelty Textile Mills, supra, the Court stated at 1094:

> 'Here there is not even a need for a presumption of harm because the undisputed evidence shows that after the introduction of Joan's fabrics into the marker, Novelty's sales declined by $11,000 a week. Consequently, we think that more than a sufficient showing has been made to require the issuance of a preliminary injunction.'

In the case at bar, the element of economic harm is present only through presumption; and it is true, as the Second Circuit stated in American Metropolitan Enterprises of New York, Inc., supra, that a copyright holder 'in the ordinary case' may be presumed to suffer irreparable harm as the result of infringement. However, I interpret that phrase to mean that the presumption of harm may be rebutted if the case is not 'ordinary'; and in the case at bar, the evidence to date tends to show that plaintiff and defendant sell to entirely different customers, with plaintiff's sales not having been directly affected by defendants' activities. Cf. Russ Berrie & Co. v. Jerry Elsner Co., Inc., 482 F.Supp. 980, 987 (S.D.N.Y. 1980). Again, further inquiry may change this picture. But plaintiff has rested its case on the application for preliminary injunction, and I must take the record as I find it.

*7 Plaintiff stresses that defendant Levine and others of his corporation have been branded as copyright infringers with some frequency in the past. This is perfectly true. In Lauratex Textile Corp. v. Allton Knitting Mills Inc. and Levine, Dkt. No. 80 Civ. 1101 (MEL) (S.D.N.Y., decided May 15, 1981), Judge Lasker was moved to say that '[t]he inference is inescapable that Levine has made a practice of copying the designs of other converters, and that an award of statutory damages is appropriate as a deterrent to further activity of this kind.' Slip op. at 5. Judge Lasker awarded the plaintiff in Lauratex attorneys' fees, because defendants' copying was 'willful,' and 'constituted a continuation of Levine's business practice over at least five years.' Id. at 7. But I must be wary of drawing inferences from this past record of infringement in order to fill in the gaps in the proof of the case at bar. Rule 404(a), F.R.Evid., specifically provides:

> 'Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

particular occasion . . .'

More specifically, Rule 404(b) provides:

'Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'

In the case at bar, plaintiff's references to earlier, discrete infringements by Levine fall within the prohibition stated in the first sentence of Rule 404(b). They are not, in my judgment, embraced by the description of legitimate evidentiary purposes set forth in the second sentence of the Rule, as that provision has been construed by Second Circuit authority.

It is also worth observing that in Lauratex, supra, Levine refused to testify at trial, and Judge Lasker regarded his excuse for failure to do so as 'a pretense,' thereupon drawing 'a negative inference from his failure to testify.' Slip op. at 5. In the case at bar, Levine testified under oath, and furnished documents which tend to support his version of events.

If plaintiff ultimately prevails on the merits, I may properly consider Levine's past transgressions on the issue of statutory damages. But I do not consider them on the issue of liability.

III.

For the foregoing reasons, I decline to enter a preliminary injunction in this case.

A scheduling order which will govern the further conduct of the litigation is being entered concurrently.

It is SO ORDERED.

1984 WL 367 (S.D.N.Y.), 1984 Copr.L.Dec. P 25,663

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,
Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF ANTHONY S. DESNICK
VOLUME I, Pages 1 - 218

(The following is the deposition of ANTHONEY S. DESNICK, taken pursuant to Notice of Taking Deposition, at the offices of Fredrikson & Byron, 4000 Pillsbury Center, 200 South Sixth Street, in the city of Minneapolis, state of Minnesota, commencing at approximately 9:11 o'clock a.m., June 23, 2004.)

[redacted] COPY

10:43:56 Homes are similar to the Rottlund product.
10:43:58 Q. But you haven't done any in depth analysis of
10:44:03 the two products, have you?
10:44:06 A. Right next to one another, no. Jerry's Homes
10:44:08 and Rottlund villa next to one another? No, I have
10:44:10 not.
10:44:12 Q. So you are not prepared to offer any opinions
10:44:12 about whether or not the Jerry's Homes project, by
10:44:16 way of side-by-side comparison to the villa product,
10:44:19 are substantially similar; isn't that right?
10:44:22 A. That's right.
10:44:22 Q. And you haven't included any such analysis in
10:44:25 any of the reports that you have issued; isn't that
10:44:25 correct?
10:44:27 A. Correct.
10:44:30 Q. You base any conclusions related to Jerry's
10:44:35 Homes solely on the fact you believe there is a
10:44:36 relationship between Midland and Jerry's; correct?
10:44:40 A. That's correct.
10:44:59 Q. Are there any items in the Villa II product that
10:45:04 you believe are standard features?
10:45:10 A. I was never asked to opine as to whether or not
10:45:13 any of the elements in any of these projects were
10:45:16 standard features. I'm not even sure how you would
10:45:21 define standard features, because I've never in my

14:39:28 Good Value. And it was interesting to me that when
14:39:30 we looked back at Midland Homes and Jerry's Homes we
14:39:34 found one case materials in the file and the other
14:39:36 case the direct evidence of copying, we saw a
14:39:38 pasted-up copy of a Rottlund floor plan with their
14:39:41 title block removed from it in the file.
14:39:43 Q. Did you compare the Meredith Pointe villas to
14:39:47 the Midland BSB product?
14:39:49 A. I didn't, I didn't make that comparison.
14:39:52 Q. Again if there is direct copying, don't you
14:39:53 think they would be at least similar?
14:39:56 A. I was asked -- I wasn't asked to look at that
14:40:01 aspect of it at all. I was really asked to look at
14:40:03 how Midland, Good Value and Jerry's Homes were used
14:40:08 as source material for Homestead.
14:40:11 Q. Did you compare the Meredith Villa Pointe to the
14:40:14 Homestead?
14:40:16 A. You have to refresh my memory what Meredith at
14:40:20 Villa Pointe was.
14:40:20 Q. It's evidently the material you are referring to
14:40:23 in the Midland file.
14:40:24 A. Midland files, okay. To Homestead, no.
14:40:28 Q. Did you compare it to Chateau?
14:40:30 A. I didn't compare it to Chateau.
14:40:32 Q. Washington Square?

**Midland Homes, Inc. 11/2/94 Greystone T.H. v. New Villas A/B**

These two townhomes are not substantially similar. The following are some examples of the differences between the two townhomes.

**<u>End Unit B v. End Unit A</u>**

<u>First Floor</u>

The shape of the footprint is different with the Midland living room offset as opposed to a straight end wall in New Villa. The stair direction in these two plans are 90° from each other, creating a totally different feel to the space. The kitchen sink in Midland has a sight line to the sliding glass door which will visually expand the space, as opposed to New Villa's kitchen sink which faces a wall. Powder rooms are a different shape and size and Midland has a desk area adjacent to the garage access.

<u>Second Floor</u>

The Midland master is larger than the New Villa, and positioned over the garage as opposed to over the dining area. The landing and hallway in Midland will feel totally different than New Villa because of the angled direction from the head of the stair and the enclosure of walls. New Villa has a loft space which overlooks the open living area visually expanding the stair opening and the second floor, while Midland does not have a loft space. The perception of the volume living space will be totally different because Midland's stair is going up in the same direction as the volume ceiling in the living room, and New Villa's stair is going up at a right angle to the

direction of the volume and is not inside the volume space but under the second floor. The Midland second bedroom has a different shape and will have a different feel due to the length of the angled wall. Midland's bathroom has the tub and water closet in a separate compartment.

**Interior Unit A v. Interior Unit B**

First Floor

The stair location in Midland runs front to back adjacent to the garage, which is totally different from New Villa, which runs side to side adjacent to the rear wall. The kitchen layouts will feel totally different with New Villa's having a sight line to the front windows while Midland's looks into a wall. The Midland garage access enters into a small hallway while New Villa's enters directly into the kitchen. There is a mechanical room in New Villa while Midland has a closet for the furnace and water heater. The fireplace locations are on opposite sides of the living area and Midland has an open 2 sided fireplace as opposed to a front open fireplace.

Second Floor

The Midland master is much smaller than the New Villa's due to the stair location. Midland's master closet will feel much larger than New Villa's. Midland's bath has a separate compartment for the tub and water closet and a laundry area adjacent to the bath.

**Exterior**

The roof massing and use of materials on the side elevations will have a different feel because of New Villa's cantilevered bedrooms, use of a high brick wainscot, projected chimney chases,

steeper roof pitch and flat first floor footprint at the side wall. The front elevations are similar and like other back to back townhouses, but New Villa will feel bigger due to the steeper roof pitches for both the front to back shed roofs and the side to side gable roofs. New Villa also uses more brick accent material and has fireplace chases projecting through the roof as well as on the sides.

These two projects are similar only because they are back-to-back products. While the zoning of first floor spaces are in the same location, the stairs and entry sequences will feel different, and generate different second floors. As with the Homestead Collection, BSB went through the typical design process (as described in my initial disclosure) when creating the back to back townhome for Midland Homes. The progress of the design, receipt of comments from the builder, and revisions to the drawings are what one would expect in a case of independent creation. It is my opinion that BSB independently created this back to back townhome. As I indicated in my initial disclosure, it is common for builders to send their residential architects marketing materials from those builders' competitors. The receipt of these marketing materials is not evidence of copying, or an intent to copy. The fact that BSB, or its clients, have communicated ideas to each other, or to third parties, using these marketing materials has no bearing on the ethics of BSB or its architects. This practice is common among residential architects.