TIMOTHY WHITTEN, PLAINTIFFS' WITNESS, SWORN

DIRECT EXAMINATION

BY MS. BARNHILL:

Q. Mr. Whitten, would you please state your name for the record?

A. Timothy Mark Whitten.

Q. And what is your occupation?

A. Vice president of architecture to the Rottlund Company and registered architect.

Q. Would you tell us about your education?

A. I graduated from the University of Minnesota with a bachelors of architecture and bachelors of environmental design.

Q. Have you had any additional training since your formal education?

A. I passed the required architectural test to become registered. I'm an AIA member, and I'm also a member of the National Council of Architectural Review Boards.

Q. And what is AIA?

A. American Institute of Architects.

Q. Are you licensed in Minnesota?

A. Yes.

Q. Where else are you licensed?

A. Iowa, Wisconsin, Indiana, Illinois, Florida, and Maryland.

Q. What does it mean to be a registered architect?

[redacted]

TIMOTHY WHITTEN, PLAINTIFFS' WITNESS, SWORN

DIRECT EXAMINATION

BY MS. BARNHILL:

Q. Mr. Whitten, would you please state your name for the record?

A. Timothy Mark Whitten.

Q. And what is your occupation?

A. Vice president of architecture to the Rottlund Company and registered architect.

Q. Would you tell us about your education?

A. I graduated from the University of Minnesota with a bachelors of architecture and bachelors of environmental design.

Q. Have you had any additional training since your formal education?

A. I passed the required architectural test to become registered. I'm an AIA member, and I'm also a member of the National Council of Architectural Review Boards.

Q. And what is AIA?

A. American Institute of Architects.

Q. Are you licensed in Minnesota?

A. Yes.

Q. Where else are you licensed?

A. Iowa, Wisconsin, Indiana, Illinois, Florida, and Maryland.

Q. What does it mean to be a registered architect?

[redacted]

A. That you have the right to design buildings that are of a certain size in a particular state. Each state is a little bit different.
Q. Where do you work now?
A. In Minneapolis for the Rottlund Company.
Q. How long have you worked there?
A. Almost five years.
Q. What did you do before that?
A. I had a consulting firm. I was president of a consulting firm that was architectural and development consulting. Prior to that I was a partner in an architectural firm HRMA in Minneapolis. Prior to that I was a partner with Architectural Forum, also in Minneapolis.
Q. So you've had a lot of experience working as an architect.
A. I'm sorry. I couldn't hear you.
Q. So you have a lot of experience working as an architect in a private practice.
A. Correct.
Q. Did you design the Rottlund villa product?
A. Yes.
Q. What can you tell us about that design derivation? How did you go about designing the product? How did this come about?
A. Well, the president at that time was-- The president of Rottlund Company was Bud Routter, and he approached me and our firm of Architectural Forum with a concept to address the

market of singles, specifically single women, that was not being met in the Twin Cities.

So we needed an affordable product that matched that market and that produced a certain density to be able to offset the cost of the land at that time. And so we worked together on developing the product at that time, and that was approximately eleven years ago.

Q. You independently created the villa product?

A. Correct.

Q. What does the density-- How does this villa product solve density problems differently?

A. The fact that it's a back-to-back design as opposed to the more traditional, conventional townhome of row-type design where they align side by side. This is side by side and also back to back. It also had a unique combination of two-car and single-car garages, which allowed us to address a range of prices and size of units to address the markets that we saw.

Q. How did the arrangement of garages do that?

A. In the fact that the-- We had a combination of two-car and single-car. The single-car garages were associated with the smaller units so we could keep the prices down. They would be more affordable. And the end units were a larger unit and a preferred position on the site plan, and so those were larger units with two-car garages.

Q. What other rationales were incorporated into your plans?

A. Well, the fact that we decided to go slab on grade was an issue of being affordable. Two-story was an issue of affordability and density. To address the issue of two-car--I'm sorry, two-bedroom units was also an issue addressing the market. The size of the units and how we basically arrange those units, we all took in effect the arrangements of the garage to the units to address the driveway depths to be able to increase our density.

Q. All right. Let's go back and do these one at a time. What about the size of the units is different, or how did that come about?

A. Well, we were trying to be efficient as far as the construction costs and the amount of land that the product used up. So, for example, on the interior unit of two-car, we kept it as narrow as we could to be able to increase our density. We took advantage of the upper floor and having that expand over the garage to be able to lessen the cost of the average square footage of the units.

Q. Okay. What about this slab-on-grade issue?

A. That allowed us to save costs as opposed to putting in a full basement or a crawl space.

Q. How about the arrangement?

A. We found an efficiency in the eight-unit building in the fact that it gave us a balance of two-car garages with single-car garages, and it also maximized our density as

opposed to our arrangement opportunities that were afforded to us. In time we created additional building sizes, combinations of units, but that was our initial building.
Q. And what is this issue about addressing the driveway?
A. About what?
Q. You mentioned something about the driveway.
A. Yeah.
Q. How configurations affected the driveway.
A. Yeah, we wanted to have the garages project out to be able--to be farther out than the house, which would allow us to minimize the length of the driveway to then be able to offer some private space to those interior units.
Q. Would you say that the--that your two-story villa townhome product has a distinctive look and feel?
A. Yes.
Q. Do you feel that it's distinguishable from other designs?
A. Yes.
Q. And you copyrighted it on that basis; correct?
A. Yes.
Q. Let's take a look at these exhibits starting with Exhibit No. 14. If you would like, I think it would probably be helpful if you stood up.
A. Okay. Would it be possible that if I started a different sequence than maybe you're suggesting?
Q. Absolutely. I want you to show me what you see on these

plans-- Start in the order you would prefer.
A. Okay. And I can move around?
Q. It would probably make more sense to you the way you thought through the plans to analyze it the way you designed them.
A. Very good.
Q. Just tell us what you're on.
A. I'd say that this is probably the most important exhibit in my mind. It's kind of a starting point of a design.
Q. That would be Exhibit 15 you're referring to?
A. Excuse me. Yeah, this is Exhibit 16.
Q. 16. All right.
A. In that it kind of determines the arrangement of the units in the relationship of the garages to the main level of the units.
Q. This is the foundation plan?
A. It is. But it's the best exhibit as far as the arrangement of the units. The other ones specifically are to unit-to-unit plans, so I'm using this one as the best example.
Q. All right.
A. We specifically arranged the units and the garages in such a way that we exposed the outside of the building to maximize the kind of courtyard experience here and then to do the two-car garages on the ends because we're going with the larger units on the ends and the single-car garages on the interior to

minimize these. So these were more of our price-sensitive units within the development. And we combined these two together architecturally for the look.

When we got into the elevations, the look was stronger, and it created more privacy for these two courtyards for these particular units as opposed to putting them next to each other. What I've kind of done is-- If I can be free to kind of look at the bigger picture of it, I'm kind of focusing on the common elements between the two products and the items that are kind of understood. And none are unique in themselves as a single line item, but when you bring them into combination with each other, it becomes more unique.

Q. Are those what you would refer to as standard features?

A. No. That's more detailed into the interior of the plan. I'm really kind of starting with the outside, and I'll work in. And as the project--product gets more detailed and it gets more finished, then it becomes a little more different from each other.

Q. Okay. What are these things you're referring to that are common--

A. The common--

Q. --in and of themselves?

A. The common elements are kind of understood and again not unique in the fact that they're back to back, that they're slab on grade, and that they're all two-story as opposed to being,

you know, just the back-to-back. It's understood that's what we're dealing with. There's nothing unique about back-to-back. There are many cases of back-to-back products out there.

Slab on grade is unique. In fact, there could be a basement. There could be a slab on-- I'm sorry. It could be a basement, or it could be a crawl space. Two-story could be a story and a half, or it could be a one-level. Those are all common between the two products. What happened in the garage arrangement is that you have a two-car garage on the end units that are towards the interior units-- This is falling down.

It's the arrangement of the garages. It's the fact that there's two-car garages on the end units and single-car garages on the interior units, the position of the garages and the fact that it's on the inside adjacent to this unit and these are side by side to each other. And also the arrangement of the entrances, the entrances in each case in these products are located in exactly the same location. These entrances and these entrances are the same. These entrances and these entrances are the same.

And I just kind of took the liberty of doing a combination of potential combinations, and that is that in just taking the two-car garages on the outside and the single-car garages on the inside, there's the combination of this garage could be in this position or in this position, and this garage could either be in this position or in this position. And so

there are four combinations of that arrangement. It could also be that the two-car garages are on the inside, the single-car garages are all on the outside. There's also the combination that they could all be two-car garages. There's also the combination that they could all be single-car garages.

All of these are kind of available in designing a two-story, back-to-back, slab-on-grade townhome in an eight-unit building configuration. You take the fact that the entrances are in the same location, here and here and here and here, when in fact--and we've done this ourselves--the entrance could be on the end. The entrance could also be on the side, and the entrance could also be moved over here in this particular case.

You add those combinations to each other, and there's virtually I think, if I calculated it right, 480 different--I'm sorry. There's 96 different combinations that are available as far as arranging those garages and those entries together when in fact in this case they're both the same.

When you add to that the fact that there is two-story as opposed to story-and-a-half or one-story, that's three additional combinations that could happen in this particular case. The fact that it could be a slab on grade, basement, or crawl space, in this particular case these are both slab on grade. You multiply that together, that's 480 different combinations of putting these buildings together when in fact

these two are the same.

And to me what I look at too is the fact that the square footages are almost identical, the fact that the-- I can't remember which unit is which, but they're within 1 and 5 percent of each other. The fact that they're two-bedroom units, that they go over the garage, and that the end units have an option for a loft, that's common to both. I couldn't calculate the different combinations of square footages and so forth to add to that 480, but those are the kinds of things that I've seen.

And the rarity of two people developing products and coming back to the same product with all those different combinations available to them-- And I haven't even mentioned the potential of asymmetry, you know, the fact that the garages don't necessarily have to be balanced with each other. That was an option in design. That in this particular case was not explored. Those are the things that I see that really stand out as far as the common elements of design. Getting into the elevations, the position--

Q. Can we get that picture up? You can flip it over.

THE COURT: Counsel, there's never a convenient time to break, but it's right at 12, and if he is going to go into the elevation now, maybe rather than interrupt him in the middle of that, now would be the best time to take our noon recess. Can you give me an idea how we're coming for time? I

know you said you had two long witnesses.

MS. BARNHILL: He's my second long witness.

THE COURT: Right.

MS. BARNHILL: I have two more real short witnesses.

THE COURT: Okay. And then, Mr. Goodman, how many does the defendant have?

MR. GOODMAN: Your Honor, we have-- With the stipulation, which would eliminate at least one witness, we have about two hours of direct testimony.

THE COURT: Okay. How about taking our recess till 1:15? That hopefully will give you time to get lunch, and we'll get started again at 1:15. Is that agreeable?

MR. GOODMAN: That's fine. Thank you.

THE COURT: We'll stand in recess.

(Recess from 12:00 p.m., until 1:15 p.m.)

AFTERNOON SESSION (1:15 p.m.)

THE COURT: Be seated. We're going to continue with--

MS. BARNHILL: Mr. Whitten, Your Honor.

THE COURT: --Plaintiffs' witness?

MS. BARNHILL: Yes.

THE COURT: We're ready to talk about elevations; right?

THE WITNESS: Am I just to go right back to the--

MS. BARNHILL: Yeah, go right ahead.

THE COURT: And I think, Counsel, this saved some time. You don't have any objection to him more or less responding in the way he's doing rather than question and answer, do you?

MR. GOODMAN: No. And, Your Honor, our witnesses, most of them we're going to have a photographic walk-through that's going to be brief, and I think it's going to be fairly quick because of that, so--

THE COURT: Okay. That's fine.

MR. GOODMAN: We'll just wind them up, and they'll take off. And I agree the same thing is true of Mr. Whitten.

THE COURT: So wherever you were at, you can continue. Okay?

DIRECT EXAMINATION (Resumed)

BY MS. BARNHILL:

Q. Before we broke, I'd like to back up, because you testified that you had calculated there were 480 combinations of elements. How did you arrive at this?

A. Am I free to move about?

Q. Yeah, please.

A. I think maybe it might be easier if I was able to just kind of draw it graphically real quick.

THE COURT: You may.

THE WITNESS: Being an architect, drawing's a little more easy for me.

BY MS. BARNHILL:

Q. Do you need some help getting it on the easel?

A. I don't know if I can get this. I failed the last time.

Q. Okay. Show us what you mean by that.

A. Okay. In the-- And I apologize, gentlemen, for turning my back to you. We've got a-- I'm using an eight-unit building as an example. We've got an eight-unit building configuration that's like this, and it's back to back, and I'm just using that as kind of an example, and I'm just really using this area right here as kind of a study area.

If I just took this-- And our villas are situated where we have the two-car garage sitting in this location and a single-car garage sitting in this location and then another

two-car garage sitting in this location for Unit A, B, B, A. And just taking one portion of this, just saying that we've got how many different combinations of garages, again, I'm just focusing on this area right here, I've got-- I've got four units like this.

I could take the garages and slide them over to the ends over here, take the garage of this one and slide it over to the end, and then keep these two in the same location. You could take and you could divide this up into four units again, and I could slide this over here, again in that location, and then split these apart like this and like this. And then I could take that four-unit cluster again, and I could leave this over here and leave this one over here and then split these apart and put them over here. So I really have four different combinations.

And with that I've got one group of four, which is two-car on the outside, which I'll say is the A Unit, and I've got a B Unit here, and I've got a single-car. That's one combination. And two is that there is a two-car here and two-car again, and the third combination is one-car and one-car. And the fourth combination-- What am I missing here? I've got this as a one-car garage and this is a two-car. So with this-- And any one of these can be arranged in this order. So there's actually 16 different combinations in that group.

And then I really just took the entries-- And I'll focus on just one element like this. We'll take the one that we have right now in our villas, which the garage is sitting here and here. Then the B Unit I could have the entry here adjacent to the garage; I could have the entry here. And in the A Unit I could have the entry here; I could have the entry here; or I could have the entry here, which we've done in the course of developing plans across the country any one of these combinations ourselves.

And so I picked this as one, two combinations, and this is one, two, or three combinations. And you multiply these, 2 times this, and that's 6. And 6 times 16 equals 96 different combinations within arrangements of garages and entries. And then I take that and just go the common element of the fact that you have an option of two-story, one-and-a-half-story, or one-level plans. That's an additional three. And then the opportunity of doing slab on grade, basement, or crawl space, that's an additional three. And actually I miscalculated the last time, and that actually adds up to 684 different combinations of any of those things mixed together.

Those are the odds that those are all the different kinds of choices where we've got two builders in Iowa that are building exactly the same models, and I haven't even factored in the issue the fact that there's bedrooms over the garage,

which is somewhat unique to build over the garage, that there's shed roofs over the entries and the garage, which is a pretty hard thing to calculate because of all the different things, different combinations.

The fact is, the square footage of the units, this being smaller, this being larger, this common to both building types, that they're within 1 to 5 percent of each other, and that there are two-bedroom plans except there's an option for a loft in the A units, which is common to both. Again, I can't start multiplying the 684 times those because there's an endless number of combinations, so that's kind of how I came up with the calculation.

Then we were going to kind of move to the elevations, which I kind of of-- My feeling is there are some differences of splitting windows apart and so forth. You see the shed roofs are basically in the same location. They're over the garage and over the entries. The hip roof is different, and some of the gable combinations are different. And I feel that kind of like when you start a planning and you start designing, you start with a basic plan and kind of build out from there, which I've kind of done in the demonstration.

And as time goes on to develop those, it becomes easier and easier, a little tweak of this, a little tweak of that, the kitchen changes around and the bathroom changes around. I think that the majority of the plan between the two

of them are virtually identical, and I think the odds are astronomical that they would come out the same starting from that.

Q. You were talking about common elements. Is there anything you wanted to discuss-- Is there any of those other schematics that you had that you wanted to address?

A. I think I kind of summarized those. I've got back to back, the slab on grade, two-story, end units with two-car garages, interior with one-car garages, entries in the same location with shed roofs, rooms that are generally in the same location, all two bedrooms with end units having loft options, basically the same square footage. The real difference seems to be in the stair location.

Q. Okay.

A. And that seems to have affected the other parts of the plan.

Q. All right. And you say that you think the odds--that you had an opinion about the odds of two people sitting in the room and coming up with this design are what?

A. I hesitate to use the term that Steve used. I'd say it's incalculable. That's not my answer. I'd say it's astronomical and close to impossible.

Q. Okay. Now, what about the stairway issue you just mentioned?

A. Well, it feels like that there was an effort to make the

plans different, and moving the stair location was the key element to that, and I think that effectively kind of rearranged the upper bedrooms because of the relocation of the stair. And that is-- That's the main difference between the two plans.

Q. Are you saying you believe that the changes were made merely to minimize similarity?

A. I have no real knowledge of why the change was made. It could have been an attempt to make the plans better. It could have been an attempt to--marketing purposes or whatever to be different. I can't answer that.

Q. All right. Is there anything else about common elements that I don't understand that you could explain?

A. Not at this point. Again, I'm focusing on the big picture, and I'm kind of minimizing the minor differences.

MS. BARNHILL: All right. Jeff, he's going to have to leave to go back to Minneapolis. May I-- I'm going to put up your side-by-sides, if I might, and let him address those.

MR. GOODMAN: That's fine.

BY MS. BARNHILL:

Q. Since you aren't going to be here to address these later, I'm going to ask you to take a look at what the defendants have prepared with respect to their exhibits.

A. Do you want to just use their easel?

Q. Yeah, let's just use their easel. Can you see it?

A. I'm afraid I'm going to have to get up. Is that all right?
Q. Yeah.
A. Did you want me just to read it and comment on any of this stuff or--
Q. I want you to take a look at what is shown on those. And what are they essentially demonstrating for you?

THE COURT: Let's say for the record what it is first. Is it marked as an exhibit, Counsel?

MR. GOODMAN: Your Honor, these are demonstrative exhibits that are in the notebooks in smaller form, and those-- Those would be double-digit exhibits.

MS. BARNHILL: AA?

MR. GOODMAN: That sounds right.

MS. BARNHILL: Is that AA, BB, CC, and DD?

MR. GOODMAN: Well, it's actually DD, I believe.

MS. BARNHILL: All right. All four of them?

MR. GOODMAN: Yes.

MS. BARNHILL: All right.

THE COURT: Thank you.

BY MS. BARNHILL:
Q. All right. Mr. Whitten, what is that first one titled?
A. This is Unit A, which is the end unit, and it's comparing the main floor of the two townhomes, The Oaks Development being on my right and the Rottlund Homes over here.
Q. What does the comparison show?

A. Here they're going kind of line-by-line item what the differences are, that if it's in this case I assume it's not in this case and vice versa. They're referencing the ceiling, bulkheads in the kitchen--ceiling heights, rather, stairs--and I recognize that the stairs are really the key difference in the location of the stairs between the two--fireplace venting and angle. Again, I guess I-- My sense is these are kind of minor issues in the comparisons of the big picture. Angle sink and 42-inch cabinets, all those. I can't see anything except for the stairway that kind of jumps out as being--

Q. Are you saying that the differences are cosmetic?

A. I don't know if cosmetic is the right word. I consider these differences to be minor and really a derivative of once you kind of go through this exercise of getting to the main concept of the design, then this is just kind of a continuation. When this is the same, then this is just slightly different details as you go forward.

Q. All right. What about the next list?

A. Okay. We're moving up to the Unit A, which is also the end unit comparison, and now we're in the upper levels, and there is a two-bedroom option here with two bathrooms, and then this is two bedrooms and a loft. And I recognize in one of the other exhibits that there is an option on this floor plan to have a loft in there also. The stair location, again, has generated the plans to be different on the upper level, so I

concede that when the stair was moved that--

Q. Would you explain that? When the stair moves, what happens?

A. Basically where you end-- If the stairs come up from the lower level on the Oaks plan, it comes up here and ends in a different location. As you move the stair different from what we have, then the relationship to the entry doors and the bathrooms will become different just from that one move of moving the stair.

Q. So those changes flow out of the stairway move.

A. Yeah. And I think that we have a plan that has an option of two bathrooms on the upper floor also.

Q. All right. What about the next one?

A. The next one will be the interior unit, which is the B Unit, on the main level. And I think the general configuration and I think it was pointed out-- I'm sorry. I don't know your name. But generally what was happening on a two-story townhome is you would have these spaces and generally this arrangement and this location, and the stair's the difference here. Again, the kitchen's in the back. Those are kind of the common elements. The stair is really the difference. And some of the things that were listed in the previous plan as far as ceiling heights and bulkheads in the kitchen and so forth and cabinets in my opinion would be the same on that also.

Then moving up to the Unit B on the upper level,

two-bedroom plan, again, where the stair ends up is kind of determining what's kind of happening in the back. The bathrooms and the laundry area are towards the rear of this townhome, which would only make sense. The stair location has really kind of affected the difference in that upper floor.

Q. Okay. Would you say the original elements of your design have been copied?

A. I'd say yes, if I understood the question.

Q. All right. Now, the last thing I'd like to cover with you is the word--the name "villas." Why is it important to Rottlund to protect the name "villas" with respect to the two-story, two-bedroom townhomes?

A. I'll go back in time a little bit. When we first developed the product in Minneapolis, we associated the name "villas" to those townhomes, basically what you're seeing on our example. And it was an important association, and it was the first time that that product had been--the back-to-back, two-story townhome had been associated with the word "villas" in the Minneapolis market.

And then as time went on, we had found that there were other products that were brought into the market, detached townhomes, one-level plans, and so forth that also used the term "villas." So it became a little less important as far as a name distinction as time went on in Minneapolis, though it was very important and very critical in the first number of

years in which we introduced our product.

We find the same cases in Iowa where the distinction of the back-to-back, two-story townhome is important with the term "villas" in our Des Moines market knowing that there really isn't another back-to-back townhome--two-story townhome with that term previous to The Oaks Development other than the Rottlund product, so we hold that distinction as long as we possibly can until it becomes somewhat diluted in the market with other types of product.

Q. How do you use the word "villas" in your efforts to promote your product?

A. Well, we use the word "villas" in everything that we produce from our sales material to our advertising to our signage that we have in the front of the developments as we're trying to market through the market. Basically we use it on everything. It is a distinction of-- We don't say townhomes. We say villas.

Q. I understand, however, that you do not put this on the final stone monument. Why is that?

A. There's a couple reasons. One is that that is kind of a long-range-- I guess it is a monument that is to last forever. It's the people who buy there who will live there for 20 years or 30 years after their purchase, and it's not important to us and I'm not sure it's important for them after they make their purchase that the name "villa" be carried on for the balance of

the development etched in stone, if you will. We carry it all the way through the marketing development. We get our point across with the name villas up until the monument.

Another reason is in some cases that we have a number of different product--housing products in one development and that maybe we'll have those with garden homes or with other types of product, so the distinction of villas would not be appropriate on the monument in that case.

MS. BARNHILL: I have no further questions of this witness.

THE COURT: You may cross-examine.

CROSS-EXAMINATION

BY MR. GOODMAN:

Q. Mr. Whitten, with respect to the testimony you gave regarding odds, do your odds calculations take into account functionality, or do they ignore that component in their calculations?

A. I think functionality can be achieved with any one of those combinations.

Q. Right. But what I'm getting at is the numbers you've provided the Court in this case that you could do this, you could do this, you could do this, or you could do that, 486 times or 96 times or whatever the number is, aren't taking into account the fact that some of those combinations may be preferable to the person that is either going to live in those

or the person that is going to sell those; correct?
A. I guess I would answer the same way. I think there's a livable combination or design within any of those combinations. So my answer would be no, I guess.
Q. Well, with all of the 486 differences that you've testified to, you have not attached a qualitative difference to one over the other; is that correct?
A. That's correct.
Q. All right. And in fact, when we're talking about odds, the process of odds making actually ignores that. In other words, if I ask the question, "Am I going to be alive tomorrow or dead," the actual odds of that are 50-50, aren't they?
A. I wouldn't be able to answer that. 50-50 that--
Q. Can't--
A. I think the odds are better that I'll be alive tomorrow than that I'll be dead.
Q. What are the odds of that?
A. I have no idea.
Q. Typically the concept of odds are if you've got two events, you've got two opportunities, one is going to happen or the other is going to happen; right? Isn't that correct?
A. I'm not understanding.
Q. What I'm getting at is that the calculations that you have made just simply are a numeric summation of the different possibilities without addressing which possibilities are

preferable either from an architect's standpoint or from a consumer's standpoint?
A. I don't believe that to be the case.
Q. Okay. You could put the living room on the second floor, couldn't you?
A. I didn't mention that in my odds.
Q. I'm not asking--
A. You could put the living room on the second floor.
Q. And are there townhomes that you're aware of that have that?
A. Yes.
Q. Okay. And where are they in Des Moines?
A. What communities are they in?
Q. No. Where are they in Des Moines that you're aware of?
A. I'm not aware of them in Des Moines.
Q. Okay. Would it be fairly unusual for the living room to be on the second floor of a townhome?
A. I'd say unusual, yes.
Q. Okay. Can you assign a percentage approximately? Is it 1 percent, 5 percent, 2 percent of the townhomes you're aware of that have those nationally?
A. I wouldn't know.
Q. Can you tell me in terms of percentages what the percentage is that the living room is going to be on the first floor in a townhome?

A. No. If I couldn't answer the last question, I can't answer this one. Sorry.
Q. Okay. Can you tell me the percentage of the living room, kitchen, and dining room being on the same floor of a particular townhome?
A. Very high.
Q. Very high. Okay. Can you think of any in the Des Moines area where that is not the case?
A. I don't know the answer to that.
Q. I'm just asking, can you think of one and name it for me?
A. No.
Q. Your testimony is that these two developments are substantially similar because of the relationship of various component parts that go into making up any townhome?
A. Yes.
Q. A garage, doorways, room areas, those kinds of things, and they are laid out in a way that you believe to be similar?
A. Yes.
Q. Okay. When you set about to draft this, did you have in your mind utilizing the space as efficiently as you could so that there was not wasted space and that so--so that from a functionality standpoint the rooms worked in concert with one another well?
A. Yes.
Q. And the-- I didn't write it down, and I just want to get

an idea of the odds of-- What's the odds calculation on this not happening with another architect without seeing your plans, the configuration of the living room being where it is at the bottom of 18 in relation to the dining room in relation to the kitchen in relation to the two-car garage in relation to the entry? What are the odds of that not being duplicated without ever seeing your plans?

A. I don't know.

Q. Are they high that it wouldn't happen?

A. Try to calculate the number of different combinations of assembling those particular rooms?

Q. No. If I went out and hired an architect and I said, "I want you to design me--let's just say, well, a two-story townhome, and on the first floor I want to have whatever you recommend to be the rooms that should be on the first floor, and I want you to put those in the combination you think are appropriate," what's the likelihood that they would be arranged like this as is depicted on the bottom half of Exhibit 18?

A. I don't know.

Q. Would this be a fairly typical configuration--let's just talk first in terms of the living room--excuse me, the kitchen and the dining room being adjacent one way or the other, whether it's side to side or front to back.

A. Individually I would say it would be very common to have the dining room and the kitchen together.

Q. And is it fairly common to have the dining room and the living room adjacent to one another?
A. Uh-huh, yes.
Q. Is it fairly common at least in this day and age in modern housing to have the garage facing the street and making up the substantial part of the front townhome in this case?
A. Yes.
Q. And that design is not really unique to townhomes, is it? If we were to drive to West Des Moines and look at single-family housing units, would we tend to find a lot of houses that have a garage that either takes up a substantial portion in front of the house or dominates the front of the house with the entrance at one side? Would that be fairly typical?
A. Having the garage on the front of the house facing the street is very common, yes.
Q. And it's your testimony, if I understand correctly, that no trained architect would stumble upon a design like this without having the aid of your plans; is that correct?
A. No, that's not correct. What I was referring to in my exhibit of the odds was the placement of the garages in relationship to an eight-unit building in a back-to-back townhome and their entries. From that point on if those are--if those are established in the common position of which ours are, then the odds would increase that the room layouts

would fall into a similar position.
Q. What's the significance of the eight-unit development? That's where the odds come into play and get multiplied?
A. That's the one example I used, and that's common to both the townhomes.
Q. And what does Rottlund have in terms of they have eightplex units?
A. Eightplex units.
Q. Do they have any other plexes?
A. A fourplex and a twelveplex.
Q. Four, eight, and twelve. Do you know what the Oaks has?
A. I believe they have a four and an eight.
Q. Do they have a six and a ten?
A. I don't know that.
Q. Okay. You've not studied their plans close enough to discern that?
A. Not to those particular buildings, no.
Q. Your testimony is principally about the similarities; is that correct?
A. That is correct.
Q. You have lightly touched on our documents which deal with the differences. I know you're reluctant to use the word "cosmetic." It's Ms. Barnhill's word. Do you consider those differences outlined on our plans--or I should say our exhibits to be merely cosmetic?

A. Yes. I think you've-- The heart of a building is designed from the very beginning, as I kind of demonstrated, and it gets you to a certain point where almost anything after that stage is cosmetic, that the variations of bulkheads, for example, in the kitchen, of having bulkheads or not having bulkheads, are quite minor.
Q. Are you the only individual that's developed an eightplex?
A. No.
Q. You testified that you started at Rottlund five years ago; is that correct?
A. Yes.
Q. And I think your affidavit indicates that these plans were prepared for these back-to-back townhomes ten years ago.
A. Correct.
Q. So they were developed by you in your employment with whom?
A. Architectural Forum.
Q. And were they later acquired by Rottlund?
A. That's correct.
Q. During the time that you have been employed by any other entity, individual, or group other than Rottlund, did you ever have occasion to prepare or review design plans for back-to-back townhomes developed by any other developers?
A. No.
Q. Okay. Are you aware that that is a concept, the back-to-back concept, that is utilized by other developers in

the industry other than Rottlund?
A. I'm aware of that.
Q. On a national basis.
A. I am aware of that also.
Q. Do you subscribe to the concept that Mr. Theis testified to that the Rottlund and Oaks units to individuals that are in this profession are easily mistaken? In other words, if you were to drive by the Villas of Grey Hawk and pass the Rottlund Homes of Iowa, the two that are depicted on Exhibit 15, would you just be dumbfounded by the differences?
A. Dumbfounded by the differences.
Q. I mean, in other words, would you-- Maybe I-- Let me restate it. Would you look at those two units and say, "They're the same"?
A. I would say they're more alike than they are different.
Q. And I understand that's your testimony, but would you be unable to distinguish the two?
A. I would be able to distinguish between the two.
Q. These are back-to-back units. Do they have a rear access?
A. No.
Q. Okay. So you've got to have a door-- Your choices are a door on the front or a door on the side?
A. Or as I noted on mine, you could have the entry door in a position on one side or the other on the front or somewhere else, around the corner.

Q. And I think on one of these units there are actually patios with sliders; is that correct?
A. Yes.
Q. And on the other unit made by the other company, there are not.
A. I believe that to be the case.
Q. Of the permutations and the combinations that you came up with, the 486 and the 96 and all those other numbers, is it your view that Rottlund has proprietary rights in all of those combinations to the relationships that could possibly be among these different component parts of a townhome?
A. No.
Q. Just this configuration depicted on Exhibit 15 or the other copyrighted information?
A. We don't have, you know, ownership of back to back. We don't have slab on grade. We don't have two-story. We don't have all sorts of individual items that we're talking about. It's the combination of all those together that we have ownership of.
Q. Does Rottlund develop townhomes that aren't back to back?
A. Yes.
Q. We've talked this morning--and I think you were in the courtroom--about the Parade of Homes in Minneapolis, and I won't belabor that magazine if you're able to tell me. The: are a number of different developers that use back to back,

only in the Minneapolis area but nationwide; correct?

A. Correct.

Q. And many of those are two-story; correct?

A. Correct.

Q. With doors on the front, next to, and on one side of the garage?

A. Any combination of that you mentioned, yes.

Q. Okay. And it would look similar to what's depicted on Exhibit 18?

A. Not as similar, no.

Q. I understand not as similar, but they would look similar in the sense that the front would be partially dominated by a garage with a door to one side with a second-level, dormer-type window; correct?

A. They may have one or the other of those features.

Q. Are you aware that some have all of those together?

A. All of the dormer and garage door features?

Q. Dormer, a garage door, and a front door with the windows in the dormer.

A. I'm aware of a lot of townhomes with a dormer and a front door and a garage door, yes.

Q. Do you have any specific information that you are aware of, actual information, that establishes, other than your opinion that you've expressed today, that your plans were actually copied, Xeroxed, or duplicated by someone on behalf of Oaks

Development?

A. I have no proof of that.

Q. The concept of villas is a concept that in your mind as a representative of Rottlund is an identifying label; is that correct?

A. Correct.

Q. It's your belief that if I were to say the word "villa" to someone in the hallway in the courtroom, they would immediately think Rottlund?

A. I'd say that if they're familiar with townhomes in Des Moines, they would say Rottlund. If they are not in the townhome market and aren't aware of the new marketplace for housing, they may think of something in Italy for all I know.

Q. If it is an identifying characteristic, you would agree it's important that it be used in the marketplace as an identifier; is that correct?

A. That's correct.

Q. In Paragraph 8 of your affidavit, you state that, "The Villas of Grey Hawk is positioned"--you use the word "positioned"--"in the Des Moines market to be deceptively similar to Rottlund products." What do you mean by the word "positioned"?

A. I'd have to see that.

Q. It's Exhibit J in the three-ring black binder notebook.

A. This one right here?

Q. And the reason I'm asking is I read that to mean--and I may be mistaken--you're talking about the fact that it was located across Interstate 35 from the Rottlund project. Is that what you mean by positioned?

A. Could you tell me what section that's in? I've got the three-ring binder.

Q. It's in J.

A. J? Excuse me just a moment. I was not referencing the position--or location, rather. It was a position in the marketplace.

Q. Okay. And when you say, "They're positioned in the market to be deceptively similar," what do you mean positioned in the market?

A. Meaning we identified a market of young professionals and singles for our villas, and the product is developed for that market. We then developed a product for that and named them the villas. And I believe the Grey Hawk is looking at the same marketplace and using the name "villas" as an opportunity to capture part of that market.

Q. What is the square footage of the Rottlund unit?

A. I don't know the exact number.

Q. Can you calculate it from the drawings which have been prepared for you today?

A. I would have to calculate it from the working documents.

Q. How did you come up with the percentages that were

testified to earlier, the 1 percent and 4 percent and the 96 and the 90--

A. That was not derived by me. That was derived by Joel Goodman to determine, you know, basically the square footage comparisons.

Q. Well--

A. I know approximately what the square footages are of our units, but I don't know exactly what the--

Q. You're the designer. Why don't you tell me what you recall the square footage being of the Rottlund units?

A. I'd have to look at the plan if you want something more definitive than within 50 square feet or something. Do you want me to go through that exercise?

Q. Sure. That would be fine. And if you are--

THE WITNESS: Do Joel's exhibits show the--how he got the number of square footage?

MS. BARNHILL: Huh-uh.

THE WITNESS: Okay. I'll have to get a calculator and a scale.

BY MR. GOODMAN:

Q. I'll also give you-- While you're calculating, I just want to give you The Oaks Development drawings too so we have--

A. We have that too. It does list here the finished square footage on the document.

Q. What is that square footage?

A. The main level is 568 on the first floor and 570 on the second floor. That's the A Unit. Are you writing this down?
Q. Just a moment. 568 and 570 on the A Unit.
A. Right. And then on the B Unit it is--it is 530 on the main floor and 583 on the finish floor--the upper level floor, excuse me. And did you want me to find the square footages on these, the Oaks?
Q. That would be great, yes.
A. Let's see if it's listed on the plan. Is this the set you gave us? I don't think your set has the-- It doesn't have the individual floor plans.
Q. I think they may be on these unit here if you want to--
A. I have a set here that has yours. I'm just trying to see if-- Here we go. Ready?
Q. Okay.
A. This is the set that I have. The A Unit main level is 600, and the upper level is 745.
Q. Okay.
A. The B Unit, the main level is 534, and the second level is 602.
Q. I come out with 1136 and 1345 for ours and 1113 and 1138 for Rottlund. Does that sound about right now?
A. Ours sound about right. I can't explain our answer and Joel and his calculations. In many cases, interior walls are excluded and stairways walls, and I assume he calculated them

in such a way that it was apples to apples.
Q. Let's just deal in round numbers. I know you're good at calculations. We've got a 200-square-foot difference in one instance, which would be more like a 20 percent difference; is that correct?
A. 200-foot difference, and what was the--
Q. 1345.
A. I suppose that would be a 15 to 20 percent.
Q. Not a 1 percent difference.
A. I can't answer for those.
Q. These were done by Joel, who's not going to testify, provided to this Court through Mr. Theis; correct? Is that who we heard it from? Where did you hear it?
A. I can't answer for his calculations. It was part of the exhibit, one of the exhibits that we presented showing the percentages, the 1 percent and the 5 percent.
Q. Okay. Would you agree it's inaccurate?
A. Not necessarily because what we put for square footages on a set of CAD documents and what somebody else puts on for square footages for CAD documents could be calculating different square footages. As we use different square footages for our construction and subcontractor bidding, it may be different than what we use for the sales, so I would have to-- Joel would have to answer whether he got apples for apples.
Q. Let's go to your calculation sheet, and maybe you can

calculate for me what your number would be, and we won't have to use Joel's. Would that be okay?
A. Sure. I just need a scale and a calculator. Oh, okay. I just got an explanation that Joel's calculations were based on the foundations. He was comparing square footage on the foundations. We could go through the documents and get the exact number of square footage, but I need a scale and a calculator.
Q. Well, let me ask you this. Would you agree that if you were to calculate it, it would not be 1 percent and it would not be 4 percent, but it would be more near or closer to the number we've already discussed, 16 to 20 percent?
A. I can't say that. If you want me to--
Q. Go ahead.
A. --give you a percentage, then I'll have to calculate it.
Q. Go ahead.
A. This could take some time. In fact, I need--
Q. And Mr. Gunhus has asked, if you could, to describe for the record how you calculate square footage or what goes into your square footage calculation.
A. What I would measure is-- In fact, we can do it together.
MR. GUNHUS: Sure.
THE COURT: You know, what you're doing, you're making it impossible for the court reporter. She's supposed to take down everything that goes on in the courtroom, and I feel

like I've sort of lost control because we're mumbling and we're figuring. You know, if you want to do the calculations, fine. If you want it on the record, let's don't make it impossible for her to take it down.

MR. GOODMAN: If I could suggest this, why don't you do your calculations. We'll write them up there, and then we will ask you separately when you're done with that how you calculated square feet.

THE COURT: Yeah, but let's let him go ahead and do them without expecting her to take down everything you say.

MR. GOODMAN: That's fine.

THE COURT: Okay.

MR. GOODMAN: Thank you, Your Honor.

THE WITNESS: I should just calculate it?

THE COURT: In fact, would you like to take a little break while you do it?

THE WITNESS: That would be fine if everybody wants to take a little break, because it will take about five, ten minutes.

THE COURT: Why don't we take a break? You tell us when you're done.

(Short recess.)

THE COURT: You may continue, Counsel.

BY MR. GOODMAN:

Q. Have you had an opportunity to review the drawings and

reach your own independent conclusions regarding square footage calculations?

A. Yes.

Q. And what are those conclusions?

A. That's-- The differences between the Grey Hawk townhomes and our townhomes on the A Unit are 10.2 percent difference, the Grey Hawk being larger. And the differences between the B units is 4.3 percent. I believe that ours are larger in that case.

Q. And during the break did you have an opportunity to speak with anyone about those calculations by phone?

A. Yes, Joel Goodman.

Q. So you called Joel during the break to find out how he reached his conclusions?

A. Yes.

Q. And I think you testified before-- And maybe you reached some confirmation with Joel on this. You testified that the square footage calculations that were utilized by Rottlund were different as published to the members of the public or the consumers than what you provided to the subcontractors who would charge for work on a square footage basis; is that correct?

A. That is not correct.

Q. Okay. The same numbers were given to the subcontractors and to the public?

A. I can't answer that. I don't know.
Q. Is it possible they could have been different?
A. It could be just in two different people calculating the square footage.
Q. And what method of calculation did Mr. Joel Goodman use to reach his 1 percent difference calculations?
A. He explained to me--and I didn't get into real depth with Joel because we were calculating by hand, so I didn't really need it, but--that he used the number on the sheet of documents. And then we would have to go back and understand the CAD operator and what he was thinking exactly, how he calculated it, to determine how he came up with that number. And I don't have that information available. But he just used a number on the sheet, where we in fact measured directly this afternoon.
Q. Would your numbers be more accurate?
A. More accurate in comparison to Grey Hawk, yes.
Q. Are the plans that you relied on for the Rottlund project plans that are relied upon by the subcontractors employed by Rottlund?
A. I can't say for certain, but I assume that those CAD documents are the ones that are used for the subcontractors, yes.
Q. And so the subcontractors would be using the calculations of square footage as prepared by Joel Goodman or whoever

prepared those CAD drawings?
A. They shouldn't.
Q. They--
A. They should do their own calculations. Every subcontractor should do his own calculations on the plans.
MR. GOODMAN: No further questions, Your Honor. Thank you.
THE COURT: Any redirect, Counsel?
MS. BARNHILL: Nothing, Your Honor.
THE COURT: You may step down. Thank you.
(Witness excused.)
THE COURT: Call your next witness, please.
MS. BARNHILL: Plaintiffs call D.A. Hayworth.

DUANE ALVIN HAYWORTH, PLAINTIFFS' WITNESS, SWORN

DIRECT EXAMINATION

BY MS. BARNHILL:
Q. Okay. Mr. Hayworth, would you please state your full name for the record?
A. My name is Duane Alvin Hayworth.
Q. Do you go by a nickname?
A. I go by my initials, D.A.
Q. What is your occupation?
A. I'm the customer service manager of Rottlund Homes.
Q. How long have you been employed by Rottlund?
A. Going on four years.