UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

FOURTH DIVISION

| | |
|---|---|
| THE ROTTLUND COMPANY, INC. d/b/a ROTTLUND HOMES, A MINNESOTA CORPORATION<br><br>Plaintiff<br><br>vs.<br><br>PINNACLE CORPORATION d/b/a TOWN & COUNTRY HOMES, AN ILLINOIS CORPORATION, TOWN & COUNTRY HOMES, INC., A MINNESOTA CORPORATION, BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., AN IOWA CORPORATION, AND THE BLOODGOOD GROUP, INC., AN IOWA CORPORATION<br><br>Defendants<br><br>and<br><br>TOWN & COUNTRY HOMES, INC., A MINNESOTA CORPORATION<br><br>Third-Party Plaintiff<br><br>vs.<br><br>BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., AN IOWA CORPORATION<br><br>Third-Party Defendant | No. 01-CV-1980<br><br>DEPOSITION OF JASON JORGENSON<br><br>ORIGINAL |

Reported by: Connie Overberg, RPR, CSR

 [redacted]

Q. From whom?

A. I can't remember.

Q. Somebody within Rottlund Company of Iowa?

A. Probably.

Q. Do you recall any of the information that you received about the lawsuit?

A. No. Just that there was one.

Q. Are you aware that Rottlund has been involved in similar lawsuits in Iowa?

A. Yes.

Q. What do you know about the lawsuits that Rottlund has been involved in in Iowa that are similar to this, claims that the plan was copied?

A. Very little. I wasn't involved. At that time as a superintendent I wasn't privy to information.

Q. Do you know any information?

A. Some.

Q. What do you know?

A. Just that there was a situation with both Rogers and Oaks, and that there is a confidentiality agreement I have heard that we can't talk about it.

Q. Who is Rogers?

A. I believe it is a company in Ankeny, Iowa, who builds town homes.

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

FOURTH DIVISION

THE ROTTLUND COMPANY, INC. )
d/b/a ROTTLUND HOMES, A )
MINNESOTA CORPORATION ) No. 01-CV-1980
)
Plaintiff )
) DEPOSITION OF
vs. ) JASON JORGENSON
)
PINNACLE CORPORATION )
d/b/a TOWN & COUNTRY HOMES, )
AN ILLINOIS CORPORATION, ) **ORIGINAL**
TOWN & COUNTRY HOMES, INC., )
A MINNESOTA CORPORATION, )
BLOODGOOD SHARP BUSTER ARCHITECTS & )
PLANNERS OF IOWA, INC., AN IOWA )
CORPORATION, AND THE BLOODGOOD )
GROUP, INC., AN IOWA CORPORATION )
)
Defendants )
)
and )
)
TOWN & COUNTRY HOMES, INC., )
A MINNESOTA CORPORATION )
)
Third-Party Plaintiff )
)
vs. )
)
BLOODGOOD SHARP BUSTER ARCHITECTS & )
PLANNERS OF IOWA, INC., AN IOWA )
CORPORATION )
)
Third-Party Defendant )

Reported by: Connie Overberg, RPR, CSR



[redacted]

Q. From whom?
A. I can't remember.
Q. Somebody within Rottlund Company of Iowa?
A. Probably.
Q. Do you recall any of the information that you received about the lawsuit?
A. No. Just that there was one.
Q. Are you aware that Rottlund has been involved in similar lawsuits in Iowa?
A. Yes.
Q. What do you know about the lawsuits that Rottlund has been involved in in Iowa that are similar to this, claims that the plan was copied?
A. Very little. I wasn't involved. At that time as a superintendent I wasn't privy to information.
Q. Do you know any information?
A. Some.
Q. What do you know?
A. Just that there was a situation with both Rogers and Oaks, and that there is a confidentiality agreement I have heard that we can't talk about it.
Q. Who is Rogers?
A. I believe it is a company in Ankeny, Iowa, who builds town homes.

Q. Were the plans that were at issue in the Rogers matter plans for a villa product?
A. Yes.
Q. Were there more than one version of the villa product that is being built in Iowa?
A. Yes.
Q. How many?
A. Two I believe, maybe three. Can you clarify that?
Q. Are there particular marketing names that you give two or three versions of villa that are being built in Iowa?
A. They name the floor plans. The Villa 2 was the Chattum and Dunhill, and there have been several names for the original villas. They all start with an A or B.
Q. Always start with --
A. A or B signifying A unit or B unit.
Q. Would it be fair to say that the Villa 2 and the original villa are the two versions of villa product that are being built in Iowa?
A. I believe we have started with the original villa and upgraded through to the new villas, and then the Villa 2, so I think there is probably three versions.

Q. What product was at issue in the Rogers lawsuit?
A. It would have either been the original or the new villa.
Q. You don't know which?
A. No.
Q. And then in the Oaks litigation?
A. Same answer.
Q. Do you know if Rogers developed their plans for the product that they were building that Rottlund claimed was copied was designed in-house or by an architect?
A. I don't know.
Q. Do you know anything about how Rogers came up with the plan that they were building that was at issue in the lawsuit of Rottlund involving Rottlund?
A. No, I don't.
Q. Do you have any information how Oaks came up with the plan that they were building in the lawsuit involving Rottlund?
A. No.
Q. Do you know if Oaks was working with an architect or if they developed their plan in-house?
A. I don't know.
Q. Have you ever talked with anybody at

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

FOURTH DIVISION

THE ROTTLUND COMPANY, INC. d/b/a ROTTLUND HOMES, A MINNESOTA CORPORATION )
) No. 01-CV-1980

Plaintiff )

) DEPOSITION OF STEVEN THIES

vs. )

PINNACLE CORPORATION d/b/a TOWN & COUNTRY HOMES, AN ILLINOIS CORPORATION, TOWN & COUNTRY HOMES, INC., A MINNESOTA CORPORATION, BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., AN IOWA CORPORATION, AND THE BLOODGOOD GROUP, INC., AN IOWA CORPORATION )

ORIGINAL

Defendants )

and )

TOWN & COUNTRY HOMES, INC., A MINNESOTA CORPORATION )

Third-Party Plaintiff )

vs. )

BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC., AN IOWA CORPORATION )

Third-Party Defendant )

Reported by: Connie Overberg, RPR, CSR [redacted]

subcontractors?

A. Yes. We will talk about zoning issues, other legal issues like that, what is going on.

Q. What about litigation involving other developers?

A. We have nothing currently.

Q. Historically?

A. We have had two. One was the Rogers, and the other one was the Oaks, but I have not discussed those with Bud.

Q. So you didn't discuss either of the Rottlund litigation or the Oaks litigation with Bud Rotter?

A. No.

Q. What about any other historical litigation?

A. That was the only two.

Q. Ever been in any litigation brought by homeowners?

A. We have gone to mediation on several issues.

Q. Is the mediation a term of the purchase agreement?

A. Yes. Currently I have one pending. There was one other litigation we were involved in early on

other Defendants make any claims back against Rottlund?

A. Not to my knowledge.

Q. Who designed the Oaks product that was at issue in that litigation, do you know?

MR. KRUMMEN: Same instruction in terms of the caution.

THE WITNESS: Decline to answer that on the grounds of confidentiality agreement.

Q. (By Ms. Moyer) And just so you know, that is one of the topics we will bring up with the Court in about a half hour. You said there might have been another Defendant that was ultimately dismissed called Custom Creations?

A. Yes.

Q. What business is Custom Creations in?

A. Architectural firm.

Q. Are they a local architectural firm?

A. Omaha.

Q. Do you know whether they were still in the case as of the date of the preliminary injunction hearing?

A. I do not remember.

Q. What about the other litigation, I think you mentioned was Rogers litigation?

A. Yes.
Q. What was the Rogers litigation?
A. Copyright infringement.
Q. Is Rogers also a home builder?
A. Yes.
Q. And I think we heard from Jason Jorgenson this morning the Rogers litigation involved a product up in Ankeny; is that right?
A. Yes.
Q. Did that litigation occur while you were with Rottlund?
A. Yes.
Q. When was that litigation?
A. Late '98, I believe.
Q. You said it was copyright infringement litigation?
A. Yes.
Q. Was Rottlund the Plaintiff?
A. Yes.
Q. And what was the product at issue?
A. New villa.
Q. And again what was the basis for the copyright infringement claim?
A. Confidentiality agreement, on this one does that cover that?

MR. KRUMMEN: We will get back to the same caution I gave out earlier. I thought I interpreted the Court's order to mean Gestalt. Beyond that please do whatever you are comfortable with knowing what the confidentiality is.

Q. (By Ms. Moyer) Let me re-ask it and say was the allegation or the basis for the allegation of copyright infringement again Gestalt?

A. Yes.

Q. Meaning total look and feel of the product was the same?

A. Yes.

Q. And in this case are you testifying that there is also a confidentiality order with regard to the Rogers litigation?

A. Confidentiality agreement with Rogers.

Q. So it is an agreement between the parties?

A. Yes.

Q. Is that also true with the Oaks litigation?

A. Yes.

Q. It is a confidentiality agreement between the parties?

A. In the Oaks there was also an order.

Q. But not in the Rogers?

A. Yes.
Q. I am sorry, I didn't understand the yes. Was there?
A. What was the question again?
Q. I didn't understand the answer. I apologize.
A. I guess I didn't understand the question.
Q. Let me go back and make sure our record is clear. In the Rogers litigation I think you testified there was a confidentiality agreement but not a confidentiality order; is that correct?
A. Yes.
Q. In the Oaks litigation I believe you testified there was a confidentiality agreement and confidentiality order?
A. Yes.
Q. Do you recall when the Rogers litigation concluded?
A. I believe late '98.
Q. I thought that's when you said it started.
A. It was rather quick. It could have been early '99.
MS. NEWMAN: I am sorry. Did you say yes?
Q. (By Ms. Moyer) How long did it last?
A. I don't recall the exact times, but it was

not a long time.
Q. I take it there was no trial in the Rogers litigation?
A. There was no trial.
Q. There was a preliminary injunction hearing?
A. No.
Q. Were there any hearings at which anyone testified?
A. No.
Q. How about any depositions?
A. Not to my knowledge, but I would have to check Kathryn's files to be sure.
Q. With regard to the product built by Rogers that was the subject of that litigation, do you know whether Rogers is still building that product?
A. No, they are not, or they may have one unit left. I don't know.
Q. What about any other copyright infringement litigation brought by Rottlund, do you have any knowledge of any other infringement litigation setting aside the current case that we are in other than these two, the Rogers and the Oaks?
A. Not that I am aware of.
Q. So you are not aware of any other cases

**H**
Motions, Pleadings and Filings

United States District Court, D. Minnesota.

Robert MEMS, Nathanial Khaliq, Phillip Webb, Thurman Smith, and Byron Brown, Plaintiffs,
v.
THE CITY OF ST. PAUL-DEPARTMENT OF FIRE and SAFETY SERVICES, Defendant.

**No. CIV. NO. 97-1589(PAM.**

Feb. 20, 2002.

MEMORANDUM AND ORDER

MAGNUSON, District Court J.

*1 This matter is before the Court on Plaintiffs' Motion for New Trial. [FN1] After a review of the record and consideration of Plaintiffs' arguments, the Court denies the Motion.

> FN1. Although Plaintiffs have not filed a Motion but only a Memorandum in support of the Motion for a New Trial, the Court will consider the merits of Plaintiffs' arguments.

DISCUSSION

The Court may grant a new trial if, because of an unsupported verdict, an excessive damage award, or significant legal errors at trial, a "miscarriage of justice" has occurred. *Gray v. Bicknell,* 86 F.3d 1472, 1480 (8th Cir.1996); *Hannah v. Haskins,* 612 F.2d 373, 376 (8th Cir.1980) (stating that a new trial is appropriate if "prejudicial error has been committed in the trial of the action").

Plaintiffs argue that a new trial is warranted because of six alleged errors of law made by the Court during the trial. These errors include the exclusion of Plaintiffs' expert witness testimony, the exclusion of certain evidence, the exclusion of Plaintiffs' claims of failure to promote and early retirement, the Court's limitation of damages to the statute of limitations period, and alleged errors in the jury instructions. Finally, Plaintiffs argue that the jury's verdict was against the great weight of the evidence. None of the grounds cited by Plaintiffs, either individually or taken together, rises to the level of prejudicial error that would mandate a new trial. Because the jury in this case deliberated with care and the verdicts were supported by the evidence in the case, the Court will not set the jury's verdicts aside.

A. Exclusion of Expert Testimony

Plaintiffs complain that the Court "unfairly denied ... their substantial rights to ultimately prove their case" (Pls.' Mem. at 4) by excluding the expert testimony of Dr. John Taborn. In particular, Plaintiffs contend that the Court erred by concluding that they submitted untimely information that amounted to a supplementation of Dr. Taborn's expert report, that, in any event, excluding Dr. Taborn's testimony was an inappropriate and extreme remedy, and that the Court erred in reconsidering and reversing its earlier *Daubert* ruling.

It is worth noting at the outset that the exclusion of Dr. Taborn, a damages witness, could have had an adverse effect only on Plaintiff Phillip Webb because the jury did not reach the damages question for any of the other Plaintiffs. Having made that note, the Court will not revisit at length its determination that Plaintiffs supplemented their expert's report in an untimely manner. Suffice it to say that the Federal Rules of Civil Procedure make it absolutely clear that a testifying expert's report "shall contain a complete statement of all opinions to be expressed and the basis and reasons therefore [and] *the data or other information considered* by the witness in forming the opinions ..." Fed.R.Civ.P. 26(a)(2)(B) (emphasis added). There is no question

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

that Dr. Taborn re-interviewed each Plaintiff and took new notes of those interviews after the initial disclosure required by the Rules. These notes were not provided to Defense counsel until after business hours on the night before Dr. Taborn was to testify. Pursuant to Fed.R.Civ.P. 26(e)(1), this additional or changed information was due prior to the trial, at the very latest.

***2** Despite Plaintiffs' petulance at the remedy imposed by the Court, as Defendant correctly points out, district courts need not impose the least onerous sanction available. *Chrysler Corp. v. Carey,* 186 F.3d 1016, 1022 (8th Cir.1999). Under the circumstances of this case, the Court determined that granting a continuance or rescheduling the testimony of Dr. Taborn was insufficient to remedy Plaintiffs' egregious abuse of the judicial process.

Finally, it was not an error for the Court to reconsider and reverse its earlier *Daubert* ruling in this case. Plaintiffs had represented during the *Daubert* hearing that Dr. Taborn's testimony was necessary because the Plaintiffs themselves could not express their complaints of emotional distress due to their denial and repression. During the course of the trial, however, each Plaintiff took the stand and testified at length about his emotional complaints. In light of Plaintiffs' misrepresentation during the *Daubert* hearing, the Court was moved to reconsider and reverse its earlier decision.

B. Exclusion of Evidence

Plaintiffs contend that the Court erred by excluding no less than six categories of evidence that they claim was necessary to prove their prima facie case. As an initial matter, the Court agrees with Defendant that not all of these rulings have the same potential effect on all of the Plaintiffs. These rulings have no effect on Plaintiff Webb because the jury determined that he had proven his prima facie case. Additionally, to the extent that the rulings relate to the B-shift, these rulings have no bearing on Plaintiff Smith's case.

Because Plaintiffs have raised no new considerations, the Court will not review each of its rulings in detail. Most of Plaintiffs' complaints about the evidentiary rulings of the Court distill to the claim that "the court's crabbed notions ... unfairly prevented the Plaintiffs from proving their case." (Pls.' Mem. at 13.) Plaintiffs, however, must do more than merely claim that the Court erred in its rulings. Beyond establishing that the Court erred, Plaintiffs must also demonstrate that these alleged errors were "so prejudicial that a new trial would likely produce a different result ." *Bevan v. Honeywell, Inc.,* 118 F.3d 603, 612 (8th Cir.1997). Not only have Plaintiffs failed to show that the Court's rulings were erroneous, but they have failed to show that any alleged errors were so prejudicial as to alter the outcome of the case.

C. Exclusion of Failure to Promote and Early Retirement Claims

Plaintiffs contend that they should have been allowed to present evidence that the allegedly hostile work environment "took away their ability to take the promotional exams." (Pls. Mem. at 18.) Plaintiffs, however, were not prevented from taking promotional exams. Plaintiffs chose not to take such exams allegedly because of the hostile work environment. As the Court determined when ruling on the motions in limine, such a choice was only relevant to show that Plaintiffs subjectively felt that the work environment was hostile. Because Plaintiffs were able to, and ultimately did, adduce other evidence of the subjectively hostile nature of the work environment, evidence relating to their choice not to take promotional exams was cumulative and its probative value was outweighed by its potential to confuse or mislead the jury.

***3** In a rather perplexing argument, Plaintiffs also contend that a new trial is justified because the Court should have allowed them to amend their Complaint to include a claim of constructive discharge. Plaintiffs, however, never made such a request. Accordingly, a new trial is not warranted to allow Plaintiffs such an opportunity.

D. Statute of Limitations

Plaintiffs' next argument is that the Court incorrectly narrowed the period of recovery for illegal acts of discrimination under the Minnesota Human Rights Act ("MHRA"), Minn.Stat. § 363.01 *et seq .,* to the one-year statute of limitations period. Once again, it is important to note that because the jury only reached the question of damages for

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Plaintiff Webb, this alleged error could have affected only him.

Plaintiffs claim that the law in Minnesota does not limit the damages for employment discrimination plaintiffs to only the acts that occurred within the statute of limitations period. Plaintiffs cite no Minnesota case law that supports their position, however. Instead, Plaintiffs merely argue that the Court's ruling "abrogates the continuing violation doctrine with nonsensical results." (Pls.' Mem. at 20.)

Significantly, Plaintiffs do not challenge the Court's ruling with regard to their claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* Plaintiffs' contention that limiting recovery for illegal acts of discrimination to the statute of limitations period is "nonsensical" would seem to apply equally to claims under Title VII. Such a contention, however, would flout the firmly ensconced law of this Circuit. The Court of Appeals has continually justified the rule that "plaintiffs may only recover damages on their [Title VII] discrimination claims for acts committed during [the] statute of limitations period, even if there was a continuing violation." *Madison v. IBP, Inc.*, 257 F.3d 780, 796-97 (8th Cir.2001) (citing *Kline v. Kansas City Fire Dep't,* 175 F.3d 660, 665 (8th Cir.1999) ("Damages, however, may be recovered only with respect to events that occurred within the limitations period.")). This rule "strikes a reasonable balance between permitting redress of an ongoing wrong and imposing liability for conduct long past." *IBP, Inc.*, 257 F.3d at 797 (quoting *Ashley,* 66 F.3d at 167-68). It is therefore disingenuous to say that applying this rule to the MHRA, when there is no controlling Minnesota case law to the contrary, is "nonsensical." Accordingly, the Court did not err in limiting the extent of Plaintiffs' recovery to the MHRA statute of limitations period.

E. Jury Instructions

Finally, Plaintiffs contend that the Court erred in instructing the jury. Specifically, Plaintiffs argue that Instruction 12 was misleading and confusing because it provided that "Defendant City of St. Paul ... claims that Plaintiffs unreasonably failed to take advantage of corrective opportunities." According to Plaintiffs, Defendant offered no evidence that Plaintiffs failed to take advantage of any corrective opportunities.

***4** As Defendant notes, however, proof that an employer promulgated an anti-harassment policy with complaint procedures and proof that an employee failed to use the complaint procedures may constitute a defense. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765 (1998). In this case, Defendant did provide such proof. Accordingly, Instruction 12 was a fair and accurate statement of the law.

Plaintiffs also argue that the language in Instructions 16, 18, and 22 was erroneous. Plaintiffs argument overlooks the fact that the language used in these instructions is based on the law of this Circuit. The definition of the term "unwelcome" in instruction 16 is taken from *Moylan v. Maries County,* 792 F.2d 746, 749 (8th Cir.1986). The factors to be considered in determining whether a reasonable person in each Plaintiff's circumstances would find his or her work environment hostile or abusive and the descriptions of what constitutes a hostile work environment are likewise grounded in the case law of this Circuit. *See Cater v. Chrysler Corp.,* 173 F .3d 693, 702 (8th Cir.1999); *Hathaway v. Renyen,* 132 F.3d 1214, 1221 (8th Cir.1997). Finally, as Defendant notes, Instruction 22 was a correct statement of the law. *See Madison,* 257 F.3d at 797. Taken as a whole, these instructions concisely and accurately set forth the essential elements of Plaintiffs' claims.

CONCLUSION

Plaintiffs have failed to demonstrate that a new trial is warranted. Accordingly, based on the files, record, and proceedings herein, IT IS HEREBY ORDERED that Plaintiff's Motion for a New Trial (Clerk Doc. No. 155) is DENIED.

2002 WL 334411 (D.Minn.), 88 Fair Empl.Prac.Cas. (BNA) 530

Motions, Pleadings and Filings (Back to top)

• 2002 WL 32507106 (Trial Motion, Memorandum and Affidavit) Defendant's Memorandum in Opposition to Plaintiffs' New Trial Motion (Feb. 14,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2002)

• 2002 WL 32507105 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Support of Motion for a New Trial (Feb. 04, 2002)

• 2002 WL 32512738 (Verdict and Settlement Summary) (Jan. 11, 2002)

• 1998 WL 34260883 (Trial Pleading) Defendant's Answer to Joint Complaint and Second Amended Counterclaim (May. 08, 1998)

• 1998 WL 34260882 (Trial Pleading) Joint Complaint (Apr. 21, 1998)

• 0:97CV01589 (Docket) (Jul. 07, 1997)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Architects and Planners, Inc.
Bloodgood Sharp Buster

# TRANSMITTAL

FROM

■ 400 Locust St., Suite 265
Des Moines, Iowa 50309
515 283 0404
Fax 515 283 0484

☐ 2356 Gold Meadow Way, Suite 201
Gold River, California 95670
916 683 0404
Fax 916 683 0493

☐ 15436 N. Florida Ave., Suite 101
Tampa, Florida 33613
813 265 4808
Fax 813 265 4809

☐ 7525 Camelback Rd., Suite 204
Scottsdale, Arizona 85152
602 994 9114
Fax 602 994 9134

☐ 1530 Dundee Rd., Suite 100
Palatine, Illinois 60067
847 705 2200
Fax 847 705 2201

☐ 5025 Arapaho Rd., Suite 400
Dallas, Texas 75248
972 789 2908
Fax 972 789 2999

TO Steve Sandelin
Town & Country Homes

WE ARE SENDING YOU

■ Attached
☐ Separately

FOR YOUR

■ Use
☐ Approval
☐ Review and Comment
☐ As Requested

JOB # 38107

PROJECT Villa Townhomes

REMARKS

Steve : Competition product survey for Minneapolis area.

EXHIBIT
tabbies
114

ATTORNEY EYES ONLY

FROM Larry

DATE Tuesday, May 05, 1998

BSB 01944

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

---

The Rottlund Company, Inc.
d/b/a Rottlund Homes, a Minnesota corporation,

Plaintiff,

vs.

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois corporation, and
Town & Country Homes, Inc.,
a Minnesota corporation,

Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,

Third-Party Plaintiff,

vs.
Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa corporation,

Third-Party Defendant.

---

Videotaped Deposition of
LARRY MOORE
Thursday, September 4, 2003
9:40 a.m.

Reporter: Patrick J. Mahon
Registered Merit Reporter
Certified Realtime Reporter
Award of Excellence Recipient

---

Twin West Reporting, LLC
Twin West Reporting, LLC

326 South Broadway #218
Wayzata, MN 55391
952.449.4884 (Fax) 952.476.9207
myrina@myrina.com

[redacted]

sent right on to Steve to keep him in the loop. Whether they were faxed or transmittal, I don't know.
Q. So let's back up, and I'm going to spend a few minutes following up on that last answer. If I understand your testimony, you received the competition product survey for the Minneapolis area from Art Plant in or about May of 1998?
MS. NEWMAN: Objection as to form. Go ahead.
BY MR. KRUMMEN:
Q. Is that what you just told me?
A. I think that's the dates, yeah, around there.
Q. Okay. Now, once you got the competition product survey from the Minneapolis area, you forwarded it to Steve Sandelin and did not keep a copy for your own files; is that what you're telling me?
MS. NEWMAN: Objection --
THE WITNESS: It's possible.
MS. NEWMAN: -- as to form. Go ahead.
THE WITNESS: I don't know that I sent it on. That's the point. I mean, I don't know that I personally did it, so --



BY MR. KRUMMEN:
Q. Well, do you have any basis to dispute that the transmittal, which appears in front of you as Exhibit 114, was sent to Steve Sandelin?
A. I have no -- no, I have no basis to dispute that.
Q. So my question is -- we're back in May of 1998, just to set the time. Okay?
A. Uh-huh.
Q. And you have received a competition product survey for the Minneapolis area from Art Plante; is that where we're at?
A. Yeah.
Q. What was in the competition product survey that Mr. Plante sent to you?
A. It appeared to be a number of competitors' products, some plans, some elevations, some ideas that -- that Art liked, this and that, you know, a suggestion to say, "Hey, do we want to think of ideas like this" or, you know, "This works in the market. Should we consider these pieces in part?" So that was the information, I think, we got there.
Q. Did you keep a copy of the competition product survey for the Minneapolis area attachment, which Mr. Art Plante sent to you in or about May of



1998?
A. Apparently not.
Q. So it's also incorrect to say that no documents were destroyed in response to interrogatory 3.i.?
MS. NEWMAN: Objection as to form. Go ahead.
THE WITNESS: No documents were destroyed. No documents were destroyed.
BY MR. KRUMMEN:
Q. But you didn't keep the competition product survey, so if it wasn't destroyed, what happened to it?
MS. NEWMAN: Objection as to form and foundation. You can answer if you know.
THE WITNESS: It was -- it was forwarded to -- the information, I think, was just forwarded to -- to Steve. I don't think our admin- -- administrative assistant made copies. Kind of happens sometimes, so --
BY MR. KRUMMEN:
Q. So the original competition product survey that you received from Art Plante in or about May of 1998 was sent on to Steve Sandelin?
A. Yeah, I think so.



Q. And BSB of Iowa did not make a copy of that competition product survey?
A. I didn't make a copy of it. I think it got -- my guess is, it got sent out without the secretary making a copy. It just went out.
Q. Do you know that for a fact as you sit here today?
A. No, I don't know that for a fact. But that's -- that seems to make sense.
Q. Why do you say it seems to make sense that a secretary forwarded the original copy of the competition product survey that you received from Art Plante, on to Steve Sandelin?
A. That was the kind of a task that we were asking our re- -- receptionist/administrative assistant to do, trying to delegate tasks to that person and --
Q. But in every other case when an assistant had sent something out, you asked them to make a copy for BSB of Iowa's files; is that fair?
MS. NEWMAN: Objection as to form and foundation.
THE WITNESS: Those may have been sent by me, and in which case I did make copies or I did -- if it's a fax, the copy is already -- we have the

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

---

The Rottlund Company, Inc.
d/b/a Rottlund Homes, a Minnesota
corporation,

Plaintiff,

vs.

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois corporation, and
Town & Country Homes, Inc.,
a Minnesota corporation,

Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,

Third-Party Plaintiff,

vs.
Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa corporation,

Third-Party Defendant.

---

Videotaped Deposition of
LARRY MOORE
Thursday, September 4, 2003
9:40 a.m.

Reporter: Patrick J. Mahon
Registered Merit Reporter
Certified Realtime Reporter
Award of Excellence Recipient

Twin West Reporting, LLC
Twin West Reporting, LLC [redacted]

326 South Broadway #218
Wayzata, MN 55391
952.449.4884 (Fax) 952.476.9207
myrina@myrina.com

Page 205

the -- the meeting. I came out of there with an understanding that we had a --
BY MR. KRUMMEN:
Q. What was the basis of your understanding, coming out of the July 23, 2002, meeting here in Des Moines, that BSB of Iowa had a common interest agreement with Pinnacle?
MR. CARMICHAEL: Objection, asked and answered.
THE WITNESS: That was -- that was the meeting we had. The date -- the day was given to me -- this was by our attorney, that that was the date of the meeting. And I didn't remember when that meeting took place, but I do remember the meeting.
BY MR. KRUMMEN:
Q. And you --
A. That was the situation of the meeting and --
Q. And you remember --
A. I guess I don't have an understanding completely of everything that happened in that meeting, but I believe that to be true, that we were in a common interest agreement with the parties that were there.

Page 206

Q. And Pinnacle was there? Yes or no.
A. I understand them to be -- have been there, yes. They were --
Q. Who represented Pinnacle during that meeting?
MR. CARMICHAEL: Objection, asked and answered.
MS. MOYER: And no foundation.
MS. NEWMAN: Go ahead.
THE WITNESS: It was my understanding that was Dean Karau's rule -- role.
BY MR. KRUMMEN:
Q. As of July 23, 2002, you understood that Dean Karau was representing Pinnacle?
MR. CARMICHAEL: Objection, asked and answered.
THE WITNESS: Yeah.
MR. KRUMMEN: I have no further questions.
MS. NEWMAN: Why don't we take a short break. I might have a couple.
MR. KRUMMEN: You might?
MS. NEWMAN: I might.
MR. KRUMMEN: Okay.
THE VIDEOGRAPHER: Off the record at 2:48.
(Short break.)

Page 207

THE VIDEOGRAPHER: On the record at 3:02.
(Exhibits 264 and 265 were marked for identification by the reporter.)
THE REPORTER: Exhibits 264 and 265 are marked.

EXAMINATION

BY MS. NEWMAN:
Q. Okay. Mr. Moore, in front of you are Exhibits 264 and 265. Let's start with Exhibit Number 264.
MR. KRUMMEN: Can we get copies of those, Counsel?
MS. NEWMAN: I don't have copies.
MR. KRUMMEN: We can go downstairs and make them.
MS. NEWMAN: Yeah, if you want to do that before we begin.
MR. KRUMMEN: All right. Let's make copies.
MS. NEWMAN: Off the record, then.
THE VIDEOGRAPHER: Off the record at 3:03.
(Short break.)
THE VIDEOGRAPHER: On the record at 3:14.
BY MS. NEWMAN:

Page 208

Q. Okay. We've taken a short break to make some copies of Exhibit 264 and 265. First, let's start with 264. I just want to identify this for the record. The top line is indicating it's an e-mail from Darren Schwiebert to Ben Patrick, and it's dated on July 9, 2003, and it's regarding Rottlund versus TCM versus BSB; is that accurate, sir?
A. Correct.
Q. And it indicates that, "Ben, I apologize for the delay. You can share those documents with BSB witnesses. Darren." Did I correctly read the message from Ben -- or, excuse me, from Darren to Ben?
A. Yes.
Q. And then below, there is an e-mail from Ben to Darren, which asks for permission to share with BSB witnesses certain sets of documents that were originally marked AEO by the defendants in this matter; is that accurate?
A. Yes.
Q. Okay. And in the documents that were being requested are documents that were Bates labeled. It's the fifth line down under "Documents Which Were Sent To Or From BSB," and there's a Bates label

range there of D 00265 through D 00309? Do you see where I'm at? Right here?

A. Yes, I see that. Uh-huh.

Q. So those Bates label ranges were included in the request. And according to at least Exhibit 264, permission was granted; is that correct?

A. Correct.

Q. Now, it was sometime after July 9 of 2003 that we shared with you the documents that you testified earlier you believed were the competition product survey; is that accurate?

A. Yes.

Q. Okay. Taking a look at Exhibit Number 265.

A. Okay.

Q. I'll let you identify this, if you would, please, for our record.

A. These are faxes I received from Art on, it looks like, a couple different projects. Yes, two of them. First one is -- there's a note on it that's very hard to read, talks about a back-to-back product, and I think it says, "Not bad stuff. Art," addressed to me, five pages, received on 5/1/98.

And it looks like it's a magazine article or something on a product that received an award, back-to-back product that received an award in the



Twin Cities, and Art had seen that and faxed that to my attention.

The second piece, which starts on 271, is another fax from Art, 4/30/98, which I guess that means that one came in before. Six pages from Art. "Comments: Larry - saw this product by Orrin Thompson," parentheses, "(U S Home) and it works & sells very well. The elevations are terrible. Use it for ideas."

And these are Xeroxes of some plans, some interior shots, various back-to-back products. And we do not have this stuff in our file.

Q. And so our record is clear, the -- the front Bates label is -- on the top of Exhibit 265 is 00265, and it goes all the way through 00276?

A. Yes.

Q. Mr. Moore, is the -- is Exhibit 265 the competition product survey that you gave to Steve Sandelin pursuant to the transmittal which we had earlier marked as Exhibit 114?

A. I believe it to be, yes.

MS. NEWMAN: Thank you. I have nothing further.

FURTHER EXAMINATION



BY MR. KRUMMEN:

Q. Mr. Moore, do you remember when I deposed you on about March 6, 2003, in this very hotel, a different conference room?

A. Yes.

Q. And I asked you about Exhibit 114, which references the competition product survey?

A. Yes.

Q. I'm going to hand you what is your prior deposition testimony, page 26. Would you read into the record the question I asked you on page 26, at line 16 through 17, please.

A. Question: "What does the competition product survey language refer to in your transmittal?"

Q. And would you read your answer at lines 18 and 19, please.

A. Answer is, "I do not remember this. I don't think we had any kind of proj- -- product or project survey that I remember."

MR. KRUMMEN: I have no further questions.

MS. MOYER: Nothing further.

MR. CARMICHAEL: Nothing further.

MS. NEWMAN: Nothing further. We'll read and sign.



THE VIDEOGRAPHER: Off the record. Ending the deposition on tape three at 3:19 p.m.

(Deposition concluded at 3:19 p.m.)

# TOWN & COUNTRY HOMES

Minnesota Division

Telephone: (612)944-3455
FAX: (612) 944-3437

## FACSIMILE TRANSMISSION FORM

Date: 5/1/98

To: Jerry Moore

Company: Blandford

Fax #: 515-283-0494

From: Art Plantz

Number of pages including this cover sheet: 5

Comments:

[illegible]

[illegible]

[illegible]

Art

EXHIBIT 265

ATTORNEY EYES ONLY

D 00265

11471 Valley View Road • Eden Prairie, MN 55344
(612) 944-3455 • Fax (612) 944-3437 MN Builder License #9137



# The Best in Building

For thirty years, builders in the Twin Cities have coveted the prestigious Reggie Award.

When you build a new home, you want the best construction, design, and value for your dollar, whether you're building your first house or the home in which you plan to retire. But how do you find the best team of builders available?

You can begin your search by checking out our list of Reggie Award winners, a group of Twin Cities builders who have received "the Oscar of the building world" for their quality homes.

Every year for the past thirty years, the Builders Association of the Twin Cities has recognized builder members for excellence in new-home construction. Contestants for the Reggie (or registered builder) Award are judged by members of the Builders Association, which represents more than twelve hundred member firms involved in all phases of homebuilding.

The association aims to make the competition fair as well as relevant to consumers. Someone looking to build a $100,000 house probably won't call on a builder who specializes in million-dollar homes, even if the builder has won a Reggie. The awards are therefore categorized by price range and geographic location. In 1997 price categories started at $74,000 and went to $1.45 million, with seven to ten contestants in each category.

The awards program divides the Twin Cities area into five main categories: north, south, east, west, and upper bracket. Only homes entered in the Twin Cities Parade of Homes Fall Showcase, which ranks as the largest new-home showcase of its kind held in the United States, are eligible for the Reggie Award.

Attendees of the Parade of Homes Fall Showcase may have noticed clusters of note-takers. These were not overzealous decorating-idea seekers, but rather teams of Reggie Award judges visiting houses entered in a particular price category on the tour. Each five-person team usually comprises three Builders Association member builders, a Builders Association associate member, who is often a subcontractor or products supplier, and a local Realtor. To guard against conflicts of interest, builders serving as judges may not judge other homes in the same category in which they have a home entered.

Like new-home buyers who are deciding on a builder, the judges consider countless factors as they rank contestants. Nothing goes unnoticed. Judges consider such consumer concerns as





D 00266

ATTORNEY EYES ONLY




BrightKEYS Chadwick plan

workmanship, landscaping, creativity of design, special features, location and site planning, and execution and practicality of the floor plan

The first-place winner in each category receives the Reggie Award, and the second-place winner receives the Award of Excellence. Both awards are considered prestigious. Without tough competition, winning the Reggie statuette would mean little more than gaining an attractive office decoration. But as anyone who has attended the Parade of Homes Fall Showcase knows, the competition is stiff. Of the 747 homes that participated in the fall 1997 Parade, 403 entered the awards competition, yet only forty-nine Reggie Awards and fifty Awards of Excellence were given.

Leading the pack, Park Grove Development Corporation of Stillwater won two Reggie Awards and one Award of Excellence. David Williams RE and Construction of Chaska also brought home two Reggies. Other big winners include Pulte Homes of Minnesota in Mendota Heights, winner of one Reggie and two Awards of Excellence, and Wensmann Homes of Rosemount, which received three Awards of Excellence.

"It's a great honor to have your peers vote your homes the best in the Twin Cities," says Dean Hackey, 1997 president of the Builders Association of the Twin Cities and owner of LifeStyle Homes in Lake Elmo. "It's definitely the award most builders would like to bring home."

—Elizabeth Hemur





D 00267

ATTORNEY EYES ONLY

# ASHLEY

- *Private entry & patio*
- *U-Shaped kitchen with open staircase*
- *Large loft overlooking living room*
- *Optional skylight and 1/2 bath*
- *Upper level laundry*
- *Fireplace*

*1453 Sq. Ft.*

UPPER LEVEL







MAIN LEVEL

**ATTORNEY EYES ONLY**

**D 00268**

# ENGLEWOOD

- End location
- Walk-in pantry
- Center island
- Fireplace
- Huge master bedroom and walk-in closet
- Walk-through deluxe bath (option)
- Vaulted living room
- Open Staircase

1453 Sq. Ft.




ATTORNEY EYES ONLY

# CHADWICK




- Private entry & patio
- U-Shaped kitchen
- Large loft overlooking living room
- Optional skylight and 1/2 bath
- Upper level laundry room

~1422 Sq. Ft.



Bright

D 00270

ATTORNEY EYES ONLY

TOWN & COUNTRY HOMES
Minnesota Division

Telephone: (612)944-3455
FAX. (612) 944-3437

FACSIMILE TRANSMISSION FORM

Date: 4/30/98

To: Larry Moore

Company: Bloodgood

Fax #: 1-575-293-0454

From: Curt Platte

Number of pages including this cover sheet: 6

Comments:

Larry - saw this product by Conn Thompson (US Home) and it works & sells very well. The elevations are terrible. Use it for ideas

Curt

ATTORNEY EYES ONLY

D 00271

# The Grandview

*The Grandview, a thoughtfully designed 3 story home is truly a place in which you will find total comfort. This spectacular design is highlighted by a master retreat and features everything you're looking for in a special place you'll be proud to call home!*

- *2 Bedroom, 3 stories with over 1550 square feet*
- *Gourmet kitchen including double sink, breakfast bar and featuring GE appliances*
- *Dramatic vaulted ceiling in living room overlooking a huge private balcony*
- *Master retreat with private bath, walk-in closet and loft*
- *Gracious foyer, attached 2 car garage and first floor laundry room featuring full-size GE washer and dryer*




Upper Level Plan




Main Level Plan

Optional Bonus Room, Luxury And 3/4 Bath Available!





D 00272

ATTORNEY EYES ONLY

# The Grand Marais

1385

*Orrin Thompson's new Grand Marais design lets you enjoy life to the fullest! You will truly feel "at home" here with a gourmet kitchen, spacious vaulted bedrooms, even a formal dining area. Add to this complete maintenance free living, and you'll find The Grand Marais to be the home you've been looking for..." this is home!"*





Upper Level Plan

Optional Bonus Room And Luxury Bath Available.

- *2 bedroom, 2 story featuring vaulted ceilings and loft with over 1375 square feet*
- *U-shaped kitchen including GE appliances, breakfast counter and dinette*
- *Formal dining area with sliding glass door overlooking 10 x 10 patio*
- *Master suite with large walk-in closet and walk through full bath*
- *Convenient attached 2 car garage and first floor laundry room featuring full sized GE washer and dryer*



Main Level Plan

ATTORNEY EYES ONLY

D 00273

# The Portage

*Come take a look at The Portage, an exciting new design from Orrin Thompson Homes. You'll find everything you've always wanted in a new home, along with the added benefit of maintenance free living!*

- *2 bedroom, 2 story, over 1225 square feet*
- *Spacious master bedroom with walk-in closet*
- *Galley kitchen including GE appliances, and a snack bar*
- *Formal living and dining rooms with gas fireplace and built in TV niche*
- *Convenient attached garage and 10 x 10 patio*

1280#

## Optional Luxury Bath Available!




Upper Level Plan



Main Level Plan



D 00274

ATTORNEY EYES ONLY

Copyright © 1996
U.S. Home Corporation

# The Birchdale

*The versatile new Birchdale design combines style and functionality in a spacious home that's ideally suited to your lifestyle. All of the amenities you want with the benefits of a homeowners association in an outstanding Woodbury setting. You'll find The Birchdale to be your perfect home!*

- 3 bedrooms, two story foyer, loft area; over 1550 square feet
- U-shaped kitchen with breakfast counter, GE appliances and dinette
- Formal living and dining rooms with sliding glass door overlooking 10 x 10 patio
- Master suite with large walk-in closet.
- Convenient attached 2 car garage & first floor laundry featuring GE washer and dryer



Great loft area to create that special place



Upper Level Plan

Optional Bonus Room And Luxury Bath Available!




Main Level Plan

D 00275

ATTORNEY EYES ONLY

# The Highland

1578

*The design of The Highland offers you spacious living areas ideal for entertaining friends and family. Combining the features you are looking for in a new home with a prime location that fits your lifestyle makes The Highland at The Lodges your choice in a new home!*



Great open living area for entertaining friends.

- *2 Bedroom, three stories with over 1525 square feet*
- *Spacious master bedroom with angled entry, walk-in closet.*
- *Gourmet kitchen including snack bar & featuring GE appliances*
- *Enormous living and dining rooms perfect for entertaining your friends*
- *Gracious foyer, attached two car garage and first floor laundry room featuring full-size GE washer and dryer.*



Upper Level Plan



Main Level Plan

Optional Bonus Room, Luxury Bath And Deck Available!



Entry Level Plan

ATTORNEY EYES ONLY

D 00276