UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| The Rottlund Company, Inc. d/b/a Rottlund Homes, a Minnesota Corporation,<br>Plaintiff,<br>vs.<br><br>Pinnacle Corporation d/b/a Town & Country Homes, an Illinois Corporation, Town & Country Homes, Inc., a Minnesota Corporation, Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation, and The Bloodgood Group, Inc., an Iowa Corporation,<br>Defendants,<br>and<br><br>Town & Country Homes, Inc., a Minnesota Corporation,<br><br>Third-Party Plaintiff,<br>vs.<br><br>Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation,<br><br>Third-Party Defendant. | ) | No.: 01-CV-1980 (DSD/SRN) |

**PLAINTIFF'S TRIAL BRIEF**

**TABLE OF CONTENTS**

Page No.


I. THE FACTS ROTTLUND INTENDS TO PROVE ........ 1

A. Rottlund's Copyrights ........ 1

B. The Defendants' Access To And Direct Copying Of Rottlund's Copyrights ........ 2

1. Midland Homes ........ 2

2. Jerry's Homes ........ 4

3. The Defendants' "Villa Product" Project (the Homestead Collection) ........ 4

4. The Chateau Collection (a revised, slightly modified, and renamed Homestead Collection) ........ 10

C. Communities Where The Town & Country Defendants Earned Profits From The Infringing Products And Profits From Other Products Attributable To The Infringement ........ 12

1. 1998-1999: The Town & Country Defendants Purchase the Hollander Property and Develop Their Centennial Crossing Community ........ 12

a. The Town & Country Defendants Were Allowed to Build Other Products at Centennial Crossing Because the Infringing Homestead Collection Satisfied the City's Requirements for a Multi-Product Community ........ 14

2. February 28, 2000: Town & Country Defendants Transferred The Infringing Homestead Collection Drawings From Their Centennial Crossing Development In Maple Grove, Minnesota, To Their Washington Square Development in Aurora, Illinois ........ 17

3. November 29, 2000: Town & Country Defendants Transferred The Infringing Homestead Collection Drawings From Their Centennial Crossing Development In Maple Grove, Minnesota, To Their Harvest Hills Development in Plymouth, Minnesota ........ 18

4. January 18, 2001: Town & Country Defendants Transferred The Infringing Homestead Collection Drawings From Their Centennial Crossing Development In Maple Grove, Minnesota To Their Cornerstone Lake Development in Lakeville, Minnesota ........ 19

5. April 30, 2001: Town & Country Defendants Transferred The Infringing Homestead Collection Drawings From Their Cornerstone Lake Development In Lakeville, Minnesota, To Their Springbrook Development in Lakeville, Minnesota ................................20

6. April 30, 2001: Town & Country Defendants Transferred The Infringing Homestead Collection Drawings From Their Harvest Hills Development In Plymouth, Minnesota, To Their Providence Pointe Development in Shakopee, Minnesota .........................................20

D. The Defendants' Infringement Was Intentional .................................................22

E. The Town & Country Homes Defendants' Direct Infringement, Vicarious Liability, And Contributory Infringement..........................................................23

F. The Bloodgood Defendants' Direct Infringement, Vicarious Liability, And Contributory Infringement .......................................................................24

G. Rottlund's Ability To Develop The Communities Where The Town & Country Homes Defendants Sold Infringing Products ........................................25

1. Rottlund's Unsuccessful Negotiations For The Other Properties That The Town & Country Homes Defendants Wrongfully Acquired And Developed With Infringing Products................................25

2. Rottlund's Capacity To Develop Properties That Town & Country Acquired And Developed With Infringing Products................................26

3. Rottlund's Ability To Sell Other Products In Place of The Town & Country Defendants' Non-Infringing Products Whose Profits Are Attributable To The Infringement .........................................................27

H. Rottlund's Willingness To Negotiate A One Time License Of Its Villa II Town Homes...................................................................................................29

I. Rottlund's Actual Damages.................................................................................30

J. The Town & Country Homes Defendants' Infringers' Profits.............................31

K. The Bloodgood Defendants' Infringers Profits ..................................................34

L. The Defendants' Representations Which Violate The Lanham Act And Minnesota Deceptive Trade Practices Act .........................................................35

II. UNRESOLVED SUBSTANTIVE ISSUES ....................................................................38

A. Rottlund's Copyright Claims ..........................................................................38

1. Rottlund's Copyrights Protect The Total Look And Feel Of Its Villa Designs and As-Built Structures.....................................................38

2. Rottlund's 17 U.S.C. § 106 Rights ...........................................................41

3. Copyright Infringement ...........................................................................42

a. Ownership Of A Valid Copyright...............................................42

b. Copying ..........................................................................................43

i. Direct Evidence of Copying...........................................44

ii. Access and Substantial Similarity ..................................44

c. Contributory Infringement .........................................................46

d. Vicarious Liability ........................................................................48

4. Copyright Infringement Damages ..........................................................49

a. Actual Damages.............................................................................49

b. Infringers' Profits...........................................................................52

c. Statutory Damages and Attorneys' Fees .....................................56

5. The Defendants' Infringement Was Intentional, As They Acted With Reckless Disregard of Rottlund's Copyright Interests ....................60

6. Because The Defendants' Infringement Was Intentional, They Are Not Allowed To Deduct Their Overhead Expenses Or Apportion Their Damages In Determining Infringers' Profits .................................62

B. Rottlund's Lanham Act And Minnesota Deceptive Trade Practices Act Claims ..........................................................................................................63

III. UNRESOLVED EVIDENTIARY ISSUES ..........................................................63

A. The Defendants' Foundation And Authentication Objections .............................63

IV. UNRESOLVED PROCEDURAL ISSUES ........................................................ 65

A. The Defendants Should Be Ordered To Bring Original, Color Copies Of Trial Exhibits To Trial For Rottlund To Use In Its Case-In-Chief ........................ 65

B. Subpoenas Served On Rottlund Employees ........................................................ 65

C. The Parties' Letters To The Court Regarding Pre-Trial Issues ............................ 66

V. ESTIMATED LENGTH OF TIME FOR TRIAL ........................................................ 67

Pursuant to Local Rule 39.1(b)(1)(A), Plaintiff The Rottlund Company, Inc. ("Rottlund")[1] respectfully submits Plaintiff's Trial Brief. Plaintiff's Trial Brief shall indicate the facts which Rottlund intends to prove, and indicate, to the best of Rottlund's ability, any unresolved substantive, evidentiary and procedural issues. Plaintiff's Trial Brief will also include citations and discussions of authority upon which Rottlund relies for its positions on the unresolved issues. Lastly, Plaintiff's Trial Brief will estimate the length of time for the entire trial, including jury selection and jury charge.

## I. THE FACTS ROTTLUND INTENDS TO PROVE

### A. Rottlund's Copyrights.

In 1987, Rottlund created its Original Villa back to back multi-family town home designs. In 1991, Rottlund created its New Villa back to back multi-family town home designs. Rottlund applied for, and received, copyright protection for its New Villa designs pursuant to 17 U.S.C. §§ 102(a)(5) (technical drawings) and 102(a)(8) (architectural works). Rottlund's § 102(a)(5) New Villa copyright became effective on October 5, 1993 through Copyright Registration VAu 268-404. In 1997, Rottlund created its Villa II back to back multi-family town home designs. Rottlund applied for, and received, copyright protection for its Villa II designs pursuant to 17 U.S.C. §§ 102(a)(5) and 102(a)(8). Rottlund's § 102(a)(8) New Villa and Villa II copyrights also protect Rottlund's New Villa and Villa II as-built structures. Rottlund's Villa II multi-family town home designs are protected by technical drawings Copyright Registrations VAu 447-395 and VAu 546-285, and architectural works Copyright Registration VAu 534-723. Rottlund's copyrighted protected Villa II multi-family town home designs and as-built structures

[1] The Defendants are Pinnacle d/b/a Town & Country Homes ("Pinnacle") and its Minnesota Division, Defendant Town & Country Homes, Inc. ("TCM"), (collectively the "Town & Country Homes Defendants"); and The Bloodgood Group, Inc. ("BGI") and its subsidiary Bloodgood Sharp Buster Architects & Planners of Iowa, Inc. ("BSB") (collectively the "Bloodgood Defendants").

contain two copyrighted town home floor plans: 1) the Chatham (exterior unit home); and 2) the Dunhill (interior unit home).

Rottlund's Original Villa was designed by Rottlund owner Bernard Rotter, with some assistance from Tim Whitten, an outside architect. Neither Mr. Rotter or Mr. Whitten had ever seen any product similar to the Original Villa prior to Rottlund's independent creation of the Original Villa. At least two different third parties, including Roger Conhaim from Conhaim & Associates, have testified that Rottlund was the first to offer back to back town homes to the Twin Cities market in the late 1980's.

**B. The Defendants' Access To And Direct Copying Of Rottlund's Copyrights.**

BSB's architect Larry Moore was responsible for the initial design concepts for the Town & Country Homes Defendants' Homestead Collection town homes. Before Mr. Moore assembled the Homestead Collection design he researched BSB's prior back-to-back town home project files for Midland Homes and Jerry's Homes. Mr. Moore only had substantive involvement as an architect with the Midland Homes project. Mr. Moore consulted and reviewed the working drawings from these files before beginning to work on what is now the Defendants' Homestead Collection town home design. According to Mr. Moore, the placement and arrangement of room locations and elements for the Homestead Collection came from his review of these prior project files. BSB copied Rottlund's Villa designs when it assembled the prior Midland and Jerry's Homes town home designs.

**1. Midland Homes.**

In 1994, BSB architect Larry Moore used Rottlund's Villa product plans when BSB assembled the Midland Homes back-to-back design. Mr. Moore signed a contract on behalf of BSB with Design Development, Inc. and instructed Design Development to assemble

construction drawings "similar to the Rottlund Homes plans" he provided to Design Development's owner. Mr. Moore gave a "cut and paste job" of Rottlund's floor plans to Design Development. A comparison of the Rottlund Homes floor plans produced from Design Development's files with the "cut and paste job" document Mr. Moore identified reveals that someone cut off Rottlund's copyright notice and logo, and assembled the "cut and paste" document using the floor plans in Rottlund's Villa marketing brochure. Specifically, Rottlund's lower level internal and external unit floor plans were cut out, copied, reversed, copied, inverted, copied, inverted and reversed, copied, and then assembled into an eight unit back-to-back floor plan configuration. For instance, the distinctive marks on the garage of Rottlund's floor plan appear on every external unit in the eight unit cluster found in the "cut and paste" document.

A comparison of the Rottlund Villa elevation that Mr. Moore gave to Design Development with the elevation which BSB assembled for Midland Homes demonstrates BSB copied Rottlund's copyrighted design. For example, the change from the three-over-three window design to a two-over-two window design evidences copying and the remainder of the elevation duplicates the total look and feel of Rottlund's elevation. Also, in the earlier draft of the Midland elevation, a handwritten note above the offset center gables states: "can we omit this offset?" The offset was omitted and the center gables were changed to mirror Rottlund's single center gable design. When considered in light of the check box for "copyright issue" on the first page of this version of the Midland Homes design, it is clear that BSB directly copied Rottlund's Villa design and was cognizant of this fact. Mr. Moore subsequently wrote an internal memorandum, attached a copy of BSB's Midland Homes' design and Rottlund's design, and asked: "is our design enough 'departure' from Rottlund" to avoid copyright liability. BSB claims it no longer has the Rottlund plans referenced in this internal memorandum.

**2. Jerry's Homes.**

BSB architect Chris Jorgenson worked extensively with BSB architect Larry Moore on the Homestead Collection town home designs. In or about late 1996 or early 1997, prior to any of BSB's work on the Homestead Collection, Mr. Jorgenson worked on a back-to-back town home project for Jerry's Homes. While working on the Jerry's Homes town home project, Mr. Jorgenson received a facsimile from Jerry's Homes that included the floor plans and elevations for Rottlund's Villas of Meredith Pointe. The Rottlund floor plans and elevations Mr. Jorgenson received bear a copyright notice. Subsequently, BSB worked on the Jerry's Homes back to back town homes designs and changed the name of the project for Jerry's Homes to the Bent Tree "Villas."

**3. The Defendants' "Villa Product" Project (the Homestead Collection).**

In early 1998, TCM President Art Plante proposed that the Town & Country Homes Defendants start offering a back-to-back multi-family town home design in Minnesota. Prior to this time, the Town & Country Homes Defendants did not offer a back-to-back multi-family town home design in the Minnesota market and their Minnesota Division (TCM) was not profitable.[2]

On March 19, 1998, Pinnacle's in-house architect and Vice President of Product Development Steve Sandelin met with Doug Buster, a named partner of BSB and the majority shareholder of BGI, in Chicago, Illinois. Mr. Buster made a "multi family presentation" to Mr. Sandelin. Thereafter, it was decided that BSB, BGI's subsidiary, would help assemble the back-to-back multi-family town home design.

---

[2] After losing money for at least four straight years, the Town & Country Homes Defendants' Minnesota operation essentially doubled their net income each year for at least four straight years after offering the Minnesota market the back-to-back multi-family town home designs they copied from Rottlund. Consequently, the Town & Country Homes Defendants' Minnesota operation now ranks as the sixth largest in Minnesota.

On March 31, 1998, representatives of the Town & Country Homes Defendants and BSB traveled to Minnesota to tour Rottlund's Villa II back to back town homes. During this tour, members of the tour group took photographs of Rottlund's Villa II town homes, and took at least one marketing brochure which contained pictures and floor plans of Rottlund's copyrighted Villa II design. The Defendants maintained numerous photographs of Rottlund's product in their files and at least two brochures containing the Rottlund's copyrighted floor plans.

A week later, on April 6, 1998, BSB entered into a contract with the Town & Country Homes Defendants to provide architectural schematic design services for a "Villa Program." The contract describes the Defendants' Villa Program as an eight unit, back to back multi-family town home. Pursuant to the contract, BSB was to provide schematic designs for two town home units (interior and exterior), one eight unit cluster configuration, and a prototypical density site plan study. Shortly thereafter, BSB forwarded the schematic designs for an end unit to the Town & Country Defendants.

On April 29, 1998, Larry Moore and Chris Jorgenson (both BSB architects), along with Pinnacle's in-house architect Steve Sandelin and TCM President Art Plante, again toured Rottlund's Villa II town homes. Members of the tour group again took photographs and marketing brochures depicting Rottlund's floor plan. Mr. Plante testified to still other tours that he took of Rottlund's Villa II product. Mr. Plante admitted that he "disposed of" much of the competitor brochures he gathered and TCM never produced its copy of Rottlund's marketing brochure.

According to BSB architect Larry Moore, the Defendants toured Rottlund's Villa II town homes to find "mistakes" that Rottlund was making with its back-to-back town home designs. The goal of the tours was to fix these "mistakes" and "find opportunities to one-up" the

competition. According to Mr. Moore: "[we] see a mistake they're making and we better it. If their rooms are too small, we make them bigger. If their closets are too small, we make them bigger. We better it."

On May 5, 1998, a week after Defendants' second tour of Rottlund's Villa II design, Larry Moore sent Steve Sandelin a "competition product survey for Minneapolis market." When deposed in his capacity as BSB's Rule 30(b)(6) representative, Mr. Moore testified that he could not recall anything about the contents of the competition product survey. He later testified in his individual capacity that he could not testify with certainty that Rottlund's floor plans were not included in the attached survey. The competition product survey would likely be in TCM President Art Plante's "file with the documentation pertaining to the design and development" of the Defendants' town home, but the Town & Country Homes Defendants have not produced this important file and have admitted that they cannot "recreate" the file even though it was sent to their counsel on July 16, 2001.

On May 18, 1998, through an internal BSB correspondence regarding "Town & Country, Villas," Chris Jorgenson stated "Doug Buster called and faxed these to me after talking with Steve Sandelin . . . Doug thought it might be good to call Art Plante and discuss with him what Steve is suggesting." Doug Buster is BGI's majority shareholder and works for BGI "every day." During their discussion, Mr. Sandelin asked Mr. Buster to review "Town & Country/BSB Minneapolis back-to-back townhouses" in order to help develop a back-to-back town home design for the Chicago marketplace. Mr. Buster worked on the project and turned his designs over to BSB Illinois. A BGI graphic artist and a BGI technician also worked on the back-to-back town home designs.

On June 23, 1998, after BSB completed the schematic design services provided under the April 6, 1998 contract with the Town & Country Homes Defendants, the Defendants entered into a second contract. Pursuant to the terms of this contract, BSB was to continue its work on the "Villa Product" and provide design development and construction document services to the Town & Country Homes Defendants. This contract was revised on July 1, 1998. Less than two weeks later, BSB sent TCM President Art Plante detailed designs entitled "The Villas" and received back from Mr. Plante "client" red-lines which included revisions, a color photograph of Rottlund's Villa II product, a hand drawn sketch by Mr. Plante, and Mr. Plante's instruction to "see Rottlund product."

On June 7, 1999, BSB advised the Town & Country Homes Defendants that they needed a new name for the "The Villas" design because "Villas" was already being used. Thereafter, the Town & Country Homes Defendants changed the name of their "Villa Product" design to the Homestead Collection.

The Town & Country Homes Defendants hired Tim Johnson, an architect that previously worked in-house at Rottlund. While employed by Rottlund, Mr. Johnson worked on Rottlund's Villa II designs. The Town & Country Homes Defendants also hired three other former Rottlund employees that had access to Rottlund's Villa II designs when they worked for Rottlund: Dan Geegan, Marc Harris, and Joey Zorn. Each of these former Rottlund employees was an instrumental part of the Town & Country Homes Defendants' team "involved in the red lining process" for the Homestead Collection town home designs. The Town & Country Homes Defendants also successfully lured Rottlund's land development manager, Richard Palmiter, away from Rottlund and hired him as their land development manager for their Minnesota operation. The Town & Country Homes Defendants tried to hire many other Rottlund

employees during the time they were copying Rottlund's Villa II copyrights. The Town & Country Homes Defendants also sent a former Rottlund employee to a Rottlund office to request a list of all of Rottlund's vendors.

On January 5, 2000, the Town & Country Homes Defendants began to develop the Homestead Collection back-to-back town home designs in Aurora, Illinois because there was no direct competition for this product type in the Chicago market. These Illinois town homes were developed from the working drawings originally prepared for the Town & Country Homes' Defendants' Maple Grove, Minnesota development (Centennial Crossings). The Town & Country Homes Defendants hired BGI architect Doug Buster to work on these Homestead Collection town homes in Aurora, Illinois. Mr. Buster simply "re-elevated" the Homestead Collection town houses for the Town & Country Homes Defendants in a mere "day and a half or two." Other BGI employees worked on these town homes and BGI admits its involvement in the re-elevation of the Homestead Collection. The Town & Country Homes Defendants then renamed the re-elevated Homestead Collection town homes the Washington Square Back-to-Back Town Homes.

Thereafter, in 2000 and 2001, the Town & Country Homes Defendants began to sell the Homestead Collection town homes at the Centennial Crossing Development in Maple Grove, Minnesota. During this time, the Town & Country Homes Defendants acquired property in Plymouth, Minnesota, and began to develop, along with BSB, the Homestead Collection at the Harvest Hills Development, which is on this property.

On July 5, 2001, Rottlund wrote the Town & Country Homes Defendants a cease and desist letter and demanded that they stop infringing upon Rottlund's copyrighted Villa II designs. On July 9, 2001, Mr. Sandelin admitted the Defendants' Homestead Collection designs were

"obviously similar" to Rottlund's Villa II designs. Mr. Sandelin then began to spin the Town & Country Homes Defendants' unlawful copying by sending a memorandum to BSB regarding "copyright infringement," and asked if BSB had a co-license agreement with Rottlund. No co-license agreement exists.

On July 25, 2001, TCM employee, and former Rottlund employee, Dan Geegan, sent a portion of Rottlund's copyrighted technical drawings, Registration No. 546-285, depicting the design and layout for Rottlund's sprinkler room to BSB architect Beth Miller. The Rottlund logo and copyright notice on Rottlund's copyrighted designs were cut off from the margin when it was photocopied. Thereafter, on November 2, 2001, Dan Geegan and Beth Miller had further discussions concerning the sprinkler room designs for the Homestead Collection, and Mr. Geegan was "going to call an old arch[itect] friend to determine what they did in this situation."

On April 25, 2002, the Defendants still had not completed a sprinkler room design or layout for their Homestead Collection. Thus, BSB again received a facsimile concerning a sprinkler system design and layout. BSB again received photocopied portions of Rottlund's copyrighted Villa II designs, Registration No. 546-285, but this time the right hand margins on the attached pages were not fully deleted. Instead, Rottlund's logo was scribbled out and the following copyright notice was scribbled over: "© Copyright 2000 The Rottlund Company, Inc."

On July 3, 2002, TCM's in-house architect and former Rottlund in-house architect Tim Johnson sent BSB another facsimile concerning Rottlund's Villa II sprinkler system. This time, the right hand margin Rottlund's copyrighted design was cut off. In addition, letters were added to the words "SPRINKLER" and "SCALE", and the scale was crossed out.

The Homestead Collection and Washington Square Back-to-Back town home plans and structures were directly copied from Rottlund's copyrighted Villa II plans and structures. In

addition, the Homestead Collection and Washington Square Back-to-Back town home plans and structures are substantially similar to Rottlund's copyrighted Villa II plans and structures.

**4. The Chateau Collection (a revised, slightly modified, and renamed Homestead Collection).**

The Chateau Collection design is a slightly modified Homestead Collection design, which was directly copied from and is substantially similar to Rottlund's copyrighted Villa II plans and structures. On March 12, 2002, the Town & Country Homes Defendants submitted a "proposal for a new residential community called Traditions at Clover Field" to the City of Chaska. The Town & Country Homes Defendants proposed to develop single family homes -- Traditions Collection -- and a multi-family home -- Courtyard Collection. The Town & Country Homes Defendants stated to the City of Chaska that "[t]his product [the single family home product] has been well received in Town & Country's Foxford Hills development in Chicago" and they attached examples of their Chicago designs. On April 15, 2002, the Town & Country Homes Defendants submitted a revised proposal to the City of Chaska, which proposed to develop the Homestead Collection town homes in addition to the two products identified above. On May 20, 2002, the City of Chaska passed and adopted a resolution approving the Town & Country Homes Defendants' proposed development as whole.

On August 1, 2002, the Town & Country Homes Defendants submitted a "proposed Pinebrook community" plan to the City of Brooklyn Park. Their proposal was to develop a community comprised entirely of Homestead Collection townhomes. The City of Brooklyn Park approved the proposal for development in October 2002.

Thereafter, the Town & Country Homes Defendants made some minor changes to the Homestead Collection in Chaska and Brooklyn Park and identified these changes when asking Chaska and Brooklyn Park for continued approval. For instance, on October 18, 2002, the Town

& Country Homes Defendants explained the changes in a facsimile to a Brooklyn Park representative: "We basically added a porch to the end as opposed to just a stoop, added dormers at the ends and kept the shutters on the ends." Likewise, on October 25, 2002 and again on November 12, 2002, the Town & Country Homes Defendants again explained to Brooklyn Park that some "enhancements" had been made to the "revised architectural elevations." Ultimately, the Town & Country Homes Defendants' revised Homestead Collection town homes in Chaska and Brooklyn Park were renamed the Chateau Collection town homes.

On March 21, 2003, the Town & Country Homes Defendants explained the revisions as "enhancements" and outlined the following differences to the City of Brooklyn Park:

> The attached architectural elevations show the enhancements. Gables were added to break up the mass of the roofline and end elevations. Two different end unit styles/floor plans are now offered. One style features an entrance from the end with an angled living room/bedroom area, while the other enters from the same side as the private driveway without the angle while still offering a porch on the end elevation.

Similarly, in an April 4, 2003 memorandum to the City of Chaska, the Town & Country Homes Defendants described the Chateau Collection as "architectural enhancements on the back-to-back product (Homestead Collection) at Traditions."

The Town & Country Homes Defendants were "excited to offer these architectural enhancements" and requested that Brooklyn Park and Chaska would permit them to develop these revised Homestead Collection townhomes in place of the Homestead Collection townhome version that that had been previously approved for development. Based on the Town & Country Homes Defendants' representations regarding the limited scope of the "revisions" or "enhancement" to the Homestead Collection town homes, both Brooklyn Park and Chaska approved the Town & Country Homes Defendants' proposal to develop and sell the Chateau Collection town homes.

The Town & Country Homes Defendants hired Tushie Montgomery Architects ("TMA") to assist them with these "architectural enhancements" and entered into contracts with TMA requiring TMA to "[r]eview all available information completed for the project." According to documents produced by TCM, there was also a separate agreement between TMA and the Town & Country Homes Defendants related to TMA's review of all information pertaining to the Homestead Collection documents. Rottlund's former in-house architect Tim Johnson who had access to and worked on Rottlund's Villa II designs, and who was subsequently on the Town & Country Homes Defendants' Homestead Collection design "red-line" team – executed the contracts with TMA. During the revision process, Mr. Johnson electronically delivered designs directly to TMA, including sprinkler room design details.

The Town & Country Defendants' Traditions at Clover Ridge development is in Chaska, Minnesota, and is within one hundred feet of Rottlund's Clover Ridge development in Chaska, Minnesota. Their Pinebrook development in Brooklyn Park, Minnesota, is in close geographical proximity to Rottlund's ongoing Club West and The Lakes developments, both located in Blaine, Minnesota.

### C. Communities Where The Town & Country Defendants Earned Profits From The Infringing Products And Profits From Other Products Attributable To The Infringement.

#### 1. <u>1998-1999</u>: The Town & Country Defendants Purchase the Hollander Property and Develop Their Centennial Crossing Community.

In early 1998, several real estate consultants and brokers worked on a widely known development opportunity in Maple Grove, Minnesota, located on a choice piece of real estate referred to as the Hollander property. By June 1, 1998, the city council approved a mixed use, diversified, residential housing concept plan for developing this property: e.g., 220 units of town house and/or duplex housing, and 69 units of single family housing. On or about July 9, 1998,

this widely known and publicly disclosed development opportunity proceeded to formal bidding, and both Rottlund and the Town & Country Defendants received invitations to bid.

Maple Grove officials required that the Hollander property be developed with density housing, affordable housing, and diverse housing. The affordability guideline was perhaps the most important, as Maple Grove was previously involved in a lawsuit for not providing enough affordable housing. The city offered the successful bidder "density credits" – meaning the developer could build more units, and in turn earn more profit, on the same finite parcel of land – if the developer constructed: (a) affordable housing; (b) multiple products/diversity housing; and/or (c) rental housing. Maple Grove requested that potential developers submit "package deals" with multiple products that would satisfy these guidelines before Maple Grove would approve a proposal to develop the Hollander property. This was an all-or-nothing proposition, meaning the successful bidder could not offer to build only one product or build non-conforming products on the property, but instead was required to work out joint ventures or partial sales of subplots of this parcel of land to other developers with products that satisfied Maple Grove's guidelines.

Both Rottlund and the Town & Country Defendants submitted bids to acquire the Hollander property. On September 17, 1998, Rottlund submitted its second and final bid for the property, but was unwilling to raise the price beyond its prior offer. On September 17, 1998, the Town & Country Defendants also submitted their second round bid for the Hollander property; they were also unwilling to raise the price beyond their prior offer. On April 11, 1999, the Town & Country Defendants terminated their purchase agreement to acquire the Hollander Property because they "had less time than originally anticipated to reach a comfort level with the City."

Thereafter, on August 26, 1999, the Defendants first issued the infringing Homestead Collection drawings at issue in this lawsuit.

The Town & Country Defendants then entered into a new purchase agreement and ultimately paid approximately 5% more for the Hollander property than Rottlund offered to pay: $4.25 million versus $4.0 million. The Court ultimately awarded the Hollander property to Town & Country, even though their $4.25 million bid was "third highest." The Town & Country Defendants were able to pay slightly more for this land because they had substantially lower overhead for developing the infringing Homestead Collection design in comparison to Rottlund, who spent over one year developing the copyrighted Villa products. The infringing Homestead Collection design for Centennial Crossing cost only $35,890. The initial April 6, 1998 contract price for the infringing Homestead Collection design for Centennial Crossing (which was internally called the "Villa Program") was $10,110. On July 1, 1998, the parties contracted for additional "Villa Program" architectural services which cost an additional $19,840. The July 21, 1999 contract price for additional design work for Centennial Crossing was $6,300. Town & Country sold a piece of the apartment portion of this land to another developer to satisfy the apartment housing guideline. (*Id.*, Ex. R11, 123:8-20.) Subsequently, the Town & Country Defendants renamed the Hollander property and began developing their Centennial Crossing community in Maple Grove, MN.

**a. The Town & Country Defendants Were Allowed to Build Other Products at Centennial Crossing Because the Infringing Homestead Collection Satisfied the City's Requirements for a Multi-Product Community.**

Because of Maple Grove's requirements for multiple, different housing products, the Town & Country Defendants proposed to build two multi-family products at Centennial Crossing: (i) the infringing Homestead Collection back-to-back town home product; and (ii) a

side-by-side town home product. The Homestead Collection was the key to this proposal, as it satisfied the affordability guideline which helped the Defendants win the bidding contest and receive approval for their development proposal. The Homestead Collection also satisfied the "housing diversity" guideline, which helped the Defendants receive approval for their proposed development.

In addition to satisfying Maple Grove's housing diversity and affordability guidelines and enabling Town & Country to obtain approval to develop the Hollander property, the Homestead Collection also satisfied the city's prerequisites for "density credits," which Town & Country received and used to build more units, and thereby achieved greater profits, from this fine piece of land. Furthermore, the infringing 8-unit Homestead Collection satisfied the 8-plex town home site plan requirement for this planned community. Other than the Homestead Collection, the Town & Country Homes Defendants did not have a product to satisfy this 8-unit town home requirement.

On September 6, 1999, third-party Edina Realty completed a study for Town & Country and wrote the results in a memorandum captioned, "Competition Shop, Maple Grove and Plymouth, August Sales, Townhouse Competition." This memorandum identifies Rottlund's Cornerstone Villas and Cornerstone Common Garden Homes in Plymouth, Minnesota, as direct competition for Town & Country's Homestead Collection town homes at its Centennial Crossing community in Maple Grove, Minnesota. It also identified Rottlund's rambler town homes at Rottlund's Elm Creek Bluffs development in Maple Grove as direct competition for Town & Country's other town homes at Centennial Crossing.

On February 1, 2000, third party Edina Realty completed another study for Town & Country and wrote the results in a memorandum captioned, "Competition shop for the

Homestead Collection- Back to back townhomes." The very first competitive product identified in this memorandum was the "Maple Lake Villas, by Rottlund, in Maple Grove." The February 1, 2000 memorandum also listed Rottlund's Maple Lake Urban Townhomes as a competitor product for the Centennial Crossing development. In early 2000, the Town & Country Defendants' Centennial Crossing development in Maple Grove was in direct competition with Rottlund's Maple Lakes development in Maple Grove. As the February 1, 2000 memorandum explains, Rottlund was just beginning to sell Villa II and New Urban Town Homes at its Maple Lakes development (it had sold just 4 of the 64 contemplated Villa units) at the time Town & Country began offering infringing Homestead Collection town homes and row town homes in its Centennial Crossing development in Maple Grove.

Rottlund lost sales to Town & Country in this head-to-head competition, and Town & Country also saturated a development opportunity with an infringing knockoff product only a few miles away. This is true because value, not location, is the single most important consideration for the first-time homebuyers that purchase Rottlund's Villa II town homes, and the same potential customers are more than willing to buy a Villa II in more than one location. Unfortunately for Rottlund, demand for the Villa II was so great, some potential customers actually paid more for an infringing Homestead Collection town home within the same geographic proximity.

The demand for the Villa II product rightfully belonged to Rottlund, but Town & Country took this demand out of the market by supplying infringing Homestead Collection town homes in close geographic proximity to other Rottlund Villa II developments and future Villa II developments. Rottlund's damages expert prepared a chart and map that illustrate the close geographic proximity of Rottlund's Villa II developments and Town & Country's infringing

Homestead Collection developments. The Joint Defendants' damages experts also prepared charts that corroborate the fact that the developments at issue in this matter are in close geographic proximity. Rottlund witnesses and the Town & Country Defendants' damages experts all testified that Rottlund lost Villa II sales to the infringing Homestead Collection, but the Defendants' damages experts failed to conduct any type of analysis to quantify the magnitude of the lost sales.

If the Town & Country Homes Defendants did not have the infringing product: (1) Rottlund would have acquired the Hollander property and made these Villa II sales; (2) Rottlund would have made these Villa II sales in its Maple Lakes development in Maple Grove; and/or (3) Rottlund would have made these Villa II sales at other developments in close geographic proximity to Maple Grove.

**2. <u>February 28, 2000</u>: Town & Country Defendants Transferred The Infringing Homestead Collection Drawings From Their Centennial Crossing Development In Maple Grove, Minnesota, To Their Washington Square Development in Aurora, Illinois.**

On August 26, 1999, the Town & Country Defendants first issued the infringing Homestead Collection drawings for their Centennial Crossing community. On or about February 28, 2000, BSB and the Town & Country Defendants entered into a "jurisdictional transfer" contract which took the Homestead Collection drawings for the Centennial Crossing development in Maple Grove, Minnesota, and transferred them to the Town & Country Defendants' Washington Square development in Aurora, Illinois. The specific drawings subject to the transfer were "the Multi-family documents dated 8/26/99 and prepared for Centennial Crossing subdivision in Maple Grove, Minnesota." BSB subsequently admitted that the designs for Town & Country's Aurora, Illinois, development were "based on the Homestead Collection BSB designed for Town & Country – Minnesota."

Like its Centennial Crossing development, Town & Country's Washington Square development in Aurora, Illinois, had to satisfy the city's density requirements and product mix/product diversity requirements. Town & Country used the infringing Homestead Collection back-to-back product to satisfy the density requirement. Moreover, Town & Country sold only two products at the Washington Square development: back-to-back town homes and row town homes. Accordingly, Town & Country necessarily used the infringing Homestead Collection back-to-back product to satisfy the product diversity requirement which the row town homes could not satisfy alone.

**3. <u>November 29, 2000</u>: Town & Country Defendants Transferred The Infringing Homestead Collection Drawings From Their Centennial Crossing Development In Maple Grove, Minnesota, To Their Harvest Hills Development in Plymouth, Minnesota.**

On November 29, 2000, BSB and the Town & Country Defendants entered into another contractual "jurisdictional transfer" of the then "existing Homestead Collection plans" for the Centennial Crossing development to the Town & Country Defendants' Paulson Property/Harvest Hills development in Plymouth, Minnesota. The Town & Country Defendants' Harvest Hills development in Plymouth, Minnesota is within three miles of Rottlund's The Reserve development in Plymouth, Minnesota. The Town & Country Defendants' "Harvest Hills Guidebook" includes elevations and floor plans of the following directly competing Rottlund products sold at Rottlund's The Reserve development: (i) The Villa II Town Homes; (ii) The Gables Town Homes; and (iii) The New Urban Town Homes.

The City of Plymouth has affordable housing guidelines, life cycle housing guidelines, and housing diversity guidelines. The Town & Country Defendants asked the city to approve a package deal proposed community which included the affordable, entry level back-to-back Homestead Collection product and a more expensive "move-up" side-by-side town home

product. Once again, the Homestead Collection was the key to obtaining this approval as it satisfied Plymouth's affordable housing, life cycle housing, and housing diversity guidelines, and satisfied the continued demand for entry level housing in Plymouth.

In his presentation to the City of Plymouth Planning & Zoning Committee, the President of Town & Country's Minnesota Division informed Plymouth officials that Town & Country's "mission is to build innovative, value-oriented designs that capture the needs of a multitude of homebuyer profiles." He then urged the municipality to approve the Town & Country Defendants' proposed Harvest Hills community because their plan met the "3 primary goals of the city housing needs": (i) life cycle housing; (ii) housing diversity; and (iii) affordable housing. The infringing Homestead Collection was one of just two products in the proposed community that were used to satisfy these three goals, and it was also used to satisfy the city's density requirement of 3-6 units per acre.

**4. January 18, 2001: Town & Country Defendants Transferred The Infringing Homestead Collection Drawings From Their Centennial Crossing Development In Maple Grove, Minnesota To Their Cornerstone Lake Development in Lakeville, Minnesota.**

On January 18, 2001, BSB and the Town & Country Defendants agreed to another contractual "jurisdictional transfer" of the Homestead Collection drawings for the Centennial Crossing development in Maple Grove, Minnesota, to the Town & Country Defendants' Cornerstone Lake development in Lakeville, Minnesota. The Homestead Collection drawings subject to the transfer were "conceptual drawings dated 8/11/00 previously provided by ARCHITECT." The Homestead Collection was the only product the Town & Country Defendants constructed at the Cornerstone Lake development.

The Town & Country Defendants' Cornerstone Lake development in Lakeville, Minnesota is within roughly five miles of Rottlund's Vermillion Grove development in

Farmington, Minnesota. On January 25, 1999, a third-party consultant prepared a market overview report for Town & Country's prospective Lakeville town home site and concluded that it had " a 'Farmington' feel because it is located on the margin (far east side) of Lakeville." On October 4, 2001, a different third-party consultant completed a study for Town & Country and wrote the results in a memorandum captioned, "Competition Shop for Cornerstone Lake in Lakeville." This study concluded Town & Country's Homestead Collection products in Lakeville, Minnesota, competed head-to-head with Rottlund's Villa II products at its Vermillion Grove development in Farmington, Minnesota, which was then in its very early stages.

**5. April 30, 2001: Town & Country Defendants Transferred The Infringing Homestead Collection Drawings From Their Cornerstone Lake Development In Lakeville, Minnesota, To Their Springbrook Development in Lakeville, Minnesota.**

On April 30, 2001, BSB and the Town & Country Defendants executed another contractual jurisdictional transfer of the Homestead Collection designs for the Cornerstone Lake development in Lakeville, Minnesota, to the their Stone's Throw/Springbrook development in Lakeville, Minnesota. The Homestead Collection was the only product the Town & Country Defendants constructed at the Stone's Throw/Springbrook development.

**6. April 30, 2001: Town & Country Defendants Transferred The Infringing Homestead Collection Drawings From Their Harvest Hills Development In Plymouth, Minnesota, To Their Providence Pointe Development in Shakopee, Minnesota.**

On April 30, 2001, BSB and the Town & Country Defendants executed a contractual jurisdictional transfer of the Homestead Collection designs for the Harvest Hills development in Plymouth, Minnesota, to the Town & Country Defendants' Heritage Square/Providence Pointe development in Shakopee, Minnesota. The Town & Country Defendants' Providence Pointe development in Shakopee, Minnesota, is within ten miles of Rottlund's Clover Ridge

development in Chaska, Minnesota. The Town & Country Defendants cannot seriously dispute that these developments are within close geographic proximity, and they know that Homestead Collection sales cut across artificial suburban boundaries. For instance, in a November 15, 2002 memorandum, the Town & Country Defendants decided they would not construct a model for their Homestead Collection at their Traditions at Clover Ridge development in Chaska, Minnesota, because they could sell to potential Chaska customers from their Homestead Collection model in Shakopee, Minnesota. In other words, sales to potential Homestead Collection customers in Chaska are interchangeable with sales to potential Homestead Collection customers in Shakopee.

Initially, Town & Country referred to its Shakopee development as Heritage Square, but later changed the name to Providence Pointe. In their preliminary plat proposal, Town & Country informed Shakopee officials that the Heritage Square/Providence Pointe development would contain "life cycle" housing: (i) entry level, affordable town homes; (ii) larger town homes; (iii) move-up single family homes; and (iv) one-level homes for retirees. (*Id.*, Ex. R88.) The goal was to allow purchasers to move within the same development as their family needs changed. As Town & Country's Rule 30(b)(6) witness stated: "it was obvious that the City wanted a unique plan for the site. They wanted a mixture of product for the site. They didn't want to see all one product. They wanted to see a number of different products. . . [including] several variations of multifamily products." Once again, Town & Country used the infringing Homestead Collection to satisfy the municipality's life cycle housing guidelines, density housing guidelines, and mixed-use housing guidelines. (*Id.*, Ex. R88.)

**D. The Defendants' Infringement Was Intentional.**

On July 5, 2001, Rottlund sent a cease and desist letter to Mr. Michael Ryan at Town & Country Homes in Lombard, Illinois. Mr. Mike Ryan testified he received Rottlund's cease and desist letter while working in his capacity as the CEO of Town & Country's Minnesota Division, and he made the decision to continue building Homestead Collection units after receiving this notice. Steve Sandelin, the Vice President of Product Development at the Illinois Division, also received the July 5, 2001 cease and desist letter on behalf of the Illinois Division. On July 9, 2001, just four days later, he wrote to BSB architect Larry Moore and put BSB on notice of Rottlund's cease and desist letter. All of the Defendants received written notice of Rottlund's infringement allegations at least by July 16, 2001, but there infringing conduct did not cease.

The Town & Country Homes Defendants continued to construct and sell the infringing town homes at each and every planned development at issue after receiving Rottlund's July 5, 2001 cease and desist letter. Of the 754 infringing Homestead Collection town homes constructed at Minnesota developments, only 24 were sold in 2000. About half of the 75 Homestead Collection units sold in 2001 occurred after the Defendants received Rottlund's July 5, 2001 cease and desist letter. All other Homestead Collections sales were made on or after January 1, 2002, or well after Town & Country received Rottlund's July 5, 2001 cease and desist letter. As of December 31, 2003, the Homestead Collection units at these developments were either sold out or were selling out fast: (1) Centennial Crossing (104 of 104 units sold); (2) Harvest Hills (96 of 96 units sold); (3) Providence Pointe (118 of 214 units sold); (4) Cornerstone Lake (56 of 186 units sold); and (5) Springbrook (45 of 154 units sold). Construction of the infringing Chateau Collection town homes in Brooklyn Park, Minnesota, and

Chaska, Minnesota, began in late 2003. Rottlund intends to introduce evidence to update these sales and show the Town & Country Homes Defendants' 2004 sales in each community at issue.

**E. The Town & Country Homes Defendants' Direct Infringement, Vicarious Liability, And Contributory Infringement.**

In addition to the above facts which Rottlund intends to prove, Rottlund intends to prove that the Town & Country Homes Defendants represent that they are one entity – "Town & Country Homes" – and operate as one entity. The Town & Country Homes Defendants marketing materials demonstrate that they are one entity – Town & Country Homes. On their business cards and on their letterhead, the Town & Country Defendants refer to their "Minnesota Division." Indeed, the July 16, 2001 response to Rottlund's cease and desist letter was on "Town & Country Homes Minnesota Division" letterhead, and was signed by "Art Plante, President Minnesota Division." The Town & Country Defendants' payroll is processed from their Illinois office, their human resources department office is located in Illinois, their accounting department is located in Illinois, financial reporting takes place in Illinois, and insurance services, computer information services, executive financial services, and executive management services are provided from their Illinois office. When the Town & Country Homes Defendants apply for municipality approval to develop land, they represent themselves as one, national entity and submit housing products from Illinois projects as representative samples of products they intend to develop in Minnesota.

Pinnacle and TCM both pay an "equity fee" to a third company called TCH, Inc. The directors set this equity fee. Pinnacle, TCH, Inc., and TCM have the same directors – the six Ryan family members. Pinnacle, TCH, Inc., and TCM have the same officers – the six Ryan family members. Pinnacle, TCH, Inc., and TCM have the same shareholders – the six Ryan family members. In addition to paying "equity fees" to TCH, Inc., Pinnacle and TCM have

"inter-company transactions" or payments made directly from one company to the other which involve a "myriad of transactions." As of September 30, 2003, Pinnacle was owed $417,841 from TCM and other inter-companies.

TCM's financial statements also contain a separate line item entitled "litigation expense," which reflects amounts TCM spent on this lawsuit only. During the twelve month period ended December 31, 2003, TCM spent approximately $2.48 million in litigation expenses related to this lawsuit only. This is a staggering amount, because total shareholders' equity in TCM was only $11.75 million as of December 31, 2003, and TCM's profit was $6.99 million for fiscal year 2003. In other words, in a single year, TCM spent over 20% of its shareholders' equity, and nearly 35% of its profit, defending a lawsuit in which both TCM and Pinnacle are named defendants.

Unlike TCM, Pinnacle's financial statements do not contain a separate line item for "litigation expenses." Instead, all of Pinnacle's legal fees – including all transactional work – are "lumped into one line item." For the nine months ended September 30, 2003, Pinnacle's reported total legal fees – *i.e.,* all litigation and all corporate work – were just $271,000 (roughly one tenth of TCM's litigation expenses on this case alone for 2003).

**F. The Bloodgood Defendants' Direct Infringement, Vicarious Liability, And Contributory Infringement.**

In addition to the above facts which Rottlund intends to prove, Rottlund intends to prove that BGI supervises and controls BSB. All of BSB's profits are directed to BGI, and BGI then uses its "specific profit sharing formula" to direct a portion of those profits back to BSB, and all the other related Bloodgood companies.

**G. Rottlund's Ability To Develop The Communities Where The Town & Country Homes Defendants Sold Infringing Products.**

**1. Rottlund's Unsuccessful Negotiations For The Other Properties That The Town & Country Homes Defendants Wrongfully Acquired And Developed With Infringing Products.**

Unlike the formal bidding process for the Hollander Property (a/k/a Centennial Crossings in Maple Grove, Minnesota) which ultimately required court approval before Mr. Hollander's estate could sell the property, the Town & Country Homes Defendants' other land acquisitions at issue here were very informal. For instance, the Town & Country Homes Defendants purchased the Paulson property (a/k/a Harvest Hills in Plymouth, Minnesota) as a result of informal, oral discussions with the owner. A similar informal, oral exchange led to their acquisition of the Finnegan property (a/k/a Cornerstone Lake in Lakeville, Minnesota). The Town & Country Homes Defendants were uncertain regarding the formalities surrounding their acquisitions of the Brown property (a/k/a Providence Pointe in Shakopee, Minnesota), and the Kenrick Development property (a/k/a Springbrook in Lakeville, Minnesota).

Rottlund was generally aware of these other land development opportunities before Town & Country acquired them, and Rottlund had several oral dealings with the appropriate municipalities, brokers, real estate, consultants, and/or property owners to try and acquire these other pieces of real estate but the Defendants purchased these properties first.

All of these Town & Country communities were developed in close geographic proximity to other ongoing Rottlund Villa II projects and competed directly against Rottlund's ongoing developments. Rottlund lost significant land development opportunities to Town & Country due to the infringing town homes. For instance, according to Rottlund's 1998 Annual Report, Rottlund had 1,339 total lots in available inventory in Minnesota as of March 31, 1998. According to the 2000 Annual Report, this inventory sagged to 982 total lots in available

inventory in Minnesota as of March 31, 2000: a decrease of over 25% during this crucial two-year span. During this same period of time, Rottlund's unsold lots in Minnesota dropped from 911 to just 565, a decrease of approximately 38%. In other words, while Town & Country used the infringing Homestead Collection to acquire Centennial Crossing and other land development opportunities at Rottlund's expense, Rottlund had less land to build on and fewer model homes to attract potential customers.

**2. Rottlund's Capacity To Develop Properties That Town & Country Acquired And Developed With Infringing Products.**

In terms of capacity, Rottlund needed four things to develop communities during the time the Town & Country Defendants took opportunities away from Rottlund: (1) land; (2) monetary resources; (3) internal superintendents and assistant superintendents; and (4) outside subcontractors. Of these constraints, land was the only limitation that prevented Rottlund from developing all of the projects where Town & Country Defendants sold infringing town homes and related products. As Rottlund's owner explained, "The only problem we've ever had with Villas is finding enough land to build Villas on." Monetary resources were not a constraint because Rottlund had the ability to obtain additional capital through many different sources, including its line of credit, a secondary offering, leasing its assets, option financing, *etc.* Likewise, internal superintendents and assistant superintendents were not a limitation. Since 1997, Rottlund has developed approximately 16-24 projects per year in the Twin Cities metropolitan area.

The Town & Country Homes Defendants' seven Minnesota projects at issue are in their fifth year of ongoing construction; e.g., they began construction in 1999 and are not yet complete as of 2004. Accordingly, beginning in 1999, Rottlund needed to add approximately one project per year to handle the Minnesota developments at issue in this lawsuit. To support 24 projects

per year, Rottlund uses approximately 20-22 superintendents and 24-28 assistant superintendents. To take on seven additional projects, Rottlund would need 7 additional superintendents, which could be hired from the outside or easily could be promoted from within Rottlund, because many of its assistant superintendents are waiting for promotions. Rottlund would then need to hire approximately seven assistant supervisors (assuming it promoted 7 superintendents from within to supervisor, to handle 7 additional projects). As of 1998, Rottlund employed 248 people, so it could easily hire 7 additional people to fill the assistant superintendent positions. No additional Rottlund personnel beyond superintendents and assistant superintendents are necessary to take on the 7 additional projects, as current employees in areas such as human resources or information systems can easily absorb one or more project per year.

Finally, vendors were not a limitation to Rottlund's ability to take on 7 infringing developments. Vendors were obviously available in the Minnesota marketplace. Town & Country found vendors to support its infringing developments; most of them are the same vendors that Rottlund uses at its developments, so Rottlund could have easily found vendors.

### 3. Rottlund's Ability To Sell Other Products In Place of The Town & Country Defendants' Non-Infringing Products Whose Profits Are Attributable To The Infringement.

Rottlund's in-house architect, with the help of Rottlund's liability expert, studied the other, non-infringing products Town & Country sold at the developments where Town & Country also sold infringing Homestead Collection and Chateau Collection town homes. They determined that Rottlund offered comparable products to Town & Country's other products, such that Rottlund could have developed the entire community and obtained sales and profits from all the products Town & Country sold as a result of using the infringing Homestead Collection to acquire the development opportunity. Rottlund's CFO and its damages expert then used these other products in their damages reports.

The Town & Country Defendants used the infringing Homestead Collection to acquire developments and to sell Homestead Collection products and other products, and usurp Rottlund's economic opportunity to sell the following comparable Rottlund products: Gable Town Homes, New Urban Town Homes, Lodge Single Family Homes, and Traditions Single Family Homes. These are the very same products that the Town & Country Defendants admit compete directly with the non-infringing products sold at their developments. Indeed, the Town & Country Defendants' competition study set forth in their Harvest Hills Development Guidebook indicates that their products compete directly against Rottlund's The Gables Town Home, as well as Rottlund's New Urban Town Home; their competition study for their Maple Grove development (Centennial Crossings) reveals that their products compete directly against Rottlund's New Urban Town Home; and their competition study and brochure for Lakeville and Shakopee provide that their products compete directly against Rottlund's Lodge Homes.

Furthermore, in their preliminary plat proposal, the Town & Country Defendants informed Shakopee officials that the Heritage Square/Providence Pointe development would contain "life cycle" housing: (i) entry level, affordable town homes; (ii) larger town homes; (iii) move-up single family homes; and (iv) one-level homes for retirees. The goal was to allow purchasers to move within the same development as their family needs changed. These products are comparable to the products Rottlund offers and advertises in its brochures. For example, Rottlund's Farmington community brochure advertises that prospective homeowners may: (i) start out as a first time buyer in a Villa home; (ii) move up to a single family Lodge home; and (iii) simplify with a one level Garden town home. The Defendants obtained this Rottlund brochure as part of their "Competition Shop" for their Lakeville developments. The brochure

demonstrates Rottlund and Town & Country offer comparable other products at the developments where Villa II and Homestead Collection town homes are sold.

### H. Rottlund's Willingness To Negotiate A One Time License Of Its Villa II Town Homes.

Rottlund would have agreed to negotiate a one-time license of its Villa II copyright town homes with the Town & County Homes Defendants, which would have allowed the Town & Country Homes Defendants to construct and sell the town homes in their Washington Square Development in Aurora, Illinois. Rottlund would have sold this one-time license to the Town & Country Homes Defendants at a price equal to Rottlund's average estimated incremental profit margin per unit (16.9%) multiplied by the number of units to be constructed by the Town & Country Homes Defendants (72). Thus, Rottlund would have received approximately $1.9 million for this one-time license fee. This license fee agreement would have been entirely reasonable in light of the fact that the Town & Country Homes Defendants used the infringing back-to-back town home designs to gain approval to develop a community (Washington Square) that so far as sold and closed 260 housing units. In other words, the Town & Country Homes Defendants did not have another back-to-back town home option and they used Rottlund's product to gain approval to sell and close an additional 188 non-infringing housing units, upon which they made substantial profits.

The Town & Country Defendants' damages expert estimates that a 25% margin was realized on the 72 infringing units, and that a 25% margin was also realized on the 188 other units which are not part of Rottlund's claim for actual damages. Accordingly, if Pinnacle had paid Rottlund the 16.9% royalty Rottlund is claiming as actual damages on the 72 infringing units, Pinnacle would have made an 8.1% margin on the 72 infringing units (25% margin –

16.9% licensing fee = 8.1%) and made its full 25% margin on the other 188 non-infringing units sold at this same development.

**I. Rottlund's Actual Damages.**

Rottlund has suffered over $33.85 in actual damages: $15.75 million in lost profits on Villa II products; $1.9 million of lost licensing fees off Villa II products; and $16.2 million in lost profits on other products attributable to the infringement. Rottlund's actual damages by development are as follows:

- Rottlund incurred approximately $3 million in actual damages from the Cornerstone Lake development in Lakeville, Minnesota. This entire amount relates to infringing product, as only Homestead Collection units were constructed at Cornerstone Lake.

- Rottlund sustained approximately $2 million in actual damages from the Springbrook development in Lakeville, Minnesota. This entire amount relates to infringing product, as only Homestead Collection units were constructed at Springbrook.

- Rottlund suffered approximately $950,000 in actual damages from the Pinebrook development in Brooklyn Park, Minnesota. This entire amount relates to infringing product, as only Chateau Collection units were constructed at Pinebrook.

- Rottlund incurred approximately $8.9 million in actual damages from the Centennial Crossing development in Maple Grove. Of this amount, approximately $2.75 million relates to infringing town home sales. The remaining $6.15 million flows from three other products that were part of the "package deal" approved by Maple Grove and which could not be constructed alone. Rather, the other products could only be constructed after the infringing product was used to satisfy Maple Grove's housing density, affordability, and diversity guidelines and requirements.

- Rottlund sustained approximately $4.5 million in actual damages from the Harvest Hills development in Plymouth, Minnesota. Of this amount, approximately $2.55 million relates to infringing town home sales. The remaining $1.95 million relates to the only other product sold at a development. Again, the infringing product was used to satisfy Plymouth's affordability and product diversity guidelines.

- Rottlund suffered approximately $10.8 million in actual damages from the Providence Pointe development in Shakopee, Minnesota. Of this amount, approximately $4.1 million relates to infringing product that satisfied Shakopee's guidelines, and $6.7 million relates to the other two products approved as part of this package deal.

- Rottlund incurred approximately $1.8 million in actual damages from the Traditions at Clover Ridge development in Chaska, Minnesota. Of this amount, approximately $400,000 relates to infringing product that was used to satisfy Chaska's guidelines, and the remaining $1.4 million relates to the other two products approved as part of the package.

- Rottlund's actual damages from the Washington Square development in Aurora, Illinois, were approximately $1.9 million. This entire amount relates to a 16.9% reasonable royalty for only the 72 infringing products sold at this development; nothing is claimed as actual damages from the 188 non-infringing units sold at the same development.

**J. The Town & Country Homes Defendants' Infringers' Profits.**

Rottlund intends to prove that the Town & Country Homes Defendants have received revenues attributable to their infringement by closing on the sales of infringing and non-infringing products. The Town & Country Homes Defendants' gross revenues earned attributable to their infringement is approximately $248.6 million. The Town & Country Homes Defendants' damages expert artificially limited his analysis of infringers' profits, but he

concluded that as of December 31, 2003 the Town & Country Homes Defendants' infringers' profits from just 419 Homestead Collection town home units exceeded $9.1 million. These infringers' profits flow from the "total look and feel" theory of liability in this matter. The $9.1 million "total look and feel" damages does not include infringers' profits from the Washington Square units in Illinois, does not include infringers' profits from the Chateau Collection town homes, and does not include infringers' profits from closings on sales of non-infringing products which are attributable to the infringement.

Assuming the Town & Country Homes Defendants can carry their burden of establishing legitimate costs and expenses and applying the Town & Country Homes Defendants' damages experts' infringers' profit methodology used to calculate the "total look and feel" damages flowing from the Homestead Collection town homes, at a minimum the infringers' profits figure is approximately $34.2 million. Because the Town & Country Homes Defendants engaged in intentional infringement, their overhead deductions are excluded, and the infringers' profits figure is, approximately $62.7 million. These profits are broken down below as follows:

➢ At the five Minnesota developments where the Town & Country Homes Defendants sold and closed 545 Homestead Collection town homes through September 30, 2004, their infringers' profits are approximately $11.4 million; if the infringement is found to be intentional, their infringers' profits are approximately $23 million. Sales of other products in these five Minnesota developments which are attributable to the infringement add approximately another $14 million in infringers' profits; if the infringement is intentional, this figure increases to approximately $22.9 million.

➢ At the Aurora, Illinois, development where the Town & Country Homes Defendants constructed 72 Homestead Collection town homes, the Town & Country Defendants'

infringers' profits are approximately $2 million; if the infringement is intentional, this becomes approximately $3.3 million. Sales of other products at the Aurora development which are attributable to the infringement add approximately another $5 million in infringers' profits; if the infringement is intentional, this becomes approximately $8.3 million.

- Concerning the two Minnesota developments where the Town & Country Homes Defendants constructed infringing Chateau Collection town homes, their infringers' profits are approximately $1.3 million; if the infringement is intentional, this figure increases to approximately $2.7 million. Sales of other products at these two Minnesota developments which are attributable to the infringement add approximately another $500,000 in infringers' profits; if the infringement is intentional, this figure increases to approximately $2.5 million.

The Town & Country Homes Defendants' damages expert made a material factual mistake in calculating infringers' profits because, according to the Town & Country Homes Defendants' Chief Financial Officer – Paul Anderson, – their expert failed to account for TCM's 20% artificial "mark-up" which appears in their subdivision income statements in the line item "land cost – closing" for the years 2000 through 2003. This 20% mark-up in Minnesota overstates land costs and materially affects the actual profit margin of developments, but the Town & Country Homes Defendants' expert failed to account for it in his calculations of infringers' profits. Accounting for this material mistake and still applying the Town & Country Homes Defendants' damages expert's methodology for determining infringers' profits, at a minimum the infringers' profits figure is approximately $39.4 million. Because the Town & Country Homes Defendants engaged in intentional infringement, their overhead deductions are excluded, and the infringers' profits figure is approximately $68.1 million. These profits are broken down below as follows:

- At the five Minnesota developments where the Town & Country Homes Defendants sold and closed 545 Homestead Collection town homes through September 30, 2004, their infringers' profits are approximately $14.1 million; if the infringement is found to be intentional, their infringers' profits are approximately $25.8 million. Sales of other products in these five Minnesota developments which are attributable to the infringement add approximately another $16.4 million in infringers' profits; if the infringement is intentional, this figure increases to approximately $25.4 million.

- At the Aurora, Illinois, development where the Town & Country Homes Defendants constructed 72 Homestead Collection town homes, the Town & Country Defendants' infringers' profits are approximately $2 million; if the infringement is intentional, this becomes approximately $3.3 million. Sales of other products at the Aurora development which are attributable to the infringement add approximately another $5 million in infringers' profits; if the infringement is intentional, this becomes approximately $8.3 million.

- Concerning the two Minnesota developments where the Town & Country Homes Defendants constructed infringing Chateau Collection town homes, their infringers' profits are approximately $1.3 million; if the infringement is intentional, this figure increases to approximately $2.7 million. Sales of other products at these two Minnesota developments which are attributable to the infringement add approximately another $500,000 in infringers' profits; if the infringement is intentional, this figure increases to approximately $2.5 million.

**K. The Bloodgood Defendants' Infringers' Profits.**

On September 2, 2003, BSB architect Chris Jorgensen submitted a sworn affidavit and informed the Court that the total billings BSB sent to the Town & Country Defendants concerning only the Minnesota Homestead Collection developments were $192,396.19. This

figure did not include $24,700.00 in billings for the Washington Square community in Aurora, Illinois. Thus, total billings from BSB for the Minnesota developments and BGI for the Illinois development are at least $217,096.19 (Minnesota billings of $192,396.19 + Illinois billings of $24,700.00).

### L. The Defendants' Representations Which Violate The Lanham Act And Minnesota Deceptive Trade Practices Act.

The Town & Country Homes Defendants have knowingly and intentionally made false and misleading statements, descriptions, or representations of fact in interstate commerce in connection with the sale of the Homestead and Chateau Collection, and Washington Square Back-to-Back town homes through their advertising and promotional materials concerning the origin, source, characteristics, and/or design of these townhomes. These false and misleading statements have actually caused, and are likely to cause, confusion, which has damaged Rottlund. More specifically, the Town & Country Homes Defendants' failure to attribute to Rottlund the authorship and copyright ownership of these copyright protected original works of authorship, in connection with the sale of each Homestead and Chateau Collection, and Washington Square Back-to-Back town home creates a false impression of the origin, source, characteristics, and/or design of these townhomes.

The Town & Country Homes Defendants claim that they won "the Twin Cities market with innovative, affordable home designs that meet today's lifestyles." This "Chicago-based national residential builder" aggressively claims its "innovative designs" for "middle-income buyers" results in "thoughtful home designs that have been carefully planned to meet the needs of today's diverse lifestyles." Thus, this Chicago-based entity concluded that expansion into the Twin Cities market was ripe because "the community lacked innovation and creativity in the design of homes for the average, middle income Twin Cities family."

In early 1997, the Town & Country Homes Defendants placed Art Plante at the head of its Minnesota division and his objective was to "offer complete, well-designed homes that include all the basics . . . (with options) so new home buyers can create their own personal home." Art Plante then led the Defendants' charge to copy Rottlund's Villa II designs and works, which are developed for and marketed to the same consumers the Town & Country Homes Defendants were aiming for with their "innovative designs." The Town & Country Homes Defendants directly compete with Rottlund in the design, development, construction, and sale of townhomes.

As discussed above, on or about April 6, 1998, the Town & Country Homes Defendants contracted with BSB for a Villa Product project, which they agreed would be an eight unit, back-to-back, multi-family townhome. Pursuant to the contract, BSB claimed to be the creator of the designs and retained any purported ownership/authorship rights in them, including copyrights. On August 26, 1999, BSB issued the infringing Homestead Collection construction documents from Iowa and transferred them for use at the Centennial Crossing development in Maple Grove, Minnesota. On February 28, 2000, BSB contracted and transferred the infringing Homestead Collection designs from Iowa to the Washington Square development in Aurora, Illinois. On November 29, 2000, BSB contracted and transferred the designs from Iowa to the Paulson Property/Harvest Hills development in Plymouth, Minnesota. On January 18, 2001, BSB contracted and transferred the designs from Iowa to the Cornerstone Lake development in Lakeville, Minnesota. On April 30, 2001, BSB contracted and transferred the designs from Iowa to the Stone's Throw/Springbrook development in Lakeville, Minnesota. Also on April 30, 2001, BSB contracted and transferred the designs from Iowa to the Heritage Square/Providence Pointe development in Shakopee, Minnesota.

According to BSB architect Chris Jorgensen, these various Homestead Collection designs were all kept in Iowa, and for each "jurisdictional transfer, those files were saved down to create the next version. So in that sense, if you want to call that cut and pasting" then it is. In other words, on multiple occasions, these infringing "cut and paste" Homestead Collection designs were sent from Iowa to different states, Minnesota and Illinois, yet Rottlund was never given credit as the original creator of the design from which the Homestead Collection was copied. In addition, as provided in the jurisdictional transfer contracts, BSB continued to claim that it was the creator of the designs.

Likewise, the Town & Country Homes Defendants never gave credit to Rottlund, either in their advertising and promotional material or in their various submissions to municipalities for community development approval. None of their submissions seeking community development approval from various municipalities gave any credit to Rottlund; rather, they gave such credit to BSB. For instance, the Town & Country Homes Defendants represented to the City of Plymouth, Minnesota, that the Homestead Collection product originated from and was "designed by the nationally renowned architectural firm of Bloodgood, Sharp, Buster." Likewise, in their advertising and promotional material, the Town & Country Homes Defendants represented that the Homestead Collection design sets them apart from the "ordinary" townhomes offered in the market. Similarly, the Town & Country Homes Defendants represented that the value of their Homestead Collection design is "the wide open spaces," (which they failed to disclose were copied from Rottlund's design). In addition, the Town & Country Homes Defendants prominently displayed the Homestead Collection elevations and routinely stated that the value of their product is its innovative design. The Town & Country Homes Defendants have made similar representations concerning the Chateau Collection, but never credited Rottlund as the

original designer of the product from which the Chateau Collection was illegally derived. Rather than crediting Rottlund as the originator of the designs from which the Homestead Collection, Washington Square Back-to-Back, and Chateau Collection town home designs were copied, these Defendants attempted to set their copied designs apart from Rottlund's Villa II designs by representing that they carefully designed the Homestead Collection designs to be "fresh alternatives."

Further, the Town & Country Homes Defendants' representations concerning the Homestead Collection design include their claims of copyright ownership of the design, and their representations concerning all the various design components which comprise the total look and feel of the Homestead Collection townhomes which they claim originated from them. The Town & Country Homes Defendants have made similar representations in connection with the Washington Square Back-to-Back town homes in their Washington Square community in Aurora, Illinois. Similar advertising occurred through the Town and Country Defendants' website, which shares a common link.

## II. UNRESOLVED SUBSTANTIVE ISSUES.

### A. Rottlund's Copyright Claims.

#### 1. Rottlund's Copyrights Protect The Total Look And Feel Of Its Villa Designs and As-Built Structures.

Section 102(a)(5) of the Copyright Act protects pictorial, graphic and sculptural works, which are defined to include "two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs . . . and technical drawings, including architectural plans." 17 U.S.C. §§ 101, 102. Section 102(a)(8) of the Copyright Act protects architectural works, which are defined to include "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings." *Id.* Thus, the Copyright Act protects architectural

plans pursuant to §§ 102(a)(5) and 102(a)(8), and buildings (as-built structures) pursuant to § 102(a)(8). *See e.g.*, *J.R. Lazaro Builders, Inc. v. R.E. Ripberger Builders, Inc.,* 883 F. Supp. 336, 339 (S.D. Ind. 1995) (copyright protection is extended to the plans for the design of a house as well as the house itself); *Yankee Candle Co., Inc. v. New England Candle Co., Inc.,* 14 F. Supp. 2d 154, 158 (D. Mass. 1998) (*citing* H.R. Rep. 101-735, *reprinted in* 1990 U.S.C.C.A.N. 6935, 6950 ("Either or both of these copyrights may be infringed and eligible separately for damages")), *vacated pursuant to settlement by* 29 F. Supp. 2d 44 (D. Mass. 1998).

The Court concluded as a matter of law that copyright protection extends to the total look and feel, or the "selection, arrangement, and combination of elements expressed," of a work such as an architectural design. (Order, 8/20/04 at pp. 28-36, adopted in its entirety by Order, 10/19/04 at p. 3("[t]he magistrate judge correctly noted copyright's protection of the form … [,] arrangement and composition of spaces and elements in [building] design").) Therefore, the Defendants' prior challenges concerning the scope of protection afforded to Rottlund by its §§ 102(a)(5) and 102(a)(8) Villa II copyrights – *i.e.*, protection for the "the total look and feel," "combination of component parts," "overall form," "arrangement and combination of spaces and elements," or "gestalt" – should be resolved. *See e.g.*, *CSM Investors, Ltd. V. Everest Dev., Inc.*, 840 F. Supp. 1304, 1311 (D. Minn. 1994) (J. Doty) (citing *Hartman v. Hallmark Cards, Inc.,* 833 F.2d 117, 120-21 (8th Cir. 1987)); *Richmond Homes Mgmt., Inc. v. Raintree, Inc.*, 862 F. Supp. 1517, 1523 (W.D. Va. 1994) ("selection and arrangement" of the underlying component parts is protected under copyright law and susceptible to infringement), *aff'd in part and rev'd in part on other grounds by* 66 F.3d 316 (4th Cir. 1995); *Nelson-Salabes, Inc. v. Morningside Holdings*, No. Civ. B-98-2226, 2001 WL 419002 at *4 (D. Md. Feb. 16, 2001) ("selection and arrangement of common architectural features" is protected and susceptible to infringement), *aff'd in part and*

*vacated in part on other grounds by* 284 F.3d 505 (4th Cir. 2002); *Sturdza v. United Arab Emirates,* 281 F.3d 1287, 1296 (D.C. Cir. 2002) ("works as a whole" are protected and susceptible to infringement); *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.,* 186 F. Supp. 2d 1, 10 (D. Mass. 2002) (the plaintiff's "choices regarding the shape, arrangement, and location of the buildings, the design of the open space, the location of parking and sidewalks, as well as the combination of these individual design elements . . ." is copyrightable and susceptible to infringement); *Richmond Homes Management, Corp. v. Raintree, Inc.,* 1994 WL 98922, *5 (W.D. Va. 1994) ("[a]lthough the idea of a colonial style house is not itself protectable, the specific layout designed by [plaintiff], that is the particular expression of the [plaintiff's] design . . . constitutes an expression of an idea which this Court shall protect against infringement"); *Arthur Rutenberg Homes, Inc. v. Maloney,* 891 F. Supp. 1560, 1566 (M.D. Fla. 1995) ("a creator's independent selection and arrangement of component parts into an original design is copyrightable [because] the overall arrangement of these features, all of which provide a 'look' and 'feel' to a home, distinguishes [plaintiff's designs] from other homes"); *Ga-On Homes, Inc. v. Spitzer Homes, Inc.,* 178 U.S.P.Q. 183, 185 (M.D. Fla. 1973) ("the peculiar arrangement" of rooms, "when all put together," is copyrightable and susceptible to infringement).

However, because Rottlund's motion for partial summary judgment on liability issues related only to its § 102(a)(5) copyrights, it remains unclear whether the Defendants will continue to challenge the scope of copyright protection concerning Rottlund's § 102(a)(8) copyrights. The Defendants should not challenge this well established total look and feel copyright protection because it is now the law of the case. (Order, 8/20/04 at pp. 28-36, adopted in its entirety by Order, 10/19/04; Order, 10/28/04 at 5 (holding that Rottlund's copyrights protect the total look and feel of its copyrighted works), adopted in its entirety by Order,

10/29/04.) *See e.g.*, *CSM Investors*, 840 F. Supp. at 1310 ("as the Eighth Circuit has recognized, '[w]hile the concept of a T-shaped building is not entitled to copyright protection, detailed plans and drawings of a specific building are'") (quoting *Nucor Corp. v. Tennessee Forging Steel Service, Inc.*, 476 F.2d 386, 390 (8th Cir. 1973)); *Nelson-Salabes, Inc. v. Morningside Holdings*, No. Civ. B-98-2226, 2001 WL 419002 at *4 (D. Md. Feb. 16, 2001) (holding that the scope of copyright protection includes the selection and arrangement of common architectural features because "the mere fact that component parts of a collective work are neither original to the plaintiff nor copyrightable by the plaintiff does not preclude a determination that the combination of such component parts as a separate entity is both original and copyrightable," and subject to infringement) (internal quotations omitted); *Sturdza*, 281 F.3d at 1296 ("considering works as a whole is particularly important because protectable expression may arise through the ways in which artists combine even unprotectable elements. For example, while color is not protectible, the manner in which an artist 'select[s], coordinate[s] and arrange[s],' color may be").

**2. Rottlund's 17 U.S.C. § 106 Rights.**

Section 106 of the Copyright Act gives Rottlund, *inter alia*, the exclusive right to reproduce its Villa architectural plans and buildings, prepare derivative works based upon them, and distribute copies of its Villa architectural plans and buildings to the public by sale or otherwise. 17 U.S.C. § 106 (1),(2) and (3) (2004). If the Defendants violated any of Rottlund's § 106 rights they are liable to Rottlund for copyright infringement. 17 U.S.C. § 501(a). Rottlund intends to prove that the Homestead Collection, Washington Square Back-to-Back, and Chateau Collection town homes violate Rottlund's § 106 rights because, among other things, they are illegal derivatives of Rottlund's copyrighted New Villa and Villa II designs and buildings.

**3. Copyright Infringement.**

In order to establish a claim of copyright infringement, Rottlund must prove: (1) ownership of a valid copyright, and (2) copying. *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991) (citing *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 548 (1985)); *CSM Investors*, 840 F. Supp. at 1309 (citing *Hartman,* 833 F.2d at 120; *Moore v. Columbia Pictures Indus., Inc.*, 972 F.2d 939, 941 (8th Cir. 1992). Issues concerning this test should be resolved.

**a. Ownership Of A Valid Copyright.**

The Court held as a matter of law that Rottlund owns valid § 102(a)(5) copyrights for all of its Villa town homes designs, including its New Villa and Villa II copyrighted designs. (Order, 8/20/04 at 14-28, adopted in its entirety by Order, 10/19/04.) In addition, the Court held that its legal analysis concerning Rottlund's ownership of valid copyrights, which completely rejected all of the Defendants' invalidly arguments concerning Rottlund's §§ 102(a)(5) and 102(a)(8) copyrights raised during the Defendants' cross motions for partial summary judgment on liability, "nearly compels granting of summary judgment in Rottlund's favor of ownership and validity of the *architectural works copyrights* as well …" (*Id.* at 28, adopted in its entirety by Order, 10/19/04.) Thus, all issues concerning Rottlund's ownership of valid § 102(a)(5) and 102(a)(8) copyrights should be resolved, but it remains unclear whether the Defendants will continue to challenge the validity of Rottlund's § 102(a)(8) copyrights.

If the Defendants wrongly continue to challenge the validity of Rottlund's § 102(a)(8) copyrights despite the Court's Order, they will have to overcome a heavy burden to invalidate Rottlund's § 102(a)(8) copyrights. Rottlund's § 102(a)(8) Villa II Certificates of Copyright Registration are *prima facie* evidence of ownership of a valid copyright. (Order, 8/20/04 at p.

15, adopted in its entirety by Order, 10/19/04.) *See e.g.*, 17 U.S.C. § 410(c); *Arthur Rutenberg Corp. v. Dawney*, 647 F. Supp. 1214, 1216 (M.D. Fla. 1986). Thus, the Defendants must overcome this presumption and bear the burden of demonstrating, with competent evidence, why Rottlund's Villa II copyrights are not valid. *Yankee Candle*, 14 F. Supp. 2d at 157 (citations omitted). The Defendants can not invalidate Rottlund's § 102(a)(8) copyrights by arguing that the designs and buildings are not original to Rottlund because these same arguments were made (and rejected) when the Court held that Rottlund's designs (upon which the buildings are constructed from) protected by § 102(a)(5) copyrights are original to Rottlund. Moreover, to be original, and thereby copyrightable, Rottlund's § 102(a)(8) copyrights need only be independently created by Rottlund. *Feist*, 499 U.S. at 344 (originality "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity;" thus, "[t]he vast majority of works make the grade quite easily . . . no matter how crude, humble or obvious it might be") (internal quotations omitted). It should be resolved that Rottlund owns valid § 102(a)(8) Villa II copyrights.

**b. Copying.**

"'Copying may be proven either by direct evidence <u>or</u> by demonstrating circumstantial evidence establishing access and substantial similarity of the two works'." (Order, 8/20/04 at 37 (quoting *Nelson v. PRN Prod., Inc.*, 873 F.2d 1141, 1142 (8th Cir. 1989), adopted in its entirety by Order, 10/19/04.)

**i. Direct Evidence of Copying.**

Rottlund's direct evidence of copying "raise(s) eyebrows." (*Id.* at 38.) Nevertheless, the Court held that reasonable jurors could find that there is direct evidence of copying, but they may not be compelled to do so. (*Id.*) Thus, proof of copying by direct evidence is unresolved.

**ii. Access and Substantial Similarity.**

<u>Access</u>

Because the Defendants toured Rottlund's Villa II as-built structures, the Defendants admit they had access to Rottlund's buildings protected by its § 102(a)(8) copyrights. The Court held that all of the Defendants had access to Rottlund's § 102(a)(5) copyrights, which protect Rottlund's architectural drawings. (Order, 8/19/04 at 38-44, adopted in its entirety by Order, 10/20/04.) Rottlund's § 102(a)(8) copyrights also protect its Villa II architectural drawings. Consequently, the Defendants' access to Rottlund's §§ 102(a)(5) and 102(a)(8) copyrights should be resolved. *See*, *e.g.*, *Robert R. Jones Assoc., Inc. v. Nino Homes*, 858 F.2d 274, 277, n.2 (6th Cir. 1988) (access because the defendant had a reasonable opportunity to see an abridged version of copyrighted designs depicted in promotional brochures); *Parrino*, 664 F. Supp. 479 (access to plans because defendant obtained a brochure depicting a simplified copy of plaintiff's copyrighted floor plan); *Donald Frederick Evans*, 785 F.2d at 905-05 (depictions of copyrighted floor plans in unregistered brochures are protected by copyright laws).

<u>Substantial Similarity</u>

Substantial similarity is shown through a two-part test, which the 8th Circuit Court of Appeals has consistently applied and this Court carefully followed. (Order, 8/19/04 at 44-47, adopted in its entirety by Order, 10/20/04 at 5-6; Order, 10/28/04 at 6-9, adopted in its entirety by Order, 10/20/04.) The Court has ruled that Rottlund has satisfied the first part of this test (the

extrinsic test) as it relates to Rottlund's copyright infringement allegations concerning whether the Homestead Collection, Washington Square Back-to-Back, and Chateau Collection town home drawings and as-built structures infringe upon Rottlund's §§ 102(a)(5) and 102(a)(8) Villa II copyrights. (*Id.*) Thus, the first part of the two-part test for substantial similarity is resolved.

However, the second part of the substantial similarity test (the intrinsic test) is unresolved, but only in so far as it is up to the jury to determine whether Rottlund can satisfy the test. The intrinsic test depends upon the response of an ordinary, reasonable person evaluating the expression of the ideas embodied in the works in question. (*Id.*) Infringement of expression occurs "when the total concept and feel of the works in question are substantially similar." (Order, 8/19/04 at 46 (citing *CSM*, 840 F. Supp. at 1311), adopted in its entirety by Order, 10/20/04.) Whether works contain a similarity of expression depends upon the presence of similarities rather than differences. *CSM,* 840 F. Supp. at 1312. Thus, "[t]he existence of differences will not negate infringement unless they so outweigh similarities that the similarities can only be deemed inconsequential within the total context of [the copyrighted] work." *Id.* (quoting *Chuck Blore & Don Richman, Inc. v. 20/20 Advertising, Inc.,* 674 F. Supp. 671, 680 (D. Minn. 1987) (citations omitted)); *Maloney,* 891 F. Supp. at 1567-68 (citing *CSM*); *Johnson v. Jones,* 921 F. Supp. 1573, 1583 (E.D. Mich. 1996) (citing *CSM*); *LaJoie v. Pavcon, Inc.,* 146 F. Supp. 2d 1240, 1247 (M.D. Fla. 2000) (citing *CSM*); *Shaw v. Lindheim,* 919 F.2d 1353, 1362 (9th Cir. 1990) ("[n]o plagiarist can excuse the wrong by showing how much of his work he did not pirate").

Evaluating expression for substantial similarity "'should be based on the ordinary and reasonable layperson's overall impression of the two works, not on a detailed comparison of the two works, focusing on individual differences'." *Raintree*, 862 F. Supp. at 1527 (quoting *Ganz*

*Bros. Toys v. Midwest Importers*, 834 F. Supp. 896, 901 (E.D. Va. 1993)). Thus, the methodology for determining substantial similarity turns upon the fact finder's "overall impression of the two works," not irrelevant, hyper-technical methodologies using protractors, rulers and compasses. Based on the Court's prior Orders, the only unresolved issue concerning Rottlund's circumstantial evidence of copy concerns whether the existence of differences, if any, in the Defendants' town homes and Rottlund's copyrighted town homes so outweigh the similarities between the town homes that the jury will deem the similarities inconsequential within the total context of Rottlund's copyrighted works.

**c. Contributory Infringement.**

The Court held that genuine issues of material fact exist concerning each Defendant's claim that it did not contribute to the infringing conduct of any other Defendant. (Order, 10/29/04 at 13-15.) Thus, Rottlund's contributory infringement claim is unresolved.

A party who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another is jointly and severally liable for the infringement. (*Id.* at 13.) *See also Peer International Corp. v. Luna Records, Inc.*, 887 F. Supp. 560, 565 (S.D.N.Y. 1995) (quoting *Demetriades v. Kaufmann*, 690 F. Supp. 289, 292-93 (S.D.N.Y. 1988)). The touchstone requirements are knowledge and participation. *Demetriades*, 690 F. Supp. 289.

The knowledge requirement is objective, demanding proof that a party knew or had reason to know of the infringing activity. *Casella v. Morris*, 820 F.2d 362, 365 (11th Cir. 1987) (citing *Gershwin Publishing Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159 (2nd Cir. 1971)). Thus, constructive knowledge is sufficient and "may be inferred from the facts …" (Order, 10/29/04 at 13.)

Participation is satisfied when a party aids another in an infringing endeavor. *Demetriades*, 690 F. Supp. 289; *Cable/Home Communication v. Network Productions*, 902 F.2d 829 (11th Cir. 1990).

The contributory infringement principle does not require intent or knowledge of actual copying since all members of the distribution chain for an infringing product are liable regardless of their intent or knowledge of infringement. *See Nationwide Educational Development Corp v. Rex Communications, Inc.*, 1990 WL 64595 (S.D.N.Y. 1990); *see also Costello Pub. Co. v. Rotelle*, 670 F.2d 1035 (D.C. Cir. 1981) (copyright holder may proceed against good faith distributor of infringing product); *Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc.*, 256 F. Supp. 399 (S.D.N.Y. 1966); *Ford Motor Co. v. B & H Supply, Inc.*, 646 F. Supp. 975 (D. Minn. 1986). The *Ford Motor* court examined copyright and trademark infringement claims involving the distribution of automotive parts. The plaintiff sued multiple defendants, including a company that sold the automotive products at issue through telephone solicitations. The plaintiff presented evidence that the multiple defendants "marketed, sold, or distributed automotive parts in the packaging found to be infringing." *Id.* at 988. The court rejected the defendants', including the telemarketer's, innocent intent defense, holding that "intent is not an element of copyright infringement and, thus, absence of intent is not a valid defense . . .." *Id.* at 989. The court found that each defendant, including the telemarketer, was a "an essential element in the chain of distribution . . ." and jointly and severally liable to the plaintiff.

Because the Defendants (1) induced, caused, or materially contributed to the infringing conduct of one another, and (2) knew of the infringing activity, the Defendants are jointly and severally liable to Rottlund.

**d. Vicarious Liability.**

Whether the Town & Country Homes Defendants are vicariously liable as to each other, and whether the Bloodgood Defendants are vicariously liable as to each other remains unresolved. (Order, 10/29/04 at 10-12.)

"Vicarious liability exits '[w]hen the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials.'" (*Id.* (quoting *Peer International*, 887 F. Supp. at 565).) The touchstone requirements are benefit and control. *Demetriades*, 690 F. Supp. at 293. Where benefit and control is shown, vicarious liability is imposed, "even in the absence of actual knowledge, on those who fail to supervise the conduct of primary infringers . . .." *Peer International*, 887 F. Supp. at 565.

The requisite degree of control exists where a party has "the right and ability to supervise the infringing activities of another ..." *Metzke v. May Dept. Stores Co.*, 878 F. Supp. 756, 760 (W.D. Pa. 1995). The requisite degree of benefit exists where a party has "an obvious and direct financial interest in [the infringing] activities." *Id.*; *see also Softel, Inc. v. Dragon Med. & Scientific Communications, Inc.*, 118 F.3d 955, 971 (2nd Cir. 1997). It is not necessary to identify a specific profit earned directly from the infringing work to demonstrate an obvious and direct financial interest. *See e.g.*, *Broadcast Music, Inc. v. Blumonday, Inc.*, 32 U.S.P.Q.2d 1474, 1475 (D. Nev. 1994) ("both the legislative history and the case law of the Copyright Act only require the 'direct financial interest' to be tied to the operation as a whole, not exclusively to the act of infringement"); *Realsongs v. Gulf Broadcasting Corp.*, 824 F. Supp. 89 (M.D. La. 1993). In fact, the prospect of future revenue is sufficient to demonstrate a direct financial interest. *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001).

Because the Town & Country Homes Defendants had the right and ability to supervise the infringing activities of each another and had an obvious and direct financial interest in the infringing activities of one another, these Defendants are jointly and severally liable to Rottlund. Likewise, because the Bloodgood Defendants had the right and ability to supervise the infringing activities of each another and had an obvious and direct financial interest in the infringing activities of one another, these Defendants are jointly and severally liable to Rottlund.

**4. Copyright Infringement Damages.**

The Court has held that Rottlund may pursue its actual damages, the infringers' profits, statutory damages, and attorneys' fees. (Order, 10/25/04.) Thus, the type of damages Rottlund may pursue is resolved. In addition, it is resolved that the Defendants are jointly and severally liable to Rottlund for its actual damages, but the amount of Rottlund's actual damages is unresolved. (*Id.*) It is also resolved that "[Rottlund] is entitled to elect to recover either its actual damages, or its actual damages and the excess profits enjoyed by [the Defendants]." (Order, 10/25/04 at 27).

**a. Actual Damages.**

Pursuant to the Copyright Act, Rottlund is entitled to recover the "actual damages suffered by [it] as a result of the infringement." 17 U.S.C. § 504(b). "[O]nce a copyright holder establishes with reasonable probability the existence of a causal connection between the infringement and a loss of revenue, the burden properly shifts to the infringer to show that this damage would have occurred had there been no taking of copyrighted expression." *Harper & Row Publishers,* 471 U.S. at 567, 105 S. Ct. at 2234 (citing 3 Nimmer § 14.02, at 14-7 to 14-8.1).

Courts consider the sanction policy behind the Copyright Act when determining the appropriate measure of damages. "'A rule of liability which merely takes away the profits from

an infringement would offer little discouragement to infringers. It would fall short of an effective sanction for enforcement of the copyright policy.'" *Robert R. Jones Assocs., Inc. v. Nino Homes,* 686 F. Supp. 160, 164 (E.D. Mich. 1987), *aff'd in relevant part,* 858 F.2d 274, 281 (6th Cir. 1988) (quoting *F.W. Woolworth Co. v. Contemporary Arts,* 344 U.S. 228, 233, 73 S. Ct. 222, 225 (1952)).

In terms of actual damages, Rottlund lost entire development opportunities to Town & Country because of the infringing Homestead Collection. Rottlund's actual damages theory was affirmed by the Sixth Circuit's decision in *Robert R.* Jones. 858 F.2d at 281. It was also recently affirmed by the Eighth Circuit in *Andreas,* 336 F.3d at 795-96. In *Robert R. Jones,* the court clearly and succinctly explained the prerequisites for recovering actual damages in an architectural works copyright infringement case just like this one. 686 F. Supp. at 164-65. *Robert R. Jones* involved two competitive home builders that constructed and sold houses in subdivisions situated in the same geographical proximity – approximately two miles apart. 686 F. Supp. at 162, 164. After the plaintiff established the necessary liability elements for infringement of its copyrighted architectural drawings, the court turned to the issue of damages. *Id.* at 164.

The court recognized that no one could be certain that the defendants' infringing homes would have been purchased from plaintiff had no infringing product been put on the market. *Id.* Nevertheless, the court reasonably found that "there were purchasers and a demand for this particular kind of house in this geographic area." *Id.* This was sufficient to establish with reasonable probability the existence of a causal relationship between the infringement and a loss of revenue, and the burden shifted to defendants to prove that purchasers of their infringing homes would not have purchased plaintiff's homes in the same geographic vicinity. *Id.* The

court also explicitly noted that plaintiff "might not have made every one of [defendant's] sales." Nevertheless, the defendants failed to carry their burden to establish that purchasers of defendant's homes would not have purchased plaintiff's homes in the same geographic vicinity. Accordingly, it was "presumed [plaintiff] would have sold [the seven homes] absent the infringement." *Id.* The Sixth Circuit Court of Appeals affirmed the court's rationale, and stated the evidence satisfied the nexus for recovering actual damages. 858 F.2d at 281; *see also Ford Motor Co. v. B&H Supply, Inc.,* 646 F. Supp. 975, 991-92 (D. Minn. 1986) (awarding plaintiff the "actual economic profit" it would have made if defendants had not sold infringing product even though court "necessarily engage[d] in some degree of speculation in establishing lost sales due to sales of infringing product"); *Arthur Rutenberg Homes, Inc. v. Maloney*, 891 F. Supp. 1560, 1568-69 (M.D. Fla. 1995) (awarding actual damages to plaintiff in copyright infringement case involving architectural plans equal to the profits the plaintiff would have realized had the plaintiff constructed and sold the residence at issue); *Cornerstone Home Builders, Inc. v. McAllister,* 303 F. Supp. 2d 1317, 1321 (M.D. Fla. 2004) (same); *Intown Enters., Inc. v. Barnes,* 721 F. Supp. 1263, 1266-67 (N.D. Ga. 1989) (denying defendant's motion for summary judgment because there were disputed issues of material fact as to whether the infringement resulted in any lost sales to plaintiff); *Flying J,* 2002 WL 2022061, at **2 (awarding lost franchise fee to copyright holder/truck stop franchisor as actual damages; causal link established because defendants would not have secured the architectural plans without purchasing a franchise); *accord Pfanenstiel Architects, Inc. v. Chouteau Petroleum Co.,* 978 F.2d 430, 432 (8th Cir. 1992) ("The Copyright Act allows recovery of actual damages . . . in recognition that some types of infringement inflict more harm to the copyright owner than the benefit reaped by

the infringer, for example, where the infringer's minimal use forecloses a broader market") (citation omitted).

In addition, Rottlund's lost licensing fee is appropriately claimed as an actual damage. *See The Gap,* 246 F.3d at 161, 164-172 (jury could reasonably find copyright owner was entitled to actual damages in the form of a reasonable licensing fee even if there was no evidence to support higher fee claimed by copyright owner); *Kleier Advertising, Inc. v. John Deery Motors, Inc.,* 834 F. Supp. 311, 314 (N.D. Iowa 1993) (awarding the lost licensing fees copyright holder would have earned in one specific market and "two unknown markets" as actual damages); *accord Iowa State University Research Foundation, Inc. v. American Broadcasting Cos.,* 475 F. Supp. 78, 83 (S.D.N.Y. 1979) (a defendant infringer "cannot expect to pay the same price in damages as it might have paid after freely negotiated bargaining, or there would be no reason scrupulously to obey the copyright law."); *Deltak, Inc. v. Advanced Systems, Inc.,* 767 F.2d 357, 361-63 (7th Cir. 1985) (same).

It is resolved that Rottlund may pursue its actual damages claims. (Order, 10/25/04.) The amount of actual damages is unresolved. (*Id.*)

**b. Infringers' Profits.**

The Copyright Act provides that a copyright owner is entitled to recover actual damages as well as "any profits of the infringer that are attributable to the infringement." 17 U.S.C. § 504(b). The infringer's profits are awarded to the copyright owner "to prevent the infringer from unfairly benefiting from a wrongful act." *Andreas v. Volkswagen of Am., Inc.,* 336 F.3d 789, 795 (8th Cir. 2003) (quoting H.R.Rep. No. 94-1476, § 504, 94th Cong., 2d Sess. at 161 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5777); *Arthur Rutenberg Corp. v. Dawney,* 647 F. Supp. 1214, 1216 (M.D. Fla. 1986) (same).

The Copyright Act "makes clear that there is no gain to be made from taking someone else's intellectual property without their consent." *Walker v. Forbes, Inc.*, 28 F.3d 409, 412 (4th Cir. 1994). To achieve this legal principle, Congress required that all of the infringer's profits be disgorged and awarded to the copyright owner to ensure that the infringer did not unfairly benefit from a wrongful act. *See* 1976 Act Notes of House Comm. on the Judiciary, 94th Cong., report on copyrights 1476 (Comm. Print 1976); *Kleier Adver. Co., Inc. v. James Miller Chevrolet, Inc.*, 722 F. Supp. 1544, 1545 (N.D. Ill. 1989) (Congress intended to award the copyright owner the infringer's profits to deny the infringer any unjust enrichment).

"In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses *and the elements of profit attributable to factors other than the copyrighted work.*" *Andreas,* 336 F.3d at 795 (citing § 504(b)) (emphasis in original); *Fishing Concepts, Inc. v. Ross,* 226 U.S.P.Q. 692, 696 (D. Minn. 1985) (same). "[W]here some of the defendant's profits result from the infringement and other profits are caused by different factors, . . . the burden of proof is on the defendant . . . [to] prove not only 'his or her deductible expenses' but also 'the element of the profit attributable to factors other than the copyrighted work.'" *Andreas,* 336 F.3d at 795 (quoting H.R.Rep. No. 94-1476, § 504, at 161 (quoting § 504(b))). '"Any doubt as to the computation of costs or profits is to be resolved in favor of the plaintiff. If the infringing defendant does not meet its burden of proving costs, the gross figure stands as the defendant's profits."' *Id.* (quoting *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.,* 772 F.2d 505, 514 (9th Cir. 1985) (*Frank Music I*) (internal citations omitted)).

The Defendants are not allowed to prove their expenses by evidence of average margins or overall profit margins, but must show what their particular expenses were. *See Johnson v.*

*Jones,* 149 F.3d 494, 506 (6th Cir. 1998). The Defendants must adduce evidence of "specific valuations" of the allocated factors. *See Flying J, Inc. v. Cent. CA Kenworth,* 2002 WL 2022061, at **1 (9th Cir. 2002).

The Supreme Court has held that "an infringer who commingles infringing and noninfringing elements 'must abide by the consequences, unless he can make a separation of the profits so as to assure to the injured party all that justly belongs to him.'" *Harper & Row Publishers, Inc. v. Nation Enters., Inc.,* 471, U.S. 539, 567, 105 S. Ct. 2218, 2234 (1985) (quoting *Sheldon v. Metro-Goldwyn Pictures Corp.,* 309 U.S. 390, 406, 60 S. Ct. 681, 687 (1940)). If non-infringing factors are so intertwined with infringing factors that it is impossible to apportion profits, then no apportionment is appropriate. *See Business Trends Analysts, Inc. v. Freedonia Group, Inc.,* 887 F.2d 399, 407 (2d Cir. 1989); *see also Belford, Clarke & Co. v. Scribner,* 144 U.S. 488, 508, 12 S. Ct. 734, 740 (1892) ("The rule is well settled, that, although the entire copyrighted work be not copied in an infringement, but only portions thereof, if such portions are so intermingled with the rest of the piratical work that they cannot well be distinguished from it, the entire profits realized by the defendants will be given to the plaintiff."); *Callaghan v. Myers,* 128 U.S. 617, 665-66, 9 S. Ct. 177, 191 (1888) (same).

Although some cases distinguish between direct and indirect profits, the Copyright Act does not, and the Eighth Circuit does not. According to the Eighth Circuit: "in an indirect profits case the profits 'attributable' to the infringement are more difficult to quantify. But that difficulty does not change the burden of proof established by the statute." *Andreas,* 336 F.3d at 796. Once the plaintiff demonstrates a nexus between the infringement and either direct profits or indirect profits, the burden then shifts to the defendant to prove apportionment (i.e., the

contribution to profits of elements other than the infringed property). *Id.* (citing *Frank Music I,* 772 F.2d at 518).

When analyzing profits "attributable to the infringement," the Eighth Circuit and courts from across the country have long held that infringers must give up profits that come from non-infringing products as well as profits that come from infringing products. For instance, in *Andreas,* the Eighth Circuit reversed the district court, and ruled the plaintiff could retain profits flowing from sales of Audi's non-infringing TT coupe that had a nexus to Audi's infringing TT coupe advertisement. 336 F.3d at 796. In making this decision, the Court found the infringing commercial was an important part of the TT coupe launch, it was highly rated, and sales of the TT coupe were above projections after the commercial aired. *Id.* at 797. According to the Eighth Circuit, "the jury had enough circumstantial evidence to find that the commercial contributed to the profitable introduction of the TT coupe, which shifted the burden to Audi of showing what effect other factors had on its profits." *Id.* The Court also stated the only reason the plaintiff was not allowed to recover profits from sales of other Audi models was because the TT coupe was not an infringing product, so it could not be used to tie into sales of other non-infringing cars. *Id.* at 799-800. The Eighth Circuit's rationale clearly implied that if the TT coupe had infringed the plaintiff's copyright, then the plaintiff could have sought damages off sales of other non-infringing models so long as the TT coupe was used as a "door opener" product for these other sales. *Id.* at 800; *accord On Davis v. The Gap, Inc.*, 246 F.3d 152, 160-61 (2d Cir. 2001) (explaining by analogy that the publisher of a poetry anthology with one infringing poem bears burden of proving profits from sale of other poems in the volume are not attributable to infringing poem); *Three Boys Music Corp. v. Bolton,* 212 F.3d 477, 487 (9th Cir. 2000) (jury awarded portion of profits earned from all songs in album that contained only one

infringing song); *Knitwaves, Inc. v. Lollytogs Ltd.,* 71 F.3d 996, 1010 (2d Cir. 1995) (plaintiff recovered profits made from sales of non-infringing skirts and pants sold along with infringing sweater); *Frank Music I,* 772 F.2d at 518-19 (holding that infringing use of music in one of ten acts of a Las Vegas casino musical revue entitled copyright holder to portion of casino's hotel and gaming operations based on revue's promotional nature); *In re Indep. Serv. Org. Antitrust Litig.,* 23 F. Supp. 2d 1242, 1250-51 (D. Kan. 1998) (copyright holder allowed to present gross revenues defendant derived from selling and servicing entire family of copiers that used infringing diagnostic software, not just revenues limited to infringing software); *Sunset Lamp Corp. v. Alsy Corp.,* 749 F. Supp. 520, 524-25 (S.D.N.Y. 1990) (plaintiff recovered profits from non-infringing line of lamps fairly attributable to infringing lamp).

It is resolved that Rottlund may pursue the infringers' profits from sales on infringing products and non-infringing products sold within communities where infringing products have been constructed. (Order, 10/25/04.) The amount of the infringers' profits is unresolved. (*Id.*)

**c. Statutory Damages and Attorneys' Fees.**

Pursuant to the Copyright Act, Rottlund may recover statutory damages, costs, and attorney's fees for the infringement of its Villa designs, so long as the infringement did not "commence" before the effective date of the registration. 17 U.S.C. §§ 412, 504(c), 505. There are two purposes for this statutory scheme: (1) it induces copyright holders to register and, in turn, receive an additional right to recover statutory damages; and (2) it provides potential infringers with an incentive to check the federal register, as they are deemed to have constructive notice that any registered work is covered by a valid copyright. *Johnson,* 149 F.3d at 505 ("Had Tosch checked the federal register when he first began his infringing activity, he would have discovered that Johnson's copyright was not registered.")

Rottlund registered its New Villa technical drawings (VAu 268-404) with the Copyright Office on October 5, 1993. This registration occurred before BSB worked on the Midland design in 1994, before BSB worked on the Jerry's Homes design in 1996, and before any of the Defendants worked on any of the Homestead Collection, Washington Square, or Chateau Collection designs. Pursuant to 17 U.S.C. § 106(2), Rottlund has the exclusive right to prepare a derivative work based upon the copyrighted New Villa. Ever since Rottlund registered its New Villa copyright in October 1993, the Defendants have had constructive notice of this legal right. *Johnson,* 149 F.3d at 505.

The Defendants are well aware of Rottlund's position concerning its registered New Villa copyright and the Defendants' subsequent illegal derivative works. Since February 6, 2003, in its Second-Eighth Amended Complaints, Rottlund consistently pled: (i) Rottlund had the exclusive right to create derivative material from the New Villa designs, and (ii) Rottlund was entitled to litigate its New Villa copyright pursuant to the carry-forward doctrine. 17 U.S.C. § 106(2); *Richmond Homes Mgmt Inc. v. Raintree, Inc.,* 862 F. Supp. 1517 W.D. Va. 1994) ("Where the same creator owns both the original and derivative copyrights, the only sound interpretation of the Copyright Act is that the derivative work carries forward all preexisting copyrights in the original work." ); *Data General Corp. v. Grumman Systems Support Corp.,* 825 F. Supp. 361, 364-65 (D. Mass. 1993) (holding that up to 100% of attorneys' fees were recoverable in software infringement case where some derivative software revision copyrights were registered before infringement commenced but others were not because compensable and non-compensable issues were closely intertwined and involved a common core of facts and related legal theories).

There is no question that the compensable New Villa copyright is intertwined with the Villa II copyright, just as the software revision copyrights in *Data General,* were intertwined. Rottlund's registered New Villa technical drawings are substantially similar to Rottlund's next generation Villa II technical drawings. The Homestead Collection floor plans infringe upon both Rottlund's New Villa floor plans and Rottlund's Villa II floor plans. The New Villa floor plans were registered on October 5, 1993 – almost five years before "BSB [allegedly] began its schematic design of the Homestead Collection for TCM on April 6, 1998." Rottlund is thus entitled to attorneys' fees and statutory damages.

The Court recognized the viability of Rottlund's claims and arguments in this regard when it denied the Defendants' motion for summary judgment requesting a finding that their infringement commenced prior to Rottlund's copyrights being registered. (Order, 10/25/04 at 7-10.) Specifically, in support of its holding that "numerous" fact issues exist concerning when the Defendants' infringement commenced, the Court noted that Rottlund's § 102(a)(5) New Villa copyright registration issued prior to BSB entering into a contract with Design Development to produce construction drawings similar to Rottlund's designs. (*Id.* at 8.)

As a secondary basis for recovering the same damages under §§ 412(1), 504(c), and 505, Rottlund the jury will determine whether Rottlund's Villa II floor plans were registered before the Defendants commenced their infringement of Rottlund's Villa II floor plans. (Order, 10/25/04.)

In *Arthur Rutenberg Corp. v. Parrino*, 664 F. Supp. 479, 480-82 (M.D. Fla. 1987), the court awarded statutory damages and attorneys' fees to the copyright owner of an architectural design pursuant to §§ 412(1), 504(c), and 505. The infringer in *Parrino* met with a drafter on at least eight occasions from July 1983 to November 1983 to design the infringing plan. *Id.* at 480.

The copyright registration was not obtained until August 18, 1983 – at least two months after the first of several meetings that took place from July through August 18, 1983. *Id.* Nevertheless, the Court awarded the copyright owner statutory damages for willful infringement pursuant to § 504(c), and attorneys' fees pursuant to § 505.

In *Robert R. Jones,* the court addressed the same issue and held that "the infringing act was the making of infringing plans" not the single event of taking the copyright holder's plans. 686 F. Supp. 160. According to the *Robert R. Jones* chronology of facts plaintiff and its architect created the plans for a residential house known as the "Aspen" in 1980. 686 F. Supp. at 162. In "early 1983," defendant builder gave to defendant architect a copy of plaintiff's Aspen plans. *Id.* at 163. Subsequently, in March 1983, defendant architect sent back to defendant builder the completed plans for the infringing house identified as the "Riverside," which the architect admitted were 80% copied from the Aspen plan. *Id.* According to the Sixth Circuit, when it considered the chronology of facts on appeal, this subsequent March 1983 date – *i.e.,* the date when the defendant architect sent the final Riverside plans to the defendant builder – was the "infringing act" when "the making of the infringing plans" occurred. 858 F.2d at 281. This is only logical, as the defendants were free to make non-infringing plans at any time before the defendant architect sent the builder the final infringing Riverside plans which were filed with the township and then used for construction purposes. 686 F. Supp. 163. Three months later, in June 1983, plaintiff registered the Aspen plans. *Id.* The Sixth Circuit thus unremarkably held that the plans were not registered before the infringement commenced.

If the Town & Country Defendants intend to argue to a jury that each development has an entirely different back-to-back town home design, and that the Illinois Division had nothing to do with the infringement that commenced with the Centennial Crossing Homestead Collection

design, then the infringement for each development's back-to-back town home design "commenced" on a different date and each back-to-back design for each development is a separate "work" as that term is defined in 17 U.S.C. §§ 504(c) and 412(1).

It is resolved that Rottlund may pursue statutory damages and attorneys' fees. (Order, 10/25/04.) The amount of both is unresolved. (*Id.*)

**5. The Defendants' Infringement Was Intentional, As They Acted With Reckless Disregard of Rottlund's Copyright Interests.**

It is resolved that Rottlund may pursue its intentional infringement claim. (Order, 10/25/04.)[3] Willful copyright infringement may be shown by either direct or circumstantial evidence. *N.A.S. Import, Corp. v. Chenson Enterprises, Inc.,* 968 F.2d 250, 251 (2d Cir. 1992). For example, an attempt to disguise the appropriation of a copyrighted architectural work by making superficial changes to it is evidence of willful infringement. *Maloney,* 891 F. Supp. at 1568. Also, in *Knitwaves,* 71 F.3d at 1010, the court found that the defendant infringed on copyrights for plaintiff's sweaters and held the infringement was willful. *Id.* According to the court, the plaintiff was not required to prove actual knowledge of infringement to establish willfulness; rather, the plaintiff needed to only establish constructive knowledge or "reckless disregard of the copyright holder's rights." *Id.* The court found incredible the defendant's testimony that it set out to create a new design but started with plaintiff's sweaters. *Id.; see also Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., Inc.,* 74 F.3d 488, 495-96 (4th Cir. 1996) (upholding jury instruction that stated "notice . . . is not the only way that willfulness can be established" and affirming willfulness finding based on infringer's attempt to copyright the copyrighted material he took from plaintiff); *RCA/Ariola Int'l, Inc. v. Thomas & Grayston*

[3] Rottlund expects that the Defendants will object to Magistrate Judge Nelson's well reasoned October 25, 2004 Report & Recommendation, thus Rottlund will address the issue of intentional infringement because it expects the

*Co.,* 845 F.2d 773, 779 (8th Cir. 1988) ("reckless disregard of the copyright holder's rights . . . suffices to warrant award of enhanced damages.")

There is no written notice prerequisite in copyright law to establish intentional infringement. Neither notice nor actual knowledge is required to prove intentional infringement and whether the infringer acted in reckless disregard of the copyright owner's rights involves a credibility determination reserved for the finder of fact. *Video Views,* 925 F.2d at 1020-21. In *Video Views,* the court stated: "Accordingly, willfulness would ordinarily be demonstrated where the infringer is provided oral or written notice of its infringing conduct by the copyright owner, yet 'passe[s] the matter off as a nuisance.'" 925 F.2d at 1021 (emphasis added) (citing *International Korwin Corp.,* 855 F.2d at 381). It certainly did not hold that written notice is the only way willful infringement can be found. *Id.* "In general, evidence that notice had been accorded to the alleged infringer before the specific acts found to have constituted infringement occurred is perhaps the most persuasive evidence of willfulness; it is not the only way that willfulness can be established.

Other factors may demonstrate that the alleged infringer should have known that its conduct was infringement. That is, "one who undertakes a course of infringing conduct may neither sneer in the face of the copyright owner nor hide its head in the sand like an ostrich." 925 F.2d at 1021. In addition, the *Video Views* court stated: "The determination whether a particular infringer acted willfully is left to the trier of fact, although a finding of willfulness should ordinarily be made [against the defendant] where the defendant knows that its conduct is an infringement or is reckless in not knowing that fact." *Id.*

---

Defendants to argue in their Trial Brief that whether Rottlund may pursue its intentional infringement claim is unresolved.

According to the Copyright Act:

> If a notice of copyright in the form and position specified by this section appears on the published copy or copies to which a defendant had access, then no weight shall be given to such a defendant's interposition of a defense based on innocent infringement in mitigation of actual or statutory [exception not applicable].

17 U.S.C. § 401(d).

When a party receives notice of infringing activity, that party has an affirmative duty to exercise due care to determine whether or not continuing those activities will constitute infringement. *See, e.g., Zip Dee, Inc. v. Dometic Corp.,* 1997 WL 323814 at *1 (N.D. Ill. 1997). While this Court held that there is no affirmative duty to seek and obtain a competent legal opinion regarding infringement, failure to do so is a factor to consider in the totality of circumstances surrounding willful infringement. (Order, 10/06/04.) *See, e.g., Wildlife Express Corp., v. Carol Wright Sales, Inc.,* 18 F.3d 502, 512 (7th Cir. 1994); *International Korwin Corp.,* 855 F.2d at 380-81; *Northlake Marketing & Supply, Inc. v. Glaverbel,* 72 F. Supp. 2d 893, 562-63 (N.D. Ill. 1999); *Great Northern Corp. v. Davis Core & Pad Co.,* 226 U.S.P.Q. 540, 562-63 (N.D. Ga. 1985).

**6. Because The Defendants' Infringement Was Intentional, They Are Not Allowed To Deduct Their Overhead Expenses Or Apportion Their Damages In Determining Infringers' Profits.**

If the jury finds the Defendants willfully infringed upon Rottlund's copyrighted architectural plans and works, that finding will impact damages in two important ways. First, a willfulness finding eliminates the Defendants' ability to claim any deduction under § 504(b) for overhead expenses. *Saxon,* 968 F.2d at 681 ("Overhead may not be deducted from gross revenues to arrive at profits when an infringement was deliberate or willful.") (citing *Frank Music I,* 772 F.2d at 515). Second, a willfulness finding precludes any apportionment of the Defendants' profits to "factors other than the infringement." *Knitwaves,* 71 F.3d at 1010 (no

apportionment where defendant's infringement was deliberate); *ABKCO Music, Inc. v. Harrisongs Music, Ltd.,* 508 F. Supp. 798, 801 n.10 (S.D.N.Y. 1981), *aff'd* 722 F.2d 988 (2d Cir. 1983) (no apportionment allowed when the defendant's infringement was deliberate); *Sheldon,* 106 F.2d at 55, *aff'd* 309 U.S. 390 (1940) (no apportionment allowed when the defendant's infringement was deliberate).

**B. Rottlund's Lanham Act And Minnesota Deceptive Trade Practices Act Claims.**

It is resolved that Rottlund's Lanham Act and Minnesota Deceptive Trade Practices Act claims are not pre-empted by the Copyright Act. (Order, 10/14/04, adopted in its entirety by Order, 10/29/04.) Rottlund's damages resulting from the Defendants' violations of the Lanham Act and Minnesota Deceptive Trade Practices Act Claims are unresolved.

**III. UNRESOLVED EVIDENTIARY ISSUES.**

**A. The Defendants' Foundation And Authentication Objections.**

On August 15, 2003, Rottlund served discovery on the Town & Country Homes Defendants which was designed to elicit foundation and/or authentication objections the Defendants may have concerning documents they have produced during discovery. The Town & Country Homes Defendants did not provide a substantive response. However, in their reply brief in support of their motion for partial summary judgment on damages, the Town & Country Homes Defendants, for the first time, lodged foundation, authentication and hearsay objections to several documents, many of which bear their own Bates label and were produced by them in response to Rottlund's discovery requests. Many of the documents objected to are the Town & Country Homes Defendants' business records. Several others were prepared by agents of the Town & Country Homes Defendants and are also business records pursuant to Rule 803(6) of the

Federal Rules of Evidence, thus these documents easily satisfy Rules 901 and 902 of the Federal Rules of Evidence.

Thus, Rottlund has subpoenaed third-parties, including a former TCM employee, to trial in order to lay foundation for and authenticate documents. One such party is Edina Realty – the Town & Country Homes Defendants' agent who prepared their "competition shop" business records. Because these business records, which include Rottlund materials, were designated as "Attorney Eyes Only" and the Town & Country Homes Defendants refused to lift document designations until November 15, 2004, Rottlund was forced to serve a trial subpoena *duces tecum* on Edina Realty because Rottlund could not show Edina Realty the documents it prepared until Edina Realty produced them to Rottlund. As a result, Rottlund continues to try to obtain a Rule 902(11) declaration from Edina Realty, but the Town & Country Homes Defendants have filed a Motion to Quash the trial subpoena served on Edina Realty in order to prevent Rottlund from overcoming their misguided foundation and authentication objections at trial. As a result of the Motion to Quash and resulting delay in obtaining a declaration from Edina Realty, Rottlund intends to amend its Trial Exhibit List once it receives a declaration, and documents, from Edina Realty.

In addition, many of the documents the Town & Country Homes Defendants object to, but produced from their files, are public records and reports pursuant to Fed. R. Evid. 803(8). Thus, there should be no Rule 901 or 902 challenges, but the Defendants have lodged them. To address these foundation and authentication objections, Rottlund has recently obtained these documents and the appropriate declarations/certifications relating to them directly from the municipalities in question. These municipalities are: (1) Maple Grove, Minnesota; (2) Plymouth, Minnesota; (3) Shakopee, Minnesota; and (4) Chaska, Minnesota.

Rottlund expects that the Defendants will continue to raise foundation and authentication objections, thus there are many unresolved evidentiary issues.

## IV. UNRESOLVED PROCEDURAL ISSUES.

### A. The Defendants Should Be Ordered To Bring Original, Color Copies Of Trial Exhibits To Trial For Rottlund To Use In Its Case-In-Chief.

Rottlund respectfully requests that the Court order the Defendants to bring originals of the following types of trial exhibits, which appear on Rottlund's Exhibit List, to trial for Rottlund to use in its case-in-chief: (1) client redline documents; (2) Rottlund's and Town & Country Homes' brochures produced by the Defendants; and (3) photographs of Rottlund's products. To clarify, by original Rottlund does not mean the exhibit from counsel's office which bears the original Bates label if it is a copy of an original document from a Defendant's file. Rather, Rottlund respectfully requests that these original exhibits from the Defendants' files be made available for Rottlund's use at trial because, in part, the original documents are in color.

These original, color documents are important for the jury. For example, Exhibit Nos. 6 and 6A are client redline documents which TCM's President – Art Plante – sent to BSB. These exhibits, in there original state, bear red markings (client redlines) and a color photograph of Rottlund's copyrighted Villa II town home is physically attached to the document. The jury is entitled to see these important, original documents as they were prepared, received, used and maintained by the Defendants. The same holds true for brochures and photographs produced by the Defendants.

### B. Subpoenas Served On Rottlund Employees.

The Bloodgood Defendants served Rottlund employees with subpoenas purporting to compel employees to appear at trial "[b]eginning November 15, 2004 at 9:00 a.m. and continuing each and every weekday thereafter until you are excused." One such subpoena was

served on Todd Stutz, Rottlund's President. Rottlund contacted the Bloodgood Defendants' counsel to discuss their intentions concerning these subpoenas. Specifically, Rottlund intends to make its employees within the subpoena power of the Court and identified on the Defendants' witnesses lists available to testify at trial, but Rottlund does not believe that the Bloodgood Defendants can justifiably compel Rottlund employees to appear at trial on days on which such witnesses will not testify, or on days for which trial will not be conducted (Fridays). The Bloodgood Defendants have not responded to Rottlund regarding this issue.

**C. The Parties' Letters To The Court Regarding Pre-Trial Issues.**

Pursuant to the Court's Order, the parties submitted letters to the Court regarding pre-trial issues they believed the Court should address. Attached hereto as Exhibit A is Rottlund's September 30, 2004 letter to the Court in this regard. The following issues from Exhibit A remain unresolved:

1. **The Defendants' Common Interest**;
2. **Length Of Trial And Order Of Cases-In-Chief**;
3. **Exhibit Lists**;
4. **"48-Hour Rule"**;
5. **Exchange Of Exhibits To Be Used In Opening Statements**;
6. **Peremptory Challenges And Cross-Examination**; and
7. **Documents Designated As "Attorney Eyes Only" Or As "Confidential."**

## V. ESTIMATED LENGTH OF TIME FOR TRIAL.

While it is difficult to know how long TCM will take to present its case-in-chief against BSB and the amount of time the Defendants will use to defend against the remaining unresolved issues, Rottlund's best estimate of the length of time for the entire trial is 15 trial days.

Dated: November 1, 2004

s/ David A. Davenport
Craig S. Krummen, #0259081
David A. Davenport, #0285109
Winthrop & Weinstine, P.A.
**Attorneys for Plaintiff**
225 South Sixth Street, Suite 3500
Minneapolis, MN 55402-4629
Telephone: (612) 604-6400
Facsimile: (612) 604-6800
ddavenport@winthrop.com

2155717v1