UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

The Rottlund Company, Inc., d/b/a Rottlund Homes, a Minnesota Corporation,

Plaintiff,

v.

Pinnacle Corporation, d/b/a Town & County Homes, an Illinois Corporation, Town & County Homes, Inc., a Minnesota Corporation, Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation, and The Bloodgood Group, Inc., an Iowa Corporation,

Defendants,

and

Town & County Homes, Inc., a Minnesota Corporation,

Third-Party Plaintiff,

v.

Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

No.: 01-CV-1980 (DSD/SRN)

**PINNACLE CORPORATION AND TOWN & COUNTRY HOMES, INC.'S TRIAL BRIEF**

## INTRODUCTION

Rottlund claims the protectible expression of its copyrights is the "look and feel" that arises from the "selection, arrangement and combination" of seventy-one

unprotectible architectural elements. Having prevailed on this theory in the pretrial proceedings, Rottlund is estopped from reverting to any claim of infringement on the basis of substantial similarity between individual elements. *Rottlund Co., Inc. v. Pinnacle Corp.,* 2004 WL 1879983, *14 (D. Minn.) ("[I]nfringement of individual elements in this case cannot be the basis for liability"). In fact, Rottlund cannot even argue that individual townhome units are substantially similar as the Magistrate Judge has already ruled that an individual unit is "an individual element." Docket Number 587 (Report dated October 25, 2004) at 41.

Defendants will seek to demonstrate that their selection, coordination and arrangement of the unprotectible architectural ideas is neither the same nor substantially similar to Rottlund's, and that as a result, the over all look and feel cannot be substantially similar. For example, defendants will prove that none of the interior units in the parties' eight-plexes are similar to each other, and that the second floors of the exterior units are also dissimilar. Rottlund will not be able to prove that the overall look and feel are substantially similar when three fourths of the design at issue is not at all similar.

Rottlund may not rely on the comparison of unprotectible ideas to demonstrate that the "overall look and feel" of the works are similar. The jury may not find infringement based on an "overall impression" that includes both protectible expression and unprotectible ideas or functional aspects. The Court must guard against such reversible error. *See Durham Industries Inc. v. Tomy*

*Corp.,* 630 F.2d 905, 912 (2d Cir. 1980) ("A general impression of similarity is not sufficient to make out a case of infringement. The only similarity of significance in assessing claims of infringement is similarity of expression."); *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 206 (9th Cir. 1989) (reversing jury verdict because instructions "invited the jury to consider the works as a whole, possibly leading the jury to focus on whether the two 'books' look alike, not on whether defendants copied protectible expression;" trial court was ordered to instruct jury to compare only original and protectible aspects of works), *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1541-44 (11th Cir. 1996) (reversing trial court for failing to instruct jury that infringement occurs only when original, protectible portions of copyright work are taken, and that similarities of unprotectible aspects cannot form the basis for liability).

Instead, Rottlund's evidence and arguments must be limited to the protectible expression – as defined by Rottlund, the "look and feel" – of its work. It cannot rely on evidence of similarity among unprotectible elements. The Court must also carefully instruct the jury to prevent an erroneous finding of infringement based upon similarities between the works that are neither original to Rottlund nor protectible under the copyright. *See Attia v. Society of New York Hospital*, 201 F.3d 50, 52-53 (2d Cir. 1999) ("The problem underlying plaintiff's claim of copyright infringement, however, is that not all copying from copyrighted materials is necessarily an infringement of the copyright. There are elements of a copyrighted work that are not protected even from intentional copying."); 4 M. Nimmer, *Nimmer*

*on Copyright*, § 13.03 [B][2][a] at 13-59 (2003) ("An essential element of an infringement case is that plaintiff must show that defendants' works are substantially similar to elements of plaintiff's work that are copyrightable or protected by the copyright. When similar works resemble each other only in those unprotected aspects, then defendant prevails.").

Rottlund bears the burden of segregating the unprotectible aspects of its plans (ideas, functional components, unoriginal elements) from the protectible and proving that defendants have copied the protectible aspect. If it fails, defendants are entitled to judgment as a matter of law.

If the Court leaves it to the jury to discern what is protectible and what is not (i.e., that this inquiry is a question of fact rather than law), it must allow expert testimony on the topic. *Kohus v. Mariol*, 328 F.3d 848, 857-58 (6th Cir. 2003) ("drawings are technical in nature and a lay person is unlikely to understand what constitutes creativity in this area, which elements are standard in the industry, and which elements are dictated by efficiency or external standards.") If the Court will not allow expert testimony on this subject, Pinnacle and TCM will seek to make an offer of proof through the testimony of its expert Jeffery Scherer to preserve the issue for appeal.

**FACTS TO BE PROVEN AT TRIAL**

Pinnacle Corporation is an Illinois developer of residential real estate. It is owned by the six children of William Ryan, who formed the company. The Ryans also own a majority of the stock in Town & Country Homes, Inc. (TCM), which they

formed in the early 1990s. Although the Ryan family members sometimes refer to TCM and Pinnacle as "divisions," "our," or with other colloquialisms, Pinnacle and TCM have always maintained their corporate separateness. Although they share common ownership, Pinnacle has no financial interest in TCM, and TCM has no financial interest in Pinnacle. Consequently, Rottlund does not seek to pierce the corporate veils or substantively consolidate the two companies.[1]

## I. The Architectural Works at Issue.

### A. TCM's Homestead Collection

In late 1997 or early 1998, TCM decided to design and build a back-to-back townhome building. Many of TCM's competitors offered a back-to-back townhouse, including GM Homes, Pulte, Centex, Rottlund and others. There was nothing novel about this idea. In fact, the idea of arranging townhomes in a back-to-back configuration has been used in the Minneapolis market since at least the early 1970s, and earlier than that in other parts of the country. Pinnacle and TCM's expert, Jeffery Scherer will testify that eight unit back-to-back townhomes can be traced back to 1840 in England.

Art Plante asked Pinnacle's former Vice President of Design Development, Steve Sandelin, to recommend an architect to assist in designing a back-to-back townhome building as well as other concepts. Mr. Sandelin contacted Doug Buster

[1] In various pleadings Rottlund has asserted that Pinnacle and TCM are "the same company." These claims are based on nothing more than the fact that several individuals are officers of both companies. Paul Anderson, for example is CFO of both TCM and Pinnacle. Peter Brennan is the General Counsel for both companies. This is neither unusual nor remarkable, and it is indicative of nothing.

of the architectural firm Bloodgood Sharp Buster ("BSB") in Illinois. Mr. Buster recommended Larry Moore of BSB's Iowa company.

In the spring of 1998, Plante, Sandelin and Moore met to discuss the back-to-back project generally. In April 1998 Sandelin and Moore met Plante in Minneapolis to look at the back-to-backs being offered by other builders. They walked through the models of at least four or five competitors, including Centex, Pulte, Rottlund and GM Homes. Plante and Sandelin took some snapshots, and when available they picked up marketing brochures.

It is common for any homebuilder to learn what its competitors are doing. Builders tour each other's developments constantly. The purpose is to gather ideas, learn what the competition is offering, and understand what the consumers are buying. Rottlund explicitly requires its personnel to "regularly 'shop' competition to become knowledgeable of their products, prices, promotions, performance and activities, and report such findings to the Sales Manager." Rottlund's CEO, Todd Stutz will admit that "you don't stay in business very long" unless you do.

Moreover, looking at built structures, gathering ideas and building upon them is the very essence of design. As Pinnacle's expert will explain, "architects and developers routinely and actively maintain their currency in their respective fields of endeavor by reading publications, attending seminars, visiting built work, discussing designs with their peers, and staying abreast of developments relating to their core expertise and interests."

After shopping the competition to collect ideas, BSB and TCM set about designing their own back-to-back. The evidence will be overwhelming that they independently created their drawings. BSB has its original notes, programmatic instructions, schematics, and its various generations of drawings. The BSB architects and Art Plante will testify regarding the evolution of their design and the reasons for their choices. They will also testify as to the ways in which they sought to differentiate their back-to-back from the rest of the market.

In opposition to the significant evidence of independent creation, Rottlund will have no direct evidence of copying of the expression it seeks to protect here. Instead, it will attempt to draw inferences from evidence that might have been sufficient to survive summary judgment but will not be convincing to a jury. For example, BSB initially named its back-to-back project the "villa." Rottlund would have the jury believe that TCM set about to copy Rottlund right down to the name of its townhomes. In fact, the term "villa" was a common name for townhomes, including back-to-back townhomes. GM Homes, one of the other homebuilders TCM and BSB scouted in the spring of 1998, used it as well. Consequently, Rottlund has never claimed any copyright or even trademark protection to the name – it is a smokescreen. Furthermore, it is common for homebuilders to assign affected names to the products in their developments (e.g., "villa," "manor," "estate") to create an upscale image for their homes. When TCM moved to the marketing stage, the name "villa" was abandoned because of its prevalent use by other builders. TCM's

decision to change the name because it was used by others, including Rottlund, is evidence that it had never intended to copy Rottlund, not the contrary.

Rottlund will also submit evidence that when BSB provided TCM with an initial sketch of the exterior elevation, the side entries were incorrect. Art Plante sent BSB a suggestion for a gable roof for the entry, which was the form of roof that Rottlund had used, with copy of Rottlund materials and a note stating "See Rottlund product." Rottlund seizes on this as proof of actual copying. Even if BSB had copied the Rottlund side entry, that would be irrelevant here, because Rottlund admits that it has no protectible interest in that element. Moreover, BSB did not copy Rottlund's gable side entry; the two look nothing alike. Art Plante's note and photograph merely indicated the *idea* of a gable roof over a doorway and then BSB designed its own expression.

Finally, Mr. Scherer will testify that that BSB's claim of independent creation, bolstered by the overwhelming documentary evidence, is entirely consistent with the final designs. TCM set out to design a building consisting of 1200 – 1400 square foot townhomes arranged in a back-to-back configuration. In light of the minimum required building blocks (kitchen, garage, master bedroom, spare bedroom, dining area and living room), as well as the controlling consumer tastes (two car garage, two-story living room, powder room, fireplaces) it is not at all surprising that TCM's and BSB's design turned out the way it did. The design is a logical solution to the constraints BSB and TCM faced. Given the very low level of creativity shown by Rottlund's plans, any similarities in the two layouts is not

indicative of copying, but rather of two architects reaching an obvious solution to a common design challenge – a solution that many trained architects could choose when faced with the same constraints. To corroborate that, Mr. Scherer will point to several other developers who, faced with the same constraints, came to designs that appear generally similar.

**B. TCM's Homestead As Compared to Rottlund's "Villa II"**

The back-to-backs that BSB designed for TCM were ultimately named the "Homestead Collection." They have either been constructed and sold or are planned for development in Maple Grove (the Centennial Crossing Development), Plymouth (the Harvest Hills Development), Shakopee (the Providence Park Development), and Lakeville (the Cornerstone Lake Development and Springbrooke Development). The designs for Providence Point are different than the others because Shakopee required larger garages. In addition, because purchasers selected many optional second floor configurations, the buildings themselves are all different.

Rottlund claims that these townhomes and townhome designs infringe Rottlund's copyrights on its Villa II technical drawings and back-to-back townhome building. It places three copyrights at issue:

| Copyright Registration No. | Work |
|---|---|
| VAu 447-395 | Rush Creek Villa II, 8 unit w/ no step technical drawings |
| VAu 534-723 | Rush Creek Villa II, 8 unit with no step architectural work |
| VAu 546-285 | The Reserve Villa II 8 unit building technical drawings |

Despite the overwhelming evidence that back-to-back townhomes have been sold in the Twin Cities area since the early 1970s, Rottlund claims to have invented the idea. However, it does not have any design development documents from its first "Villa." In fact, it cannot even locate a copy of the deposit materials for its first "Villa," or even a complete set of the architectural plans for Summerwood, the development it claims was its first Villa. To date, it has produced only four sheets of architectural drawings for the Summerwood.

Thus, the evidence is very strong that Rottlund borrowed the concept of a back-to-back arrangement from other townhome buildings. Pinnacle's expert witness, Jeffery Scherer, an Adjunct Associate Professor at the College of Architecture & Landscape Architecture at the University of Minnesota and a member of the AIA College of Fellows, will testify that he sees "nothing in the plaintiff's designs that suggests they were created in a vacuum – void of any input from the marketplace." He will further opine that the plaintiff's architectural works exhibit a very low level of originality, have no "signature stamp," and amount to nothing more than a functional arrangement of commonly used architectural building blocks (i.e., ideas such as a living room, or the placement of a bathroom next to a bedroom). It is also clear to Mr. Scherer's trained eye that Rottlund's designs are heavily predetermined by consumer tastes, salability, and cost. Although the Court's pretrial rulings limit Mr. Scherer's ability to testify as to whether the drawings and homes are similar, his expertise in residential architecture enables him to testify that these configuration of elements is the sort of

solution many architects would reach, and therefore likely to have been chosen by BSB independent of Rottlund's works.

Rottlund claims that the Homestead townhomes and townhome designs infringe the overall look and feel of the Villa II architectural work and technical drawings. By "total look and feel," or "gestalt," what Rottlund means is the general impression that arises from Rottlund's selection and arrangement of 71 individual elements, such as the "placement of garage entry into kitchen area," the "layout of garage," the "layout of powder room, including single sink and toilet with no tub or shower," the "placement of toilet in owner's suite bathroom," and the use of other basic, functional elements. Significantly, Rottlund's corporate designee testified that its official position is that the "overall look and feel" of their 8-unit building can be substantially similar to another 8-unit building even if none of these individual elements are themselves substantially similar. Thus, the only thing Rottlund claims the defendants have infringed is the total look and feel of the entire 8-unit building, ***without reference to the expression of any of the individual elements that it claims make up the total look and feel.***

This very claim has been rejected at least twice by District Courts in the Eighth Circuit, once with regard to Rottlund's Villa designs in particular. The District Court of Iowa held that Rottlund had no likelihood of success on the merits in *Rottlund Homes, Inc. v. The Oaks Development Co.*, Case No. 4-98-CV 10574, (Attached as Ex. A) when it rejected the very claim Rottlund asserts here:

> Rottlund admits that the elements of similarity are not, on their own, infringement, but claims that the elements in combination infringe

> Rottlund's buildings. The Court disagrees with this assessment. A back-to-back, slab on grade, two story townhome is simply *not* an original idea; yet, these elements are the essence of Rottlund's claim to originality. (*Id.* p. 16-17)

The District Court of Minnesota held likewise in *Kootenia Homes, Inc. v. Reliable Homes, Inc.*, 2002 WL 15594 (D. Minn. 2002), when it rejected a builder's claim of copyright infringement:

> Many features of a designed residence are common in many other homes. Efficiency concerns and the need for functional living in the home inevitably constrain the number of variations in the configuration of the rooms and spaces. **Common elements and generic features are share by all homes. The Copyright Act does not protect the ideas for juxtaposing these living spaces**.

*Id.* at *4 (emphasis supplied).

With regard to substantial similarity, the law is well settled that the technical drawings can only be compared to technical drawings, and architectural works compared to architectural works. *National Medical Care, Inc. v. Espiritu*, 284 F. Supp. 2d 424, 435 (S.D.W. Va. 2003) ("[A]n as-built structure or feature cannot be an infringing copy of a technical drawing.") Similarly, Rottlund has no copyright on the design of any individual units, only on the entire work. Thus, even substantial similarity of individual units cannot form the basis of a finding of liability. *Yankee Candle Co., Inc. v. New England Candle Co., Inc.*, 14 F. Supp. 2d 154, 160-61 (D. Mass. 1998) ("The Court believes that [copyright] protection extends to free standing structures, like Yankee's 'stand alone' flagship candle store in South Deerfield, not individual units comprising a larger structure. Surely Congress did not intend for individual offices in an office building, though elaborately designed, to qualify as 'buildings' themselves.").

When the "overall look and feel" of the entire Homestead Collection eight-plex building is compared to the Villa II, they are not substantially similar. Some individual features, such as the fireplace/loft wall in the living room may have similarities, but this does not render the entire design of the building, or the building itself, substantially similar. Significantly, Rottlund has admitted that the Homestead the four interior units are not substantially similar to the Villa II interior units. Rottlund has also admitted that the second floor designs for the exterior units are not substantially similar. This leaves only the first floor of the corner units. Rottlund wants the jury to find that the "look and feel" of the entire building is substantially similar even though it admits that three-fourths of the building is not.

### C. TCM's Chateau

After this litigation commenced, TCM elected to create a new design for its back-to-back townhomes. It hired a new architect, Tushie Montgomery, and instructed that firm to come up with something new and non-obvious. Tushie Montgomery was specifically told to avoid the obvious solution embodied in the Homestead design. The Chateau designs did, in fact, turn out completely different. TCM has sold a small number of Chateau townhomes. They are planned for development in Brooklyn Park (the Pinebrook Commons development) and Chaska (the Traditions at Clover Ridge development).

Rottlund does not even contend the Chateau townhome is substantially similar to the Villa II. Instead, Rottlund claims the Chateau is a "derivative" of the

Homestead, and argues that Rottlund has the exclusive right to make derivatives of its copyrighted works. Even if Rottlund proves that TCM derived the Chateau from the Homestead (which it did not), a derivative of a copy is not infringing unless it is substantially similar to the copyrighted work itself. *John Alden Homes, Inc. v. Kangas*, 142 F. Supp. 2d 1338 (M.D. Fla. 2001), *aff'd,* 37 Fed. Appx. 979; *Arthur Rutenberg Homes, Inc. v. Maloney*, 891 F. Supp. 1560 (M.D. Fla. 1995).

Even a superficial comparison of the plans reveals that the Chateau Collection design is not substantially similar to the copyrighted works. For example, the interior units of the Chateau are not at all similar to the interior units of the Villa II. The Chateau's two-story volume space at the entry is totally different from the Villa II's nine-foot ceiling. The switchback stair at the rear of the unit is totally different from the Villa II's stair and changes the circulation through the dining area. The Chateau's U-shaped kitchen is substantially different from the Villa II's L-shaped kitchen. The fireplace and media niches are in different locations. The Chateau offers a storage room not found in the Villa II. The second floors of the interior units are also substantially different.

In addition, the Chateau Collection has two different exterior or end units: End Unit A and End Unit C. End Unit C is a front loaded entry plan that does not exist in the Villa II plans and, thus, is totally different. The End Unit A plan is not substantially similar to the exterior units in the Villa II. The End Unit A's nine-foot ceiling is different from the Villa II's two-story volume space. The line of sight of entry is directed at the dining and kitchen area as opposed to the Villa II's line of

sight entry towards the central stair and two-story living space. The fireplace in the bay of the End Unit A is in a completely different location. The kitchen is a galley kitchen with a different shape and size than the Villa II's L-shaped kitchen. The second floor of the Unit A is also dramatically different than the second floor of the Villa II.

The claims based on The Chateau have been largely vitiated in any event by the defendant's motion for partial summary judgment. The Court has ruled that Rottlund may not recover damages for anything that has not yet been built. This ruling covers that vast majority of the Chateaus.

**D. Pinnacle's Washington Square**

In early 2000, Pinnacle decided to test the back-to-back idea in Illinois. It retained BSB to transfer TCM's Homestead designs to Illinois, and then substantially revamped the exteriors. In addition, it elected to offer only four unit and six unit back-to-backs, with a significant difference. All earlier four unit back-to-backs consisted of four identical "end units." Pinnacle elected to construct a four unit back-to-back with only two of the end unit designs, and two of the "interior unit" layouts.

Like the Chateau, Pinnacle's Washington Square is significantly different than Rottlund's Villa Product. A side-by-side comparison of the exteriors reveals little similarity at all.

**II. Damage Claims on accused designs**

**(A) Actual Damages**

Rottlund seeks lost profits as "actual damages." It does not contend the price of the Villa II was driven down by TCM's sale of an infringing copy. (In fact, TCM's Homestead is more expensive than the Villa II.) Moreover, Rottlund cannot point to a single sale that it lost to TCM. Thus, Rottlund is left with its attenuated claim that it lost the opportunity to sell the homes that TCM sold. This claim is premised on the assumption that Rottlund competes head-to-head with TCM at every development, and that every TCM sale represents a lost Rottlund sale. Not only does this theory ignore the presence of other competition in the market (for both back-to-back sales and other home styles), it ignores the fact that Rottlund lacked the ability to satisfy the extra demand. Unlike a book or a record manufacturer, which can simply increase production, Rottlund needs land to increase production of housing products in any specific geographic area. Rottlund cannot identify any available land that it could have acquired, but chose not to because TCM was soaking up all of the demand.

Rottlund will also seek a licensing fee from Pinnacle for the back-to-back townhomes at Washington Square. Rottlund's damage expert will opine that a "reasonable licensing fee" would be equal to the full amount of profits that Rottlund would have made on the townhomes if it had constructed and sold them. No reasonable licensee would ever pay a fee equal to the entire profit on the project, let alone for the right to use expressions that are so ill-defined as the "gestalt" of the project, and so inexpensive to design without infringement. The only basis for her belief that such a licensing fee would be reasonable is the litigation position of

Rottlund officials that it would not accept anything lower. Pinnacle will present evidence that the licensing fee sought is inconsistent with any realistic hypothetical bargaining model. Pinnacle will also present evidence that Rottlund once before licensed the use of its Villa product in Indiana at a far lower rate.

**(B) Infringer's Profits**

Rottlund will also seek infringer's profits to the extent they are not duplicative of Rottlund's actual damages. Rottlund has no evidence that the profits from the sales of these townhomes were attributable to the infringement. Moreover, defendants have ample evidence to the contrary. The defendants' damages expert, Art Cobb, will break down the defendants' profits by category and offer some examples of profit portions that cannot possibly be attributable to infringement. A hefty portion of the cost of any home, for example, is the land cost. Mr. Cobb segregates out TCM's profit on the [re]-sale of its land on the theory that this cannot be attributable to the infringing designs. Cobb gives other examples of non-infringing elements that contributed to the profitability of the project, such as design of the interior units, the choice of appliances, and others factors for which Rottlund is entitled to no recovery. Mr. Cobb will present several different alternatives to the jury.

In addition, the defendants will offer the testimony of Roger Conheim, a local real estate analyst who worked for both Rottlund and TCM. He will testify that most residential purchase decisions are based on location, not design. Thus, a

significant portion of the profits from the sale of the Homestead and Chateau was not due to any infringing design, but rather to location.

Finally, defendants' expert Jeffery Scherer will testify that Rottlund's copyrighted designs exhibit a low level of creativity and that several functional equivalents exist in the Minneapolis area. This will tend to prove that purchasers of TCM's Homestead and Chateau were not seeking a unique or original design that they could not get elsewhere, so their purchasing decisions must have been made on other factors.

## III. Rottlund's Claimed Consequential Damages Based On Non-Accused Designs.

Rottlund also intends to seek "lost profits" and "infringers' profits" from the sale of other unrelated housing units within the developments where the Homestead, Chateau, and Washington Square townhomes were sold. Rottlund does not contend that those homes infringed its copyrights, or even that they were similar to any units Rottlund sells. Rather, Rottlund asserts that TCM and Pinnacle would not have been able to acquire or develop these parcels at all without resorting to the infringing designs. Rottlund claims (1) that the municipalities where these developments were built would not have approved any part of the planned developments without the back-to-backs, and (2) that TCM couldn't have designed the back-to-backs without infringing Rottlund's narrow "gestalt" copyright. Proof of that attenuated causal string will be very difficult. That is true of both components of Rottlund's damages – its own damages and the "infringers' profit."

Rottlund surely cannot prove that it lost sales itself because of the of non-infringing homestyles. To establish this connection, Rottlund would need to prove that it would have acquired and developed the subject parcels if TCM had not. In fact, Rottlund only bid on two of the parcels. At Maple Grove, Rottlund's initial bid was not even the second highest. When the sellers asked all interested parties to rebid, Rottlund refused and dropped out of the auction. Thus, even if TCM had not been in the running, someone else would have acquired the land. At Lakeville, Rottlund had a contract to purchase the land but withdrew once it learned that the Villa II was unacceptable. The Village of Shakopee advised Rottlund that its two-car garages were two small and needed to be enlarged. Rottlund refused to modify its designs and let the property go.

The same is true of Rottlund's claim for "infringer's profits" in connection with unrelated housing units. Rottlund cannot establish that TCM's profits on the non-accused homestyles are "attributable to the infringement." To establish this, it must show that no municipality would have allowed TCM to build and sell these homes without also offering infringing back-to-back units. Rottlund has no such evidence. At best it has discovered guidelines from some Villages indicating a desire for varied home styles, affordable housing, or "life cycle" living. It grasps at TCM's references to of these terms when seeking approval, but it has absolutely no evidence that TCM would have been refused had it failed to meet these "guidelines," or that the back-to-backs were a necessary condition to meeting the guidelines.

Defendants intend to seek a judgment as a matter of law on this aspect of Rottlund's claim.

Even if Rottlund could establish some thin nexus between the allegedly infringing units and other units in the developments, Rottlund still cannot prove that its lost profits or TCM's profits on those other units are attributable to the infringement. Thus, all, or nearly all, of the profits from these sales should be apportioned out. Rottlund's proof at best would establish that TCM got the opportunity to sell these non-infringing homes by using the back-to-back. It does not prove that anyone bought the homes because back-to-backs were also in the community. Thus, the profits are not "attributable to the infringement."

## LEGAL STANDARDS

### I. Proof of Copyright Infringement.

In order to establish a claim of copyright infringement, Rottlund must prove: "(1) ownership of a valid copyright, and (2) copying by the defendant of the protected constituent elements of the work." *Schoolhouse, Inc. v. Anderson*, 2001 WL 1640081, *2 (D. Minn.), *aff'd*, 275 F.3d 726 (8th Cir. 2002). Copying may be shown either by direct evidence of actual copying or by circumstantial evidence, proving that defendants had access to the copyrighted work and that there is substantial similarity between the works. *Id.* at *4.

### II. Legal standards implicated by the copyright claims

### A. Compilations

Architectural plans are not typically considered compilations. Ordinarily, the owner of a copyright in architectural drawings alleges that the infringer copied one or more elements in its drawings. In this case, however, Rottlund decided for strategic reasons to concede that it has no protectible interest in the expression of any element of its drawings or its as-built structures. Instead, it asserts that the <u>**only**</u> protectible expression in its copyrights is its selection and arrangement of seventy-one building elements, none of which have individual expressions or are themselves protectible. As the Order entering partial summary judgment in favor of Rottlund explained, "The Court 'filters out' the use of individual elements in Rottlund's drawings. The use of, for instance, gabled entries, lofts, or fireplaces in this case represent mere ideas that others may utilize without consequence." (Docket Number 514 (Report Dated August 20, 2004) at 29) Thus, as described above, Rottlund is estopped now from claiming protection for anything other than the combination and arrangement of the unprotectible elements. That sort of combination of unprotectible elements is, itself, protectible only if it satisfies the standard for a protectible compilation, under *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.,* 499 U.S. 340, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991). *See also Tufenkian v. Import/Export Ventures Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 136 (2nd Cir. 2003) ("The non-mechanical adaptation of individually unprotectible elements from the public domain is precisely the type of 'original selection' that the Supreme Court indicated was protectible expression in *Feist."*); 17 U.S.C. § 101 (defining "compilation" as "a work formed by the collection and

assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship"). In this regard, Rottlund's claim is most analogous to *Domingo Cambeiro Professional Corp. v. Advent*, 2000 WL 262597 (9th Cir. 2000), where the plaintiff asserted his combination of various New York City icons in the façade of a new casino amounted to protectible expression. The Ninth Circuit recognized the plaintiff's architectural plans were sufficiently original to be copyrightable, but amounted to a compilation that was entitled to only "thin" protection. *Id.* at *2.

The "thin" protection afforded compilations such as Rottlund's requires a showing of virtual identity, or "extensive verbatim copying" to constitute infringement. *Schoolhouse, Inc.,* 275 F.3d at 729; *Feist*, 499 U.S. at 349 (competing work will not infringe a compilation unless the work "features *the same* selection and arrangement") (emphasis supplied). The Court should instruct the jury that unless they find the defendants' selection, arrangement and combination of the seventy-one elements is "virtually identical" to Rottlund's selection, arrangement and combination, no infringement can be found.

**B. Substantial Similarity**

If Rottlund is allowed to pursue a theory that its selection, arrangement and coordination of unprotectible architectural ideas creates an expression that deserves more than thin protection, it must demonstrate that the defendants' townhome buildings and designs infringe the protectible expressions of Rottlund's architectural plans and works. 4 M. Nimmer, *Nimmer on Copyright*, § 13.03

[B][2][a] at 13-59 (2003) ("An essential element of an infringement case is that plaintiff must show that defendants' works are substantially similar to elements of plaintiff's work that are copyrightable or protected by the copyright. When similar works resemble each other only in those unprotected aspects, then defendant prevails.") Rottlund seeks to have the jury compare the overall look and feel of the works without ever bothering to determine whether similarity is limited to unprotected aspects.

**C. Direct Copying**

Rottlund has suggested in pretrial pleadings that it will pursue a claim of direct copying. On this issue, Rottlund seeks to confuse evidence of access with evidence of direct copying. Thus, it will claim that defendants' product tours and photographing of different builder's products are direct evidence of direct copying. They are not. Instead, they are merely circumstantial evidence of access, which does not prove direct copying. *Cf. Ganz Bros. Toys v. Midwest Importers of Cannon Falls, Inc.*, 834 F.Supp. 896 (E. D. Va. 1993) (evidence that same designer worked on both works is not proof of direct copying). There will be no evidence of direct copying of the works. Moreover, all of Rottlund's evidence relating to direct copying is specific to individual elements of the designs that are not protectible – the sprinkler shed or a listing of code requirements, for example. None of this tends to show direct copying of the protectible expression.

**D. Independent Creation**

Rottlund will also seek to argue that access disproves any claim of independent creation, on the theory that independent creation requires creation in a creation in a vacuum with no outside influence or prior reference to the copyrighted work. These arguments misstate the law and will only serve to confuse the jury .

**E. Damages**

A "copyright owner is entitled to recover the actual damages suffered by him or her as the result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). With regard to any actual damages, Rottlund bears the burden of proving the existence and amount of the loss was a natural and probable consequence of the infringement. *Data General Corp. v. Grumman Systems Support Corp.,* 36 F.3d 1147, 1171 (1st Cir. 1994). Rottlund will not be able to prove that it is a natural and probable consequence of the infringement that it would cause Rottlund to sell fewer unrelated homes, or cause TCM to sell more unrelated homes.

Rottlund's evidence that it would have acquired the properties TCM acquired if TCM was not in the picture will fail. Rottlund was completely unaware of many of the land opportunities, affirmatively declined to purchase others, and was outbid by other competitors in addition to TCM on the rest. Nor will Rottlund be able to point to a single lost sale at any of its neighboring developments, all of which are substantially completed. Finally, Rottlund either has no proof of alternative land

sites, or it destroyed the documentation. Either way, it cannot claim that additional land was available.

With regard to infringer's profits, Rottlund seeks not only the profits from the sales of the allegedly infringing units (direct profits), but also the profits from the sales of all homes within any development where an accused townhome was sold (indirect profits). Rottlund bears the burden of proving that both sets of profits are "attributable to the infringement:"

> The burden of establishing that profits are attributable to the infringed work often gets confused with the burden of apportioning profits between various factors contributing to the profits. '[T]he plaintiff has the "burden" to demonstrate a nexus between the infringement and the indirect profits before apportionment can occur.

*Andreas v. Volkswagen of America, Inc.*, 336 F.3d 789, 796 (8th Cir. 2003).

Thus, Rottlund must establish a nexus between the alleged infringement and sales on non-infringing products before it can claim them as "attributable to the infringement." "In establishing an infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Andreas*, 336 F.3d at 795.

Thus, TCM and Pinnacle will introduce evidence of its costs and expenses to arrive at a figure for profits "attributable to the infringement." In addition, defendants shall introduce evidence of apportionment to show that a large percentage of the profits on the sales of defendants' homes are not attributable to Rottlund's copyrighted design.

**F. Statutory Damages**

As an alternative to actual damages, Rottlund can elect to seek statutory damages pursuant to 17 U.S.C. § 504(c), so long as as defendants' alleged infringement did not commence prior to the registration of the copyrights. 17 U.S.C. § 412(c); *see also M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1493 (11th Cir. 1990). The earliest of Rottlund's three copyrights at issue was registered on June 22, 1999. BSB, however, began its schematic design of the Homestead Collection for TCM on April 6, 1998, well before the earliest registration date Rottlund can claim. *Cornerstone Home Builders, Inc. v. McAllister*, 311 F. Supp. 2d 1351, 1352 (M.D. Fla. 2004) ("Plaintiff's reasoning, however, is flawed because courts have found that the first steps of architectural infringement, including tracing architectural floor plans and re-labeling architectural drawings, commence the infringing conduct and not the completion of construction plans as Plaintiff indicates.")

If Rottlund is allowed to pursue a claim for statutory damages, it is limited to an amount of not less than $250 and not more than $30,000 for each copyright, or a total of $90,000. *Venegas-Hernandez v. Sonolux Records,* 370 F.3d 183 (1st Cir. 2004).

**G. Willfulness**

Rottlund contends that defendants' infringement was willful. It will bear the burden of proving willfulness at trail. *Original Appalachian Artworks, Inc. v. J.F. Reichert Inc.,* 658 F.Supp. 458, 463 (E.D. Pa. 1987). Rottlund will need to prove that defendants acted "with knowledge that [their] conduct constitutes copyright

infringement." M. Nimmer & D. Nimmer, *Nimmer on Copyright*, § 14.04[B][3]; *RSO Records, Inc. v. Peri*, 596 F.Supp. 849, 859 (S.D.N.Y. 1984). This requires more than intentional copying. It requires knowing disregard of the bar against copyright infringement.

Generally, allegations of "willful" infringement require evidence that "the infringer is provided oral or written notice of its infringing conduct by the copyright owner. . . ." *Video Views, Inc. v. Studio 21, Ltd.*, 925 F.2d 1010, 1021 (7th Cir. 1991). Rottlund claims that its letter to Michael Ryan of Pinnacle constitutes notice to all defendants. That letter, however, does not identify either the Villa technical drawings or the Villa townhomes and thus cannot serve as the basis for willfulness in this case. *Id.*

Rottlund cannot attempt to prove willfulness by asking defendants about conversations with their attorneys. Defendants have not waived attorney-client privilege as to those communications by asserting them as an issue in this case. *See Medtronic, Inc. v. Intermedics, Inc.*, 162 F.R.D. 133, 135 (D. Minn. 1995). Rottlund has identified no admissible evidence to support its claim of willful infringement.

In the unlikely event that Rottlund can offer proof of willful infringement, the Court has the discretion to increase the amount of statutory damages to $150,000 per copyright, or a total of $400,000. 17 U.S.C. § 504(c)(2). A finding of willful infringement could also have an effect on Rottlund's claim for infringer's profits. If the infringement is willful, the defendants will not be entitled to deduct their general overhead expenses. *Saxon v. Blann*, 968 F.2d 676, 681 (8th Cir. 1992).

Rottlund has argued that a finding of willfulness also means that defendants may not offer any evidence of apportionment. There is no law to support this position in the Eighth Circuit.

III. **Other claims**

Rottlund has also alleged claims under the Lanham Act and Minnesota's Consumer Fraud and Deceptive Practices Act. Both claims require proof of "more than a violation of the author's copyright-protected right to credit and profit from a creation." *Weber v. Geffen Records, Inc.*, 63 F. Supp. 2d 458, 473-74 (S.D.N.Y. 1999). The claim must be qualitatively different from the copyright claim and include injuries caused by something other than the copyright infringement damages. Rottlund's claim under the Minnesota Uniform Deceptive Trade Practices Act is limited to an award of attorney's fees and costs. (10/25/04 Report & Recommendation, p. 43-44.) The basis for the claim is the same as Rottlund's Lanham Act claim, and the evidence of a violation and damages must be qualitatively different than the copyright claim.

Dated: November 1, 2004

s/Darren B. Schwiebert
Cynthia Jokela Moyer (#211229)
Darren B. Schwiebert (#260642)
FREDRIKSON & BYRON, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402
Telephone: (612) 492-7312
Facsimile: (612) 492-7077

ATTORNEYS FOR DEFENDANT
TOWN & COUNTRY HOMES, INC.

– AND –

Edward F. Ryan
Christopher J. Murdoch
Matthew I. Farmer
**HOLLAND & KNIGHT LLP**
131 South Dearborn Street, 30th Fl.
Chicago, IL 60603
Telephone: (312) 263-3600
Facsimile: (312) 578-6666

David Donna (#163624)
**DONNA & DALY**
1460 Buffet Way, Suite 150
Eagan, MN 55121
Telephone: (651) 406-4242
Facsimile: (651) 406-4243

ATTORNEYS FOR DEFENDANT PINNACLE CORPORATION