UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| The Rottlund Company, Inc. d/b/a Rottlund Homes, a Minnesota Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>Pinnacle Corporation d/b/a Town & Country Homes, an Illinois Corporation, Town & Country Homes, Inc., a Minnesota Corporation, Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation, and The Bloodgood Group, Inc., an Iowa Corporation,<br><br>Defendants,<br><br>and<br><br>Town & Country Homes, Inc., a Minnesota Corporation,<br><br>Third-Party Plaintiff,<br><br>vs.<br><br>Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation,<br><br>Third-Party Defendant. | No.: 01-CV-1980 (DSD/SRN) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS BLOODGOOD SHARP BUSTER ARCHITECTS AND PLANNERS OF IOWA, INC., AND THE BLOODGOOD GROUP, INC.'S MOTION IN LIMINE**[1]

[1] Rottlund will refer to these Defendants collectively as "the Bloodgood Defendants."

## INTRODUCTION

The Court should deny the Bloodgood Defendants' Motion in Limine because it seeks (1) to prevent Rottlund from impeaching the Defendants' independent creation affirmative defense; (2) to preclude Rottlund from offering relevant fact and Rule 701 testimony from its in-house architect – Tim Whitten, (3) to require an unnecessary jury tour of selected town homes throughout the Twin Cities suburbs; and (4) to prevent Rottlund from arguing to the jury that they may draw all reasonable inferences from the evidence presented to them at trial concerning the Defendants' Competition Product Survey.

## I. ROTTLUND SHOULD BE PERMITTED TO OFFER EVIDENCE AND ARGUMENT CONCERNING MIDLAND HOMES AND JERRY'S HOMES.

### *Background Facts*

BSB architect Larry Moore assembled the Town & Country Homes Defendants' Homestead Collection town homes constructed and sold throughout the Twin Cities suburbs. [Doc. No. 609, Ex. A at ¶ 2.] Pursuant to his sworn testimony and affidavit previously filed with the Court, Mr. Moore claims BSB independently created the Homestead Collection designs by referencing and relying upon three back-to-back townhome projects that he had previously worked on for BSB: (1) Good Value Homes; (2) Midland Homes; and (3) Jerry's Homes. [*Id.* at ¶ 5; Ex. B at 12:24-13:6; Ex. C at 15:18-16:5; Order, 8/20/04 at 9-10.] In fact, Mr. Moore testified that the placement and arrangement of room locations and elements for the Homestead Collection came from his review of these prior project files. [*Id.*, Ex. C at 15:18-16:5.]

The Bloodgood Defendants' liability expert – Albert Bloom – also claims that BSB independently created the Homestead Collection. [Doc. No. 629, Ex. B at p. 25.] Despite Mr. Moore's testimony that he relied on only three prior BSB designs, including Midland Homes and Jerry's Homes, Mr. Bloom opines that "BSB independently created the Homestead Collection from

design concepts that they had worked with for over 20 years." [*Id.*] The admissibility of Mr. Bloom's opinions in this regard are the subject of a pending motion in limine [Doc. No. 618]. In addition, the admission of argument such as that offered by Mr. Bloom is also the subject of a pending motion in limine [Doc. No. 606.]

Because the Bloodgood Defendants assert that they independently created the Homestead Collection by relying on their prior work for Midland Homes and Jerry's Homes, it is fair for Rottlund to introduce evidence from which the jury may reasonably conclude that the Bloodgood Defendants did not independently create the Homestead Collection. In other words, the Bloodgood Defendants made the Midland Homes and Jerry's Homes evidence relevant.

**A. Midland Homes.**

Mr. Moore testified that in 1994 he used Rottlund's Villa product plans when BSB assembled the Midland Homes back-to-back design. [Doc. No. 516, Ex. R27 at 229:12-230:11.] In fact, Mr. Moore signed a contract on behalf of BSB with Design Development, Inc., and instructed Design Development to assemble construction drawings "similar to the Rottlund Homes plans" he provided to Design Development. [*Id.*, Ex. R31.] Mr. Moore testified that he actually went so far as to give a "cut and paste job" of Rottlund's floor plans to Design Development. [*Id.*, Exs. R27 at 229:8-16; Ex. R32.] A comparison of the Rottlund Homes floor plans produced from Design Development's files with the "cut and paste job" document Mr. Moore identified reveals that someone cut off Rottlund's copyright notice and logo, and assembled the "cut and paste" document using the floor plans in Rottlund's Villa marketing brochure. [*Id.*, compare Ex. R32 with Ex. R33 at DDI000021-22.][2] Specifically, Rottlund's

2 Rottlund's elevations and floor plans are protected by its New Villa copyrights, which were attached to, and referenced in, Rottlund's Seventh Amended Complaint. Through the carry-forward doctrine, the New Villa designs and structures are incorporated into, and protected by, Rottlund's Villa II copyrights. *See, e.g.*, *Raintree*, 862

lower level internal and external unit floor plans were cut out, copied, reversed, copied, inverted, copied, inverted and reversed, copied, and then assembled into an eight unit back-to-back floor plan configuration.[3] [*Id.*] Mr. Moore faxed this "cut and paste" document to BGI principal Doug Buster in Chicago, Illinois. [*Id.*, Ex. R140 at BSB06379-80.] Doug Buster is BGI's majority shareholder and testified that he works for BGI "every day." [*Id.*, Ex. R58 at 59:24-60:2.]

Similarly, a comparison of the Rottlund Villa elevation that Mr. Moore gave to Design Development with the elevation which BSB assembled for Midland Homes demonstrates BSB copied Rottlund's copyrighted design. [*Id.,* compare Ex. R33 at DDI000023 with Ex. R34 at DDI000309.] For example, the change from the three-over-three window design to a two-over-two window design evidences copying, and the remainder of the elevation duplicates the total look and feel of Rottlund's elevation. [*Id.*] Also, in the earlier draft of the Midland elevation, a handwritten note above the offset center gables states: "can we omit this offset?" [*Id.*, Ex. R35 at BSB03484.] The offset was omitted and the center gables were changed to mirror Rottlund's single center gable design. [*Id.*, Ex. R34 at DDI000309.] When considered in light of the check box for "copyright issue" on the first page of this version of the Midland Homes design, it is clear that BSB directly copied Rottlund's Villa design and was cognizant of this fact. [*Id.*, Ex. R35 at BSB03482.] Mr. Moore subsequently wrote an internal memorandum, attached a copy of BSB's Midland Homes' design and Rottlund's design, and asked: "is our design enough 'departure' from Rottlund" to avoid copyright liability.[4] [*Id.*, Ex. R37.]

---

F. Supp. at 1525-26 (where the same creator owns both the original and derivative copyrights, the derivative work carries forward all preexisting copyrights in and protections of the original work).

[3] For instance, the distinctive marks on the garage of Rottlund's floor plan appear on every external unit in the eight unit cluster found in the "cut and paste" document. [*Id.*, Exs. R32 and R33 at DDI000021.]

[4] BSB claims it no longer has the Rottlund plans referenced in this internal memorandum. [*Id.*, Ex. R36 at 62:9-21.]

**B. Jerry's Homes.**

BSB architect Chris Jorgensen worked extensively with BSB architect Larry Moore on the Homestead Collection townhome designs. In or about late 1996 or early 1997, prior to any of BSB's work on the Homestead Collection, Mr. Jorgensen worked on a back-to-back townhome project for Jerry's Homes. [*Id.*, Ex. R38 at 82:21-23.][5] While working on the Jerry's Homes townhome project, Mr. Jorgensen received a facsimile from Jerry's Homes that included the floor plans and elevations for Rottlund's Villas of Meredith Pointe. [*Id.,* Ex. R39.] Subsequently, BSB changed the name of the project for Jerry's Homes to the Bent Tree "Villas." [*Id.*, Ex. R40 at 206:9-24.] Obviously, Jerry's Homes had these Rottlund materials before forwarding them to BSB, and likely used them during the design process.

***Legal Argument***

**A. Rule 404(b) Does Not Preclude The Admission Of The Evidence Concerning Midland Homes and Jerry's Homes.**

Rule 404(b) provides that evidence of "other crimes, wrongs, or acts" is admissible for purposes other than proving the character of a person in order to show an action in conformity with such character. Fed. R. Civ. P. 404(b) (2004). "Rule 404(b) is a rule of inclusion rather than exclusion and admits evidence of other crimes or acts relevant to any issue in the trial, unless it tends to prove only criminal disposition." *United States v. Simon*, 767 F.2d 524, 526 (8th Cir. 1985). "Although it is not one of the listed permissible purposes [in Rule 404(b)], an attempt to impeach through contradiction a defendant acting as a witness is indisputably a legitimate reason to introduce evidence of other crimes or wrongs." *United States v. Copelin*, 996 F.2d 379, 382 (D.C. Cir. 1993) (the list provided in Rule 404(b) is illustrative, not exhaustive); *see also United States v. James*, 169 F.3d 1210, 1214-15 (9th Cir. 1999) (bad acts

[5] As noted above, Mr. Moore testified that he researched BSB's Jerry's Homes files before beginning to assemble the Defendants' Homestead Collection designs.

evidence is admissible to establish defendant's credibility even though it is offered for a reason other than one specifically articulated in Rule 404(b)).

Rule 404(b) does not preclude the admission of evidence and argument concerning Midland Homes and Jerry's Homes because Rottlund intends to offer this evidence to, among other things, impeach all of the Defendants' claims that the town homes at issue – the Homestead Collection, Washington Square Back-to-Backs, and Chateau Collection townhomes – were independently created. [Doc. No. 435, Pinnacle's Affirmative Defense No. 8 at p. 30; Doc. No. 433, TCM's Affirmative Defenses Nos. 8-9 at p. 29; Doc. No. 429, BSB's Affirmative Defense No. 250 at p. 51; Doc. No. 428, BGI's Affirmative Defense No. 250 at p. 49.]

BSB architect Larry Moore testified that he independently created the Homestead Collection designs by relying upon Midland Homes' and Jerry's Homes' designs for the placement and arrangement of room locations and elements for the Homestead Collection. As the Court held in its July 10, 2003 discovery Order regarding the Bloodgood Defendants' reliance on other back-to-back town homes to support their defenses in this case, such an approach has "consequences." (Order, 7/10/03 at 20.) Here, the consequences are readily apparent: because the Bloodgood Defendants affirmatively placed Midland Homes and Jerry's Homes at issue in support of their independent creation affirmative defense, Rottlund is entitled to impeach them with evidence and argument concerning how the Bloodgood Defendants designed Midland Homes and Jerry's Homes. In short, the jury may conclude that the Bloodgood Defendants relied upon Rottlund's Villa designs to assemble the back-to-back town homes upon which they hang their hat on for purposes of their independent creation defense.

The Bloodgood Defendants' attempt to divert attention away from the real issue at hand by repeatedly arguing that Rottlund must first prove the Midland Homes and Jerry's Homes designs

infringe Rottlund's copyrights. However, the issue is whether Rottlund should be permitted to probe the veracity and credibility of the Defendants' independent creation allegations by offering proof of the facts concerning the design process of the designs (Midland Homes and Jerry's Homes) upon which the Defendants' independent creation defense rests. Whether these underlying designs infringe Rottlund's copyrights is not relevant to the Rule 404(b) analysis. Because Rule 404(b) permits evidence of other crimes, wrongs or acts to be admitted for impeachment purposes, Rottlund should be entitled to introduce all of the evidence discovered concerning BSB's design process for Midland Homes and Jerry's Homes.

**B. <u>The Evidence Concerning Midland Homes And Jerry's Homes Supports A Finding By The Jury That BSB Relied Upon Rottlund's Copyrighted Designs</u>.**

Again, the Bloodgood Defendants mistakenly argue that Rottlund must introduce sufficient evidence to permit the jury to find that their Midland Homes and Jerry's Homes designs infringe Rottlund's copyrights before Rottlund may introduce the evidence in question. However, because the Defendants bear the burden to convincingly prove independent creation with strong and persuasive evidence that the Homestead Collection plans were created ignorant of and without reliance on Rottlund's copyrighted designs and works, *Arthur Rutenberg Homes, Inc. v. Maloney*, 891 F. Supp. 1560, 1567 (M.D. Fla. 1995) (rejecting independent creation affirmative defense because infringers did not demonstrate that their plans were "created independently and without reliance on the copyrighted [work]"), the issue is one of reliance. Thus, it is fair for Rottlund to introduce evidence from which the jury may reasonably conclude that the Bloodgood Defendants relied upon Rottlund's copyrighted works to assemble the underlying designs at the heart of the Defendants' independent creation defense. The jury should be permitted to evaluate the direct and circumstantial evidence concerning the Bloodgood Defendants' independent creation

defense and determine for themselves whether Mr. Moore's testimony that he relied upon Midland Homes' and Jerry's Homes' designs, not Rottlund's, is credible.

**C. The Midland Homes And Jerry's Homes Evidence Is Relevant, And Will Not Cause Undue Delay Or Waste Time.**

Rule 607 of the Federal Rules of Evidence expressly and unequivocally provides that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." Fed. R. Evid. 607. Similarly, Rule 611(b) provides that cross examination is permitted regarding "matters affecting the credibility of . . . witness[es]." Fed. R. Evid. 611(b); *see also* Fed. R. Evid. 608 (Evidence of Character and Conduct of Witness); Fed. R. Evid. 613 (Prior Statements of Witnesses); Fed. R. Civ. P. 32(a)(1) (use of depositions for purposes of contradicting or impeaching testimony of deponent as witness).

Impeachment evidence is presumptively relevant. "[I]mpeachment evidence is itself relevant since it affects the probabilities of the facts asserted by the testimonial evidence." 27 Wright & Gold, *Federal Practice and Procedure: Evidence* § 6092 at 487. Moreover, "impeachment evidence is admissible because, without it, the jury may develop an inaccurate view of the facts based upon unreliable testimony." *Id.* at 488-89. "Since impeachment evidence is relevant, it is admissible under Rule 402[.]" *Id.* at 487 & n.5 (citing *U.S. v. Abel*, 105 S. Ct. 465, 468 (1984)).

Evidence that contradicts a witness undermines credibility in at least two ways. First, it permits the inference that a particular witness lied or was otherwise mistaken with respect to the specific facts contradicted. Second, such evidence also tends to demonstrate that the same witness may have erred or lied with respect to other facts as well. Accordingly, impeachment evidence is relevant and advances accurate fact-finding." 27 Wright & Gold, *Federal Practice and Procedure: Evidence* § 6093 at 503-04; *see also* 3A Wigmore, *Evidence* § 904 (Chadbourn

rev. 1970) (". . . to forbid [impeachment evidence] is to . . . suppress a portion of the truth."); Wright & Gold, *Federal Practice and Procedure: Evidence* § 6092 at 492 ("the pursuit of accurate fact-finding will be promoted, not undermined, by admission of impeachment evidence.").

In addition, rebuttal evidence is offered to explain, repel, counteract, or disprove evidence offered by an adverse party. *Sterkel v. Freuhauf Corp.*, 975 F.2d 528, 532 (8th Cir. 1992). "The proper function of rebuttal evidence is to contradict, impeach, or diffuse the impact of the evidence offered by an adverse party." *United States v. Grintjes*, 237 F.3d 876, 879 (7th Cir. 2001). Indeed, the Eighth Circuit has recognized that a party may "open the door" to their opponent's admission of evidence, even if it would otherwise be inadmissible, for use in rebuttal. See Buchholz v. Rockwell Int'l Corp., 120 F.3d 146, 151 (8th Cir. 1997); *Paul v. Farmland Indus.*, 37 F.3d 1274, 1277 (8th Cir. 1994). Use of evidence in this manner is permitted in order to allow a party to fairly rebut a false impression created by the other party's evidence even if that rebuttal is made with otherwise inadmissible evidence. *Paolitto v. John Brown E. & C., Inc.*, 151 F.3d 60, 66 (2d Cir. 1998).

For the reasons stated above, Rottlund respectfully submits that the Bloodgood Defendants arguments concerning relevance, undue delay and waste are without merit. In short, the Bloodgood Defendants made this evidence relevant by relying on the Midland Homes and Jerry's Homes' designs as the basis for their independent creation defense. In addition, the Bloodgood Defendants must necessarily call witnesses to testify in support of their independent creation defense, thus no additional witnesses will have to be called to testify if the Court permits Rottlund to challenge the Defendants' independent creation defense.

## II. TIMOTHY WHITTEN SHOULD BE PERMITTED TO PROVIDE FACT AND RULE 701 TESTIMONY.

Prior to their filing of the instant motion, the Court granted Rottlund's motion to exclude any expert testimony from four architects employed by the Bloodgood Defendants. (Order, 11/1/04.) The Court noted, however, that the Bloodgood Defendants "were free to attempt to lay foundation for these witnesses to testify pursuant to Fed. R. Evid. 701, although their testimony appears to be duplicative." (*Id.* at p. 6.) Rottlund did not move to exclude proper Rule 701 testimony, but it intends to so move at trial if the Bloodgood Defendants attempt to offer such duplicative testimony.

Rottlund does not intend to offer Rule 702 testimony from Mr. Whitten, thus all of the Bloodgood Defendants' misplaced allegations concerning Mr. Whitten regularly giving expert testimony not relevant.[6] However, Rottlund certainly intends to offer Mr. Whitten as a fact witness. For instance, consistent with its Witness List filed with the Court, Mr. Whitten is expected to testify about, among other things:[7]

> the design process in general, and the role he played during the design of the Original Villa, New Villa, and Villa II products in particular. In addition, he will likely explain the importance of finding niches in the market and independently creating designs from a blank sheet of paper to satisfy a market niche. He is also expected to testify as to the copyright registration process and the copyrights Rottlund holds on its Villa products. Mr. Whitten is also expected to testify about Rottlund's investigation into the similarities between Rottlund's Villa products and the other products at issue in this case both before and after Rottlund sent its cease and desist letter to the Defendants and initiated this lawsuit. He is also expected to explain the other comparable products that Rottlund would have sold at developments where Town & Country used the infringing design to achieve approval from municipalities that have

---

[6] For example, Mr. Whitten did not provide expert testimony in *The Rottlund Company, Inc. v. Scott Larson Construction, Inc.*, or any of the subsequent cases cited by the Bloodgood Defendants in their brief. Thus, their representation that "[t]he record before the Court demonstrates that in at least three separate cases in the last five years, [Mr.] Whitten has served as an expert witness on behalf of Rottlund" is false. (Defendants' Mem., p. 9.)

[7] Importantly, the Bloodgood Defendants' Witness List [Doc No. 652] does not comply with Local Rule 39.1 because it fails to "include a short statement of the substance of the expected testimony of each witness" identified. Consequently, the Court should strike the Witness List in its entirety.

> density, affordability, life-cycle housing, and product diversity guidelines and then built other products in addition to the infringing products at these developments. Mr. Whitten is also expected to explain how several former Rottlund employees who had access to the Villa product designs and structures while they worked at Rottlund, who subsequently left and went to work for Town & Country.

(Doc. No. 665 at 12.) In addition, consistent with the Court's November 1, 2004 Order, Rottlund intends to lay foundation sufficient to permit Mr. Whitten to testify pursuant to Fed. R. Evid. 701. (Order, 11/1/04 at 6.)

In sum, the Bloodgood Defendants' motion as it relates to Mr. Whitten is moot. To the extent that the Bloodgood Defendants' motion seeks to exclude Mr. Whitten from providing fact and Rule 701 testimony, it should be denied.

## III. THE BLOODGOOD DEFENDANTS HAVE FAILED TO DEMONSTRATE WHY A SUBURBAN PRODUCT TOUR IS NECESSARY.

The Bloodgood Defendants request a jury tour of some of the town homes constructed by Rottlund and the Town & Country Homes Defendants, including: (1) Rottlund's Villa II at Rush Creek; (2) Town & Country's Homestead Collection at Centennial Crossing; (3) Town & Country's Homestead Collection at Cornerstone Lake; and (4) Town & Country's Chateau Collection in Brooklyn Park. (Affidavit of David A. Davenport In Support of Plaintiff's Memorandum of Law In Opposition To Bloodgood Sharp Buster Architects & Planners of Iowa, Inc. and The Bloodgood Group, Inc.'s Motion in Limine ("Davenport Aff."), Ex. A.) Rottlund does not believe such a product tour would be an efficient use of the Court's, the parties', and most importantly the jurors' time. *See* Fed. R. Civ. P. Rule 1. In addition, it would not be possible to fairly and completely tour the Rottlund development and product the Bloodgood Defendants propose to tour because Rottlund no longer owns any town home units at the Rush Creek development; thus, a full and fair tour cannot occur. Moreover, if a full and fair tour is to

occur, the jurors should drive or fly to Chicago, Illinois, and view the infringing products the Town & Country Homes Defendants constructed in Aurora, Illinois (which is also completely sold out). Completing these multiple tours in a fair and reasonable way would increase the length of trial by at least 2-3 days, and the jurors' time will already be taxed in full with the 15 trial days already estimated.

First, what additional evidentiary value will the tours provide? During discovery, the parties participated in officially noticed inspections of developments and as-built structures.[8] And while it is true that, unlike the technical drawings, the as-built town homes cannot be brought into the courtroom, numerous photographs were taken from all angles, inside and out during the parties' inspections and tours.[9] These photographs admitted into evidence at trial will provide the jury with a clear, unbiased opportunity to view and compare the as-built structures right in the courtroom. Indeed, the parties have designated photographs of as-built structures as trial exhibits. [*See, e.g.*, Doc. No. 666 at PLTF 626 and 627; Doc. No. 718 at TCM/PINN 173.] It is unclear from the Bloodgood Defendants' moving papers what more they think they need, or, more precisely, what more their proposed jury tour would provide the jury.

Second, the parties have 15 trial days. A jury tour from downtown Minneapolis to Lakeville, then to Shakopee, then to Maple Grove, and concluding in Brooklyn Park, which according to the Bloodgood Defendants will involve walking through and about the developments and town homes at issue, would take the better part of 2-3 trial days (assuming Murphy's Law does not hold true during these tours). Indeed, a more fair and complete jury tour would take longer. The photographs the parties intend to introduce as evidence at trial will

---

[8] In addition, the Bloodgood Defendants' expert, with assistance and participation from the Bloodgood Defendants' counsel, improperly conducted his own, private inspection of Rottlund's developments still under construction and Villa II model homes.

[9] Again, the Bloodgood Defendants have produced photographs of Rottlund's Villa II as-built structures, which someone from their counsel's office apparently took.

provide the jury with a sufficient visual comparison of the as-built structures without the wasted time and inconvenience of driving the jury to the western, southern, southwestern, and northern outer ring suburbs of the Twin Cities. Moreover, because the on-site tour will not provide a true side-by-side comparison of the works in question, but will be separated in time by days, the tour will not obviate the need for any other evidence at trial.

Third, how will the juror tour be conducted? Will the tour be of actual, completed town homes or model town homes (with the Town & Country Office in the garage location)? The Bloodgood Defendants have not offered any logistical explanation for their proposed tour. How will the jurors be transported and at whose expense? Will the parties and their attorneys attend? Will any witnesses be allowed to testify during the tours? If so, which witnesses? Moreover, it is unclear whether the jurors will be permitted to view both the interior and exterior of these buildings. Rottlund's Villa II town homes at Rush Creek and the Town & Country Homes Defendants' Homestead Collection town homes at Centennial Crossing (the designs from which all other Town & Country Homes Defendants' town homes at issue in this case derive), for example, are completely sold out. The Bloodgood Defendants proposed exercise will entail substantial logistical planning, but they have offered no suggestions to the Court.

Fourth, will the jurors also need to travel to Chicago to view the Washington Square Back-to-Back town homes? If photographic evidence is sufficient to compare the total look and feel of the Washington Square Back-to-Back and Villa II town homes, is a 2-3 day tour of town homes scattered throughout the Twin Cities really necessary?

In short, while it is certainly within the Court's discretion to grant a jury tour, the Bloodgood Defendants have failed to adequately articulate a need for such an excursion. As was the case in the *Skyway Aviation Corporation v. Minneapolis, Northfield and Southern Railway*

*Company*, cited in the Bloodgood Defendants' moving papers, the evidence sought by this excursion can be sufficiently and efficiently presented to the jury with photographs and testimony. 326 F.2d 701, 708 (8th Cir. 1964) (finding no abuse of discretion where trial court determined that nothing could be gained by a view and inspection when the evidence could be present at trial through two witnesses). Accordingly, Rottlund requests that the Bloodgood Defendants motion for a jury tour be denied in its entirety.

## IV. The Defendants' Competition Product Survey Is Relevant And Admissible.[10]

### *Background Facts*

On July 5, 2001, Rottlund sent the Town & Country Homes Defendants a cease and desist letter. [Doc No. 632, Ex. C.) On October 30, 2001, Rottlund filed its Complaint alleging, *inter alia*, that the Town & Country Homes Defendants' architectural designs infringed upon Rottlund's copyrighted architectural designs. [Doc. No. 1.] On April 2, 2002, the Town & Country Homes Defendants counsel – Dean Karau spoke with BSB architect James Grundmeier by telephone regarding this case and asked Mr. Grundmeier to forward, without ever serving a subpoena on BSB, important documents to him regarding the Town & Country Homes Defendants' infringing designs. [Doc. No. 632, Ex. B at D00116.] Later that day, Mr. Grundmeier sent Mr. Karau "the contents of [BSB architect] Larry Moore's design file for the Town & Country project." (*Id.*) (emphasis added). Mr. Karau received the contents of Mr. Moore's design file on April 3, 2002. (*Id.*) *The Rottlund Company, Inc. v. Pinnacle Corp.*, 222 F.R.D. 362, 377 (D. Minn. 2004). One of the documents Mr. Karau received from Mr. Grundmeier is a transmittal cover page demonstrating that Mr. Moore sent Steve Sandelin a

[10] Rottlund filed a motion seeking an adverse inference concerning the Defendants' Competition Product Survey. [Doc. No. 626.] This motion will be argued before the Court on November 3, 2004.

"competition product survey for Minneapolis area" ("Competition Product Survey") on May 5, 1998. [*Id.*, Ex. B at D00225.]

**A. Defendant BSB's Rule 30(b)(6) Testimony Concerning The Competition Product Survey.**

Defendant BSB does not know what the Competition Product Survey is:

> Q. Have you ever heard of the term "competition product survey"?
> A. I do, because I remember there's a transmittal from me on that.
> Q. That's right. And what does competition product survey refer to?
> A. That I do not recall.
>
> * * *
>
> Q. What did the competition product survey that you transmitted to Town & Country of Minnesota contain?
>
> * * *
>
> A. I don't recall. I really don't remember what was in that.
>
> * * *
>
> Q. Before you as Exhibit Number 114 is a transmittal from you to Steve Sandelin at Town & Country Homes. The date is Tuesday, May 5, 1998, and it relates to a villa townhomes project. Have I accurately characterized the exhibit thus far?
> A. Correct.
> Q. The bottom right-hand corner contains the Bates label BSB 01944, and under the "Remarks" you wrote, "Steve," colon, quote, "Competition product survey for Minneapolis area," period, end quote. Have I accurately read that?
> A. Yes.
> Q. What does the competition product survey language refer to in your transmittal?
> A. I do not remember this. I don't think we had any kind of a product or project survey that I remember.
>
> * * *
>
> Q. Why were you sending a competition product survey file for the Minneapolis area to Steve Sandelin on or about May 5 of 1998?
> A. I'd be speculating . . . I don't know.
> Q. Do you have any knowledge regarding the competition product survey file that's referenced in Exhibit 114, as you sit here today?
> MR. FARMER: Objection. Asked and answered.
> MS. NEWMAN: Same objection.
> A. I do not know what that was.

(Davenport Aff., Ex. B at 24:6–30:25.)

**B. Steve Sandelin's Testimony Concerning The Competition Product Survey.**

Steve Sandelin, the recipient of the Competition Product Survey, does not know what the Competition Product Survey is:

> Q. All right, sir. I'd like you to stick with Exhibit No. 225, and I'd like you to turn to D 00225, please. Are you with me?
> A. Yes.
> Q. On D 00225, do you see it's dated Tuesday, May 5, 1998? It's a transmittal from Larry to Steve Sandelin at Town & Country Homes. The project is, quote, Villa town homes, quote. Have I accurately identified this particular document?
> A. Yes.
> Q. Could you read the remarks?
> A. "Steve, competition product survey for Minneapolis area."
> Q. What do you recall about the competition product survey for the Minneapolis area?
> MR. FARMER: Objection, foundation.
> THE WITNESS: I don't recall anything about a competition survey.

(*Id.*, Ex. C at 241:10-242:11.)

**C. Larry's Moore's Testimony Concerning The Competition Product Survey.**

Larry Moore, BSB's Rule 30(b)(6) witness who bound Defendant BSB to having no knowledge about the contents of the Competition Product Survey, speculated approximately six months after he testified for BSB that he thinks the Competition Product Survey that he sent to Mr. Sandelin was competitor brochures that TCM's President sent to him. Specifically, Mr. Moore testified:

> Q. As you sit here today, sir, do you know what the competition product survey for the Minneapolis area attachment to Exhibit 114 is?
> A. Specifically, no. I couldn't tell you what is in that, but I do know it's some other plans, some competitor product plans and images and things like that that Art sent down to us. I didn't -- I didn't have a copy of that in my file. I'm guessing I probably had those just sent right on to Steve to keep him in the loop. Whether they were faxed or transmittal, I don't know.
>
> * * *

> Q. So my question is -- we're back in May of 1998, just to set the time. Okay?
> A. Uh-huh.
> Q. And you have received a competition product survey for the Minneapolis area from Art Plante; is that where we're at?
> A. Yeah.
> Q. What was in the competition product survey that Mr. Plante sent to you?
> A. It appeared to be a number of competitors' products, some plans, some elevations, some ideas that -- that Art liked, this and that, you know, a suggestion to say, "Hey, do we want to think of ideas like this" or, you know, "This works in the market. Should we consider these pieces in part?" So that was the information, I think, we got there.

(*Id.*, Ex. D at 144:17-146:22.)

***Legal Argument***

The jury is free to draw all reasonable inferences from the evidence presented to them at trial, including circumstantial evidence. The Court will likely give the jury the following definition regarding inferences:

> You are to consider only the evidence in the case. However, you are not limited to the statements of the witnesses. In other words, you are not limited to what you see and hear as the witnesses testify. You may draw from the facts that you find have been proved such reasonable inferences as seem justified in light of your experience.
>
> "Inferences" are deductions or conclusions that reason and common sense lead you to draw from facts established by the evidence in the case.

O'Malley, Grenig & Lee, FEDERAL JURY PRACTICE AND INSTRUCTIONS (CIVIL) at § 104.20, p. 146 (West Group, 5th ed. 2000).

Here, BSB testified that it does not know what the Competition Product Survey was. Likewise, Steve Sandelin testified that he can't recall anything about the contents of the Competition Product Survey. Larry Moore testified that he believes the Competition Product Survey was "a number of competitors' products, some plans, some elevations, some ideas . . . sent to him by Art Plante." As the Court recognized in a recent Order, "Rottlund has loudly

voiced a reasonable suspicion that the competition product survey would likely have some reference to or include Rottlund materials . . . ." *The Rottlund Company, Inc. v. Pinnacle Corp.*, 222 F.R.D. 362, 367 (D. Minn. 2004). Thus, it is fair to expect that the circumstantial evidence presented to the jury may permit them to draw the same reasonable conclusions concerning the contents of the Competition Product Survey.

Consequently, the Court should deny the Bloodgood Defendants' motion to preclude Rottlund from introducing evidence of and making arguments concerning the Competition Product Survey, and its contents.

## CONCLUSION

Based on the foregoing, Rottlund respectfully requests that the Court deny the Bloodgood Defendants' motion in limine in its entirety.

Dated: November 2, 2004

s/ David A. Davenport
Craig S. Krummen, #259081
David A. Davenport, #00285109
Winthrop & Weinstine, P.A.
**Attorneys for Plaintiff**
225 South Sixth Street, Suite 3500
Minneapolis, MN 55402-4629
Telephone: (612) 604-6400
Facsimile: (612) 604-6800
ddavenport@winthrop.com

2156048v2