FILED
DES MOINES, IOWA
99 JUL 13 PM 2:08
CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| ROTTLUND HOMES, INC. and<br>ROTTLUND HOMES OF IOWA, INC.<br><br>Plaintiffs,<br><br>vs.<br><br>THE OAKS DEVELOPMENT CO.,<br>RANDAL L. WALTERS, JOHN C. KLINE,<br>JOHN C. KLINE, INC., WALTERS<br>DEVELOPMENT CO., LTD. and<br>PHYLLIS KLINE,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 4-98-CV-10574<br><br><br><br>ORDER |

The Court has before it plaintiffs' motion for a preliminary injunction, seeking to enjoin defendants The Oaks Development Co., Randal Walters, John and Phyllis Kline, John C. Kline, Inc., and Walters Development Co., Ltd. (collectively "The Oaks"). The Court held an evidentiary hearing on May 6, 1999. At the Court's request, the parties submitted post-hearing arguments and proposed findings of fact June 7, 1999. The motion is considered fully submitted.

Entered on 7/13/99
By DK

EXHIBIT A

I. BACKGROUND

Plaintiffs Rottlund Homes, Inc. and Rottlund Homes of Iowa, Inc. (collectively "Rottlund")[1] filed a complaint against defendant Oaks Development[2] October 27, 1998. Rottlund filed an amended complaint, adding additional defendants, March 26, 1999. The amended complaint consists of seven claims, specifically: copyright infringement (Count I); quantum meruit-unjust enrichment (Count II); misappropriation of trade secrets in violation of Iowa Code § 550 (Count III); unfair competition (Count IV); violations of the Lanham Act (Count V); tortious interference with prospective business advantage (Count VI); and tortious interference with contract (Count VII). On April 19, 1999, Rottlund filed the instant motion for injunctive relief against defendants.

Rottlund and The Oaks are engaged in land development, as well as design, construction, and marketing of high density townhouse projects and single family homes. Defendants are currently constructing a project known as The Villas of Grey Hawk ("Grey Hawk"). Plaintiffs' claims are based on The Oaks' development and construction of the Grey Hawk project, which Rottlund claims is similar to some of their townhome developments.

The developments to which Rottlund refers took shape in the late 1980s, when Timothy Whitten, currently vice president of architecture for Rottlund Homes, collaborated with Bud Rotter, president of Rottlund Homes at the time. The two sought to design townhomes that

---

[1] Rottlund Homes, Inc. is a Minnesota corporation located in the Minneapolis area. Plaintiff Rottlund Homes of Iowa, Inc. is an Iowa corporation with its offices located in West Des Moines.

[2] The Oaks Development Company is an Iowa partnership involving the companies of John C. Kline and Randal L. Walters.

could be marketed to single women and young professionals. At the hearing, Whitten testified that he and Rotter conceived an architectural design that met the needs of this market, while satisfying construction cost and density requirements necessary to offset real estate costs and provide an affordable product. Whitten testified that Rottlund's townhomes were designed to have a distinctive look and feel and were intended to produce units in a range of prices and sizes. In addition, Rottlund used the term "villas" to market the townhomes. Rottlund registered copyrights on its various villa projects with the United States Copyright Office. *See* Exhibits 1-6. Rottlund acknowledges that the individual characteristics are not unique to townhomes; rather, Rottlund claims that the combination of the aforementioned concepts is owned exclusively by Rottlund. Tr. 146-48 (Whitten testimony).

In July 1993, Rottlund expanded its operations to Iowa, forming a wholly owned subsidiary, Rottlund Iowa. Steven Theis is the division president of Rottlund Iowa. Among other activities, Rottlund Iowa began and completed villa projects in the Des Moines metro area. Theis testified that Rottlund Iowa has realized returns greater than a "typical" homebuilder by using its "comprehensive system" which includes construction methods which minimize cost variations. The comprehensive system to which Theis referred is known as "the Rottlund Advantage." As explained by Theis, the Rottlund Advantage is a builder system which takes Rottlund through the entire construction management process, from land acquisition to marketing and sales of the townhomes. Tr. 11-14. The Rottlund Advantage system includes the "blue book," which Theis describes as "the Rottlund Advantage Bible that's used throughout the corporation," Tr. 12, and a computer software system. Rottlund purchased a license to use the system from Snoqualmie

Group, who owns the trademark and copyright. At the hearing, Theis asserted that the Rottlund Advantage is a trade secret that is being used in an unauthorized manner by defendants. Tr. 16.

Duane "D.A." Hayworth, a Rottlund customer service manager, affirmed that the company's overall "fast track" process, the Rottlund Advantage, was designed to reduce delays and costs, while increasing profitability. Tr. 161. He described the construction process as one in which one or two units in a building are completed at a time, moving on and around the project, so that "before you actually complete construction on the backside of the building, you'll have homeowners already taking possession on the front side of the building. And that way there's no delay." Tr. 161-62. He explained that Rottlund brings subcontractors in "on top of each other where it's possible to maximize the time, the construction time." Tr. 162. He also testified that all subcontractors working on Rottlund projects were required to sign confidentiality clauses as part of the contracts they sign. Tr. 163. When questioned about the confidentiality clauses, Hayworth presented the following clause: "Subcontractor shall refrain from, and shall be fully liable to Contractor for, any alleged or actual infringement or violation of any of Contractor's copyrights, patents, trademarks, or unauthorized use of Contractor's plans and specifications."[3] Exhibit 28, at 20.

In late 1998, Theis became aware that The Oaks' Grey Hawk townhouse project included townhomes he believed were similar to the Rottlund villas. The Grey Hawk development is in close proximity to plaintiffs' Villas of Glen Oaks ("Glen Oaks") development; in fact, the two projects are within view of each other. Believing defendants were in some manner causing

[3] Although Rottlund intimates that defendants appropriated Rottlund secrets from subcontractors, the company has apparently not filed suit against any subcontractors for violating the confidentiality clauses. Tr. 168-69.

actionable injury to Rottlund, plaintiffs filed the instant suit against The Oaks. Several months later, Rottlund filed the instant motion for a preliminary injunction.

At the hearing, Rottlund presented evidence of similarities between The Oaks' Grey Hawk development and Rottlund's copyrighted development plans. Whitten testified that the unique elements of Rottlund's "villa" townhomes were apparent in the Grey Hawk townhomes. Whitten also testified that Rottlund's design approached density problems by using the following elements, and that The Oaks copied these elements and used them in the Grey Hawk development:

> a) slab on grade (instead of a basement);
> b) back-to-back and side-by-side alignment of units;
> c) two-story, eight-unit buildings;
> d) the position and arrangement of entrances;
> e) a combination of two-car garages on the larger end units and single-car garages on the smaller interior units;
> f) all garages project out farther than the house to minimize the driveway length and give some privacy to the interior units.

Tr. 116-19. Whitten also stated that the rooms of Rottlund's units and the Grey Hawk units were "generally in the same location, all two bedrooms with end units having loft options, basically the same square footage."[4] Tr. 131. Whitten acknowledged that the stair location was different, and the location of the bedrooms on the upstairs level, but referred to these differences as minor. Tr. 131-34. He also explained the importance of the term "villa:"

> When we first developed the [townhome] product in Minneapolis, we associated the name "villas" to those townhomes, basically what you're seeing on our example. And it was an important association, and it was the first time that that product had been–the back-to-back, two-story townhome that had been associated with the word "villas" in the Minneapolis market. And then as time went on, we had found that there were other townhome products that were brought into the market, detached townhomes, one-level plans, and so forth that also used the term

[4] As noted later in this Order, subsequent testimony at the hearing by Whitten and defendants' witnesses proved this statement to be inaccurate.

> "villas." So it became a little less important as far as a name distinction as time went on in Minneapolis, though it was very important and very critical in the first number of years in which we introduced the product. We find that same cases in Iowa where the distinction of the back-to-back, two-story townhome is important with the term "villas" in our Des Moines market knowing that there really isn't another back-to-back townhome–two-story townhome with that term previous to The Oaks Development other than the Rottlund product, so we hold the distinction as long as we possibly can until it becomes somewhat diluted in the market with other types of product.

Tr. 136-37.

Whitten also calculated the differences in square footage between the units in Rottlund's villa townhomes (the Glen Oaks development) and those of the Grey Hawk development. Whitten concluded that the Grey Hawk "A" units were larger, with a 10.2% square footage difference, while the Grey Hawk "B" units were smaller, with a 4.3% square footage difference. Tr. 156. Notably, Whitten so testified after being cross-examined as to the basis of Rottlund's original claim that the foundation plan on the B unit was about 99% the same, and the A unit was about 95% the same.[5] Tr. 41.

Ted Gunhus owns Custom Creations Plan Service ("Custom Creations"), an Omaha-based architectural design and drafting company. Gunhus sketched the concept drawings, and the later hard line drawings, for Grey Hawk, at the request of Kline and Walters. He discussed at length his reasoning behind the room layouts he eventually competed for the Grey Hawk townhomes. He noted that in back-to-back townhomes, the plumbing is normally located across the back wall,

---

[5] At the hearing, Theis testified to the similarities in square footage, although his testimony was unclear as to which units were larger or smaller. Tr. 41-42. When asked to clarify, Theis testified that when he said the first floor plans were the same, he was referring to the square footage, and not to the relationship and the extent to which the rooms were adjacent to one another. Tr. 62. As noted, Theis' statement that the room layouts were different is contrary to Whitten's statement that the room layouts were the same. When asked later, Theis reiterated that the square footages of the units, based on the foundations, were 99% the same. Tr. 66.

since the front and back units would share the plumbing; as a result of this arrangement, most back-to-back townhomes have rooms requiring plumbing on the back walls. Tr. 191, 201. He also testified that his plans usually placed the kitchen close to the garage, as a matter of convenience for the homeowner. Tr. 191.

Gunhus also testified at length about some of the differences between the first floors of the B units of the Grey Hawk townhomes and the similar units of the Rottlund townhomes: the Grey Hawk units have a main floor utility room; the powder room location and configuration is different; the Grey Hawk units have galley kitchens, while the Rottlund units have U-shaped kitchens; the kitchens of the Grey Hawk units feed directly into the dining room, while the kitchens in Rottlund's units are separated from the dining rooms by staircases; the Grey Hawk entries have a complete covered stoop and the Rottlund entries are projected; the Grey Hawk front doors have side lights; the Rottlund units have front entry closets; the beams are in different locations with different configurations; the window configurations are different; the Grey Hawk units have storage closets in the garage; the fireplaces are in different locations (and the Grey Hawk fireplace is on an angle, while the Rottlund fireplaces are not); the ceiling heights are different, which results in different configurations for the steps of the staircases; and the room sizes and dimensions differ substantially. Tr. 192-94; 201. Gunhus also explained how the second floor levels of the units are entirely different: the Grey Hawk units have two master suites, while Rottlund's have a master bedroom suite and a smaller bedroom; the two master bedrooms in the Grey Hawk units are divided and insulated by the stairway, while the two upstairs bedrooms in the Rottlund units are contiguous. Tr. 194; 201-02. Also, the Grey Hawk units have two upstairs bathrooms, while the Rottlund units have one. *Id.* The Grey Hawk units have

an upstairs walk-in closet and an additional closet, while the Rottlund units have only a walk-in. Tr. 194. Additionally, Whitten testified that the Rottlund projects had four, eight, and twelve unit structures within them. Tr. 144. The Grey Hawk development has four, six, eight and ten unit structures. Tr. 196.

Gunhus also compared the foundation plans, and noted differences between the Rottlund Glen Oaks townhomes and the Oak's Grey Hawk townhomes. The overall dimensions of the plans were different. Tr. 198. He described the Grey Hawk townhomes as having a "more boxy" look, with fewer jogs and ins and outs. Tr. 198. He testified that the roof lines and pitches were completely different: the gabling above the dormer windows differs–Gray Hawk has five gables, Rottlund has three; the Grey Hawk roofs are hipped, Rottlund's are gabled; the Grey Hawk roofs have living space above the roofs, Rottlund's do not. Tr. 199, 203. He also noted that in an eightplex there would naturally be four garage doors on each side, and four front doors. Additionally, he noted that a front living room window is normally part of townhomes, as well as windows on the upper level above the front room window. Tr. 199. He also testified that the shed roof and the space that comes out over the garage was the only reasonable configuration in designing these type of back-to-back townhomes. Tr. 199.

In addition to architectural similarities between the townhomes, Rottlund also alleges defendants used its construction methods and sequences, and hired subcontractors away from it. Tr. 22-26 (Theis testimony). Rottlund contends that Chris Dawson, a former Rottlund Iowa employee, had access to this information at Rottlund and gave the information to The Oaks after he accepted a job offer from Oaks Development and resigned from Rottlund. *Id.* Dawson was a Rottlund employee for approximately two years, until he was fired in January 1998 because he

missed two days of work. During the two year period, his work for Rottlund included time at Rottlund's Meadow Ridge project. For a few days in November 1997, Dawson worked overtime, at the request of Claudia Gerdes, then vice president of Rottlund Homes. He helped her with some estimates for framing and trim packages for one of Rottlund's single-family home developments. In the course of completing the work, Dawson had access to Rottlund Advantage software. Gerdes noted that although Dawson had a password to the software, he only knew how to run reports, and didn't enter any information into the system, and the Rottlund Advantage was so complex that he couldn't possibly have known all phases of the system.[6] Tr. 286.

After Rottlund terminated him, Dawson worked for a construction company installing countertops and cabinets. He later worked in a sales job for a building products company. Rottlund rehired Dawson in August 1998, in an assistant superintendent position. Dawson testified that an assistant superintendent handles the schedule from the time the drywall has been installed, including: scheduling trim carpenters, painters, etc; helping homeowners move in; taking customers on walk-throughs; following up on punch lists, and other details. Tr. 212-13. He left Rottlund to work at The Oaks approximately one month later.[7]

In additional to arguing that the Grey Hawk townhomes are substantially similar to Rottlund's Glen Oaks townhomes, Rottlund alleges The Oaks purposefully hired Dawson away

---

[6] Gerdes testified, "[h]e could run reports, but that's about it. He didn't enter any information in the system, and–the system is very complex. There wasn't anyone at Rottlund that knew all the phases of that system." Tr. 285-86.

[7] Rottlund emphasizes the fact that Dawson's income at The Oaks was higher, but Dawson also testified that the higher income was deceptive, because he had to pay for his own health insurance and retirement plan at The Oaks, while these benefits had been provided by Rottlund as part of his compensation.

from Rottlund Iowa, and Dawson disclosed the Rottlund Advantage to The Oaks and solicited and hired subcontractors away from Rottlund. At the hearing, Dawson testified that he had never before seen the "blue book" that Theis referred to as the "Rottlund Advantage Bible." Tr. 214-15. Indeed, he stated, "I've never seen anything like this. I don't think they would give an assistant superintendent access to something like this." Tr. 215. These statements were consistent with the testimony of Theis, who stated that access to the blue book was limited.[8] Tr. 15-17. Dawson also testified that he never took portions of the book, photocopied it, delivered it, or provided it to anyone other than Rottlund representatives, or Gunhus. Tr. 215, 219. He indicated that he never provided documentary information from his work at Rottlund to Kline, Walters, or anyone else at The Oaks, and that he never used Rottlund's confidential or proprietary information during his employment at The Oaks. Tr. 215-16. Dawson testified that he did not gain access to the information Rottlund alleges he misappropriated. Tr. 226-28.

Dawson also discussed several differences between the Grey Hawk townhomes and the Rottlund townhomes. The differences are numerous, but include: Rottlund townhomes have patio sliding glass doors on the ends and the Grey Hawk units do not; the walls of the Grey Hawk townhomes are flush from the first to the second floor and the walls of the Rottlund townhomes are not; the fireplaces in the Grey Hawk units angle and are next to the staircase and Rottlund's fireplaces are arranged differently; the Grey Hawk units have upstairs "Hollywood baths"[9] and the

[8] Theis also testified, "It is my understanding prior to my arrival [at Rottlund Iowa] that Claudia Gerdes gave [Dawson] access so he could work bringing up some budgeting issues that needed to be done." Tr. 17.

[9] As explained by Dawson, a Hollywood bath has a tub/shower in a middle room and two bathrooms are on either side of the common room. Each of the two side bathrooms in the Grey Hawk units have a sink, a toilet fixture, a vanity and a linen closet.

Rottlund units do not. Tr. 231-54. Dawson also testified that when he began working for The Oaks, he made a list of subcontractors to call, so he could obtain bids from them. Tr. 263. He admitted that when he was at The Oaks, he called some of the same contractors who had also worked for Rottlund. He explained that he called these contractors because he was comfortable with them, and knew they did quality work. He testified that he did not tell the subcontractors to do the work just like Rottlund, or that the townhomes would be just like Rottlund, but he might have told them that the townhomes were better than Rottlund's. Tr. 228-30.

Theis stated by affidavit: "One individual reported that the defendant partner told him to make the project just like Rottlund but better so as to not get caught." Tr. 290; *see also* Affidavit of Stephen Theis, ¶ 13. At the hearing, Theis indicated that the individual was Stanton Grubb. Grubb, a trim carpenter, testified at the hearing that nobody from The Oaks, including Kline, Walters, or Dawson, made such a statement to him. He also testified that the construction process used at the Grey Hawk development differed from that used by Rottlund. For example, he explained that The Oaks did not use job plans like Rottlund, and that The Oaks did not use the eighty-day schedule Rottlund used. Tr. 293. He also testified that the building sequence Rottlund used, *i.e.*, building in a circle, was not used by The Oaks. Rather, The Oaks completed units as they were sold. Tr. 293.

Randy Walters, a named defendant, testified that The Oaks was not involved in copying, stealing, or usurping Rottlund's design information. Tr. 298. He also indicated that he didn't encourage Chris Dawson to use or share Rottlund's proprietary or confidential information. Tr. 298.

In the Application for Injunction, plaintiffs request that the Court bar defendants from the following conduct:

> a. Use of Plaintiffs' subcontractors on the Villas of Grey-Hawk.
> b. Use of the name "Villas" to describe Defendants' project now or any future project.
> c. Using in any way Plaintiffs' pricing strategies, marketing strategies, rate quotas or other confidential business methods and procedures acquired during or as a consequence of their employment of Plaintiffs' subcontractors or any notes or memoranda prepared therefrom that are in their possession or under their control or that they have now transferred onto lists and records of Defendants.
> d. Contacting, by any means on behalf of themselves or any agent of Defendant any subcontractor or employee of Plaintiffs including but not limited any company or individual that does or has done business with Plaintiffs to obtain Plaintiffs' proprietary information.
> e. Entering into or continuing to perform under any contract arrangement or understanding with any company or individual including Iowa Realty Company or any that is listed on Plaintiffs' subcontractor lists attached hereto and made a part hereof by this reference.
> f. Any discussion with any parties other than the Plaintiffs' or the Defendants' attorney regarding this injunction.
> g. Using in any way the proprietary information including the construction methods and procedures or any notes or memoranda prepared therefrom that are in their possession or under their control or that they have now transferred onto any other records of any other person or entity....

Application for Injunction, at 4-5.

## II. PRELIMINARY INJUNCTION

When evaluating whether to issue a preliminary injunction, a court should consider the following factors: 1) plaintiffs' probability of success on the merits; 2) the threat of irreparable harm to plaintiffs; 3) the balance between this harm and potential harm to others if relief is granted; and 4) whether an injunction serves the public interest. *Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d 926, 929 (8th Cir. 1994) (citation omitted). No single factor is

dispositive. *See Calvin Klein Cosmetics Corp. v. Lenox Lab.*, 815 F.2d 500, 503 (8th Cir. 1987); *Dataphase*, 640 F.2d at 113. The Eighth Circuit favors a flexible approach:

> At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene ... until the merits are determined. The equitable nature of the proceeding mandates that the court's approach be flexible enough to encompass the particular circumstances of each case.... The likelihood that plaintiff will prevail is meaningless in isolation.

*Dataphase*, 640 F.2d at 113. Keeping in mind the Eighth Circuit's pragmatic approach, this Court now considers plaintiffs' motion seeking a preliminary injunction.

A. Plaintiff's Probability of Success on the Merits

1. Copyright Infringement

Rottlund alleges that The Oaks' Grey Hawk development has infringed the copyrights it has filed to cover building plans of its various villa projects. The claim evolves from the Architectural Works Copyright Protection Act, an amendment to the Copyright Act of 1976. The statute provides copyright protection to architectural works, which the statute defines as:

> ...[t]he design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.

17 U.S.C. § 101.

To establish infringement, an aggrieved party must prove: (1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original. *See Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (citation omitted); *Moore v. Columbia Pictures Indus.*, 972 F.2d 939, 941 (8th Cir. 1992). The second element may be

established by either direct evidence of copying or circumstantial evidence of copying.[10] *See Moore*, 972 F.2d at 941-42; *see also Selle v. Gibb*, 741 F.2d 896, 901 (7th Cir. 1984). Because direct evidence of copying is rarely available, a plaintiff may establish "copying" through the use of circumstantial evidence proving: (1) the defendant had access to the allegedly infringed material; and (2) substantial similarity between the copyrighted material and the allegedly infringing material. *See Moore*, 972 F.2d at 941-42; *see also Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 360 (1991). For purposes of this ruling, the Court presumes Rottlund is the owner of a valid copyright[11] and defendants had access to the allegedly infringed material.[12] The Court is therefore left with the issue of whether substantial similarity exists between the copyrighted material and the allegedly infringing material.

The Eighth Circuit has described the "substantial similarity" analysis, in the summary judgment context, as follows:

> Determination of substantial similarity involves a two-step analysis. There must be substantial similarity not only of the general ideas but of the expressions of those ideas as well.... First, similarity of ideas is analyzed extrinsically, focusing on objective similarities in the details of the works. Second, if there is substantial similarity in ideas, similarity of expression is evaluated using an intrinsic test depending on the response of the ordinary, reasonable person to the forms of expression.... Thus ... we first determine whether the details of the works contain objective similarities, and if they do, then we examine the works to ascertain if they

[10] In the instant case, Rottlund has provided no direct evidence of copying.

[11] Rottlund has submitted copies of certificates of copyright registration for six different villa projects located in the Des Moines metro area.

[12] The Rottlund townhomes are located throughout the Des Moines metro area, Rottlund advertises in newspapers, and the company distributes sales brochures. Therefore, it is possible that defendants or their employees observed the Rottlund villas, or photos or drawings of the villas.

> are so dissimilar that ordinary, reasonable minds cannot differ as to the absence of substantial similarity in expression.

*Moore*, 972 F.2d at 945 (citations and internal quotation marks omitted). The Eighth Circuit's bifurcated test was originally set forth in *Hartman v. Hallmark Cards, Inc.*, 833 F.2d 117, 1280-21 (8th Cir. 1987), and drew much of its reasoning from two Ninth Circuit cases. *See Hartman*, 833 F.2d at 1280-81; *see also McCulloch v. Albert E. Price, Inc.*, 823 F.2d 316, 318-19 (9th Cir. 1987), *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977).

In *Krofft* and *McCulloch*, the courts explained the difference between the similarity in ideas prong[13] and the similarity in expression prong of the infringement analysis. "Similarity of ideas may be shown by an extrinsic test which focuses on similarities in the objective details of the works.... This step is extrinsic because it depends not on the responses of the trier of fact, but on specific criteria which can be listed and analyzed.... The extrinsic test may often be decided as a matter of law." *McCulloch*, 823 F.2d at 319 (citing *Krofft*, 562 F.2d at 1164) (internal quotations marks and other citations omitted). The Court finds that the Rottlund and Grey Hawk townhomes are substantially similar in general ideas, as the structures at issue are all multi-family back-to-back townhomes.

The comparison of similarity in expression requires a more complex and subtle assessment. *Krofft*, 562 F.2d at 1164. "Infringement of expression occurs only when the total concept and feel of the works in question are substantially similar." *Hartman*, 833 F.2d at 120-

---

[13] Although it appears that many courts skip over or have perhaps abandoned the first prong of the bifurcated analysis, the Eighth Circuit has not abrogated it.

21. Usually this issue is one for the fact finder, but in the context of a motion for preliminary injunction, this Court must make the preliminary findings of fact. *McCulloch*, 823 F.2d at 319.

Rottlund alleges the following similarities between the Grey Hawk townhomes and Rottlund's townhomes: "the foundations, the sequence and placement of rooms, the back to back, high density 8-plex configuration with single garages on the interior units and double garage on the two exterior units, and 4-plex units with double garages for each unit." Plaintiffs' Preliminary Injunction Brief, at 25. Rottlund recognizes that defendants presented testimony as to the differences in the Grey Hawk and the Rottlund villas, but describes these differences as minor, trivial, and cosmetic. Specifically, Rottlund describes its "Dellwood" design, a unit model available (out of four models) at the Glen Oaks townhomes, as substantially similar in interior design and layout to the Grey Hawk units. Plaintiffs also characterize the testimony of Ted Gunhus as an admission that he copied Rottlund's room plans and then moved the rooms around to avoid the instant litigation. The Court shall address each of plaintiffs' allegations.

Rottlund relies on Theis' testimony that defendants copied or traced plaintiffs' plans, and Whitten's testimony that the odds of defendants independently creating townhomes with the characteristics similar to Rottlund's is astronomical. Theis' testimony was speculative and unsupported. The Court also finds little value in Whitten's description of the odds that The Oaks could independently create townhomes with the similarities, as his calculations appear to disregard the functionality of various combinations.

Rottlund admits that the elements of similarity are not, on their own, infringement, but claims that the elements in combination infringe Rottlund's buildings. The Court disagrees with this assessment. A back-to-back, side-by-side, slab on grade, two story townhome is simply *not*

an original idea; yet, these elements are the essence of Rottlund's claim to originality. The other complaints Rottlund makes–the placement of garages and front entries, the protrusion of garages so as to minimize the driveway and provide privacy–do not provide further proof of originality, even when considered in conjunction with the previously-mentioned elements. A back-to-back, side-by-side multi-unit townhome structure will naturally have garages and front entries in certain positions; functionally, there is no placement alternative. Even a layperson can discern that in an eightplex unit, an efficient use of space includes a combination of two garages on the end, and two singles next to each other in the middle. The garage arrangement would leave limited potential locations for the front entrance, which is usually located near the garage. Additionally, the concept of designing a protruding garage so that the driveway is shorter and the front entry is set back from the garage is not novel, even with the combination of elements Rottlund has already noted. Rottlund also argues that the placement of the first floor window is similar; yet, it is natural for townhomes to have first floor windows, and the placement of the garage and front entrance leave little alternatives as to placement of the window. Also, a shed roof over the garage is a common feature for townhomes of this type.

The differences between the townhomes are substantial. Applying the "ordinary observer" standard, the Grey Hawk townhomes have quite a different exterior look than Rottlund's townhomes. The roofs differ, the sides of the buildings differ, the placement of porches and patios differ, and the foundation dimensions differ. Rottlund witnesses testified at the hearing and Rottlund's exhibits included statements that the square footage of the units, when compared, were within 1% of each other (the Glen Oaks B unit and the Grey Hawk A unit), and within 5% of each other (the Glen Oaks A unit and the Grey Hawk A unit). Plaintiffs' Exhibits 18-19, Tr. 41

(Testimony of Stephen Theis), Tr. 151-56 (Testimony of Tim Whitten). When cross-examined about how Rottlund arrived at such figures, Whitten recalculated the comparisons and conceded that these figures were wrong. Tr. 151-58.

In addition to the exterior differences, defendants' witnesses noted numerous interior differences. Rottlund considers such differences "cosmetic," but the Court does not agree. Ted Gunhus and Chris Dawson testified at length to differences in the layouts and interior features of the Grey Hawk townhomes. The Court has noted most of the testimony regarding differences in a previous section, and will not repeat them in full. A few qualities of the Grey Hawk units which differ from the Rottlund units include nine foot ceilings, food pantry, two full bathrooms upstairs, stairway location, laundry room location. These, as well as the other interior differences mentioned in the testimony of Gunhus and Dawson, provide ample evidence of differences between the two products so that an ordinary observer would not find their aesthetic appeal the same.

Rottlund contends that the "Dellwood" unit of the Glen Oaks development has floor plans that match exactly the Grey Hawk unit B ("Quill") floor plans. After comparing the main level floor plans, the Court notes that the stair locations of both units are similar, and the floor plans are similar. However, differences remain: exterior differences (which the Court has already discussed); kitchen arrangements are different; fireplace arrangements are different; and other interior differences, such as ceiling heights and the existence of side vents on the front door.[14]

---

[14] Unfortunately, Rottlund did not provide additional information, such as square footage or photographs of the Dellwood units, so the Court cannot compare other important elements that may be similar or dissimilar. Despite the omission, the Court finds the evidence submitted sufficient to support its findings.

The upstairs levels of the two units, contrary to Rottlund's suggestion, are not the same. .The Court finds that any similarities between Rottlund's Glen Oaks Dellwood units and The Oaks Grey Hawk B (Quill) units do not support a finding of substantial similarity and infringement.[15]

Rottlund characterizes the testimony of Ted Gunhus as an admission that he copied Rottlund floor plans and moved elements of the plans around to avoid allegations of copying, and did not originally create the Grey Hawk floor plans. The Court has reviewed the testimony to which Rottlund refers, and finds the characterization inaccurate. When asked if he copied or used Rottlund's plans, he responded "No, I did not." Tr. 186. He responded "no" to similar questions as to whether he had Rottlund plans, or had been provided access to Rottlund plans when he drafted the Grey Hawk concept drawings. Tr. 186. Gunhus explained in detail his reasons for placing some rooms in certain positions. For example, he generally places a kitchen close to the garage so the homeowners don't have to carry their groceries far, and he finds placing kitchens to the front "dated." Tr. 191-92. The Court finds Gunhus' testimony does not constitute not an admission that he copied Rotlunds plans and changed them to avoid accusations of copying. Rather, Gunhus was trying to explain in detail the differences between Rottlund's units and Grey Hawk's units.

The Oaks initially called the units A and B, names similar to those used by Rottlund. However, "A" and "B" are commonly used in product designations in many industries, and the

---

[15] The Court also observes that Rottlund has submitted the technical drawings of six different Rottlund townhome developments, including the floor plans to fourteen different units. The Court did not consider this point in making findings and conclusions for the instant Order. However, the Court notes again that the number of functional floor plan combinations is finite, and the likelihood of *some* similarity in floor plans is inevitable when comparing The Oaks' two plans to Rottlund's fourteen.

Court finds this not probative of whether defendants infringed plaintiffs' copyrights. The units' names were later changed to Talon and Quill for marketing purposes in the later development stages of the townhomes, although Rottlund alleges the name change occurred in response to the instant lawsuit.

After careful consideration of the evidence presented at the hearing, the Court finds that Rottlund's and The Oaks townhomes are not substantially similar, and therefore concludes that Rottlund is not likely to prevail on the merits of its copyright infringement claim.

2. Misappropriation of Trade Secrets

Although the decision to issue a preliminary injunction is determined by federal law, the Iowa Trade Secrets Act[16] ("the Trade Secrets Act") governs Rottlund's claim that The Oaks misappropriated its trade secrets. *See Austin v. Super Valu Stores, Inc.*, 31 F.3d 615, 618 (8th Cir. 1994); Iowa Code §§ 550 *et seq*. A party alleging misuse of a trade secret may request an injunction. Iowa Code § 550.3. Prerequisites for relief based on appropriation of a trade secret are: (1) existence of a trade secret; (2) acquisition of the secret as a result of a confidential relationship; and (3) unauthorized use of the trade secret. *Lemmon v. Hendrickson*, 559 N.W.2d 278, 279 (Iowa 1997) (citation omitted); *see also* Iowa Code § 550.2.

a. Existence of a Trade Secret

The Trade Secrets Act defines a "trade secret" as follows:

> "Trade secret" means information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process that is both of the following:

---

[16] The Iowa Trade Secrets Act is commonly cited as the Uniform Trade Secrets Act. *See* Iowa Code § 550.1.

> a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Iowa Code § 550.2(4). In defining the term "information," Iowa Code § 550.2(4), the Iowa Supreme Court has observed: "Business information may also fall within the definition of a trade secret, including such matters as maintenance of data on customer lists and needs, source of supplies, confidential costs, price data and figures." *US West Comm., Inc. v. Office of Consumer Advocate*, 498 N.W.2d 711, 714 (Iowa 1993); *see also Lemmon*, 559 N.W.2d at 280 (noting a customer list can be a trade secret). As previously discussed, Rottlund purchased a licensing agreement from Snoqualmie for the Rottlund Advantage, a comprehensive copyrighted business system. The Rottlund Advantage includes: manufacturing techniques, internal price rates and quotes, construction processes, computer programs and software, construction methods and sequences, subcontractor lists, contracts and price quotes, sales methods, and business procedures. The Court finds that this is the type of "information" the Iowa Trade Secrets Act is intended to protect.

Additionally, the Court finds that the information at issue derived independent economic value from the fact that it was not readily ascertainable. The Iowa Supreme Court has described "economic value" as: "the value of the information to either the owner or the competitor; any information which protects the owner's competitive edge or advantage.... information kept secret that would be useful to a competitor and require cost, time and effort to duplicate is of economic value." *US West Comm.*, 498 N.W.2d at 714 (citations omitted). The Rottlund Advantage would



ROTTIA00392

fall within this definition, as it would likely be of value to a competitor, particularly in light of the fact that Rottlund purchased a license for the system.

The Court must also consider whether Rottlund took efforts to maintain the information's secrecy. To satisfy this standard, only reasonable efforts are necessary; absolute secrecy is not required. *See Pioneer Hi-Bred Int'l v. Holden Foundation Seeds, Inc.*, 35 F.3d 1226, 1235-36 (8th Cir. 1994) (citations omitted). "Companies need not 'guard against the unanticipated, the undetectable, or the unpresentable methods of espionage now available' or create 'an impenetrable fortress.'" *Id.* at 1236 (citations omitted). In the instant case, only a few Rottlund employees had access to the entire Rottlund Advantage system, including materials and computer programs. Rottlund witnesses testified that many employees had partial access to the system, but only to the aspects of the Rottlund Advantage software which pertained to their specific work responsibilities.

The Oaks argues that Rottlund has not made reasonable efforts to protect the alleged trade secrets. For example, although Rottlund alleges all employees must sign a nondisclosure agreement, the confidentiality provision Rottlund submitted to the Court was only a page from the employee handbook.[17] Rottlund has not submitted a confidentiality contract signed by Chris Dawson, the employee who left Rottlund to work at Oaks development. The Oaks also notes that some of Rottlund's subcontractors and suppliers knew parts of the Rottlund Advantage.

Rottlund's lack of sophistication regarding trade secret policies is not sufficient cause for this Court to find that the company failed to take reasonable efforts to keep their trade secret

[17] The page, which Chris Dawson signed, is an "Employee Handbook Acknowledgment," and states "I understand that this Handbook is intended only as a general reference, and not as a full statement of Company policy nor is it a legal contract." Exhibit D.



ROTTIA00393

information confidential. Although defendants claim Rottlund did not take measures to keep this information secret, there is no evidence that other people had knowledge of the information. *See 205 Corp. v. Brandow*, 517 N.W.2d 548, 551 (Iowa 1994) (evaluating whether the number of people with knowledge of a secret was reasonable under the circumstances, and finding a trade secret existed). Certainly, some parties who were not Rottlund employees knew bits and pieces of the Rottlund Advantage. Such a dissemination of information by Rottlund does not indicate Rottlund failed to take reasonable efforts to keep the information confidential. Indeed, the situation requires Rottlund to pass this information on to outsiders, *i.e.*, Rottlund hires outsiders–subcontractors–to build townhomes and make then operational.

The Court concludes that Rottlund took reasonable measures to keep the alleged trade secrets confidential. Consequently, the Court finds it likely that Rottlund's information would be considered a trade secret under Iowa law.

b. Acquisition of the Secret as a Result of a Confidential Relationship

Rottlund argues that a confidential relationship existed between Chris Dawson and Rottlund, and that Dawson passed this information to defendants in the course of his employment at The Oaks. Defendants do not address or contest this issue.

In *Economy Roofing & Insulating Co. v. Zumaris*, the Iowa Supreme Court discussed circumstances in which an employee might have a fiduciary duty to keep information secret. 538 N.W.2d 641, 646-48 (Iowa 1995). The court noted that employees "constantly act on behalf of employers. In doing so, employees have the confidence and trust of their employers. That is the essence of the relationship." *Id.* at 648. In *Economy Roofing*, the court found a fiduciary relationship existed between a corporation and two of its former officers. *Id.* Chris Dawson was

not an officer or high-ranking managerial employee of Rottlund, and the question of whether a fiduciary duty existed is more complex than that presented in *Economy Roofing*. Dawson did have at least partial access to the Rottlund Advantage software system. Under the principles set forth by the Iowa Supreme Court, this Court finds that Dawson was obligated, as a result of the employment relationship, to maintain the confidentiality of any trade secret information he may have acquired during his tenure at Rottlund. *See Economy Roofing*, 538 N.W.2d at 648. However, Dawson's obligation to maintain confidentiality does not extend to general knowledge acquired during his employment with Rottlund. *See Economy Roofing*, 538 N.W.2d at 648. For purposes of the present motion, the Court finds plaintiffs have satisfied the second element of a trade secret claim.

c. Unauthorized Use of the Trade Secrets

To evaluate plaintiffs' likelihood of success on the merits, the Court must also consider whether Dawson used Rottlund's trade secrets in an unauthorized manner. The Iowa Code defines "misappropriation" in pertinent part:

> d. Disclosure or use of a trade secret by a person who at the time of disclosure or use knows that the trade secret is acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.
> e. Disclosure or use of a trade secret by a person who at the time of disclosure or use knows that the trade secret is derived from or through a person who owes a duty to maintain the trade secret's secrecy or limit its use.

Iowa Code § 550.2(3).

Rottlund presents few examples of The Oaks' alleged use of the trade secret information. Initially, Rottlund notes that immediately upon resigning from Rottlund Iowa, Dawson began working for The Oaks. Plaintiffs allege The Oaks sought out Dawson while he was still employed

by Rottlund to obtain the Rottlund Advantage system, and have been exploiting the trade secret information since. Rottlund presented no direct testimony or evidence to prove this allegation.

Rottlund's main complaint appears to be that Dawson and the Oaks used Rottlund's trade secret information to induce subcontractors to pull off Rottlund's jobs to work on Grey Hawk jobs. Rottlund presented no testimony from subcontractors to prove this allegation. Tim Wells works for Bell Brothers, a subcontractor, and was a plaintiffs' witness, but Wells' testimony did not support Rottlund's accusation.

Wells did testify that Dawson told him "something to the effect that they'd be easy to bid. They're just like the villas." Tr. 99. Rottlund alleges this testimony proves that Dawson used and disclosed the Rottlund Advantage for The Oaks' benefit. Dawson testified that he never told subcontractors that The Oaks' development would be just like Rottlund's, but that he might have said they would be like the Rottlund projects but better. The Court has no cause to discredit Dawson's testimony. The Court finds nothing suggestive of inappropriate activity in Dawson's comment that The Oaks' townhomes were going to be better than a competitors' townhomes.

Wells also testified that he did not take the bid document from Rottlund and rebid the exact same bid to The Oaks. Tr. 103. The subcontractors hired by Rottland and The Oaks were independent of either entity. Dawson became familiar with the employees of and work performed by several subcontractors through his employment at Rottlund. As the subcontractors did not work exclusively for Rottlund, Dawson or The Oaks are not barred from soliciting the subcontractors. Knowledge of subcontractors is the type of general information that is not a trade secret. Rottlund has not provided any evidence that Dawson did more than solicit subcontractors

whose work he respected. Dawson's and defendants' solicitation of subcontractors who also worked for Rottlund is not an unauthorized use of a trade secret.

Rottlund also argues that Dawson gave defendants information about Rottlund's construction methods and sequences. Plaintiffs provided no specifics as to the similar methods used. The Oaks provided testimony from a subcontractor who had worked for both Rottlund and The Oak's Grey Hawk project that the construction sequences and methods were different. Tr. 293 (Testimony of Stanton Grubb).[18] The Court therefore finds no evidence that defendants used the Rottlund Advantage system. The Iowa Supreme Court has addressed a similar situation, noting: "Although it is undisputed that [defendant] failed to return any customer lists in his possession upon termination of his employment, [plaintiff] offers no proof that [defendant] retained a list to use to [plaintiff's] advantage." *Lemmon*, 559 N.W.2d at 280. Similarly, Rottlund only speculates that Dawson gave The Oaks trade secret information. Dawson denies having done so, and the Court finds no reason to discredit his testimony.

The Court also notes that Rottlund has provided no evidence that Dawson ever possessed a great deal of trade secret information. Rottlund asks the Court to infer that because Dawson had access to the Rottlund Advantage computer in November 1997 when he helped Claudia Gerdes, his supervisor (at her request), he must have been able to obtain trade secret information. Given the evidence presented, the Court will not make this inference. After Rottlund fired Dawson, he held at least two other jobs which were quite different from the one he held at Rottlund. When he returned to Rottlund, Gerdes was gone and Theis was in charge. Theis

---

[18] Despite plaintiffs' attack of this witness' credibility, the Court finds Grubb quite credible. *See* Tr. 294.

testified that he tried to keep access to the Rottlund Advantage notebook and software limited, by means including limiting knowledge of passwords to the system. Under such circumstances, Dawson could not have obtained access to the Rottlund Advantage system during the month he returned to Rottlund before he was hired by The Oaks. Thus, if Dawson had obtained Rottlund trade secret information in an unauthorized manner, he would have collected it after working with Gerdes in November 1997. The Court finds this suggestion without merit, given the period of time after Dawson was fired from Rottlund during which he pursued other careers.

Rottlund has provided no convincing evidence at this stage in the proceedings to indicate that The Oaks actually used or misappropriated its trade secrets. The Court finds Rottlund has failed to establish that it is likely to succeed on the merits of its trade secret claim.

3. Unfair Competition

Under Iowa law, an unfair competition claim requires proof of the following:

> 1. The defendant directly or indirectly represented that the [townhomes] marketed by defendant were the product of plaintiff.
> 2. The defendant did so with an intent to deceive customers.
> 3. Consumers were confused or were likely to be confused as to the manufacturer of the [townhomes] as a natural consequence of the defendant's conduct.
> 4. The defendant's conduct was a proximate cause of damage to the plaintiff.
> 5. The nature and extent of damage.

Iowa Civil Jury Instructions, § 3410.1; *see also Basic Chemicals, Inc. v. Benson*, 251 N.W.2d 220, 231 (Iowa 1977) ("The doctrine of unfair competition ... goes to the question of a defendant's methods and representations in marketing his products, not his right to manufacture or produce them.").

Citing a New York state district court, Rottlund defines unfair competition as follows: "Unfair competition arises when a former employee misappropriates and exploits confidential

information in abdication of his relationship of trust." Plaintiffs' Preliminary Injunction Brief, at 32. In explaining the manner in which defendants allegedly unfairly competed with Rottlund, plaintiffs argue: Dawson had a common law duty of loyalty to Rottlund which required him to keep confidential information secret; Dawson breached his duty of loyalty and misappropriated confidential information belonging to plaintiffs by disclosing this information to The Oaks; to compete with plaintiff, Dawson intentionally hired away Rottlund's key subcontractors who were knowledgeable about Rottlund's plans and designs, as well as confidential construction sequences, methods, and procedures; The Oaks is now using Dawson to exploit confidential information to compete with plaintiffs. Plaintiffs' Preliminary Injunction Brief, at 32-33.

The Court finds plaintiffs have not alleged an unfair competition claim under Iowa law. Rottlund has not alleged in any manner that The Oaks is attempting to market the Grey Hawk townhomes as a Rottlund product. Rottlund has not alleged that consumers have been confused as to the developer of the townhomes. Additionally, the Court finds no cause to disregard the Iowa Supreme Court's definition of an unfair competition claim and to adopt a definition of the cause of action as defined under New York state law. The Court finds plaintiffs unlikely to prevail on the merits of the unfair competition claim.

4. Lanham Act

Plaintiffs argue the "signature look" of their townhomes is entitled to protection as an unregistered trademark under the Lahnam Act, 15 U.S.C. §§ 1051 *et seq.* Specifically, Rottlund alleges its two-story, two-bedroom, slab on grade, back-to-back townhomes "have a recognizable 'look and feel' based on their appearance, floor plan and amenities package and the fact that they are denominated by the term 'Villas.'" Plaintiffs' Preliminary Injunction Brief, at 34.

"The trade dress of a product in the total image of a product, the overall impression created, not the individual features." *InstyBit, Inc. v. Poly-Tech Indus., Inc.*, 95 F.3d 663, 667 (8th Cir. 1996). (citations and internal quotation marks omitted). "In order to form the basis for an action under the Lanham Act, a trade dress must satisfy three criteria: 1) it must be distinctive;[19] 2) it must be nonfunctional;[20] and 3) there must be a likelihood that it will be confused with the accused product." *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 868 (8th Cir. 1994).

a. Distinctiveness

The United States Supreme Court addressed the distinctiveness element of a trade dress action in *Two Pesos, Inc. v. Taco Cabana, Inc.*, stating: "The general rule regarding distinctiveness is clear: An identifying mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning." 505 U.S. 763, 769 (1992) (citations omitted) (emphasis in original). The Supreme Court also recognized three categories of "generally increasing distinctiveness," namely: "(1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos*, 505 U.S. at 768 (citation omitted). The latter three categories are deemed inherently distinctive and entitled to protection. *Id.* The Lanham Act never protects generic marks. *Id.* (citations omitted).

The Eighth Circuit discussed the trade dress categories in *Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 784-87 (8th Cir. 1995). The categories were originally set forth in

---

[19] Rottlund makes no argument as to the distinctiveness argument, other than asserting that its townhomes are distinctive.

[20] Rottlund provides no argument as to the functionality element.



ROTTIA00400

*Abercrombie & Fitch Co. v. Hunting World Inc.*, 537 F.2d 4, 9 (2nd Cir. 1976), where they were defined as follows:

> A generic term is one that refers, or has come to be understood as referring to the genus of which the particular product is a species.... A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.

*Abercrombie*, 537 F.2d at 9-11 (citations and internal quotation marks omitted); *see also Stuart Hall*, 51 F.3d at 785-86. "[T]he terms "fanciful," as a classifying concept, is usually applied to words invented solely for their use as trademarks. When the same legal consequences attach to a common word, *i.e.*, when applied in an unfamiliar way, the use is called 'arbitrary.'" *Abercrombie*, 537 F.2d at 11 n.12. The definitions "address the relation between the product and the trade dress, not the relation between the trade dress and the consumer." *Stuart Hall*, 51 F.3d at 786.

The trade dress Rottlund describes is the "signature look and feel" of the townhomes, based on the floor plans, amenities and appearance, as well as the term "villa." Rottlund's trade dress does not fall into the classification of fanciful or arbitrary, because the Court finds no aspects of the trade dress that are applied in an unfamiliar way, or invented solely for use as trade dress. Even the term "villa" is not unique to the townhome industry, as demonstrated by Exhibit CC, an issue of "Parade of Homes" from the Twin Cities that lists some townhomes which are called "villas."

The Court also believes the trade dress is not suggestive. The "signature look and feel" of Rottllund's townhomes suggest they are multi-family living quarters, and this conclusion does not require a great deal of contemplation or imagination. The term "villas" suggests living quarters;



ROTTIA00401

again, this conclusion does not require imagination or thought. In fact, defendant's trademark search indicates that the term "villa" is so common that it may not be registered alone, and has been registered for use with several townhome developments. Exhibit B. Because the Court has found that Rottlund's trade dress is not fanciful, arbitrary or suggestive, it cannot be considered inherently distinctive. *See Two Pesos*, 505 U.S. at 768.

"If a trade dress is descriptive of the product itself, a showing of secondary meaning is required to obtain trade dress protection." *Stuart Hall*, 51 F.3d at 785. Secondary meaning requires a showing that through "long and exclusive use in the sale of the user's goods, the dress has become so associated in the public mind with such goods that the dress serves to identify the source of the goods and to distinguish them from those of others." *Id.* at 789 (citations and internal quotation marks omitted). "The ultimate inquiry is whether in the consumer's mind the mark denotes a single thing coming from a single source." *Id.* (citations and internal quotation marks omitted). Consumers need not know the name of the single source. *Id.*

Rottlund could choose from several factors in proving the trade dress has acquired distinctiveness through secondary meaning, including consumer surveys, deliberate copying of the trade dress, advertising featuring the trade dress at issue, expenditure on such advertising, and anecdotal evidence showing consumer identification of the trade dress at issue. *See Stuart Hall*, 51 F.3d at 789. Rottlund has not provided any such evidence. Although Rottlund argues its townhomes all have a signature look and feel, it submits the drawings of several different townhome developments, which all differ in some manner. The common elements appear to include the two-story, back-to-back, slab on grade aspects of the townhomes, as well as the placement of the garages and front entries. The Court will not base a finding of acquired

distinctiveness on bare allegations. The Court finds the Rottlund's trade dress is not descriptive and therefore has not acquired distinctiveness through secondary meaning. Rottlund has failed to establish a likelihood of success on the distinctiveness element of its Lanham Act claim.

b. Functionality

The Supreme Court discussed the functionality element in *Qualitex Co. v. Jacobson Products, Inc.*:

> The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature.... This Court consequently has explained that, "[i]n general terms, a product feature is functional," and cannot serve as a trademark, "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article," that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage.

514 U.S. 159, 164-65 (1995) (internal citations omitted).

The claim to the term "villa" is the one nonfunctional characteristic that Rottlund names. However, even the company's vice president of architecture testified that the term was not distinctive to Rottlund. *See* Tr. 136-37 (testimony of Tim Whitten) (describing the term villas as being distinctive in the Des Moines market but not the Twin Cities market, where other townhome projects have used the term). Additionally, defendants' trademark exhibit shows the term "villa" is not in itself a protected name, and may only be registered when used in a unique manner in conjunction with other words. Exhibit B. The remaining townhome elements listed by Rottlund–including back-to-back, two-story, slab on grade–are entirely functional and necessary to the use or purpose of the townhomes, and therefore do not qualify as nonfunctional, even when

considered cumulatively. The Court finds Rottlund has not established a likelihood of success on the functionality element of its Lanham Act claim.

c. Likelihood of Confusion

Success on a Lanham Act claim also requires proof of the likelihood of customer confusion. *Two Pesos*, 505 U.S. at 769. To find a likelihood of confusion, "[there must be a substantial likelihood that the public will be confused." *Children's Factory, Inc. v. Benee's Toys, Inc.*, 160 F.3d 489, 494 (8th Cir. 1998) (citation and internal quotation marks omittted). The Eighth Circuit has required district courts to apply the six "Co-Rect" factors to the consumer confusion prong of a trade dress infringement analysis:

> (1) the strength of the owner's mark;
> (2) the alleged infringer's trade dress;
> (3) the degree to which the products compete with each other;
> (4) the alleged infringer's intent to "pass off" its goods as those of the trade dress owner;
> (5) incidents of actual confusion;
> (6) the type of product, its costs and conditions of purchase.

*InstyBit, Inc. v. Poly-Tech Indus., Inc.*, 95 F.3d 663, 669-70 (8th Cir. 1996). Each factor must be analyzed in turn, and no single factor is determinative. *Id.* at 670 (citation omitted).

First, Rottlund did not demonstrated the strength of its trade dress. Aside from Rottlund's allegation that the villas have a signature look and feel, the Court finds no evidence in the record to suggest the trade dress is strong. Second, Rottlund showed the townhomes are similar to the extent that they are back-to-back, slab on grade, two-story townhomes. Defendants also showed that the townhomes differ in several aspects, discussed at length previously in this Order. Third, the products unquestionably compete with each other. The products are targeted at the same market, and the townhome prices are in the same range.

As for the fourth factor, although the townhomes compete with each other, the evidence has not given rise to a presumption of intent that defendants are attempting to pass off their townhomes as Rottlund's. In fact, Chris Dawson's statement to subcontractors that the townhomes were going to be better than Rottlund's suggests defendants did not wish to pass off their Grey Hawk townhomes as Rottlund townhomes.

Fifth, Rottlund presented no incidents of actual confusion except by Rottlund employees. The Court does not find this probative of alleged confusion by consumers. Finally, the townhome products are costly and the type of product over which consumers devote substantial time in making a purchasing decision, which suggests no likelihood of confusion by consumers.

Overall, the Court finds the balance of factors falls in favor of defendants. The Court finds that Rottlund has not met its burden of showing a substantial likelihood of confusion in consumers' minds as to the source of the townhomes.

Plaintiffs have not presented evidence tending to establish any of the three elements of a Lanham Act claim. The Court accordingly finds that plaintiffs are not likely of succeeding on the merits of this claim.

5. Tortious Interference with Prospective Business Advantage

Under Iowa law, a tortious interference with prospective business advantage claim requires proof of the following:

1. The plaintiff has a prospective contractual or business relationship;
2. The defendant knew of the prospective relationship;
3. The defendant intentionally and improperly interfered with the relationship;
4. The interference caused harm to the plaintiff;
5. The amount of the damage.

*See* Iowa Civil Jury Instructions, § 1200.2.

Plaintiffs claim that The Oaks interfered with Rottlund's business expectancies with customers, subcontractors, and suppliers. *See* Plaintiffs' Preliminary Injunction Brief, at 45. With regard to customers, plaintiffs argue that defendant's conduct was calculated to cause a termination of Rottlund's expectancies as to sales of townhomes.

The Court finds that as to customers, The Oaks did not tortiously interfere with business expectancies of Rottlund. Rottlund cannot name any customers with whom it had a prospective business relationship, and instead generally alleges that it has had successful sales efforts in the past. The Court finds this insufficient to state a claim of tortious interference with prospective business advantage. Additionally, The Oaks' activities of which Rottlund complains were calculated to encourage sales. Although such activities may also have the effect of diminishing Rottlund's sales, the reason for the lost sales is a competitive market. Free competition is not prohibited by the interference with prospective business advantage tort.

Rottlund also alleges The Oaks interfered with prospective business relationships with subcontractors and suppliers, by misappropriating and usurping these contractors and suppliers, resulting in slowed construction schedules and diverting customers from plaintiffs' to defendant's townhomes. Plaintiffs make no specific allegations of such "misappropriation and usurpation," and did not provide testimony or evidence, aside from the speculation of Rottlund employees and executives, that might establish such proof. Plaintiffs have also failed to present proof of any specific relationship with which The Oaks interfered, or that The Oaks tortiously interfered with these alleged relationships. Rottlund asks the Court to infer that subcontractors and suppliers worked for The Oaks because defendants wished to slow construction of the Rottlund townhome

project. Absent proof, the Court will not make such an inference, and instead finds a more reasonable explanation for Rottlund's alleged loss of subcontractors: a competitive market.

The Court finds Rottlund unlikely to prevail on the merits of the tortious interference with prospective business advantage claim.

6. Other Claims

In the complaint, Rottlund also alleges unjust enrichment and tortious interference with contract. Rottlund does not argue these points in its preliminary injunction brief, so the Court declines to address the likelihood of success on the merits of these claims.

7. Summary

The Court has found that plaintiffs are unlikely to succeed on the merits of any claims on which they base their request for injunctive relief. Accordingly, the Court finds this *Dataphase* factor falls in favor of defendants.

B. The Threat of Irreparable Harm to Plaintiffs

In determining whether to grant a preliminary injunction, the Court must also evaluate the threat of irreparable harm to plaintiffs if relief is not granted. *See Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d at 929. In *Dataphase*, the Eighth Circuit noted that although it encourages a flexible approach to evaluating the necessity of a preliminary injunction, "under any test *the movant is required to show the threat of irreparable harm*." 640 F.2d at 114 n.9 (emphasis added). Rottlund argues it will suffer irreparable harm if the Court does not grant an injunction, because plaintiffs will experience intangible injuries. As examples, Rottlund cites that subcontractors have experienced confusion as to who is responsible for invoices, which results in injury to goodwill and business relationships. Rottlund also notes that the exploitation of

proprietary information is impossible to quantify in dollar terms and asks the Court to adopt a rule presuming irreparable harm upon misappropriation of proprietary information.

Rottlund has not persuaded the Court that it will suffer *irreparable* harm. Indeed, this Court has already found that Rottlund is unlikely to succeed on the merits regarding its proprietary information claim; the Court therefore need not reach Rottlund's argument that such a misappropriation raises a presumption of irreparable harm. The essence of Rottlund's allegations is that The Oaks' actions have caused it to suffer reductions in sales of its townhomes, as well as lost future sales. A damages award could adequately compensate Rottlund for lost sales, as plaintiffs ask for 18% of defendant's gross revenues be escrowed as potential damages. *See* Plaintiffs' Brief, at 17. Such a request implies that money damages could adequately compensate plaintiffs. *See Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1025 (8th Cir. 1992) (preliminary injunction should not be granted where plaintiff had adequate remedy at law). This Court therefore finds this factor therefore weighs in favor of defendants.

C. The Balance of Harms

The next *Dataphase* factor is the balance of harm to plaintiffs if the injunction is denied, and the possibility of harm to others if the injunction is granted. *See Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d at 929. Rottlund claims if the injunction is not denied, defendants will continue its practice of taking customers away from plaintiffs by using Rottlund's proprietary information and trade secrets. In support of its claim that the balance of harm falls in Rottlund's favor, the company presents several allegations attacking the credibility of defendants'

witnesses at the hearing. Many of these allegations are unsupported by the evidence presented at the hearing.[21]

Plaintiffs claim that they do not wish to shut down The Oaks' construction at Grey Hawk. Yet, considering the laundry list of relief Rottlund seeks, the practical effect of this Court enjoining The Oaks would likely be a shut-down at Grey Hawk, lasting until the matter is fully adjudicated. *See* Application for Injunction, at 4-5. If some of the profits were kept in escrow during this time period, as Rottlund requests, The Oaks' ability to make payments on loans taken to complete the project would undoubtedly be adversely affected.

The Court is left with a situation in which Rottlund may lose sales and future customers if the injunction is not granted, while The Oaks may have to shut down construction completely if an injunction is granted. The Court finds that the balance of harms would be appreciable for both parties, but that the harm would be greater to The Oaks if an injunction is granted. Consequently, the Court finds this factor favors defendants.

D. Public Interest

The final *Dataphase* factor is whether granting an injunction is in the public's best interest. *See Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d at 929. The Court recognizes that preventing the misuse or misappropriation of trade secrets is in the public interest. In part, therefore, the factor weighs in favor of plaintiffs. However, a competitive marketplace is also in

---

[21] For example, Rottlund's brief states: "In return, for replicating and duplicating Villas for Defendant, Dawson received more money, a new truck and an office." Plaintiffs' Preliminary Injunction Brief, at 17. The brief also states, "Attorney Walters and Cline assisted in his tortious acts directed at the Plaintiffs, knowingly benefitted from the use of the misappropriated proprietary and confidential information, and used such information to solicit and misappropriate business from the Plaintiffs." *Id.* These allegations are purely speculative and unsupported by any evidence presented at the hearing.

public interest, and in this respect the factor weighs in favor of defendants. Additionally, if the injunction were to be granted, the practical effect of the injunction would likely be a shut-down of The Oaks' Grey Hawk operations. This would be detrimental to consumers who may have purchased units, and to subcontractors who relied on the project for income. The Court finds this factor favors neither party.

## III. CONCLUSION

In conclusion, the Court finds three *Dataphase* factors weigh against granting a preliminary injunction. After considering the balance of equities discussed above, the Court finds that justice does not require Court intervention to alter the status quo of the parties until the merits of this case are determined. Plaintiffs' motion for preliminary injunction is DENIED.

IT IS SO ORDERED.

Dated this 13th day of July, 1999.

RONALD E. LONGSTAFF, JUDGE
UNITED STATES DISTRICT COURT



ROTTIA00410