UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

The Rottlund Company, Inc.,
d/b/a Rottlund Homes,
a Minnesota Corporation

Plaintiff,

vs.

Pinnacle Corporation,
d/b/a Town & County Homes,
an Illinois Corporation, and
Town & County Homes, Inc., a
Minnesota Corporation, Bloodgood Sharp
Buster Architects and Planners of Iowa,
Inc., an Iowa Corporation, and The
Bloodgood Group, Inc.

Defendants.

and

Town & County Homes, Inc., a
Minnesota Corporation,

Third-Party Plaintiff
vs.

Bloodgood Sharp Buster Architects and
Planners of Iowa, Inc., an Iowa
Corporation,

Third-Party Defendant.

No. 01-CV-1980 (DSD/SRN)

**DEFENDANTS BLOODGOOD SHARP BUSTER ARCHITECTS AND PLANNERS OF IOWA, INC. AND THE BLOODGOOD GROUP, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO ROTTLUND'S MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY AND REPORTS OF ALBERT H. BLOOM AND JOSEPH D. KENYON**

## INTRODUCTION

Bloodgood Sharp Buster Architects and Planners of Iowa, Inc. ("BSB") and The Bloodgood Group, Inc. ("BGI") submit this Memorandum of Law in opposition to

Rottlund's Motions in Limine seeking to exclude the expert testimony and reports of Albert H. Bloom and Joseph D. Kenyon.

## ARGUMENT

### I. GENERAL BACKGROUND

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

One of the policy goals of Rule 702 is to promote the trier-of-fact's search for the truth by helping it to understand other evidence or determine the facts in dispute. See generally Smith v. BMW N.Am., Inc., 308 F.3d 913, 919 (8th Cir. 2002) ("An expert's testimony need not relate directly to the ultimate issue that is to be resolved by the trier of fact, it only need be relevant to evaluating a factual matter."); In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 744 (3rd Cir. 1994) (ultimate question as to admissibility under Rule 702 is whether expert's testimony will aid jury in reaching accurate results). The Daubert decision embraces a liberal approach to the admission of expert testimony on scientific or specialized knowledge matters. This liberal approach favors admitting expert opinion testimony and relies on the opposing party to test the sufficiency of those opinions. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 595, 113 S.Ct. 2786, 2798, 125 L.Ed. 2d 469 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. * * * These conventional

devices, rather than wholesale exclusion under an uncompromising 'general acceptance' test, are the appropriate safeguard where the basis of scientific testimony meets the standards of Rule 702.").

There is no requirement that expert testimony relate to only esoteric matters. See Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993) ("The subject matter of Rule 702 testimony need not be arcane or even especially difficult to comprehend. If again in the disjunctive, the proposed testimony will recount or employ 'scientific, technical, or other specialized knowledge,' it is a proper subject. There is no gap between the 'specialized knowledge' that is admissible under the rule and the 'common knowledge' that is not. The boundary between the two is defined by helpfulness."); United States v. Cruz, 981 F.2d 659, 664 (2nd Cir. 1992) (expert testimony may be used "to explain even non-esoteric matters"). Expert testimony helps even where the jury has knowledge of the subject, but that knowledge may be incomplete or inaccurate. Furthermore, there is no requirement that the expert testimony prove or disprove a disputed fact. See Heller v. Shaw Industries, Inc., 167 F.3d 146, 152 (3rd Cir. 1999) ("Clearly, the Court envisioned cases in which expert testimony meets the Daubert standard yet is 'shaky,' and cases in which admissible expert testimony provides only a 'scintilla' of support for a claim or defense. Put differently, an expert opinion must be based on reliable methodology and must reliably flow from that methodology and the facts at issue – but it need not be so persuasive as to meet a party's burden of proof or even necessarily its burden of production.")

In order to admit expert testimony, that testimony must be based on scientific, technical, or specialized knowledge and the proposed evidence must be reliable and

trustworthy in the evidentiary sense, so that if the finder of fact accepts it as true, it provides assistance to the finder of fact. Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001). Trial courts have substantial latitude to determine whether specific expert testimony is reliable. United States v. Reed & Sons Partnership, 280 F.3d 1212, 1215 (8th Cir. 2002). Here, BSB and BGI will present expert testimony on both liability and damages issues. These are appropriate topics for admission of expert opinions. See Donnelly Corp. v. Gentex Corp., 918 F.Supp. 1126 (W.D. Mich. 1996) (In this patent infringement case, expert testimony was admissible with regard to ultimate issues of fact, including whether patent was infringed by competitor's products, whether those claims were valid, whether patentee met legal requirement to be awarded lost profit damages, and amount of royalty which would be reasonable.)

## II. THE EXPERT TESTIMONY OF ALBERT H. BLOOM SHOULD BE ADMITTED.

In some cases, the concerns about the reliability of an expert's opinion focus upon personal knowledge or experience. There are many different kinds of experts, and many different kinds of expertise. Failure to perform independent testing of a well-established principle, or to submit a conclusion based on long-accepted theories to peer review, does not render an opinion unreliable or inadmissible. See Smith v. Ford Motor Co., 215 F.3d 713, 721 (7th Cir. 2000). Here, Mr. Bloom will apply well-established architectural standards and practices to the particular designs and design process at issue in this case.

**A. Standard Features and Independent Creation**

There are several matters where testimony regarding the "specialized knowledge" of an architect with many years of experience in designing residential product will assist the jury in understanding the evidence or determining facts. For example, in any analysis of substantial similarity, the jury cannot be permitted to consider any standard features or ideas. Instead, the jury must only compare Rottlund's expression of the selection and arrangement of elements to the Defendant's expression of the selection and arrangement of elements. In making this comparison, the jury cannot include a comparison of selections and arrangements that are standard or are the result of an unavoidable consequence of the product type[1]. See Schoolhouse, Inc. v. Anderson, 2001 WL 1640081 (D. Minn.) (substantial similarity was judged against the background that similarity was an unavoidable consequence of the type of data presented in the two works at issue)[2]; Kregos v. Associated Press, 3 F.3d 656, 664 (2nd Cir. 1991) (holding that copyright protection is minimal when materials can only be selected or arranged in a limited number of meaningful ways). An expert witness who has significant experience and expertise in the production builder industry should be permitted to provide testimony and evidence on the issue of standard features, unavoidable similarities due solely to factors unrelated to copying, and the limited number of ways that standard building

---

[1] On page 9 of his Supplemental Report, Al Bloom opined: "It would be extremely difficult, if not impossible, to design a commercially successful back-to-back townhome that did not share some elements in common with the Villa II, the Chateau Collection, or the Homestead Collection. Additionally, as noted in my initial report, many of the elements which these townhomes share in common have been used by BSB (and other designers and builders) for years. … Furthermore, all of the elements which these townhomes share in common are standard features, including the standard arrangements of standard features found in both townhomes." See Exhibit C attached to Affidavit of Philip R. Mahowald.

[2] A copy of the Schoolhouse opinion is attached hereto as Exhibit 1 to the Affidavit of Holly J. Newman.

elements can be put together, as none of this information would be within the knowledge of the ordinary lay person. [3]

Mr. Bloom will also testify on the design process. He will explain the components that make up a design program and how they impact, and limit, the available design features. Mr. Bloom will also explain the typical process followed by builders and architects when creating a new product. Jurors are not expected to understand how the residential building business works, or the typical practices of architects. This testimony will support BSB's defense of independent creation. The jury will need to compare what BSB did to create the designs for the Homestead Collection to the ordinary practice of those in the industry. The expert opinions of Mr. Bloom will assist them in making this determination.

Mr. Bloom will provide testimony on the purpose of touring product. The jury may be acquainted with the "Parade of Homes" and how the public and potential buyers are invited to participate in the same. However, they are not expected to be aware of the practice in the architectural and home builder industry to sponsor tours and encourage the participation in tours of industry members. This expert testimony will rebut any argument that touring product is somehow probative of an architect's plan to copy the protectable expression of another product.

---

[3] These issues have been properly pled. See paragraphs 244 and 245 of BGI's and BSB's answer to the 7th Amended Complaint:

> 244. The standard features included in the technical drawings and/or architectural works at issue in this matter are not copyrightable or protected by Copyright Registrations VAu 159-813, VAu 268-380, VAu 268-404, VAu 447-395, VAu 534-723, VAu 546-285, or VAu 567-088 and are available for use by any party, including BSB, BGI, TCM and Pinnacle.
> 245. Any similarities between the Homestead Collection town home and the technical drawings and/or architectural works reflected in Copyright Registrations VAu 159-813, VAu 268-380, VAu 268-404, VAu 447-395, VAu 534-723, VAu 546-285 or VAu 567-088 are limited to elements that cannot properly be the basis for a finding of substantial similarity or copyright infringement.

Mr. Bloom will provide expert testimony regarding the use of the term "Villa." Rottlund has claimed that this is a term of art used to describe their own back-to-back town homes. BSB and BGI disagree, and should be permitted to offer testimony from an expert about the origin and pervasive use of the term "villa" in the residential builder industry.

There is a pending motion in limine to exclude any arguments or inferences that BSB's designs for town homes built by Midland and Jerry's Homes infringe on Rottlund copyrights that are not at issue in this case. (See docket nos. 630, 631, 633). If that motion is denied and Rottlund is permitted to argue that these products infringe on earlier copyrights, then Mr. Bloom's analysis and comparisons of these products would certainly be useful to the jury. See EZ Dock, Inc. v. Schafer Systems, Inc., 2003 WL 1610781 (D. Minn) at p.*7 [4](in patent infringement case, industry expert permitted to testify to facts pertaining to the comparison of the patented product to the accused products or to prior art references).

Rottlund has suggested that expert testimony from an architect can be used only to determine the first prong of the Eighth Circuit's test for substantial similarity and for no other purpose whatsoever. Based upon the authority listed above and the policy considerations behind Rule 702, BSB and BGI respectfully disagree that expert testimony has been, or should be, so limited. Rather, so long as the testimony is reliable and would assist the jury, it is admissible. For the reasons stated above, Mr. Bloom's testimony is both reliable and would assist the jury. Therefore, it should be admitted.

## III. BLOOM'S ERRATA SHEET AND DEPOSITION TESTIMONY EXPLAINING HIS CHANGES ARE ADMISSIBLE.

[4] See Exhibit 2 attached to Affidavit of Holly J. Newman.

Rottlund argues that Bloom's errata sheet should be excluded. The cases cited by Rottlund to support this dubious proposition are all materially distinguishable, and none of them contravene the clear language of Fed.R.Civ.P. 30(e), which provides that an errata sheet may be used to make "changes in [the] form or substance" of the deposition testimony.

**A. The cases cited by Rottlund are entirely inapposite.**

Rottlund first relies on Workman v. Chinchinian, 807 F.Supp. 634 (E.D.Wash. 1992), for the proposition that a deponent cannot change any portion of his or her deposition testimony by means of an errata sheet. In Workman, Dr. Chinchinian was deposed on November 5, 1991. On November 20, 1991, his counsel was sent the errata sheet and instructed to return the errata sheet on or before December 20, 1991, or else Dr. Chinchinian would be deemed to have waived his right to make corrections. Workman, 807 F.Supp. at 644. Dr. Chinchinian signed the errata sheet on January 9, 1992, and did not serve it upon plaintiff's counsel until January 16, 1992. The plaintiffs moved to "strike the correction sheet as untimely…." Id. The court granted the motion, determining that "Dr. Chinchinian signed the deposition but failed to do so within the thirty day time period. His delay in making the necessary corrections and signing the deposition is prejudicial to the plaintiffs because he changed his answer on a material issue of the case." Id. Importantly, the Workman court *did not* hold that Dr. Chinchinian could not make the changes he did; rather, the court concluded that the late service of the changes constituted a waiver of Dr. Chinchinian's right to make changes. The court in Workman said nothing applicable to this case, and Rottlund's argument to the contrary is without support.

Rottlund next relies on Brooks v. City of Turlock, 1993 WL 540281 (9th Cir. 1993)[5]. Rottlund fails to discuss the important procedural posture of Brooks, even though this procedural posture drives the court's decision. In Brooks, the plaintiff was deposed. Some time after the deposition was taken, the defendant moved for summary judgment based, in no small part, on Brooks' deposition testimony. Id. at *2. In connection with the summary judgment motion, Brooks submitted a "declaration" which "contradicts in many instances averments made in the [deposition]." Id. The court concluded that "Brooks substantially revised this deposition testimony in an obvious effort to salvage his claims and create a genuine issue of material fact. The Ninth Circuit allows the district court to disregard *a declaration* under such circumstances." Id. (emphasis added) Thus, the court in Brooks was not even considering an errata sheet; it was considering a sworn declaration which attempted to modify the deposition. Furthermore, the court rejected the declaration *solely* in the context of ruling on the pending summary judgment motion. The court took no position regarding whether an errata sheet can modify deposition testimony, and Rottlund's contention to the contrary is unfounded.

Rottlund next cites to Greenway v. International Paper Co., 144 F.R.D. 322 (W.D.La. 1992). Greenway presents a dramatic set of facts: the deponent returned an errata sheet with 64 corrections (Bloom made 17). Many of the "corrections" were in fact substantial expansions on the answers originally given. The vast majority of the written opinion is dedicated solely to listing these egregious changes. Faced with these particular facts, the court disallowed the errata sheet. The facts presented by this case

[5] Rottlund fails to note that this is an unpublished decision, and also fails to include a copy of the opinion in its submission.

could scarcely be more different that those in Greenway: Bloom's changes are few, the modifications are slight, and the reasons given for each modification are understandable. The decision of the court in Greenway was a reaction to a dramatic set of facts not present here, and as such, the decision is not informative in this setting.

The facts presented in Barlow v. Esselte Pendaflex Corp., 111 F.R.D. 404 (M.D.N.C. 1986), are equally unique. In Barlow, the plaintiff was provided a copy of her deposition transcript so that she could make changes where necessary. Barlow "returned it to the court reporter with ink corrections, comments and cross references to other parts of the deposition, and she cut and pasted numerous pages into a different order. * * * Additionally, the Court has in its possession an envelope with cut pieces of the deposition, apparently portions the plaintiff did not like." Barlow, 111 F.R.D. at 406. The court concluded that "Plaintiff's actions are at variance with the letter and spirit of Rule 30(e) and, therefore, her attempted 'changes' are simply inoperable or a nullity." Id. Of course, no such facts exist in this case. Bloom complied entirely with Rule 30(e) when he submitted his errata sheet. Like Greenway, Barlow is instructive only because it shows how dramatic the facts must be before Rottlund would be entitled to get the relief it seeks. These cases demonstrate that relief like that sought by Rottlund is available only in exceptionally extreme situations involving facts absolutely unlike those in the present case.

The court in Securities and Exchange Commission v. Parkersburg Wireless L.L.C., 156 F.R.D. 529 (D.D.C. 1994), confronted an issue not present in this case. In Parkersburg, Michelle Gerstner was deposed in connection with the SEC's investigation of alleged violations of Rule 10b-5. The deposition took place on June 3, 1994.

Parkersburg, 156 F.R.D. at 532. At a subsequent hearing on June 15, 1994, Gerstner raised, for the first time, a claim that the deposition testimony she gave was barred under the Fifth Amendment. Id. at 534. Thus, the question facing the court was whether Gerstner could retroactively invoke the Fifth Amendment, and wipe away her deposition answers, by submitting an errata sheet. Id. at 535. The court declined to permit Gerstner to do so, stating that "Rule 30(e)…is geared towards correcting factual statements and not meant as a mechanism to invoke constitutional protections. The language of Rule 30(e) allows only for changes in 'form or substance.' The focus is to provide an accurate record for trial that will reduce inconsistencies." Id. Once again, Parkersburg supports BSB and BGI's position, rather than Rottlund's, since the court acknowledges that errata sheets can be used to make changes in "form or substance" and to "correct[] factual statements."

The final case relied upon by Rottlund is Rios v. Bigler, 847 F.Supp. 1538 (D.Kan. 1994). The Rios court considered whether to accept an errata sheet submitted in connection with a summary judgment motion. The plaintiff in Rios attempted to use an errata sheet to *add* testimony not adduced at the deposition. Rios, 847 F.Supp. at 1546. The court rejected this as "an attempt to create sham fact issue" to preclude summary judgment. Id. The court, however, recognized that "the errata sheet, like the affidavit, may be used to correct errors or to clarify or change an answer when a question is misunderstood…." Id. Once again, this supports BSB and BGI's position, not Rottlund's, for a review of Bloom's errata sheet reveals that the purpose for every change listed on the errata sheet is either to clarify Bloom's answer, or because Bloom misunderstood the question.

**B. Rottlund had an opportunity to cross-examine Bloom regarding these changes.**

Perhaps the most important fact for the Court to consider when weighing Rottlund's motion is the fact that Rottlund had an opportunity to cross-examine Bloom regarding each and every change on his errata sheet. Bloom was first deposed on June 9, 2004. He signed his errata sheet on June 30, 2004. His deposition was continued on that day, and his errata sheet was marked as a deposition exhibit. Bloom was questioned about each and every change, and explained each and every change. Rottlund had two attorneys present at the June 30, 2004 deposition, and they cross-examined Bloom regarding the changes on his errata sheet. This rather unique factual background makes Rottlund's position in this motion even more untenable. Typically, a party is never afforded the opportunity to cross-examine a deponent who submits an errata sheet, unless that party does so at trial. In this case, Rottlund had a full and fair opportunity to inquire as to each and every change made, and did in fact make some inquiry. Rottlund can hardly now be heard to complain that Bloom's changes prejudice it in any way.

Because Rule 30(e) expressly permits a deponent to make changes to the "form or substance" of his or her deposition testimony, and because no case cited by Rottlund supports Rottlund's motion to exclude Bloom's errata sheet, and because Rottlund was afforded the unique opportunity to cross-examine Bloom as to each and every change on his errata sheet, Rottlund's motion to exclude Bloom's errata sheet should be denied.

## IV. THE EXPERT TESTIMONY OF JOSEPH D. KENYON SHOULD BE ADMITTED.

"As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the

factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." Bonner v. ISP Trechs., Inc., 259 F.3d 924, 929-30 (8th Cir. 2001) (internal citations and quotations omitted). Any doubts regarding usefulness should be resolved in favor of admissibility. Clark v. Hendrick, 150 F.3d 912, 915 (8th Cir. 1998).

**A. Analysis of Profits**

Here, BSB and BGI seek to offer expert testimony analyzing economic concepts and calculating profits. Both are admissible to help the jury calculate damages. Mr. Kenyon's qualifications are listed on Appendix II of his initial report[6]. Mr. Kenyon will testify that he relied upon generally accepted accounting principals to make his calculations and reach his opinions on the profits earned by BSB and BGI on the Homestead Collection and the profits earned by BGI on the Washington Square Townhomes. If the jury were to find that there was infringement, then the jury will also be required to assign monetary damages for the profits earned. Mr. Kenyon's testimony will assist the jury in making this determination. Although the concepts may not be esoteric or complex, the work of analyzing all of the invoices, determining what can properly be deducted when calculating expenses, actually calculating expenses, and then reaching a conclusion on the profits earned on the Homestead Collection are not skills possessed by the average lay person. Mr. Kenyon's testimony regarding profits will be based upon the actual financial records produced by BSB and BGI and the application of

---

[6] Mr. Kenyon has over 30 years of experience in accounting, auditing and tax practice and is a Shareholder of Schecter Dokken Kanter. Mr. Kenyon is a Past President and Member of Board of Directors for the Minnesota Society of Certified Public Accountants. Mr. Kenyon provides litigation support services, including development or rebuttal of economic damage studies, forensic accounting, fraud investigations, business valuations, expert testimony, and analysis of documents and financial data. See Exhibit A attached to Mahowald Affidavit.

general accounting principals, and will assist the jury to understand the financial aspects of this case.

**B. Analysis of Rottlund's claimed damages.**

Here, Mr. Kenyon has analyzed the reports of Ms. Snelson and has concluded that Ms. Snelson failed to consider facts and circumstances that would determine any analysis of actual damages. For example, Rottlund chose not to purchase the land on which TCM built the Homestead Collection. Without land, Rottlund could not claim that it would have built and sold its Villa II but for the alleged infringement. Rottlund did not consider these facts when calculating its actual damages. Mr. Kenyon should be permitted to explain to the jury the factors that should be considered in analyzing actual damages. The jury cannot be expected to know how to conduct an economic analysis of the factors that need to be considered in an actual damages analysis. Things like the existence of the demand for back-to-back townhomes in a certain price range, the availability of substitutes offered by other builders, and the capacity of a builder to build additional homes are all subjects upon which expert's testimony would assist the jury.

**C. Apportionment of Damages.**

Mr. Kenyon researched the reasons why buyers purchase homes. Mr. Kenyon identified at least four sources of information: 1) testimony of Rottlund witnesses regarding factors that influence buyers to purchase a home; 2) National Association of Realtors Profile of Home Buyers and Sellers; 3) testimony from Roger Conhaim, a market research analyst; and 4) customer surveys conducted by both Rottlund and TCM[7]. The point of this research is to demonstrate that profits need to be apportioned between the design as a whole and the other factors that have nothing to do with the design.

[7] See Mr. Kenyon's reports attached as Exhibits A and B to Mahowald Affidavit.

Rottlund incorrectly frames the argument when it claims: "The defendants cannot establish and prove that individual design elements are not part of the total look and feel of the infringing Homestead Collection and Chateau Collection town homes, and therefore, Defendants cannot apportion any of their profits." (Rottlund Memorandum at p. 5). Mr. Kenyon is not picking and choosing between certain design elements; rather he is considering the design as a whole, along with the myriad of other factors that influence buying decisions, to provide the jury with a method to apportion damages. Mathematical exactness is not required in apportioning profits. John G. Danielson, Inc. v. Winchseter-Conant Properties, Inc., 322 F.3d 26 (1st Cir. 2003), citing Abend v. MCA, Inc., 863 F.2d 1465, 1480 (9th Cir. 1988).

Rule 703 of the Federal Rules of Evidence provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion of inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Here, Mr. Kenyon is permitted to rely on the sworn testimony of Rottlund's own witness. The testimony is admissible and Rottlund does not argue that reliance on the same is in any way improper. Mr. Kenyon also relied upon a publication of a national trade association. Mr. Cobb has testified that this is the type of document and research that is ordinarily relied upon by economic experts in forming opinions. (See Cobb Deposition Transcript at pp. 244 - 251, attached as Exhibit 3 to Affidavit of Holly J. Newman). Roger Conhaim was deposed in this matter. Mr. Conhaim testified that he

had been working in the field of market research for homebuilders since 1970. (See Conhaim Deposition Transcript at pp. 1- 12, attached as Exhibit 4 to Affidavit of Holly J. Newman). Mr. Conhaim was subject to cross examination by all parties and has been listed by all parties as a witness who will provide testimony at trial. Reliance upon the sworn testimony of another qualified expert is also permitted. See Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc., 125 F.3d 1176 (8th Cir. 1997) (holding that reliance upon the unsworn report of an expert in the gas industry was permitted when it was the type of information reasonably relied upon by experts in the field.) Finally, Mr. Kenyon should be permitted to rely upon the business records produced by Rottlund and TCM. Both builders survey their customers in an effort to gain insight into, among other things, the reasons why the customers purchased their home. As these surveys are business records they are themselves admissible. Any analysis based upon these surveys should also be admissible.

In Arkwright, the court recognized: "Where an expert's opinion is partly based on hearsay which does not meet the Rule 703 requirements, his opinion is nevertheless admissible if it is supported by the other independent basis upon which he relied to form that opinion." Id. at 1182. See also Thurman v. Missouri Gas Energy, 107 F.Supp.2d 1046, 1051 (W.D. Mo. 2000). Here, in addition to relying upon the testimony of Rottlund witnesses, a national trade association's publication, the sworn testimony of another expert, and Rottlund's own business records, Mr. Kenyon also relied upon his own investigation, training, and extensive experience to arrive at his conclusions. Thus, Mr. Kenyon's testimony should be admitted.

All of Rottlund's arguments for exclusion of the testimony relate to the *weight* to be given to Mr. Kenyon's opinions, and not to the *admissibility* of Mr. Kenyon's opinions. For example, Rottlund relies upon Nelson-Salabes, Inc. v. Morningside Dev., LLC, 284 F.3d 505 (4th Cir. 2002). In that case the court *admitted* testimony of an appraisal expert who opined that design was not an important factor in determining the value of an assisted living center. After considering the *weight* to be given to this testimony, the Court found that aesthetics did contribute to the value of the building. Mr. Kenyon's testimony should also be admitted so that the jury can decide what contribution design made to buyers' decisions to purchase.

Rottlund spends much of its time arguing about the factual basis of the data upon which Mr. Kenyon reasonably relies in forming his opinions. However, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." Hose v. Chicago Northwestern Transportation Co., 70 F.3d 968, 974 (8th Cir. 1995) (citations omitted). Questions of an expert's credibility and the weight accorded to his testimony are ultimately for the jury to determine. Fox v. Dannenberg, 906 F.2d 1253, 1256 (8th Cir. 1990). Similarly, arguments about the methodology used are also for the jury to decide. In Thurman, the court explained:

> Which formula should have been chosen is a decision to be made by the jury. In *DiCarlo v. Keller Ladders*, 211 F.3d 465, 467 (8th Cir. 2000), the Eighth Circuit states that it is the jury's responsibility to compare two competing methodologies offered by experts – not the District Court Judge. The clear trend of authority is for the jury to hear testimony and evaluate the facts bearing on the witnesses' testimony which should be brought out on cross-examination. *Id.* (citing 3 Weinstine Federal Evidence § 601.03[2][a] at 601-13. Joseph M. McLaughlin 2d. Edition 2000). Each side will have the opportunity to examine and cross-examine

> the witness on their reasoning for choosing a particular formula. The ultimate decision on which is correct will be made by the jury.

Thurman, 107 F. Supp.2d at 1052. Mr. Kenyon will offer testimony about several different methodologies that the jury could employ in order to reach a conclusion about the apportionment of damages between design and other factors. Mr. Kenyon will explain how these methodologies can be applied to the particular facts presented in this case and it will be up to the jury to apply the same. Thus, Mr. Kenyon will not invade the province of the jury; rather he will provide them with tools to reach a fair result.

## CONCLUSION

Rule 702 favors admitting expert testimony. See Arcoren v. United States, 929 F.2d 1235, 1239 (8th Cir. 1991) (holding that Rule 702 "is [a rule] of admissibility rather than exclusion"). If Rottlund disputes the basis for the expert testimony to be offered, then it may cross-examine Mr. Bloom and Mr. Kenyon. However, any such dispute on the basis for the expert testimony goes to weight and not admissibility. For the reasons stated above, BSB and BGI respectfully request that Rottlund's Motions in Limine seeking to exclude the testimony and reports of Albert H. Bloom and Joseph D. Kenyon be denied.

MACKALL, CROUNSE & MOORE, PLC

Dated: November 3, 2004

By: s/ Holly J. Newman

Holly J. Newman (MN Bar #026457X)
Ben Patrick (MN Bar #312460)
1400 AT&T Tower
901 Marquette Avenue
Minneapolis, Minnesota 55402-2859
Telephone: (612) 305-1400
Facsimile: (612) 305-1414

***Attorneys for Defendants Bloodgood Sharp Buster Architects and Planners of Iowa, Inc. and The Bloodgood Group, Inc.***

HJN/hjn#723892v1