**H**
Only the Westlaw citation is currently available.

United States District Court, D. Minnesota.

SCHOOLHOUSE, INC. Plaintiff,
v.
Jeff ANDERSON, Margaret Richardson, d/b/a Market Solutions, Defendants.

**No. 99-1214 DSD/JMM.**

Nov. 8, 2001.

Susan C. Laine, and Laine Law office, Minneapolis, MN, and Michael S. Sherrill, and Sherrill Law office, White Bear Lake, MN, for plaintiff.

Christopher K. Sandberg, Kristine M. Boylan, and Lockridge, Grindal and Nauen, Minneapolis, MN, for defendants.

ORDER

DOTY, J.

***1** This matter is before the court on defendant Jeff Anderson's ("Anderson") motion for summary judgment on plaintiff Schoolhouse Inc.'s ("Schoolhouse") claims of copyright infringement and unfair competition under Minnesota statute and the common law, and on plaintiff's motion to dismiss defendant's counterclaims for abuse of copyright and an antitrust violation. Based upon the file, record, and for the reasons stated below, the court: (1) grants defendant's motion for summary judgment on the copyright claim; (2) dismisses plaintiff's state law claims without prejudice; and (3) grants plaintiff's motion to dismiss defendant's counterclaims.

BACKGROUND

Schoolhouse publishes a periodical magazine entitled *Schoolhouse Magazine* which lists facts and statistical information about schools in the Twin Cities area. It obtains the information directly from the school districts. Anderson is a realtor engaged in the business of selling residential properties in the Twin Cities metropolitan area. In connection with his work as a real estate agent, Anderson has developed an internet web site that contains, among other things, factual information about school districts in the greater Twin Cities area. Plaintiff alleges that defendant copied portions of the *Schoolhouse Magazine* tables and published these on his web site. Defendant denies this allegation and argues that he independently obtains this public record information regarding the school districts and that the manner in which he presents the data is dissimilar to plaintiff's magazine. Plaintiff initiated this action for: (1) copyright infringement under 17 U.S.C. § 101 et seq.; (2) unfair business practices under the Minnesota Deceptive Trade Practices statute, Minn.Stat. § 325D.44; and (3) unfair competition under state common law. Defendant counterclaimed abuse of copyright and an antitrust violation.

DISCUSSION

I. Defendant's Motion for Summary Judgment

A. Summary Judgment Standard

The court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material only when its resolution affects the outcome of the case. *See Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id.* at 252. There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249.

On a motion for summary judgment, the court

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

views the evidence in favor of the nonmoving party and gives that party the benefit of all justifiable inferences that can be drawn in its favor. *Id.* at 250. The nonmoving party, however, cannot rest upon mere denials or allegations in the pleadings. Nor may the nonmoving party simply argue that facts supporting its claim will be developed later or at trial. Rather the nonmoving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). If a plaintiff fails to support an essential element of a claim, summary judgment must issue because a complete failure of proof regarding an essential element renders all other facts immaterial. *Celotex,* 477 U.S. at 322-23. With this standard at hand, the court addresses defendant's motion. [FN1]

FN1. Moreover, "it is clear that summary judgment is entirely appropriate in an action for copyright infringement." *Knickerbocker Toy Co. v. Genie Toys Inc.,* 491 F.Supp. 526, 528 (E.D.Mo.1980) citing *Ferguson v. Nat'l Broad. Co., Inc.,* 584 F .2d 111 (5th Cir.1978). To arrive at summary judgment, "a side-by-side comparison of the works involved in a copyright infringement action is both proper and appropriate." *Id.,* citing *McMahon v. Prentice Hall,* 486 F.Supp. 1296 (E.D.Mo.1980).

B. Copyright Infringement

***2** In order to establish a claim of copyright infringement, plaintiff must prove: (1) ownership of a valid copyright, and (2) copying by the defendant of the protected constituent elements of the work. *See Feist Publications, Inc. v. Rural Tel. Servs. Co .,* 499 U.S. 340, 361 (1991) (citing *Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 548 (1985)); *Moore v. Columbia Pictures Indus., Inc.,* 972 F.2d 939, 941 (8th Cir.1992) (same).

Plaintiff argues that both elements are satisfied here, and while the copyright laws do not prevent defendant "from using the assembled facts, it most certainly prevents him from copying the original manner in which the facts have been selected and arranged." (Pl.'s Memo. at 2.) Defendant conversely argues that summary judgment is appropriate here because: (1) any copyright that plaintiff holds here is extremely narrow in scope; and (2) since the two works share only underlying ideas, defendant's work does not infringe. Additionally, to support this latter position, defendant contends that plaintiff cannot show substantial similarity between the works sufficient to sustain a claim of copyright infringement.

1. Validity of Copyright

Plaintiff contends that it has a valid copyright because its publication *Schoolhouse Magazine* holds a registration certificate which names plaintiff as the author of the work and specifically references the tables that appear within the magazine.

A copyright certificate is prima facie evidence of a valid copyright. 17 U.S.C. § 410(c). The parties do not dispute the validity of this copyright certificate but do dispute its scope. Plaintiff argues that its copyright includes the selection and arrangement of the facts as displayed in the magazine tables as an "original factual compilation". Essentially, plaintiff contends that two components of the compilation are original and entitled to copyright protection: (1) the selection of specific categories or topics of factual data to present in the tables; and (2) the arrangement and display of the factual data in the tables. Defendant counters that even if plaintiff's copyright is valid for the selection and arrangement of the factual information, it is limited to the actual layout of the data, that is, the tables without included data and the specific topical headings that plaintiff actually uses, not the general idea of a tabular display of school district data or the general topical categories of information regarding the school districts. Moreover, defendant contends that, irrespective of validity, when comparing the two works side by side there exists no similarity sufficient to support a claim of infringement.

Both parties concede that the materials at issue here are a compilation of facts. A compilation of facts is entitled to copyright protection in certain circumstances. Federal law defines a copyrightable compilation as:

> [a] work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

original work of authorship.
*3 17 U.S.C. § 101. A factual compilation is copyrightable but the underlying facts themselves are not. *Feist,* 499 U.S. at 34. ("The mere fact that a work is copyrighted does not mean that every element of the work may be protected."). Determining "whether an infringement of a compilation copyright has occurred is particularly difficult where less than the entire work is copied," *BellSouth Adver. & Publ'g Corp. v. Donnelley Info. Publ'g, Inc.,* 999 F.2d 1436, 1438 (11th Cir.1993) (en banc), especially when a competitor can take "the bulk of the factual material from a preexisting compilation without infringement." *Id.* at 1445.

The U.S. Supreme Court has recognized that the protection available for a compilation is "thin." *Feist,* 499 U.S. at 349; *see also BellSouth,* 999 F.2d at 1438 (applying *Feist* and concluding that defendant did not appropriate "original elements" of BellSouth directory "as a whole" by preparing data base and sales leads based upon listing information and units of advertising appearing in preexisting directory); *Key Publications, Inc. v. Chinatown Today Publ'g Enters., Inc.,* 945 F.2d 509, 513, 516 (2d Cir.1991) (recognizing copyrightability of specialty directory but concluding no infringement by smaller competing publication that utilized "significantly different principles of [listing] selection").

Plaintiff's tables organize information in two ways: first, the names of the region's school districts are listed alphabetically in the lefthand column; and second, specific categories of information about the school districts (e.g. student population, student to teacher ratios, availability of hot lunch, etc.) are listed across the top row of each table. The corresponding factual data is then provided within the table. [FN2]

FN2. The factual data is public information and both parties concede that it is not entitled to copyright protection per se.

Defendant argues that any copyright protection here is thin. Defendant first argues that the selection and listing of the school districts is not protectable because it is an inclusive alphabetical listing of all of the region's school districts. *See Feist,* 499 U.S. at 362-363 (determining that an alphabetical arrangement is not protectable). Defendant then argues that the general selection of the topical categories is not protectable given the inherent limitations of the particular nature of the underlying factual data. That is, the selection of topics is non-original because there are only a limited number of categories of information that prospective homeowners with school-age children are likely to find relevant. *See Kregos v. Associated Press,* 3 F.3d 656, 664 (2d Cir.1993) (holding that similarity that was necessitated because of the limited number of statistics regarding baseball pitchers was not infringement). Accordingly, defendant contends that plaintiff's copyright is narrow in scope and can only protect the specific manner that plaintiff's tables are arranged and plaintiff's actual topical categories.

The court agrees that plaintiff's copyright is narrow, and after eliminating all of the unprotectable underlying factual data, including the alphabetical listing of school districts and the "ideas" of the general topical categories, plaintiff's copyright is limited to protecting only: (1) the particular manner in which plaintiff has selected and arranged the factual tables as they actually appear in plaintiff's magazine; and (2) the selection of the specific topical categories of information regarding the school districts as plaintiff actually presents them in its publication. In other words, plaintiff's copyright protection is limited to the original elements of the actual manner of presentation through the specific order of the tables and under the actual topical headings. The copyright does not protect the non-original alphabetical arrangement of this data. It does not protect the underlying idea of presenting to prospective home buyers selected data regarding public information on school districts in a tabular form. It does not protect the presentation of the general type of topical categories that are included here (e.g. number of students in a district, average class sizes, student to teacher ratios, testing statistics, etc.). Since there is a limited number of categories of information that prospective homeowners with school-age children are likely to find relevant, some similarity of topical categories is inevitable and permissible. Plaintiff cannot claim copyright protection for these general categories of relevant public information.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Case 0:01-cv-01980-DWF-AJB Document 736-2 Filed 11/03/2004 Page 4 of 39

***4** Thus, the court concludes that while plaintiff's copyright is valid, it is limited in scope to plaintiff's specific form of expression through the actual arrangement of the factual tables and the specific selection of topical category headings as worded and published in the *Schoolhouse Magazine* tables. With the these limitations in mind, the court now turns to the second part of the infringement analysis--copying.

2. Copying

Under the second step of an infringement determination, plaintiff must prove that the protected work has been copied. Given the "thin" protection that is afforded a factual compilation, the facts must support that defendant copied the protected selection, arrangement, or display to support a claim of infringement. *See Key Publications,* 945 F.2d at 513. Copying of the underlying factual material contained in the compilation is not infringement. *See Warren Publ'g, Inc. v. Microdos Data Corp.,* 115 F.3d 1509, 1515 (11th Cir.1997); *Sid & Marty Kroft v. McDonalds Corp.,* 562 F.2d 1157, 1163 (9th Cir.1977) (protection granted to copyrighted work extends to cover only the particular expression of the idea, never the idea itself). Thus, plaintiff must show copying of the particular form of the expression, not the underlying ideas. Defendant asserts that plaintiff has failed to show copying of the protected parts of plaintiff's work.

In most copyright cases there is not direct evidence of copying. In an absence of direct evidence, and mindful of the court's previous determinations regarding validity, plaintiff may establish copying by proving two elements: (1) that defendant had access to plaintiff's work; and (2) that there is a substantial similarity between the works. *Hartman v. Hallmark Cards, Inc.,* 833 F.2d 117, 120 (8th Cir.1987). While defendant expressly denies copying plaintiff's materials, he does concede access. Accordingly, to survive summary judgment, plaintiff must establish substantial similarity between the works. *Moore,* 972 F.2d at 945. *See O'Neill v. Dell Publ'g Co., Inc.,* 630 F.2d 685, 690 (5th Cir.1980) (summary judgment proper in copyright action where comparison shows substantial similarity is clearly lacking).

The Eighth Circuit applies a two-step analysis to determine substantial similarity:

> There must be substantial similarity "not only of the general ideas but of the expressions of those ideas as well." First, similarity of ideas is analyzed extrinsically, focusing on objective similarities in the details of the works. Second, if there is substantial similarity in ideas, similarity of expression is evaluated using an intrinsic test depending on the response of the ordinary, reasonable person to the forms of expression.

*Hartman,* 833 F.2d at 120 (citations omitted).

In the Eighth Circuit, if the district court is able to examine both works it has sufficient evidence upon which to grant summary judgment because the district court is capable of determining both the intrinsic and extrinsic steps of the *Hartman* analysis. *See Nelson v. PRN Prods. Inc.,* 873 F.2d 1141, 1143 (8th Cir.1991) citing *Hartman,* 823 F.2d at 120. Under the *Hartman* test, the court must first determine whether the details of the works contain objective similarities, and if so, then the court must "examine the works to ascertain if they are so dissimilar that ordinary, 'reasonable minds [can]not differ as to the absence of substantial similarity in expression." ' *Moore,* 972 F.2d at 945, citing *Hartman,* 833 F.2d at 120. Under the first step, expert testimony may be relevant. *Id.* Under the second step, expert testimony is not relevant because the focus is on the similarity of expression from the perspective of the ordinary, reasonable person. *Hartman,* 833 F.2d at 120-121 ("Infringement of expression occurs only when the total concept and feel of the works in question are substantially similar.").

***5** Lastly, although a compilation gains copyright protection with only minimal creativity in the selection and arrangement of facts, *Feist'* s statement that the copyright is "thin" has implications when the holder sues an alleged infringer. "It would seem to follow analytically that more similarity is required when less protectable matter is at issue. Thus, if substantial similarity is the normal measure required to demonstrate infringement, 'supersubstantial' similarity must pertain when dealing with 'thin' works." 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright,* § 13.03[A] at 13-28 (1997); *see Transwestern Publ'g Co. v. Multimedia Mktg.*

Case 0:01-cv-01980-DWF-AJB Document 736-2 Filed 11/03/2004 Page 5 of 39

*Assoc., Inc.*, 133 F.3d 773, 776-777 (10th Cir.1998) (same); *see also Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1439 (9th Cir.1994) ("When the range of protectable and unauthorized expression is narrow, the appropriate standard for illicit copying is virtual identity."), cert. denied, 513 U.S. 1184 (1995); Jane C. Ginsburg, *No "Sweat"? Copyright and Other Protection of Works of Information After Feist v. Rural Telephone*, 92 Colum. L.Rev. 338, 349 (1992) ( " 'Even if the compilation is deemed original, what kind of copying will be held to infringe it?' The answer [after *Feist* ] appears to be: 'Virtually none, short of extensive verbatim copying." '). Further, because the copyrightability of a factual compilation depends upon the originality in selection, coordination, or arrangement of the facts "as a whole" work, 17 U.S.C. § 101, in an infringement action the court must compare the allegedly infringing work to the protected work as a *whole. See Transwestern,* 133 F.3d at 777.

In the instant case, the court has before it copies of both works and is in a proper position to apply the substantial similarity test. Here, the court concludes that applying the *Hartman* test generates no issue of fact sufficient to preclude summary judgment. While the works appear to contain some objective similarities in detail, the works here are so dissimilar in expression that reasonable minds could not differ as to the absence of substantial similarity. Moreover, when the court focuses on the respective works as a whole, there are many palpable differences. [FN3] Thus, the court readily concludes that there is little similarity between the two works.

FN3. The court specifically notes some of the following palpable differences. The competing works are in different mediums: plaintiff's being a print publication, and defendant's an internet web site. They are very different in appearance. The organization and layout are different. Plaintiff uses large-scale tables with information for up to 20 districts on each page, while defendant's web site presents each school district individually on a separately linked web page. Defendant has no tables comparable to plaintiff's large-scale data tables. Defendant's site does not use a column and row grid like plaintiff's but rather presents its data in well-defined groupings. Furthermore, the topical categories used to organize defendant's site differ widely in number and the actual heading used from plaintiff's, and only five of the topical headings are identically named. (*See* Kathleen Kelly Aff. ¶ 7.) Plaintiff puts all information about athletics into a separate set of tables while defendant integrates information regarding athletics into his main display. Plaintiff has separate sections for charter schools and alternative schools; defendant does not have these categories but rather has a "specialized schools" category. (*See* Margaret Richardson Aff. ¶ 16.) Defendant includes information on preschools and universities; plaintiff does not. (*Id.*) Plaintiff's directory has advertisements throughout; while the defendant's does not.

Plaintiff makes great effort to show that its selection of the topical categories is original and that defendant's work copies these topical headings with substantial similarity. The court is not persuaded by this argument when comparing the two works. Although similar in general topical information, the format, layout, and content varies between the two. Any similarity in categories here is an unavoidable consequence of the type of data being compiled. [FN4] The court agrees with defendant's contention that there are a limited set of facts regarding school districts that are of interest to potential home buyers with school-age children. Thus, while many of the general topics are similar, the means of expression, or words, used on defendant's web pages are different from the means of expression, or words, in plaintiff's print publication. The topical headings are not substantially similar to satisfy a determination of copying under copyright law.

FN4. Copyright protection is minimal when factual materials can only be selected or arranged in a limited universe of meaningful ways. *Kregos,* 3 F.3d at 664 ("[M]uch of the similarity ... is necessitated because there are a limited number of statistics generally considered outcome-predictive by those familiar with

the sport.").

***6** Since plaintiff does not show circumstantial evidence of copying sufficient to support a claim of infringement and since no genuine issues of material fact exists, judgment for defendant is warranted. Accordingly, the court grants defendant summary judgment on the copyright infringement claim.

C. Minnesota State Law Claims of Unfair Competition

This court's jurisdiction over plaintiff's state law claims rests upon supplemental jurisdiction. *See* 28 U.S.C. § 1367(a). Absent a valid copyright claim, this court lacks jurisdiction over the state law claims. *Id. See Con dor Corp. v. City of St. Paul,* 912 F.2d 215, 220 (8th Cir.1990) (holding that courts should "exercise judicial restraint and avoid state law issues wherever possible"). [FN5] Therefore, since the court grants defendant's motion for summary judgment, the state law claims are dismissed without prejudice. *See Fry v. Layne-Western Co.,* 282 F.2d 97, 99 (8th Cir.1960) (unless joined with related federal claim, common law unfair competition is a state action); *Banker's Promotional,* 926 F.2d at 705 (holding that after summary judgment was entered on copyright claim for defendant, pendant state law claims for unfair competition were properly dismissed without prejudice).

FN5. The court notes that even in the absence of dismissal for lack of jurisdiction, the state claims lack merit and defendant would be granted summary judgment. In relevant part, a party violates the Minnesota Deceptive Trade Practices Act when he passes off goods or services as those of another, or causes a likelihood of confusion or misunderstanding as to: (a) the source, sponsorship, approval, or certification of goods or services; (b) affiliation, connection, sponsorship, or association by another; or (c) any other conduct that creates a likelihood of confusion or misunderstanding. Minn.Stat. § 325D.44, subd. 1 (1998). While proof of actual confusion is not required, a party alleging a violation of the deceptive trade practices act must show there is a likelihood of confusion. *See McClure v. American Family Mut. Ins. Co.,* 29 F.Supp.2d 1046, 1065 (D.Minn.1998), aff'd, 223 F.3d 845 (8th Cir.2000). The court concludes that plaintiff has made no such showing here. Furthermore, it is highly improbable that any consumer would be confused or misunderstand that defendant's web site is unaffiliated with plaintiff's magazine. Schoolhouse publishes a periodical magazine that disseminates factual information about school districts, whereas Anderson is a real estate agent of residential properties. Anderson's website is clearly labeled as his own and bears little similarity to Schoolhouse's publication. Plaintiff fails to present sufficient evidence from which a reasonable jury could find in its favor on the alleged violation of Minn.Stat. § 325D.44. *See id.*

II. Plaintiff's Motion to Dismiss

Rule 12(b)(6) provides that a party may move to dismiss a complaint where the complaint does not state a cause of action upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). The court must convert a motion to dismiss into one for summary judgment when matters outside the pleadings are considered by the court in determining the Rule 12(b)(6) motion. *See* Fed.R.Civ.P. 12(b)(6); *see Gibb,* 958 F.3d at 816; *see* Charles Allan Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 1366 (3d ed.1992). Any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings constitutes matters outside the pleadings. *See Gibb v. Scott,* 958 F.2d 814, 816 (8th Cir.1992). The court notes that the parties here have submitted a significant body of evidence through the submission of numerous affidavits that accompanied their respective motions for summary judgment. Moreover, express notice of conversion of a motion to dismiss into a summary judgment motion is unnecessary when the parties have had reasonable opportunity, as here, to present pertinent materials and when the surrounding circumstances give reasonable notice. *See C.B. Trucking Inc. v. Waste*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*Management Inc.*, 137 F.3d 41, 43 (1st Cir.1998) (court acted within its discretion by treating motion to dismiss as motion for summary judgment and without giving parties express notice). Because this lawsuit is no longer in its earliest stages, and given the accompanying motions for summary judgment on plaintiff's claims which include substantial briefing and evidentiary submissions, the court believes a motion for summary judgment is presently appropriate on defendant's counterclaims. Accordingly, the court will consider evidence outside the pleadings thereby treating this matter as a motion for summary judgment. [FN6] *See Gibb,* 958 F.3d at 816. *Lewis v. Kroger Co.*, 109 F.Supp. 484, 486 (D.W.Va.1952) (dismissal warranted when court concluded no infringement by comparing two works).

FN6. The standard for summary judgment as laid out above will also be applied here. *See supra* pp. 3-4.

*7 Thus, based upon the fact that there are no material facts in dispute, the court concludes that defendant's counterclaims of abuse of copyright and an antitrust violation fail as a matter law. The court dismisses defendant's counterclaims and grants plaintiff's motion to dismiss applying Rule 56. *See* Fed.R.Civ.P. 12(b)(6).

At the outset, the court notes that abuse of copyright is generally recognized as an equitable affirmative defense to a copyright infringement claim and is rarely recognized as an independently justiciable cause of action. *See Lasercomb America, Inc. v. Reynolds,* 911 F.2d 970, 973 (4th Cir.1990); *see also M. Witmark & Sons v. Jensen,* 80 F.Supp. 843, 850 (D.Minn.1948) (abuse of copyright recognized as an affirmative defense but only where party unlawfully exceeds or tries to extend copyright beyond its proper scope); *Warner /Chappel Music, Inc. v. Pilz Compact Disc, Inc. et al.*, Civ. No. 99- 293, 1999 U.S. Dist. LEXIS 17161, at *5 n. 5, 52 U.S.P.Q.2d 1942 (E.D.Pa. Oct. 26, 1999) (not permitting an affirmative claim of copyright abuse to go forward because there is no "authority in this Circuit for such a claim, and virtually no authority in any Circuit for such a claim ... [t]he Court is not persuaded that this is a viable claim."). In asserting such a defense, a copyright infringer would argue that their infringement is justified under equity because the copyright holder was enforcing its rights in copyrighted material in such a way as to violate antitrust laws or public policy. *Id.*

Here, based upon the court's determination granting defendant summary judgment on the infringement claim, any abuse of copyright affirmative defense, even when posed as a counterclaim, is moot and warrants dismissal. More important, the facts do not support a determination that plaintiff misused its copyright. Irrespective of defendant's subsequent summary judgment success on the copyright claims, the record supports the conclusion that plaintiff originally initiated this copyright infringement claim under the good faith belief, albeit mistaken as determined above, that defendant was infringing upon plaintiff's valid copyright rights. Defendant's counterclaim for abuse of copyright fails as a matter of law and is dismissed with prejudice.

The court also concludes that defendant's antitrust violation counterclaim warrants dismissal when the court juxtaposes the tenets of antitrust law with the undisputed facts in the present matter. Generally, only litigation brought as a mere sham, to cover what is actually nothing more than an attempt to interfere with business relationships of a competitor, is open to antitrust counterclaim actions. *See California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508 (1972). The Noerr-Pennington doctrine also provides that the act of bringing litigation is generally privileged from antitrust liability. *See E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of America v. Pennington,* 381 U.S. 657 (1965); and *Surgidev Corp. v. Eye Tech., Inc.*, 625 F.Supp. 800, 803 (D.Minn.1986) (counterclaim based upon allegation that suit was brought by plaintiff with intent to disrupt business dismissed under the Noerr-Pennington doctrine of privilege). Furthermore, as a general rule, "it is no defense to a copyright infringement claim that owner is violating the antitrust laws." *Orth-O-Vision, Inc. v. Home Box Office,* 474 F.Supp. 672, 686 (S.D.N.Y.1979). Thus, the filing of a lawsuit can only invoke antitrust liability when it can be determined to be "sham litigation" intended to disguise anti-competitive activity or is so clearly baseless as to amount to an abuse of process. *See California*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*Motor Transp.*, 404 U.S. at 508; *Razorback Ready Mix Concrete Co., Inc. v. Weaver,* 761 F.2d 484 (8th Cir.1985).

***8** The facts here do not support such a determination, and the record does not reflect that plaintiff attempted to extend the exclusionary power granted by its copyright beyond the protected work itself or initiated this action as sham litigation to interfere with defendant's real estate business. *See Surgidev,* 625 F.Supp. at 803. The facts strongly support the conclusion that plaintiff and defendant are not commercial competitors. Based upon the fairly extensive record here, the court concludes that defendant's counterclaim of antitrust fails as a matter of law and is accordingly dismissed with prejudice.

Therefore, is HEREBY ORDERED that:

1. On the copyright infringement claim, defendant's motion for summary judgment is granted and plaintiff's claim is dismissed with prejudice.

2. The state law claims for unfair competition are dismissed without prejudice.

3. Plaintiff's motion for dismissal of defendant's counterclaims is granted, and defendant's counterclaims are dismissed with prejudice.

LET JUDGMENT BE ENTERED ACCORDINGLY

2001 WL 1640081 (D.Minn.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.

EZ DOCK, INC., Plaintiff,
v.
SCHAFER SYSTEMS, INC., et al. Defendants.

**No. Civ.98-2364(RHK/AJB).**

March 8, 2003.

Daniel J. Maertens and Lora Esch Mitchell, Fredrikson & Byron, P.A., Minneapolis, Minnesota; and McPherson D. Moore and Ned W. Randle, Polster, Lieder, Woodruff & Lucchesi, L.C., Saint Louis, Missouri, for Plaintiff.

Douglas J. Williams, Jon Trembath, and William F. McIntyre, Jr. Merchant & Gould, P.C., Minneapolis, Minnesota, for Defendants.

MEMORANDUM OPINION AND ORDER

KYLE, J.

Introduction

***1** Plaintiff EZ Dock, Inc. alleges that Defendants Schafer Systems, Inc. and Connect-A-Dock, Inc. (collectively, "Defendants" or "Schafer") have, through their manufacture and sale of the Model 1000 and Model 2000 "Connect-A-Dock" floating docks and the Defendants' corner dock sections, infringed multiple claims of United States Patent No. 5,281,055 (hereinafter "the '055 patent"), which describes a floating dock comprised of one or more uniform sections that can be coupled together to make an endless combination of formations. For their part, Defendants deny that their products infringe the '055 patent, either literally or under the doctrine of equivalents. Defendants further contend that (1) the invention disclosed in the '055 patent was reduced to practice and sold more than one year prior to the filing of the application for the patent, rendering the patent invalid, (2) the invention claimed in the '055 patent is obvious in light of a combination of prior art references and therefore invalid, (3) the invention was anticipated by one of four earlier patents and is therefore invalid, and (4) the patent is unenforceable due to inequitable conduct before the Patent and Trademark Office ("PTO").

Before the Court are the parties' Motions in Limine. EZ Dock has brought ten motions; Schafer has brought one. Several of the motions involve the admissibility of expert testimony under Federal Rules of Evidence 702 and 703 and the Supreme Court's decisions in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. The Court begins with the motions relating to expert testimony.

*I. Motions in Limine Relating to Expert Testimony*
*A. General Principles*

The admissibility of expert testimony and the qualifications of a witness to testify as an expert are preliminary questions that the district court must determine. Fed.R.Evid. 104(a). The proponent of the proposed expert testimony bears the burden of demonstrating by a preponderance of the evidence that it is admissible. *See Daubert,* 509 U.S. at 592 & n. 10; *B ourjaily v. U.S.,* 483 U.S. 171, 175-76 (1987); *Lauzon v. Senco Prods. Inc.,* 270 F.3d 681, 686 (8th Cir.2001).

Effective December 1, 2000, Rule 702 was amended to add language consistent with the holdings from a line of Supreme Court opinions regarding expert testimony that began with *Daubert.* [FN1] As amended, Rule 702 provides that

FN1. At the time this action was commenced, Rule 702 provided that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702 (2000).

[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts.

Fed.R.Evid. 702 (2001) (emphasis added).

***2** Under both *Daubert* and the amended Rule 702, the trial judge is charged with a "gatekeeper function," the objective of which is to ensure the reliability and relevance of the expert testimony admitted into evidence. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 149 (1999). The court ensures the *relevance* of proposed expert testimony by evaluating whether the opinions offered are sufficiently tied to the facts of the case, *see Daubert,* 509 U.S. at 591, and ensures the *reliability* of such testimony by considering a number of non-exclusive factors, such as "(1) whether the theory or technique can be (and has been) tested, (2) whether the theory has been subjected to peer review and publication, (3) the known or potential rate of error, and (4) whether the theory has been generally accepted." *Peitzmeier v. Hennessy Indus., Inc.,* 97 F.3d 293, 297 (8th Cir.1996) (quoting *Daubert,* 509 U.S. at 593-94). Other factors pertinent to assessing the reliability of expert testimony have evolved from *Daubert'* s progeny, including "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Lauzon,* 270 F.3d at 687.

Although the Supreme Court in *Daubert* stated that the focus of the trial court's gatekeeping inquiry "must be solely on principles and methodology, not on the conclusions they generate," 509 U.S. at 595, the Court later acknowledged that "conclusions and methodology are not entirely distinct from one another." *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* Thus, the district court may evaluate whether the studies or data upon which the expert relies are sufficient, either individually or in combination, to support the conclusions and opinions being advanced, there being "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.*

The ultimate goal of the trial court's "gatekeeping" inquiry is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152. To accomplish that "gatekeeper function," the trial court has discretion both in deciding *how* to evaluate the reliability of the expert testimony and *whether* the expert's relevant testimony is reliable. *Id.* In evaluating the admissibility of expert testimony, the trial court must also be mindful that "[v]igorous cross-examination [and the] presentation of contrary evidence ... are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596. This last observation reflects the fundamental principle that Rule 702 is generally one of inclusion rather than exclusion.

*B. Defendants' Motion to Exclude Testimony of Arthur H. Cobb Re: Lost Profits Analysis and Reasonable Royalty Analysis*

***3** Arthur H. Cobb is EZ Dock's damages expert. (Pl.'s Trial Brief at 20.) Cobb is a certified public accountant who has been engaged for almost thirty years in providing professional services in financial matters, with emphases in the areas of litigation support and capital finance. (McIntyre Aff. Ex. 1 at 35.) He has held engagements regarding the estimation and evaluation of lost profits and economic damages in business litigation (including reasonable royalties) and has held engagements regarding the recreational boat industry. (*Id.*)

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Schafer moves to exclude Cobb's testimony with respect to two main areas: (1) his determination of damages measured by a "lost profits" analysis, and (2) his determination of damages using a reasonable royalty analysis. Defendants criticize Cobb's analysis of "lost profits" on the grounds that it lacks sound economic evidence of the nature of the market and likely outcomes with infringement factored out of the picture. Specifically Defendants complain that Cobb's "lost profits" analysis fails to analyze the demand for the patented features of EZ Dock's product that are at issue in this litigation and improperly relies on the unsupported opinions of another expert regarding the absence of acceptable, non-infringing alternatives to EZ Dock's. Defendants criticize Cobb's "reasonable royalty" analysis for failing to address many aspects of the framework set out in the seminal case of *Georgia Pacific Corp. v. U.S. Plywood Corp.,* 318 F.Supp. 1116 (S.D.N.Y.1970).

Upon a finding of infringement, Title 35 permits an award of "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. The party establishing infringement of a patent can recover lost profits as its damages if it proves that, "but for" the infringement, it reasonably would have made the additional profits enjoyed by the infringer. *See King Instruments Corp. v. Perego,* 65 F.3d 941, 952 (Fed.Cir.1995). The successful plaintiff "may resort to any method showing, with reasonable probability, entitlement to lost profits 'but for' the infringement." *Micro Chemical, Inc. v. Lextron, Inc.,* 318 F.3d 1119, 1122 (Fed.Cir.2003) (citing *King Instruments,* 65 F.3d at 952.) The Court begins its analysis of Schafer's motion in limine with the issue of "lost profits."

*1. Lost Profits*

Proof of an entitlement to lost profits calls for a two-step analysis. First, the patentee must establish the reasonableness of an inference that, "but for" the infringement, it would have made the additional profits enjoyed by the infringer. *Micro Chemical, Inc.,* 318 F.3d at 1122. The burden then shifts to the infringer to show that the inference is unreasonable as to some or all of the lost profits. *Id.* There are two recognized methods of showing "but for" causation: the four-factor test set out in *Panduit Corp. v. Stahlin Bros. Fibre Works,* 575 F.2d 1152, 1156 (6th Cir.1978), and the two-supplier market test. *Micro Chemical,* 318 F.3d at 1122; *see also Lam, Inc. v. Johns-Manville Corp.,* 718 F.2d 1056, 1065 (Fed.Cir.1983).

***4** Cobb describes the dock industry as including both fixed and floating docks made from a variety of materials, including but not limited to concrete, wood, polystyrene, aluminum, and polyethylene. (McIntyre Aff. Ex. 1 at 6.) Thus, part of the dock industry involves floating docks; a segment that comprises large companies, small manufacturers, and many one-person operations. (*Id.*) Cobb asserts that "[t]he majority of the total dollar value of the dock industry is estimated to be generated by less than six companies." (*Id.*) According to Cobb, EZ Dock competes in the floating dock segment of the industry with, *inter alia,* Schafer and Connect-A-Dock; Jet Dock Systems, Inc.; CanDock, Inc.; and ShoreMaster. (*Id.* at 7.)

Framing his analysis around the "but for" causation factors set forth in *Panduit,* Cobb considers four issues relevant to determining whether alleged lost profits were caused by infringement: (1) the existence of a demand for the patented product, (2) the absence of available, non-infringing substitutes, (3) the patent holder's manufacturing and marketing capability to exploit the demand, and (4) the amount of profit the patent holder would have made. *See Panduit,* 575 F.2d at 1156. With respect to the first factor, Cobb opines that "[d]emand for EZ Dock's floating dock and related products are [sic] substantiated by EZ Dock and by Connect-A-Dock product sales." (McIntyre Aff. Ex. 1 at 19.) After summarizing Connect-A-Dock's sales from 1998 through May 31, 2002, Cobb states that "Connect-A-Dock revenues were assumed to be net of discounts, returns and allowances, freight, and sales commissions." (*Id.*)

For the second *Panduit* factor, Cobb's analysis consists, *in toto,* of the following:

> EZ Dock and Connect-A-Dock products exist in a two-supplier market and directly compete for the same customers. C. Allen Wortley determined and opined that no acceptable non-infringing alternatives to the EZ Dock patented product exist.

We assume that EZ Dock would have captured all Connect-A-Dock sales.

(*Id.*) At the end of his expert report, Cobb lists the data and other information considered. (Id. at 32-34.) Nowhere in that three-page list does Cobb specifically identify the expert report of C. Allen Wortley.

The difficulties with Cobb's proposed expert opinions are illustrated by his deposition testimony. Asked what he relied on for his opinion that a purchaser buys a dock from either EZ Dock or Defendants because it has "pylon" structures on the underside that assist with floatation and structural rigidity, Cobb responds as follows:

A: In that regard I'm relying on the analysis, considerations and opinions of Mr. Wortley.

Q: What have you done to see if he's done the proper analysis?

A: I've not--I've not done anything specific in that regard. I've read his material and relied on his material but I've not undertaken an independent investigation or analysis on that.

***5** Q: The material you reviewed, in all the material that you reviewed, do you recall anything anywhere suggesting that a dock was purchased because it had a conical or frustoconical space underneath the dock?

A: Not specifically.

(McIntyre Aff. Ex. 2 at 18.) Regarding the existence of a two-supplier market, Cobb testified as follows:

Q: Am I correct that you rely upon Dr. Wortley's statement that there are two suppliers in the market, only two suppliers in the market and that -

A: Two suppliers with the particular feature and the importance of that feature, yes.

Q: And because of that you don't need to do any type of elasticity analysis?

A: Yes.

(Id. at 33-34.)

In his expert report, therefore, Cobb has not himself formed an opinion as to the existence of a "two-supplier" market; he has simply adopted Wortley's opinion regarding the nature of the market. This adoption is problematic, however, given Cobb's earlier observation that EZ Dock competes in the floating dock segment of the market with at least *four* companies, including Schafer/Connect-A-Dock. Furthermore, Defendants have presented evidence that Wortley himself doubts that every EZ Dock product that is purchased has been purchased because it has the "pylon" structure. (McIntyre Aff. Ex. 3 at 100.) Wortley further testified as follows:

Q: ... Did you do any research to see why people purchased the EZ Dock system?

A: No.

Q: Did you do any research to see why people purchased the Connect-A-Dock system?

A: No.

Q: Do you believe that every dock sold by Connect-A-Dock would have been sold by EZ Dock?

A: No.

(Id. at 101.)

Cobb has failed to account for the effect of competition from other companies that manufacture floating docks, such as CanDock, JetDock Systems, and ShoreMaster. *See Children's Broadcasting Corp. v. Walt Disney Co.,* 245 F.3d 1008, 1018 (8th Cir.2001) (excluding expert testimony on damages where expert failed to consider the effect of competition by others in industry). Furthermore, Cobb does not explain why it is reasonable to assume that EZ Dock would capture all Connect-A-Dock sales. His proposed opinions regarding the existence of a demand for the patented product and the absence of non-infringing alternative products is not "based upon sufficient facts or data" as required by Rule 702.

This case is distinguishable from *Micro Chemical, Inc v. Lextron, Inc.,* 317 F.3d 1387 (Fed.Cir.2003) ( *"Lextron I"* ), on which EZ Dock relies for the admissibility of Cobb's testimony. In *Lextron I,* the defendants challenged the admissibility of expert opinion testimony on the grounds that it was not based on "reliable facts." The parties in *Lextron I* hotly disputed many of the facts relevant to a reasonable royalty analysis, leading the Federal Circuit to caution that, "[w]hen ... the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony." 317 F.3d at 1392.

***6** In this case, by contrast, Cobb's expert report points to *no* facts that underlie his proposed

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

testimony regarding either the demand for the patented product, the availability of non-infringing alternatives, or the nature of the market as a two-supplier market. The Defendants cannot subject Cobb's proposed testimony on those factors to "vigorous cross-examination" because Cobb himself does not purport to know anything about those subjects; he has deferred to Wortley's analysis and opinions. With respect to Cobb's opinions regarding "lost profits" the Court concludes that "there is simply too great an analytical gap between the data and the opinion proffered." *Joiner,* 522 U.S. at 146. In neither his expert report nor his deposition could Cobb identify a reliable factual basis for his opinions regarding the demand for the patented product or the existence of available non-infringing alternatives.

EZ Dock has failed to meet its burden of proving that Cobb's proposed expert testimony satisfies the criteria of Federal Rule of Evidence 702. Accordingly, the Court will grant Defendants' motion with respect to Cobb's testimony regarding lost profits.

*2. Reasonable Royalty Analysis*

Defendants also challenge the admissibility of Cobb's determination of a 20% " reasonable royalty" rate on the grounds that he has failed to address several factors relevant to the analysis set out by the *Georgia Pacific* case and has also failed to account for a "commonly-used 25% 'rule of thumb' method" as the starting point of his analysis. Defendants further complain that Cobb has failed to factor in the established licensing practices in the industry, which Defendants contend are in the range of 1% to 5%. The Court concludes that any shortcomings in Cobb's "reasonable royalty" analysis go to the weight rather than the admissibility of his analysis, and are more appropriately the subject of cross-examination than a motion to exclude and go more to the weight than the admissibility of his testimony. Accordingly, the Court will deny the Defendants' motion with respect to Cobb's proposed expert testimony regarding a "reasonable royalty" rate.

*C. EZ Dock's Motion to Exclude Evidence and Testimony from Glenn L. Beall*

Glenn Beall has worked in the plastics industry since receiving his bachelor of science degree in 1957, and has worked with the rotational molding process since 1963. (Mitchell Aff. Ex. 1 at 1.) He teaches rotational molding and has published several articles and books in the field. (*Id.*) He indicates having an understanding of patents, but acknowledges that he is not a patent attorney. (*Id*.)

EZ Dock moves to exclude any testimony of Glenn L. Beall relating to "the skill of rotomolding, plastic dock design, patent infringement, patent validity, the state of the law, legal conclusions, patent office procedures, or any other related matter." (Pl.'s Mot. in Limine to Exclude Evid. and Testimony of Beall at 1.) EZ Dock argues that Beall lacks the necessary background or experience in "the areas of science ... which are crucial to the case at bar, namely the design and manufacture of floating plastic docks," and is therefore incompetent under Rule 702 to provide expert testimony in this case.

*7 EZ Dock's current argument stands in sharp contrast to the assertions EZ Dock made in the context of the *Markman* hearing: namely, that a person of ordinary skill in the art of dock design and construction is someone who has a high school education and has no experience in rotational molding. (Pl.'s Initial Markman Brief at 11.) Accepting as true EZ Dock's representation of who constitutes a person of ordinary skill in the art, it is clear that, far from being unqualified to testify, Beall is overqualified. Furthermore, the specification of the '055 patent recommends a preferred embodiment in which the docking members are made of "specialized molded polyethylene"; i.e., a type of plastic. Beall qualifies as an expert in the manufacture of plastic items through rotational molding. Therefore, Beall should be allowed to offer expert testimony on rotational molding and the design and manufacture of plastic items, to the extent those subjects are relevant to the questions the jury must resolve.

With respect to Beall's ability to testify about patent law or claim interpretation, EZ Dock's arguments are more well-taken. Beall's expert report indicates that he is not qualified to provide expert testimony on the operations of the PTO or how to construe claims. Furthermore, issues of law are not properly the subject of expert testimony. It is the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*Court's* duty to instruct the jury on the applicable principles of patent law, just as claim construction is an issue for the *Court* and not the jury. The Court has already construed the claims at issue in the January 22, 2003 *Markman* Order. At the hearing on the motion in limine regarding Beall, counsel for the Defendants represented that Beall will not testify regarding claim construction, such as the language from the claims at issue requiring the pylons to extend from the top surface to the bottom surface of the docking member. Nor will Beall purport to testify about patent law. Accordingly, that aspect of EZ Dock's argument appears to be moot.

Finally, with respect to issues of patent infringement and validity, Defendants persuasively argue that Beall, as a person experienced in the manufacture of plastic devices through rotational molding, is adequately qualified to compare elements of the '055 patent with elements of the accused products to assist the jury in determining whether they are equivalent or perform substantially the same function in substantially the same way to obtain substantially the same result. Accordingly, Beall will be allowed to testify to facts pertaining to the comparison of the patent-in-suit to the accused products or to prior art references.

*D. EZ Dock's Motion to Exclude Evidence and Testimony from Brian Pingel*

Brian Pingel has served as patent counsel for Schafer in connection with the Connect-A-Dock products from at least late 1997. In December 1997 and January 1998, prior to the start of this lawsuit, Pingel sent letters to Schafer stating his opinions as to whether the design for a floating dock system that Schafer was developing infringed the '055 patent. (Mitchell Aff. Exs. A & B.) Also prior to this lawsuit, in response to a letter from EZ Dock's counsel demanding that Schafer cease and desist with the manufacture and sale of its floating dock product, Pingel wrote to EZ Dock's counsel challenging whether in fact Schafer's product infringed the '055 patent. (*Id.* Ex. C.) Finally, since this lawsuit began, Pingel has written letters to dealers and potential purchasers of Connect-A-Dock products (*id.* Exs. D, E, & G), and has written an additional opinion letter in light of the PTO's issuance of a re-examination certificate adding additional claims (*id.* Ex. F). Finally, in light of the Supreme Court's decision in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* Pingel wrote a letter to Schafer explaining the case's impact on his prior opinion letters. (*Id.* Ex. H.)

***8** EZ Dock moves to exclude any evidence or testimony from Pingel "regarding matters outside the contents of his non-infringement letters"; i.e., the letters of December 1997 and January 1998. (Pl.'s Mot. in Limine to Exclude Letters of Pingel and Evid. and Testimony Re: Same at 2.) EZ Dock argues that Defendants did not identify Pingel as an expert witness or produce an expert report from him; therefore, the Court should not allow him to offer opinion testimony on issues such as the validity of the '055 patent, its enforceability, claim construction, or other areas of patent law. The Court concurs with EZ Dock's observation that Pingel can be called only as a fact witness, not as an expert witness. Accordingly, Defendants are cautioned that Pingel's testimony shall be confined to the facts--e.g., what he did, said, or wrote--that are relevant to the issue of willful infringement.

Turning to the admissibility of the letters, the Court begins with Pingel's March 15, 2002 letter to Defendants regarding his review of the reexamination certificate issued by the PTO on the '055 patent. EZ Dock has not adequately explained why this opinion letter, generated in light of the fact that EZ Dock had obtained a re-examination certificate adding additional claims, and in light of the fact that EZ Dock amended its Complaint to assert infringement of those new claims, should be treated substantially differently from Pingel's opinion letters regarding non-infringement of the patent as originally issued. With respect to the March 15, 2002 letter, EZ Dock's motion in limine will be denied. [FN2]

FN2. The Court does not here attempt to address any other objections EZ Dock may have to the admissibility of the March 15, 2002 letter.

The February 26, 1998 letter to EZ Dock's counsel reflects Pingel's position prior to the start of litigation regarding the non-infringement of the '055 patent by the Connect-A-Dock design. EZ Dock has not established a basis for excluding that letter.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Accordingly, the Court will deny the motion in limine with respect to that letter as well.

Turning to letters Pingel sent to Connect-A-Dock dealers and potential purchasers--Exhibits D, E, & G to Mitchell's Affidavit--the Court concludes that those letters are not relevant to the question of willful infringement. Rather, they seek to communicate Defendants' litigation position to third parties who are aware of the lawsuit. As such, they have no bearing on the Defendants' intent in engaging in the manufacture and sale of the accused products after conducting due diligence on the question of infringement. Pingel's letters dated December 2, 1999, April 3, 2001, and April 29, 2002 are not admissible. Finally, Defendants have failed to establish how Pingel's July 9, 2002 letter to Defendants regarding the *Festo* decision--Exhibit H to Mitchell's Affidavit--is relevant to or admissible on the issue of willfulness.

The Court will grant in part EZ Dock's motion with respect to the letters dated December 2, 1999, April 3, 2001, April 29, 2002, and July 9, 2002. The letters shall not be introduced into evidence, nor shall Pingel nor any other defense witness testify as to their contents or the circumstances surrounding them.

*E. EZ Dock's Motion to Exclude Testimony from Kent A. Herink Re: State of Patent Law or Legal Conclusions*

*9 Kent Herink has practiced as a patent attorney for over twenty years. He holds both a Bachelor of Arts degree and a Masters of Science degree in physics. In Herink's "Updated Expert Witness Statement," dated August 14, 2002, he anticipates being called to testify on "a variety of matters regarding [PTO] practice and procedures, both in general and as they apply to this case." Herink expresses his opinions as to the proper construction of the claims at issue in this litigation. He also states opinions as to the invalidity of the '055 patent on several theories, including anticipation and failure to disclose the best mode. In his "Updated" statement, Herink also opines as to the enforceability of the patent due to inequitable conduct before the patent office.

In September 2002, Herink signed a "Supplemental Expert Witness Statement" that contains opinions that the Connect-A-Dock products do not literally infringe the '055 patent and that the doctrine of equivalents is unavailable to EZ Dock because of prosecution history estoppel. Herink also offers opinions on the issue of willful infringement in response to the expert report of Thomas J. Nikolai.

EZ Dock moves to preclude Herink from testifying as to "the legal standards of claim interpretation, patent infringement, patent validity, or patent enforceability, or his legal conclusions based on his understanding of the law." (Mot. in Limine to Exclude Opinion Test. of Kent Herink at 1.) Based on the issues framed by EZ Dock's motion in limine and the representations made at the hearing on the motions in limine, the Court concludes that EZ Dock has no objection to Herink testifying about PTO practices and procedures or the reasonableness of Pingel's opinion letters. Accordingly, Herink shall be free to testify as to those matters.

EZ Dock's objections to testimony concerning claim construction are well taken. Herink shall not testify regarding the correct interpretation of the patent claims. It is beyond dispute that

> [a] determination of infringement requires a two-step analysis. "First, the court determines the scope and meaning of the patent claims asserted ... [Second,] the properly construed claims are compared to the allegedly infringing device." *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454, 46 USPQ2d 1169, 1172 (Fed.Cir.1998) (en banc) (citations omitted). Step one, claim construction, is an issue of law, *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 970-71, 34 USPQ2d 1321, 1322 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).... Step two, comparison of the claim to the accused device, requires a determination that every claim limitation or its equivalent be found in the accused device. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). Those determinations are questions of fact. *Bai v. L & L Wings, Inc.,* 160 F.3d 1350, 1353, 48 USPQ2d 1674, 1676 (Fed.Cir.1998).

***10** *Transclean Corp. v. Bridgewood Servs., Inc.,* 290 F.3d 1364, 1370 (Fed.Cir.2002) (emphasis added). Herink similarly will not be permitted to explain to the jury or otherwise testify regarding

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

prosecution history estoppel or its interface with the theory of infringement under the doctrine of equivalents.

Furthermore, having reviewed Herink's proposed opinions regarding patent invalidity and unenforceability, the Court finds in them nothing that satisfies the prerequisite of Rule 702: that his "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." The Court rejects Defendants argument that Herink's "specialized knowledge" as a patent attorney will help the jury understand the various statutory requirements for obtaining a valid and enforceable patent and the duties of an applicant in the patenting process. These are issues of law on which the Court will instruct the jury. Herink shall not inform the jury about the legal requisites of patentability. Likewise, Herink shall not inform the jury about the methods of proving infringement.

As for Defendants' argument that Herink should be allowed to opine on "ultimate issues," such as whether the '055 patent has been infringed or is valid or enforceable, the Court finds Herink's opinions to be little more than an *ipse dixit* that is insufficiently tied to the facts of the case. For example, after relaying his understanding of various facts pertaining to Plaintiff's alleged purchase of dock sections from Winnebago, the manufacturer, more than one year prior to the patent application, Herink "opines" as follows: "if the order of approximately 100 dock members from Winnebago was a commercial offer for sale, or the sale and delivery of approximately 64 dock members from Winnebago to Plaintiff was a commercial sale, at least claims 8, 9, and 13-20 of the patent-in-suit are invalid." (Herink Updated Expert Witness Statement at 5.)

Herink's proposed opinions are little more than assertions that "if X is found (presumably by the jury), then the patent is invalid/ unenforceable/ not infringed." The same statements could (and the Court expects, will) be made by counsel in closing arguments. Herink's proposed testimony does not assist the jury in making findings on the factual questions it must decide. The Defendants effectively conceded at the motion in limine hearing that such opinion testimony from Herink is not proper and would not be offered at trial. [FN3] EZ Dock's motion will be granted.

FN3. As discussed with counsel at the hearing, the Court is not precluding Defendants from raising similar objections to testimony from Plaintiff's "patent law" expert, Nikolai.

*F. EZ Dock's Motion to Exclude Evidence and Testimony from Herink not Previously Disclosed*

EZ Dock also moves to preclude Herink from testifying as to any matters not previously disclosed in his expert reports, specifically any opinion testimony regarding the PTO's re-examination of the '055 patent. EZ Dock contends that Rule 26 of the Federal Rules of Civil Procedure requires Herink to limit his expert testimony to the contents of his expert reports, and the expert reports Herink provided as of thirty days before trial did not address the re-examination of the '055 patent.

***11** Under Rule 26(e)(1), parties have a duty to supplement disclosures made pursuant to Rule 26(a) . With respect to expert disclosures made pursuant to Rule 26(a)(2)(B)--such as the expert witness statements Herink prepared--"the duty extends both to information contained in the report and to information provided through a deposition of the expert, and *any additions or other changes to this information shall be disclosed by the time the party's disclosures under Rule 26(a)(3) are due."* Fed.R.Civ.P. 26(e)(1) (emphasis added). In this case, the Rule 26(a)(3) pretrial disclosures of witness lists and exhibit lists were due on February 20, 2003. Defendants respond to EZ Dock's motion by pointing out that Herink supplemented his expert report, in light of the Court's January 22 *Markman* Order, shortly before the pretrial submissions were due. Herink's supplemental expert report is timely under Rule 26(e)(1). EZ Dock's motion will be denied.

*II. EZ Dock's Other Motions in Limine*

*A. EZ Dock's Motion to Exclude Evidence and Testimony Regarding Schafer's Earlier Motion for Summary Judgment Based on the On-Sale Bar of § 102(b)*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

The parties agree that there is no need for either party to introduce evidence or testimony regarding either the trial court's granting of Defendants' earlier motion for summary judgment or EZ Dock's success on appeal to get that decision overturned. Accordingly, the Court will grant this motion.

*B. EZ Dock's Motion to Preclude Evidence or Testimony of Defendants' Own Patents*

EZ Dock has not identified the specific patents subject to its motion; Defendants have apparently obtained, however, at least two patents in connection with floating docks. EZ Dock complains that Defendants will try to "take advantage of a common misconception by the public that a patent grants an affirmative right to make the patented article." (Pl.'s Mot. to Preclude Evid. or Test. of Defs.' own Patents at 1.) Therefore, it claims, the evidence of Defendants' patents must be excluded.

Defendants also do not identify the patents at issue in this motion. They respond generally that the PTO's decision to issue patents to them rebuts EZ Dock's claim of willful infringement because Defendants cannot have *copied* EZ Dock's product and still have obtained patents on their connector design and support structure. As none of the claims at issue have anything to do with the connector design, Defendants' possession of a patent on that feature is irrelevant to the issue of infringement. As for the "support structure," Defendants do not explain what this feature entails or how it relates to the claims at issue. Accordingly the Court will grant the motion, pursuant to Rules 402 and 403, as to any patents held by Defendants.

*C. EZ Dock's Motion to Exclude Evidence and Testimony Inconsistent with the Court's Claim Construction*

EZ Dock complains that Defendants is going to introduce evidence and testimony at trial suggesting that the jury may interpret the claims at issue in a way inconsistent with the Court's claim construction. As set forth above, the determination of whether a patent is infringed is a two step process:

> *12 "First, the court determines the scope and meaning of the patent claims asserted ... [Second,] the properly construed claims are compared to the allegedly infringing device." *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454, 46 USPQ2d 1169, 1172 (Fed.Cir.1998) (en banc) (citations omitted). Step one, claim construction, is an issue of law, *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 970-71, 34 USPQ2d 1321, 1322 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).... Step two, comparison of the claim to the accused device, requires a determination that every claim limitation or its equivalent be found in the accused device. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). Those determinations are questions of fact. *Bai v. L & L Wings, Inc.,* 160 F.3d 1350, 1353, 48 USPQ2d 1674, 1676 (Fed.Cir.1998).

*Transclean Corp.,* 290 F.3d at 1370. In principle, EZ Dock is right: the jury cannot be encouraged to depart from the Court's claim construction and to interpret the claims on their own. How Cobb, Herink, Beall, Pingel or others would have construed the claims (left to their own devices) is irrelevant to the issues now before the jury for trial. [FN4]

> FN4. To the extent the analyses and opinions of Defendants' experts reflect a claim construction other than the Court's January 22, 2003, claim construction, those opinions and analyses have no relevance to the issues for trial and will be excluded.

Furthermore, the parties are not entitled to "construe" the Court's claim construction. Nor can the parties argue that, based on the specification and the file history, the inventors "really" invented something other than what the trial court has construed the claims to mean. Defendants cite no authority for the proposition that the Court's claim construction is "open to interpretation" by the jury, and the Court has found none. Accordingly, the Court will grant in part EZ Dock's motion and preclude Defendants from arguing to the jury how the claims of the patents-in-suit should be construed. Nothing in this ruling shall prevent Defendants from presenting evidence that is properly relevant to issues other than claim construction.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*D. EZ Dock's Motion to Preclude Defendants from Referring to Plaintiff Negatively Because It Sought Legal Protection for Its Invention or from Denigrating the Patent Office or Its Examiners*

EZ Dock seek pre-trial relief from the Court to prevent Defendants from "making comments or eliciting testimony that negatively refers to EZ Dock or inventor Neitzke or inventor Vierus as a 'monopolist' or EZ Dock owning a 'monopoly' or similar terms because they sought legal protection for their invention." With respect to both points, the Court can see no grounds on which the Defendants could introduce *testimony*--lay or expert--about either the competence of the PTO's examiners or the monopolistic character of a patent. As for *argument* on those points, in point of fact, a patent is a kind of monopoly that rewards the inventor (or patent holder) for having taken the initiative to "build a better mousetrap." To the extent Defendants would--in their closing argument--seek to describe EZ Dock as a "monopolist," EZ Dock is free to rebut that characterization. The old schoolyard chant about sticks and stones applies here as well.

***13** As for assertions that the PTO and its examiners are not diligent or are prone to error, the Court can find no relevance in either evidence to that effect or argument. It is Defendants' burden to prove, *by the greater weight of the evidence,* that the '055 patent (as re-examined) is either invalid or unenforceable. Aspersions are not evidence. Accordingly, the Court will grant in part EZ Dock's motion with respect to the PTO and its examiners.

*E. EZ Dock's Motion to Exclude References to Dismissed Claims*

During the course of this litigation, EZ Dock dismissed claims for trade dress infringement, deceptive trade practices, and unfair competition. EZ Dock now seeks a ruling precluding the Defendants from making any references to the dismissed claims. Defendants respond that the dismissal of the other claims is relevant to "rebutting EZ Dock's claim of willfulness and copying" and is relevant to Defendants' claim that EZ Dock has brought this suit in bad faith, warranting fees to Defendants. Their legal analysis in opposition to the motion, however, focuses entirely on the Defendants' claim to attorneys fees and not at all to how dismissal of the claims relates to willfulness.

Under the patent statutes, "[t]he *court* in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S .C. § 285 (emphasis added). Thus, the question of whether this is an exceptional case is not one for the jury, but rather one for the Court. The Court finds that EZ Dock's dismissal of certain claims has no relevance to the patent infringement claim the jury must decide. Accordingly, the Court will grant the motion.

*F. EZ Dock's Motion to Preclude Defendants from Admitting Any Evidence or Testimony on Defendants Not Previously Pled, from Admitting Any Evidence or Testimony Regarding Prior Art Not Previously Identified, and from Admitting Any Evidence Or Testimony Regarding Untimely Supplemental Expert Reports*

After the time for filing motions in limine had passed, EZ Dock brought a last motion in limine, which has three distinct sub-parts. First, EZ Dock complains that Defendants are trying to proceed on an affirmative defense under § 132 that was not pled and, therefore, has been waived. [FN5] Second, EZ Dock argues that Defendants must be precluded from presenting a prior art reference--the Meriwether patent--that was disclosed for the first time in a § 282 disclosure on February 7, 2003. [FN6] Finally, EZ Dock contends that Defendants have untimely supplemented their expert reports, to EZ Dock's prejudice.

FN5. Originally at issue in EZ Dock's motion were two affirmative defenses: the equitable defense of estoppel and the statutory defense of new matter. At the hearing on the motions in limine, Defendants advised the Court and opposing counsel that it was dropping the estoppel issue.

FN6. Defendants had asserted thirty-eight new prior art references in their § 282 disclosure, to which EZ Dock had objected as being late. At the hearing on the motions in limine, Defendants advised the Court and opposing counsel that it was

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

withdrawing the thirty-five prior art references it had marked as exhibits 49 through 86. As for the '271 Brill patent, Defendants contend that they would not argue it to be invalidating prior art, but rather would simply like to present it to the jury to show the state of the art regarding floating docks. Defendants have failed to establish the relevance of the '271 Brill patent; accordingly, the Court will excluded it under Fed.R.Evid. 401 and 402.

Section 132 provides that "[n]o amendment shall introduce new matter into the disclosure of the invention." Therefore, the affirmative defense that a patent is invalid based upon the introduction of new matter is a statutory affirmative defense. Review of the Amended Answer in this action, filed May 24, 2002, reveals that the Defendants did not plead a new matter affirmative defense or otherwise reference 35 U.S.C. § 132. The Court rejects the Defendants' efforts to bootstrap a new matter defense onto its affirmative defenses asserted under § 112. The Defendants failed to preserve a new matter affirmative defense in their responsive pleading under Fed.R.Civ.P. 12, and they are therefore precluded from presenting it at trial.

***14** As for the Meriwether patent, Defendants argue that there is no prejudice to EZ Dock because Meriwether was part of the file history of the EZ Dock patent on re-examination. This argument fails to address the fact that EZ Dock had served the Defendants with an interrogatory directing them to "identify all prior art of any kind, including but not limited to publications, disclosures, teachings, existing devices or prior art patents relating in any way to the subject matter claimed in the patent in suit" and to "state each and every fact that you allege supports the affirmative defenses" raised against EZ Dock's causes of action. (Mitchell Aff. Ex. C.) Although Defendants supplemented their responses to these interrogatories at various times through the course of discovery, they never disclosed the Meriwether patent. [FN7] The Court concludes that Defendants have prejudiced EZ Dock in their failure to supplement discovery responses with respect to the Meriwether patent. The Court will grant EZ Dock's motion with respect to the patent.

FN7. At the motion in limine hearing, Defendants' counsel argued that the Meriwether patent did not become relevant until after the Court's January 22, 2003 claim construction order, an order that, among other things, rejected the Defendants' argument that the pylons have to have a circular base. Defendants have never asserted until yesterday, however, that the Court's claim construction order would necessitate additional time for expert discovery or the supplementation of earlier discovery responses. In fact, the Court held a telephone conference with all counsel in early January, advising them of the Court's proposed timeline for issuing its *Markman* order by the end of January and discussing the feasibility of a March 10 trial date. During that telephone conference, neither party suggested that, because of the closeness in time between the *Markman* ruling and the proposed trial date, the trial should be continued to a later date.

Finally, the Court has already addressed the issue of supplemental expert reports, observing that Rule 26(e)(1) allows the parties to supplement expert reports up to the day pre-trial submissions under Rule 26(a)(3) are due. In this case, the Court ordered the parties to file their pre-trial submissions on February 20. EZ Dock has not indicated that any supplemental expert report was served on them after that date. Accordingly, the Court will permit the Defendants to examine their experts on matters disclosed in the final supplemental expert reports, subject to the Court's rulings above on the subject matter of expert testimony.

Conclusion

Based on the foregoing, and all of the files, records and proceedings herein, IT IS ORDERED that

1. EZ Dock's Motion in Limine to Exclude Evidence and Testimony Regarding Schafer Systems' Motion for Summary Judgment re: the alleged 35 U.S.C. § 102(b) on sale bar (Doc. No. 127) is GRANTED;

2. EZ Dock's Motion in Limine to Preclude

Evidence or Testimony of Defendants' Own Patents (Doc. No. 129) is GRANTED;

3. EZ Dock's Motion in Limine to Exclude All Evidence and Testimony Inconsistent with the Court's Claim Construction (Doc. No. 131) is GRANTED IN PART in that Defendants shall not present evidence or testimony to the jury regarding how the claims of the patent-in-suit should be construed. Nothing in this ruling shall prevent Defendants, however, from presenting evidence that is relevant to issues other than claim construction.

4. EZ Dock's Motion in Limine to Exclude Evidence and Testimony of Glenn L. Beall (Doc. No. 133) is DENIED;

5. EZ Dock's Motion in Limine to Exclude Opinion Testimony of Kent A. Herink Addressing the State of the Law or His Legal Conclusions (Doc. No. 136) is GRANTED;

6. EZ Dock's Motion in Limine to Exclude Evidence and Testimony of Kent A. Herink Not Previously Disclosed in his Expert Witness Report (Doc. No. 138) is DENIED;

***15** 7. EZ Dock's Motion in Limine to Prevent Defense from Referring to Plaintiff Negatively Because It Sought Legal Protection for Its Invention or from Denigrating the Patent Office or Its Examiners (Doc. No. 141) is GRANTED IN PART with respect to testimony disparaging the PTO and its examiners;

8. EZ Dock's Motion in Limine to Exclude Opinion Letters of Mr. G. Brian Pingel and Evidence and Testimony Regarding Same (Doc. No. 143) is GRANTED IN PART. Defendants shall not introduce into evidence or elicit testimony from any witness about Pingel's letters dated December 2, 1999, April 3, 2001, April 29, 2002, and July 9, 2002.

9. EZ Dock's Motion in Limine to Exclude References to Dismissed Claims (Doc. No. 146) is GRANTED.

10. Defendants' Motion in Limine to Preclude Expert Report and Testimony of Arthur H. Cobb (Doc. No. 149) is GRANTED IN PART. Cobb shall not offer testimony regarding damages calculated under a "lost profits" analysis. Cobb may testify regarding damages calculated under a "reasonable royalty" analysis.

11. EZ Dock's Motion in Limine to Preclude Defendants form Admitting Any Evidence or Testimony on Defenses Not Previously Pled, from Admitting Any Evidence Or Testimony Regarding Prior Art Not Previously Identified, and from Admitting Any Evidence or Testimony Regarding Untimely Supplemental Expert Opinions (Doc. No. 165) is GRANTED IN PART. Defendants shall not present evidence or argument regarding the new matter defense under 35 U.S.C. § 132, and shall not present evidence regarding either the Meriwether patent or the ' 271 Brill patent.

2003 WL 1610781 (D.Minn.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

00237

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

- - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes, a Minnesota
Corporation,

Plaintiff,

vs.

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc.,
a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects &
Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - -

Deposition of

ARTHUR H. COBB
Volume II

Tuesday, June 22, 2004

9:01 a.m.



[redacted]

00244

This one we had previously marked as Exhibit 401, and it's dated April 15 of 2004.

A All right.

Q And I'll have you direct your attention to page 4 of this report.

A (Complies.) All right.

Q Middle of the page on page 4 are four numbered items. Each of these items refer to information that was used by Schechter Dokken Kanter to analyze potential allocations of damages in this matter.

Here is my question for you just generally first: Is it reasonable and appropriate for an expert to rely upon the sworn deposition testimony of a party witness in providing opinions?

A I believe so.

Q Is it reasonable and appropriate for a damages expert to rely upon independently published studies and research done by national associations?

A I believe so.

Q Is --

A There obviously may be exceptions to both of those, but as a general proposition.

00245

Q Is it reasonable and appropriate for a damages expert to rely upon the testimony of other experts?

A Generally speaking, yes.

Q And finally, is it appropriate and reasonable for a damages expert to rely upon business documents produced by a party in the course of litigation?

A Generally speaking, yes.

Q Specifically then in this matter the first numbered item on page 4 of Exhibit 401 refers to testimony that was offered by Rottlund employees during the course of their deposition that there were at least 20 factors that weigh on a customer's decision when buying a home.

Do you believe it's appropriate for a damages expert to rely in part upon testimony from Rottlund personnel in this matter?

A At least generally speaking, yes.

Q And specifically this particular testimony, anything inappropriate about relying upon the sworn deposition testimony of Rottlund personnel regarding the choices that customers -- or excuse me, the factors that customers consider when buying a home?

00246

A I think that it's reasonable to rely on that.

Q Okay. Item number 2, Mr. Cobb, have you seen The National Association of Realtors 2002 Profile of Home Buyers and Sellers?

A If I have, I don't recall today. I've looked at National Association of Realtors' materials off and on over the past, but I don't have that particular profile in mind.

Q Is there -- is it reasonable and appropriate for a damages expert in this case to rely in part upon the study published by The National Association of Realtors 2002 Profile of Home Buyers and Sellers?

A I believe so.

Q You said you have at least some familiarity with The National Association of Realtors profiles or published publications in the past?

A Yes.

Q What is your experience with that particular national association?

A At least from time to time I've been familiar with the general constituency of the association, general purposes of the association, and have at least in background reading looked at materials generated by that

00247

association.

Q Do you find that The National Association of Realtors provides generally helpful and useful information?

A Yes.

Q Do you find that The National Association of Realtors provides generally reliable information?

A I have not done a specific test of their information. I recall that the information is consistent with my experience and with other information. And I know that they are taken in the industry as reliable.

Q How do you know that they're taken in the industry as reliable?

MR. FARMER: Off the record.

(A discussion was had off the record.)

MS. NEWMAN: Can you read back my last question, please.

(The requested portion of the record was read by the reporter.)

A I have dealt with industry people, for example, realtors in the past that have been members and have participated in surveys and have used surveys in the conduct of their business,

surveys and materials from The National Association of Realtors.
BY MS. NEWMAN:
Q Mr. Cobb, have you reviewed as part of your scope of work on this matter the testimony that was provided by Roger Conhaim, the market analyst?
A I think so, but I don't have it clearly in mind.
Q Mr. Conhaim testified that 85 percent of the buying decision is based on the location and price and 15 percent relates to all other elements.
MR. FARMER: 15?
MS. NEWMAN: 15, yes. 15 percent relates to all other elements.
BY MS. NEWMAN:
Q Mr. Cobb, in this matter is it reasonable and appropriate to rely upon the testimony of a marketing analyst for the Twin Cities market in trying to determine the appropriate apportionment of profits?
A At least generally, yes.
Q And specifically in this matter relying upon the testimony of Mr. Conhaim, anything inappropriate about doing so?

00249

A Not that I know of.

Q And finally, Mr. Cobb, have you seen the surveys that were produced by Rottlund that are returned from the buyers of its product and that rank some of the reasons why it is that they purchased a Rottlund product?

A I have. I've seen at least some of them.

Q Mr. Cobb, is there anything unreasonable or -- let me say it the other way. Is it reasonable and appropriate for a damages expert in this matter to rely at least in part on the information that is contained in those surveys that were produced by Rottlund in this matter?

A I believe so.

Q Do you consider opinions that are formed, at least in part, by relying upon items like we've just described as speculative?

A No.

Q Why?

A They have some -- they have a basis of information. They have a basis in analysis. They have a basis in fact.

Q Generally again with respect to Exhibit 401, the April 15, 2004, report, I have the same question that I had for the previous report, which is do

00250

you intend to offer any objections or criticisms to the facts and opinions set forth in the report of Schechter Dokken Kanter?

A No. Although I don't know specifically what I'd be asked.

Q Mr. Cobb, you were asked by Mr. Krummen in your first round of your deposition about ways in which an appropriate license fee could be determined. Do you recall generally being asked about that?

A Yes.

Q And I believe that you referenced the Georgia Pacific case and some of the factors that are listed in that case as important to determine a reasonable royalty rate or license fee?

A I think they can be important considerations.

Q Would the typical costs associated with paying an architect to create from scratch, if you will, multifamily product something that should be considered in determining what a willing licensee would pay for a license?

MR. KRUMMEN: Calls for a legal conclusion.

A I believe so. It's a measure of the creative process.

00251

BY MS. NEWMAN:

Q Just generally speaking, research and development type of figures and amounts, are those reasonable to take into account in determining what an appropriate license or royalty fee would be?

A Yes, at least generally so.

MS. NEWMAN: Mr. Cobb, I don't have anything further for you. Thank you.

THE WITNESS: Okay.

MR. KRUMMEN: Nothing further.

(Time Noted: 9:16 a.m.)

(The signature was reserved.)

* * * * *

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

No.: 01-CV-1980 (DSD/SRN)

\- - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc. d/b/a Rottlund Homes, a Minnesota Corporation,

Plaintiff,

vs.

Pinnacle Corporation d/b/a Town & Country Homes, an Illinois Corporation, and Town & Country Homes, Inc., a Minnesota Corporation,

Defendants,

and

Town & Country Homes, Inc., a Minnesota Corporation,

Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa Corporation,

Third-Party Defendant.

\- - - - - - - - - - - - - - - - - - - - - - - - - -

Deposition of

ROGER E. CONHAIM

Wednesday, August 13, 2003

9:02 a.m.

APPEARANCES:

FOR PLAINTIFF THE ROTTLUND COMPANY, INC.:

MR. PHILIP R. MAHOWALD
Attorney at Law
WINTHROP & WEINSTINE, P.A.
Suite 3500
225 South Sixth Street
Minneapolis, Minnesota 55402

FOR DEFENDANT PINNACLE CORPORATION:

MR. CHRISTOPHER J. MURDOCH
Attorney at Law
HOLLAND & KNIGHT, LLC
55 West Monroe Street #800
Chicago, Illinois 60603

FOR THIRD-PARTY PLAINTIFF TOWN & COUNTRY HOMES:

MS. CYNTHIA JOKELA MOYER
Attorney at Law
FREDRIKSON & BYRON, P.A.
4000 Pillsbury Center
200 South Sixth Street
Minneapolis, Minnesota 55402-1425

FOR THIRD-PARTY DEFENDANT BLOODGOOD SHARP BUSTER ARCHITECTS & PLANNERS OF IOWA, INC.:

MR. BEN PATRICK
Attorney at Law
MOORE, COSTELLO & HART, P.L.L.P.
701 Fourth Avenue South #1350
Minneapolis, Minnesota 55415-1823

* * * * *

Deposition, taken before Myrina Kleinschmidt, a Notary Public in and for the County of Hennepin, State of Minnesota, held at the law offices of MOORE, COSTELLO & HART, P.L.L.P., 701 Fourth Avenue South #1350, Minneapolis, Minnesota.

WHEREUPON, the following proceedings were duly had:

(The oath was administered by the reporter.)

WITNESS RESPONSE: Yes.

ROGER E. CONHAIM,

called as a witness, after first having been duly sworn, deposed under oath as follows:

EXAMINATION

BY MR. PATRICK:

Q Mr. Conhaim, I introduced myself earlier. I know that we've spoken. Introduce myself again, my name is Ben Patrick. I represent a defendant in this lawsuit: Bloodgood Sharp Buster Architects and Planners of Iowa, Inc.; and another defendant called Bloodgood Group, Inc.

Let me start out by just asking you a little bit about your background and experience.

Conhaim and associates is your company; is that correct?
A Conhaim Associates. No ampersand.
Q Okay. What does Conhaim Associates do?
A Conhaim Associates provides marketing and planning services for individuals and organizations.
Q Including residential home developers?
A Including residential home developments and home building.
Q What sort of marketing services do you provide?
A Okay. I want to make it clear at the outset that there's -- this is a very small business of two individuals, one of whom is my wife who does not work in the real estate and/or home building fields. So that question therefore must be addressed to Roger Conhaim and not to his spouse. Okay.
The services I provide are basically site specific market research studies for developers and/or developers who also have a home building component to their -- to their company, and occasionally get called on to perform other related services having to do with market research and/or marketing.

Q What information would typically be included in a market research study?

A Each study I do is custom designed for -- to meet the specific need of a client; but typically the clients ask me for site-based research that has to do with a specific piece of land, parcel of land that they are looking at to option and/or typically to buy or have already acquired and desire market research to help them inform them on the product package that should be on that site once it's developed. And by product package I refer to type of product, price range, amenities.

Q Would a market research study typically include information regarding products offered by competing builders in sites close to the target development?

A I do some work in that field. It's usually where a -- one particular national builder that I work with, employs me to provide product information in terms of price range, square footage of the townhome or condominium or single family amenities, and some analysis work that requires figuring out the price per square foot and so forth for each development that they are

-- that they are working on. And that's typically for them to provide backup material for their corporate headquarters to make the final decision on the site.
Q Which national builder would that be?
A U.S. Home, Lundgren Brothers -- I should say Orrin Thompson, Lundgren Brothers under U.S. Home. Under Lennar -- under Lennar.
Q How long have you been working in this field?
A Since 1970.
Q Where did you start working, with what company did you start working in this field?
A In this particular field, which is the one that's been the bulk of my career, I started with the company called Pemtom, Inc. P-e-m-t-o-m, comma, I-n-c.
Q Locally?
A Local.
Q Are they still around?
A Not as that company any longer. They have a -- there's another company locally in the market called the Pemtom Land Company, that is a wholly separate company that some of the individuals from the original company called Pemtom, Inc. are associated with.

Q How long were you at Pemtom?
A Two years.
Q Where did you go after that?
A I set up my own business.
Q So you've been doing Conhaim Associates or your own business of some sort since 1972?
A Yes.
Q Would it be fair to say that you are well informed about the Twin Cities residential housing market?
A Yes.
Q Is that part of your job?
A Well informed. Not fully informed. It's hard to be fully informed.
Yes, definitely.
Q I think that's fair. How do you keep informed? Do you review trade publications like Professional Builder?
A Yes. I subscribe to several industry publications: Professional Builder; Builder magazine, Midwest Realestate Journal, something like that out of Chicago; the Realestate Journal here in Minneapolis/St. Paul metro; and -- and newspapers local and suburban. I subscribe to probably 15 to 20 suburban newspapers on a

weekly basis. And meetings with people I know in the industry, and on specific research assignments that I do for clients.

Q When you say that you meet with people in the industry, do you mean to say you meet with professional builders?

A I over the years have developed what I would call professional relationships with individuals here in the metro area who are developing land, sometimes who are building homes. These are not necessarily clients of mine but professional colleagues, if you will.

And one way I obtain more information about the market and who is doing what is by just informal meetings, usually over a breakfast or a lunch with them.

Q I take it that you sit down, you eat, you talk about what they're building, they ask you about what other people are building, you talk about what's been successful, what hasn't worked. Is that about right?

A Not really "about right." I mean, it's more related to a little bit what I've been doing in the last -- since our last meeting, three months to six months, or -- and what they have been

doing, what developments they're looking at and so forth.

And this is not information that is proprietary that I pass on or that they would pass on to me. Knowing my role and who may be working for one of their competitors, but we're friends anyway.

So it's -- it's -- it's usually site specific kinds of information. Who has acquired a given site, where they are in the process of the development of that site, et cetera.

Q Do you go out in the field and tour or look at housing product?

A Spend a lot of time out in the field.

Q Do you go on Parade of Homes tours?

A My own, my own tours.

Q Do you go out to model centers for builders?

A Definitely.

Q When you're at the model centers do you pick up brochures?

A Definitely.

Q Take pictures?

A I typically take pictures of landscaping and entry monuments, outdoor amenities, that sort of thing. I do not bring a camera into the model,

per se.
Q Would it be fair to say that touring model centers, picking up brochures is necessary or important to someone who needs to know what's going on in the market?
A Definitely.
Q I told you at the beginning of all of this that I represented Bloodgood Sharp Buster. Is that a firm that you're aware of?
A I'm aware of, yes.
Q What do you know about them?
A I'm aware that they are a large architectural design and planning firm. I receive their news letters, which I should have mentioned, as part of my industry informational structure.
I know some of the individuals who have been part of that organization over the years, but not in a -- any form of truly professional capacity. Typically I meet them at seminars in various parts of the country, occasionally maybe here in the Twin Cities, that I attend.
Q What in your opinion is the professional reputation of Bloodgood Sharp Buster?
A Excellent.
Q Are they innovators?