Court File No. 01-1980 / ROTTLUND / Pinnacle
Mahowald Affidavit dated November 19, 2004

# EXHIBIT A

FREDRIKSON & BYRON, P.A.
*Attorneys and Advisors*

Minneapolis
London
Washington, DC
*Affiliates:*
Mexico City
Warsaw
Montreal
Toronto
Vancouver

1100 International Centre
900 Second Avenue South
Minneapolis, MN 55402-3397
(612) 347-7000
FAX (612) 347-7077
www.fredlaw.com

Dean R. Karau
(612) 347-7178
dkarau@fredlaw com

July 17, 2001

VIA FACSIMILE (612-347-0600)
& U.S. MAIL

Ryan F. Urness, Esq.
Winthrop & Weinstine, P.A.
3000 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, Minnesota 55402

Re: Rottlund Company, Inc./Town & Country Homes

Dear Mr. Urness:

I am one of the attorneys representing Town & Country Homes, and write in response to your July 5, 2001, letter to Michael Ryan.

Your letter and attachments are unclear about which designs Rottlund believes are proprietary and for which it claims cognizable rights. It is also unclear which Town & Country features Rottlund claims infringe the alleged copyrightable designs. Therefore, please provide a detailed explanation of designs in which Rottlund is claiming rights and the Town & Country features that Rottlund alleges infringe those rights. Also, please provide a copy of Rottlund's copyright registration(s) for the designs that it claims are being infringed.

As an owner of intellectual property, Town & Country takes seriously allegations of infringement. Therefore, we look forward to promptly receiving from you sufficient information to evaluate Rottlund's claim of infringement

Sincerely,

Dean R. Karau

DRK:seb:2536465

cc: Cynthia Jokela Moyer, Esq.
Jay Erstling, Esq.

Mr. Ryan F. Urness
July 17, 2001
Page 2

bcc: Mr. Art Plante
Mary Ranum, Esq.

# EXHIBIT B

111804

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| The Rottlund Company, Inc., d/b/a Rottlund Homes, a Minnesota corporation, | File No. CV-01-1980 (DSD/SRN) |
| Plaintiff, | Minneapolis, Minnesota November 18, 2004 9:00 a.m. |
| vs. | |
| Pinnacle Corporation, d/b/a Town & Country Homes, an Illinois corporation; and Town & Country Homes, Inc., a Minnesota corporation; and Bloodgood Sharp Buster Architects & Planners of Iowa, Inc., an Iowa corporation; and The Bloodgood Group, Inc., an Iowa corporation, | Volume IV |
| Defendants. | |

BEFORE THE HONORABLE DAVID S. DOTY
UNITED STATES DISTRICT COURT JUDGE AND A JURY
(TRIAL - VOLUME IV)

Court Reporters: LORI SIMPSON, RMR-CRR
KRISTINE MOUSSEAU, RPR-CRR
1005 U.S. Courthouse
300 South Fourth Street
Minneapolis, Minnesota 55415

Proceedings recorded by mechanical stenography; transcript produced by computer.

LORI A. SIMPSON, RMR-CRR
(612) 664-5104

APPEARANCES

facts are, you'll hear the evidence, that Rottlund has a whole host of copyrights; they have a policy of copyrighting each building as it gets built.

The other thing to keep in mind is that two of the three copyrights at issue in this case have not been registered at this point in time. The final point to remember about that letter is, what's attached to that letter -- and you saw them -- are two brochures, two advisements. Rottlund does not allege in this case, copyrights on advisements. Rottlund alleges copyrights on architectural works and designs for town homes.

When Pinnacle, Town & Country Minnesota get this letter, what do they know? They already know, because they were part of the process, that Town & Country Homes and Bloodgood Sharp Buster independently created their work.

You heard Rottlund tell you that Peter Brennan, who came over here and made gestures, did nothing. Well that's not accurate, ladies and gentlemen.

This is a letter on the -- the letterhead from my law firm, Fredrikson & Byron, and it's dated July 17, 2001. And I'm going to pull up the text in a second, but I want you to see the whole letter and the

date because it's important.

Here's the letter on July 17th, a mere two weeks after the letter has gone to Lombard, Illinois. Mr. Urness, I'm one of the attorneys representing Town & Country Homes and write in response to your July 5th, 2001 letter to Michael Ryan. Your letter and attachments are unclear about which designs Rottlund believes are proprietary and which it claims cognizable rights. It is also unclear which Town & Country features Rottlund claims infringe the alleged copyrightable designs. Therefore, please provide a detailed explanation of designs in which Rottlund is claiming rights and the Town & Country features that Rottlund alleges those copyrights. Also, please provide a copy of Rottlund's copyright registration for the designs that it claims are being infringed. As an owner of intellectual property, Town & Country takes seriously allegations of infringement, therefore, we look forward to promptly receiving from you sufficient information to evaluate Rottlund's claim of infringement.

After this letter goes in from my law firm to Winthrop & Weinstine, the law firm that wrote the letter, there's a couple letters back and forth; and you may get a chance to see them. And then this

lawsuit begins.

The fact is, ladies and gentlemen, Town & Country, Pinnacle, they did respond. What they wanted to know is the same questions that this lawsuit is going to be about. What is it in our town home that is substantially similar. What is it about our plans that they allege to have protection over that is substantially similar in our plans.

In 2002, Town & Country Minnesota made a business decision to develop a new back-to-back product. And they went out and hired a new architectural firm and that architectural firm is called Tushie-Montgomery. They are located here in the Twin Cities. And Tushie Montgomery, after signing a contract with Town & Country Minnesota, went about designing the Chateau Collection. One thing to keep in mind about the Chateau Collection, is that there are actually two different end units. Unlike the Homestead, which has one end unit with a bunch of options, and one interior unit, the Chateau Collection actually has two different end units. They are called the Aspen and the Copper; and one interior unit, which is the Brighton. And Mr. Murdoch went through some of the options that exist in the Homestead Collection and showed you that one of the issues in this case is

earlier, July 5, 2001, which is a letter with two attachments and the record should reflect they are both out of the brochure, one of which shows the so-called money shot, the other one shows floor plans out of the brochure. I would move for its admissibility at this time.

MR. MURDOCH: Your Honor, at this time we would like to renew our objection to the use of the phrase "obviously similar" and ask for an instruction regarding the proper legal standard.

THE COURT: I will give that instruction now and I think that's the appropriate way to do it. You will see occasionally and maybe even heard on this deposition the words "obviously similar." There's a legal definition of copyright infringement. It does not include the words "obviously similar." You will have that definition given to you by the court, but don't become confused when someone says "obviously similar" or they have in this particular letter those words, don't become confused by that. The legal definition is different and you will have that later.

Okay. Is that sufficient, Mr. Murdoch?

MR. MURDOCH: Thank you very much, Your Honor.

THE COURT: But is there any objection to --

MR. MURDOCH: We still have an objection to the exhibit for the reasons stated previously.

THE COURT: It will be overruled on that basis

things over and concluded they were obviously similar, correct?

A. Yes.

Q. The lawyers ask Rottlund for more information even though the architect on staff full time has already concluded that the plans are obviously similar. That's what went on, correct, sir?

MR. MURDOCH: Judge, could I just have a formal objection to the repetitive repetition of repeating questions.

THE COURT: Sustained. I sustained the objection.

MR. WEINSTINE: Okay.

BY MR. WEINSTINE:

Q. Now, let me show you exhibit Plaintiff's 697. The record should reflect that this is a letter of August 20th, 2001. It's sent from the Frederickson firm -- or from my law firm to the Frederickson firm.

Have I thus far accurately characterized the exhibit?

A. Yes.

Q. Okay. You've seen this before, haven't you?

A. Yes, I have.

MR. WEINSTINE: Move for its admission.

MR. MURDOCH: No objection.

MS. NEWMAN: No objection.

MR. WEINSTINE: It's a fair statement, is it not that the letter --

THE COURT: No objection, Mr. Schwiebert?

MR. SCHWIEBERT: I'm sorry. No objection.

THE COURT: 697 will be received.

BY MR. WEINSTINE:

Q. It's a fair statement, is it not, that the letter was a response to the Frederickson firm saying we take this seriously?

A. Yes.

Q. Can you give us some support? And the letter says, "The materials we sent to Mr. Ryan on or about July 5th, 2001, adequately explain which designs Rottlund believes are proprietary and for which it claims cognizable rights," correct?

A. Yes.

Q. We say you know, we can't believe you didn't get it, but here we go, and then it goes on to list the following:

1. The main level first floor room arrangement including living room, two-story space and living room, dining room, kitchen, powder room, mechanical room, stair location, fireplace location and patio door design, okay, infringe, correct?

A. Yes.

Court File No. 01-1980 / ROTTLUND / Pinnacle
Mahowald Affidavit dated November 19, 2004

EXHIBIT C

WINTHROP & WEINSTINE
A PROFESSIONAL ASSOCIATION
Attorneys and Counselors at Law

3200 Minnesota World Trade Center
30 East Seventh Street
Saint Paul, Minnesota 55101
Telephone (651) 290-8400
Fax (651) 292-9347

3000 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, Minnesota 55402
Telephone (612) 347-0700
Fax (612) 347-0600

ckrummen@winthrop.com

SHERMAN WINTHROP •
ROBERT R. WEINSTINE
RICHARD A. HOEL
STEVEN C. TOUREK
STEPHEN J. SNYDER
MARVIN C. INGBER
HART KULLER
DAVID P. PEARSON
THOMAS M. HART IV
DARRON C. KNUTSON
JOHN A. KNAPP
MICHELE D. VAILLANCOURT
DONALD J. BROWN
JON J. HOGANSON
SANDRA J. MARTIN
TODD B. URNESS
TIMOTHY M. BARNETT
SCOTT J. DONGOSKE
PETER J. GLEEKEL
EDWARD J. DRENTTEL

JEFFREY R. ANSEL
LAURIE A. KNOCKE
LLOYD W. GROOMS
MARK T. JOHNSON
THOMAS J. PUFF
BROOKS F. POLEY
THOMAS H. BOYD
DANIEL C. BECK
JOANNE L. MATZEN
PATRICK W. WEBER
PAUL W. MARKWARDT
CRAIG A. BRANDT
JAMES W. DIERKING
THERESE M. MARSO
JEFFREY L. LECLERC
THOMAS A. WALKER
JOHN C. HOLPER
TIFFANY A. BLOFIELD
MARK R. GLEEMAN
RYAN K. CRAYNE

BETH GERSTEIN TIMM
JULIE A. SILVERMAN
ERIC F. SWANSON
LAURA A. PFEIFFER
CRAIG S. KRUMMEN
MATTHEW R. MCBRIDE
PHILIP R. MAHOWALD
NORMAN L. JONES III
KARL E. ROBINSON
JONATHAN W.J. ARMOUR
DANIEL S. SCHLECK
MARK A. PIHART
CHARLES J. SCHOENWETTER
ANDREW C. TRIGGS
JULIE ANN FISHEL
DARRELL E. GRAHAM
ASHISH MISHRA
DAVID A. DAVENPORT
KENNETH A. PRINE
JOY S. MCGINNIS

RYAN R. URNESS
BO W. WILLSEY
BRIAN W. KENSICKI
DANIEL W. GODFREY
WILLIAM H. KOMP
JOHN D. NOLDE
JENNIFER K. BOWER
MICHAEL T. RATTING
CHUANPIS SANTILUKKA

ROGER D. GORDON
(1950-2000)

Direct Dial

(612) 347-0606

August 20, 2001

Reply to

Minneapolis

Dean R. Karau, Esq.
Fredrikson & Byron, P.A.
1100 International Centre
900 Second Avenue South
Minneapolis, Minnesota 55402-3397

*Via Facsimile*
*and First Class Mail*

*Re: Rottlund Company, Inc. v. Town & Country Homes*

Dear Mr. Karau:

This correspondence responds to your letter requesting additional information concerning Town & Country Homes' ("Town & Country's") infringement upon Rottlund Company Inc.'s ("Rottland's") copyrighted designs.

The materials we sent to Mr. Ryan on or about July 5, 2001, adequately explain which designs Rottlund believes are proprietary and for which it claims cognizable rights. Town & Country should certainly be in a position to assess Rottlund's claims of copyright infringement based on these materials and Town & Country's prior misconduct. Nevertheless, to address your request, this correspondence provides a list of 12 demonstrative -- but certainly not exclusive -- design features that were infringed upon. For instance, Town & Country's "Bayview" Model infringes upon the design features of Rottlund's "Chatham" Model in many respects, including, but not limited to the following:

1. Main level (first floor) room arrangement including living room, two-story space in living room, dining room, kitchen, powder room, mechanical room, stair location, fireplace location, and patio door location.

EXHIBIT
Pltf. #697
Civ. 01-1980

2. Upper level (second floor), room arrangement including two story space open to living room below, loft, bedrooms, stair location and bathroom location.

3. Building configuration consists of 8 units in a back-to-back design with 4 units on each side; each side is a mirror image of the other.

4. Garage placement and size with each unit having a 2-car garage.

5. Front door entrance placement with each end unit having entrance placed on the end of the building.

6. Roof configuration.

7. Window placement.

8. Exterior patio placement.

9. Slab on grade design with no basement.

10. Fireplace location and architectural detail including drywall arch above fireplace.

11. Upper level loft railing overlooking two-story space in main level living room.

12. Kitchen cabinet peninsula breakfast bar area in dining room.

Again, this list is certainly not an exhaustive list, and your client, due to its prior misconduct, should not need even this level of detail to assess Rottlund's infringement claim.

At this point, the parties can either sit down and attempt to resolve this matter amicably, or, in the alternative, Rottlund can prepare and serve a Complaint on Town & Country and initiate formal litigation. Please be advised that senior executives of Rottlund are available to meet with senior representatives of Town & Country in Minneapolis during the week of September 10, 2001. Please respond on or before Tuesday, August 28, regarding your client's availability to conduct such a meeting. If we do not hear from you, we will have no choice but to prepare a Complaint and begin formal litigation regarding this matter.

Thank you for your time and attention to this matter.

Very truly yours,

WINTHROP & WEINSTINE, P.A.

By - Craig S. Krummen

Craig S. Krummen

CSK/jas/10150-3-/-idmsmpl:462739-1

Court File No. 01-1980 / ROTTLUND / Pinnacle
Mahowald Affidavit dated November 19, 2004

# EXHIBIT D

FREDRIKSON & BYRON, P.A.
*Attorneys and Advisors*

Minneapolis
London
Washington, DC
*Affiliates:*
Mexico City
Warsaw
Montreal
Toronto
Vancouver

1100 International Centre
900 Second Avenue South
Minneapolis, MN 55402-3397
(612) 347-7000
FAX (612) 347-7077
www.fredlaw.com

Dean R. Karau
(612) 347-7178
dkarau@fredlaw.com

August 23, 2001

**VIA FACSIMILE (612-347-0600)**
**& U.S. MAIL**

Craig S. Krummen, Esq.
Winthrop & Weinstine, P.A.
3000 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, Minnesota 55402

Re: Rottlund Company, Inc./Town & Country Homes

Dear Mr. Krummen:

I write in response to your August 20, 2001, letter. Contrary to your assertion, the two one-page documents that Mr. Urness sent to Mr. Ryan do not adequately explain either the specific design features in which Rottlund claims cognizable rights or the specific Town & Country features Rottlund claims infringe those alleged rights.

Your letter does not clarify Rottlund's claims. As described, the twelve design features are generic, commonplace features that appear in hundreds, if not thousands, of home designs. Your letter fails to describe, with the requisite specificity, the original design elements Rottlund claims are present and the allegedly infringing Town & Country features.

You also failed to comply with my request for copies of the copyright registrations for the designs you claim to be infringed.

Finally, Town & Country takes exception to unsupported, and therefore actionable, allegations of "prior misconduct."

Until Rottlund can identify with specificity the features in which it claims rights and the allegedly infringing Town & Country features, there appears to be little that could be

meaningfully accomplished in a face-to-face meeting.

Sincerely,

Dean R. Karau

DRK:seb:2550358

cc: Cynthia Jokela Moyer, Esq.
Jay Erstling, Esq.

Court File No. 01-1980 / ROTTLUND / Pinnacle
Mahowald Affidavit dated November 19, 2004

EXHIBIT E

Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.

**EZ DOCK, INC., Plaintiff,**
**v.**
**SCHAFER SYSTEMS, INC., et al. Defendants.**

**No. Civ.98-2364(RHK/AJB).**

March 8, 2003.

Daniel J. Maertens and Lora Esch Mitchell, Fredrikson & Byron, P.A., Minneapolis, Minnesota; and McPherson D. Moore and Ned W. Randle, Polster, Lieder, Woodruff & Lucchesi, L.C., Saint Louis, Missouri, for Plaintiff.

Douglas J. Williams, Jon Trembath, and William F. McIntyre, Jr. Merchant & Gould, P.C., Minneapolis, Minnesota, for Defendants.

MEMORANDUM OPINION AND ORDER

KYLE, J.

Introduction

***1** Plaintiff EZ Dock, Inc. alleges that Defendants Schafer Systems, Inc. and Connect-A-Dock, Inc. (collectively, "Defendants" or "Schafer") have, through their manufacture and sale of the Model 1000 and Model 2000 "Connect-A-Dock" floating docks and the Defendants' corner dock sections, infringed multiple claims of United States Patent No. 5,281,055 (hereinafter "the '055 patent"), which describes a floating dock comprised of one or more uniform sections that can be coupled together to make an endless combination of formations. For their part, Defendants deny that their products infringe the '055 patent, either literally or under the doctrine of equivalents. Defendants further contend that (1) the invention disclosed in the '055 patent was reduced to practice and sold more than one year prior to the filing of the application for the patent, rendering the patent invalid, (2) the invention claimed in the '055 patent is obvious in light of a combination of prior art references and therefore invalid, (3) the invention was anticipated by one of four earlier patents and is therefore invalid, and (4) the patent is unenforceable due to inequitable conduct before the Patent and Trademark Office ("PTO").

Before the Court are the parties' Motions in Limine. EZ Dock has brought ten motions; Schafer has brought one. Several of the motions involve the admissibility of expert testimony under Federal Rules of Evidence 702 and 703 and the Supreme Court's decisions in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. The Court begins with the motions relating to expert testimony.

*I. Motions in Limine Relating to Expert Testimony*
*A. General Principles*

The admissibility of expert testimony and the qualifications of a witness to testify as an expert are preliminary questions that the district court must determine. Fed.R.Evid. 104(a). The proponent of the proposed expert testimony bears the burden of demonstrating by a preponderance of the evidence that it is admissible. *See Daubert,* 509 U.S. at 592 & n. 10; *Bourjaily v. U.S.,* 483 U.S. 171, 175-76 (1987); *Lauzon v. Senco Prods. Inc.,* 270 F.3d 681, 686 (8th Cir.2001).

Effective December 1, 2000, Rule 702 was amended to add language consistent with the holdings from a line of Supreme Court opinions regarding expert testimony that began with *Daubert.* [FN1] As amended, Rule 702 provides that

FN1. At the time this action was commenced, Rule 702 provided that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702 (2000).

[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

principles and methods, and (3) the witness has applied the principles and methods reliably to the facts.

Fed.R.Evid. 702 (2001) (emphasis added).

***2** Under both *Daubert* and the amended Rule 702, the trial judge is charged with a "gatekeeper function," the objective of which is to ensure the reliability and relevance of the expert testimony admitted into evidence. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 149 (1999). The court ensures the *relevance* of proposed expert testimony by evaluating whether the opinions offered are sufficiently tied to the facts of the case, *see Daubert,* 509 U.S. at 591, and ensures the *reliability* of such testimony by considering a number of non-exclusive factors, such as "(1) whether the theory or technique can be (and has been) tested, (2) whether the theory has been subjected to peer review and publication, (3) the known or potential rate of error, and (4) whether the theory has been generally accepted." *Peitzmeier v. Hennessy Indus., Inc.,* 97 F.3d 293, 297 (8th Cir.1996) (quoting *Daubert,* 509 U.S. at 593-94). Other factors pertinent to assessing the reliability of expert testimony have evolved from *Daubert'* s progeny, including "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Lauzon,* 270 F.3d at 687.

Although the Supreme Court in *Daubert* stated that the focus of the trial court's gatekeeping inquiry "must be solely on principles and methodology, not on the conclusions they generate," 509 U.S. at 595, the Court later acknowledged that "conclusions and methodology are not entirely distinct from one another." *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* Thus, the district court may evaluate whether the studies or data upon which the expert relies are sufficient, either individually or in combination, to support the conclusions and opinions being advanced, there being "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.*

The ultimate goal of the trial court's "gatekeeping" inquiry is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152. To accomplish that "gatekeeper function," the trial court has discretion both in deciding *how* to evaluate the reliability of the expert testimony and *whether* the expert's relevant testimony is reliable. *Id.* In evaluating the admissibility of expert testimony, the trial court must also be mindful that "[v]igorous cross-examination [and the] presentation of contrary evidence ... are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596. This last observation reflects the fundamental principle that Rule 702 is generally one of inclusion rather than exclusion.

*B. Defendants' Motion to Exclude Testimony of Arthur H. Cobb Re: Lost Profits Analysis and Reasonable Royalty Analysis*

***3** Arthur H. Cobb is EZ Dock's damages expert. (Pl.'s Trial Brief at 20.) Cobb is a certified public accountant who has been engaged for almost thirty years in providing professional services in financial matters, with emphases in the areas of litigation support and capital finance. (McIntyre Aff. Ex. 1 at 35.) He has held engagements regarding the estimation and evaluation of lost profits and economic damages in business litigation (including reasonable royalties) and has held engagements regarding the recreational boat industry. (*Id.*)

Schafer moves to exclude Cobb's testimony with respect to two main areas: (1) his determination of damages measured by a "lost profits" analysis, and (2) his determination of damages using a reasonable royalty analysis. Defendants criticize Cobb's analysis of "lost profits" on the grounds that it lacks sound economic evidence of the nature of the market and likely outcomes with infringement factored out of the picture. Specifically Defendants complain that Cobb's "lost profits" analysis fails to analyze the demand for the patented features of EZ Dock's product that are at issue in this litigation and improperly relies on the unsupported opinions of another expert regarding the absence of acceptable, non-infringing alternatives to EZ Dock's. Defendants criticize Cobb's "reasonable royalty"

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

analysis for failing to address many aspects of the framework set out in the seminal case of *Georgia Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y.1970).

Upon a finding of infringement, Title 35 permits an award of "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. The party establishing infringement of a patent can recover lost profits as its damages if it proves that, "but for" the infringement, it reasonably would have made the additional profits enjoyed by the infringer. *See King Instruments Corp. v. Perego*, 65 F.3d 941, 952 (Fed.Cir.1995). The successful plaintiff "may resort to any method showing, with reasonable probability, entitlement to lost profits 'but for' the infringement." *Micro Chemical, Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed.Cir.2003) (citing *King Instruments*, 65 F.3d at 952.) The Court begins its analysis of Schafer's motion in limine with the issue of "lost profits."

*1. Lost Profits*

Proof of an entitlement to lost profits calls for a two-step analysis. First, the patentee must establish the reasonableness of an inference that, "but for" the infringement, it would have made the additional profits enjoyed by the infringer. *Micro Chemical, Inc.*, 318 F.3d at 1122. The burden then shifts to the infringer to show that the inference is unreasonable as to some or all of the lost profits. *Id.* There are two recognized methods of showing "but for" causation: the four-factor test set out in *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir.1978), and the two-supplier market test. *Micro Chemical*, 318 F.3d at 1122; *see also Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed.Cir.1983).

***4** Cobb describes the dock industry as including both fixed and floating docks made from a variety of materials, including but not limited to concrete, wood, polystyrene, aluminum, and polyethylene. (McIntyre Aff. Ex. 1 at 6.) Thus, part of the dock industry involves floating docks; a segment that comprises large companies, small manufacturers, and many one-person operations. (*Id.*) Cobb asserts that "[t]he majority of the total dollar value of the dock industry is estimated to be generated by less than six companies." (*Id.*) According to Cobb, EZ Dock competes in the floating dock segment of the industry with, *inter alia*, Schafer and Connect-A-Dock; Jet Dock Systems, Inc.; CanDock, Inc.; and ShoreMaster. (*Id.* at 7.)

Framing his analysis around the "but for" causation factors set forth in *Panduit*, Cobb considers four issues relevant to determining whether alleged lost profits were caused by infringement: (1) the existence of a demand for the patented product, (2) the absence of available, non-infringing substitutes, (3) the patent holder's manufacturing and marketing capability to exploit the demand, and (4) the amount of profit the patent holder would have made. *See Panduit*, 575 F.2d at 1156. With respect to the first factor, Cobb opines that "[d]emand for EZ Dock's floating dock and related products are [sic] substantiated by EZ Dock and by Connect-A-Dock product sales." (McIntyre Aff. Ex. 1 at 19.) After summarizing Connect-A-Dock's sales from 1998 through May 31, 2002, Cobb states that "Connect-A-Dock revenues were assumed to be net of discounts, returns and allowances, freight, and sales commissions." (*Id.*)

For the second *Panduit* factor, Cobb's analysis consists, *in toto*, of the following:

EZ Dock and Connect-A-Dock products exist in a two-supplier market and directly compete for the same customers. C. Allen Wortley determined and opined that no acceptable non-infringing alternatives to the EZ Dock patented product exist. We assume that EZ Dock would have captured all Connect-A-Dock sales.

(*Id.*) At the end of his expert report, Cobb lists the data and other information considered. (Id. at 32-34.) Nowhere in that three-page list does Cobb specifically identify the expert report of C. Allen Wortley.

The difficulties with Cobb's proposed expert opinions are illustrated by his deposition testimony. Asked what he relied on for his opinion that a purchaser buys a dock from either EZ Dock or Defendants because it has "pylon" structures on the underside that assist with floatation and structural rigidity, Cobb responds as follows:

A: In that regard I'm relying on the analysis, considerations and opinions of Mr. Wortley.
Q: What have you done to see if he's done the proper analysis?

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

A: I've not--I've not done anything specific in that regard. I've read his material and relied on his material but I've not undertaken an independent investigation or analysis on that.
***5** Q: The material you reviewed, in all the material that you reviewed, do you recall anything anywhere suggesting that a dock was purchased because it had a conical or frustoconical space underneath the dock?
A: Not specifically.

(McIntyre Aff. Ex. 2 at 18.) Regarding the existence of a two-supplier market, Cobb testified as follows:

Q: Am I correct that you rely upon Dr. Wortley's statement that there are two suppliers in the market, only two suppliers in the market and that -
A: Two suppliers with the particular feature and the importance of that feature, yes.
Q: And because of that you don't need to do any type of elasticity analysis?
A: Yes.
(Id. at 33-34.)

In his expert report, therefore, Cobb has not himself formed an opinion as to the existence of a "two-supplier" market; he has simply adopted Wortley's opinion regarding the nature of the market. This adoption is problematic, however, given Cobb's earlier observation that EZ Dock competes in the floating dock segment of the market with at least *four* companies, including Schafer/ Connect-A-Dock. Furthermore, Defendants have presented evidence that Wortley himself doubts that every EZ Dock product that is purchased has been purchased because it has the "pylon" structure. (McIntyre Aff. Ex. 3 at 100.) Wortley further testified as follows:

Q: ... Did you do any research to see why people purchased the EZ Dock system?
A: No.
Q: Did you do any research to see why people purchased the Connect-A-Dock system?
A: No.
Q: Do you believe that every dock sold by Connect-A-Dock would have been sold by EZ Dock?
A: No.
(Id. at 101.)

Cobb has failed to account for the effect of competition from other companies that manufacture floating docks, such as CanDock, JetDock Systems, and ShoreMaster. *See Children's Broadcasting Corp. v. Walt Disney Co.,* 245 F.3d 1008, 1018 (8 th Cir.2001) (excluding expert testimony on damages where expert failed to consider the effect of competition by others in industry). Furthermore, Cobb does not explain why it is reasonable to assume that EZ Dock would capture all Connect-A-Dock sales. His proposed opinions regarding the existence of a demand for the patented product and the absence of non-infringing alternative products is not "based upon sufficient facts or data" as required by Rule 702.

This case is distinguishable from *Micro Chemical, Inc v. Lextron, Inc.,* 317 F.3d 1387 (Fed.Cir.2003) (*"Lextron I"* ), on which EZ Dock relies for the admissibility of Cobb's testimony. In *Lextron I,* the defendants challenged the admissibility of expert opinion testimony on the grounds that it was not based on "reliable facts." The parties in *Lextron I* hotly disputed many of the facts relevant to a reasonable royalty analysis, leading the Federal Circuit to caution that, "[w]hen ... the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony." 317 F.3d at 1392.

***6** In this case, by contrast, Cobb's expert report points to *no* facts that underlie his proposed testimony regarding either the demand for the patented product, the availability of non-infringing alternatives, or the nature of the market as a two-supplier market. The Defendants cannot subject Cobb's proposed testimony on those factors to "vigorous cross-examination" because Cobb himself does not purport to know anything about those subjects; he has deferred to Wortley's analysis and opinions. With respect to Cobb's opinions regarding "lost profits" the Court concludes that "there is simply too great an analytical gap between the data and the opinion proffered." *Joiner,* 522 U.S. at 146. In neither his expert report nor his deposition could Cobb identify a reliable factual basis for his opinions regarding the demand for the patented product or the existence of available non-infringing alternatives.

EZ Dock has failed to meet its burden of proving that Cobb's proposed expert testimony satisfies the criteria of Federal Rule of Evidence 702. Accordingly, the Court will grant Defendants'

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

motion with respect to Cobb's testimony regarding lost profits.

*2. Reasonable Royalty Analysis*

Defendants also challenge the admissibility of Cobb's determination of a 20% " reasonable royalty" rate on the grounds that he has failed to address several factors relevant to the analysis set out by the *Georgia Pacific* case and has also failed to account for a "commonly-used 25% 'rule of thumb' method" as the starting point of his analysis. Defendants further complain that Cobb has failed to factor in the established licensing practices in the industry, which Defendants contend are in the range of 1% to 5%. The Court concludes that any shortcomings in Cobb's "reasonable royalty" analysis go to the weight rather than the admissibility of his analysis, and are more appropriately the subject of cross-examination than a motion to exclude and go more to the weight than the admissibility of his testimony. Accordingly, the Court will deny the Defendants' motion with respect to Cobb's proposed expert testimony regarding a "reasonable royalty" rate.

*C. EZ Dock's Motion to Exclude Evidence and Testimony from Glenn L. Beall*

Glenn Beall has worked in the plastics industry since receiving his bachelor of science degree in 1957, and has worked with the rotational molding process since 1963. (Mitchell Aff. Ex. 1 at 1.) He teaches rotational molding and has published several articles and books in the field. (*Id.*) He indicates having an understanding of patents, but acknowledges that he is not a patent attorney. (*Id .*)

EZ Dock moves to exclude any testimony of Glenn L. Beall relating to "the skill of rotomolding, plastic dock design, patent infringement, patent validity, the state of the law, legal conclusions, patent office procedures, or any other related matter." (Pl.'s Mot. in Limine to Exclude Evid. and Testimony of Beall at 1.) EZ Dock argues that Beall lacks the necessary background or experience in "the areas of science ... which are crucial to the case at bar, namely the design and manufacture of floating plastic docks," and is therefore incompetent under Rule 702 to provide expert testimony in this case.

*7 EZ Dock's current argument stands in sharp contrast to the assertions EZ Dock made in the context of the *Markman* hearing: namely, that a person of ordinary skill in the art of dock design and construction is someone who has a high school education and has no experience in rotational molding. (Pl.'s Initial Markman Brief at 11.) Accepting as true EZ Dock's representation of who constitutes a person of ordinary skill in the art, it is clear that, far from being unqualified to testify, Beall is overqualified. Furthermore, the specification of the '055 patent recommends a preferred embodiment in which the docking members are made of "specialized molded polyethylene"; i.e., a type of plastic. Beall qualifies as an expert in the manufacture of plastic items through rotational molding. Therefore, Beall should be allowed to offer expert testimony on rotational molding and the design and manufacture of plastic items, to the extent those subjects are relevant to the questions the jury must resolve.

With respect to Beall's ability to testify about patent law or claim interpretation, EZ Dock's arguments are more well-taken. Beall's expert report indicates that he is not qualified to provide expert testimony on the operations of the PTO or how to construe claims. Furthermore, issues of law are not properly the subject of expert testimony. It is the *Court's* duty to instruct the jury on the applicable principles of patent law, just as claim construction is an issue for the *Court* and not the jury. The Court has already construed the claims at issue in the January 22, 2003 *Markman* Order. At the hearing on the motion in limine regarding Beall, counsel for the Defendants represented that Beall will not testify regarding claim construction, such as the language from the claims at issue requiring the pylons to extend from the top surface to the bottom surface of the docking member. Nor will Beall purport to testify about patent law. Accordingly, that aspect of EZ Dock's argument appears to be moot.

Finally, with respect to issues of patent infringement and validity, Defendants persuasively argue that Beall, as a person experienced in the manufacture of plastic devices through rotational molding, is adequately qualified to compare elements of the '055 patent with elements of the accused products to assist the jury in determining whether they are equivalent or perform substantially the same function in substantially the same way to obtain substantially the same result. Accordingly,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Beall will be allowed to testify to facts pertaining to the comparison of the patent-in-suit to the accused products or to prior art references.

*D. EZ Dock's Motion to Exclude Evidence and Testimony from Brian Pingel*

Brian Pingel has served as patent counsel for Schafer in connection with the Connect-A-Dock products from at least late 1997. In December 1997 and January 1998, prior to the start of this lawsuit, Pingel sent letters to Schafer stating his opinions as to whether the design for a floating dock system that Schafer was developing infringed the '055 patent. (Mitchell Aff. Exs. A & B.) Also prior to this lawsuit, in response to a letter from EZ Dock's counsel demanding that Schafer cease and desist with the manufacture and sale of its floating dock product, Pingel wrote to EZ Dock's counsel challenging whether in fact Schafer's product infringed the '055 patent. (*Id.* Ex. C.) Finally, since this lawsuit began, Pingel has written letters to dealers and potential purchasers of Connect-A-Dock products (*id.* Exs. D, E, & G), and has written an additional opinion letter in light of the PTO's issuance of a re-examination certificate adding additional claims (*id.* Ex. F). Finally, in light of the Supreme Court's decision in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, Pingel wrote a letter to Schafer explaining the case's impact on his prior opinion letters. (*Id.* Ex. H.)

***8** EZ Dock moves to exclude any evidence or testimony from Pingel "regarding matters outside the contents of his non-infringement letters"; i.e., the letters of December 1997 and January 1998. (Pl.'s Mot. in Limine to Exclude Letters of Pingel and Evid. and Testimony Re: Same at 2.) EZ Dock argues that Defendants did not identify Pingel as an expert witness or produce an expert report from him; therefore, the Court should not allow him to offer opinion testimony on issues such as the validity of the '055 patent, its enforceability, claim construction, or other areas of patent law. The Court concurs with EZ Dock's observation that Pingel can be called only as a fact witness, not as an expert witness. Accordingly, Defendants are cautioned that Pingel's testimony shall be confined to the facts--e.g., what he did, said, or wrote--that are relevant to the issue of willful infringement.

Turning to the admissibility of the letters, the Court begins with Pingel's March 15, 2002 letter to Defendants regarding his review of the reexamination certificate issued by the PTO on the '055 patent. EZ Dock has not adequately explained why this opinion letter, generated in light of the fact that EZ Dock had obtained a re-examination certificate adding additional claims, and in light of the fact that EZ Dock amended its Complaint to assert infringement of those new claims, should be treated substantially differently from Pingel's opinion letters regarding non-infringement of the patent as originally issued. With respect to the March 15, 2002 letter, EZ Dock's motion in limine will be denied. [FN2]

FN2. The Court does not here attempt to address any other objections EZ Dock may have to the admissibility of the March 15, 2002 letter.

The February 26, 1998 letter to EZ Dock's counsel reflects Pingel's position prior to the start of litigation regarding the non-infringement of the '055 patent by the Connect-A-Dock design. EZ Dock has not established a basis for excluding that letter. Accordingly, the Court will deny the motion in limine with respect to that letter as well.

Turning to letters Pingel sent to Connect-A-Dock dealers and potential purchasers--Exhibits D, E, & G to Mitchell's Affidavit--the Court concludes that those letters are not relevant to the question of willful infringement. Rather, they seek to communicate Defendants' litigation position to third parties who are aware of the lawsuit. As such, they have no bearing on the Defendants' intent in engaging in the manufacture and sale of the accused products after conducting due diligence on the question of infringement. Pingel's letters dated December 2, 1999, April 3, 2001, and April 29, 2002 are not admissible. Finally, Defendants have failed to establish how Pingel's July 9, 2002 letter to Defendants regarding the *Festo* decision--Exhibit H to Mitchell's Affidavit--is relevant to or admissible on the issue of willfulness.

The Court will grant in part EZ Dock's motion with respect to the letters dated December 2, 1999, April 3, 2001, April 29, 2002, and July 9, 2002. The letters shall not be introduced into evidence, nor shall Pingel nor any other defense witness testify as to their contents or the circumstances surrounding them.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*E. EZ Dock's Motion to Exclude Testimony from Kent A. Herink Re: State of Patent Law or Legal Conclusions*

***9** Kent Herink has practiced as a patent attorney for over twenty years. He holds both a Bachelor of Arts degree and a Masters of Science degree in physics. In Herink's "Updated Expert Witness Statement," dated August 14, 2002, he anticipates being called to testify on "a variety of matters regarding [PTO] practice and procedures, both in general and as they apply to this case." Herink expresses his opinions as to the proper construction of the claims at issue in this litigation. He also states opinions as to the invalidity of the '055 patent on several theories, including anticipation and failure to disclose the best mode. In his "Updated" statement, Herink also opines as to the enforceability of the patent due to inequitable conduct before the patent office.

In September 2002, Herink signed a "Supplemental Expert Witness Statement" that contains opinions that the Connect-A-Dock products do not literally infringe the '055 patent and that the doctrine of equivalents is unavailable to EZ Dock because of prosecution history estoppel. Herink also offers opinions on the issue of willful infringement in response to the expert report of Thomas J. Nikolai.

EZ Dock moves to preclude Herink from testifying as to "the legal standards of claim interpretation, patent infringement, patent validity, or patent enforceability, or his legal conclusions based on his understanding of the law." (Mot. in Limine to Exclude Opinion Test. of Kent Herink at 1.) Based on the issues framed by EZ Dock's motion in limine and the representations made at the hearing on the motions in limine, the Court concludes that EZ Dock has no objection to Herink testifying about PTO practices and procedures or the reasonableness of Pingel's opinion letters. Accordingly, Herink shall be free to testify as to those matters.

EZ Dock's objections to testimony concerning claim construction are well taken. Herink shall not testify regarding the correct interpretation of the patent claims. It is beyond dispute that

> [a] determination of infringement requires a two-step analysis. "First, the court determines the scope and meaning of the patent claims asserted ... [Second,] the properly construed claims are compared to the allegedly infringing device." *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454, 46 USPQ2d 1169, 1172 (Fed.Cir.1998) (en banc) (citations omitted). Step one, claim construction, is an issue of law, *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71, 34 USPQ2d 1321, 1322 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).... Step two, comparison of the claim to the accused device, requires a determination that every claim limitation or its equivalent be found in the accused device. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). Those determinations are questions of fact. *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353, 48 USPQ2d 1674, 1676 (Fed.Cir.1998).

***10** *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1370 (Fed.Cir.2002) (emphasis added). Herink similarly will not be permitted to explain to the jury or otherwise testify regarding prosecution history estoppel or its interface with the theory of infringement under the doctrine of equivalents.

Furthermore, having reviewed Herink's proposed opinions regarding patent invalidity and unenforceability, the Court finds in them nothing that satisfies the prerequisite of Rule 702: that his "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." The Court rejects Defendants argument that Herink's "specialized knowledge" as a patent attorney will help the jury understand the various statutory requirements for obtaining a valid and enforceable patent and the duties of an applicant in the patenting process. These are issues of law on which the Court will instruct the jury. Herink shall not inform the jury about the legal requisites of patentability. Likewise, Herink shall not inform the jury about the methods of proving infringement.

As for Defendants' argument that Herink should be allowed to opine on "ultimate issues," such as whether the '055 patent has been infringed or is valid or enforceable, the Court finds Herink's opinions to be little more than an *ipse dixit* that is insufficiently tied to the facts of the case. For example, after relaying his understanding of various facts pertaining to Plaintiff's alleged purchase of dock sections from Winnebago, the manufacturer,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

more than one year prior to the patent application, Herink "opines" as follows: "if the order of approximately 100 dock members from Winnebago was a commercial offer for sale, or the sale and delivery of approximately 64 dock members from Winnebago to Plaintiff was a commercial sale, at least claims 8, 9, and 13-20 of the patent-in-suit are invalid." (Herink Updated Expert Witness Statement at 5.)

Herink's proposed opinions are little more than assertions that "if X is found (presumably by the jury), then the patent is invalid/ unenforceable/ not infringed." The same statements could (and the Court expects, will) be made by counsel in closing arguments. Herink's proposed testimony does not assist the jury in making findings on the factual questions it must decide. The Defendants effectively conceded at the motion in limine hearing that such opinion testimony from Herink is not proper and would not be offered at trial. [FN3] EZ Dock's motion will be granted.

FN3. As discussed with counsel at the hearing, the Court is not precluding Defendants from raising similar objections to testimony from Plaintiff's "patent law" expert, Nikolai.

*F. EZ Dock's Motion to Exclude Evidence and Testimony from Herink not Previously Disclosed*

EZ Dock also moves to preclude Herink from testifying as to any matters not previously disclosed in his expert reports, specifically any opinion testimony regarding the PTO's re-examination of the '055 patent. EZ Dock contends that Rule 26 of the Federal Rules of Civil Procedure requires Herink to limit his expert testimony to the contents of his expert reports, and the expert reports Herink provided as of thirty days before trial did not address the re-examination of the '055 patent.

***11** Under Rule 26(e)(1), parties have a duty to supplement disclosures made pursuant to Rule 26(a). With respect to expert disclosures made pursuant to Rule 26(a)(2)(B)--such as the expert witness statements Herink prepared--"the duty extends both to information contained in the report and to information provided through a deposition of the expert, and *any additions or other changes to this information shall be disclosed by the time the party's disclosures under Rule 26(a)(3) are due.*" Fed.R.Civ.P. 26(e)(1) (emphasis added). In this case, the Rule 26(a)(3) pretrial disclosures of witness lists and exhibit lists were due on February 20, 2003. Defendants respond to EZ Dock's motion by pointing out that Herink supplemented his expert report, in light of the Court's January 22 *Markman* Order, shortly before the pretrial submissions were due. Herink's supplemental expert report is timely under Rule 26(e)(1). EZ Dock's motion will be denied.

*II. EZ Dock's Other Motions in Limine*

*A. EZ Dock's Motion to Exclude Evidence and Testimony Regarding Schafer's Earlier Motion for Summary Judgment Based on the On-Sale Bar of § 102(b)*

The parties agree that there is no need for either party to introduce evidence or testimony regarding either the trial court's granting of Defendants' earlier motion for summary judgment or EZ Dock's success on appeal to get that decision overturned. Accordingly, the Court will grant this motion.

*B. EZ Dock's Motion to Preclude Evidence or Testimony of Defendants' Own Patents*

EZ Dock has not identified the specific patents subject to its motion; Defendants have apparently obtained, however, at least two patents in connection with floating docks. EZ Dock complains that Defendants will try to "take advantage of a common misconception by the public that a patent grants an affirmative right to make the patented article." (Pl.'s Mot. to Preclude Evid. or Test. of Defs.' own Patents at 1.) Therefore, it claims, the evidence of Defendants' patents must be excluded.

Defendants also do not identify the patents at issue in this motion. They respond generally that the PTO's decision to issue patents to them rebuts EZ Dock's claim of willful infringement because Defendants cannot have *copied* EZ Dock's product and still have obtained patents on their connector design and support structure. As none of the claims at issue have anything to do with the connector design, Defendants' possession of a patent on that feature is irrelevant to the issue of infringement. As for the "support structure," Defendants do not explain what this feature entails or how it relates to the claims at issue. Accordingly the Court will grant

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

the motion, pursuant to Rules 402 and 403, as to any patents held by Defendants.

*C. EZ Dock's Motion to Exclude Evidence and Testimony Inconsistent with the Court's Claim Construction*

EZ Dock complains that Defendants is going to introduce evidence and testimony at trial suggesting that the jury may interpret the claims at issue in a way inconsistent with the Court's claim construction. As set forth above, the determination of whether a patent is infringed is a two step process:

> ***12** "First, the court determines the scope and meaning of the patent claims asserted ... [Second,] the properly construed claims are compared to the allegedly infringing device." *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454, 46 USPQ2d 1169, 1172 (Fed.Cir.1998) (en banc) (citations omitted). Step one, claim construction, is an issue of law, *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71, 34 USPQ2d 1321, 1322 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).... Step two, comparison of the claim to the accused device, requires a determination that every claim limitation or its equivalent be found in the accused device. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). Those determinations are questions of fact. *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353, 48 USPQ2d 1674, 1676 (Fed.Cir.1998).

*Transclean Corp.*, 290 F.3d at 1370. In principle, EZ Dock is right: the jury cannot be encouraged to depart from the Court's claim construction and to interpret the claims on their own. How Cobb, Herink, Beall, Pingel or others would have construed the claims (left to their own devices) is irrelevant to the issues now before the jury for trial. [FN4]

FN4. To the extent the analyses and opinions of Defendants' experts reflect a claim construction other than the Court's January 22, 2003, claim construction, those opinions and analyses have no relevance to the issues for trial and will be excluded.

Furthermore, the parties are not entitled to "construe" the Court's claim construction. Nor can the parties argue that, based on the specification and the file history, the inventors "really" invented something other than what the trial court has construed the claims to mean. Defendants cite no authority for the proposition that the Court's claim construction is "open to interpretation" by the jury, and the Court has found none. Accordingly, the Court will grant in part EZ Dock's motion and preclude Defendants from arguing to the jury how the claims of the patents-in-suit should be construed. Nothing in this ruling shall prevent Defendants from presenting evidence that is properly relevant to issues other than claim construction.

*D. EZ Dock's Motion to Preclude Defendants from Referring to Plaintiff Negatively Because It Sought Legal Protection for Its Invention or from Denigrating the Patent Office or Its Examiners*

EZ Dock seek pre-trial relief from the Court to prevent Defendants from "making comments or eliciting testimony that negatively refers to EZ Dock or inventor Neitzke or inventor Vierus as a 'monopolist' or EZ Dock owning a 'monopoly' or similar terms because they sought legal protection for their invention." With respect to both points, the Court can see no grounds on which the Defendants could introduce *testimony*--lay or expert--about either the competence of the PTO's examiners or the monopolistic character of a patent. As for *argument* on those points, in point of fact, a patent is a kind of monopoly that rewards the inventor (or patent holder) for having taken the initiative to "build a better mousetrap." To the extent Defendants would--in their closing argument--seek to describe EZ Dock as a "monopolist," EZ Dock is free to rebut that characterization. The old schoolyard chant about sticks and stones applies here as well.

***13** As for assertions that the PTO and its examiners are not diligent or are prone to error, the Court can find no relevance in either evidence to that effect or argument. It is Defendants' burden to prove, *by the greater weight of the evidence,* that the '055 patent (as re-examined) is either invalid or unenforceable. Aspersions are not evidence. Accordingly, the Court will grant in part EZ Dock's motion with respect to the PTO and its examiners.

*E. EZ Dock's Motion to Exclude References to Dismissed Claims*

During the course of this litigation, EZ Dock dismissed claims for trade dress infringement,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

deceptive trade practices, and unfair competition. EZ Dock now seeks a ruling precluding the Defendants from making any references to the dismissed claims. Defendants respond that the dismissal of the other claims is relevant to "rebutting EZ Dock's claim of willfulness and copying" and is relevant to Defendants' claim that EZ Dock has brought this suit in bad faith, warranting fees to Defendants. Their legal analysis in opposition to the motion, however, focuses entirely on the Defendants' claim to attorneys fees and not at all to how dismissal of the claims relates to willfulness.

Under the patent statutes, "[t]he *court* in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S .C. § 285 (emphasis added). Thus, the question of whether this is an exceptional case is not one for the jury, but rather one for the Court. The Court finds that EZ Dock's dismissal of certain claims has no relevance to the patent infringement claim the jury must decide. Accordingly, the Court will grant the motion.

*F. EZ Dock's Motion to Preclude Defendants from Admitting Any Evidence or Testimony on Defendants Not Previously Pled, from Admitting Any Evidence or Testimony Regarding Prior Art Not Previously Identified, and from Admitting Any Evidence Or Testimony Regarding Untimely Supplemental Expert Reports*

After the time for filing motions in limine had passed, EZ Dock brought a last motion in limine, which has three distinct sub-parts. First, EZ Dock complains that Defendants are trying to proceed on an affirmative defense under § 132 that was not pled and, therefore, has been waived. [FN5] Second, EZ Dock argues that Defendants must be precluded from presenting a prior art reference--the Meriwether patent--that was disclosed for the first time in a § 282 disclosure on February 7, 2003. [FN6] Finally, EZ Dock contends that Defendants have untimely supplemented their expert reports, to EZ Dock's prejudice.

FN5. Originally at issue in EZ Dock's motion were two affirmative defenses: the equitable defense of estoppel and the statutory defense of new matter. At the hearing on the motions in limine, Defendants advised the Court and opposing counsel that it was dropping the estoppel issue.

FN6. Defendants had asserted thirty-eight new prior art references in their § 282 disclosure, to which EZ Dock had objected as being late. At the hearing on the motions in limine, Defendants advised the Court and opposing counsel that it was withdrawing the thirty-five prior art references it had marked as exhibits 49 through 86. As for the '271 Brill patent, Defendants contend that they would not argue it to be invalidating prior art, but rather would simply like to present it to the jury to show the state of the art regarding floating docks. Defendants have failed to establish the relevance of the '271 Brill patent; accordingly, the Court will excluded it under Fed.R.Evid. 401 and 402.

Section 132 provides that "[n]o amendment shall introduce new matter into the disclosure of the invention." Therefore, the affirmative defense that a patent is invalid based upon the introduction of new matter is a statutory affirmative defense. Review of the Amended Answer in this action, filed May 24, 2002, reveals that the Defendants did not plead a new matter affirmative defense or otherwise reference 35 U.S.C. § 132. The Court rejects the Defendants' efforts to bootstrap a new matter defense onto its affirmative defenses asserted under § 112. The Defendants failed to preserve a new matter affirmative defense in their responsive pleading under Fed.R.Civ.P. 12, and they are therefore precluded from presenting it at trial.

***14** As for the Meriwether patent, Defendants argue that there is no prejudice to EZ Dock because Meriwether was part of the file history of the EZ Dock patent on re-examination. This argument fails to address the fact that EZ Dock had served the Defendants with an interrogatory directing them to "identify all prior art of any kind, including but not limited to publications, disclosures, teachings, existing devices or prior art patents relating in any way to the subject matter claimed in the patent in suit" and to "state each and every fact that you allege supports the affirmative defenses" raised against EZ Dock's causes of action. (Mitchell Aff. Ex. C.) Although Defendants supplemented their responses to these interrogatories at various times through the course of discovery, they never disclosed the Meriwether patent. [FN7] The Court concludes that Defendants have prejudiced EZ Dock in their failure to supplement discovery responses with respect to the Meriwether patent. The Court will grant EZ Dock's motion with respect to the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

patent.

FN7. At the motion in limine hearing, Defendants' counsel argued that the Meriwether patent did not become relevant until after the Court's January 22, 2003 claim construction order, an order that, among other things, rejected the Defendants' argument that the pylons have to have a circular base. Defendants have never asserted until yesterday, however, that the Court's claim construction order would necessitate additional time for expert discovery or the supplementation of earlier discovery responses. In fact, the Court held a telephone conference with all counsel in early January, advising them of the Court's proposed timeline for issuing its *Markman* order by the end of January and discussing the feasibility of a March 10 trial date. During that telephone conference, neither party suggested that, because of the closeness in time between the *Markman* ruling and the proposed trial date, the trial should be continued to a later date.

Finally, the Court has already addressed the issue of supplemental expert reports, observing that Rule 26(e)(1) allows the parties to supplement expert reports up to the day pre-trial submissions under Rule 26(a)(3) are due. In this case, the Court ordered the parties to file their pre-trial submissions on February 20. EZ Dock has not indicated that any supplemental expert report was served on them after that date. Accordingly, the Court will permit the Defendants to examine their experts on matters disclosed in the final supplemental expert reports, subject to the Court's rulings above on the subject matter of expert testimony.

Conclusion

Based on the foregoing, and all of the files, records and proceedings herein, IT IS ORDERED that

1. EZ Dock's Motion in Limine to Exclude Evidence and Testimony Regarding Schafer Systems' Motion for Summary Judgment re: the alleged 35 U.S.C. § 102(b) on sale bar (Doc. No. 127) is GRANTED;

2. EZ Dock's Motion in Limine to Preclude Evidence or Testimony of Defendants' Own Patents (Doc. No. 129) is GRANTED;

3. EZ Dock's Motion in Limine to Exclude All Evidence and Testimony Inconsistent with the Court's Claim Construction (Doc. No. 131) is GRANTED IN PART in that Defendants shall not present evidence or testimony to the jury regarding how the claims of the patent-in-suit should be construed. Nothing in this ruling shall prevent Defendants, however, from presenting evidence that is relevant to issues other than claim construction.

4. EZ Dock's Motion in Limine to Exclude Evidence and Testimony of Glenn L. Beall (Doc. No. 133) is DENIED;

5. EZ Dock's Motion in Limine to Exclude Opinion Testimony of Kent A. Herink Addressing the State of the Law or His Legal Conclusions (Doc. No. 136) is GRANTED;

6. EZ Dock's Motion in Limine to Exclude Evidence and Testimony of Kent A. Herink Not Previously Disclosed in his Expert Witness Report (Doc. No. 138) is DENIED;

***15** 7. EZ Dock's Motion in Limine to Prevent Defense from Referring to Plaintiff Negatively Because It Sought Legal Protection for Its Invention or from Denigrating the Patent Office or Its Examiners (Doc. No. 141) is GRANTED IN PART with respect to testimony disparaging the PTO and its examiners;

8. EZ Dock's Motion in Limine to Exclude Opinion Letters of Mr. G. Brian Pingel and Evidence and Testimony Regarding Same (Doc. No. 143) is GRANTED IN PART. Defendants shall not introduce into evidence or elicit testimony from any witness about Pingel's letters dated December 2, 1999, April 3, 2001, April 29, 2002, and July 9, 2002.

9. EZ Dock's Motion in Limine to Exclude References to Dismissed Claims (Doc. No. 146) is GRANTED.

10. Defendants' Motion in Limine to Preclude Expert Report and Testimony of Arthur H. Cobb (Doc. No. 149) is GRANTED IN PART. Cobb shall not offer testimony regarding damages calculated under a "lost profits" analysis. Cobb may testify regarding damages calculated under a "reasonable royalty" analysis.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

11. EZ Dock's Motion in Limine to Preclude Defendants form Admitting Any Evidence or Testimony on Defenses Not Previously Pled, from Admitting Any Evidence Or Testimony Regarding Prior Art Not Previously Identified, and from Admitting Any Evidence or Testimony Regarding Untimely Supplemental Expert Opinions (Doc. No. 165) is GRANTED IN PART. Defendants shall not present evidence or argument regarding the new matter defense under 35 U.S.C. § 132, and shall not present evidence regarding either the Meriwether patent or the ' 271 Brill patent.

2003 WL 1610781 (D.Minn.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.