The Rottlund Company, Inc. v.
Pinnacle Corporation and Town & Country Homes, Inc.
Court File No. 01-1980 DSD/SRN

Affidavit of Mathew Farmer in Support of Pinnacle and
Town & Country Homes, Inc.'s Motion *in Limine* to Preclude
Certain Testimony of Timothy M. Whitten

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,

COPY

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation, and
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF TIMOTHY M. WHITTEN 30(b)(6)
VOLUME II, Pages 260 - 509

(The following is the continuation of the 30(b)(6) deposition of TIMOTHY M. WHITTEN, taken pursuant to Notice of Taking Deposition, at the offices of Moore, Costello & Hart, 1400 Fifth Street Center, 55 East Fifth Street, in the city of St. Paul, state of Minnesota, commencing at approximately 9:04 o'clock a.m., May 30, 2003.)

14:48:50 Q. And the -- some of the items that you listed on Exhibit 150 are also individual elements.
14:48:56 A. Yes.
14:48:57 Q. Why are there items on the list a. through triple m. which are not on the list Exhibit 150?
14:49:02 A. Well really this list of 150 was an exercise I did for myself. I wanted to look at the plans and just get a general feeling for how I felt that they were substantially similar. I had already convinced myself that it was a direct copy of our plans.
14:49:20 I wanted to see if in fact there were similar items and how they were itemized there and then what Town & Country could have done in lieu of the items I felt that were the same. So as opposed to doing the roof in a certain way that's a direct copy of ours, they could have done it another way, and I made a list for that purpose. It was really my tool. It wasn't to be, you know, a comparison to this particular item -- I'm sorry, I said "this" -- item 134.
14:49:50 Q. Sir, did you perform the analysis that resulted in Exhibit 150 after December 10th of 2002?
14:49:56 A. That is correct.
14:50:04 Q. And in your analysis that resulted in Exhibit 150 you identified specific elements that you felt

were present in both the Town & Country Homes and The Rottlund Company's products.
A. Yes.
Q. You felt were substantially similar in both.
A. Yes.
Q. But there are certainly a very long list of items which you had previously analyzed as being substantially similar in both that are not part of your list of similarities in Exhibit 150.
A. That is correct. I answered that before and said that's a partial list. Exhibit 150 is a partial list of items.
Q. Okay. How did you select this partial list as opposed to the more exhaustive list already provided in your analysis a. through triple m.?
A. Because that is a comparison of -- of some of the building elements, the overall elements of it and specific items I felt that I could identify as alternatives that they could have created. So there was no match between these two. There was no -- I wasn't trying to match one for the other or have one complete and added to it. That was a separate effort that I did for me personally.
Q. So starting from scratch you came up with this list, Exhibit 150.

14:54:41 done, but I was never -- it was never my understanding that I would never have an opportunity to add on to that list.

14:54:48 Q. You do understand --

14:54:49 A. So "complete" is -- is where I think the question is.

14:54:51 Q. You do understand at some point you're going to have to complete that analysis; right?

14:54:56 A. Yes, I'd be happy to do that.

14:55:04 Q. What do you mean by you'd be happy to do that?

14:55:09 A. I don't know what I meant by that.

14:55:11 Q. Well sir, I said: You understand at some point you're going to have to complete your analysis; right? You answered: "Yes, I'd be happy to do that."

14:55:18 A. My answer is "yes."

14:55:19 Q. Okay. When is it you plan to have your complete analysis?

14:55:23 A. I don't know.

14:55:28 Q. Sir, you -- you testified about this earlier. You walked through Town & Country Homes built structures of its Homestead Collection; is that correct?

14:55:43 A. I did.

14:55:47 Q. We did it on a frigid day together; didn't we?

15:00:24 are substantially similar between the two structures.
15:00:27 Is that your testimony?
15:00:29 A. Yes. I would need more time.
15:00:31 Q. How much more time?
15:00:32 A. Two days.
15:00:35 Q. Two days inside Town & Country Homes' product?
15:00:41 A. No.
15:00:45 Q. When do you plan to spend two days performing
15:00:48 that analysis?
15:00:49 A. I don't know.
15:00:53 Q. But you didn't spend those two days before this
15:00:55 deposition.
15:01:01 A. That is correct. I have done an adequate
15:01:02 analysis to this point to answer these questions, and
15:01:04 I reserve the right to be able to continue the
15:01:07 analysis.
15:02:19 THE REPORTER: I need to change my paper.
15:02:19 (Recess taken from 3:02 to 3:13 p.m.)
15:13:55 BY MR. SCHWIEBERT:
15:13:55 Q. Mr. Whitten, does Rottlund contend that there
15:13:59 are elements in the structures as built that are
15:14:04 substantially similar between the Town & Country Home
15:14:05 product and the Rottlund product that are not
15:14:07 reflected in the architectural plans, Exhibits 104
15:14:10 and Exhibit 5?

15:14:12 A. There may be.
15:14:13 Q. What are those elements?
15:14:16 A. I'd have to look at it further.
15:14:20 Q. As you sit here today can you tell me what the items are that are substantially similar between the Town & Country Home product and the Rottlund product that are not reflected in the architectural plans?
15:14:33 A. I would -- I would study it further before I could answer that.
15:14:39 Q. How long do you think it would take you to study it further?
15:14:45 A. Approximately two days.
15:14:47 Q. When do you intend to perform that analysis?
15:14:51 A. Deja vu. I don't know when that would be.
15:14:57 Q. But you didn't perform that analysis before this deposition; did you?
15:15:01 A. I performed a sizeable analysis, I did a lot of work on it. You're -- There may be a couple of items that are still left to be discovered and I would like the time to be able to do that.
15:15:12 Q. Sir, did you spend the time to figure out if there are elements that are substantially similar in the built products that are not reflected in the architectural drawings before the deposition today?
15:15:24 MR. KRUMMEN: Renew my standing objection

15:16:38 can answer these questions. I would like to reserve
15:16:45 the right to be able to continue that analysis. I'm
15:16:46 sorry, but I -- have we not asked and answered these
15:16:49 questions four or five times?
15:16:51 Q. Sir, I'm specifically talking about the elements
15:16:53 of the built structure. You believe that it would
15:16:54 take two days to complete your analysis of the items
15:16:57 in the built structure that are substantially
15:17:00 similar?
15:17:01 A. I'm just saying that is a continuation of our
15:17:03 discussion when you said could I complete the list of
15:17:06 what was substantially similar items today as we sit
15:17:10 and I said I would like two days to be able to do
15:17:12 that. I apply that same time to the built project as
15:17:16 well because I look at them both as -- in the same
15:17:19 light.
15:17:21 Q. But you do understand they're different
15:17:22 copyrights.
15:17:22 A. I do.
15:17:24 Q. Do you intend to spend those two days and
15:17:27 complete the analysis?
15:17:27 A. Yes.
15:17:27 Q. Is it two days total or is it two days for each?
15:17:30 A. I was just thinking in terms of, you know, 16
15:17:33 hours, and I guess I would -- I could combine the two

15:17:36 together.

15:17:48 Q. Sir, does Rottlund contend that the color scheme 15:17:51 of the built Town & Country Home Homestead Collection 15:17:54 is substantially similar to the color scheme of the 15:17:58 built Villa II?

15:17:59 A. Is that in the interrogatory number 3?

15:18:04 Q. It's just a question. I don't believe it's on 15:18:07 the list, it's your list.

15:18:31 A. The color schemes would vary typically from 15:18:36 project to project and building to building, so I 15:18:38 would have to make a comparison of exactly one 15:18:42 building to exactly another building, one of Rottlund 15:18:45 and one of Town & Country's, to be able to determine 15:18:48 if I believe that the color schemes are substantially 15:18:51 similar.

15:18:51 Q. And that's an example of the type of item in the 15:18:54 built structure that would not be reflected in the 15:18:57 architectural drawings; is that correct?

15:19:00 A. That may be an example, yes.

15:19:00 Q. And you have not yet performed that analysis.

15:19:03 A. I have not.

15:19:06 Q. Can you let us know when you've completed your 15:19:08 analysis?

15:19:10 A. When I've spent the two days to do the analysis? 15:19:12 I'd be hap -- Yes.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation, and
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF TIMOTHY M. WHITTEN 30(b)(6)
VOLUME I, Pages 1 - 259

(The following is the 30(b)(6) deposition of TIMOTHY M. WHITTEN, taken pursuant to Notice of Taking Deposition, at the offices of Moore, Costello & Hart, 1400 Fifth Street Center, 55 East Fifth Street, in the city of St. Paul, state of Minnesota, commencing at approximately 8:12 o'clock a.m., May 28, 2003.)

gestalt of a 12-unit Original Villa?
A. Yes, only the fact that it's a longer building. The general gestalt would be the same.
Q. Is there something other than the general gestalt like a specific gestalt that you're referring to when you distinguish here?
A. I don't understand your question.
Q. You just --
You just referred to the "general gestalt."
MR. KRUMMEN: I'll object to the extent that he's asking for a legal conclusion. You may give your opinion if you understand the question.
Q. Let me try to make the question more clear. You said that the general gestalt of the 8- and 10- and 12-unit original Villas would be the same. Is there a -- a gestalt other than the general gestalt that you referred to?
A. No. I guess I could rephrase that as just the gestalt of the 8-unit building is the same as the 12.
Q. Now Mr. Whitten, you've also been designated as an expert in this lawsuit; correct?
A. Yes.
Q. And what is the scope of your expertise in this lawsuit?
A. I don't understand the question.

Q. For what purpose have you been designated an expert in this lawsuit?
A. To review the documents of -- of the Town & Country and the Pinnacle and to determine whether or not they are substantially similar to ours.
Q. Now was there anything in your training at the University of Minnesota as an architect in which you learned about substantial similarity of designs and how to determine whether one is substantially similar to another?
A. There is certainly training in your -- to understand what is similar and what is dissimilar.
Q. And when did that training -- when did you receive that training?
A. Just in the course of -- of my education.
Q. Can you --
Can you direct me to any text that would explain that?
A. I cannot.
Q. Okay. Have you been designated as an expert in any other lawsuit ever?
A. Not that I recall.
Q. Okay. But you have given testimony in other lawsuits; correct?
A. Does that qualify as testimony in --

A. Just from, I guess, what I have seen and what, you know, and my discussion with Bud Rotter.
Q. These are the two discussions we talked about --
A. Yeah.
Q. -- early on?
A. (Nodding.)
Q. And so you --
Were you aware generally, did you try to stay abreast of what types of -- of townhomes were being built and sold in the Twin Cities in 1985-1986?
A. Actually, no, I actually try to avoid looking at anything else.
Q. Why is that?
A. I just really have a lot of faith in my individual design abilities and I see no real particular reason to do that.
Q. Is the same true with -- with single-family homes, that you try to stay away from -- from those to the extent you're going to be designing them?
A. I'd probably rephrase "stay away." I don't go out and look at -- at different product designs, but I would say that that's true of single family as well.
Q. You don't try to stay abreast of what's going on in the residential housing market. Is that fair?

A. I don't make an effort to do that, no.
Q. And is that because you're concerned that it would contaminate your own creative abilities?
A. No. It's just that the compa -- we're a market-driven company, we identify markets and then we design accordingly. I don't see much value in looking at what others have done.
Q. Well one of the ways to design based on a market is to figure out what that market's been buying in the past; correct?
A. I'd say that's one way, yes.
Q. And what are some others?
A. I think for experienced developers they would have a pretty good feel for what -- the buyers, they're selling to those buyers and they can relay that information to me.
Q. Well what about as an experienced architect, is that something that you want to learn about on your own, independent of clients or potential clients?
A. Well really the marketplace is my client, and so when a client, or when I look at the -- working at the Rottlund Company, what we do is we identify a market and I treat that as a client.
Q. All right. So let's get back to 1986. You've got a single-parent market, you're not sure what Mr.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

The Rottlund Company, Inc.
d/b/a Rottlund Homes,
a Minnesota corporation,
Plaintiff,

vs. Case No. 01-CV-1980 (DSD/SRN)

Pinnacle Corporation
d/b/a Town & Country Homes,
an Illinois Corporation, and
Town & Country Homes, Inc.,
a Minnesota Corporation, and
Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Defendants,

and

Town & Country Homes, Inc.,
a Minnesota corporation,
Third-Party Plaintiff,

vs.

Bloodgood Sharp Buster
Architects & Planners of Iowa,
Inc., an Iowa corporation,
Third-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF TIMOTHY M. WHITTEN 30(b)(6)

VOLUME III, Pages 510 - 742

(The following is the continuation of the 30(b)(6) deposition of TIMOTHY M. WHITTEN, taken pursuant to Notice of Taking Deposition, at the offices of Colliers Towle, Fifth Street Center, 55 East Fifth Street Mezzanine, in the city of St. Paul, state of Minnesota, commencing at approximately 9:00 a.m., June 12, 2003.)

A. Oaks, does that sound -- Yeah.
Q. Okay. And you'd been inside the product that was at issue in the Iowa litigation?
A. No.
Q. Just saw the floor plans some other way, either by looking at drawings or brochures or something?
A. Yes. I was given that information, yes.
Q. Have you ever looked at pictures or -- or brochures or depictions of floor plans in any back-to-back product other than the Town & Country Homes and Rottlund product?
A. Floor plans or -- I don't -- No, I don't believe so.
Q. So you wouldn't have knowledge of what other builders are doing --
A. No.
Q. -- in terms of floor plans?
A. No.
Q. Why did you choose to put the living room adjacent to the dining room in the Villa II product?
A. Well they are adjacent but they're also separated by the entry, so I don't know if I'd really call that adjacent.
Q. So you're saying that when rooms are separated by an entrance that makes them no longer adjacent if