Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| Rottlund Company, Inc., | : | |
| Plaintiff, | : | 01-CV-1980 DSD/SRN |
| vs. | : | March 17, 2004 |
| | : | St. Paul, Minnesota |
| Pinnacle Corporation, et al., | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - -x

TRANSCRIPT OF PROCEEDINGS

(Plaintiff's Motion for Partial Summary Judgment)

BEFORE THE HONORABLE SUSAN R. NELSON

U.S. DISTRICT COURT MAGISTRATE JUDGE

--oOo--

Robert W. Riley
United States Court Reporter
646 U.S. Courthouse
316 North Robert St.
St. Paul, MN 55101-1549
(651) 848-1220

right? You copied the first half and then replicated it.

It's as if they have a copyright on an entire book and then we copy the first chapter and reprint it ten times. Instead of copying all ten chapters we only copy the first one and then just repeat it verbatim ten times. Are those two books then going to be substantially similar? That's what they're trying to get you to say, is that you can ingnore the interior units on our plans because they're not at issue.

But then and if we go to-- and because, Your Honor -- this is another issue here. Mr. Whitten's testimony about copying the exterior unit and then sliding it over for the interior unit -- it's referenced in their brief at page 20. You'll notice the page numbers, page 903 and 904 of the deposition testimony. That testimony was given for the first time on August 14th, after their expert report was issued. It's not in their expert report. Their expert doesn't make that comparison. And the day before our response expert reports were made.

If you look at Mr. Scherer's affidavit and the report, you can see we spent an enormous amount of time comparing interior units to interior units, because we thought this was a comparison of the buildings as a whole, so we're comparing exterior to exterior and interior to interior. It is completely illogical to claim that you have a protectable interest in the design as a whole. Oh, but by the way, you didn't copy the

interior units. You changed those completely. You actually copied the exterior units. That's an amazing admission that they make and still try to claim that the design as a whole is substantially similar when you disregard the interior units. But now I'd like to actually compare our interior units to their exterior units. What I have done is taken two of the exhibits from the appendices -- If I could give you a copy.

THE COURT: Sure.

MR. MURDOCH: From Mr. Scherer's affidavit in his expert report. You can see these are very simplified floor plans comparing our interior unit with Rottlund's end unit. They've never made this comparison for you, Your Honor. That's another issue that I think is important to make here. But they don't have this in their briefing, any of these comparisons.

You will note right off the bat that the doors are in different locations. There's been a lot of mention in this litigation about the side entry gable. We don't have one in our interior unit. They make that to be a prominent feature in their corner units, at least in their claim for infringement. We don't have one. We enter right into the living room.

The other thing is that we do have a loft. You can't really see it from this actual diagram. Their loft is above the garage and sits over the fireplace. That's on their Rottlund plan C on the right side of the page. That's the glossy brochure you've seen before where there's a railing above and

sits above the fireplace. We don't have that.

On our first floor the loft wall runs across the front of the staircase so you walk under it to get to the dining room. It has a completely different wall. There is no fireplace option on our first floor of the interior unit. The loft is in a completely different space.

Then if you turn the page and compare the upstairs to the two units, and again this is at the most general level, Your Honor, you'll see that they have two bedrooms in corners of the units. They're able to do that because it's a corner unit. It's an exterior unit and you can get light and windows at both bedrooms. On ours, in our interior units, we had to put both bedrooms next to each other. Bedroom number two is moved to the front next to the master bedroom. And again there's a loft space but it's in a different location.

The number of differences that you can go on and talk about here are innumberable. But we have a walk-in laundry room; they have laundry closet. They have two closets for the master bedroom; we only have one. I could go on with these differences but I think the point is at summary judgment when you have to draw inferences in our favor because we are the respondant, they are telling you that the total look and feel of their design as a whole -- the total look and design of our design as a whole is substantially similar to the total look and feel of their design as a whole. I'll get to the legal

sufficiency analysis later.

But at the same time they're saying, except that you don't look at their interior units and then you have to compare our interior units to their exterior units. When you make that comparison our interior units don't really look like their exterior units.

So not only are their interior units out of place, ours are out of place, too, because there is no corresponding design that meets the -- even the casual, reasonable ovbserver test, which is part two of the substantial similarity examination, they can't establish substantial similarity for the interior unit.

So then we're now down to the exterior corner units of their design. I think this is the next slide. This is in Mr. Scherer's report. I just want to look very quickly at the upper levels of the exterior units, do the side-by-side comparison, very general drawing.

You will notice that in Town & Country the master bedroom is in the front right-hand corner of the plan. Their's is in the back left-hand corner of the plan. Again, there's a laundry closet rather than a walk-in laundry. The bathroom layout is different. But the two main bedrooms are flip-flopped. They are in opposite corners of this building.

We asked Mr. Whitten about this at his deposition when he was testify as 30(b)(6) witness. He put together a little

transparency. I have Mr. Whitten's deposition testimony here from June 12th, page 675 at line 17. Let me back up for a second, Your Honor. Page 637 at line three. He says, It appeared to me that the Town & Country plan, if you took the upper level and main parts of the upper level and flipped it in reverse and laid it on top of ours, that it would match up exactly to ours.

Keep in mind that what they're claiming is the layout or particular configuration of generic architectural elements, the layout of rooms. The selection and layout of rooms is what they call it at page 17 and 18 of their brief. But now we have Mr. Whitten saying, well, it's not only our layout but it's also the reverse flip of our layout.

And then here's the kicker, Your Honor. He was smart enough not to say that, Your Honor. We asked him if he believes as their 30(b)(6) witness that the second floor of the exterior units are are substantially similar and he said no. He said they're not claiming that the second floor of the exterior units are substantially similar.

Page 676 of Mr. Whitten's 30(b)(6) desposition, so this is Rottlund testifying, line 19. And is it Rottlund's position that because a portion of the upper level of the Town & Country product is a mirror image of the Rottlund product, that that's what makes them substantially similar?

ANSWER: No. It's just that the rest of the building

units are already substantially similar. This just takes that part that seems the least similar and explains it.

So what we have here, Your Honor, their claim is that they have a protectable interest in a total look and feel of their entire building, but not including the interior units. And our interior units don't copy -- I don't think you can find in summary judgment any aspect of their building, because they admit they're not similar to the interior units. And they clearly are not similar to the exterior units. I think if you asked some of the purchasers of these units, the one who bought the interior units at a substantial discount over the corner units, or vice versa, I don't think any of the buyers would tell you that they consider those two to be substantially similar. So the interior units of their's are out. The interior units of our's are out. The second floor of the exterior units of all of them are out.

So what we have now, Your Honor, is a claim that the total look and feel of the building as a whole is substantially similar because the first floor of the exterior units is substantially similar. That's it. That's their case in a nutshell.

There are several problems with this analysis. First of all, the first floor of the exterior unit is an individual element. The floor plans actually are individual elements. But the first floor of the exterior units, clearly an individual

element, which they have backed away from and refused to base their case on.

THE COURT: Isn't also the elevations--

MR. MURDOCH: Elevations are not claimed, Your Honor. They don't claim elevations in their list of 70 items.

THE COURT: Outward appearance has nothing to do with it --

MR. MURDOCH: Not in their interrogatory answers sworn to by Mr. Whitten, their 30(b)(6) witness and their disclosed expert in an interrogatory submitted to this Court the same day that the motion for summary judgment was filed. They do not list the outward appearance or the elevation as an item claimed to be protectable or comprising gestalt. It's not in there.

And then, finally, even if we were to go down the road to the elevation, Your Honor, it's another individual level.

THE COURT: They're all individual levels. We're trying to look at the total look and feel, just like Judge Doty did. He looked at a bunch of elements and their relationship to each other, did he not?

MR. MURDOCH: Yes, he did. He did look at those specific protectable elements in those plans. But they're not making the same case as CSM made, because CSM premised its claim for infringement upon individual elements, upon the specific similarity of individual elements. There are two -- Judge Doty

lists them. Judge Doty lists the sawtooth doors, the bay windows. And actually when he looks at the drawings he says you have the same people on these drawings. You know how artists make renderings of the people walking down the sidewalk.

THE COURT: This is the part I'm confused about. He is making that comparison in an effort to satisify part II of the test which is a total look and feel test, right?

MR. MURDOCH: Yes.

THE COURT: Isn't that exactly what Rottlund is doing?

MR. MURDOCH: It's exactly the opposite of what Rottlund claims here, Your Honor, because they are claiming -- and because we asked for discovery on the individual elements and they stymied us and you denied us a motion to compel on documents.

THE COURT: Well the --

MR. MURDOCH: If I could finish, Your Honor. What's going on here is you can look at just the total look and feel. You take it all in at once. Mr. Whitten, their expert, testified that that's how he does it. He takes all the individual elements in together. Sort of like taking in a work of music where there's a violin and a cello and drums and the brass, but you hear it all at once. That's how he absorbs architectural plans. He says there's no methodology for comparing the gestalt of these two -- the total look and feel of

these two. He's able to just look at them as a -- taking the aura, just the total look and feel of the plans without actually breaking it down and saying, why are these substantially similar.

What we wanted to do -- what has intrigued me, Your Honor, is how they intended to try this case, because if it is total look and feel without reference to any of the individual elements, without comparison of any of the individual elements, because Mr. Whitten also testified and I asked him this, it's in our brief, if all of those 70 items were not substantially similar could the gestalt still be substantially similar, and he said, yes.

So their testimony is that it doesn't matter what any of those individual elements look like or whether any of the individual elements are substantially similar. You still look at the total look and feel. And what intrigued me, Your Honor, was how do you present that to a jury, other than holding up the plans and saying nothing. As soon as you say -- and you'll notice that these gables are in the same spot. You are talking about individual elements. And when we tried to get them to compare, and Mr. Schwiebert can tell you, but I think that's one of the reasons that TCM sent out this big blanket request to admit, is when we tried to get them to compare individual elements to individual elements to find out which of them they're actually to point to when they try to describe the total

look and feel, they said no, no, that's individual elements. We're not answering that question.

THE COURT: I think there is a distinction between a lawsuit which claims infringement on individual elements, and a lawsuit which claims total look and feel in the course of determining that obviously looks at the combination of elements and how they are put together.

It was certainly the Court's understanding all along that this was a total look and feel case. This was not a case in which there was an allegation, there was infringement of individual elements. Because it's a total look and feel case, the Court has also assumed that CSM would be an important precedent to take a look at because in that case that's exactly what the claim is; it's a total look and feel case.

MR. MURDOCH: Your legal analysis, Your Honor, I'm sorry, is wrong. All copyright cases have a total look and feel analysis at the end of the second step. That's not unique.

THE COURT: Sometimes the infringement, for instance in the Kootenia case had to do with the location of a particular room, the kitchen, and that's all that was --

MR. MURDOCH: That's not even true, Your Honor. I'm sorry.

THE COURT: You go ahead and argue.

MR. MURDOCH: That was the point, Your Honor. I am very sorry, but that was the point which the plaintiff made

and I found their reading of Kootenia to be a little problematic, because in Kootenia what the Court actually said is, and what the plaintiffs were actually stipulating, was based upon the testimony approach who designed the *Hoffel Home and Wells who drafted it, the only original design element that plaintiff seeks to protect is the location of the home office off the kitchen area. That's what they read. And that's correct.

The very next sentence, and this is in the West Law decision at *4. All other design elements of the *Hoffel Home are common to many other homes, and refers to an affidavit from Kelly who is the copyright holder's witness.

It's clear to me that what happened in Kootenia was when they got to the extrinsic analysis they did what Rottlund should do in this case, and that is filter out all of the common home design elements and tell us, what is it about your design that is not just a general idea or a general location of rooms, but rather is a protectable element.

The other thing, Your Honor, that is important to keep in mind is that there are two levels of -- there are two original, for lack of a better word, concepts in copyright law, as I understand it. The first relates to validity. When you talk about whether or not a copyright is valid, does it possess sufficient originality to be valid. That's a very low featherweight standard that they talk about, that the

arrangement of unprotectable ideas can be a valid copyright, that that can be protected by a valid copyright.

But when you go to the step about infringement and during the extrinic analysis when the Court filters out the unprotectable ideas, that's a different level. What you are getting at is what is it that's protectable here, because there can be all sorts of aspects of a valid copyright which are unprotectable ideas, which are either abandoned or just common ideas.

So when they provide cases which say that the level of originality is so low, and in fact that's what they rely on Nucor for and the first sentence of CSM for, which is -- you know, a T-shaped building or a rectangular office building is not protectable but the detailed plans are. That's just validity.

Then when you go to the question of infringement, you have to get to what are the protectable elements that they're claiming here, because that's what you need to compare. If you compare unprotectable elements during either the first or the second step, you've destroyed the idea -- expression of that copy and you've run rough shod over the copyright law.

THE COURT: Is that what Judge Doty did in CSM? Did he specifically identify the unprotectable elements?

MR. MURDOCH: I believe he did. If you look at the CSM case, and this on 840 F.Supp, page 1312, the last

paragraph before Section C. I don't know which copy you have there.

THE COURT: I have it here.

MR. MURDOCH: The last sentence of that paragraph says, the Court also concludes that the similarity between the plans involves protectable material insofar as the similarities reflect products of Everest's creativity. He is only comparing the elements which are protectable.

That's what we're asking you to do here, Your Honor, which is something that we expected. We're not asking that. The plaintiffs have said that you can do this yourself by filtering out that which is unprotectable.

Let me get away from this comparison for a second, because what I did here in talking about the floor plans and eliminating the interior units, that's really an ordinary observer test. That's the ordinary observer analysis. I'm not an architect but that's really what you do if you get past the first test.

I'd like to go through a little bit of the case law on substantial similarity and what the test is in the Eighth Circuit, Your Honor. Mr. Krummen cited the Nucor case, a 1973 case and one of the propositions that he cited it for was correct. That was the proposition that items with minimal originality can be protected. But he went on to cite, and I was surprised he read this, Your Honor, at pages 391 and 392 when

Exhibit C

Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.

THE ROTTLUND COMPANY, INC., a Minnesota corporation, Plaintiff,
v.
SCOTT LARSON CONSTRUCTION, INC., a Minnesota corporation d/b/a Scott Larson Homes; Scott E. Larson, an individual d/b/a Scott Larson Homes; and Christine D. Larson, an individual d/b/a Scott Larson Homes, Defendants.

No. Civ. 02-1238 JRTFLN.

March 4, 2004.

Craig S. Krummen and David A. Davenport, Winthrop & Weinstine, P.A., Minneapolis, MN, for plaintiff.

Robert T. Stich and Louise A. Behrendt, Stich, Angell, Kreidler & Dodge, P.A., Minneapolis, MN, for defendants.

MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

TUNHEIM, J.

*1 Plaintiff The Rottlund Company ("Rottlund") is a Minnesota corporation that designs, builds, markets, and sells, among other things, townhomes. Defendant Scott Larson Construction, which is owned entirely by defendants Scott Larson ("Scott") and Christine Larson ("Christine"), is also a Minnesota corporation that, among other things, builds and sells townhomes, albeit on a smaller scale. [FN1] Rottlund alleges that each defendant has infringed its copyrighted building plans and is directly, contributorily, and vicariously liable for that alleged infringement. Additionally, Rottlund contends that each defendant is liable for false advertising in violation of the Lanham Act, violation of the Minnesota Uniform Deceptive Trade Practices Act, and common law unfair competition. Defendants request partial summary judgment. For the following reasons, the Court grants defendants' motion.

FN1. For purposes of this motion, the Court will refer to defendants Scott Larson Construction, Scott Larson, and Christine Larson collectively as "defendants".

BACKGROUND

Scott Larson Construction was incorporated in Minnesota in 1982. Defendant Scott Larson ("Scott") is its President, as well as the Director and Secretary of its Board of Directors. Defendant Christine Larson ("Christine") is the Vice-President of Scott Larson Construction, as well as the Treasurer of its Board of Directors. Christine also acts as the company's bookkeeper. Scott and Christine each own 50% of the Scott Larson Construction shares and are its only officers, directors, and employees. In 1983, Scott Larson Construction filed a Certificate of Assumed Name with the Minnesota Secretary of State, making it a registered "nameholder" of Scott Larson Homes.

As the original Certificate neared expiration in 1993, Christine filled out a Certificate of Assumed Name Renewal form, which Scott signed. It was then filed with the Minnesota Secretary of State. On the renewal form, Christine and Scott were listed individually as registered name holders of Scott Larson Homes. Christine and Scott testified that neither intended to make any changes to the original Certificate, that inclusion of their individual names was a mistake, and that Christine misunderstood the directions on the form. They also testified that they were unaware of the mistake until this lawsuit brought it to their attention. On June 11, 2002, five days after the commencement of this action, Scott Larson Homes filed an amendment to its Certificate of Assumed Name, removing Scott and Christine Larson as nameholders.

In late 2000, Scott met with a team at the architectural firm Archnet, The Architectural Network, Inc. ("Archnet") to begin work on what became known as the Village Point Urban Townhomes Development ("Village Point") in Chaska, Minnesota. A former employee of Archnet who worked on the project testified in deposition that Scott gave him a copy of a Rottlund brochure containing a sample floor plan of a town home and asked that it be used as a concept guide. Discovery revealed that Archnet's files on the Village Point project contained some tracings that line up very closely with the sample floor plan found in a Rottlund brochure advertising their New Urban Townhomes

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

product. [FN2] Archnet's Village Point files also contained notes and drawings showing dimensions that match those of Rottlund's New Urban Townhomes product. Those notes refer to two different unit designs as "Albany" and "Boston" units. Rottlund's New Urban Townhomes have units named Albany and Boston.

FN2. Rottlund has constructed and sold New Urban Townhomes in multiple developments in the greater Twin Cities area.

***2** Rottlund owns copyrights for the architectural designs and town-home product known as the New Urban Townhomes. Rottlund contends that the defendants, acting "in concert," copied its copyrighted architectural plans for the New Urban Townhomes product and used them to "plan, develop, construct, advertise and sell" the Village Point project.

Scott denies suggesting that the Village Point project design be based on the New Urban Townhomes product and denies providing Archnet with a Rottlund brochure. Michael Hoefler, a principal at Archnet who also worked on the project, testified that clients frequently provide examples or ideas as starting points for projects, but denied having seen a Rottlund brochure or having used the Rottlund designs in any way in connection with the Village Point project.

Rottlund's complaint includes twenty-one counts--seven each against Scott Larson Construction, Scott Larson and Christine Larson. The seven different claims are (1) Copyright Infringement under 17 U.S.C. § 102(a)(5), (2) Copyright Infringement under 17 U.S.C. § 102(a)(8), (3) Contributory Liability for copyright infringement, (4) Vicarious Liability for copyright infringement, (5) False Advertising under the Lanham Act, (6) Violation of the Minnesota Uniform Deceptive Trade Practices Act, and (7) Unfair Competition.

Scott and Christine seek summary judgment on the direct liability copyright infringement claims, the false advertising claims, and the deceptive trade practices claims against each individually. Christine also moves for summary judgment on the claims of contributory infringement and vicarious liability. Finally, all defendants seek summary judgment on the claim of unfair competition. Aside from the unfair competition claim, Scott Larson Construction does not seek summary judgment on the claims against it.

The Court addresses each argument in turn.

## DISCUSSION

### I. Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Vette Co. v. Aetna Casualty & Surety Co.,* 612 F.2d 1076, 1077 (8th Cir.1980). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *Forrest v. Kraft Foods, Inc.,* 285 F.3d 688, 691 (8th Cir.2002).

### II. Copyright Infringement

***3** Architectural plans and drawings are protected by copyright law as "pictorial, graphic, and sculptural works" and "architectural work." 17 U.S.C. § 102(a)(5) & (8). Under 17 U.S.C. § 501(a), "[a]nyone who violates any of the exclusive rights of the copyright owner ... is an infringer of the copyright...." In order to prove copyright infringement, a plaintiff must demonstrate that it owns a valid copyright, and that the defendant engaged in unauthorized copying of the work protected by the copyright. *Feist Pubs. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361 (1991). It is long established that even where direct infringement

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

cannot be proven, a defendant can be held liable for the infringing activities of another. *See Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 432-36 (1984). In this case, it is undisputed that Rottlund owns valid copyrights related to the New Urban Townhomes product. In order to prevail on this motion, Scott and Christine must demonstrate that there is no genuine issue of material fact from which a jury could conclude that Scott and Christine individually are directly, vicariously, and/or contributorily liable for infringement of those copyrights.

A. Direct infringement (Counts VIII, IX, XV, XVI)

Rottlund is suing Scott and Christine Larson in their individual capacity based on their designation as nameholders of Scott Larson Homes on the Certificate of Assumed Name Renewal form. [FN3] As this Court stated in its November 15, 2002 order:

> FN3. Plaintiff asserts two additional theories on which it bases its claims of direct liability against Scott and Christine as individuals. Specifically, plaintiff asserts "Scott and Christine Larson can not escape direct liability since they used Scott Larson Construction, Inc. as an instrument to carry out willful and deliberate copyright infringement." Additionally, plaintiff contends "Scott and Christine Larson can not escape direct liability since they are the dominant influence in Scott Larson Construction, Inc. and determined the policies that resulted in infringement." The Court disagrees with Rottlund's contention that these theories appropriately support claims of direct liability. Rather, these theories are properly understood as versions either of vicarious liability or contributory infringement. As discussed below, vicarious liability permits a person with a financial interest in and sufficient control over the activity in question, such as the president and sole shareholder of a company, to be held liable for infringing activity. *See, e.g., Ford Motor Co. v. B & H Supply, Inc.*, 646 F.Supp. 975, 989 (D.Minn.1986) (citing *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1161-62 (2nd Cir.1971)). Contributory infringement permits a person, again such as an active board member, who knowingly induced, caused, or materially contributed to infringing conduct to be held liable therefor. *See, e.g. Demetriades v. Kaufmann*, 690 F.Supp. 289, 293-94 (S.D.N.Y.1988).

> [i]t is well established that a person or corporation doing business under another name is not a separate entity, and is liable for obligations of the entity bearing that name. *Duval v. Midwest Auto City, Inc.*, 425 F.Supp. 1381, 1387 (D.Neb.1977), *aff'd*, 578 F.2d 721 (8th Cir.1978) ("The individual who does business ... under one or several names remains one person, personally liable for all his obligations.") *See Jaffe v. Nocera*, 493 A.2d 1003, 1008 (D.C.Ct.App.1985) ; *Krawfish Kitchen Restaurant, Inc. v. Ardoin*, 396 So.2d 990, 993 (La.Ct.App.1981) (citing *Duval* ); *Southern Ins. Co. v. Consumer Ins. Agency*, 442 F.Supp. 30, 31 (E.D.La.1977).

Therefore, if Scott and Christine were doing business as Scott Larson Homes, they are individually liable for Scott Larson Homes' alleged infringement of plaintiff's copyrights. The legal question remains, however, whether mere nameholder status, without any further action, constitutes "doing business" so as to give rise to personal liability.

The Court simply cannot agree with Rottlund's contention that filing a form, albeit a sworn form, with the Secretary of State that is not verified or otherwise checked for accuracy constitutes "doing business" sufficient to subject Scott and Christine to individual, direct liability. Minnesota Statutes §§ 333.01-.04 require registration of any commercial assumed names with the Secretary of State before conducting business under that name. Section 333.06 provides penalties for failure to register. The penalties include payment of $250 to the opposing party in a civil action and stay of any civil action until the certificate has been filed. Minn.Stat.. § 333.06, 333.065. The purpose of these statutes is "to protect the integrity of tradenames and to protect corporate creditors. It is not for the purpose of providing the public with a means to ascertain the correct name of an entity to properly designate it in a lawsuit." [FN4] *Watson v. Stonewings on the Lake*, 393 N.W.2d 518, 520 (Minn.Ct.App.1986). Given this purpose, it is apparent that Rottlund is not the intended beneficiary of these statutes. Further, given the minimal penalties prescribed for violation of the statutes, it is apparent to this Court that the Minnesota legislature did not intend nameholder registration or non-registration to provide a basis for the potentially severe consequence associated with a strict liability reading of the statute.

> FN4. Even if the statutes were intended to provide the public with a means of ascertaining who to name in a lawsuit,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

refusing to extend liability to Scott and Christine individually does not thwart this goal or leave plaintiff without an appropriate defendant since Scott Larson Construction remains both a nameholder and a defendant.

***4** Additionally, it is widely recognized that a basic purpose of incorporation is protection of the incorporators from personal liability. *See 1 Fletcher Cyclopedia of Private Corporations § 41* (2003). Under Minnesota law, the corporate veil is not lightly pierced. *Agristor Leasing v. Guggisberg*, 617 F.Supp. 902, 906 (D.Minn.1985) (citing *Victoria Elevator Co. v. Meriden Grain Co.*, 283 N.W.2d 509 (Minn.1979) ). To impose personal liability on Scott and Christine based solely on their status as nameholders would essentially permit Rottlund to do an end run around the protections of incorporation by using the assumed name statute in a way never intended by the legislature. Thus, the Court finds that mere nameholder status is insufficient basis to create individual liability. Rather, Rottlund must demonstrate that Scott and Christine in fact conducted business in their individual capacities.

Scott and Christine admit that at the time this lawsuit was filed the Certificate listed both their names as individual nameholders. However, they assert that the listing was a mistake due to Christine's misunderstanding of the directions, and thus should not be a basis for imposing individual liability for any alleged acts of the corporation. More specifically, evidence before the Court indicates that Scott and Christine originally named only Scott Larson Construction as the nameholder of Scott Larson Homes, that they intended to renew this status, that they and the business had changed addresses shortly prior to the renewal, and that Christine believed that she needed to indicate the change of address of the directors to the Secretary of State. Scott and Christine maintain that each acted only in a professional capacity as officers or employees of Scott Larson Construction, that there is no evidence to the contrary, and that the proper defendant of these claims is Scott Larson Construction.

Rottlund points to several documents that Scott signed with only his name rather than his name and company title and deposition testimony from an Archnet employee as evidence to the contrary. The employee testified that he had never heard of Scott Larson Construction; and that when he did business with Scott Larson, he was doing business with Scott Larson Homes. This evidence is insufficient to raise a question of material fact as to whether Scott or Christine as individuals ever did business as Scott Larson Homes.

Where, as in this case, the owner of the company has lent his name to the company and is the company's principal employee, it is often difficult to draw a line between the company and the individual. The evidence presented by Rottlund does not suggest that Archnet ever thought that it was doing business with an individual. To the contrary, it suggests that Archnet was fully aware that it was doing business with the business known to it as Scott Larson Homes.

The evidence Rottlund relies on is of such paucity that even viewing this evidence in the light most favorable to the Rottlund, the Court finds that no reasonable jury could find that either Scott or Christine personally conducted business as Scott Larson Homes or that they did not simply make a mistake in listing themselves, individually, as nameholders of Scott Larson Homes. In light of the above discussion, the Court dismisses counts VIII, IX, XV, XVI. [FN5]

FN5. The preceding analysis (section I(A) is equally applicable to the claims against Scott and Christine individually for false advertising in violation of the Lanham Act, violation of the Minnesota Uniform Deceptive Trade Practices Act, and common law unfair competition. The Court therefore also dismisses counts XII, XIII, XIV, XIX, XX, and XXI.

B. Vicarious liability (Count XVIII)

***5** Christine Larson also moves for dismissal of the vicarious liability claim against her as an individual. Christine contends that there is no evidence that she directly benefited from or had the ability/right to control Scott Larson Homes' alleged infringement of plaintiff's copyright as required under vicarious infringement law. Again, the Court agrees.

The theory of vicarious liability is properly applied to "prevent an entity that profits from infringement from hiding behind undercapitalized 'dummy' operations when the copyright owner eventually sues." *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1150 (7th Cir.1992). In order to establish vicarious liability, a plaintiff copyright owner must demonstrate that defendant (1) possessed the right and ability to supervise the infringing activity; and (2) possessed an

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

obvious and direct financial interest in the exploited copyrighted materials. *Nelson Salabes, Inc. v. Morningside Development, LLC,* 284 F.3d 505, 513 (4th Cir.2002); *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1022 (9th Cir.2001); *Pinkham v. Sara Lee Corp.,* 983 F.2d 824, 834 (8th Cir.1992) (same); *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.,* 443 F.2d 1159, 1162 (2nd Cir.1971) (same); *Hard Rock Cafe,* 955 F.2d at 1150 (same); *Shapiro, Bernstein & Co. v. H.L. Green Co .,* 316 F.2d 304, 307 (2nd Cir.1963) (same); *Ford Motor Co. v.. B & H Supply, Inc.,* 646 F.Supp. 975, 989 (D.Minn.1986).

Vicarious liability may be found even where the defendant had no knowledge that copyright ownership was being violated. *Gershwin Publishing,* 443 F.2d at 1162; *Shapiro, Bernstein,* 316 F.2d at 307; *B & H Supply,* 646 F.Supp. at 989. However, "[s]ome degree of control or supervision over the individual(s) directly responsible for the infringement is of crucial importance." *Demetriades,* 690 F.Supp. at 293 (citations omitted). "Whether the defendant[ ] had the right and ability to control the activities which infringe on copyrights and whether [she] had a direct financial interest in the activities are issues of law." *Realsongs v. Gulf Broadcasting Corp.,* 824 F.Supp. 89, 91 (M.D.La.1993) (citing *Warner Bros., Inc. v. Lobster Pot, Inc.,* 582 F. Supp 478 (N.D.Ohio 1984)).

Rottlund contends that Christine's position as a corporate officer and employee authorized to sign contracts on behalf of Scott Larson Homes gave her the right and ability to supervise the infringing activity. The Court disagrees. The uncontradicted testimony is that Scott (with some participation from his son) was solely responsible for contacting and dealing with the architects who allegedly actually copied the plans, and for directing and overseeing the construction of the townhomes. Thus, while her position may technically have given Christine the right to supervise the allegedly infringing activity, she clearly did not have the ability. *See Ford Motor,* 646 F.Supp. at 990 (imposing liability on principal shareholder/officer actively involved in business, but not refusing to impose liability on minority shareholder/treasurer). The Court therefore dismisses the claim for vicarious liability (County XVIII) against Christine individually.

C. Contributory infringement (Counts XVII)

***6** Christine moves for dismissal of the contributory infringement claim found in Count XVII. She asserts that there is no evidence that she knew of or participated in Scott Larson Homes' alleged infringement of plaintiff's copyright as required under contributory infringement law. The Court agrees.

In order to establish contributory infringement, a plaintiff must establish that the defendant (1) induced, caused, or materially contributed to the infringing conduct of another, and (2) knew of the infringing activity. *Casella v. Morris,* 820 F.2d 362, 365 (11th Cir.1987); *Gershwin,* 443 F.2d at 1162; *see also Sony Corporation of America v. Universal City Studios, Inc.,* 464 U .S. 417, 437 (1983); *Demetriades v. Kaufmann,* 690 F.Supp. 289, 292 (S.D.N.Y.1988); *Aitken, Hazen, Hoffman, Miller v. Empire Const. Co.,* 542 F.Supp. 252 (D.Neb.1982); *McMillan Co. v. I.V .O.W. Corp.,* 495 F. Supp 1134 (D.Vt.1980); 3 Nimmer § 12.04[A]. According to a leading treatise on copyright, a defendant who has provided a copyrighted work to a third party who in turn copied that work may be liable as a contributory infringer, unless the defendant had no knowledge of the third party's intended infringement. 3 Nimmer § 12.04[A] (citing *Herman Frankel Organization v. Tegman,* 367 F.Supp. 1051, 1054 (E.D.Mich.1973)).

In this case, Christine participated in the town home project by providing bookkeeping services, paying bills, and occasionally signing a subcontractor contract on behalf of Scott Larson Homes. As an initial matter, the Court is not convinced that such minor participation qualifies as material contribution to the alleged infringing activity. However, even assuming that Christine's actions do satisfy the first prong, they do not satisfy the second. Evidence in the record demonstrates that Christine knew that the townhomes were being designed and built. However, there is no evidence that she attended any of the design meetings with Archnet or otherwise reviewed any of the plans. There is likewise no evidence that Christine visited a Rottlund development, saw a copy of the Rottlund brochure containing the sample floor plan, or was otherwise made aware that the design of the Scott Larson Homes townhomes was similar to that of the Rottlund homes. In short, there is no evidence that in paying bills and signing the occasional contract, Christine was aware that her actions were contributing to the alleged unlawful infringement of Rottlund's copyright. *See Demetriades,* 690 F.Supp. at 293-94 (declining to impose contributory liability based on routine business calls). The Court therefore dismisses count XVII alleging contributory liability against Christine Larson.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

III. Unfair Competition (Counts VII)

Defendants move for dismissal of the common law unfair competition claims found in Counts VII, XIV, and XXI, asserting that the Copyright Act preempts them. Rottlund contends that its unfair competition claim refers to the separate torts of false and misleading designation of origin and false advertising. The Court dismissed counts XIV and XXI in section I(a), *supra*, and thus discusses only count VII.

***7** "Unfair competition is not a tort with specific elements; it describes a general category of torts which courts recognize for the protection of commercial interests." *Zimmerman Group, Inc. v. Fairmont Foods of Minnesota, Inc.*, 882 F.Supp. 892, 895 (D.Minn.1994) (quoting *Rehabilitation Specialists, Inc. v. Koering*, 404 N.W.2d 301, 305-06 (Minn.Ct.App.1987)). In order to make out a claim for unfair competition, a plaintiff must identify the underlying tort that is the basis for the claim. *Id.* In *Zimmerman*, the plaintiff alleged in his complaint that the defendant's "acts of copyright infringement separately and together with the acts of interference with contract alleged herein, constitute unfair competition." The court determined that "[t]o the extent that the unfair competition claim is based upon acts of copyright infringement, it is preempted by 17 U.S.C. § 301." *Id.* [FN6]

FN6. The court in *Zimmerman* found the interference with contract portion duplicative of another count, and dismissed it on that ground.

This Court applied *Zimmerman* in *Lens Crafters, Inc. v. Vision World, Inc.*, stating "[m]oreover, if the underlying tort is duplicative of another Count of the Complaint, the claim for unfair competition cannot stand." *Lens Crafters, Inc. v. Vision World, Inc.*, 943 F.Supp. 1481, 1490 (D.Minn.1996) (citing *Zimmerman*, 882 F.Supp. at 895). Count V alleges false advertising under the Lanham Act, while count VI alleges violation of the Minnesota Uniform Deceptive Trade Practices Act by, among other things, making false and misleading statements about the origin of the product. The conduct underlying the unfair competition claims, as identified by Rottlund, is thus duplicative of other counts in the complaint and cannot stand. The Court therefore dismisses Count VII.

ORDER

Based on the foregoing, all the records, files, and proceedings herein, IT IS HEREBY ORDERED that:

1. Defendants' Motion for Partial Summary Judgment [Docket No. 45] is GRANTED. Counts VII, VIII, IX, XII, XIII, XIV, XV, XVI, XVII, XVIII, XIX, XX, XXI of the Amended Complaint [Docket No. 34] are DISMISSED with prejudice.

2. Defendant Christine Larson is DISMISSED from this case as there are no remaining claims against her.

2004 WL 742054 (D.Minn.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.